## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF ADAM KEIL
### IN SUPPORT OF THE MOTION OF DEBTORS FOR
### ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
### THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND
### (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
### ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

I, Adam Keil, make this Declaration pursuant to 28 U.S.C. § 1746:

1.    I am a Managing Director of Moelis & Company LLC (together with its affiliates, "Moelis"), the proposed financial advisor and investment banker to the above captioned debtors and debtors in possession (collectively, the "Debtors").

2.    I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"). In particular, I submit this Declaration in support

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

of my view that the proposed debtor-in-possession financing facilities (the "<u>DIP Facilities</u>") are (a) the product of an arm's-length, good-faith negotiation process, (b) the best and only available postpetition financing option currently available to the Debtors, and (c) contain reasonable terms and conditions under the circumstances.

3.      The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Moelis working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Moelis team, which, since March 2024, has been one of the principal restructuring advisors to the Debtors.  In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and postpetition financing efforts.  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## <u>Background and Qualifications</u>

4.      Moelis is a leading international investment banking and financial advisory firm (NYSE: MC) with approximately 1,200 employees in locations around the world.  Moelis provides a broad range of investment banking and financial advisory services including (a) mergers and acquisitions, (b) recapitalization and restructuring, (c) capital markets advisory, and (d) private funds advisory.  Moelis has been, and is, involved in some large and complex restructuring cases throughout the United States, including advising debtors, creditors, acquirers, and official committees in numerous chapter 11 cases in this and other districts.

5.      I am a Managing Director of Moelis in Moelis' New York office, located at 399 Park Avenue, 4th floor, New York, NY 10022.  Moelis is the proposed financial advisor and investment banker to the Debtors.  As a Managing Director, I am responsible for the day-to-day activities of the Moelis deal team in this engagement.  I have 23 years of experience in investment banking, providing in-court and out-of-court recapitalization and restructuring advisory services to companies, creditors, sponsors, and other interested parties.  Furthermore, I have specific expertise in chapter 11 bankruptcies, distressed mergers and acquisitions, lender negotiations, and distressed financings.

6.      Prior to joining Moelis in 2008, I spent approximately eight years in the Recapitalization and Restructuring Group at Jefferies & Company, Inc.  I received a B.S. in Economics with concentrations in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

7.      Since I began my career, my experience has included involvement in the chapter 11 cases of major consumer product and retail companies, such as A&P, Cengage Learning, Inc., Motor Coach Industries International, Inc., Orchard Supply Hardware, Party City Holdco Inc., Sbarro LLC, Simmons Co., Toys R Us, Inc., Vlasic Pickles, and Winn-Dixie.  I have been involved in major chapter 11 cases across a range of industries, including but not limited to ATD Corporation, C&J Energy Services Ltd., Hornbeck Offshore Services Inc., iHeartMedia, Inc., Internap Technology Solutions Inc., Knotel, Inc., MD Helicopters Inc., NewPage Corporation, SFX Entertainment Inc., Sungard Availability Services, L.P., Talen Energy Supply, LLC, and WeWork Inc.

8.      The Debtors retained Moelis on March 11, 2024 to serve as their financial advisor and investment banker in relation to any potential restructuring transaction, sale transaction, or

capital raising transaction involving the Debtors' operations.  I understand that the Debtors engaged Moelis for these roles because of our expertise on issues relating to financially distressed companies and our extensive experience acting as an advisor in both in and out-of-court restructurings of companies of all sizes across a wide array of industries.  Moelis and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate-compensated professional in various capacities in numerous chapter 11 cases in this and other districts.  I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the DIP Motion.[2]

**<u>The Debtors' Need for the DIP Facilities and Access to Cash Collateral</u>**

9.      Since Moelis' retention by the Debtors, I, along with other Moelis professionals, engaged in numerous discussions and meetings with the Debtors' management team and other advisors regarding the Company's liquidity position and capital structure alternatives, and we have provided financial advisory and investment banking advisory services to the Debtors in connection with their evaluation of various possible strategic alternatives, including a sale process and recapitalization transaction process.  As it became apparent that the Debtors would not be able to address their liquidity and capital structure challenges without filing these chapter 11 cases, I was involved in countless discussions with the Debtors and their other advisors on the Debtors' evolving cash position, the need for potential postpetition financing, and continued access to Cash Collateral.  Ultimately, this process, which is described further below, culminated in the DIP Facilities with the Debtors' prepetition secured lenders (collectively in such capacity, the "<u>DIP Lenders</u>"), and the commencement of these chapter 11 cases pursuant to which the Debtors intend to, among other things, file and consummate a chapter 11 plan (the "<u>Plan</u>") to effectuate either a

---

[2]     Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the DIP Motion.

going concern equity sale of the Debtors' business or one or more value-maximizing sales of the Debtors' assets in connection with an orderly wind down. Specifically, I believe that the DIP Facilities and continued access to Cash Collateral should provide the Debtors with sufficient liquidity to continue the operation of their businesses postpetition, market and pursue one or more sales, maintain business relationships with vendors, suppliers, and marketing partners, make payroll, make certain capital expenditures, and continue to satisfy working capital and operational needs.

10.     As part of the Debtors' preparations for these chapter 11 cases, the Debtors and their advisors analyzed the magnitude of postpetition financing required to operate the Debtors' businesses and fund the administrative costs of this chapter 11 process. As part of this analysis, the Debtors and their advisors developed a 4-week and 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of a chapter 11 filing on the operations of the Debtors' business, the fees, and interest expense associated with the DIP Facilities and consensual use of Cash Collateral, restructuring costs (including professional fees), required operational payments, and the potential acceleration of demands on available liquidity through working capital contraction.

11.     Based on these analyses, the Debtors determined that they would require incremental liquidity to operate postpetition, pay critical vendors, and satisfy administrative costs and expenses. I understand that the Debtors believe that the DIP Facilities and access to Cash Collateral will provide a strong, clear message to their customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the Debtors' bankruptcy filing will not unnecessarily negatively impact the Debtors' business operations. Specifically,

5

access to liquidity should communicate that the Debtors are able to continue meeting the needs of their customers, provide compensation to their employees, and continue to manage their businesses as closely to the ordinary course of business as possible. Furthermore, access to the proposed DIP Facilities and Cash Collateral should provide the Debtors with sufficient funds to pay wages to their employees, administer these chapter 11 cases, and thereby enable the Debtors to continue their efforts to preserve and maximize the value of their estates during these chapter 11 cases.

### The Debtors' Efforts to Obtain Postpetition Financing

12.    The Debtors, with Moelis' assistance, solicited a new money postpetition financing facility from various third parties and existing equityholders and secured lenders. Specifically, prepetition, Moelis engaged in arms'-length negotiations with the Debtors' existing secured lenders and agents (the "Prepetition Secured Parties"), the Debtors' equity sponsor, WHP Global ("WHP"), and seven additional third parties and lenders on the terms of a potential financing. The third-party financial institutions involved in the marketing process included well known commercial banks and specialty institutions that routinely provide asset based and cash flow based financing. Five of these seven additional parties signed non-disclosure agreements with the Debtors, and over the course of multiple weeks, the Debtors and their advisors provided due diligence to the parties that signed non-disclosure agreements, and engaged in various conversations and extensive negotiations with such parties to achieve the best possible terms for the DIP Facilities and consensual use of Cash Collateral.

13.    Following these arm's-length negotiations, the Debtors were able to secure the proposed DIP Facilities with the DIP Lenders. The resulting consensus between the Debtors and the DIP Lenders has the support of other stakeholders, including WHP. The negotiations resulted in certain concessions being made by the DIP Lenders, such as providing for both a going concern sale and a liquidation sale, as well as including certain waivers under section 522(b) and

section 506(c) of the Bankruptcy Code.  The DIP Facilities were the Debtors' only viable source of postpetition funding, and I do not believe that any other, better alternative is currently reasonably attainable under the circumstances.

## I.    The Prepetition Marketing Processes

14.    Leading up to the Petition Date, the Debtors, the Prepetition Secured Parties, and the DIP Lenders engaged in arm's-length negotiations over the terms of the DIP Facility.  Given the Debtors' current capital structure and circumstances, I believe that the only currently viable, actionable source of debtor-in-possession financing is with the DIP Lenders.

15.    In connection with outreach to a range of potential postpetition capital providers, the Debtors also considered various chapter 11 financing structures and concluded that it was highly likely that postpetition financing would have to be provided by the Prepetition Secured Parties.  After weeks of diligence and discussions with potential new capital providers, it became apparent that no parties outside of the Debtors' existing stakeholders were identified that would be willing to provide post-petition financing to the Debtors.  Feedback from third parties indicated a market view that there is not enough collateral value in the Debtors' assets to provide a financing package to responsibly prosecute these chapter 11 cases on a junior secured or unsecured financing basis.

16.    Further, based upon my experience and review of the Debtors' capital structure and financial records, any potential lenders—if any were to make a financing proposal at all—would require priming of the Prepetition Secured Parties.  Priming the Prepetition Secured Parties would require either (a) the consent of the Prepetition Secured Parties, or (b) the Debtors to be able to "adequately protect" such parties.  The Prepetition Secured Parties have made clear that they would not consent to a priming loan from a third-party.  In my experience, any such priming attempt,

even if actionable by the Debtors, would likely result in expensive and distracting litigation at the outset of these chapter 11 cases that the Debtors do not have the requisite capital to support.

17.     Further, the Debtors would incur the execution risk associated with a third-party transaction, including timing and due diligence constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed consensual DIP Facilities and access to Cash Collateral offered by the DIP Lenders allows the Debtors to limit such risks at the outset of these chapter 11 cases.

18.     To ensure that there was no other available financing on better and more viable terms under the circumstances, my colleagues and I reached out to seven other parties to assess their willingness to provide financing.  Of those seven parties, five executed confidentiality agreements and were given access to, among other things, a virtual data room containing customary diligence materials, but none expressed an interest in providing financing to the Debtors.

## II.     The DIP Facility Proposal.

19.     The proposed DIP Facility contemplates superpriority senior secured financing comprising:  (a) a first lien revolving credit facility that "rolls up" up to an aggregate principal amount of $161 million under the First Lien Prepetition ABL Facility; and (b) a delayed draw term loan facility including up to $25 million of new money, and a "roll up" of the Second Lien Prepetition Term Facility.  The DIP Facilities are an integral part of the Debtors' strategy for chapter 11 and the transactions contemplated therein.  Further, the DIP Facilities are critical to the Debtors' ability to fund the administrative costs of these chapter 11 cases and should provide the Debtors with sufficient liquidity to operate their business during these cases.  As noted above, the Prepetition Secured Parties indicated that they would not consent to a "priming" DIP financing provided by a third party, and therefore the DIP Facilities avoid the need for a value-destructive

"priming" or valuation dispute at the outset of these chapter 11 cases.  In connection with the Plan and the marketing and sale processes, the DIP Facilities should provide the Debtors with a path to emergence while reassuring customers and vendors, protecting operations, and maximizing value for creditors.

**The DIP Facilities Were Negotiated in Good Faith and at Arm's Length,**
**and the Fees in Connection with the DIP Facilities are Reasonable and Market**

20.    In the lead up to the Petition Date, my team and I, along with the Debtors' other advisors, negotiated the terms and provisions of the DIP Facilities on behalf of the Debtors.  During that time, the parties exchanged multiple term sheets and mark-ups.  Over the course of these negotiations, the size and terms of the DIP Facilities improved to the benefit of the Debtors, including but not limited to lower fees and interest rates, longer milestones, and less restrictive operating and financial covenants.

21.    The fees and rates to be paid under the proposed DIP Facilities were the subject of arm's-length and good faith negotiation between the Debtors and the DIP Lenders, are an integral component of the overall terms of the proposed DIP Facilities, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  These fees are summarized below.

| Interest Rate | Interest on the First Lien DIP ABL Facility is paid at S + 4.25%, interest on the Second Lien New Money DIP Term Loan is paid at S + 11.50%, and interest on the balance of the Second Lien DIP Term  Loan is paid at S + 13.0%  Interest on the First Lien DIP ABL Facility and the balance of the Second Lien DIP Term Loan is based on the interest rates under the Prepetition Credit Agreements plus the Default Rate (2.0% and 3.0%, respectively) |
| --- | --- |
| | See First Lien DIP ABL Credit Agreement, § [●]; Second Lien DIP Term Credit Agreement, § [2.07]. |

| First Lien DIP ABL Closing Fee | A nonrefundable closing fee equal to 1.00% of the Maximum Revolving Amount shall be earned in full on the Closing Date and due and payable in full to the First Lien DIP ABL Administrative Agent (for the ratable account of the First Lien DIP ABL Lenders).<br><br>*See* DIP Term Sheet, Addendum I. |
|---|---|
| Second Lien DIP Term Closing Fee | A nonrefundable closing fee equal to 3.75% of the Second Lien New Money DIP Term Loans shall be earned in full on the Closing Date and due and payable in full to the Second Lien DIP Term Administrative Agent (for the ratable account of the Second Lien DIP Term Lenders) on the date such Second Lien New Money DIP Term Loans are advanced.<br><br>*See* DIP Term Sheet, Addendum I. |
| Expenses and Indemnification | The Debtors shall pay reasonable and documented fees and expenses of the DIP Professionals, the DIP Agents, and the DIP Lenders in connection with the chapter 11 cases.<br><br>The Debtors shall indemnify and hold harmless the DIP Secured Parties in accordance with, and subject to, the terms and conditions of the DIP Documents.<br><br>*See* Interim Order, ¶ 23. |

22.     Under the current circumstances, given the lack of any other alternatives, and based on my knowledge of other financings in the market, I believe that the fees, rates, and other economics provided for in the DIP Facilities are reasonable under the circumstances.

**The DIP Facilities Were the Best Postpetition Financing Arrangement Available to the Debtors**

23.     Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the negotiation of the DIP Facilities and the facts of these cases, the DIP Facilities are the best financing option currently available to the Debtors under the circumstances. The proposed DIP Facilities should provide the Debtors with the opportunity to maximize the value of their enterprise by allowing them to:  (a) fund certain costs, fees, and expenses related to these chapter 11 cases; (b) provide for Adequate Protection Claims (as defined in the Interim Order); (c) fund the anticipated fees, interest, payments, and expenses associated with the DIP Facility, including fees, costs, and expenses incurred by the DIP Agents and/or the DIP Lenders;

and (d) fund the anticipated working capital needs, capital improvements, and expenditures related to these chapter 11 cases. In short, the proposed DIP Facilities will allow the Debtors to attempt to maximize value by continuing operations with minimal disruption.

24.     The DIP Lenders agreed to provide the DIP Facilities to the Debtors on terms that I consider to be reasonable under the circumstances. The DIP Lenders expressly conditioned their proposals on, among other things, first and second superpriority liens on assets encumbered by the First Lien Prepetition ABL Facility and the Second Lien Prepetition Term Facility (collectively, the "Prepetition Credit Facilities"), respectively, and customary forms of adequate protection. The DIP Lenders also expressly conditioned their proposals on postpetition liens on the Debtors' prepetition unencumbered assets as part of the collateral package securing the DIP Loans. Because the DIP Liens (as defined in the Interim Order) maintain the same relative priorities as under the Prepetition Credit Facilities, none of the Prepetition Secured Parties' prepetition liens will be primed, and no additional consent is required.

25.     In addition to providing the Debtors with incremental liquidity, the DIP Facilities will provide the Debtors with access to the use of Cash Collateral on a consensual basis and will allow the Debtors to fund their business in the ordinary course, which should ensure continued, uninterrupted operations, preserving the value of the Debtors' estate for the benefit of all stakeholders.

26.     Finally, and perhaps most importantly, the DIP Facilities are designed to provide the Debtors with a path towards a successful and expeditious sale process and confirmation of a Plan that positions the Debtors to remain operating as a going concern. The DIP Facilities contain certain milestones that the Debtors must meet during the chapter 11 cases. These milestones were negotiated with the DIP Lenders and should provide the Debtors with adequate time to negotiate

and implement a restructuring, and I believe that agreeing to include these milestones in the DIP Facilities is reasonable and in the Debtors' best interests under the circumstances.  I further believe that the proposed DIP Facilities provide the Debtors with the clearest path to an orderly reorganization or wind down, which should best preserve the value of the Debtors' business and operations.  Ultimately, the Debtors, in consultation with its advisors, determined that the DIP Facilities are the only actionable proposal available to the Debtors at this time.

27.     In sum, it is my professional opinion that the terms of the DIP Facility are reasonable under the circumstances, were the product of good faith, arm's-length negotiations. For all of the reasons included in this Declaration, I submit that it would be appropriate for the Court to approve the DIP Facilities and the use of cash collateral as contemplated by the DIP Motion.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

April 22, 2024
New York, New York

By:
/s/  *Adam Keil*

Adam Keil
Managing Director
Moelis & Company LLC