**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Re: Docket Nos. 14, 84 |

**DECLARATION OF**
**STEWART GLENDINNING IN SUPPORT**
**OF THE MOTION OF DEBTORS FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE**
**DEBTORS TO ASSUME THE CONSULTING AGREEMENT,**
**(II) AUTHORIZING AND APPROVING THE CONDUCT OF STORE**
**CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS,**
**CLAIMS, AND ENCUMBRANCES, (III) AUTHORIZING CUSTOMARY BONUSES**
**TO EMPLOYEES OF CLOSING STORES, AND (IV) GRANTING RELATED RELIEF**

I, Stewart Glendinning, declare under penalty of perjury:

1. I am the Chief Executive Officer at Express, Inc. ("Express" or the "Company"). I have served in my current position since September 2023. I hold a Juris Doctor degree from the University of Miami School of Law and bachelor's degree in business administration and accounting from the college of William & Mary. Before joining Express, I served as Group President and Chief Financial Officer at Tyson Foods, Inc. from 2017 to 2023, where I managed national brands such as Jimmy Dean and Hillshire Farm. Before joining Tyson Foods, Inc., I served as President, Chief Executive Officer, and Chief Financial Officer at Molson Coors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

International and several of its affiliates from 2005 to 2017. I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information, and/or my experience, knowledge, and familiarity with the Debtors' business and operations. I am over the age of 18, and if called upon to testify, I would testify competently to the facts set forth in this declaration.

3. On April 22, 2024, Express and certain of its affiliates, as debtors and debtors in possession (the "Debtors") filed the *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of all Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* [Docket No. 14] (the "Motion"). On April 24, 2024, the United States Bankruptcy Court for the District of Delaware entered the *Interim Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of all Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* [Docket No. 84] (the "Interim Order"), authorizing Hilco Merchant Resources, LLC ("Hilco") to act as the exclusive agent for the purpose of providing services in connection with the disposition of certain merchandise and FF&E located at certain of the Debtors' retail locations on an interim basis.

4. I now submit this declaration (this "Declaration") in support of final approval of the Motion and specifically in support of a final order authorizing the assumption of the consulting

agreement attached to the Interim Order as Exhibit 1 (the "Consulting Agreement") as having been negotiated, proposed, and entered into by Hilco and the Debtors in good faith, and from arm's length bargaining positions.

5.  In November 2019, the Debtors engaged Hilco to facilitate store closures and provide other advisory services for the Company. The Debtors' original agreement governing the disposition of certain inventory and FF&E at some of the Debtors' retail locations is attached hereto as **Exhibit 1** (the "Agreement"). Following entry into the Agreement, the Debtors and Hilco entered into a variety of amendments to the Agreement and statements of work with respect to inventory and FF&E disposal at closing retail locations.

6.  In the weeks leading up to the Petition Date, Hilco submitted a proposal, structured as the twenty-sixth amendment to the Agreement, to act as the exclusive agent for inventory and FF&E disposal at certain of the Debtors' stores (the "Proposal"). Additionally, the Debtors received a separate proposal from a competing agent to perform substantially similar services to those contemplated in the Proposal.

7.  The Debtors needed the services proposed and considered each of the two competing proposals in earnest, comparing the terms of each to discern which one represented the most value-maximizing option for the Debtors' estates. Ultimately, the Debtors determined in a sound exercise of their business judgment that Hilco was the appropriate agent for the Debtors' store closures while in chapter 11 given Hilco's significant expertise and knowledge of the Debtors' business, their merchandise, and their store operations. The Debtors and Hilco, through counsel, negotiated the terms of the Proposal with Hilco at arms' length and in good faith, exchanging several drafts of the Proposal over the course of several days, until both parties agreed that the terms were appropriate and maximized value for the Debtors' estates.

8. In addition to obtaining meaningful economic concessions during the course of the negotiations, Hilco's significant experience working with the Debtors provides the Debtors with an additional savings, of both cost and time, when considering the ramp up any other comparable consultant would face. As a result, it is my belief that the terms of the Consulting Agreement maximize value for these estates and are the result of good faith, arm's length negotiation.

9. It is therefore my belief that the Motion should be approved on a final basis and that the Consulting Agreement should be assumed as having been negotiated, proposed, and entered into by Hilco and the Debtors without collusion, in good faith, and from arm's length bargaining positions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 13, 2024

By: */s/ Stewart Glendinning*
Name:  Stewart Glendinning
Title:  Chief Executive Officer
Express, Inc.

**Exhibit 1**



November 6, 2019

*VIA EMAIL*
Todd Painter
Vice President, Corporate Initiatives & International
Express, LLC
1 Express Drive
Columbus, OH 43230
Email: tpainter@express.com

      Re:    **Letter Agreement Governing Inventory and FF&E Disposition**

Dear Todd:

By executing below, this letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC ("Consultant" or a "Party"), and Express, LLC, on the other hand ("Merchant" or a "Party" and together with the Consultant, the "Parties"), under which Consultant shall act as the exclusive consultant for the purpose of (i) conducting a sale of certain Merchandise and FF&E (each as defined below) at the Merchant's stores set forth on Exhibit A-1 (each a "Store" and collectively, the "Stores") through a "Store Closing", "Everything Must Go", "Everything on Sale" or similar themed sale (the "Sale"), and (ii) assisting with the sale of certain FF&E at the locations set forth on Exhibit A-2 (the "Non-Store Locations").  Only Merchant-approved Sale terminology will be utilized at each Store.

**A.**    **Merchandise**

For purposes hereof, "Merchandise" shall mean all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below) and through the end of the Sale Term (defined below).  "Merchandise" does not mean and shall not include: (a) goods that belong to sublessees, licensees or concessionaires of Merchant or are leased or licensed from third parties by Merchant; (b) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores or Non-Store Locations (collectively, "FF&E"), or any FF&E that is leased by Merchant located in the Stores or Non-Store Locations; and (c) damaged or defective merchandise that cannot be sold.

**B.**    **Sale Term**

For each Store, the Sale shall commence on or about Thursday, December 5, 2019 (the "Sale Commencement Date") and conclude no later than Friday, January 31, 2020 (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to terminate the Sale at any Store prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "Sale Term."  At the conclusion of the Sale, Consultant shall surrender the premises for each Store to Merchant (a) in broom clean condition, and (b) if requested by Merchant, in accordance with the lease requirements for such premises; provided, however, that, if Merchant requests that Consultant surrender any

premises in accordance with the lease requirements, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises to the extent such expenses were incurred by Consultant in accordance with a budget mutually agreed to in writing between the Consultant and Merchant. At the conclusion of the Sale at each Store, Consultant shall photographically document the condition of each such Store and provide such photographs to Merchant within ten (10) days. Photographs shall reference with specificity each Store by number, name and/or location.

C.     **Project Management**

(i)     Consultant's Undertakings

During the Sale Term, Consultant shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Consultant and approved in advance by Merchant to oversee the management of the Stores and the Sale; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) determine appropriate discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees, in each case approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) to the extent necessary, assist Merchant in obtaining all required permits and governmental consents required to conduct the Sale; (i) ensure that all marketing, advertising and other communications provided by Merchant to Consultant for distribution to customers are provided to customers by including same in bags along with purchased merchandise or through other similarly appropriate means; and (j) provide such other related services deemed necessary or appropriate by Merchant and Consultant.

Without limiting the generality of the foregoing, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Merchant, its customers, employees, parent, subsidiary, or other affiliated entities (for purposes of this paragraph, all such entities are included within each reference to "Merchant"), including the terms and existence of this Agreement, is Merchant's confidential, trade secret information ("Merchant Confidential Information"), which is and shall remain the exclusive intellectual property of Merchant. Except as may be required for Consultant to perform its obligations under this Agreement in respect of the Sale, Consultant shall not divulge, furnish, make available, or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives, and agents. Consultant shall take and shall cause its officers, employees, representatives, and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Merchant Confidential Information. Consultant agrees to maintain strict confidentiality and agrees that it may use Merchant Confidential Information only as reasonably necessary to the performance of its obligations related to the Sale. If and to the extent the use or other handling of any Personal Information is necessary for Consultant to perform its obligations hereunder, Consultant shall comply with all Data Security Requirements and such other reasonable restrictions requested by Merchant. For purposes of this Agreement, "Personal Information" means any natural person's name, street address, telephone

2

number, e-mail address, social security number, driver's license number, passport number, credit card number, or user or account number, or any other piece of information that, individually or when combined with other information, allows the identification of a natural person or is otherwise considered personally identifiable information or personal data protected under any applicable Data Security Requirement.  For purposes of this Agreement, "Data Security Requirements" means, collectively, all of the following to the extent relating to privacy, security, or security breach notification requirements: (a) Merchant's own rules, policies, and procedures; (b) all applicable statutes and regulations; (c) industry standards applicable to the industry in which the Merchant's business is conducted (including, as applicable, the Payment Card Industry Data Security Standard (PCI DSS)); and (d) contracts into which Merchant has entered or by which it is otherwise bound, provided such contracts (or the requirements of such contracts) are provided to Consultant.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, bonuses, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Consultant's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)    Merchant's Undertakings

During the Sale Term, Merchant shall: (a) be the employer of the Stores' employees, other than the Supervisors; (b) be responsible for all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales tax and other applicable taxes assessed on the sale of the Merchandise and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Consultant and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Consultant to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; and (h) use reasonable efforts to ensure that Consultant has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, as currently available through the Merchant's existing accounting and IT systems, all at no cost to Consultant.

The Parties expressly acknowledge and agree that Consultant shall have no liability to Merchant's employees for wages, bonuses, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Consultant.

D.    **The Sale**

All sales of Merchandise shall be made on behalf of Merchant. Consultant does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, merchandise credit, or credit or debit card in accordance with Merchant's policies, and, beginning on or about Sunday, December 29, 2019 and through the end of the Sale Term, all

3

sales of Merchandise shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

E. **Consultant Fee and Expenses in Connection with the Sale**

In consideration of its services hereunder, Merchant shall pay Consultant a "Base Fee" equal to 1.25% of net sales. In addition to the "Base Fee", and to the extent the net sales at the Stores increase by ninety percent (90%) over last year's net sales at the same Stores during the same period of time, Consultant may also earn an "Incentive Fee" (together with the Base Fee, the "Merchandise Fee") in an amount equal to an additional 0.25% of net sales (as calculated back to first dollar).

The Incentive Fee shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of Consultant's Merchandise Fee. Merchant shall pay Consultant's definitive Merchandise Fee in connection with the Final Reconciliation as set forth in Section G of this Agreement.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Consultant's other reasonable, documented out of pocket expenses (the "Costs"). To control Costs, Merchant and Consultant have established an aggregate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs. The Expense Budget for the Sale is attached hereto as Exhibit B. The Expense Budget may only be modified by mutual written (including email) agreement of Consultant and Merchant. The costs of supervision set forth on Exhibit B include, among other things, industry standard deferred compensation. Notwithstanding anything herein to the contrary, unless otherwise agreed to by Merchant, Merchant shall not be obligated to pay costs of supervision and advertising costs that have not been included, or provided for, in the Expense Budget, as may be amended in accordance with this Agreement.

F.   **Furniture, Fixtures and Equipment**

With respect to the FF&E located in the Stores and owned by Merchant, Consultant shall sell such FF&E from the Stores themselves.  With respect to the FF&E located in the Non-Store Locations and owned by Merchant, Consultant shall assist the Merchant with selling such FF&E remotely.  Merchant shall be responsible for all reasonable and documented costs and expenses incurred by Consultant in connection with the sale of the FF&E from the Stores as well as the Non-Store Locations, which costs and expenses shall be incurred pursuant to a written budget or budgets (in addition to the Expense Budget) to be established from time to time by mutual agreement of the Parties (such costs and expenses, not including the Costs, shall be referred to as the "FF&E Costs").  For the avoidance of doubt, Merchant and Consultant shall agree on separate budgets governing the FF&E Costs at the Stores and the Non-Store Locations.  Unless otherwise advised by the Merchant, the Consultant shall not have the right to abandon at the Stores or Non-Store Locations any unsold FF&E.

In consideration for providing the services set forth in this section F, Consultant shall be entitled to a commission from the sale of the FF&E at both the Stores and Non-Store Locations in an amount equal to fifteen percent (15%) of the net sales proceeds of such FF&E (the "FF&E Fee").

G.   **Payments & Accounting**

During the Sale Term, all accounting matters (including, without limitation, the determination of the Merchandise Fee, Costs, FF&E Fee, FF&E Costs and all other fees, expenses, or other amounts reimbursable or payable hereunder) shall be reconciled by the Parties on (i) Wednesday, January 8, 2020, for the period between the Sale Commencement Date through and including Saturday, January 4, 2020; and (ii) Wednesday, February 5, 2020, for the period between January 5, 2020 through and including Saturday, February 1, 2020; and the amounts determined to be owing for such periods pursuant to such reconciliation shall be paid within seven (7) days from invoice after each such reconciliation.

The Parties shall complete a final reconciliation and settlement of all amounts payable pursuant to this Agreement (including, without limitation, the determination of the Merchandise Fee, Costs, FF&E Fee, FF&E Costs and all other fees, expenses, or other amounts reimbursable or payable hereunder) no later than forty five (45) days following (a) the Sale Termination Date for the last Store (the "Final Reconciliation"), or (b) the date upon which this Agreement is terminated in accordance with its terms.  In connection with the Final Reconciliation, Hilco shall issue an invoice, and within ten (10) days from the date of issuance of such invoice:, (a) any amounts that are determined to be owing by Merchant to the Consultant shall be paid by the Merchant to the Consultant; and (b) any amounts that are determined to be owing by the Consultant to the Merchant as a result of any overpayments shall be paid by the Consultant to the Merchant.

H.   **Indemnification**

(i)   Merchant's Indemnification

Merchant shall indemnify, defend, and hold Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Consultant Indemnified

5

Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Consultant Indemnified Parties) against Consultant or a Consultant Indemnified Party, except claims arising from Consultant's negligence, willful misconduct, gross negligence, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Consultant's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

(ii)     Consultant's Indemnification

Consultant shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Consultant or the Consultant Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Consultant or the Consultant Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Consultant; (c) any liability or other claims made by Consultant's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, gross negligence, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Consultant or any of the Consultant Indemnified Parties and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement, including, without limitation, the Supervisors.

I.     **Insurance**

(i)     Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall, to the extent reasonably practicable, cause Consultant to be named an additional insured with respect to all such policies. At Consultant's request, Merchant shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii) <u>Consultant's Insurance Obligations</u>

Consultant shall maintain (at Consultant's expense) throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Consultant's provision of services at the Stores. Consultant shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Consultant shall maintain throughout the Sale Term, workers' compensation insurance in compliance with all statutory requirements. Further, should Consultant employ or engage third parties to perform any of Consultant's undertakings with regard to this Agreement, Consultant will ensure that such third parties are covered by Consultant's insurance or maintain all of the same insurance as Consultant is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

**J.** **<u>Representations, Warranties, Covenants and Agreements</u>**

(i) Merchant warrants, represents, covenants and agrees that: (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein; (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with Merchant's customary practices; and (e) the Stores will be operated in the ordinary course of business in all respects, except as otherwise expressly agreed to by Merchant and Consultant.

(ii) Consultant warrants, represents, covenants and agrees that: (a) Consultant is a company duly organized, validly existing and in good standing under the laws of its organization, with full power and authority to execute and deliver this Agreement and to perform the Consultant's obligations hereunder; (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Consultant and this Agreement constitutes a valid and binding obligation of Consultant enforceable against Consultant in accordance with its terms and conditions, and the consent of no other entity or person is required for Consultant to fully perform all of its obligations herein; (c) Consultant shall comply with and act in accordance with any and all applicable federal, state and local laws, rules, and regulations, and other legal obligations of all governmental authorities; (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent; and (e) Consultant will not take any disciplinary action against any employee of Merchant.

**K.** **<u>Termination</u>**

The following shall constitute "Termination Events" hereunder:

(a) Merchant's or Consultant's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party (an "<u>Event of Default</u>");

(b) Any representation or warranty made by Merchant or Consultant is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c) the Sale is terminated or materially interrupted or impaired for any reason, other than as a result of an Event of Default by Consultant or Merchant.

If Termination Event occurs, the non-defaulting Party (in the case of an Event of Default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in the case of an Event of Default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such Event of Default. If this Agreement is terminated, Merchant shall be obligated to pay Consultant all amounts due and owing by Merchant to Consultant under this Agreement through and including the termination date.

**L.     Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by electronic mail or by recognized overnight delivery service as follows: (a) To Merchant: at the address listed above; and (b) To Consultant: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, Illinois 60062, Fax: 847-897-0859, Attn: Ian S. Fredericks.

**M.     Independent Consultant**

Consultant's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Consultant or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Consultant is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**N.     Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns.

**O.**     **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**P.**     **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Delaware (without reference to the conflicts of laws provisions therein).  Merchant and Consultant waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Consultant against Merchant or Merchant against Consultant on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Consultant, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

**Q.**     **Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**R.**     **Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

        Very truly yours,

        HILCO MERCHANT RESOURCES, LLC

        By:  Sarah Baker
        Its:  VP & AGC, Managing Member

**AGREED AND ACCEPTED as of the ___ day of November, 2019:**

Express, LLC

By:
Its:

**Express**
**Exhibit A-1**

Store List

| Store # | Location Type - Mall Grade | Name | Address | City | State | Zip | District | Lease Expiration | Target Close | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 397 | Mall- C | WESTGATE | 205 W. BLACKSTOCK RD SPACE # 40 | SPARTANBURG | SC | 29301-1305 | 121- N. GEORGIA/ S. CAROLINA | 12/31/19 | 01/31/20 | 7,632 | 6,450 |
| 506 | Mall- B | RIVER OAKS CENTER | 125 RIVER OAKS CTR SP #B | CALUMET CITY | IL | 60409-5509 | 61- CHI SOUTH/ CENTRAL IL/ NW IN | 01/31/20 | 01/31/20 | 11,044 | 8,435 |
| 590 | Mall- B- | PARK PLAZA | 6000 WEST MARKHAM SP #2086 | LITTLE ROCK | AR | 72205-3198 | 480- HOUSTON/ S. CENTRAL | 01/31/20 | 01/31/20 | 7,963 | 6,481 |
| 638 | Mall- B | BURNSVILLE CENTER | 1039 BURNSVILLE CTR SP #1140 | BURNSVILLE | MN | 55306-4447 | 66- MINNESOTA | 01/31/20 | 01/31/20 | 8,322 | 6,650 |
| 652 | Mall- B- | FOX RUN MALL | FOX RUN RD SP #G29 | NEWINGTON | NH | 03801-2851 | 16- BOSTON NORTH | 01/31/20 | 01/31/20 | 6,552 | 5,084 |
| 873 | Mall- C | GWINNETT MALL | 2100 PLEASANT HILL ROAD SP #2204 | DULUTH | GA | 30096-4701 | 121- N. GEORGIA/ S. CAROLINA | 01/31/15 | 01/31/20 | 7,807 | 6,130 |
| 932 | Mall- B | SOLANO | 1350 TRAVIS BLVD. STE #1492A | FAIRFIELD | CA | 94533-3432 | 82- SACRAMENTO VALLEY | 01/31/21 | 01/31/20 | 7,500 | 5,804 |
| 2002 | Hybrid- B | SHOPS AT WIREGRASS | 28210 PASEO DR SPACE 270 | WESLEY CHAPEL | FL | 33543-5392 | 132- NW FLORIDA | 01/31/20 | 01/31/20 | 8,026 | 6,201 |
| 8 | | | | | | | | | | 8,106 | 6,404 |

Express
Exhibit A-2
Store List

| Store # | Location Type - Mall Grade | Name | Address | City | State | Zip | Target Close | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 44 | Mall-C | CIRCLE CENTER | 49 W. MARYLAND ST. | INDIANAPOLIS | IN | | 01/31/20 | 7,195 | 5,760 |
| 46 | Mall-C | MIDLAND | 6800 EASTMAN AVE SPACE #244/248 | MIDLAND | MI | | 01/31/20 | 5,293 | 4,320 |
| 51 | Lifestyle-A | RICE VILLAGE | 2414 UNIVERSITY SPACE: B & D | HOUSTON | TX | | 01/31/20 | 8,867 | 6,778 |
| 95 | Mall-C | NITTANY | 2900 E. COLLEGE AVE SP #318 | STATE COLLEGE | PA | | 01/31/20 | 6,000 | 5,041 |
| 127 | Mall-B- | OAKVIEW | 144TH & WEST CENTER ROAD SPACE H-1 | OMAHA | NE | | 01/31/20 | 8,902 | 6,785 |
| 158 | Mall-B | CUMBERLAND | 1425 CUMBERLAND MALL | ATLANTA | GA | | 01/31/20 | 7,605 | 6,193 |
| 208 | Mall-B | GREENBRIER | 1401 GREENBRIER PKWY SP #1090 | CHESAPEAKE | VA | | 01/31/20 | 8,680 | 6,666 |
| 209 | Mall-C | WILTON MALL | 417 WILTON RD SP #B8 | SARATOGA SPRINGS | NY | | 01/31/20 | 7,006 | 5,455 |
| 252 | Mall-B+ | LLOYD CENTER | 959 LLOYD CTR | PORTLAND | OR | | 01/31/20 | 8,144 | 6,336 |
| 331 | Mall-C | WOODLAND MALL | 3135 28TH ST S.E. SP #D7 & 9 | KENTWOOD | MI | | 01/31/20 | 8,213 | 6,570 |
| 341 | Mall-B- | MONTGOMERY MALL | 222 MONTGOMERY MALL | NORTH WALES | PA | | 01/31/20 | 8,830 | 7,056 |
| 571 | Mall-B- | MID RIVERS | 1600 MID RIVERS MALL SP #1310, #1312, AND #1 | SAINT PETERS | MO | | 01/31/20 | 8,066 | 5,765 |
| 582 | Street-C | THAMES STREET | 144148 THAMES ST. | NEWPORT | RI | | 01/31/20 | 8,846 | 7,343 |
| 613 | Mall-B- | SUNRISE CENTER | 6040 SUNRISE BLVD. SP #B9 | CITRUS HEIGHTS | CA | | 01/31/20 | 8,083 | 6,497 |
| 625 | Mall-C | VISALIA | 2031 S. MOONEY BLVD SP #1605 | VISALIA | CA | | 01/18/20 | 7,800 | 6,190 |
| 629 | Hybrid-C | THE STREETS | 2140 NE ALLIE AVENUE | HILLSBORO | OR | | 01/31/20 | 8,150 | 6,476 |
| 633 | Hybrid-C | CARRIAGE CROSSING | 4650 MERCAHANTS PARK CIRCLE SUITE 836 | COLLIERVILLE | TN | | 01/31/20 | 7,494 | 6,030 |
| 634 | Mall-B | EDEN PRAIRIE | 8251 FLYING CLOUD DRIVE SPACE#1282/EDEN Pf | EDEN PRAIRIE | MN | | 01/31/20 | 7,630 | 5,965 |
| 640 | Mall-B | OAKRIDGE | 152 OAKRIDGE MALL | SAN JOSE | CA | | 01/31/20 | 6,741 | 5,466 |
| 770 | Street-B+ | 51ST & MADISON | 477 MADISON AVE | NEW YORK | NY | | TBD - end of year | 10,306 | 7,741 |
| 816 | Mall-B | HAWTHORNE | 705 HAWTHORNE CTR #G4 & G5 | VERNON HILLS | IL | | 01/31/20 | 13,963 | 10,541 |
| 912 | Mall-C | MERIDIAN MALL | 1982 GRAND RIVER AVE. | OKEMOS | MI | | 01/31/20 | 9,075 | 7,258 |
| 1516 | Mall-C | VALLE VISTA | 2020 S. EXPRESSWAY 83 SPACE B2,B3,B4 | HARLINGEN | TX | | 01/31/20 | 4,940 | 3,962 |
| 1550 | Mall-B- | NESHAMINY | 638 NESHAMINY MALL SPACE 638 | BENSALEM | PA | | 01/31/20 | 8,000 | 6,474 |
| 1942 | Mall-Outlet (EFO) | PARADISE VALLEY MAL | 4500 EAST CACTUS RD SP# F016 | PHOENIX | AZ | | 01/31/20 | 8,112 | 6,490 |
| 2003 | Mall-B- | BRASS MILL | 495 UNION STREET SPACE #1038 | WATERBURY | CT | | 01/31/20 | 8,552 | 6,883 |
| 2006 | Hybrid-B- | RIDGE HILL MALL | 18 SECOND STREET SP# 1250 | YONKERS | NY | | 01/31/20 | 7,305 | 5,612 |
| 27 | | | | | | | | 8,067 | 6,358 |

# Express
## Exhibit B

### Expense Budget (1)

**Advertising**

| | |
|---|---:|
| Media | 5,000 |
| Signs (2) | 16,000 |
| Sign Walkers | - |
| Subtotal Advertising | 21,000 |

**Supervision**

| | |
|---|---:|
| Fees / Wages / Expenses (3) | 87,249 |
| Subtotal Supervision | 87,249 |
| | |
| Total Expenses | 108,249 |

*Note(s):*
*1. This Expense Budget contemplates a sale term of December, 5, 2019 through January 26, 2020.  The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.*
*2. Includes Sales Tax.*
*3. Includes Deferred Compensation and Insurance.*