**<u>EXHIBIT A</u>**

**Revised Proposed Order**

10973692.v1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
|  | ) |  |
| Debtors. | ) | (JointlyAdministered) |
|  | ) |  |
|  | ) | **Re:  Docket No. 14** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO**
**ASSUME THE CONSULTING AGREEMENT, (II) AUTHORIZING**
**AND APPROVING THE CONDUCT OF STORE CLOSING SALES,**
**WITH SUCH SALES TO BE FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**AND ENCUMBRANCES, (III) AUTHORIZING CUSTOMARY BONUSES TO**
**EMPLOYEES OF CLOSING STORES, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order") (a) authorizing the Debtors to assume the Consulting Agreement, (b) authorizing and approving the initiation of the Store Closings in accordance with the terms of the Consulting Agreement and the Sale Guidelines, with such sales to be free and clear of all liens, claims, and encumbrances, (c) authorizing the Debtors to conduct Store Closings with respect to the Additional Closing Stores at a later date or dates, (d) authorizing customary bonuses to non-insider Closing Store employees who remain employed for the duration of the store closing process, (e) approving modifications to the Gift Card Program solely with respect to the Closing Stores, and (f) granting related relief, all as more

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor it is HEREBY FOUND AND DETERMINED THAT:[3]

    A.    The Debtors have advanced sound business reasons for assuming the Consulting Agreement and adopting the Sale Guidelines, as set forth in the Motion and at the Hearing, and assuming the Consulting Agreement is a reasonable exercise of the Debtors' business judgement and in the best interest of the Debtors and their estates.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

B.      The Consulting Agreement, a copy of which is attached to this Final Order as **Exhibit 1**, was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith and from arm's length bargaining positions.

C.      The assumption of the Consulting Agreement is a sound exercise of the Debtors' business judgment.

D.      The Sale Guidelines, which are attached hereto as **Exhibit 2**, are reasonable and appropriate, and the conduct of the Sales in accordance with the Sale Guidelines will provide an efficient means for the Debtors to dispose of the Store Closure Assets, and are in the best interest of the Debtors' estates.

E.      The Store Closings and Sales are in the best interest of the Debtors' estates.

F.      The Dispute Resolution Procedures are fair and reasonable and comply with applicable law.

G.      The Debtors have represented that they intend to neither sell nor lease personally identifiable information pursuant to the relief requested in the Motion, although the Consultant will be authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

H.      The Store Closing Bonus Plan is justified by the facts and circumstances of these chapter 11 cases, is a sound exercise of the Debtors' business judgment, and is necessary to maximize value to the Debtors' estates.

I.      The entry of this Final Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is hereby ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Final Order.

3.      The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan, as may be amended and modified from time to time.

4.      To the extent any conflict between this Final Order, the Sale Guidelines, and the Consulting Agreement, the terms of this Final Order shall control over all other documents and the Sale Guidelines shall control over the Consulting Agreement.

**I.      Authority to Assume the Consulting Agreement.**

5.      The Debtors are authorized to assume and perform under the Consulting Agreement pursuant to sections 363 and 365 of the Bankruptcy Code, including: (a) making payments required by the Consulting Agreement to the Consultant without the need for any application of the Consultant or a further order of the Court, (b) allowing the sale of Additional Agent Goods, and (c) participating in an augmentation program, all as permitted under the Consulting Agreement. Consultant's fees and expenses shall be paid from the gross proceeds of the Sale, without adherence to any weekly, monthly or aggregate limitation in a debtor-in-possession financing or cash collateral budget entered in connection with these chapter 11 cases, but shall be subject to the terms of the Consulting Agreement itself, including as to any expense budget attached thereto.

6.      Subject to the restrictions set forth in this Final Order and the Sale Guidelines and any Side Letters (as defined below), the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement and the Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and/or the Sales beginning as of the date of the Interim Order, are hereby approved and ratified.

7.      The Consulting Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.  The Debtors are hereby authorized to enter into additional agreements in connection with any Closing Stores, or Sales related thereto, on terms materially consistent with the Debtors' historic practices.

8.      Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising out of the Consultant's fraud, willful misconduct, or gross negligence.

9.      To the extent the Consultant seeks to contract with Additional Consultants, the Consultant is authorized to enter into an agreement with Additional Consultants.

10.      The failure to include any provisions of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that such provisions of the Consulting Agreement be, and hereby are, authorized and approved.

## II.      Authority to Engage in Sales and Conduct Store Closings.

11.      The Debtors are authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sales at the Closing Stores in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement, as may be modified by any Side Letters (as defined below) between the Debtors or the Consultant and the landlords at the Closing Stores.

12.      The Sale Guidelines are approved in their entirety on a final basis.

13.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order and the Sale Guidelines.

14.      All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Consulting Agreement

or this Final Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Consultant.

15.     Neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to conduct the Sales and Store Closings and to take the related actions authorized herein.

**III.     Conduct of the Sales.**

16.     All newspapers and other advertising media in which the Sales and Store Closings may be advertised and all landlords are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Sales and Store Closings pursuant to the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement.

17.     The Debtors and Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the Sales and Store Closings without necessity of further order of this Court as provided in the Consulting Agreement and the Sale Guidelines (subject to any Side Letters, as defined below), including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales as contemplated in the Sale Guidelines through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, A-frames, and other street signage, as contemplated in the Sale Guidelines.

18.     Except as expressly provided in the Consulting Agreement and the Sale Guidelines (subject to any Side Letter (as defined herein), the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Sales (including the sale of the Merchandise and FF&E), abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with the Store Closings or the Sales.  Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Sales are conducted in accordance with the terms of this Final Order, any Side Letter (as defined below) and the Sale Guidelines.  The Debtors, the Consultant, and the landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Debtors, the Consultant and any such landlords.  In the event of any conflict between the Sale Guidelines, the Consulting Agreement, any Side Letter, and this Final Order, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, or creditors, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Merchandise or FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditors and all those acting for or on behalf of

such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closings, or (b) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the landlords at the closing locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the closing locations or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.    In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as modified by any Side Letters) and this Final Order.

21.    All in-store sale of Store Closure Assets and the Additional Agent Goods shall be "as is" and final as of the Sale Commencement Date.  Conspicuous signs stating that "all sales are final" and "as is" will be posted at the point-of-sale areas at all Closing Stores.  As to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.    The Consultant shall not be liable for sales taxes except as expressly provided in the Consulting Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due, provided that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of such dispute, if and to the extent that the

dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Consultant shall collect, remit to the Debtors, and account for sales taxes as and to the extent provided in the Consulting Agreement.  This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state, provincial or federal law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state, provincial or federal law.

23.    Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell the Store Closure Assets and all sales of Store Closure Assets, whether by the Consultant or the Debtors, shall be free and clear of any and all liens, claims, encumbrances, and other interests; *provided, however*, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale of the Store Closure Assets with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Consultant's fees and expenses (as provided in the Consulting Agreement).

24.    The Debtors or the Consultant (as the case may be) are authorized and empowered to transfer Store Closure Assets among, and into, the Closing Stores in accordance with the Sale Guidelines, as applicable.  The Consultant is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Consulting Agreement and the Sale Guidelines (as may be modified by any Side Letter).

25.     The Consultant is authorized to supplement the Merchandise in the Sales with Additional Agent Goods of like kind and no lesser quality to the Merchandise in the Sale at the Closing Stores or through the e-commerce platform; provided, that the Debtors may reasonably object to the inclusion of Additional Agent Goods that are not of like kind and are of lesser quality to the Merchandise in the Sale at the Closing Stores or through the e-commerce platform, in which case the Debtors and the Consultant shall work in good faith to resolve such objection, which resolution may require the exclusion of such Additional Agent Goods subject to the objection; provided, further, that the cost of Additional Agent Goods shall not exceed fifteen percent (15%) of the aggregate Cost Value (as defined in the Consulting Agreement) of the Merchandise in the Sale.  The Additional Agent Goods shall be purchased by the Consultant as part of the Sales and delivered to the Closing Stores at the Consultant's sole expense (including as to labor, freight, and insurance relative to shipping such Additional Agent Goods to the Closing Stores).  Sales of Additional Agent Goods shall be run through the Debtors' cash register systems; provided, however, that the Consultant shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  The Consultant and Debtors shall cooperate to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods from the Merchandise.  The Consultant shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

26.     The Consultant shall pay the Debtors an amount equal to seven and one-half percent (7.5%) of the gross proceeds (excluding Sale Taxes) from the Sale of the Additional Agent Goods (the "Additional Agent Goods Fee").  The Consultant shall retain all remaining amounts from the sale of the Additional Agent Goods.  The Consultant shall pay the Debtors the Additional Agent

Goods Fee in connection with each weekly reconciliation with respect to the sales of Additional Agent Goods sold by the Consultant during each then prior week (or at such other mutually agreed upon time).

27.    All transactions relating to the Additional Agent Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from the Consultant to the Debtors under Article 9 of the Uniform Commercial Code (the "UCC") and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to the Debtors the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Agent Goods or the proceeds thereof.  The Additional Agent Goods shall at all times remain subject to the exclusive control of the Consultant.  The Debtors shall, at Consultant's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard thereto.  The Consultant shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

28.    The Consultant is hereby granted a first-priority security interest in and lien upon (a) the Additional Agent Goods and (b) the Additional Agent Goods proceeds, which security interest shall be deemed perfected without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that the Consultant is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Consultant's interest in the Additional Agent Goods as consigned goods thereunder and the Debtors as the consignee therefor,

and the Consultant's security interest in and lien upon such Additional Agent Goods and the Additional Agent Goods proceeds).

29.    Neither the Sale Guidelines, Consulting Agreement, nor this Final Order authorize the Debtors to transfer or sell to Consultant or any other party the personal identifying information (which means information that alone or in conjunction with other information identifies an individual, including but not limited to an individual's first name (or initial) and last name, physical address, electronic address, telephone number, social security number, date of birth, government-issued identification number, account number and credit or debit card number) ("PII") of any customers unless such sale or transfer is permitted by the Debtors' privacy policy and state, provincial or federal privacy and/or identity theft prevention laws and rules (collectively, the "Applicable Privacy Laws").  The foregoing shall not limit the Consultant's use of the Debtors' customer lists and mailing lists in accordance with the Consulting Agreement solely for purposes of advertising and promoting the Sales.

30.    The Debtors shall remove or cause to be removed any confidential and/or PII in any of the Debtors hardware, software, computers or cash registers or similar equipment which are to be sold or abandoned so as to render the PII unreadable or undecipherable.  At the conclusion of the Sales, the Consultant shall provide the Debtors with written verification that the Consultant has not removed, copied, or transferred any customer PII and that any records containing PII were shredded, erased, or otherwise modified to render the PII unreadable or undecipherable.

31.    Nothing herein shall limit the Debtors' right to pause or discontinue a Sale at a Closing Store on notice to affected parties.

32.    Nothing herein is intended to affect any rights of any applicable government unit to enforce any law affecting the Debtors' conduct of any store closing sale that occurred before the Petition Date.

**IV.    Procedures Relating to Additional Closing Stores.**

33.    To the extent that the Debtors seek to conduct Sales at any Additional Closing Store, the Sale Guidelines and this Final Order shall apply to the Additional Closing Stores.

34.    Prior to conducting the Sales at any Additional Closing Store, the Debtors will file a list including such Additional Closing Store with this Court (each, an "Additional Closing Store List"), and serve a notice of their intent to conduct the Sales at the Additional Closing Store on the applicable landlords (collectively, the "Additional Closing Store Landlords"), the Additional Closing Store Landlord's counsel of record (if known), and other interested parties by email (to the extent available to the Debtors) or overnight mail.  With respect to Additional Closing Store Landlords, the Debtors will mail, if applicable, such notice to the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

35.    The Additional Closing Store Landlords and any interested parties shall have seven (7) days after service of the applicable Additional Closing Store List to object to the application of this Final Order, object to the Sale Guidelines, or otherwise enter into a Side Letter with the applicable landlord of the Additional Closing Store as permitted by paragraph 18 herein.  If no timely objections are filed with respect to the application of this Final Order to an Additional Closing Store, the Debtors are authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting the Sales at the Additional Closing Stores in accordance with this Final Order, the Sale Guidelines, and the Consulting Agreement.  If any objections are filed with respect to the application of this Final Order, to an Additional Closing

Store, and such objections are not resolved, the objections and the application of this Final Order to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, subject to the rights of any party to seek relief on an emergency basis on shortened notice, to the extent necessary.  Any objections as to particular Additional Closing Stores will not affect the Debtors' and Consultant's right to begin Closing Sales at non-objected Additional Closing Stores.

**V.      Gift Card Program.**

36.      Gift cards shall no longer be accepted on the e-commerce platform or in the Closing Stores and shall be deemed to have no remaining value.  Notwithstanding any policy or state law to the contrary, the gift cards are not redeemable for cash at any time.

37.      Nothing in this Final Order authorizes the Debtors to cease acceptance of gift cards in the ordinary course of business in stores other than the Closing Stores or online.

**VI.     Dispute Resolution Procedures with Governmental Units.**

38.      Nothing in this Final Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.  The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and Safety, criminal, tax (including, but not limited to, the collection of Sales Taxes), labor,

employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising, consumer protection, the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring (collectively, "General Laws").  Nothing in this Final Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter shall alter or affect obligations to comply with all applicable federal Safety Laws and regulations.  Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court, that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order.  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

39.     To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state or Local statute, ordinance, rule, or licensing requirement directed at regulating "going out of business," "store closing," or similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, signage, and use of sign-walkers solely in connection with the sale of the Store Closing Assets, including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale

of the Store Closure Assets, the dispute resolution procedures in this section shall apply and the

Dispute Resolution Procedures shall control over any Side Letters:

(A)     Provided that the Sales are conducted in accordance with this Order, any Final
        Order, and the Sale Guidelines, the Consultant, and the Debtors, and the Debtors'
        landlords, shall be deemed to be in compliance with any requirements of all county,
        parish, or municipal or other local government (hereinafter referred to as "Local")
        and State requirements governing the conduct of the Sales of the Store Closure
        Assets, including but not limited to Local statutes, regulation and ordinances
        establishing licensing or permitting requirements, waiting periods or time limits, or
        bulk sale restrictions that would otherwise apply to the Sales and sales of the Store
        Closure Assets (collectively, the "Liquidation Sale Laws") of any state or Local
        Governmental Unit (as defined in Bankruptcy Code section 101(27)); *provided*,
        that the term "Liquidation Sale Laws" shall be deemed not to include any public
        health or safety laws of any state (collectively, "Safety Laws"), and the Debtors and
        the Consultant shall continue to be required to comply, as applicable, with such
        Safety Laws and General Laws, subject to any applicable provision of the
        Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar
        Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or
        public officials from enforcing Safety Laws or General Laws.

(B)     Within three (3) business days after entry of this Final Order, the Debtors will serve
        by first-class mail, copies of this Final Order, the Consulting Agreement, and the
        Sale Guidelines on the following: (a) the Attorney General's office for each state
        where the Sales are being held; (b) the county consumer protection agency or
        similar agency for each county where the Sales are being held; (c) the division of
        consumer protection for each state where the Sales are being held; and (d) the
        landlords for the Closing Stores (collectively, the "Dispute Notice Parties").

(C)     With respect to any Additional Closing Stores, within three (3) business days after
        filing any Additional Closing Store List with the Court, the Debtors will serve by
        first-class mail, copies of this Final Order, the Consulting Agreement, and the Sale
        Guidelines on the Dispute Notice Parties.

(D)     To the extent that there is a dispute arising from or relating to the Sales, this Final
        Order, the Consulting Agreement, or the Sale Guidelines, which dispute relates to
        any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive
        jurisdiction to resolve the Reserved Dispute. Within ten (10) days following entry
        of this Final Order, any Governmental Unit may assert that a Reserved Dispute
        exists by sending a notice (the "Dispute Notice") explaining the nature of the
        dispute to: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York
        10022, Attn: Joshua A. Sussberg, P.C., Emily E. Geier, P.C., and Nicholas M.
        Adzima and Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois
        60654, Attn.: Charles B. Sterrett; (b) Klehr Harrison Harvey Branzburg LLP, 919
        North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn.: Domenic E.
        Pacitti, Michael W. Yurkewicz, and Alyssa M. Radovanovich and Klehr Harrison

Harvey Branzburg LLP, 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103, Attn: Morton R. Branzburg; (c) counsel to Hilco Merchant Resources, LLC, Chipman, Brown, Cicero & Cole, LLP, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801, Attn: Mark L. Desgrosseilliers; and (d) the affected landlord.  If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days after service of the notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(E)     In the event that a Dispute Resolution Motion is filed, nothing in this Final Order shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of this Final Order nor the conduct of the Debtors pursuant to this Final Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to this Final Order, absent further order of the Court.  Upon the entry of this Final Order, the Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of this Final Order, the Consulting Agreement, and the Sale Guidelines (as may be modified by the Side Letters) and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in this Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(F)     If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (D) and (E) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

40.     Subject to paragraphs 38 and 39 above, each and every federal, state, or Local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Final Order as binding authority that no further approval, license, or permit of any Governmental Unit

shall be required, nor shall the Debtors or the Consultant be required to post any bond, to conduct the Sales.

41.     Provided that the Sales are conducted in accordance with the terms of this Final Order, the Consulting Agreement, and the Sale Guidelines (as may be modified by Side Letters), and in light of the provisions in the laws that exempt court-ordered sales from their provisions, the Debtors and Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Final Order and the Sale Guidelines (as may be modified by Side Letters) without the necessity of further showing compliance with any such Liquidation Sale Laws.

42.     Nothing in this Final Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, the Consulting Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.

**VII.    Other Provisions.**

43.     To the extent the Debtors are subject to any state Fast Pay Laws in connection with the Store Closings, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven (7) calendar days following the termination date of the relevant

employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

44.     The Debtors shall have the authority, but not the obligation, to make payments under the Store Closing Bonus Plan, as may be amended from time to time.

45.     Neither the Consultant nor any of its respective affiliates (whether individually, as part of a joint venture, or otherwise), shall be precluded from providing additional services to the Debtors or bidding on the Debtors' assets in connection with any other future process that may or may not be undertaken by the Debtors to close stores.

46.     Not later than seven (7) days prior to the objection deadline related to entry of an order approving the Motion on a final basis, the Consultant shall file a declaration disclosing connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases, and all parties who have filed requests for service under Bankruptcy Rule 2002, by email, or if the email address is not available to the Debtors, then by first class mail.

47.     Consultant shall act solely as consultant to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Consulting Agreement (including the Consultant's indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of gross negligence or willful misconduct and, for greater certainty, the Consultant shall not be deemed to be an employer, or a joint or successor employer or a related or common employer or payor within the meaning of any legislation governing employment or labor standards or pension benefits or health and Safety or other statute, regulation or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

48.     Subject to paragraphs 29 and 30 above, the Debtors are authorized and permitted to transfer to the Consultant personal information in the Debtors' custody and control solely for

the purposes of assisting with and conducting the Sales and only to the extent necessary for such purposes, provided that Consultant removes such personal information from the FF&E prior to the abandonment of the same.

49.     Comenity Bank is authorized, and the Debtors consent to, the institution of a temporary reserve (the "Temporary Reserve") in favor of Comenity Bank in an amount no greater than $250,000; *provided that* Comenity Bank shall return all unused funds in the Temporary Reserve to the Debtors no later than three (3) months following the completion of all Sales at the Closing Stores.  Additionally, all parties reserve their rights with respect to the limited objections and responses discussed by Comenity Bank and the Debtors on the record at the hearing held on April 23, 2024.

50.     Nothing in this Final Order shall amend, alter, or otherwise modify the terms of the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "Final DIP Order") as it relates to the Tax Reserve (as defined therein) established as adequate protection for the claims of the Texas Taxing Authorities (as defined therein).

51.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the validity amount of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract,

or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors'
or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or
(g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise)
that may be satisfied pursuant to the Motion are valid, and the rights of all parties are expressly
reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any
payment made pursuant to this Final Order is not intended and should not be construed as an
admission as to the validity of any particular claim or a waiver of the Debtors' rights to
subsequently dispute such claim, other than with respect to payments made to the Consultant,
which are governed by the reconciliation procedures in the Consulting Agreement.

52.     No payment may be made by the Debtors to, or for the benefit of, any non-Debtor
Insider (as defined in section 101 of the Bankruptcy Code) or any non-Debtor affiliate of or related
party to any such Insider pursuant to this Final Order without further court approval on notice to
parties in interest.

53.     The banks and financial institutions on which checks were drawn or electronic
payment requests made in payment of the prepetition obligations approved herein are authorized
to receive, process, honor, and pay all such checks and electronic payment requests when presented
for payment, and all such banks and financial institutions are authorized to rely on the Debtors'
designation of any particular check or electronic payment request as approved by this Final Order.

54.     Nothing contained in the Motion or this Final Order, and no action taken pursuant
to the relief requested or granted (including any payment made in accordance with this Final
Order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount,
validity or priority of, or basis for any claim against the Debtors under the Bankruptcy Code or
other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's

right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; *provided, however*, that this Final Order does and shall provide that the Consulting Agreement is assumed by the Debtors; *provided, further*, that any claims of the Consultant under the terms of the Consulting Agreement shall be and hereby are allowed as post-petition claims, entitled to priority as administrative expense claims under section 503(b)(1).

55.    The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

56.    Notwithstanding anything to the contrary in this Final Order, any payment made, or authorization contained, hereunder, shall be subject to the "Approved Budget" as defined in the order of the Court approving the debtor-in-possession financing in these chapter 11 cases.

57.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

58.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

59.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

60.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

61.     This Court shall retain jurisdiction with regard to all issues or disputes relating to this Final Order or the Consulting Agreement, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords and/or the Consultant for protection from interference with the Store Closings or Sales, (c) any other disputes related to the Store Closings or Sales, and (d) protect the Debtors and/or the Consultant against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the Consultant, the landlords, the Store Closings, or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

## Exhibit 1

**Consulting Agreement**



November 6, 2019

***VIA EMAIL***
Todd Painter
Vice President, Corporate Initiatives & International
Express, LLC
1 Express Drive
Columbus, OH 43230
Email: tpainter@express.com

Re:    <u>**Letter Agreement Governing Inventory and FF&E Disposition**</u>

Dear Todd:

By executing below, this letter shall serve as an agreement ("<u>Agreement</u>") between Hilco Merchant Resources, LLC ("<u>Consultant</u>" or a "<u>Party</u>"), and Express, LLC, on the other hand ("<u>Merchant</u>" or a "<u>Party</u>" and together with the Consultant, the "<u>Parties</u>"), under which Consultant shall act as the exclusive consultant for the purpose of (i) conducting a sale of certain Merchandise and FF&E (each as defined below) at the Merchant's stores set forth on <u>Exhibit A-1</u> (each a "<u>Store</u>" and collectively, the "<u>Stores</u>") through a "Store Closing", "Everything Must Go", "Everything on Sale" or similar themed sale (the "<u>Sale</u>"), and (ii) assisting with the sale of certain FF&E at the locations set forth on Exhibit A-2 (the "<u>Non-Store Locations</u>").  Only Merchant-approved Sale terminology will be utilized at each Store.

**A.    <u>Merchandise</u>**

For purposes hereof, "<u>Merchandise</u>" shall mean all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below) and through the end of the Sale Term (defined below).  "Merchandise" does not mean and shall not include: (a) goods that belong to sublessees, licensees or concessionaires of Merchant or are leased or licensed from third parties by Merchant; (b) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores or Non-Store Locations (collectively, "<u>FF&E</u>"), or any FF&E that is leased by Merchant located in the Stores or Non-Store Locations; and (c) damaged or defective merchandise that cannot be sold.

**B.    <u>Sale Term</u>**

For each Store, the Sale shall commence  on or about Thursday, December 5, 2019 (the "<u>Sale Commencement Date</u>") and conclude no later than Friday, January 31, 2020 (the "<u>Sale Termination Date</u>"); <u>provided</u>, <u>however</u>, that the Parties may mutually agree in writing to terminate the Sale at any Store prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "<u>Sale Term</u>."  At the conclusion of the Sale, Consultant shall surrender the premises for each Store to Merchant (a) in broom clean condition, and (b) if requested by Merchant, in accordance with the lease requirements for such premises; <u>provided</u>, <u>however</u>, that, if Merchant requests that Consultant surrender any

premises in accordance with the lease requirements, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises to the extent such expenses were incurred by Consultant in accordance with a budget mutually agreed to in writing between the Consultant and Merchant.  At the conclusion of the Sale at each Store, Consultant shall photographically document the condition of each such Store and provide such photographs to Merchant within ten (10) days.  Photographs shall reference with specificity each Store by number, name and/or location.

**C.**    **Project Management**

(i)    Consultant's Undertakings

During the Sale Term, Consultant shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Consultant and approved in advance by Merchant to oversee the management of the Stores and the Sale; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) determine appropriate discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees, in each case approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) to the extent necessary, assist Merchant in obtaining all required permits and governmental consents required to conduct the Sale; (i) ensure that all marketing, advertising and other communications provided by Merchant to Consultant for distribution to customers are provided to customers by including same in bags along with purchased merchandise or through other similarly appropriate means; and (j) provide such other related services deemed necessary or appropriate by Merchant and Consultant.

Without limiting the generality of the foregoing, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Merchant, its customers, employees, parent, subsidiary, or other affiliated entities (for purposes of this paragraph, all such entities are included within each reference to "Merchant"), including the terms and existence of this Agreement, is Merchant's confidential, trade secret information ("Merchant Confidential Information"), which is and shall remain the exclusive intellectual property of Merchant.  Except as may be required for Consultant to perform its obligations under this Agreement in respect of the Sale, Consultant shall not divulge, furnish, make available, or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives, and agents. Consultant shall take and shall cause its officers, employees, representatives, and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Merchant Confidential Information. Consultant agrees to maintain strict confidentiality and agrees that it may use Merchant Confidential Information only as reasonably necessary to the performance of its obligations related to the Sale. If and to the extent the use or other handling of any Personal Information is necessary for Consultant to perform its obligations hereunder, Consultant shall comply with all Data Security Requirements and such other reasonable restrictions requested by Merchant.  For purposes of this Agreement, "Personal Information" means any natural person's name, street address, telephone

2

number, e-mail address, social security number, driver's license number, passport number, credit card number, or user or account number, or any other piece of information that, individually or when combined with other information, allows the identification of a natural person or is otherwise considered personally identifiable information or personal data protected under any applicable Data Security Requirement.   For purposes of this Agreement, "Data Security Requirements" means, collectively, all of the following to the extent relating to privacy, security, or security breach notification requirements: (a) Merchant's own rules, policies, and procedures; (b) all applicable statutes and regulations; (c) industry standards applicable to the industry in which the Merchant's business is conducted (including, as applicable, the Payment Card Industry Data Security Standard (PCI DSS)); and (d) contracts into which Merchant has entered or by which it is otherwise bound, provided such contracts (or the requirements of such contracts) are provided to Consultant.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, bonuses, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Consultant's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

(ii)     Merchant's Undertakings

During the Sale Term, Merchant shall: (a) be the employer of the Stores' employees, other than the Supervisors; (b) be responsible for all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales tax and other applicable taxes assessed on the sale of the Merchandise and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Consultant and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Consultant to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; and (h) use reasonable efforts to ensure that Consultant has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, as currently available through the Merchant's existing accounting and IT systems, all at no cost to Consultant.

The Parties expressly acknowledge and agree that Consultant shall have no liability to Merchant's employees for wages, bonuses, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Consultant.

**D.     The Sale**

All sales of Merchandise shall be made on behalf of Merchant. Consultant does not have, nor shall it have, any right, title or interest in the Merchandise.  All sales of Merchandise shall be by cash, gift card, merchandise credit, or credit or debit card in accordance with Merchant's policies, and, beginning on or about Sunday, December 29, 2019 and through the end of the Sale Term, all

sales of Merchandise shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.**     **Consultant Fee and Expenses in Connection with the Sale**

In consideration of its services hereunder, Merchant shall pay Consultant a "Base Fee" equal to 1.25% of net sales.  In addition to the "Base Fee", and to the extent the net sales at the Stores increase by ninety percent (90%) over last year's net sales at the same Stores during the same period of time, Consultant may also earn an "Incentive Fee" (together with the Base Fee, the "Merchandise Fee") in an amount equal to an additional 0.25% of net sales (as calculated back to first dollar).

The Incentive Fee shall be determined in connection with the Final Reconciliation, and once determined, the parties (as part of the Final Reconciliation) shall determine the actual amount of Consultant's Merchandise Fee.  Merchant shall pay Consultant's definitive Merchandise Fee in connection with the Final Reconciliation as set forth in Section G of this Agreement.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Consultant's other reasonable, documented out of pocket expenses (the "Costs"). To control Costs, Merchant and Consultant have established an aggregate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs.  The Expense Budget for the Sale is attached hereto as Exhibit B.  The Expense Budget may only be modified by mutual written (including email) agreement of Consultant and Merchant.  The costs of supervision set forth on Exhibit B include, among other things, industry standard deferred compensation. Notwithstanding anything herein to the contrary, unless otherwise agreed to by Merchant, Merchant shall not be obligated to pay costs of supervision and advertising costs that have not been included, or provided for, in the Expense Budget, as may be amended in accordance with this Agreement.

**F.**     **Furniture, Fixtures and Equipment**

With respect to the FF&E located in the Stores and owned by Merchant, Consultant shall sell such FF&E from the Stores themselves.  With respect to the FF&E located in the Non-Store Locations and owned by Merchant, Consultant shall assist the Merchant with selling such FF&E remotely.  Merchant shall be responsible for all reasonable and documented costs and expenses incurred by Consultant in connection with the sale of the FF&E from the Stores as well as the Non-Store Locations, which costs and expenses shall be incurred pursuant to a written budget or budgets (in addition to the Expense Budget) to be established from time to time by mutual agreement of the Parties (such costs and expenses, not including the Costs, shall be referred to as the "FF&E Costs").  For the avoidance of doubt, Merchant and Consultant shall agree on separate budgets governing the FF&E Costs at the Stores and the Non-Store Locations.  Unless otherwise advised by the Merchant, the Consultant shall not have the right to abandon at the Stores or Non-Store Locations any unsold FF&E.

In consideration for providing the services set forth in this section F, Consultant shall be entitled to a commission from the sale of the FF&E at both the Stores and Non-Store Locations in an amount equal to fifteen percent (15%) of the net sales proceeds of such FF&E (the "FF&E Fee").

**G.**     **Payments & Accounting**

During the Sale Term, all accounting matters (including, without limitation, the determination of the Merchandise Fee, Costs, FF&E Fee, FF&E Costs and all other fees, expenses, or other amounts reimbursable or payable hereunder) shall be reconciled by the Parties on (i) Wednesday, January 8, 2020, for the period between the Sale Commencement Date through and including Saturday, January 4, 2020; and (ii) Wednesday, February 5, 2020, for the period between January 5, 2020 through and including Saturday, February 1, 2020; and the amounts determined to be owing for such periods pursuant to such reconciliation shall be paid within seven (7) days from invoice after each such reconciliation.

The Parties shall complete a final reconciliation and settlement of all amounts payable pursuant to this Agreement (including, without limitation, the determination of the Merchandise Fee, Costs, FF&E Fee, FF&E Costs and all other fees, expenses, or other amounts reimbursable or payable hereunder) no later than forty five (45) days following (a) the Sale Termination Date for the last Store (the "Final Reconciliation"), or (b) the date upon which this Agreement is terminated in accordance with its terms.  In connection with the Final Reconciliation, Hilco shall issue an invoice, and within ten (10) days from the date of issuance of such invoice:, (a) any amounts that are determined to be owing by Merchant to the Consultant shall be paid by the Merchant to the Consultant; and (b) any amounts that are determined to be owing by the Consultant to the Merchant as a result of any overpayments shall be paid by the Consultant to the Merchant.

**H.**     **Indemnification**

(i)     Merchant's Indemnification

Merchant shall indemnify, defend, and hold Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Consultant Indemnified

Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Consultant Indemnified Parties) against Consultant or a Consultant Indemnified Party, except claims arising from Consultant's negligence, willful misconduct, gross negligence, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Consultant's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

       (ii)    <u>Consultant's Indemnification</u>

Consultant shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Consultant or the Consultant Indemnified Parties) (collectively, "<u>Merchant Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Consultant or the Consultant Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Consultant; (c) any liability or other claims made by Consultant's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, gross negligence, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Consultant or any of the Consultant Indemnified Parties and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement, including, without limitation, the Supervisors.

## I.   **Insurance**

       (i)    <u>Merchant's Insurance Obligations</u>

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall, to the extent reasonably practicable, cause Consultant to be named an additional insured with respect to all such policies. At Consultant's request, Merchant shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements.

(ii)     Consultant's Insurance Obligations

Consultant shall maintain (at Consultant's expense) throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Consultant's provision of services at the Stores.  Consultant shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Consultant shall maintain throughout the Sale Term, workers' compensation insurance in compliance with all statutory requirements.  Further, should Consultant employ or engage third parties to perform any of Consultant's undertakings with regard to this Agreement, Consultant will ensure that such third parties are covered by Consultant's insurance or maintain all of the same insurance as Consultant is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

**J.      Representations, Warranties, Covenants and Agreements**

(i)      Merchant warrants, represents, covenants and agrees that: (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein; (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with Merchant's customary practices; and (e) the Stores will be operated in the ordinary course of business in all respects, except as otherwise expressly agreed to by Merchant and Consultant.

(ii)     Consultant warrants, represents, covenants and agrees that: (a) Consultant is a company duly organized, validly existing and in good standing under the laws of its organization, with full power and authority to execute and deliver this Agreement and to perform the Consultant's obligations hereunder; (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Consultant and this Agreement constitutes a valid and binding obligation of Consultant enforceable against Consultant in accordance with its terms and conditions, and the consent of no other entity or person is required for Consultant to fully perform all of its obligations herein; (c) Consultant shall comply with and act in accordance with any and all applicable federal, state and local laws, rules, and regulations, and other legal obligations of all governmental authorities; (d) no non-emergency repairs or maintenance in the Stores will be conducted without Merchant's prior written consent;  and (e) Consultant will not take any disciplinary action against any employee of Merchant.

**K.      Termination**

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Consultant's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party (an "Event of Default");

(b)    Any representation or warranty made by Merchant or Consultant is untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

(c)    the Sale is terminated or materially interrupted or impaired for any reason, other than as a result of an Event of Default by Consultant or Merchant.

If Termination Event occurs, the non-defaulting Party (in the case of an Event of Default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in the case of an Event of Default, in addition to terminating this Agreement, pursue any and all rights and remedies and damages resulting from such Event of Default. If this Agreement is terminated, Merchant shall be obligated to pay Consultant all amounts due and owing by Merchant to Consultant under this Agreement through and including the termination date.

**L.**    **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by electronic mail or by recognized overnight delivery service as follows: (a) To Merchant: at the address listed above; and (b) To Consultant: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, Illinois 60062, Fax: 847-897-0859, Attn: Ian S. Fredericks.

**M.**    **Independent Consultant**

Consultant's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Consultant or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Consultant is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**N.**    **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns.

**O.**    <u>Severability</u>

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.  If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**P.**    <u>Governing Law, Venue, Jurisdiction and Jury Waiver</u>

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Delaware (without reference to the conflicts of laws provisions therein).  Merchant and Consultant waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Consultant against Merchant or Merchant against Consultant on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Consultant, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

**Q.**    <u>Entire Agreement</u>

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement.  All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**R.**    <u>Execution</u>

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

*          *          *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

_____
By:  Sarah Baker
Its:    VP & AGC, Managing Member


**AGREED AND ACCEPTED as of the ___ day of November, 2019:**

Express, LLC


_____
By:
Its:

**Express**
**Exhibit A-1**

| Store List |
|---|

| Store # | Location Type - Mall Grade | Name | Address | City | State | Zip | District | Lease Expiration | Target Close | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 397 | Mall- C | WESTGATE | 205 W. BLACKSTOCK RD SPACE # 40 | SPARTANBURG | SC | 29301-1305 | 121- N. GEORGIA/ S. CAROLINA | 12/31/19 | 01/31/20 | 7,632 | 6,450 |
| 506 | Mall- B | RIVER OAKS CENTER | 125 RIVER OAKS CTR SP #B | CALUMET CITY | IL | 60409-5509 | 61- CHI SOUTH/ CENTRAL IL/ NW IN | 01/31/20 | 01/31/20 | 11,044 | 8,435 |
| 590 | Mall- B- | PARK PLAZA | 6000 WEST MARKHAM SP #2086 | LITTLE ROCK | AR | 72205-3198 | 480- HOUSTON/ S. CENTRAL | 01/31/20 | 01/31/20 | 7,963 | 6,481 |
| 638 | Mall- B | BURNSVILLE CENTER | 1039 BURNSVILLE CTR SP #1140 | BURNSVILLE | MN | 55306-4447 | 66- MINNESOTA | 01/31/20 | 01/31/20 | 8,322 | 6,650 |
| 652 | Mall- B- | FOX RUN MALL | FOX RUN RD SP #G29 | NEWINGTON | NH | 03801-2851 | 16- BOSTON NORTH | 01/31/20 | 01/31/20 | 6,552 | 5,084 |
| 873 | Mall- C | GWINNETT MALL | 2100 PLEASANT HILL ROAD SP #2204 | DULUTH | GA | 30096-4701 | 121- N. GEORGIA/ S. CAROLINA | 01/31/15 | 01/31/20 | 7,807 | 6,130 |
| 932 | Mall- B | SOLANO | 1350 TRAVIS BLVD. STE #1492A | FAIRFIELD | CA | 94533-3432 | 82- SACRAMENTO VALLEY | 01/31/21 | 01/31/20 | 7,500 | 5,804 |
| 2002 | Hybrid- B | SHOPS AT WIREGRASS | 28210 PASEO DR SPACE 270 | WESLEY CHAPEL | FL | 33543-5392 | 132- NW FLORIDA | 01/31/20 | 01/31/20 | 8,026 | 6,201 |
| 8 | | | | | | | | | | 8,106 | 6,404 |

**Express**
**Exhibit A-2**

| Store List |
|---|

| Store # | Location Type - Mall Grade | Name | Address | City | State | Zip | Target Close | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| 44 | Mall-C | CIRCLE CENTER | 49 W. MARYLAND ST. | INDIANAPOLIS | IN | | 01/31/20 | 7,195 | 5,760 |
| 46 | Mall-C | MIDLAND | 6800 EASTMAN AVE SPACE #244/248 | MIDLAND | MI | | 01/31/20 | 5,293 | 4,320 |
| 51 | Lifestyle-A | RICE VILLAGE | 2414 UNIVERSITY SPACE: B & D | HOUSTON | TX | | 01/31/20 | 8,867 | 6,778 |
| 95 | Mall-C | NITTANY | 2900 E. COLLEGE AVE SP #318 | STATE COLLEGE | PA | | 01/31/20 | 6,000 | 5,041 |
| 127 | Mall-B- | OAKVIEW | 144TH & WEST CENTER ROAD SPACE H-1 | OMAHA | NE | | 01/31/20 | 8,902 | 6,785 |
| 158 | Mall-B | CUMBERLAND | 1425 CUMBERLAND MALL | ATLANTA | GA | | 01/31/20 | 7,605 | 6,193 |
| 208 | Mall-C | GREENBRIER | 1401 GREENBRIER PKWY SP #1090 | CHESAPEAKE | VA | | 01/31/20 | 8,680 | 6,666 |
| 209 | Mall-C | WILTON MALL | 417 WILTON RD SP #B8 | SARATOGA SPRINGS | NY | | 01/31/20 | 7,006 | 5,455 |
| 252 | Mall-B+ | LLOYD CENTER | 959 LLOYD CTR | PORTLAND | OR | | 01/31/20 | 8,144 | 6,336 |
| 331 | Mall-C | WOODLAND MALL | 3135 28TH ST S.E. SP #D7 & 9 | KENTWOOD | MI | | 01/31/20 | 8,213 | 6,570 |
| 341 | Mall-B- | MONTGOMERY MALL | 222 MONTGOMERY MALL | NORTH WALES | PA | | 01/31/20 | 8,830 | 7,056 |
| 571 | Mall-B- | MID RIVERS | 1600 MID RIVERS MALL SP #1310, #1312, AND #1 | SAINT PETERS | MO | | 01/31/20 | 8,066 | 5,765 |
| 582 | Street-C | THAMES STREET | 144148 THAMES ST. | NEWPORT | RI | | 01/31/20 | 8,846 | 7,343 |
| 613 | Mall-B- | SUNRISE CENTER | 6040 SUNRISE BLVD. SP #B9 | CITRUS HEIGHTS | CA | | 01/31/20 | 8,083 | 6,497 |
| 625 | Mall-C | VISALIA | 2031 S. MOONEY BLVD SP #1605 | VISALIA | CA | | 01/18/20 | 7,800 | 6,190 |
| 629 | Hybrid-C | THE STREETS | 2140 NE ALLIE AVENUE | HILLSBORO | OR | | 01/31/20 | 8,150 | 6,476 |
| 633 | Hybrid-C | CARRIAGE CROSSING | 4650 MERCAHANTS PARK CIRCLE SUITE 836 | COLLIERVILLE | TN | | 01/31/20 | 7,494 | 6,030 |
| 634 | Mall-B | EDEN PRAIRIE | 8251 FLYING CLOUD DRIVE SPACE#1282/EDEN PF | EDEN PRAIRIE | MN | | 01/31/20 | 7,630 | 5,965 |
| 640 | Mall-B | OAKRIDGE | 152 OAKRIDGE MALL | SAN JOSE | CA | | 01/31/20 | 6,741 | 5,466 |
| 770 | Street-B+ | 51ST & MADISON | 477 MADISON AVE | NEW YORK | NY | | TBD - end of year | 10,306 | 7,741 |
| 816 | Mall-B | HAWTHORNE | 705 HAWTHORNE CTR #G4 & G5 | VERNON HILLS | IL | | 01/31/20 | 13,963 | 10,541 |
| 912 | Mall-C | MERIDIAN MALL | 1982 GRAND RIVER AVE. | OKEMOS | MI | | 01/31/20 | 9,075 | 7,258 |
| 1516 | Mall-C | VALLE VISTA | 2020 S. EXPRESSWAY 83 SPACE B2,B3,B4 | HARLINGEN | TX | | 01/31/20 | 4,940 | 3,962 |
| 1550 | Mall-B- | NESHAMINY | 638 NESHAMINY MALL SPACE 638 | BENSALEM | PA | | 01/31/20 | 8,000 | 6,474 |
| 1942 | Mall-Outlet (EFO) | PARADISE VALLEY MAL | 4500 EAST CACTUS RD SP# F016 | PHOENIX | AZ | | 01/31/20 | 8,112 | 6,490 |
| 2003 | Mall-B- | BRASS MILL | 495 UNION STREET SPACE #1038 | WATERBURY | CT | | 01/31/20 | 8,552 | 6,883 |
| 2006 | Hybrid-B- | RIDGE HILL MALL | 18 SECOND STREET SP# 1250 | YONKERS | NY | | 01/31/20 | 7,305 | 5,612 |
| 27 | | | | | | | | 8,067 | 6,358 |

# Express
## Exhibit B

| Expense Budget (1) |
| --- |

**Advertising**

| | |
| --- | --- |
| Media | 5,000 |
| Signs (2) | 16,000 |
| Sign Walkers | - |
| Subtotal Advertising | 21,000 |

**Supervision**

| | |
| --- | --- |
| Fees / Wages / Expenses (3) | 87,249 |
| Subtotal Supervision | 87,249 |

| | |
| --- | --- |
| Total Expenses | 108,249 |

*Note(s):*
*1. This Expense Budget contemplates a sale term of December, 5, 2019 through January 26, 2020. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.*
*2. Includes Sales Tax.*
*3. Includes Deferred Compensation and Insurance.*



February 5, 2024

Express, LLC
Attn: Mark Still
SVP
Planning and Allocation and Interim CFO
1 Express Drive
Columbus, OH 43230
Email: MStill@express.com


**_VIA EMAIL_**

Re:     **Twenty-fourth Amendment to Letter Agreement**

Dear Mark:

Reference is made to that certain letter agreement dated November 6, 2019 (as supplemented or amended, the "Agreement") by and between Express, LLC (the "Merchant" or a "Party"), on the one hand, and Hilco Merchant Resources, LLC ("Consultant" or a "Party" and together with Merchant, the "Parties"), on the other hand.[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Reference is also made to that certain Software License Agreement dated October 5, 2023 between the Merchant and ReStore App, LLC ("ReStore"), and affiliate of Consultant concerning Merchant's use of the ReStore App at its stores (as may be supplemented or amended, the "License").

The Parties hereby amend the Agreement as follows (the "Amendment"):

As set forth in the Agreement, Consultant was engaged to act as the exclusive Consultant for the purpose of providing certain services in connection with the disposition of the Merchandise and FF&E located at certain of Merchant's retail locations. Consultant and Merchant have agreed to amend the Agreement to conduct a clearance program at the [ ] stores reflected on Exhibit A to this Amendment (the "Clearance Stores").

Merchant and Consultant hereby further agree that, with respect to the Clearance Stores, Consultant will assist in overseeing the Merchant's clearance strategy with respect to saleable clearance inventory, deploy people and technology including the ReStore App, and develop and implement a playbook with Merchant to drive operational focus at additional stores beyond the Clearance Stores (such program, the "Clearance Program"). The Clearance Program shall at all times be conducted with the goal of returning the Clearance Stores to profitability, increasing cost discipline, and driving increased customer engagement. The Clearance Program will commence on January [   ], 2024 (the "Clearance Program Commencement Date") and will terminate no later than April [ ], 2024 (the "Clearance Program Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Clearance Program at any Clearance Store prior to the Clearance Program Termination Date. The period from the Clearance Program Commencement

---

[1] For purposes of the Amendment, "Merchant" shall include UW, LLC, an affiliate of Express, LLC.

Date to the Clearance Program Termination Date shall be referred to as the "Clearance Program Term."

## A. Consultant's Clearance Undertakings

For purposes of this Amendment, with respect to the Clearance Stores and the Clearance Program, the first paragraph of section C.(i) of the Agreement shall be replaced in its entirety with the following:

During the Clearance Program Term, Consultant shall (a) develop, oversee, and assist Merchant with implementing the Clearance Program in the Clearance Stores; (b) provide qualified supervisors (the "Supervisors") and, to the extent requested by Merchant, retail SWAT teams engaged by Consultant to (i) oversee, organize, assist and guide Merchant with the setup and implementation of the Clearance Program, (ii) oversee the management of the Clearance Program, (iii) work with Merchant's management and employees who will conduct and remain active during and with respect to the Clearance Program, (iv) memorialize learnings from the Clearance Program to apply to other Merchant stores (c) recommend and assist Merchant with developing a marketing plan and implementing appropriate Clearance Program point-of-sale and internal and external advertising for the Clearance Program, including (without limitation) billboards, interior and exterior signage, and sign-walkers; (d) recommend and assist Merchant with implementing appropriate Clearance Program pricing of Merchandise and discount cadence to maximize return; (e) oversee the display of Merchandise for the Clearance Stores consistent with the Clearance Program; (f) provide signage and sign walkers, at Merchant's cost and expense; (g) provide guidelines necessary or appropriate to conduct the Clearance Program; (i) assist Merchant in implementing the ReStore App at the Clearance Stores, including making the Clearance Stores "Activated Stores" under the License, with the goal of implementing the ReStore App across Merchant's other stores; and (j) provide such other related services related to the Clearance Program deemed necessary or appropriate by Merchant and Consultant.

## B. Consultant's Fees and Expenses in Connection with the Clearance Program

For purposes of this Amendment, with respect to the Clearance Stores and the Clearance Program, section E of the Agreement shall be replaced in its entirety with the following:

In consideration of its services hereunder, Merchant shall reimburse Consultant for Clearance Program Expenses (as defined below) and pay Consultant the fees as set forth below:

      a.   Clearance Program Expenses.  Merchant shall be responsible for all expenses of the Clearance Program, including (without limitation) all Clearance Store level operating expenses, all costs and expenses related to Merchant's other store operations, the cost of marketing and advertising the Clearance Program, and Consultant's other reasonable, documented out of pocket expenses, including travel and other expenses required to sign and market the clearance program, for Supervisors and for retail SWAT team assistance as applicable (the "Clearance Program Expenses"). To control Clearance Program Expenses, Merchant and Consultant have established an operating budget (the "Clearance Program Budget"), a copy of which is attached hereto as Exhibit B, of the expected costs of Supervisors and the retail SWAT team. Any deviation from

DocuSign Envelope ID: 5F9AD076-6363-479B-8F2D-FC95A8FD54F1

the Clearance Program Budget shall be mutually agreed upon by the parties. For the avoidance of doubt, the Consultant shall deploy no more than two Supervisors during the Clearance Program Term without Merchant consent and shall only incur retail SWAT team expenses at Merchant's direction, taking into account Consultant's recommendation. During the Clearance Program Term, Merchant shall be responsible for the timely payment of Supervisor expenses and for any retail SWAT team expenses incurred at Merchant's request, at the rates set forth on Exhibit B.

b. <u>Clearance Program Fees</u>. For the purposes of this initial Clearance Program, Merchant shall pay Consultant fees equal to an additional twenty percent (20%) of the actual Clearance Program Expenses incurred by Consultant in implementing the Clearance Program, all as set forth in more detail in Exhibit B. For example, if during a given week of the Clearance Program the Clearance Program Expenses are $28,400 ($13,400 for two Supervisors plus $15,000 for a Retail SWAT team, plus airfare), the fees owing to Consultant would be $5,680.00.

The Parties anticipate that the Clearance Program will provide gross margin improvement at the Clearance Stores, and the Parties will work together in good faith to quantify such improvement and develop a mechanism for attribution and anchoring such improvement to apply to future clearance programs. The Parties ultimately intend for Consultant to share in ten percent (10%) of such quantified gross margin improvement in this and future clearance programs subject to final mutual written agreement between the parties.

c. <u>ReStore App Fees</u>. As set forth above, to implement the Clearance Program and provide other operational improvements at the Clearance Stores, the Parties intend to utilize ReStore App, which shall be installed on Merchant's in-store devices and on Merchant's WiFi network at the outset of the Clearance Program, and identify the Clearance Stores as "Activated Stores" under the License. Consultant will cause ReStore App to waive the standard $59/store Monthly Fee (as defined in the License) during the Clearance Program Term. The Parties will leverage the lessons learned during the Clearance Program and the accompanying ReStore App implementation to activate the ReStore App on Merchant's in-store devices and WiFi for all of Merchant's other stores, as previously agreed by the Parties. Pursuant to a separate agreement entered into concurrently herewith, the Consultant will cause its affiliate ReStore Capital, LLC ("ReStore Capital") to offset the amount of the ReStore License fees payable for year 1 against interest otherwise payable to its affiliate under that certain Asset-Based Term Loan Agreement, dated as of September 5, 2023, by and among Merchant and certain of its affiliates and Restore Capital. Merchant shall use the funds that otherwise would have been paid to ReStore Capital to pay the year 1 fees under the License as and when they come due.

Both the Agreement and this Amendment shall govern the Clearance Program at the Clearance Stores. For purposes of interpreting the Agreement and the Amendment with respect to the Clearance Program, the following defined terms and exhibits shall be replaced in the Agreement with the corresponding defined terms and exhibits in or attached to this Amendment:

| Agreement | Amendment |
|---|---|
| Budget | Clearance Program Budget |
| Sale | Clearance Program |
| Store or Stores | Clearance Store or Additional Stores |
| Sale Commencement Date | Clearance Program Commencement Date |
| Sale Termination Date | Clearance Program Termination Date |
| Sale Term | Clearance Program Term |
| Consultant's Undertakings | Consultant's Clearance Undertakings |

With respect to this Amendment, (i) Merchant hereby reaffirms the representations, warranties, and agreements set forth in section H of the Agreement, and (ii) Consultant hereby reaffirms the representations, warranties, and agreements set forth in section H of the Agreement.

This Amendment, together the Agreement, all prior amendments or supplements, and all schedules and exhibits attached hereto and thereto, constitutes a single, integrated written contract expressing the entire agreement of the parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party to this Amendment except as specifically set forth in this Amendment or the Agreement.

If this Amendment is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

*T. Kellan Grant*

By:  T. Kellan Grant
Its:  EVP Commercial Counsel

2/15/2024

**AGREED AND ACCEPTED as of the ___day**
**of February, 2024:**

EXPRESS, LLC

DocuSigned by:

8B3E70B35036475...

By:  Mark Still
Its: SVP Brand Finance and Planning and Allocation and Interim CFO

4

## <u>Twenty-Fourth Amendment to Letter Agreement – Exhibit A</u>

<u>Clearance Stores</u>

**Twenty-Fourth Amendment to Letter Agreement – Exhibit B**

Clearance Program Expense Budget

**Advertising**

| | | |
|---|---|---|
| Signs (1) | | $1,330 / store (4) |
| Media | *as requested by Merchant* | $1,200 / month / store |
| Sign Walkers | *as requested by Merchant* | $700 / weekend / store |

**Supervision (2)**

| | # of Supervisors | Duration | Weekly Cost (3) |
|---|---|---|---|
| Project Supervisors | 2 | Clearance Program Term | 13,400 |
| Retail Swat Team (s) | 3 | As needed as requested by Merchant | 15,000 |

Notes:

1. Includes Sales Tax and freight
2. Includes Deferred Compensation and Insurance.
3. Does not include travel expenses.
4. Average per store, expected to decrease with scale

February [15], 2024

Express, Inc.
One Express Drive
Columbus, OH 43230
Attn: Stewart Glendinning
Email: sglendinning@express.com

RE:    ReStore for Retail License Payments

Dear Mr. Glendinning:

This letter refers to (i) that certain Asset-Based Term Loan Agreement, dated as of September 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Express, Inc., a Delaware corporation ("Holdings"), Express TopCo LLC, a Delaware limited liability company ("Intermediate Holdings"), Express Holding, LLC, a Delaware limited liability company (the "Parent"), Express, LLC, a Delaware limited liability company (the "Borrower"), the other Loan Parties (as defined therein) party thereto from time to time, each lender party thereto from time to time (collectively, the "Lenders" and each individually, a "Lender"), ReStore Capital, LLC, as collateral agent (together with any successor collateral agent appointed pursuant to Article VII thereof, the "Collateral Agent") for the Secured Parties (as defined therein) and as administrative agent (together with any successor administrative agent appointed pursuant to Article VII thereof, the "Administrative Agent" and, together with the Collateral Agent, the "Agents") for the Lenders and (ii) that certain Software License Agreement, dated as of October 5, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "R4R License Agreement"), by and among the Borrower and ReStore App, LLC, a Delaware limited liability company ("ReStore for Retail"). Capitalized terms used but not otherwise defined in this letter are used in this letter as defined in the Credit Agreement or the R4R License Agreement, as applicable.

Pursuant to the terms of the Credit Agreement (including, without limitation, Sections 2.05 and 2.07 thereof), ReStore Capital (EXPRS-II), LLC (the "ReStore Lender"), in its capacity as a Lender, is entitled to a share of interest payments, in an aggregate amount of $409,224 (such amount calculated assuming the contract rate of interest is in effect under the Credit Agreement during all applicable periods), payable (x) for the month of March 2024, in an amount equal to $204,612 and (y) for the month of April 2024, in an amount equal to $204,612 (collectively, the "Specified ReStore Interest Payment Amount"). To the extent additional interest, in an amount exceeding the Specified ReStore Interest Payment Amount, is due under the Credit Agreement for the applicable periods, whether due to the application of the default rate or otherwise, such additional amounts shall be paid to the Administrative Agent, for the benefit of the ReStore Lender, as and when required under the Credit Agreement. The Borrower, the ReStore Lender and the Administrative Agent hereby agree that each portion of the Specified ReStore Interest Payment Amount due from the Borrower to the Administrative Agent, for the benefit of the ReStore Lender, shall be waived so long as an equivalent amount of cash, in U.S. Dollars and immediately available funds, is instead paid to ReStore for Retail on March 1, 2024 and April 1, 2024, for application by ReStore for Retail to payment, pursuant to the R4R License Agreement, for the License described therein with a term of one year (commencing on March 1, 2024 and ending on February 28, 2025). Payments of such amounts to ReStore for Retail shall be made in accordance with the wire instructions below:

Bank Name:                                        [__]
Branch Name:                                      [__]
ABA # or BIC/SWIFT Code (if applicable):          [__]
Account Name:                                     [__]

Reference Data:                                    [__]
Beneficiary Address (complete physical address     [__]
required):
**ACCOUNT NUMBER**                                 [__]

Notwithstanding anything to the contrary contained in the Credit Agreement, the Borrower acknowledges and agrees that the failure to comply with this letter and the payment of the amounts described above when due and payable shall constitute an Event of Default under Section 6.01(a)(ii) of the Credit Agreement (after giving effect to the grace period set forth therein).

This letter is a Loan Document. This letter is a contract made under, and shall be governed by and construed in according with, the law of the State of New York. This letter may be executed in any number of counterparts and by the different parties in different counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Execution of any such counterpart may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, as in effect from time to time, state enactments of the Uniform Electronic Transactions Act, as in effect from time to time, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.

*[Signature pages follow]*

Very truly yours,

RESTORE CAPITAL, LLC,
as the Administrative Agent

By:      _____
Name:    _____
Title:   _____

[Signature Page to Side Letter]

Agreed and Accepted:

EXPRESS, LLC, as the Borrower

By: _____

Name: _____Mark Stitt_____

Title: _____Interim CFO_____

11799570v4

Agreed and Accepted:

RESTORE CAPITAL (EXPRS-II), LLC, as a Lender

By: _____
Name: _____
Title: _____

[Signature Page to Side Letter]



DocuSign Envelope ID: 811359E0-72D3-4A81-805A-11F98092F601

April 3, 2024

Express, LLC
Attn: Mark Still
SVP
Planning and Allocation and Interim CFO
1 Express Drive
Columbus, OH 43230
Email: MStill@express.com


***VIA EMAIL***

        Re:      **Twenty-fifth Amendment to Letter Agreement**

Dear Mark:

Reference is made to that certain letter agreement dated November 6, 2019 (as supplemented or amended, the "Agreement") by and between Express, LLC (the "Merchant" or a "Party"), on the one hand, and Hilco Merchant Resources, LLC ("Agent" or a "Party" and together with Merchant, the "Parties"), on the other hand.[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

The Parties hereby amend the Agreement as follows (the "Amendment"):

As set forth in the Agreement, Agent was engaged to act as the exclusive agent for the purpose of providing certain services in connection with the disposition of the Merchandise and FF&E located at certain of Merchant's retail locations.  Agent and Merchant have agreed to amend the Agreement to add the 9 additional stores reflected on Exhibit A to this Amendment (the "Additional Stores").

Merchant and Agent hereby further agree that, with respect to the Additional Stores, Agent will assist Merchant in disposing of the Merchandise and FF&E at the Additional Store through the conduct of "Store Closing", "Everything on Sale" or similar themed sales (such sale, the "Supplemental Sale") provided, however, "going out of business" or "everything must go" themed sales are not permitted.  The Supplemental Sale will commence on April 1, 2024 (the "Supplemental Sale Commencement Date") and will terminate no later than May 28, 2024 (the "Supplemental Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Supplemental Sale at any Additional Store prior to the Supplemental Sale Termination Date.  The period from the Supplemental Sale Commencement Date to the Supplemental Sale Termination Date shall be referred to as the "Supplemental Sale Term."

To control expenses of the Supplemental Sale, Merchant and Agent have established a budget not to exceed $148,414.00 (the "Supplemental Budget," a copy of which is attached hereto as Exhibit B, of certain delineated expenses, including costs of supervision, deferred compensation, advertising (including signage and the shipping, freight, and sales tax related thereto where applicable).  With

---

[1] For purposes of the Amendment, "Merchant" shall include UW, LLC, an affiliate of Express, LLC.

respect to the Supplemental Sale at the Additional Stores, the Agent shall be entitled to payment of the Base Fee and the Incentive Fee.

Both the Agreement and this Amendment shall govern the Supplemental Sale at the Additional Stores.  For purposes of interpreting the Agreement and the Amendment with respect to the Supplement Sale, the following defined terms and exhibits shall be replaced in the Agreement with the corresponding defined terms and exhibits in or attached to this Amendment:

| Agreement | Amendment |
| --- | --- |
| Budget | Supplemental Budget |
| Sale | Supplemental Sale |
| Store or Stores | Additional Store or Additional Stores |
| Sale Commencement Date | Supplemental Sale Commencement Date |
| Sale Termination Date | Supplemental Sale Termination Date |
| Sale Term | Supplemental Sale Term |

With respect to this Amendment, (i) Merchant hereby reaffirms the representations, warranties, and agreements set forth in section H of the Agreement, and (ii) Agent hereby reaffirms the representations, warranties, and agreements set forth in section H of the Agreement.

This Amendment, together the Agreement, all prior amendments or supplements, and all schedules and exhibits attached hereto and thereto, constitutes a single, integrated written contract expressing the entire agreement of the parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party to this Amendment except as specifically set forth in this Amendment or the Agreement.

If this Amendment is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned.  Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

*T. Kellan Grant*
_____
By:  T. Kellan Grant
Its:  EVP Commercial Counsel

**AGREED AND ACCEPTED as of the 3rd day
of April, 2024:**

EXPRESS, LLC

_____
By:   Mark Still
Its: SVP Planning and Allocation and Interim CFO

2

## Twenty-Fifth Amendment to Letter Agreement – Exhibit A

| Store List | | | | | | | |
|---|---|---|---|---|---|---|---|

| Store # | Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|
| 129 | QUAIL SPRINGS | 2501 W. MEMORIAL RD | OKLAHOMA CITY | OK | 73134-8021 | 6,925 | 5,326 |
| 363 | PARAMUS PARK | 700 PARAMUS PARK | PARAMUS | NJ | 07652-3557 | 8,212 | 6,680 |
| 443 | OXFORD VALLEY MALL | 2300 E. LINCOLN HWY | LANGHORNE | PA | 19047-1824 | 11,997 | 9,598 |
| 523 | COLLEGE MALL | 3060 EAST 3RD ST | BLOOMINGTON | IN | 47401-5425 | 8,000 | 6,868 |
| 618 | NORTHWOODS MALL | 2150 NORTHWOODS BLVD. | NORTH CHARLESTON | SC | 29406-4021 | 7,517 | 5,561 |
| 876 | OGLETHORPE | 7804 ABERCORN ST | SAVANNAH | GA | 31406-3500 | 7,290 | 6,065 |
| 1471 | TIPPECANOE | 2415 SAGAMORE PKWY S. | LAFAYETTE | IN | 47905-5124 | 7,763 | 6,178 |
| 1861 | GENESEE VALLEY | 3383 S LINDEN RD | FLINT | MI | 48507-3007 | 6,854 | 5,483 |
| 1876 | WHITE OAKS MALL | 2501 WABASH AVE. | SPRINGFIELD | IL | 62704-4276 | 7,500 | 6,215 |
| **9** | | | | | | **8,006** | **6,442** |

DocuSign Envelope ID: 811359E0-72D3-4A81-895A-11F98092F601

## Twenty-Third Amendment to Letter Agreement – Exhibit B

### Supplemental Budget (1)

| | 1st Week | Subsequent Weeks |
|---|---|---|
| **Advertising** | | |
| Media | 2,406 | 2,406 |
| Signs (2) | 10,504 | - |
| Sign Walkers | - | - |
| Subtotal Advertising | 12,910 | 2,406 |
| | | |
| **Supervision** | | |
| Fees / Wages / Expenses (3) | 42,494 | 35,894 |
| Subtotal Supervision | 42,494 | 35,894 |
| | | |
| Miscellaneous /Legal (4) | | |
| | | |
| Total Expenses | 55,404 | 38,300 |

Notes:

1. This Expense Budget contemplates a sale term of April, 1, 2024 through May 27, 2024.  The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.

2. Includes Sales Tax.

3. Includes Deferred Compensation and Insurance.

4. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.



April 21, 2024

Express, LLC
Attn: Mark Still
SVP
Planning and Allocation and Interim CFO
1 Express Drive
Columbus, OH 43230
Email: MStill@express.com

**_VIA EMAIL_**

Re:    **Twenty-sixth Amendment to Letter Agreement**

Dear Mark:

Reference is made to that certain letter agreement dated November 6, 2019 (as supplemented or amended, the "Agreement") by and between Express, LLC (the "Merchant" or a "Party"), on the one hand, and Hilco Merchant Resources, LLC ("Agent" or a "Party" and together with Merchant, the "Parties"), on the other hand.[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

The Parties hereby amend the Agreement as follows (the "Amendment"):

As set forth in the Agreement, Agent was engaged to act as the exclusive agent for the purpose of providing certain services in connection with the disposition of the Merchandise and FF&E located at certain of Merchant's retail locations.  Agent and Merchant have agreed to amend the Agreement to add (i) the 95 additional stores reflected on Exhibit A to this Amendment and (ii) any other Stores designated for disposition by Merchant from the date of this Amendment (the "Additional Stores").

Merchant and Agent hereby further agree that, with respect to the Additional Stores, Agent will assist Merchant in disposing of the Merchandise and FF&E at the Additional Store through the conduct of "Everything Must Go," "Store Closing", "Everything on Sale" or similar themed sales (such sale, the "Supplemental Sale") provided, however, "going out of business" themed sales are not permitted.  The Supplemental Sale will commence on April 20, 2024 (the "Supplemental Sale Commencement Date") and will terminate no later than June 30, 2024 (the "Supplemental Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Supplemental Sale at any Additional Store prior to the Supplemental Sale Termination Date. The period from the Supplemental Sale Commencement Date to the Supplemental Sale Termination Date shall be referred to as the "Supplemental Sale Term."

To control expenses of the Supplemental Sale, Merchant and Agent have established a budget for the disposition of the Additional Stores set forth on Exhibit A, not to exceed $2,044,418 (the "Supplemental Budget"), a copy of which is attached hereto as Exhibit B, of certain delineated expenses, including costs of supervision, deferred compensation, advertising (including signage and

---

[1] For purposes of the Amendment, "Merchant" shall include UW, LLC, an affiliate of Express, LLC.

the shipping, freight, and sales tax related thereto where applicable). The Merchant shall pay by wire transfer to the Agent an advance payment of costs and expenses delineated in the Expense Budget of $300,000 (the "Supplemental Sale Expense Advance") which shall be held by Agent and applied towards Supplemental Budget items as incurred. Should Merchant designate Additional Stores beyond those initially set forth on Exhibit A, the Parties will agree to an appropriate update to the Supplemental Budget, Supplemental Sale Term and any Supplemental Sale Expense Advance.

With respect to the Supplemental Sale at the Additional Stores, the Base Fee shall be 2.00%. Agent shall be entitled to payment of the Base Fee and the Incentive Fee, as applicable.

Both the Agreement and this Amendment shall govern the Supplemental Sale at the Additional Stores. For purposes of interpreting the Agreement and the Amendment with respect to the Supplement Sale, the following defined terms and exhibits shall be replaced in the Agreement with the corresponding defined terms and exhibits in or attached to this Amendment:

| Agreement | Amendment |
|---|---|
| Budget | Supplemental Budget |
| Sale | Supplemental Sale |
| Store or Stores | Additional Store or Additional Stores |
| Sale Commencement Date | Supplemental Sale Commencement Date |
| Sale Termination Date | Supplemental Sale Termination Date |
| Sale Term | Supplemental Sale Term |

Moreover, paragraph N of the Agreement is hereby replaced and reinstated as follows:

"Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns. Notwithstanding the foregoing, Agent shall have the right to syndicate the transaction contemplated by this Agreement by providing Merchant with written notice of such syndication. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns."

Additionally, new paragraph S is added to the Agreement as follows:

**S.    Bankruptcy**

"If the Merchant commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), with a bankruptcy court (the "Bankruptcy Court"), the Merchant shall promptly file a motion to assume sections of this Agreement under section 365 and/or 363 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by an order that provides, among other things,

as follows (the "<u>Approval Order</u>"): (i) the payment of all fees and reimbursement of expenses under this Agreement is approved without further order of the court; (ii) all such payments of fees and reimbursement of expenses related to such Approval Order shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) the payment of all fees and reimbursement of expenses to Agent related to such Approval Orders shall be included in any approved debtor in possession, cash collateral, or other post-petition financing budget as a condition to the Assumption of the Agreement; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; (vi) approving the sale of Additional Agent Goods in accordance with the terms and conditions hereof; and (vii) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement. In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Merchant, and each Party waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the Approval Order, Agent shall conduct the Sale in accordance with the terms of the Approval Order in all material respects."

Additionally, new paragraph T is added to the Agreement as follows:

**T.**    **Additional Agent Goods**

"Agent shall have the right, at Agent's sole cost and expense, to supplement the Merchandise in the Sale at the Stores with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale at the Stores ("<u>Additional Agent Goods</u>"); provided, that Merchant may reasonably object to the inclusion of Additional Agent Goods that are not of like kind and are of lesser quality to the Merchandise in the Sale at the Stores, in which case the Parties shall work in good faith to resolve such objection, which resolution may require the exclusion of such Additional Agent Goods subject to the objection; provided, further, that the cost of Additional Agent Goods shall not exceed fifteen percent (15%) of the aggregate Cost Value of Merchandise in the Sale.  The Additional Agent Goods shall be purchased by Agent as part of the Sale, and delivered to the Stores at Agent's sole expense (including as to labor, freight and insurance relative to shipping such Additional Agent Goods to the Stores).  Sales of Additional Agent Goods shall be run through Merchant's cash register systems; provided however, that Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods have been included in the Sale.

3

With respect to the Additional Stores set forth on Exhibit A, Agent shall pay to Merchant an amount equal to seven and one half percent (7.5%) (the "<u>Additional Agent Goods Fee</u>")of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "<u>Additional Agent Goods Proceeds</u>").  Agent shall retain all remaining amounts from the sale of the Additional Agent Goods.  Agent shall pay Merchant its Additional Agent Goods Fee in connection with each weekly sale reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time). Should Merchant elect to add additional Stores to the scope of this Agreement as Additional Stores, the Merchant reserves the right to negotiate revised terms for the Additional Agent Goods Fee for such additional Stores.

Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

Merchant shall, at Agent's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code.  Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, and which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds)."

With respect to this Amendment, (i) Merchant hereby reaffirms the representations, warranties, and agreements set forth in section H of the Agreement, and (ii) Agent hereby reaffirms the representations, warranties, and agreements set forth in section H of the Agreement.

This Amendment, together the Agreement, all prior amendments or supplements, and all schedules and exhibits attached hereto and thereto, constitutes a single, integrated written contract expressing the entire agreement of the parties concerning the subject matter hereof.  No covenants, agreements, representations or warranties of any kind whatsoever have been made by any party to this Amendment except as specifically set forth in this Amendment or the Agreement.

4

Very truly yours,

HILCO MERCHANT RESOURCES, LLC


*/s/ T. Kellan Grant*_____
By:  T. Kellan Grant
Its:  EVP Commercial Counsel


**AGREED AND ACCEPTED as of the 21st day
of April, 2024:**

EXPRESS, LLC

_____
By:  Mark Still
Its: SVP Planning and Allocation and Interim CFO

**Twenty-Sixth Amendment to Letter Agreement – Exhibit A**

**Stores**

| Loc # | Concept/Banner | Name | Address | City | State | Zip |
|-------|----------------|------|---------|------|-------|-----|
| 42 | Retail | Stonewood | 234 Stonewood Street | Downey | CA | 90241-3907 |
| 55 | Retail | Galleria At Sunset | 1300 Sunset Rd | Henderson | NV | 89014-6620 |
| 85 | Retail | Citrus Park Twn Ctr | 8021 Citrus Park | Tampa | FL | 33625-3179 |
| 107 | Retail | Moreno Valley | 22500 Town  Circle | Moreno Valley | CA | 92553-7509 |
| 112 | Retail | Garden State | 110 Garden State Plaza | Paramus | NJ | 07652-2417 |
| 121 | Retail | Kings Plaza | 5036 Kings Plaza | Brooklyn | NY | 11234-5208 |
| 123 | Retail | Hanes Mall | 3320 Silas Creek Pkwy | Winston Salem | NC | 27103-3031 |
| 126 | Retail | Denver Pavilions | 500 16Th St | Denver | CO | 80202-4259 |
| 154 | Retail | Woodbridge | 250 Woodbridge Ctr Dr. | Woodbridge | NJ | 07095-1321 |
| 159 | Retail | Danbury Fair | 7 Backus Ave | Danbury | CT | 06810-7422 |
| 184 | Retail | Dulles Town Center | 21100 Dulles Town Ctr | Sterling | VA | 20166-2437 |
| 185 | Retail | La Palmera | 5488 S. Padre Island Dr. | Corpus Christi | TX | 78411-4147 |
| 217 | Retail | North Dartmouth | 104B N Dartmouth Mall | North Dartmouth | MA | 02747-4204 |
| 253 | Retail | Cool Springs | 1800 Galleria Blvd. | Franklin | TN | 37064-1605 |
| 267 | Retail | Valencia Town Centr | 24201 Valencia Blvd. | Valencia | CA | 91355-1861 |
| 285 | Retail | Flatiron Crossing | One West Flatiron Drive | Broomfield | CO | 80021-8881 |
| 300 | Retail | Warwick | 400 Bald Hill Road | Warwick | RI | 02886-1617 |
| 311 | Retail | Southlake Mall | 2121 Southlake Mall | Merrillville | IN | 46410-6438 |
| 324 | Retail | Lakeside | 14600 Lakeside Circle | Sterling Heights | MI | 48313-1356 |
| 332 | Retail | University Town Ctr | 4485 La Jolla Village Dr | San Diego | CA | 92122-6237 |
| 352 | Retail | Countryside Mall | 27001 U.S. Highway 19 N | Clearwater | FL | 33761-3402 |
| 353 | Retail | Freehold Raceway | 3710 Route 9 | Freehold | NJ | 07728-4801 |
| 483 | Retail | Deptford Mall | 1750 Deptford Center Rd | Deptford Township | NJ | 08096-5222 |
| 489 | Retail | Sherman Oaks Fash | 14006 Riverside Dr | Sherman Oaks | CA | 91423-1945 |
| 498 | Retail | Lincolnwood Twn Ctr | 3333 West Touhy Ave. | Lincolnwood | IL | 60712-2721 |
| 500 | Retail | Bayside | 401 Biscayne Blvd. | Miami | FL | 33132-1924 |
| 502 | Retail | Bay Street | 5680 Bay Street | Emeryville | CA | 94608-2408 |
| 509 | Retail | Westfield Gateway | 414 Gateway Mall | Lincoln | NE | 68505-2466 |
| 510 | Retail | East Towne Mall | 89 East Towne Mall | Madison | WI | 53704-3711 |
| 522 | Retail | Mall At Hamilton Cr | 4403 Black Horse Pike | Mays Landing | NJ | 08330-3103 |
| 529 | Retail | Southshore | 1701 Sunrise Highway | Bayshore | NY | 11706-6091 |
| 531 | Retail | Mainplace Mall | 2800 N Main St | Santa Ana | CA | 92705-6607 |
| 546 | Retail | Crossroads Center | 4101 W Division St | Saint Cloud | MN | 56301-6600 |
| 559 | Retail | Atlantic Station | 230 18Th Street | Atlanta | GA | 30363-1073 |

**Exhibit A—Stores (Cont.)**

| Loc # | Concept/Banner | Name | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 568 | Retail | Los Cerritos | 224 Los Cerritos Center | Cerritos | CA | 90703-5423 |
| 580 | Retail | St. Clair Square | 134 St. Clair Square | Fairview Heights | IL | 62208-2135 |
| 601 | Retail | Mission Valley | 1640 Camino Del Rio N | San Diego | CA | 92108-1506 |
| 602 | Retail | Zona Rosa | 7120 Nw 86 Terrace | Kansas City | MO | 64153-1896 |
| 603 | Retail | Franklin Park | 5001 Monroe | Toledo | OH | 43623-3627 |
| 605 | Retail | Valley View Mall | 4802 Valley View Blvd | Roanoke | VA | 24012-2001 |
| 623 | Retail | Northlake | 6801 Northlake Mall Dr | Charlotte | NC | 28216-0711 |
| 637 | Retail | Montclair Plaza | 2149 Montclair Plaza | Montclair | CA | 91763-1536 |
| 648 | Retail | North County Fair | 200 E Via Rancho Pkwy | Escondido | CA | 92025-8006 |
| 660 | Retail | Shops At Centerra | 5971 Sky Pond Drive | Loveland | CO | 80537-9011 |
| 664 | Retail | Wheaton | 11160 Veirs Mill Rd. | Wheaton | MD | 20902-2538 |
| 688 | Retail | Valley Fair Mall | 2855 Stevens Creek Blvd | Santa Clara | CA | 95050-6709 |
| 735 | Retail | Green Acres Mall | 2034 Green Acres Mall | Valley Stream | NY | 11581-1535 |
| 762 | Retail | Plaza Bonita | 3030 Plaza Bonita Rd. | National City | CA | 91950-8009 |
| 798 | Retail | Cross County | 5130 Xavier Dr. | Yonkers | NY | 10704-1300 |
| 860 | Retail | Aventura Mall | 19501 Biscayne Blvd. | Aventura | FL | 33180-2342 |
| 880 | Retail | Bay Terrace | 26Th Avenue & Bell Blvd | Bayside | NY | 11360-2492 |
| 900 | Retail | Town Center At Cobb | 400 Ernest W. Barrett Pkwy. | Kennesaw | GA | 30144-4917 |
| 903 | Retail | Fresno Fashion Fair | 645 Shaw Ave. | Fresno | CA | 93710-7709 |
| 922 | Retail | Chandler Fashion | 3111 West Chandler Blvd | Chandler | AZ | 85226-5071 |
| 925 | Retail | The Oaks | 202 W Hilcrest Dr | Thousand Oaks | CA | 91360-4210 |
| 934 | Retail | Lakewood | 500 Lakewood Blvd | Lakewood | CA | 90712-2407 |
| 942 | Retail | The Sands | 3513 Long Beach Road | Oceanside | NY | 11572-5701 |
| 967 | Retail | Dallas Galleria | 13350 Dallas Pkwy | Dallas | TX | 75240-6670 |
| 985 | Retail | North Point | 1174 N Point Pkwy | Alpharetta | GA | 30004 |
| 1771 | EFO | Williamsburg | 150 Tanger Dr. | Williamsburg | IA | 52361-9653 |
| 1774 | EFO | Outlets At The Dells | 210 N. Gasser Rd. | Baraboo | WI | 53913-9535 |
| 1775 | EFO | Louisiana Boardwalk | 355 Boardwalk Blvd | Bossier City | LA | 71111-4379 |
| 1788 | EFO | Commerce Outlets | 800 Steven B Tanger Blvd | Commerce | GA | 30529-3552 |
| 1828 | EFO | Settlers Green | 2 Common Ct | North Conway | NH | 03860-5439 |
| 1841 | EFO | Fashion District Phil | 901 Market Street | Philadelphia | PA | 19107-2934 |
| 1854 | EFO | Fulton Street | 490 Fulton St. | Brooklyn | NY | 11201-5323 |
| 1857 | EFO | Sangertown Square | 1 Sangertown Square | New Hartford | NY | 13413-1500 |
| 1858 | EFO | Crossroads Mall | 6650 Westredge Ave | Portage | MI | 49024-3557 |

7

**Exhibit A—Stores (Cont.)**

| Loc # | Concept/Banner | Name | Address | City | State | Zip |
|-------|----------------|------|---------|------|-------|-----|
| 1866 | EFO | Rolling Oaks | 6906 N Loop 1604 E | San Antonio | TX | 78247-5317 |
| 1867 | EFO | Lindale | 4444 1St Avenue Ne | Cedar Rapids | IA | 52402-3223 |
| 1881 | EFO | Northpark | 320 W. Kimberly Rd. | Davenport | IA | 52806-5920 |
| 1896 | EFO | Post Oak | 1500 Harvey Rd | College Station | TX | 77840-3713 |
| 1898 | EFO | Northtown | 4750 Division St. | Spokane | WA | 99208-1411 |
| 1908 | EFO | Livingston Mall | 112 Eisenhower Pkwy | Livingston | NJ | 07039-4995 |
| 1912 | EFO | Eastland Mall | 800 N. Green River Rd. | Evansville | IN | 47715-2471 |
| 1915 | EFO | White Marsh | 8200 Perry Hall Boulevard | Baltimore | MD | 21236-4901 |
| 1929 | EFO | Buckland Hills | 194 Buckland Hills Drive #2500 | Manchester | CT | 06042-8705 |
| 1931 | EFO | Centre At Salisbury | 2300 North Salisbury Boulevard | Salisbury | MD | 21801-7830 |
| 1932 | EFO | Moorestown | 400 New Jersey 38 | Moorestown | NJ | 08057-1522 |
| 2001 | Retail | Hillside Village | 305 West Fm 1382 | Cedar Hill | TX | 75104-1885 |
| 2010 | Retail | Vancouver | 8700 N.E. Vancouver Mall Dr. | Vancouver | WA | 98662-6750 |
| 2045 | Retail | West Diversey Street | 655 West Diversey Parkway | Chicago | IL | 60614-1510 |
| 2061 | Retail | Times Square | 1552 North Broadway | New York | NY | 10036-1518 |
| 2064 | Retail | State Street | 17 N State Street | Chicago | IL | 60602-3201 |
| 2073 | Retail | Pearlridge | Moanalua Rd | Honolulu | HI | 96701-4707 |
| 2076 | Retail | Liberty Center | 7540 Bales St | Liberty Township | OH | 45069-7516 |
| 2903 | Retail | Main Street- Westport | 125 West Main Street | Westport | CT | 06880-3300 |
| 2906 | Retail | F Street | 555 11Th St Nw | Washington | DC | 20004-1300 |
| 2909 | Retail | Broadway - Soho | 514 Broadway | New York | NY | 10012-4427 |
| 2910 | Retail | Walnut Street | 1521 Walnut Street | Philadelphia | PA | 19102-3001 |
| 2911 | Retail | Newbury Street | 109 Newbury Street | Boston | MA | 02116-2902 |
| 2912 | Retail | Flatiron (Fifth Avenue) | 129 5Th Avenue | New York | NY | 10003-1003 |
| 2914 | Retail | Lincoln Road | 904 Lincoln Rd | Miami Beach | FL | 33139-2602 |
| 2916 | Retail | Greenwich Avenue | 181 Greenwich Ave | Greenwich | CT | 06830-6576 |
| 3003 | EFO | South Bay | 20-36 District Ave | Dorchester | MA | 02125-1680 |

95

## Twenty-Sixth Amendment to Letter Agreement – Exhibit B

### Supplemental Budget (1)

**Advertising**

| | |
|---|---:|
| Digital & Media | 765,900 |
| Signs (2) | 148,285 |
| Sign Walkers | - |
| Subtotal Advertising | 914,185 |

**Supervision**

| | |
|---|---:|
| Fees / Wages / Expenses (3) | 1,080,233 |
| Subtotal Supervision | 1,080,233 |

**Miscellaneous**

| | |
|---|---:|
| Miscellaneous /Legal (4) | 50,000 |
| Subtotal Miscellaneous | 50,000 |
| Total Expenses | 2,044,418 |

Notes:

1. This Expense Budget contemplates a sale term of April, 21, 2024 through June 30, 2024. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.

2. Includes Sales Tax.
3. Includes Deferred Compensation and Insurance.
4. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.

## Exhibit 2

**Sale Guidelines**

## Sale Guidelines[1]

1.   The Sales shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2.   The Sales shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Store on a Sunday prior to the commencement of the Sales.

3.   On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Consultant may solicit customers in the Closing Stores themselves.  On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.   The Debtors and the Consultant shall have the right to use and sell the Store Closure Assets and the Additional Agent Goods.  The Debtors and the Consultant may advertise the sale of the Store Closure Assets and the Additional Agent Goods in a manner consistent with these Sale Guidelines.  The purchasers of any of the Store Closure Assets and the Additional Agent Goods sold during the Sales shall be permitted to remove the Store Closure Assets and the Additional Agent Goods either through the back or alternative shipping areas at any time, or through other areas after store business hours; provided, however, that the foregoing shall not apply to the sale of de minimis Store Closure Assets and Additional Agent Goods, whereby the item(s) can be carried out of the store in a shopping bag.

5.   At the conclusion of the Sale, the Consultant shall vacate the Closing Stores; *provided* that Consultant may abandon any furniture, fixtures, and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) ("FF&E") not sold in the Sales at the conclusion of the Sales (the "Termination Date"), without cost or liability of any kind to the Consultant.  The Consultant shall notify the Merchant of its intention to abandon any FF&E at least two (2) days prior to the Termination Date.  The Merchant will have the option to remove the FF&E, at its own cost prior to the Termination Date.  For the avoidance of doubt, as of the Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any FF&E.

---

[1]   Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Debtors' *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief.*

6.    The Consultant may advertise the Sales as "store closing", "sale on everything", "everything must go", "everything on sale", or similar-themed sales.  The Consultant may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.  All signs, banners, ads and other advertising material, promotions, and campaigns will be approved by the Merchant, prior to purchase, in accordance with the Consulting Agreement.

7.    The Consultant shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Merchant and Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Merchant and Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Consultant any additional restrictions not contained in the applicable lease agreement.

8.    Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

9.    Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

10.    The Consultant shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease.  No property of the landlord of a Closing Store shall be removed or sold during the Sales.  The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

11.    The Consultant shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

12.    The Consultant, at the direction of the Debtors, and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

13.    Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all FF&E owned by the Merchant (the "Owned FF&E"), approved by the Merchant.  The Consultant may advertise the sale of the Owned FF&E in a manner

consistent with these guidelines and the Consulting Agreement. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* FF&E sales made whereby the item can be carried out of the Closing Store in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility, any FF&E.

14.     At the conclusion of the Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Merchant, Consultant and their agents and representatives shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

15.     The rights of landlords against Merchant for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease; *provided* that to the extent certain leases of Closing Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

16.     If and to the extent that the landlord of any Closing Store affected hereby contends that the Merchant or Consultant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant and Consultant as follows:

        <u>If to Consultant:</u>

        Hilco Merchant Resources, LLC
        One Northbrook Place
        5 Revere Drive, Suite 206
        Northbrook, IL 60062
        Facsimile: 847-849-0859
        Attention: T. Kellan Grant, Esq.

        with copies (which shall not constitute notice) to:

        Chipman, Brown, Cicero & Cole, LLP
        1313 North Market Street
        Suite 5400
        Wilmington, Delaware 19801
        Attention: Mark L. Desgrosseilliers
        Email: desgross@chipmanbrown.com

        <u>If to Merchant</u>:

        Express, Inc.

One Express Drive
Columbus, OH 43230
Attention:  Laurel Krueger

with copies (which shall not constitute notice) to:

Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Attention: Domenic E. Pacitti, Michael W. Yurkewicz, and Alyssa M.
Radovanovich
Email:  dpacitti@klehr.com
        myurkewicz@klehr.com
        aradvanovich@klehr.com

- and -

Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Attention: Morton R. Branzburg
Email:  mbranzburg@klehr.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C., Emily E. Geier, P.C., and Nicholas M.
Adzima
Email:  joshua.sussberg@kirkland.com
        emily.geier@kirkland.com
        nicholas.adzima@kirkland.com

- and -

Kirkland & Ellis LLP
300 West Wolf Point Plaza
Chicago, Illinois 60654
Attention:  Charles B. Sterrett
Email:  charles.sterrett@kirkland.com

17.    If the parties are unable to resolve the dispute, either the landlord or the Debtors
       shall have the right to schedule a hearing before the Court on no less than three
       (3) business days' written notice to the other party, served by email or overnight
       delivery.

31