## Exhibit A

**Engagement Letter**



August 18, 2023

Express, Inc.
1 Express Drive
Columbus, Ohio 43230
Attention:    Jason Judd, Senior Vice President,
              Chief Financial Officer and Treasurer

<u>Engagement Letter</u>

Ladies and Gentlemen:

This letter agreement (this "***Agreement***") sets forth the terms and conditions of the engagement (the "***Engagement***") of M3 Advisory Partners, LP ("***M3***") to provide the Services (as defined below) to Express, Inc. (the "***Client***").  M3 and the Client are collectively referred to in this Agreement as the "***Parties***."

    1.  <u>Services</u>:  The Client hereby retains M3 to provide, and M3 hereby agrees to provide, the following services (the "***Services***") upon the terms and subject to the conditions set forth in this Agreement:

        (a)  support the Client's management team in evaluating the business operations and financial prospects of the Client and preparing cash flow forecasts;

        (b)  advise and assist the Client and its counsel with their on-going assessment of the Client's financial performance and its ability to repay its outstanding obligations; and

        (c)  provide such services as outlined in the **August 2023 M3 Scope & Fee Estimate** attached hereto and incorporated herein by reference, and such other services as M3 and the Client shall otherwise agree in writing.

    2.  <u>Engagement Term</u>.  The Engagement shall commence on the date of acceptance of this Agreement and may be terminated by either Party at any time upon ten business days' written notice.  Notwithstanding the foregoing, the minimum term of this Engagement shall be two months (with an expected term of five months), except that the Engagement may be terminated by (a) M3, in the event that a material conflict of interest shall be discovered or (b) M3 or the Client, as applicable, upon breach of this Agreement by the other Party.  Following any such termination, neither Party shall have further liability to the other, except with respect to fees and expenses earned and incurred through the date of termination and any provisions of this Agreement which are expressly stated to survive its termination or expiration.

    3.  <u>Staffing</u>.  M3 will staff a team that it believes to be appropriate to provide the Services in accordance with the terms of this Agreement.  The individual members of the team are subject

to change by M3 from time to time in its reasonable discretion. M3 also may provide Services through independent contractors and, unless the context shall otherwise indicate, references in this Agreement to M3 and its employees or staff shall be deemed to include any such independent contractors and their respective employees, so long as such persons remain subject to the terms of this Agreement, including the confidentiality provisions herein.

4.   Compensation for Services. (a)  M3's compensation for services rendered under this Agreement shall be paid by the Client by wire transfer of immediately available funds in accordance with instructions provided from time to time by M3 to the Client and will consist of the following:

(i)      Retainer:  Promptly following the date hereof, the Client will deliver to M3 a retainer of $150,000.$^{00}$ (the "***Retainer***") as collateral security for amounts from time to time owing under this Agreement or otherwise on account of the Engagement and hereby grants to M3 a security interest in the Retainer balance from time to time held by M3. The Retainer is not intended to be an estimate of the fees and expenses for the Engagement. Except to the extent applied in accordance with the provisions of Section 3(b) below, M3 will hold the Retainer until the conclusion of the Engagement, at which time the final billing shall be applied against it, with any excess being returned promptly to the Client and any deficiency being promptly paid by the Client.

(ii)      Service Fees:  As compensation for providing the Services hereunder, M3 shall be entitled to non-refundable professional fees based on the actual hours incurred by M3 personnel on matters pertinent to the Engagement (the "***Service Fees***"). The Service Fees shall be based upon the following hourly rates:

| Professional | Hourly Rate |
|---|---|
| Managing Partner | $1,350 |
| Senior Managing Director | $1,245 |
| Managing Director | $1,025 - $1,150 |
| Director | $840 - $945 |
| Vice President | $750 |
| Senior Associate | $650 |
| Associate | $550 |
| Analyst | $450 |

The Service Fees shall be billed by M3 to the Client twice per month by M3 furnishing to the Client an invoice for the Service Fees in respect of the billing period and shall be paid in accordance with the provisions of Section 4(b) below. M3 may adjust its billing rates in the ordinary course of business on or about January 1 of each year upon notice to the Client. Notwithstanding anything to the contrary contained herein, the Service Fee for the first two months of the Engagement shall not exceed $250,000 per month and the Service Fee shall for the subsequent three months shall not exceed $125,000 per month (with any amount



that is not used during any month being carried over to increase the amount available in subsequent months).

       (iii)   <u>Expenses</u>:  In addition to any compensation for providing the Services, the Client shall reimburse M3 for all reasonable and documented out-of-pocket expenses incurred in the performance of the Services (including, without limitation, reasonable travel costs).  Any request for reimbursement of an out-of-pocket expense in excess of $100 shall be accompanied by reasonable back-up for each expense and as otherwise required by applicable law.

(b)  All amounts owing hereunder shall be paid by offset against the Retainer, with the Client being obligated to replenish the Retainer to the amount described in clause (a)(i) above or to such other amount as may be agreed upon in writing by M3 and the Client from time to time by wire transfer of immediately available funds within ten days following the invoice date.  In the event that the amount of any invoice exceeds the Retainer balance at such time, then (in addition to replenishing the Retainer) the Client shall pay such excess by wire transfer of immediately available funds within ten days following the invoice date.  Any amounts payable hereunder which are not paid within ten business days of the invoice date shall be deemed "past due".  M3 reserves the right to suspend further Services until payment is received on past due invoices and/or the Retainer is restored and to exercise all rights and remedies available under applicable law (with the Client being obligated to pay M3's reasonable attorney fees and other costs of collection and enforcement).  In the event that M3 so suspends the Services, M3 shall not be responsible or liable for any resulting loss, damage or expense due to such suspension.

       (c)  Unless expressly stated otherwise in the relevant invoice, none of the amounts invoiced by M3 from time to time with respect to the Engagement shall be contingent upon, or in any way tied to the delivery of, any reports or other work product in the future, nor upon the outcome of any case or matters.  All fees payable to M3 are exclusive of taxes or similar charges, which shall be the sole obligation of the Client (other than any taxes which may be payable on account of M3's income generally, which shall be the obligation of M3).

       5.  <u>Cooperation from Client</u>.  In order to properly perform the Services and fulfill its responsibilities on a timely basis, M3 will rely on the timely cooperation of the Client and its other professional advisors, including, without limitation, making available to M3 relevant data, information and personnel, performing any tasks or responsibilities assigned to the Client and notifying M3 of any issues or concerns that the Client may have relating to the Services.  The Client will make commercially reasonable efforts to provide M3 with full access to all personnel, books and records of the Client and its subsidiaries, as well as to all advisors and professionals retained by the Client and its Subsidiaries, to the extent reasonably practicable.  Upon reasonable notice, the Client also will provide M3 with access to workspaces and data connectivity at the Client's offices on an as-needed basis.  The Client understands and acknowledges that M3's proper delivery of the Services is dependent upon timely decisions and approvals by the Client and its management. M3 shall have no responsibility or liability for any delays, additional costs or other deficiencies caused by the Client failing to properly fulfill its responsibilities under this Agreement.



6.   <u>Deliverables</u>.  (a) In connection with the Engagement, M3 may furnish the Client with information, advice, reports, analyses, presentations or other materials (the "***Deliverables***").  The Deliverables may contain factual data, the interpretation of which may change over the project term as more information or better understanding becomes available.  The Client acknowledges that M3 will have no obligation to update the Deliverables as part of the Services in the event of such a change.

(b)  Any materials prepared by M3 are solely for the confidential use of the Client and its directors, officers and employees and will not be distributed, reproduced, summarized, referred to, disclosed publicly or given to any other person without the prior written consent of M3, which shall not be unreasonably withheld, conditioned or delayed, *provided* that such permission shall not be required if the materials are required to be disclosed by applicable law or by order or act of any court or governmental or regulatory authority or body.  For the sake of clarity, M3 shall not provide any materials produced or created during the course of this agreement to any third parties without the prior written consent of Client.

(c)  The provisions of this Section shall survive the termination or expiration of this Agreement.

7.   <u>Limitations on Services</u>.  (a)  The Services are limited to those specifically noted in this Agreement.

(b)  M3 does not provide accounting or tax-related assistance and no Deliverable or other information or advice provided to the Client shall be deemed to be accounting or tax-related assistance.  The Client shall be solely responsible for determining the accounting and tax-related implications of the Deliverables and other information and advice provided to it by M3.  M3 shall not express any professional opinions on financial statements or perform attest procedures with respect to other information in conjunction with the Engagement.  The Services are not designed, nor should they be relied upon, to disclose weaknesses in internal controls, financial statement errors, irregularities or illegal acts.  M3 shall assume the accuracy and completeness of all information submitted by or on behalf of the Client to M3 for analysis and which will form the basis of M3's conclusions, without any obligation of M3 to verify the accuracy or completeness of such information, and M3 shall not be responsible for any analysis, advice or other Services to the extent based on inaccurate or incomplete information provided or accepted by or on behalf of the Client.

(c) The Services shall not include preparing, auditing or otherwise attesting in any way (including without limitation, with respect to the accuracy, achievability, reliability, relevance, usefulness or other appropriateness) to the Client's financial projections, and the Client has not engaged M3 for that purpose.  The Services are provided based upon the understanding that the Client has sole responsibility for its financial projections (including preparation thereof), developing underlying assumptions and providing any disclosure related thereto.  To the extent that, during the performance of Services hereunder, M3 is required to consider the Client's



financial projections, the Client understands that M3's procedures with respect to such projections do not constitute an examination in accordance with procedures established by the American Institute of Certified Public Accountants and do not and are not intended to provide any assurance on any aspect of such projections, including, without limitation, the reasonableness of the assumptions underlying such projections, nor do they provide assurance that M3 might not become aware of significant matters affecting the reasonableness of the projections that might be disclosed by more extensive procedures. There will usually be differences between projected and actual results, and those differences may be material. The Client understands and agrees that M3 will have no responsibility or liability relating to any such differences.

(b) M3 does not provide investment advice and the Services shall not include the provision of investment advice. The Client shall have sole responsibility for all investment decisions made by it. Similarly, M3 is providing advisory and consulting services only and will not make management decisions for the Client. Although M3 may from time to time suggest or recommend options that may be available to the Client, the ultimate decision with respect to such options rests with the Client and the Client shall be solely responsible for such decision and its outcome. M3 makes no representation, promise or guarantee with respect to the outcome of any matter affecting the Client.

(d) To the extent that the performance of the Services requires that M3 form conclusions or reach opinions, M3 shall do so without regard to or consideration of the impact that such conclusions or opinions may have on the initiation or outcome of any litigation to which the Client is or may become a party.

(e) The Client shall be solely responsible for the work and fees of any third parties engaged by the Client to provide services in connection with the Engagement, regardless of whether such third party was recommended to the Client by M3 or M3 is involved with the services provided by it. M3 shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters.

(f) The provisions of this Section shall survive the termination or expiration of this Agreement.

8. <u>Non-Solicitation</u>. The Client covenants and agrees that, prior to the first anniversary of the termination or expiration of this Agreement, it will not, directly or indirectly, hire directly or as an independent contractor, or refer to another for employment, any person who was during the term of this Agreement an employee or contractor of M3 or any of its affiliated entities who was involved on behalf of M3 with the Engagement or the performance of the Services. In the event of the breach of the foregoing covenant, the Client shall be liable to M3, and shall pay on demand to M3, liquidated damages equal to 200% of the total annual compensation of each relevant employee for the preceding calendar year (and, in the event that any such employee was not employed for the full year, the amount equal to 200% of his or her annualized compensation). The Parties mutually agree that the actual damages that would be sustained by M3 as the result of any such breach will be substantial and will be impossible to measure accurately, and that the



foregoing liquidated damage amount is fair and reasonable.  The provisions of this Section shall survive the termination or expiration of this Agreement.

9.  <u>Confidentiality</u>.  (a)  Each Party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other Party in the scope of the Engagement (the "***Confidential Information***"), and neither Party will disclose any Confidential Information of the other Party to any other person or entity.  For the avoidance of doubt, the term "Confidential Information" shall include (i) the terms of this Agreement, (ii) all non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, and models and (iii) any work product relating to the business of either Party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants. Notwithstanding the foregoing, the term "Confidential Information" shall not include information that (a) is or becomes publicly available other than as a result of disclosure by the receiving Party in violation of this Agreement, (b) was already known to the receiving Party or (c) was independently acquired or developed by the receiving Party from a source not known by it to be bound by a confidentiality requirement with respect to such information.  In performing the Services, M3 will use and rely primarily on the Confidential Information and on information available from public sources without having independently verified any of such information.

(b)  The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, M3 from making such disclosures of Confidential Information that M3 reasonably believes are required by law or any regulatory requirement or authority, or to clear client conflicts.  M3 also may disclose Confidential Information to its partners, directors, officers, employees, independent contractors, agents and advisors who have a need to know the Confidential Information for the proper performance of the Services or otherwise in connection with the Engagement.  M3 may make reasonable disclosures of Confidential Information to third parties to the extent that M3 reasonably believes that such disclosure is consistent with its performance of the Services.  In addition, M3 will have the right to disclose to any person that it provided services to the Client or its affiliates and a general description of such services, but such disclosure shall not provide any other Confidential Information about M3's involvement with the Client.

(c)  The provisions of this Section shall survive for a period of two years following the termination or expiration of this Agreement and shall supersede any separate confidentiality or analogous agreement between M3 and the Client.

10.  <u>Intellectual Property</u>.  Upon payment in full of all amounts owing to M3 hereunder, the Client will own all Deliverables furnished by M3 to the Client in connection with the Services, *provided* that M3 will retain ownership of (a) all concepts, analyses, know-how, tools, frameworks, models and industry perspectives used and/or developed by M3 in connection with the Services and (b) all other intellectual property not containing Confidential Information which has been developed by M3 outside of the provision of the Services (the "***M3 Tools***"), it being understood that M3 will have no ownership right to, and will maintain in accordance with the provisions of this Agreement the confidentiality of, any Confidential Information contained in the M3 Tools.



To the extent that the Deliverables include any M3 Tools, M3 hereby grants the Client a non-exclusive, non-transferable, non-sublicensable worldwide, royalty-free license to use and copy the M3 Tools solely as part of the Deliverables and subject to the confidentiality provisions contained in this Agreement. The Client acknowledges and agrees that the M3 Tools are provided to the Client on an "as is" basis and without any warranty or condition of any kind (whether express, implied or otherwise), and including without limitation any implied warranty of merchantability or fitness for a particular purpose. The provisions of this Section shall survive the termination or expiration of this Agreement.

11. <u>Indemnification</u>. The Client hereby irrevocably agrees to indemnify and hold harmless the Indemnitees (as defined in Annex I to this Agreement) to the extent described in Annex I to this Agreement, with such Annex I being incorporated herein by reference and constituting an integral and enforceable part of this Agreement. The provisions of this Section (including, without limitation, the provisions of Annex I) shall survive the termination or expiration of this Agreement.

12. <u>Limitation on Damages</u>. In no event shall M3 or any other Indemnitee be liable to the Client or its affiliates, successors, or any person claiming on behalf of or in the right of the Client (including the Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors) for (i) any amount which, when taken together with all losses for which M3 and all Indemnitees are liable in connection with this Agreement or the Engagement, would exceed the amount of fees for the Services actually received by M3 from the Client in connection with the Engagement during the immediately preceding 12 months or (ii) any special, consequential, incidental or exemplary damages or loss (or any lost profits, savings or business opportunity) (collectively, the "***Liability Cap***"). This paragraph shall apply regardless of the nature of any claim(s) (including claims based on contract, statute, negligence, tort, strict liability or otherwise), regardless of any failure of the essential purpose of any remedy and whether or not M3 was advised of the possibility of the damage or loss asserted, but shall not apply to the extent finally determined by final and non-appealable judgment of a court of competent jurisdiction to be prohibited by applicable law. For the avoidance of doubt, the Parties hereby irrevocably agree that the Liability Cap is intended to be the total limit of liability for M3 and all other Indemnitees in the aggregate for any and all claims or demands by anyone in connection with this Agreement, the Services and the Engagement, including without limitation any liability to the Client and to any others making claims relating to the Services and the Engagement. Any such claimants shall allocate among themselves any amounts payable by M3, but the failure of the claimants to reach such an agreement shall not affect the enforceability of the Liability Cap. Under no circumstances shall the collective liability of M3 and the other Indemnitees in connection with this Agreement exceed the Liability Cap. The provisions of this Section shall survive the termination or expiration of this Agreement.

13. <u>Client Acknowledgement</u>. The Client hereby acknowledges and agrees that M3 may, in the ordinary course of its business, serve clients who are competitive with, or have conflicting interests with, the Client. Consistent with its confidentiality obligations hereunder and its confidentiality obligations to its other clients, M3 will not advise or consult to the Client with respect to any aspect of M3's engagement or potential engagement with any other client, potential client or former client. Similarly, M3 will not advise or consult to any other client, potential client or former client with respect to any aspect of the Engagement. M3 will maintain the confidentiality



of the Confidential Information in accordance with the terms of this Agreement and, similarly, will not share confidential information of any client, potential client or former client of M3 with the Client. The provisions of this Section shall survive the termination or expiration of this Agreement.

14. <u>Miscellaneous</u>. (a) This Agreement (i) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements (both written and oral) among the parties with respect to the subject matter hereof, and (ii) may be modified, amended or supplemented only by prior written agreement of each of the Parties.

(b) The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction. If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; *provided* that, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(c) M3's services hereunder are personal in nature and may not be assigned without the written consent of the Client. The obligations of M3 hereunder are owing only to the Client and there shall be no third-party beneficiaries of the obligations of M3 hereunder.

(d) This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.

(e) This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts to be executed and performed within such state. The Parties hereby submit to the exclusive jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

*[Remainder of Page Intentionally Left Blank]*



This Agreement shall be binding upon the Parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M3 ADVISORY PARTNERS, LP

By _____
    Name:  Mohsin Y. Meghji
    Title:  Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

EXPRESS, INC.

By: _____
    Name: Jason Judd
    Title:  Chief Financial Officer



Annex I

AGREEMENTS REGARDING INDEMNIFICATION

In consideration of M3 performing the Services for the benefit of the Client, the Client (the "***Indemnitor***") shall indemnify M3 and its affiliates, equity holders, partners, directors, employees, agents, representatives and contractors, including past, present or future partners, principals and personnel of each (collectively hereinafter called the "***Indemnitees***") against all costs, fees, expenses, damages, and liabilities (including defense costs) associated with any pending or threatened claim, action, proceeding or investigation (a "***Claim***") relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement ("***Losses***").  This provision is intended to apply regardless of the nature of any Claim (including contract, statute, any form of negligence, whether of the Client, M3, or others, tort, strict liability or otherwise), except to the extent such Losses are determined by a final and non-appealable judgment of a court of competent jurisdiction to be the result of M3's bad faith, gross negligence or willful misconduct.

The Indemnitor shall not, without M3's prior written consent (which will not be unreasonably withheld) settle, compromise, or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification could reasonably be sought hereunder (whether or not M3 or any other Indemnitee is an actual or potential party to such Claim), if such settlement, compromise, or consent does not include an unconditional release of each Indemnitee from all liability arising out of such Claim; *provided*, *however*, that the Indemnitor shall not enter into any such settlement, compromise or consent of a Claim without M3's prior written consent (which may be granted or withheld in M3's sole discretion) if such settlement, compromise or consent provides for injunctive relief against an Indemnitee or an admission of liability by an Indemnitee or would require payment of any amount by an Indemnitee or any insurer of an Indemnitee.  The Indemnitor shall not be liable hereunder to any Indemnitee for any amount paid or payable in the settlement of any action, proceeding or investigation entered into by such Indemnitee without the Indemnitor's written consent.

Upon receipt by an Indemnitee of actual notice of a Claim against such Indemnitee in respect of which indemnity may be sought hereunder, such Indemnitee shall promptly notify the Indemnitor with respect thereto.  In addition, an Indemnitee shall promptly notify the Indemnitor after any action is commenced (by way of service with a summons or other legal process giving information as to the nature and basis of the claim) against such Indemnitee in respect of which indemnity may be sought hereunder.  In any event, failure to notify the Indemnitor shall not relieve the Indemnitor from any liability which the Indemnitor may have on account of this indemnity or otherwise, except to the extent, and only to the extent, that the Indemnitor shall have been materially prejudiced by such failure.

Indemnitor shall advance all expenses indemnifiable hereunder that are reasonably incurred by or on behalf of each Indemnitee in connection with any Claim within thirty (30) days after receipt by Indemnitor of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Claim.  Such statement or statements shall reasonably evidence the expenses incurred by Indemnitee and shall include or be

DocuSign Envelope ID: BFBDB1F0-F4DD-439E-BF9E-389568A29FB1

preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any expenses advanced if it shall ultimately be determined by a final and non-appealable judgment of a court of competent jurisdiction that Indemnitee is not entitled to be indemnified against such expenses. Any advances and undertakings to repay pursuant to this paragraph shall be unsecured and interest free.

To the extent that the Indemnitor so elects, it shall be entitled to assume the defense, with counsel selected by the Indemnitor (and approved by M3, with such approval not to be unreasonably withheld), of any action that is the subject of the Claim in respect of which indemnity may be sought. After notice to the Indemnitees of its election to assume the defense thereof, the Indemnitor will not be liable to the Indemnitee under this Agreement for any expenses subsequently incurred by such Indemnitee in connection with the defense thereof except as otherwise provided below. Such Indemnitee shall have the right to employ counsel of its choice in such Claim, but the fees and expenses of such counsel incurred after notice from the Indemnitor of the assumption of the defense thereof shall be at the expense of the Indemnitee unless the employment of counsel by the Indemnitee has been authorized by the Indemnitor, in which case the reasonably incurred fees and expenses of such counsel of the Indemnitee shall be at the expense of the Indemnitor.

The Client agrees that neither M3 nor any other Indemnitee shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Client or any person or entity asserting claims on behalf of or in right of the Client caused by, relating to, based upon or arising out of (directly or indirectly) this Agreement or the Engagement, except for losses, claims, damages, penalties or liabilities incurred by the Client which are finally determined by a non-appealable judgment of a court of competent jurisdiction to have resulted primarily and directly from the bad faith, willful misconduct or gross negligence of M3 or any such other Indemnitee, as the case may be. In no event, however, shall M3's or any other Indemnitee's liability to the Client or their respective affiliates, successors, or any person claiming on behalf of or in the right of the Client (including the Client's owners, parents, affiliates, directors, officers, employees, agents, security holders, or creditors) exceed the Liability Cap.

In the event that any M3 personnel are requested or required to appear as a witness in connection with any claim, action or proceeding relating to or arising as a result of the Engagement or the provision of the Services, the Client's use or disclosure of the Deliverables, or this Agreement, the Indemnitor shall, to the extent permitted by applicable law, reimburse M3 for all reasonable and documented out-of-pocket expenses incurred by it in connection with such personnel appearing and preparing to appear as a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel, and to compensate M3 at a rate equal to M3's then standard hourly rate for the relevant personnel for each day that such personnel is involved in preparation, discovery proceedings or testimony pertaining to such Claim. Additionally, M3 will have the right to obtain advice from independent legal counsel with respect to its actual or potential obligations and liability hereunder and the Client will promptly reimburse M3 for the reasonable out-of-pocket fees and expenses paid by M3 on account thereof.

The provisions of this Annex I shall be deemed to be an integral part of this Agreement to which this Annex I is affixed and shall survive the termination or expiration of this Agreement for any



reason.  The provisions of this Annex I shall be binding upon the Client and its successors and assigns.



Services for the initial month following the execution of the First Amendment to this Agreement (the "*Initial Month*") such that the Service Fees for the Initial Month will not exceed $500,000 and M3 will provide a 5% discount on any fees over $125,000.  After the Initial Month and subject to written agreement of the Parties on a revised scope of work, the Service Fees will not exceed $125,000 per month."

3.  No Other Modifications.    Except to the extent expressly modified hereby, the Agreement shall remain in full force and effect in accordance with its terms and without amendment, supplement or other modification.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M3 ADVISORY PARTNERS, LP

By _____
    Name:  Mohsin Y. Meghji
    Title:  Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

EXPRESS, INC.

By: _____
    Name:  Laurel Krueger
    Title:  Chief Legal Officer



1700 Broadway, 19th Floor
New York, NY 10019-5905
212.202.2300
www.m3-partners.com

November 28, 2023

Express, Inc.
1 Express Drive
Columbus, Ohio 43230
Attention:    Stewart Glendinning, Chief Executive Officer

<u>First Amendment to Engagement Letter</u>

Ladies and Gentlemen:

Reference is made to the letter agreement, dated as of August 18, 2022 (the "***Agreement***"), which sets forth the terms and conditions of the engagement (the "***Engagement***") of M3 Advisory Partners, LP ("***M3***") by Express, Inc. (the "***Client***") to provide the services described therein. Unless otherwise defined herein, capitalized terms which are used in this amendment shall have the meanings set forth in the Agreement.

    1.    <u>Amendment of Services</u>. Section 1 of the Agreement hereby is amended by (a) deleting the word "and" at the end of clause (b) thereof, (b) deleting the period at the end of clause (c) thereof and substituting therefor a semi-colon and (c) inserting the following as new clauses (d) through (f) of such Section 1:

       (d)  support the Client's management team in developing and implementing initiatives to optimize cash flow;

       (e)  support the Client's executive team in developing and implementing initiatives to enhance the enterprise value of Express; and

       (f)  provide such other services as may be agreed between the Parties from time to time in writing.

    2.    <u>Amendment of Compensation</u>. Section 4 of the Agreement hereby is amended by deleting the final paragraph of clause (a)(ii) thereof in its entirety and by substituting therefor the following:

"The Service Fees shall be billed by M3 to the Client weekly by M3 furnishing to the Client an invoice for the Service Fees in respect of the billing period and shall be paid in accordance with the provisions of Section 4(b) below. M3 may adjust its billing rates in the ordinary course of business on or about January 1 of each year upon notice to the Client; *provided* that M3 will not adjust its billing rates prior to March 1, 2024. Notwithstanding anything to the contrary contained herein, M3 will make reasonable efforts to limit the hours spent on the

DocuSign Envelope ID: DEE1B8E9-C9FA-45CB-8A52-DGA5CB3547DC



1700 Broadway, 19th Floor
New York, NY 10019-5905
212.202.2300
www.m3-partners.com

March 8, 2024

Express, Inc.
1 Express Drive
Columbus, Ohio 43230
Attention:    Stewart Glendinning, Chief Executive Officer

<u>Fourth Amendment to Engagement Letter</u>

Ladies and Gentlemen:

Reference is made to the letter agreement, dated as of August 18, 2022 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), which sets forth the terms and conditions of the engagement of M3 Advisory Partners, LP ("***M3***") by Express, Inc. to provide the services described therein.  Unless otherwise defined herein, capitalized terms which are used in this amendment shall have the meanings set forth in the Agreement.

1.  <u>Amendment of Section 4(a)(i)</u>.  The Parties hereby agree that the amount "$400,000.$^{\underline{00}}$" shall be substituted for the amount "150,000.$^{\underline{00}}$" in the definition of the term "Retainer" set forth in the first sentence of Section 4(a)(i) of the Agreement and that the Client shall deliver to M3 an additional $250,000.$^{\underline{00}}$ on account of the Retainer promptly following the date hereof.

2.  <u>Amendment of Section 4(a)(ii)</u>.  The Parties have agreed that the paragraph following the table of Service Fees in Section 4(a)(ii) of the Agreement shall be deleted in its entirety and that the following shall be substituted therefor:

> "The Service Fees shall be billed by M3 to the Client weekly by M3 furnishing to the Client an invoice for the Service Fees in respect of the billing period and shall be paid in accordance with the provisions of Section 4(b) below.  M3 may adjust its billing rates in the ordinary course of business on or about January 1 of each year upon notice to the Client. Although it is not feasible to estimate the scope of Services to be provided in any specific month, M3 shall make good faith efforts to limit the Service Fees to (x) $500,000 per month for each of the first two months of the Engagement (i.e., each of January and February of 2024) and to inform the Client in the event that the Service Fees for either such month are expected to exceed $500,000 and (y) $800,000 for the third month of the Engagement (i.e., March of 2024) and to inform the Client in the event that the Service Fees for such month are expected to exceed $800,000. The Parties shall review such $800,000 target during March of 2024 in order to mutually agree upon a monthly target for periods thereafter."

EXPERIENCE. ALIGNMENT. RESULTS.

3.  <u>No Other Modifications</u>.  Except to the extent expressly modified hereby, the Agreement shall remain in full force and effect in accordance with its terms and without amendment, supplement or other modification.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M3 ADVISORY PARTNERS, LP

By _____
      Name:  Mohsin Y. Meghji
      Title:  Managing Member

ACCEPTED AND AGREED
<u>as of the date first set forth above</u>:

EXPRESS, INC.

By: _____
      Name: Laurel Krueger
      Title:   Chief Legal Officer



1700 Broadway, 19th Floor
New York, NY 10019-5905
212.202.2300
www.m3-partners.com

January 18, 2024

Express, Inc.
1 Express Drive
Columbus, Ohio 43230
Attention:    Stewart Glendinning, Chief Executive Officer

<u>Third Amendment to Engagement Letter</u>

Ladies and Gentlemen:

Reference is made to the letter agreement, dated as of August 18, 2022 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), which sets forth the terms and conditions of the engagement of M3 Advisory Partners, LP ("***M3***") by Express, Inc. to provide the services described therein.  Unless otherwise defined herein, capitalized terms which are used in this amendment shall have the meanings set forth in the Agreement.

The Parties have agreed that the final sentence of Section 4(a)(ii) of the Agreement shall be deleted in its entirety and that the following shall be substituted therefor:

> "Although it is not feasible to estimate the scope of Services to be provided in any specific month, M3 shall make good faith efforts to limit the Service Fees to $500,000 per month (the "***Service Fee Target***") for each of the first two months of the Engagement (i.e., each of January and February of 2024) and to inform the Client in the event that the Service Fees for any month are expected to exceed $500,000.  The Parties shall review the Service Fee Target during February of 2024 in order to mutually agree upon a monthly target for periods thereafter."

In addition, we note that M3 customarily adjusts its hourly billing rates on January 1 of each year. M3's new rate schedule as of January 1, 2024 is as follows:

| Title | Hourly Rate |
|---|---|
| Managing Partner | $1,415 |
| Senior Managing Director | $1,305 |
| Managing Director | $1,075 - $1,205 |
| Director | $880 - $990 |
| Vice President | $786 |
| Senior Associate | $680 |
| Associate | $575 |
| Analyst | $470 |

In keeping with our prior agreement with you and subject to agreeing upon a target monthly fee for periods from and after March 1, 2024.

Except to the extent expressly modified hereby, the Agreement shall remain in full force and effect in accordance with its terms and without amendment, supplement or other modification.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M3 ADVISORY PARTNERS, LP

By _____
    Name:  Mohsin Y. Meghji
    Title:  Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

EXPRESS, INC.

By: _____
    Name:  Laurel Krueger
    Title:
           Chief Legal Officer



1700 Broadway, 19th Floor
New York, NY 10019-5905
212.202.2300
www.m3-partners.com

December 21, 2023

Express, Inc.
1 Express Drive
Columbus, Ohio 43230
Attention:    Stewart Glendinning, Chief Executive Officer

<u>Second Amendment to Engagement Letter</u>

Ladies and Gentlemen:

Reference is made to the letter agreement, dated as of August 18, 2022 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), which sets forth the terms and conditions of the engagement (the "***Engagement***") of M3 Advisory Partners, LP ("***M3***") by Express, Inc. (the "***Client***") to provide the services described therein.  Unless otherwise defined herein, capitalized terms which are used in this amendment shall have the meanings set forth in the Agreement.

Pursuant to the First Amendment, dated as of November 28, 2023 (the "***First Amendment***"), to the Agreement, M3 and the Client agreed that the Service Fees for the Initial Month would not exceed $500,000 and the Service Fees thereafter would, subject to written agreement on a revised scope of work, not exceed $125,000 per month.  This Second Amendment shall evidence the agreement of the Parties that any portion of the Service Fees for the Initial Month which are not utilized in such Initial Month may be carried over to subsequent months.

Except to the extent expressly modified hereby, the Agreement shall remain in full force and effect in accordance with its terms and without amendment, supplement or other modification.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

M3 ADVISORY PARTNERS, LP

By _____
    Name:  Mohsin Y. Meghji
    Title:  Managing Member

ACCEPTED AND AGREED
as of the date first set forth above:

EXPRESS, INC.

By: _____

Name: Laurel Krueger

Title:  Chief Legal Officer