**Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  Docket No. __** |

**ORDER AUTHORIZING**
**THE EMPLOYMENT AND RETENTION**
**OF RCS REAL ESTATE ADVISORS AS REAL ESTATE ADVISOR TO**
**THE DEBTORS AND DEBTORS IN POSSESSION, EFFECTIVE AS OF APRIL 26, 2024**

Upon the application (the "Application")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rules 2014-1 and 2016-2(h):   (a) authorizing the employment and retention of Retail Consulting Services, Inc. d/b/a RCS Real Estate Advisors ("RCS"), as real estate advisor to the Debtors, on the terms set forth in the Engagement Letter; (b) approving the terms of the Engagement Letter (as modified by this Order); (c) waiving certain time-keeping requirements pursuant to Local Rule 2016-2(h); and (d) granting related relief, all as more fully set forth in the Application; and the declaration of Ivan L. Friedman (the "Friedman Declaration") filed in support

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2]   Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Application.

of the same; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and that the Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Application and opportunity for a hearing on the Application were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Application and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Application is approved as set forth in this Order.

2.      In accordance with sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rules 2014-1 and 2016-2(h), the Debtors are authorized to retain and employ RCS in accordance with the terms and conditions set forth in the Engagement Letter, as modified herein, effective as of April 26, 2024.

3.      The Engagement Letter, together with all annexes and exhibits thereto and all compensation set forth therein, including, without limitation, fees connected with the Monetary Lease Modifications, the Non-Monetary Lease Modifications, the Early Termination Rights, the

Lease Sales, and the Landlord Consents (each as defined in the Application and described in the Engagement Letter), as modified by this Order, is approved pursuant to sections 327(a) and 328(a) of the Bankruptcy Code.

4.      Notwithstanding anything herein to the contrary, RCS shall be compensated for fees and reimbursed for out-of-pocket expenses pursuant to section 328 of the Bankruptcy Code, and all fees and out-of-pocket expense reimbursements to be paid to RCS shall be subject to review pursuant only to the standard of review set forth in section 328(a) of the Bankruptcy Code, and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code; *provided, however,* notwithstanding anything in this Order, or in the Letter Agreement, to the contrary, the U.S. Trustee, and solely the U.S Trustee, shall retain all rights to object to RCS's fees based on the reasonableness standard provided for in section 330 of the Bankruptcy Code.

5.      The Debtors are authorized to pay RCS's fees and to reimburse RCS for its costs and expenses in accordance with, and at the times provided by, the Engagement Letter as modified by this Order, and none of the fees payable to RCS shall constitute a "bonus" or fee enhancement under applicable law.

6.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, orders of this Court, or any guidelines regarding submission and approval of fee applications, in light of services to be provided by RCS and the structure of RCS's compensation pursuant to the Engagement Letter, RCS and its professionals shall be excused from maintaining and filing time records in accordance with Bankruptcy Rule 2016(a), Local Rule 2016-2, the fee guidelines established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and any otherwise applicable orders or procedures of the Court in connection with the services to be rendered pursuant to the Engagement Letter.

7.     Notwithstanding anything to the contrary set forth in the Engagement Letter, or in any other order entered by the Bankruptcy Court setting procedures for the allowance and payment of professional fees, the payment of all fees to RCS under Engagement Letter is as follows. The payment to RCS of fees on account of Lease Sales ("Lease Sales") shall be due and payable upon the closing of the applicable sale.  Except for payments on account of Lease Sales as provided for above, the Company shall pay all fees to RCS within ten (10) business days of the Company's receipt of an invoice.  In the event of any dispute of an invoice or any portion of an invoice, the parties shall work in good faith to resolve the dispute, and in the event the parties are not able to resolve such dispute, such dispute may be submitted to the Bankruptcy Court for resolution.  RCS may, but shall not be required to, file interim fee applications; *provided, however,* RCS shall file a final fee application with all payments made to RCS by the Debtors in these chapter 11 cases to remain subject to the filing of a final fee application and the entry of an order thereon.  Such final fee application shall include a summary statement of all compensation and reimbursements for which payment or reimbursement is sought or was already paid by Debtors.  RCS shall be reimbursed for only its actual and necessary expenses, and RCS's request for reimbursement of expenses in its final fee application shall include the detail required by Local Rule 2016-2(e).

8.     To the extent that this Order is inconsistent with the Engagement Letter, the Application, or the Friedman Declaration with respect to the terms and conditions of RCS's retention and employment by the Debtors in these chapter 11 cases, the terms of this Order shall govern.

9.     The indemnification provisions set forth in the Engagement Letter are approved, and shall survive in effect notwithstanding the expiration or termination of the RCS engagement, subject during the pendency of these cases to the following:

     a.     subject to the provisions of subparagraphs (b) and (c), *infra*, the Debtors are authorized to indemnify, and to provide contribution and reimbursement to, and shall indemnify, and provide contribution and reimbursement to, the Indemnified Persons (as defined in the Application) in accordance with the Engagement Letter for any claim arising from, related to, or in connection with the services provided for in the Engagement Letter;

     b.     notwithstanding subparagraph (a) above or any provisions of the Engagement Letter to the contrary, the Debtors shall have no obligation to indemnify RCS or provide contribution or reimbursement to RCS (i) for any claim or expense that is judicially determined (the determination having become final) to have arisen from RCS's bad faith, self-dealing, breach of fiduciary duty (if any), willful misconduct or gross negligence, (ii) for a contractual dispute in which the Debtors allege the breach of RCS's contractual obligations if the Court determines that indemnification, contribution, or reimbursement would not be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003), or (iii) for any claim or expense that is settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice and a hearing pursuant to subparagraph (c), *infra*, to be a claim or expense for which RCS should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter, as modified by this Order; and

     c.     if, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these cases, RCS believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Engagement Letter, as modified by this Order, RCS must file an application therefor in this Court, and the Debtors may not pay any such amounts to RCS before the entry of an order by this Court approving the payment. This subparagraph (d) is intended only to specify the period of time during which the Court shall have jurisdiction over any request by RCS for compensation and expenses by RCS for indemnification, contribution or reimbursement and is not a provision limiting the duration of the Debtors' obligation to indemnify.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Application.

12.     Notwithstanding anything to the contrary in the Engagement Letter, this Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

13.     The Debtors are authorized to take all actions reasonably necessary to effectuate the relief granted pursuant to this Order.

14.     Notice of the Application as provided therein shall be deemed good and sufficient notice of such Application and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

Dated: _____, 2024          THE HONORABLE KAREN B. OWENS
Wilmington, Delaware                 UNITED STATES BANKRUPTCY JUDGE

## **Annex 1**

**Engagement Letter**



470 Seventh Avenue, 8th Floor
New York, NY 10018
(212) 239-1100
info@rcsrealestate.com

April 26, 2024

**Stewart Glendinning**
CEO
**Express, Inc.**
**One Express Drive**
**Columbus, OH 43230**

Stewart:

This letter agreement ("Agreement") shall set forth the terms of the engagement of Retail Consulting Services, Inc. d/b/a RCS Real Estate Advisors as Exclusive Real Estate Consultant ("Consultant") to Express, Inc. ("Company") with respect to analysis, negotiation, termination and disposition of certain retail real estate assets, (the "Designated Properties" as listed by the Company on "Exhibit A") and the compensation Consultant expects to receive.

I.    **Term:**

    **A.** The term of the Agreement shall be from the execution of this Agreement, through the confirmation and consummation of a plan of reorganization, unless terminated prior to completion by Consultant or Company upon written notice. For the avoidance of doubt, sections V and VII herein shall remain in effect upon any termination or expiration of this Agreement.

    **B.** Bankruptcy.

    The Company shall apply to the Bankruptcy Court for an order, in a form acceptable to RCS, authorizing the Company to retain and compensate RCS in accordance with the terms of this Agreement and to use its best efforts to obtain such order. The Company shall (a) seek the hiring and retention of RCS under sections 327 and 328 of the Bankruptcy Code and (b) file any applications necessary and otherwise assist RCS in obtaining Bankruptcy Court approval of the payment of its fees and costs hereunder. The Company shall provide RCS with a copy of the pleadings requesting retention of RCS prior to submission to the Bankruptcy Court for RCS's review and comments and advise RCS of any objection or hearings pertaining to RCS's retention. The order authorizing RCS's retention must be reasonably acceptable to RCS and RCS's obligations hereunder are conditioned upon the grant of such order. Furthermore, if such order is not obtained within sixty days from the date that it is filed solely by the cause of the Company and not relating to any third party or Bankruptcy Court approval, RCS shall have the right to terminate this Agreement at any time thereafter; provided, however, that if such delay is not caused by the Company, then such termination shall not be enforceable. If a reasonably acceptable order is not obtained authorizing RCS's services and fees as set

forth herein, the Company agrees to amend the application in conjunction with RCS and request a hearing to consider the application. In the event the Company is unable to obtain a reasonably acceptable order authorizing the hiring and retention of RCS under the terms of this Agreement and the Agreement is terminated, RCS reserves any and all rights with respect to any rights or obligations incurred or accrued prior to such termination.

## II.    Real Estate Restructuring Services:

During the term of this engagement Consultant, shall provide the following services:

**A.** The creation of a "Lease Portfolio Book" which shall be used as a basis for our analysis and shall centralize the following information:
   a. Current and future lease terms
   b. Current and Historical Sales
   c. Current and Historical Profitability; EBIT and/or EBITDA
   d. Occupancy costs; including base rent, percentage rent and extra charges
   e. Landlord
   f. Square footage
   g. Location
   h. Designated Properties rental costs relative to location profitability
   i. Designated Properties sales relative to square footage
   j. Designated Properties termination date, option information and kickout information

**B.** Consultant shall undertake an in-depth analysis of all the Company's leased retail real estate assets. Such analysis will involve a review of each asset's occupancy costs relative to sales volume and store profit contribution. Consultant shall meet with the Company to discuss its analysis.

**C.** Consultant shall assist Company in developing real estate goals and parameters (the "Real Estate Action Plan") to determine the most suitable course of action for each store (i.e. lease rejection, disposition, term modification, size modification, relocation, rent reduction, lease extension).

**D.** Subsequent to the determination of the Real Estate Action Plan, Consultant shall contact each designated landlord with respect to negotiation of the said goals and parameters as deemed necessary for all of the Company's Designated Properties.

**E.** Consultant will work with landlords and the Company to document accurately all lease modification proposals and provide timely status reports that will reflect current progress.

## III.    Real Estate Disposition Services:

**A.** Consultant's services with respect to the Disposition Properties as defined below shall include those generally described below, as appropriate.

   a. Consultant will create a marketing program and budget which may include newspaper, magazine or journal advertising, letter and/or flyer solicitation,

2

placement of signs, direct telemarketing, email, fax blasts and such other marketing methods as may be necessary.

b. Consultant will use all professional contacts, mailing lists and other resources available to Consultant to market the Disposition Properties. All marketing efforts, advertising, signs, flyers and other marketing strategies shall be subject to the Company's prior approval as to form and content and shall be submitted to the Company for such approval prior to dissemination.

c. Consultant will prepare and disseminate all such marketing materials, all of which shall have been approved by, and shall be at the sole cost and expense, of the Company. Consultant shall not incur any costs or expenses with respect to the preparation or dissemination of marketing materials except in accordance with the provisions and limitations contained in this agreement.

d. Consultant will communicate with parties who have expressed an interest in a Disposition Property and will endeavor to locate additional parties who may have an interest in the purchase of a Disposition Property. Consultant shall provide to the Company from time- to-time an updated and current list of all parties which shall have expressed interest in a Disposition Property which list shall include the name and address of each such party as well as the date of initial contact with each such party.

e. Consultant will respond to and provide information necessary to negotiate with and solicit offers from prospective purchasers and/or settlements from landlords and shall make recommendations to the Company as to the advisability of accepting particular offers or settlements.

f. Consultant shall have the sole and exclusive authority to offer for disposition, on terms and conditions established by the Company, all properties designated in writing by Company for sale or other disposition on an "exclusive right to sell" basis.Upon the Company's designation to Consultant of a property for marketing and disposition, such property shall be referred to as a "Disposition Property" and shall be expressly included on Exhibit A attached hereto, which shall be modified from time to time as necessary.

g. The Company shall have, and retain throughout the term of this agreement, the complete discretion and authority to accept or reject any offer and withdraw any Disposition Properties from Consultant's marketing effort. Said list of stores to market is attached hereto as Exhibit A.

3

IV. **Compensation:**

   A. **Definitions**

   "Bankruptcy Code" – shall mean title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

   "Bankruptcy Court" – shall mean the Bankruptcy Court for the District of Delaware whereby the Company currently has pending chapter 11 cases Nos. 24-10831 through 24-10842 that are jointly administered under case No. 24-10831.

   "Document" – shall be defined as any amendment or agreement that modifies a Lease in any manner, including, but not limited to, the granting of a lease modification, Early Termination Right or landlord consent. It also includes any amendment or agreement that effectuates a Lease Sale, or any part thereof. A Document also shall include any letter agreement relating to a lease or any other written communication (including, but not limited to, an email communication) from a landlord or third party consenting to the applicable Service. For the avoidance of doubt, a Document can be generated by the Landlord, a third party or the Company.

   "Early Termination Right" – shall be defined as the Company's exclusive right to terminate the Lease prior to the expiration date of the Lease.

   "Gross Occupancy Cost" – shall be defined as the sum of the remaining base rent, any annual increases, percentage rent, CAM, taxes payable directly to the Landlord, insurance, rental tax, marketing and merchants' association charges, utility charges, HVAC usage charges, trash removal charges, sprinkler usage charges, unpaid rents, or any other sums due to the landlord under a particular lease as of this Agreement date. For clarification purposes, Gross Occupancy Cost is calculated using the first date that the Service commences (i.e., the date that the rent reduction commences) through the earlier of the end of the Lease Term in effect as of the agreement date (or longer if a Lease extension is also requested and negotiated by RCS on behalf of the Company) or when the Service is no longer in effect. CAM, taxes, insurance, marketing and merchants' association charges and all other applicable charges will be calculated using the last available full year charge for each item (which may be a calendar year or a lease year, depending upon which is the most recent full year charge available). In the event that rent increases periodically based upon the change in the Consumer Price Index (CPI), the assumed annual CPI increase shall be Three (3%).

   "Gross Proceeds" – shall be defined as the total consideration paid or payable to the Company by a landlord, investor, purchaser, or any other party to either waive, terminate, sublease, or purchase a lease or any right related to a lease. It includes, but is not limited to, cash and any other form of currency paid or waived by the landlord, sub-tenant or other third party to the Company in relation to a Lease Sale. This list is not meant to be exhaustive and Gross Proceeds shall include any consideration or other quantifiable economic benefit paid or payable to the Company in conjunction with a Lease Sale, including all (i) Company debt assumed, satisfied or paid by a purchaser or which remains outstanding at closing (including, without limitation, the amount of any indebtedness "credit bid" at any sale), and (ii) amounts placed in escrow and deferred, contingent payments and installment payments.

4

"Lease Sale" – shall be defined as the sale or assignment, whether all or part, of a lease and includes the sale of designation rights.

"Monetary Lease Modification" – shall be defined as any modification to or inclusion of additional provisions relating to the monetary terms of a Lease agreement, including, but not limited to, reduction in rent/other Lease charges, reduction in Lease Term, reduction in lease space, termination of/waiver of/free rent or other Lease charges (including any previously deferred rent payment due or other Lease charges), reduction or elimination of any outstanding amounts due under a Lease, reduction in square footage of premises covered by a lease, the granting of tenant allowance or capital improvement dollars from the landlord, the waiver of Company's capital expenditure obligations, extensions of existing rent reductions past their original end date, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, reductions in or returns of security deposits and FF&E if otherwise non-refundable (either pursuant to the terms of the lease or as determined by the landlord), or any other amendment to a lease that results in Occupancy Cost Savings to the Company.

"New Gross Occupancy Cost" – shall be defined as the reduced Gross Occupancy Cost that results from a lease modification or any other amendment to the lease.

"Non-Monetary Lease Modification" – shall be defined as any modification to the non-monetary terms of a lease agreement, including, but not limited to, change of use, co-tenancy clause, sublease rights, the negotiation of a lease extension, the granting of an additional option term or terms, an amendment to the current option term or terms (Early Termination Right fees are set forth separately for fee purposes), relocation of lease spaces that do not result in a reduction in Gross Occupancy Cost and any other amendments to the lease that is or would be beneficial to the Company that do not fall within the above definition of Monetary Lease Modifications.

"Occupancy Cost Savings" – shall be defined as the difference between the original Gross Occupancy Cost and the New Gross Occupancy Cost for the period the date in which the Lease Modification or other service becomes effective or the date in which RCS becomes entitled to its Fees under the terms herein, through the end of the then-current Lease Term, the Revised Lease Term, or the date on which the Company no longer realizes the savings, pursuant to the terms of the Services, less any payment(s) or costs payable by the Company to effectuate the lease modification or other service, excluding legal fees. "Lease Term" shall be defined as the commencement date and expiration date of the then-current term of the lease as set forth in the lease as of the Agreement date. "Revised Lease Term" shall be defined as the new Lease expiration date pursuant to any Lease extensions obtained by RCS on behalf of the Company. For example, if a service includes a Monetary Lease Modification and an extension of the Lease, the Occupancy Cost Savings shall be applicable through the duration of such Lease extension (i.e., the Revised Lease Term).

Occupancy Cost Savings include, but are not limited to, reduction in rent/other Lease charges, reduction in Lease Term, reduction in lease space, termination of/waiver of/free rent or other lease charges (including any previously deferred rent or other lease charges), reduction or elimination of any outstanding amounts due under a lease, reduction of

unamortized tenant allowance, reduction or elimination of the obligation to repay tenant allowance to the landlord, reduction or elimination of the requirement to improve the lease space that have a direct monetary benefit to the Company, the granting of tenant allowance or capital improvement dollars from landlord or landlord improvements to the property, the waiver of Company's capital expenditure obligations, reduction in square footage of premises covered by a lease, extensions of existing rent reductions past their original end date, any lease extensions that result in a rent decrease, reduction in CAM charges, taxes, elimination of percentage rent, conversion to percentage rent, or any or any other amendment to a lease that results in direct monetary savings to the Company.

For Occupancy Cost Savings resulting from the extension of a rent reduction past the Lease Term in effect as of the Agreement date, the savings shall be based upon the original rent and option rent set forth in the lease, allocated proportionately to the time period during the Lease Term and the extended term, as the case may be. For example purposes only, if RCS obtains a 4-year rent reduction and only 2 years remain on the Lease Term, RCS's fee will be based upon the blended Occupancy Costs Savings resulting from the reduced rent as compared to the rent in effect during the Term for a period of 2 years, and the Occupancy Costs Savings resulting from the reduced rent as compared to the option rent set forth in the Lease, provided the Company exercises such option. For Occupancy Cost Savings resulting from lease extensions where there is no rent increase, the savings shall be based upon the option price for the period of the duration of the extension or if there is no option price, the rent price for the immediately preceding period increased by an assumed annual CPI increase of three percent (3%).

In the event base or gross rent (i.e., contract rent) is converted to percentage rent based on sales, Occupancy Cost Savings will be calculated based on the difference between the contract rent and the percentage rent using sales figures for the twelve (12) months ended December 31, 2023.

**B. Fees**

RCS shall be compensated for the Services as follows:

1. <u>Monetary Lease Modifications.</u> For each Monetary Lease Modification obtained by RCS on behalf of the Company and agreed to by the Company in its sole and absolute discretion, RCS shall earn and be paid a fee in the amount of four percent (4%) of the Occupancy Cost Savings per lease during the Lease Term and 2% of the occupancy cost savings per lease during the option term of such lease.

2. <u>Non-Monetary Lease Modifications.</u> For each lease that becomes subject to one or more Non-Monetary Lease Modifications obtained by RCS on behalf of the Company and agreed to by the Company in its sole and absolute discretion, RCS shall earn and be paid a fee of $2,500.00 per lease.

3. <u>Early Termination Rights.</u> For each Early Termination Right obtained by RCS on behalf of the Company and agreed to by the Company in its sole and absolute discretion, RCS shall earn and be paid a flat fee $2,000 per lease.

4. <u>Lease Sales.</u> For each Lease Sale obtained by RCS on behalf of the Company and agreed to by the Company in its sole and absolute discretion, RCS shall earn and be paid a fee of four percent (4%) of the Gross Proceeds.

5. <u>Landlord Consents.</u> If requested by the Company, for each consent obtained by RCS to extend the Company's time to assume or reject a lease, or pay rent on a per diem basis, as a part of any applicable Chapter 11 case, RCS shall earn and be paid a fee in the amount of five hundred dollars ($500) per lease.

6. <u>Fee Cap Amount.</u> It is understood that total fees paid to Consultant shall be capped at one million dollars ($1,000,000).

**C. Payment of Fees**

RCS shall provide the Company with a reasonably detailed deal sheet with the terms of the proposed lease modification, Early Termination Right, or Landlord Consent (the "Deal Sheet"). For clarification purposes, a Deal Sheet can include, but not be limited to, an email or other written communication from RCS setting forth the terms of the proposed service.

If: (i) the Company approves the terms of the Deal Sheet and the Landlord or other third party (if applicable) submits, approves or executes a Document that reflects the Company accepted Deal Sheet; (ii) the Company approves a Document that embodies a lease modification, Early Lease Termination or Landlord Consent to be transmitted to a landlord and that landlord agrees to all the material terms of such Document with no contingencies pursuant to Landlord's signature to the Document or confirming email; or (iii) the Company begins to receive the benefit of the terms set forth in the Deal Sheet, RCS shall be entitled to, and be paid, its fees in accordance with the above fee structure. For the avoidance of doubt, RCS shall be entitled to its fees notwithstanding the fact that the service transaction is not fully executed by a landlord or the Company. A service may incur more than one fee.

The Company shall pay all fees to RCS within ten (10) business days of the receipt of an invoice therefor or as soon as reasonably practical following Bankruptcy Court approval, except that for Lease Sales, RCS shall be paid its fee upon the closing of the applicable sale, except, in each case, as may be approved or directed otherwise in the Company's chapter 11 bankruptcy proceeding. In the event of any dispute of an invoice, the parties shall work in good faith to resolve the dispute. For the avoidance of doubt, any and all reasonable and documented fees and expenses are subject to Bankruptcy Court approval and timing of payment shall be as soon as reasonably practical following such Bankruptcy Court approval.

**V. Survival:**

A. If Company, after the expiration or termination of this Agreement, enters into any agreement with a landlord with whom Consultant had been engaged in active negotiations and Company begins to receive benefits of that specific negotiation within six (6) months after the expiration of this Agreement, or executes a lease or extension, modification or letter agreement within six (6) months after the expiration of this Agreement, then Consultant shall be entitled to a fee in accordance with the terms of this Agreement.

    **B.** If Company, after the expiration or termination of this agreement, enters into a contract for, or closes, the sale of a Disposition Property to a party with whom Consultant had been engaged in active discussions, and the contract is executed and delivered, or the closing of the sale thereof, occurs within six (6) months after the expiration or termination of the term of this agreement, then Consultant shall be entitled to a disposition fee in accordance with the terms of this Agreement (i.e. only if, as and when a closing actually occurs).

**VI.**    **Indemnity:**

    **A.** To the fullest extent permitted by law, Consultant shall indemnify and hold harmless the Company, its affiliates and their respective partners, officers, directors, agents and employees, from and against any and all claims, demands, actions, liabilities, damages, losses and expenses (including, but not limited to, attorney's fees), resulting from or arising out of any acts, errors or omissions of Consultant. To the fullest extent permitted by law, the Company shall indemnify and hold harmless Consultant, its affiliates and their respective partners, officers, directors, agents and employees, from and against any and all claims, demands, actions, liabilities, damages, losses and expenses (including, but not limited to, attorney's fees), resulting from or arising out of any acts, errors or omissions of the Company. Each party hereto will not be responsible for any losses, claims, damages or liabilities (or expenses relating thereto) (i) to the extent that they are determined to have resulted from the gross negligence, bad faith, or willful misconduct of the other party as determined by a final non-appealable order of a court of competent jurisdiction.

**VII.**    **Expenses and Disbursements:**

    **A.** All reasonable and documented, reimbursable out-of-pocket expenses, shall include, but not be limited to, lodging, travel, express mail and postage. These expenses related to Consultant's retention and provided services shall be borne by the Company. Company must approve in writing (including fax or e-mail) any item in excess of one thousand dollars ($1,000) prior to expenditure. The Company agrees to pay such expenses within thirty (30) days upon proper presentation of invoices, but no more than one time a month or as soon as reasonably practical subject to Bankruptcy Court approval.

    **B.** Consultant will not be responsible for any transactional costs and/or legal expenses incurred by Company in connection with its retention of Consultant and its involvement with the Designated Properties.

    **C.** Marketing expenses are to be pre-approved in writing by the Company, and such reasonable and documented pre-approved marketing expenses will be paid by the Company. Pre-approved out-of-pocket expenses of Consultant (including, but not limited to, marketing costs) will be paid directly by the Company within ten (10) business days of Consultant's written request or as soon as reasonably practical subject to Bankruptcy Court approval. In the event any reasonable and documented marketing expenses are required to be pre-paid, the Company will be presented with those requests and, if such expenses are approved in writing by the Company, the Company will be responsible for those payments subject to Bankruptcy Court approval.

**VIII.    Company's Responsibility:**

    **A.**  Company shall deal with Consultant fairly and in good faith to allow Consultant to perform their duties and earn the benefits of this Agreement. Company shall forward all communications from any landlord or other interested party to the Consultant immediately.

    **B.**  As, when and to the extent that same is in Company's possession or under its control, Company shall make available to Consultant all information requested hereto concerning the Designated Properties and Company's operations of such Designated Properties as may be reasonable required in connection with the performance of Consultant's obligations hereunder. Consultant shall have the right to rely, without independent verification, on the accuracy and completeness of all such information supplied to Consultant in connection with Consultant's engagement hereunder and shall not be responsible for the inaccuracy or incompleteness of any information provided to it.

    **C.**  Additionally, the Company agrees to assist RCS in the performance of its services, including but not limited to, by (i) providing a response, within a reasonable period of time, anticipated to be seven (7) business days, of RCS's transmittal to the Company of a Deal Sheet for each lease, which states whether a proposed service transaction is approved or not, and (ii) providing all necessary legal support to review Documents (as defined below) submitted by RCS in connection with a service and getting all Documents in form and substance acceptable to the Company executed accurately and timely. In addition, the Company shall track the status of all Documents through an RCS legal tracking report provided by RCS.

**IX.    General Provisions:**

    **A.**  This Agreement shall be construed fairly as to all parties and deemed drafted by both parties hereto and there shall be no presumption against either party in the interpretation of this agreement.

    **B.**  By executing or otherwise accepting this Agreement, Company acknowledges and represents that it is represented by and has consulted with legal counsel with respect to the terms and conditions contained herein.

    **C.**  Any and all issues, disputes, controversies, claims, or causes of action which relate or pertain to, or result or arise from this Agreement, the alleged breach thereof, or Consultant's services hereunder, shall be settled by the Bankruptcy Court . The laws of the State of New York shall govern this agreement.

    **D.**  The Company acknowledges and represents that the decision to adopt any strategy or engage in a business transaction of any kind is the sole responsibility of the Company. The services to be provided by Consultant are in its role as Consultant only. Consultant's status shall be that of an independent contractor and not that of an agent, servant, partner or employee of the Company, and nothing contained herein shall be construed to create the relationship of agent, servant, partner or employee between Consultant and the Company. Consultant is not an attorney and does not provide legal advice. Consultant strongly

suggests that the Company obtain legal counsel in connection with its decision to adopt any strategy or to engage in a business transaction of any kind.

**E.** Consultant may use Company's name and logo to identify Company as one of Consultant's clients.

**F.** Notwithstanding anything to the contrary herein, Consultant shall only represent the Company in this matter and shall meet the standards of section 327 and 328 under the Bankruptcy Code. In the event that the Company is unable to obtain Bankruptcy Court approval of the Company's retention of RCS due to any action or inaction by RCS, including with respect to the requirements under sections 327 and 328 of the Bankruptcy Code, then the Company reserves any and all rights with respect to this Agreement.

**G.** The services to be provided by Consultant pursuant to this agreement are, in general, services transactional in nature, and Consultant will not be billing Company by the hour or keeping a record of its time spent on behalf of the Company; provided, however, Consultant will record time and services in accordance with any requirements of the Bankruptcy Court.

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same agreement. This Agreement may be executed in counterparts of faxed or electronic signature pages, and such counterpart faxed, or electronic signature pages shall be binding upon the parties hereto.

If the Company agrees with the terms and conditions of this Agreement, kindly countersign where indicated below and return to me.

Very truly yours,

Retail Consulting Services, Inc. d/b/a
**RCS Real Estate Advisors**

Ivan L. Friedman
President

**Accepted and Agreed to:**
**This 30th day of April 2024**

**Express, Inc.**

BY:    Stewart Glendinning
ITS:    Chief Executive Officer

10

Exhibit "A" Designated Property Listing - page 1 of 3

| Str# | Express Location | Str# | Express Location |
|------|------------------|------|------------------|
| 58 | ROSEDALE CENTER | 505 | FAIR OAKS MALL |
| 63 | WILLOW GROVE MALL | 507 | CAPITOL CITY MALL |
| 66 | SANTA ANITA FASHION | 520 | POUGHKEEPSIE MALL |
| 68 | MALL OF AMERICA | 536 | BRANDON TOWN CENTER |
| 73 | SOMERSET COLLECTION | 552 | FRIENDLY CENTER |
| 80 | CHERRY HILL | 555 | BRIDGEWATER COMMONS |
| 101 | TWELVE OAKS | 564 | PALM DESERT |
| 102 | TRUMBULL | 586 | MALL AT ROBINSON |
| 106 | CONNECTICUT POST | 628 | MONTEBELLO TOWN CNT |
| 109 | WESTFARMS | 655 | WOODBURY LAKES |
| 110 | GREEN HILLS | 661 | DOS LAGOS |
| 138 | WALDEN GALLERIA | 662 | CROSSGATES |
| 140 | COUNTRY CLUB | 665 | ALGONQUIN COMMONS |
| 147 | SOUTHPARK | 678 | MALL DEL NORTE |
| 153 | BELLEVUE | 693 | HOLYOKE MALL |
| 195 | VIEWMONT | 698 | TOWN SQUARE LAS VEGAS |
| 207 | CHERRY CREEK | 700 | NORTHPARK CENTER |
| 215 | PALISADES | 712 | SPRINGFIELD T.C. |
| 221 | SPRINGFIELD | 724 | BROOKFIELD CENTER |
| 225 | WEST TOWNE MALL | 745 | ACADIANA MALL |
| 235 | THE GARDENS | 759 | EDISON MALL |
| 258 | BROWARD MALL | 768 | LAKESIDE CENTER |
| 265 | MUSIC CITY | 776 | ARBOR LAKES |
| 270 | SOUTH COAST | 777 | COASTAL GRAND |
| 274 | RIVERSIDE PARK | 784 | GALLRIA/FT LAUDRDLE |
| 301 | BERKSHIRE MALL | 787 | MALL AT WELLINGTON |
| 309 | CRABTREE VALLEY | 800 | WATERTOWER PLACE |
| 318 | ARDEN FAIR MALL | 801 | OLD ORCHARD |
| 323 | OAK PARK MALL | 808 | CHICAGO RIDGE |
| 336 | BEVERLY CENTER | 813 | INTERNATIONAL PLAZA |
| 344 | FOX VALLEY | 864 | ARROWHEAD TWN CNTR |
| 362 | FAYETTE MALL | 865 | WEST COVINA |
| 369 | SUN VALLEY | 886 | SHORT HILLS |
| 380 | SUNRISE | 895 | SPOTSYLVANIA |
| 384 | ANTELOPE VALLEY MALL | 902 | BELDEN VILLAGE |
| 396 | MEMORIAL CITY | 929 | HAMILTON PLACE |
| 401 | PARKWAY PLACE | 945 | INGRAM PARK MALL |
| 412 | TYSONS CORNERS | 954 | PADDOCK SHOPS |
| 414 | GALLERIA @ ROSEVILL | 955 | EASTON TOWN CENTER |
| 438 | AURORA MALL | 958 | MALL AT MILLENIA |
| 465 | WEST ACRES MALL | 969 | STEINWAY ST |
| 466 | VINTAGE FAIRE | 972 | GENEVA PAVILION |
| 468 | MONTGOMERY MALL | 979 | CROCKER PARK |
| 490 | CITY PLACE | 980 | QUEENS CENTER |
| 499 | SCOTTSDALE FASHION | 986 | ANNAPOLIS |
| 504 | EASTVIEW MALL | 988 | EASTWOOD TOWNE CTR |

Exhibit "A" Designated Property Listing - page 2 of 3

| Str# | Express Location | Str# | Express Location |
|------|------------------|------|------------------|
| 1632 | VALLEY FAIR MALL MENS | 1806 | OUTLETS OF DES MOINES |
| 1701 | PALM BEACH OUTLETS | 1808 | OUTLETS @ ATLANTA |
| 1704 | NATIONAL HARBOR | 1817 | OUTLETS AT EL PASO |
| 1712 | GREAT LAKES CROSSING | 1825 | OUTLETS AT BERGEN TC |
| 1713 | RIVERHEAD | 1830 | THE PIKE OUTLETS |
| 1716 | SAN MARCOS | 1832 | ATLANTIC CITY OUTLETS |
| 1717 | REHOBOTH | 1835 | SEVIERVILLE OUTLETS |
| 1718 | OUTLETS OF SAVANNAH | 1843 | NASHVILLE OUTLETS |
| 1721 | FOXWOODS | 1851 | SOUTH PLAINS |
| 1722 | DEER PARK | 1852 | PARKWAY PLAZA |
| 1725 | WESTGATE | 1856 | PARKDALE |
| 1728 | PARK CITY OUTLETS | 1859 | MILLCREEK |
| 1729 | PITTSBURGH OUTLETS | 1860 | HARLEM IRVING |
| 1730 | MYRTLE BEACH | 1863 | OAKDALE COMMONS |
| 1733 | GONZALES OUTLETS | 1864 | THE WATERFRONT |
| 1737 | FASH OUT OF NIAGARA | 1868 | LOUIS JOLIET |
| 1744 | LEGENDS OUTLETS | 1869 | BRUNSWICK SQUARE |
| 1745 | GRAND RAPIDS OUTLETS | 1870 | BOWIE TOWN CENTER |
| 1746 | COLUMBUS OUTLETS | 1872 | IMPERIAL VALLEY |
| 1748 | ASSEMBLY ROW | 1873 | CHERRYVALE |
| 1749 | SOUTHAVEN OUTLETS | 1874 | COLONIE CENTER |
| 1752 | OUTLETS @ CASTLE ROCK | 1875 | FAIRLANE TOWN CENTER |
| 1753 | BRANSON OUTLETS | 1877 | TRIANGLE TOWN CENTER |
| 1757 | DOLPHIN MALL | 1878 | PEARLAND TOWN CNTR |
| 1758 | MIROMAR | 1879 | MELBOURNE SQUARE |
| 1759 | ASHEVILLE OUTLETS | 1883 | IRVING MALL |
| 1760 | OUTLET SHOPPES AT LAREDO | 1884 | WESTLAND |
| 1761 | OUTLETS @ LITTLE ROCK | 1885 | MALL AT PRINCE GEORGES |
| 1762 | CHARLESTON OUTLETS | 1886 | WESTGATE MALL |
| 1763 | OUTLETS OF BLUEGRASS | 1889 | YORKTOWN |
| 1769 | FOLEY | 1895 | GLENBROOK SQUARE |
| 1770 | LANCASTER | 1901 | BROADWAY |
| 1772 | HOUSTON OUTLETS | 1902 | SOUTHLAKE |
| 1773 | FORT WORTH OUTLETS | 1905 | NORTHWEST ARKANSAS |
| 1781 | NEBRASKA CROSSINGS | 1906 | GREAT LAKES |
| 1784 | COLLECTION SEATTLE | 1907 | OAKLAND |
| 1786 | TULARE OUTLETS | 1910 | CROSS CREEK |
| 1787 | DAYTONA BEACH OUTLETS | 1917 | JEFFERSON VALLEY |
| 1789 | LAKE BUENA VISTA | 1920 | AVENUE AT MURFREESBORO |
| 1792 | MEBANE OUTLETS | 1921 | COTTONWOOD |
| 1793 | LOCUST GROVE | 1924 | MALL AT GREECE RIDGE |
| 1794 | HERSHEY OUTLETS | 1925 | WESTMORELAND |
| 1795 | OUTLET SHOPPES @ OK CITY | 1934 | BASSETT PLACE |
| 1797 | OUTLET@ SPARKS MARINA | 1938 | EASTWOOD |
| 1801 | OUTLETS AT TEJON | 1941 | GALLERIA AT CRYSTAL RUN |
| 1802 | FASH OUT OF CHICAGO | 1950 | SOUTH HILL |

Exhibit "A" Designated Property Listing - page 3 of 3

| Str# | Express Location | | Str# | Bonobos Location |
|------|------------------|---|------|------------------|
| 2007 | STREETS @ BRENTWOOD | | 5003 | LINCOLN PARK |
| 2008 | PARTRIDGE CREEK | | 5040 | COBBLE HILL |
| 2009 | POLARIS | | 5005 | BETHESDA ROW |
| 2012 | DESTIN COMMONS | | 5006 | CADY'S ALLEY |
| 2013 | CITY CREEK | | 5007 | CROSBY STREET - SOHO |
| 2017 | CULVER CITY | | 5008 | 2ND STREET |
| 2023 | PATRIOT PLACE | | 5009 | KNOX-HENDERSON |
| 2027 | THE GREENE | | 5011 | BUCKHEAD |
| 2065 | MALL @ BAY PLAZA | | 5036 | GREENWICH AVENUE (BNBS) |
| 2066 | AMERICAN DREAM | | 5013 | SANTANA ROW |
| 2074 | UNIVERSITY T.C. | | 5018 | AVALON |
| 2075 | DOWNTOWN SUMMERLIN | | 5022 | SHAY, THE |
| 2101 | PLAZA LAS AMERICAS | | 5027 | DOMAIN NORTHSIDE |
| 2103 | PLAZA DEL CARIBE | | 5029 | NORTH LOOP |
| 2913 | BRICKELL CITY CENTRE | | 5030 | HILL, THE |
| 3000 | ELMWOOD | | 5031 | WOODWARD AVE |
| 3001 | KILDEER VILLAGE SQUARE | | 5033 | SOUTHPORT AVENUE |
| 3002 | TOWN SQUARE | | 5037 | LEGACY WEST |
| 3004 | WATERFORD LAKES | | 5041 | COW HOLLOW |
| | | | 5044 | SHOPS AT PRUDENTIAL |
| | | | 5048 | WEST END |
| | | | 5051 | HARBOR EAST |
| | | | 5053 | ICE BLOCKS |
| | | | 5055 | BROADWAY PLAZA |
| | | | 5058 | VILLAGE AT CORTE MADERA, THE |
| | | | 5061 | TWENTY NINTH STREET (BOULDER) |
| | | | 5067 | ATHERTON MALL |
| | | | 5073 | HIGHLAND VILLAGE |
| | | | 5015 | FASHION ISLAND |
| | | | 5026 | MADISON AVE |
| | | | 5035 | CHERRY CREEK NORTH |
| | | | 5052 | NORTH HILLS |
| | | | 5004 | GRANT AVENUE |
| | | | 5042 | MARYLAND PLAZA |
| | | | 5019 | UNIVERSITY VILLAGE |
| | | | 5012 | UNIVERSITY TOWNE CENTRE |
| | | | 5034 | CENTURY CITY |
| | | | 5021 | N. MICHIGAN AVE |
| | | | 5028 | SCOTTSDALE QUARTER |
| | | | 5043 | SEAPORT SQUARE |
| | | | 5062 | HYDE PARK VILLAGE |
| | | | 5064 | DERBY STREET SHOPPES |
| | | | 5060 | CITY CREEK |