## EXHIBIT C

**2023 Audit Engagement Letter**



May 8, 2023

Mr. Michael Archbold
Chair of the Audit Committee
Express, Inc.
One Express Drive
Columbus, Ohio 43230

Dear Mr. Archbold:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Express, Inc. (the "Company").

<u>2023 Integrated Audit of the Consolidated Financial Statements and Internal Control Over Financial Reporting - Services and related report</u>

We will perform an integrated audit of the consolidated financial statements of the Company at February 3, 2024 and for the year then ending and of the effectiveness of the Company's internal control over financial reporting as of February 3, 2024.  Upon completion of our work, we will provide the Company with our report on the audit work referred to above.  If for any reason we are unable to complete our integrated audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of this engagement.

In conjunction with the annual financial statement audit, we will perform reviews of the Company's unaudited consolidated quarterly financial information for each of the first three quarters in the year ending February 3, 2024, before the Form 10-Q is filed.  These reviews will be conducted in accordance with the standards established by the Public Company Accounting Oversight Board (the "PCAOB") and are substantially less in scope than an audit.  Accordingly, a review may not reveal material modifications necessary to make the quarterly financial information conform with generally accepted accounting principles.  We will communicate to the audit committee and management any matters that come to our attention as a result of the review that we believe may require material modifications to the quarterly financial information to make it conform with accounting principles generally accepted in the United States.  If for any reason we are unable to complete our review, we will notify the audit committee and management.

As part of this engagement and as is customary in our role as auditor, we may provide various types of insights-whether oral, written or visual.

You confirm that the requirements for audit committee pre-approval under the Sarbanes-Oxley Act of 2002 have been complied with relating to this engagement.

<u>Our responsibilities and limitations</u>

The objective of a financial statement audit is the expression of an opinion on the financial statements.  We will be responsible for performing the audit in accordance with the standards established by the PCAOB.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.  The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We will consider the Company's internal control over financial reporting in determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements.

The objective of an audit of internal control over financial reporting is the expression of an opinion on the effectiveness of the Company's internal control over financial reporting.  We



will be responsible for performing the audit in accordance with the standards established by the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. The audit will include obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control over financial reporting based on the assessed risk, and performing such other procedures as we consider necessary in the circumstances.

Under the standards established by the PCAOB, the existence of one or more material weaknesses will require us to issue an adverse opinion regarding the effectiveness of the Company's internal control over financial reporting.

All significant deficiencies and material weaknesses relating to internal control over financial reporting identified while performing our work will be communicated in writing to management and the audit committee. All deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude than significant deficiencies) identified while performing our work will be communicated in writing to management of the Company, and the Audit Committee will be informed when such a communication has been made. We will communicate in writing to the Board of Directors of the Company if we conclude that the oversight of the Company's external financial reporting and internal control over financial reporting by the Company's audit committee is ineffective.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness of internal control over financial reporting from February 3, 2024, the date of our audit of the Company's internal control over financial reporting, to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts, and of identifying material weaknesses in internal control over financial reporting. Absolute assurance is not attainable due to the nature of audit evidence and the characteristics of fraud. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements or other illegal acts having an indirect or immaterial financial statement impact or deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness. It is important to recognize that there are inherent limitations in the auditing process. An audit is based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Because of the characteristics of fraud, an audit designed and executed in accordance with the standards established by the PCAOB may not detect a material misstatement due to fraud. Characteristics of fraud include (i) concealment through collusion among management, employees, or third parties; (ii) withheld, misrepresented, or falsified documentation; and (iii) the ability of management to override or instruct others to override what otherwise appears to be effective controls. Further, while effective internal control over financial reporting reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the audit committee and management of the Company, as appropriate, any such matters identified during our audit.



We also are responsible for determining that the audit committee is informed about certain other matters related to the conduct of our audit, including (i) any disagreements with management about matters that could be significant to the Company's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the Company; and (iv) other matters related to the Company's financial statements including its significant accounting policies and practices, including critical accounting policies and alternative treatments within accounting principles generally accepted in the United States. Lastly, we are responsible for ensuring that the audit committee receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The financial statement audit and the audit of the Company's internal control over financial reporting will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Management's responsibilities

The Company's management is responsible for the financial statements, including disclosures, and information referred to above and for establishing and maintaining effective internal control over financial reporting. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in the United States. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements relating to accounts or disclosures and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's assessment, including separately disclosing to us all such deficiencies that it believes to be significant deficiencies or material weaknesses in internal control over financial reporting. Management also is responsible for identifying and ensuring that the Company complies with the laws and regulations applicable to its activities. Furthermore, management of the Company is responsible for:

- Establishing and maintaining internal control over financial reporting;
- Evaluating the effectiveness of the Company's internal control over financial reporting using suitable control criteria;
- Supporting its evaluation with sufficient evidential matter, including documentation, and
- Presenting a written assessment of the effectiveness of the Company's internal control over financial reporting as of the end of the Company's most recent fiscal year.

As part of management's responsibility for the financial statements and the effectiveness of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Company's financial records and relevant information and company personnel to whom we may direct inquiries. Management is responsible for maintaining evidential matter, including documentation of the design of controls to provide

3



reasonable support for management's assessment of the operating effectiveness of internal control over financial reporting.

As required by the standards of the PCAOB, we will make specific inquiries of management and others about the representations embodied in the financial statements and the internal control over financial reporting. Standards of the PCAOB also require that at the conclusion of the engagement we obtain a letter from management that confirms certain representations made during the audit of the financial statements and internal control over financial reporting. The results of our tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements and the effectiveness of the Company's internal control over financial reporting. Similarly, the results of our analytical procedures, the responses to our inquiries and the written representations obtained comprise the basis for our review on the unaudited quarterly financial information.

The internal auditors providing direct assistance to support our audit will be allowed to follow our instructions and the Company's management will not intervene in the work the internal auditors perform for us in a direct assistance capacity.

<u>Document retention</u>

The Company agrees to maintain documentation sufficient to support its assessment of internal control over financial reporting as of February 3, 2024 for a period of seven years from the date of our audit report.

<u>Other documents</u>

Standards established by the PCAOB require that we read any annual report (or similar document) that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements or management's assessment of the effectiveness of the Company's internal control over financial reporting. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

With regard to electronic filings, such as in connection with the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, you agree that, before filing any document in electronic format with the SEC with which we are associated, management of the Company will advise us of the proposed filing on a timely basis. We will provide the Company with a signed copy of our report(s) and consent(s). These manually signed documents will serve to authorize the use of our name prior to any electronic transmission by the Company. For our files, management of the Company will provide us with a complete copy of the document as accepted by EDGAR.

The Company may wish to include our report on these financial statements and internal control over financial reporting in a registration statement proposed to be filed under the Securities Act of 1933 or in offering materials for other securities offerings, including without limitation offerings under Rule 144A and other offerings exempt from registration under the Securities Act of 1933. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Additionally, regulations established by certain non-U.S. countries include a requirement for the auditor to be registered in that country if the Company offers its securities to the public in the non-U.S. country or provides financial information to a non-U.S. regulator or government. The potential consequences of our non-compliance with these regulatory regimes in a timely manner can be severe for both our Firm and the Company. Accordingly, you will notify us of (i) your current or planned offerings of securities on a regulated market in



a non-U.S. country or (ii) when you have provided or plan to provide audited financial statements to a non-U.S. regulator or government in connection with your access to its public capital markets, whether or not you include or refer to our report or include reference to our Firm.

<u>Dispute resolution procedures</u>

Any controversy or claim between the parties arising out of or relating to this engagement letter, the services provided hereunder, or any prior audit engagement letters or services (a "Dispute") shall be submitted first to non-binding, confidential mediation, and if not resolved by mediation, then to binding arbitration as described herein. The mediation shall be conducted in accordance with these procedures and, except to the extent inconsistent with these procedures, the Mediation Procedure of International Institute for Conflict Prevention and Resolution ("CPR") then in effect.

A party shall submit a Dispute to mediation by written notice to the other party or parties. The mediator shall be selected by mutual agreement of the parties. If the parties cannot agree on a mediator, the CPR shall designate a mediator in accordance with its Mediation Procedure. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of PricewaterhouseCoopers LLP or any PricewaterhouseCoopers LLP audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The mediation shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. The mediator may not testify for either party in any later proceeding relating to the Dispute. The mediation proceeding shall not be recorded or transcribed. Each party shall bear its own costs (including attorneys' fees) of the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a Dispute within 90 days after the written notice beginning the mediation process is served (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the Dispute shall be settled by binding arbitration. The arbitration shall be conducted in accordance with these procedures and, except to the extent inconsistent with these procedures, the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("Rules") then in effect. The arbitration shall be conducted before a panel of three arbitrators selected using the screened process provided in the Rules. The arbitration panel, and not any federal, state or local court or agency, shall have exclusive authority to resolve any dispute regarding the extent to which a Dispute is subject to arbitration, or relating to the interpretation, applicability, enforceability or formation of the engagement letter.

Any Dispute between the parties, including any claims or defenses asserted, and the interpretation of the engagement letter shall be governed by the law of New York State, without giving effect to its choice-of-law rules. The arbitrators may render early or summary disposition of some or all issues, after the parties have had a reasonable opportunity to make submissions on those issues. Discovery shall be conducted in accordance with the Rules. Upon a showing that the evidence sought is material to the Dispute, hearing sessions attended by one or more panel members may be convened to secure (i) documents from third-party witnesses, if the production cannot reasonably be obtained by other means; and/or (ii) testimony from third-party witnesses who could not be compelled to attend the arbitration hearing at its scheduled location.

Judgment on an arbitration award may be entered in any court having jurisdiction. All aspects of the arbitration shall be treated as confidential, except to the limited extent



necessary to obtain entry of the award by a court.  The arbitration panel shall have no power to award non-monetary or equitable relief of any sort.

Other PricewaterhouseCoopers firms and subcontractors

PricewaterhouseCoopers LLP is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers LLP, the "Other PwC Firms").  PricewaterhouseCoopers LLP may, in its discretion, draw on the resources of and/or subcontract to its subsidiaries, the Other PwC Firms and/or third party contractors and subcontractors (each, a "PwC Subcontractor"), in each case within or outside the United States in connection with the provision of the services and/or for internal, administrative and/or regulatory compliance purposes.  The Company agrees that PricewaterhouseCoopers LLP may provide information PricewaterhouseCoopers LLP receives in connection with this agreement to the PwC Subcontractors for such purposes.  PricewaterhouseCoopers LLP will be solely responsible for the provision of the services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Company's personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters.  When and if for any reason the Company is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit. Should the Company be acquired, PricewaterhouseCoopers LLP will reserve the right to renegotiate the fees.

Our fees for this integrated audit engagement will be $1,368,000, subject to the terms and conditions above. We will advise you should any circumstances arise which may require a change in scope and/or fee.

We also will bill the Company for our reasonable out-of-pocket expenses, any applicable sales, use or value added tax, and our internal per ticket charges for booking travel.  Amounts billed for services performed by PricewaterhouseCoopers LLP or PwC Subcontractors shall be considered fees and not expenses.

Invoices rendered are due and payable within 45 days upon receipt.

Any additional services that may be requested and we agree to provide will be the subject of separate arrangements.

Other matters

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs.  Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

Compliance with the auditor independence rules is a shared responsibility between a company and its independent auditor.  Because the independence rules encompass not only the Company but also its affiliates, as defined in Rule 2-01 of Regulation S-X, and beneficial owners (known through reasonable inquiry) of the Company's or an affiliate's equity securities where such beneficial owner has significant influence over the Company, as provided in Rule 2-01 of Regulation S-X,  the Company agrees to inform us periodically about the identity of each such affiliate or beneficial owner and will notify us in advance regarding any expected addition or removal of such an affiliate or beneficial owner which may impact our auditor independence, including, for example, due to the Company's (i) acquisition of a

6



new affiliate, (ii) disposition or change in control of, or additional investment in, an existing affiliate, or (iii) the identification of a new beneficial owner with significant influence over the Company. The Company acknowledges that we will use this information confidentially to assess and/or reassess independence.

In the event we are requested or authorized by the Company or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Company, the Company will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Company agrees that it will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP arising out of or in any way relating to this engagement letter, any services provided hereunder, or any fees for this engagement or such services, to anyone, except to an entity with which the Company merges or an entity which acquires all or substantially all of the assets of the Company and where, in either case, the assignee entity agrees to be bound by this provision. Any assignment or transfer by the Company in violation of this paragraph shall be void and invalid.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

The Company agrees that PricewaterhouseCoopers may use the Company's name and logo in experience citations.

Notwithstanding any other provision of this engagement letter, PwC and the Other PwC Firms may use the information received under this engagement letter, including tax return information, to develop, enhance, modify and improve technologies, tools, methodologies, services and offerings, and/or for development or performance of data analysis or other insight generation. Information developed in connection with these purposes may be used or disclosed to you or current or prospective clients to provide them services or offerings. PwC and the Other PwC Firms will not use or disclose the information in a way that would permit the Company to be identified by third parties without the Company's consent.

With respect to tax return information, the Company may request in writing a more limited use and disclosure than the foregoing. The foregoing consent is valid until further notice by the Company.

The provisions of the Data Protection Addendum hereto shall apply to the extent that PwC processes Client Personal Information (as that term is defined in the addendum) in connection with its performance of Services hereunder.



*   *   *   *   *

We are pleased to have the opportunity to provide services to Express, Inc..  If you have any questions about this letter, please discuss them with Nicholas Doland at (513) 673-2696. If the services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to me.  You may return the signed copy by hand, by mail or by air courier, attached to an email as a pdf, jpeg or similar file type sent to me at nicholas.doland@pwc.com, or by electronic signature.

Very truly yours:

DocuSigned by:

*PricewaterhouseCoopers LLP*

28710DE8D9804C4...

PricewaterhouseCoopers LLP

Date:

_____



cc: Audit Committee Members

The services and terms as set forth in this letter are agreed to.

Express, Inc.

By:



Michael Archbold

Chair of the Audit Committee

Date:

_____

Senior management of the Company is authorized by the Express, Inc.'s Audit Committee, to whom PricewaterhouseCoopers LLP will directly report, to execute this letter.

By:

Timothy Baxter

Chief Executive Officer

Date:

_____

By:

Jason Judd

Chief Financial Officer

Date:

_____



# DATA PROTECTION ADDENDUM

This Data Protection Addendum (this "***Addendum***") is made a part of the engagement letter (the "***Engagement Letter***") or the Statement of Work, as applicable, to which it is attached, by and between PricewaterhouseCoopers LLP ("***PwC***") and Express, Inc. ("***Client***") dated May 8, 2023, as amended, supplemented or otherwise modified by PwC and Client from time to time (the Engagement Letter, together with the Statement of Work, if applicable, the "***Agreement***"). Capitalized terms used in this Addendum but not defined herein will have the meanings assigned to such terms in the Agreement. If there is a conflict or inconsistency between the terms contained in the Engagement Letter, this Addendum, and the SCCs (as defined below) (to the extent the SCCs are effective between the parties), and/or the Statement of Work (if any), the following order of precedence shall apply: (i) the SCCs (to the extent applicable); (ii) the Statement of Work (if any); (iii) this Addendum; and then (iv) the Engagement Letter. This Addendum sets forth the confidentiality and security requirements for Client Personal Information (as defined below).

1. For purposes of this Addendum, (i) the term "***process***" shall mean any operation or set of operations which is performed upon Client Personal Information, whether or not by automatic means, such as collection, recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure, or destruction; and (ii) the term "***Services***" shall have the meaning set forth in the Agreement or, if the Agreement does not define "Services", shall mean the services to be performed by PwC as set forth in and pursuant to the Agreement.

2. "***Client Personal Information***" shall mean information that relates to an identified or identifiable household or living individual that is provided by or on behalf of Client to PwC in connection with PwC's performance of Services pursuant to the Agreement. The categories of data subjects and types of Client Personal Information anticipated to be provided to PwC in connection with the performance of Services are set forth on the attached Schedule A, provided that, in the event the parties execute a Statement of Work pursuant to the Engagement Letter, such Statement of Work shall set forth the categories of data subjects and types of Client Personal Information to be provided to PwC in connection with its performance of Services thereunder. Client shall not provide PwC with Client Personal Information except as agreed by the parties and set forth in Schedule A or the applicable Statement of Work (if any). For the avoidance of doubt, Client Personal Information shall not include any information that has been anonymized such that the data no longer relates to an identified or identifiable household or living individual.

3. PwC and Client shall process Client Personal Information in accordance with applicable data protection laws, rules, and regulations, including without limitation and in each case to the extent applicable, the General Data Protection Regulation (EU) 2016/679 (the "***GDPR***"), the California Consumer Privacy Act of 2018 (the "***CCPA***"), the California Privacy Rights Act of 2020 (the "***CPRA***"), and similar state laws (collectively, "***Applicable Data Protection Laws***") and PwC shall process Client Personal Information only in accordance with Client's documented instructions as established in or provided in accordance with this Addendum (including, without limitation, Schedule A) and/or the Agreement.

4. For purposes of this Addendum, "***SCCs***" means the Standard Contractual Clauses set out in Commission Implementing Decision (EU) 2021/914 of 4 June 2021, with Module One (Transfer controller to controller), Module Two (Transfer controller to processor), and/or Module Three (Transfer processor to processor) selected, as the context requires, including their annexes. At all times during the term of the Agreement, Client (as data exporter) and PwC (as data importer) shall comply with the SCCs with respect to Client Personal Information relating to EEA, Swiss, and/or UK data subjects (collectively, "***Client EEA Personal Information***") provided in accordance with Schedule A and/or the applicable Statement of Work (if any), which SCCs are hereby incorporated into and subject to the terms of the Agreement. To the extent SCC Module(s) Two and/or Three apply(ies), the parties hereby agree that PwC may engage PwC Sub-Processors (as defined



below) in accordance with Option 2 of SCC Clause 9(a), as described in Section 9 of this Addendum. Annex I to the SCCs is deemed to be prepopulated as set forth in <u>Schedule A</u>. Annex II to the SCCs is deemed to be prepopulated with the technical and organizational measures described in this Addendum and at https://www.pwc.com/us/en/site/assets/pwc-isp-security-statement.pdf. The SCCs shall be governed by the laws of the EU Member State in which Client is established or the laws of Malta, as applicable. Notwithstanding anything in the SCCs or the Agreement to the contrary, the parties acknowledge and agree that, to the extent permitted by applicable law and excluding individual data subject claims brought under SCC Clause 12: (i) any claims or proceedings against PwC arising from or in any way related to the SCCs shall be brought solely by Client in accordance with and subject to the Agreement; and (ii) any claims arising from or in any way related to the SCCs shall be subject to any limitation of liability, dispute resolution requirements, and other limitations set forth in the Agreement. PwC and Client hereby acknowledge and agree that each party's signature to the Agreement shall constitute such party's signature to the SCCs, as required by Applicable Data Protection Laws and to the extent the SCCs apply.

5. The parties acknowledge and agree that PwC is acting as a service provider (as such term is defined by the CCPA) to Client in connection with PwC's performance of Services pursuant to the Agreement. PwC acknowledges and confirms that it does not provide Client with any monetary or other valuable consideration in exchange for Client Personal Information and certifies that it understands and will comply with the restrictions set forth in this Section 5. Except as required by applicable law, regulation, or professional standard, PwC will not collect, access, use, disclose, process, or retain Client Personal Information for any purpose other than the purpose of performing the Services or another business purpose permitted by 11 CCR § 999.314(c), this Addendum, or the Agreement. In particular, PwC shall not sell (as defined by Applicable Data Protection Laws, including without limitation and to the extent applicable, the CCPA) or share (as defined by the CPRA) any Client Personal Information. PwC will, to the extent legally permissible, notify Client if PwC receives a request from a data subject of Client Personal Information seeking to exercise such data subject's rights under Applicable Data Protection Laws ("***Data Subject Access Request***"), and will, on Client's reasonable request, provide reasonable assistance in connection with Client's response to such Data Subject Access Request.

6. Client shall provide PwC with prior written notice if it intends to provide PwC with access to "***Protected Health Information***" as defined in the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations. If PwC agrees to process such Protected Health Information, then Client shall not provide Protected Health Information and PwC shall not commence such processing unless and until a Business Associate Agreement, in a form acceptable to both parties, has been executed and is effective between the parties.

7. The parties acknowledge that PwC does not maintain compliance with the Payment Card Industry Data Security Standard ("***PCI DSS***"), and Client therefore agrees that it will not provide PwC, directly or indirectly, with access to any payment card information, including without limitation any information relating to a payment card transaction except to the extent such access: (i) is expressly agreed upon in the Agreement; and (ii) occurs solely at a Client facility utilizing Client computing devices.

8. PwC shall ensure that persons authorized by PwC to process Client Personal Information have committed themselves to confidentiality or are under an appropriate statutory obligation of confidentiality. Without limiting the foregoing, except as otherwise permitted under this Addendum or the Agreement, PwC shall limit access to Client Personal Information to the Beneficiaries who require such access in order to perform the Services or to comply with applicable law or professional standards. PwC shall be solely responsible for all Client Personal Information provided to the Beneficiaries. For purposes of this Addendum, the term "Beneficiaries" shall have the meaning set forth in the Agreement or, if the Agreement does not define "***Beneficiaries***", shall mean the PwC



Subcontractors and the partners, principals, members, and employees of PwC and the PwC Subcontractors.

9. For purposes of this Addendum, "***PwC Sub-Processor***" means a PwC Subcontractor engaged to process Client Personal Information on behalf of Client in connection with such PwC Subcontractor's performance of Services. Client hereby grants PwC general written authorization to engage the PwC Sub-Processors set forth in <u>Schedule A</u>. PwC shall inform Client of: (i) any changes concerning the addition or replacement of Other PwC Firms by updating the hyperlink set forth in <u>Schedule A</u>, and (ii) to the extent the SCCs apply, any intended changes to the list of PwC Sub-Processors (other than Other PwC Firms) set forth in <u>Schedule A</u> in writing at least two (2) business days in advance. If Client notifies PwC in writing of any objections to such changes, PwC shall work with Client in good faith to find a commercially reasonable, mutually agreeable resolution to such objection. Without limiting the foregoing, Client also agrees that PwC may provide information PwC receives in connection with the Agreement, including without limitation Client Personal Information, to: its subsidiaries and affiliates; the Other PwC Firms, including those listed at the hyperlink set forth in <u>Schedule A</u>; and other PwC Subcontractors for internal, administrative, and/or regulatory compliance purposes as permitted under the Agreement. For a list of the primary PwC Subcontractors who provide back-office and administrative support to PwC, please visit https://www.pwc.com/us/en/site/privacy.html. PwC shall require the PwC Subcontractors, including without limitation the PwC Sub-Processors, who are provided access to, or otherwise come into contact with, Client Personal Information to protect all such Client Personal Information according to terms substantively similar to the terms of this Addendum. PwC will be solely responsible for the protection of any Client Personal Information provided to the PwC Subcontractors, including without limitation the PwC Sub-Processors, and for compliance with this Addendum.

10. PwC will implement and maintain the security controls set forth at https://www.pwc.com/us/en/site/assets/pwc-isp-security-statement.pdf, which are designed to comply with Applicable Data Protection Laws and protect against the unauthorized or unlawful processing, accidental loss, destruction, or damage of information such as Client Personal Information. Client acknowledges that PwC may change the security controls through the adoption of new or enhanced security technologies, provided that such changes do not diminish the level of security of Client Personal Information in PwC's possession, custody, or control, and Client authorizes PwC to make such changes.

11. PwC shall make available to Client all information necessary to demonstrate PwC's compliance with the obligations laid down in this Addendum and allow for and contribute to audits, including inspections, conducted by Client or another auditor mandated by Client that is not a PwC competitor. For the avoidance of doubt, the audits and inspections described in the preceding sentence shall be conducted solely as follows: on Client's written request, not more than once annually or if there are indications of non-compliance, in each case during the term of the Agreement, PwC will: (i) accurately complete a written security and privacy assessment questionnaire related to the Services, provided that doing so does not violate applicable law or PwC's confidentiality obligations, meet with Client to discuss the results of the assessment and answer questions regarding PwC's information security program, and reasonably treat any noted assessment deficiencies based upon risk severity; and/or (ii) provide PwC's then-current SOC3 audit report for its U.S. data center around AICPA trust principles of security and availability. To the extent SCC Module(s) Two and/or Three apply(ies), the parties hereby acknowledge and agree that such audits and inspections shall satisfy the audit-related requirements set forth in SCC Clause 8.9

12. Client represents that it shall comply with Applicable Data Protection Laws and acknowledges and agrees that, as between the parties, Client is responsible for providing any required notices to, and/or obtaining any required consents or authorizations from,



data subjects of the Client Personal Information and/or regulatory authorities, as applicable, in connection with Client Personal Information.

13. PwC will notify Client without undue delay upon learning of any accidental or unlawful destruction, loss, alteration, unauthorized disclosure of or access to Client Personal Information in its possession that is in breach of this Addendum (a "***Security Incident***"). PwC shall take reasonable steps to mitigate the effects of, and to minimize any damage resulting from, such Security Incident. At Client's reasonable request and subject to applicable law and PwC's confidentiality obligations, PwC agrees to meet with Client to discuss, as applicable and available at the time, the procedures that were followed during the investigation of any Security Incident, the chain of custody information, the forensic analysis of event logs used to determine the root cause, any restoration of data that may be required, and the remedial/corrective actions to be taken to prevent the Security Incident from occurring again.

14. On Client's written request at termination or expiration of the Agreement, PwC shall, where feasible, promptly and securely destroy and confirm such destruction of all Client Personal Information in its possession or control (including, without limitation, all electronic copies such as on hard drives, backup tapes, portable devices, optical, magnetic, or other storage media, as well as all hard copies) or, at the request and cost of Client, return such Client Personal Information in its possession or control, delete existing copies thereof, and confirm such destruction. Notwithstanding the foregoing, PwC shall be permitted to retain copies of Client Personal Information consistent with its document retention policies or as required by applicable law, regulation, or professional standards. Any Client Personal Information so kept shall be maintained in accordance with PwC's obligations under this Addendum and only processed to the extent and for as long as required for such purposes. To the extent the SCCs apply, the parties hereby acknowledge and agree that compliance with this Section 14 shall satisfy SCC Module One Clause 8.4, SCC Module(s) Two and/or Three Clause 8.5, and/or SCC Clause 16(d), as applicable.



**Schedule A**

1. **LIST OF PARTIES**

   a. Client (as defined in this Addendum) shall, to the extent the SCCs apply, act as data exporter

      i. Client address, contact person: As set forth in the Agreement

      ii. Activities: Procurement of Services pursuant to the Agreement

      iii. Role (controller/processor): Controller or processor, as the context requires

   b. PwC (as defined in this Addendum) shall, to the extent the SCCs apply, act as data importer

      i. PwC address, contact person: As set forth in the Agreement

      ii. Activities: Performance of Services pursuant to the Agreement

      iii. Role (controller/processor): Controller or processor, as the context requires

2. **DESCRIPTION OF TRANSFER**

   a. Categories of data subjects (e.g., current and/or former employees of Client) whose Client Personal Information is provided to PwC in connection with its performance of the Services:

      - Employees of this client
      - Individuals who do business with our clients (e.g. individual customers or contractors of this client)

   b. Categories of Client Personal Information (e.g., Social Security Numbers, dates of birth, or home addresses) provided to PwC in connection with its performance of the Services:

      - Personal financial information (financial accounts of parties, such as bank accounts, investment accounts, payroll records, credit check/score etc.)
      - Government issued ID numbers (SSN, Passport, driver's license, national health ID, tax ID)
      - Alternate Identifier (non-sensitive identifiers used to identify parties e.g. employee ID number, customer number, GUID etc.)
      - Resume (a bio that depicts a person's work experience and education background)
      - Basic personal information commonly referred to as "business card data " such as name, titles, email, office address, and phone number

   c. Sensitive data transferred (if applicable): None, except to the extent expressly agreed by the parties in this Schedule A or the applicable Statement of Work (if any). For this purpose, "sensitive data" means Client Personal Information revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, or trade union membership, genetic data, or biometric data for the purpose of uniquely identifying a natural person, data concerning health or a person's sex life or sexual orientation, or data relating to criminal convictions or offences.

   d. Frequency of the transfer (e.g., whether the Client Personal Information is transferred on a one-off or continuous basis): As needed to facilitate performance of the Services in accordance with the Agreement.

   e. Nature and purpose(s) of the processing:



i.   When PwC processes Client Personal Information as a controller, PwC shall do so for the purposes of: (i) providing the Services; (ii) administering, managing, and developing PwC's business and services; (iii) security, quality, and risk management activities; (iv) providing Client with information about PwC and its range of services; and/or (v) complying with any applicable requirement of law, regulation, or professional standards.

ii.  When PwC processes Client Personal Information as a processor, PwC shall do so in accordance with PwC's obligations under Article 28 of the GDPR as set forth in this Addendum and the SCCs (to the extent applicable), and solely for the purposes permitted under this Addendum and/or the Agreement, including to perform the Services and as required by applicable law, regulation, or professional standards.

f.   Period for which the Client Personal Information will be retained: Until such Client Personal Information is returned or destroyed in accordance with and subject to the terms of this Addendum.

g.   PwC may engage the following PwC Sub-Processors in accordance with the terms of this Addendum and the Agreement:

i.   PwC's subsidiaries and affiliates and the Other PwC Firms, including those listed at https://www.pwc.com/gx/en/about/office-locations.html.

ii.  Independent contractors who are natural persons acting under PwC's supervision.

iii. Additional PwC Subcontractors engaged to perform Services as permitted under the Agreement.

3.  **COMPETENT SUPERVISORY AUTHORITY**

a.   To the extent the SCCs apply, the competent supervisory authority shall be determined in accordance with SCC Clause 13(a).