**<u>Exhibit A</u>**

**First Lien DIP ABL Credit Agreement**

**SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION
ASSET-BASED LOAN CREDIT AGREEMENT**

**Dated as of
April 24, 2024**

among

**EXPRESS, INC.,**
as Holdings

**EXPRESS TOPCO LLC,**
as Intermediate Holdings

**EXPRESS HOLDING, LLC,**
as Parent

**EXPRESS, LLC,**
as Borrower

**THE OTHER LOAN PARTIES PARTY HERETO**

**THE INITIAL LENDERS, INITIAL ISSUING BANK AND
SWING LINE BANK NAMED HEREIN,**
as Initial Lenders, Initial Issuing Bank and Swing Line Bank

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative Agent and Collateral Agent

**BANK OF AMERICA, N.A.,**
as Documentation Agent

and

**WELLS FARGO BANK, NATIONAL ASSOCIATION
BANK OF AMERICA, N.A.**
as Joint Lead Arrangers and Joint Bookrunners

# T A B L E   O F   C O N T E N T S

**SECTION**                                                                     **PAGE**

ARTICLE I - DEFINITIONS AND ACCOUNTING TERMS ............................................... 1

    SECTION 1.01.  Certain Defined Terms ........................................................................ 2
    SECTION 1.02.  Computation of Time Periods; Other Definitional Provisions ............... 50
    SECTION 1.03.  Accounting Terms. ............................................................................. 51
    SECTION 1.04.  [Reserved]. ........................................................................................ 51
    SECTION 1.05.  Letter of Credit Amounts. .................................................................. 51
    SECTION 1.06.  Divisions. ........................................................................................... 51
    SECTION 1.07.  Rates. ................................................................................................ 51

ARTICLE II - AMOUNTS AND TERMS OF THE ADVANCES AND THE LETTERS OF CREDIT .. 52

    SECTION 2.01.  The Advances. ................................................................................... 52
    SECTION 2.02.  Making the Advances. ........................................................................ 53
    SECTION 2.03.  Letters of Credit. ............................................................................... 56
    SECTION 2.04.  Repayment of Advances ..................................................................... 64
    SECTION 2.05.  Termination or Reduction of the Commitments. .................................... 64
    SECTION 2.06.  Prepayments. ..................................................................................... 65
    SECTION 2.07.  Interest. ............................................................................................. 67
    SECTION 2.08.  Fees. ................................................................................................. 67
    SECTION 2.09.  Conversion of Advances. ..................................................................... 68
    SECTION 2.10.  Increased Costs, Etc. .......................................................................... 69
    SECTION 2.11.  Payments and Computations. ............................................................... 72
    SECTION 2.12.  Taxes. ................................................................................................ 75
    SECTION 2.13.  Sharing of Payments, Etc. ................................................................... 78
    SECTION 2.14.  Use of Proceeds .................................................................................. 79
    SECTION 2.15.  Defaulting Lenders. ............................................................................ 79
    SECTION 2.16.  Evidence of Debt. ............................................................................... 81
    SECTION 2.17.  Reserves; Eligibility Criteria ............................................................... 82
    SECTION 2.18.  Security and Administrative Priority. .................................................... 83
    SECTION 2.19.  Prepetition Bank Product Obligations; Deposit Account Control Agreements ...... 85
    SECTION 2.20.  Superpriority ...................................................................................... 85
    SECTION 2.21.  Waiver of any Priming Rights ............................................................. 85

ARTICLE III - CONDITIONS TO EFFECTIVENESS AND OF LENDING ......................... 86

    SECTION 3.01.  Conditions Precedent to Initial Extensions of Credit Hereunder ............. 86
    SECTION 3.02.  Conditions Precedent to Each Borrowing and Issuance .......................... 88
    SECTION 3.03.  Determinations Under Section 3.01 ....................................................... 89

ARTICLE IV - REPRESENTATIONS AND WARRANTIES ............................................... 89

    SECTION 4.01.  Representations and Warranties ............................................................ 89

ARTICLE V - COVENANTS OF THE LOAN PARTIES .................................................... 95

    SECTION 5.01.  Affirmative Covenants ........................................................................ 95
    SECTION 5.02.  Negative Covenants .......................................................................... 103
    SECTION 5.03.  Reporting Requirements .................................................................... 114
    SECTION 5.04.  Holding Company Status ................................................................... 120
    SECTION 5.05.  Financial Covenant ........................................................................... 121

ARTICLE VI - EVENTS OF DEFAULT ......................................................................... 121

    SECTION 6.01.  Events of Default .............................................................................. 121
    SECTION 6.02.  Actions in Respect of the Letters of Credit upon Default ...................... 128

ARTICLE VII - THE AGENTS ..................................................................................... 128

SECTION 7.01.   Authorization and Action. ....................................................... 128
SECTION 7.02.   Agents' Reliance, Etc. ............................................................... 129
SECTION 7.03.   WFB and Affiliates .................................................................. 131
SECTION 7.04.   Lender Party Credit Decision .................................................. 131
SECTION 7.05.   Indemnification. ....................................................................... 131
SECTION 7.06.   Successor Agents ..................................................................... 132
SECTION 7.07.   [Reserved]. ............................................................................... 133
SECTION 7.08.   Collateral and Guaranty Matters .............................................. 133
SECTION 7.09.   Notice of Transfer. ................................................................... 133
SECTION 7.10.   Reports and Financial Statements. ........................................... 134
SECTION 7.11.   Agency for Perfection. ............................................................. 134
SECTION 7.12.   Providers. ................................................................................. 135

ARTICLE VIII - GUARANTY ................................................................................. 135

SECTION 8.01.   Guaranty; Limitation of Liability ............................................ 135
SECTION 8.02.   Guaranty Absolute ................................................................... 136
SECTION 8.03.   Waivers and Acknowledgments. .............................................. 137
SECTION 8.04.   Subrogation .............................................................................. 138
SECTION 8.05.   Guaranty Supplements ............................................................. 139
SECTION 8.06.   Subordination ........................................................................... 139
SECTION 8.07.   Continuing Guaranty; Assignments ......................................... 140

ARTICLE IX - MISCELLANEOUS ......................................................................... 140

SECTION 9.01.   Amendments, Etc. ..................................................................... 140
SECTION 9.02.   Notices, Etc. ............................................................................. 141
SECTION 9.03.   No Waiver; Remedies ............................................................... 143
SECTION 9.04.   Costs and Expenses .................................................................. 143
SECTION 9.05.   Right of Set-off ........................................................................ 145
SECTION 9.06.   Binding Effect .......................................................................... 145
SECTION 9.07.   Assignments and Participations. .............................................. 145
SECTION 9.08.   Execution in Counterparts; Integration .................................... 149
SECTION 9.09.   No Liability of the Issuing Bank .............................................. 149
SECTION 9.10.   Confidentiality. ........................................................................ 149
SECTION 9.11.   Release of Collateral ............................................................... 150
SECTION 9.12.   Replacement of Holdout Lender. ............................................. 150
SECTION 9.13.   Patriot Act Notice, Etc. ........................................................... 151
SECTION 9.14.   Jurisdiction, Etc. ...................................................................... 151
SECTION 9.15.   Governing Law ......................................................................... 152
SECTION 9.16.   Waiver of Jury Trial ................................................................. 152
SECTION 9.17.   [Intentionally Omitted] ............................................................ 152
SECTION 9.18.   Keepwell .................................................................................. 152
SECTION 9.19.   [Intentionally Omitted] ............................................................ 152
SECTION 9.20.   Acknowledgment and Consent to Bail-In of Affected Financial Institutions ....... 152
SECTION 9.21.   Acknowledgment Regarding Any Supported QFCs ................. 153
SECTION 9.22.   Severability .............................................................................. 153
SECTION 9.23.   Intercreditor Agreements ......................................................... 153
SECTION 9.24.   Erroneous Payments .................................................................. 154
SECTION 9.25.   Orders ....................................................................................... 156

### SCHEDULES TO THIS AGREEMENT

Schedule I          -          Commitments
Schedule II         -          Subsidiary Guarantors
Schedule 2.03(e)    -          Prepetition Letters of Credit
Schedule 4.01(b)    -          Company Information
Schedule 4.01(c)    -          Subsidiaries and Other Equity Investments
Schedule 4.01(u)    -          Tax Returns
Schedule 5.01(r)    -          Milestones
Schedule 5.02(a)    -          Existing Liens
Schedule 5.02(b)    -          Existing Debt
Schedule 5.02(f)    -          Existing Investments

### EXHIBITS TO THIS AGREEMENT

Exhibit A    -    Form of Revolving Credit Note
Exhibit B    -    Form of Notice of Borrowing
Exhibit C    -    Form of Assignment and Assumption
Exhibit D    -    Form of Guaranty Supplement
Exhibit E    -    Form of Initial Budget
Exhibit F    -    Form of Borrowing Base Certificate

## SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION ASSET-BASED LOAN CREDIT AGREEMENT

This **SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION ASSET-BASED LOAN CREDIT AGREEMENT** dated as of April 24, 2024 (as amended, amended and restated, supplemented, modified or otherwise in effect from time to time, this "***Agreement***"), among EXPRESS, INC., a Delaware corporation ("***Holdings***"), EXPRESS TOPCO LLC, a Delaware limited liability company ("***Intermediate Holdings***"), EXPRESS HOLDING, LLC, a Delaware limited liability company (the "***Parent***"), EXPRESS, LLC, a Delaware limited liability company (the "***Borrower***"), the other Loan Parties (as hereinafter defined), the Lenders (as hereinafter defined), the Issuing Bank (as hereinafter defined), the Swing Line Bank (as hereinafter defined), WELLS FARGO BANK, NATIONAL ASSOCIATION, as collateral agent (together with any successor collateral agent appointed pursuant to Article VII, the "***Collateral Agent***") for the Secured Parties (as hereinafter defined) and as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "***Administrative Agent***" and, together with the Collateral Agent, the "***Agents***") for the Lender Parties (as hereinafter defined), and Bank of America, N.A., as documentation agent (the "***Documentation Agent***").

## PRELIMINARY STATEMENTS:

(1)    On April 22, 2024 (the "*Petition Date*"), (i) Holdings, (ii) Intermediate Holdings, (iii) Parent, (iv) the Borrower and (v) the other Loan Parties party hereto (collectively, the "***Debtors***" and each individually, a "***Debtor***") commenced Chapter 11 Cases Nos. 24-10831 through 24-10842, as jointly administered under Chapter 11 Case No. 24-10831 (collectively, the "***Chapter 11 Cases***" and each individually, a "***Chapter 11 Case***"), by filing with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

(2)    the Debtors continue to operate their businesses as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

(3)    prior to the Petition Date, the Prepetition ABL Lenders (as hereinafter defined) provided financing to the Borrower pursuant to that certain Second Amended and Restated Asset-Based Loan Credit Agreement, dated as of May 20, 2015, by and among, Holdings, Intermediate Holdings, Parent, the Borrower, each of the other Loan Parties party thereto, the Prepetition ABL Lenders, and the Prepetition ABL Agents (as hereinafter defined) (as amended, restated, modified, waived or supplemented through the date hereof, the "***Prepetition ABL Credit Agreement***");

(4)    Borrower has requested and Lenders have agreed to provide a secured revolving credit facility to Borrower in order to (a) fund the continued operation of Borrower's businesses as debtor and debtor-in-possession under the Bankruptcy Code during the pendency of the Chapter 11 Cases and (b) repay in full the Prepetition Secured Obligations (as hereinafter defined); and

(4)    the Lenders are willing to make available to Borrower such postpetition loans, other extensions of credit and financial accommodations upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby covenant and agree as follows:

## ARTICLE I -

## DEFINITIONS AND ACCOUNTING TERMS

1

SECTION 1.01. Certain Defined Terms. As used in this Agreement (including in the preamble and the preliminary statements hereto), the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account(s)*" means "accounts" as defined in the UCC and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, or (b) for services rendered or to be rendered. The term "Account" does not include (a) rights to payment evidenced by chattel paper or an instrument, (b) commercial tort claims, (c) deposit accounts, (d) investment property, or (e) letter-of-credit rights or letters of credit.

"*Account Debtor*" means the Person obligated on an Account.

"*Additional Guarantor*" has the meaning specified in Section 8.05.

"*Adequate Protection Provisions*" means the provisions of the Orders providing adequate protection to the Prepetition Term Loan Secured Parties and Prepetition ABL Secured Parties, including, the "Adequate Protection Obligations" and "Adequate Protection Liens" as defined therein.

"*Adjusted Term SOFR*" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Administrative Agent's Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lender Parties from time to time.

"*Advance*" means a Revolving Credit Advance, a Swing Line Advance, a Letter of Credit Advance, or a Protective Advance.

"*Affected Financial Institution*" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or other agreement. For the avoidance of doubt, each of Express JV and Bonobos shall constitute an Affiliate for all purposes.

"*Agents*" has the meaning specified in the preamble to this Agreement.

"*Agent's Advisor*" Alix Partners, LLC or any other financial advisor or consultant retained by the Administrative Agent or the attorneys or other advisors of the Administrative Agent.

"*Aggregate Commitments*" means the Commitments of all of the Lenders. The Aggregate Commitments of all Revolving Credit Lenders as of the Effective Date is $160,852,550.35.

"***Aggregate Loan Cap***" means, at any time of determination, the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base.

"***Agreement***" has the meaning specified in the preamble hereto.

"***Agreement Value***" means, for each Hedge Agreement, on any date of determination, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreement, (a) for any date on or after the date such Hedge Agreement has been closed out and termination value determined in accordance therewith, such termination value, and (b) for any date prior to the date referenced in clause (a), the amount determined as the mark-to-market value for such Hedge Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreement (which may include a Lender or any Affiliate of a Lender).

"***Anti-Corruption Laws***" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"***Anti-Money Laundering Laws***" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"***Applicable Lending Office***" means, with respect to each Lender Party, the office or offices of such Lender Party described as such in such Lender Party's administrative questionnaire provided to the Administrative Agent, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent in writing.

"***Applicable Margin***" means the percentages set forth below:

| Base Rate Advances | SOFR Advances |
|:---:|:---:|
| 3.25% | 4.25% |

"***Appropriate Lender***" means, at any time, with respect to (a) the Revolving Credit Facility, a Lender that has a Commitment at such time, (b) the Letter of Credit Facility, (i) the Issuing Bank and (ii) if the other Revolving Credit Lenders have made Letter of Credit Advances pursuant to Section 2.03(d) that are outstanding at such time, each such other Revolving Credit Lender and (c) the Swing Line Facility, (i) the Swing Line Bank and (ii) if the other Revolving Credit Lenders have made Swing Line Advances pursuant to Section 2.02(b) that are outstanding at such time, each such other Revolving Credit Lender.

"***Approved Accounting Firm***" means any of the "Big 4" accounting firms or any other independent public accountant of recognized standing reasonably acceptable to the Administrative Agent.

"***Approved Budget***" means the Initial Budget until, if applicable, there is an Updated Approved Budget, in which case the Approved Budget shall be the most recent Updated Approved Budget approved by the Administrative Agent and Required Lenders in accordance with Section 5.01(s).

"*Approved Fund*" means any Fund that is administered or managed by (i) a Lender Party, (ii) an Affiliate of a Lender Party or (iii) an entity or an Affiliate of an entity that administers or manages a Lender Party.

"*Arrangers*" means, collectively, WFB and Bank of America, N.A., each in its capacity as a joint lead arranger and a joint bookrunner.

"*Assignment and Assumption*" means an assignment and assumption entered into by a Lender Party and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "*Eligible Assignee*"), and accepted by the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent and the Borrower.

"*Audited Financial Statements*" means the audited Consolidated balance sheet of Holdings and its Subsidiaries for the Fiscal Year ended January 28, 2023, and the related Consolidated statements of income or operations and cash flows for such Fiscal Year of Holdings and its Subsidiaries, including the notes thereto.

"*Auto-Extension Letter of Credit*" shall have the meaning specified in Section 2.03(b)(iii).

"*Available Amount*" of any Letter of Credit means, at any time, the maximum amount for which such Letter of Credit may be honored (assuming compliance at such time with all conditions to drawing).

"*Available Tenor*" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.10(g)(iv).

"*Average Daily Availability*" means, for any Fiscal Quarter, an amount equal to the sum of Excess Availability for each day of such Fiscal Quarter divided by the actual number of days in such Fiscal Quarter, as determined by the Administrative Agent, which determination shall be conclusive absent manifest error.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, remedies, or causes of action that may be brought by or on behalf of the Loan Parties or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under Bankruptcy Code sections 502, 510, 542, 544, 545, 547 through and including Bankruptcy Code sections 553, and 724(a) or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

"*Avoided Payment*" has the meaning set forth in Section 2.06(b)(vi) of this Agreement.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which

is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"***Bank Products***" means any services or facilities provided to any Loan Party by any Lender or any of its Affiliates (but excluding Cash Management Services) including, without limitation, on account of (a) Hedge Agreements, (b) merchant services constituting a line of credit, (c) leasing, (d) Factored Receivables, and (e) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"***Bank Product Reserves***" means such reserves as the Administrative Agent from time to time determines in its Permitted Discretion and subject to <u>Section 2.17(a)</u> as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"***Bankruptcy Code***" means Title 11 of the United States Code, as in effect from time to time.

"***Bankruptcy Court***" has the meaning specified in the recitals hereto.

"***Bankruptcy Law***" or "***Debtor Relief Law***" means, collectively, the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"***Base Rate***" means, for any day, the greatest of (a) the Floor, plus 1%, (b) the Federal Funds Rate in effect on such day plus ½%, (c) Term SOFR for a one month tenor in effect on such day, plus 1%, <u>provided</u> that this clause (c) shall not be applicable during any period in which Term SOFR is unavailable or unascertainable, and (d) the rate of interest announced, from time to time, within WFB at its principal office in San Francisco as its "prime rate" in effect on such day, with the understanding that the "prime rate" is one of WFB's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as WFB may designate.

"***Base Rate Advance***" means an Advance that bears interest at a rate based on the Base Rate.

"***Base Rate Term SOFR Determination Day***" has the meaning specified in the definition of "Term SOFR".

"***Basel III***" means the set of reform measures designed to improve the regulation, supervision and risk management within the banking sector, as developed by the Basel Committee on Banking Supervision.

"***Benchmark***" means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 2.10(g)(i)</u>.

"***Benchmark Replacement***" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-

prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated, syndicated credit facilities at such time.

"***Benchmark Replacement Date***" means, with respect to any then-current Benchmark, the earlier to occur of the following events with respect to such Benchmark:

        (a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

        (b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Event***" means, with respect to the then-current Benchmark, the occurrence of one or more of the following events with respect to such Benchmark:

        (a)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

        (b)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof),

the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if the then-current Benchmark has any Available Tenors, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Start Date*" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication).

"*Benchmark Unavailability Period*" means, with respect to any then-current Benchmark, if a Benchmark Transition Event and its related Benchmark Replacement Date has occurred with respect to such then-current Benchmark and solely to the extent that such then-current Benchmark has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10(g) and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10(g).

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*BHC Act Affiliate*" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States of America.

"*Bonobos*" means BNWHP, LLC, a Delaware limited liability company (as successor by conversion to Bonobos, Inc., a Delaware corporation).

7

"***Bonobos IP***" means any and all Intellectual Property that (i) are or have been assigned, transferred, contributed, conveyed, sold, delivered, or provided (or are required to be assigned, transferred, contributed, conveyed, sold, delivered, or provided) to Bonobos or any Affiliate thereof pursuant to any Bonobos IP Transaction Document, or (ii) are licensed or sublicensed to Holdings or any of its Affiliates pursuant to any Bonobos IP Transaction Document.

"***Bonobos IP License Agreements***" means, collectively:

  (a) that certain License Agreement dated as of May 23, 2023, by and between Bonobos, as "licensor", and Holdings, as "licensee" (the "***Bonobos Prime License Agreement***"),

  (b) the Intercompany IP License Agreements, and

  (c) any other license agreement between any Loan Party or any Subsidiary as "licensee" and a third party as "licensor" with respect to any of the Bonobos IP,

in each case as in effect as of the Effective Date (or, in the case of any Bonobos IP License Agreement described in clause (c) above, as in effect on the date of execution thereof and in form and substance substantially identical to the Intercompany IP License Agreements or otherwise reasonably satisfactory to the Agents) or subsequently amended in accordance with Section 5.02(k)(ii).

"***Bonobos IP Rights Agreement***" means that certain Bonobos IP Rights Agreement, dated as of September 5, 2023, by Bonobos and Holdings (in its capacity as sublicensor under the applicable Bonobos IP License Agreement) and acknowledged and agreed by the Loan Parties, the Prepetition Agents and the Prepetition Term Agents, as amended, restated, supplemented or otherwise modified in accordance with the terms hereof and thereof.

"***Bonobos IP Transaction Documents***" means the documents, instruments and agreements described on Schedule V to the Prepetition Credit Agreement.

"***Bonobos IP Transactions***" means collectively, the transactions described in the Bonobos IP Transaction Documents.

"***Bonobos Prime License Agreement***" has the meaning specified in the definition of "Bonobos IP License Agreements".

"***Borrower***" has the meaning specified in the preamble to this Agreement.

"***Borrower's Account***" means the account of the Borrower specified by the Borrower in writing to the Administrative Agent from time to time.

"***Borrowing***" means a Revolving Credit Borrowing or a Swing Line Borrowing.

"***Borrowing Base***" means, at any time, the sum of

  (a) the product of (i) the Inventory Advance Rate at such time, *multiplied* by (ii) the Net Orderly Liquidation Value of the Eligible Inventory of the Borrowing Base Parties at such time, *multiplied* by (iii) the Cost of such Eligible Inventory of the Borrowing Base Parties at such time, plus

(b)     the product of the Credit Card Advance Rate at such time and the face amount of Eligible Credit Card Receivables of the Borrowing Base Parties at such time, plus

(c)     the lesser of (x) 100% of Borrowing Base Eligible Cash Collateral, and (y) an amount equal to 30% of the Borrowing Base, minus

(d)     the sum of (x) the Term Pushdown Reserve, (y) the Carve Out Reserve, and (z) the aggregate amount of all Reserves at such time.

"***Borrowing Base Certificate***" means a certificate of the Borrower on behalf of the Loan Parties, signed by a Responsible Officer of the Borrower, in the form of Exhibit F (or another form which is mutually acceptable to the Collateral Agent and the Borrower).

"***Borrowing Base Eligible Cash Collateral***" means only such unrestricted cash and Cash Equivalents of a Borrowing Base Party (a) that are maintained in a deposit or investment account with WFB or an affiliate thereof specifically and solely used for purposes of holding such cash or Cash Equivalents, which account is subject to a first priority perfected security interest in favor of the Collateral Agent, for the benefit of the Secured Parties (subject to Permitted Liens that do not have priority over the Lien of the Collateral Agent (other than inchoate or other Liens arising by operation of law and Liens described in clause (x) of the definition of "Permitted Liens")), and (b) for which the Collateral Agent shall have received evidence, in form and substance reasonably satisfactory to the Collateral Agent, of the amount of such cash or Cash Equivalents held in such deposit or investment account as of the applicable date of the calculation of Availability by the Collateral Agent.  It is understood and agreed that Cash Collateral pledged to secure L/C Obligations constitutes Borrowing Base Eligible Cash Collateral and will be added to and included with immediate effect to the calculation of the Borrowing Base up to the amount of such L/C Obligations from the time pledged and deposited with Administrative Agent in accordance with the terms hereof, notwithstanding the "as of date" or timing of the then current Borrowing Base Certificate or similar reporting timing requirements set forth herein.

"***Borrowing Base Party***" means (a) the Borrower and/or (b) any Subsidiary Guarantor.

"***Business Day***" means any day that is not a Saturday, Sunday or other day on which the Federal Reserve Bank of New York is closed.

"***Capitalized Leases***" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases, subject to <u>Section 1.03</u>.

"***Carve Out***" has the meaning specified in the Orders.

"***Carve Out Reserve***" means a mandatory reserve established by the Administrative Agent in an amount equal to the "Specified ABL Reserve Amount" (as defined in the Orders) as calculated and updated by the Administrative Agent in accordance with the Orders.

"***Cash Collateralize***" means (i) with respect to L/C Obligations, to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 103% of the Outstanding Amount of all L/C Obligations (other than L/C Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which L/C Obligations shall be Cash Collateralized in an amount equal to 107% of the Outstanding Amount of such L/C Obligations), pursuant to documentation in form and substance satisfactory to the Administrative Agent in its Permitted Discretion and the Issuing Bank (which documents are hereby Consented to by the Lenders), and (ii) with respect to Obligations on account of Bank

Products, to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the applicable Providers, as collateral for such Obligations, cash or deposit account balances in an amount determined by the Administrative Agent as sufficient to satisfy the reasonably estimated credit exposure, operational risk or processing risk with respect to such Obligations then existing, pursuant to documentation in form and substance satisfactory to the Administrative Agent in its Permitted Discretion (which documents are hereby Consented to by the Lenders).   The term "Cash Collateral" shall have a correlative meaning.

"*Cash Equivalents*" means any of the following, to the extent owned by the Parent or any of its Restricted Subsidiaries free and clear of all Liens other than Permitted Liens and Liens created under the Collateral Documents and, in each case, having a maturity of not greater than one year from the date of issuance thereof:

(a)    readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States,

(b)    readily marketable direct obligations of any member of the European Economic Area, Switzerland or Japan, or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of such country, and, at the time of acquisition thereof having a credit rating of at least AA- (or the equivalent grade) by Moody's or Aa3 by S&P,

(c)    marketable general obligations issued by any state of the United States or any political subdivision thereof or any or any instrumentality thereof that is guaranteed by the full faith and credit of such state and, at the time of acquisition thereof having a credit rating of at least AA- (or the equivalent grade) by Moody's or Aa3 by S&P,

(d)    insured certificates of deposit, time deposits, eurodollar time deposits or overnight time deposits with any commercial bank that is organized under the laws of the United States or any State thereof, any member of the European Economic Area, Switzerland or Japan and has combined capital and surplus of at least $500 million,

(e)    commercial paper issued by any Lender or any corporation organized under the laws of any State of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P, (f) repurchase agreements and reverse repurchase agreements with a duration of not more than 30 days for underlying securities of the types set forth in clauses (a) through (e) of this definition entered into with any financial institution meeting the specifications in clause (d) above,

(g)    [intentionally omitted], or

(h)    Investments in money market funds, of which at least 95% of the portfolios are limited solely to Investments of the character, quality and maturity described in clauses (a) through (f) of this definition.

With respect to any Foreign Subsidiary, "Cash Equivalents" shall also include any Investment substantially comparable to the foregoing but in the currency of the jurisdiction of organization of such Subsidiary, Euros or Dollars.

"*Cash Management Bank*" means any Person that is a Lender or an Affiliate of a Lender and that enters into a Secured Cash Management Agreement.

10

"***Cash Management Reserves***" means the amount of reserves as the Administrative Agent determines in its Permitted Discretion and subject to <u>Section 2.17(a)</u> as being appropriate to reflect the reasonably anticipated credit exposure of the Loan Parties with respect to Cash Management Services then provided or outstanding; <u>provided</u>, that, in order to qualify as Cash Management Reserves, the method of calculation of such reserves must be established on or substantially contemporaneously on the date that any Lender or any of its respective Affiliates provides the applicable Cash Management Service or promptly after any amendment to the terms and conditions of such Cash Management Service.

"***Cash Management Services***" means any cash management services or facilities, if any, provided to the Borrower and its Restricted Subsidiaries by any Lender or any of its respective Affiliates, including, without limitation: (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) credit or debit cards, (d) credit card processing services, and (e) purchase cards.

"***Cash Management Order***" means any order entered by the Bankruptcy Court, in form and substance acceptable to the Administrative Agent and Lenders, governing the Debtors' cash management system on an interim basis and final basis, as applicable.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"***CERCLIS***" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"***Change in Law***" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority, (c) any new, or adjustment to, requirements prescribed by the Board for "Eurocurrency Liabilities" (as defined in Regulation D of the Board), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by any Agent or any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or (d) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"***Change of Control***" means the occurrence of any of the following:

       (a)       any Person or two or more Persons acting in concert shall have acquired beneficial ownership (within the meaning of Rule 13(d)-3 of the SEC under the Securities Exchange Act of 1934, as amended), directly or indirectly, of Voting Interests (or other securities convertible into such Voting Interests) representing 50% or more of the combined voting power of all Voting Interests of Holdings;

       (b)       during any period of up to 12 consecutive months, Continuing Directors shall cease for any reason to constitute a majority of the board of directors of Holdings;

(c)    Holdings fails at any time to own 100% of the Equity Interests of Intermediate Holdings free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the Junior DIP Collateral Agent, the Prepetition Agents and the Prepetition Term Agents permitted pursuant to clause (y) of the definition of "Permitted Liens");

(d)    Intermediate Holdings fails at any time to own 100% of the Equity Interests of the Parent free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the Junior DIP Collateral Agent, the Prepetition Agents and the Prepetition Term Agents permitted pursuant to clause (y) of the definition of "Permitted Liens");

(e)    the Parent fails at any time to own 100% of the Equity Interests of the Borrower free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the Junior DIP Collateral Agent, the Prepetition Agents and the Prepetition Term Agents permitted pursuant to clause (y) of the definition of "Permitted Liens");

(f)    the Parent fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party (other than Holdings, Intermediate Holdings and the Borrower) free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the Junior DIP Collateral Agent, the Prepetition Agents and the Prepetition Term Agents permitted pursuant to clause (y) of the definition of "Permitted Liens"), except where such failure is as a result of a transaction permitted by the Loan Documents;

(g)    Holdings and the other Loan Parties, collectively, fail at any time to own at least 30% of the Equity Interests of Express JV free and clear of all Liens (other than the Liens in favor of the Collateral Agent, the Prepetition Agents and the Prepetition Term Agents permitted pursuant to clause (y) of the definition of "Permitted Liens"); or

(h)    any "change of control" or similar event as defined in the Prepetition ABL Credit Agreement, the Prepetition Term Credit Agreement or the Junior DIP Credit Agreement.

"***Chapter 11 Cases***" has the meaning specified in the recitals hereto.

"***Collateral***" means all "Collateral" referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Collateral Agent for the benefit of the Secured Parties. Without limitation of the foregoing, subject to the terms of the Interim Order, Final Order, the Intercreditor Agreement and the Carve Out, (a) the Collateral shall not include any Avoidance Actions but shall include all proceeds of any and all Avoidance Actions and (b) the Collateral shall not contain any real property until the Collateral Agent and each Lender shall have received (i) all flood insurance documentation and completed all diligence and coverage in accordance with Flood Insurance Laws and (ii) in the event that any such real property is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", evidence that Borrower and Loan Parties have maintained flood insurance with respect to such real property (including any personal property which is located thereon) complying with the Flood Disaster Protection Act of 1973, as amended from time to time, in amounts satisfactory to all Lenders and otherwise satisfactory to all Lenders.

"***Collateral Access Agreement***" means an agreement reasonably satisfactory in form and substance to the Collateral Agent executed by (a) a bailee or other Person in possession of Collateral, and/or (b) any landlord of real property leased by any Loan Party.

"***Collateral Account***" shall mean a deposit account maintained by the Borrower with the Collateral Agent, for its own benefit and the benefit of the other Secured Parties, under the sole and exclusive

dominion and control of the Collateral Agent, in the name of the Collateral Agent or as the Collateral Agent shall otherwise direct, which account will be subject to the terms and conditions of this Agreement and the other Loan Documents.

"*Collateral Agent*" has the meaning specified in the preamble to this Agreement.

"*Collateral Documents*" means the Orders and each of the other collateral documents, instruments and agreements delivered pursuant to Section 5.01(j) under this Agreement, and each other agreement that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"*Collection Account*" means a Deposit Account of a Loan Party which is used exclusively for deposits of collections and proceeds of Collateral and not as a disbursement or operating account upon which checks or other drafts may be drawn.

"*Commercial Letter of Credit*" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"*Commercial Letter of Credit Agreement*" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the Issuing Bank.

"*Commitment*" means, with respect to any Revolving Credit Lender at any time, the commitment of such Revolving Credit Lender to make Advances to the Borrower in the amount set forth opposite such Lender's name on Schedule I hereto under the caption "Commitment" or, if such Lender has entered into one or more Assignment and Assumptions, set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(d) as such Lender's "Commitment," as such amount may be reduced at or prior to such time pursuant to Section 2.05 or Section 2.06.

"*Commitment Fee Percentage*" means 0.25% per annum.

"*Committee*" means an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee, if any.

"*Committee Professionals*" means the professionals retained by any Committee under Section 1103 of the Bankruptcy Code.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"*Confidential Information*" means information that any Loan Party or its Subsidiaries furnishes to any Agent or any Lender Party, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender Party of its obligations hereunder or that is or becomes available to such Agent or such Lender Party from a source other than the Loan Parties who is not subject to any legally binding obligation to any Loan Party or its Subsidiaries to keep such information confidential.

"*Conforming Changes*" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest

13

Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 9.04(c) and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Borrower) may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides (in consultation with the Borrower) is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Consolidated*" refers to the consolidation of the accounts, financial condition or operating results of a Person and its Subsidiaries in accordance with GAAP.

"*Continuing Directors*" means in the case of Holdings and, with respect to any period, the directors of Holdings on the first day of such period and each other director if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by at least a majority of the then Continuing Directors.

"*Conversion*," "*Convert*" and "*Converted*" each refer to a conversion of Advances of one Type into Advances of the other Type pursuant to Section 2.09 or 2.10.

"*Cost*" means the cost of purchases of Inventory determined according to the accounting policies used in the preparation of the Audited Financial Statements.

"*Costa Rica Subsidiary*" means Express Fashion Digital Services Costa Rica, S.R.L., a limited liability company organized under the laws of Costa Rica.

"*Covered Entity*" means any of the following:

> (a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

> (b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

> (c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"*Covered Party*" has the meaning specified in Section 9.21.

"*Credit Card Advance Rate*" means 90%.

"*Credit Card Issuer*" means any person (other than any Loan Party or any Affiliate of a Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including private label cards, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Novus Services, Inc. and other issuers approved by the Agent in its Permitted Discretion.

"***Credit Card Processor***" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrowing Base Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"***Credit Card Receivables***" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Borrowing Base Party resulting from charges by a customer of a Borrowing Base Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Borrowing Base Party, or services performed by a Borrowing Base Party, in each case in the ordinary course of its business.

"***Customer Credit Liabilities***" means, at any time, the aggregate remaining balance reflected on the books and records of the Loan Parties at such time of (a) outstanding gift certificates and gift cards of the Loan Parties entitling the holder thereof to use all or a portion of the gift certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits and customer deposits of the Loan Parties.

"***Debt***" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables, deferred compensation and straight line rent and landlord allowance in each case incurred and then outstanding in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (e) all Obligations of such Person as lessee under Capitalized Leases, (f) the maximum amount of all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person with respect to Disqualified Stock and Prohibited Preferred Stock, (h) net Obligations of such Person in respect of Hedge Agreements, valued at the Agreement Value thereof, (i) all Guaranteed Debt and Synthetic Debt of such Person and (j) all indebtedness and other payment Obligations referred to in clauses (a) through (i) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations; but limited in amount to the lesser of (i) the fair market value of such property and (ii) the amount of such indebtedness or other payment obligations.

Notwithstanding anything to the contrary contained herein, Debt shall not include (i) any amounts relating to preferred equity (other than Disqualified Stock and Prohibited Preferred Stock), employee consulting arrangements, accrued expenses, deferred rent (other than Capitalized Leases), deferred taxes, obligations under employment agreements, unredeemed gift card deferred revenue and deferred compensation, (ii) in connection with the existing letters of credit or any acquisition otherwise permitted hereunder or consented to by the Lenders in writing, (A) reimbursement obligations in respect of such existing letters of credit or any letter of credit assumed in such acquisition the payment of which is either fully (x) backed by a letter of credit or (y) cash collateralized, or (B) post-closing purchase price adjustments, earn-outs or similar obligations that are dependent upon the performance of the acquisition target after such closing to which the seller in such acquisition may become entitled, (iii) contingent obligations incurred in the ordinary course of business, (iv) non-recourse obligations under or in respect of securitization transactions, (v) customary payables with respect to money orders or wire transfers, and (vi) the obligations of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on December 31, 2018 (whether or not such lease existed on December 31, 2018 or thereafter arose).  Notwithstanding

anything to the contrary, the financial ratios and related definitions set forth in the Loan Documents shall be computed (a) to exclude (i) the application of ASC 815 (Derivatives and Hedging), ASC 480 (Distinguishing Liabilities from Equity) or ASC 718 (Stock Compensation) (to the extent that the pronouncements in ASC 718 result in recording an equity award as a liability on the Consolidated balance sheet of the Parent and its Subsidiaries in the circumstance where, but for the application of the pronouncements, such award would have been classified as equity), (ii) any mark-to-market adjustments to any derivatives (including embedded derivatives contained in other debt or equity instruments under ASC 815), (iii) any non-cash compensation charges resulting from the application of ASC 718, and (iv) any change to lease accounting rules from those in effect pursuant to ASC 842 (Leases) and other related lease accounting guidance as in effect on the Effective Date, and (b) by disregarding the effects of FASB ASC 825 (Financial Instruments) and ASC 470-20 (Debt with Conversion and Other Options) on financial liabilities.

"***Debtor Professionals***" means persons or firms retained by the Loan Parties pursuant to Section 327, 328 or 363 of the Bankruptcy Code.

"***Debtors***" has the meaning specified in the recitals hereto.

"***Default***" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"***Default Rate***" means (a) when used with respect to Obligations other than Letter of Credit Fees, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin, if any, applicable to Base Rate Advances, as applicable, plus (iii) 2% per annum; provided, however, that with respect to a SOFR Advance, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such SOFR Advance plus 2% per annum, and (b) when used with respect to Letter of Credit Fees with respect to any Letter of Credit, a rate equal to the rate otherwise then applicable for such Letter of Credit pursuant to Section 2.08(b), plus 2% per annum.

"***Default Right***" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"***Defaulting Lender***" means, at any time, any Lender Party that (a) has failed to fund any amounts required to be funded by it under this Agreement within one (1) Business Day of the date that it is required to do so under this Agreement (including the failure to make available to the Administrative Agent amounts required pursuant to a settlement or to make a required payment in connection with a Letter of Credit Advance), (b) has notified the Borrower, the Administrative Agent, or any Lender Party in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally (as reasonably determined by the Administrative Agent) under which it has committed to extend credit, (d) has failed, within one (1) Business Day after written request by the Administrative Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to the Administrative Agent or any other Lender Party any other amount required to be paid by it under the Agreement within one (1) Business Day of the date that it is required to do so under the Agreement, or (f) has, or has a direct or indirect parent company that has, (i) taken any action or been the subject of any action or proceeding of a type described in Section 6.01(f), or (ii) become the subject of a Bail-in Action; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of

judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (f) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower, the Issuing Bank, and each Lender.

"*Defaulting Lender Rate*" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Committed Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"*Discharge of Term Obligations*" has the meaning set forth for such term in the Intercreditor Agreement.

"*Disqualified Stock*" means any Equity Interest that, by its terms (or by the terms of any Equity Interests into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), matures or is Redeemable, in whole or in part, provides for scheduled payments, dividends or distributions in cash or is or becomes convertible into or exchangeable or exercisable for Debt or any other Equity Interests that would constitute Disqualified Stock, in each case on or prior to the date that is 91 days after the Maturity Date. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement shall be the maximum amount that the Loan Parties may become obligated to pay upon such maturity of, or pursuant to such Redeemable provisions in respect of, such Disqualified Stock.

"*Dollars*" and "*$*" mean lawful money of the United States of America.

"*Drawing Document*" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

 "*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" has the meaning specified in Section 3.01.

"*Eligible Assignee*" means (a) a Lender Party; (b) an Affiliate of a Lender Party; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by (w) the Administrative Agent, (x) the Issuing Bank, and (y) the Swing Line Bank (each such approval not to be unreasonably withheld or delayed); *provided*, *however*, that neither any Loan Party nor any Affiliate of a Loan Party shall qualify as an Eligible Assignee under this definition.

"*Eligible Credit Card Receivables*" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination, as determined by the Administrative Agent in its Permitted Discretion in accordance with Section 2.17: such Credit Card Receivable (x) has been earned by performance and represents the bona fide amounts due to a Borrowing Base Party from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrowing Base Party, and (y) in each case is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (i) through (xi) below.  Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrowing Base Party as payee or remittance party.  In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (x) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrowing Base Party may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (y) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Borrowing Base Parties to reduce the amount of such Credit Card Receivable.  Any Credit Card Receivable meeting the foregoing criteria shall be deemed to be an Eligible Credit Card Receivable, but only as long as such Credit Card Receivable is not included within any of the following categories as determined by Administrative Agent in its Permitted Discretion in accordance with Section 2.17, in which case such Credit Card Receivable shall not constitute an Eligible Credit Card Receivable:

     (i)    Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC);

     (ii)    Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale, or for such longer period(s) as may be approved by the Administrative Agent in its Permitted Discretion;

     (iii)    Credit Card Receivables with respect to which a Borrowing Base Party does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent for its own benefit and the benefit of the other Secured Parties pursuant to the Collateral Documents, and (ii) Permitted Liens (other than any Liens under clauses (i) and (j) of the definition of "Permitted Liens"));

     (iv)    Credit Card Receivables that are not subject to a perfected, first priority security interest in favor of the Collateral Agent for its own benefit and the benefit of the other Secured Parties (subject to (i) claims, counterclaims, offsets or chargebacks permitted in clause (v) of this definition, (ii) the Carve Out, and (iii) Permitted Liens having priority by operation of applicable law) (the foregoing not being intended to limit the Permitted Discretion of the Administrative Agent to change, establish or eliminate any Reserves on account of any such Liens to the extent permitted hereunder);

     (v)    Credit Card Receivables which are disputed, or with respect to which a claim, counterclaim, offset or chargeback (other than chargebacks in the ordinary course by the Credit Card Issuer or Credit Card Processor) has been asserted, by the related credit card processor (but only to the extent of such dispute, counterclaim, offset or chargeback);

     (vi)    except as otherwise approved by the Administrative Agent in its Permitted Discretion, Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor

has the right under certain circumstances to require a Borrowing Base Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(vii)    except as otherwise approved by the Administrative Agent in its Permitted Discretion in an aggregate amount not to exceed $10,000,000 (such approval not to be unreasonably withheld), Credit Card Receivables arising from any private label credit card program of the Borrowing Base Parties;

(viii)    Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(ix)    Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

(x)    [reserved]; and

(xi)    Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection.

"***Eligible Inventory***" means, as of any date of determination, without duplication, items of Inventory of a Borrowing Base Party in each case that are not excluded as ineligible by virtue of one or more of the criteria set forth below and that are reflected in the most recent Borrowing Base Certificate delivered to the Administrative Agent.  Except as otherwise agreed by the Administrative Agent, in its Permitted Discretion in accordance with Section 2.17 after completion of an updated field examination and appraisal, none of the following shall be deemed to be Eligible Inventory:

(a)    Inventory with respect to which a Borrowing Base Party does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent for its own benefit and the benefit of the other Secured Parties pursuant to the Collateral Documents and (ii) other Permitted Liens), or is leased by or is on consignment to a Borrowing Base Party, or that is not solely owned by a Borrowing Base Party;

(b)    Inventory that (i) is not located in the United States of America (excluding territories or possessions of the United States) or (ii) is stored at a leased or rented location (other than a retail store location) where the aggregate value of Inventory exceeds $500,000, unless the Administrative Agent has given its prior consent thereto or unless either (x) a Collateral Access Agreement or an Existing Collateral Access Agreement in respect of such location has been delivered to the Administrative Agent or (y) Reserves reasonably satisfactory to the Administrative Agent have been established with respect thereto (*provided* that the Borrowing Base Parties shall use commercially reasonable efforts to ensure that the aggregate value of all Inventory stored at such leased or rented location and not deemed "Eligible Inventory" shall not exceed $7,500,000 at any one time outstanding), (iii) is stored with a bailee or warehouseman where the aggregate value of Inventory exceeds $500,000, unless either (x) an acknowledged Collateral Access Agreement or an Existing Collateral Access Agreement which is in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent has been received by the Administrative Agent or (y) Reserves reasonably satisfactory to the Administrative Agent in its Permitted Discretion have been established with respect thereto (*provided* that the Borrowing Base Parties shall use commercially reasonable efforts to ensure that the aggregate value of all Inventory stored with a bailee or warehouseman and not deemed "Eligible Inventory" shall not exceed $7,500,000 at any one time outstanding),

19

(c)        Inventory that represents goods which (i) are damaged, defective, "seconds", or otherwise unmerchantable, (ii) are to be returned to the vendor and which is no longer reflected in the Borrowing Base Parties' stock ledger, (iii) are obsolete or slow moving, or special-order items, work in process, raw materials, or that constitute spare parts, shipping materials or supplies used or consumed in a Borrower's business, or (iv) are bill and hold goods;

(d)        Except as otherwise agreed by the Administrative Agent in its Permitted Discretion, Inventory that represents goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Loan Documents;

(e)        Inventory that is not subject to a perfected first priority security interest in favor of the Collateral Agent for its own benefit and the benefit of the other Secured Parties (subject only to (i) Permitted Liens having priority by operation of applicable law, (ii) the Carve Out or (iii) with respect to which Permitted Liens the Administrative Agent may establish Reserves in the exercise of its Permitted Discretion pursuant to Section 2.17);

(f)        Inventory that is not insured in compliance with the provisions of Section 5.01(d) hereof;

(g)        Inventory which consists of samples, labels, bags (other than handbags), packaging materials, and other similar non-merchandise categories;

(h)        Inventory which contains or bears any Intellectual Property rights licensed to such Borrowing Base Party (including, without limitation, any Intellectual Property subject to any JV IP License Agreement or any Bonobos IP License Agreement) unless (i) the Collateral Agent is satisfied that it may sell or otherwise dispose of such Inventory without (A) infringing the rights of such licensor, (B) violating any contract with such licensor, or (C) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the then-applicable licensing agreement, (ii) with respect to any Intellectual Property subject or licensed pursuant to any JV IP License Agreement, the IP Rights Agreement is in full force and effect and the Collateral Agent is entitled to exercise all rights and remedies afforded to it thereunder, or (iii) with respect to any Intellectual Property subject or licensed pursuant to any Bonobos IP License Agreement, the Bonobos IP Rights Agreement is in full force and effect and the Collateral Agent is entitled to exercise all rights and remedies afforded to it thereunder;

(i)        Inventory which has been sold but not yet delivered or Inventory to the extent that any Borrowing Base Party has accepted a deposit therefor; and

(j)        Inventory acquired pursuant to Section 5.02(f), unless the Administrative Agent shall have received or conducted (A) appraisals, from appraisers reasonably satisfactory to the Administrative Agent, of such Inventory to be acquired in such Investment and has established an Inventory Advance Rate and Inventory Reserves (if applicable) therefor and (B) such other due diligence as the Administrative Agent may reasonably require, all of the results of the foregoing to be reasonably satisfactory to the Administrative Agent in its Permitted Discretion.

"*Environmental Action*" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any violation of, or liability under, any Environmental Law, or an Environmental Permit or arising from an alleged injury or threat to the environment, or to health and safety with regard to exposure to Hazardous Materials, including, without limitation, and to the extent arising from the foregoing, by any governmental or regulatory authority or third party for enforcement, cleanup,

removal, response, remedial or other actions, damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"***Environmental Law***" means any Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment, natural resources or exposure of any individual to Hazardous Material, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"***Environmental Permit***" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized on any date of determination.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 4001(a)(14) of ERISA.

"***ERISA Event***" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"***Erroneous Payment***" has the meaning specified in Section 9.24.

"***Erroneous Payment Deficiency Assignment***" has the meaning specified in Section 9.24.

"***Erroneous Payment Impacted Loans***" has the meaning specified in Section 9.24.

"***Erroneous Payment Return Deficiency***" has the meaning specified in Section 9.24.

"***EU Bail-In Legislation Schedule***" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"***Events of Default***" has the meaning specified in Section 6.01.

"***Excess Availability***" means, at any time, the amount, if any, by which (a) the Loan Cap exceeds (b) the aggregate amount of Used Commitments at such time.

"***Excluded Subsidiary***" means the Costa Rica Subsidiary.

"***Excluded Swap Obligation***" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation but for such Guarantor's failure to constitute an "eligible contract participant" at such time.

"***Excluded Taxes***" means, with respect to any Payee, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case, of any Lender, in which its Applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 9.12), any withholding tax that is imposed on amounts payable hereunder at the time such Payee becomes a party hereto (or designates a new Applicable Lending Office) or is attributable to such Payee's failure or inability (other than as a result of a Change in Law) to comply with Section 2.12, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Applicable Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 2.12(a), (d) any U.S. federal, state or local backup withholding tax, and (e) any U.S. federal withholding tax imposed under FATCA.

"***Existing Collateral Access Agreements***" means the Collateral Access Agreements entered into pursuant to the Prepetition Credit Agreement.

"***Existing Debt***" means such Debt set forth on Schedule 5.02(b).

"***Express JV***" means EXP Topco, LLC, a Delaware limited liability company.

"***Facility***" means the Revolving Credit Facility, the Swing Line Facility or the Letter of Credit Facility, as the context may require.

"***Factored Receivables***" means any Accounts originally owed or owing by a Loan Party to another Person which have been purchased by or factored with WFB or any of its Affiliates pursuant to a factoring arrangement or otherwise with the Person that sold the goods or rendered the services to the Loan Party which gave rise to such Account.

"*FATCA*" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) and any current or future regulations or other official interpretations thereof, any intergovernmental agreements and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"*FCPA*" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"*Federal Funds Rate*" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if such rate is not so published for any day which is a Business Day, the Federal Funds Rate for such day shall be the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it (and, if any such rate is below the Floor, then the rate determined pursuant to this definition shall be deemed to be the Floor ).

"*Final Order*" means the "Final Order" as defined in the Interim Order, which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Administrative Agent, which Final Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent.

"*Financing Order*" means (a) until the entry of the Final Order, the Initial Order, and (b) from and after entry of the Final Order, the Final Order, together with all amendments, modifications and supplements to such Initial Order or Final Order, as applicable, which are acceptable to the Agent in its sole discretion.

"*First Day Orders*" means the orders entered by the Bankruptcy Court in respect of first day motions and applications.

"*Fiscal Month*" means any fiscal month of the Parent and its Consolidated Subsidiaries ending on the dates set forth on Schedule III to the Prepetition Credit Agreement.

"*Fiscal Quarter*" means any fiscal quarter of the Parent and its Consolidated Subsidiaries ending on the dates set forth on Schedule III to the Prepetition Credit Agreement.

"*Fiscal Year*" means a fiscal year of the Parent and its Consolidated Subsidiaries ending on the Saturday closest to January 31 in any calendar year.

"*Floor*" means a rate of interest equal to 0%.

"*Foreign Lender*" means a Payee that is not a United States person within the meaning of Internal Revenue Code Section 7701(a)(30).

"*Foreign Subsidiary*" means a Subsidiary of the Parent that is organized under the laws of a jurisdiction located outside of the United States.

"*Fund*" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*GAAP*" has the meaning specified in Section 1.03.

"*GC Purchase Agreement*" has the meaning specified on Schedule 5.01(r).

"*Governmental Authority*" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Governmental Authorization*" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"*Guaranteed Debt*" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) the grant of any Lien on any assets of such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien) or (d) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Guaranteed Debt" shall not include any product warranties or other ordinary course contingent obligations incurred in the ordinary course of business, including indemnities. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Guaranteed Obligations*" has the meaning specified in Section 8.01.

"*Guaranties*" means, collectively, the Parent Guaranty, the Holdings Guaranty, the Intermediate Holdings Guaranty and the Subsidiary Guaranty.

"*Guarantors*" means, collectively, the Parent, the Holdings Entities, the Subsidiary Guarantors, and any other Person that guarantees the Obligations.

"*Guaranty Supplement*" has the meaning specified in <u>Section 8.05</u>.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, radon gas and toxic mold and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or explosive or radioactive substances or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"*Hedge Bank*" means any Lender Party or an Affiliate of a Lender Party in its capacity as a party to a Secured Hedge Agreement.

"*Holdings*" has the meaning specified in the preamble to this Agreement.

"*Holdings Entities*" means, collectively, Holdings and Intermediate Holdings. "*Holdings Entity*" means any one of such Persons.

"*Holdings Guaranty*" means the guaranty of Holdings set forth in Article VIII.

"*Indemnified Party*" has the meaning specified in <u>Section 9.04(b)</u>.

"*Indemnified Taxes*" means Taxes imposed with respect to any Loan Document or any payment thereunder other than Excluded Taxes.

"*Initial Budget*" means the cash flow forecast commencing with the week of the Petition Date through and including the week ending May 18, 2024, attached as <u>Exhibit E</u> hereto (the "*Initial Budget*"), setting forth cash revenues, receipts, expenses, professional fees and other disbursements (including, without limitation, any payments with respect to real property leases), net cash flows, inventory receipts and other items on a line item basis (including all necessary and required expenses which the Loan Parties expect to incur and anticipated uses of proceeds of draws under this Agreement and the Junior DIP Facility) on a weekly basis for the period beginning as of the week of the Petition Date through and including the week ending May 18, 2024, with a break-out for stores being closed or proposed to be closed, as the same may be amended, supplemented or modified from time to time only with the prior written consent of the Administrative Agent and Required Lenders in their respective sole discretion. The Initial Budget shall be

deemed the "Approved Budget" for all purposes of this Agreement and the other Loan Documents until superseded by an Updated Approved Budget in accordance with Section 5.01(s).

"*Initial Issuing Bank*" means the bank listed on the signature pages hereof as the Initial Issuing Bank.

"*Initial Lender Parties*" means the Initial Issuing Bank, the Initial Lenders and the Initial Swing Line Bank.

"*Initial Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as the Initial Lenders.

"*Initial Swing Line Bank*" means the bank listed on the signature pages hereof as the Initial Swing Line Bank.

"*Insufficiency*" means, with respect to any Plan, the amount, if any, of a Plan's accumulated benefit obligation (determined in accordance with GAAP) in excess of the Plan's fair value of assets.

"*Intellectual Property*" means all assets of the type described in the definition of "Intellectual Property Collateral" as set forth in the Security Agreement under and as defined in the Prepetition Credit Agreement.

"*Intercreditor Agreements*" means the Prepetition ABL Intercreditor Agreement as modified by and including the provisions of Section 7 of the Interim Order or the Final Order (from and after the date the Final Order is entered), as the case may be.

"*Intercreditor Provisions*" has the meaning specified in Section 6.01(p).

"*Interest Period*" means, for each SOFR Advance comprising part of the same Borrowing, the period commencing on the date of such SOFR Advance or the date of the Conversion of any Base Rate Advance into such SOFR Advance, and ending on the last day of the period selected by the Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Borrower pursuant to the provisions below.  The duration of each such Interest Period shall be one, three or six months, as the Borrower may, upon notice received by the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the first day of such Interest Period, select; *provided*, *however*, that:

(a)     the Borrower may not select any Interest Period with respect to any SOFR Advance under a Facility that ends after any principal repayment installment date for such Facility or the Termination Date unless, after giving effect to such selection, the aggregate principal amount of Base Rate Advances and of SOFR Advances having Interest Periods that end on or prior to such principal repayment installment date or Termination Date for such Facility shall be at least equal to the aggregate principal amount of Advances under such Facility due and payable on or prior to such date;

(b)     Interest Periods commencing on the same date for SOFR Advances comprising part of the same Borrowing shall be of the same duration;

(c)     whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next

succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day;

(d)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month;

(e)    no Interest Period shall extend beyond the Maturity Date; and

(f)    no tenor that has been removed from this definition pursuant to <u>Section 2.10(g)(iv)</u> shall be available for specification in any Notice of Borrowing or conversion or continuation notice.

"***Interim Order***" means an interim order of the Bankruptcy Court approving the Advances, the Junior DIP Loans and the Loan Documents on an interim basis, in form and substance satisfactory to the Administrative Agent and Lenders, together with all other extensions, modifications, and amendments thereto.

"***Intermediate Holdings***" has the meaning specified in the preamble to this Agreement.

"***Intermediate Holdings Guaranty***" means the guaranty of Intermediate Holdings set forth in Article VIII.

"***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended from time to time.

"***Intercompany IP License Agreements***" means, collectively:

(a)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Intermediate Holdings, as "sublicensee",

(b)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and the Parent, as "sublicensee",

(c)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and the Borrower, as "sublicensee",

(d)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Finance Corp., a Delaware corporation, as "sublicensee",

(e)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express GC, LLC, an Ohio limited liability company, as "sublicensee",

(f)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Fashion Operations, LLC, a Delaware limited liability company, as "sublicensee",

(g)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Fashion Logistics, LLC, a Delaware limited liability company, as "sublicensee",

(h)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and UW, LLC, a Delaware limited liability company, as "sublicensee",

(i)    that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Fashion Investments, LLC, a Delaware limited liability company, as "sublicensee", and

(j)    that certain Intercompany License Agreement, dated as of July 25, 2023, by and between Holdings, as "sublicensor", and Express BNBS Fashion, LLC, a Delaware limited liability company, as "sublicensee".

"*Inventory*" has the meaning given that term in the UCC.

"*Inventory Advance Rate*" means 90%.

"*Inventory Reserves*" means such reserves as may be established from time to time by the Administrative Agent acting in its Permitted Discretion in accordance with Section 2.17, with respect to changes in the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory or otherwise.

"*Investment*" in any Person means any loan or advance to such Person (other than (a) third-party trade receivables or (b) intercompany trade receivables, in each case incurred in the ordinary course of such Person's business), any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (i) or (j) of the definition of "*Debt*" in respect of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"*IP Rights Agreement*" means that certain Amended and Restated IP Rights Agreement, dated as of September 5, 2023, by Express JV and Holdings (in its capacity as sublicensor under the applicable JV IP License Agreement) and acknowledged and agreed by the Loan Parties, the Prepetition Agents and the Prepetition Term Agent, as amended, restated, supplemented or otherwise modified in accordance with the terms hereof and thereof.

"*ISP*" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"*Issuer Documents*" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the Issuing Bank and the Borrower (or any Subsidiary) or in favor of the Issuing Bank and relating to any such Letter of Credit.

"*Issuing Bank*" means (a) WFB in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which successor may only be (x) an Eligible Assignee or (y) a Lender selected by the Administrative Agent in its discretion pursuant to Section 9.07 and, so long as no Event of Default has occurred and is continuing, approved by the Borrower), and (b) any other Lender selected by the Administrative Agent in its discretion agreed to by such Lender and, so long as no Event of Default has occurred and is continuing, approved by the Borrower.  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"*Junior DIP Administrative Agent*" means (a) ReStore Capital LLC, its capacity as administrative agent for the lenders under the Junior DIP Credit Agreement, (b) any successor to ReStore Capital LLC, by assignment or otherwise, in its capacity as administrative agent for the lenders under the Junior DIP Credit Agreement, and (c) any other party that may become agent or trustee under the Junior DIP Credit Agreement in respect thereof.

"*Junior DIP Agents*" means, collectively, the Junior DIP Administrative Agent and the Junior DIP Collateral Agent.

"*Junior DIP Borrowing Base*" means the "*Term Loan Borrowing Base*" as such term is defined in the Junior DIP Credit Agreement.

"*Junior DIP Borrowing Base Certificate*" means the "*Term Loan Borrowing Base Certificate*" as such term is defined in the Junior DIP Credit Agreement.

"*Junior DIP Collateral Agent*" means (a) ReStore Capital LLC, its capacity as collateral agent for the lenders under the Junior DIP Credit Agreement, (b) any successor to ReStore Capital LLC, by assignment or otherwise, in its capacity as collateral agent for the lenders under the Junior DIP Credit Agreement, and (c) any other party that may become agent or trustee under the Junior DIP Credit Agreement.

"*Junior DIP Credit Agreement*" means that certain Senior Secured Super-Priority Priming Debtor-In-Possession Asset-Based Term Loan Agreement dated as of the Effective Date, among the Loan Parties, the lenders party thereto, and the Term Agents.

"*Junior DIP Documents*" means the "*Loan Documents*" as such term is defined in the Junior DIP Credit Agreement.

"*Junior DIP Facility*" means the credit facility provided pursuant to the Junior DIP Credit Agreement.

 "*Junior DIP Loans*" means the "Loans" as defined in the Junior DIP Credit Agreement.

"*Junior DIP Obligations*" means the "Obligations" as such term is defined in the Junior DIP Credit Agreement.

"*JV IP*" means any and all Intellectual Property that (i) are or have been assigned, transferred, contributed, conveyed, sold, delivered, or provided (or are required to be assigned, transferred, contributed, conveyed, sold, delivered, or provided) to Express JV or any Affiliate thereof pursuant to any JV IP

29

Transaction Document, or (ii) are licensed or sublicensed to Holdings or any of its Affiliates pursuant to any JV IP Transaction Document.

"***JV IP License Agreements***" means, collectively:

(a)      that certain License Agreement dated as of January 25, 2023, by and between Express JV, as "licensor", and Holdings, as "licensee" (the "***Prime License Agreement***"),

(b)      the Intercompany IP License Agreements, and

(c)      any other license agreement between any Loan Party or any Subsidiary as "licensee" and a third party as "licensor" with respect to any of the JV IP,

in each case as in effect as of the Effective Date (or, in the case of any JV IP License Agreement described in clause (c) above, as in effect on the date of execution thereof and in form and substance substantially identical to the Intercompany IP License Agreements or otherwise reasonably satisfactory to the Agents) or subsequently amended in accordance with Section 5.02(k)(ii).

"***JV IP LLC Agreement***" means that certain Amended and Restated Limited Liability Company Agreement of Express JV dated as of January 25, 2023, by and among the Borrower, Express Fashion Investments, LLC, EXWHP, LLC, and Express JV.

"***JV IP Transaction Documents***" means the documents, instruments and agreements described on Schedule I of the Fourth Amendment (as defined in the Prepetition Credit Agreement) (including, without limitation, the JV IP License Agreements and the JV IP LLC Agreement).

"***JV IP Transactions***" means collectively, the transactions described in the JV IP Transaction Documents.

"***L/C Credit Extension***" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"***L/C Obligations***" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit.  For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.05.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of UCP 600, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"***Lead Arranger***" Wells Fargo Bank, National Association, in its capacity as lead arranger and lead bookrunner.

"***Lender Party***" means any Lender, the Issuing Bank or the Swing Line Bank.

"***Lenders***" means the Initial Lenders and each Person that shall become a Lender hereunder pursuant to Section 9.07 for so long as such Initial Lender or Person, as the case may be, shall be a party to this Agreement.

"***Letter of Credit***" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder.

"***Letter of Credit Advance***" means an advance made by the Issuing Bank or any Revolving Credit Lender pursuant to Section 2.03(d).

"***Letter of Credit Application***" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Issuing Bank.

"***Letter of Credit Expiration Date***" means the day that is seven days prior to the Termination Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"***Letter of Credit Facility***" means the subfacility for the issuance of Letters of Credit pursuant Section 2.03 of this Agreement.

"***Letter of Credit Fee***" has the meaning specified in Section 2.08(b)(i).

"***Letter of Credit Indemnified Costs***" has the meaning specified in Section 2.03(f).

"***Letter of Credit Related Person***" has the meaning specified in Section 2.03(f).

"***Lien***" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capitalized Leases, Synthetic Debt, or other title retention agreement, any easement, right of way or other encumbrance on title to real property).

"***Liquidation Agreement***" has the meaning specified on Schedule 5.01(r).

 "***Loan Account***" has the meaning specified in Section 2.16.

"***Loan Cap***" means, at any time of determination, (x) the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base less (y) the sum of (a) the principal amount of any Reinstated Prepetition Secured Obligations then outstanding plus (b) the principal amount of the Prepetition Secured Obligations.

"***Loan Documents***" means (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents, (iv) all Variance Reports, (v) the Borrowing Base Certificates and the Term Borrowing Base Certificates, (vi) the Intercreditor Agreements, (vii) the Orders, (viii) the IP Rights Agreement and the Bonobos IP Rights Agreement, and (ix) any other instrument, certificate or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"***Loan Parties***" means, collectively, the Borrower and the Guarantors.

"***M3***" means M3 Advisory Partners, LP.

"***M3 Engagement Letter***" means that certain Engagement Letter, dated as of August 18, 2023, between M3 and Holdings, as amended by that certain First Amendment to Engagement Letter, dated as of November 28, 2023, as further amended by that certain Second Amendment to Engagement Letter, dated as of December 21, 2023, as further amended by that certain Third Amendment to Engagement Letter, dated as of January 18, 2024, and as further amended by that certain Fourth Amendment to Engagement Letter, dated as of March 8, 2024.

"***Margin Stock***" has the meaning specified in Regulation U.

"***Material Adverse Effect***" means a material adverse effect on (a) the business, financial condition, operations, performance or properties of the Parent and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or any Lender under any Loan Document, (c) the Collateral, or the Collateral Agent's Liens (on behalf of itself and the other Secured Parties) on the Collateral or the priority of such Liens, or (d) the ability of any Loan Party to perform its Obligations under any Loan Document to which it is a party, in each case, other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that led to the commencement of the Chapter 11 Cases, and events that reasonably result from the commencement of the Chapter 11 Cases (in each case other than matters affecting the Loan Parties that are not subject to the automatic stay provisions of the Bankruptcy Code).

"***Material Intellectual Property***" means Intellectual Property (including, for the avoidance of doubt, licensed Intellectual Property) that is material to the conduct of business of any of the Loan Parties.

"***Maturity Date***" means the earliest of (a) the 120th day following the Petition Date, (b) the date on which all of the Obligations become due and payable, whether by acceleration or otherwise, (c) the effective date of a Plan of Reorganization, and (d) the date of consummation of a sale or disposition of all or substantially all of the Debtors' working capital assets under Section 363 of the Bankruptcy Code.

"***MGF***" means MGF Sourcing US, LLC, a Delaware limited liability company.

"***MGF Intercreditor Agreement***" means that certain Amended and Restated Subordination and Intercreditor Agreement, dated as of September 5, 2023, by and among the Agents, MGF, the Term Agents and the Loan Parties, as amended, modified, restated or replaced from time to time in accordance with the terms thereof.

"***Milestones***" has the meaning specified in Section 5.01(r).

"***Moelis***" means Moelis & Company LLC.

"***Moelis Engagement Letter***" means that certain Engagement Letter, dated as of March 11, 2024, by and among Express, Inc., and Moelis.

"***Moody's***" means Moody's Investors Services, Inc.

"***Multiemployer Plan***" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or with respect to which any Loan Party has any liability.

"***Multiple Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA and subject to Title IV of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"***Net Income***" means, for any period, the net income or loss of the Parent and the Restricted Subsidiaries for such period determined on a Consolidated basis in accordance with GAAP; provided that there shall be excluded (a) unrealized gains and losses with respect to Hedge Agreements during such period, and (b) the impact of purchase accounting or similar adjustments required or permitted by GAAP in connection with any Permitted Acquisition (as defined in the Prepetition Credit Agreement) occurring prior to the Effective Date (including the reduction of revenue from any write down of deferred revenue).

For the avoidance of doubt, Net Income shall exclude the net income or loss of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; provided, that Parent's or any Restricted Subsidiary's equity in the net income of such Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be included in the Net Income of the Parent and the Restricted Subsidiaries for any period up to the aggregate amount of dividends or distributions or other payments in respect of such equity that are actually paid in cash (or to the extent converted into cash) by such Person to the Parent or a Restricted Subsidiary during such period, in each case, to the extent not already included therein.

"**Net Orderly Liquidation Value**" means, with respect to Inventory of any Person, and subject to Section 2.17(a), the appraised orderly liquidation value thereof used in connection with the Approved Budget.

"**Net Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Transfer of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Debt (other than the Obligations, the Prepetition Secured Obligations, the Prepetition Term Obligations, or the Junior DIP Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a financial officer of the Borrower).

"**Non-Defaulting Lender**" means each Lender other than a Defaulting Lender.

"**Non-Extension Notice Date**" has the meaning specified in Section 2.03(b)(iii).

"**Note**" means a Revolving Credit Note.

"**Notice of Borrowing**" has the meaning specified in Section 2.02(a).

"**Notice of Swing Line Borrowing**" has the meaning specified in Section 2.02(b).

"**NPL**" means the National Priorities List under CERCLA.

"**Obligation**" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 6.01(f). Without limiting the generality of the foregoing, the Obligations of any Loan Party under the Loan Documents include (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Advance or Letter of Credit (including payments in respect

of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding, and (b) any Other Liabilities.  Notwithstanding the foregoing, the Obligations shall not include any Excluded Swap Obligations.

"*OFAC*" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"*Orders*" means, collectively, the Interim Order and the Final Order and separately, the Interim Order or the Final Order, as the context requires.

"*Other Liabilities*" means (a) any obligation on account of (i) any Cash Management Services furnished to any of the Loan Parties or any of their Restricted Subsidiaries and/or (ii) any transaction with any Lender or any of its Affiliates, which arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

"*Other Statutory Liabilities*" means accrued and unpaid statutory liabilities of the Loan Parties which may result in claims that have lien priority or priority of payment over all or any portion of the Obligations, are a statutory trust and/or which are legally required to be paid prior to the repayment in full of such Obligations.

"*Other Taxes*" has the meaning specified in Section 2.12(b).

"*Outstanding Amount*" means with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"*Overadvance*" means an Advance to the extent that, immediately after its having been made, Excess Availability is less than zero.

"*Parent*" has the meaning specified in the preamble to this Agreement.

"*Parent Guaranty*" means the guaranty of the Parent set forth in Article VIII.

"*Participant Register*" has the meaning specified in Section 9.07(g).

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub.  L. 107-56, signed into law October 26, 2001.

"*Payee*" means any Agent, Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, including any participant.

 "*Payment Recipient*" has the meaning specified in Section 9.24.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Periodic Term SOFR Determination Day*" has the meaning specified in the definition of "Term SOFR".

"*Permitted Discretion*" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of, and with customary business practices for, a secured asset-based lender in the retail industry) business judgment, based upon its consideration of any factor that it reasonably believes (i) could materially adversely affect the quantity, quality, mix or value of Collateral (including any applicable laws that may inhibit collection of a receivable), the enforceability or priority of an Agent's liens thereon, or the amount that the Administrative Agent, the Lenders or the Issuing Bank could receive in liquidation of any Collateral; (ii) that any collateral report or financial information delivered by a Borrower or any Guarantor is incomplete, inaccurate or misleading in any material respect; or (iii) creates or could result in an event of default.  In exercising such judgment, the Administrative Agent may consider any factors that could materially increase the credit risk of lending to the Borrower on the security of the Collateral.  Any Reserve or eligibility criteria established or modified by the Administrative Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such Reserve or eligibility criteria, as reasonably determined, without duplication, by the Administrative Agent in good faith.

"*Permitted Distributions*" means:

      (i)     [intentionally omitted],

      (ii)     payments by the Borrower or its Subsidiaries to or on behalf of Parent for franchise taxes and other fees required to maintain the legal existence of Parent or to pay the out-of-pocket legal, accounting and other fees and expenses in the nature of overhead in the ordinary course of business of Parent, including without limitation payment of fees and reimbursement of expenses of the board of directors and payments by the Parent to its direct or indirect parent company for such taxes, fees and expenses applicable to such parent company, in each case, (i) up to the amount of Permitted Distributions expressly set forth in the Approved Budget then in effect and (ii) so long as no Default or Event of Default shall have occurred and be continuing or would result from the making of such payment, and

      (iii)     any payments to Parent (and payments by Parent to its direct or indirect parent company) in order for Parent (or such direct or indirect parent company) to pay for any taxable period for which Parent, the Borrower and any of its Subsidiaries are members of a consolidated, combined or similar income tax group for federal and/or applicable state or local income tax purposes or are entities treated as disregarded from any such member for U.S. federal income tax purposes (a "*Tax Group*") of which Parent (or any direct or indirect parent company of Parent) is the common parent, any consolidated, combined or similar income taxes of such Tax Group that are due and payable by Parent (or any such direct or indirect parent company of Parent) for such taxable period; *provided* that the amount of such payment shall not exceed the amount that the Borrower would be required to pay in respect of federal, state, local or non-US taxes were the Borrower a corporation filing a consolidated return with each of its domestic Subsidiaries, in each case, (i) up to the amount of Permitted Distributions expressly set forth in the Approved Budget then in effect and (ii) so long as no Default or Event of Default shall have occurred and be continuing or would result from the making of such payment.

"*Permitted Investment*" has the meaning specified in <u>Section 5.02(f)</u>.

"*Permitted Liens*" means:

(a)        Liens for taxes, assessments and governmental charges or levies to the extent not yet due or not required to be paid under Section 5.01(b) and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)        Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) in the aggregate do not materially adversely affect the use of the property to which they relate and (ii) are being contested in good faith and for which adequate reserves have been established in accordance with GAAP;

(c)        Liens in the ordinary course of business to secure obligations under workers' compensation laws, unemployment insurance, social security or similar legislation or to secure public or statutory obligations;

(d)        deposits to secure the performance of bids, trade contracts and leases (other than Debt), contracts for the purchase of property otherwise permitted by this Agreement, statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business and, to the extent constituting a cash disbursement, set forth in the Approved Budget, subject to any Permitted Variances therefrom;

(e)        Liens securing judgments, decrees, attachments or awards (or the payment of money) not constituting an Event of Default under Section 6.01(g) or securing appeal or other surety bonds related to such judgments;

(f)        easements, rights of way, restrictions, zoning, building  codes and other land use laws and other encumbrances on imperfections of title to real property that do not materially adversely affect the use of such property for its present purposes;

(g)        statutory or common law Liens of landlords, creditor depository institutions or institutions holding securities accounts (including rights of set-off or similar rights and remedies);

(h)        any interest or title of a lessor or sublessor under any lease of real estate or non-exclusive licensor or sublicensor of Intellectual Property not prohibited hereby;

(i)        [intentionally omitted];

(j)        [intentionally omitted];

(k)        Liens in favor of MGF securing obligations (consisting solely of trade receivables and not, for the avoidance of doubt, any Debt for borrowed money) owing to MGF by the Borrower or any Subsidiary, to the extent such Liens are subject to the MGF Intercreditor Agreement; *provided* that any such Liens are junior to the Liens on the Collateral securing the Obligations;

(l)        Liens arising under conditional sale, title retention, consignment or similar arrangements for the sale of goods in the ordinary course of business;

(m)        Liens on insurance proceeds securing the payment of financed insurance premiums;

(n)      leases or subleases and licenses or sublicenses granted to others in the ordinary course of business and otherwise permitted by Section 5.02(e);

(o)      [reserved];

(p)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(q)      the filing of precautionary financing statements in connection with operating leases, consignment, Transfers permitted under Section 5.02(e) and similar matters;

(r)      Liens arising out of Adequate Protection Provisions;

(s)      [intentionally omitted];

(t)      Liens granted pursuant to the Collateral Documents and Orders;

(u)      any Lien in existence on the Effective Date and set forth on Schedule 5.02(a) or securing Debt permitted pursuant to Section 5.02(b)(iii);

(v)      replacement, extension and renewal of any Lien permitted hereby (provided, however, that (1) no such Lien shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced and (2) the aggregate amount secured shall not exceed the amount permitted to be secured prior to such extension, renewal, replacement, refinancing, refunding or defeasance (plus the amount of any premium paid in respect thereof in connection with any such extension, refunding, refinancing, renewing, replacing or defeasing and plus the amount of reasonable expenses incurred in connection therewith));

(w)      Liens securing Debt incurred pursuant to Section 5.02(b)(ii), *provided* that any such Liens attach only to the property being financed pursuant to such Debt and do not encumber any other property of any Loan Party;

(x)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements, provided that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Debt; and

(y)      Liens in favor of (i) the Prepetition Term Collateral Agent securing the Prepetition Term Obligations to the extent permitted under Section 5.02(b)(viii), (ii) the Prepetition Collateral Agent securing the Prepetition Secured Obligations to the extent permitted under Section 5.02(b)(viii) and (iii) the Junior DIP Collateral Agent securing the Junior DIP Obligations to the extent permitted under Section 5.02(b)(viii), and, in each case, in accordance with the Orders and Intercreditor Agreement, as applicable.

"***Permitted Priority Liens***" means all Liens permitted to have priority over the Liens in favor of Collateral Agent, solely to the extent that such Liens are valid, perfected and non-avoidable as of the Petition Date (or as may be permitted to be perfected after the Petition Date pursuant to section 546 of the

Bankruptcy Code) and were not subordinated by agreement or applicable law, subject to the terms of the Financing Order and otherwise agreed to by Administrative Agent.

"***Permitted Variance***" has the meaning specified in <u>Section 5.02(o)</u>.

"***Person***" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"***Petition Date***" shall have the meaning set forth in the recitals.

"***Plan***" means a Single Employer Plan or a Multiple Employer Plan.

"***Plan of Reorganization***" means a plan of reorganization with respect to the Debtors pursuant to the Chapter 11 Cases.

"***Post-Petition Interest***" has the meaning specified in <u>Section 8.06</u>.

"***Preferred Stock***" means, as applied to the Equity Interests of any Person, the Equity Interests of any class or classes (however designated) that is preferred with respect to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Equity Interests of any other class of such Person.

"***Prepetition ABL Collateral***" means the "Collateral" under and as defined in the Prepetition Loan Documents securing the Prepetition Secured Obligations.

"***Prepetition ABL Intercreditor Agreement***" means that certain Intercreditor Agreement, dated as of September 5, 2023 by and among the Agents and the Term Agents, and acknowledged and agreed to by the Loan Parties, as amended, modified, restated or replaced from time to time in accordance with the terms thereof.

"***Prepetition ABL Loan Documents***" means the "Loan Documents" under and as defined in the Prepetition Credit Agreement.

"***Prepetition Administrative Agent***" means Wells Fargo Bank, National Bank, as Administrative Agent (as defined in the Prepetition Credit Agreement") for the Prepetition Lenders.

"***Prepetition Agents***" means, collectively, the Prepetition Administrative Agent and the Prepetition Collateral Agent.

"***Prepetition Collateral***" means, collectively, the Prepetition ABL Collateral and Prepetition Term Loan Collateral.

"***Prepetition Collateral Agent***" means Wells Fargo Bank, National Bank, as Collateral Agent (as defined in the Prepetition Credit Agreement") for the Prepetition Lenders.

"***Prepetition Credit Agreement***" means that Second Amended and Restated Asset-Based Loan Credit Agreement dated as of May 20, 2015, among the Loan Parties, the lenders party thereto, and the Prepetition Agents, as amended, restated, modified, waived or supplemented through the date hereof.

"***Prepetition Lender***" means the "Lender" under and as defined in the Prepetition Credit Agreement.

"***Prepetition Letters of Credit***" has the meaning set forth in <u>Section 2.03(e)</u>.

"***Prepetition Loan Documents***" means, collectively, the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents.

"***Prepetition Secured Obligations***" means the "Obligations" as defined in the Prepetition Credit Agreement (in any event excluding, for the avoidance of doubt, upon the Effective Date, the reimbursement obligations with respect to the Prepetition Letters of Credit that are deemed to be reissued as Letters of Credit hereunder on the Effective Date).

"***Prepetition Other Liabilities***" means the "Other Liabilities" as defined in the Prepetition Credit Agreement.

"***Prepetition Term Administrative Agent***" means (a) ReStore Capital LLC, in its capacity as administrative agent for the lenders under the Prepetition Term Credit Agreement, (b) any successor to ReStore Capital LLC, by assignment or otherwise, in its capacity as administrative agent for the lenders under the Prepetition Term Credit Agreement, and (c) any other party that may become agent or trustee under the Prepetition Term Credit Agreement in connection with any refinancing, renewal or replacement thereof.

"***Prepetition Term Agents***" means, collectively, the Prepetition Term Administrative Agent and the Prepetition Term Collateral Agent.

"***Prepetition Term Collateral Agent***" means (a) ReStore Capital LLC, in its capacity as collateral agent for the lenders under the Prepetition Term Credit Agreement, (b) any successor to ReStore Capital LLC, by assignment or otherwise, in its capacity as collateral agent for the lenders under the Prepetition Term Credit Agreement, and (c) any other party that may become agent or trustee under the Prepetition Term Credit Agreement in connection with any refinancing, renewal or replacement thereof.

"***Prepetition Term Credit Agreement***" means that certain Asset-Based Term Loan Agreement dated as of September 5, 2023, among the Loan Parties, the lenders party thereto, and the Prepetition Term Agents, as amended, amended and restated, supplemented, extended or otherwise modified prior to the date hereof.

"***Prepetition Term Loan Collateral***" means the "Collateral" under and as defined in the Prepetition Term Loan Documents securing the Prepetition Term Obligations.

"***Prepetition Term Loan Documents***" means the "Loan Documents" under and as defined in the Prepetition Term Credit Agreement.

"***Prepetition Term Loan Lenders***" means the "Lenders" under and as defined the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Obligations***" means the "Obligations" under and as defined in the Prepetition Term Credit Agreement.

"***Prepetition Term Loan Secured Parties***" means the "Secured Parties" under and as defined the Prepetition Term Loan Credit Agreement.

"***Prime License Agreement***" has the meaning specified in the definition of "JV IP License Agreements".

"***Priority Payable Reserves***" means reserves established in the Permitted Discretion of the Administrative Agent and subject to <u>Section 2.17(a)</u> for amounts secured by any Liens, choate or inchoate, which rank or are capable of ranking in priority to the Agents' and/or Lenders' Liens and/or for amounts which may represent costs relating to the enforcement of the Agent's Liens including, without limitation, in the Permitted Discretion of the Administrative Agent, any such amounts due and not paid for vacation pay, amounts due and not paid under any legislation relating to workers' compensation or to employment insurance.

"***Professional Persons***" means Debtor Professionals and Committee Professionals and any notice claims agent retained in the Chapter 11 Cases.

"***Professional Fees***" means all unpaid fees and expenses incurred by Professional Persons.

"***Pro Rata Share***" means, with respect to each Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Facility or Facilities at such time; *provided* that if such Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"***Prohibited Preferred Stock***" means any Preferred Stock that by its terms is mandatorily redeemable or subject to any other payment obligation (including any obligation to pay dividends, other than dividends of shares of Preferred Stock of the same class and series payable in kind or dividends of shares of common stock) on or before a date that is less than one year after the Maturity Date, or, on or before the date that is less than one year after the Maturity Date, is redeemable at the option of the holder thereof for cash or assets or securities (other than distributions in kind of shares of Preferred Stock of the same class and series or of shares of common stock).

"***Protective Advance***" has the meaning specified in <u>Section 2.01(d)</u>.

"***Provider***" has the meaning specified in <u>Section 7.12</u>.

"***PTO***" means the United States Patent and Trademark Office (or any equivalent office).

"***QFC***" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"***QFC Credit Support***" has the meaning specified in <u>Section 9.21</u>.

"***Qualified Capital Stock***" of any person shall mean any Equity Interests of such person that are not Disqualified Stock.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible

contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*Receipts Variance*" has the meaning specified in Section 5.01(s)(ii).

"*Redeemable*" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"*Register*" has the meaning specified in Section 9.07(d).

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Reinstated Prepetition Secured Obligations**" means any Prepetition Secured Obligations constituting Avoided Payments, to the extent such obligations have been reinstated, in each case, pursuant to, and subject to the requirements and terms of the Bankruptcy Court.

"*Relevant Governmental Body*" means the Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board and/or the Federal Reserve Bank of New York or any successor thereto.

"*Required Lenders*" means, at any time, at least two Lenders that are not Affiliates (unless there shall, at any date of determination, be fewer than two Lenders that are not Affiliates) owed or holding at least a majority in interest of the sum of (a) the aggregate principal amount of the Advances outstanding at such time, (b) the aggregate Available Amount of all Letters of Credit outstanding at such time and (c) the aggregate Unused Commitments at such time; *provided*, *however*, that if any Lender shall be a Defaulting Lender at such time, there shall be excluded from the determination of Required Lenders at such time (A) the aggregate principal amount of the Advances owing to such Lender (in its capacity as a Lender) and outstanding at such time, (B) such Lender's Pro Rata Share of the aggregate Available Amount of all Letters of Credit outstanding at such time and (C) the Unused Commitment of such Lender at such time.  For purposes of this definition, the aggregate principal amount of Swing Line Advances owing to the Swing Line Bank and of Letter of Credit Advances owing to the Issuing Bank and the Available Amount of each Letter of Credit shall be considered to be owed to the Revolving Credit Lenders ratably in accordance with their respective Commitments.

"*Reserves*" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion and subject to Section 2.17(a), to maintain against the Borrowing Base: (a) to reflect the impediments to the Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, (d) with respect to the Carve Out, or (e) to reflect that a Default has occurred and is continuing (provided that in the case of this clause (f), the reserve shall be reasonably related to the event giving rise to such Default), which may be instituted by the Administrative Agent in accordance with Section 2.17 hereof (including, without limitation, Inventory Reserves, Priority Payable Reserves, Cash Management Reserves, Bank Product Reserves, reserves for Customer Credit Liabilities (not to exceed 50% of such liability), reserves due to reasonably anticipated changes in the Net Orderly Liquidation Value of Eligible Inventory between appraisals, and reserves due to the difference, if a positive number, between

(x) the Net Orderly Liquidation Value of Inventory which contains or bears any Intellectual Property rights licensed to any Loan Party (including, without limitation, any Intellectual Property subject to any JV IP License Agreement or any Bonobos IP License Agreement), and (y) the purchase price of such Inventory that would be payable by a licensor under the applicable license agreement (including, without limitation, any JV IP License Agreement or any Bonobos IP License Agreement) in connection with any right of such licensor to purchase such Inventory pursuant to such license agreement); *provided, however*, that (i) rent Reserves for locations leased by any Loan Party (A) shall not be taken for leased retail stores or for leased locations covered by a Collateral Access Agreement or an Existing Collateral Access Agreement and (B) for all other leased locations, shall be limited to (x) in the case of the Borrower's corporate headquarters, one month's rent and (y) in all other cases, three months' rent but in any event shall not exceed the total value of Eligible Inventory at any such other location, (ii) Reserves for consignee's, warehousemen's and bailee's charges (A) shall not be taken for locations covered by a Collateral Access Agreement or an Existing Collateral Access Agreement and (B) for all other such locations, shall be limited to three months' charges but in any event shall not exceed the total value of Eligible Inventory at any such other location, (iii) all Reserves (including the amount of such Reserve) shall bear a reasonable relationship to the events, conditions or circumstances that are the basis for such Reserve and (iv) the amount of any Reserve shall not be duplicative of the amount of any other Reserve imposed hereunder with respect to the same events, conditions or circumstances.  In the event that the Administrative Agent determines in its Permitted Discretion that (a) the events, conditions or circumstances underlying the maintenance of any Reserve shall cease to exist or (b) the liability that is the basis for any Reserve has been reduced, then such Reserve shall be rescinded or reduced in an amount as determined in Administrative Agent's Permitted Discretion, as applicable, at the request of the Borrower.

"***Resolution Authority***" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***Responsible Officer***" means the Chief Executive Officer, Chief Financial Officer and Treasurer of the Parent or the Borrower, as applicable, or any other individual designated in writing to the Administrative Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder, which other individual has been authenticated through the Administrative Agent's electronic platform or portal in accordance with its procedures for such authentication.   Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"***Restricted Payment***" has the meaning specified in Section 5.02(g).

"***Restricted Subsidiary***" means a Subsidiary of Holdings.

"***Revolving Credit Advance***" has the meaning specified in Section 2.01(a).

"***Revolving Credit Borrowing***" means a borrowing consisting of simultaneous Revolving Credit Advances of the same Type made by the Revolving Credit Lenders.

"***Revolving Credit Facility***" means, at any time, the aggregate amount of the Revolving Credit Lenders' Commitments at such time.

"***Revolving Credit Lender***" means any Lender that has a Commitment.

"**_Revolving Credit Note_**" means a promissory note of the Borrower payable to the order of any Revolving Credit Lender, in substantially the form of Exhibit A hereto, evidencing the aggregate indebtedness of the Borrower to such Lender resulting from the Revolving Credit  Advances, Letter of Credit Advances and Swing Line Advances made by such Lender, as amended.

"**_S&P_**" means S&P Global Ratings, a division of The McGraw-Hill Companies, Inc.

"**_Sanctioned Entity_**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or territory sanctions program administered and enforced by OFAC.

"**_Sanctioned Person_**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity that would be prohibited by applicable Sanctions, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**_Sanctions_**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future applicable executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over any Secured Party or any Loan Party or any of their respective Subsidiaries or Affiliates.

"**_SEC_**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**_Secured Bank Product Agreement_**" means any agreement that is entered into by and between the Borrower or any of its Restricted Subsidiaries and any Agent or Lender or any of its Affiliates in connection with Bank Products provided by such Agent, Lender or Affiliate.

"**_Secured Cash Management Agreement_**" means any agreement that is entered into by and between the Borrower or any of its Restricted Subsidiaries and any Agent or Lender or any of its Affiliates in connection with Cash Management Services provided by such Agent or Lender or Affiliate.

"**_Secured Hedge Agreement_**" means any Hedge Agreement required or permitted under Article V that is entered into by and between the Borrower and any Hedge Bank.

"**_Secured Obligations_**" means all Obligations and Guaranteed Obligations or now or hereafter existing under the Loan Documents, the Secured Hedge Agreements and the Secured Cash Management Agreements, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise; _provided_ that, notwithstanding anything to the contrary, the Secured Obligations shall exclude any Excluded Swap Obligations.

"***Secured Parties***" means the Agents, the Lender Parties, the Hedge Banks, the Agents, Lenders or Affiliates thereof that provide Bank Products, the Cash Management Banks, the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, each other Person to whom Obligations under this Agreement and other Loan Documents are owing, and the successors and assigns of each of the foregoing.

"***Security Agreement***" means the "Security Agreement" under and as defined in the Prepetition Loan Documents.

"***Single Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA and subject to Title IV of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"***SOFR***" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"***SOFR Administrator***" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"***SOFR Advance***" means an Advance that bears interest at a rate determined by reference to Term SOFR (other than pursuant to clause (c) of the definition of "Base Rate").

"***Specified Fiscal Quarter***" has the meaning specified in <u>Section 6.03</u>.

"***Specified Intellectual Property***" means assets of the type described in <u>clauses (i)</u> through <u>(iii)</u> of the definition of "Intellectual Property Collateral" set forth in the Security Agreement under and as defined in the Prepetition Credit Agreement (whether or not constituting Collateral).

"***Specified Liquidation Agents***" means Hilco Merchant Resources, LLC and any other person approved by the Administrative Agent, together with their respective Affiliates acting with respect to the Specified Store Closing Sales.

"***Specified Liquidation Agreement***" means that certain Letter Agreement Governing Inventory and FF&E Disposition, dated as of November 6, 2019, by and between the Borrower and Hilco Merchant Resources, LLC, as amended from time to time, including pursuant to that Twenty-Sixth Amendment to Letter Agreement, dated as of April 21, 2024 (the "***Specified Liquidation Agreement Twenty-Sixth Amendment***").

"***Specified Liquidation Agreement Twenty-Sixth Amendment***" has the meaning specified in the definition of Specified Liquidation Agreement.

"***Specified Store Closing Sales***" means the closure of the Loan Parties' Stores and the liquidation of assets related thereto by the Specified Liquidation Agents pursuant to the Specified Liquidation Agreements.

"***Store***" means any retail store which may include real property, fixtures, equipment, inventory and other property related thereto operated or to be operated by a Loan Party.

"**_Store Closing Final Order_**" means an order of the Bankruptcy Court approving the Specified Liquidation Agreement and transactions contemplated thereby, on a final basis, in form and substance acceptable to the Administrative Agent.

"**_Store Closing Interim Order_**" has the meaning specified in Section 3.01(d).

"**_Store Closing Orders_**" means, collectively, the Store Closing Interim Order and the Store Closing Final Order and separately, the Store Closing Interim Order and the Store Closing Final Order, as the context requires.

"**_Spot Rate_**" for a specified currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. (New York City time) on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"**_Standard Letter of Credit Practice_**" means, for the Issuing Bank, any domestic or foreign Law or letter of credit practices applicable in the city in which the Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such Laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP 600, as chosen in the applicable Letter of Credit.

"**_Standby Letter of Credit_**" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"**_Standby Letter of Credit Agreement_**" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the Issuing Bank.

"**_Subordinated Debt_**" means any Debt of any Loan Party that is secured by a Lien that is junior to Liens securing the Obligations (other than Debt under the Term Credit Agreement) or subordinated to the Obligations of such Loan Party under the Loan Documents, which Debt is on, and otherwise contains, terms and conditions satisfactory to the Administrative Agent.

"**_Subordinated Obligations_**" has the meaning specified in Section 8.06.

"**_Subsidiary_**" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is, in the case of clauses (a), (b) and (c), at the time directly or indirectly owned or controlled by such

Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"**Subsidiary Guarantors**" means the Subsidiaries of the Parent listed on Schedule II hereto and each other Subsidiary of the Parent that shall be required to execute and deliver a guaranty pursuant to Section 5.01(j), and any other Person that guarantees the Obligations.  For the avoidance of doubt, no Excluded Subsidiary shall be a Subsidiary Guarantor.

"**Subsidiary Guaranty**" means the guaranty of the Subsidiary Guarantors set forth in Article VIII, together with each other guaranty and guaranty supplement delivered pursuant to Section 5.01(j) of this Agreement, in each case, as amended, amended and restated, modified or otherwise supplemented.

"**Supermajority Lenders**" means, at any time, at least two Lenders that are not Affiliates (unless there shall, at any date of determination, be fewer than two Lenders that are not Affiliates) owed or holding at least 66⅔% of the sum of (a) the aggregate principal amount of the Advances outstanding at such time, (b) the aggregate Available Amount of all Letters of Credit outstanding at such time and (c) the aggregate Unused Commitments at such time; *provided*, *however*, that if any Lender shall be a Defaulting Lender at such time, there shall be excluded from the determination of Supermajority Lenders at such time (A) the aggregate principal amount of the Advances owing to such Lender (in its capacity as a Lender) and outstanding at such time, (B) such Lender's Pro Rata Share of the aggregate Available Amount of all Letters of Credit outstanding at such time and (C) the Unused Commitment of such Lender at such time.  For purposes of this definition, the aggregate principal amount of Swing Line Advances owing to the Swing Line Bank and of Letter of Credit Advances owing to the Issuing Bank and the Available Amount of each Letter of Credit shall be considered to be owed to the Revolving Credit Lenders ratably in accordance with their respective Commitments.

"**Superpriority Claims**" means all of the allowed superpriority administrative expense claims of the Agents and the other Secured Parties on account of the Obligations, which claims shall be entitled to the benefits of Sections 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Loan Parties. Superpriority Claims shall, at all times be (x) junior only to the Carve Out and (y) senior to any and all other administrative expense claims or other claims against the Debtors their estates, in the Chapter 11 Cases and any successor cases.

"**Supplemental Collateral Agent**" has the meaning specified in Section 7.01(c).

"**Supported QFC**" has the meaning specified in Section 9.21.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swing Line Advance**" means an advance made by (a) the Swing Line Bank pursuant to Section 2.01(b) or (b) any Revolving Credit Lender pursuant to Section 2.02(b).

"**Swing Line Bank**" means the Initial Swing Line Bank and any Eligible Assignee to which the Swing Line Commitment hereunder has been assigned pursuant to Section 9.07.

"**Swing Line Borrowing**" means a borrowing consisting of a Swing Line Advance made by the Swing Line Bank pursuant to Section 2.01(b) or the Revolving Credit Lenders pursuant to Section 2.02(b).

"*Swing Line Commitment*" means, with respect to the Swing Line Bank at any time, the obligation to make a Swing Line Advance up to a maximum principal amount of $45,000,000 at any one time outstanding or, if the Swing Line Bank has entered into an Assignment and Assumption, set forth for the Swing Line Bank in the Register maintained by the Administrative Agent pursuant to <u>Section 9.07(d)</u> as the Swing Line Bank's "Swing Line Commitment," as such amount may be reduced at or prior to such time pursuant to <u>Section 2.05</u>.

"*Swing Line Facility*" means, at any time, an amount equal to the Swing Line Bank's Swing Line Commitment at such time, as such amount may be reduced at or prior to such time pursuant to <u>Section 2.05</u>.

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "Debt," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "synthetic lease") and (b) Obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Debt" or as a liability on a Consolidated balance sheet of such Person and its Restricted Subsidiaries in accordance with GAAP.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Term Pushdown Reserve*" means the "*Term Pushdown Reserve*" as defined in the Junior DIP Credit Agreement.

"*Term SOFR*" means:

(a)    for any calculation with respect to a SOFR Advance, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "*Periodic Term SOFR Determination Day*") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to a Base Rate Advance on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "*Base Rate Term SOFR Determination Day*") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for

which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"*Term SOFR Adjustment*" means a percentage equal to 0.10% per annum.

"*Term SOFR Administrator*" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" means the forward-looking term rate based on SOFR.

"*Termination Date*" means the earlier of (a) the date of termination in whole of the Commitments, the Letter of Credit Facility and the Swing Line Commitment, pursuant to Section 2.05 or 6.01, and (b) the Maturity Date.

"*Testing Period*" has the meaning specified in Section 5.01(s)(ii).

"*Trading With the Enemy Act*" has the meaning specified in Section 4.01(h)(ii).

"*Transaction*" means the transactions contemplated by the Loan Documents, including any amendments thereto.

"*Transaction Expenses*" means fees, costs and expenses incurred in connection with the Transaction, whether before or after the Effective Date.

"*Transfer*" has the meaning specified in Section 5.02(e).

"*Type*" refers to the distinction between Advances bearing interest based upon the Base Rate and Advances bearing interest based upon Term SOFR (other than pursuant to clause (c) of the definition of "Base Rate") or any Benchmark Replacement.

"*UCC*" has the meaning specified in the Security Agreement.

"*UCP 600*" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unadjusted Benchmark Replacement*" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"***Unintentional Overadvance***" means an Overadvance which, to the Agents' knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Secured Parties, including, without limitation, a reduction in the value of property or assets included in the Borrowing Base, increase in Reserves, or misrepresentation by the Loan Parties.

"***Unmatured Surviving Obligations***" means Obligations under this Agreement and the other Loan Documents that by their terms survive the termination of this Agreement or the other Loan Documents but are not, as of the date of determination, due and payable and for which no outstanding claim has been made.

"***Unused Commitment***" means, with respect to any Revolving Credit Lender at any time, (a) such Lender's Commitment at such time minus (b) the sum of (i) the aggregate principal amount of all Revolving Credit Advances, Swing Line Advances and Letter of Credit Advances made by such Lender (in its capacity as a Lender) and outstanding at such time *plus*, without duplication, (ii) such Lender's Pro Rata Share of (A) the aggregate Available Amount of all Letters of Credit outstanding at such time, (B) the aggregate principal amount of all Letter of Credit Advances made by the Issuing Bank pursuant to Section 2.03(d) and outstanding at such time and (C) the aggregate principal amount of all Swing Line Advances made by the Swing Line Bank pursuant to Section 2.01(b) and outstanding at such time.

"***Updated Approved Budget***" has the meaning specified in Section 5.01(s)(i).

"***Updated Budget***" has the meaning specified in Section 5.01(s)(i).

"***U.S. Government Securities Business Day***" means any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities; provided, that for purposes of notice requirements in Sections 2.02(b) and 2.06(a), such day is also a Business Day.

"***U.S. Special Resolution Regimes***" has the meaning specified in Section 9.21.

"***Used Commitment***" means, with respect to any Revolving Credit Lender at any time, the sum of (a) the aggregate principal amount of all Revolving Credit Advances, Swing Line Advances and Letter of Credit Advances made by such Lender (in its capacity as a Lender) and outstanding at such time and, without duplication, (b) such Lender's Pro Rata Share of (i) the aggregate Available Amount of all Letters of Credit outstanding at such time, (ii) the aggregate principal amount of all Letter of Credit Advances made by the Issuing Bank pursuant to Section 2.03(d) and outstanding at such time and (iii) the aggregate principal amount of all Swing Line Advances made by the Swing Line Bank pursuant to Section 2.01(b) and outstanding at such time.

"***USCO***" means the United States Copyright Office (or any equivalent office).

"***Variance Report***" has the meaning specified in Section 5.01(s)(ii).

"***Variance Report Date***" has the meaning specified in Section 5.01(s)(ii).

"***Voting Interests***" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"**WFB**" means Wells Fargo Bank, National Association and its successors.

"***Withdrawal Liability***" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

"***Write-Down and Conversion Powers***" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Notwithstanding anything to the contrary herein or in any other Loan Document, any reference to a defined term as defined in the Junior DIP Credit Agreement or any other Junior DIP Document shall refer to the definition of such term as in effect on the Effective Date (including with respect to any component definitions (or any sub-component definitions)), except with respect to any amendment or modification thereto (or to any component definitions (or any sub-component definitions)) permitted under this Agreement, the Intercreditor Agreement and the Orders or otherwise consented to by the Agents and the Required Lenders.

SECTION 1.02. Computation of Time Periods; Other Definitional Provisions. In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "***from***" means "from and including" and the words "***to***" and "***until***" each mean "to but excluding." References in the Loan Documents to any agreement or contract "***as amended***" shall mean and be a reference to such agreement or contract as amended, amended and restated, restated, supplemented or otherwise modified from time to time in accordance with its terms (subject to any restrictions on such amendments, amendments and restatements, restatements, supplements or other modifications set forth herein or in any other Loan Document). The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(b)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the indefeasible repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Hedge Agreements) and any other Unmatured Surviving Obligation, including indemnification obligations, providing Cash Collateralization) or other collateral as may be requested by any Agent of all of the Obligations and all Prepetition Secured Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations or other Prepetition Secured Obligations) under Hedge Agreements) other than (A) Unmatured Surviving Obligations, (B) any Obligations or Prepetition Secured Obligations relating to Bank Products (other than Hedge Agreements) that, at such time, are allowed by the applicable Provider to remain outstanding without being required to be repaid or Cash Collateralized or other collateral as may be requested by any Agent, and (C) any Obligations or Prepetition Secured Obliations relating to Hedge Agreements that, at such time, are allowed by the applicable Provider of such Hedge Agreements to remain outstanding without being required to be repaid, and (ii) the termination of (A) the Aggregate Commitments, (B) the obligation of the Issuing Bank to issue Letters of Credit hereunder, and (C) the Loan Documents.

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.03. Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in accordance with generally accepted accounting principles as in effect from time to time in the United States ("GAAP"), applied on a consistent basis; *provided, however*, that if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and the Borrower or the Administrative Agent shall so request, the Administrative Agent and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein.  Notwithstanding anything herein to the contrary or any changes in GAAP after December 31, 2018 that would require lease obligations (whether or not such lease existed on December 31, 2018 or thereafter arose) that would be treated as operating leases as of December 31, 2018 to be classified and accounted for as a Capitalized Lease or otherwise reflected on a Person's consolidated balance sheet, such obligations shall continue to be excluded from the definition of Debt and shall not be treated as an obligation under a Capitalized Lease for any purposes hereunder or under any Loan Document.

SECTION 1.04. [Reserved].

SECTION 1.05. Letter of Credit Amounts. Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Available Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or any Issuer Documents related thereto, provides for one or more automatic increases in the Available Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Available Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Available Amount is in effect at such time.

SECTION 1.06. Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.07. Rates. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to Section 2.10(g), will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any other

Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II -
## AMOUNTS AND TERMS OF THE ADVANCES
## AND THE LETTERS OF CREDIT

SECTION 2.01. <u>The Advances.</u>

(a)    <u>The Revolving Credit Advances</u>.  Subject to the terms and conditions set forth herein and subject to the terms and conditions of the Financing Order, (i) each Revolving Credit Lender severally agrees to make revolving credit loans denominated in Dollars to the Borrower pursuant to <u>Section 2.02</u> (a "***Revolving Credit Advance***") from time to time, on any Business Day until the Termination Date, in an aggregate principal amount of $1,000,000 or an integral multiple of $100,000 in excess thereof (other than a Borrowing the proceeds of which shall be used solely to repay or prepay in full outstanding Swing Line Advances or outstanding Letter of Credit Advances) and shall consist of Revolving Credit Advances made simultaneously by the Revolving Credit Lenders ratably according to their Commitments; *provided*, *however*, that the aggregate principal amount of all such Revolving Credit Advances (together with the aggregate principal amount of all Swing Line Advances then outstanding plus the aggregate Available Amount of all Letters of Credit outstanding at such time) shall not exceed the Loan Cap then in effect, subject to the Administrative Agent's authority, in its sole discretion to make Protective Advances pursuant to the terms of <u>Section 2.01(d)</u>.  Within the limits of each Revolving Credit Lender's Unused Commitment in effect from time to time, the Borrower may borrow under this <u>Section 2.01(a)</u>, prepay pursuant to <u>Section 2.06(a)</u> and reborrow under this <u>Section 2.01(a)</u>.

(b)    <u>The Swing Line Advances</u>.  The Swing Line Bank agrees on the terms and conditions hereinafter set forth, to make Swing Line Advances to the Borrower from time to time on any Business Day during the period from the Effective Date until the Termination Date (i) in an aggregate amount not to exceed at any time outstanding $45,000,000 at such time and (ii) in an amount for each such Swing Line Borrowing not to exceed the aggregate of the Unused Commitments of the Revolving Credit Lenders at such time; *provided*, *however*, that the aggregate principal amount of all such Swing Line Advances (together with the aggregate principal amount of all Revolving Credit Advances then outstanding plus the aggregate Available Amount of all Letters of Credit outstanding at such time) shall not exceed the Loan Cap then in effect, subject to the Administrative Agent's authority, in its sole discretion to make Protective Advances pursuant to the terms of <u>Section 2.01(d)</u>.  No Swing Line Advance shall be used for the purpose of funding the payment of principal of any other Swing Line Advance.  Each Swing Line Borrowing shall be in an amount of $1,000,000 or an integral multiple of $100,000 in excess thereof and shall be made as a Base Rate Advance.  Within the limits of the Swing Line Facility and within the limits referred to in clause (ii) above, the Borrower may borrow under this <u>Section 2.01(b)</u>, repay pursuant to <u>Section 2.04(b)</u> or prepay pursuant to <u>Section 2.06(a)</u> and reborrow under this <u>Section 2.01(b)</u>.  Immediately upon the making of a Swing Line Advance, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Bank a risk participation in such Swing Line Advance in an amount equal to the product of such Lender's Pro Rata Share times the amount of such Swing Line Advance.

(c)    [Intentionally Omitted].

(d)     Protective Advances.  Any provision of this Agreement to the contrary notwithstanding, (i) subject to the limitations set forth below, the Administrative Agent and the Collateral Agent are authorized by the Borrower and the Lenders, from time to time in each of their sole discretion (but shall have absolutely no obligation to), to make Advances to the Borrower, on behalf of all Lenders, which the Administrative Agent or the Collateral Agent, in such Person's reasonable discretion, deems necessary or desirable (A) after the occurrence and during the continuance of an Event of Default or (B) at any time that any of the other applicable conditions precedent set forth in Section 3.02 are not satisfied (x) to preserve or protect the Collateral, or any portion thereof, (y) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations under the Loan Documents or (z) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of principal, interest, Letter of Credit Advances, fees, reimbursable expenses (including costs, fees and expenses as described in Section 9.04) and other sums payable under the Loan Documents (any of such Advance are herein referred to as "**_Protective Advances_**"); _provided_ that no Protective Advance shall cause the sum of the aggregate principal amount of all Swing Line Advances and Revolving Credit Advances then outstanding (together with the aggregate Available Amount of all Letters of Credit outstanding at such time) to exceed the Aggregate Commitments; _provided_, _further_, that the aggregate amount of Protective Advances outstanding at any time, which were made pursuant to clauses (x) and (y) above, shall not at any time exceed the lesser of (1) $25,000,000 and (2) 10% of the Borrowing Base. Protective Advances shall be secured by Liens in favor of the Administrative Agent in and to the Collateral and shall constitute Obligations hereunder.  All Protective Advances shall be Base Rate Advances.  The Administrative Agent's and the Collateral Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.  At any time that there is sufficient Excess Availability and the conditions set forth in Section 3.02 have been satisfied, the Administrative Agent or the Collateral Agent may request the Revolving Credit Lenders to make a Revolving Credit Advances to repay a Protective Advance.  At any other time, the Administrative Agent or the Collateral Agent may require the Lenders to fund their risk participations as described in clause (ii).  The making by any Agent of a Protective Advance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letter of Credits or of Section 2.01(b) regarding the Lenders' obligations to purchase participations with respect to Swing Line Loans. No Agent shall have any liability for, and no Loan Party or Secured Party shall have the right to, or shall, bring any claim of any kind whatsoever against any Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

(ii)    Upon the making of a Protective Advance by the Administrative Agent or the Collateral Agent (whether before or after the occurrence of an Event of Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent or the Collateral Agent, as applicable, without recourse or warranty, an undivided interest and participation in any Protective Advance in proportion to its Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

SECTION 2.02. Making the Advances.

(a)     Except as otherwise provided in Section 2.02(b) or 2.03, each Borrowing shall be made on notice (which may be delivered through the Administrative Agent's electronic platform or portal), given not later than 11:00 A.M. (New York City time) on the third U.S. Government Securities Business Day prior to the date of the proposed Borrowing in the case of a Borrowing consisting of SOFR Advances, or the first Business Day prior to the date of the proposed Borrowing in the case of a Borrowing consisting of Base Rate Advances by the Borrower to the Administrative Agent, which shall give to each Appropriate Lender prompt notice thereof by telecopier or electronic communication.  Each such notice of a Borrowing

(a "***Notice of Borrowing***") shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B hereto, specifying therein the requested (1) date of such Borrowing, (2) Facility under which such Borrowing is to be made, (3) Type of Advances comprising such Borrowing, (4) aggregate amount of such Borrowing and (5) in the case of a Borrowing consisting of SOFR Advances, initial Interest Period for each such Advance. Each Appropriate Lender shall, before 11:00 A.M. (New York City time) on the date of such Borrowing, make available for the account of its Applicable Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, such Lender's ratable portion of such Borrowing in accordance with the respective Commitments under the applicable Facility of such Lender and the other Appropriate Lenders. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower by crediting the Borrower's Account; *provided*, *however*, that, in the case of any Revolving Credit Borrowing, the Administrative Agent shall first apply such funds to prepay ratably the aggregate principal amount of any Swing Line Advances and Letter of Credit Advances outstanding at such time, together with interest accrued and unpaid thereon to and as of such date. All Borrowing requests which are not made on-line via the Administrative Agent's electronic platform or portal shall be subject to (and unless the Administrative Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) the Administrative Agent's authentication process (with results satisfactory to the Administrative Agent) prior to the funding of any such requested Advance.

(b)    (i)  Each Swing Line Borrowing shall be made on notice, given not later than 11:00 A.M. (New York City time) on the date of the proposed Swing Line Borrowing, by the Borrower to the Swing Line Bank and the Administrative Agent. Each such notice of a Swing Line Borrowing (a "***Notice of Swing Line Borrowing***") shall be by telephone, confirmed promptly in writing, or by telecopier or electronic communication, specifying therein the requested (i) date of such Borrowing (which shall be a Business Day), (ii) amount of such Borrowing and (iii) maturity of such Borrowing (which maturity shall be no later than the seventh day after the requested date of such Borrowing). The Swing Line Bank will make the amount of the requested Swing Line Advances available to the Administrative Agent at the Administrative Agent's Account, in same day funds. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrower by crediting the Borrower's Account.

(ii)    The Swing Line Bank may, at any time in its sole and absolute discretion, request on behalf of the Borrower (and the Borrower hereby irrevocably authorizes the Swing Line Bank to so request on its behalf) that each Revolving Credit Lender make a Base Rate Advance in an amount equal to such Lender's Pro Rata Share of the amount of Swing Line Advances then outstanding. Such request shall be deemed to be a Notice of Borrowing for purposes hereof and shall be made in accordance with the provisions of Section 2.02(a) without regard solely to the minimum amounts specified in Section 2.01(b) but subject to the satisfaction of the conditions set forth in Section 3.02. The Swing Line Bank shall furnish the Borrower with a copy of the applicable Notice of Borrowing promptly after delivering such notice to the Administrative Agent. Each Revolving Credit Lender shall make an amount equal to its Pro Rata Share of the amount specified in such Notice of Borrowing available for the account of its Applicable Lending Office to the Administrative Agent for the account of the Swing Line Bank, by deposit to the Administrative Agent's Account, in same day funds, not later than 11:00 A.M. (New York City time) on the day specified in such Notice of Borrowing.

(iii)    If for any reason any Swing Line Advance cannot be refinanced by a Revolving Credit Borrowing as contemplated by Section 2.02(b)(ii), the request for Base Rate Advances submitted by the Swing Line Bank as set forth in Section 2.02(b)(ii) shall be deemed to be a request by the Swing Line Bank that each of the Revolving Credit Lenders fund its risk participation in the

relevant Swing Line Advance and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swing Line Bank pursuant to Section 2.02(b)(ii) shall be deemed payment in respect of such participation.

(iv)    If and to the extent that any Revolving Credit Lender shall not have made the amount of its Pro Rata Share of such Swing Line Advance available to the Administrative Agent in accordance with the provisions of Section 2.02(b)(ii), such Revolving Credit Lender agrees to pay to the Administrative Agent forthwith on demand such amount together with interest thereon, for each day from the date of the applicable Notice of Borrowing delivered by the Swing Line Bank until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate.

(v)    Each Revolving Credit Lender's obligation to make Revolving Credit Advances or to purchase and fund risk participations in Swing Line Advance pursuant to this Section 2.02(b) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Bank, the Borrower or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; *provided*, *however*, that each Revolving Credit Lender's obligation to make Revolving Credit Advances pursuant to this Section 2.02(b) is subject to satisfaction of the conditions set forth in Section 3.02.  No funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swing Line Advances, together with interest as provided herein.

(c)    Anything in subsection (a) above to the contrary notwithstanding, (i) the Borrower may not select SOFR Advances for any Borrowing if the aggregate amount of such Borrowing is less than $1,000,000 or if the obligation of the Appropriate Lenders to make SOFR Rate Advances shall then be suspended pursuant to Section 2.09 or 2.10 and (ii) the SOFR Advances may not be outstanding as part of more than 15 separate Borrowings.

(d)    Each Notice of Borrowing and each Notice of Swing Line Borrowing shall be irrevocable and binding on the Borrower.  In the case of any Borrowing that the related Notice of Borrowing specifies is to be comprised of SOFR Advances, the Borrower shall indemnify each Appropriate Lender against any loss, cost or expense incurred by such Lender (as set forth in a written notice delivered by such Lender or the Administrative Agent to the Borrower) as a result of any failure to fulfill on or before the date specified in such Notice of Borrowing for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Advance to be made by such Lender as part of such Borrowing when such Advance, as a result of such failure, is not made on such date.

(e)    Unless the Administrative Agent shall have received notice from an Appropriate Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower or Swing Line Bank or Issuing Bank, as applicable, on such date a corresponding amount.  If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender, the Borrower or Swing Line Bank or Issuing Bank, as applicable, severally agrees to repay or pay to the Administrative Agent forthwith on demand such corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrower or Swing Line Bank or Issuing Bank, as applicable, until the date such amount is repaid or

paid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at such time under Section 2.07 to Advances comprising such Borrowing and (ii) in the case of such Lender, or Swing Line Bank or Issuing Bank, as applicable, the Federal Funds Rate.  If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Advance as part of such Borrowing for all purposes.

(f)      The failure of any Lender to make the Advance to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on the date of any Borrowing.

(g)      To the extent not paid by the Borrower when due (after taking into consideration any grace period), the Administrative Agent, without the request of the Borrower, may advance any interest, fee, service charge (including direct wire fees), costs and expenses of any Secured Party in accordance with Section 9.04(a), or other payment to which any Secured Party is entitled from the Loan Parties pursuant hereto or any other Loan Document, as and when due and payable, and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby.  The Administrative Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's rights and the Borrower's obligations under Section 2.06(b).  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(g) shall bear interest at the interest rate then and thereafter applicable to Base Rate Advances.

SECTION 2.03. Letters of Credit.

(a)      Subject to the terms and conditions of this Agreement, the Issuing Bank agrees to (i) issue the Prepetition Letters of Credit as provided in clause (q) below and (ii) not deliver any notices of non-renewal with respect to the Prepetition Letters of Credit prior to the earlier of (x) June 6, 2024 and (y) the entry by the Debtors into a Liquidation Agreement.  By submitting a request to the Issuing Bank for the issuance of a Letter of Credit, the Borrower shall be deemed to have requested that the Issuing Bank issue the requested Letter of Credit.  Each request for the issuance of a Letter of Credit, or the amendment or extension of any outstanding Letter of Credit, shall be (i) irrevocable and shall be made in writing pursuant to a Letter of Credit Application by a Responsible Officer, (ii) delivered to the Issuing Bank and the Administrative Agent via telefacsimile or other electronic method of transmission reasonably acceptable to the Issuing Bank not later than 11:00 a.m. (New York City time) at least two Business Days (or such other date and time as the Administrative Agent and the Issuing Bank may agree in a particular instance in their sole discretion) prior to the requested date of issuance, amendment or extension, and (iii) subject to the Issuing Bank's authentication procedures with results satisfactory to the Issuing Bank.  Each such request shall be in form and substance reasonably satisfactory to the Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment or extension, identification of the Letter of Credit to be so amended or extended) as shall be necessary to prepare, amend or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as the Administrative Agent or the Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that the Issuing Bank generally requests for Letters of Credit in similar circumstances.  The Administrative Agent's records of the content of any such request will be conclusive.  Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of a Loan Party in respect of (x) a lease of real property to the extent that the face amount of such Letter of Credit exceeds the highest rent (including all rent-like charges) payable under such lease for a period of one year, or (y) an

employment contract to the extent that the face amount of such Letter of Credit exceeds the highest compensation payable under such contract for a period of one year.

(b)     The Issuing Bank shall have no obligation to issue any Letter of Credit other than the Prepetition Letters of Credit as provided in clause (q) below.

(c)     In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's participation with respect to such Letter of Credit may not be reallocated pursuant to Section 2.15(b), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and the Borrower to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrower cash collateralizing such Defaulting Lender's participation with respect to such Letter of Credit in accordance with Section 2.15(b).  Additionally, the Issuing Bank shall have no obligation to issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any law applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit or request that the Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally, or (C) the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Administrative Agent may agree) or all the Lenders have approved such expiry date.

(d)     Any Issuing Bank (other than WFB or any of its Affiliates) shall notify the Administrative Agent in writing no later than the Business Day immediately following the Business Day on which such Issuing Bank issued any Letter of Credit; provided that (i) until the Administrative Agent advises any such Issuing Bank that the provisions of Section 3.02 are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by the Administrative Agent and such Issuing Bank, such Issuing Bank shall be required to so notify the Administrative Agent in writing only once each week of the Letters of Credit issued by such Issuing Bank during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Administrative Agent and such Issuing Bank may agree.  Each Letter of Credit shall be in form and substance reasonably acceptable to the Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars; provided that if the Issuing Bank, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrower of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate.  If the Issuing Bank makes a payment under a Letter of Credit, the Borrower shall pay to Administrative Agent an amount equal to the applicable Letter of Credit Advance on the Business Day such Letter of Credit Advance is made and, in the absence of such payment, the amount of the Letter of Credit Advance immediately and automatically shall be deemed to be a Revolving Credit Advance hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3.02 hereof) and, initially, shall bear interest at the rate then applicable to Base Rate Advances. If a Letter of Credit Advance is deemed to be a Revolving Credit Advance hereunder, the Borrower' obligation to pay the amount of such Letter of Credit Advance to the Issuing Bank shall be automatically converted into an obligation to pay the resulting Revolving Credit Advance.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that the Lenders have made payments pursuant to Section 2.03(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.

(e)     Promptly following receipt of a notice of a Letter of Credit Advance pursuant to Section 2.03(d), each Lender agrees to fund its Pro Rata Share of any Revolving Credit Advance deemed made pursuant to Section 2.03(d) on the same terms and conditions as if the Borrower had requested the amount thereof as a Revolving Credit Advance and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  By the issuance of a Letter of Credit (or an amendment or extension of a Letter of Credit) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank shall be deemed to have granted to each Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by the Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Lender agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Share of any Letter of Credit Advance made by the Issuing Bank under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Share of each Letter of Credit Advance made by the Issuing Bank and not reimbursed by Borrower on the date due as provided in Section 2.03(d), or of any reimbursement payment that is required to be refunded (or that the Administrative Agent or the Issuing Bank elects, based upon the advice of counsel, to refund) to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to deliver to the Administrative Agent, for the account of the Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Advance pursuant to this Section 2.03(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of a Default or the failure to satisfy any condition set forth in Section 3.02 hereof.  If any such Lender fails to make available to the Administrative Agent the amount of such Lender's Pro Rata Share of a Letter of Credit Advance as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and the Administrative Agent (for the account of the Issuing Bank) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)     The Borrower agrees to indemnify, defend and hold harmless each Secured Party (including the Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including the Issuing Bank, a "***Letter of Credit Related Person***") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable documented fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by Section 2.12) (the "***Letter of Credit Indemnified Costs***"), and which arise out of or in connection with, or as a result of:

(i)     any Letter of Credit or any pre-advice of its issuance;

(ii)     any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)     any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)     any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)      any unauthorized instruction or request made to the Issuing Bank in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

(vi)      an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated in connection with any Letter of Credit;

(vii)      any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii)      the fraud, forgery or illegal action of parties in connection with any Letter of Credit other than the Letter of Credit Related Person;

(ix)      any prohibition on payment or delay in payment of any amount payable by Issuing Bank to a beneficiary or transferee beneficiary of a Letter of Credit arising out of Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions;

(x)      the Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation in connection with a Letter of Credit;

(xi)      any foreign language translation provided to Issuing Bank in connection with any Letter of Credit;

(xii)      any foreign law or usage as it relates to Issuing Bank's issuance of a Letter of Credit in support of a foreign guaranty including the expiration of such guaranty after the related Letter of Credit expiration date and any resulting drawing paid by Issuing Bank in connection therewith; or

(xiii)      the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person related to a Letter of Credit;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (xiii) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity.  The Borrower hereby agrees to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.03(f).  If and to the extent that the obligations of the Borrower under this Section 2.03(f) are unenforceable for any reason, the Borrower agrees to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable law.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)      The liability of the Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrower that are caused directly by the Issuing Bank's gross negligence, bad faith or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents

presented under a Letter of Credit. The Issuing Bank shall be deemed to have acted with due diligence and reasonable care if the Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. The Borrower' aggregate remedies against the Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrower to the Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.03(d), plus interest at the rate then applicable to Base Rate Loans hereunder. The Borrower shall take action to avoid and mitigate the amount of any damages claimed against the Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit. Any claim by the Borrower under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by the Borrower as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had the Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing the Issuing Bank to effect a cure.

(h)    The Borrower shall be responsible for the final text of the Letter of Credit as issued by the Issuing Bank, irrespective of any assistance the Issuing Bank may provide such as drafting or recommending text or by the Issuing Bank's use or refusal to use text submitted by the Borrower. The Borrower understands that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by Issuing Bank, and the Borrower hereby consents to such revisions and changes not materially different from the application executed in connection therewith. The Borrower is solely responsible for the suitability of the Letter of Credit for the Borrower's purposes. If the Borrower requests the Issuing Bank to issue a Letter of Credit for an affiliated or unaffiliated third party (an "***Account Party***"), (i) such Account Party shall have no rights against the Issuing Bank; (ii) Borrower shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be between the Issuing Bank and the Borrower. The Borrower will examine the copy of the Letter of Credit and any other documents sent by the Issuing Bank in connection therewith and shall promptly notify the Issuing Bank (not later than three (3) Business Days following the Borrower's receipt of documents from the Issuing Bank) of any non-compliance with the Borrower's instructions and of any discrepancy in any document under any presentment or other irregularity. If the Borrower so requests in any applicable Letter of Credit Application, the Issuing Bank may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "***Auto-Extension Letter of Credit***"); *provided* that any such Auto-Extension Letter of Credit must permit the Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "***Non-Extension Notice Date***") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued. Unless otherwise directed by the Administrative Agent or the Issuing Bank, Borrower shall not be required to make a specific request to the Administrative Agent or the Issuing Bank for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the Issuing Bank to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date unless either such Standby Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Standby Letter of Credit (or such later date as to which the Administrative Agent may agree) or all the Lenders have approved such expiry date; *provided*, however, that the Administrative Agent shall instruct the Issuing Bank not to permit any such extension if (A) the Issuing Bank has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 2.03(a) or otherwise), or (B) the Issuing Bank has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date (1) from the Administrative Agent that the Required Lenders have elected not to permit such extension or (2) from the Administrative Agent, any Lender or the Borrower that one or more of the applicable

conditions specified in Section 3.02 is not then satisfied, and in each such case directing the Issuing Bank not to permit such extension.

(i)      The Borrower's reimbursement and payment obligations under this Section 2.03 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)      any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)      payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)      the Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)      the Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)      the existence of any claim, set-off, defense or other right that Holdings or any of its Subsidiaries may have at any time against any beneficiary, any assignee of proceeds, the Issuing Bank or any other Person;

(vi)      any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.03(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Loan Party's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against the Issuing Bank, the beneficiary or any other Person; or

(vii)      the fact that any Default shall have occurred and be continuing;

provided, however, that subject to Section 2.03(g) above, the foregoing shall not release the Issuing Bank from such liability to the Borrower as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against the Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrower to the Issuing Bank arising under, or in connection with, this Section 2.03 or any Letter of Credit.

(j)      Without limiting any other provision of this Agreement, the Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrower for, and the Issuing Bank's rights and remedies against the Borrower and the obligation of the Borrower to reimburse the Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)      honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)    honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)    acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)    the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)    acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that the Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)    any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to the Borrower;

(vii)    any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP 600 that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)    payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)    acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where the Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)    honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the Issuing Bank if subsequently the Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)    dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by the Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)      Upon the request of the Administrative Agent, (i) if the Issuing Bank has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Obligation that remains outstanding, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrower shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.  The Borrower hereby grants to the Administrative Agent a security interest in all cash, deposit accounts and all balances therein and all proceeds of the foregoing constituting Cash Collateral.  Cash Collateral shall be maintained in blocked, non-interest bearing deposit accounts at WFB.  If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon written demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent determines, in its Permitted Discretion, to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable laws, to reimburse the Issuing Bank and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations under this Agreement and the other Loan Documents.

(l)      Unless otherwise expressly agreed by the Issuing Bank and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP and the UCP600 shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP600 shall apply to each Commercial Letter of Credit.

(m)      The Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article VII with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article VII included the Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Issuing Bank.

(n)      In the event of a direct conflict between the provisions of this <u>Section 2.03</u> and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.03</u> shall control and govern.

(o)      With respect to any Letters of Credit that remain outstanding, the provisions of this <u>Section 2.03</u> shall survive the termination of this Agreement and the repayment in full of the Obligations.

(p)      At Borrower's costs and expense, Borrower shall execute and deliver to Issuing Bank such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by Issuing Bank to enable Issuing Bank to issue any Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce Issuing Bank's rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document. Borrower irrevocably appoints Issuing Bank as its attorney-in-fact and authorizes Issuing Bank, without notice to Borrower, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents.  The power of attorney granted by Borrower is limited solely to such actions related to the issuance, confirmation or amendment of any Letter of Credit and to ancillary documents or letters customary in the letter of credit business.  This appointment is coupled with an interest.

(q)     Schedule 2.03(e) hereto contains a list of all Letters of Credit outstanding on the Petition Date pursuant to the Prepetition Credit Agreement.  For the period from and after the effective date of the Interim Financing Order, each such Letter of Credit set forth on Schedule 2.03(e), including any extension or renewal thereof, that remains outstanding on the effective date of the Interim Financing Order (each, as amended from time to time in accordance with the terms thereof and hereof, an "Prepetition Letter of Credit") shall be deemed Letters of Credit re-issued hereunder for the account of Borrower, for all purposes of this Agreement, including, without limitation, calculations of Loan Cap, Excess Availability, the Borrowing Base, Outstanding Amount of the L/C Obligations and all other fees and expenses relating to the Letters of Credit (including any related indemnification obligations).  Issuing Bank hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the issuers of the Prepetition Letters of Credit.  Borrowers agree to execute and deliver such documentation, if any, requested by Agent, or a Issuing Bank to evidence, record, or further the foregoing deemed re-issuance.

SECTION 2.04. Repayment of Advances.

(a)     Revolving Credit Advances.  The Borrower shall repay to the Administrative Agent for the ratable account of the Revolving Credit Lenders on the Termination Date the aggregate principal amount of the Revolving Credit Advances then outstanding.

(b)     Swing Line Advances.  The Borrower shall repay to the Administrative Agent for the account of the Swing Line Bank and each other Revolving Credit Lender that has made a Swing Line Advance the outstanding principal amount of each Swing Line Advance made by each of them on the earlier of the maturity date specified in the applicable Notice of Swing Line Borrowing (which maturity shall be no later than the seventh day after the requested date of such Borrowing) and the Termination Date.

(c)     Protective Advances.  The Borrower shall repay to the Administrative Agent for the ratable account of the Revolving Credit Lenders that have made a Protective Advance the outstanding principal amount of each Protective Advance made by each of them on the earlier of demand and the Termination Date.

SECTION 2.05. Termination or Reduction of the Commitments.

(a)     Optional.   The Borrower may, upon at least five Business Days' notice to the Administrative Agent, terminate in whole or reduce in part the Aggregate Commitments; *provided*, *however*, that each partial reduction of the Aggregate Commitments (i) shall be in an aggregate amount of $1,000,000 or an integral multiple of $500,000 in excess thereof, and (ii) shall be made ratably among the Appropriate Lenders in accordance with their Pro Rata Share of the Aggregate Commitments.

(b)     Mandatory.  (i) [Reserved].

(ii)     The Swing Line Facility shall be permanently reduced from time to time on the date of each permanent reduction in the Revolving Credit Facility by the amount, if any, by which the amount of the Swing Line Facility exceeds the Revolving Credit Facility after giving effect to such permanent reduction of the Revolving Credit Facility.

(c)     In connection with any reduction in the Aggregate Commitments prior to the Termination Date, if any Loan Party or any of its Subsidiaries owns any Margin Stock, the Borrower shall deliver to the Administrative Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrower, together with such other documentation as the Administrative Agent shall reasonably request, in order to enable the Agents and the Lenders to comply with any of the requirements under Regulations T, U or X of the Board.

SECTION 2.06. <u>Prepayments.</u>

(a)    <u>Optional</u>.  Subject to the Prepetition Secured Obligations being fully and finally paid, with regards to the prepayment of any Revolving Credit Advance, the Borrower may, upon at least one Business Day's notice in the case of Base Rate Advances and three U.S. Government Securities Business Days' notice in the case of SOFR Advances, in each case to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given, the Borrower shall prepay the outstanding aggregate principal amount of the Advances comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid without premium or penalty; *provided*, *however*, that (x) each partial prepayment shall be in an aggregate principal amount of $1,000,000 or an integral multiple of $500,000 in excess thereof and (y) if any prepayment of a SOFR Advance is made on a date other than the last day of an Interest Period for such Advance, the Borrower shall also pay any amounts owing pursuant to <u>Section 9.04(c)</u>. Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under this <u>Section 2.06(a)</u> if such prepayment would have resulted from a refinancing of a Facility, or the consummation of an acquisition or disposition, which refinancing, acquisition or disposition shall not be consummated or shall otherwise be delayed.

(b)    <u>Mandatory</u>.

(i)    <u>Borrowing Base</u>.  The Borrower shall, subject to <u>Section 2.11</u>, on each Business Day, prepay an aggregate principal amount of the Revolving Credit Advances comprising part of the same Borrowings, the Letter of Credit Advances and the Swing Line Advances and deposit an amount in the Collateral Account in an amount equal to the amount by which (A) the sum of the aggregate principal amount of the Advances then outstanding plus the aggregate Outstanding Amount of all L/C Obligations plus Prepetition Secured Obligations plus Reinstated Prepetition Secured Obligations exceeds (B) the Aggregate Loan Cap on such Business Day; <u>provided</u>, that nothing in this clause (b)(i) shall reduce the Commitments.

(ii)    <u>Letter of Credit Usage</u>.  The Borrower shall, on each Business Day, pay to the Administrative Agent for deposit in the Collateral Account an amount sufficient to cause the aggregate amount on deposit in the Collateral Account to equal the aggregate Outstanding Amount of all L/C Obligations on such Business Day.

(iii)    <u>Cash Dominion</u>.  All cash and Cash Equivalents in the Collateral Account shall be applied by the Collateral Agent to prepay first, the Prepetition Secured Obligations, and second, the Revolving Credit Facility in the manner set forth in Section 2.06(d) below.

(iv)    <u>[Intentionally Omitted]</u>.

(v)    <u>Proceeds of Debt</u>.  Upon the incurrence by a Loan Party of any Debt for borrowed money other than Debt permitted to be incurred pursuant to <u>Section 5.02(b)</u>, not later than two (2) Business Days following the date of receipt by any Loan Party of any Net Proceeds thereof, the Borrower shall prepay shall prepay the Advances and Cash Collateralize the L/C Obligations in an amount equal to 100% in an amount equal to such Net Proceeds.  The foregoing application of such Net Proceeds shall not reduce the Commitments. If all Obligations then due are paid, any excess Net Proceeds shall be remitted to the operating account of the Borrower maintained with the Administrative Agent.

(vi)    In the event that any Prepetition Agent or any of the Prepetition Lenders are required to repay or disgorge to Debtors or any representatives of the Debtors' estate (as agents,

with derivative standing or otherwise) all or any portion of the Prepetition Secured Obligations authorized and directed to be repaid pursuant to the Financing Order, or any payment on account of the Prepetition Secured Obligations made to any Prepetition Agent or any Prepetition Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or other applicable Insolvency Laws or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, Borrower shall prepay the Revolving Loans in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by Debtors or any representative of the Debtors' estate.

(vii)    Within one (1) Business Day following receipt by any Loan Party or any of its Subsidiaries of the Net Proceeds of any sale or Transfer of any assets or property of the type not included in the Borrowing Base in excess of $1,000,000 (for all sales or Transfers of assets on an aggregate basis) (including Net Proceeds of insurance or arising from casualty losses or condemnations and payments in lieu thereof), Borrowers shall prepay, first, the balance of the Prepetition Secured Obligations in the manner set forth in the Prepetition Credit Agreement until paid in full and, second, the Advances and Cash Collateralize the L/C Obligations in the manner set forth in Section 2.06(d) below in an amount equal to 100% in an amount equal to 100% of the Net Proceeds received by such Person in connection with such disposition of such Collateral. The application of any prepayments under this clause (vii) shall result in a corresponding reduction of the Commitments. Nothing contained in this Section 2.06(b)(vii) shall permit any Loan Party or any of its Subsidiaries to sell or otherwise dispose of any assets other than in accordance with Section 5.02(e).

(viii)    If the amount of unrestricted cash and Cash Equivalents of the Loan Parties held in the Loan Parties' operating account exceeds $15,000,000 for any three consecutive Business Days, then the Borrower shall prepay on such third Business Day, in the amount of cash and Cash Equivalents in excess of $15,000,000 as of such third Business Day, first, the balance of the Prepetition Secured Obligations in the manner set forth in the Prepetition Credit Agreement until paid in full and, second, the Advances and Cash Collateralize the L/C Obligations in the manner set forth in Section 2.06(d) below.

(c)    [Reserved.]

(d)    Application of Proceeds.  Prepayments of the Revolving Credit Facility made pursuant to subsection (b) above shall be made to each of the Revolving Credit Lenders on a pro rata basis to be *first*, applied to prepay the balance of the Prepetition Secured Obligations in the manner set forth in the Prepetition Credit Agreement until paid in full, *second*, applied to prepay Letter of Credit Advances then outstanding until such Advances are paid in full, *third* applied to prepay Swing Line Advances then outstanding until such Advances are paid in full, *fourth* applied to prepay Revolving Credit Advances then outstanding comprising part of the same Borrowings until such Advances are paid in full and *fifth* deposited in the Collateral Account to Cash Collateralize the Letters of Credit then outstanding.  Upon the drawing of any Letter of Credit for which funds are on deposit in the Collateral Account, such funds shall be applied to reimburse the Issuing Bank or Revolving Credit Lenders, as applicable.

(e)    Payment of Interest.  All prepayments under subsections (b) and (c) shall be made together with accrued interest to the date of such prepayment on the principal amount prepaid, together with any amounts owing pursuant to Section 9.04(c).

SECTION 2.07.Interest.  (a)  Scheduled Interest.  The Borrower shall pay interest on the unpaid principal amount of each Advance owing to each Lender from the date of such Advance until such principal amount shall be paid in full, at the following rates per annum:

(i)    Base Rate Advances.  Subject to Section 2.07(b), during such periods as such Advance is a Base Rate Advance, a rate per annum equal at all times to the sum of (A) the Base Rate in effect from time to time plus (B) the Applicable Margin in effect from time to time, payable in arrears on the first day of each calendar month and on the date such Base Rate Advance shall be Converted or paid in full.

(ii)    SOFR Advances.  Subject to Sections 2.07(b) and 2.10, during such periods as such Advance is a SOFR Advance, a rate per annum equal at all times during each Interest Period for such Advance to the sum of (A) Adjusted Term SOFR for such Interest Period for such Advance plus (B) the Applicable Margin in effect on the first day of such Interest Period, payable in arrears on the last day of such Interest Period and, if such Interest Period has a duration of more than three months, on each day that occurs during such Interest Period every three months from the first day of such Interest Period and on the date such SOFR Advance shall be Converted or paid in full.

(b)    Default Interest.

(i)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable law and shall be payable on demand.

(ii)    If any Event of Default has occurred and is continuing, then the Administrative Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter, until such Event of Default has been duly waived as provided in Section 9.01 hereof, such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable law and shall be payable on demand.

(c)    Notice of Interest Period and Interest Rate.  Promptly after receipt of a Notice of Borrowing pursuant to Section 2.02(a), a notice of Conversion pursuant to Section 2.09 or a notice of selection of an Interest Period pursuant to the terms of the definition of "Interest Period," the Administrative Agent shall give notice to the Borrower and each Appropriate Lender of the applicable Interest Period and the applicable interest rate determined by the Administrative Agent for purposes of clause (a)(i) or (a)(ii) above.

SECTION 2.08.Fees.

(a)    Commitment Fee.  The Borrower shall pay to the Administrative Agent for the account of the Revolving Credit Lenders a commitment fee, from the Effective Date in the case of each Initial Lender and from the effective date specified in the Assignment and Assumption pursuant to which it became a Lender in the case of each other Lender until the Termination Date, payable in arrears monthly on the first day of each calendar month and on the Termination Date (pro rated for the number of days elapsed in such month), equal to the Commitment Fee Percentage *multiplied by* the sum of the average daily Unused Commitment of such Lender during such month, plus its Pro Rata Share of the average daily outstanding Swing Line Advances during such month; *provided*, *however*, that no commitment fee shall accrue on any of the Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(b)    Letter of Credit Fees, Etc.

(i)        The Borrower shall pay to the Agent for the account of each Lender in accordance with its Pro Rata Share a Letter of Credit fee (the "***Letter of Credit Fee***") for each Letter of Credit equal to (A) in the case of Standby Letters of Credit, the Applicable Margin applicable to SOFR Advances _times_ the daily Available Amount under each such Standby Letter of Credit and (B) in the case of Commercial Letters of Credit, the Applicable Margin applicable to SOFR Advances minus 0.5% _times_ the daily Available Amount under each such Commercial Letter of Credit; <u>provided</u> that notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the foregoing applicable rate, plus 2% per annum. Letter of Credit Fees shall be (1) due and payable on the first Business Day of each month and on the Termination Date, in each case, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand, and (2) computed on a monthly basis, in arrears.  For purposes of computing the daily Available Amount of each Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.05.  If there is any change in the Applicable Margin during any quarter or month, as applicable, the daily Available Amount of each Letter of Credit shall be computed and multiplied by the Applicable Margin separately for each period during such month that such Applicable Margin was in effect.

(ii)        Documentary and Processing Charges Payable to Issuing Bank.  The Borrower shall pay directly to the Issuing Bank, for its own account, on demand (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of Section 2.02(g) shall be deemed to constitute a demand for payment thereof for the purposes of this Section 2.09(b)(ii)) (i) a fronting fee which shall be imposed by the Issuing Bank upon the issuance of each Letter of Credit of 0.125% per annum of the face amount thereof, _plus_ (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, the Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, extensions or cancellations).

(c)        Closing Fee.  The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Pro Rata Share, a fee in cash on the Effective Date equal to 1.00% of the amount of such Lender's Commitments. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

SECTION 2.09. Conversion of Advances.

(a)        Optional.    The Borrower may on any Business Day, upon notice given to the Administrative Agent not later than 11:00 A.M. (New York City time) on the third Business Day prior to the date of the proposed Conversion and subject to the provisions of Section 2.10, Convert all or any portion of the Advances of one Type comprising the same Borrowing into Advances of the other Type; *provided*, *however*, that any Conversion of SOFR Advances into Base Rate Advances shall be made only on the last day of an Interest Period for such SOFR Advances, any Conversion of Base Rate Advances into SOFR Advances shall be in an amount not less than $1,000,000, no Conversion of any Advances shall result in more than 15 Interest Periods in effect and each Conversion of Advances comprising part of the same Borrowing under any Facility shall be made ratably among the Appropriate Lenders in accordance with their Commitments under such Facility.  Each such notice of Conversion shall, within the restrictions specified above, specify (i) the date of such Conversion, (ii) the Advances to be Converted and (iii) if such Conversion is into SOFR Advances, the duration of the initial Interest Period for such Advances.  Each notice of Conversion shall be irrevocable and binding on the Borrower.

(b)     Mandatory.  (i)  If the Borrower shall fail to select the duration of any Interest Period for any SOFR Advances in accordance with the provisions contained in the definition of "Interest Period" in Section 1.01, the Administrative Agent will forthwith so notify the Borrower and the Appropriate Lenders, whereupon with respect to each such SOFR Advance, on the last day of the then existing Interest Period therefor, Borrower shall be deemed to have selected an Interest Period of one month's duration.

(ii)     Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent and the Required Lenders may require, by notice to the Borrower, that (x) at the end of the then existing applicable Interest Period each SOFR Advance be Converted into a Base Rate Advance and (y) the obligation of the Lenders to make, or to Convert Advances into, SOFR Advances shall be suspended.

SECTION 2.10. Increased Costs, Etc.

(a)     If, due to either (i) any Change in Law or (ii) the compliance with any guideline or request or directive from any central bank or other governmental authority (whether or not having the force of law), (A) any reserve, deposit, or similar requirement is or shall be imposed, modified or deemed applicable in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or any Advances or obligations to make Advances hereunder or hereby, or (B) there shall be imposed on the Issuing Bank or any other Lender Party any other condition regarding any Letter of Credit, Advance, or obligations to make Advances hereunder, and the result of the foregoing is to increase the cost to any Lender Party of agreeing to make or of making, funding or maintaining SOFR Advances (or Base Rate Advances determined with reference to Term SOFR) or, in the case of any Issuing Bank or Revolving Credit Lender, of agreeing to issue or of issuing or maintaining or participating in Letters of Credit or of agreeing to make or of making or maintaining Letter of Credit Advances (excluding, for purposes of this Section 2.10, any such increased costs resulting from (x) Taxes described in the definitions of Excluded Taxes, Indemnified Taxes or Other Taxes (as to which Section 2.12 shall govern) and (y) changes in the basis of imposition, or the rate, of any taxes, levies, imposts, deductions, charges, withholdings or liabilities that are excluded from the definition of Taxes), or to reduce the amount receivable in respect thereof, then the Borrower shall from time to time, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party additional amounts sufficient to compensate such Lender Party for such increased cost or reduced receipt.  A certificate as to the amount of such increased cost or reduced receipt, submitted to the Borrower by such Lender Party, shall be conclusive and binding for all purposes, absent manifest error.  Notwithstanding anything contained herein to the contrary, the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 2.10(a) for any such increased cost or reduced receipt incurred more than one-hundred-eighty (180) days prior to the date that such Lender or Issuing Bank demands compensation therefor; *provided* that, if the circumstance giving rise to such increased cost or reduced receipt is retroactive, then such 180 day period shall be extended to include the period of retroactive effect thereof.

(b)     If any Lender Party determines that any compliance with any law or regulation or any guideline or request from any central bank or other governmental authority (whether or not having the force of law) affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender Party or any holding company controlling such Lender Party and that the amount of such capital or liquidity is increased by or based upon the existence of such Lender Party's commitment to lend or to issue or participate in Letters of Credit hereunder, then, upon demand by such Lender Party or such holding company (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender Party, from time to time as specified by such Lender Party, additional amounts sufficient to compensate such Lender Party in the light of such circumstances, to the extent that such Lender Party reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender Party's commitment to lend or to issue or participate in Letters of Credit

hereunder or to the issuance or maintenance of or participation in any Letters of Credit, for any reduction in the rate of return on such Lender Party's capital or liquidity or on the capital or liquidity of such Lender Party's holding company.  A certificate as to such amounts submitted to the Borrower by such Lender Party shall be conclusive and binding for all purposes, absent manifest error.  Notwithstanding anything contained herein to the contrary, the Borrower shall not be required to compensate a Lender pursuant to this <u>Section 2.10(b)</u> for any such increased cost incurred more than one-hundred-eighty (180) days prior to the date that such Lender demands compensation therefor; *provided* that, if the circumstance giving rise to such increased cost is retroactive, then such 180 day period shall be extended to include the period of retroactive effect thereof.

(c)      [Reserved].

(d)      Notwithstanding any other provision of this Agreement, but subject to <u>Section 2.10(g)</u> below, if (x) any Change in Law shall make it unlawful or impractical, or any central bank or other Governmental Authority shall assert that it is unlawful or impractical, for any Lender or its Applicable Lending Office to perform its obligations hereunder to make SOFR Advances (or Base Rate Advances determined with reference to Term SOFR) or to continue to fund or maintain SOFR Advances (or Base Rate Advances determined with reference to Term SOFR) hereunder, or to charge interest rates based upon Term SOFR, (y) the Required Lenders determine that, for any reason in connection with any request for a SOFR Advance or a conversion to or continuation thereof, Term SOFR cannot be determined pursuant to the definition thereof on or prior to the first day of any Interest Period, or (z) the Required Lenders determine that Term SOFR will not adequately reflect the cost to such Lenders of making, funding or maintaining their SOFR Advances, then, in any case of clauses (x), (y) or (z), on notice thereof and demand therefor by such Lender (in the case of clause (x)) to the Borrower through the Administrative Agent or by the Administrative Agent on behalf of the Required Lenders (in the case of clauses (y) or (z)) to the Borrower, (i) each SOFR Advance under each Facility under which such Lender has a Commitment will automatically, upon such demand, Convert into a Base Rate Advance (and, if applicable, determined without reference to Term SOFR), and the Borrower shall pay accrued interest on the amount so Converted, (ii) with respect to each Base Rate Advance under each Facility under which such Lender has a Commitment, to the extent such Base Rate Advance is determined with reference to Term SOFR, interest upon such Base Rate Advance of such Lender after the date specified in such Lender's notice shall accrue interest at the rate then applicable to Base Rate Advances without reference to the Term SOFR component thereof, and (iii) the obligation of the Appropriate Lenders to make, or to Convert Advances into, SOFR Advances (or Base Rate Advances determined with reference to Term SOFR) shall be suspended until the Administrative Agent shall notify the Borrower that such Lender has (in the case of clause (x)), or the Required Lenders have (in the case of clauses (y) or (z)), determined that the circumstances causing such suspension no longer exist.  Upon receipt of the initial notice from the Administrative Agent described in the immediately preceding sentence, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Advances or, failing that, will be deemed to have converted such request into a request for a Base Rate Advance in the amount specified therein, without any cost, expense or penalty (including no cost, expense or penalty of the type described in <u>Section 9.04</u>) to the Borrower.

(e)      [Reserved].

(f)      [Reserved].

(g)      <u>Benchmark Replacement Setting</u>.

(i)      <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current

Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.10(g) will occur prior to the applicable Benchmark Transition Start Date.

(ii)    Conforming Changes. In connection with the use, administration, adoption or implementation of Term SOFR or a Benchmark Replacement, the Administrative Agent will have the right (in consultation with the Borrower) to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document (including, without limitation, Section 9.01 hereof), any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (1) the implementation of any Benchmark Replacement, (2) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of Term SOFR or a Benchmark Replacement, and (3) the commencement or conclusion of any Benchmark Unavailability Period.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.10(g)(iv) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.10(g), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.10(g).

(iv)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (1) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Advances to be made, converted

or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Advances, and (2) any outstanding affected SOFR Advances will be deemed to have been converted to Base Rate Advances at the end of the applicable Interest Period.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

(h)     Anything to the contrary contained herein notwithstanding, neither any Agent, nor any Lender, nor any of their participants, is required actually to acquire match fund any Obligation as to which interest accrues at Adjusted Term SOFR or the Term SOFR Reference Rate.

SECTION 2.11. Payments and Computations.

(a)     The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in Section 2.15), not later than 10:30 A.M. (New York City time) on the day when due in Dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day (it being acknowledged and agreed by the Borrower that should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment).  The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender Party, to such Lender Parties for the account of their respective Applicable Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lender Parties and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender Party, to such Lender Party for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Assumption and recording of the information contained therein in the Register pursuant to Section 9.07(d), from and after the effective date of such Assignment and Assumption, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)     [Intentionally Omitted].

(c)     All computations of interest based on the Base Rate shall be made by the Administrative Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on Term SOFR or any other Benchmark and of fees shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment or letter of credit fee or commission, as the case may be; *provided*, *however*, that, if such

extension would cause payment of interest on or principal of SOFR Advances to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender Party hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender Party on such due date an amount equal to the amount then due such Lender Party.  If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender Party shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender Party together with interest thereon, for each day from the date such amount is distributed to such Lender Party until the date such Lender Party repays such amount to the Administrative Agent, at the Federal Funds Rate.

(f)    Whenever any payment received by the Administrative Agent from the Borrower under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Agents and the Lender Parties by the Borrower under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Agents and the Lender Parties in the following order of priority (x) upon the occurrence and during the continuance of an Event of Default or (y) at any other time that the Administrative Agent receives a payment from the Borrower without direction as to the application of such payment:

(i)    *first,* to reduce the balance of the Prepetition Secured Obligations in the manner set forth in the Prepetition Credit Agreement;

(ii)    *second,* to the payment of all of the fees, indemnification payments, costs and expenses that are due and payable to the Agents (solely in their respective capacities as Agents) under or in respect of this Agreement and the other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the Agents on such date;

(iii)    *third*, to the payment of all of the fees, indemnification payments other than indemnification payments as set forth in clause (iii) below, costs and expenses that are due and payable to the applicable Issuing Bank and the applicable Lenders under or in respect of this Agreement and the other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the applicable Issuing Bank and the applicable Lenders on such date;

(iv)    *fourth*, to the payment of all of the indemnification payments, costs and expenses that are due and payable to the Lenders under Sections 9.04 hereof and any similar Section of any other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such indemnification payments, costs and expenses owing to the applicable Lenders on such date;

(v)    *fifth*, to the payment of all of the amounts that are due and payable to the Administrative Agent and the Lender Parties under Sections 2.10 and 2.12 hereof on such date by the Borrower, ratably based upon the respective aggregate amounts thereof owing to the Administrative Agent and the Lender Parties on such date;

(vi)    *sixth*, to the payment of all of the fees that are due and payable to the Appropriate Lenders under Section 2.08(a) on such date by the Borrower, ratably based upon the respective

applicable undrawn aggregate Commitments of the Lenders under the applicable Facilities on such date;

(vii)    *seventh*, to the payment of all of the accrued and unpaid interest on the Obligations of the Borrower under or in respect of the Loan Documents that is due and payable to the Agents and the applicable Lender Parties under Section 2.07(b) on such date, ratably based upon the respective aggregate amounts of all such interest owing to the Agents and the applicable Lender Parties on such date;

(viii)    *eighth*, to the payment of all of the accrued and unpaid interest on the applicable Advances that is due and payable to the applicable Lender Parties under Section 2.07(a) on such date, ratably based upon the respective aggregate amounts of all such interest owing to such applicable Lender Parties on such date;

(ix)    *ninth*, to the payment of the principal amount of all of the outstanding applicable Advances that is due and payable to the Agents and the applicable Lender Parties on such date by the Borrower, ratably based upon the respective aggregate amounts of all such principal owing to the Agents and the applicable Lender Parties on such date; and

(x)    *tenth*, to the payment of all other Obligations owing under or in respect of the Loan Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date by the Borrower, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date.

(g)    Whenever any cash proceeds are received by the Administrative Agent from any sale of, collection from, or other realization upon all or any part of the Collateral, such cash proceeds shall be distributed by the Administrative Agent and applied by the Agents and the Lender Parties and Hedge Banks in the following order of priority upon the occurrence and during the continuance of an Event of Default:

(i)    *first,* to reduce the balance of the Prepetition Secured Obligations in the manner set forth in the Prepetition Credit Agreement;

(ii)    *second,* to the payment of all of the fees, indemnification payments, costs and expenses that are due and payable to the Agents (solely in their respective capacities as Agents) under or in respect of this Agreement and the other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the Agents on such date;

(iii)    *third*, to the payment of all of the fees, indemnification payments (other than indemnification payments as set forth in clause (iii) below), costs and expenses that are due and payable to the applicable Issuing Bank and the applicable Lenders under or in respect of this Agreement and the other Loan Documents and the applicable Hedge Banks under or in respect of the Secured Hedge Agreements, in each case on such date by the Borrower, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the applicable Issuing Bank, the applicable Lenders and the applicable Hedge Banks on such date;

(iv)    *fourth*, to the payment of all of the indemnification payments, costs and expenses that are due and payable to the Lenders under Sections 9.04 hereof and any similar section of any other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate

amounts of all such indemnification payments, costs and expenses owing to the applicable Lenders on such date;

(v)      *fifth*, to the payment of all of the amounts that are due and payable to the Administrative Agent and the Lender Parties under Sections 2.10 and 2.12 hereof on such date by the Borrower, ratably based upon the respective aggregate amounts thereof owing to the Administrative Agent and the Lender Parties on such date;

(vi)      *sixth*, to the payment of all of the fees that are due and payable to the Appropriate Lenders under Section 2.08(a) on such date by the Borrower, ratably based upon the respective applicable undrawn aggregate Commitments of the Lenders under the applicable Facilities on such date;

(vii)      *seventh*, to the payment of all of the accrued and unpaid interest on the Obligations of the Borrower under or in respect of the Loan Documents that is due and payable to the Agents and the applicable Lender Parties under Section 2.07(b) on such date, ratably based upon the respective aggregate amounts of all such interest owing to the Agents and the applicable Lender Parties on such date;

(viii)      *eighth*, to the payment of all of the accrued and unpaid interest on the applicable Advances that is due and payable to the applicable Lender Parties under Section 2.07(a) on such date, ratably based upon the respective aggregate amounts of all such interest owing to such applicable Lender Parties on such date;

(ix)      *ninth*, to the payment of the principal amount of all of the outstanding applicable Advances that is due and payable to the Agents and the applicable Lender Parties on such date by the Borrower, ratably based upon the respective aggregate amounts of all such principal owing to the Agents and the applicable Lender Parties on such date (which, for the avoidance of doubt, shall include payment to the Administrative Agent, for the account of the Issuing Bank, to Cash Collateralize the Letters of Credit then outstanding);

(x)      *tenth*, to the payment of all amounts due under Secured Hedge Agreements, Secured Bank Product Agreements, and Secured Cash Management Agreements, ratably among the Lenders, Hedge Banks and the Cash Management Banks in proportion to the respective aggregate amount owing to such Lenders, Hedge Banks and Cash Management Banks; and

(xi)      *eleventh*, to the payment of all other Obligations owing under or in respect of the Loan Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date by the Borrower, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date.

(h)      For the avoidance of doubt, notwithstanding any other provision of any Loan Document, no amount received directly or indirectly from any Loan Party that is not a Qualified ECP Guarantor shall be applied directly or indirectly by Administrative Agent or otherwise to the payment of any Excluded Swap Obligations.

SECTION 2.12. Taxes.

(a)      Any and all payments by any Loan Party to or for the account of any Lender Party or any Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.11 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any

Indemnified Taxes or Other Taxes.  If any Loan Party shall be required by law to deduct any Indemnified Taxes or Other Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender Party or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such Lender Party or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)      Without limiting the provisions of clause (a) above, each Loan Party shall timely pay any present or future stamp, documentary, excise, property, intangible, mortgage recording or similar taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (collectively, the "**Other Taxes**") to the relevant Governmental Authority in accordance with applicable law.

(c)      The Loan Parties shall indemnify each Lender Party and each Agent for and hold them harmless against the full amount of Indemnified Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.12, imposed on or paid by such Lender Party or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date such Lender Party or such Agent (as the case may be) makes written demand therefor.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender Party (with a copy to the Administrative Agent) or by the Agents on their own behalf or on behalf of a Lender Party shall be conclusive absent manifest error.

(d)      Within 30 days after the date of any payment of Indemnified Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.  For purposes of subsections (d) and (e) of this Section 2.12, the terms "**United States**" and "**United States person**" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)      (I) Each Payee organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial Lender Party and on the date pursuant to which it becomes a Payee in the case of each other Payee, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as such Lender Party remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two executed copies of Internal Revenue Service Forms W-8IMY (together with certification documents from the applicable beneficial owners), W-8BEN, W-8BEN-E or W-8ECI or (in the case of a Payee that has certified in writing to Borrower and the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code, (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code)), Internal Revenue Service Form W-8BEN or W-8BEN-E, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Payee is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document.  If, at the time such Payee first becomes a Payee hereunder payments pursuant to this Agreement or any other Loan Document are subject to withholding tax rate at a rate in excess of zero, withholding tax at such rate shall be considered excluded from Indemnified Taxes unless and until such

Lender Party provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such forms; *provided*, *however*, that if, at the effective date of the Assignment and Assumption pursuant to which a Lender Party becomes a party to this Agreement, the Lender Party assignor was entitled to payments under subsection (a) of this Section 2.12 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding taxes that may be imposed in the future as a result of a Change in Law after the date that a Lender becomes a party to this Agreement) United States withholding tax, if any, applicable with respect to the Lender Party assignee on such date.

(II)    Each Payee that is a "United States person" shall deliver to the Administrative Agent two duly signed completed copies of IRS Form W-9.  If such Payee fails to deliver such forms, then Borrower and the Administrative Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable backup withholding tax imposed by the Internal Revenue Code, without reduction, and such amount shall be excluded from Indemnified Taxes.

(III)    Each Payee agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    For any period with respect to which a Payee has failed to provide the Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a Change in Law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided), such Lender Party shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.12 with respect to Taxes imposed by the United States by reason of such failure; *provided*, *however*, that should a Payee become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Payee shall reasonably request to assist such Payee to recover such Taxes.

(g)    If a payment made to a Payee under this Agreement would be subject to withholding tax imposed by the United States of America with respect to FATCA if such Payee were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Payee shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code or any intergovernmental agreement) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with its obligations under FATCA, to determine that such Payee has or has not complied with such Payee's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)    If a Payee determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses such Payee, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Parties, upon the request of such Payee,

agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Payee in the event such Payee is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require the Administrative Agent or any Lender Party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(i)       If any Payee requests compensation under <u>Section 2.10</u> or requires the Borrower to pay any additional amount to any Lender Party or any Governmental Authority for the account of any Lender Party pursuant to this <u>Section 2.12</u>, then such Payee shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Lending Office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates or to file any certificate or document reasonably requested by the Borrower, if, in the judgment of such Payee, such designation, assignment or filing would (x) eliminate or reduce amounts payable pursuant to <u>Section 2.10</u> or <u>2.12</u>, as the case may be, in the future and (y) would not subject such Payee to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Payee. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Payee in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such Payee to the Borrower shall be conclusive absent manifest error.

SECTION 2.13. <u>Sharing of Payments, Etc.</u>  If any Lender Party shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to <u>Section 9.07</u>) (a) on account of Obligations due and payable to such Lender Party hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender Party at such time to (ii) the aggregate amount of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all the Lender Parties at such time or (b) on account of Obligations owing (but not due and payable) to such Lender Party hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender Party at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lender Parties hereunder and under the other Loan Documents at such time obtained by all of the Lender Parties at such time, such Lender Party shall forthwith purchase from the other Lender Parties such interests or participating interests in the Obligations due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender Party to share the excess payment ratably with each of them; *provided*, *however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender Party, such purchase from each other Lender Party shall be rescinded and such other Lender Party shall repay to the purchasing Lender Party the purchase price to the extent of such Lender Party's ratable share (according to the proportion of (i) the purchase price paid to such Lender Party to (ii) the aggregate purchase price paid to all Lender Parties) of such recovery together with an amount equal to such Lender Party's ratable share (according to the proportion of (i) the amount of such other Lender Party's required repayment to (ii) the total amount so recovered from the purchasing Lender Party) of any interest or other amount paid or payable by the purchasing Lender Party in respect of the total amount so recovered.  The Loan Parties agree that any Lender Party so purchasing an interest or participating interest from another Lender Party pursuant to this <u>Section 2.13</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender Party were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be.

SECTION 2.14. Use of Proceeds.   The proceeds of the Facilities shall be available (and the Borrower agrees that it shall use such proceeds solely (i) refinance the Prepetition Secured Obligations; (ii) fund certain fees and expenses associated with this Agreement and the Loan Documents, including without limitation, the professional fees and expenses of counsel to the Agents and Lenders (without the need to file a fee application or Bankruptcy Court approval for payment but copies of invoices for fees and expenses will be sent to the United States Trustee and counsel for any Committee); (iii) pay for administrative expenses incurred during the Chapter 11 Cases and set forth in the Initial Budget or the Approved Budget then in effect, and in each case, subject to any Permitted Variances; (iv) for payment of Bankruptcy Court approved prepetition obligations of the Loan Parties consistent with the Initial Budget or Approved Budget then in effect, and in each case, subject to any Permitted Variances therefrom, or otherwise approved by the Lenders, and (v) provide for adequate protection in favor of Prepetition Lenders and Prepetition Term Lenders.   No proceeds of any Facility, whether directly or, to the Loan Parties' knowledge after due care and inquiry, indirectly, and whether immediately, incidentally or ultimately, shall be used (a) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or extending credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board; (b) to make any payments to a Sanctioned Entity (that would be prohibited by applicable Sanctions) or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity (that would be prohibited by applicable Sanctions) or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity (that would be prohibited by applicable Sanctions) or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person that is a party to any Loan Document; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person, or otherwise in any manner that would result in a violation by any Person (including any Secured Party or other individual or entity participating in any transaction) of any applicable Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws; or (d) for purposes other than those permitted under this Agreement.

SECTION 2.15. Defaulting Lenders.

(a)      Notwithstanding the provisions of Section 2.11 hereof, the Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrower to the Administrative Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments (i) first, to the Swing Line Bank to the extent of any Swing Line Advances that were made by the Swing Line Bank and that were required to be, but were not, paid by the Defaulting Lender, (ii) second, to the Issuing Bank, to the extent of the portion of a Letter of Credit Advance that was required to be, but was not, paid by the Defaulting Lender, (iii) third, to cash collateralize such Defaulting Lender's participation in Letters of Credit, in accordance with Section 2.15(b)(ii), (iv) fourth, to the Collateral Account, the proceeds of which shall be retained by the Administrative Agent and may be made available to be re-advanced to or for the benefit of the Borrower (upon the request of the Borrower and subject to the conditions set forth in Section 3.02) as if such Defaulting Lender had made its portion of the Advances (or other funding obligations) hereunder, (iv) fifth, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of an Advance (or other funding obligation) was funded by such other Non-Defaulting Lender), and (vi) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender.   Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.   Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Shares in connection therewith) and for the purpose of calculating

the fee payable under Section 2.08(a), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 9.01(c).  The provisions of this Section 2.15 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Administrative Agent, the Issuing Bank, and the Borrower shall have waived, in writing, the application of this Section 2.15 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Administrative Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Administrative Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by the Administrative Agent pursuant to Section 2.15(b) shall be released to the Borrower).  The operation of this Section 2.15 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrower of its duties and obligations hereunder to the Administrative Agent, the Issuing Bank, the Swing Line Bank, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrower, at its option, upon written notice to the Administrative Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender pursuant to Section 9.12, such substitute Lender to be reasonably acceptable to the Administrative Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than any Other Liabilities, but including (1) all interest, fees (except any commitment fees or Letter of Credit Fees not due to such Defaulting Lender in accordance with the terms of this Agreement), and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Secured Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this Section 2.15 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.15 shall control and govern.

(b)    If any Swing Line Advance or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(i)    such Defaulting Lender's participation interest in any Swing Line Advance or Letter of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the Used Commitment of all Non-Defaulting Lenders after giving effect to such reallocation does not exceed the total of all Non-Defaulting Lenders' Commitments and (y) the conditions set forth in Section 3.02 are satisfied at such time;

(ii)    if the reallocation described in clause (b)(i) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Administrative Agent (x) first, prepay such Defaulting Lender's participation in any outstanding Swing Line Advances (after giving effect to any partial reallocation pursuant to clause (b)(i) above) and (y) second, cash collateralize such Defaulting Lender's participation in Letters of Credit (after giving effect to any partial reallocation pursuant to clause (b)(i) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent, for so long

as such L/C Obligations are outstanding; provided, that the Borrower shall not be obligated to cash collateralize any Defaulting Lender's participations in Letters of Credit if such Defaulting Lender is also the Issuing Bank;

(iii)    if the Borrower cash collateralizes any portion of such Defaulting Lender's participation in Letters of Credit pursuant to this Section 2.15(b), the Borrower shall not be required to pay any Letter of Credit Fees to the Administrative Agent for the account of such Defaulting Lender pursuant to Section 2.08 with respect to such cash collateralized portion of such Defaulting Lender's participation in Letters of Credit during the period such participation is cash collateralized;

(iv)    to the extent the participation by any Non-Defaulting Lender in the Letters of Credit is reallocated pursuant to this Section 2.15(b), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.08 shall be adjusted in accordance with such reallocation;

(v)    to the extent any Defaulting Lender's participation in Letters of Credit is neither cash collateralized nor reallocated pursuant to this Section 2.15(b), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.08 with respect to such portion of such participation shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's participation is cash collateralized or reallocated;

(vi)    so long as any Lender is a Defaulting Lender, the Swing Line Bank shall not be required to make any Swing Line Advance and the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Line Advances or Letter of Credit cannot be reallocated pursuant to this Section 2.15(b) or (y) the Swing Line Bank or the Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Line Bank or the Issuing Bank, as applicable, and the Borrower to eliminate the Swing Line Bank's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Line Advances or Letters of Credit; and

(vii)    The Administrative Agent may release any cash collateral provided by the Borrower pursuant to this Section 2.15(b) to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Advance that is not reimbursed by the Borrower pursuant to Section 2.03.

(c)    The rights and remedies against a Defaulting Lender under this Section 2.15 are in addition to other rights and remedies that the Borrower or any Agent or any Lender Party may have against such Defaulting Lender with respect to any amounts not funded or obligations not fulfilled by such Default Lender.

SECTION 2.16. Evidence of Debt.  (a)  The Advances and other credit extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (the "***Loan Account***") in the ordinary course of business.  In addition, each other Lender Party shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender Party resulting from each Advance owing to such Lender Party from time to time, including the amounts of principal and interest payable and paid to such Lender Party from time to time hereunder. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  The Borrower agrees that upon notice

by any Lender Party to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender Party to evidence (whether for purposes of pledge, enforcement or otherwise) the Advances owing to, or to be made by, such Lender Party, the Borrower shall promptly execute and deliver to such Lender Party, with a copy to the Administrative Agent, a Revolving Credit Note, in substantially the form of Exhibit A hereto payable to the order of such Lender Party in a principal amount equal to the Commitment of such Lender Party.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)     The Register maintained by the Administrative Agent pursuant to Section 9.07(d) shall include a control account, and a subsidiary account for each Lender Party, in which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder, the Type of Advances comprising such Borrowing and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Assumption delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender Party hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender Party's share thereof.

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender Party in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender Party and, in the case of such account or accounts, such Lender Party, under this Agreement, absent manifest error; *provided*, *however*, that the failure of the Administrative Agent or such Lender Party to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.17. Reserves; Eligibility Criteria.

(a)     The Administrative Agent may hereafter establish Reserves or change any of the Reserves in its Permitted Discretion;  *provided* that such Reserves shall not be established or changed except upon not less than five (5) Business Days' notice to the Borrower (during which period the Administrative Agent shall be available to discuss any such proposed Reserve with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Reserve no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent in its Permitted Discretion), except that, no such prior notice shall be required (x) if an Event of Default is continuing, or (y) for changes to Reserves solely by virtue of mathematical calculations of the amount of such Reserves in accordance with the methodology previously utilized; *provided*, *further*, that if, as a result of any such adjustment or modification described in this clause (a), the aggregate principal amount of the Revolving Credit Advances and Swing Line Advances then outstanding (together with the Available Amount of the Letters of Credit outstanding at such time) exceeds the Borrowing Base then in effect, then, notwithstanding anything to the contrary, the Borrower shall not be permitted to request any borrowings or extensions of credit hereunder to the extent any such borrowing or extension of credit would cause an Overadvance or an Event of Default after giving effect to such new or modified Reserves.

(b)     Subject to Section 9.01(b)(i), the Administrative Agent may hereafter establish new, or modify existing, eligibility criteria in its Permitted Discretion as set forth in the definitions of "Eligible Inventory" and "Eligible Credit Card Receivables";  provided that such criteria shall not be established or changed except upon not less than five (5) Business Days' notice to the Borrower (during which period the Administrative Agent shall be available to discuss any such proposed criterion with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis

for such criterion no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent in its Permitted Discretion), except that no such prior notice shall be required if an Event of Default is continuing; provided, further, that if, as a result of any such adjustment or modification described in this clause (b), the aggregate principal amount of the Revolving Credit Advances and Swing Line Advances then outstanding (together with the Available Amount of the Letters of Credit outstanding at such time) exceeds the Borrowing Base then in effect, then, notwithstanding anything to the contrary, the Borrower shall not be permitted to request any borrowings or extensions of credit hereunder to the extent any such borrowing or extension of credit would cause an Overadvance or an Event of Default after giving effect to such adjustment or modification.

SECTION 2.18. Security and Administrative Priority.

(a)       Collateral; Grant of Lien and Security Interest.

(i)       As security for the full and timely payment and performance of all of the Obligations, each of the Debtors, as of the Effective Date, and pursuant to and to the extent permitted in the Interim Order and the Final Order, collaterally assigns, pledges and grants (or causes the collateral assignment, pledge and grant in respect of any indirectly owned assets) to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and to, and Liens on, all property of the estate under Section 541 of the Bankruptcy Code including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (A) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (B) all proceeds of leased real property; (C) subject to entry of a Final Order, the proceeds of any Avoidance Actions; (D) proceeds of the Debtors' rights under Sections 506(c) (solely to the extent such rights result from the use of Collateral, and are, therefore, enforceable against parties other than the Prepetition Secured Parties) and 550 of the Bankruptcy Code; (E) all Prepetition Collateral; and (F) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. For the avoidance of doubt, Collateral shall not include the Debtors' nonresidential real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a Lien (or Adequate Protection Lien) is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law to attach to any such real property lease. All property of the Debtors subject to the security interest referred to in this Section 2.18(a)(i) being hereafter collectively referred to as the "*Collateral*".

(ii)       Upon entry of the Interim Order or Final Order, and pursuant to and to the extent permitted in the Interim Order and Final Order, each as the case may be, the Liens and security interests in favor of the Administrative Agent referred to in Section 2.18(a)(i) shall be valid and perfected Liens on, and security interests in, the Collateral. Such Liens and security interests and their priority shall be governed by the Orders and remain in effect until all Obligations shall have been repaid in cash in full.  The entry of the Financing Order shall create in favor of the Collateral

Agent, for the benefit of the Secured Creditors, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject to the Intercreditor Agreements solely with respect to the ABL Excluded Collateral (as defined therein), (ii) an allowed administrative expense in each of the Bankruptcy Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carveout (the "Superpriority Claims"), (iii) sufficient replacement Liens to the extent of any post-petition diminution in value of the Collateral (as defined in the Prepetition Credit Agreement) securing the Prepetition Secured Obligations, subject, in each case and as applicable, to the Carve-Out.

(iii)    Notwithstanding anything herein to the contrary (A) all proceeds received by the Administrative Agent and the Lenders from the Collateral subject to the Liens granted in <u>Section 2.18(a)(i)</u> and in each other Loan Document and by the Orders shall be subject to the Carve Out and (B) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(b)    <u>Grants; Rights and Remedies</u>. The Liens and security interests granted pursuant to <u>Section 2.18</u> may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.

(c)    <u>No Filings Required</u>. The Liens and security interests referred to herein shall be deemed to be valid and perfected by entry of the Interim Order or the Final Order, as the case may be. The Administrative Agent shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Order or the Final Order, as the case may be, or any other Loan Document; provided, that the Administrative Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any United States jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

(d)    <u>Further Assurances</u>. The Loan Parties shall take any other actions reasonably requested by the Administrative Agent and the Lenders from time to time to cause the attachment, perfection and priority as set forth in the Orders of, and the ability of the Administrative Agent and the Lenders to enforce, the security interest of the Administrative Agent and the Lenders in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law of the United States or any state thereof, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing the Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, and (e) obtaining the consents and approvals of any Governmental Authority or third party and taking all actions required by the UCC or by other law, as applicable in any relevant jurisdiction.

(e)      Each Loan Party (x) will promptly instruct each Person obligated at any time to make any payment to such Loan Party for any reason (an "*Obligor*") to make such payment to the Collateral Account except that such Grantor shall not be under such obligation with respect to Persons (i) making payments to a Pledged Deposit Account that is a Collection Account or Collateral Account as of the date hereof, (ii) making payments to such Grantor less than $100,000 a year in the aggregate, or (iii) making payments to accounts not purported to be subject to the security interest of the Secured Parties in accordance with the Credit Agreement, if any; and (y) shall cause all cash receipts and collections received by such Loan Party from all sources, including, without limitation, all available cash receipts from the sale of Inventory and other assets (whether or not constituting Collateral), all proceeds of collections of Receivables (including, without limitation, all Credit Card Receivables), all net proceeds and other cash payments received by a Loan Party from any Person or from any source or on account of a Transfer or other transaction or event, and the proceeds of all credit card charges to be deposited into a Pledged Deposit Account that is a Collection Account or the Collateral Account.

(f)      All cash and Cash Equivalents in each Collection Account shall, on each Business Day, be transferred to the Collateral Account through daily sweeps.

SECTION 2.19. Prepetition Bank Product Obligations; Deposit Account Control Agreements. All Prepetition Secured Obligations under Prepetition Other Liabilities, a list of which is contained in Schedule 2.19 hereto, shall be deemed to have been incurred pursuant hereto, and from and after the Effective Date shall be subject to and governed by the terms and conditions hereof and shall constitute Secured Other Liabilities, if applicable hereunder.  Each Provider hereby assumes and agrees to perform any and all duties, obligations and liabilities to be performed or discharged by the "Provider" (as defined in the Prepetition Credit Agreement) in accordance with and pursuant to the Prepetition Credit Agreement and this Agreement, as applicable.  Borrower agrees to execute and deliver such documentation, if any, requested by Administrative Agent, Provider to evidence, record, or further the foregoing deemed re-incurrence.  All Deposit Account Control Agreements entered in connection with the Prepetition Secured Obligations shall secure the Obligations hereunder as well as the Prepetition Secured Obligations.

SECTION 2.20. Superpriority.  Except as set forth herein or in the Financing Order, no other claim having a priority superior or pari passu to that granted to the Agent and the Lenders by the Financing Order shall be granted or approved while any Obligations under this Agreement remain outstanding.  Except for the Carve Out and subject to entry of the Final Order, no costs, fees or expenses of administration shall be imposed against the Administrative Agent, the Lenders or any of the Collateral or any of the Prepetition Agents, the Prepetition Lenders or the Collateral (as defined in the Prepetition Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and each of the Loan Parties hereby waives for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against Agent, Lenders or any of the Collateral or any of the Prepetition Agents or the Prepetition Lenders.

SECTION 2.21. Waiver of any Priming Rights.  On and after the Effective Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrower and the Guarantors hereby agree they will not seek by motion or otherwise, directly or indirectly through another party, and irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations, in each case other than the Carve Out and as contemplated herein.

## ARTICLE III -

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01. Conditions Precedent to Initial Extensions of Credit Hereunder.  The obligation of each Lender to make any Advance hereunder became effective on and as of the first date on or before April 24, 2024 (the "***Effective Date***") on which the following conditions precedent were satisfied:

(a)    The Administrative Agent shall have received on or before the Effective Date the following, each dated such day (unless otherwise specified), in form and substance reasonably satisfactory to the Administrative Agent (unless otherwise specified):

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Agents, each Lender and the Borrower;

(ii)    Notes payable to the order of the Lenders to the extent requested by the Lenders pursuant to the terms of Section 2.16 duly executed by the Borrower;

(iii)    Certified copies of the resolutions of the board of directors, board of managers or members, as applicable, of each Loan Party approving the commencement of the Chapter 11 Cases and the entry into and performance under each Loan Document to which it is or is to be a party;

(iv)    A certificate of the Secretary, Assistant Secretary or Responsible Officer of each Loan Party certifying as to (A) the absence of any amendments to the charter, articles of organization, or certificate of formation, as applicable, of such Loan Party since the date of the Secretary of State's certificate last delivered to the Administrative Agent on or around the effective date of the Prepetition Credit Agreement, (B) a true and correct copy of the bylaws, limited liability company agreement or operating agreement, as applicable, of such Loan Party as in effect on the date on which the resolutions referred to in Section 3.01(a)(ii) were adopted and on the Effective Date (or a certification reflecting that no changes have been made to any such bylaws, limited liability company agreement or operating agreement, as applicable, since the effective date of the Prepetition Credit Agreement), (C) the good standing or valid existence of such Loan Party as a corporation organized under the laws of the jurisdiction of its incorporation or formation and (D) the names and true signatures of the officers of such Loan Party authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder (or a certification reflecting that no changes have been made since the same certification was provided on or around the effective date of the Prepetition Credit Agreement).

(b)    Engagement Letters.  Each Lender shall have received true, correct and complete copies of the M3 Engagement Letter and Moelis Engagement Letter, duly executed by the parties thereto, together with all amendments and modifications thereto.  Each of the Lenders hereby confirm that such condition was satisfied on or prior to the Effective Date.

(c)    Junior DIP Facility.  Substantially concurrently with the satisfaction of other conditions precedent set forth in this Section 3.01, (i) the Borrower and the other Loan Parties shall have entered into the Junior DIP Credit Agreement and the other Junior DIP Documents and the Administrative Agent shall have received a certificate signed by a Responsible Officer certifying that true, correct and complete copies of all material documents relating to the Junior DIP Documents (A) have been delivered to Administrative Agent on or prior to the Effective Date, and (B) are in full force and effect and (ii) proceeds of the Junior DIP Loans in an amount not less than $25,000,000 shall have prepaid the Prepetition Secured Obligations.

(d)    <u>Specified Liquidation Agreement</u>. The Administrative Agent shall have received a duly executed copy of the Specified Liquidation Agreement Twenty-Sixth Amendment, in form and substance satisfactory to the Administrative Agent. The Specified Liquidation Agreement (as amended by the Specified Liquidation Agreement Twenty-Sixth Amendment) (i) shall have been assumed by the Borrower on an interim basis and shall have been approved by the Bankruptcy Court pursuant to an interim order in form and substance satisfactory to the Administrative Agent (the "***Store Closing Interim Order***") and (ii) shall be in full force and effect.  The Administrative Agent hereby confirms that such condition was satisfied on or prior to the Effective Date.

(e)    The Bankruptcy Court shall have entered the Interim Order within three (3) Business Days of the commencement of the Chapter 11 Cases, which Interim Order (i) shall have been entered upon an application or motion of the Loan Parties satisfactory in form and substance to Administrative Agent in its sole discretion and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Administrative Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of Administrative Agent; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Loans or the performance by the Loan Parties of any of the Obligations shall be the subject of a presently effective stay; (iii) such order shall (A) authorize and approve the Loan Parties' entry into this Agreement, the Loan Documents and the transactions contemplated thereby and hereby, (B) grant the super-priority status, security interests and priming Liens in favor of the Collateral Agent, and approve the payment of all fees of the Agents and Lenders, (C) provide for the lifting or modifying the automatic stay to permit the Debtors to perform their obligations and Agents and the Lenders to exercise their rights and remedies with respect to this Agreement and the other Loan Documents, (D) except to the extent required to be paid pursuant to the Final Order, authorizing the roll up of the Prepetition Secured Obligations on the date of the Interim Order, (E) provide for adequate protection in favor of Prepetition Agents and Prepetition Lenders, (F) provide for the prohibition on non-consensual use of cash collateral or third party financing secured by Liens senior or pari passu with the Liens securing the Obligations or the Prepetition Secured Obligations, (G) include terms and conditions customary for transactions of this type and (H) shall otherwise be in form and substance satisfactory to Administrative Agent; (iv) which Interim Order shall be in full force and effect and shall not have been amended, modified or stayed, or reversed, except for amendments or modifications with the written consent of the Administrative Agent, and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the entrance into this Agreement and the other Loan Documents or the performance by the Loan Parties thereunder shall be the subject of a presently effective stay.

(f)    The Chapter 11 Cases shall have been commenced in the Bankruptcy Court, and all material First Day Orders and all material related orders and motions to be entered and documents to be filed with the Bankruptcy Court at or promptly following the commencement of the Chapter 11 Cases shall have been provided in advance to Administrative Agent and shall be in form and substance reasonably satisfactory to Administrative Agent.

(g)    The Bankruptcy Court shall have entered a cash management order authorizing the Loan Parties to maintain and continue to use their cash management system in the ordinary course of business, which order shall be in form and substance reasonably satisfactory to Administrative Agent (the "<u>Cash Management Order</u>").

(h)    Administrative Agent and Lenders shall have received a copy of the Initial Budget, which shall be in form and substance satisfactory to the Administrative Agent and the Lenders and in the form of <u>Exhibit E</u> attached hereto. The Administrative Agent and each of the Lenders hereby confirms that such condition was satisfied on the Effective Date.

(i)        Upon entry of the Interim Order, the entry into this Agreement shall not violate any applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(j)        The Collateral Agent shall have a valid and fully perfected lien on the Collateral, having the priorities set forth in the Orders and the Intercreditor Agreement.

(k)        The Borrower shall have paid or made arrangements to pay, to the extent invoiced at least one (1) Business Day prior to the Effective Date, all accrued fees of the Agents, the Lead Arranger and the Lender Parties required under this Agreement and all accrued expenses of the Agents and the Lead Arranger (including the accrued fees and expenses of counsel to the Lead Arranger payable by the Borrower hereunder).

(l)        The Lead Arranger shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

SECTION 3.02. Conditions Precedent to Each Borrowing and Issuance.  The obligation of each Lender to make an Advance on the occasion of each Borrowing (including any Borrowing on the Effective Date) shall be subject to the further conditions precedent that on the date of such Borrowing the following statements shall be true (and the acceptance by the Borrower of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrower that on the date of such Borrowing such statements are true):

(i)        the representations and warranties of the Loan Parties contained in each Loan Document are correct in all material respects (unless any such representation or warranty is qualified by materiality in the text thereof, in which case, such representation or warranty shall be true and correct in all respects) on and as of such date, immediately before and immediately after giving effect to such Borrowing or issuance or extension and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Borrowing or issuance or extension, in which case as of such specific date;

(ii)        no Default has occurred and is continuing, or would result immediately after giving effect to such Borrowing or issuance or extension or from the application of the proceeds therefrom;

(iii)        no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against Borrower, any Agent, or any Lender;

(iv)        no Material Adverse Effect shall have occurred since the Effective Date; and

(v)        with respect to any Loan or Letter of Credit to be made or issued thirty (30) days from the entry of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Order, which Final Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of Agent.

Each request for an Advance or a Letter of Credit (other than a conversion of a SOFR Advance to a Base Rate Advance) submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Section 3.02 have been satisfied on and as of the date of the applicable Advance or issuance of such Letter of Credit.  The conditions set forth in this Section 3.02 are

for the sole benefit of the Secured Parties, but until the Required Lenders otherwise direct the Administrative Agent to cease making Advances and issuing Letters of Credit, the Lenders will fund their Pro Rata Shares of all Advances and participate in all Swing Line Advances and Letters of Credit whenever made or issued, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article III, are agreed to by the Administrative Agent, provided, however, the making of any such Advances or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Secured Party of the provisions of this Article III on any future occasion or a waiver of any rights or the Secured Parties as a result of any such failure to comply.

SECTION 3.03. Determinations Under Section 3.01.  For purposes of determining compliance with the conditions specified in Section 3.01, each Lender Party shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lender Parties unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender Party prior to the Effective Date specifying its objection thereto.

# ARTICLE IV -

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties.   Subject to Section 3.02, each Loan Party represents and warrants as follows (a) on the Effective Date, each of the following representations and warranties, which shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), and (b) at and as of the date of the making of each Advance made after the Effective Date, each of the following representations and warranties, each of which shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), at and as of the date of the making of such Advance, as though made on and as of the date of such Advance (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that are already qualified or modified by materiality in the text thereof) as of such earlier date:

(a)     Each Loan Party and each of its Restricted Subsidiaries (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing (to the extent applicable in the relevant jurisdiction) in each other jurisdiction in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not be reasonably expected to have a Material Adverse Effect and (iii) subject to approval of the Bankruptcy Court pursuant to the Orders, has all requisite power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted except where the failure to have such power and authority could not be reasonably expected to have a Material Adverse Effect.  All of the outstanding Equity Interests in the Borrower have been validly issued, are fully paid and non-assessable and are owned, directly or indirectly, by the Parent free and clear of all Liens except the Liens in favor of the Collateral Agent and other Permitted Liens.

(b)     Set forth on Schedule 4.01(b) are complete and accurate lists of all Loan Parties, showing as of the Effective Date (as to each Loan Party) the jurisdiction of its incorporation or formation, the address of its principal place of business and its U.S. taxpayer identification number or, in the case of any non-U.S.

Loan Party that does not have a U.S. taxpayer identification number, its unique identification number issued to it by the jurisdiction of its incorporation or formation.

(c)     Set forth on Schedule 4.01(c) is a complete and accurate list of all Subsidiaries of each Loan Party as of the Effective Date, showing as of the Effective Date (as to each such Subsidiary) the jurisdiction of its formation, the number of shares, membership interests or partnership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the Effective Date and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Effective Date.  All of the outstanding Equity Interests in each Loan Party's Restricted Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Restricted Subsidiaries free and clear of all Liens except Liens in favor of the Collateral Agent and other Permitted Liens.

(d)     Subject to the approval of the Bankruptcy Court and pursuant to the Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated hereby and thereby, are within such Loan Party's powers, have been duly authorized by all necessary action, and do not (i) contravene such Loan Party's charter, bylaws, limited liability company agreement, partnership agreement or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board), order, writ, judgment, injunction, decree, determination or award, except for violations that (either individually or in the aggregate) could not reasonably be expected to have a Material Adverse Effect, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any material contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting any Loan Party, any of its Subsidiaries  or any of their properties, except for violations, defaults or the creation of such rights that could not (either individually or in the aggregate) reasonably be expected to have a Material Adverse Effect, or (iv) except for the Liens created under the Loan Documents, Liens in favor of the Prepetition Collateral Agent, the Junior DIP Collateral Agent and Prepetition Term Collateral Agent permitted pursuant to clause (y) of the definition of "Permitted Liens", Liens in favor of MGF permitted pursuant to clause (k) of the definition of "Permitted Liens", and other Permitted Liens, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of any Loan Party or any of its Subsidiaries.  Except as otherwise permitted by the Bankruptcy Code or pursuant to any order of the Bankruptcy Court, which order shall be in form and substance acceptable to Agent, each Loan Party and each of its Restricted Subsidiaries is in compliance with (i) all applicable laws, rules and regulations, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, and (ii) Sections 2.14 and 9.13.

(e)     Subject to the approval of the Bankruptcy Court and pursuant to the Orders, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery or performance by any Loan Party of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated hereby or thereby, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the applicable priority thereof) or (iv) the exercise by any Agent or any Lender Party of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (v) any notices or filings which are required to be made with the SEC in connection with the Transaction, (w) the authorizations, approvals, actions, notices and filings contemplated by the Collateral Documents, (x) those authorizations, approvals, actions, notices and filings, the failure of which to obtain, take, give or make could not be reasonably expected to have a Material Adverse Effect, (y) notices and filings which customarily are required in connection with the exercise of remedies in respect of the Collateral and (z) landlord consents and waivers.

(f)     Subject to the approval of the Bankruptcy Court and pursuant to the Orders, this Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party party thereto.  This Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against such Loan Party in accordance with its terms.

(g)     There is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or threatened before any Governmental Authority or arbitrator that (i) could be reasonably expected to have a Material Adverse Effect or (ii) other than the filing, commencement and continuation of the Chapter 11 Cases and any litigation resulting therefrom, purports to affect the legality, validity or enforceability of any Loan Document.

(h)     Each Loan Party and each of its Subsidiaries is:

(i)     not a "blocked" person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "***Annex***"),

(ii)     in compliance in all material respects with the applicable requirements of the Patriot Act, the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "***Trading With the Enemy Act***"), and all other requirements contained in the rules and regulations of OFAC,

(iii)     operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act,

(iv)     not in receipt of any notice from the Secretary of State of the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act,

(v)     not listed as a Specially Designated Terrorist (as defined in the Patriot Act) or as a "blocked" person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act,

(vi)     not a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act, and

(vii)     not owned or controlled by or now acting and or will be in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be subject to the prohibitions contained in the Patriot Act.

(i)     No Loan Party nor any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities that would be prohibited by applicable Sanctions, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries (x) has implemented and maintains in effect policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Anti-Corruption Laws, and (y) has implemented and maintains in effect policies and procedures reasonably designed to promote compliance by the Loan Parties

and their Subsidiaries and their respective directors, officers and employees with all applicable Sanctions and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance (i) with all applicable Sanctions, and (ii) in all material respects, with all applicable Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Advance will be used in any manner prohibited by <u>Section 2.14</u>.

(j)     Since the date of the Effective Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(k)     On each date that any Hedge Agreement is executed by any Provider, each Loan Party satisfies all eligibility, suitability and other requirements under the Commodity Exchange Act and the Commodity Futures Trading Commission regulations.

(l)     None of the Loan Parties is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Advance will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, or for any purpose that violates the provisions of Regulations T, U or X promulgated by the Board. Neither any Loan Party nor any of its Subsidiaries expects to acquire any Margin Stock.

(m)     Neither any Loan Party nor any of its Restricted Subsidiaries (other than Foreign Subsidiaries) is or is required to be registered as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended.

(n)     The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a legal, valid and enforceable, non-avoidable and automatically and fully and properly perfected priority security interest in all right, title and interest of the Loan Parties in each item of Collateral and the proceeds thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents with the priorities set forth in the Orders. Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, other than the Permitted Liens. Pursuant to the terms of the Orders, the Obligations of the Loan Parties under this Agreement will constitute Superpriority Claims and be allowed administrative expense claims in the Chapter 11 Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the terms of the Orders and the Carve-Out.

(o)     No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

(p)     The entry of the Financing Order is effective to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carve Out) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject to the Intercreditor Agreements solely with respect to the ABL Excluded Collateral (as defined therein), (ii) an allowed administrative expense in each of the Chapter 11 Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other

administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carve Out (the "Superpriority Claims"), (iii) sufficient replacement Liens to the extent of any post-petition diminution in value of the Collateral (as defined in the Prepetition Credit Agreement) securing the Prepetition Secured Obligations, subject, in each case and as applicable, to the Carve-Out.

(q)     Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for either (x) the pledge or grant by Holdings or any of its Subsidiaries of the Liens purported to be created in favor of Collateral Agent pursuant to this Agreement or any of the other Loan Documents or (y) the exercise by Agents of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to this Agreement, any of the other Loan Documents or created or provided for by applicable law), except as may be required in connection with the disposition of any pledged Collateral by laws generally affecting the offering and sale of securities..

(r)     No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(s)     (i)  [Intentionally Omitted].

(ii)     No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has resulted in or is reasonably expected to result in a material liability of any Loan Party or any ERISA Affiliate.

(iii)     Schedule B (Actuarial Information) to the most recent annual report (Form 5500 Series) for each Plan, copies of which have been filed with the Internal Revenue Service and made available to the Administrative Agent, is complete and accurate and fairly presents the funding status of such Plan, and since the date of such Schedule B there has been no material adverse change in such funding status.

(iv)     Neither any Loan Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan.

(v)     Neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(t)     Except as would not reasonably be expected to result in a Material Adverse Effect (which representations are, along with clause (g) above, the sole representations of the Loan Parties in respect of environmental matters):

(i)     the operations and properties of each Loan Party and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits and all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs;

(ii)     to the knowledge of each Loan Party of any of its Subsidiaries, no Hazardous Materials have been released at or from any property currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its

Subsidiaries in a manner that would be reasonably likely to (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties or (B) cause any such property to be subject to any restrictions on ownership, occupancy, transferability or use under any Environmental Law;

(iii)    none of the properties currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list;

(iv)    Hazardous Materials have not been released, discharged or disposed of, or maintained, on any property currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries, except in each case for Hazardous Materials in the ordinary course of business in such quantities and in a manner that (x) does not constitute a violation of any Environmental Law or require any reporting or disclosure under any Environmental Law; (y) is consistent with product labeling; and (z) is consistent with customary business practice for such operations in the jurisdiction where such property is located;

(v)    neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and

(vi)    all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries.

(u)    Except as set forth on Schedule 4.01(u):

(i)    [Reserved].

(ii)    Each Loan Party and each of its Restricted Subsidiaries (A) has filed, has caused to be filed or has been included in all material tax returns (federal, state, local and foreign) required to be filed and such tax returns are true and correct in all material respects and (B) has paid all taxes shown thereon to be due, together with applicable interest and penalties or adequate provision therefor has been made in accordance with GAAP except for taxes (x) that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP and (y) that could not (individually or in the aggregate) have a Material Adverse Effect.

(iii)    No issues have been raised in writing by any tax authorities that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)    The JV IP Transaction Documents and the Bonobos IP Transaction Documents are in full force and effect and the Loan Parties have not received any notice of the intention of any other party thereto to terminate any JV IP Transaction Document or Bonobos IP Transaction Document.

(w)      Each Loan Party and each of its Subsidiaries owns, or holds licenses in, all trademarks, trade names, domain names, patents, industrial designs, copyrights, trade secrets and other Intellectual Property that are used in the conduct of business of the Loan Parties and their Subsidiaries as currently conducted and as currently proposed to be conducted. To the knowledge of the Borrower, (i) there is no action, proceeding, claim or complaint pending or, threatened in writing to be brought against any Loan Party or any Subsidiary which might jeopardize or challenge the validity or enforceability of any of the foregoing patents, copyrights, trademarks, trade names, domain names or designs, except those which are not Material Intellectual Property, (ii) no Material Intellectual Property infringes upon any rights held by any other Person, and (iii) no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Parent or any of its Subsidiaries infringes upon any rights held by any other Person. The Loan Parties have taken commercially reasonable actions that in the exercise of their reasonable business judgment should be taken to protect any rights they have in Material Intellectual Property, including Material Intellectual Property that is confidential in nature.

(x)      The Initial Budget and each Updated Budget delivered in accordance with Section 5.01(s), has been prepared in good faith based upon assumptions the Borrower believed to  be reasonable assumptions on the date of delivery to the Lenders.

(y)      The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (a) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (b) the hearing for the entry of the Interim Order, and (c) the hearing for the entry of the Final Order. The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(z)      Each of the Interim Order and the Final Order (from and after the date the Final Order is entered) are in full force and effect and have not been vacated or subject to a stay pending appeal, reversed, modified, amended, stayed or rescinded, without the prior written consent of the Administrative Agent and Required Lenders.  Upon the entry of the Orders, each such Order and the Loan Documents are sufficient to provide that the Obligations will constitute a Superpriority Claims and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth in the Orders..

(aa)      The Loan Parties are in compliance with the terms and conditions of the Orders.  Each of the Initial Order (with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered), is in full force and effect and has not been vacated, reversed or rescinded, amended or modified (except as otherwise consented to by Administrative Agent in its sole discretion) and no appeal of such order has been timely filed or, if timely filed, a stay pending such appeal is currently effective.

## ARTICLE V -

## COVENANTS OF THE LOAN PARTIES

SECTION 5.01. Affirmative Covenants.  Until the payment in full of the Obligations in accordance with Section 1.02(b), each Loan Party will (unless Required Lenders consent in writing):

(a)      Compliance with Laws, Etc.

(i)       Comply, and cause each of its Subsidiaries to comply, with (x) (i) with all applicable Sanctions, and (ii) in all material respects, all applicable Anti-Corruption Laws and Anti-Money Laundering Laws, and (y) Sections 2.14 and 9.13.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Anti-Corruption Laws.  Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii)       Implement and maintain in effect, and cause each of its Subsidiaries to implement and maintain in effect, policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Sanctions and Anti-Money Laundering Laws.

(iii)       Comply, and cause each of its Restricted Subsidiaries to comply with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)       Payment of Taxes, Etc.

(i)       Subject to the Approved Budget then in effect (and any Permitted Variances therefrom) and subject to the automatic stay in connection with the Chapter 11 Cases, pay and discharge, and cause each of its Restricted Subsidiaries to pay and discharge, before the same shall become delinquent, (A) all material  taxes, assessments and governmental charges or levies imposed upon it or upon its property and (B) all material lawful claims that, if unpaid, might by law become a Lien upon its property; *provided*, *however*, that neither the Parent nor any of its Restricted Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

(c)       Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, (i) comply, and cause each of its Restricted Subsidiaries to comply, with all applicable Environmental Laws and Environmental Permits; (ii) obtain and renew, and cause each of its Restricted Subsidiaries to obtain and renew, all Environmental Permits necessary for its operations and properties; and (iii) conduct, and cause each of its Restricted Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of and to the extent required by any Governmental Authority pursuant to all Environmental Laws; *provided*, *however*, that neither the Parent nor any of its Restricted Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances.

(d)       Maintenance of Insurance.  Maintain, and cause each of its Restricted Subsidiaries to maintain, insurance (as deemed to be reasonably prudent in the good faith judgment of the Responsible Officers of such Loan Party or its Restricted Subsidiaries) (including, without limitation, business interruption insurance) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar

properties in the same general areas and with similar risk factors in which the Parent or such Restricted Subsidiary operates.

(e)    Preservation of Corporate Existence, Etc.  Except as permitted under Section 5.02(d) or 5.02(e)(viii), preserve and maintain, and cause each of its Restricted Subsidiaries to preserve and maintain, its existence, rights (charter and statutory), permits, licenses, approvals, privileges and franchises; *provided* that neither the Parent nor any of its Restricted Subsidiaries shall be required to preserve or maintain any right, permit, license, approval, privilege or franchise if the failure to do so could not reasonably be expected to have a Material Adverse Effect.  Nothing contained in this Section 5.01(e) shall be deemed to prohibit any Subsidiary or the parent entity of such Subsidiary from reorganizing or changing the entity form of such Subsidiary upon prior notice to the Administrative Agent and provided that such reorganization or change is not materially adverse to the Lenders.

(f)    Visitation Rights; Field Examinations.

(i)    Visitation Rights.  At any reasonable time and from time to time, upon reasonable prior notice at any mutually agreeable reasonable time during normal business hours, permit any of the Agents or any of the Lender Parties, or any agents or representatives thereof, to examine and make copies of and abstracts from the financial records and books of account of, and visit the properties of, Holdings and any of its Restricted Subsidiaries, and to discuss the affairs, finances and accounts of Holdings and any of its Restricted Subsidiaries with any of their officers or directors and with their independent certified public accountants (subject to the consent of such accountants); *provided*, that, so long as no Event of Default has occurred and is continuing, the Agents and the Lender Parties shall coordinate the exercise of such rights through the Administrative Agent and shall not be entitled to exercise the foregoing rights more than once in any calendar year at the expense of the Borrower, on a collective basis; *provided, however,* that a representative of the Borrower shall be given the opportunity to be present for any communication with the independent accountants.

(ii)    Field Examinations.  Upon the occurrence and during the continuance of any Event of Default, with reasonable prior notice and at any mutually agreeable reasonable time during normal business hours and from time to time, permit the Collateral Agent and/or any representatives designated by the Collateral Agent (including any consultants, accountants and lawyers retained by the Collateral Agent) to visit the properties of the Loan Parties to conduct periodic field examinations, and any such field examination shall be at the Borrower's expense.

(g)    Keeping of Books.  Keep, and cause each of its Restricted Subsidiaries to keep, proper books of record and account, in which full and correct entries in all material respects shall be made of all financial transactions and the assets and business of Holdings and each such Restricted Subsidiary in accordance with generally accepted accounting principles in effect from time to time.

(h)    Maintenance of Properties, Etc.

(i)    Maintain and preserve, and cause each of its Restricted Subsidiaries to maintain and preserve, all of its properties that are used or useful in the conduct of and material to its business in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, except to the extent the failure to do so could reasonably be expected not to have a Material Adverse Effect.

(ii)    Take, and cause each of its Subsidiaries to take, in its commercially reasonable business judgment, commercially reasonable steps, including, in any proceeding before the PTO

and the USCO, as applicable, to maintain and pursue each application (and to obtain the relevant issuance or registration) and to maintain each issuance or registration of the Material Intellectual Property owned by it or such Subsidiary or, in the case of licensed Material Intellectual Property, to the extent it or such Subsidiary has rights to do so under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)), including, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(iii)    Preserve and renew, and cause each of its Subsidiaries preserve and renew, all of the Material Intellectual Property owned by it or such Subsidiary or, in the case of licensed Material Intellectual Property, to the extent it or such Subsidiary has rights to do so under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)), except to the extent in the commercially reasonable business judgement of the applicable Loan Party or applicable Subsidiary such Material Intellectual Property is no longer used or necessary in the business of any Loan Party or its Subsidiaries.

(i)    Transactions with Affiliates.  Conduct, and cause each of its Restricted Subsidiaries to conduct, all transactions otherwise permitted under the Loan Documents with any of their Affiliates on terms that are no less favorable, in the aggregate, to Holdings or such Restricted Subsidiary than it would obtain in a comparable arm's length transaction with a Person not an Affiliate, as determined by the board of directors of Holdings, the Borrower or such Restricted Subsidiary in good faith; *provided*, the foregoing restriction shall not apply to (i) transactions between or among Loan Parties or transactions between or among Subsidiaries of Holdings that are not Loan Parties or transactions between a Loan Party and a Subsidiary that is not a Loan Party so long as the terms of such transaction are no less favorable to the Loan Party than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; (ii) Restricted Payments permitted to be made pursuant to Section 5.02(g), Investments permitted under Section 5.02(f) and permitted intercompany Debt and asset transfers; (iii) reasonable and customary cash fees paid to and indemnification of members of the board of directors (or similar governing body) of Holdings and its Subsidiaries paid in cash; (iv) cash compensation and indemnity arrangements payable in cash and benefit plans for officers and other employees of Holdings and its Subsidiaries entered into or maintained or established in the ordinary course of business and paid in cash; (v) sales of Equity Interests of Parent to Affiliates of Loan Parties or contributions to the equity capital of Parent by any shareholder or any of its Affiliates not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith; (vi) any transaction with an Affiliate where the only consideration paid is Equity Interests of Parent; (vii) transactions involving consideration (as determined as though on fair and reasonable terms in an arm's length transaction with a Person other than an Affiliate) not to exceed $100,000 as to any individual transaction; (viii) the existence of, and the performance by the Parent (or the Borrower on behalf of the Parent) and the Borrower of their respective obligations under any limited liability company, limited partnership or other constitutive document or security holders agreement (including any registration rights agreement or purchase agreement related thereto); (ix) sublicenses to Subsidiaries with respect to JV IP or Bonobos IP to the extent permitted by the JV IP License Agreements or the Bonobos IP License Agreements, as applicable (each as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); (x) the transactions contemplated by the JV IP Transaction Documents (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); and (xi) the transactions contemplated by the Bonobos IP Transaction Documents (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)).

(j)    <u>Covenant to Guarantee Obligations and Give Security</u>.    Upon (x) the formation or acquisition of any new direct or indirect Restricted Subsidiaries or (y) the acquisition of any property by any Loan Party, in the judgment of the Collateral Agent, shall not already be subject to a perfected (subject to Permitted Liens and other Liens created or permitted by the Loan Documents) security interest in favor of the Collateral Agent for the benefit of the Secured Parties, then in each case at the Borrower's expense and subject to the terms of the Collateral Documents:

(i)    in connection with the formation or acquisition of a Restricted Subsidiary, within fifteen (15) days after such formation or acquisition (or such later date as permitted by the Administrative Agent in its sole discretion), cause each such Restricted Subsidiary, and cause each direct and indirect parent of such Restricted Subsidiary (if it has not already done so), to duly execute and deliver to the Collateral Agent a guaranty or guaranty supplement, in form and substance reasonably satisfactory to the Collateral Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)    within fifteen (15) days (or such later date as permitted by the Administrative Agent in its sole discretion) after (A) such request or acquisition of property by any Loan Party, duly execute and deliver, and cause each Loan Party to duly execute and deliver, to the Collateral Agent such additional security agreement supplements and other security agreements as specified by, and in form and substance reasonably satisfactory to the Collateral Agent, securing payment of all the Obligations of such Loan Party under the Loan Documents and constituting Liens on all such properties and (B) such formation or acquisition of any new Restricted Subsidiary, duly execute and deliver and cause such Restricted Subsidiary to duly execute and deliver to the Collateral Agent security agreement supplements and other security agreements as specified by, and in form and substance reasonably satisfactory to, the Collateral Agent, securing payment of all of the obligations of such Restricted Subsidiary under the Loan Documents,

(iii)    within fifteen (15) days (or such later date as permitted by the Administrative Agent in its sole discretion) after such request, formation or acquisition, take, and cause each Loan Party and each newly acquired or newly formed Restricted Subsidiary to take, all reasonable actions (including, without limitation, the filing of Uniform Commercial Code financing statements) as may be necessary or advisable in the opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the security agreement supplements and security agreements delivered pursuant to this <u>Section 5.01(j)</u>, enforceable against all third parties in accordance with their terms, and

(iv)    at any time and from time to time, promptly execute and deliver, and cause each Loan Party and each newly acquired or newly formed Restricted Subsidiary to execute and deliver, any and all further instruments and documents and take, and cause each Loan Party and each newly acquired or newly formed Restricted Subsidiary to take, all such other action as the Collateral Agent may deem reasonably necessary in obtaining the full benefits of, or in perfecting and preserving the Liens of, such guaranties, security agreement supplements and security agreements.

Notwithstanding anything to the contrary contained in this Agreement, the Collateral Agent may (x) in its sole discretion, lengthen the foregoing time periods, (y) in consultation with the Borrower, otherwise modify the foregoing requirements to the extent it deems it reasonable and prudent to do so, and (z) waive the foregoing requirements to the extent that the cost of obtaining a security interest in the foregoing Collateral is excessive (as reasonably determined by the Collateral Agent) in relation to the benefits to the Lender Parties.

At all times, each "Loan Party" (as defined in the Junior DIP Documents) shall be and remain a Loan Party under the Loan Documents.

(k)    <u>Further Assurances</u>. (i) Promptly upon the reasonable request by any Agent, or any Lender Party through the Administrative Agent, correct, and cause each of its Restricted Subsidiaries promptly to correct, any matter that the parties mutually agree is a material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof.

(ii)    Promptly upon request by any Agent, or any Lender Party through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any document or instrument supplemental to or confirmatory of the Collateral Documents as any Agent, or any Lender Party through the Administrative Agent, may reasonably require from time to time in order to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder.

(iii)    [Intentionally Omitted].

(iv)    Notwithstanding anything to the contrary contained herein (including this <u>Section 5.01</u>) or in any other Loan Document, the Agents shall not accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and the Administrative Agent has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to the Administrative Agent.

(l)    [Intentionally Omitted].

(m)    [Intentionally Omitted].

(n)    <u>JV IP Transaction Documents</u>.  Except (x) as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (y) to the extent the failure to satisfy any requirement set forth below would not be materially adverse to the Agents or the Lenders, or (z) to the extent set forth in the Orders or Approved Budget, (i) perform and observe all the terms and provisions of each JV IP Transaction Document to be performed or observed by it, (ii) maintain each such JV IP Transaction Document in full force and effect, (iii) enforce each such JV IP Transaction Document in accordance with its terms, (iv) take all such action to such end as may be from time to time reasonably requested by any Agent, (v) upon the reasonable request of the Agent, make such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such JV IP Transaction Document, and (vi) cause each of its Subsidiaries to do the foregoing.

(o)    [Intentionally Omitted].

(p)    <u>Agent's Advisor</u>. Pay all reasonable fees and expenses (whether incurred before or after the Petition Date) of one Agent's Advisor, which fees and expenses shall constitute Obligations and be secured by the Collateral. The Agent, on behalf of itself and the Lenders, shall be entitled to retain or continue to retain (either directly or through counsel) one Agent's Advisor as the Agent may deem necessary to provide advice, analysis and reporting, for the benefit of the Agent and the Lenders, with respect to such matters relating to the Debtors as the Agent may determine in its sole and absolute discretion. The Loan Parties, their advisors and their respective Affiliates shall cooperate with the Agent, the Lenders, the Agent's Advisor, and any other representatives of the foregoing in all material respects and provide all

information that such parties may reasonably request; provided that no such disclosure shall be required to be made with respect to information (i) that is subject to attorney-client or similar privilege or constitutes attorney work product or (ii) in respect of which disclosure to such parties is prohibited by applicable law or obligations owed to any unaffiliated third party pursuant to a binding agreement.

(q)    <u>Chapter 11 Matters</u>.

(i)    Comply, in all material respects, in a timely manner with its obligations and responsibilities as a debtor in possession under the Bankruptcy Code, the Orders and any other order of the Bankruptcy Court.

(ii)    The Borrower shall deliver to the Administrative Agent and Lenders (and their respective advisors) as soon as reasonably practicable, but in no event less than two (2) Business Days prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect the Agents or the Lenders, or distributed by or on behalf of the Debtors to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest, including, without limitation, the Orders, any plan of reorganization or liquidation and any disclosure statements related to such plan, in the Chapter 11 Cases (each of which must be in form and substance acceptable to the Required Lenders and the Administrative Agent).

(iii)    If not otherwise provided by the Bankruptcy Court's electronic docketing system, Borrower shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court with respect to the Chapter 11 Cases or filed with respect to any Loan Document, (y) reporting and financial information distributed by or on behalf of the Loan Parties to any Junior DIP Agent (or its advisors) or any Committee and (z) such other reports and information as the Administrative Agent may, from time to time, reasonably request.

(iv)    Except as otherwise is permitted by the Orders, the Borrower shall provide prior written notice as soon as reasonably practicable to the Administrative Agent and the Lenders (and their respective counsel) prior to any assumption or rejection of any Debtor's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), if the Administrative Agent (acting at the direction of the Required Lenders) informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

(v)    In connection with the Chapter 11 Cases, the Loan Parties shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Financing Order and (y) the hearings for the approval of the Financing Order.  The Borrower and the other Loan Parties shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in the Financing Order. The Borrower and the other Loan Parties shall use best efforts to obtain the Final Order.

(vi)    Each Loan Party shall promptly deliver or cause to be delivered to the Administrative Agent and the Lenders copies of any term sheets, proposals, or presentations from any party, related to (i) the restructuring of the Loan Parties, or (ii) a material sale of assets of one or all of the Loan Parties.

(r)    Required Milestones. Comply with each of the covenants (the "*Milestones*") on Schedule 5.01(r) upon the terms and at the times provided for therein.

(s)    Approved Budget; Variance Report; Variance Covenant; Lender Calls.

(i)    On or before 5:00 p.m. New York City time on the Thursday of each fourth (4th) calendar week following the Petition Date and, upon the election of the Borrower, at any additional delivery time during the Chapter 11 Cases, the Borrower shall deliver to the Administrative Agent and the Lenders a supplement to the Initial Budget (or the previously supplemented Updated  Budget, as the case may be), covering the subsequent period that commences with the week immediately following the date of delivery of the supplemental budget to the week of the projected emergence date of the Chapter 11 Cases, in each case, consistent with the form and level of detail set forth in the Initial Budget (each such supplemental budget, an "*Updated Budget*"). Upon (and subject to) the approval in writing of any such Updated Budget by the Administrative Agent and Required Lenders in their sole discretion, such Updated DIP Budget shall constitute the budget for all purposes under the Term Loan Facility (such budget, an "*Updated Approved Budget*") until superseded, if at all, by any subsequent Updated Approved Budget.

(ii)    Commencing with the first full calendar week following the Petition Date and for each calendar week thereafter, by no later than 5:00 p.m. New York City time on the Thursday of such calendar week, (each such Thursday, a "*Variance Report Date*"), the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, a variance report (each, a "*Variance Report*") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) the actual cash receipts on a line-item basis for such Testing Period compared to the projected cash receipts on a line-item basis set forth in the Approved Budget for such Testing Period (any such difference, a "*Receipts Variance*") and (ii) the actual cash disbursements on a line-item basis for such Testing Period compared to the projected cash disbursements on a line-item basis set forth in the Approved Budget for such Testing Period (any such difference, a "*Disbursements Variance*"), together with a statement from the Borrower's chief financial officer or similar financial officer certifying the information contained in such Variance Report and compliance with Section 5.02(o) hereof. The Variance Report shall also provide a reasonably detailed explanation for any variance. The term "*Testing Period*" means, with respect to each Variance Report required to be delivered on a Variance Report Date, the consecutive four-week period ending immediately prior to such Variance Report Date; *provided* that (i) the Testing Period for the first Variance Report Date shall be the week ended immediately prior to such Variance Report Date (i.e., the week in which the Petition Date occurs), (ii) the Testing Period for the second Variance Report Date shall be the two-week period ended immediately prior to such Variance Report Date (i.e., the week in which the Petition Date occurs and the week following the week in which the Petition Date occurs) and (iii) the Testing Period for the third Variance Report Date shall be the three-week period ended immediately prior to such Variance Report date (i.e., the week in which the Petition Date occurs and the two weeks following the week in which the Petition Date occurs).

(iii)    The Agent and the Lenders (a) may assume that the Loan Parties will comply with the Approved Budget, (b) shall have no duty to monitor such compliance and (c) subject to

102

the Carve Out, shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order (including any limitations on such expenses to the extent provided in the Loan Documents and the applicable Order) regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(iv)    On a weekly basis, the Loan Parties shall hold a telephonic conference call with Agent and the Lenders (and their advisors) to discuss the Variance Report, the Chapter 11 Cases, the financial and operational performance of the Loan Parties, and such other related matters as may be reasonably requested with reasonable advance notice by Agent or the Lenders.

(v)    To the extent an Updated Budget has not become an Updated Approved Budget by May 25, 2024, then the Updated Approved Budget for all purposes under this Agreement shall be the "Preliminary Chapter 11 Liquidation Scenario Version 5, dated as of April 22, 2024" until an Updated Approved Budget is consented to by the Administrative Agent and Required Lenders.

(t)    <u>Cash Management and Cash Management Order</u>. The Borrower shall keep the Cash Management Order in effect at all times on and after the Interim Order Funding Date and maintain a cash management system that is satisfactory to the Required Lenders.

(u)    <u>Specified Liquidation Agreement</u>. The Borrower shall comply in all material respects with the Specified Liquidation Agreement, Store Closing Interim Order and Store Closing Final Order.

(v)    <u>GC Purchase Agreement and Liquidation Agreement</u>. The Borrower shall comply in all material respects with any Bankruptcy Court approved GC Purchase Agreement and Liquidation Agreement.

SECTION 5.02. <u>Negative Covenants</u>.  Until the payment in full of the Obligations in accordance with <u>Section 1.02(b)</u>, unless the Required Lenders shall otherwise consent in writing, no Loan Party will, at any time:

(a)    <u>Liens, Etc</u>.  Create, incur, assume or suffer to exist, or permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist, any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist, or permit any of its Restricted Subsidiaries to sign or file or suffer to exist, under the Uniform Commercial Code of any jurisdiction, a financing statement that names Holdings or any of its Restricted Subsidiaries as debtor, or sign or suffer to exist, or permit any of its Restricted Subsidiaries to sign or suffer to exist, any security agreement authorizing any secured party thereunder to file such financing statement, or assign, or permit any of its Restricted Subsidiaries to assign, any accounts or other right to receive income, except for Permitted Liens and Transfers permitted by <u>Section 5.02(e)</u>.

(b)    <u>Debt</u>.  Create, incur, assume or suffer to exist, or permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist, any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    (A) Capitalized Leases, and (B) purchase money Debt incurred by the Borrower or any Restricted Subsidiary to finance the acquisition, lease, construction, repair, replacement or improvement of fixed or capital assets; provided that (x) (i) such Debt is incurred concurrently with or no later than 270 days after the applicable acquisition, lease, construction, repair, replacement or improvement, and (y) the aggregate amount of Debt incurred pursuant to this clause (ii) shall not exceed the aggregate amount of Debt incurred pursuant to Section 5.02(b)(ii) of the Prepetition Credit Agreement prior to the Effective Date;

(iii)    any Existing Debt;

(iv)    [intentionally omitted];

(v)    Debt owed to the Borrower or any Subsidiary of the Borrower, which Debt shall be otherwise permitted under the provisions of Section 5.02(f);

(vi)    [intentionally omitted];

(vii)    Debt which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal, completion guarantees, export or import indemnities, customs and revenue bonds or similar instruments, workers' compensation claims, self-insurance obligations and bankers acceptances issued for the account of any Loan Party in the ordinary course of business, including guarantees or obligations of any Loan Party with respect to letters of credit supporting such bid, performance or surety bonds, workers' compensation claims, self-insurance obligations and bankers acceptances (in each case other than for an obligation for money borrowed) or similar obligations incurred in the ordinary course of business;

(viii)    Debt of the Loan Parties incurred under the (i) Junior DIP Documents and Prepetition Term Documents in an aggregate principal amount not to exceed the amount permitted under the Intercreditor Agreement and the Orders and (ii) Prepetition Loan Documents in the amount contemplated by the Orders;

(ix)    [intentionally omitted];

(x)    [intentionally omitted];

(xi)    [intentionally omitted];

(xii)    [Intentionally Omitted];

(xiii)    Guaranteed Debt of any Loan Party in respect of Debt otherwise permitted under or not prohibited by this Section 5.02 (other than Debt permitted under Section 5.02(f)(xii));

(xiv)    Debt arising in connection with endorsement of instruments for collection or deposit in the ordinary course of business;

(xv)    [Intentionally Omitted];

(xvi)    [intentionally omitted];

(xvii)    Debt incurred in connection with the financing of insurance premiums in an amount not to exceed the annual premiums in respect thereof at any one time outstanding; and

(xviii)   Debt in an aggregate principal amount outstanding not to exceed $50,000.

(c)    <u>Change in Nature of Business</u>.  Make, or permit any of its Restricted Subsidiaries to conduct any business other than the businesses as carried on at the Effective Date and other businesses substantially related, incidental thereto or complementary thereto, or are reasonable extensions thereof.

(d)    <u>Mergers, Etc</u>.  Merge into or consolidate with any Person or permit any Person to merge into it, or permit any of its Restricted Subsidiaries to do so, except that:

(i)    any Restricted Subsidiary of the Borrower may merge into or consolidate or amalgamate with any other Restricted Subsidiary of the Borrower or with the Borrower; *provided* that, in the case of any such merger, consolidation or amalgamation, the Person formed by such merger, consolidation or amalgamation shall be a wholly owned (other than directors' qualifying shares or other nominal issuance in order to comply with local laws) Restricted Subsidiary of the Borrower or the Borrower; and *provided further* that, in the case of any such merger, consolidation or amalgamation to which a Subsidiary Guarantor is a party, the Person formed by such merger, consolidation or amalgamation shall be a Subsidiary Guarantor or the Borrower;

(ii)    as part of any acquisition permitted under <u>Section 5.02(f)</u>, any Restricted Subsidiary of the Borrower may merge into or consolidate or amalgamate with any other Person or permit any other Person to merge into or consolidate or amalgamate with it; *provided* that the Person surviving such merger, consolidation or amalgamation shall be a wholly owned (other than directors' qualifying shares or other nominal issuance in order to comply with local laws) Restricted Subsidiary of the Borrower; and *provided further* that, in the case of any merger, consolidation or amalgamation to which a Subsidiary Guarantor is a party, the Person formed by such merger, consolidation or amalgamation shall be a Subsidiary Guarantor;

(iii)    as part of any Transfer permitted under <u>Section 5.02(e)</u>, any Restricted Subsidiary of the Borrower may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; and

(iv)    any Restricted Subsidiary may dissolve, liquidate or wind up its affairs at any time; *provided* that such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect and the assets of such Restricted Subsidiary are distributed to a Loan Party (other than to the Parent or either Holdings Entity).

(e)    <u>Sales, Etc. of Assets</u>.  Sell, lease, transfer, assign, exchange, convey or otherwise dispose of (including, without limitation, pursuant to an allocation of assets among newly divided limited liability companies pursuant to a "plan of division") (each a "***Transfer***"), or permit any of its Restricted Subsidiaries to Transfer, any assets, except:

(i)    (A) Transfers of Inventory in the ordinary course of business (including unusable, excess, obsolete or slow-moving Inventory) or in accordance with a Liquidation Agreement, delinquent accounts receivables and other capital assets in the ordinary course of its business (it being agreed that for purposes of this Agreement, Transfers of such assets from a Loan Party to a Foreign Subsidiary shall be deemed not in the ordinary course of business if the consideration for such Transfer is less than the selling Loan Party's cost of the assets subject to such Transfer or the selling Loan Party does not receive payment for such Transfer within ten (10) days after the consummation thereof, and for the avoidance of doubt, any amounts owing by a Foreign Subsidiary to a Loan Party in connection with such Transfer described in this parenthetical may be evidenced by an intercompany balance or intercompany note and shall be permitted as a Permitted Investment

so long as such Investment is otherwise in compliance with Section 5.03(f) hereof) and Transfers of accounts receivables in connection with the private label credit card programs in the ordinary course of business, and (B) dispositions of cash and Cash Equivalents in the ordinary course of business;

(ii)     (A) Transfers of assets among Loan Parties (other than to the Parent or either Holdings Entity); (B) Transfers of assets among Restricted Subsidiaries that are not Loan Parties; and (C) Transfers of assets from Subsidiaries that are not Loan Parties to Loan Parties (other than to the Parent or either Holdings Entity); *provided* that, for purposes of determining the application of each of clauses (A) through (C) above in connection with any Transfer made in connection with reorganizing or restructuring of Subsidiaries, any Transfer or series of related Transfers between Loan Parties and/or Subsidiaries shall be deemed to be a Transfer solely between the initial and the ultimate holder of any such assets transferred without regard to any intermediate holder of such assets;

(iii)     Transfers of worn out, obsolete or damaged equipment and trade-ins and exchanges of equipment in the ordinary course of business and the abandonment or other disposition or Transfer of Intellectual Property that is, in the reasonable judgment of Loan Parties, no longer economically practicable or commercially desirable in the conduct of the business of the Loan Parties taken as a whole (which, for the avoidance of doubt, shall not include any Material Intellectual Property);

(iv)     Transfers in connection with any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation, expropriation or similar proceeding of, any property or asset of a Loan Party;

(v)     [intentionally omitted];

(vi)     Leases and subleases, licenses and sublicenses of real or personal property (other than Intellectual Property, which is addressed in clause (vii) below) in the ordinary course of business;

(vii)     Licensing or sublicensing of Intellectual Property (x) on a non-exclusive basis in the ordinary course of business or (y) on an exclusive basis (in jurisdictions outside of the United States and Canada for the use of such Intellectual Property) so long as such exclusive licensing is limited to geographic areas, particular fields of use, customized products for customers or limited time periods in the ordinary course of business and, in the case of any Intellectual Property as to which such Loan Party or Restricted Party is a licensee, permitted by the applicable license agreement; provided that in the case of this clause (vii), (A) no such licensing or sublicensing shall adversely affect (1) in any material respect the fair value of any Eligible Inventory or the ability of the Agents to dispose of or otherwise realize upon any Eligible Inventory after an Event of Default, (2) in the case of the JV IP, the right of the Loan Parties to utilize the JV IP under the JV IP License Agreements or the rights of the Agents under the IP Rights Agreement, or (3) in the case of the Bonobos IP, the right of the Loan Parties to utilize the Bonobos IP under the Bonobos IP License Agreements or the rights of the Agents under the Bonobos IP Rights Agreement, (B) with respect to any JV IP, such licensing or sublicensing shall be permitted by the JV IP License Agreements (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), and (C) with respect to any Bonobos IP, such licensing or sublicensing shall be permitted by the Bonobos IP License Agreements (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii));

(viii)    Any liquidation or dissolution of a Restricted Subsidiary (other than the Borrower) so long as its immediate parent or a Loan Party (other than the Parent or either Holdings Entity) becomes the owner of its assets;

(ix)    Transfers of Inventory and other capital assets pursuant to franchise arrangements in the ordinary course of business and on terms substantially consistent with past practice;

(x)    Transfers of assets (other than assets of the type included in the Borrowing Base or the Term Borrowing Base), not otherwise permitted hereunder as long as (A) no Event of Default then exists or would arise therefrom, (B) such sale or transfer is made for fair market value and 100% of the consideration received by Holdings and its Restricted Subsidiaries for such sale or transfer is cash, and (C) 100% of the Net Proceeds from such Transfer of assets is used to make a prepayment in accordance with Section 2.06(b)(vii);

(xi)    mergers, amalgamations, consolidations and dissolutions in compliance with Section 5.02(d);

(xii)    Investments in compliance with Section 5.02(f);

(xiii)    discounts or forgiveness of accounts receivable in the ordinary course of business or in connection with collection or compromise thereof;

(xiv)    Permitted Liens;

(xv)    [intentionally omitted];

(xvi)    (x) Transfers, licenses and sublicenses, in each case as and to the extent required pursuant to Sections 7(B), 10.A(2) and 10.A(3) of the Prime License Agreement (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), or (y) sublicenses in favor of the Agents described in clause (i) of the third sentence of Section 19(B) of the Prime License Agreement (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); and

(xvii)    the JV IP Transactions and Bonobos IP Transactions consummated prior to the date hereof..

Notwithstanding anything to the contrary set forth herein, (a) no Intellectual Property owned by a Loan Party or Restricted Subsidiary or in which Loan Party or Restricted Subsidiary has rights under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)) shall be the subject of any Transfer (including, without limitation, by sale, contribution, pledge, assignment or other transfer of the Equity Interest of any Restricted Subsidiary that owns or holds such Intellectual Property or resulting in such Intellectual Property being owned or controlled by a Subsidiary that is an Excluded Subsidiary) (other than as provided in clauses (iii), (vii), (xvi) or (xvii) above), and (b) no other asset included in the determination of any Borrowing Base (other than Transfers described in Section 5.02(e)(i)) shall be the subject of any Transfer (in each case, whether pursuant to a Transfer, a Permitted Investment, a Permitted Lien or otherwise) unless, in the case of this clause (b), (1) the consideration received by Holdings and its Restricted Subsidiaries for such Transfer is cash

or Cash Equivalents, (2) in connection with Transfers of assets (in one transaction or a series of related transactions) having an aggregate fair market value in excess of $5,000,000, at least three (3) Business Days prior to the consummation of such Transfer, the Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate and an updated Term Borrowing Base Certificate excluding the assets subject to such Transfer from the calculations thereunder, and (3) contemporaneously therewith, the Borrower shall have made such payments as are required by Section 2.06(b).

(f)     Investments in Other Persons.  Make or hold, or permit any of its Restricted Subsidiaries to make or hold, any Investment in any Person, except (each of the following a "***Permitted Investment***" and collectively, the "***Permitted Investments***"):

(i)     (A) Investments by Holdings and its Restricted Subsidiaries in their Subsidiaries outstanding on the Effective Date, (B) additional Investments by Holdings and its Restricted Subsidiaries in their Subsidiaries that are Loan Parties, (C) additional Investments by Holdings and its Restricted Subsidiaries in the Costa Rica Subsidiary in the ordinary course of business in an aggregate amount not to exceed (x) $75,000 from the Interim Order Funding Date (as defined in the Junior DIP Credit Agreement) to the date of the Final Order Funding Date (as defined in the Junior DIP Credit Agreement) and (y) an amount to be agreed between the Administrative Agent and the Borrower from the Final Order Funding Date to the Maturity Date, in each case, unless such higher amount is approved by Administrative Agent, and (D) additional Investments by Subsidiaries of the Borrower that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(ii)     loans and advances to employees in the ordinary course of the business of the Borrower and its Restricted Subsidiaries in an aggregate principal amount not to exceed $25,000 at any time outstanding;

(iii)     [intentionally omitted];

(iv)     Investments by the Borrower and its Restricted Subsidiaries in bank deposits in the ordinary course of business or Cash Equivalents;

(v)     Investments existing on the Effective Date and described on Schedule 5.02(f);

(vi)     [intentionally omitted];

(vii)     [intentionally omitted]:

(viii)     Investments (A) received in satisfaction or partial satisfaction of accounts from financially troubled Account Debtors (whether in connection with a foreclosure, bankruptcy, workout or otherwise) and (B) consisting of deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of the Borrower and its Restricted Subsidiaries;

(ix)     guaranties in the ordinary course of business of obligations owed to or of landlords, suppliers, customers, franchisees and licensees of the Borrower and its Subsidiaries or otherwise permitted hereunder;

(x)     the JV IP Transactions and Bonobos IP Transactions consummated prior to the date hereof;

(xi)    the Loan Parties and their Restricted Subsidiaries may (A) acquire and hold accounts receivable owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (B) invest in, acquire and hold cash and Cash Equivalents, (C) endorse negotiable instruments held for collection in the ordinary course of business or (D) make lease, utility and other similar deposits in the ordinary course of business in accordance with the Approved Budget (subject to Permitted Variances thereon);

(xii)    the Loan Parties and their Restricted Subsidiaries may make Transfers and acquire assets, in each case to the extent permitted by Section 5.02(e);

(xiii)    any Loan Party and its Restricted Subsidiaries may hold Investments to the extent such Investments reflect an increase in the value of Investments already made; and

(xiv)    Investments not otherwise specifically permitted herein in an aggregate principal amount not to exceed, as to all Investments made in reliance on this clause (xiv) outstanding at any time, $50,000.

For purposes of determining compliance with the provisions of this Section 5.02(f), Investments made by a Loan Party or any of its Subsidiaries (the "investor") in any Subsidiary that are effected pursuant to one or more Investments made contemporaneously or in prompt succession by the investor and/or any of its Subsidiaries shall be deemed one Investment by the investor.

Notwithstanding anything to the contrary set forth herein, (a) no Intellectual Property owned by a Loan Party or Restricted Subsidiary or in which Loan Party or Restricted Subsidiary has rights under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)) shall be the subject of any Investment (including an Investment by any Loan Party of the Equity Interest of any Restricted Subsidiary that owns or holds such Intellectual Property or resulting in such Intellectual Property being owned or controlled by an Excluded Subsidiary) and (b) no other asset included in the determination of any Borrowing Base shall be the subject of any Investment unless, in the case of this clause (b), (i) before and after giving effect to such Investment, no Event of Default shall have occurred and be continuing, (ii) in connection with Investments in respect of assets (in one transaction or a series of related transactions) having an aggregate fair market value in excess of $5,000,000, at least three (3) Business Days prior to the consummation of such Investment, the Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate and an updated Term Borrowing Base Certificate excluding the assets subject to such Investment from the calculations thereunder, and (iii) contemporaneously therewith, the Borrower shall have made such payments as are required by Section 2.06(b).

(g)    Restricted Payments.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to Parent's stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Restricted Subsidiaries to do any of the foregoing, or permit any of its Restricted Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower (any of the foregoing, a "**_Restricted Payment_**"), except that:

       (i)       the Parent may declare and pay dividends and distributions payable only in Equity Interests (other than Disqualified Stock) of the Parent;

       (ii)      the JV IP Transactions and the Bonobos IP Transactions consummated prior to the date hereof;

       (iii)     any Restricted Subsidiary of the Borrower may declare and pay cash dividends or other cash distributions to the Borrower or to any Loan Party (other than to Parent or either Holdings Entity) of which it is a Subsidiary;

       (iv)     the Loan Parties may acquire Equity Interests of the Borrower or the Parent (or any direct or indirect holding company of the Parent) or any other Loan Party in connection with the exercise of stock options (or the equivalent with respect to membership interests) or stock appreciation rights (or the equivalent with respect to membership interests) by way of cashless exercise or in connection with the satisfaction of withholding tax obligations so long as no Event of Default shall have occurred and be continuing at the time of the acquisition of such Equity Interests or would result therefrom;

       (v)      [intentionally omitted];

       (vi)     [intentionally omitted];

       (vii)    [intentionally omitted];

       (viii)   the Loan Parties may make Permitted Distributions;

       (ix)     [intentionally omitted];

       (x)      [intentionally omitted]; and

       (xi)     [intentionally omitted].

Notwithstanding anything to the contrary set forth herein, (a) no Intellectual Property owned by a Loan Party or Restricted Subsidiary or in which Loan Party or Restricted Subsidiary has rights under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)) shall be the subject of any Restricted Payment to any non-Loan Party (including by way of a Restricted Payment of the Equity Interests of any Restricted Subsidiary that owns such Intellectual Property or as a result of such Intellectual Property being owned or controlled by an Excluded Subsidiary), and (b) no other asset included in the determination of any Borrowing Base shall be the subject of any Restricted Payment (including by way of a Restricted Payment of the Equity Interests of any Restricted Subsidiary that owns such other assets or as a result of such other assets being owned or controlled by a Subsidiary that is an Excluded Subsidiary) unless, in the case of this clause (b), (i) in connection with Restricted Payments in respect of assets (in one transaction or a series of related transactions) having an aggregate fair market value in excess of $5,000,000, at least three (3) Business Days prior to the consummation of such Restricted Payment, the Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate and an updated Term Borrowing Base Certificate excluding the assets subject to such Restricted Payment from the calculations thereunder, and (ii) contemporaneously therewith, the Borrower shall have made such payments as are required by Section 2.06(b).

(h)    <u>Amendments of Constitutive Documents</u>.    Amend, or permit any of its Restricted Subsidiaries to amend, its certificate of incorporation or bylaws or other constitutive documents in a manner materially adverse to the Lenders.  Nothing contained in this <u>Section 5.02(h)</u> shall be deemed to prohibit any Subsidiary or the parent entity of such Subsidiary from reorganizing or changing the entity form of such Subsidiary upon prior notice to the Administrative Agent and provided that such reorganization or change is not materially adverse to the Lenders (it being understood that any reorganization or change into a limited partnership or a limited liability company by any Subsidiary or the parent entity of such Subsidiary shall not be deemed to be materially adverse to the Lenders).

(i)    <u>Accounting Changes</u>.  Make or permit, or permit any of its Restricted Subsidiaries to make or permit, any change in Fiscal Year.

(j)    <u>Amendments and Prepayments of Debt</u>.

(i)    <u>Prepayments of Unsecured and Subordinated Debt</u>.  Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, (x) any unsecured Debt, or (y) any Subordinated Debt (but in any event not in violation of any subordination terms applicable to such Subordinated Debt);

(ii)    <u>Amendments to Unsecured and Subordinated Debt</u>.  Amend, modify or change in any manner materially adverse to the Lenders any term, provision or condition of any unsecured Debt or Subordinated Debt (unless, with respect to Subordinated Debt, expressly permitted by the subordination provisions thereof);

(iii)    <u>Prepayments of Term Obligations</u>.  Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner the Prepetition Term Obligations or the Junior DIP Obligations prior to the payment in full of the Prepetition Secured Obligations and the Obligations in accordance with <u>Section 1.02(b)</u>;

(iv)    <u>Amendments to Term Documents</u>.  Amend, modify, waive or change in any manner any term, provision or condition of any Junior DIP Document or agreement in respect of any refinancing of any Debt under any Junior DIP Document, unless permitted under the Intercreditor Agreement and the Orders; or

(v)    <u>Prepayments and Amendments Generally</u>.  Permit any of its Restricted Subsidiaries  to do any of the foregoing other than to prepay any Debt permitted to be incurred hereunder payable to the Borrower or another Restricted Subsidiary.

(k)    <u>JV IP Transaction Documents; Bonobos IP Transaction Documents.</u>

(i)    Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled payment date thereof (as set forth in the JV IP Transaction Documents or the Bonobos IP Transaction Documents, as applicable, each as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>) in any manner any obligations arising under any JV IP Transaction Document or Bonobos IP Transaction Document, except that Holdings may make payments in respect of royalties arising under any JV IP Transaction Document or Bonobos IP Transaction Document within ten (10) Business Days prior to the scheduled payment date thereof;

(ii)    Except with the prior written consent of the Agents or in accordance with the Orders, amend, modify, waive or change in any manner any term, provision or condition of (w) the

JV IP License Agreements in a manner inconsistent with the JV IP Rights Agreement or in a manner that could reasonably be expected to have a material adverse effect on the Secured Parties or the rights, remedies or privileges of the Agents including, without limitation, any amendment, modification or waiver of, or change to, any JV IP License Agreement that could reasonably be expected to have a material adverse effect on the ability of any Agent, upon the occurrence and during the continuance of an Event of Default, to utilize the Intellectual Property subject to the JV IP License Agreements in exercising the rights and remedies of such Agent in connection with any liquidation of the Collateral, (x) any other JV IP Transaction Document (other than the JV IP License Agreements) in a manner materially adverse to the Secured Parties (it being understood and agreed that any amendment, modification, waiver or change that addresses (1) Quarterly Distributions (as defined in the JV IP LLC Agreement as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>), (2) Holdings' consent right over any actions described in Section 7.6 of the JV IP LLC Agreement (as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>), or (3) limitations on the pledge, in favor of the Collateral Agent, of Equity Interests in the JV IP by Holdings or any other Loan Party, shall be materially adverse to the Secured Parties, it being further understood and agreed that the foregoing is not an exhaustive list of all events that are materially adverse to the Secured Parties), (y) the Bonobos IP License Agreements in a manner inconsistent with the Bonobos IP Rights Agreement or in a manner that could reasonably be expected to have a material adverse effect on the Secured Parties or the rights, remedies or privileges of the Agents including, without limitation, any amendment, modification or waiver of, or change to, any Bonobos IP License Agreement that could reasonably be expected to have a material adverse effect on the ability of any Agent, upon the occurrence and during the continuance of an Event of Default, to utilize the Intellectual Property subject to the Bonobos IP License Agreements in exercising the rights and remedies of such Agent in connection with any liquidation of the Collateral, or (z) any other Bonobos IP Transaction Document (other than the Bonobos IP License Agreements) in a manner materially adverse to the Secured Parties; or

(iii)     Without the prior written consent of the Agents, agree to, commit to, propose to or otherwise consent to any Transfer, or any other action for which the consent of Holdings is required pursuant to Sections 7.6(e), 7.6(l) or 7.6(o) of the JV IP LLC Agreement, in each case in respect of JV IP that is Material Intellectual Property.

(l)     <u>Negative Pledge</u>.  Enter into or suffer to exist, or permit any of its Restricted Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets securing the Obligations under the Loan Documents, except (i) prohibitions or conditions under (A) any purchase money Debt permitted by <u>Section 5.02(b)(ii)</u> solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt (together with any accessions and additions thereto and the proceeds thereof), (B) [intentionally omitted] or (C) any Capitalized Lease permitted by <u>Section 5.02(b)(ii)</u> solely to the extent that such Capitalized Lease prohibits a Lien on the property subject thereto (together with any accessions and additions thereto and the proceeds thereof); (ii) customary restrictions and conditions relating to (A) specific property to be sold pursuant to an executed agreement with respect to a Transfer permitted under this agreement, including under <u>Section 5.02(d)</u> or (e) or (B) the sale of any property pending the consummation of such sale under stock sale agreements, joint venture agreements, sale/leaseback agreements, purchase agreements, or acquisition agreements (including by way of merger, acquisition or consolidation), entered into by Parent or any Restricted Subsidiary solely to the extent pending the consummation of such transaction; (iii) restrictions by reason of customary provisions restricting Liens, assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar

agreements, as the case may be); (iv) restrictions and conditions applicable to any Subsidiary acquired after the Effective Date if such restrictions and conditions existed at the time such Subsidiary was acquired, were not created in anticipation of such acquisition and apply solely to such acquired Subsidiary; (v) [intentionally omitted]; (vi) prohibitions or limitations that exist in any JV IP License Agreement or Bonobos IP License Agreement (each as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>); (vii) prohibitions or limitations that exist in any agreement governing Debt permitted by <u>Section 5.02(b)(viii)</u> or <u>5.02(b)(xi)</u>, *provided* that such prohibition or limitation is not more restrictive in any material respect than those contained in the Loan Documents; (viii) restrictions or limitations imposed by any amendments, refinancings, refundings, renewals, replacements or defeasance that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (ii), *provided* that such amendments, refinancings, refundings, renewals, replacements or defeasance are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment, refinancing, refunding, renewal, replacement or defeasance; (ix) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Debt or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Obligations; or (x) any prohibition or limitation that exists pursuant to applicable requirements of law.

(m) [Intentionally Omitted].

(n) <u>Subsidiaries</u>. Notwithstanding anything to the contrary set forth herein or in any other Loan Document, create, form, or acquire or hold any Investment in any Subsidiary that may be a Foreign Subsidiary (other than the Costa Rica Subsidiary) or an Excluded Subsidiary or otherwise allow any Subsidiary to be a Foreign Subsidiary (other than the Costa Rica Subsidiary) or an Excluded Subsidiary, in each case without prior written consent of the Administrative Agent in its sole discretion.

(o) <u>Budget Covenant</u>.

(i) a Receipts Variance (on an aggregate basis) (w) with respect to the second Testing Period, to have a negative variance in excess of 30% (with negative variance meaning, for the avoidance of doubt, that actual receipts on an aggregate basis are less than projected receipts on an aggregate basis) (x) with respect to the third Testing Period, to have a negative variance in excess of 20%, (y) with respect to each of the fourth and fifth Testing Periods, to have a negative variance in excess of 15%, and (z) thereafter, to have a negative variance in excess of 10%; or

(ii) a Disbursements Variance (on an aggregate basis, but excluding (x) Professional Fees and (y) restructuring charges arising on account of the Chapter 11 Cases (which restructuring charges shall solely consist of (A) U.S. Trustee fees, (B) professional fees and expenses incurred by or for the benefit of (1) the Administrative Agent, Collateral Agent, ABL DIP Agents and/or (2) Lenders and ABL DIP Lenders, (C) amounts paid by the Debtors as adequate protection and (D) interest payable under this Agreement and the ABL DIP Credit Agreement) for the second Testing Period and thereafter to have a negative variance in excess of 10% (with negative variance meaning, for the avoidance of doubt, that actual disbursements on a line item basis are greater than the projected disbursements on a line item basis); provided that the Disbursements Variance for the (x) second Testing Period shall be 20% and (y) third Testing Period shall be 15%;

(such permitted variances, the "***Permitted Variances***").

(p)      Store Closings. Close any Stores or commence liquidation or "Going-Out-Of- Business" sales at such Stores, except (i) pursuant to the Specified Liquidation Agreement, (ii) in accordance with a liquidation commenced in accordance with the process set forth by the Milestones or (iii) as may be approved in writing by the Agent and Required Lenders.

(q)      Chapter 11 Cases.

(i)      Incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority administrative expense claim which is pari passu with, or senior to the claims and Liens of, the Administrative Agent and the other Secured Parties, except for the Carve Out and certain claims and Liens of the Specified Liquidation Agents, ABL DIP Agents and Prepetition ABL Agents, subject to the Intercreditor Agreement and the Orders.

(ii)      Make or permit to be made any amendment, modification, supplement or change to the Orders or Store Closing Orders, as applicable, without the prior written consent of the Required Lenders and, if such amendment, modification, supplement or change to any Order would adversely affect the Agents, without the prior written consent of the Administrative Agent.

(iii)      Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent, any Lender, the Prepetition Term Agents, Prepetition ABL Agents, any Prepetition Term Loan Lender or any Prepetition ABL Lender with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Term Loan Documents, the Prepetition ABL Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby; *provided*, that during the Remedies Notice Period (as defined in the Orders), nothing herein or in the Orders, as applicable, shall limit the ability of the Loan Parties to seek to challenge the fact that an Event of Default occurred.

(iv)      Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan, employee retention plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice and a hearing or (b) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget or otherwise with the consent of the Required Lenders.

(v)      File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Required Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be acceptable to Required Lenders in their sole discretion)) notice and the opportunity to review and comment on each such motion.

SECTION 5.03. Reporting Requirements.   Until the payment in full of the Obligations in accordance with Section 1.02(b), the Borrower will furnish to the Administrative Agent:

(a)      Default Notice.  Promptly upon the occurrence of each Event of Default or any event, development or occurrence that has resulted in a Material Adverse Effect, a statement of a Responsible Officer of the Borrower setting forth details of such Event of Default, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto.

(b)    Annual Financials.

(i)    With respect to Holdings, within 120 days after the end of each Fiscal Year, (x) a Consolidated balance sheet as of the end of such Fiscal Year, (y) a Consolidated statement of income and Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Year and (z) a Consolidated statement of income and a Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified by a Responsible Officer of the Parent as having been prepared in accordance with GAAP.

(ii)    Incidental to the delivery of the reporting required in Section 6.03(b)(i), within 120 days after the end of each Fiscal Year, derivative reconciliations with respect to the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to each Agent, and with respect to calculation of income, including separate disclosures with respect to Net Income described in the last sentence of the definition of such term) as of the end of such Fiscal Year, covering balance sheets, statements of income, and statements of cash flows, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP, together with a certificate on behalf of the Parent signed by a Responsible Officer of the Parent stating that no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Parent has taken and proposes to take with respect thereto.

(c)    Quarterly Financials.  Within 60 days after the end of each Fiscal Quarter:

(i)    With respect to Holdings, (x) a Consolidated balance sheet as of the end of such quarter, (y) a Consolidated statement of income and Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter and (z) a Consolidated statement of income and a Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, as applicable, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP (other than the absence of footnotes).

(ii)    Incidental to the delivery of the reporting required in subparagraph (c)(i) above, derivative reconciliations with respect to the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to the Administrative Agent, and with respect to calculation of income, including separate disclosures with respect to Net Income described in the last sentence of the definition of such term), (x) balance sheets of the Parent and its Restricted Subsidiaries as of the end of such quarter, (y) statements of income and statement of cash flows of the Parent and its Restricted Subsidiaries for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter, and (z) statements of income and statements of cash flows of the Parent and its Restricted Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail, including the consolidated and unconsolidated profits and

losses of the Express JV and Bonobos, as applicable, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP (other than the absence of footnotes), together with a certificate on behalf of the Parent signed by a Responsible Officer of the Parent stating that no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Parent has taken and proposes to take with respect thereto.

(d)    [Intentionally Omitted].

(e)    Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting any Loan Party or any of its Subsidiaries of the type described in Section 4.01(g).

(f)    Securities Reports.  Promptly after the sending or filing thereof copies of all material regular, periodic and special reports, and all material registration statements, that any Loan Party or any of its Subsidiaries files with the SEC or any Governmental Authority that may be substituted therefor, or with any national securities exchange.

(g)    Monthly Financials.  Within 30 days after the end of each Fiscal Month, a Consolidated balance sheet of the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to the Administrative Agent) as of the end of such Fiscal Month and a Consolidated statement of income and a Consolidated statement of cash flows of the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to the Administrative Agent) for the period commencing at the end of the previous Fiscal Month and ending with the end of such Fiscal Month, and a Consolidated statement of income and a Consolidated statement of cash flows of the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to the Administrative Agent) for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Month, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, as applicable, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP (other than the absence of footnotes), together with a certificate on behalf of the Parent signed by a Responsible Officer stating that no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Parent has taken and proposes to take with respect thereto.

(h)    Other Notices.

(i)    Promptly and in any event within two Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(ii)    Promptly upon request by the Administrative Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Plan.

(iii)    Promptly and in any event within five Business Days after receipt thereof by any Loan Party or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability by any such Multiemployer Plan, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan or (C) the amount of liability incurred, or that may be incurred, by such Loan Party or any ERISA Affiliate in connection with any event described in clause (A) or (B).

(iv)    Promptly and in any event within five Business Days after obtaining knowledge thereof by any Loan Party, the assertion of any claim against Material Intellectual Property that would reasonably be expected to have a Material Adverse Effect or otherwise could reasonably be expected to result in a liability of the Loan Parties in excess of $1,000,000.

(i)    Environmental Conditions.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by any Loan Party or any of its Restricted Subsidiaries with any Environmental Law or Environmental Permit, in each case, that could reasonably be expected to have a Material Adverse Effect.

(j)    JV IP Transaction Events; Bonobos IP Transaction Events.

(i)    Promptly following receipt by any Loan Party, copies of each amendment, supplement, modification, waiver, consent or forbearance in respect of any JV IP License Agreement or Bonobos IP License Agreement, and of any material notices received from any counterparty to any JV IP License Agreement or Bonobos IP License Agreement, to the extent not otherwise provided to the Administrative Agent under the Loan Documents.

(ii)    Promptly following receipt by any Loan Party, copies of each amendment, supplement, modification, waiver, consent or forbearance in respect of any JV IP Transaction Document or Bonobos IP Transaction Document other than any JV IP License Agreement or Bonobos IP License Agreement (each of which is governed by sub-clause (j)(i) above), and of any material notices received from any counterparty to any such JV IP Transaction Document or Bonobos IP Transaction Document, in each case to the extent material to the interests of the Secured Parties (it being understood and agreed that any amendment, supplement, modification, waiver, consent, forbearance or notice that addresses (x) Quarterly Distributions (as defined in the JV IP LLC Agreement as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), (y) Holdings' consent right over any actions described in Section 7.6 of the JV IP LLC Agreement (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), or (z) limitations on the pledge, in favor of the Collateral Agent, of Equity Interests in the JV IP by Holdings or any other Loan Party, shall be material to the interests of the Secured Parties, it being further understood and agreed that the foregoing is not an exhaustive list of all events that are material to the interests of the Secured Parties) and not otherwise provided to the Administrative Agent under the Loan Documents.

(iii)    Promptly following the earlier to occur of the Loan Parties' obtaining knowledge thereof or the receipt by the Loan Parties of notice thereof from any counterparty to any JV IP Transaction Document or Bonobos IP Transaction Document, the occurrence of any breach of, or default or event of default under, any JV IP Transaction Document or Bonobos IP Transaction Document.

(iv)    Promptly after the Administrative Agent's request therefor, a calculation of the amount of Royalties (as defined in any JV IP License Agreement or Bonobos IP License Agreement) then owing pursuant to the JV IP License Agreements or Bonobos IP License Agreements.

(k)    [Intentionally Omitted].

(l)    Other Information.  Such other information respecting the business, financial condition, operations of any Loan Party or any of its Restricted Subsidiaries as any Agent, or any Lender Party through the Administrative Agent, may from time to time reasonably request, including, without limitation, (x) such

information as requested pursuant to <u>Section 9.13</u>, (y) (i) confirmation of the accuracy of the information set forth in the most recent Beneficial Ownership Certification for the Borrower provided to the Agents and the Lenders, (ii) to the extent a Beneficial Ownership Certification has previously been delivered with respect to the Borrower, any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification, and (iii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and a Beneficial Ownership Certification has not previously been delivered with respect to the Borrower, information regarding such change in status together with a Beneficial Ownership Certification for the Borrower, and (z) if applicable, financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of financial ratios or requirements made before and after giving effect to any changes in GAAP. Notwithstanding anything to the contrary in this Agreement, none of the Parent, the Borrower or any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any binding agreement or (iii) is confidential or is subject to attorney-client or similar privilege or constitutes attorney work product.

(m)    <u>Borrowing Base Certificates, Etc.</u>

(i)    Borrowing Base Certificates and Term Borrowing Base Certificates will be delivered by 6:00 p.m. New York City time Friday of each calendar week, completed as of the close of business on the immediately preceding Saturday (it being understood and acknowledged that the Borrower does not close its books on a basis more frequently than monthly and weekly Borrowing Base Certificates may only include a Collateral roll-forward); (B) if a Default or Event of Default has occurred and is continuing, an updated Borrowing Base Certificate and an updated Term Borrowing Base Certificate will be delivered within one (1) Business Day following request therefor by the Administrative Agent (provided that any such updated Borrowing Base Certificate and updated Term Borrowing Base Certificate shall be completed as of the close of business on the immediately preceding Friday; and (C) notwithstanding the foregoing, updated Borrowing Base Certificates and Term Borrowing Base Certificates (each based upon the most recent month-end information and other estimates reasonably believed to be true and correct at the time furnished) will be required within five (5) Business Days prior to a Transfer, not in the ordinary course of business, of any Eligible Inventory or Eligible Credit Card Receivables (or any combination thereof) with an aggregate value in excess of $5,000,000 since the last Borrowing Base Certificate and Term Borrowing Base Certificate were delivered; provided that the Borrower may, from time to time, elect to deliver Borrowing Base Certificates and Term Borrowing Base Certificates more frequently than as required pursuant to this <u>Section 5.03(m)</u> in its sole discretion (it being understood and agreed that if the Borrower makes such election, the Borrower shall continue to furnish Borrowing Base Certificates and Term Borrowing Base Certificates of such more frequent basis for at least thirty (30) consecutive days).

(ii)    On a weekly basis not later than three (3) Business Days after each Saturday, a certificate of a financial officer of the Borrower providing the cash balances of the Loan Parties and the Excess Availability as of the date of delivery of such certificate, in form and substance reasonably satisfactory to the Administrative Agent (and with such supporting documentation as the Administrative Agent may reasonably request) and certified as true and correct by such financial officer.

(iii)    The Borrowing Base Certificates and Term Borrowing Base Certificates referred to in clause (i) above shall be delivered with the supporting documentation set forth on Schedule 5.03(m), to the Prepetition Credit Agreement to the extent required to be delivered at such time.

(iv)    The Borrower shall deliver reports as to Eligible Inventory by Loan Party and location on a weekly basis, completed as of each Saturday and delivered three (3) Business Days thereafter based on information available to it and other estimates reasonably believed to be true and correct.

(v)    The Borrower shall deliver to the Administrative Agent, together with delivery of the Borrowing Base Certificate, (i) accounts receivables agings and accounts payable agings (including summary of both prepetition and post-petition accounts payable), (ii) an accounts payable report, in form and substance reasonably satisfactory to the Administrative Agent, and (iii) such other reports as requested by the Administrative Agent.

Documents required to be delivered (i) pursuant to Section 5.03(a) through 5.03(m) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are sent via e-mail to the Administrative Agent for posting on the Borrower's behalf on Syndtrak, IntraLinks/IntraAgency or another relevant website, if any, established on its behalf by the Administrative Agent and to which each Lender and the Administrative Agent have access or on which Borrower has posted such documents on its own website to which each Lender and the Administrative Agent have access and notified the Administrative Agent of such posting and (ii) pursuant to Section 5.03(b) and (c) may be delivered by filing such documents with public availability on the SEC's Electronic Data Gathering and Retrieval System and providing the Administrative Agent and the Lenders with a notice of such filing.  Notwithstanding anything contained herein, at the reasonable written request of the Administrative Agent, the Borrower shall thereafter promptly be required to provide paper copies of any documents required to be delivered pursuant to Section 5.03, or with respect to items delivered pursuant to clause (ii) of the immediately preceding sentence, by electronic mail electronic versions (i.e., soft copies, or links to access such documents) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  If the delivery of any of the foregoing documents required under this Section 5.03 shall fall on a day that is not a Business Day, such deliverable shall be due on the next succeeding Business Day.

The Loan Parties and the Administrative Agent hereby agree that the delivery of any Borrowing Base Certificate or any Term Borrowing Base Certificate through the Administrative Agent's electronic platform or portal, subject to the Administrative Agent's authentication process, by such other electronic method as may be approved by the Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the Borrowing Base or the Term Borrowing Base as may be approved by the Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of the Borrower to deliver such Borrowing Base Certificate or Term Borrowing Base Certificate, with the same legal effect as if such Borrowing Base Certificate or such Term Borrowing Base Certificate had been manually executed by the Borrower and delivered to the Administrative Agent.

(n)    Term Loan Events.

119

(i)     Promptly following receipt by any Loan Party, copies of each amendment, supplement, modification, waiver, consent or forbearance in respect of the Junior DIP Documents, and of any material notices received from any lender or agent of, under or with respect to the Junior DIP Obligations (including, without limitation, any Junior DIP Agent), to the extent not otherwise provided to the Administrative Agent under the Loan Documents.

(ii)    As and when due pursuant to the Junior DIP Credit Agreement, Junior DIP Borrowing Base Certificates, to the extent not otherwise provided to the Administrative Agent under the Loan Documents.

(iii)   Contemporaneously with the earlier to occur of the Loan Parties' obtaining knowledge thereof or the receipt by the Loan Parties of notice thereof from any Junior DIP Agent, the occurrence of any "Event of Default" under (and as defined in) the Junior DIP Documents.

(iv)    Promptly after the Administrative Agent's request therefor, a calculation of the outstanding principal balance of the Junior DIP Obligations.

(o)     Chapter 11 Notices.  Promptly notify the Administrative Agent in writing, (a) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in the Chapter 11 Cases, if any, or to the U.S. Trustee, as the case may be, (i) the Final Order and (ii) all other material proposed orders and pleadings that are (A) adverse to the interests of the Agents or the Lenders or (B) inconsistent with the Approved Budget or terms of the Loan Documents, in each case, relating to any of (w) the Chapter 11 Cases, (x) the Prepetition Credit Agreement and this Agreement and the credit facilities contemplated thereby and hereby, (y) the Junior DIP Facility, or (z) any sale contemplated in accordance with the Milestones, any Plan of Reorganization or any disclosure statement related thereto, (b) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, and (c) each report, notice or certificate required to be delivered to any of the lenders or agents under the Junior DIP Documents.

SECTION 5.04. Holding Company Status.

(a)     Parent shall not engage in any business or activity other than (i) the ownership of all outstanding Equity Interests in the Borrower and Express Finance Corp., (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as parent of the consolidated group of companies including the Loan Parties, (iv) the performance of obligations under the Loan Documents to which it is a party, (v) making or receiving any Restricted Payment permitted under Section 5.02(g) and (e) activities incidental to the businesses or activities described in the foregoing clauses (i) through (v).

(b)     Intermediate Holdings shall not engage in any business or activity other than (i) the ownership of all outstanding Equity Interests in the Parent, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as parent of the consolidated group of companies including the Loan Parties, (iv) the performance of obligations under the Loan Documents to which it is a party, (v) making or receiving any Restricted Payment permitted under Section 5.02(g) and (e) activities incidental to the businesses or activities described in the foregoing clauses (i) through (v).

(c)        Holdings shall not engage in any business or activity other than (i) the ownership of all outstanding Equity Interests in Intermediate Holdings, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as parent of the consolidated group of companies including the Loan Parties, (iv) the performance of obligations under the Loan Documents to which it is a party, (v) making or receiving any Restricted Payment permitted under Section 5.02(g) and (e) activities incidental to the businesses or activities described in the foregoing clauses (i) through (v).

SECTION 5.05.Financial Covenant.

(a)        The Borrower shall maintain, at all times, Excess Availability of at least $25,000,000.

# ARTICLE VI -

## EVENTS OF DEFAULT

SECTION 6.01.Events of Default.  If any of the following events ("**Events of Default**") shall occur and be continuing:

(a)        (i) the Borrower shall fail to pay any principal of any Advance when the same shall become due and payable, (ii) the Borrower shall fail to pay any interest on any Advance or any fee within three (3) Business Days after the same shall become due and payable, or (iii) any Loan Party shall fail to make any other payment under any Loan Document within five (5) Business Days after the same shall become due and payable; or

(b)        any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect (or, in the case of any representation or warranty qualified by materiality in the text thereof, in any respect) when made, except to the extent such representations and warranties relate to an earlier date in which case such representations and warranties shall prove to have been incorrect in any material respect (or, in the case of any representation or warranty qualified by materiality in the text thereof, in any respect) as of such earlier date; or

(c)        any Loan Party shall fail to perform or observe any term, covenant or agreement contained in any of (i) Sections 2.06(b), 5.01(n), 5.01(r), 5.01(s), 5.01(t), 5.01(u), 5.01(v), 5.02, 5.03(a), 5.03(j)(iii), 5.03(m), 5.03(n)(iii), 5.03(o) or 5.05, or (ii) Sections 2.14, 5.01(a)(ii), 5.01(c)(ii), 5.01(d), 5.01(e) (as to preservation of existence only), 5.01(f), 5.01(h)(iii), 5.01(i), 5.03(q), 5.03(c), 5.03(e), 5.03(f), 5.03(g), 5.03(h), 5.03(j) (other than Section 5.03(j)(iii), which is governed by clause (i) above), 5.03(n) (other than Section 5.03(n)(iii), which is governed by clause (i) above), or 5.04 (solely with respect to this clause (ii), with a five (5) Business Day grace period from the earlier of the date on which (x) any Responsible Officer of a Loan Party becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party); or

(d)        any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied or shall not be waived for a period of 15 days after the earlier of the date on which (i) any Responsible Officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender Party; or

(e)        Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or any Subsidiary not to comply, (i) any Loan Party or any of

121

its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of (x) the Junior DIP Obligations, or (y) any other Debt of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount (or, in the case of any Hedge Agreement, an Agreement Value) of at least $25,000,000 either individually or in the aggregate for all such Loan Parties and Subsidiaries (but excluding Debt outstanding hereunder) (the Debt described in the foregoing clauses (x) and (y), collectively, "***Material Debt***"), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after all applicable grace and notice periods have expired, if any, specified in the agreement or instrument relating to such Material Debt; or (ii) any other event shall occur or condition shall exist under any Junior DIP Document or any agreement or instrument relating to any other Material Debt and shall continue after all applicable grace and notice periods have expired, if any, specified in such Junior DIP Document or other agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Material Debt or otherwise to cause, or to permit the holder thereof to cause, such Material Debt to mature; or (iii) any such Material Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption or mandatory prepayments), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Material Debt shall be required to be made, in each case prior to the stated maturity thereof; provided that this clause (e)(iii) shall not apply to secured Material Debt (other than the Junior DIP Obligations) that becomes due as a result of the voluntary Transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Material Debt, if such Transfer is not prohibited hereunder and under the documents providing for such Material Debt; or

(f)        any Loan Party shall fail to comply in any material respect with the terms of the Specified Liquidation Agreement or Store Closing Orders for the Specified Store Closing Sales; or

(g)        any judgments or orders, either individually or in the aggregate, for the payment of money in excess of $25,000,000 (to the extent not reasonably expected to be adequately covered by (i) insurance in respect of which a solvent and unaffiliated insurance company has acknowledged coverage or (ii) a third party indemnification agreement under which the indemnifying party has accepted responsibility and would reasonably be expected to remain solvent after satisfying such indemnification obligations) shall be rendered against any Loan Party or any of its Subsidiaries and either (A) enforcement proceedings shall have been commenced by any creditor upon such judgment or order (and such proceedings shall not have been stayed) or (B) there shall be any period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(h)        any material provision of any Loan Document after delivery thereof shall for any reason cease to be valid and binding on or enforceable against any Loan Party party to it, or any such Loan Party shall so state in writing; or

(i)        any Collateral Document or financing statement after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in a material portion of the Collateral purported to be covered thereby with the priority set forth in the Orders, except to the extent that any such loss of perfection or priority results from the acts or omissions of the Administrative Agent or the Collateral Agent; or

(j)        a Change of Control shall occur; or

(k)        any ERISA Event shall have occurred with respect to a Plan that, when taken and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then

exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) exceeds $25,000,000; or

(l)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds $25,000,000 or requires payments exceeding $3,000,000 per annum; or

(m)    any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding $25,000,000; or

(n)    (i) there shall occur (x) a breach of, or default or event of default under any JV IP Transaction Document or Bonobos IP Transaction Document, with a five (5) Business Day grace period from the earlier of the date on which (1) any Responsible Officer of a Loan Party becomes aware of such breach, default or event of default, or (2) written notice thereof shall have been given to any Loan Party by any counterparty to the applicable JV IP Transaction Document or Bonobos IP Transaction Document, except for breaches, defaults or events of default occasioned by the filing of the Chapter 11 Cases or arising from the Loan Parties' compliance with the Orders and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or any Subsidiary not to comply, or (y) a loss or material impairment of continuing efficacy or utility in respect of any Material Intellectual Property; (ii) any JV IP License Agreement, any Bonobos IP License Agreement, the IP Rights Agreement or the Bonobos IP Rights Agreement shall cease, for any reason, to be in full force and effect; or (iii) Holdings or any other Loan Party under any JV IP License Agreement or Bonobos IP License Agreement shall cease at any time to have rights as a licensee or sublicensee, as applicable, of any Material Intellectual Property under such JV IP License Agreement or Bonobos IP License Agreement (each as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); or

(o)    the subordination provisions of the documents evidencing or governing any Subordinated Debt (the "***Subordination Provisions***") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Debt; (ii) the Borrower or any other Loan Party shall, directly or indirectly, (A) make any payment on account of any Subordinated Debt that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent that such payment is permitted by the terms of the Subordination Provisions applicable to such Subordinated Debt or (B) disavow or contest in any manner (x) the effectiveness, validity or enforceability of any of the Subordination Provisions or the Intercreditor Provisions (as defined below), (y) that the Subordination Provisions and the Intercreditor Provisions exist for the benefit of the Secured Parties, or (z) that all payments of principal of or premium and interest on the applicable Subordinated Debt, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions or the Intercreditor Provisions, as applicable; or (iii) any Intercreditor Agreement or any provision thereof (the "***Intercreditor Provisions***") shall, in whole or in part, terminate or otherwise fail or cease to be effective or legally valid and binding on, or enforceable against, any Loan Party, any Term Agent or any holder of the Term Obligations (or any Loan Party, any Term Agent, MGF (in the case of the MGF Intercreditor Agreement only) or any such holder shall so state in

writing); or (iv) any provision of any Intercreditor Agreement shall, at any time after the delivery of such Intercreditor Agreement, fail to be legally valid, binding or enforceable; or

(p)    Any Loan Party shall fail to comply in any material respect with the terms of the Specified Liquidation Agreement or Store Closing Orders for the Specified Store Closing Sales. Any Loan Party shall fail to comply in any material respect with the terms of the GC Purchase Agreement or Liquidation Agreement as applicable and any Bankruptcy Court order within respect thereto; or

(q)    <u>Bankruptcy Events of Default.</u> The occurrence of any of the following in the Chapter 11 Cases:

(i)    The bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (a) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or that is not consented to by the Administrative Agent; (b) to grant any Lien other than Permitted Liens upon or affecting any Collateral; or (c) except as provided in this Agreement, the Interim Order or Final Order, as the case may be, to use Cash Collateral of the Agent and the Lenders or the Prepetition Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent;

(ii)    (a) the filing of any Plan of Reorganization or disclosure statement attendant thereto, or any amendment to such plan or disclosure statement, that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Prepetition Obligations, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (b) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (c) the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(iii)    the entry of an order in any of the Chapter 11 Cases confirming a Plan of Reorganization other than a Plan of Reorganization that indefeasibly repays in full in cash the Obligations under this Agreement, the Junior DIP Obligations and the Prepetition Obligations;

(iv)    (a) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order without the written consent of the Administrative Agent or the filing of a motion for reconsideration with respect to the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order, or the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order shall otherwise not be in full force and effect or (b) any Loan Party or any Subsidiary shall fail to comply with the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order any material respect;

(v)    the payment of, or application for authority to pay, any prepetition claim without the Administrative Agent's prior written consent unless consistent with the Approved Budget or in accordance with any "first day" orders entered by the Bankruptcy Court on the Petition Date;

(vi)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral or against any Prepetition Agent, any Prepetition Lender or any Prepetition Collateral;

(vii)    (a) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (b) the sale without the Administrative Agent's consent of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization in the Chapter 11 Cases or otherwise that does not result in the indefeasible repayment in full in cash of all of the Obligations under this Agreement, the Junior DIP Obligations and all Prepetition Obligations at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable;

(viii)    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code;

(ix)    any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (a) to allow any creditor (other than the Agents, Prepetition Agents or Junior DIP Agents) to execute upon or enforce a Lien on any Collateral, (b) approving any settlement or other stipulation not approved by the Administrative Agent with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (c) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $250,000 or more or (d) to permit other actions that would have a Material Adverse Effect;

(x)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against any Agent or any Lender, any Junior DIP Agent or any Junior DIP Lender or any Prepetition Secured Party and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on such Agent or such Lender, such Junior DIP Agent, such Junior DIP Lender or any Prepetition Secured Party, that asserts or seeks by or on behalf of a Loan Party, any state of federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (a) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of (i) any Agent or any Lender under the Loan Documents, (ii) the Junior DIP Agents or Junior DIP Lenders under the Junior DIP Documents or (iii) the Prepetition Secured Parties under the Prepetition Loan Documents, in each case, to any other claim, or (b) have a material adverse effect on the rights and remedies of any Agent or any Lender, any Junior DIP Agent, Junior DIP Lenders or the Prepetition Secured Parties or the collectability of all or any portion of the Obligations, Junior DIP Obligations or Prepetition Obligations;

(xi)    the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or

125

the other Loan Documents, the Junior DIP Obligations owing under the Junior DIP Documents or the Prepetition Obligations owing under the Prepetition Loan Documents;

(xii)    the existence of, or the Borrower's consent to, any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents or as otherwise permitted under the applicable Loan Documents or permitted under the Order and the terms thereof (including the Carve Out), entitled to superpriority administrative or other expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code or otherwise pari passu with or senior to the claims of the Administrative Agent and the Lenders under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (a) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code, or otherwise, or (b) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Order and the terms thereof then in effect (but only in the event specifically consented to by the Agent), whichever is in effect;

(xiii)    the Order and the terms thereof shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent;

(xiv)    an order in the Chapter 11 Cases shall be entered (a) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Lenders or (b) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Agents on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to the Administrative Agent and the Lenders or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

(xv)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the Agent or the Prepetition Lenders with respect to the Pre-Petition Obligations, or without the consent of the Agent, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent or lender that is inconsistent with the Order;

(xvi)    unless otherwise approved by the Agent in writing, any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Debt or payables other than payments permitted under this Agreement, the Orders, or one or more "first day" or "second day" orders (or other orders with the consent of the Administrative Agent), in each case on a basis consistent with the Approved Budget;

(xvii)    any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral, whether senior, equal or subordinate to the Administrative Agent's liens and security interests, except as permitted by the Orders or this Agreement; or (b) to modify or affect any of the rights of the Administrative Agent

or the Lenders under the Orders, the Loan Documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xviii) an order of the Bankruptcy Court or any other court of competent jurisdiction shall be entered or granted that materially adversely impacts the rights and interests of Administrative Agent or the Lenders, without the prior written consent of Administrative Agent and the Lenders; or

(xix) any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 6.01(p) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal.

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, in all cases subject to the Orders and the Intercreditor Agreement, the Administrative Agent, upon the written request of the Required Lenders, shall deliver written notice to the Borrower, that, pursuant to the Orders, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to exercise, subject to any Remedies Notice Period (as defined in the Orders), all rights and remedies provided for in the Loan Documents or the Orders, and in addition to any other right or remedy provided under any Loan Document or by any applicable law, including the following, in each case, without further order of or application to the Bankruptcy Court (as applicable): (a) declare the Commitments of each Lender Party and the obligation of each Lender Party to make Advances terminated (other than Letter of Credit Advances by the Issuing Bank or a Revolving Credit Lender pursuant to <u>Section 2.03(d)</u> and Swing Line Advances by a Revolving Credit Lender pursuant to <u>Section 2.02(b)</u>) and of the Issuing Bank to issue Letters of Credit to be terminated, whereupon the same shall forthwith terminate, (b) declare the Advances, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Advances, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower, (c) subject to the terms of the Intercreditor Agreements, enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Collateral Documents in accordance with the terms thereof; (d) enforce each Guaranty, (e) terminate this Agreement and the Loan Documents as to any future liability or obligation of the Loan Parties, but without affecting any of the Collateral Agent's Liens in the Collateral and without affecting the Obligations; (f) immediately terminate the Loan Parties' limited use of any cash collateral; (g) freeze monies or balances in the Loan Parties' Deposit Accounts and Securities Accounts, (h) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Agents or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the Agents or the applicable Lenders, including, without limitation, disposition of the Collateral solely for application towards the Obligations; (i) obtain an order from the Bankruptcy Court approving bid procedures for a sale of substantially all of the Loan Parties' assets pursuant to section 363 of the Bankruptcy Code; (j) in connection with an Event of Default that is continuing in respect of a breach of <u>Section 5.02(o)</u> at the written direction of the Required Lenders, immediately commence the sale of all or substantially all of the Collateral pursuant to section 363 of the Bankruptcy Code and the Loan Parties and their advisors will cooperate therewith, including by delivering an Updated Budget that contemplates the liquidation of all of the Loan Parties' assets in form and substance satisfactory to the Required Lenders, (k) declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the Orders) and (l) take any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable law or equity.

SECTION 6.02. Actions in Respect of the Letters of Credit upon Default.  If any Event of Default shall have occurred and be continuing, the Administrative Agent may, or shall at the request of the Required Lenders, irrespective of whether it is taking any of the actions described in Section 6.01 or otherwise, make demand upon the Borrower to, and forthwith upon such demand the Borrower will, pay to the Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Collateral Account, an amount equal to the aggregate Available Amount of all Letters of Credit then outstanding; *provided*, *however*, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code or any other Bankruptcy Law, the Borrower shall be obligated to pay to the Collateral Agent on behalf of the Lender Parties in same day funds at the Collateral Agent's Office, for deposit in the Collateral Account, an amount equal to the aggregate Available Amount of all Letters of Credit then outstanding, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.  If at any time during the occurrence and continuance of an Event of Default the Administrative Agent or the Collateral Agent determines that any funds held in the Collateral Account are subject to any right or claim of any Person other than the Agents and the Lender Parties or that the total amount of such funds is less than the aggregate Available Amount of all Letters of Credit, the Borrower will, forthwith upon demand by the Administrative Agent or the Collateral Agent, pay to the Collateral Agent, as additional funds to be deposited and held in the Collateral Account, an amount equal to the excess of (a) such aggregate Available Amount over (b) the total amount of funds, if any, then held in the Collateral Account that the Administrative Agent or the Collateral Agent, as the case may be, determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit in the Collateral Account, such funds shall be applied to reimburse the Issuing Bank or Revolving Credit Lenders, as applicable, to the extent permitted by applicable law.

# ARTICLE VII -

## THE AGENTS

SECTION 7.01. Authorization and Action.

(a)     Each Lender Party (in its capacities as a Lender, the Swing Line Bank (if applicable), the Issuing Bank (if applicable) and on behalf of itself and its Affiliates as potential Hedge Banks) hereby appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties under the Loan Documents), no Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lender Parties, all Hedge Banks and all holders of Notes; *provided*, *however*, that no Agent shall be required to take any action that exposes such Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)     In furtherance of the foregoing, each Lender Party (in its capacities as a Lender, the Swing Line Bank (if applicable), the Issuing Bank (if applicable) and on behalf of itself and its Affiliates as potential Hedge Banks) hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender Party for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent (and any Supplemental

Collateral Agents appointed by the Collateral Agent pursuant to Section 7.01(c) for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights or remedies thereunder at the direction of the Collateral Agent) shall be entitled to the benefits of this Article VII (including, without limitation, Section 7.05) as though the Collateral Agent (and any such Supplemental Collateral Agents) were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)    Any Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder at the direction of the Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Collateral Agent may also from time to time, when the Collateral Agent deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "***Supplemental Collateral Agent***") with respect to all or any part of the Collateral; *provided*, *however*, that no such Supplemental Collateral Agent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Collateral Agent. Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Collateral Agent to more fully or certainly vest in and confirm to such Supplemental Collateral Agent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon the reasonable request by the Collateral Agent. If any Supplemental Collateral Agent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall automatically vest in and be exercised by the Collateral Agent until the appointment of a new Supplemental Collateral Agent. No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Agent that it selects in accordance with the foregoing provisions of this Section 7.01(c) in the absence of such Agent's gross negligence or willful misconduct.

(d)    Notwithstanding anything contained in this Agreement to the contrary, each of the Documentation Agent and the Arrangers is named as such for recognition purposes only and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the Transaction. Without limitation of the foregoing, none of the Documentation Agent or the Arrangers shall, solely by reason of this Agreement or any other Loan Document, have any fiduciary relationship in respect of any Lender or any other Person.

SECTION 7.02. Agents' Reliance, Etc.

(a)    Neither any Agent nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, each Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender Party and shall not be responsible to any Lender Party for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents or for the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party;

(d) shall not be responsible to any Lender Party for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

(b)     The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agents:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that none of the Agents shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(iii)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(c)     No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 6.02 and 9.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(d)     Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender Party, each Agent may presume that such condition is satisfactory to such Lender Party unless such Agent shall have received written notice to the contrary from such Lender Party prior to the making of such Loan or the issuance of such Letter of Credit.

(e)     No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Loan Parties or a Lender Party. Upon the occurrence of a Default, the Agents shall take such action with respect to such Default as shall be reasonably directed by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).  Unless and until the Agents shall have received such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default as they shall deem advisable in the best interest of the Secured Parties.  In no

event shall any Agent be required to comply with any such directions to the extent that such Agent believes that its compliance with such directions would be unlawful.

SECTION 7.03. WFB and Affiliates.  With respect to its Commitments, the Advances made by it and any Notes issued to it, WFB shall have the same rights and powers under the Loan Documents as any other Lender Party and may exercise the same as though it were not an Agent; and the term "Lender Party" or "Lender Parties" shall, unless otherwise expressly indicated, include WFB in its individual capacity. WFB and its affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if WFB were not an Agent and without any duty to account therefor to the Lender Parties.  WFB shall have no duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Agent.

SECTION 7.04. Lender Party Credit Decision.  Each Lender Party acknowledges that it has, independently and without reliance upon any Agent or any other Lender Party and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender Party also acknowledges that it will, independently and without reliance upon any Agent or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05. Indemnification.

(a)    Each Lender Party severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "***Indemnified Costs***"); *provided*, *however*, that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.  Without limitation of the foregoing, each Lender Party agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender Party or any other Person.

(b)    Each Lender Party severally agrees to indemnify the Issuing Bank (to the extent not promptly reimbursed by the Borrower) from and against such Lender Party's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Issuing Bank in any way relating to or arising out of the Loan Documents or any action taken or omitted by the Issuing Bank under the Loan Documents; *provided*, *however*, that no Lender Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Issuing Bank's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction.  Without limitation of the foregoing, each Lender Party agrees to reimburse the Issuing Bank promptly upon demand

for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that the Issuing Bank is not promptly reimbursed for such costs and expenses by the Borrower.

(c)    For purposes of this Section 7.05, each Lender Party's ratable share of any amount shall be determined, at any time, according to the sum of (i) the aggregate principal amount of the Advances outstanding at such time and owing to such Lender Party's, (ii) such Lender Party's Pro Rata Share of the aggregate Available Amount of all Letters of Credit outstanding at such time and (iii) such Lender Party's Unused Commitments at such time; *provided* that the aggregate principal amount of Swing Line Advances owing to the Swing Line Bank and of Letter of Credit Advances owing to the Issuing Bank shall be considered to be owed to the Revolving Credit Lenders ratably in accordance with their respective Commitments. The failure of any Lender Party to reimburse any Agent or the Issuing Bank, as the case may be, promptly upon demand for its ratable share of any amount required to be paid by the Lender Parties to such Agent or the Issuing Bank, as the case may be, as provided herein shall not relieve any other Lender Party of its obligation hereunder to reimburse such Agent or the Issuing Bank, as the case may be, for its ratable share of such amount, but no Lender Party shall be responsible for the failure of any other Lender Party to reimburse such Agent or the Issuing Bank, as the case may be, for such other Lender Party's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender Party hereunder, the agreement and obligations of each Lender Party contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 7.06. Successor Agents. Any Agent may resign at any time by giving written notice thereof to the Lender Parties and the Borrower, and any Agent (other than Wells Fargo in its capacity as an Agent) may be removed at any time with or without cause by the Required Lenders (without giving effect to the provision set forth in the definition of "Required Lenders" requiring that there be at least two Lenders that are not Affiliates); *provided*, *however*, that any removal of the Administrative Agent will not be effective until (x) it has also been replaced as Collateral Agent, Swing Line Bank and Issuing Bank and released from all of its obligations in respect thereof and (y) WFB's Commitment has been terminated, reduced or assigned to other Lenders after the Effective Date on terms satisfactory to it. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent. If no successor Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lender Parties, appoint a successor Agent, which shall be a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $250,000,000; *provided* that, if, such retiring Administrative Agent is unable to find a commercial banking institution which is willing to accept such appointment and which meets the qualifications set forth above, subject to this Section 7.06, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Required Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above. Upon the acceptance of any appointment as Agent hereunder by a successor Agent and, in the case of a successor Collateral Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Agent's resignation or removal under this Section 7.06 no successor Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Agent's resignation or removal shall become effective, (b) the retiring Agent shall thereupon be discharged from its duties and obligations under the

Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above.  After any retiring Agent's resignation or removal hereunder as Agent shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

SECTION 7.07. [Reserved].

SECTION 7.08. Collateral and Guaranty Matters.  The Secured Parties irrevocably authorize each Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by such Agent under any Loan Document (i) upon payment in full of the Obligations in accordance with Section 1.02(b), (ii) that is disposed of or sold or to be disposed of or sold as part of or in connection with any disposition or sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the applicable Lenders in accordance with Section 9.01;

(b)    to subordinate any Lien on any property granted to or held by such Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (w) of the definition of Permitted Liens; and

(c)    to release any Guarantor from its obligations under its Guaranty if such Person ceases to be a Subsidiary or otherwise becomes an Excluded Subsidiary, in either case as a result of a transaction or designation permitted hereunder; provided that (i) if such Person is, or continues to be, an obligor with respect to the Term Obligations (whether as a borrower or a guarantor thereunder), the Agents shall not release any such Person from its obligations under the Subsidiary Guaranty unless and until such Person is no longer an obligor with respect to the Term Obligations, and (ii) a Guarantor that becomes an Excluded Subsidiary of the type described in clause (v) of such term will not be released from the Subsidiary Guaranty unless the transaction (or series of related transactions) giving rise to such release is being effected primarily for a bona fide business purpose independent of, and unrelated to, obtaining such release from the Subsidiary Guaranty, and not in contemplation of adversely affecting the Secured Parties' interests in the Subsidiary Guaranty provided by such Guarantor and the Collateral owned by it securing the Obligations.

Upon request by any Agent at any time, the Lenders will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Subsidiary Guaranty pursuant to this Section 7.08.  In each case as specified in this Section 7.08, the Agents will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Subsidiary Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 7.08.

Notwithstanding anything to the contrary, the Agents shall not be obligated to release their Liens on any Collateral until proceeds of such Collateral have been received as required by this Agreement.

SECTION 7.09. Notice of Transfer.

The Agent may deem and treat a Lender Party party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 9.07.

SECTION 7.10.<u>Reports and Financial Statements</u>**.**

By signing this Agreement, each Lender Party:

(a)    agrees to furnish the Administrative Agent (at such frequency as the Administrative Agent may reasonably request) with a summary of all Other Liabilities due or to become due to such Lender Party.  In connection with any distributions to be made hereunder, the Administrative Agent shall be entitled to assume that no amounts are due to any Lender Party on account of Other Liabilities unless the Administrative Agent has received written notice thereof from such Lender;

(b)    is deemed to have requested that the Administrative Agent furnish such Lender Party, promptly after they become available, copies of all Borrowing Base Certificates, Term Borrowing Base Certificates, financial statements and other certificates, reports, documents and notices delivered by the Borrower hereunder and all field examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the "<u>Reports</u>");

(c)    expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)    agrees to keep all Reports confidential in accordance with the provisions hereof; and

(f)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agents and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Advances that the indemnifying Lender Party has made or may make to the Borrower, or the indemnifying Lender Party's participation in, or the indemnifying Lender's purchase of, an Advance; and (ii) to pay and protect, and indemnify, defend, and hold the Agents and any such other Lender Party preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents and any such other Lender Party preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

SECTION 7.11.<u>Agency for Perfection.</u>

Each Lender Party hereby appoints each other Lender Party as agent for the purpose of perfecting Liens for the benefit of the Agents and the Lender Parties, in assets which, in accordance with Article 9 of the UCC or any other applicable law of the United States can be perfected only by possession.  Should any Lender Party (other than the Collateral Agent) obtain possession of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

SECTION 7.12. Providers.

Each provider of Bank Products or Cash Management Services (each, a "***Provider***") in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom any Agent is acting. The Agents hereby agree to act as agent for such Providers and, by virtue of entering into an agreement in respect of Bank Products or Cash Management Services (each, a "***Specified Agreement***"), the applicable Provider automatically shall be deemed to have appointed each Agent as its agent and to have accepted the benefits of the Loan Documents. It is understood and agreed that the rights and benefits of each Provider under the Loan Documents consist exclusively of such Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to the Collateral Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Provider, by virtue of entering into a Specified Agreement, automatically shall be deemed to have agreed that the Administrative Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release Bank Products Reserves and reserves in respect of Cash Management Services and that if reserves are established there is no obligation on the part of the Administrative Agent to determine or insure whether the amount of any such reserve is appropriate or not. The Administrative Agent shall have no obligation to calculate the amount due and payable with respect to any Other Liabilities, but may rely upon a written notice from the applicable Provider provided pursuant to Section 7.10(a). In the absence of an updated written notice, the Administrative Agent shall be entitled to assume that the amount due and payable to the applicable Provider is the amount last certified to the Administrative Agent by such Provider as being due and payable (less any distributions made to such Provider on account thereof). The Borrower may obtain Bank Products or Cash Management Services from any Provider, although the Borrower is not required to do so. The Borrower acknowledges and agrees that no Provider has committed to provide any Bank Products or Cash Management Services and that any provision of any Bank Products or Cash Management Services by any Provider is in the sole and absolute discretion of such Provider.

# ARTICLE VIII -

## GUARANTY

SECTION 8.01. Guaranty; Limitation of Liability. (a) Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment and performance when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents, any Secured Hedge Agreement, any Secured Bank Product Agreement, or any Secured Cash Management Agreement (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "***Guaranteed Obligations***"; provided that the Guaranteed Obligations shall not include any Excluded Swap Obligations), and agrees to pay any and all expenses (including, without limitation, fees and expenses of counsel) incurred by either Agent, any other Lender Party, any Hedge Bank, any provider of Bank Products, or any Cash Management Bank in enforcing any rights under, as applicable, this Guaranty, any other Loan Document, any Secured Hedge Agreement, Secured Bank Product Agreement, or any Secured Cash Management Agreement. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Lender Party or any Hedge Bank or any Cash Management Bank under or in respect of, as applicable, the Loan Documents or any Secured Hedge Agreement, Secured Bank Product Agreement, or any Secured Cash Management Agreement but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party under any Debtor Relief Law. Each

Guarantor hereby acknowledges and agrees that this Guaranty constitutes a guaranty of payment and performance when due of all Guaranteed Obligations and not of collection and, to the fullest extent permitted by applicable law, waives any right to require that any resort be had by any Lender Party or any Hedge Bank or any Cash Management Bank to any of the Collateral or other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of any Lender Party or any Hedge Bank or any Cash Management Bank in favor of any Loan Party or any other Person or to any other guarantor of all or part of the Guaranteed Obligations.

(b)    Each Guarantor, and by its acceptance of this Guaranty, the Administrative Agent and each other Lender Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of any Debtor Relief Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Lender Parties and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.  Without limiting the foregoing, in any action or proceeding with respect to any Guarantor involving any Debtor Relief Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor under this Guaranty, if the obligations of such Guarantor under Section 8.01 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 8.01, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, the Administrative Agent, the other Lender Parties or any other Person, be automatically limited and reduced to the highest amount which is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

(c)    Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender Party under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender Parties or Hedge Banks or any Cash Management Bank under or in respect of, as applicable, the Loan Documents or any Secured Hedge Agreement, Secured Bank Product Agreement, or any Secured Cash Management Agreement.

SECTION 8.02. Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents or any Secured Hedge Agreement, Secured Bank Product Agreement, or any Secured Cash Management Agreement, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of, as applicable, any Lender Party or any Hedge Bank with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents or any Secured Hedge Agreement or any Secured Bank Product Agreement or any Secured Cash Management Agreement, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)      any lack of validity or enforceability of any Loan Document or any Secured Hedge Agreement or any Secured Bank Product Agreement or any Secured Cash Management Agreement or any agreement or instrument relating thereto;

(b)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents or any Secured Hedge Agreement or any Secured Bank Product Agreement or any Secured Cash Management Agreement in accordance with their respective terms, or any other amendment or waiver of or any consent to departure from any Loan Document or any Secured Hedge Agreement or any Secured Bank Product Agreement or any Secured Cash Management Agreement in accordance with their respective terms, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)      any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty in accordance with its terms, for all or any of the Guaranteed Obligations;

(d)      any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or under any Secured Hedge Agreement or under any Secured Bank Product Agreement or under any Secured Cash Management Agreement or any other assets of any Loan Party or any of its Subsidiaries;

(e)      any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)      any failure of any Lender Party to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Lender Party (each Guarantor waiving any duty on the part of the Lender Parties to disclose such information);

(g)      the failure of any other Person to execute or deliver this Agreement, any Guaranty Supplement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)      any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender Party that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety, except payment in full of the Obligations in accordance with <u>Section 1.02(b)</u>.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Lender Party or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

SECTION 8.03. <u>Waivers and Acknowledgments.</u>

(a)      Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default, acceleration, protest or dishonor and, except for those notices specified under this Agreement, any other

notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Lender Party protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)     Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender Party that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)     Each Guarantor acknowledges that the Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Collateral Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)     Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Lender Party to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Lender Party.

(f)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents or any Secured Hedge Agreement and that the waivers set forth in Section 8.02 and this Section 8.03 are knowingly made in contemplation of such benefits.

SECTION 8.04. Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document or any Secured Hedge Agreement or any Secured Bank Product Agreement or any Secured Cash Management Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender Party against the Borrower, any other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in accordance with Section 1.02(b).  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) the payment in full of the Guaranteed Obligations and all other amounts payable under this Guaranty in accordance with Section 1.02(b), and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Lender Parties, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed

Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents or any Secured Hedge Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If (i) any Guarantor shall make payment to any Lender Party of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in accordance with Section 1.02(b), and (iii) the Maturity Date shall have occurred, the Lender Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

SECTION 8.05. Guaranty Supplements.  Upon the execution and delivery by any Person of a guaranty supplement in substantially the form of Exhibit D hereto (each, a "**_Guaranty Supplement_**"), (a) such Person shall be referred to as an "**_Additional Guarantor_**" and shall become and be a Guarantor hereunder, and each reference in this Guaranty to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document or any Secured Hedge Agreement to a "Subsidiary Guarantor" shall also mean and be a reference to such Additional Guarantor, and (b) each reference herein to "this Guaranty," "hereunder," "hereof" or words of like import referring to this Guaranty, and each reference in any other Loan Document or any Secured Hedge Agreement or any Secured Bank Product Agreement or Secured Cash Management Agreement to the "Guaranty," "thereunder," "thereof" or words of like import referring to this Guaranty, shall mean and be a reference to this Guaranty as supplemented by such Guaranty Supplement.

SECTION 8.06. Subordination.  Each Guarantor hereby subordinates any and all debts, liabilities and other Obligations owed to such Guarantor by each other Loan Party (the "**_Subordinated Obligations_**") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this Section 8.06:

(a)     Prohibited Payments, Etc.  Except during the continuance of an Event of Default, each Guarantor may receive payments from any other Loan Party on account of the Subordinated Obligations. After the occurrence and during the continuance of any Event of Default, however, unless the Required Lenders otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations.

(b)     Prior Payment of Guaranteed Obligations.  In any proceeding under any Debtor Relief Law relating to any other Loan Party, each Guarantor agrees that the Lender Parties shall be entitled to receive payment in full in cash of all Guaranteed Obligations (including all interest and expenses accruing after the commencement of a proceeding under any Debtor Relief Law, whether or not constituting an allowed claim in such proceeding ("**_Post-Petition Interest_**")) before such Guarantor receives payment of any Subordinated Obligations.

(c)     Turn-Over.  After the occurrence and during the continuance of any Event of Default, each Guarantor shall, if the Administrative Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Lender Parties and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

(d)     Administrative Agent Authorization.  After the occurrence and during the continuance of any Event of Default, the Administrative Agent is authorized and empowered (but without any obligation to so do), in its discretion, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and to apply any amounts received thereon to the Guaranteed

Obligations (including any and all Post-Petition Interest), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Guaranteed Obligations (including any and all Post-Petition Interest).

SECTION 8.07. <u>Continuing Guaranty; Assignments</u>.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the later of (i) the payment in full of the Guaranteed Obligations in accordance with <u>Section 1.02(b)</u>, and (ii) the Maturity Date; <u>provided</u> that this Guaranty shall be reinstated if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored by any Lender Party or any Guarantor upon the bankruptcy or reorganization of any Loan Party or otherwise, (b) binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lender Parties and their successors, transferees and assigns that are permitted under <u>Section 9.07</u>.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender Parties.

# ARTICLE IX -

## MISCELLANEOUS

SECTION 9.01. <u>Amendments, Etc.</u>

(a)    No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders (or by an Agent with the written approval of the Required Lenders) (except as provided in <u>Section 5.01(k)(i)</u>, which may be performed by the Administrative Agent), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that (a) no amendment, waiver or consent shall, unless in writing and signed by all of the Lender Parties (other than any Lender Party that is, at such time, a Defaulting Lender), do any of the following at any time:

(i)    on or prior to the Effective Date, waive any of the conditions specified in <u>Section 3.01</u> or <u>Section 3.02</u>,

(ii)    amend the definition of "Required Lenders", "Supermajority Lenders", or "Pro Rata Share" or any other provision hereof that would change the percentage of (x) the Commitments, (y) the aggregate unpaid principal amount of the Advances or (z) the aggregate Available Amount of outstanding Letters of Credit that, in each case, shall be required for the Lenders or any of them to take any action hereunder,

(iii)    except to the extent that it would constitute a Transfer permitted under <u>Section 5.02(e)</u>, release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lender Parties under the Guaranties) if such release or limitation is in respect of all or substantially all of the value of the Guaranties to the Lender Parties, except as a transfer or dissolution would be permitted under <u>Section 5.02(d)</u>,

(iv)    (A) release all or substantially all of the Collateral in any transaction or series of related transactions, (B) except as expressly permitted herein or in any other Loan Document, contractually subordinate any of the Collateral Agent's Liens, or (C) except as expressly permitted herein or in any other Loan Document, contractually subordinate in right of payment the Obligations to any other Debt,

(v)      amend this Section 9.01, or

(vi)      amend or modify Sections 2.11(f), 2.11(g) or 2.13,

(b)      no amendment, waiver or consent shall, unless in writing and signed by the Supermajority Lenders:

(i)      change the definition of "Excess Availability" or "Borrowing Base" or any component definition of any such terms if, as a result thereof, the amounts available to be borrowed by the Borrower would be increased, *provided* that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves pursuant hereto,

(ii)      increase either (A) the Credit Card Advance Rate or the Inventory Advance Rate, or (B) the percentage of the Borrowing Base permitted to be composed of Borrowing Base Eligible Cash Collateral, if, as a result thereof, the amount available to be borrowed by the Borrower would be increased,

(iii)      amend, modify or eliminate the definition of "Initial Budget" or "Approved Budget", and

(c)      no amendment, waiver or consent shall, unless in writing and signed by the Required Lenders and each Lender Party specified below for such amendment, waiver or consent:

(i)      increase the Commitments of a Lender Party without the consent of such Lender Party,

(ii)      reduce the principal of, or stated rate of interest (other than default rate) on, the Advances owed to a Lender Party or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender Party (other than in accordance with the terms hereof) without the consent of such Lender Party, or

(iii)      postpone any date scheduled for any payment of principal of, or interest on, the Advances pursuant to Section 2.07 or any date fixed for any payment of fees hereunder in each case payable to a Lender Party without the consent of such Lender Party;

*provided further* that (x) no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents, and (y) any amendment contemplated by Section 2.10(g) in connection with the use or administration of Term SOFR or a Benchmark Transition Event, as applicable, shall be effective as contemplated by such Section 2.10(g).

SECTION 9.02. Notices, Etc.

(a)      All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic communication) and mailed, telegraphed, telecopied or delivered or (y) as and to the extent set forth in Section 9.02(b) and in the proviso to this Section 9.02(a), in an electronic medium and delivered as set forth in Section 9.02(b), if to any Loan Party, to the Borrower at its address at One Express Drive, Columbus, OH 43230, Attention: Mark Still, Chief Financial Officer; E-mail Address: mstill@express.com; with a copy (which shall not constitute notice) to: Kirkland & Ellis LLP, 609 Main Street, Houston, TX 77002, Telecopy: (713) 836-3601, Attention: Rachael L. Lichman, P.C., E-mail Address: rachael.lichman@kirkland.com; if to any Lender Party, its Applicable Lending

Office; if to the Administrative Agent and to the Collateral Agent, to Wells Fargo Bank, National Association, at its address at 125 High Street, 11th Floor, Boston, Massachusetts 02110, Attention: Emily Abrahamson, Director, Telecopy: (866) 842-6360, E-mail Address: emily.abrahamson@wellsfargo.com, with a copy (which shall not constitute notice) to Goldberg Kohn Ltd., 55 E. Monroe Street, Suite 3300, Chicago, Illinois 60603, Attention: Randall L. Klein, Telecopy: (312) 863-7474, E-mail Address: Randall.klein@goldbergkohn.com; or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties; *provided*, *however*, that materials and information described in Section 9.02(b) shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent.  All such notices and other communications shall, when mailed, telegraphed, telecopied, or e-mailed, be effective upon receipt.

(b)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a Conversion of an existing, Borrowing (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower.  In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks, SyndTrak or a substantially similar electronic transmission system (the "***Platform***").

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender Party agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender Party for purposes of the Loan Documents.  Each Lender Party agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender Party's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender Party to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03. No Waiver; Remedies.  No failure on the part of any Lender Party or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04. Costs and Expenses.  (a)  Each Loan Party agrees to pay promptly after demand (i) all reasonable, documented and out-of-pocket costs and expenses of each Agent and the Lead Arranger in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver (regardless of whether such modification, amendment, consent or waiver is consummated) under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, (B) the Administrative Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (C) the Administrative Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of the Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (D) customary charges imposed or incurred by the Administrative Agent resulting from the dishonor of checks payable by or to any Loan Party, (E) the reasonable fees and expenses of one counsel (together with one local or foreign counsel in each relevant jurisdiction) representing both the Administrative Agent and the Lead Arranger with respect thereto, with respect to advising such Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents or the Prepetition Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Event of Default or any events or circumstances that may give rise to an Event of Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto, and (F) upon the occurrence of an Event of Default, the reasonable fees and expenses of one financial advisor to the Administrative Agent, Collateral Agent and Lenders, (ii) all reasonable, documented and out-of-pocket costs and expenses of the Administrative Agent, the Lead Arranger and each Lender Party in connection with the enforcement of the Loan Documents or the Prepetition Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of (x) one counsel (in addition to a single special counsel and up to one local counsel in each applicable local jurisdiction) for the Administrative Agent and each Lender Party with respect thereto, (y) one counsel for each Lender with respect thereto, and (z) one financial advisor for the Agent's with respect thereto, and (iii) the reasonable fees and expenses of one counsel for each Lender with respect to the transactions contemplated to occur on the Effective Date.

143

(b)      Each Loan Party agrees to indemnify, defend and save and hold harmless each Agent, the Lead Arranger, each Lender Party and each of their Affiliates and their respective officers, directors, employees, agents and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Facilities, the actual or proposed use of the proceeds of the Advances, the Loan Documents or any of the transactions contemplated thereby or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Restricted Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Restricted Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, bad faith or willful misconduct or that of its affiliates, directors, officers, employees, advisors or agents or any material violation by any such Indemnified Party of the Loan Documents; *provided* that the Loan Parties shall not be required to reimburse the legal fees and expenses of more than one outside counsel (in addition to a single special counsel and up to one local counsel in each applicable local jurisdiction) for all Indemnified Parties (which shall be selected by the Administrative Agent) unless, in the reasonable opinion of the Administrative Agent, representation of all such Indemnified Parties would be inappropriate due to existence of an actual or potential conflict of interest.  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto.  Each Loan Party also agrees not to assert any claim against the Administrative Agent, any Lender Party or any of their Affiliates, or any of their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facilities, the actual or proposed use of the proceeds of the Advances, the Loan Documents or any of the transactions contemplated by the Loan Documents.

(c)      If any payment of principal of, or Conversion of, any SOFR Advance is made by the Borrower or to or for the account of a Lender Party other than on the last day of the Interest Period for such Advance, as a result of a payment or Conversion pursuant to Section 2.06, 2.09(a)(i) or 2.10(d), acceleration of the maturity of the Advances pursuant to Section 6.01 or for any other reason, or if the Borrower fails to make any payment or prepayment of a SOFR Advance for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.04, 2.06 or 6.01 or otherwise, the Borrower shall, upon demand by such Lender Party (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender Party any amounts required to compensate such Lender Party for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or Conversion or such failure to pay or prepay, as the case may be, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender Party to fund or maintain such Advance.

(d)      If any Loan Party fails to pay when due any undisputed costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender Party, in its sole discretion.

(e)      Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Loan Parties contained in

Sections 2.10 and 2.12 and this Section 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 9.05. Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Advances due and payable pursuant to the provisions of Section 6.01, each Agent and each Lender Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) (other than trust and tax accounts) at any time held and other indebtedness at any time owing by such Agent, such Lender Party or such Affiliate to or for the credit or the account of any Loan Party against any and all of the Obligations of the Loan Parties now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender Party shall have made any demand under this Agreement and although such Obligations may be unmatured.  Each Agent and each Lender Party agrees promptly to notify the Borrower after any such set-off and application; *provided*, *however*, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Agent and each Lender Party and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender Party and their respective Affiliates may have.

SECTION 9.06. Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have been notified by each Initial Lender Party that such Initial Lender Party has executed it and thereafter shall be binding upon and inure to the benefit of the Loan Parties, each Agent and each Lender Party and their respective successors and assigns, except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender Party.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Secured Parties, regardless of any investigation made by any Secured Party or on their behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Default at the time of any Advance, and shall continue in full force and effect until payment in full of the Obligations in accordance with Section 1.02(b).  Further, the provisions of Sections 2.10, 2.12 and 9.04 and Article VII shall survive and remain in full force and effect regardless of the payment in full of the Obligations in accordance with Section 1.02(b).  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agents may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Secured Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under Section 9.04.

SECTION 9.07. Assignments and Participations.

(a)    Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment, the Advances owing to it and the Note or Notes held by it); *provided*, *however*, that (i) each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of the applicable Facility, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Assumption with respect to such assignment) shall in no event be less than $5,000,000, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment

shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Assumption, together with any Note or Notes (if any) and a processing and recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(b)    Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Assumption, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption, have the rights and obligations of a Lender or Issuing Bank, as the case may be, hereunder and (ii) the Lender or Issuing Bank assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights (other than its rights under Sections 2.10, 2.12 and 9.04 to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the remaining portion of an assigning Lender's or Issuing Bank's rights and obligations under this Agreement, such Lender or Issuing Bank shall cease to be a party hereto).

(c)    By executing and delivering an Assignment and Assumption, each Lender Party assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Assumption, such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender Party makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender Party or any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender or Issuing Bank, as the case may be.

(d)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Lender Parties and the Commitment under each Facility of, and principal amount of the Advances owing under each Facility to, each Lender Party from time to time (the "***Register***").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lender Parties shall treat each Person whose name is recorded in the Register as a Lender Party hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower or any Agent or any Lender Party at any reasonable time and from time to time upon reasonable prior notice. This Section 9.07(d) shall be construed so that the Facilities are at all times maintained in "registered form"

within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and Section 5f.103-1(c) of the United States Treasury Regulations.

(e)     Upon its receipt of an Assignment and Assumption executed by an assigning Lender Party and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Assumption has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent.  In the case of any assignment by a Lender, within five Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) a new Note to the order of such Eligible Assignee in an amount equal to the Commitment assumed by it under each Facility pursuant to such Assignment and Assumption and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder under such Facility, a new Note to the order of such assigning Lender in an amount equal to the Commitment retained by it hereunder.  Such new Note or Notes shall be dated the effective date of such Assignment and Assumption and shall otherwise be in substantially the form of Exhibit A hereto.  Notwithstanding anything contained herein to the contrary, Notes shall not be required in respect of the Letter of Credit Facility.

(f)     The Issuing Bank may assign to an Eligible Assignee all of its rights and obligations under the undrawn portion of its Letters of Credit (or the right to issue subsequent Letters of Credit) at any time; *provided*, *however*, that (i) each such assignment shall be to an Eligible Assignee and (ii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment.

(g)     Each Lender Party may sell participations to one or more Persons (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Advances owing to it and the Note or Notes (if any) held by it); *provided*, *however*, that (i) such Lender Party's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender Party shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender Party shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lender Parties shall continue to deal solely and directly with such Lender Party in connection with such Lender Party's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Advances or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Advances or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or release all or substantially all of the Collateral or the value of the Guaranties. Each Lender Party that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal and interest amounts of each participant's interest in the Loans or other obligations under this Agreement (a "***Participant Register***"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Sections 163(f), 871(h)(2) and 881(e)(2) of the Internal Revenue Code and Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(h)     Any Lender Party may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender Party by or on behalf of the Borrower; *provided*, *however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender Party.

(i)     Notwithstanding any other provision set forth in this Agreement, any Lender Party may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Advances owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(j)     Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Advances owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(k)     Notwithstanding anything to the contrary contained herein, any Lender Party (a "***Granting Lender***") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "***SPC***") the option to provide all or any part of any Advance that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Advance and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Advance, the Granting Lender shall be obligated to make such Advance pursuant to the terms hereof. The making of an Advance by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Advance were made by such Granting Lender. Each party hereto hereby agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender Party would be liable, (ii) no SPC shall be entitled to the benefits of Sections 2.10 or 2.12 (or any other increased costs protection provision) and (iii) the Granting Lender shall for all purposes, including, without limitation, the approval of any amendment or waiver of any provision of any Loan Document, remain the Lender Party of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior Debt of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained in this Agreement, any SPC may (i) with notice to, but without prior consent of, the Borrower and the Administrative Agent, assign all or any portion of its interest in any Advance to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Advances to any rating agency, commercial paper dealer or provider of any surety or guarantee or credit or liquidity enhancement to such SPC. This subsection (k) may not be amended without the prior written consent of each Granting Lender, all or any part of whose Advances are being funded by the SPC at the time of such amendment.

SECTION 9.08. Execution in Counterparts; Integration.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 3.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Execution of any such counterpart may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, as in effect from time to time, state enactments of the Uniform Electronic Transactions Act, as in effect from time to time, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  The Administrative Agent reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement or on any notice delivered to the Administrative Agent under this Agreement.  Any party delivering an executed counterpart of this Agreement by faxed, scanned or photocopied manual signature shall, upon the request of the Administrative Agent, also deliver an original manually executed counterpart, but the failure to deliver an original manually executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document, and any notice delivered hereunder or thereunder, *mutatis mutandis*.

SECTION 9.09. No Liability of the Issuing Bank.  The Borrower assumes all risks of the acts or omissions of any beneficiary or transferee of any Letter of Credit with respect to its use of such Letter of Credit.  Neither the Issuing Bank nor any of its officers or directors shall be liable or responsible for:  (a) the use that may be made of any Letter of Credit or any acts or omissions of any beneficiary or transferee in connection therewith; (b) the validity, sufficiency or genuineness of documents, or of any endorsement thereon, even if such documents should prove to be in any or all respects invalid, insufficient, fraudulent or forged; (c) payment by the Issuing Bank against presentation of documents that do not comply with the terms of a Letter of Credit, including failure of any documents to bear any reference or adequate reference to the Letter of Credit; or (d) any other circumstances whatsoever in making or failing to make payment under any Letter of Credit, except that the Borrower shall have a claim against the Issuing Bank, and the Issuing Bank shall be liable to the Borrower, to the extent of any direct, but not consequential, damages suffered by the Borrower that the Borrower proves were caused by (i) the Issuing Bank's willful misconduct or gross negligence as determined in a final, non-appealable judgment by a court of competent jurisdiction in determining whether documents presented under any Letter of Credit comply with the terms of the Letter of Credit or (ii) the Issuing Bank's willful failure to make lawful payment under a Letter of Credit after the presentation to it of a draft and certificates strictly complying with the terms and conditions of the Letter of Credit.  In furtherance and not in limitation of the foregoing, the Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary.

SECTION 9.10. Confidentiality.

(a)    Neither any Agent nor any Lender Party shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Agent's or such Lender Party's Affiliates and their officers, directors, employees, agents and advisors and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-

regulatory authority) regulating such Lender Party, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender Party or (e) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document; *provided* that, in the case of disclosure under clause (b), unless specifically prohibited by law or court order, each Agent and each Lender Party shall make reasonable efforts to notify the Borrower of any such requirement for disclosure prior to the disclosure of such Confidential Information; or (f) to any direct or indirect contractual counterparty or prospective counterparty (or such contractual counterparty's or prospective counterparty's professional advisor) to any credit derivative transaction relating to Obligations of the Borrower hereunder; *provided* that such counterparty (or such counterparty's professional advisor) shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it in connection with such credit derivative transaction.

(b)    Anything in this Agreement to the contrary notwithstanding, the Agents may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of the Borrower or the other Loan Parties and the Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Administrative Agent.   The Administrative Agent shall provide a draft reasonably in advance of any press release or advertising materials to the Borrower for review and comment prior to the publication thereof.

SECTION 9.11. Release of Collateral.  Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party in accordance with the terms of the Loan Documents, the Collateral Agent will, at the Borrower's expense, execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents and, in the case of any sale or dissolution of any Guarantor (to the extent permitted by the Loan Documents), a release of such Guarantor from the Guaranty; provided that all of such documents shall be in form and substance reasonably satisfactory to the Collateral Agent.

SECTION 9.12. Replacement of Holdout Lender.

(a)    (i)  If any action to be taken by the Lender Parties or any Agent hereunder requires the unanimous consent, authorization, or agreement of all Lender Parties and the consent of the Required Lenders is obtained but a Lender ("***Holdout Lender***") fails to give its consent, authorization, or agreement or (ii) if at any time any Lender becomes a Defaulting Lender or becomes insolvent or (iii) if at any time the Borrower becomes obligated to pay additional payments described in Section 2.10 and 2.12(a) to a Lender, in each case, then the Administrative Agent or the Borrower, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender, Defaulting Lender or other Lender, as the case may be, may permanently replace the Holdout Lender, Defaulting Lender or other Lender, as the case may be, with one or more substitute Lenders (each, a "***Replacement Lender***"), and the Holdout Lender, the Defaulting Lender or other Lender, as the case may be, shall have no right to refuse to be replaced hereunder.   Such notice to replace the Holdout Lender, the Defaulting Lender or other Lender, as the case may be, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Holdout Lender, the Defaulting Lender or other Lender, as the case may be, and each Replacement Lender shall execute and deliver an Assignment and Assumption, subject only to the Holdout Lender, the Defaulting Lender or other Lender, as the case

may be, being repaid its share of the outstanding Obligations under the Loan Documents (other than any Other Liabilities, but including (1) all accrued but unpaid interest, fees (except any amounts, including commitment fees or Letter of Credit Fees, not due to such Defaulting Lender in accordance with the terms of this Agreement, after subtracting all amounts such Lender owes to the Loan Parties), and other amounts that may be due and payable in respect thereof, and (2) an assumption of such Lender's participation, if such Lender is a Revolving Credit Lender, in all Letters of Credit outstanding hereunder in an amount equal to such Lender's Pro Rata Share of the Available Amount of such Letter of Credit) without any premium or penalty of any kind whatsoever.  If the Holdout Lender, the Defaulting Lender or other Lender, as the case may be, shall refuse or fail to execute and deliver any such Assignment and Assumption prior to the effective date of such replacement, the Holdout Lender, the Defaulting Lender or other Lender, as the case may be, shall be deemed to have executed and delivered such Assignment and Assumption.  The replacement of any Holdout Lender, the Defaulting Lender or other Lender, as the case may be, shall be made in accordance with the terms of <u>Section 9.07</u>.  Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender, the Defaulting Lender or the other Lender, as the case may be, shall remain obligated to make the Holdout Lender's, the Defaulting Lender's or the other Lender's Pro Rata Share of Advances and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of the Available Amount of such Letter of Credit.

SECTION 9.13. <u>Patriot Act Notice, Etc.</u>

(a)     Each Lender Party and each Agent (for itself and not on behalf of any Lender Party) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender Party or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act.  The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender Party in order to assist the Agents and the Lender Parties in maintaining compliance with applicable laws (including, without limitation, the Patriot Act and other "know your customer" and Ani-Money Laundering Laws) and any policy or procedure implemented by any Agent or such Lender Party to comply therewith) on all Loan Parties, their senior management and key principals and legal and beneficial owners.  Each Loan Party agrees that the reasonable and documented out-of-pocket costs and charges incurred by any Agent in connection with conducting due diligence searches and checks in connection with the foregoing shall constitute expenses payable by the Borrower pursuant to <u>Section 9.04</u> hereof.

(b)     No Advance, Letter of Credit or use of the proceeds of any thereof will violate the Patriot Act, the Trading With the Enemy Act or any other requirements contained in the rules and regulations of the OFAC.

SECTION 9.14. <u>Jurisdiction, Etc.</u>

(a)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City and the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and if the Bankruptcy Court abstains from hearing or refused to exercise jurisdiction over any of the following, each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or

proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Notwithstanding any other provision of this Section 9.14, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this Agreement or the other Loan Documents.

SECTION 9.15. Governing Law.  This Agreement and the Notes shall be governed by, and construed in accordance with, the law of the State of New York and, to the extent applicable, the Bankruptcy Code.

SECTION 9.16. Waiver of Jury Trial.  THE LOAN PARTIES, THE AGENTS AND THE LENDER PARTIES IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE ADVANCES, THE LETTERS OF CREDIT OR THE ACTIONS OF ANY AGENT OR ANY LENDER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 9.17. [Intentionally Omitted].

SECTION 9.18. Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.18 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.18, or otherwise under the Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations in accordance with Section 1.02(b). Each Qualified ECP Guarantor intends that this Section 9.18 constitute, and this Section 9.18 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 9.19. [Intentionally Omitted].

SECTION 9.20. Acknowledgment and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)        the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)        the effects of any Bail-In Action on any such liability, including, if applicable:

(i)        a reduction in full or in part or cancellation of any such liability;

(ii)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)        the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.21. Acknowledgment Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

SECTION 9.22. Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.23. Intercreditor Agreements.

(a)        EACH LENDER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT LIENS SHALL BE CREATED ON THE COLLATERAL PURSUANT TO THE LOAN DOCUMENTS, WHICH LIENS SHALL BE SUBJECT TO TERMS AND CONDITIONS OF EACH INTERCREDITOR

AGREEMENT.    PURSUANT TO THE EXPRESS TERMS OF EACH INTERCREDITOR AGREEMENT, IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF SUCH INTERCREDITOR AGREEMENT AND ANY OF THE LOAN DOCUMENTS, THE PROVISIONS OF SUCH INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

(b)    EACH LENDER AUTHORIZES AND INSTRUCTS THE AGENTS TO ENTER INTO EACH INTERCREDITOR AGREEMENT (AND ANY OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT TO THE EXTENT CONTEMPLATED BY THE TERMS HEREOF) ON BEHALF OF THE LENDERS, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY THE AGENTS IN ACCORDANCE WITH THE TERMS OF SUCH INTERCREDITOR AGREEMENT (OR SUCH OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT).    THE PARTIES HERETO ACKNOWLEDGE THAT EACH INTERCREDITOR AGREEMENT OR SUCH OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT IS BINDING UPON THEM.    EACH LENDER HEREBY AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT OR ANY OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT ENTERED INTO PURSUANT TO THE IMMEDIATELY PRECEDING SENTENCE.

(c)    THE PROVISIONS OF THIS SECTION 9.22 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF ANY INTERCREDITOR AGREEMENT.    REFERENCE MUST BE MADE TO EACH INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.    EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF EACH INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER ANY AGENT NOR ANY OF ANY AGENT'S AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN ANY INTERCREDITOR AGREEMENT.

SECTION 9.24. Erroneous Payments.

(a)    Each Lender, each Issuing Bank, each other Provider and any other party hereto hereby severally agrees that if (i) the Administrative Agent notifies (which such notice shall be conclusive absent manifest error) such Lender or Issuing Bank or any Provider (or the Lender which is an Affiliate of a Lender, Issuing Bank or Provider) or any other Person that has received funds from the Administrative Agent or any of its Affiliates, either for its own account or on behalf of a Lender, Issuing Bank or Provider (each such recipient, a "***Payment Recipient***") that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) or (ii) any Payment Recipient receives any payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (z) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in clauses (i) or (ii) of this Section 9.24(a), whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "***Erroneous Payment***"), then, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; provided that nothing in this Section shall require the Administrative Agent to provide any of the notices specified in clauses (i) or (ii) above. Each Payment Recipient agrees that it shall

not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(b)        Without limiting the immediately preceding clause (a), each Payment Recipient agrees that, in the case of clause (a)(ii) above, it shall promptly notify the Administrative Agent in writing of such occurrence.

(c)        In the case of either clause (a)(i) or (a)(ii) above, such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and upon demand from the Administrative Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)        In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (c), from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to such Lender, an "*Erroneous Payment Return Deficiency*"), then at the sole discretion of the Administrative Agent and upon the Administrative Agent's written notice to such Lender (i) such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of the Advances owing to it (but not its Commitments) with respect to which such Erroneous Payment was made (the "*Erroneous Payment Impacted Loans*") to the Administrative Agent or, at the option of the Administrative Agent, the Administrative Agent's applicable lending affiliate (such assignee, the "*Agent Assignee*") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of such Advances (but not Commitments) of the Erroneous Payment Impacted Loans, the "*Erroneous Payment Deficiency Assignment*") plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by the Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment.  Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, the Administrative Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Advances assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration.  The parties hereto acknowledge and agree that (1) any assignment contemplated in this clause (d) shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (2) the provisions of this clause (d) shall govern in the event of any conflict with the terms and conditions of <u>Section 9.07</u> and (3) the Administrative Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)        Each party hereto hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent (1) shall be subrogated to all the rights of such Payment Recipient and (2) is authorized to set off, net and apply any and all amounts at any time owing to such

Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under this <u>Section 9.24</u> or under the indemnification provisions of this Agreement, (y) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making for a payment on the Obligations and (z) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received.

(f)    Each party's obligations under this <u>Section 9.24</u> shall survive the resignation or replacement of the Administrative Agent or any transfer of right or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(g)    The provisions of this <u>Section 9.24</u> to the contrary notwithstanding, (i) nothing in this <u>Section 9.24</u> will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery of the Erroneous Payment to the extent that the Administrative Agent has received payment from the Payment Recipient in immediately available funds the Erroneous Payment Return, whether directly from the Payment Recipient, as a result of the exercise by the Administrative Agent of its rights of subrogation or set off as set forth above in clause (e) or as a result of the receipt by an Agent Assignee of a payment of the outstanding principal balance of the Advances assigned to such Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by such Agent Assignee in respect of the Advances assigned to such Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of such Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

SECTION 9.25. <u>Orders</u>. This Agreement is subject to the terms and provisions of the applicable Order. In the event of a conflict between the terms hereof and the terms of the applicable Order, the terms of the applicable Order shall govern and control.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**EXPRESS, LLC**, as Borrower

By: _____

Name:  Mark Still

Title:  Senior Vice President and Chief Financial Officer

**EXPRESS, INC.**, as Holdings and a Guarantor

By: _____

Name:  Mark Still

Title:  Senior Vice President and Chief Financial Officer

**EXPRESS TOPCO LLC**, as Intermediate Holdings and a Guarantor

By: _____

Name:  Mark Still

Title:  Senior Vice President and Chief Financial Officer

**EXPRESS HOLDING, LLC**, as Parent and a Guarantor

By: _____

Name:  Mark Still

Title:  Senior Vice President and Chief Financial Officer

DocuSign Envelope ID: A32A5DE2-EB14-4C55-B94C-A8F8DB7B4525

**EXPRESS FASHION LOGISTICS, LLC**,
**EXPRESS FASHION OPERATIONS, LLC**,
**EXPRESS FINANCE CORP.**,
**EXPRESS GC, LLC**,
**UW, LLC**,
**EXPRESS FASHION INVESTMENTS, LLC**,
**EXPRESS BNBS FASHION, LLC**,
Each as a Subsidiary Guarantor

By: _____

Name:  Mark Still
Title:   Senior   Vice   President   and   Chief
Financial Officer

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Administrative Agent, Collateral Agent and Initial Lender

By: _____
Name:  Emily Abrahamson
Title:  Director

_____

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Initial Issuing Bank and Initial Swing Line Bank

By: _____

Name: _Emily Abrahamsen_

Title: _Director_

BANK OF AMERICA, N.A., as an Initial Lender

By: _____

Name:  Bryn Lynch
Title:   Vice President

U.S. BANK NATIONAL ASSOCIATION, as an Initial
Lender

By:
Name:   James P. Cecil
Title:    Senior Vice President

FIFTH THIRD BANK, NATIONAL ASSOCIATION
(f/k/a Fifth Third Bank), as an Initial Lender

By: _____
Name:  Jason Rockwell
Title:    Vice President

**Schedule I**
**Commitments**

| Lender | Commitment |
|---|---|
| Wells Fargo Bank, National Association | $72,106,315.67 |
| Bank of America, N.A. | $47,146,437.17 |
| Fifth Third Bank | $27,733,198.34 |
| U.S. Bank National Association | $13,866,599.17 |
| | $160,852,550.35 |

**Schedule II**
**Subsidiary Guarantors**

1.  Express GC, LLC, an Ohio limited liability company

2.  Express Finance Corp., a Delaware corporation

3.  Express Fashion Operations, LLC, a Delaware limited liability company

4.  Express Fashion Logistics, LLC, a Delaware limited liability company

5.  UW, LLC, a Delaware limited liability company

6.  Express Fashion Investments, LLC, a Delaware limited liability company

7.  Express BNBS Fashion, LLC, a Delaware limited liability company

## Schedule 2.03(e)
### Prepetition Letters of Credit

| Created Date | Expiration Date | Beneficiary | Letter of Credit ID | Letter of Credit Balance |
|---|---|---|---|---|
| 04/23/2020 | 05/03/2025 | LIBERTY MUTUAL INSURANCE COMPANY | IS000127239U | $6,744,191.25 |
| 05/24/2023 | 06/01/2025 | EKFH LLC | IS000374290U | $166,666.66 |
| 05/24/2023 | 07/31/2024 | CPF DISTRICT OWNER LLC | IS000374278U | $16,079.28 |
| 05/24/2023 | 04/30/2025 | 173 COURT STREET HOLDINGS, LCC | IS000374281U | $63,750.00 |
| 05/24/2023 | 05/24/2025 | WFP RETAIL CO. L.P. | IS000374288U | $49,582.94 |
| 05/24/2023 | 05/23/2025 | DAJ REALTY LLC | IS000374274U | $48,000.00 |
| 05/24/2023 | 03/01/2025 | BP PRUCENTER ACQUISITION LLC | IS000374287U | $40,791.21 |
| 01/19/2023 | 01/19/2025 | L BRANDS SERVICE COMPANY, LLC | IS000342066U | $10,000,000.00 |
| 05/24/2023 | 01/18/2025 | 488 MADISON AVENUE ASSOCIATES, LLC | IS000374275U | $212,500.00 |
| 05/24/2023 | 01/18/2025 | SAM WALNUT, LLC | IS000374264U | $28,523.60 |
| 11/12/2014 | 11/10/2024 | STATE OF RHODE ISLAND DIRECTOR OR DIRECTOR'S DESIGNEE DEPARTMENT OF LABOR AND TRAINING DIVISION OF WORKFORCE REGULATION AND SAFETY LABOR STANDARDS UNI | IS0255831U | $42,000.00 |
| 07/31/2012 | 07/27/2024 | TRAVELERS | IS0013779 | $2,670,000.00 |

**Schedule 4.01(b)**
**Company Information**

| Name of Company | Type of Organization | Corporate Function | Jurisdiction of Organization | Federal Taxpayer Identification Number | Chief Executive Office / Principal Place of Business |
|---|---|---|---|---|---|
| Express, Inc. | Corporation | Holding Company | Delaware | 26-2828128 | One Express Drive, Columbus, OH |
| Express Topco LLC | Limited liability company | Holding Company | Delaware | 26-2828079 | One Express Drive, Columbus, OH |
| Express, LLC | Limited liability company | Operating company | Delaware | 54-2170160 | One Express Drive, Columbus, OH |
| Express Holding, LLC | Limited liability company | Holding company | Delaware | 35-2298454 | One Express Drive, Columbus, OH |
| Express GC, LLC | Limited liability company | Issuer of gift cards | Ohio | 31-1816092 | One Express Drive, Columbus, OH |
| Express Finance Corp. | Corporation | Holding Company | Delaware | 27-1817713 | One Express Drive, Columbus, OH |
| Express Fashion Operations, LLC | Limited liability company | Operating Company | Delaware | 45-5573400 | One Express Drive, Columbus, OH |
| Express Fashion Logistics, LLC | Limited liability company | Holding Company | Delaware | 46-0570481 | One Express Drive, Columbus, OH |
| UW, LLC | Limited liability company | Operating Company | Delaware | 32-0608688 | 81 Mill Street Suite 2010 |
| Express Fashion Investments, LLC | Limited liability company | Holding Company | Delaware | 92-1607622 | One Express Drive, Columbus, OH |
| Express BNBS Fashion, LLC | Limited liability company | Operating Company | Delaware | 92-3453861 | One Express Drive, Columbus, OH |

**Schedule 4.01(c)**
**Subsidiaries and Other Equity Investments**

| Issuer | Type of Organization | Jurisdiction | Subsidiary Type | Percentage Owned | Total Shares Outstanding | Shares Subject to Warrants, Options, etc. | Owner | Certificate No. |
|---|---|---|---|---|---|---|---|---|
| Express Topco LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express, Inc. | N/A |
| Express Holding, LLC | Limited Liability Company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express Topco LLC | 1 |
| Express Fashion Logistics, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express, LLC | N/A |
| Express Fashion Operations, LLC | Limited liability company | Delaware | Restricted Subsidiary, Material Subsidiary | 100% | N/A | N/A | Express, LLC | N/A |
| Express, LLC | Limited liability company | Delaware | Restricted Subsidiary, Material Subsidiary | 100% | N/A | N/A | Express Holding, LLC | 2 |
| Express Finance Corp. | Corporation | Delaware | Restricted Subsidiary | 100% | 1,000 Shares of Common Stock | N/A | Express Holding, LLC | 2 |
| Express GC, LLC | Limited liability company | Ohio | Restricted Subsidiary | 100% | N/A | N/A | Express Fashion Operations, LLC | 2 |
| UW, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express Fashion Operations, LLC | N/A |
| Express Fashion Digital Services Costa Rica, S.R.L. | Costa Rica Limited Liability Company | Costa Rica | Foreign Subsidiary, Restricted Subsidiary | 100% | 100 | N/A | Express, LLC | 1 |
| Express Fashion Investments, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express, LLC | N/A |

| Issuer | Type of Organization | Jurisdiction | Subsidiary Type | Percentage Owned | Total Shares Outstanding | Shares Subject to Warrants, Options, etc. | Owner | Certificate No. |
|---|---|---|---|---|---|---|---|---|
| Express BNBS Fashion, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | 100 | N/A | Express Fashion Operations, LLC | N/A |

**Schedule 4.01(u)**
**Tax Returns**


Holdings has accrued approximately $1,700,000 of U.S. federal income taxes with respect to the fiscal year ended January 28, 2023, based on estimated taxes due for such fiscal year.

# SCHEDULE 5.01(R)
# MILESTONES

| Event | Date |
|---|---|
| File motion to approve Specified Liquidation Agreement with respect to 95 Stores of the Debtors (such motion, the "Store Closing Sales Motion") acceptable to the Lenders. | Petition Date + 1 day |
| File Bidding Procedures Motion acceptable to the Lenders, which shall contemplate a going concern sale of all or substantially all of the remaining Stores (the "Going Concern Sale") and, in the alternative, (ii) orderly liquidation of all of the Company's assets, including (without limitation) an entire chain liquidation of all stores and all the assets relating thereto (the "Liquidation"). | Petition Date + 1 day |
| Entry of Store Closing Interim Order acceptable to the Lenders, which shall include approval for the Specified Liquidation Agents to act as the liquidation agents pursuant to the Specified Liquidation Agreement for any stores not included in the Going Concern Sale on the terms and conditions contained in the Specified Liquidation Agreement. | Petition Date + 3 days |
| Entry of Interim Order acceptable to the Lenders | Petition Date + 3 days |
| Entry of Final Order acceptable to the Lenders | May 22, 2024 |
| Entry of order approving Bidding Procedures Motion acceptable to the Lenders | May 22, 2024 |
| Either:<br><br>(i)  Entry into a "stalking horse" purchase agreement for a Going Concern Sale that has no financing or due diligence outs and is otherwise in accordance with these milestones (a "GC Purchase Agreement"); or<br><br>(ii)  Entry into a "stalking horse" agreement in the form of an agreement (the "Liquidation Agreement") for a Liquidation (either pursuant to a fee deal or equity deal). | May 22, 2024 |
| If GC Purchase Agreement is entered into by May 22, 2024, then the following additional milestones shall apply: | |
| File GC Purchase Agreement with the Bankruptcy Court | May 23, 2024 |
| Bid Deadline for Going Concern Sale | June 3, 2024 |
| Final Store List delivered to Lenders and Debtors for Going Concern Sale | June 3, 2024 |
| Auction Date for Going Concern Sale | June 5, 2024 |
| Entry of Sale Order approving the Going Concern Sale | June 7, 2024 |
| Closing of Going Concern Sale | June 10, 2024 |
| If Liquidation Agreement is entered into by May 22, 2024, then the following additional milestones shall apply: | |

| | |
|---|---|
| Bid Deadline for Liquidation | May 24, 2024 |
| Auction Date for Liquidation | May 28, 2024 |
| Entry of Order approving Liquidation Bid | May 30, 2024 |
| Commencement of Liquidation | May 31, 2024 |

**Schedule 5.02(a)**
**Existing Liens**

None.

**Schedule 5.02(b)**
**Existing Debt**

None.

**Schedule 5.02(f)**
**Existing Investments**

None.

**EXHIBIT A**

**FORM OF**
**REVOLVING CREDIT NOTE**

$_____                                                                 Dated: _____, 20__

      FOR VALUE RECEIVED, the undersigned, Express, LLC, a Delaware limited liability company (the "***Borrower***"), HEREBY PROMISES TO PAY to the order of _____ or its registered assigns (the "***Lender***") for the account of its Applicable Lending Office (as defined in the Credit Agreement referred to below) the aggregate principal amount of the Revolving Credit Advances (as defined below) owing to the Lender by the Borrower pursuant to that certain Senior Secured Super-Priority Priming Debtor-In-Possession Asset-Based Loan Credit Agreement dated as of April 24, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"; terms defined therein, unless otherwise defined herein, being used herein as therein defined) among the Borrower, Express Holding, LLC, a Delaware limited liability company, the Subsidiary Guarantors party thereto, the Lenders party thereto, and Wells Fargo Bank, National Association, as Collateral Agent and as Administrative Agent for the Lender Parties.

      The Borrower promises to pay interest on the unpaid principal amount of each Revolving Credit Advance from the date of such Revolving Credit Advance until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement.

      Both principal and interest are payable in lawful money of the United States of America to the Administrative Agent, for the ratable account of the Lender, at One Boston Place, 18th Floor, Boston, MA 02108, in same day funds.  Each Revolving Credit Advance owing to the Lender by the Borrower, and all payments made on account of principal thereof, shall be recorded by the Lender and, prior to any transfer hereof, endorsed on the grid attached hereto, which is part of this Revolving Credit Note; *provided*, *however*, that the failure of the Lender to make any such recordation or endorsement shall not affect the Obligations of the Borrower under this Revolving Credit Note.

      This Revolving Credit Note is one of the Notes referred to in, and is entitled to the benefits of, the Credit Agreement.  The Credit Agreement, among other things, (i) provides for the making of advances from time to time (each such advance, a "***Revolving Credit Advance***") by the Lender to the Borrower in an aggregate amount not to exceed at any time outstanding the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from each such Revolving Credit Advance being evidenced by this Revolving Credit Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.  The obligations of the Borrower under this Revolving Credit Note and the other Loan Documents, and the obligations of the other Loan Parties under the Loan Documents, are secured by the Collateral as provided in the Loan Documents.

      This Revolving Credit Note shall be governed by, and construed in accordance with, the laws of the State of New York.

*[Signature Page Follows]*

BORROWER:

EXPRESS, LLC


By: _____
   Name:
   Title:

**REVOLVING CREDIT ADVANCES
AND PAYMENTS OF PRINCIPAL**

| Date | Amount of Revolving Credit Advances | Amount of Principal Paid or Prepaid | Unpaid Principal Balance | Notation Made By |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Express – Exhibit A to Second Amended and Restated ABL Credit Agreement

**EXHIBIT B**

**FORM OF
NOTICE OF BORROWING**

Wells Fargo Bank, National Association,
as Administrative Agent
under the Credit Agreement
referred to below

[_____]

_____, 20__

       Attention: _____
       Phone: _____
       Telecopy: _____
       Email: _____

Ladies and Gentlemen:

       The undersigned, Express, LLC, a Delaware limited liability company, refers to the Senior Secured Super-Priority Priming Debtor-In-Possession Asset-Based Loan Credit Agreement dated as of April 24, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"; terms defined therein, unless otherwise defined herein, being used herein as therein defined), by, among others, the undersigned, Express Holding, LLC, a Delaware limited liability company, the Subsidiary Guarantors party thereto, the Lenders party thereto, and Wells Fargo Bank, National Association, as Collateral Agent and as Administrative Agent for the Lender Parties, and hereby gives you notice, irrevocably, pursuant to Section 2.02(a) of the Credit Agreement that the undersigned hereby requests a Borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such Borrowing (the "***Proposed Borrowing***") as required by Section 2.02(a) of the Credit Agreement:

       (i)      The Business Day (or, in the case of a SOFR Advance, the U.S. Government Securities Business Day) of the Proposed Borrowing is _____, 20__ (the "***Proposed Borrowing Date***").

       (ii)     The Facility under which the Proposed Borrowing is to be made is the [Revolving Credit Facility] [Swing Line Facility].

       (ii)     The Type of Advance comprising the Proposed Borrowing is a [Base Rate Advance] [SOFR Advance].

       (iii)    The aggregate amount of the Proposed Borrowing is $_____.

(iv)    [1][The initial Interest Period for each SOFR Advance made as part of the Proposed Borrowing is _____ month[s].]

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(a)    the representations and warranties contained in each Loan Document are correct in all material respects (unless any such representation or warranty is qualified by materiality in the text thereof, in which case, such representation or warranty are true and correct in all respects) on and as of the Proposed Borrowing Date, immediately before and immediately after giving effect to such Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, other than any such representation or warranties that, by their terms, refer to a specific date other than the Proposed Borrowing Date, in which case as of such specific date.

(b)    no Default has occurred and is continuing, or would result immediately after giving effect to such Proposed Borrowing or from the application of the proceeds therefrom.

Delivery of an executed counterpart of this Notice of Borrowing by telecopier or other electronic transmission (such as pdf) shall be effective as delivery of an original executed counterpart of this Notice of Borrowing.

Very truly yours,

EXPRESS, LLC, as Borrower

By: _____
   Name:
   Title:

---

[1] Applicable only for SOFR Advances.

**EXHIBIT C**

**FORM OF**
**ASSIGNMENT AND ASSUMPTION**

Reference is made to that certain Senior Secured Super-Priority Priming Debtor-In-Possession Asset-Based Loan Credit Agreement dated as of April 24, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"; the terms defined therein, unless otherwise defined herein, being used herein as therein defined) among Express, LLC, a Delaware limited liability company (the "***Borrower***"), Express Holding, LLC, a Delaware limited liability company, the Subsidiary Guarantors party thereto, the Lenders party thereto, and Wells Fargo Bank, National Association, as Collateral Agent and as Administrative Agent for the Lender Parties.

Each "Assignor" referred to on Schedule 1 hereto (each, an "***Assignor***") and each "Assignee" referred to on Schedule 1 hereto (each, an "***Assignee***") agrees severally with respect to all information relating to it and its assignment hereunder and on Schedule 1 hereto as follows:

(1)     Such Assignor hereby sells and assigns, without recourse except as to the representations and warranties made by it herein, to such Assignee, and such Assignee hereby purchases and assumes from such Assignor, an interest in and to such Assignor's rights and obligations under the Credit Agreement as of the date hereof equal to the percentage interest specified on Schedule 1 hereto of all outstanding rights and obligations under the Credit Agreement Facility specified on Schedule 1 hereto. After giving effect to such sale and assignment, such Assignee's Commitments and the amount of the Advances owing to such Assignee will be as set forth on Schedule 1 hereto.

(2)     Such Assignor (i) represents and warrants that its name set forth on Schedule 1 hereto is its legal name, that it is the legal and beneficial owner of the interest or interests being assigned by it hereunder and that such interest or interests are free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; and (iv) attaches the Note or Notes (if any) held by such Assignor and requests that the Administrative Agent exchange such Note or Notes for a new Note or Notes payable to the order of such Assignee in an amount equal to the Commitments assumed by such Assignee pursuant hereto or new Notes payable to the order of such Assignee in an amount equal to the Commitments assumed by such Assignee pursuant hereto and such Assignor in an amount equal to the Commitments retained by such Assignor under the Credit Agreement, respectively, as specified on Schedule 1 hereto.

(3)     Such Assignee (i) confirms that it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption; (ii) agrees that it will, independently and without reliance upon any Agent, any Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) represents and warrants that its name set forth on Schedule 1 hereto is its legal name; (iv) confirms that it is an Eligible Assignee; (v) appoints and

authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; (vi) agrees that it will perform in accordance with their terms all of the obligations that by the terms of the Credit Agreement are required to be performed by it as a Lender; and (vii) attaches any U.S. Internal Revenue Service forms required under Section 2.12 of the Credit Agreement.

(4)     Following the execution of this Assignment and Assumption, it will be delivered to the Administrative Agent for acceptance and recording by the Administrative Agent.  The effective date for this Assignment and Assumption (the "***Effective Date***") shall be the date of acceptance hereof by the Administrative Agent, unless otherwise specified on Schedule 1 hereto.

(5)     Upon such acceptance and recording by the Administrative Agent, as of the Effective Date, (i) such Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Assumption, have the rights and obligations of a Lender thereunder and (ii) such Assignor shall, to the extent provided in this Assignment and Assumption, relinquish its rights and be released from its obligations under the Credit Agreement (other than its rights and obligations under the Loan Documents that are specified under the terms of such Loan Documents to survive the payment in full of the Obligations of the Loan Parties under the Loan Documents to the extent any claim thereunder relates to an event arising prior to the Effective Date of this Assignment and Assumption) and, if this Assignment and Assumption covers all of the remaining portion of the rights and obligations of such Assignor under the Credit Agreement, such Assignor shall cease to be a party thereto.

(6)     Upon such acceptance and recording by the Administrative Agent, from and after the Effective Date, the Administrative Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees with respect thereto) to such Assignee.  Such Assignor and such Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Effective Date directly between themselves.

(7)     This Assignment and Assumption shall be governed by, and construed in accordance with, the laws of the State of New York.

(8)     This Assignment and Assumption may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of Schedule 1 to this Assignment and Assumption by telecopier or other electronic transmission (such as pdf) shall be effective as delivery of an original executed counterpart of this Assignment and Assumption.

IN WITNESS WHEREOF, each Assignor and each Assignee have caused Schedule 1 to this Assignment and Assumption to be executed by their officers thereunto duly authorized as of the date specified thereon.

**SCHEDULE 1**
**TO**
**ASSIGNMENT AND ASSUMPTION**

| ASSIGNEES: | |
|---|---|
| *Facility* | |
| Percentage interest assumed | % |
| Commitment assumed | $ |
| Outstanding principal amount of Advance assumed | $ |
| Principal amount of Note payable to **Assignee** | $ |

Effective Date (if other than date of acceptance by Administrative Agent):

[1]_____, 20__

**<u>Assignors</u>**

_____, as Assignor
*[Type or print legal name of Assignor]*

By: _____
   Name:
   Title:

Dated: _____, 20__

_____

[1]     This date should be no earlier than five Business Days after the delivery of this Assignment and Assumption to the Administrative Agent.

**Assignees**

_____, as Assignee
*[Type or print legal name of Assignee]*

By: _____
   Name:
   Title:

Dated: _____, 20__
Domestic Lending Office:
Eurodollar Lending Office:

Accepted [and Approved] this _____
day of _____, 20__

WELLS FARGO BANK, NATIONAL ASSOCIATION,
    as Administrative Agent[2]

By: _____
    Name:
    Title:

[WELLS FARGO BANK, NATIONAL ASSOCIATION,
    as Issuing Bank

By: _____
    Name:
     Title:   ][3]

[WELLS FARGO BANK, NATIONAL ASSOCIATION,
    as Swing Line Bank

By: _____
    Name:
     Title:   ][4]

---

[2]    Approval required if (i) the Assignee is an Eligible Assignee solely by reason of clause (d) of the definition of "Eligible Assignee", or (ii) Administrative Agent shall have not notified the Lender Parties that syndication of the Commitments hereunder has been completed

[3]    Required if the Assignee is an Eligible Assignee solely by reason of clause (d) of the definition of "Eligible Assignee."

[4]    Required if the Assignee is an Eligible Assignee solely by reason of clause (d) of the definition of "Eligible Assignee."

EXHIBIT D

FORM OF
GUARANTY SUPPLEMENT

___, 20__

Wells Fargo Bank, National Association,
    as Administrative Agent
[_____]

Attention: _____
Phone: _____
Telecopy: _____
Email: _____

Re:      Senior Secured Super-Priority Priming Debtor-In-Possession Asset-Based Loan Credit
Agreement dated as of April 24, 2024 (the "***Credit Agreement***") among Express, LLC, a Delaware
limited liability company (the "***Borrower***"), Express Holding, LLC, a Delaware limited liability
company, the Subsidiary Guarantors party thereto, the Lenders party thereto, and Wells Fargo Bank,
National Association, as Collateral Agent and as Administrative Agent

Ladies and Gentlemen:

        Reference is made to the above-captioned Credit Agreement and to the Guaranty referred
to therein.  The capitalized terms defined in the Credit Agreement and not otherwise defined herein are
used herein as therein defined.

        Section 1. Guaranty; Limitation of Liability.(a) The undersigned hereby absolutely,
unconditionally and irrevocably guarantees the punctual payment when due, whether at scheduled
maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all
Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan
Documents, any Secured Hedge Agreement, any Secured Bank Product Agreement, or any Secured Cash
Management Agreement (including, without limitation, any extensions, modifications, substitutions,
amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or
contingent, and whether for principal, interest, premium, fees, indemnities, contract causes of action,
costs, expenses or otherwise (such Obligations being the "***Guaranteed Obligations***"; provided that the
Guaranteed Obligations shall not include any Excluded Swap Obligations), and agrees to pay any and all
expenses (including, without limitation, fees and expenses of counsel) incurred by the Administrative
Agent, any other Lender Party, any Hedge Bank, any provider of Bank Products, or any Cash
Management Bank in enforcing any rights under, as applicable, this Guaranty, any other Loan Document,
any Secured Hedge Agreement, Secured Bank Product Agreement, or any Secured Cash Management
Agreement.  Without limiting the generality of the foregoing, the undersigned's liability shall extend to
all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan
Party to any Lender Party or any Hedge Bank  or any Cash Management Bank under or in respect of, as
applicable, the Loan Documents or any Secured Hedge Agreement, Secured Bank Product Agreement, or
any Secured Cash Management Agreement but for the fact that they are unenforceable or not allowable
due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan
Party.

(b)        The undersigned, and by its acceptance of this Guaranty Supplement, the Administrative Agent and each other Lender Party, hereby confirms that it is the intention of all such Persons that this Guaranty Supplement, the Credit Agreement and the Obligations of the undersigned hereunder and thereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty Supplement, the Credit Agreement and the Obligations of the undersigned hereunder and thereunder.  To effectuate the foregoing intention, the Administrative Agent, the other Lender Parties and the undersigned hereby irrevocably agree that the Obligations of the undersigned under this Guaranty Supplement and the Credit Agreement at any time shall be limited to the maximum amount as will result in the Obligations of the undersigned under this Guaranty Supplement and the Credit Agreement not constituting a fraudulent transfer or conveyance.

(c)        The undersigned hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender Party under this Guaranty Supplement, the Credit Agreement or any other guaranty, the undersigned will contribute, to the maximum extent permitted by applicable law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lender Parties or Hedge Banks or any Cash Management Bank under or in respect of, as applicable, the Loan Documents or any Secured Hedge Agreement, Secured Bank Product Agreement, or any Secured Cash Management Agreement.

Section 2.  <u>Obligations Under the Guaranty</u>.The undersigned hereby agrees, as of the date first above written, to be bound as a Guarantor by all of the terms and conditions of the Guaranty, as set forth in the Credit Agreement, to the same extent as each of the other Guarantors thereunder.  The undersigned further agrees, as of the date first above written, that each reference in the Credit Agreement to an "***Additional Guarantor***" or a "***Guarantor***" shall also mean and be a reference to the undersigned, and each reference in any other Loan Document to a "***Guarantor***", "***Subsidiary Guarantor***" or a "***Loan Party***", as applicable, shall also mean and be a reference to the undersigned.

Section 3.  <u>Execution in Counterparts</u>.This Guaranty Supplement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 4.  <u>Governing Law; Jurisdiction; Waiver of Jury Trial, Etc.</u>(a)        This  Guaranty Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)        The undersigned hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guaranty Supplement or any of the other Loan Documents to which it is or is to be a party, or for recognition or enforcement of any judgment, and the undersigned hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such Federal court.  The undersigned agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Guaranty Supplement or any other Loan Document shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Guaranty Supplement or any of the other Loan Documents to which it is or is to be a party in the courts of any jurisdiction.

(c)        The undersigned irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Guaranty Supplement or any of the other

Loan Documents to which it is or is to be a party in any New York State or Federal court. The undersigned hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court.

(d)    THE UNDERSIGNED HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE ADVANCES OR THE ACTIONS OF ANY SECURED PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

Very truly yours,

[NAME OF ADDITIONAL GUARANTOR]

By: _____
    Name:
    Title:

**EXHIBIT E**

**FORM OF
INITIAL BUDGET**

[see attached]

Express, Inc.
Preliminary Chapter 11 Liquidation Scenario Version 5, dated as of April 22, 2024

DRAFT
CONFIDENTIAL
SUBJECT TO CONTINUED REVIEW AND REVISION

($ in MMs)

| Week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Classification: | Apr wk3 | Apr wk4 | May wk1 | May wk2 | May wk3 | May wk4 | Jun wk1 | Jun wk2 | Jun wk3 | Jun wk4 | Jun wk5 | Jul wk1 | Jul wk2 | Jul wk3 | Jul wk4 | Aug wk1 | 16-Weeks | Wind Down |
| Type: | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | | |
| Period Ending: | 4/27/2024 | 5/4/2024 | 5/11/2024 | 5/18/2024 | 5/25/2024 | 6/1/2024 | 6/8/2024 | 6/15/2024 | 6/22/2024 | 6/29/2024 | 7/6/2024 | 7/13/2024 | 7/20/2024 | 7/27/2024 | 8/3/2024 | 8/10/2024 | | |
| **Cash Operating Receipts** | | | | | | | | | | | | | | | | | | |
| Express | $28.7 | $27.3 | $25.8 | $28.3 | $18.4 | – | – | – | – | – | – | – | – | – | – | – | $128.6 | – |
| UpWest | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Bonobos | 5.0 | 4.8 | 5.0 | 5.4 | 2.5 | – | – | – | – | – | – | – | – | – | – | – | 22.7 | – |
| Other Receipts | 1.9 | 1.0 | 0.2 | 0.5 | – | – | – | – | – | – | – | – | – | – | – | 157.9 | 161.5 | 17.8 |
| Store Closing Receipts | 4.0 | 7.0 | 5.7 | 5.1 | 39.4 | 69.1 | 60.7 | 53.2 | 49.6 | 46.2 | 39.4 | 31.5 | 26.8 | 20.1 | 8.4 | 0.8 | 467.0 | – |
| FF&E | – | – | – | – | – | – | – | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.3 | 0.3 | 0.3 | – | 1.4 | – |
| Augment, Net | – | – | – | 0.0 | 0.3 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.0 | 3.3 | – |
| **Total Cash Operating Receipts** | **$39.7** | **$40.1** | **$36.8** | **$39.4** | **$60.6** | **$69.6** | **$61.2** | **$53.6** | **$50.0** | **$46.6** | **$39.8** | **$32.0** | **$27.2** | **$20.5** | **$8.8** | **$158.7** | **$784.5** | **$17.8** |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Merchandise | – | – | ($5.3) | ($6.2) | ($11.0) | ($9.3) | ($1.4) | ($0.6) | ($0.8) | – | – | – | – | – | – | – | ($34.6) | ($0.7) |
| Rent | (6.3) | (25.6) | – | – | (24.7) | – | – | – | – | (21.1) | – | – | – | – | – | – | (77.7) | – |
| Non-Merchandise | (6.7) | (3.4) | (6.0) | (5.7) | (10.9) | (9.4) | (8.2) | (7.8) | (7.3) | (7.3) | (4.2) | (3.8) | (3.4) | (2.1) | (0.0) | – | (86.2) | – |
| Payroll | (1.9) | (12.7) | – | (12.7) | – | (12.7) | – | (12.7) | – | (10.8) | – | (9.5) | – | (9.5) | – | (10.4) | (92.9) | (1.3) |
| Sales and Use Tax | (3.4) | (0.1) | (0.1) | (0.1) | (8.9) | (0.1) | (0.1) | (0.1) | (14.1) | (0.1) | (0.1) | (0.1) | (0.1) | (15.6) | (4.8) | (0.1) | (48.0) | – |
| WHP / Bonobos Royalty | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (17.0) | (17.0) | – |
| Other | (0.8) | (0.5) | (0.2) | (0.5) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.4) | (0.2) | (0.2) | (0.4) | (0.2) | – | (4.9) | – |
| **Total Operating Disbursements** | **($19.0)** | **($42.3)** | **($11.6)** | **($25.2)** | **($31.1)** | **($56.5)** | **($9.9)** | **($21.4)** | **($22.4)** | **($39.6)** | **($4.7)** | **($13.6)** | **($3.8)** | **($27.6)** | **($5.1)** | **($27.5)** | **($361.3)** | **($2.0)** |
| **Operating Cash Flow** | **$20.7** | **($2.2)** | **$25.2** | **$14.1** | **$29.4** | **$13.1** | **$51.2** | **$32.2** | **$27.6** | **$7.0** | **$35.1** | **$18.5** | **$23.5** | **($7.1)** | **$3.7** | **$131.2** | **$423.2** | **$15.9** |
| **Restructuring Items** | | | | | | | | | | | | | | | | | | |
| Debtor Professionals | ($2.1) | ($1.8) | ($1.8) | ($2.0) | ($1.8) | ($1.8) | ($1.8) | ($1.9) | ($1.6) | ($1.6) | ($1.4) | ($1.4) | ($1.4) | ($1.4) | ($1.4) | ($1.6) | ($26.7) | – |
| UCC Professionals | – | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (3.8) | – |
| Lender Professionals | (0.6) | (0.6) | (0.6) | (0.6) | (0.5) | (0.5) | (0.5) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | – | (6.4) | – |
| UST Fees | – | – | – | – | – | – | – | – | (0.8) | – | – | – | – | – | (0.3) | – | (1.0) | (0.3) |
| Taxes and Duties | (8.1) | – | (0.0) | (1.8) | (8.1) | (0.1) | – | – | (0.3) | – | (0.1) | – | (0.1) | (0.0) | (0.1) | – | (18.6) | – |
| Utility Deposits | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 0.9 |
| Critical Vendors | (0.9) | (0.9) | (0.9) | (0.9) | (0.9) | – | – | – | – | – | – | – | – | – | – | – | (4.6) | – |
| Critical Foreign Vendors | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Admin Priority Reserves | (0.0) | – | – | – | (3.6) | (3.6) | (3.6) | (3.6) | (3.6) | (3.6) | (3.6) | (3.3) | (3.3) | (3.3) | – | – | (35.4) | – |
| Shippers / Lienholders / Warehouse Claims | – | (3.0) | – | – | – | – | – | – | – | – | – | – | – | – | – | – | (3.0) | – |
| KERP | – | (2.0) | – | – | – | – | – | – | – | – | – | – | (2.0) | – | – | – | (4.0) | – |
| Store Closure Costs | (0.3) | (0.3) | (0.2) | (0.2) | (2.1) | (2.0) | (1.8) | (1.7) | (1.6) | (1.5) | (1.2) | (1.1) | (1.0) | (0.8) | (0.5) | – | (16.4) | – |
| Employee Related Reserves | (0.1) | (0.1) | (0.1) | (0.1) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (0.6) | (0.6) | (11.2) | – |
| Store Closing Bonus | – | – | – | – | – | – | – | – | – | – | (0.7) | – | – | – | – | (4.3) | (5.0) | – |
| Federal WARN | – | – | – | – | – | – | – | – | – | – | (5.5) | – | – | – | – | – | (5.5) | – |
| **Total Restructuring Items** | **($12.1)** | **($8.0)** | **($3.9)** | **($5.8)** | **($18.3)** | **($9.1)** | **($8.9)** | **($8.8)** | **($8.7)** | **($15.3)** | **($7.8)** | **($7.3)** | **($9.4)** | **($7.1)** | **($3.4)** | **($6.7)** | **($141.5)** | **$0.6** |
| **Cash Flow Before Financing** | **$8.6** | **($11.1)** | **$21.3** | **$8.4** | **$11.1** | **$4.0** | **$42.3** | **$23.4** | **$18.9** | **($8.4)** | **$27.3** | **$11.2** | **$14.1** | **($14.2)** | **$0.3** | **$124.5** | **$281.7** | **$16.5** |
| **Financing Related Cash Flows** | | | | | | | | | | | | | | | | | | |
| Interest / Fees | – | ($1.7) | – | – | – | ($2.0) | – | – | – | – | ($1.3) | – | – | – | ($0.4) | – | ($5.4) | – |
| DIP Proceeds | 24.1 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 24.1 | – |
| **Total Financing Related Cash Flows** | **$24.1** | **($1.7)** | **–** | **–** | **–** | **($2.0)** | **–** | **–** | **–** | **–** | **($1.3)** | **–** | **–** | **–** | **($0.4)** | **–** | **$18.6** | **–** |
| **Net Cash Flow** | **$32.6** | **($12.8)** | **$21.3** | **$8.4** | **$11.1** | **$2.0** | **$42.3** | **$23.4** | **$18.9** | **($8.4)** | **$26.0** | **$11.2** | **$14.1** | **($14.2)** | **($0.1)** | **$124.5** | **$300.3** | **$16.5** |
| **Bank Cash** | | | | | | | | | | | | | | | | | | |
| BOP Bank Cash Balance | $20.3 | $15.0 | $15.0 | $15.0 | $15.0 | $15.0 | $15.0 | $15.0 | $15.0 | $20.0 | $11.6 | $15.0 | $15.0 | $15.0 | $0.8 | $0.7 | $20.3 | $101.0 |
| Net Cash Flow | 32.6 | (12.8) | 21.3 | 8.4 | 11.1 | 2.0 | 42.3 | 23.4 | 18.9 | (8.4) | 26.0 | 11.2 | 14.1 | (14.2) | (0.1) | 124.5 | 300.3 | 16.5 |
| Revolver Draw / (Paydown) | (38.0) | 12.8 | (21.3) | (8.4) | (11.1) | (2.0) | (42.3) | (18.8) | – | – | (22.6) | (11.2) | (14.1) | – | – | – | (129.1) | – |
| Term Loan Pre-Payment | – | – | – | – | – | – | – | (4.6) | (13.9) | – | – | – | – | – | (24.2) | – | (90.6) | – |
| **EOP Bank Cash Balance** | **$15.0** | **$15.0** | **$15.0** | **$15.0** | **$15.0** | **$15.0** | **$15.0** | **$15.0** | **$20.0** | **$11.6** | **$15.0** | **$15.0** | **$15.0** | **$0.8** | **$0.7** | **$101.0** | **$101.0** | **$117.5** |
| **Net Revolver Availability** | **$45.4** | **$32.6** | **$45.0** | **$35.6** | **$44.7** | **$14.8** | **$14.9** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |
| **Total Liquidity** | **$60.4** | **$47.6** | **$60.0** | **$50.6** | **$59.7** | **$29.8** | **$29.9** | **$15.0** | **$20.0** | **$11.6** | **$15.0** | **$15.0** | **$15.0** | **$0.8** | **$0.7** | **$101.0** | **$101.0** | **$117.5** |
| *Memo: First Lien Prepetition ABL Facility* | *$42.0* | *$2.0* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* |
| *Memo: First Lien DIP ABL Facility* | *$28.4* | *$81.2* | *$61.9* | *$53.5* | *$42.4* | *$40.4* | *$18.8* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* |
| *Memo: Second Lien New Money DIP Term Loans* | *$25.0* | *$25.0* | *$25.0* | *$25.0* | *$25.0* | *$25.0* | *$25.0* | *$20.4* | *$16.5* | *$16.5* | *–* | *–* | *–* | *–* | *–* | *–* | *–* | *–* |
| *Memo: Second Lien Prepetition Term Facility* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$49.5* | *$38.3* | *$24.2* | *$24.2* | *$24.2* | *–* | *–* | *–* |

4/24/2024

**EXHIBIT F**

**FORM OF**
**BORROWING BASE CERTIFICATE**

[see attached]

**Express, LLC**
**Borrowing Base Certificate**

| | | Cert. #: | Apr Wk 1 |
|---|---|---|---|
| | | As of Date: | 4/13/2024 |
| | | Date Prepared: | 4/19/2024 |
| | | Month: | APR |

### Accounts Receivable:

| | | As of: | | |
|---|---|---|---|---|
| Credit Card Receivables - US Locations (A/C C0's 110400, 110405, 110410, 110415,110425, 110430) | | As of: | 4/13/2024 | $12,481,175 |
| Credit Card Receivables - Puerto Rico (A/C 110400, 110405, 110410, 110415) | | As of: | 4/13/2024 | 45,796 |
| **Gross Credit Card Receivables** | | | | **$12,526,972** |
| Private Label (Bread) Credit Card Receivables | | As of: | 4/13/2024 | ($1,291,396) |
| >5 days aged (Bonobos Reserve) | | As of: | 4/13/2024 | -- |
| **Total Credit Card Receivables Ineligibles** | | | | **($1,291,396)** |
| **Eligible Credit Card Receivables** | | | | **$11,235,576** |
| *Advance Rate* | | | | *90.0%* |
| **Credit Card Receivable Availability** | | | | **$10,112,018** |

### Express Inventory - Store Closing Inventory

| | | As of: | | |
|---|---|---|---|---|
| Express - Ending Stock Ledger Inventory - US Locations (A/C 114100) | | As of: | 4/13/2024 | $27,644,573 |
| Express - Ending Stock Ledger Inventory - Puerto Rico (A/C 114100) | | As of: | 4/13/2024 | -- |
| Express- Franchise Inventory (A/C 114150) | | As of: | 4/13/2024 | -- |
| Express - Outlet Inventory (A/C 114160; ZBA as amounts included in 114100 above) | | As of: | 4/13/2024 | -- |
| **Total Gross Express Inventory (Store Closing Inventory)** | | | | **$27,644,573** |
| Consignment Inventory | | As of: | 4/13/2024 | -- |
| Other Adjustments - US Locations (A/C 114300) | | As of: | 4/13/2024 | (2,515,656) |
| Other Adjustments - Puerto Rico (A/C 114300) | | As of: | 4/13/2024 | -- |
| Ecommerce (inventory sold not yet delivered A/C 114300) | | As of: | 4/13/2024 | -- |
| Shrink Accrual - US Locations (A/C 114310) | | As of: | 4/13/2024 | -- |
| Shrink Accrual - Puerto Rico (A/C 114310) | | As of: | 4/13/2024 | -- |
| Store Recall Inventory - Location 9050 & 9051 | | As of: | 4/13/2024 | -- |
| Ecomm Recall Inventory - Location 9052 | | As of: | 4/13/2024 | -- |
| Inventory Insurance Claims - Location 1994 | | As of: | 4/13/2024 | -- |
| Licensed Inventory | | As of: | 4/13/2024 | -- |
| CBD Product | | As of: | 4/13/2024 | -- |
| Offsite Locations | | As of: | 4/13/2024 | -- |
| Closed Stores | | As of: | 4/13/2024 | -- |
| **Total Express Inventory Ineligibles (Store Closing Inventory)** | | | | **($2,515,656)** |
| **Eligible Express Inventory (Store Closing Inventory)** | | | | **$25,128,917** |
| *NOLV %* | | Month: | APR | *94.1%* |
| *Advance Rate %* | | | | *90.0%* |
| **Express Inventory Availability (Store Closing Inventory):** | | | | **$21,281,679** |

### Inventory - Go Forward Inventory

| | | As of: | | |
|---|---|---|---|---|
| Express - Ending Stock Ledger Inventory - US Locations (A/C 114100) | | As of: | 4/13/2024 | $283,791,660 |
| Express - Ending Stock Ledger Inventory - Puerto Rico (A/C 114100) | | As of: | 4/13/2024 | 915,319 |
| Express- Franchise Inventory (A/C 114150) | | As of: | 4/13/2024 | -- |
| Express - Outlet Inventory (A/C 114160; ZBA as amounts included in 114100 above) | | As of: | 4/13/2024 | -- |
| **Total Gross Express Inventory (Go Forward Inventory)** | | | | **$284,706,979** |
| Consignment Inventory | | As of: | 4/13/2024 | -- |
| Other Adjustments - US Locations (A/C 114300) | | As of: | 4/13/2024 | (25,825,041) |
| Other Adjustments - Puerto Rico (A/C 114300) | | As of: | 4/13/2024 | (83,294) |
| Ecommerce (inventory sold not yet delivered A/C 114300) | | As of: | 4/13/2024 | -- |
| Shrink Accrual - US Locations (A/C 114310) | | As of: | 4/13/2024 | (13,166,461) |
| Shrink Accrual - Puerto Rico (A/C 114310) | | As of: | 4/13/2024 | (17,714) |
| Store Recall Inventory - Location 9050 & 9051 | | As of: | 4/13/2024 | (99,868) |
| Ecomm Recall Inventory - Location 9052 | | As of: | 4/13/2024 | (3,902) |
| Inventory Insurance Claims - Location 1994 | | As of: | 4/13/2024 | -- |
| Licensed Inventory | | As of: | 4/13/2024 | -- |
| CBD Product | | As of: | 4/13/2024 | -- |
| Offsite Locations | | As of: | 4/13/2024 | -- |
| Closed Stores | | As of: | 4/13/2024 | -- |
| **Total Express Inventory Ineligibles (Go Forward Inventory)** | | | | **($39,196,280)** |
| **Eligible Express Inventory (Go Forward Inventory)** | | | | **$245,510,699** |
| *NOLV %* | | Month: | APR | *99.2%* |
| *Advance Rate %* | | | | *90.0%* |
| **Express Inventory Availability (Go Forward Inventory):** | | | | **$219,234,146** |

### Express In-Transit Inventory

| | | As of: | | |
|---|---|---|---|---|
| Express - In-yard/In-transit Inventory (A/C114110) | | As of: | 4/13/2024 | -- |
| **Gross Express In-Transit Inventory** | | | | **--** |
| >60 Days In Transit | | As of: | 4/13/2024 | -- |
| Bangladesh Originated In-transit | | As of: | 4/13/2024 | -- |
| **Total In-Transit Ineligibles** | | | | **--** |
| **Eligible Express In-Transit Inventory** | | | | **--** |
| *NOLV %* | | Month: | [TBD] | *[TBD]* |
| *Advance Rate %* | | | | *90.0%* |
| **Express In-Transit Inventory Availability** | | | | **--** |

### Bonobos Inventory

| | | As of: | | |
|---|---|---|---|---|
| Bonobos - Ending Stock Ledger Inventory | | As of: | 4/13/2024 | $54,773,394 |
| **Total Gross Bonobos Inventory** | | | | **$54,773,394** |
| Guideshops Inventory | | As of: | 4/13/2024 | ($4,774,778) |
| Other Reserves | | As of: | 4/13/2024 | (2,199,335) |
| **Total Inventory Ineligibles** | | | | **($6,974,113)** |
| **Eligible Bonobos Inventory** | | | | **$47,799,282** |
| *NOLV %* | | Month: | APR | *79.1%* |
| *Advance Rate %* | | | | *90.0%* |
| **Gross Bonobos Inventory Availability** | | | | **$34,028,309** |
| **Gross Inventory Availability** | | | | **$274,544,134** |

### AVAILABILITY RESERVES

| | | As of: | | |
|---|---|---|---|---|
| Gift Certificates Reserve - US, Puerto Rico, Bonobos (50%) (A/C 212100, 212110, 212120) | | As of: | 4/13/2024 | ($15,277,553) |
| Capitalized Vendor Rebates (A/C 114330) | | As of: | 4/13/2024 | -- |
| Bonobos Merchandise Credits (50%) | | As of: | 4/13/2024 | -- |
| Landlord Lien Reserve (PA, WA, VA - 2 months rent) * | | As of: | 4/13/2024 | (3,325,707) |
| Texas Sales Tax (6 week average) | | As of: | 4/13/2024 | (1,294,560) |
| Texas Property Tax (last amount paid) | | As of: | 4/13/2024 | (607,162) |
| Term Loan Pushdown | | As of: | 4/13/2024 | (78,967,719) |
| Net Customs Duties Payable (A/C 210300, 210310, 210320, 210330, 210350) | | As of: | 4/13/2024 | (1,588,094) |
| Landed Cost - duties (15.4% of in-Transit less ineligibles) | | As of: | 4/13/2024 | -- |
| Bank Products Reserve | | As of: | 4/13/2024 | (1,500,000) |
| Prepayment Penalty | | As of: | 4/13/2024 | -- |
| Post Trigger Carve Out Reserve | | As of: | 4/13/2024 | (500,000) |
| UST Fee Reserve | | As of: | 4/13/2024 | (250,000) |
| 726(b) Reserve | | As of: | 4/13/2024 | (25,000) |
| Professional Fee Reserve | | As of: | 4/13/2024 | (4,200,000) |
| **Total Availability Reserves** | | | | **($107,535,735)** |

### Cash Collateral

| | | | |
|---|---|---|---|
| Eligible Cash Collateral | | | -- |
| **Total Cash Collateral Availability** | | | **--** |
| **Total Uncapped Borrowing Base (A + B + C + D)** | | | **$177,120,417** |
| **Total Capped Borrowing Base** | | | **$160,852,550** |

---

#### *AVAILABILITY CALCULATION*

| | | | |
|---|---|---|---|
| **Beginning Principal Balance** | As of: | 4/12/2024 | $147,326,893 |
| **ADD:** | Advances through | Closing | 44,878,097 |
| **LESS:** [1] | Payments through | Closing | (129,297,479) |
| **Ending Principal Balance** | | | **$62,907,512** |
| **Total L/Cs Outstanding** | Standby L/C's | $20,082,085 | Doc L/C's | $ - | **$20,082,085** |
| **Total Usage (F + G)** | | | **$82,989,597** |
| **Excess Availability (E - H)** | | | **$77,862,953** |

The undersigned, a Responsible Officer (as defined in the ABL Credit Agreement referred to below) of Express, LLC, as borrower (in such capacity, the "ABL Borrower"), represents and warrants that the information set forth above and the supporting documentation and information delivered herewith (i) is true and correct in all material respects, and (ii) has been prepared in accordance with the requirements of that certain Second Amended and Restated Asset-Based Loan Credit Agreement dated as of May 20, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement"), by, among others, (1) the ABL Borrower, (2) the Guarantors party thereto, (3) the Lenders party thereto, and (4) Wells Fargo Bank, National Association (as successor to Wells Fargo Retail Finance, LLC), as Administrative Agent

* Subject to increase, at any time notwithstanding the provisions of Section 2.17 of the Credit Agreement, to up to three months' rent as provided in the definition of "Reserves".

| | | | |
|---|---|---|---|
| **Responsible Officer:** | **Printed Name:  Mark Still** | Signature: _____ |
| **WFRF  Account Manager:** | **Printed Name:** _____ | Signature: _____ |