## Exhibit C

**Second Lien DIP Term Credit Agreement**

**Execution Version**

**SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR IN POSSESSION ASSET-BASED
TERM LOAN AGREEMENT**

dated as of April 24, 2024,

among

**EXPRESS, INC.**,
as Holdings,

**EXPRESS TOPCO LLC**,
as Intermediate Holdings,

**EXPRESS HOLDING, LLC**,
as Parent,

**EXPRESS, LLC**,
as Borrower,

**THE OTHER LOAN PARTIES PARTY HERETO FROM TIME TO TIME**,

**THE LENDERS PARTY HERETO FROM TIME TO TIME**,

and

**RESTORE CAPITAL, LLC**,
as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS AND ACCOUNTING TERMS** ................................................ 2

SECTION 1.01. Certain Defined Terms ........................................................... 2

SECTION 1.02. Computation of Time Periods; Other Definitional Provisions ........... 42

SECTION 1.03. Accounting Terms .............................................................. 42

SECTION 1.04. [Intentionally Omitted] ........................................................ 42

SECTION 1.05. Divisions ......................................................................... 42

SECTION 1.06. Rates .............................................................................. 42

**ARTICLE II AMOUNTS AND TERMS OF THE TERM LOAN** ................................ 43

SECTION 2.01. Term Loan; Protective Advances ............................................ 43

SECTION 2.02. Borrowing of the New Money DIP Loans ................................... 44

SECTION 2.03. [Intentionally Omitted] ........................................................ 44

SECTION 2.04. [Intentionally Omitted] ........................................................ 45

SECTION 2.05. Repayment of the Loans ....................................................... 45

SECTION 2.06. Prepayments ..................................................................... 45

SECTION 2.07. Interest ........................................................................... 46

SECTION 2.08. Fees. .............................................................................. 47

SECTION 2.09. [Intentionally Omitted] ........................................................ 47

SECTION 2.10. Increased Costs, Etc ........................................................... 47

SECTION 2.11. Payments and Computations .................................................. 49

SECTION 2.12. Taxes .............................................................................. 52

SECTION 2.13. Sharing of Payments, Etc ..................................................... 54

SECTION 2.14. Use of Proceeds ................................................................ 55

SECTION 2.15. [Intentionally Omitted] ........................................................ 55

SECTION 2.16. Evidence of Debt ............................................................... 55

SECTION 2.17. Net Orderly Liquidation Value; Reserves and Eligibility Criteria ...... 56

**ARTICLE III CONDITIONS TO EFFECTIVENESS AND OF LENDING** ................. 58

SECTION 3.01. Conditions Precedent to Interim Order Funding Date and Interim
Order Roll-Up ................................................................... 58

SECTION 3.02. Conditions Precedent to Final Order Roll-Up .............................. 61

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** .................................... 62

SECTION 4.01. Representations and Warranties .............................................. 62

**ARTICLE V COVENANTS OF THE LOAN PARTIES** ......................................... 67

SECTION 5.01. Affirmative Covenants ......................................................... 67

SECTION 5.02. Negative Covenants ............................................................ 75

SECTION 5.03. Reporting Requirements ....................................................... 86

SECTION 5.04. Holding Company Status ...................................................... 91

**ARTICLE VI EVENTS OF DEFAULT** ............................................................. 92

SECTION 6.01. Events of Default ............................................................... 92

**ARTICLE VII THE AGENTS** ........................................................................ 99

SECTION 7.01. Authorization and Action ..................................................... 99

SECTION 7.02. Agents' Reliance, Etc ........................................................ 100
SECTION 7.03. Agents and Affiliates ......................................................... 101
SECTION 7.04. Lender Credit Decision ..................................................... 101
SECTION 7.05. Indemnification ................................................................. 101
SECTION 7.06. Successor Agents .............................................................. 102
SECTION 7.08. Collateral and Guaranty Matters ...................................... 104
SECTION 7.09. Notice of Transfer ............................................................ 104
SECTION 7.10. Reports and Financial Statements .................................... 105
SECTION 7.11. Agency for Perfection ....................................................... 105

**ARTICLE VIII GUARANTY** ................................................................ 105
SECTION 8.01. Guaranty; Limitation of Liability .................................... 105
SECTION 8.02. Guaranty Absolute ........................................................... 106
SECTION 8.03. Waivers and Acknowledgments ....................................... 107
SECTION 8.04. Subrogation ...................................................................... 108
SECTION 8.05. Guaranty Supplements ..................................................... 109
SECTION 8.06. Subordination ................................................................... 109
SECTION 8.07. Continuing Guaranty; Assignments ................................. 110

**ARTICLE IX MISCELLANEOUS** ....................................................... 110
SECTION 9.01. Amendments, Etc ............................................................. 110
SECTION 9.02. Notices, Etc ...................................................................... 111
SECTION 9.03. No Waiver; Remedies ...................................................... 112
SECTION 9.04. Costs and Expenses ......................................................... 113
SECTION 9.05. Right of Set-off ................................................................ 114
SECTION 9.06. Binding Effect .................................................................. 114
SECTION 9.07. Assignments and Participations ....................................... 115
SECTION 9.08. Execution in Counterparts; Integration ........................... 118
SECTION 9.09. Intercreditor Agreements ................................................. 118
SECTION 9.10. Confidentiality .................................................................. 119
SECTION 9.11. Release of Collateral ........................................................ 119
SECTION 9.12. Replacement of Holdout Lender ...................................... 119
SECTION 9.13. Patriot Act Notice, Etc .................................................... 120
SECTION 9.14. Jurisdiction, Etc ............................................................... 120
SECTION 9.15. Governing Law ................................................................. 121
SECTION 9.16. Waiver of Jury Trial ......................................................... 121
SECTION 9.17. [Intentionally Omitted] .................................................... 121
SECTION 9.18. [Intentionally Omitted] .................................................... 121
SECTION 9.19. [Intentionally Omitted] .................................................... 121
SECTION 9.20. Acknowledgment and Consent to Bail-In of Affected Financial
                        Institutions ....................................................................... 121
SECTION 9.21. [Intentionally Omitted] .................................................... 122
SECTION 9.22. Severability ...................................................................... 122
SECTION 9.23. Erroneous Payments ........................................................ 122

## **SCHEDULES TO THE AGREEMENT**

Schedule I              -       Commitments and Applicable Percentages
Schedule II             -       Subsidiary Guarantors
Schedule 4.01(b)        -       Company Information
Schedule 4.01(c)        -       Subsidiaries and Other Equity Investments
Schedule 4.01(s)        -       Tax Returns
Schedule 5.01(r)        -       Milestones
Schedule 5.02(a)        -       Existing Liens
Schedule 5.02(b)        -       Existing Debt
Schedule 5.02(f)        -       Existing Investments

## **EXHIBITS TO THE AGREEMENT**

Exhibit A       -       Initial Budget
Exhibit B       -       Form of Term Loan Borrowing Base Certificate

**SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR IN POSSESSION ASSET-BASED
TERM LOAN AGREEMENT**

This SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR IN POSSESSION ASSET-BASED TERM LOAN AGREEMENT dated as of April 24, 2024 (as amended, amended and restated, restated, supplemented, modified or otherwise in effect from time to time, this "***Agreement***"), among **EXPRESS, INC.**, a Delaware corporation ("***Holdings***"), **EXPRESS TOPCO LLC**, a Delaware limited liability company ("***Intermediate Holdings***"), **EXPRESS HOLDING, LLC**, a Delaware limited liability company (the "***Parent***"), **EXPRESS, LLC**, a Delaware limited liability company (the "***Borrower***"), the other Loan Parties (as hereinafter defined) party hereto from time to time, each lender party hereto from time to time (collectively, the "***Lenders***" and each individually, a "***Lender***"), **RESTORE**, as collateral agent (together with any successor collateral agent appointed pursuant to Article VII, the "***Collateral Agent***") for the Secured Parties (as hereinafter defined) and as administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "***Administrative Agent***" and, together with the Collateral Agent, the "***Agents***") for the Lenders.

**PRELIMINARY STATEMENTS:**

**WHEREAS**, on April 22, 2024 (the "***Petition Date***"), (i) Holdings, (ii) Intermediate Holdings, (iii) Parent, (iv) the Borrower and (v) the other Loan Parties party hereto (collectively, the "***Debtors***" and each individually, a "***Debtor***") commenced Chapter 11 Cases Nos. 24-10831 through 24-10842, as jointly administered under Chapter 11 24-10831 (collectively, the "***Chapter 11 Cases***" and each individually, a "***Chapter 11 Case***"), by filing with the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**WHEREAS**, the Debtors continue to operate their businesses as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, the Prepetition Term Loan Lenders (as hereinafter defined) provided financing to the Borrower pursuant to that certain Asset-Based Term Loan Credit Agreement, dated as of September 5, 2023, by and among, Holdings, Intermediate Holdings, Parent, the Borrower, each of the other Loan Parties party thereto, the Prepetition Term Loan Lenders, and the Prepetition Term Loan Agents (as hereinafter defined) (as amended, restated, modified, waived or supplemented through the date hereof, the "***Prepetition Term Loan Credit Agreement***");

**WHEREAS**, prior to the Petition Date, the Prepetition ABL Lenders (as hereinafter defined) provided financing to the Borrower pursuant to that certain Second Amended and Restated Asset-Based Loan Credit Agreement, dated as of May 20, 2015, by and among, Holdings, Intermediate Holdings, Parent, the Borrower, each of the other Loan Parties party thereto, the Prepetition ABL Lenders, and the Prepetition ABL Agents (as hereinafter defined) (as amended, restated, modified, waived or supplemented through the date hereof, the "***Prepetition ABL Credit Agreement***");

**WHEREAS**, the Borrower has requested and the Lenders have agreed to provide a term loan facility (the "***Term Loan Facility***") to the Borrower, comprised of (i) $25,000,000 of Term Loan Commitments in respect of New Money DIP Loans (as hereinafter defined) available on the Interim Order Funding Date and (ii) Rolled-Up Loans (as hereinafter defined), (x) $25,261,220.50 of which will be deemed issued on the Interim Order Funding Date, and (y) in an amount equal to the remaining outstanding amount of Prepetition Term Loan Obligations as of the Final Oder Funding Date shall deemed issued on the Final Order Funding Date;

**WHEREAS**, the Lenders have indicated their willingness to advance the Term Loans to the Borrower, in each case, on the terms and conditions set forth herein; and

**WHEREAS**, the net proceeds of the New Money DIP Loans will be used to repay Prepetition ABL Loans (as hereinafter defined).

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby covenant and agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. <u>Certain Defined Terms</u>

As used in this Agreement (including in the preamble and the preliminary statements), the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"***ABL DIP Administrative Agent***" means (a) Wells Fargo, in its capacity as administrative agent for the ABL DIP Lender Parties under the ABL DIP Credit Agreement, (b) any successor to Wells Fargo in such capacity, by assignment or otherwise, and (c) any other party that may become administrative agent or trustee under the ABL DIP Credit Agreement in connection with a refinancing, renewal or replacement thereof.

"***ABL DIP Agents***" means, collectively, the ABL DIP Administrative Agent and the ABL DIP Collateral Agent.

"***ABL DIP Borrowing Base***" means the "Borrowing Base" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Borrowing Base Certificate***" means the "Borrowing Base Certificate" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Collateral Agent***" means (a) Wells Fargo, in its capacity as collateral agent for the ABL DIP Secured Parties under the ABL DIP Credit Agreement, (b) any successor to Wells Fargo in such capacity, by assignment or otherwise, and (c) any other party that may become collateral agent or trustee under the ABL DIP Credit Agreement in connection with a refinancing, renewal or replacement thereof.

"***ABL DIP Commitments***" means the "Commitments" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Credit Agreement***" means that certain Senior Secured Super-Priority Priming Debtor-in-Possession Asset-Based Loan Credit Agreement, dated as of April 24, 2024, by and among the Borrower, the guarantors party thereto, the ABL DIP Agents and the ABL DIP Lenders, as may be amended, amended and restated, supplemented, extended or otherwise modified from time to time in accordance with the provisions hereof, the Intercreditor Agreement and the Orders.

"***ABL DIP Credit Card Advance Rate***" means the "Credit Card Advance Rate" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Excess Availability***" means "Excess Availability" as such term is defined in the ABL DIP Credit Agreement

"***ABL DIP Facility***" means the credit facility provided pursuant to the ABL DIP Credit Agreement.

"***ABL DIP Inventory Advance Rate***" means the "Inventory Advance Rate" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Lender Party***" means a "Lender Party" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Lenders***" means the "Lenders" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Loan Documents***" means the "Loan Documents" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Loans***" means the "Revolving Credit Advances" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Obligations***" means the "Obligations" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Secured Party***" means a "Secured Party" as such term is defined in the ABL DIP Credit Agreement.

"***ABL DIP Used Commitment***" means the aggregate "Used Commitment" (as such term is defined in the ABL DIP Credit Agreement) of all ABL DIP Lenders (which shall include, for certainty, the aggregate principal amount of all "Revolving Credit Advances", the aggregate principal amount of all "Swing Line Advances" then outstanding, the aggregate principal amount of all "Protective Advances" then outstanding and the aggregate "Available Amount" of all "Letters of Credit" outstanding at such time, as each such term is defined in the ABL DIP Credit Agreement).

"***Account(s)***" means "accounts" as defined in the UCC and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, or (b) for services rendered or to be rendered. The term "Account" does not include (a) rights to payment evidenced by chattel paper or an instrument, (b) commercial tort claims, (c) deposit accounts, (d) investment property, or (e) letter-of-credit rights or letters of credit.

"***Account Debtor***" means the Person obligated on an Account.

"***Additional Guarantor***" has the meaning specified in Section 8.05.

"***Adequate Protection Provisions***" means the provisions of the Orders providing adequate protection to the Prepetition Term Loan Secured Parties and Prepetition ABL Secured Parties, including, the "Adequate Protection Super-Priority Claims" and "Adequate Protection Liens" as defined therein.

"***Administrative Agent***" has the meaning specified in the preamble to this Agreement.

"***Administrative Agent's Account***" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Borrower and the Lenders from time to time.

"***Affected Financial Institution***" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Affiliate***" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person by contract or other agreement. For the avoidance of doubt, each of Express JV and Bonobos shall constitute an Affiliate for all purposes.

"***Agent Assignee***" has the meaning specified in Section 9.23(d).

"***Agent's Advisor***" Alix Partners, LLC or any other financial advisor or consultant retained by the Administrative Agent or the attorneys or other advisors of the Administrative Agent.

"***Agents***" has the meaning specified in the preamble to this Agreement.

"***Agreement***" has the meaning specified in the preamble hereto.

"***Agreement Value***" means, for each Hedge Agreement, on any date of determination, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreement, (a) for any date on or after the date such Hedge Agreement has been closed out and termination value determined in accordance therewith, such termination value, and (b) for any date prior to the date referenced in clause (a), the amount determined as the mark-to-market value for such Hedge Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreement (which may include a Lender or any Affiliate of a Lender).

"***Anti-Corruption Laws***" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"***Anti-Money Laundering Laws***" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"***Applicable Lending Office***" means, with respect to each Lender, the office or offices of such Lender described as such in such Lender's administrative questionnaire provided to the Administrative Agent, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent in writing.

"***Applicable Margin***" means (a) in the case of SOFR Loans, 11.50%, and (b) in the case of Base Rate Loans, 10.50%.

"***Applicable Percentage***" means, with respect to (i) Term Loan Commitments or Term Loans of any Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is such Lender's Term Loan Commitment or Term Loan at such time, as the context may require, subject to adjustment as provided in Section 9.07, and the denominator of which is the total

outstanding amount of Term Loans and Term Loan Commitments at such time and (ii) Prepetition Term Loans of any Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is such Lender's outstanding amount of Prepetition Term Loans at such time, as the context may require, and the denominator of which is the total outstanding amount of Prepetition Term Loans at such time.  The initial Applicable Percentage of each Lender's Term Loan Commitment is set forth opposite the name of such Lender on Schedule I or in the Assignment and Assumption or other instrument pursuant to which such Lender becomes a party hereto, as applicable.

"***Approved Budget***" means the Initial Budget until, if applicable, there is an Updated Approved Budget, in which case the Approved Budget shall be the most recently approved Updated Approved Budget by the Administrative Agent and Lenders in accordance with Section 5.01(s).

"***Approved Fund***" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate or branch of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"***Assignment and Assumption***" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "Eligible Assignee"), and accepted by the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C to the Prepetition Term Loan Credit Agreement with such modifications approved by the Administrative Agent and the Borrower.

"***Audited Financial Statements***" means the audited Consolidated balance sheet of Holdings and its Subsidiaries for the Fiscal Year ended January 28, 2023, and the related Consolidated statements of income or operations and cash flows for such Fiscal Year of Holdings and its Subsidiaries, including the notes thereto.

"***Available Tenor***" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from any definition providing for "interest periods" (or any similar or analogous definition) pursuant to Section 2.10(g)(iv).  For the avoidance of doubt, the only Available Tenor as of the Effective Date is three (3) months.

"***Avoidance Actions***" shall mean any and all avoidance, recovery, subordination, or other claims, remedies, or causes of action that may be brought by or on behalf of the Loan Parties or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under Bankruptcy Code sections 502, 510, 542, 544, 545, 547 through and including Bankruptcy Code sections 553, and 724(a) or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

"***Bail-In Action***" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"***Bail-In Legislation***" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or

rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"***Bankruptcy Code***" means Title 11 of the United States Code, as in effect from time to time.

"***Bankruptcy Court***" has the meaning specified in the recitals hereto.

"***Base Rate***" means, for any day, the greatest of (a) the Floor plus 1.00%, (b) the Federal Funds Rate in effect on such day plus 0.50%, (c) Term SOFR for a one month tenor in effect on such day, plus 1%, provided that this clause (c) shall not be applicable during any period in which Term SOFR is unavailable or unascertainable, and (d) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco (or another national bank selected by the Administrative Agent in its reasonable discretion) as its "prime rate" in effect on such day, with the understanding that the "prime rate" is one of Wells Fargo's (or such other national bank's) base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo (or such other national bank) may designate.

"***Base Rate Loan***" means a Loan that bears interest at a rate based on the Base Rate.

"***Base Rate Term SOFR Determination Day***" has the meaning specified in the definition of "Term SOFR".

"***Basel III***" means the set of reform measures designed to improve the regulation, supervision and risk management within the banking sector, as developed by the Basel Committee on Banking Supervision.

"***Benchmark***" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.10(g)(i).

"***Benchmark Replacement***" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement shall be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or

determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated, syndicated credit facilities at such time.

"**_Benchmark Replacement Date_**" means, with respect to any then-current Benchmark, the earlier to occur of the following events with respect to such Benchmark:

> (a)    in the case of <u>clause (a)</u> or <u>(b)</u> of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

> (b)    in the case of <u>clause (c)</u> of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such <u>clause (c)</u> and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of <u>clause (a)</u> or <u>(b)</u> with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**_Benchmark Transition Event_**" means, with respect to the then-current Benchmark, the occurrence of one or more of the following events with respect to such Benchmark:

> (a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

> (b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

> (c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if the then-current Benchmark has any Available Tenors, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Start Date***" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication).

"***Benchmark Unavailability Period***" means, with respect to any then-current Benchmark, if a Benchmark Transition Event and its related Benchmark Replacement Date has occurred with respect to such then-current Benchmark and solely to the extent that such then-current Benchmark has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10(g) and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.10(g).

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***BHC Act Affiliate***" of a Person means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Person.

"***Board***" means the Board of Governors of the Federal Reserve System of the United States of America.

"***Bonobos***" means BNWHP, LLC, a Delaware limited liability company (as successor by conversion to Bonobos, Inc., a Delaware corporation).

"***Bonobos IP***" means any and all Intellectual Property that (i) are or have been assigned, transferred, contributed, conveyed, sold, delivered, or provided (or are required to be assigned, transferred, contributed, conveyed, sold, delivered, or provided) to Bonobos or any Affiliate thereof pursuant to any Bonobos IP Transaction Document, or (ii) are licensed or sublicensed to Holdings or any of its Affiliates pursuant to any Bonobos IP Transaction Document.

"***Bonobos IP License Agreements***" means, collectively:

(a)     that certain License Agreement dated as of May 23, 2023, by and between Bonobos, as "licensor", and Holdings, as "licensee" (the "***Bonobos Prime License Agreement***"),

(b)     the Intercompany IP License Agreements, and

(c)     any other license agreement between any Loan Party or any Subsidiary as "licensee" and a third party as "licensor" with respect to any of the Bonobos IP,

in each case as in effect as of the Effective Date (or, in the case of any Bonobos IP License Agreement described in underline(c) above, as in effect on the date of execution thereof and in form and substance substantially identical to the Intercompany IP License Agreements or otherwise reasonably satisfactory to the Agents) or subsequently amended in accordance with Section 5.02(k)(ii).

"*Bonobos IP Rights Agreement*" means that certain Bonobos IP Rights Agreement, dated as of September 5, 2023, by Bonobos and Holdings (in its capacity as sublicensor under the applicable Bonobos IP License Agreement) and acknowledged and agreed by the Loan Parties, the Prepetition Term Loan Agents and the Prepetition ABL Agents, as amended, restated, supplemented or otherwise modified in accordance with the terms hereof and thereof.

"*Bonobos IP Transaction Documents*" means the documents, instruments and agreements described on Schedule V to the Prepetition Term Loan Credit Agreement.

"*Bonobos IP Transactions*" means collectively, the transactions described in the Bonobos IP Transaction Documents.

"*Bonobos Prime License Agreement*" has the meaning specified in the definition of "Bonobos IP License Agreements".

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrowing*" means an advance of the New Money DIP Loans pursuant to Section 2.01(a) to the Borrower on the Interim Order Funding Date or Final Order Funding Date, as applicable.

"*Borrowing Base Certificate*" means, collectively, the ABL DIP Borrowing Base Certificate and the Term Loan Borrowing Base Certificate.

"*Borrowing Base Party*" means (a) the Borrower and/or (b) any Subsidiary Guarantor.

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which the Federal Reserve Bank of New York is closed.

"*Capitalized Leases*" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases, subject to Section 1.03.

"*Carve Out*" has the meaning specified in the Orders.

"*Carve Out Reserve*" has the meaning given to the term "Carve Out Reserve" in the ABL DIP Credit Agreement.

"*Cash Equivalents*" means any of the following, to the extent owned by the Parent or any of its Restricted Subsidiaries free and clear of all Liens other than Permitted Liens and Liens created under the Collateral Documents and, in each case, having a maturity of not greater than one year from the date of issuance thereof:

(a)    readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States,

(b)      readily marketable direct obligations of any member of the European Economic Area, Switzerland or Japan, or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of such country, and, at the time of acquisition thereof having a credit rating of at least AA- (or the equivalent grade) by Moody's or Aa3 by S&P,

(c)      marketable general obligations issued by any state of the United States or any political subdivision thereof or any or any instrumentality thereof that is guaranteed by the full faith and credit of such state and, at the time of acquisition thereof having a credit rating of at least AA- (or the equivalent grade) by Moody's or Aa3 by S&P,

(d)      insured certificates of deposit, time deposits, eurodollar time deposits or overnight time deposits with any commercial bank that is organized under the laws of the United States or any State thereof, any member of the European Economic Area, Switzerland or Japan and has combined capital and surplus of at least $500 million,

(e)      commercial paper issued by any Lender or any corporation organized under the laws of any State of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or "A-1" (or the then equivalent grade) by S&P,

(f)      repurchase agreements and reverse repurchase agreements with a duration of not more than 30 days for underlying securities of the types set forth in clauses (a) through (e) of this definition entered into with any financial institution meeting the specifications in clause (d) of this definition,

(g)      [intentionally omitted], or

(h)      Investments in money market funds, of which at least 95% of the portfolios are limited solely to Investments of the character, quality and maturity described in clauses (a) through (f) of this definition.

With respect to any Foreign Subsidiary, "Cash Equivalents" shall also include any Investment substantially comparable to the foregoing but in the currency of the jurisdiction of organization of such Subsidiary, Euros or Dollars.

"***Cash Management Order***" shall mean any order entered by the Bankruptcy Court, in form and substance acceptable to the Administrative Agent and Lenders, governing the Debtors' cash management system on an interim basis and final basis, as applicable.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time.

"***CERCLIS***" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"***Change in Law***" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority, (c) any new, or adjustment to, requirements prescribed by the Board for "Eurocurrency Liabilities" (as defined in Regulation D of the Board), requirements imposed by the Federal Deposit Insurance Corporation, or similar requirements imposed by any domestic or foreign governmental authority or resulting from compliance by any Agent or any Lender with any request or directive (whether or not having the force of

law) from any central bank or other Governmental Authority and related in any manner to SOFR, the Term SOFR Reference Rate or Term SOFR, or (d) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"***Change of Control***" means the occurrence of any of the following:

(a)      any Person or two or more Persons acting in concert shall have acquired beneficial ownership (within the meaning of Rule 13(d)-3 of the SEC under the Securities Exchange Act of 1934, as amended), directly or indirectly, of Voting Interests (or other securities convertible into such Voting Interests) representing 50% or more of the combined voting power of all Voting Interests of Holdings;

(b)      during any period of up to 12 consecutive months, Continuing Directors shall cease for any reason to constitute a majority of the board of directors of Holdings;

(c)      Holdings fails at any time to own 100% of the Equity Interests of Intermediate Holdings free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the ABL DIP Collateral Agent, Prepetition ABL Agents and Prepetition Term Loan Agents permitted pursuant to clause (z) of the definition of "Permitted Liens");

(d)      Intermediate Holdings fails at any time to own 100% of the Equity Interests of the Parent free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the ABL DIP Collateral Agent, Prepetition Term Loan Agents and Prepetition ABL Agents permitted pursuant to clause (z) of the definition of "Permitted Liens");

(e)      the Parent fails at any time to own 100% of the Equity Interests of the Borrower free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the ABL DIP Collateral Agent, Prepetition Term Loan Agents and Prepetition ABL Agents permitted pursuant to clause (z) of the definition of "Permitted Liens");

(f)      the Parent fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party (other than Holdings, Intermediate Holdings and the Borrower) free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the ABL DIP Collateral Agent, Prepetition Term Loan Agents and Prepetition ABL Agents permitted pursuant to clause (z) of the definition of "Permitted Liens"), except where such failure is as a result of a transaction permitted by the Loan Documents;

(g)      Holdings and the other Loan Parties, collectively, fail at any time to own at least 40% of the Equity Interests of Express JV free and clear of all Liens (other than the Liens in favor of the Collateral Agent and Liens in favor of the ABL DIP Collateral Agent, Prepetition Term Loan Agents and Prepetition ABL Agents permitted pursuant to clause (z) of the definition of "Permitted Liens"); or

(h)      any "change of control" or similar event as defined in the ABL DIP Credit Agreement, Prepetition Term Loan Credit Agreement or Prepetition ABL Credit Agreement.

"***Chapter 11 Cases***" has the meaning specified in the recitals hereto.

"***Collateral***" has the meaning specified in Section 2.18(a)(i) and shall include all "DIP Collateral" as defined in the Orders.

"***Collateral Access Agreement***" means an agreement reasonably satisfactory in form and substance to the Administrative Agent executed by (a) a bailee or other Person in possession of Collateral, and/or (b) any landlord of real property leased by any Loan Party.

"***Collateral Agent***" has the meaning specified in the preamble to this Agreement.

"***Collateral Documents***" means the Orders and each of the other collateral documents, instruments and agreements delivered pursuant to Section 5.01(j) under this Agreement, and each other agreement that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"***Committee***" means an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee, if any.

"***Committee Professionals***" shall mean the professionals retained by any Committee under Section 1103 of the Bankruptcy Code.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"***Confidential Information***" means information that any Loan Party or its Subsidiaries furnishes to any Agent or any Lender, but does not include any such information that is or becomes generally available to the public other than as a result of a breach by such Agent or any Lender of its obligations hereunder or that is or becomes available to such Agent or such Lender from a source other than the Loan Parties who is not subject to any legally binding obligation to any Loan Party or its Subsidiaries to keep such information confidential.

"***Conforming Changes***" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," any definition providing for "interest periods" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Borrower) may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides (in consultation with the Borrower) is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"***Consolidated***" refers to the consolidation of the accounts, financial condition or operating results of a Person and its Subsidiaries in accordance with GAAP.

"***Continuing Directors***" means in the case of Holdings and, with respect to any period, the directors of Holdings on the first day of such period and each other director if, in each case, such other director's nomination for election to the board of directors of Holdings is recommended by at least a majority of the then Continuing Directors.

"***Cost***" means the cost of purchases of Inventory determined according to the accounting policies used in the preparation of the Loan Parties' audited financial statements most recently completed prior to the Effective Date.

"***Costa Rica Subsidiary***" means Express Fashion Digital Services Costa Rica, S.R.L., a limited liability company organized under the laws of Costa Rica.

"***Covered Entity***" means any of the following:

> (a)      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

> (b)      a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

> (c)      a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"***Credit Card Advance Rate***" means the lesser of (x) 10% and (y) 100%, *minus* the ABL DIP Credit Card Advance Rate.

"***Credit Card Issuer***" shall mean any person (other than any Loan Party or any Affiliate of a Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including private label cards, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., Novus Services, Inc. and other issuers approved by the Administrative Agent in its Permitted Discretion.

"***Credit Card Processor***" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrowing Base Party's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"***Credit Card Receivables***" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Borrowing Base Party resulting from charges by a customer of a Borrowing Base Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Borrowing Base Party, or services performed by a Borrowing Base Party, in each case in the ordinary course of its business.

"***Debt***" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables, deferred compensation and straight line rent and landlord allowance in each case incurred and then outstanding in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to

property acquired by such Person, (e) all Obligations of such Person as lessee under Capitalized Leases, (f) the maximum amount of all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person with respect to Disqualified Stock and Prohibited Preferred Stock, (h) net Obligations of such Person in respect of Hedge Agreements, valued at the Agreement Value thereof, (i) all Guaranteed Debt and Synthetic Debt of such Person and (j) all indebtedness and other payment Obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations; but limited in amount to the lesser of (i) the fair market value of such property and (ii) the amount of such indebtedness or other payment obligations.

Notwithstanding anything to the contrary contained herein, Debt shall not include (i) any amounts relating to preferred equity (other than Disqualified Stock and Prohibited Preferred Stock), employee consulting arrangements, accrued expenses, deferred rent (other than Capitalized Leases), deferred taxes, obligations under employment agreements, unredeemed gift card deferred revenue and deferred compensation, (ii) in connection with any acquisition consented to by the Required Lenders in writing, post-closing purchase price adjustments, earn-outs or similar obligations that are dependent upon the performance of the acquisition target after such closing to which the seller in such acquisition may become entitled, (iii) contingent obligations incurred in the ordinary course of business, (iv) non-recourse obligations under or in respect of securitization transactions, (v) customary payables with respect to money orders or wire transfers, and (vi) the obligations of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on December 31, 2018 (whether or not such lease existed on December 31, 2018 or thereafter arose).  Notwithstanding anything to the contrary, the financial ratios and related definitions set forth in the Loan Documents shall be computed (a) to exclude (i) the application of ASC 815 (Derivatives and Hedging), ASC 480 (Distinguishing Liabilities from Equity) or ASC 718 (Stock Compensation) (to the extent that the pronouncements in ASC 718 result in recording an equity award as a liability on the Consolidated balance sheet of the Parent and its Subsidiaries in the circumstance where, but for the application of the pronouncements, such award would have been classified as equity), (ii) any mark-to-market adjustments to any derivatives (including embedded derivatives contained in other debt or equity instruments under ASC 815), (iii) any non-cash compensation charges resulting from the application of ASC 718, and (iv) any change to lease accounting rules from those in effect pursuant to ASC 842 (Leases) and other related lease accounting guidance as in effect on the Effective Date, and (b) by disregarding the effects of FASB ASC 825 (Financial Instruments) and ASC 470-20 (Debt with Conversion and Other Options) on financial liabilities.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, arrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtor Professionals**" means persons or firms retained by the Loan Parties pursuant to Section 327, 328 or 363 of the Bankruptcy Code.

"**Debtors**" has the meaning specified in the recitals hereto.

"**Default**" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

14

"***Default Rate***" means an interest rate equal to three percent (3%) per annum in excess of the rate then applicable to such Obligation.

"***Default Right***" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"***Disbursement Variance***" has the meaning specified in Section 5.01(s)(ii).

"***Discharge of ABL Obligations***" means the "Discharge of ABL Obligations" as such term is defined in the Intercreditor Agreement.

"***Disqualified Stock***" means any Equity Interest that, by its terms (or by the terms of any Equity Interests into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), matures or is Redeemable, in whole or in part, provides for scheduled payments, dividends or distributions in cash or is or becomes convertible into or exchangeable or exercisable for Debt or any other Equity Interests that would constitute Disqualified Stock, in each case on or prior to the date that is 91 days after the Maturity Date. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement shall be the maximum amount that the Loan Parties may become obligated to pay upon such maturity of, or pursuant to such Redeemable provisions in respect of, such Disqualified Stock.

"***Discretionary Reserve***" means an amount equal to $20,000,000 from the Effective Date until May 11, 2024; thereafter, $35,000,000.

"***Dollars***" and "***$***" means lawful money of the United States of America.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Effective Date***" means April 24, 2024.

"***Eligible Assignee***" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than an individual) approved by the Administrative Agent (each such approval not to be unreasonably withheld or delayed); *provided*, *however*, that neither any Loan Party nor any Affiliate of a Loan Party shall qualify as an Eligible Assignee under this definition.

"***Eligible Credit Card Receivables***"  means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination, as determined by each Agent in its Permitted Discretion in accordance with Section 2.17: such Credit Card Receivable (x) has been earned by performance and represents the bona

fide amounts due to a Borrowing Base Party from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrowing Base Party, and (y) in each case is not ineligible for inclusion in the calculation of the Term Loan Borrowing Base pursuant to any of <u>clauses (a)</u> through <u>(j)</u> below.  Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrowing Base Party as payee or remittance party.  In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrowing Base Party may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Borrowing Base Parties to reduce the amount of such Credit Card Receivable.  Any Credit Card Receivable meeting the foregoing criteria shall be deemed to be an Eligible Credit Card Receivable, but only as long as such Credit Card Receivable is not included within any of the following categories as determined by each Agent in its Permitted Discretion in accordance with <u>Section 2.17</u>, in which case such Credit Card Receivable shall not constitute an Eligible Credit Card Receivable:

(a)     Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC);

(b)     Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale, or for such longer period(s) as may be approved by each Agent in its Permitted Discretion;

(c)     Credit Card Receivables with respect to which a Borrowing Base Party does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent for its own benefit and the benefit of the other Secured Parties pursuant to the Collateral Documents, and (ii) Permitted Liens);

(d)     Credit Card Receivables that are not subject to a perfected, first priority security interest in favor of the Collateral Agent for its own benefit and the benefit of the other Secured Parties (subject to (i) chargebacks in the ordinary course by the Credit Card Issuer or Credit Card Processor, (ii) Liens in favor of the ABL DIP Collateral Agent and Prepetition ABL Collateral Agent permitted under <u>clause (z)</u> of the definition of "Permitted Liens", (iii) the Carve Out and (iv) Permitted Liens having priority by operation of applicable law);

(e)     Credit Card Receivables which are disputed, or with respect to which a claim, counterclaim, offset or chargeback (other than chargebacks in the ordinary course by the Credit Card Issuer or Credit Card Processor) has been asserted, by the related credit card processor (but only to the extent of such dispute, counterclaim, offset or chargeback);

(f)     except as otherwise approved by each Agent in its Permitted Discretion, Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Borrowing Base Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(g)     except as otherwise approved by each Agent in its Permitted Discretion in an aggregate amount not to exceed $10,000,000 (such approval not to be unreasonably withheld), Credit Card Receivables arising from any private label credit card program of the Borrowing Base Parties;

(h)       Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

(i)       Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto; and

(j)       Credit Card Receivables which any Agent determines in its Permitted Discretion to be uncertain of collection.

"*Eligible Inventory*" means, as of any date of determination, without duplication, items of Inventory of a Loan Party in each case that are not excluded as ineligible by virtue of one or more of the criteria set forth below and that are reflected in the most recent Borrowing Base Certificate delivered to the Administrative Agent.  Except as otherwise agreed by each Agent, in its Permitted Discretion, in accordance with Section 2.17 after completion of an updated field examination and appraisal, none of the following shall be deemed to be Eligible Inventory:

(a)       Inventory with respect to which a Borrowing Base Party does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent for its own benefit and the benefit of the other Secured Parties pursuant to the Collateral Documents and (ii) Permitted Liens), or is leased by or is on consignment to a Borrowing Base Party, or that is not solely owned by a Borrowing Base Party;

(b)       Inventory that (i) is not located in the United States of America (excluding territories or possessions of the United States) or (ii) is stored at a leased or rented location (other than a retail store location) where the aggregate value of Inventory exceeds $500,000, unless each Agent has given its prior consent thereto or unless either a Collateral Access Agreement or Existing Collateral Access Agreement in respect of such location has been delivered to the Administrative Agent (*provided* that the Loan Parties shall use commercially reasonable efforts to ensure that the aggregate value of all Inventory stored at such leased or rented location and not deemed "Eligible Inventory" shall not exceed $7,500,000 at any one time outstanding), (iii) is stored with a bailee or warehouseman where the aggregate value of Inventory exceeds $500,000, unless either an acknowledged Collateral Access Agreement  or Existing Collateral Access Agreement has been received by the Administrative Agent (*provided* that the Loan Parties shall use commercially reasonable efforts to ensure that the aggregate value of all Inventory stored with a bailee or warehouseman and not deemed "Eligible Inventory" shall not exceed $7,500,000 at any one time outstanding),

(c)       Inventory that represents goods which (i) are damaged, defective, "seconds", or otherwise unmerchantable, (ii) are to be returned to the vendor and which is no longer reflected in the Borrowing Base Parties' stock ledger, (iii) are obsolete or slow moving, or special-order items, work in process, raw materials, or that constitute spare parts, shipping materials or supplies used or consumed in a Borrowing Base Party's business, or (iv) are bill and hold goods;

(d)       except as otherwise agreed by each Agent in its Permitted Discretion, Inventory that represents goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Loan Documents;

(e)       Inventory that is not subject to a perfected, first priority security interest in favor of the Collateral Agent for its own benefit and the benefit of the other Secured Parties (subject only to (i) Liens in favor of the ABL DIP Collateral Agent and Prepetition ABL Collateral Agent

permitted under <u>clause (z)</u> of the definition of "Permitted Liens", (ii) the Carve Out and (iii) Permitted Liens having priority by operation of applicable law);

(f)        Inventory that is not insured in compliance with the provisions of <u>Section 5.01(d)</u>;

(g)        Inventory which consists of samples, labels, bags (other than handbags), packaging materials, and other similar non-merchandise categories;

(h)        Inventory which contains or bears any Intellectual Property rights licensed to such Borrowing Base Party (including, without limitation, any Intellectual Property subject to any JV IP License Agreement or any Bonobos IP License Agreement), unless (i) each Agent is satisfied that the Collateral Agent may sell or otherwise dispose of such Inventory without (A) infringing the rights of such licensor, (B) violating any contract with such licensor, or (C) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the then-applicable licensing agreement, (ii) with respect to any Intellectual Property subject or licensed pursuant to any JV IP License Agreement, the IP Rights Agreement is in full force and effect and the Collateral Agent is entitled to exercise all rights and remedies afforded to it thereunder; or (iii) with respect to any Intellectual Property subject or licensed pursuant to any Bonobos IP License Agreement, the Bonobos IP Rights Agreement is in full force and effect and the Collateral Agent is entitled to exercise all rights and remedies afforded to it thereunder;

(i)        Inventory which has been sold but not yet delivered or Inventory to the extent that any Borrowing Base Party has accepted a deposit therefor; and

(j)        Inventory acquired pursuant to <u>Section 5.02(f)</u>, unless the Administrative Agent shall have received or conducted (A) appraisals, from appraisers reasonably satisfactory to each Agent, of such Inventory to be acquired in such Investment and has established an Inventory Advance Rate therefor and (B) such other due diligence as any Agent may reasonably require, all of the results of the foregoing to be reasonably satisfactory to each Agent in its Permitted Discretion.

"***Environmental Action***" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any violation of, or liability under, any Environmental Law, or an Environmental Permit or arising from an alleged injury or threat to the environment, or to health and safety with regard to exposure to Hazardous Materials, including, without limitation, and to the extent arising from the foregoing, by any governmental or regulatory authority or third party for enforcement, cleanup, removal, response, remedial or other actions, damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"***Environmental Law***" means any Federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, writ, judgment, injunction or decree relating to pollution or protection of the environment, natural resources or exposure of any individual to Hazardous Material, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"***Environmental Permit***" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition

from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized on any date of determination.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*ERISA Affiliate*" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 4001(a)(14) of ERISA.

"*ERISA Event*" means (a)(i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC or (ii) the requirements of Section 4043(b) of ERISA apply with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

"*Erroneous Payment*" has the meaning specified in <u>Section 9.23(a)</u>.

"*Erroneous Payment Deficiency Assignment*" has the meaning specified in <u>Section 9.23(d)</u>.

"*Erroneous Payment Impacted Loans*" has the meaning specified in <u>Section 9.23(d)</u>.

"*Erroneous Payment Return Deficiency*" has the meaning specified in <u>Section 9.23(d)</u>.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Events of Default*" has the meaning specified in <u>Section 6.01</u>.

"*Excluded Subsidiary*" means the Costa Rica Subsidiary.

"*Excluded Taxes*" means, with respect to any Payee, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its Applicable Lending

Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 9.12), any withholding tax that is imposed on amounts payable hereunder at the time such Payee becomes a party hereto (or designates a new Applicable Lending Office) or is attributable to such Payee's failure or inability (other than as a result of a Change in Law) to comply with Section 2.12, except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Applicable Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 2.12(a), (d) any U.S. federal, state or local backup withholding tax, and (e) any U.S. federal withholding tax imposed under FATCA.

"**Existing Collateral Access Agreements**" means the Collateral Access Agreements entered into pursuant to the Prepetition Credit Agreements.

"**Existing Debt**" means such Debt set forth on Schedule 5.02(b).

"**Express JV**" means EXP Topco, LLC, a Delaware limited liability company.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with) and any current or future regulations or other official interpretations thereof, any intergovernmental agreements and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if such rate is not so published for any day which is a Business Day, the Federal Funds Rate for such day shall be the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it (and, if any such rate is below the Floor, then the rate determined pursuant to this definition shall be deemed to be the Floor).

"**Final Order**" shall mean a final order of the Bankruptcy Court approving the New Money DIP Loans, the Rolled-Up Loans, the Term Loan Facility and the Loan Documents on a final basis, in form and substance satisfactory to the Administrative Agent and Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and Lenders.

"**Final Order Funding Date**" means the next Business Day following the date that (i) the Bankruptcy Court has entered the Final Order and (ii) the Borrower has satisfied the conditions set forth in Section 3.02 (or such conditions have been waived by the Administrative Agent and Lenders).

"**Final Order Rolled-Up Loans**" has the meaning specified in Section 2.01(b).

"***Fiscal Month***" means any fiscal month of the Parent and its Consolidated Subsidiaries ending on the dates set forth on Schedule III to the Prepetition Term Loan Credit Agreement, as such schedule may be updated from time to time by delivery of a new Schedule III to the Prepetition Term Loan Credit Agreement to the Administrative Agent.

"***Fiscal Quarter***" means any fiscal quarter of the Parent and its Consolidated Subsidiaries ending on the dates set forth on Schedule III to the Prepetition Term Loan Credit Agreement, as such schedule may be updated from time to time by delivery of a new Schedule III to the Prepetition Term Loan Credit Agreement to the Administrative Agent.

"***Fiscal Year***" means a fiscal year of the Parent and its Consolidated Subsidiaries ending on the Saturday closest to January 31 in any calendar year.

"***Floor***" means a rate of interest equal to 2.00%.

"***Foreign Lender***" means a Payee that is not a United States person within the meaning of Internal Revenue Code Section 7701(a)(30).

"***Foreign Subsidiary***" means a Subsidiary of the Parent that is organized under the laws of a jurisdiction located outside of the United States.

"***Fund***" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"***Funding Date***" means the Interim Order Funding Date or the Final Order Funding Date, as applicable.

"***GAAP***" has the meaning specified in Section 1.03.

"***GC Purchase Agreement***" has the meaning specified on Schedule 5.01(r).

"***Governmental Authority***" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"***Governmental Authorization***" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Guaranteed Debt***" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt ("***primary obligations***") of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (c) the grant of any Lien on any assets of

such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien) or (d) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Guaranteed Debt" shall not include any product warranties or other ordinary course contingent obligations incurred in the ordinary course of business, including indemnities.  The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"*Guaranteed Obligations*" has the meaning specified in Section 8.01.

"*Guaranties*" means, collectively, the Parent Guaranty, the Holdings Guaranty, the Intermediate Holdings Guaranty and the Subsidiary Guaranty.

"*Guarantors*" means, collectively, the Parent, the Holdings Entities and the Subsidiary Guarantors (in each case, for so long as such Person's Guaranty remains in effect).

"*Guaranty Supplement*" has the meaning specified in Section 8.05.

"*Hazardous Materials*" means (a) petroleum or petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, radon gas and toxic mold and (b) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or explosive or radioactive substances or as a pollutant or contaminant under any Environmental Law.

"*Hedge Agreements*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"*Hilco*" has the meaning specified in Section 5.02(e).

"*Holdings*" has the meaning specified in the preamble to this Agreement.

22

"***Holdings Entities***" means, collectively, Holdings and Intermediate Holdings.  "***Holdings Entity***" means any one of such Persons.

"***Holdings Guaranty***" means the guaranty of Holdings set forth in <u>Article VIII</u>.

"***Indemnified Costs***" has the meaning specified in <u>Section 7.05</u>.

"***Indemnified Party***" has the meaning specified in <u>Section 9.04(b)</u>.

"***Indemnified Taxes***" means Taxes imposed with respect to any Loan Document or any payment thereunder other than Excluded Taxes.

"***Initial Budget***" means the cash flow forecast commencing with the week of the Petition Date through and including the week ending May 18, 2024, attached as <u>Exhibit A</u> hereto (the "***Initial Budget***"), setting forth cash revenues, receipts, expenses, professional fees and other disbursements (including, without limitation, any payments with respect to real property leases), net cash flows, inventory receipts and other items on a line item basis (including all necessary and required expenses which the Loan Parties expect to incur and anticipated uses of proceeds of draws under the Term Loan Facility and ABL DIP Facility) on a weekly basis for the period beginning as of the week of the Petition Date through and including the week ending May 18, 2024, as the same may be amended, supplemented or modified from time to time only with the prior written consent of the Administrative Agent and Lenders in their respective sole discretion. The Initial Budget shall be deemed the "Approved Budget" for all purposes of this Agreement and the other Loan Documents until superseded by an Updated Approved Budget in accordance with <u>Section 5.01(s)</u>.

"***Initial Intercreditor Agreement***" shall mean the Intercreditor Agreement, dated as of September 5, 2023, by and among the Prepetition ABL Collateral Agent (for and on behalf of the Prepetition ABL Secured Parties) and the Prepetition Term Loan Collateral Agent (for and behalf of the Prepetition Term Loan Secured Parties), and acknowledged and agreed by the Loan Parties (as amended, modified, restated and/or supplemented from time to time).

"***Insufficiency***" means, with respect to any Plan, the amount, if any, of a Plan's accumulated benefit obligation (determined in accordance with GAAP) in excess of the Plan's fair value of assets.

"***Intellectual Property***" means all assets of the type described in the definition of "Intellectual Property Collateral" as set forth in the Security Agreement under and as defined in the Prepetition Term Loan Credit Agreement.

"***Intercreditor Agreements***" shall mean the Initial Intercreditor Agreement as modified by and including the provisions of Section 7 of the Interim Order or the Final Order (from and after the date the Final Order is entered), as the case may be.

"***Intercreditor Provisions***" has the meaning specified in <u>Section 6.01(p)</u>.

"***Interest Payment Date***" means (a) the first day of each calendar month, (b) any date of prepayment, with respect to the principal amount of the Loan being prepaid, and (c) the Maturity Date.

"***Interim Financial Statements***" has the meaning specified in <u>Section 3.01(f)(ii)</u>.

"***Interim Order***" means an interim order of the Bankruptcy Court approving the New Money DIP Loans, the Rolled-Up Loans, the Term Loan Facility and the Loan Documents on an interim basis, in form

and substance satisfactory to the Administrative Agent and Lenders, together with all other extensions, modifications, and amendments thereto.

"***Interim Order Funding Date***" means the next Business Day following the date that (i) the Bankruptcy Court has entered the Interim Order and (ii) the Borrower has satisfied the conditions set forth in <u>Section 3.01</u> (or such conditions have been waived by the Required Lenders).

"***Interim Order Rolled-Up Loans***" has the meaning specified in <u>Section 2.01(b)</u>.

"***Intermediate Holdings***" has the meaning specified in the preamble to this Agreement.

"***Intermediate Holdings Guaranty***" means the guaranty of Intermediate Holdings set forth in <u>Article VIII</u>.

"***Internal Revenue Code***" means the United States Internal Revenue Code of 1986, as amended from time to time.

"***Intercompany IP License Agreements***" means, collectively:

  (a)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Intermediate Holdings, as "sublicensee",

  (b)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and the Parent, as "sublicensee",

  (c)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and the Borrower, as "sublicensee",

  (d)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Finance Corp., a Delaware corporation, as "sublicensee",

  (e)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express GC, LLC, an Ohio limited liability company, as "sublicensee",

  (f)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Fashion Operations, LLC, a Delaware limited liability company, as "sublicensee",

  (g)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Fashion Logistics, LLC, a Delaware limited liability company, as "sublicensee",

  (h)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and UW, LLC, a Delaware limited liability company, as "sublicensee",

  (i)  that certain Intercompany License Agreement, dated as of January 25, 2023, by and between Holdings, as "sublicensor", and Express Fashion Investments, LLC, a Delaware limited liability company, as "sublicensee", and

(j)     that certain Intercompany License Agreement, dated as of the Effective Date, by and between Holdings, as "sublicensor", and Express BNBS Fashion, LLC, a Delaware limited liability company, as "sublicensee".

"*Inventory*" has the meaning given that term in the UCC.

"*Inventory Advance Rate*" means the lesser of (x) 10% and (y) 100%, minus the ABL DIP Inventory Advance Rate.

"*Investment*" in any Person means any loan or advance to such Person (other than (a) third-party trade receivables or (b) intercompany trade receivables, in each case incurred in the ordinary course of such Person's business), any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction) and any arrangement pursuant to which the investor incurs Debt of the types referred to in <u>clause (i)</u> or <u>(j)</u> of the definition of "Debt" in respect of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"*IP Rights Agreement*" means that certain IP Rights Agreement, dated as of the September 5, 2023, by Express JV and Holdings (in its capacity as sublicensor under the applicable JV IP License Agreement) and acknowledged and agreed by the Loan Parties, the Prepetition ABL Agents and Prepetition Term Loan Agents, as amended, restated, supplemented or otherwise modified in accordance with the terms hereof and thereof.

"*JV IP*" means any and all Intellectual Property that (a) are or have been assigned, transferred, contributed, conveyed, sold, delivered, or provided (or are required to be assigned, transferred, contributed, conveyed, sold, delivered, or provided) to Express JV or any Affiliate thereof pursuant to any JV IP Transaction Document, or (b) are licensed or sublicensed to Holdings or any of its Affiliates pursuant to any JV IP Transaction Document.

"*JV IP License Agreements*" means, collectively:

(a)     that certain License Agreement dated as of January 25, 2023, by and between Express JV, as "licensor", and Holdings, as "licensee" (the "*Prime License Agreement*"),

(b)     the Intercompany IP License Agreements, and

(c)     any other license agreement between any Loan Party or any Subsidiary as "licensee" and a third party as "licensor" with respect to any of the JV IP,

in each case as in effect as of the Effective Date (or, in the case of any JV IP License Agreement described in <u>clause (c)</u> above, as in effect on the date of execution thereof and in form and substance substantially identical to the Intercompany IP License Agreements or otherwise reasonably satisfactory to the Agents) or subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>.

"*JV IP LLC Agreement*" means that certain Amended and Restated Limited Liability Company Agreement of Express JV dated as of January 25, 2023, by and among the Borrower, Express Fashion Investments, LLC, EXWHP, LLC, and Express JV.

"***JV IP Transaction Documents***" means the documents, instruments and agreements described on Schedule IV (including the JV IP License Agreements and the JV IP LLC Agreement) to the Prepetition Term Loan Credit Agreement.

"***JV IP Transactions***" means collectively, the transactions described in the JV IP Transaction Documents.

"***Lenders***" has the meaning specified in the preamble to this Agreement.

"***Lien***" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capitalized Leases, Synthetic Debt, or other title retention agreement, any easement, right of way or other encumbrance on title to real property).

"***Liquidation Agreement***" has the meaning specified on Schedule 5.01(r).

"***Loan Account***" has the meaning specified in Section 2.16(a).

"***Loan Documents***" means (a) this Agreement, (b) the Notes, (c) the Collateral Documents, (d) all Variance Reports, (e) the Borrowing Base Certificates, (f) the Intercreditor Agreement, (g) the Orders, (h) the IP Rights Agreement and the Bonobos IP Rights Agreement, and (i) any other instrument, certificate or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"***Loan Parties***" means, collectively, the Borrower and the Guarantors.

"***Loans***" means, collectively, the Term Loan and any Protective Advances.

"***M3***" means M3 Advisory Partners, LP.

"***M3 Engagement Letter***" means that certain Engagement Letter, dated as of August 18, 2023, between M3 and Holdings, as amended by that certain First Amendment to Engagement Letter, dated as of November 28, 2023, as further amended by that certain Second Amendment to Engagement Letter, dated as of December 21, 2023, as further amended by that certain Third Amendment to Engagement Letter, dated as of January 18, 2024, and as further amended by that certain Fourth Amendment to Engagement Letter, dated as of March 8, 2024.

"***Margin Stock***" has the meaning specified in Regulation U.

"***Material Adverse Effect***" means a material adverse effect on (a) the business, financial condition, operations, performance or properties of the Parent and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or any Lender under any Loan Document, (c) the Collateral, or the Collateral Agent's Liens (on behalf of itself and the other Secured Parties) on the Collateral or the priority of such Liens, or (d) the ability of any Loan Party to perform its Obligations under any Loan Document to which it is a party, in each case, other than the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Cases, the events that led to the commencement of the Chapter 11 Cases, and events that reasonably result from the commencement of the Chapter 11 Cases (in each case other than matters affecting the Loan Parties that are not subject to the automatic stay provisions of the Bankruptcy Code).

"**Material Intellectual Property**" means Intellectual Property (including, for the avoidance of doubt, licensed Intellectual Property) that is material to the conduct of business of any of the Loan Parties.

"**Maturity Date**" means the earliest of (a) the 120th day following the Petition Date, (b) the date on which all of the Obligations become due and payable, whether by acceleration or otherwise, (c) the effective date of a Plan of Reorganization, (d) the date of consummation of a sale or disposition of all or substantially all of the Debtors' working capital assets under Section 363 of the Bankruptcy Code; *provided* that, if an Updated Budget is approved by the Administrative Agent and the Lenders to apply to the liquidation by the Specified Liquidation Agents of the Stores not covered by such sale of all or substantially all assets, then the Maturity Date shall not be triggered pursuant to this clause (c).

"**MGF**" means MGF Sourcing US, LLC, a Delaware limited liability company.

"**MGF Intercreditor Agreement**" means that certain Amended and Restated Subordination and Intercreditor Agreement, dated as of the Effective Date, by and among the ABL Agents, the Administrative Agent, the Collateral Agent, MGF, and the Loan Parties, as amended, modified, restated or replaced from time to time in accordance with the terms thereof.

"**Milestones**" has the meaning specified in Section 5.02(r).

"**Moelis**" means Moelis & Company LLC.

"**Moelis Engagement Letter**" means that certain Engagement Letter, dated as of March 11, 2024, by and among Express, Inc., and Moelis.

"**Moody's**" means Moody's Investors Services, Inc.

"**Multiemployer Plan**" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate is making or accruing an obligation to make contributions, or with respect to which any Loan Party has any liability.

"**Multiple Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA and subject to Title IV of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"**Net Income**" means, for any period, the net income or loss of the Parent and the Restricted Subsidiaries for such period determined on a Consolidated basis in accordance with GAAP; *provided* that there shall be excluded (a) unrealized gains and losses with respect to Hedge Agreements during such period and (b) the impact of purchase accounting or similar adjustments required or permitted by GAAP in connection with any Permitted Acquisition (as defined in the Prepetition Term Loan Credit Agreement) occurring prior to the Effective Date (including the reduction of revenue from any write down of deferred revenue).  For the avoidance of doubt, Net Income shall exclude the net income or loss of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting; *provided* that Parent's or any Restricted Subsidiary's equity in the net income of such Person that is not a Subsidiary or that is accounted for by the equity method of accounting shall be included in the Net Income of the Parent and the Restricted Subsidiaries for any period up to the aggregate amount of dividends or distributions or other payments in respect of such equity that are actually paid in cash (or to the extent converted into cash) by such Person to the Parent or a Restricted Subsidiary during such period, in each case, to the extent not already included therein.

"***Net Orderly Liquidation Value***" means, with respect to Inventory of any Person, and subject to Section 2.17(a), the appraised orderly liquidation value thereof used in connection with the Approved Budget.

"***Net Proceeds***" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, *minus* (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Transfer of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Debt (other than (A) the Term Loans, (B) the Prepetition Term Loan Obligations, (C) the ABL DIP Obligations, (D) the Prepetition ABL Obligations and (E) the Prepetition L/C Obligations) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a financial officer of the Borrower).

"***New Money DIP Loans***" has the meaning specified in Section 2.01(a).

"***Note***" means the promissory note made by the Borrower in favor of a Lender evidencing the Term Loans made by such Lender from time to time, substantially in the form of Exhibit A to the Prepetition Term Loan Credit Agreement with such modifications as agreed to by the Administrative Agent and the Borrower.

"***Notice of Borrowing***" means a notice of borrowing substantially in the form of Exhibit B to the Prepetition Term Loan Credit Agreement with such modification as agreed to by the Administrative Agent and the Borrower.

"***NPL***" means the National Priorities List under CERCLA.

"***Obligation***" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 6.01(f). Without limiting the generality of the foregoing, the Obligations of any Loan Party under the Loan Documents include all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to the Term Loans or Protective Advances (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"*OFAC*" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"*Orders*" means, collectively, the Interim Order and the Final Order and separately, the Interim Order or the Final Order, as the context requires.

"*Other Taxes*" has the meaning specified in <u>Section 2.12(b)</u>.

"*Parent*" has the meaning specified in the preamble to this Agreement.

"*Parent Guaranty*" means the guaranty of the Parent set forth in <u>Article VIII</u>.

"*Participant Register*" has the meaning specified in <u>Section 9.07(g)</u>.

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"*Payee*" shall mean any Agent, Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, including any participant.

"*Payment Recipient*" has the meaning specified in <u>Section 9.23(a)</u>.

"*Payment in Full*" means the payment in Dollars in full in cash or immediately available funds of all outstanding obligations (excluding contingent indemnification obligations for which a claim has not then been asserted) and the termination of the Term Loan Commitments.  "Paid in Full" shall have the correlative meaning.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Periodic Term SOFR Determination Day*" has the meaning specified in the definition of "Term SOFR".

"*Permitted Discretion*" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of, and with customary business practices for, a secured asset-based lender in the retail industry) business judgment, based upon its consideration of any factor that the applicable Agent reasonably believes (i) could materially adversely affect the quantity, quality, mix or value of Collateral (including any applicable laws that may inhibit collection of a receivable), the enforceability or priority of an Agent's liens thereon, or the amount that any Agent or the Lenders could receive in liquidation of any Collateral; (ii) that any collateral report or financial information delivered by a Borrower or any Guarantor is incomplete, inaccurate or misleading in any material respect; or (iii) creates or could result in an event of default.  In exercising such judgment, each Agent may consider any factors that could materially increase the credit risk of lending to the Borrower on the security of the Collateral. Any eligibility criteria established or modified by any Agent shall have a reasonable relationship to circumstances, conditions, events or contingencies which are the basis for such eligibility criteria, as reasonably determined, without duplication, by such Agent in good faith.

"*Permitted Distributions*" means:

(a)    payments by the Borrower or its Subsidiaries to or on behalf of Parent for franchise taxes and other fees required to maintain the legal existence of Parent or to pay the out-of-pocket legal, accounting and other fees and expenses in the nature of overhead in the ordinary course of

business of Parent, including the payment of fees and reimbursement of expenses of the board of directors and payments by the Parent to its direct or indirect parent company for such taxes, fees and expenses applicable to such parent company, in each case, (i) up to the amount of Permitted Distributions expressly set forth in the Approved Budget then in effect and (ii) so long as no Default or Event of Default shall have occurred and be continuing or would result from the making of such payment, and

(b)      any payments to Parent (and payments by Parent to its direct or indirect parent company) in order for Parent (or such direct or indirect parent company) to pay for any taxable period for which Parent, the Borrower and any of its Subsidiaries are members of a consolidated, combined or similar income tax group for federal and/or applicable state or local income tax purposes or are entities treated as disregarded from any such member for U.S. federal income tax purposes (a "**_Tax Group_**") of which Parent (or any direct or indirect parent company of Parent) is the common parent, any consolidated, combined or similar income taxes of such Tax Group that are due and payable by Parent (or any such direct or indirect parent company of Parent) for such taxable period; _provided_ that the amount of such payment shall not exceed the amount that the Borrower would be required to pay in respect of federal, state, local or non-US taxes were the Borrower a corporation filing a consolidated return with each of its domestic Subsidiaries, in each case, (i) up to the amount of Permitted Distributions expressly set forth in the Approved Budget then in effect and (ii) so long as no Default or Event of Default shall have occurred and be continuing or would result from the making of such payment.

"**_Permitted Investment_**" has the meaning specified in <u>Section 5.02(f)</u>.

"**_Permitted Liens_**" means:

(a)      Liens for taxes, assessments and governmental charges or levies to the extent not yet due or not required to be paid under Section 5.01(b) and Liens for taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)      Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) in the aggregate do not materially adversely affect the use of the property to which they relate and (ii) are being contested in good faith and for which adequate reserves have been established in accordance with GAAP;

(c)      Liens in the ordinary course of business to secure obligations under workers' compensation laws, unemployment insurance, social security or similar legislation or to secure public or statutory obligations;

(d)      deposits to secure the performance of bids, trade contracts and leases (other than Debt), contracts for the purchase of property otherwise permitted by this Agreement, statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business and, to the extent constituting a cash disbursement, set forth in the Approved Budget, subject to any Permitted Variances therefrom;

(e)      Liens securing judgments, decrees, attachments or awards (or the payment of money) not constituting an Event of Default under <u>Section 6.01(g)</u> or securing appeal or other surety bonds related to such judgments;

(f)  easements, rights of way, restrictions, zoning, building codes and other land use laws and other encumbrances on imperfections of title to real property that do not materially adversely affect the use of such property for its present purposes;

(g)  statutory or common law Liens of landlords, creditor depository institutions or institutions holding securities accounts (including rights of set-off or similar rights and remedies);

(h)  any interest or title of a lessor or sublessor under any lease of real estate or non-exclusive licensor or sublicensor of Intellectual Property not prohibited hereby;

(i)  [intentionally omitted];

(j)  [intentionally omitted];

(k)  Liens in favor of MGF securing obligations (consisting solely of trade receivables and not, for the avoidance of doubt, any Debt for borrowed money) owing to MGF by the Borrower or any Subsidiary, to the extent such Liens are subject to the MGF Intercreditor Agreement; *provided* that any such Liens are junior to the Liens on the Collateral securing the Obligations;

(l)  Liens arising under conditional sale, title retention, consignment or similar arrangements for the sale of goods in the ordinary course of business;

(m)  Liens on insurance proceeds securing the payment of financed insurance premiums;

(n)  leases or subleases and licenses or sublicenses granted to others in the ordinary course of business and otherwise permitted by Section 5.02(e);

(o)  [intentionally omitted];

(p)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(q)  the filing of precautionary financing statements in connection with operating leases, consignment, Transfers permitted under Section 5.02(e) and similar matters;

(r)  Liens arising out of the Adequate Protection Provisions;

(s)  [intentionally omitted];

(t)  Liens granted pursuant to the Collateral Documents and Orders;

(u)  any Lien in existence on the Effective Date and set forth on Schedule 5.02(a) or securing Debt permitted pursuant to Section 5.02(b)(iii);

(v)  replacement, extension and renewal of any Lien permitted hereby (*provided, however*, that (1) no such Lien shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced and (2) the aggregate amount secured shall not exceed the amount permitted to be secured prior to such extension, renewal, replacement, refinancing, refunding or defeasance (plus the amount of any premium paid in respect thereof in connection with any such extension, refunding, refinancing, renewing, replacing or defeasing and plus the amount of reasonable expenses incurred in connection therewith));

31

(w)      Liens securing Debt incurred pursuant to <u>Section 5.02(b)(ii)</u>, *provided* that any such Liens attach only to the property being financed pursuant to such Debt and do not encumber any other property of any Loan Party;

(x)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements, *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Debt;

(y)      [intentionally omitted]; and

(z)      Liens in favor of (i) the Prepetition ABL Collateral Agent securing the Prepetition ABL Obligations to the extent permitted under <u>Section 5.02(b)(viii)</u>, (ii) the Prepetition Term Loan Collateral Agent securing the Prepetition Term Loan Obligations to the extent permitted under <u>Section 5.02(b)(viii)</u> and (iii) the ABL DIP Collateral Agent securing the ABL DIP Obligations to the extent permitted under <u>Section 5.02(b)(viii)</u>, and, in each case, in accordance with the Orders and Intercreditor Agreement, as applicable.

"***Person***" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"***Petition Date***" has the meaning specified in the recitals hereto.

"***Plan of Reorganization***" means a plan of reorganization with respect to the Debtors pursuant to the Chapter 11 Cases.

"***Prepetition ABL Administrative Agent***" means (a) Wells Fargo in its capacity as administrative agent for the Prepetition ABL Lenders under the Prepetition ABL Credit Agreement, (b) any successor to Wells Fargo in such capacity, by assignment or otherwise, and (c) any other party that may become administrative agent or trustee under the Prepetition ABL Credit Agreement in connection with a refinancing, renewal or replacement thereof.

"***Prepetition ABL Agents***" means, collectively, the Prepetition ABL Administrative Agent and the Prepetition ABL Collateral Agent.

"***Prepetition ABL Collateral***" means the "Collateral" under and as defined in the Prepetition ABL Loan Documents securing the Prepetition ABL Obligations.

"***Prepetition ABL Collateral Agent***" means (a) Wells Fargo in its capacity as collateral agent for the Prepetition ABL Secured Parties under the Prepetition ABL Credit Agreement, (b) any successor to Wells Fargo in such capacity, by assignment or otherwise, and (c) any other party that may become collateral agent under the Prepetition ABL Credit Agreement in connection with a refinancing, renewal or replacement thereof.

"***Prepetition ABL Credit Agreement***" has the meaning specified in the recitals hereto.

"***Prepetition ABL Lenders***" means the "Lenders" under and as defined in the Prepetition ABL Credit Agreement.

"***Prepetition ABL Loan Documents***" means the "Loan Documents" under and as defined in the Prepetition ABL Credit Agreement.

"***Prepetition ABL Loans***" means the "Revolving Credit Advances" as defined in the Prepetition ABL Credit Agreement.

"***Prepetition ABL Obligations***" means the "Obligations" under and as defined in the Prepetition ABL Credit Agreement.

"***Prepetition ABL Secured Parties***" means the "Secured Parties" under and as defined the Prepetition ABL Credit Agreement.

"***Prepetition Collateral***" means, collectively, the Prepetition ABL Collateral and Prepetition Term Loan Collateral.

"***Prepetition Credit Agreements***" means, collectively, the Prepetition Term Loan Credit Agreement and the Prepetition ABL Credit Agreement.

"***Prepetition L/C Obligations***" means "L/C Obligations" as defined in the Prepetition ABL Credit Agreement.

"***Prepetition Loan Documents***" means, collectively, the Prepetition ABL Loan Documents and the Prepetition Term Loan Documents.

"***Prepetition Secured Parties***" means, collectively, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties.

"***Prepetition Term Loan Administrative Agent***" means (a) ReStore in its capacity as administrative agent for the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement, (b) any successor to ReStore in such capacity, by assignment or otherwise, and (c) any other party that may become administrative agent under the Prepetition Term Loan Credit Agreement in connection with a refinancing, renewal or replacement thereof.

"***Prepetition Term Loan Agents***" means, collectively, the Prepetition Term Loan Administrative Agent and the Prepetition Term Loan Collateral Agent.

"***Prepetition Term Loan Collateral***" means the "Collateral" under and as defined in the Prepetition Term Loan Documents securing the Prepetition Term Loan Obligations.

"***Prepetition Term Loan Collateral Agent***" means (a) ReStore in its capacity as collateral agent for the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Credit Agreement, (b) any successor to ReStore in such capacity, by assignment or otherwise, and (c) any other party that may become collateral agent under the Prepetition Term Loan Credit Agreement in connection with a refinancing, renewal or replacement thereof.

"***Prepetition Term Loan Credit Agreement***" has the meaning specified in the recitals hereto.

"***Prepetition Term Loan Documents***" means the "Loan Documents" under and as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loan Obligations***" means the "Obligations" under and as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loan Lenders***" means the "Lenders" under and as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loan Secured Parties***" means the "Secured Parties" under and as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loans***" means the "Term Loans" under and as defined in the Prepetition Term Loan Credit Agreement.

"***Plan***" means a Single Employer Plan or a Multiple Employer Plan.

"***Post-Petition Interest***" has the meaning specified in Section 8.06.

"***Preferred Stock***" means, as applied to the Equity Interests of any Person, the Equity Interests of any class or classes (however designated) that is preferred with respect to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Equity Interests of any other class of such Person.

"***Prime License Agreement***" has the meaning specified in the definition of "JV IP License Agreements".

"***Professional Persons***" shall mean Debtor Professionals and Committee Professionals and any notice claims agent retained in the Chapter 11 Cases.

"***Professional Fees***" shall mean all unpaid fees and expenses incurred by Professional Persons.

"***Prohibited Preferred Stock***" means any Preferred Stock that by its terms is mandatorily redeemable or subject to any other payment obligation (including any obligation to pay dividends, other than dividends of shares of Preferred Stock of the same class and series payable in kind or dividends of shares of common stock) on or before a date that is less than one year after the Maturity Date, or, on or before the date that is less than one year after the Maturity Date, is redeemable at the option of the holder thereof for cash or assets or securities (other than distributions in kind of shares of Preferred Stock of the same class and series or of shares of common stock).

"***Protective Advances***" has the meaning specified in Section 2.01(b).

"***PTO***" means the United States Patent and Trademark Office (or any equivalent office).

"***QFC***" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"***Qualified Capital Stock***" of any person shall mean any Equity Interests of such person that are not Disqualified Stock.

"***Receipts Variance***" has the meaning specified in Section 5.01(s)(ii).

"**_Redeemable_**" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"**_Register_**" has the meaning specified in Section 9.07(d).

"**_Regulation U_**" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**_Relevant Governmental Body_**" means the Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**_Required Lenders_**" means, at any time of determination, Lenders holding greater than 50.0% of the sum of (a) the aggregate principal amount of the Loans outstanding at such time and (b) the aggregate Term Loan Commitments at such time; *provided* that at any time there are two (2) or more non-Affiliate Lenders, "Required Lenders" must include at least two (2) non-Affiliate Lenders.

"**_Reserves_**" means any and all reserves which the Administrative Agent deems necessary, in its Permitted Discretion and subject to Section 2.17(b), to maintain against the Term Loan Borrowing Base: (a) to reflect the impediments to the Agents' ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Administrative Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Term Loan Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, (d) to reflect that a Default has occurred and is continuing (*provided* that in the case of this clause (d), the reserve shall be reasonably related to the event giving rise to such Default), which may be instituted by the Administrative Agent in accordance with Section 2.17(b), or (e) reserves due to the difference, if a positive number, between (x) the Net Orderly Liquidation Value of Inventory which contains or bears any Intellectual Property rights licensed to any Loan Party (including, without limitation, any Intellectual Property subject to any JV IP License Agreement or any Bonobos IP License Agreement), and (y) the purchase price of such Inventory that would be payable by a licensor under the applicable license agreement (including, without limitation, any JV IP License Agreement or any Bonobos IP License Agreement) in connection with any right of such licensor to purchase such Inventory pursuant to such license agreement); *provided, however*, that (i) rent Reserves for locations leased by any Loan Party (A) shall not be taken for leased retail stores or for leased locations covered by a Collateral Access Agreement or Existing Collateral Excess Agreement and (B) for all other leased locations, shall be limited to (x) in the case of the Borrower's corporate headquarters, one month's rent and (y) in all other cases, three months' rent but in any event shall not exceed the total value of Eligible Inventory at any such other location, (ii) Reserves for consignee's, warehousemen's and bailee's charges (A) shall not be taken for locations covered by a Collateral Access Agreement or Existing Collateral Excess Agreement and (B) for all other such locations, shall be limited to three months' charges but in any event shall not exceed the total value of Eligible Inventory at any such other location, (iii) all Reserves (including the amount of such Reserve) shall bear a reasonable relationship to the events, conditions or circumstances that are the basis for such Reserve, (iv) the amount of any Reserve shall not be duplicative of the amount of any other Reserve imposed hereunder with respect to the same events, conditions or circumstances, (v) no Reserves shall be taken or maintained hereunder that are in duplication of "Reserves" (as defined in the ABL DIP Credit Agreement) maintained under the ABL DIP Borrowing Base and (vi) during the period following the Effective Date until the entry of the Final Order by the Bankruptcy Court, the Administrative Agent shall not take any additional discretionary Reserves unless approved by the Bankruptcy Court.  In the event that (a) the Administrative Agent determines in its Permitted Discretion that the events, conditions or

circumstances underlying the maintenance of any Reserve shall cease to exist or (b) the liability that is the basis for any Reserve has been reduced, then such Reserve shall be rescinded or reduced in an amount as determined in Administrative Agent's Permitted Discretion, as applicable, at the request of the Borrower.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means the Chief Executive Officer, Chief Financial Officer and Treasurer of the Parent or the Borrower, as applicable, or any other individual designated in writing to the Administrative Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder, which other individual has been authenticated through the Administrative Agent's electronic platform or portal in accordance with its procedures for such authentication. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**ReStore**" means ReStore Capital, LLC, a Delaware limited liability company, and its successors.

"**Restricted Payment**" has the meaning specified in Section 5.02(g).

"**Restricted Subsidiary**" means a Subsidiary of Holdings.

"**Rolled-Up Loans**" has the meaning specified in Section 2.01(b).

"**Roll-Up**" has the meaning specified in Section 2.01(b).

"**S&P**" means S&P Global Ratings, a division of The McGraw-Hill Companies, Inc.

"**Sanctioned Entity**" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or territory sanctions program administered and enforced by OFAC.

"**Sanctioned Person**" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity that would be prohibited by applicable Sanctions, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future applicable executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over any Secured Party or any Loan Party or any of their respective Subsidiaries or Affiliates.

"***SEC***" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"***Secured Parties***" means the Agents, the Lenders, or Affiliates thereof, the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, each other Person to whom Obligations under this Agreement and other Loan Documents are owing, and the successors and assigns of each of the foregoing.

"***Single Employer Plan***" means a single employer plan, as defined in Section 4001(a)(15) of ERISA and subject to Title IV of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"***SOFR***" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"***SOFR Administrator***" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"***SOFR Loan***" means a Loan that bears interest at a rate determined by reference to Term SOFR (other than pursuant to clause (c) of the definition of "Base Rate").

"***Specified Intellectual Property***" means assets of the type described in clauses (i) through (iii) of the definition of "Intellectual Property Collateral" set forth in the Security Agreement under and as defined in the Prepetition Term Loan Credit Agreement (whether or not constituting Collateral).

"***Specified Liquidation Agents***" means Hilco Merchant Resources, LLC and any other person approved by the Administrative Agent, together with their respective Affiliates acting with respect to the Specified Store Closing Sales.

"***Specified Liquidation Agreement***" means that certain Letter Agreement Governing Inventory and FF&E Disposition, dated as of November 6, 2019, by and between the Borrower and Hilco Merchant Resources, LLC, as amended from time to time, including pursuant to that Twenty-Sixth Amendment to Letter Agreement, dated as of April 21, 2024 (the "***Specified Liquidation Agreement Twenty-Sixth Amendment***").

"***Specified Liquidation Agreement Twenty-Sixth Amendment***" has the meaning specified in the definition of Specified Liquidation Agreement.

"***Specified Store Closing Sales***" means the closure of the Loan Parties' Stores and the liquidation of assets related thereto by the Specified Liquidation Agents pursuant to the Specified Liquidation Agreements.

"***Store***" means any retail store which may include real property, fixtures, equipment, inventory and other property related thereto operated, or to be operated, by a Loan Party.

"***Store Closing Final Order***" means an order of the Bankruptcy Court approving the Specified Liquidation Agreement and transactions contemplated thereby, on a final basis, in form and substance acceptable to the Administrative Agent.

"*Store Closing Interim Order*" has the meaning specified in <u>Section 3.01(k)</u>.

"*Store Closing Orders*" means, collectively, the Store Closing Interim Order and the Store Closing Final Order and separately, the Store Closing Interim Order and the Store Closing Final Order, as the context requires.

"*Subordinated Debt*" means any Debt of any Loan Party that is secured by a Lien that is junior to Liens securing the Obligations or subordinated to the Obligations of such Loan Party under the Loan Documents, which Debt is on, and otherwise contains, terms and conditions satisfactory to each Agent.

"*Subordinated Obligations*" has the meaning specified in <u>Section 8.06</u>.

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is, in the case of <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u>, at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"*Subsidiary Guarantors*" means the Subsidiaries of the Parent listed on <u>Schedule II</u> hereto and each other Subsidiary of the Parent that executes and delivers a guaranty pursuant to <u>Section 5.01(j)</u> (in each case, for so long as such Subsidiary's Subsidiary Guaranty remains in effect). For the avoidance of doubt, no Excluded Subsidiary shall be a Subsidiary Guarantor.

"*Subsidiary Guaranty*" means the guaranty of the Subsidiary Guarantors set forth in <u>Article VIII</u>, together with each other guaranty and guaranty supplement delivered pursuant to <u>Section 5.01(j)</u> of this Agreement, in each case, as amended, amended and restated, modified or otherwise supplemented.

"*Superpriority Claims*" means all of the allowed superpriority administrative expense claims of the Agents and the other Secured Parties on account of the Obligations, which claims shall be entitled to the benefits of Sections 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Debtors. Superpriority Claims shall, at all times be (x) junior only to the Carve Out, the Superpriority Claims of the Prepetition ABL Secured Parties and the Superpriority Claims of the ABL DIP Secured Parties and (y) senior to any and all other administrative expense claims or other claims against the Debtors their estates, in the Chapter 11 Cases and any successor cases.

"*Supplemental Collateral Agent*" has the meaning specified in <u>Section 7.01(c)</u>.

"*Synthetic Debt*" means, with respect to any Person, without duplication of any clause within the definition of "Debt," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "synthetic lease") and (b) Obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Debt" or as a

liability on a Consolidated balance sheet of such Person and its Restricted Subsidiaries in accordance with GAAP.

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"***Term Loan***" means a New Money DIP Loan or a Rolled-Up Loan.

"***Term Loan Borrowing Base***" means, at any time, the sum of:

(a)        the result of (i) the Inventory Advance Rate at such time, *multiplied* by (ii) the Net Orderly Liquidation Value of the Eligible Inventory of the Borrowing Base Parties at such time, *multiplied* by (iii) Cost of such Eligible Inventory of the Borrowing Base Parties at such time, *plus*

(b)        the result of (i) the Credit Card Advance Rate at such time, *multiplied* by (ii) the face amount of Eligible Credit Card Receivables of the Borrowing Base Parties at such time, *minus*

(c)        the Discretionary Reserve, *minus*

(d)        the aggregate amount of all Reserves at such time (*provided* that such Reserves shall not be in duplication of "Reserves" (as defined in the ABL DIP Credit Agreement) maintained under the ABL DIP Borrowing Base at such time).

"***Term Loan Borrowing Base Certificate***" means a certificate of the Borrower on behalf of the Loan Parties, signed by a Responsible Officer of the Borrower, in the form of Exhibit B (or another form which is mutually acceptable to each Agent and the Borrower).

"***Term Loan Commitments***" means, as to each Lender, its obligation to make its portion of the New Money DIP Loans to the Borrower pursuant to Section 2.01(a) on the Interim Order Funding Date in an aggregate principal amount not to exceed its Applicable Percentage of the amount set forth opposite such Lender's name on Schedule I or in the applicable Assignment and Assumption. As of the Effective Date, the total Term Loan Commitments of all Lenders is $25,000,000.

"***Term Loan Facility***" has the meaning specified in the recitals hereto.

"***Term Pushdown Reserve***" means, at any time of determination, an amount equal to the greater of (a) $0 and (b) the amount, if any, by which the aggregate outstanding principal amount of Term Loans and Prepetition Term Loan Obligations exceeds the Term Loan Borrowing Base. The Loan Parties hereby agree and acknowledge that the ABL Administrative Agent has agreed at all times to implement and maintain the Term Pushdown Reserve against the ABL Borrowing Base, as and when applicable, in accordance with the ABL DIP Credit Agreement and the Intercreditor Agreement.

"***Term SOFR***" means:

(a)        for any calculation with respect to a SOFR Loan, for any day in any calendar month, the Term SOFR Reference Rate for a tenor of three (3) months on the day (such day, the "***Periodic Term SOFR Determination Day***") that is two (2) U.S. Government Securities Business Days prior to the first day of such calendar month, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not

been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "***Base Rate Term SOFR Determination Day***") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day;

*provided*, *further*, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"***Term SOFR Administrator***" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"***Term SOFR Reference Rate***" means the forward-looking term rate based on SOFR.

"***Trading With the Enemy Act***" has the meaning specified in Section 4.01(h)(ii).

"***Transaction***" means the transactions contemplated by the Loan Documents.

"***Transaction Expenses***" means fees, costs and expenses incurred in connection with the Transaction, whether before or after the Effective Date.

"***Transfer***" has the meaning specified in Section 5.02(e).

"***UCC***" has the meaning specified in the Security Agreement under and as defined in the Prepetition Term Loan Credit Agreement.

"***UK Financial Institution***" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"***UK Resolution Authority***" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"***Unadjusted Benchmark Replacement***" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"***Unmatured Surviving Obligations***" means Obligations under this Agreement and the other Loan Documents that by their terms survive the termination of this Agreement or the other Loan Documents but are not, as of the date of determination, due and payable and for which no outstanding claim has been made.

"***Updated Approved Budget***" has the meaning specified in Section 5.01(s)(i).

"***Updated Budget***" has the meaning specified in Section 5.01(s)(i).

"***U.S. Government Securities Business Day***" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association, or any successor thereto, recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"***USCO***" means the United States Copyright Office (or any equivalent office).

"***Variance Report***" has the meaning specified in Section 5.01(s)(ii).

"***Variance Report Date***" has the meaning specified in Section 5.01(s)(ii).

"***Voting Interests***" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"***Wells Fargo***" means Wells Fargo Bank, National Association and its successors.

"***Withdrawal Liability***" has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

"***Write-Down and Conversion Powers***" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Notwithstanding anything to the contrary herein or in any other Loan Document, any reference to a defined term as defined in the ABL DIP Credit Agreement or any other ABL DIP Loan Document shall refer to the definition of such term as in effect on the Effective Date (including with respect to any component definitions (or any sub-component definitions)), except with respect to any amendment or modification thereto (or to any component definitions (or any sub-component definitions)) permitted under

this Agreement, Intercreditor Agreement and the Orders or otherwise consented to by each Agent and the Required Lenders.

SECTION 1.02.  Computation of Time Periods; Other Definitional Provisions.

In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including" and the words "*to*" and "*until*" each mean "to but excluding."  References in the Loan Documents to any agreement or contract "*as amended*" shall mean and be a reference to such agreement or contract as amended, amended and restated, restated, supplemented or otherwise modified from time to time in accordance with its terms (subject to any restrictions on such amendments, amendments and restatements, restatements, supplements or other modifications set forth herein or in any other Loan Document).  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.03.  Accounting Terms.

All accounting terms not specifically or completely defined herein shall be construed in accordance with generally accepted accounting principles as in effect from time to time in the United States ("*GAAP*"), applied on a consistent basis; *provided, however*, that if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and the Borrower or any Agent (or the Required Lenders) shall so request, the Agents, the Required Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided* that, until so amended, such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein.  Notwithstanding anything herein to the contrary or any changes in GAAP after December 31, 2018 that would require lease obligations (whether or not such lease existed on December 31, 2018 or thereafter arose) that would be treated as operating leases as of December 31, 2018 to be classified and accounted for as a Capitalized Lease or otherwise reflected on a Person's consolidated balance sheet, such obligations shall continue to be excluded from the definition of Debt and shall not be treated as an obligation under a Capitalized Lease for any purposes hereunder or under any Loan Document.

SECTION 1.04.  [Intentionally Omitted].

SECTION 1.05.  Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 1.06.  Rates.

The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Term SOFR or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement),

including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to Section 2.10(g), will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate or Term SOFR, or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II

## AMOUNTS AND TERMS OF THE TERM LOAN

SECTION 2.01.  Term Loan; Protective Advances.

(a)      New Money DIP Loans.  On the terms and subject to the conditions contained in this Agreement and the Orders, each Lender having a Term Loan Commitment, severally and not jointly, agrees to advance a term loan to the Borrower on the Interim Order Funding Date in an aggregate principal amount equal to such Lender's Applicable Percentage of the amount listed opposite its name on Schedule I (the "*New Money DIP Loans*").  The Borrower acknowledges and agrees that each Lender has made New Money DIP Loans denominated in Dollars to the Borrower on the Interim Order Funding Date equal to the such Lender's Applicable Percentage of the amount listed opposite its name on Schedule I hereto by transferring the proceeds of such New Money DIP Loans as directed by the Borrower in a Notice of Borrowing, and such New Money DIP Loans shall accrue interest in accordance with this Agreement from the Interim Order Funding Date. Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed. Each Lender's Term Loan Commitment shall be (i) permanently reduced on a dollar-for-dollar basis by the aggregate principal amount of any New Money DIP Loans made by such Lender in accordance with this Section 2.01(a), (ii) terminated in full upon the Maturity Date and (iii) terminated in full to the extent done so pursuant to Article VI.

(b)      Roll-Up.  Upon the Interim Order Funding Date, Prepetition Term Loans held by the Lenders as of the Petition Date in an amount equal to $25,000,000, together with accrued and unpaid interest thereon in an amount equal to $261,220.50, will be immediately and automatically substituted and exchanged on a cashless basis for (and repaid by) loans issued under this Section 2.01(b) (such loans, the "*Interim Order Rolled-Up Loans*" and, such roll-up the "*Interim Order Roll-Up*"), and such Interim Order Rolled-Up Loans shall be allocated among the Lenders in accordance with their Applicable Percentage of Prepetition Term Loans as of the Interim Order Funding Date. Upon the Final Order Funding Date, the remaining outstanding amount of Prepetition Term Loan Obligations held by the Lenders as of the Final Order Funding Date shall be immediately and automatically substituted and exchanged on a cashless basis for (and repaid by) loans issued under this Section 2.01(b) (the "*Final Order Rolled-Up Loans*" and, together with the Interim Order Rolled-UP Loans, the "*Rolled-Up Loans*"), and such Final Order Rolled-Up Loans shall be allocated among the Lenders based on their Applicable Percentage of Prepetition Term

Loans as of the Final Order Funding Date. The foregoing substitution and exchange of Prepetition Term Loan Obligations into the Rolled-Up Loans shall be referred to herein as the "***Roll-Up***".

(c)    <u>Protective Advances</u>.  Any provision of this Agreement to the contrary notwithstanding, subject to the limitations set forth below, any Agent, with the consent of each other Agent, is authorized by the Borrower and the Lenders, from time to time in each Agent's sole discretion (but each Agent shall have absolutely no obligation), to make advances ("***Protective Advances***") to or on behalf of the Borrower, which such Agent, in its reasonable discretion, deems necessary or desirable after the occurrence and during the continuance of an Event of Default (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of principal, interest, fees, reimbursable expenses (including costs, fees and expenses as described in <u>Section 9.04</u>) and other sums payable under the Loan Documents; *provided* that the aggregate amount of Protective Advances outstanding at any time shall not at any time, unless otherwise consented to by each Lender, exceed the lesser of (x) $6,500,000 and (y) 10% of the Term Loan Borrowing Base (calculated without giving effect to Reserves).  Protective Advances shall be secured by Liens in favor of the Collateral Agent in and to the Collateral and shall be deemed to constitute principal of the Loans and Obligations hereunder.  The Agents' authorization to make Protective Advances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and shall become effective prospectively upon each Agent's receipt thereof.  Each Lender shall have the right (but not the obligation) to participate in each Protective Advance (and in any portion of such Protective Advance in which any other Lender declines to participate) in accordance with its Applicable Percentage of all other Loans.  Any provision of this Agreement to the contrary notwithstanding, (i) each Protective Advance will be made and maintained as a Base Rate Loan and accrue interest at the Default Rate to the fullest extent permitted by applicable law and (ii) the Borrower shall repay to the Administrative Agent, for the ratable account of the Agents and Lenders that have made a Protective Advance, the outstanding principal amount of each Protective Advance made by each of them on the earlier of demand by the Administrative Agent and the Maturity Date.

SECTION 2.02.  <u>Borrowing of the New Money DIP Loans</u>.

(a)    The Borrowings of the New Money DIP Loans shall occur on the Interim Order Funding Date. Each Lender shall, before 2:00 P.M. (New York City time) on the date of each Borrowing, transfer to the Borrower or such other Person as directed by the Borrower in the Notice of Borrowing, in same day funds, such Lender's Applicable Percentage of such Borrowing in accordance with <u>Section 2.01(a)</u>. The Term Loans shall be SOFR Loans at all times, except as otherwise provided in <u>Sections 2.01(b)</u>, <u>2.10(d)</u> and <u>2.10(g)</u>.

(b)    To the extent not paid by the Borrower when due (after taking into consideration any grace period), the Administrative Agent, without the request of the Borrower, may advance any interest, fee, service charge (including direct wire fees), costs and expenses of any Secured Party in accordance with <u>Section 9.04(a)</u>, or other payment to which any Secured Party is entitled from the Loan Parties pursuant hereto or any other Loan Document, as and when due and payable, and may charge the same to the Loan Account.  The Administrative Agent shall advise the Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's rights and the Borrower's obligations under <u>Section 2.06</u>.  Any amount which is added to the principal balance of the Loan Account as provided in this <u>Section 2.02(b)</u> shall constitute a part of the Loans and shall bear interest at the interest rate then and thereafter applicable to the Loans.

SECTION 2.03.  [<u>Intentionally Omitted</u>].

SECTION 2.04.   [Intentionally Omitted].

SECTION 2.05.   Repayment of the Loans. The Borrower shall repay to the Lenders on the Maturity Date the aggregate principal amount of the Term Loans outstanding on the Maturity Date.

SECTION 2.06.   Prepayments.

(a)      *Optional*.  At any time when there are no outstanding ABL DIP Obligations or Prepetition ABL Obligations, the Borrower may, upon irrevocable notice from the Borrower to the Administrative Agent, at any time or from time to time voluntarily prepay the Loans in whole or in part without premium or penalty; *provided* that (i) such notice must be received by the Administrative Agent not later than 1:00 p.m. three (3) Business Days prior to any date of prepayment of the Loans (or such shorter notice period consented to by the Administrative Agent; (ii) any prepayment of the Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that the Borrower may rescind any notice of prepayment under this Section 2.06(a) if such prepayment would have resulted from a refinancing of the Loans, or the consummation of an acquisition or disposition, which refinancing, acquisition or disposition shall not be consummated or shall otherwise be delayed.  Any prepayment of the Loans shall be accompanied by all accrued interest on the amount prepaid.  Each such prepayment shall be applied to the Term Loan of the Lenders in accordance with their respective Applicable Percentages.

(b)      *Mandatory*.

(i)      Debt. Upon the incurrence by a Loan Party of any Debt for borrowed money (other than Debt permitted to be incurred pursuant to Section 5.02(b)), not later than one (1) Business Day following the date of receipt of any Net Proceeds thereof, the Borrower shall make a prepayment of ABL DIP Loans and Prepetition ABL Loans then outstanding, and to the extent the ABL DIP Loans and Prepetition ABL Loans shall be paid in full, 100% of any excess Net Proceeds shall be applied to repay the Term Loans and then the Prepetition Term Loans.

(ii)      Overadvances. If the Term Pushdown Reserve at any time exceeds the ABL DIP Borrowing Base (calculated without giving effect to the Term Pushdown Reserve) as then in effect, the Borrower shall immediately prepay such excess, with such prepayment amount to be applied first, to all Prepetition ABL Loans until paid in full, second, to prepayment of the ABL DIP Loans, third to repay the Prepetition Term Loans and fourth to repay Term Loans.

(iii)      Non-Borrowing Base Asset Sales. The Debtors shall within one (1) Business Day apply 100% of the Net Proceeds from the sale or Transfer of assets or property of the Debtors of the type not included in the Term Loan Borrowing Base in excess of $1,000,000 (for all sales or Transfers of assets on an aggregate basis) as a repayment of ABL DIP Loans and Prepetition ABL Loans then outstanding, and to the extent the ABL DIP Loans and Prepetition ABL Loans shall be paid in full (and all letters of credit cash collateralized), 100% of such Net Proceeds shall be applied to repay the Prepetition Term Loans and then the Term Loans.

(iv)      Excess Cash. If the amount of unrestricted cash and Cash Equivalents of the Debtors held in the Borrower's operating account exceeds $15,000,000 for any three consecutive Business Days, then the Borrower shall make a prepayment of ABL DIP Loans and Prepetition ABL Loans then outstanding in the amount of cash and Cash Equivalents in excess of $15,000,000 as of such third

Business Day, and to the extent the ABL DIP Loans and Prepetition ABL Loans shall be paid in full (and all letters of credit cash collateralized), 100% of any excess as of such third Business Day shall be applied to repay the Prepetition Term Loans and then the Term Loans.

      (v)      <u>Wind Down Provisions</u>.

      (i)      To the extent a Liquidation Agreement is entered into that does not include an upfront cash purchase price sufficient to pay in full in cash all Prepetition Term Loan Obligations, Prepetition ABL Obligations, ABL DIP Obligations and Obligations under this Agreement, then by the earlier of May 22, 2024 and two Business Days after the entry into such Liquidation Agreement, the Loan Parties, Administrative Agent and Lenders shall enter into an amendment to this Agreement, in form and substance reasonably satisfactory to the Lenders to include wind down provisions based on collections, subject to a minimum cash balance to be agreed based on approved disbursements to fund an orderly Liquidation.

      (ii)      To the extent a GC Purchase Agreement is entered into that does not include an upfront cash purchase price sufficient to pay in full in cash all Prepetition Term Loan Obligations, Prepetition ABL Obligations, ABL DIP Obligations and Obligations under this Agreement, then by the earlier of May 22, 2024 and two Business Days after the entry into such GC Purchase Agreement, (x) the Lenders shall have approved a new budget for an orderly Liquidation of the Stores not included in such GC Purchase Agreement, which budget shall be acceptable to the Lenders in their sole discretion and (y) enter into an amendment to this Agreement, in form and substance reasonably satisfactory to the Lenders, to include wind down provisions based on collections from the Stores not included in such GC Purchase Agreement,

      (vi)      Each prepayment of the Loans made pursuant to this <u>Section 2.06(b)</u> shall be accompanied by the payment of accrued interest to the date of such payment on the amount prepaid.

SECTION 2.07.  <u>Interest</u>.

      (a)      Subject to the provisions of <u>Sections 2.07(b)</u> and <u>(c)</u>, each Term Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to Term SOFR (or, solely to the extent provided in <u>Section 2.01(b)</u>, <u>2.10(d)</u> or <u>2.10(g)</u>, as applicable, the Base Rate), *plus* the Applicable Margin.

      (b)      If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable law and shall be payable on demand.

      (c)      If any Event of Default has occurred and is continuing, then the Administrative Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter, until such Event of Default has been duly waived as provided in <u>Section 9.01</u>, such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable law and shall be payable on demand.

      (d)      Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and

payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

SECTION 2.08.  Fees. The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage of Term Loan Commitments, a fee in cash on the Interim Order Funding Date equal to 3.75% of the amount of such Lender's Term Loan Commitments (immediately prior to the funding of any New Money Term Loans on the Interim Order Funding Date). Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

SECTION 2.09.  [Intentionally Omitted].

SECTION 2.10.  Increased Costs, Etc.

(a)     If, due to either (i) any Change in Law or (ii) the compliance with any guideline or request or directive from any central bank or other governmental authority (whether or not having the force of law), (A) any reserve, deposit, or similar requirement is or shall be imposed, modified or deemed applicable in respect of the Loans or obligations to make the Loans hereunder or hereby, or (B) there shall be imposed on any Lender any other condition regarding the Loans or obligations to make the Loans hereunder, and the result of the foregoing is to increase the cost to any Lender of agreeing to make or of making, funding or maintaining SOFR Loans (or Base Rate Loans determined with reference to Term SOFR) (excluding, for purposes of this Section 2.10, any such increased costs resulting from (x) Taxes described in the definitions of Excluded Taxes, Indemnified Taxes or Other Taxes (as to which Section 2.12 shall govern) and (y) changes in the basis of imposition, or the rate, of any taxes, levies, imposts, deductions, charges, withholdings or liabilities that are excluded from the definition of Taxes), or to reduce the amount receivable in respect thereof, then the Borrower shall from time to time, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost or reduced receipt.  A certificate as to the amount of such increased cost or reduced receipt, submitted to the Borrower by such Lender, shall be conclusive and binding for all purposes, absent manifest error.  Notwithstanding anything contained herein to the contrary, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.10(a) for any such increased cost or reduced receipt incurred more than 180 days prior to the date that such Lender demands compensation therefor; provided that, if the circumstance giving rise to such increased cost or reduced receipt is retroactive, then such 180 day period shall be extended to include the period of retroactive effect thereof.

(b)     If any Lender determines that any compliance with any law or regulation or any guideline or request from any central bank or other governmental authority (whether or not having the force of law) affects or would affect the amount of capital or liquidity required or expected to be maintained by such Lender or any holding company controlling such Lender and that the amount of such capital or liquidity is increased by or based upon the existence of such Lender's commitment to lend hereunder, then, upon demand by such Lender or such holding company (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital or liquidity to be allocable to the existence of such Lender's commitment to lend hereunder, for any reduction in the rate of return on such Lender's capital or liquidity or on the capital or liquidity of such Lender's holding company.  A certificate as to such amounts submitted to the Borrower by such Lender shall be conclusive and binding for all purposes, absent manifest error.  Notwithstanding anything contained herein to the contrary, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.10(b) for any such increased cost incurred more than 180 days prior to the date that such Lender

demands compensation therefor; *provided* that, if the circumstance giving rise to such increased cost is retroactive, then such 180 day period shall be extended to include the period of retroactive effect thereof.

(c)        [Intentionally Omitted].

(d)        Notwithstanding any other provision of this Agreement, but subject to Section 2.10(g) below, if (x) any Change in Law shall make it unlawful or impractical, or any central bank or other Governmental Authority shall assert that it is unlawful or impractical, for any Lender or its Applicable Lending Office to perform its obligations hereunder to make SOFR Loans (or Base Rate Loans determined with reference to Term SOFR) or to continue to maintain SOFR Loans (or Base Rate Loans determined with reference to Term SOFR) hereunder, or to charge interest rates based upon Term SOFR, (y) the Administrative Agent determines that, for any reason in connection with any SOFR Loan, Term SOFR cannot be determined pursuant to the definition thereof, or (z) the Required Lenders determine that Term SOFR will not adequately reflect the cost to such Lenders of making, funding or maintaining their SOFR Loans, then, in any case of clauses (x), (y) or (z), on notice thereof and demand therefor by such Lender (in the case of clause (x)) to the Borrower through the Administrative Agent or by the Administrative Agent on behalf of itself or the Required Lenders (in the case of clauses (y) or (z), as applicable) to the Borrower, (i) each applicable SOFR Loan will automatically, upon such demand, convert into a Base Rate Loan (and, if applicable, determined without reference to Term SOFR), and the Borrower shall pay accrued interest on the amount so converted, and (ii) with respect to each applicable Base Rate Loan, to the extent such Base Rate Loan is determined with reference to Term SOFR, interest upon such Base Rate Loan after the date specified in such notice shall accrue interest at the rate then applicable to Base Rate Loans without reference to the Term SOFR component thereof, until the Administrative Agent shall notify the Borrower that such Lender has (in the case of clause (x)), the Administrative Agent has (in the case of clauses (y)), or the Required Lenders have (in the case of clause (z)), determined that the circumstances causing such suspension no longer exist.

(e)        [Intentionally Omitted].

(f)        [Intentionally Omitted].

(g)        Effect of Benchmark Transition Event.

(i)        Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.10(g) will occur prior to the applicable Benchmark Transition Start Date.

(ii)        Conforming Changes. In connection with the use, administration, adoption or implementation of Term SOFR or a Benchmark Replacement, the Administrative Agent will have the right (in consultation with the Borrower) to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document (including, without limitation, Section 9.01 hereof), any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

48

(iii)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (1) the implementation of any Benchmark Replacement, (2) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of Term SOFR or a Benchmark Replacement, and (3) the commencement or conclusion of any Benchmark Unavailability Period. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.10(g)(iv) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.10(g), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.10(g).

(iv)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify any definition providing for "interest periods" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify any definition providing for "interest periods" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)    Benchmark Unavailability Period. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

(h)    Anything to the contrary contained herein notwithstanding, neither any Agent, nor any Lender, nor any of their participants, is required actually to acquire match fund any Obligation as to which interest accrues at Term SOFR or the Term SOFR Reference Rate.

SECTION 2.11.  Payments and Computations.

(a)    The Borrower shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off, not later than 10:30 A.M. (New York City time) on the day when due in Dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day (it being acknowledged and agreed by the Borrower that should any payment item not be honored when presented for payment, then Borrower shall

be deemed not to have made such payment).  The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrower is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender, to such Lenders for the account of their respective Applicable Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Borrower is in respect of any Obligation then payable hereunder to one Lender, to such Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon its acceptance of an Assignment and Assumption and recording of the information contained therein in the Register pursuant to Section 9.07(d), from and after the effective date of such Assignment and Assumption, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date (including with respect to interest on the Term Loan payable on the first Interest Payment Date) directly between themselves.

(b)    [Intentionally Omitted].

(c)    All computations of interest based on the Base Rate shall be made by the Administrative Agent on the basis of a year of 365 or 366 days, as the case may be, and all computations of interest based on Term SOFR or any other Benchmark and of fees shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)    Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or commitment or commission, as the case may be; *provided*, *however*, that, if such extension would cause payment of interest on or principal of SOFR Loans to be made in the next following calendar month, such payment shall be made on the preceding Business Day.

(e)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to any Lender hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each such Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Federal Funds Rate.

(f)    Whenever any payment received by the Administrative Agent from the Borrower under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Agents and the Lenders by the Borrower under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Agents and the Lenders in the following order of priority (x) upon the occurrence and during the continuance of an Event of Default or (y) at any other time that the Administrative Agent receives a payment from the Borrower without direction as to the application of such payment:

(i)    *first*, to the payment of all of the fees, indemnification payments, costs and expenses that are due and payable to the Agents (solely in their respective capacities as Agents) under or in respect of this Agreement and the other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the Agents on such date;

(ii)    *second*, to the payment of accrued and unpaid interest on Protective Advances, ratably based upon the respective amounts of such interest owing to the Agents and the Lenders on such date;

(iii)    *third*, to the payment of principal of Protective Advances, ratably based upon the respective amounts of such principal owing to the Agents and the Lenders on such date;

(iv)    *fourth*, to the payment of all of the fees, indemnification payments other than indemnification payments as set forth in clause (v) below, costs and expenses that are due and payable to the applicable Lenders under or in respect of this Agreement and the other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such fees, indemnification payments, costs and expenses owing to the applicable Lenders on such date;

(v)    *fifth*, to the payment of all of the indemnification payments, costs and expenses that are due and payable to the Lenders under Sections 9.04 hereof, and any similar Section of any other Loan Documents on such date by the Borrower, ratably based upon the respective aggregate amounts of all such indemnification payments, costs and expenses owing to the applicable Lenders on such date;

(vi)    *sixth*, to the payment of all of the amounts that are due and payable to the Agents and the Lenders under Sections 2.10 and 2.12 hereof on such date by the Borrower, ratably based upon the respective aggregate amounts thereof owing to the Agents and the Lenders on such date;

(vii)    *seventh*, to the payment of all of the fees that are due and payable to the applicable Lenders under Section 2.08 on such date by the Borrower, ratably based upon the respective aggregate amounts of all such principal owing to the applicable Lenders on such date;

(viii)    *eighth*, to the payment of all of the accrued and unpaid interest on the Obligations of the Borrower under or in respect of the Loan Documents that is due and payable to the Agents and the applicable Lenders under Section 2.07(b) or (c) on such date, ratably based upon the respective aggregate amounts of all such interest owing to the Agents and the applicable Lenders on such date;

(ix)    *ninth*, to the payment of all of the accrued and unpaid interest on the applicable Loan that are due and payable to the applicable Lenders under Section 2.07(a) on such date, ratably based upon the respective aggregate amounts of all such interest owing to such applicable Lenders on such date;

(x)    *tenth*, to the payment of the principal amount of all of the outstanding applicable Loans that are due and payable to the Agents and the applicable Lenders on such date by the Borrower, ratably based upon the respective aggregate amounts of all such principal owing to the Agents and the applicable Lenders on such date; and

(xi)    *eleventh*, to the payment of all other Obligations owing under or in respect of the Loan Documents that are due and payable to the Agents and the other Secured Parties on such date by the Borrower, ratably based upon the respective aggregate amounts of all such Obligations owing to the Agents and the other Secured Parties on such date.

SECTION 2.12.  Taxes.

(a)    Any and all payments by any Loan Party to or for the account of any Lender or any Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.11 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any Indemnified Taxes or Other Taxes.  If any Loan Party shall be required by law to deduct any Indemnified Taxes or Other Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such Lender or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)    Without limiting the provisions of Section 2.12(a), each Loan Party shall timely pay any present or future stamp, documentary, excise, property, intangible, mortgage recording or similar taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (collectively, the "***Other Taxes***") to the relevant Governmental Authority in accordance with applicable law.

(c)    The Loan Parties shall indemnify each Lender and each Agent for and hold them harmless against the full amount of Indemnified Taxes and Other Taxes, and for the full amount of taxes of any kind imposed or asserted by any jurisdiction on amounts payable under this Section 2.12, imposed on or paid by such Lender or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date such Lender or such Agent (as the case may be) makes written demand therefor.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent) or by the Agents on their own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)    Within 30 days after the date of any payment of Indemnified Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.  For purposes of Section 2.12(d) and (e), the terms "***United States***" and "***United States person***" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)    (I) Each Payee organized under the laws of a jurisdiction outside the United States shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Lender and on the date pursuant to which it becomes a Payee in the case of each other Payee, and from time to time thereafter as reasonably requested in writing by the Borrower (but only so long thereafter as such Lender remains lawfully able to do so), provide each of the Administrative Agent and the Borrower with two executed copies of Internal Revenue Service Forms W-8IMY (together with certification documents from the applicable beneficial owners), W-8BEN, W-8BEN-E or W-8ECI or (in the case of a Payee that has

certified in writing to Borrower and the Administrative Agent that it is not (i) a "bank" as defined in Section 881(c)(3)(A) of the Internal Revenue Code, (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code)), Internal Revenue Service Form W-8BEN or W-8BEN-E, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, certifying that such Payee is exempt from or entitled to a reduced rate of United States withholding tax on payments pursuant to this Agreement or any other Loan Document.  If, at the time such Payee first becomes a Payee hereunder payments pursuant to this Agreement or any other Loan Document are subject to withholding tax rate at a rate in excess of zero, withholding tax at such rate shall be considered excluded from Indemnified Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such forms; *provided*, *however*, that if, at the effective date of the Assignment and Assumption pursuant to which a Lender becomes a party to this Agreement, the Lender assignor was entitled to payments under Section 2.12(a) in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding taxes that may be imposed in the future as a result of a Change in Law after the date that a Lender becomes a party to this Agreement) United States withholding tax, if any, applicable with respect to the Lender assignee on such date.

(II)     Each Payee that is a "United States person" shall deliver to the Administrative Agent two duly signed completed copies of IRS Form W-9.  If such Payee fails to deliver such forms, then Borrower and the Administrative Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable backup withholding tax imposed by the Internal Revenue Code, without reduction, and such amount shall be excluded from Indemnified Taxes.

(III)     Each Payee agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     For any period with respect to which a Payee has failed to provide the Borrower with the appropriate form, certificate or other document described in Section 2.12(e) (other than if such failure is due to a Change in Law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided), such Lender shall not be entitled to indemnification under Section 2.12(a) or (c) with respect to Taxes imposed by the United States by reason of such failure; *provided*, *however*, that should a Payee become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Payee shall reasonably request to assist such Payee to recover such Taxes.

(g)     If a payment made to a Payee under this Agreement would be subject to withholding tax imposed by the United States of America with respect to FATCA if such Payee were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Payee shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code or any intergovernmental agreement) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with its obligations under FATCA, to determine that such Payee has or has not complied with such Payee's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.12(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)      If a Payee determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses such Payee, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Parties, upon the request of such Payee, agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Payee in the event such Payee is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(i)      If any Payee requests compensation under Section 2.10 or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to this Section 2.12, then such Payee shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates or to file any certificate or document reasonably requested by the Borrower, if, in the judgment of such Payee, such designation, assignment or filing would (x) eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future and (y) would not subject such Payee to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Payee. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Payee in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such Payee to the Borrower shall be conclusive absent manifest error.

SECTION 2.13.  Sharing of Payments, Etc.

If any Lender shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment pursuant to Section 9.07) (a) on account of Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) on account of Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, such Lender shall forthwith purchase from the other Lenders such interests or participating interests in the Obligations due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; *provided*, *however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each other Lender shall be rescinded and such other Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's ratable share (according to the proportion of (i) the purchase price paid to such Lender to (ii) the aggregate purchase price paid to all Lenders) of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such other Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the

purchasing Lender in respect of the total amount so recovered.  The Loan Parties agree that any Lender so purchasing an interest or participating interest from another Lender pursuant to this <u>Section 2.13</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be.

SECTION 2.14.  <u>Use of Proceeds</u>. All proceeds of the New Money DIP Loans will be used on the Interim Order Funding Date to prepay outstanding Prepetition ABL Loans in an aggregate amount not less than $24,062,500, with any remaining proceeds to pay (x) costs, fees and expenses incurred in connection with the Term Loan Facility and the transactions contemplated hereby and (y) to pay other costs and expenses with respect to the administration of the Chapter 11 Cases, in each case, pursuant to the Orders and then-Approved Budget (subject to any Permitted Variances) pursuant to the Orders and then-Approved Budget (subject to any Permitted Variances). All proceeds of the Rolled-Up Loans will be used solely for the deemed repayment (on a cashless, dollar-for-dollar basis) of all accrued and unpaid Prepetition Term Loan Obligations. No proceeds of the New Money DIP Loans, whether directly or, to the Loan Parties' knowledge after due care and inquiry, indirectly, and whether immediately, incidentally or ultimately, shall be used (a) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or extending credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board; (b) to make any payments to a Sanctioned Entity (that would be prohibited by applicable Sanctions) or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity (that would be prohibited by applicable Sanctions) or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity (that would be prohibited by applicable Sanctions) or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person that is a party to any Loan Document; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person, or otherwise in any manner that would result in a violation by any Person (including any Secured Party or other individual or entity participating in any transaction) of any applicable Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws; or (d) for purposes other than those permitted under this Agreement.

SECTION 2.15.  [<u>Intentionally Omitted</u>].

SECTION 2.16.  <u>Evidence of Debt</u>.

(a)    The Loans and other credit extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Administrative Agent (the "***Loan Account***") in the ordinary course of business.  In addition, each other Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Loans owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. The Borrower agrees that upon notice by any Lender to the Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to, or to be made by, such Lender, the Borrower shall promptly execute and deliver to such Lender, with a copy to the Administrative Agent, a Note payable to the order of such Lender in a principal amount equal to the Commitment of such Lender.  All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b)      The Register maintained by the Administrative Agent pursuant to Section 9.07(d) shall include a control account, and a subsidiary account for each Lender, in which accounts (taken together) shall be recorded (i) the date and amount of each Borrowing made hereunder, (ii) the terms of each Assignment and Assumption delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrower hereunder and each Lender's share thereof.

(c)      Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.16(b), and by each Lender in its account or accounts pursuant to Section 2.16(a), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; *provided*, *however*, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement.

SECTION 2.17.  Net Orderly Liquidation Value; Reserves and Eligibility Criteria.

(a)      [Reserved].

(b)      The Administrative Agent may hereafter establish Reserves or change any of the Reserves in its Permitted Discretion; *provided* that such Reserves shall not be established or changed except upon not less than five (5) Business Days' notice to the Borrower (during which period the Administrative Agent shall be available to discuss any such proposed Reserve with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Reserve no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent in its Permitted Discretion), except that, no such prior notice shall be required (x) if an Event of Default is continuing, or (y) for changes to Reserves solely by virtue of mathematical calculations of the amount of such Reserves in accordance with the methodology previously utilized; *provided*, *further*, that if, as a result of any such adjustment or modification described in this Section 2.17(b) (disregarding any applicable notice period), the ABL DIP Used Commitment would exceed the ABL DIP Borrowing Base then in effect, then, notwithstanding anything to the contrary, the Borrower shall not be permitted to request any borrowings or extensions of credit under the ABL DIP Credit Agreement to the extent any such borrowing or extension of credit would cause an Overadvance (as defined in the ABL DIP Credit Agreement) or an Event of Default after giving effect to such new or modified Reserves.

(c)      After the Discharge of the ABL Obligations, the Administrative Agent may, in its Permitted Discretion, establish new, or modify existing, eligibility criteria as set forth in the definitions of "Eligible Inventory", and "Eligible Credit Card Receivables"; *provided* that such criteria shall not be established or changed except upon not less than five (5) Business Days' notice to the Borrower (during which period the Agents shall be available to discuss any such proposed criterion with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such criterion no longer exists, in a manner and to the extent reasonably satisfactory to the applicable Agent, in its Permitted Discretion), except that no such prior notice shall be required if an Event of Default is continuing; *provided, further,* that any such adjustment or modification that would increase amounts available to be borrowed by the Borrower shall be subject to the requirements of Section 9.01(a)(viii).

SECTION 2.18.  Security and Administrative Priority.

(a)      Collateral; Grant of Lien and Security Interest.

(i)     As security for the full and timely payment and performance of all of the Obligations, each of the Debtors, as of the Effective Date, and pursuant to and to the extent permitted in the Interim Order and the Final Order, collaterally assigns, pledges and grants (or causes the collateral assignment, pledge and grant in respect of any indirectly owned assets) to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and to, and Liens on, all property of the estate under Section 541 of the Bankruptcy Code including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (A) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (B) all proceeds of leased real property; (C) subject to entry of a Final Order, the proceeds of any Avoidance Actions; (D) proceeds of the Debtors' rights under Sections 506(c) (solely to the extent such rights result from the use of Collateral, and are, therefore, enforceable against parties other than the Prepetition Secured Parties) and 550 of the Bankruptcy Code; (E) all Prepetition Collateral; and (F) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. For the avoidance of doubt, Collateral shall not include the Debtors' nonresidential real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a Lien (or Adequate Protection Lien) is prohibited or restricted by the terms of such real property lease or applicable non-bankruptcy law to attach to any such real property lease. All property of the Debtors subject to the security interest referred to in this Section 2.18(a)(i) being hereafter collectively referred to as the "***Collateral***".

(ii)    Upon entry of the Interim Order or Final Order, and pursuant to and to the extent permitted in the Interim Order and Final Order, each as the case may be, the Liens and security interests in favor of the Administrative Agent referred to in Section 2.18(a)(i) shall be valid and perfected Liens on, and security interests in, the Collateral. Such Liens and security interests and their priority shall be governed by the Orders and remain in effect until all Obligations shall have been repaid in cash in full.

(iii)   Notwithstanding anything herein to the contrary (A) all proceeds received by the Administrative Agent and the Lenders from the Collateral subject to the Liens granted in Section 2.18(a)(i) and in each other Loan Document and by the Orders shall be subject to the Carve Out and (B) no Person entitled to the Carve Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(b)     Grants; Rights and Remedies. The Liens and security interests granted pursuant to Section 2.18 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.

(c)      No Filings Required. The Liens and security interests referred to herein shall be deemed to be valid and perfected by entry of the Interim Order or the Final Order, as the case may be. The Administrative Agent shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Order or the Final Order, as the case may be, or any other Loan Document; provided, that the Administrative Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any United States jurisdiction or filing office or to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement.

(d)      Further Assurances. The Loan Parties shall take any other actions reasonably requested by the Administrative Agent and the Lenders from time to time to cause the attachment, perfection and priority as set forth in the Orders of, and the ability of the Administrative Agent and the Lenders to enforce, the security interest of the Administrative Agent and the Lenders in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law of the United States or any state thereof, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing the Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the security interest of the Administrative Agent in such Collateral, and (e) obtaining the consents and approvals of any Governmental Authority or third party and taking all actions required by the UCC or by other law, as applicable in any relevant jurisdiction.

## ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01.  Conditions Precedent to Interim Order Funding Date and Interim Order Roll-Up.

The obligation of each Lender to make New Money DIP Loans in an amount not to exceed Term Loan Commitment on the Interim Order Funding Date and the effectiveness of the Interim Order Roll-Up is subject to the satisfaction (or waiver by the Administrative Agent and Required Lenders) of the following conditions precedent:

(a)      Loan Documents and Deliverables.  The Administrative Agent shall have received on or before the Effective Date the following, each dated as of the Effective Date (unless otherwise specified), in form and substance reasonably satisfactory to each Agent and the Lenders (unless otherwise specified):

(i)      Executed Agreement. Executed counterparts of this Agreement sufficient in number for distribution to the Agents, each Lender and the Borrower;

(ii)      Resolutions. Certified copies of the resolutions of the board of directors, board of managers or members, as applicable, of each Loan Party approving the commencement of the Chapter 11 Cases and the entry into and performance under each Loan Document to which it is or is to be a party;

(iii)    <u>Secretary's Certificate</u>. A certificate of the Secretary, Assistant Secretary or Responsible Officer of each Loan Party certifying as to (A) the absence of any amendments to the charter, articles of organization, or certificate of formation, as applicable, of such Loan Party since the date of the Secretary of State's certificate last delivered to the Administrative Agent on or around the effective date of the Prepetition Term Loan Credit Agreement, (B) a true and correct copy of the bylaws, limited liability company agreement or operating agreement, as applicable, of such Loan Party as in effect on the date on which the resolutions referred to in <u>Section 3.01(a)(ii)</u> were adopted and on the Effective Date (or a certification reflecting that no changes have been made to any such bylaws, limited liability company agreement or operating agreement, as applicable, since the effective date of the Prepetition Term Loan Credit Agreement), (C) the good standing or valid existence of such Loan Party as a corporation organized under the laws of the jurisdiction of its incorporation or formation and (D) the names and true signatures of the officers of such Loan Party authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder (or a certification reflecting that no changes have been made since the same certification was provided on or around the effective date of the Prepetition Term Loan Credit Agreement); and

(iv)    <u>Closing Certificate</u>. A certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in <u>Sections 3.01(b)</u> and <u>(c)</u> have been satisfied, and (B) that there has been no event or circumstance since the date of the Audited Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b)    <u>Representations and Warranties</u>. The representations and warranties of the Loan Parties contained in each Loan Document are correct in all material respects (unless any such representation or warranty is qualified by materiality in the text thereof, in which case, such representation or warranty shall be true and correct in all respects) on and as of the Effective Date and Interim Order Funding Date, immediately after giving effect to the Borrowing of the New Money DIP Loans and to the application of the proceeds therefrom, as though made on and as of the Effective Date and Interim Order Funding Date, other than any such representations or warranties that, by their terms, refer to a specific date, in which case as of such specific date.

(c)    <u>No Default</u>. No Default has occurred and is continuing as of the Effective Date, or would result immediately after giving effect to the Borrowing of the New Money DIP Loans on the Interim Order Funding Date or from the application of the proceeds therefrom.

(d)    <u>Effective Date BBC</u>. The Administrative Agent shall have received a Borrowing Base Certificate (calculating the ABL DIP Borrowing Base and Term Loan Borrowing Base), dated the Effective Date, relating to the week ended on Saturday, April 13, 2024, and executed by a Responsible Officer of the Borrower.

(e)    <u>Financial Statements</u>. The Administrative Agent shall have received (i) Audited Financial Statements; and (ii) unaudited financial statements (including an income statement and a balance sheet) for the Fiscal Year ended February 3, 2024 (the "***Interim Financial Statements***"). Each Lender shall be reasonably satisfied that the Audited Financial Statements and the Interim Financial Statements delivered to it fairly present the business and financial condition of the Loan Parties in all material respects. Each of the Lenders hereby confirm that such condition was satisfied on or prior to the Effective Date.

(f)    Debtor Advisor Engagement Letters. Each Lender shall have received true, correct and complete copies of the M3 Engagement Letter and Moelis Engagement Letter, duly executed by the parties thereto, together with all amendments and modifications thereto.  Each of the Lenders hereby confirm that such condition was satisfied on or prior to the Effective Date.

(g)    ABL DIP Credit Agreement. Substantially concurrently with the satisfaction of other conditions precedent set forth in this Section 3.01, the Borrower and the other Loan Parties shall have entered into the ABL DIP Credit Agreement and the other ABL DIP Loan Documents and the Administrative Agent shall have received a certificate signed by a Responsible Officer certifying that true, correct and complete copies of all material documents relating to the ABL DIP Loan Documents (A) have been delivered to Administrative Agent on or prior to the Effective Date, and (B) are in full force and effect.

(h)    Fees and Expenses. All fees required to be paid to the Agents on or before the Effective Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Effective Date shall have been paid in full. The Borrower shall have paid all fees, charges and disbursements of counsel to the Agents and the Lenders to the extent invoiced prior to the Effective Date.

(i)    KYC. The Administrative Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(j)    Initial Budget.  On or prior to the Effective Date, the Administrative Agent and the Lenders shall have received a copy of, and the Administrative Agent and Lenders shall have approved, the Initial Budget, which shall be in form and substance satisfactory to the Administrative Agent and Lenders. Each of the Lenders hereby confirms that such condition was satisfied on the Effective Date.

(k)    Specified Liquidation Agreement.  Each  Lender shall have received a duly executed copy of the Specified Liquidation Agreement Twenty-Sixth Amendment, in form and substance satisfactory to each Lender. The Specified Liquidation Agreement (as amended by the Specified Liquidation Agreement Twenty-Sixth Amendment) (i) shall have been assumed by the Borrower on an interim basis and shall have been approved by the Bankruptcy Court pursuant to an interim order in form and substance satisfactory to each Lender (the "***Store Closing Interim Order***") and (ii) shall be in full force and effect.

(l)    Borrowing Notice.  The Administrative Agent shall have received a Notice of Borrowing at least one (1) Business Day prior to the Interim Order Funding Date.

(m)    Chapter 11 Matters. In connection with the Chapter 11 Cases, each of the following conditions shall have been met:

(i)    The Chapter 11 Cases for each of the Debtors shall have been commenced in the Bankruptcy Court for the District of Delaware, and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Lenders and shall be in form and substance acceptable to the Administrative Agent and Lenders. Each of the Lenders hereby confirms that such condition has been satisfied as of the Effective Date.

(ii)    The Bankruptcy Court shall have entered, upon motion in form and substance acceptable to the Lenders and the Administrative Agent, the Interim Order no later than three (3) calendar days after the Petition Date, approving and authorizing the Term Loan Facility and the ABL DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy

Code Sections 364(c) and (d), as applicable, in form and substance acceptable to the Lenders and the Administrative Agent. Each of the Lenders hereby confirms that such condition has been satisfied as of the date hereof.

(iii)      The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, without the prior written consent of the Lenders and the Administrative Agent, as applicable.

(iv)      The Debtors shall be in compliance in all respects with the Interim Order.

(v)      No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties.

(vi)      The Cash Management Order encompassing the cash management arrangements currently in place under the Prepetition Credit Agreements and otherwise acceptable to the Administrative Agent Lenders shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Lenders. Each of the Lenders hereby confirms that such condition has been satisfied as of the date hereof.

(vii)      Upon entry of the Interim Order, the entry into this Agreement shall not violate any applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(viii)      The Collateral Agent shall have a valid and fully perfected lien on the Collateral, having the priorities set forth in the Orders and the Intercreditor Agreement.

For purposes of determining compliance with the conditions specified in <u>Section 3.01</u>, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the Effective Date specifying its objection thereto.

SECTION 3.02.  <u>Conditions Precedent to Final Order Roll-Up</u>.

The effectiveness of the Final Order Roll-Up is subject to the satisfaction (or waiver by the Required Lenders) of the following conditions precedent.

(a)      <u>Interim Order Funding Date</u>. The Interim Order Funding Date shall have occurred. The Interim Order and the Cash Management Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal.

(b)      <u>Final Order</u>. The Final Order shall have been entered by the Bankruptcy Court on a motion by the Debtors that is in form and substance acceptable to the Required Lenders and the Administrative Agent, approving and authorizing on a final basis the matters and containing the provisions described in the Interim Order, in each case, in form and substance acceptable to the Lenders and the Administrative Agent.

# ARTICLE IV

# REPRESENTATIONS AND WARRANTIES

SECTION 4.01.  <u>Representations and Warranties</u>.

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans hereunder, each Loan Party represents and warrants as follows, each of which shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on the Effective Date:

(a)      <u>Company Status</u>. Each Loan Party and each of its Restricted Subsidiaries (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing (to the extent applicable in the relevant jurisdiction) in each other jurisdiction in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed could not be reasonably expected to have a Material Adverse Effect and (iii) subject to approval of the Bankruptcy Court pursuant to the Orders, has all requisite power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted except where the failure to have such power and authority could not be reasonably expected to have a Material Adverse Effect.  All of the outstanding Equity Interests in the Borrower have been validly issued, are fully paid and non-assessable and are owned, directly or indirectly, by the Parent free and clear of all Liens except the Liens in favor of the Collateral Agent and other Permitted Liens.

(b)      <u>Company Information</u>. Set forth on <u>Schedule 4.01(b)</u> are complete and accurate lists of all Loan Parties, showing as of the Effective Date (as to each Loan Party) the jurisdiction of its incorporation or formation, the address of its principal place of business and its U.S. taxpayer identification number or, in the case of any non-U.S. Loan Party that does not have a U.S. taxpayer identification number, its unique identification number issued to it by the jurisdiction of its incorporation or formation.

(c)      <u>Subsidiaries</u>. Set forth on <u>Schedule 4.01(c)</u> is a complete and accurate list of all Subsidiaries of each Loan Party as of the Effective Date, showing as of the Effective Date (as to each such Subsidiary) the jurisdiction of its formation, the number of shares, membership interests or partnership interests (as applicable) of each class of its Equity Interests authorized, and the number outstanding, on the Effective Date and the percentage of each such class of its Equity Interests owned (directly or indirectly) by such Loan Party and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Effective Date.  All of the outstanding Equity Interests in each Loan Party's Restricted Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Restricted Subsidiaries free and clear of all Liens except Liens in favor of the Collateral Agent and other Permitted Liens.

(d)      <u>Power and Authority</u>. Subject to approval of the Bankruptcy Court pursuant to the Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated hereby and thereby, are within such Loan Party's powers, have been duly authorized by all necessary action, and do not (i) contravene such Loan Party's charter, bylaws, limited liability company agreement, partnership agreement or other constituent documents, (ii) violate any law, rule, regulation (including Regulation X of the Board), order, writ, judgment, injunction, decree, determination or award, except for violations that (either individually or in the aggregate) could not reasonably be expected to have a Material Adverse Effect, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any material

62

contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on or affecting any Loan Party, any of its Subsidiaries or any of their properties, except for violations, defaults or the creation of such rights that could not (either individually or in the aggregate) reasonably be expected to have a Material Adverse Effect, or (iv) except for the Liens created under the Loan Documents, Liens in favor of the ABL DIP Agent, the Prepetition Term Loan Collateral Agent and the Prepetition ABL Collateral Agent, in each case, permitted pursuant to <u>clause (z)</u> of the definition of "Permitted Liens", Liens in favor of MGF permitted pursuant to <u>clause (k)</u> of the definition of "Permitted Liens", and other Permitted Liens, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of any Loan Party or any of its Subsidiaries. Each Loan Party and each of its Restricted Subsidiaries is in compliance with (i) all applicable laws, rules and regulations, except to the extent that failure to do so could not be reasonably expected to have a Material Adverse Effect, and (ii) <u>Sections 2.14</u> and <u>9.13</u>.

(e)    <u>Approvals</u>. Subject to approval of the Bankruptcy Court pursuant to the Orders, no Governmental Authorization, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery or performance by any Loan Party of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated hereby or thereby, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the applicable priority thereof) or (iv) the exercise by any Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (v) any notices or filings which are required to be made with the SEC in connection with the Transaction, (w) the authorizations, approvals, actions, notices and filings contemplated by the Collateral Documents, (x) those authorizations, approvals, actions, notices and filings, the failure of which to obtain, take, give or make could not be reasonably expected to have a Material Adverse Effect, (y) notices and filings which customarily are required in connection with the exercise of remedies in respect of the Collateral and (z) landlord consents and waivers.

(f)    <u>Enforceability</u>. Subject to approval of the Bankruptcy Court pursuant to the Orders, this Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party party thereto. This Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against such Loan Party in accordance with its terms.

(g)    <u>Environmental</u>. There is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or threatened before any Governmental Authority or arbitrator that (i) could be reasonably expected to have a Material Adverse Effect or (ii) purports to affect the legality, validity or enforceability of any Loan Document.

(h)    <u>Foreign Assets Control Regulations and Anti-Money Laundering</u>. Each Loan Party and each of its Subsidiaries is:

(i)    not a "blocked" person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "***Annex***"),

(ii)    in compliance in all material respects with the applicable requirements of the Patriot Act, the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "***Trading With the Enemy Act***"), and all other requirements contained in the rules and regulations of OFAC,

(iii)    operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act,

(iv)    not in receipt of any notice from the Secretary of State of the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act,

(v)    not listed as a Specially Designated Terrorist (as defined in the Patriot Act) or as a "blocked" person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act,

(vi)    not a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act, and

(vii)    not owned or controlled by or now acting and or will be in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be subject to the prohibitions contained in the Patriot Act.

(i)    <u>Sanctions</u>. No Loan Party nor any of its Subsidiaries is in violation of any Sanctions. No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities that would be prohibited by applicable Sanctions, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries (x) has implemented and maintains in effect policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Anti-Corruption Laws, and (y) has implemented and maintains in effect policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Sanctions and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance (i) with all applicable Sanctions, and (ii) in all material respects, with all applicable Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of the Loans will be used in any manner prohibited by <u>Section 2.14</u>.

(j)    [<u>Intentionally Omitted</u>].

(k)    <u>Historical Financial Statements</u>. The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material Debt and other liabilities, direct or contingent, of Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Debt. Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(l)    <u>Margin Stock</u>. None of the Loan Parties is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of the Loans will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying

any Margin Stock, or for any purpose that violates the provisions of Regulations T, U or X promulgated by the Board.  Neither any Loan Party nor any of its Subsidiaries expects to acquire any Margin Stock.

(m)      1940 Act. Neither any Loan Party nor any of its Restricted Subsidiaries (other than Foreign Subsidiaries) is or is required to be registered as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended.

(n)      Collateral Documents. The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Collateral Agent, for the benefit of the Secured Creditors, a legal, valid and enforceable, non-avoidable and automatically and fully and properly perfected priority security interest in all right, title and interest of the Loan Parties in each item of Collateral and the proceeds thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents with the priorities set forth in the Orders. Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, other than the Permitted Liens. Pursuant to the terms of the Orders, the Obligations of the Loan Parties under this Agreement will constitute Superpriority Claims and be allowed administrative expense claims in the Chapter 11 Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person (including avoidance actions and the proceeds thereof), subject only to the terms of the Orders and the Carve-Out.

(o)      [Intentionally Omitted].

(p)      No Default. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(q)      ERISA. (i) No ERISA Event has occurred or is reasonably expected to occur with respect to any Plan that has resulted in or is reasonably expected to result in a material liability of any Loan Party or any ERISA Affiliate, (iii) Schedule B (Actuarial Information) to the most recent annual report (Form 5500 Series) for each Plan, copies of which have been filed with the Internal Revenue Service and made available to the Administrative Agent, is complete and accurate and fairly presents the funding status of such Plan, and since the date of such Schedule B there has been no material adverse change in such funding status, (iv) neither any Loan Party nor any ERISA Affiliate has incurred or is reasonably expected to incur any Withdrawal Liability to any Multiemployer Plan, and (v) neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated, within the meaning of Title IV of ERISA, and no such Multiemployer Plan is reasonably expected to be in reorganization or to be terminated, within the meaning of Title IV of ERISA.

(r)      Environmental. Except as would not reasonably be expected to result in a Material Adverse Effect (which representations are, along with Section 4.01(g), the sole representations of the Loan Parties in respect of environmental matters):

(i)      the operations and properties of each Loan Party and each of its Subsidiaries comply with all applicable Environmental Laws and Environmental Permits and all past non-compliance with such Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs;

(ii)      to the knowledge of each Loan Party of any of its Subsidiaries, no Hazardous Materials have been released at or from any property currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries in a manner that would be reasonably likely to (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties or (B) cause any such property to be subject to any restrictions on ownership, occupancy, transferability or use under any Environmental Law;

(iii)      none of the properties currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list;

(iv)      Hazardous Materials have not been released, discharged or disposed of, or maintained, on any property currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries, except in each case for Hazardous Materials in the ordinary course of business in such quantities and in a manner that (x) does not constitute a violation of any Environmental Law or require any reporting or disclosure under any Environmental Law; (y) is consistent with product labeling; and (z) is consistent with customary business practice for such operations in the jurisdiction where such property is located;

(v)      neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and

(vi)      all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or, to the knowledge of each Loan Party or any of its Subsidiaries, formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in liability to any Loan Party or any of its Subsidiaries.

(s)      <u>Taxes</u>. Except as set forth on <u>Schedule 4.01(s)</u>:

(i)      [Intentionally omitted].

(ii)      Each Loan Party and each of its Restricted Subsidiaries (A) has filed, has caused to be filed or has been included in all material tax returns (federal, state, local and foreign) required to be filed and such tax returns are true and correct in all material respects and (B) has paid all taxes shown thereon to be due, together with applicable interest and penalties or adequate provision therefor has been made in accordance with GAAP except for taxes (x) that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP and (y) that could not (individually or in the aggregate) have a Material Adverse Effect.

(iii)      No issues have been raised in writing by any tax authorities that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(t)     <u>JV IP Matters</u>. The JV IP Transaction Documents and the Bonobos IP Transaction Documents are in full force and effect and the Loan Parties have not received any notice of the intention of any other party thereto to terminate any JV IP Transaction Document or Bonobos IP Transaction Document.

(u)     <u>Intellectual Property</u>. Each Loan Party and each of its Subsidiaries owns, or holds licenses in, all trademarks, trade names, domain names, patents, industrial designs, copyrights, trade secrets and other Intellectual Property that are used in the conduct of business of the Loan Parties and their Subsidiaries as currently conducted and as currently proposed to be conducted.  To the knowledge of the Borrower, (i) there is no action, proceeding, claim or complaint pending or, threatened in writing to be brought against any Loan Party or any Subsidiary which might jeopardize or challenge the validity or enforceability of any of the foregoing patents, copyrights, trademarks, trade names, domain names, or designs, except those which are not Material Intellectual Property, (ii) no Material Intellectual Property infringes upon any rights held by any other Person, and (iii) no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Parent or any of its Subsidiaries infringes upon any rights held by any other Person.  The Loan Parties have taken commercially reasonable actions that in the exercise of their reasonable business judgment should be taken to protect any rights they have in Material Intellectual Property, including Material Intellectual Property that is confidential in nature.

(v)     <u>Budgets</u>. The Initial Budget and each Updated Budget delivered in accordance with <u>Section 5.01(s)</u>, has been prepared in good faith based upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery to the Lenders.

(w)     <u>Chapter 11 Cases</u>. The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (a) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (b) the hearing for the entry of the Interim Order, and (c) the hearing for the entry of the Final Order. The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(x)     <u>Orders</u>. Each of the Interim Order and the Final Order (from and after the date the Final Order is entered) are in full force and effect and have not been vacated or subject to a stay pending appeal, reversed, modified, amended, stayed or rescinded, without the prior written consent of the Administrative Agent and Required Lenders.  Upon the entry of the Orders, each such Order and the Loan Documents are sufficient to provide that the Obligations will constitute a Superpriority Claims and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth in the Orders.

## ARTICLE V

## COVENANTS OF THE LOAN PARTIES

SECTION 5.01.  <u>Affirmative Covenants</u>.

Until the Payment in Full of the Obligations (other than Unmatured Surviving Obligations), each Loan Party will (unless Required Lenders consent in writing):

(a)     <u>Compliance with Laws, Etc</u>.

(i)      Comply, and cause each of its Subsidiaries to comply, with (x) (i) with all applicable Sanctions, and (ii) in all material respects, all applicable Anti-Corruption Laws and Anti-Money Laundering Laws, and (y) Sections 2.14 and 9.13.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Anti-Corruption Laws.  Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii)     Implement and maintain in effect, and cause each of its Subsidiaries to implement and maintain in effect, policies and procedures reasonably designed to promote compliance by the Loan Parties and their Subsidiaries and their respective directors, officers and employees with all applicable Sanctions and Anti-Money Laundering Laws.

(iii)    Comply, and cause each of its Restricted Subsidiaries to comply with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA and the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)      Payment of Taxes, Etc.  Subject to the Approved Budget then in effect (and any Permitted Variances therefrom) and subject to the automatic stay in connection with the Chapter 11 Cases, pay and discharge, and cause each of its Restricted Subsidiaries to pay and discharge, before the same shall become delinquent, (A) all material taxes, assessments and governmental charges or levies imposed upon it or upon its property and (B) all material lawful claims that, if unpaid, might by law become a Lien upon its property; *provided*, *however*, that neither the Parent nor any of its Restricted Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

(c)      Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, (i) comply, and cause each of its Restricted Subsidiaries to comply, with all applicable Environmental Laws and Environmental Permits; (ii) obtain and renew, and cause each of its Restricted Subsidiaries to obtain and renew, all Environmental Permits necessary for its operations and properties; and (iii) conduct, and cause each of its Restricted Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of and to the extent required by any Governmental Authority pursuant to all Environmental Laws; *provided*, *however*, that neither the Parent nor any of its Restricted Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances.

(d)      Maintenance of Insurance.  Maintain, and cause each of its Restricted Subsidiaries to maintain, insurance (as deemed to be reasonably prudent in the good faith judgment of the Responsible Officers of such Loan Party or its Restricted Subsidiaries) (including, without limitation, business interruption insurance) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas and with similar risk factors in which the Parent or such Restricted Subsidiary operates.

(e)     <u>Preservation of Corporate Existence, Etc.</u>  Except as permitted under <u>Section 5.02(d)</u> or <u>5.02(e)(viii)</u>, preserve and maintain, and cause each of its Restricted Subsidiaries to preserve and maintain, its existence, rights (charter and statutory), permits, licenses, approvals, privileges and franchises; *provided* that neither the Parent nor any of its Restricted Subsidiaries shall be required to preserve or maintain any right, permit, license, approval, privilege or franchise if the failure to do so could not reasonably be expected to have a Material Adverse Effect.  Nothing contained in this Section 5.01(e) shall be deemed to prohibit any Subsidiary or the parent entity of such Subsidiary from reorganizing or changing the entity form of such Subsidiary upon prior notice to the Administrative Agent and provided that such reorganization or change is not materially adverse to the Lenders.

(f)     <u>Visitation Rights</u>.  At any reasonable time and from time to time, upon reasonable prior notice at any mutually agreeable reasonable time during normal business hours, permit any of the Agents or any of the Lenders, or any agents or representatives thereof, to examine and make copies of and abstracts from the financial records and books of account of, and visit the properties of, Holdings and any of its Restricted Subsidiaries, and to discuss the affairs, finances and accounts of Holdings and any of its Restricted Subsidiaries with any of their officers or directors and with their independent certified public accountants (subject to the consent of such accountants); *provided*, that, so long as no Event of Default has occurred and is continuing, the Agents and the Lenders shall coordinate the exercise of such rights through the Administrative Agent and shall not be entitled to exercise the foregoing rights more than once prior to the Maturity Date at the expense of the Borrower, on a collective basis; *provided, however,* that a representative of the Borrower shall be given the opportunity to be present for any communication with the independent accountants.

(g)     <u>Keeping of Books</u>.  Keep, and cause each of its Restricted Subsidiaries to keep, proper books of record and account, in which full and correct entries in all material respects shall be made of all financial transactions and the assets and business of Holdings and each such Restricted Subsidiary in accordance with generally accepted accounting principles in effect from time to time.

(h)     <u>Maintenance of Properties, Etc</u>.

(i)     Maintain and preserve, and cause each of its Restricted Subsidiaries to maintain and preserve, all of its properties that are used or useful in the conduct of and material to its business in good working order and condition, ordinary wear and tear, casualty and condemnation excepted, except to the extent the failure to do so could reasonably be expected not to have a Material Adverse Effect.

(ii)     Take, and cause each of its Subsidiaries to take, in its commercially reasonable business judgment, commercially reasonable steps, including, in any proceeding before the PTO and the USCO, as applicable, to maintain and pursue each application (and to obtain the relevant issuance or registration) and to maintain each issuance or registration of the Material Intellectual Property owned by it or such Subsidiary or, in the case of licensed Material Intellectual Property, to the extent it or such Subsidiary has rights to do so under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>), including, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(iii)     Preserve and renew, and cause each of its Subsidiaries preserve and renew, all of the Material Intellectual Property owned by it or such Subsidiary or, in the case of licensed Material Intellectual Property, to the extent it or such Subsidiary has rights to do so under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP

License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)), except to the extent in the commercially reasonable business judgement of the applicable Loan Party or applicable Subsidiary such Material Intellectual Property is no longer used or necessary in the business of any Loan Party or its Subsidiaries.

(i)    Transactions with Affiliates.  Conduct, and cause each of its Restricted Subsidiaries to conduct, all transactions otherwise permitted under the Loan Documents with any of their Affiliates on terms that are no less favorable, in the aggregate, to Holdings or such Restricted Subsidiary than it would obtain in a comparable arm's length transaction with a Person not an Affiliate, as determined by the board of directors of Holdings, the Borrower or such Restricted Subsidiary in good faith; *provided*, the foregoing restriction shall not apply to (i) transactions between or among Loan Parties or transactions between or among Subsidiaries of Holdings that are not Loan Parties or transactions between a Loan Party and a Subsidiary that is not a Loan Party so long as the terms of such transaction are no less favorable to the Loan Party than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; (ii) Restricted Payments permitted to be made pursuant to Section 5.02(g), Investments permitted under Section 5.02(f) and permitted intercompany Debt and asset transfers; (iii) reasonable and customary cash fees paid to and indemnification of members of the board of directors (or similar governing body) of Holdings and its Subsidiaries paid in cash; (iv) cash compensation and indemnity arrangements payable in cash and benefit plans for officers and other employees of Holdings and its Subsidiaries entered into or maintained or established in the ordinary course of business and paid in cash; (v) sales of Equity Interests of Parent to Affiliates of Loan Parties or contributions to the equity capital of Parent by any shareholder or any of its Affiliates not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith; (vi) any transaction with an Affiliate where the only consideration paid is Equity Interests of Parent; (vii) transactions involving consideration (as determined as though on fair and reasonable terms in an arm's length transaction with a Person other than an Affiliate) not to exceed $100,000 as to any individual transaction; (viii) the existence of, and the performance by the Parent (or the Borrower on behalf of the Parent) and the Borrower of their respective obligations under any limited liability company, limited partnership or other constitutive document or security holders agreement (including any registration rights agreement or purchase agreement related thereto); (ix) sublicenses to Subsidiaries with respect to JV IP or Bonobos IP to the extent permitted by the JV IP License Agreements or the Bonobos IP License Agreements, as applicable (each as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); (x) the transactions contemplated by the JV IP Transaction Documents (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); and (xi) the transactions contemplated by the Bonobos IP Transaction Documents (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)).

(j)    Covenant to Guarantee Obligations and Give Security.  Upon (x) the formation or acquisition of any new direct or indirect Restricted Subsidiaries or (y) the acquisition of any Collateral that in the judgment of the Collateral Agent, shall not already be subject to a perfected (subject to Permitted Liens and other Liens created or permitted by the Loan Documents) security interest in favor of the Collateral Agent for the benefit of the Secured Parties, then in each case at the Borrower's expense and subject to the terms of the Collateral Documents:

(i)    in connection with the formation or acquisition of a Restricted Subsidiary, within fifteen (15) days after such formation or acquisition, cause each such Restricted Subsidiary, and cause each direct and indirect parent of such Restricted Subsidiary (if it has not already done so), to duly execute and deliver to the Collateral Agent a guaranty or guaranty supplement, in form and substance reasonably satisfactory to the Collateral Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

(ii)    within fifteen (15) days (or such later date as permitted by each Agent in its sole discretion) after (A) such request or acquisition of property, duly execute and deliver, and cause each Loan Party to duly execute and deliver, to the Collateral Agent such additional security agreement supplements and other security agreements as specified by, and in form and substance reasonably satisfactory to the Collateral Agent, securing payment of all the Obligations of such Loan Party under the Loan Documents and constituting Liens on all such properties and (B) such formation or acquisition of any new Restricted Subsidiary, duly execute and deliver and cause such Restricted Subsidiary to duly execute and deliver to the Collateral Agent security agreement supplements and other security agreements as specified by, and in form and substance reasonably satisfactory to, the Collateral Agent, securing payment of all of the obligations of such Restricted Subsidiary under the Loan Documents,

(iii)    within fifteen (15) days (or such later date as permitted by each Agent in its sole discretion) after such request, formation or acquisition, take, and cause each Loan Party and each newly acquired or newly formed Restricted Subsidiary to take, all reasonable actions (including, without limitation, the filing of Uniform Commercial Code financing statements) as may be necessary or advisable in the opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the security agreement supplements and security agreements delivered pursuant to this <u>Section 5.01(j)</u>, enforceable against all third parties in accordance with their terms,

(iv)    at any time and from time to time, promptly execute and deliver, and cause each Loan Party and each newly acquired or newly formed Restricted Subsidiary to execute and deliver, any and all further instruments and documents and take, and cause each Loan Party and each newly acquired or newly formed Restricted Subsidiary to take, all such other action as any Agent may deem reasonably necessary in obtaining the full benefits of, or in perfecting and preserving the Liens of, such guaranties, security agreement supplements and security agreements.

Notwithstanding anything to the contrary contained in this Agreement, the Collateral Agent may (x) in its sole discretion, lengthen the foregoing time periods, (y) in consultation with the Borrower, otherwise modify the foregoing requirements to the extent it deems it reasonable and prudent to do so, and (z) waive the foregoing requirements to the extent that the cost of obtaining a security interest in the foregoing Collateral is excessive (as reasonably determined by each Agent) in relation to the benefits to the Lenders.

At all times, each "Loan Party" (as defined in the ABL DIP Credit Agreement and Prepetition ABL Credit Agreement) shall be and remain a Loan Party under the Loan Documents.

(k)    <u>Further Assurances</u>.

(i)    Promptly upon the reasonable request by any Agent, or any Lender through the Administrative Agent, correct, and cause each of its Restricted Subsidiaries promptly to correct, any matter that the parties mutually agree is a material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof.

(ii)    Promptly upon request by any Agent, or any Lender through the Administrative Agent, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any document or instrument supplemental to or confirmatory of the Collateral Documents as any Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order

71

to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder.

(iii)     [reserved].

(iv)     Notwithstanding anything to the contrary contained herein (including this Section 5.01) or in any other Loan Document, the Agents may elect not to accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and the Administrative Agent has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to the Administrative Agent.

(l)     [Intentionally Omitted.]

(m)     Term Pushdown Reserve.  The Loan Parties shall take such steps as shall be required under the ABL DIP Credit Agreement and the Orders, as applicable (including delivery of such ABL DIP Borrowing Base Certificates and Term Loan Borrowing Base Certificates as may be required by the applicable ABL DIP Agent and any Agent), to enable the ABL DIP Administrative Agent to implement and maintain the Term Pushdown Reserve against the ABL DIP Borrowing Base, as and when the Term Pushdown Reserve is greater than zero.

(n)     JV IP Transaction Documents.  Except (x) as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (y) to the extent the failure to satisfy any requirement set forth below would not be materially adverse to the Agents or the Lenders or (z) to the extent set forth in the Orders or Approved Budget, (i) perform and observe all the terms and provisions of each JV IP Transaction Document to be performed or observed by it, (ii) maintain each such JV IP Transaction Document in full force and effect, (iii) enforce each such JV IP Transaction Document in accordance with its terms, (iv) take all such action to such end as may be from time to time reasonably requested by any Agent, (v) upon the reasonable request of any Agent, make such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such JV IP Transaction Document, and (vi) cause each of its Subsidiaries to do the foregoing

(o)     [Intentionally Omitted].

(p)     Agent's Advisor.  Pay all reasonable fees and expenses (whether incurred before or after the Petition Date) of one Agent's Advisor, which fees and expenses shall constitute Obligations and be secured by the Collateral. The Agent, on behalf of itself and the Lenders, shall be entitled to retain or continue to retain (either directly or through counsel) one Agent's Advisor as the Agent may deem necessary to provide advice, analysis and reporting, for the benefit of the Agent and the Lenders, with respect to such matters relating to the Debtors as the Agent may determine in its sole and absolute discretion. The Loan Parties, their advisors and their respective Affiliates shall cooperate with the Agent, the Lenders, the Agent's Advisor, and any other representatives of the foregoing in all material respects and provide all information that such parties may reasonably request; provided that no such disclosure shall be required to be made with respect to information (i) that is subject to attorney-client or similar privilege or constitutes attorney work product or (ii) in respect of which disclosure to such parties is prohibited by applicable law or obligations owed to any unaffiliated third party pursuant to a binding agreement.

(q)     Chapter 11 Matters.

(i)    Comply, in all material respects, in a timely manner with its obligations and responsibilities as a debtor in possession under the Bankruptcy Code, the Orders and any other order of the Bankruptcy Court.

(ii)    The Borrower shall deliver to the Administrative Agent and Lenders (and their respective advisors) as soon as reasonably practicable, but in no event less than two (2) Business Days prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect the Agents or the Lenders, or distributed by or on behalf of the Debtors to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest, including, without limitation, the Orders, any plan of reorganization or liquidation and any disclosure statements related to such plan, in the Chapter 11 Cases (each of which must be in form and substance acceptable to the Lenders and the Administrative Agent).

(iii)    If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and the Lenders and to counsel to the Administrative Agent and the Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Debtors to any official or unofficial committee appointed or appearing in the Chapter 11 Cases.

(iv)    Except as otherwise is permitted by the Orders, the Borrower shall provide prior written notice as soon as reasonably practicable to the Administrative Agent and the Lenders (and their respective counsel) prior to any assumption or rejection of any Debtor's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), if the Administrative Agent (acting at the direction of the Lenders) informs the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

(r)    <u>Required Milestones</u>. Comply with each of the covenants (the "***Milestones***") on <u>Schedule 5.01(r)</u> upon the terms and at the times provided for therein.

(s)    <u>Approved Budget; Variance Report; Variance Covenant; Lender Calls</u>.

(i)    On or before 5:00 p.m. New York City time on the Thursday of each fourth (4th) calendar week following the Petition Date and, upon the election of the Borrower, at any additional delivery time during the Chapter 11 Cases, the Borrower shall deliver to the Administrative Agent and the Lenders a supplement to the Initial Budget (or the previously supplemented Updated Budget, as the case may be), covering the subsequent period that commences with the week immediately following the date of delivery of the supplemental budget to the week of the projected emergence date of the Chapter 11 Cases, in each case, consistent with the form and level of detail set forth in the Initial Budget (each such supplemental budget, an "***Updated Budget***"). Upon (and subject to) the approval in writing of any such Updated Budget by the Administrative Agent and the Lenders in their sole discretion, such Updated DIP Budget shall constitute the budget for all purposes under the Term Loan Facility (such budget, an

"**Updated Approved Budget**") until superseded, if at all, by any subsequent Updated Approved Budget.

(ii)    Commencing with the first full calendar week following the Petition Date and for each calendar week thereafter, by no later than 5:00 p.m. New York City time on the Thursday of such calendar week, (each such Thursday, a "**Variance Report Date**"), the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, a variance report (each, a "**Variance Report**") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) the actual cash receipts on a line-item basis for such Testing Period compared to the projected cash receipts on a line-item basis set forth in the Approved Budget for such Testing Period (any such difference, a "**Receipts Variance**") and (ii) the actual cash disbursements on a line-item basis for such Testing Period compared to the projected cash disbursements on a line-item basis set forth in the Approved Budget for such Testing Period (any such difference, a "**Disbursements Variance**"), together with a statement from the Borrower's chief financial officer or similar financial officer certifying the information contained in such Variance Report and compliance with Section 5.02(o) hereof. The Variance Report shall also provide a reasonably detailed explanation for any variance. The term "**Testing Period**" means, with respect to each Variance Report required to be delivered on a Variance Report Date, the consecutive four-week period ending immediately prior to such Variance Report Date; *provided* that (i) the Testing Period for the first Variance Report Date shall be the week ended immediately prior to such Variance Report Date (i.e., the week in which the Petition Date occurs), (ii) the Testing Period for the second Variance Report Date shall be the two-week period ended immediately prior to such Variance Report Date (i.e., the week in which the Petition Date occurs and the week following the week in which the Petition Date occurs) and (iii) the Testing Period for the third Variance Report Date shall be the three-week period ended immediately prior to such Variance Report date (i.e., the week in which the Petition Date occurs and the two weeks following the week in which the Petition Date occurs).

(iii)    The Agent and the Lenders (a) may assume that the Loan Parties will comply with the Approved Budget, (b) shall have no duty to monitor such compliance and (c) subject to the Carve Out, shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order (including any limitations on such expenses to the extent provided in the Loan Documents and the applicable Order) regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(iv)    On a weekly basis, the Loan Parties shall hold a telephonic conference call with Agent and the Lenders (and their advisors) to discuss the Variance Report, the Chapter 11 Cases, the financial and operational performance of the Loan Parties, and such other related matters as may be reasonably requested with reasonable advance notice by Agent or the Lenders.

(v)    To the extent an Updated Budget has not become an Updated Approved Budget by May 25, 2024, then the Updated Approved Budget for all purposes under the this Agreement shall be the "Preliminary Chapter 11 Liquidation Scenario Version 5, dated as of April 22, 2024" until an Updated Approved Budget is consented to by the Administrative Agent and Lenders.

(t)    <u>Cash Management and Cash Management Order</u>. The Borrower shall keep the Cash Management Order in effect at all times on and after the Interim Order Funding Date and maintain a cash management system that is satisfactory to the Lenders.

(u)    <u>Specified Liquidation Agreement</u>. The Borrower shall comply in all material respects with the Specified Liquidation Agreement, Store Closing Interim Order and Store Closing Final Order.

(v)    <u>GC Purchase Agreement and Liquidation Agreement</u>. The Borrower shall comply in all material respects with any Bankruptcy Court-approved GC Purchase Agreement and Liquidation Agreement.

SECTION 5.02.  <u>Negative Covenants.</u>

Until the Payment in Full of the Obligations (other than Unmatured Surviving Obligations), unless the Required Lenders shall otherwise consent in writing, no Loan Party will, at any time:

(a)    <u>Liens, Etc</u>.  Create, incur, assume or suffer to exist, or permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist, any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist, or permit any of its Restricted Subsidiaries to sign or file or suffer to exist, under the Uniform Commercial Code of any jurisdiction, a financing statement that names Holdings or any of its Restricted Subsidiaries as debtor, or sign or suffer to exist, or permit any of its Restricted Subsidiaries to sign or suffer to exist, any security agreement authorizing any secured party thereunder to file such financing statement, or assign, or permit any of its Restricted Subsidiaries to assign, any accounts or other right to receive income, except for Permitted Liens and Transfers permitted by <u>Section 5.02(e)</u>.

(b)    <u>Debt</u>.  Create, incur, assume or suffer to exist, or permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist, any Debt, except:

(i)    Debt under the Loan Documents;

(ii)    (A) Capitalized Leases, and (B) purchase money Debt incurred by the Borrower or any Restricted Subsidiary to finance the acquisition, lease, construction, repair, replacement or improvement of fixed or capital assets; <u>provided</u> that (x) (i) such Debt is incurred concurrently with or no later than 270 days after the applicable acquisition, lease, construction, repair, replacement or improvement, and (y) the aggregate amount of Debt incurred pursuant to this <u>clause (ii)</u> shall not exceed the aggregate amount of Debt incurred pursuant to Section 5.02(b)(ii) of the Prepetition Term Loan Credit Agreement prior to the Effective Date;

(iii)    any Existing Debt;

(iv)    [intentionally omitted];

(v)    Debt owed to the Borrower or any Subsidiary of the Borrower, which Debt shall be otherwise permitted under the provisions of <u>Section 5.02(f)</u>;

(vi)    [intentionally omitted];

(vii)    Debt which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal, completion guarantees, export or import indemnities, customs and revenue bonds or similar instruments, workers' compensation claims, self-insurance obligations and

bankers acceptances issued for the account of any Loan Party in the ordinary course of business, including guarantees or obligations of any Loan Party with respect to letters of credit supporting such bid, performance or surety bonds, workers' compensation claims, self-insurance obligations and bankers acceptances (in each case other than for an obligation for money borrowed) or similar obligations incurred in the ordinary course of business;

(viii)    Debt of the Loan Parties incurred under the (i) ABL DIP Loan Documents and Prepetition ABL Loan Documents, in an aggregate principal amount not to exceed the amount permitted under the Intercreditor Agreement and the Orders and (ii) Prepetition Term Loan Documents in the amount contemplated in the Orders;

(ix)      [intentionally omitted];

(x)       [intentionally omitted];

(xi)      [intentionally omitted];

(xii)     [intentionally omitted];

(xiii)    Guaranteed Debt of any Loan Party in respect of Debt otherwise permitted under or not prohibited by this Section 5.02 (other than Debt permitted under Section 5.02(f)(xii));

(xiv)    Debt arising in connection with endorsement of instruments for collection or deposit in the ordinary course of business;

(xv)     [intentionally omitted];

(xvi)    [intentionally omitted];

(xvii)   Debt incurred in connection with the financing of insurance premiums in an amount not to exceed the annual premiums in respect thereof at any one time outstanding; and

(xviii)  Debt in an aggregate principal amount outstanding not to exceed $50,000.

Notwithstanding any of the foregoing, and except for the Carve-Out as provided for in the Orders, Indebtedness permitted under this Section 5.02(b) shall have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the superpriority administrative expense claims of (x) the Agent and the Lenders and (y) the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders, in each case, as set forth herein and in the applicable Order, other than, solely with respect to the ABL DIP Obligations and Prepetition ABL Obligations.

(c)      Change in Nature of Business.  Make, or permit any of its Restricted Subsidiaries to conduct any business other than the businesses as carried on at the Effective Date and other businesses substantially related, incidental thereto or complementary thereto, or are reasonable extensions thereof.

(d)      Mergers, Etc.  Merge into or consolidate with any Person or permit any Person to merge into it, or permit any of its Restricted Subsidiaries to do so, except that:

(i)       any Restricted Subsidiary of the Borrower may merge into or consolidate or amalgamate with any other Restricted Subsidiary of the Borrower or with the Borrower; *provided* that, in the case of any such merger, consolidation or amalgamation, the Person formed by such merger, consolidation or amalgamation shall be a wholly owned (other than directors' qualifying

shares or other nominal issuance in order to comply with local laws) Restricted Subsidiary of the Borrower or the Borrower; and *provided further* that, in the case of any such merger, consolidation or amalgamation to which a Subsidiary Guarantor is a party, the Person formed by such merger, consolidation or amalgamation shall be a Subsidiary Guarantor or the Borrower;

(ii)　　as part of any acquisition permitted under Section 5.02(f), any Restricted Subsidiary of the Borrower may merge into or consolidate or amalgamate with any other Person or permit any other Person to merge into or consolidate or amalgamate with it; *provided* that the Person surviving such merger, consolidation or amalgamation shall be a wholly owned (other than directors' qualifying shares or other nominal issuance in order to comply with local laws) Restricted Subsidiary of the Borrower; and *provided further* that, in the case of any merger, consolidation or amalgamation to which a Subsidiary Guarantor is a party, the Person formed by such merger, consolidation or amalgamation shall be a Subsidiary Guarantor;

(iii)　　as part of any Transfer permitted under Section 5.02(e), any Restricted Subsidiary of the Borrower may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; and

(iv)　　any Restricted Subsidiary may dissolve, liquidate or wind up its affairs at any time; *provided* that such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect and the assets of such Restricted Subsidiary are distributed to a Loan Party (other than to Parent or either Holdings Entity).

(e)　　Sales, Etc. of Assets.  Sell, lease, transfer, assign, exchange, convey or otherwise dispose of (including, without limitation, pursuant to an allocation of assets among newly divided limited liability companies pursuant to a "plan of division") (each a "***Transfer***"), or permit any of its Restricted Subsidiaries to Transfer, any assets, except:

(i)　　(A) Transfers of Inventory in the ordinary course of business or in accordance with a Liquidation Agreement (including unusable, excess, obsolete or slow-moving Inventory), delinquent accounts receivables and other capital assets in the ordinary course of its business (it being agreed that for purposes of this Agreement, Transfers of such assets from a Loan Party to a Foreign Subsidiary shall be deemed not in the ordinary course of business if the consideration for such Transfer is less than the selling Loan Party's cost of the assets subject to such Transfer or the selling Loan Party does not receive payment for such Transfer within ten (10) days after the consummation thereof, and for the avoidance of doubt, any amounts owing by a Foreign Subsidiary to a Loan Party in connection with such Transfer described in this parenthetical may be evidenced by an intercompany balance or intercompany note and shall be permitted as a Permitted Investment so long as such Investment is otherwise in compliance with Section 5.03(f)) and Transfers of accounts receivables in connection with the private label credit card programs in the ordinary course of business and (B) dispositions of cash and Cash Equivalents in the ordinary course of business;

(ii)　　(A) Transfers of assets among Loan Parties (other than to Parent or either Holdings Entity); (B) Transfers of assets among Restricted Subsidiaries that are not Loan Parties; and (C) Transfers of assets from Subsidiaries that are not Loan Parties to Loan Parties (other than to Parent or either Holdings Entity); *provided* that, for purposes of determining the application of each of clauses (A) through (C) above in connection with any Transfer made in connection with reorganizing or restructuring of Subsidiaries, any Transfer or series of related Transfers between Loan Parties and/or Subsidiaries shall be deemed to be a Transfer solely between the initial and the

ultimate holder of any such assets transferred without regard to any intermediate holder of such assets;

(iii)    Transfers of worn out, obsolete or damaged equipment and trade-ins and exchanges of equipment in the ordinary course of business and the abandonment or other disposition or Transfer of Intellectual Property that is, in the reasonable judgment of Loan Parties, no longer economically practicable or commercially desirable in the conduct of the business of the Loan Parties taken as a whole (which, for the avoidance of doubt, shall not include any Material Intellectual Property);

(iv)    Transfers in connection with any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation, expropriation or similar proceeding of, any property or asset of a Loan Party;

(v)    [intentionally omitted];

(vi)    Leases and subleases, licenses and sublicenses of real or personal property (other than Intellectual Property, which is addressed in clause (vii) below) in the ordinary course of business;

(vii)    Licensing or sublicensing of Intellectual Property (x) on a non-exclusive basis in the ordinary course of business or (y) on an exclusive basis (in jurisdictions outside of the United States and Canada for the use of such Intellectual Property) so long as such exclusive licensing is limited to geographic areas, particular fields of use, customized products for customers or limited time periods in the ordinary course of business and, in the case of any Intellectual Property as to which such Loan Party or Restricted Party is a licensee, permitted by the applicable license agreement; provided that in the case of this clause (vii) (A) no such licensing or sublicensing shall adversely affect (1) in any material respect the fair value of any Eligible Inventory or the ability of the Agents to dispose of or otherwise realize upon any Eligible Inventory after an Event of Default, (2) in the case of the JV IP, the right of the Loan Parties to utilize the JV IP under the JV IP License Agreements or the rights of the Agents under the IP Rights Agreement, or (3) in the case of the Bonobos IP, the right of the Loan Parties to utilize the Bonobos IP under the Bonobos IP License Agreements or the rights of the Agents under the Bonobos IP Rights Agreement, (B) with respect to any JV IP, such licensing or sublicensing shall be permitted by the JV IP License Agreements (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), and (C) with respect to any Bonobos IP, such licensing or sublicensing shall be permitted by the Bonobos IP License Agreements (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii));

(viii)    Any liquidation or dissolution of a Restricted Subsidiary (other than the Borrower) so long as its immediate parent or a Loan Party (other than Parent or either Holdings Entity) becomes the owner of its assets;

(ix)    Transfers of Inventory and other capital assets pursuant to franchise arrangements in the ordinary course of business and on terms substantially consistent with past practice;

(x)    Transfers of assets (other than assets of the type included in the Term Loan Borrowing Base), not otherwise permitted hereunder as long as (A) no Event of Default then exists or would arise therefrom, (B) such sale or transfer is made for fair market value and 100% of the consideration received by Holdings and its Restricted Subsidiaries for such sale or transfer is in

cash and (C) 100% of the Net Proceeds from such Transfer of assets is used to make a prepayment in accordance with Section 2.06(b)(iii);

(xi)    mergers, amalgamations, consolidations and dissolutions in compliance with Section 5.02(d);

(xii)    Investments in compliance with Section 5.02(f);

(xiii)    discounts or forgiveness of accounts receivable in the ordinary course of business or in connection with collection or compromise thereof;

(xiv)    Permitted Liens;

(xv)    [intentionally omitted];

(xvi)    (x) Transfers, licenses and sublicenses, in each case as and to the extent required pursuant to Sections 7(B), 10.A(2) and 10.A(3) of the Prime License Agreement (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), or (y) sublicenses in favor of the Agents described in clause (i) of the third sentence of Section 19(B) of the Prime License Agreement (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); and

(xvii)    the JV IP Transactions and Bonobos IP Transactions consummated prior to the date hereof.

Notwithstanding anything to the contrary set forth herein, (A) no Intellectual Property owned by a Loan Party or Restricted Subsidiary or in which a Loan Party or Restricted Subsidiary has rights under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)) shall be the subject of any Transfer (including, without limitation, by sale, contribution, pledge, assignment or other transfer of the Equity Interest of any Restricted Subsidiary that owns or holds such Intellectual Property or resulting in such Intellectual Property being owned or controlled by a Subsidiary that is an Excluded Subsidiary) (other than as provided in clauses (iii), (vii), (xvi) and (xvii) above) and (B) no other asset included in the determination of any Term Loan Borrowing Base (other than Transfers described in Section 5.02(e)(i)) shall be the subject of any Transfer (in each case, whether pursuant to a Transfer, a Permitted Investment, a Permitted Lien or otherwise) unless, in the case of this clause (B), (1) the consideration received by Holdings and its Restricted Subsidiaries for such Transfer is cash or Cash Equivalents, (2) in connection with Transfers of assets (in one transaction or a series of related transactions) having an aggregate fair market value in excess of $5,000,000, at least three (3) Business Days prior to the consummation of such Transfer, the Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate excluding the assets subject to such Transfer from the calculations thereunder, and (3) contemporaneously therewith, the Borrower shall have made such payments as are required by Section 2.06(b).

(f)    Investments in Other Persons.  Make or hold, or permit any of its Restricted Subsidiaries to make or hold, any Investment in any Person, except (each of the following a "*Permitted Investment*" and collectively, the "*Permitted Investments*"):

(i)    (A) Investments by Holdings and its Restricted Subsidiaries in their Subsidiaries outstanding on the Effective Date, (B) additional Investments by Holdings and its Restricted

Subsidiaries in their Subsidiaries that are Loan Parties, (C) additional Investments by Holdings and its Restricted Subsidiaries in the Costa Rica Subsidiary in the ordinary course of business in an aggregate amount not to exceed (x) $75,000 from the Interim Order Funding Date to the Final Order Funding Date and (y) an amount to be agreed between the Administrative Agent and the Borrower from the Final Order Funding Date to the Maturity Date, in each case, unless such higher amount is approved by the Administrative Agent;  (D) additional Investments by Subsidiaries of the Borrower that are not Loan Parties in other Subsidiaries that are not Loan Parties, and (E) [intentionally omitted];

(ii)      loans and advances to employees in the ordinary course of the business of the Borrower and its Restricted Subsidiaries in an aggregate principal amount not to exceed $25,000 at any time outstanding;

(iii)      [intentionally omitted];

(iv)      Investments by the Borrower and its Restricted Subsidiaries in bank deposits in the ordinary course of business or Cash Equivalents;

(v)      Investments existing on the Effective Date and described on Schedule 5.02(f);

(vi)      [intentionally omitted];

(vii)      [intentionally omitted]:

(viii)      Investments (A) received in satisfaction or partial satisfaction of accounts from financially troubled Account Debtors (whether in connection with a foreclosure, bankruptcy, workout or otherwise) and (B) consisting of deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of the Borrower and its Restricted Subsidiaries;

(ix)      guaranties in the ordinary course of business of obligations owed to or of landlords, suppliers, customers, franchisees and licensees of the Borrower and its Subsidiaries or otherwise permitted hereunder;

(x)      the JV IP Transactions and Bonobos IP Transactions consummated prior to the date hereof;

(xi)      the Loan Parties and their Restricted Subsidiaries may (A) acquire and hold accounts receivable owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (B) invest in, acquire and hold cash and Cash Equivalents, (C) endorse negotiable instruments held for collection in the ordinary course of business or (D) make lease, utility and other similar deposits in the ordinary course of business in accordance with the Approved Budget (subject to Permitted Variances thereon);

(xii)      the Loan Parties and their Restricted Subsidiaries may make Transfers and acquire assets, in each case to the extent permitted by Section 5.02(e);

(xiii)      any Loan Party and its Restricted Subsidiaries may hold Investments to the extent such Investments reflect an increase in the value of Investments already made;

(xiv)    Investments not otherwise specifically permitted herein in an aggregate principal amount not to exceed, as to all Investments made in reliance on this clause (xiv) outstanding at any time, $50,000;

(xv)    [intentionally omitted]; and

(xvi)    [intentionally omitted].

For purposes of determining compliance with the provisions of this Section 5.02(f), Investments made by a Loan Party or any of its Subsidiaries (the "investor") in any Subsidiary that are effected pursuant to one or more Investments made contemporaneously or in prompt succession by the investor and/or any of its Subsidiaries shall be deemed one Investment by the investor.

Notwithstanding anything to the contrary set forth herein, (a) no Intellectual Property owned by a Loan Party or Restricted Subsidiary or in which Loan Party or Restricted Subsidiary has rights under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement, as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)) shall be the subject of any Investment (including an Investment by any Loan Party of the Equity Interest of any Restricted Subsidiary that owns or holds such Intellectual Property or resulting in such Intellectual Property being owned or controlled by an Excluded Subsidiary) and (b) no other asset included in the determination of any Term Loan Borrowing Base shall be the subject of any Investment unless, in the case of this clause (b), (i) before and after giving effect to such Investment, no Event of Default shall have occurred and be continuing, (ii) in connection with Investments in respect of assets (in one transaction or a series of related transactions) having an aggregate fair market value in excess of $5,000,000, at least three (3) Business Days prior to the consummation of such Investment, the Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate excluding the assets subject to such Investment from the calculations thereunder, and (iii) contemporaneously therewith, the Borrower shall have made such payments as are required by Section 2.06(b).

(g)    Restricted Payments.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to Parent's stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Restricted Subsidiaries to do any of the foregoing, or permit any of its Restricted Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in the Borrower (any of the foregoing, a "***Restricted Payment***"), except that:

(i)    the Parent may declare and pay dividends and distributions payable only in Equity Interests (other than Disqualified Stock) of the Parent;

(ii)    the JV IP Transactions and Bonobos IP Transactions consummated prior to the date hereof;

(iii)    any Restricted Subsidiary of the Borrower may declare and pay cash dividends or other cash distributions to the Borrower or to any Loan Party (other than to Parent or either Holdings Entity) of which it is a Subsidiary;

(iv)    the Loan Parties may acquire Equity Interests of the Borrower or the Parent (or any direct or indirect holding company of the Parent) or any other Loan Party in connection with the exercise of stock options (or the equivalent with respect to membership interests) or stock

appreciation rights (or the equivalent with respect to membership interests) by way of cashless exercise or in connection with the satisfaction of withholding tax obligations so long as no Event of Default shall have occurred and be continuing at the time of the acquisition of such Equity Interests or would result therefrom;

(v)     [intentionally omitted];

(vi)     [intentionally omitted];

(vii)     [intentionally omitted];

(viii)     the Loan Parties may make Permitted Distributions;

(ix)     [intentionally omitted];

(x)     [intentionally omitted]; and

(xi)     [intentionally omitted].

Notwithstanding anything to the contrary set forth herein, (a) no Intellectual Property owned by a Loan Party or Restricted Subsidiary or in which Loan Party or Restricted Subsidiary has rights under any applicable license agreement (and if any such license agreement is a JV IP License Agreement or Bonobos IP License Agreement , as such JV IP License Agreement or Bonobos IP License Agreement is in effect on the Effective Date or subsequently amended in accordance with Section 5.02(k)(ii)) shall be the subject of any Restricted Payment to any non-Loan Party (including by way of a Restricted Payment of the Equity Interests of any Restricted Subsidiary that owns such Intellectual Property or as a result of such Intellectual Property being owned or controlled by an Excluded Subsidiary), and (b) no other asset included in the determination of any Term Loan Borrowing Base or any ABL Borrowing Base shall be the subject of any Restricted Payment (including by way of a Restricted Payment of the Equity Interests of any Restricted Subsidiary that owns such other assets or as a result of such other assets being owned or controlled by a Subsidiary that is an Excluded Subsidiary) unless, in the case of this clause (b), (i) before and after giving effect to any such Restricted Payment, the Payment Conditions (as defined in the Prepetition Term Loan Credit Agreement) are satisfied, (ii) in connection with Restricted Payments in respect of assets (in one transaction or a series of related transactions) having an aggregate fair market value in excess of $5,000,000, at least three (3) Business Days prior to the consummation of such Restricted Payment, the Borrower shall have delivered to the Administrative Agent an updated Borrowing Base Certificate excluding the assets subject to such Restricted Payment from the calculations thereunder, and (iii) contemporaneously therewith, the Borrower shall have made such payments as are required by Section 2.06(b).

(h)     Amendments of Constitutive Documents.  Amend, or permit any of its Restricted Subsidiaries to amend, its certificate of incorporation or bylaws or other constitutive documents in a manner materially adverse to the Lenders.  Nothing contained in this Section 5.02(h) shall be deemed to prohibit any Subsidiary or the parent entity of such Subsidiary from reorganizing or changing the entity form of such Subsidiary upon prior notice to the Administrative Agent and provided that such reorganization or change is not materially adverse to the Lenders (it being understood that any reorganization or change into a limited partnership or a limited liability company by any Subsidiary or the parent entity of such Subsidiary shall not be deemed to be materially adverse to the Lenders).

(i)     Accounting Changes.  Make or permit, or permit any of its Restricted Subsidiaries to make or permit, any change in Fiscal Year.

(j)    <u>Amendments and Prepayments of Debt</u>.

(i)    <u>Prepayments of Unsecured and Subordinated Debt</u>. Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, (x) any unsecured Debt or (y) any Subordinated Debt (but in any event not in violation of any subordination terms applicable to such Subordinated Debt);

(ii)    <u>Amendments to Unsecured and Subordinated Debt</u>. Amend, modify or change in any manner materially adverse to the Lenders any term, provision or condition of any unsecured Debt or Subordinated Debt (unless, with respect to Subordinated Debt, expressly permitted by the subordination provisions thereof);

(iii)    <u>Amendments to ABL Loan Documents</u>. Amend, modify, waive or change in any manner any term, provision or condition of any ABL DIP Loan Documents or agreement in respect of any refinancing of any Debt under any ABL DIP Loan Document, unless permitted under the Intercreditor Agreement and Orders; or

(iv)    <u>Prepayments and Amendments Generally</u>. Permit any of its Restricted Subsidiaries to do any of the foregoing other than to prepay any Debt permitted to be incurred hereunder payable to the Borrower or another Restricted Subsidiary.

(k)    <u>JV IP Transaction Documents; Bonobos IP Transaction Documents</u>.

(i)    Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled payment date thereof (as set forth in the JV IP Transaction Documents or the Bonobos IP Transaction Documents, as applicable, each as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>) in any manner any obligations arising under any JV IP Transaction Document or Bonobos IP Transaction Document, except that Holdings may make payments in respect of royalties arising under any JV IP Transaction Document or Bonobos IP Transaction Document within ten (10) Business Days prior to the scheduled payment date thereof;

(ii)    Except with the prior written consent of the Agents or in accordance with the Orders, amend, modify, waive or change in any manner any term, provision or condition of (w) the JV IP License Agreements in a manner inconsistent with the JV IP Rights Agreement or in a manner that could reasonably be expected to have a material adverse effect on the Secured Parties or the rights, remedies or privileges of the Agents including, without limitation, any amendment, modification or waiver of, or change to, any JV IP License Agreement that could reasonably be expected to have a material adverse effect on the ability of any Agent, upon the occurrence and during the continuance of an Event of Default, to utilize the Intellectual Property subject to the JV IP License Agreements in exercising the rights and remedies of such Agent in connection with any liquidation of the Collateral (x) any other JV IP Transaction Document (other than the JV IP License Agreements) in a manner materially adverse to the Secured Parties (it being understood and agreed that any amendment, modification, waiver or change that addresses (1) Quarterly Distributions (as defined in the JV IP LLC Agreement as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>), (2) Holdings' consent right over any actions described in Section 7.6 of the JV IP LLC Agreement (as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>), or (3) limitations on the pledge, in favor of the Collateral Agent, of Equity Interests in the JV IP by Holdings or any other Loan Party, shall be materially adverse to the Secured Parties, it being further understood and agreed that the foregoing is not an exhaustive list of all events that are

83

materially adverse to the Secured Parties), (y) the Bonobos IP License Agreements in a manner inconsistent with the Bonobos IP Rights Agreement or in a manner that could reasonably be expected to have a material adverse effect on the Secured Parties or the rights, remedies or privileges of the Agents including, without limitation, any amendment, modification or waiver of, or change to any Bonobos IP License Agreement that could reasonably be expected to have a material adverse effect on the ability of any Agent, upon the occurrence and during the continuance of an Event of Default, to utilize the Intellectual Property subject to the Bonobos IP License Agreements in exercising the rights and remedies of such Agent in connection with any liquidation of the Collateral, or (z) any other Bonobos IP Transaction Document (other than the Bonobos IP License Agreements) in a manner materially adverse to the Secured Parties; or

> (iii) Without the prior written consent of the Agents, agree to, commit to, propose to or otherwise consent to any Transfer, or any other action for which the consent of Holdings is required pursuant to Sections 7.6(e), 7.6(l) or 7.6(o) of the JV IP LLC Agreement, in each case in respect of JV IP that is Material Intellectual Property.

(l) <u>Negative Pledge</u>. Enter into or suffer to exist, or permit any of its Restricted Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets securing the Obligations under the Loan Documents, except (i) prohibitions or conditions under (A) any purchase money Debt permitted by Section 5.02(b)(ii) solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt (together with any accessions and additions thereto and the proceeds thereof), (B) [intentionally omitted] or (C) any Capitalized Lease permitted by <u>Section 5.02(b)(ii)</u> solely to the extent that such Capitalized Lease prohibits a Lien on the property subject thereto (together with any accessions and additions thereto and the proceeds thereof); (ii) customary restrictions and conditions relating to (A) specific property to be sold pursuant to an executed agreement with respect to a Transfer permitted under this agreement, including under Section 5.02(d) or (e) or (B) the sale of any property pending the consummation of such sale under stock sale agreements, joint venture agreements, sale/leaseback agreements, purchase agreements, or acquisition agreements (including by way of merger, acquisition or consolidation), entered into by Parent or any Restricted Subsidiary solely to the extent pending the consummation of such transaction; (iii) restrictions by reason of customary provisions restricting Liens, assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be); (iv) restrictions and conditions applicable to any Subsidiary acquired after the Effective Date if such restrictions and conditions existed at the time such Subsidiary was acquired, were not created in anticipation of such acquisition and apply solely to such acquired Subsidiary; (v) [intentionally omitted]; (vi) prohibitions or limitations that exist in any JV IP License Agreement or Bonobos IP License Agreement (each as in effect on the Effective Date or as subsequently amended in accordance with <u>Section 5.02(k)(ii)</u>); (vii) prohibitions or limitations that exist in any agreement governing Debt permitted by <u>Section 5.02(b)(viii)</u> or <u>(xi)</u>; *provided* that such prohibition or limitation is not more restrictive in any material respect than those contained in the Loan Documents; (viii) restrictions or limitations imposed by any amendments, refinancings, refundings, renewals, replacements or defeasance that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in <u>clause (ii)</u>, *provided* that such amendments, refinancings, refundings, renewals, replacements or defeasance are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment, refinancing, refunding, renewal, replacement or defeasance; (ix) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Debt or other obligation by virtue of the granting of Liens on or pledge of property

of any Loan Party to secure the Obligations; or (x) any prohibition or limitation that exists pursuant to applicable requirements of law.

(m)     [Reserved.]

(n)     Subsidiaries.  Notwithstanding anything to the contrary set forth herein or in any other Loan Document, create, form, or acquire or hold any Investment in any Subsidiary that may be a Foreign Subsidiary (other than the Costa Rica Subsidiary) or an Excluded Subsidiary, or otherwise allow any Subsidiary to be a Foreign Subsidiary (other than the Costa Rica Subsidiary) or an Excluded Subsidiary, in each case without prior written consent of the Administrative Agent in its sole discretion.

(o)     Budget Covenant. The Loan Parties shall not permit:

(i)     a Receipts Variance (on an aggregate basis) (w) with respect to the second Testing Period, to have a negative variance in excess of 30% (with negative variance meaning, for the avoidance of doubt, that actual receipts on an aggregate basis are less than projected receipts on an aggregate basis) (x) with respect to the third Testing Period, to have a negative variance in excess of 20%, (y) with respect to each of the fourth and fifth Testing Periods, to have a negative variance in excess of 15%, and (z) thereafter, to have a negative variance in excess of 10%; or

(ii)     a Disbursements Variance (on an aggregate basis, but excluding (x) Professional Fees and (y) restructuring charges arising on account of the Chapter 11 Cases (which restructuring charges shall solely consist of (A) U.S. Trustee fees, (B) professional fees and expenses incurred by or for the benefit of (1) the Administrative Agent, Collateral Agent, ABL DIP Agents and/or (2) Lenders and ABL DIP Lenders, (C) amounts paid by the Debtors as adequate protection and (D) interest payable under this Agreement and the ABL DIP Credit Agreement)) for the second Testing Period and thereafter to have a negative variance in excess of 10% (with negative variance meaning, for the avoidance of doubt, that actual disbursements on a line item basis are greater than the projected disbursements on a line item basis); provided that the Disbursements Variance for the (x) second Testing Period shall be 20% and (y) third Testing Period shall be 15%;

(such permitted variances, the "**_Permitted Variances_**").

(p)     Store Closings. Close any Stores or commence liquidation or "Going-Out-Of Business" sales at such Stores, except (i) pursuant to the Specified Liquidation Agreement, (ii) in accordance with a liquidation commenced in accordance with the process set forth by the Milestones or (iii) as may be approved in writing by the Agent and Required Lenders.

(q)     Chapter 11 Cases.

(i)     Incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority administrative expense claim which is pari passu with, or senior to the claims and Liens of, the Administrative Agent and the other Secured Parties, except for the Carve Out and certain claims and Liens of the Specified Liquidation Agents, ABL DIP Agents and Prepetition ABL Agents, subject to the Intercreditor Agreement and the Orders.

(ii)     Make or permit to be made any amendment, modification, supplement or change to the Orders or Store Closing Orders, as applicable, without the prior written consent of the Required Lenders and, if such amendment, modification, supplement or change to any Order would adversely affect the Agents, without the prior written consent of the Administrative Agent.

(iii)        Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent, any Lender, the Prepetition Term Loan Agents, Prepetition ABL Agents, any Prepetition Term Loan Lender or any Prepetition ABL Lender with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition Term Loan Documents, the Prepetition ABL Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby; *provided*, that during the Remedies Notice Period (as defined in the Orders), nothing herein or in the Orders, as applicable, shall limit the ability of the Loan Parties to seek to challenge the fact that an Event of Default occurred.

(iv)        Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan, employee retention plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice and a hearing or (b) are expressly permitted by the terms of the Loan Documents and within the limits, including any allowed variance, of the Approved Budget or otherwise with the consent of the Required Lenders.

(v)        File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Loan Parties without consulting with the Required Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be acceptable to Required Lenders in their sole discretion)) notice and the opportunity to review and comment on each such motion.

SECTION 5.03.   Reporting Requirements.

Until the Payment in Full of the Obligations (other than Unmatured Surviving Obligations), the Borrower will furnish to the Administrative Agent for further distribution to each Lender:

(a)        Default Notice.   Promptly upon the occurrence of each Event of Default or any event, development or occurrence that has resulted in a Material Adverse Effect, a statement of a Responsible Officer of the Borrower setting forth details of such Event of Default, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto.

(b)        Annual Financials.

(i)        With respect to Holdings, within 120 days after the end of each Fiscal Year, (x) a Consolidated balance sheet as of the end of such Fiscal Year, (y) a Consolidated statement of income and Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Year and (z) a Consolidated statement of income and a Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified by a Responsible Officer of the Parent as having been prepared in accordance with GAAP.

(ii)        Incidental to the delivery of the reporting required in Section 6.03(b)(i), within 120 days after the end of each Fiscal Year, derivative reconciliations with respect to the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to each Agent, and with respect to calculation of income, including separate disclosures with respect to Net Income described in the

last sentence of the definition of such term) as of the end of such Fiscal Year, covering balance sheets, statements of income, and statements of cash flows, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP, together with a certificate on behalf of the Parent signed by a Responsible Officer of the Parent stating that no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Parent has taken and proposes to take with respect thereto.

(c)        Quarterly Financials.  Within 60 days after the end of each Fiscal Quarter:

(i)        With respect to Holdings, (x) a Consolidated balance sheet as of the end of such quarter, (y) a Consolidated statement of income and Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter and (z) a Consolidated statement of income and a Consolidated statement of cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP (other than the absence of footnotes).

(ii)        Incidental to the delivery of the reporting required in Section 5.03(c)(i), derivative reconciliations with respect to the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to each Agent, and with respect to calculation of income including separate disclosures with respect to Net Income described in the last sentence of the definition of such term), (x) balance sheets of the Parent and its Restricted Subsidiaries as of the end of such quarter, (y) statements of income and statements of cash flows of the Parent and its Restricted Subsidiaries for the period commencing at the end of the previous Fiscal Quarter and ending with the end of such Fiscal Quarter, and (z) statements of income and statements of cash flows of the Parent and its Restricted Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP (other than the absence of footnotes), together with  a certificate on behalf of the Parent signed by a Responsible Officer of the Parent stating that no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Parent has taken and proposes to take with respect thereto.

(d)        [Intentionally Omitted].

(e)        Litigation.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting any Loan Party or any of its Subsidiaries of the type described in Section 4.01(g).

(f)        Securities Reports.  Promptly after the sending or filing thereof copies of all material regular, periodic and special reports, and all material registration statements, that any Loan Party or any of its Subsidiaries files with the SEC or any Governmental Authority that may be substituted therefor, or with any national securities exchange.

(g)     <u>Monthly Financials</u>.  Within 30 days after the end of each Fiscal Month, a Consolidated balance sheet of the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to each Agent) as of the end of such Fiscal Month and a Consolidated statement of income and a Consolidated statement of cash flows of the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to each Agent) for the period commencing at the end of the previous Fiscal Month and ending with the end of such Fiscal Month, and a Consolidated statement of income and a Consolidated statement of cash flows of the Parent and its Restricted Subsidiaries (in a form reasonably satisfactory to each Agent) for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Month, all in reasonable detail, including the consolidated and unconsolidated profits and losses of the Express JV and Bonobos, and duly certified (subject to normal year-end audit adjustments) by a Responsible Officer of the Parent as having been prepared in accordance with GAAP (other than the absence of footnotes), together with  a certificate on behalf of the Parent signed by a Responsible Officer stating that no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing, a statement as to the nature thereof and the action that the Parent has taken and proposes to take with respect thereto.

(h)     <u>Other Notices</u>.

(i)     Promptly and in any event within two Business Days after receipt thereof by any Loan Party or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan.

(ii)     Promptly upon request by the Administrative Agent, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Plan.

(iii)     Promptly and in any event within five Business Days after receipt thereof by any Loan Party or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability by any such Multiemployer Plan, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan or (C) the amount of liability incurred, or that may be incurred, by such Loan Party or any ERISA Affiliate in connection with any event described in clause (A) or (B).

(iv)     Promptly and in any event within five Business Days after obtaining knowledge thereof by any Loan Party, the assertion of any claim against Material Intellectual Property that would reasonably be expected to have a Material Adverse Effect or otherwise could reasonably be expected to result in a liability of the Loan Parties in excess of $1,000,000.

(i)     <u>Environmental Conditions</u>.  Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by any Loan Party or any of its Restricted Subsidiaries with any Environmental Law or Environmental Permit, in each case, that could reasonably be expected to have a Material Adverse Effect.

(j)     <u>ABL DIP Events</u>.

(i)     Promptly following receipt by any Loan Party, copies of each amendment, supplement, modification, waiver, consent or forbearance in respect of the ABL DIP Loan Documents, and of any material notices received from any lender or agent of, under or with respect to the ABL DIP Obligations (including, without limitation, any ABL DIP Agent), to the extent not otherwise provided to the Administrative Agent under the Loan Documents.

       (ii)      As and when due pursuant to the ABL DIP Credit Agreement, ABL DIP Borrowing Base Certificates, to the extent not otherwise provided to the Administrative Agent under the Loan Documents.

       (iii)     Contemporaneously with the occurrence thereof, notice of any mandatory prepayment under the ABL DIP Loan Documents.

       (iv)     Contemporaneously with the earlier to occur of the Loan Parties' obtaining knowledge thereof or the receipt by the Loan Parties of notice thereof from any ABL DIP Agent, the occurrence of any "Event of Default" under (and as defined in) the ABL DIP Loan Documents.

       (v)     Promptly after any Agent's request therefor, a calculation of the outstanding principal balance of the ABL DIP Obligations.

       (vi)     Promptly after any Agent's request therefor, a calculation of the ABL DIP Used Commitment and ABL DIP Excess Availability in form and substance reasonably satisfactory to such Agent.

    (k)     [Reserved.]

    (l)     Other Information.  Such other information respecting the business, financial condition, operations of any Loan Party or any of its Restricted Subsidiaries as any Agent, or any Lender through the Administrative Agent, may from time to time reasonably request, including, without limitation, (x) such information as requested pursuant to Section 9.13, (y) (i) confirmation of the accuracy of the information set forth in the most recent Beneficial Ownership Certification for the Borrower provided to the Agents and the Lenders, (ii) to the extent a Beneficial Ownership Certification has previously been delivered with respect to the Borrower, any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification, and (iii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and a Beneficial Ownership Certification has not previously been delivered with respect to the Borrower, information regarding such change in status together with a Beneficial Ownership Certification for the Borrower, and (z) if applicable, financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of financial ratios or requirements made before and after giving effect to any changes in GAAP. Notwithstanding anything to the contrary in this Agreement, none of the Parent, the Borrower or any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to any Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any binding agreement or (iii) is confidential or is subject to attorney-client or similar privilege or constitutes attorney work product.

    (m)    Borrowing Base Certificates, Etc.

       (i)     Borrowing Base Certificates will be delivered by 6:00 p.m. New York City time Friday of each calendar week, completed as of the close of business on the immediately preceding Saturday (it being understood and acknowledged that the Borrower does not close its books on a basis more frequently than monthly and weekly Borrowing Base Certificates may only include a Collateral roll-forward); provided that if a Default or Event of Default has occurred and is

continuing, an updated Borrowing Base Certificate will be delivered within one (1) Business Day following request therefor by any Agent.

(ii)    The Borrowing Base Certificate referred to in clause (i) above shall be delivered with the supporting documentation set forth on Schedule 5.03(m) to the Prepetition Term Loan Credit Agreement, to the extent required to be delivered at such time.

(iii)    The Borrower shall deliver reports as to Eligible Inventory by Loan Party and location on a weekly basis, completed as of each Saturday and delivered three (3) Business Days thereafter based on information available to it and other estimates reasonably believed to be true and correct.

(iv)    The Borrower shall deliver to the Administrative Agent, together with delivery of the Borrowing Base Certificate, (i) accounts receivables agings and accounts payable agings (including summary of both prepetition and post-petition accounts payable), (ii) an accounts payable report, in form and substance reasonably satisfactory to the Administrative Agent, and (iii) such other reports as requested by the Administrative Agent.

(n)    JV IP Transaction Events; Bonobos IP Transaction Events.

(i)    Promptly following receipt by any Loan Party, copies of each amendment, supplement, modification, waiver, consent or forbearance in respect of any JV IP License Agreement or Bonobos IP License Agreement, and of any material notices received from any counterparty to any JV IP License Agreement or Bonobos IP License Agreement, to the extent not otherwise provided to the Administrative Agent under the Loan Documents.

(ii)    Promptly following receipt by any Loan Party, copies of each amendment, supplement, modification, waiver, consent or forbearance in respect of any JV IP Transaction Document or Bonobos IP Transaction Document other than any JV IP License Agreement or Bonobos IP License Agreement (each of which is governed by sub-clause (n)(i) above), and of any material notices received from any counterparty to any such JV IP Transaction Document or Bonobos IP Transaction Document, in each case to the extent material to the interests of the Secured Parties (it being understood and agreed that any amendment, supplement, modification, waiver, consent, forbearance or notice that addresses (x) Quarterly Distributions (as defined in the JV IP LLC Agreement as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), (y) Holdings' consent right over any actions described in Section 7.6 of the JV IP LLC Agreement (as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)), or (z) limitations on the pledge, in favor of the Collateral Agent, of Equity Interests in the JV IP by Holdings or any other Loan Party, shall be material to the interests of the Secured Parties, it being further understood and agreed that the foregoing is not an exhaustive list of all events that are material to the interests of the Secured Parties) and not otherwise provided to the Administrative Agent under the Loan Documents.

(iii)    Promptly following the earlier to occur of the Loan Parties' obtaining knowledge thereof or the receipt by the Loan Parties of notice thereof from any counterparty to any JV IP Transaction Document or Bonobos IP Transaction Document, the occurrence of any breach of, or default or event of default under, any JV IP Transaction Document or Bonobos IP Transaction Document.

(iv)    Promptly after any Agent's request therefor, a calculation of the amount of Royalties (as defined in any JV IP License Agreement or Bonobos IP License Agreement) then owing pursuant to the JV IP License Agreements or Bonobos IP License Agreements.

Documents required to be delivered (i) pursuant to <u>Section 5.03(a)</u> through <u>5.03(m)</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are sent via e-mail to the Administrative Agent for posting on the Borrower's behalf on any relevant website, if any, established on its behalf by the Administrative Agent and to which each Lender and the Administrative Agent have access or on which any Borrower has posted such documents on its own website to which each Lender and the Administrative Agent have access and notified the Administrative Agent of such posting and (ii) pursuant to <u>Section 5.03(b)</u> and <u>(c)</u> may be delivered by filing such documents with public availability on the SEC's Electronic Data Gathering and Retrieval System and providing the Administrative Agent and the Lenders with a notice of such filing.  Notwithstanding anything contained herein, at the reasonable written request of the Administrative Agent, the Borrower shall thereafter promptly be required to provide paper copies of any documents required to be delivered pursuant to <u>Section 5.03</u>, or with respect to items delivered pursuant to <u>clause (ii)</u> of the immediately preceding sentence, by electronic mail electronic versions (i.e., soft copies, or links to access such documents) of such documents.  Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.  If the delivery of any of the foregoing documents required under this <u>Section 5.03</u> shall fall on a day that is not a Business Day, such deliverable shall be due on the next succeeding Business Day.

The Loan Parties and the Administrative Agent hereby agree that the delivery of any ABL Borrowing Base Certificate or any Term Loan Borrowing Base Certificate through the Administrative Agent's electronic platform or portal, subject to the Administrative Agent's authentication process, by such other electronic method as may be approved by the Administrative Agent from time to time in its sole discretion, or by such other electronic input of information necessary to calculate the ABL Borrowing Base or the Term Loan Borrowing Base as may be approved by the Administrative Agent from time to time in its sole discretion, shall in each case be deemed to satisfy the obligation of the Borrower to deliver such ABL Borrowing Base Certificate or Term Loan Borrowing Base Certificate, with the same legal effect as if such ABL Borrowing Base Certificate or such Term Loan Borrowing Base Certificate had been manually executed by the Borrower and delivered to the Administrative Agent.

(o)    <u>Chapter 11 Notices</u>. Promptly notify the Administrative Agent in writing, (a) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in the Chapter 11 Cases, if any, or to the U.S. Trustee, as the case may be, (i) the Final Order and (ii) all other material proposed orders and pleadings that are (A) adverse to the interests of the Agents or the Lenders or (B) inconsistent with the Approved Budget or terms of the Loan Documents, in each case, relating to any of (w) the Chapter 11 Cases, (x) the Prepetition Term Loan Credit Agreement and this Agreement and the credit facilities contemplated thereby and hereby, (y) the ABL DIP Facility, or (z) any sale contemplated in accordance with the Milestones, any Plan of Reorganization or any disclosure statement related thereto, (b) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, and (c) each report, notice or certificate required to be delivered to any of the lenders or agents under the ABL DIP Loan Documents.

SECTION 5.04.  <u>Holding Company Status.</u>

(a)      Parent shall not engage in any business or activity other than (i) the ownership of all outstanding Equity Interests in the Borrower and Express Finance Corp., (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as parent of the consolidated group of companies including the Loan Parties, (iv) the performance of obligations under the Loan Documents to which it is a party, (v) making or receiving any Restricted Payment permitted under Section 5.02(g) and (e) activities incidental to the businesses or activities described in the foregoing clauses (i) through (v).

(b)      Intermediate Holdings shall not engage in any business or activity other than (i) the ownership of all outstanding Equity Interests in the Parent, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as parent of the consolidated group of companies including the Loan Parties, (iv) the performance of obligations under the Loan Documents to which it is a party, (v) making or receiving any Restricted Payment permitted under Section 5.02(g) and (e) activities incidental to the businesses or activities described in the foregoing clauses (i) through (v).

(c)      Holdings shall not engage in any business or activity other than (i) the ownership of all outstanding Equity Interests in Intermediate Holdings, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as parent of the consolidated group of companies including the Loan Parties, (iv) the performance of obligations under the Loan Documents to which it is a party, (v) making or receiving any Restricted Payment permitted under Section 5.02(g) and (e) activities incidental to the businesses or activities described in the foregoing clauses (i) through (v).

SECTION 5.05.  ABL Excess Availability Covenant. The Borrower shall maintain, at all times, ABL Excess Availability of at least $25,000,000.

# ARTICLE VI

# EVENTS OF DEFAULT

SECTION 6.01.  Events of Default.

If any of the following events ("***Events of Default***") shall occur and be continuing:

(a)      Payment of Obligations. (i) The Borrower shall fail to pay any principal of the Loans when the same shall become due and payable, (ii) the Borrower shall fail to pay any interest on the Loans or any fee within three (3) Business Days after the same shall have become due and payable, or (iii) any Loan Party shall fail to make any other payment under any Loan Document within five (5) Business Days after the same shall become due and payable; or

(b)      Misrepresentations. (i) Any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect (or, in the case of any representation or warranty qualified by materiality in the text thereof, in any respect) when made, except to the extent such representations and warranties relate to an earlier date in which case such representations and warranties shall prove to have been incorrect in any material respect (or, in the case of any representation or warranty qualified by materiality in the text thereof, in any respect) as of such earlier date, or (ii) any information provided to the Lenders in respect of the 2020 Tax Refund Claim shall have been untrue or incorrect in any material respect as of the date provided; or

(c)      Breach of Specific Covenants. Any Loan Party shall fail to perform or observe any term, covenant or agreement contained in any of (i) Sections 2.06(b), 2.14, 5.01(m), 5.01(r), 5.01(s), 5.01(t),

5.01(u), 5.01(v), 5.02, 5.03(a), 5.03(j)(iv), 5.03(m), 5.03(n)(iii), 5.03(o) or 5.05 or (ii) Sections 5.01(a)(ii), 5.01(c)(ii), 5.01(d), 5.01(e) (as to preservation of existence only), 5.01(f), 5.01(h)(iii), 5.01(i), 5.01(q), 5.03(b), 5.03(c), 5.03(e), 5.03(f), 5.03(g), 5.03(h), 5.03(j) (other than Section 5.03(j)(iv), which is governed by clause (i) above), 5.03(n) (other than Section 5.03(n)(iii), which is governed by clause (i) above) or 5.04 (solely with respect to this clause (ii), with a five (5) Business Day grace period from the earlier of the date on which (x) any Responsible Officer of a Loan Party becomes aware of such failure or (y) written notice thereof shall have been given to the Borrower by any Agent or any Lender); or

(d)        Breach of Other Covenants.  Any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied or shall not be waived for a period of 10 days after the earlier of the date on which (i) any Responsible Officer of a Loan Party becomes aware of such failure or (ii) written notice thereof shall have been given to the Borrower by any Agent or any Lender; or

(e)        Other Defaults.  Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or any Subsidiary not to comply, (i) any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of (x) the ABL DIP Obligations, or (y) any other Debt of such Loan Party or such Subsidiary (as the case may be) that is outstanding in a principal amount (or, in the case of any Hedge Agreement, an Agreement Value) of at least $25,000,000 either individually or in the aggregate for all such Loan Parties and Subsidiaries (but excluding Debt outstanding hereunder) (the Debt described in the foregoing clauses (x) and (y), collectively, "***Material Debt***"), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after all applicable grace and notice periods have expired, if any, specified in the agreement or instrument relating to such Material Debt; or (ii) any other event shall occur or condition shall exist under any ABL DIP Loan Document or any agreement or instrument relating to any other Material Debt and shall continue after all applicable grace and notice periods have expired, if any, specified in such ABL DIP Loan Document or other agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Material Debt or otherwise to cause, or to permit the holder thereof to cause, such Material Debt to mature; or (iii) any such Material Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption or mandatory prepayments), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Material Debt shall be required to be made, in each case prior to the stated maturity thereof; *provided* that this clause (e)(iii) shall not apply to secured Material Debt (other than the ABL DIP Obligations) that becomes due as a result of the voluntary Transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Material Debt, if such Transfer is not prohibited hereunder and under the documents providing for such Material Debt; or

(f)        Store Closing Matters; GC Purchase Agreement and Liquidation Agreement. Any Loan Party shall fail to comply in any material respect with the terms of the Specified Liquidation Agreement or Store Closing Orders for the Specified Store Closing Sales. Any Loan Party shall fail to comply in any material respect with the terms of the GC Purchase Agreement or Liquidation Agreement as applicable and any Bankruptcy Court order within respect thereto.

(g)        Uninsured Losses. Any judgments or orders, either individually or in the aggregate, for the payment of money in excess of $25,000,000 (to the extent not reasonably expected to be adequately covered by (i) insurance in respect of which a solvent and unaffiliated insurance company has acknowledged coverage or (ii) a third party indemnification agreement under which the indemnifying party has accepted responsibility and would reasonably be expected to remain solvent after satisfying such indemnification obligations) shall be rendered against any Loan Party or any of its Subsidiaries and either (A) enforcement

proceedings shall have been commenced by any creditor upon such judgment or order (and such proceedings shall not have been stayed) or (B) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(h)     Loan Documents. Any material provision of any Loan Document after delivery thereof shall for any reason cease to be valid and binding on or enforceable against any Loan Party party to it, or any such Loan Party shall so state in writing; or

(i)     Collateral. Any Collateral Document or financing statement after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected lien on and security interest in a material portion of the Collateral purported to be covered thereby with the priority set forth in the Orders, except to the extent that any such loss of perfection or priority results from the acts or omissions of the Administrative Agent or the Collateral Agent; or

(j)     Change of Control. A Change of Control shall occur; or

(k)     ERISA. Any ERISA Event shall have occurred with respect to a Plan that, when taken and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) exceeds $25,000,000; or

(l)     ERISA. Any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds $25,000,000 or requires payments exceeding $3,000,000 per annum; or

(m)     ERISA. Any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and the ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding $25,000,000; or

(n)     IP Agreements. (i) There shall occur (x) a breach of, or default or event of default under any JV IP Transaction Document or Bonobos IP Transaction Document, with a five (5) Business Day grace period from the earlier of the date on which (1) any Responsible Officer of a Loan Party becomes aware of such breach, default or event of default, or (2) written notice thereof shall have been given to any Loan Party by any counterparty to the applicable JV IP Transaction Document or Bonobos IP Transaction Document, except for breaches, defaults or events of default occasioned by the filing of the Chapter 11 Cases or arising from the Loan Parties' compliance with the Orders, and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or any Subsidiary not to comply, or (y) a loss or material impairment of continuing efficacy or utility in respect of any Material Intellectual Property; (ii) any JV IP License Agreement, any Bonobos IP License Agreement, the IP Rights Agreement or the Bonobos IP Rights Agreement shall cease, for any reason, to be in full force and effect; or (iii) Holdings or any other Loan Party under any JV IP License Agreement or Bonobos IP License Agreement shall cease at any time to have rights as a licensee or sublicensee, as applicable, of any Material Intellectual Property under such JV IP License Agreement or

Bonobos IP License Agreement (each as in effect on the Effective Date or as subsequently amended in accordance with Section 5.02(k)(ii)); or

(o)    Subordinated Debt. The subordination provisions of the documents evidencing or governing any Subordinated Debt (the "*Subordination Provisions*") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Debt; (ii) the Borrower or any other Loan Party shall, directly or indirectly, (A) make any payment on account of any Subordinated Debt that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent that such payment is permitted by the terms of the Subordination Provisions applicable to such Subordinated Debt or (B) disavow or contest in any manner (x) the effectiveness, validity or enforceability of any of the Subordination Provisions or the Intercreditor Provisions (as defined below), (y) that the Subordination Provisions and the Intercreditor Provisions exist for the benefit of the Secured Parties, or (z) that all payments of principal of or premium and interest on the applicable Subordinated Debt, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions or the Intercreditor Provisions, as applicable; or (iii) any Intercreditor Agreement or any provision thereof (the "*Intercreditor Provisions*") shall, in whole or in part, terminate or otherwise fail or cease to be effective or legally valid and binding on, or enforceable against, any Loan Party, each ABL Agent or any holder of the ABL Obligations (or any Loan Party, any ABL Agent, MGF (in the case of the MGF Intercreditor Agreement only) or any such holder shall so state in writing); or (iv) any provision of any Intercreditor Agreement shall, at any time after the delivery of such Intercreditor Agreement, fail to be legally valid, binding or enforceable; or

(p)    Reserves Against the ABL DIP Borrowing Base.

(i)    The applicable ABL DIP Agent shall fail to implement and maintain the Term Pushdown Reserve against the ABL DIP Borrowing Base at any time that the Term Pushdown Reserve is greater than zero ($0); or

(ii)    the applicable ABL DIP Agent shall fail to implement and maintain the Carve Out Reserve against the ABL DIP Borrowing Base.

(q)    Bankruptcy Events of Default. The occurrence of any of the following in the Chapter 11 Cases:

(i)    The bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (a) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or that is not consented to by the Administrative Agent; (b) to grant any Lien other than Permitted Liens upon or affecting any Collateral; or (c) except as provided in this Agreement, the Interim Order or Final Order, as the case may be, to use Cash Collateral of the Agent and the Lenders or the Prepetition Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent;

(ii)    (a) the filing of any Plan of Reorganization or disclosure statement attendant thereto, or any amendment to such plan or disclosure statement, that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Prepetition Obligations, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (b) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (c) the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(iii)      the entry of an order in any of the Chapter 11 Cases confirming a Plan of Reorganization other than a Plan of Reorganization that indefeasibly repays in full in cash the Obligations under this Agreement, the ABL DIP Obligations and the Prepetition Obligations;

(iv)      (a) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order without the written consent of the Administrative Agent or the filing of a motion for reconsideration with respect to the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order, or the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order shall otherwise not be in full force and effect or (b) any Loan Party or any Subsidiary shall fail to comply with the Interim Order, the Final Order, the Store Closing Interim Order, the Store Closing Final Order or the Cash Management Order any material respect;

(v)      the payment of, or application for authority to pay, any prepetition claim without the Administrative Agent's prior written consent unless consistent with the Approved Budget or in accordance with any "first day" orders entered by the Bankruptcy Court on the Petition Date;

(vi)      the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral or against any Prepetition Agent, any Prepetition Lender or any Prepetition Collateral;

(vii)      the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties;

(viii)      the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code;

(ix)      any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (a) to allow any creditor (other than the Agents, Prepetition ABL Agents or ABL DIP Agents) to execute upon or enforce a Lien on any Collateral, (b) approving any settlement or other stipulation not approved by the Administrative Agent with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (c) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $250,000 or more or (d) to permit other actions that would have a Material Adverse Effect;

(x)      the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against the Administrative Agent or any Lender, the ABL DIP Agent or any ABL DIP Lender or any Prepetition Secured Party and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on the Administrative Agent or such Lender, the ABL DIP Agent, such ABL DIP Lender or any Prepetition Secured Party, that asserts or seeks by or on behalf of a Loan Party, any state of federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (a) have the effect of invalidating, subordinating or challenging any or all of the obligations or Liens of (i) the

Administrative Agent or any Lender under the Loan Documents, (ii) the ABL DIP Agents or ABL DIP Lenders under the ABL DIP Loan Documents or (iii) the Prepetition Secured Parties under the Prepetition Loan Documents, in each case, to any other claim, or (b) have a material adverse effect on the rights and remedies of the Administrative Agent or any Lender, the ABL DIP Agent, ABL DIP Lenders or the Prepetition Secured Parties or the collectability of all or any portion of the Obligations, ABL DIP Obligations or Prepetition Obligations;

(xi)     the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents, the ABL DIP Obligations owing under the ABL DIP Loan Documents or the Prepetition Obligations owing under the Prepetition Loan Documents;

(xii)     the existence of, or the Borrower's consent to, any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents or as otherwise permitted under the applicable Loan Documents or permitted under the Order and the terms thereof (including the Carve Out), entitled to superpriority administrative or other expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code or otherwise pari passu with or senior to the claims of the Administrative Agent and the Lenders under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (a) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code, or otherwise, or (b) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Order and the terms thereof then in effect (but only in the event specifically consented to by the Agent), whichever is in effect;

(xiii)     the Order and the terms thereof shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent;

(xiv)     an order in the Chapter 11 Cases shall be entered (a) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Lenders or (b) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Agents on the Prepetition Collateral to any proceeds, products, offspring, or profits of the Prepetition Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to the Administrative Agent and the Lenders or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

(xv)     any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the Agent or the Prepetition Lenders with respect to the Pre-Petition Obligations, or without the consent of the Agent, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent or lender that is inconsistent with the Order;

(xvi)     unless otherwise approved by the Agent in writing, any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Debt or payables other than payments permitted under this Agreement, the Orders, or one or more "first day" or "second day" orders (or other orders with the consent of the Administrative Agent), in each case on a basis consistent with the Approved Budget;

97

(xvii)    any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral, whether senior, equal or subordinate to the Administrative Agent's liens and security interests, except as permitted by the Orders or this Agreement; or (b) to modify or affect any of the rights of the Administrative Agent or the Lenders under the Orders, the Loan Documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xviii)    an order of the Bankruptcy Court or any other court of competent jurisdiction shall be entered or granted that materially adversely impacts the rights and interests of Administrative Agent or the Lenders, without the prior written consent of Administrative Agent and the Lenders; or

(xix)    any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 6.01(q) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal.

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, in all cases subject to the Orders and the Intercreditor Agreement, the Administrative Agent, upon the written request of the Required Lenders, shall deliver written notice to the Borrower, that, pursuant to the Orders, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to exercise, subject to any Remedies Notice Period (as defined in the Orders), all rights and remedies provided for in the Loan Documents or the Orders, and in addition to any other right or remedy provided under any Loan Document or by any applicable law, including the following, in each case, without further order of or application to the Bankruptcy Court (as applicable): (a) declare the Term Loan Commitments terminated, whereupon the Term Loan Commitment of each Lender shall forthwith terminate immediately without any other notice of any kind; (b) declare the principal of and any accrued interest in respect of all Loans and all other Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Loan Party; (c) subject to the terms of the Intercreditor Agreements, enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Collateral Documents in accordance with the terms thereof; (d) enforce each Guaranty, (e) terminate this Agreement and the Loan Credit Documents as to any future liability or obligation of the Loan Parties, but without affecting any of the Collateral Agent's Liens in the Collateral and without affecting the Obligations; (f) immediately terminate the Loan Parties' limited use of any cash collateral; (g) freeze monies or balances in the Loan Parties' Deposit Accounts and Securities Accounts and sweep all funds contained in the Term Loan DIP Funding Account for application in accordance with Section 2.11, (h) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Agents or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any of the Agents or the applicable Lenders, including, without limitation, disposition of the Collateral solely for application towards the Obligations; (i) obtain an order from the Bankruptcy Court approving bid procedures for a sale of substantially all of the Loan Parties' assets pursuant to section 363 of the Bankruptcy Code; (j) in connection with an Event of Default that is continuing in respect of a breach of Section 5.02(o) at the written direction of the Required Lenders, immediately commence the sale of all or substantially all of the Collateral pursuant to section 363 of the Bankruptcy Code and the Loan Parties and their advisors will cooperate therewith, including by delivering an Updated Budget that contemplates the liquidation of all of the Loan Parties' assets in form and substance satisfactory to the Required Lenders, (k) declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the Orders) and (l) take any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable law or equity.

# ARTICLE VII

# THE AGENTS

SECTION 7.01.  Authorization and Action.

(a)        Each Lender (in its capacities as a Lender and on behalf of itself and its Affiliates) hereby appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties under the Loan Documents), no Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and all holders of Notes; *provided*, *however*, that no Agent shall be required to take any action that exposes such Agent to personal liability or that is contrary to this Agreement or applicable law.

(b)        In furtherance of the foregoing, each Lender (in its capacities as a Lender and on behalf of itself and its Affiliates) hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Collateral Agent (and any Supplemental Collateral Agents appointed by the Collateral Agent pursuant to Section 7.01(c) for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights or remedies thereunder at the direction of the Collateral Agent) shall be entitled to the benefits of this Article VII (including Section 7.05) as though the Collateral Agent (and any such Supplemental Collateral Agents) were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)        Any Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder at the direction of the Collateral Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Collateral Agent may also from time to time, when the Collateral Agent deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "***Supplemental Collateral Agent***") with respect to all or any part of the Collateral; *provided*, *however*, that no such Supplemental Collateral Agent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Collateral Agent.  Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Collateral Agent to more fully or certainly vest in and confirm to such Supplemental Collateral Agent such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon the reasonable request by the Collateral Agent.  If any Supplemental Collateral Agent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall automatically vest in and be exercised by the Collateral Agent until the appointment of a new Supplemental Collateral Agent.  No Agent shall be responsible for the negligence or misconduct of any agent, attorney-in-fact or Supplemental Collateral Agent that it selects in accordance with the foregoing provisions of this Section 7.01(c) in the absence of such Agent's gross negligence or willful misconduct.

(d)    Notwithstanding anything contained in this Agreement to the contrary, each of the Sole Lead Arranger and Bookrunner and the Syndication Agent named on the title page of this Agreement is named as such for recognition purposes only and in its capacity as such shall have no powers, duties, responsibilities or liabilities with respect to this Agreement or the other Loan Documents or the Transaction. Without limitation of the foregoing, neither such Sole Lead Arranger and Bookrunner nor such Syndication Agent shall, solely by reason of this Agreement or any other Loan Document, have any fiduciary relationship in respect of any Lender or any other Person.

SECTION 7.02.  Agents' Reliance, Etc.

(a)    Neither any Agent nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing, each Agent:  (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents or for the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties.

(b)    The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agents:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that none of the Agents shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

(c)    No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders, as applicable (or such other number or percentage of the Lenders as

shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(d)    Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

(e)    No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Loan Parties or a Lender. Upon the occurrence of a Default, the Agents shall take such action with respect to such Default as shall be reasonably directed by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents). Unless and until the Agents shall have received such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default as they shall deem advisable in the best interest of the Secured Parties. In no event shall any Agent be required to comply with any such directions to the extent that such Agent believes that its compliance with such directions would be unlawful.

SECTION 7.03.  Agents and Affiliates.  With respect to its Term Loan Commitments, the Loans made by it and any Notes issued to it, each Agent (in its or its Affiliate's capacity as a Lender) shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it (or its Affiliate, as the case may be) were not an Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include such Agent (or its Affiliate) in its individual capacity. Each Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if such Agent were not an Agent and without any duty to account therefor to the Lenders. No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Agent.

SECTION 7.04.  Lender Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

SECTION 7.05.  Indemnification.

(a)    Each Lender severally agrees to indemnify each Agent (to the extent not promptly reimbursed by the Borrower) from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against

101

such Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent under the Loan Documents (collectively, the "***Indemnified Costs***"); *provided*, *however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under Section 9.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

(b)    [Intentionally Omitted].

(c)    For purposes of this <u>Section 7.05</u>, each Lender's ratable share of any amount shall be determined, at any time, according to the aggregate principal amount of the Loans outstanding at such time and owing to such Lender. The failure of any Lender to reimburse any Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to such Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 7.05 shall survive the Payment in Full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 7.06. <u>Successor Agents</u>.

Any Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower, and any Agent (other than ReStore in its capacity as an Agent) may be removed at any time with or without cause by the Required Lenders (without giving effect to the first proviso of the definition of "Required Lenders" requiring the inclusion of at least two (2) non-Affiliate Lenders); *provided*, *however*, that any removal of the Administrative Agent will not be effective until it has also been replaced as Collateral Agent and released from all of its obligations in respect thereof. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent with the consent of the Borrower (not to be unreasonably withheld or delayed). If no successor Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lenders, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed), appoint a successor Agent; *provided* that, if, such retiring Administrative Agent is unable to find an institution which is willing to accept such appointment and which meets the qualifications set forth above, subject to this <u>Section 7.06</u>, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Required Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above. Upon the acceptance of any appointment as Agent hereunder by a successor Agent and, in the case of a successor Collateral Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Agent's resignation or removal under this <u>Section 7.06</u>

no successor Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Agent's resignation or removal shall become effective, (b) the retiring Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring Agent's resignation or removal hereunder as Agent shall have become effective, the provisions of this Article VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

SECTION 7.07. <u>Credit Bidding</u>. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) in accordance with the Orders and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law and the Orders. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase); provided, that none of the Secured Parties shall be allowed to credit bid any of the Obligations independently and all such credit bids must be submitted through, and administered by, the Administrative Agent (at the direction of the Required Lenders), as set forth herein. In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that

the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 7.08.  Collateral and Guaranty Matters.  The Secured Parties irrevocably authorize each Agent, at its option and in its discretion,

(a)  to release any Lien on any property granted to or held by such Agent under any Loan Document (i) upon Payment in Full of all Obligations, (ii) that is disposed of or sold or to be disposed of or sold as part of or in connection with any disposition or sale permitted hereunder or under any other Loan Document, (iii) as to which the Agents are required to release such Lien pursuant to the terms of the Intercreditor Agreement, or (iv) if approved, authorized or ratified in writing by the applicable Lenders in accordance with Section 9.01;

(b)  to subordinate any Lien on any property granted to or held by such Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (w) of the definition of Permitted Liens;

(c)  to subordinate any Lien on Collateral to the applicable ABL Agent, subject to and in accordance with the Intercreditor Agreement; and

(d)  to release any Guarantor from its obligations under the Subsidiary Guaranty if such Person ceases to be a Subsidiary or otherwise becomes an Excluded Subsidiary as a result of a transaction permitted hereunder; *provided* that (i) if such Person is, or continues to be, an obligor with respect to the ABL Obligations (whether as a borrower or a guarantor thereunder), the Agents shall not release any such Person from its obligations under the Subsidiary Guaranty unless and until such Person is no longer an obligor with respect to the ABL Obligations, and (ii) a Guarantor that becomes an Excluded Subsidiary of the type described in clause (v) of such term will not be released from the Subsidiary Guaranty, unless the transaction (or series of related transactions) giving rise to such release is being effected primarily for a bona fide business purpose independent of, and unrelated to, obtaining such release from the Subsidiary Guaranty, and not in contemplation of adversely affecting the Secured Parties' interests in the Subsidiary Guaranty provided by such Guarantor and the Collateral owned by it securing the Obligations.

Upon request by any Agent at any time, the Lenders will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Subsidiary Guaranty pursuant to this Section 7.08.  In each case as specified in this Section 7.08, the Agents will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Subsidiary Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 7.08.

Notwithstanding anything to the contrary, the Agents shall not be obligated to release their Liens on any Collateral until proceeds of such Collateral have been received as required by this Agreement.

SECTION 7.09.  Notice of Transfer.  The Administrative Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and

until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 9.07.

SECTION 7.10.  Reports and Financial Statements.  By signing this Agreement, each Lender:

(a)        [intentionally omitted];

(b)        is deemed to have requested that the Administrative Agent or the Collateral Agent (as applicable) furnish such Lender, and each such Agent agrees to furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates, financial statements and other certificates, reports, documents and notices delivered by the Borrower hereunder and all field examinations and appraisals of the Collateral received by the Administrative Agent (collectively, the "Reports");

(c)        expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)        expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)        agrees to keep all Reports confidential in accordance with the provisions hereof; and

(f)        without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agents and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with the Loans that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, the Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agents and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agents and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

SECTION 7.11.  Agency for Perfection.  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law of the United States can be perfected only by possession.  Should any Lender (other than the Collateral Agent) obtain possession of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

# ARTICLE VIII

# GUARANTY

SECTION 8.01.  Guaranty; Limitation of Liability.

(a)    Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the punctual payment and performance when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing Obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Obligations being the "***Guaranteed Obligations***"), and agrees to pay any and all expenses (including, without limitation, fees and expenses of counsel) incurred by any Agent or any other Lender in enforcing any rights under, as applicable, this Guaranty or any other Loan Document.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Loan Party under any Debtor Relief Law.  Each Guarantor hereby acknowledges and agrees that this Guaranty constitutes a guaranty of payment and performance when due of all Guaranteed Obligations and not of collection and, to the fullest extent permitted by applicable law, waives any right to require that any resort be had by any Agent or any Lender to any of the Collateral or other security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of any Agent or any Lender in favor of any Loan Party or any other Person or to any other guarantor of all or part of the Guaranteed Obligations.

(b)    Each Guarantor, and by its acceptance of this Guaranty, any Agent and each Lender hereby confirms that it is the intention of all such Persons that this Guaranty and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of any Debtor Relief Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor hereunder.  To effectuate the foregoing intention, the Agents, the Lenders and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.  Without limiting the foregoing, in any action or proceeding with respect to any Guarantor involving any Debtor Relief Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Obligations of each Guarantor under this Guaranty, if the obligations of such Guarantor under Section 8.01 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 8.01, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, the Agents, the Lenders or any other Person, be automatically limited and reduced to the highest amount which is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

(c)    Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to any Lender under this Guaranty or any other guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor and each other guarantor so as to maximize the aggregate amount paid to the Lenders under or in respect of the Loan Documents.

SECTION 8.02.  Guaranty Absolute.  Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Lender with respect thereto.  The Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in

respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Obligations of any other Loan Party under or in respect of the Loan Documents in accordance with their respective terms, or any other amendment or waiver of or any consent to departure from any Loan Document in accordance with their respective terms, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or any of its Subsidiaries or otherwise;

(c)     any taking, exchange, release or non-perfection of any Collateral or any other collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty in accordance with its terms, for all or any of the Guaranteed Obligations;

(d)     any manner of application of Collateral or any other collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral or any other collateral for all or any of the Guaranteed Obligations or any other Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party or any of its Subsidiaries;

(e)     any change, restructuring or termination of the corporate structure or existence of any Loan Party or any of its Subsidiaries;

(f)     any failure of any Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to such Lender (each Guarantor waiving any duty on the part of the Lenders to disclose such information);

(g)     the failure of any other Person to execute or deliver this Agreement, any Guaranty Supplement or any other guaranty or agreement or the release or reduction of liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obligations; or

(h)     any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by any Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety, except Payment in Full.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Lender or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or any other Loan Party or otherwise, all as though such payment had not been made.

SECTION 8.03.  Waivers and Acknowledgments.

(a)     Each Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of nonperformance, default,

acceleration, protest or dishonor and, except for those notices specified under this Agreement, any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Lender protect, secure, perfect or insure any Lien or any property subject thereto or exhaust any right or take any action against any Loan Party or any other Person or any Collateral.

(b)     Each Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor hereby unconditionally and irrevocably waives (i) any defense arising by reason of any claim or defense based upon an election of remedies by any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Obligations of such Guarantor hereunder.

(d)     Each Guarantor acknowledges that the Collateral Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any mortgage by nonjudicial sale, and each Guarantor hereby waives any defense to the recovery by the Collateral Agent and the other Secured Parties against such Guarantor of any deficiency after such nonjudicial sale and any defense or benefits that may be afforded by applicable law.

(e)     Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by such Lender.

(f)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in Section 8.02 and this Section 8.03 are knowingly made in contemplation of such benefits.

SECTION 8.04.  Subrogation.

Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower, any other Loan Party or any other insider guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Lender against the Borrower, any other Loan Party or any other insider guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party or any other insider guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and the Term Loan Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the latest of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, and (b) the Maturity Date, such amount shall be received and held in trust for the benefit of the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement

or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to any Lender of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash, and (iii) the Maturity Date shall have occurred, the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

SECTION 8.05.  Guaranty Supplements.

Upon the execution and delivery by any Person of a guaranty supplement in substantially the form of Exhibit D hereto to the Prepetition Term Loan Credit Agreement (each, a "***Guaranty Supplement***"), (a) such Person shall be referred to as an "***Additional Guarantor***" and shall become and be a Guarantor hereunder, and each reference in this Guaranty to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document to a "Subsidiary Guarantor" shall also mean and be a reference to such Additional Guarantor, and (b) each reference herein to "this Guaranty," "hereunder," "hereof" or words of like import referring to this Guaranty, and each reference in any other Loan Document to the "Guaranty," "thereunder," "thereof" or words of like import referring to this Guaranty, shall mean and be a reference to this Guaranty as supplemented by such Guaranty Supplement.

SECTION 8.06.  Subordination.

Each Guarantor hereby subordinates any and all debts, liabilities and other Obligations owed to such Guarantor by each other Loan Party (the "***Subordinated Obligations***") to the Guaranteed Obligations to the extent and in the manner hereinafter set forth in this Section 8.06:

(a)    Prohibited Payments, Etc.  Except during the continuance of an Event of Default, each Guarantor may receive payments from any other Loan Party on account of the Subordinated Obligations. After the occurrence and during the continuance of any Event of Default, however, unless the Required Lenders otherwise agree, no Guarantor shall demand, accept or take any action to collect any payment on account of the Subordinated Obligations.

(b)    Prior Payment of Guaranteed Obligations.  In any proceeding under any Debtor Relief Law relating to any other Loan Party, each Guarantor agrees that the Lenders shall be entitled to receive payment in full in cash of all Guaranteed Obligations (including all interest and expenses accruing after the commencement of a proceeding under any Debtor Relief Law, whether or not constituting an allowed claim in such proceeding ("***Post-Petition Interest***")) before such Guarantor receives payment of any Subordinated Obligations.

(c)    Turn-Over.  After the occurrence and during the continuance of any Event of Default, each Guarantor shall, if the Administrative Agent so requests, collect, enforce and receive payments on account of the Subordinated Obligations as trustee for the Lenders and deliver such payments to the Administrative Agent on account of the Guaranteed Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but without reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Guaranty.

(d)    Administrative Agent Authorization.  After the occurrence and during the continuance of any Event of Default, the Administrative Agent is authorized and empowered (but without any obligation

to so do), in its discretion, (i) in the name of each Guarantor, to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and to apply any amounts received thereon to the Guaranteed Obligations (including any and all Post-Petition Interest), and (ii) to require each Guarantor (A) to collect and enforce, and to submit claims in respect of, the Subordinated Obligations and (B) to pay any amounts received on such obligations to the Administrative Agent for application to the Guaranteed Obligations (including any and all Post-Petition Interest).

SECTION 8.07.  Continuing Guaranty; Assignments.

This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations (other than Unmatured Surviving Obligations) and all other amounts payable under this Guaranty; provided that this Guaranty shall be reinstated if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored by any Agent, any Lender or any Guarantor upon the bankruptcy or reorganization of any Loan Party or otherwise, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lenders and their successors, transferees and assigns that are permitted under Section 9.07.  No Guarantor shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders.

# ARTICLE IX

## MISCELLANEOUS

SECTION 9.01.  Amendments, Etc.

No amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders (or by an Agent with the written approval of the Required Lenders) (except as provided in Section 5.01(k)(i), which may be performed by the Administrative Agent), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that

(a)    no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time:

(i)    amend the definition of "Required Lenders" or any other provision hereof that would change the percentage of the aggregate unpaid principal amount of the Loans that shall be required for the Lenders or any of them to take any action hereunder,

(ii)    except to the extent that it would constitute a Transfer permitted under Section 5.02(e), release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lenders under the Guaranties) if such release or limitation is in respect of all or substantially all of the value of the Guaranties to the Lenders, except as a transfer or dissolution would be permitted under Section 5.02(d),

(iii)    release all or substantially all of the Collateral in any transaction or series of related transactions,

(iv)    amend this Section 9.01,

(vi)     amend or modify Sections 2.11(f) or 2.13,

(vii)    contractually subordinate all or any portion of the Obligations under the Loan Documents, or the Collateral Agent's Liens in any Collateral securing such Obligations, to any other Debt or Liens securing any other Debt, except to the extent permitted under Section 7.08,

(viii)   change the definition of "Term Loan Borrowing Base", the definition of "Term Pushdown Reserve", or any component definition of any such terms if, as a result thereof, the amounts available to be borrowed by the Borrower would be increased, or

(ix)     increase the Credit Card Advance Rate or the Inventory Advance Rate if, as a result thereof, the amount available to be borrowed by the Borrower would be increased.

(b)      [intentionally omitted], and

(c)      no amendment, waiver or consent shall, unless in writing and signed by the Required Lenders and each Lender specified below for such amendment, waiver or consent:

(i)      increase the Loan of a Lender (other than a Protective Advance made by such Lender in accordance with Section 2.01(b)) without the consent of such Lender,

(ii)     reduce the principal of, or stated rate of interest (other than Default Rate) on, the Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender (other than in accordance with the terms hereof) without the consent of such Lender, or

(iii)    postpone any date scheduled for any payment of principal of, or interest on, the Loans pursuant to Section 2.05 or 2.07 or any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender;

*provided further* that (x) (1) no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents, (2) [reserved]; and (3) [reserved]; provided further that no such agreement or supplement shall, pursuant to this clause (3), amend, modify or otherwise effect the rights or duties of any Agent hereunder or under any other Loan Document without the prior written consent of such Agent and (y) any amendment contemplated by Section 2.10(g) in connection with the use or administration of Term SOFR or a Benchmark Transition Event, as applicable, shall be effective as contemplated by such Section 2.10(g).

SECTION 9.02.  Notices, Etc.

(a)      All notices and other communications provided for hereunder shall be either (x) in writing (including telegraphic, telecopy or electronic communication) and mailed, telegraphed, telecopied or delivered or (y) as and to the extent set forth in Section 9.02(b) and in the proviso to this Section 9.02(a), in an electronic medium and delivered as set forth in Section 9.02(b), if to any Loan Party, to the Borrower at its address at One Express Drive, Columbus, OH 43230, Attention: Jason Judd, Chief Financial Officer, E-mail Address: JJudd@express.com; with a copy (which shall not constitute notice) to: Kirkland & Ellis LLP, 609 Main Street, Houston, Texas 77002, Telecopy: (713) 836-3601, Attention: Rachael L. Lichman, P.C., E-mail Address: rachael.lichman@kirkland.com; if to any Lender, at its Applicable Lending Office; if to the Administrative Agent or the Collateral Agent, to ReStore Capital, at its address at 5 Revere Drive, Suite 206, Northbrook, Illinois 60062, Attention: Legal Department, with a copy (which shall not constitute

notice) to Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attention: Max Silverstein, Telephone: (212) 596-9658, E-mail Address: max.slverstein@ropesgray.com; or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties; *provided*, *however*, that materials and information described in <u>Section 9.02(b)</u> shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Borrower by the Administrative Agent.  All such notices and other communications shall, when mailed, telegraphed, telecopied, or e-mailed, be effective upon receipt.

(b)     The Borrower hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (ii) provides notice of any Default under this Agreement or (iii) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to an electronic mail address specified by the Administrative Agent to the Borrower.  In addition, the Borrower agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(c)     IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO THE BORROWER, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE BORROWER'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03.  <u>No Waiver; Remedies.</u>

No failure on the part of any Lender or any Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04.  <u>Costs and Expenses.</u>

(a)       Each Loan Party agrees to pay promptly after demand (i) all reasonable, documented and out-of-pocket costs and expenses of each Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver (regardless of whether such modification, amendment, consent or waiver is consummated) under, the Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication (including printing, distribution and meetings), transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, (B) the Administrative Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (C) the Administrative Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of the Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (D) customary charges imposed or incurred by the Administrative Agent resulting from the dishonor of checks payable by or to any Loan Party, (E) the reasonable fees and expenses of (x) one counsel (together with one local or foreign counsel in each relevant jurisdiction) representing the Administrative Agent and the Collateral Agent with respect thereto and (y) one counsel (together with one local or foreign counsel in each relevant jurisdiction) representing one or more Lenders, as a group, with respect thereto, in each case of the foregoing <u>clauses (x)</u> and <u>(y)</u>, with respect to advising such Agent or Lenders as to its or their rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Event of Default or any events or circumstances that may give rise to an Event of Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto and (F) the reasonable fees and expenses of one financial advisor to the Administrative Agent, Collateral Agent and Lenders and (ii) all reasonable, documented and out-of-pocket costs and expenses of each Agent and each Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of (x) one counsel (in addition to a single special counsel and up to one local counsel in each applicable local jurisdiction) for the Agents with respect thereto, (y) one counsel (in addition to a single special counsel and up to one local counsel in each applicable local jurisdiction) for one or more Lenders, as a group, with respect thereto (and any additional counsel due to existence of an actual or potential conflict of interest) and (z) one financial advisor for the Agents with respect thereto).

(b)       The Borrower agrees to indemnify, defend and save and hold harmless each Agent, each Lender and each of their Affiliates and their respective officers, directors, employees, agents and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Term Loans, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the transactions contemplated thereby or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Restricted Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Restricted Subsidiaries, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, bad faith or willful misconduct or that of its affiliates, directors, officers, employees, advisors or agents or any material violation by any such Indemnified Party of the Loan Documents; *provided* that the Borrower shall not be required to reimburse the legal fees and expenses of more than one outside counsel (in addition to a single special counsel and up to one local counsel in each

applicable local jurisdiction) for all Indemnified Parties (which shall be selected by the Administrative Agent) unless, in the reasonable opinion of the Administrative Agent, representation of all such Indemnified Parties would be inappropriate due to existence of an actual or potential conflict of interest.  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, whether or not any Indemnified Party is otherwise a party thereto.  The Borrower also agrees not to assert any claim against any Agent, any Lender or any of their Affiliates, or any of their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Term Loan, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the transactions contemplated by the Loan Documents.

(c)        [Intentionally Omitted].

(d)        If any Loan Party fails to pay when due any undisputed costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion.

(e)        Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Loan Parties contained in Sections 2.10 and 2.12 and this Section 9.04 shall survive the Payment in Full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 9.05.  Right of Set-off.

Upon (a) the occurrence and during the continuance of any Event of Default and (b) the making of the request or the granting of the consent specified by Section 6.01 to authorize the Administrative Agent to declare the Loans due and payable pursuant to the provisions of Section 6.01, each Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) (other than trust and tax accounts) at any time held and other indebtedness at any time owing by such Agent, such Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender shall have made any demand under this Agreement and although such Obligations may be unmatured.  Each Agent and each Lender agrees promptly to notify the Borrower after any such set-off and application; *provided*, *however*, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Agent and each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender and their respective Affiliates may have.

SECTION 9.06.  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and each Agent and the Administrative Agent shall have been notified by each Lender that such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Secured Parties, regardless of any investigation made by any Secured Party or

on their behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Default at the time of the Loans, and shall continue in full force and effect as long as the Loans or any other Obligation hereunder shall remain unpaid or unsatisfied.  Further, the provisions of <u>Sections 2.10</u>, <u>2.12</u>, and <u>9.04</u>, and <u>Article VII</u> shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Term Loan Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agents may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Secured Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked and (y) any Obligations that may thereafter arise under Section 9.04.

SECTION 9.07.  <u>Assignments and Participations</u>.

(a)      Each Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Term Loan Commitment, the Loan or Loans owing to it and the Note or Notes held by it); *provided*, *however*, that (i) each such assignment shall be of a uniform, and not a varying, percentage of all rights and obligations under and in respect of this Agreement, (ii) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Term Loan being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Assumption with respect to such assignment) shall in no event be less than $5,000,000, (iii) each such assignment shall be to an Eligible Assignee, and (iv) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Assumption, together with any Note or Notes (if any) and a processing and recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(b)      Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Assumption, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights (other than its rights under <u>Sections 2.10</u>, <u>2.12</u> and <u>9.04</u> to the extent any claim thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)      By executing and delivering an Assignment and Assumption, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Assumption, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in

Section 4.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting for this purpose (but only for this purpose) as the agent of the Borrower, shall maintain at its address referred to in Section 9.02 a copy of each Assignment and Assumption delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the principal amount of Term Loan Commitments and/or the Loans owing to, each Lender from time to time (the "*Register*").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower or any Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice.  This Section 9.07(d) shall be construed so that the Term Loan at all times is maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and Section 5f.103-1(c) of the United States Treasury Regulations.

(e)    Upon its receipt of an Assignment and Assumption executed by an assigning Lender and an assignee, together with any Note or Notes (if any) subject to such assignment, the Administrative Agent shall, if such Assignment and Assumption has been completed and is in substantially the form of Exhibit C to the Prepetition Term Loan Credit Agreement, (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Borrower and each other Agent.  In the case of any assignment by a Lender, within five Business Days after its receipt of such notice, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent in exchange for the surrendered Note or Notes (if any) a new Note to the order of such Eligible Assignee in an amount equal to the Loans assumed by it pursuant to such Assignment and Assumption.  Such new Note or Notes shall be dated the effective date of such Assignment and Assumption and shall otherwise be in substantially the form of Exhibit C to the Prepetition Term Loan Credit Agreement.

(f)    [Intentionally Omitted].

(g)    Each Lender may sell participations to one or more Persons (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Loans owing to it and the Note or Notes (if any) held by it); *provided*, *however*, that (i) such Lender's obligations under this Agreement (including, without limitation, its Term Loan Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to

116

such participation, or release all or substantially all of the Collateral or the value of the Guaranties. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal and interest amounts of each participant's interest in the Loans or other obligations under this Agreement (a "***Participant Register***"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Sections 163(f), 871(h)(2) and 881(e)(2) of the Internal Revenue Code and Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(h)    Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this <u>Section 9.07</u>, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided*, *however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender.

(i)    Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(j)    Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this <u>Section 9.07</u>, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(k)    [Intentionally Omitted].

(l)    Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, (i) no Lender nor any of its Affiliates shall be required to comply with this Section 9.07 in connection with any transaction involving any of its lenders or funding or financing sources, and no Lender nor any of its Affiliates shall have an obligation to disclose any such transaction to any Person and (ii) there shall be no limitation or restriction on (A) the ability of any Lender or its Affiliates to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan or any Obligation to any lender or financing or funding source of such Lender or any of its Affiliates or (B) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan or any Obligation; *provided, however*, that such Lender shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender."

SECTION 9.08. <u>Execution in Counterparts; Integration</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 3.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Execution of any such counterpart may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, as in effect from time to time, state enactments of the Uniform Electronic Transactions Act, as in effect from time to time, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  The Administrative Agent reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement or on any notice delivered to the Administrative Agent under this Agreement.  Any party delivering an executed counterpart of this Agreement by faxed, scanned or photocopied manual signature shall, upon the request of the Administrative Agent, also deliver an original manually executed counterpart, but the failure to deliver an original manually executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document, and any notice delivered hereunder or thereunder, *mutatis mutandis*.

SECTION 9.09. <u>Intercreditor Agreements</u>.

(a)    EACH LENDER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT LIENS SHALL BE CREATED ON THE COLLATERAL PURSUANT TO THE LOAN DOCUMENTS, WHICH LIENS SHALL BE SUBJECT TO TERMS AND CONDITIONS OF THE INTERCREDITOR AGREEMENTS.    PURSUANT TO THE EXPRESS TERMS OF THE INTERCREDITOR AGREEMENTS, IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE INTERCREDITOR AGREEMENTS AND ANY OF THE LOAN DOCUMENTS, THE PROVISIONS OF THE INTERCREDITOR AGREEMENTS SHALL GOVERN AND CONTROL.

(b)    EACH LENDER AUTHORIZES AND INSTRUCTS THE AGENTS TO ENTER INTO THE INTERCREDITOR AGREEMENTS (AND ANY OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT TO THE EXTENT CONTEMPLATED BY THE TERMS HEREOF) ON BEHALF OF THE LENDERS, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY THE AGENTS IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENTS (OR SUCH OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT).    THE PARTIES HERETO ACKNOWLEDGE THAT THE INTERCREDITOR AGREEMENTS OR SUCH OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT ARE BINDING UPON THEM.  EACH LENDER HEREBY AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENTS OR ANY OTHER DOCUMENT EVIDENCING AN INTERCREDITOR ARRANGEMENT ENTERED INTO PURSUANT TO THE IMMEDIATELY PRECEDING SENTENCE.

(c)    THE PROVISIONS OF THIS SECTION 9.09 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF THE INTERCREDITOR AGREEMENTS.  REFERENCE MUST BE MADE TO EACH INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.  EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN

ANALYSIS AND REVIEW OF THE INTERCREDITOR AGREEMENTS AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER ANY AGENT NOR ANY OF ANY AGENT'S AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN THE INTERCREDITOR AGREEMENTS.

SECTION 9.10.  Confidentiality.

(a)      Neither any Agent nor any Lender shall disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) to such Agent's or such Lender's Affiliates and their officers, directors, employees, agents, advisors, investment committees and funding sources, and to actual or prospective Eligible Assignees and participants, and then only on a confidential basis, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, Federal or foreign authority or examiner (including the National Association of Insurance Commissioners or any similar organization or quasi-regulatory authority) regulating such Lender, (d) to any rating agency when required by it, *provided* that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it from such Lender or (e) in connection with the exercise of any right or remedy under this Agreement or any other Loan Document; *provided* that, in the case of disclosure under clause (b), unless specifically prohibited by law or court order, each Agent and each Lender shall make reasonable efforts to notify the Borrower of any such requirement for disclosure prior to the disclosure of such Confidential Information; or (f) to any direct or indirect contractual counterparty or prospective counterparty (or such contractual counterparty's or prospective counterparty's professional advisor) to any credit derivative transaction relating to Obligations of the Borrower hereunder; *provided* that such counterparty (or such counterparty's professional advisor) shall undertake to preserve the confidentiality of any Confidential Information relating to the Loan Parties received by it in connection with such credit derivative transaction.

(b)      Anything in this Agreement to the contrary notwithstanding, the Agents and the Sole Lead Arranger and Bookrunner and the Syndication Agent named on the title page of this Agreement (i) may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in their respective marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of the Borrower or the other Loan Parties and the Term Loan Commitments provided hereunder in any "tombstone" or other advertisements, on their respective websites or in other marketing materials of the such Persons, and (ii) shall provide a draft reasonably in advance of any press release or advertising materials to the Borrower for review and comment prior to the publication thereof.

SECTION 9.11.  Release of Collateral.  Upon the sale, lease, transfer or other disposition of any item of Collateral of any Loan Party in accordance with the terms of the Loan Documents, the Collateral Agent will, at the Borrower's expense, execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in accordance with the terms of the Loan Documents and, in the case of any sale or dissolution of any Guarantor (to the extent permitted by the Loan Documents), a release of such Guarantor from the Guaranty; provided that all of such documents shall be in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders.

SECTION 9.12.  Replacement of Holdout Lender.

(a)      (i) If any action to be taken by the Lenders or any Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders and the consent of the Required Lenders is obtained but a Lender (other than any Agent in its capacity as a Lender) ("***Holdout Lender***") fails to give its consent,

authorization, or agreement or (ii) if at any time the Borrower becomes obligated to pay additional payments described in Section 2.10 and 2.12(a) to a Lender, in each case, then the Administrative Agent or the Borrower, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender or other Lender, as the case may be, may permanently replace the Holdout Lender or other Lender, as the case may be, with one or more substitute Lenders (each, a "**Replacement Lender**"), and the Holdout Lender or other Lender, as the case may be, shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender or other Lender, as the case may be, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Holdout Lender or other Lender, as the case may be, and each Replacement Lender shall execute and deliver an Assignment and Assumption, subject only to the Holdout Lender or other Lender, as the case may be, being repaid its share of the outstanding Obligations under the Loan Documents (including all accrued but unpaid interest, fees and other amounts that may be due and payable in respect thereof. If the Holdout Lender or other Lender, as the case may be, shall refuse or fail to execute and deliver any such Assignment and Assumption prior to the effective date of such replacement, the Holdout Lender or other Lender, as the case may be, shall be deemed to have executed and delivered such Assignment and Assumption. The replacement of any Holdout Lender or other Lender, as the case may be, shall be made in accordance with the terms of Section 9.07. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Term Loan Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender or the other Lender, as the case may be, shall remain obligated to make the Holdout Lender's or the other Lender's pro rata share of Loans.

SECTION 9.13.  Patriot Act Notice, Etc.

(a)    Each Lender and each Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act. The Borrower shall, and shall cause each of its Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender in order to assist the Agents and the Lenders in maintaining compliance with applicable Laws (including, without limitation, the Patriot Act and other "know your customer" and Ani-Money Laundering Laws) and any policy or procedure implemented by any Agent or such Lender to comply therewith) on all Loan Parties, their senior management and key principals and legal and beneficial owners. Each Loan Party agrees that the reasonable and documented out-of-pocket costs and charges incurred by any Agent in connection with conducting due diligence searches and checks in connection with the foregoing shall constitute expenses payable by the Borrower pursuant to Section 9.04 hereof.

(b)    Neither the Loans nor use of the proceeds of any thereof will violate the Patriot Act, the Trading With the Enemy Act or any other requirements contained in the rules and regulations of the OFAC.

SECTION 9.14.  Jurisdiction, Etc.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the fullest extent permitted by law, in such Federal

court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.15.  <u>Governing Law</u>.

This Agreement and the Notes shall be governed by, and construed in accordance with, the law of the State of New York.

SECTION 9.16.  <u>Waiver of Jury Trial</u>.

THE LOAN PARTIES, THE AGENTS AND THE LENDERS IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE LOANS, OR THE ACTIONS OF ANY AGENT OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 9.17.  [Intentionally Omitted].

SECTION 9.18.  [Intentionally Omitted].

SECTION 9.19.  [Intentionally Omitted].

SECTION 9.20.  <u>Acknowledgment and Consent to Bail-In of Affected Financial Institutions</u>.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares

or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.21.  [Intentionally Omitted].

SECTION 9.22.  Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.23.  Erroneous Payments.

(a)    Each Lender and any other party hereto hereby severally agrees that if (i) the Administrative Agent notifies (which such notice shall be conclusive absent manifest error) such Lender or any other Person that has received funds from the Administrative Agent or any of its Affiliates, either for its own account or on behalf of a Lender (each such recipient, a "*Payment Recipient*") that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) or (ii) any Payment Recipient receives any payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (z) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in clauses (i) or (ii) of this Section 9.23(a), whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "*Erroneous Payment*"), then, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; provided that nothing in this Section shall require the Administrative Agent to provide any of the notices specified in clauses (i) or (ii) above. Each Payment Recipient agrees that it shall not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(b)    Without limiting the immediately preceding clause (a), each Payment Recipient agrees that, in the case of clause (a)(ii) above, it shall promptly notify the Administrative Agent in writing of such occurrence.

(c)    In the case of either clause (a)(i) or (a)(ii) above, such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and upon demand from the Administrative Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a

demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)        In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding clause (c), from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to such Lender, an "***Erroneous Payment Return Deficiency***"), then at the sole discretion of the Administrative Agent and upon the Administrative Agent's written notice to such Lender (i) such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of the Loans owing to it (but not its Term Loan Commitments) with respect to which such Erroneous Payment was made (the "***Erroneous Payment Impacted Loans***") to the Administrative Agent or, at the option of the Administrative Agent, the Administrative Agent's applicable lending affiliate (such assignee, the "***Agent Assignee***") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of such Loans (but not Term Loan Commitments) of the Erroneous Payment Impacted Loans, the "***Erroneous Payment Deficiency Assignment***") plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by the Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment.  Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, the Administrative Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Loans assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration.  The parties hereto acknowledge and agree that (1) any assignment contemplated in this clause (d) shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (2) the provisions of this clause (d) shall govern in the event of any conflict with the terms and conditions of Section 9.07 and (3) the Administrative Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)        Each party hereto hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent (1) shall be subrogated to all the rights of such Payment Recipient and (2) is authorized to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under this Section 9.23 or under the indemnification provisions of this Agreement, (y) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrowers or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrowers or any other Loan Party for the purpose of making for a payment on the Obligations and (z) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received.

(f)        Each party's obligations under this Section 9.23 shall survive the resignation or replacement of the Administrative Agent or any transfer of right or obligations by, or the replacement of, a

Lender, the termination of the Term Loan Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(g)    The provisions of this <u>Section 9.23</u> to the contrary notwithstanding, (i) nothing in this <u>Section 9.23</u> will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery of the Erroneous Payment to the extent that the Administrative Agent has received payment from the Payment Recipient in immediately available funds the Erroneous Payment Return, whether directly from the Payment Recipient, as a result of the exercise by the Administrative Agent of its rights of subrogation or set off as set forth above in clause (e) or as a result of the receipt by an Agent Assignee of a payment of the outstanding principal balance of the Loans assigned to such Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by such Agent Assignee in respect of the Loans assigned to such Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of such Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

SECTION 9.24.  <u>Orders</u>. This Agreement is subject to the terms and provisions of the applicable Order. In the event of a conflict between the terms hereof and the terms of the applicable Order, the terms of the applicable Order shall govern and control.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**EXPRESS, LLC**, as Borrower

By: _____
Name: Mark Still
Title:   Senior Vice President and Chief
         Financial Officer

**EXPRESS, INC.**, as Holdings and a Guarantor

By: _____
Name: Mark Still
Title:   Senior Vice President and Chief
         Financial Officer

**EXPRESS TOPCO LLC**, as Intermediate Holdings and a Guarantor

By: _____
Name: Mark Still
Title:   Senior Vice President and Chief
         Financial Officer

**EXPRESS HOLDING, LLC**, as Parent and a Guarantor

By: _____
Name: Mark Still
Title:   Senior Vice President and Chief
         Financial Officer

**EXPRESS FASHION LOGISTICS, LLC,**
**EXPRESS FASHION OPERATIONS, LLC,**
**EXPRESS FINANCE CORP.,**
**EXPRESS GC, LLC,**
**UW, LLC,**
**EXPRESS FASHION INVESTMENTS, LLC,**
**EXPRESS BNBS FASHION, LLC,**
Each as a Subsidiary Guarantor

By: _____
Name:  Mark Still
Title:   Senior Vice President and Chief
Financial Officer

[*Express – Signature Page to Asset-Based Term Loan Agreement*]

**RESTORE CAPITAL, LLC**,
as the Administrative Agent and Collateral Agent

By: _____
Name: Ian Fredericks
Title: President


**RESTORE CAPITAL (EXPRS II), LLC**, as a Lender

By: _____
Name:  Ian Fredericks
Title:    President

**FIRST EAGLE DIRECT LENDING V-A, LLC** as a Lender

By: First Eagle Alternative Credit, LLC
Its: Manager

By: _____
Name: Michelle Handy
Title: Senior Managing Director

**FIRST EAGLE DIRECT LENDING V-B SPV, LLC** as a Lender

By: First Eagle Direct Lending V-B, LLC
Its: Designated Manager

By: First Eagle Alternative Credit, LLC
Its: Manager

By: _____
Name: Michelle Handy
Title: Senior Managing Director

**FIRST EAGLE DIRECT LENDING V-C SCSP** as a Lender

By: First Eagle Alternative Credit, LLC
Its: Portfolio Manager

By: _____
Name:  Michelle Handy
Title: Senior Managing Director

**FIRST EAGLE PEI FUND (BLOCKER), LLC**

By: First Eagle PEI Fund (Blocked), LP
Its: Sole Member

By: First Eagle Alternative Credit, LLC
Its: Investment Adviser

By: _____
Name:  Michelle Handy
Title: Senior Managing Director

*[Express – Signature Page to DIP Asset-Based Term Loan Agreement]*

**1903 PARTNERS, LLC**

By: _Patricia Parent_
Name: Patricia Parent
Title: Vice President and Treasurer

**GB FUNDING, LLC**

By: _____
Name: Kyle C. Shonak
Title: Manager

[*Express – Signature Page to DIP Asset-Based Term Loan Agreement*]

**Schedule I**
**Commitments and Applicable Percentages**

**New Money DIP Loans:**

| Lender | Term Loan Commitment | Applicable Percentage |
|---|---|---|
| ReStore Capital (EXPRS-II), LLC | 8,653,846.16 | 34.6% |
| First Eagle PEI Fund (Blocker), LLC | $7,692,307.69 | 30.8% |
| GB Funding, LLC | $8,653,846.15 | 34.6% |
| Totals: | **$25,000,000** | **100%** |

**Prepetition Term Loans:**

| Lender | Outstanding Prepetition Term Loans[1] | Applicable Percentage |
|---|---|---|
| ReStore Capital (EXPRS-II), LLC | $22,706,370.00 | 34.6% |
| First Eagle Direct Lending V-A, LLC | $3,934,441.44 | 6.0% |
| First Eagle Direct Lending V-B SPV, LLC | $11,000,183.34 | 16.8% |
| First Eagle Direct Lending V-C SCSP | $1,609178.50 | 2.5% |
| First Eagle PEI Fund (Blocker), LLC | $3,639,636.72 | 5.5% |
| 1903 Partners, LLC | $22,706,370.00 | 34.6% |
| Totals: | **$65,596,180** | **100%** |

---

[1] Prior to the Interim Order Roll-Up.

**Schedule II**
**Subsidiary Guarantors**

1.  Express GC, LLC, an Ohio limited liability company

2.  Express Finance Corp., a Delaware corporation

3.  Express Fashion Operations, LLC, a Delaware limited liability company

4.  Express Fashion Logistics, LLC, a Delaware limited liability company

5.  UW, LLC, a Delaware limited liability company

6.  Express Fashion Investments, LLC, a Delaware limited liability company

7.  Express BNBS Fashion, LLC, a Delaware limited liability company

**Schedule 4.01(b)**
**Company Information**

| Name of Company | Type of Organization | Corporate Function | Jurisdiction of Organization | Federal Taxpayer Identification Number | Chief Executive Office / Principal Place of Business |
|---|---|---|---|---|---|
| Express, Inc. | Corporation | Holding Company | Delaware | 26-2828128 | One Express Drive, Columbus, OH 43230 |
| Express Topco LLC | Limited liability company | Holding Company | Delaware | 26-2828079 | One Express Drive, Columbus, OH 43230 |
| Express, LLC | Limited liability company | Operating company | Delaware | 54-2170160 | One Express Drive, Columbus, OH 43230 |
| Express Holding, LLC | Limited liability company | Holding company | Delaware | 35-2298454 | One Express Drive, Columbus, OH 43230 |
| Express GC, LLC | Limited liability company | Issuer of gift cards | Ohio | 31-1816092 | One Express Drive, Columbus, OH 43230 |
| Express Finance Corp. | Corporation | Holding Company | Delaware | 27-1817713 | One Express Drive, Columbus, OH 43230 |
| Express Fashion Operations, LLC | Limited liability company | Operating Company | Delaware | 45-5573400 | One Express Drive, Columbus, OH 43230 |
| Express Fashion Logistics, LLC | Limited liability company | Holding Company | Delaware | 46-0570481 | One Express Drive, Columbus, OH 43230 |
| UW, LLC | Limited liability company | Operating Company | Delaware | 32-0608688 | 81 Mill Street Suite 2010 Gahanna, OH 43230 |
| Express Fashion Investments, LLC | Limited liability company | Holding Company | Delaware | 92-1607622 | One Express Drive, Columbus, OH 43230 |
| Express BNBS Fashion, LLC | Limited liability company | Operating Company | Delaware | 92-3453861 | One Express Drive, Columbus, OH 43230 |

**Schedule 4.01(c)**
**Subsidiaries and Other Equity Investments**

| Issuer | Type of Organization | Jurisdiction | Subsidiary Type | Percentage Owned | Total Shares Outstanding | Shares Subject to Warrants, Options, etc. | Owner | Certificate No. |
|---|---|---|---|---|---|---|---|---|
| Express Topco LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express, Inc. | N/A |
| Express Holding, LLC | Limited Liability Company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express Topco LLC | 1 |
| Express Fashion Logistics, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express, LLC | N/A |
| Express Fashion Operations, LLC | Limited liability company | Delaware | Restricted Subsidiary, Material Subsidiary | 100% | N/A | N/A | Express, LLC | N/A |
| Express, LLC | Limited liability company | Delaware | Restricted Subsidiary, Material Subsidiary | 100% | N/A | N/A | Express Holding, LLC | 2 |
| Express Finance Corp. | Corporation | Delaware | Restricted Subsidiary | 100% | 1,000 Shares of Common Stock | N/A | Express Holding, LLC | 2 |
| Express GC, LLC | Limited liability company | Ohio | Restricted Subsidiary | 100% | N/A | N/A | Express Fashion Operations, LLC | 2 |
| UW, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express Fashion Operations, LLC | N/A |
| Express Fashion Digital Services Costa Rica, S.R.L. | Costa Rica Limited Liability Company | Costa Rica | Foreign Subsidiary, Restricted Subsidiary | 100% | 100 | N/A | Express, LLC | 1 |
| Express Fashion Investments, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | N/A | N/A | Express, LLC | N/A |
| Express BNBS Fashion, LLC | Limited liability company | Delaware | Restricted Subsidiary | 100% | 100 | N/A | Express Fashion Operations, LLC | N/A |

**Schedule 4.01(s)**
**Tax Returns**

Holdings has accrued approximately $1,700,000 of U.S. federal income taxes with respect to the fiscal year ended January 28, 2023, based on estimated taxes due for such fiscal year.

**Schedule 5.01(r)**
**Milestones**

| Event | Date |
|---|---|
| File motion to approve Specified Liquidation Agreement with respect to 95 Stores of the Debtors (such motion, the "Store Closing Sales Motion") acceptable to the Lenders. | Petition Date + 1 day |
| File Bidding Procedures Motion acceptable to the Lenders, which shall contemplate a going concern sale of all or substantially all of the remaining Stores (the "Going Concern Sale") and, in the alternative, (ii) orderly liquidation of all of the Company's assets, including (without limitation) an entire chain liquidation of all stores and all the assets relating thereto (the "Liquidation"). | Petition Date + 1 day |
| Entry of Store Closing Interim Order acceptable to the Lenders, which shall include approval for the Specified Liquidation Agents to act as the liquidation agents pursuant to the Specified Liquidation Agreement for any stores not included in the Going Concern Sale on the terms and conditions contained in the Specified Liquidation Agreement. | Petition Date + 3 days |
| Entry of Interim Order acceptable to the Lenders | Petition Date + 3 days |
| Entry of Final Order acceptable to the Lenders | May 22, 2024 |
| Entry of order approving Bidding Procedures Motion acceptable to the Lenders | May 22, 2024 |
| Either:<br><br>(i)    Entry into a "stalking horse" purchase agreement for a Going Concern Sale that has no financing or due diligence outs and is otherwise in accordance with these milestones (a "GC Purchase Agreement"); or<br><br>(ii)    Entry into a "stalking horse" agreement in the form of an agreement (the "Liquidation Agreement") for a Liquidation (either pursuant to a fee deal or equity deal). | May 22, 2024 |
| If GC Purchase Agreement is entered into by May 22, 2024, then the following additional milestones shall apply: | |
| File GC Purchase Agreement with the Bankruptcy Court | May 23, 2024 |
| Bid Deadline for Going Concern Sale | June 3, 2024 |
| Final Store List delivered to Lenders and Debtors for Going Concern Sale | June 3, 2024 |
| Auction Date for Going Concern Sale | June 5, 2024 |
| Entry of Sale Order approving the Going Concern Sale | June 7, 2024 |
| Closing of Going Concern Sale | June 10, 2024 |

| If Liquidation Agreement is entered into by May 22, 2024, then the following additional milestones shall apply: | |
|---|---|
| Bid Deadline for Liquidation | May 24, 2024 |
| Auction Date for Liquidation | May 28, 2024 |
| Entry of Order approving Liquidation Bid | May 30, 2024 |
| Commencement of Liquidation | May 31, 2024 |

**Schedule 5.02(a)**
**Existing Liens**

None.

**Schedule 5.02(b)**
**Existing Debt**

None.

**Schedule 5.02(f)**
**Existing Investments**

None.

**Exhibit A**
Initial Budget

**Express**
**Initial DIP Budget**

DRAFT

($ in MMs)

| Week:<br>Week Classification:<br>Type:<br>Period Ending: | 1<br>Apr wk3<br>Fcst<br>4/27/2024 | 2<br>Apr wk4<br>Fcst<br>5/4/2024 | 3<br>May wk1<br>Fcst<br>5/11/2024 | 4<br>May wk2<br>Fcst<br>5/18/2024 | Total<br>4-Weeks |
|---|---|---|---|---|---|
| **Cash Operating Receipts** | | | | | |
| Express | $28.7 | $27.3 | $25.8 | $28.3 | $110.2 |
| Bonobos | 5.0 | 4.8 | 5.0 | 5.4 | 20.2 |
| Other Receipts | 1.9 | 1.0 | 0.2 | 0.5 | 3.6 |
| Store Closing Receipts | 4.0 | 7.0 | 5.7 | 5.1 | 21.9 |
| **Total Cash Operating Receipts** | **$39.7** | **$40.1** | **$36.8** | **$39.4** | **$155.9** |
| **Operating Disbursements** | | | | | |
| Merchandise | – | – | ($5.3) | ($6.2) | ($11.5) |
| Rent | (6.3) | (25.6) | – | – | (31.9) |
| Non-Merchandise | (6.7) | (3.4) | (6.0) | (5.7) | (21.8) |
| Payroll | (1.9) | (12.7) | – | (12.7) | (27.3) |
| Sales and Use Tax | (3.4) | (0.1) | (0.1) | (0.1) | (3.7) |
| Other | (0.8) | (0.5) | (0.2) | (0.5) | (2.1) |
| **Total Operating Disbursements** | **($19.0)** | **($42.3)** | **($11.6)** | **($25.2)** | **($98.2)** |
| **Operating Cash Flow** | **$20.7** | **($2.2)** | **$25.2** | **$14.1** | **$57.7** |
| **Restructuring Items** | | | | | |
| Debtor Professionals | ($2.1) | ($1.8) | ($1.8) | ($2.0) | ($7.7) |
| UCC Professionals | – | (0.3) | (0.3) | (0.3) | (0.8) |
| Lender Disbursements | (0.6) | (0.6) | (0.6) | (0.6) | (2.2) |
| Taxes and Duties | (8.1) | – | (0.0) | (1.8) | (9.9) |
| Critical Vendors | (0.9) | (0.9) | (0.9) | (0.9) | (3.7) |
| Critical Foreign Vendors | – | – | – | – | – |
| Admin Priority Reserves | (0.0) | – | – | – | (0.0) |
| Shippers / Lienholders / Warehouse Claims | – | (3.0) | – | – | (3.0) |
| KERP | – | (2.0) | – | – | (2.0) |
| Store Closing Costs | (0.3) | (0.3) | (0.2) | (0.2) | (1.0) |
| Employee Related Reserves | (0.1) | (0.1) | (0.1) | (0.1) | (0.2) |
| **Total Restructuring Items** | **($12.1)** | **($8.9)** | **($3.9)** | **($5.8)** | **($30.6)** |
| **Cash Flow Before Financing** | **$8.6** | **($11.1)** | **$21.3** | **$8.4** | **$27.2** |
| **Financing Related Cash Flows** | | | | | |
| Interest / Fees | – | ($1.7) | – | – | ($1.7) |
| DIP Proceeds | 24.1 | – | – | – | 24.1 |
| **Total Financing Related Cash Flows** | **$24.1** | **($1.7)** | **–** | **–** | **$22.4** |
| **Net Cash Flow** | **$32.6** | **($12.8)** | **$21.3** | **$8.4** | **$49.5** |
| **Bank Cash** | | | | | |
| BOP Bank Cash Balance | $20.3 | $15.0 | $15.0 | $15.0 | $20.3 |
| Net Cash Flow | 32.6 | (12.8) | 21.3 | 8.4 | 49.5 |
| Revolver Draw / (Paydown) | (38.0) | 12.8 | (21.3) | (8.4) | (54.9) |
| Term Loan Pre-Payment | – | – | – | – | – |
| **EOP Bank Cash Balance** | **$15.0** | **$15.0** | **$15.0** | **$15.0** | **$15.0** |
| **Net Revolver Availability** | **$45.4** | **$32.6** | **$45.0** | **$35.6** | **$35.6** |
| **Total Liquidity** | **$60.4** | **$47.6** | **$60.0** | **$50.6** | **$50.6** |
| *Memo: First Lien Prepetition ABL Facility* | *$42.0* | *$2.0* | *–* | *–* | |
| *Memo: First Lien DIP ABL Facility* | *$28.4* | *$81.2* | *$61.9* | *$53.5* | *$53.5* |
| *Memo: Second Lien New Money DIP Term Loans* | *$25.0* | *$25.0* | *$25.0* | *$25.0* | *$25.0* |
| *Memo: Second Lien Prepetition Term Facility* | *$65.6* | *$65.6* | *$65.6* | *$65.6* | *$65.6* |

4/22/2024

**Exhibit B**
Form of Term Loan Borrowing Base Certificate

**Express, LLC**
**Borrowing Base Certificate**

| | | | | Cert. #: | Apr Wk 1 |
| | | | | As of Date: | 4/13/2024 |
| | | | | Date Prepared: | 4/19/2024 |

| | | | | ABL Revolver BBC | Term Loan BBC |
|---|---|---|---|---|---|
| **Accounts Receivable:** | | | | | |
| Credit Card Receivables - US Locations (A/C C0's 110400, 110405, 110410, 110415,110425, 11043 | As of: | 4/13/2024 | | $12,481,175 | $12,481,175 |
| Credit Card Receivables - Puerto Rico (A/C 110400, 110405, 110410, 110415) | As of: | 4/13/2024 | | 45,796 | 45,796 |
| **Gross Credit Card Receivables** | | | | **$12,526,972** | **$12,526,972** |
| Private Label (Bread) Credit Card Receivables | As of: | 4/13/2024 | | ($1,291,396) | ($1,291,396) |
| >5 days aged (Bonobos Reserve) | As of: | 4/13/2024 | | – | – |
| **Total Credit Card Receivables Ineligibles** | | | | **($1,291,396)** | **($1,291,396)** |
| **Eligible Credit Card Receivables** | | | | **$11,235,576** | **$11,235,576** |
| *Advance Rate* | | | | 90.0% | 10.0% |
| **Credit Card Receivable Availability** | | | | **$10,112,018** | **$1,123,558** |
| | | | | | |
| **Express Inventory - Store Closing Inventory** | | | | | |
| Express - Ending Stock Ledger Inventory - US Locations (A/C 114100) | As of: | 4/13/2024 | | $27,644,573 | $27,644,573 |
| Express - Ending Stock Ledger Inventory - Puerto Rico (A/C 114100) | As of: | 4/13/2024 | | – | – |
| Express- Franchise Inventory (A/C 114150) | As of: | 4/13/2024 | | – | – |
| Express - Outlet Inventory (A/C 114160; ZBA as amounts included in 114100 above) | As of: | 4/13/2024 | | – | – |
| **Total Gross Express Inventory (Store Closing Inventory)** | | | | **$27,644,573** | **$27,644,573** |
| Consignment Inventory | As of: | 4/13/2024 | | – | – |
| Other Adjustments - US Locations (A/C 114300) | As of: | 4/13/2024 | | (2,515,656) | (2,515,656) |
| Other Adjustments - Puerto Rico  (A/C 114300) | As of: | 4/13/2024 | | – | – |
| Ecommerce (inventory sold not yet delivered A/C 114300) | As of: | 4/13/2024 | | – | – |
| Shrink Accrual - US Locations (A/C 114310) | As of: | 4/13/2024 | | – | – |
| Shrink Accrual - Puerto Rico (A/C 114310) | As of: | 4/13/2024 | | – | – |
| Store Recall Inventory - Location 9050 & 9051 | As of: | 4/13/2024 | | – | – |
| Ecomm Recall Inventory - Location 9052 | As of: | 4/13/2024 | | – | – |
| Inventory Insurance Claims - Location 1994 | As of: | 4/13/2024 | | – | – |
| Licensed Inventory | As of: | 4/13/2024 | | – | – |
| CBD Product | As of: | 4/13/2024 | | – | – |
| Offsite Locations | As of: | 4/13/2024 | | – | – |
| Closed Stores | As of: | 4/13/2024 | | – | – |
| **Total Express Inventory Ineligibles (Store Closing Inventory)** | | | | **($2,515,656)** | **($2,515,656)** |
| **Eligible Express Inventory (Store Closing Inventory)** | | | | **$25,128,917** | **$25,128,917** |
| *NOLV %* | Month: | APR | | 94.1% | 94.1% |
| *Advance Rate %* | | | | 90.0% | 10.0% |
| **Express Inventory Availability (Store Closing Inventory)** | | | | **$21,281,679** | **$2,364,631** |
| | | | | | |
| **Inventory - Go Forward Inventory** | | | | | |
| Express - Ending Stock Ledger Inventory - US Locations (A/C 114100) | As of: | 4/13/2024 | | $283,791,660 | $283,791,660 |
| Express - Ending Stock Ledger Inventory - Puerto Rico (A/C 114100) | As of: | 4/13/2024 | | 915,319 | 915,319 |
| Express- Franchise Inventory (A/C 114150) | As of: | 4/13/2024 | | – | – |
| Express - Outlet Inventory (A/C 114160; ZBA as amounts included in 114100 above) | As of: | 4/13/2024 | | – | – |
| **Total Gross Express Inventory (Go Forward Inventory)** | | | | **$284,706,979** | **$284,706,979** |
| Consignment Inventory | As of: | 4/13/2024 | | – | – |
| Other Adjustments  - US Locations (A/C 114300) | As of: | 4/13/2024 | | (25,825,041) | (25,825,041) |
| Other Adjustments - Puerto Rico  (A/C 114300) | As of: | 4/13/2024 | | (83,294) | (83,294) |
| Ecommerce (inventory sold not yet delivered A/C 114300) | As of: | 4/13/2024 | | – | – |
| Shrink Accrual - US Locations (A/C 114310) | As of: | 4/13/2024 | | (13,166,461) | (13,166,461) |
| Shrink Accrual - Puerto Rico (A/C 114310) | As of: | 4/13/2024 | | (17,714) | (17,714) |
| Store Recall Inventory - Location 9050 & 9051 | As of: | 4/13/2024 | | (99,868) | (99,868) |
| Ecomm Recall Inventory - Location 9052 | As of: | 4/13/2024 | | (3,902) | (3,902) |
| Inventory Insurance Claims - Location 1994 | As of: | 4/13/2024 | | – | – |
| Licensed Inventory | As of: | 4/13/2024 | | – | – |
| CBD Product | As of: | 4/13/2024 | | – | – |
| Offsite Locations | As of: | 4/13/2024 | | – | – |
| Closed Stores | As of: | 4/13/2024 | | – | – |
| **Total Express Inventory Ineligibles (Go Forward Inventory)** | | | | **($39,196,280)** | **($39,196,280)** |
| **Eligible Express Inventory (Go Forward Inventory)** | | | | **$245,510,699** | **$245,510,699** |
| *NOLV %* | Month: | APR | | 99.2% | 99.2% |
| *Advance Rate %* | | | | 90.0% | 10.0% |

| Express Inventory Availability (Go Forward Inventory) | $219,234,146 | $24,359,350 |

## Express In-Transit Inventory

| | | | | |
|---|---|---|---|---|
| Express - In-yard/In-transit Inventory (A/C114110) | As of: | 4/13/2024 | – | – |
| **Gross Express In-Transit Inventory** | | | | |
| >60 Days In Transit | As of: | 4/13/2024 | – | – |
| Bangladesh Originated In-transit | As of: | 4/13/2024 | – | – |
| **Total In-Transit Ineligibles** | | | **–** | **–** |
| **Eligible Express In-Transit Inventory** | | | **–** | **–** |
| NOLV % | Month: | *[TBD]* | *[TBD]* | *[TBD]* |
| *Advance Rate %* | | | *90.0%* | *10.0%* |
| **Express In-Transit Inventory Availability** | | | **–** | **–** |

## Bonobos Inventory

| | | | | |
|---|---|---|---|---|
| Bonobos - Ending Stock Ledger Inventory | As of: | 4/13/2024 | $54,773,394 | $54,773,394 |
| **Total Gross Bonobos Inventory** | | | **$54,773,394** | **$54,773,394** |
| Guideshops Inventory | As of: | 4/13/2024 | ($4,774,778) | ($4,774,778) |
| Other Reserves | As of: | 4/13/2024 | (2,199,335) | (2,199,335) |
| **Total Inventory Ineligibles** | | | **($6,974,113)** | **($6,974,113)** |
| **Eligible Bonobos Inventory** | | | **$47,799,282** | **$47,799,282** |
| NOLV % | Month: | APR | 79.1% | 79.1% |
| *Advance Rate %* | | | *90.0%* | *10.0%* |
| **Gross Bonobos Inventory Availability** | | | **$34,028,309** | **$3,780,923** |
| **Gross Inventory Availability** | | | **$274,544,134** | **$30,504,904** |

## AVAILABILITY RESERVES

| | | | | |
|---|---|---|---|---|
| Gift Certificates Reserve  - US, Puerto Rico, Bonobos (50%) (A/C 212100, 212110, 212120) | As of: | 4/13/2024 | ($15,277,553) | – |
| Capitalized Vendor Rebates (A/C 114330) | As of: | 4/13/2024 | – | – |
| Bonobos Merchandise Credits (50%) | As of: | 4/13/2024 | – | – |
| Landlord Lien Reserve (PA, WA, VA - 2 months rent) * | As of: | 4/13/2024 | (3,325,707) | – |
| Texas Sales Tax (6 week average) | As of: | 4/13/2024 | (1,294,500) | – |
| Texas Property Tax (last amount paid) | As of: | 4/13/2024 | (607,162) | – |
| Term Loan Pushdown | As of: | 4/13/2024 | (78,967,719) | – |
| Net Customs Duties Payable (A/C 210300, 210310, 210320, 210330, 210350) | As of: | 4/13/2024 | (1,588,094) | – |
| Landed Cost - duties (15.4% of in-Transit less ineligibles) | As of: | 4/13/2024 | – | – |
| Bank Products Reserve | As of: | 4/13/2024 | (1,500,000) | – |
| Prepayment Penalty | | | – | – |
| Post Trigger Carve Out Reserve | As of: | 4/13/2024 | (500,000) | – |
| UST Fee Reserve | As of: | 4/13/2024 | (250,000) | – |
| 726(b) Reserve | As of: | 4/13/2024 | (25,000) | – |
| Professional Fee Reserve | As of: | 4/13/2024 | (4,200,000) | – |
| Term Loan Reserve | As of: | 4/13/2024 | – | (20,000,000) |
| **Total Availability Reserves** | | | **($107,535,735)** | **($20,000,000)** |

## Cash Collateral

| | | | | |
|---|---|---|---|---|
| Eligible Cash Collateral | | | – | – |
| **Total Cash Collateral Availability** | | | **–** | **–** |
| **Total Uncapped Borrowing Base (A + B + C + D)** | | | **$177,120,417** | **$90,596,180** |
| **Total Capped Borrowing Base** | | | **$160,852,550** | **$90,596,180** |

### *AVAILABILITY CALCULATION*

| | | | | |
|---|---|---|---:|---:|
| **Beginning Principal Balance** | As of: | 4/12/2024 | $147,326,893 | $63,073,250 |
| ADD: | FILO Prepayment Premium | Closing | – | 2,522,930 |
| ADD: | New Money DIP | Closing | – | 25,000,000 |
| ADD: | Advances through | Closing | 44,878,097 | – |
| LESS:[(1)] | Payments through | Closing | (129,297,479) | – |
| **Ending Principal Balance** | | | **$62,907,512** | **$90,596,180** |
| **Total L/Cs Outstanding** | Standby L/C's | $20,082,085 | Doc L/C's | $ - | $20,082,085 | – |

| | | |
|---|---:|---:|
| **Total Usage  (F + G)** | $82,989,597 | $90,596,180 |
| **Excess Availability (E - H)** | $77,862,953 | – |

| | | |
|---|---:|---|
| **MEA test ($25MM)** | $25,000,000 | |

| Check |
|---|
| TRUE |

The undersigned, a Responsible Officer (as defined in the ABL Credit Agreement referred to below) of Express, LLC, as borrower (in such capacity, the "ABL Borrower"), represents and warrants that the information set forth above and the supporting documentation and information delivered herewith (i) is true and correct in all material respects, and (ii) has been prepared in accordance with the requirements of that certain Second Amended and Restated Asset-Based Loan Credit Agreement dated as of May 20, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement"), by, among others, (1) the ABL Borrower, (2) the Guarantors party thereto, (3) the Lenders party thereto, and (4) Wells Fargo Bank, National Association (as successor to Wells Fargo Retail Finance, LLC), as Administrative Agent and Collateral Agent (in such capacities, the "ABL Agent").

* Subject to increase, at any time notwithstanding the provisions of Section 2.17 of the Credit Agreement, to up to three months' rent as provided in the definition of "Reserves".

| | | | |
|---|---|---|---|
| **Responsible Officer:** | **Printed Name:**  Mark Still _____ | **Signature:** _____ | |
| **WFRF  Account Manager:** | **Printed Name:** _____ | **Signature:** _____ | |

[(1)] Assumes amount currently held in Collection Bank Accounts which will be swept to pay down the loan balance upon or shortly after closing