**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| EXPRESS, INC., *et al.*, [1] | Case No. 24-10831 (KBO) |
| Debtors. | (Jointly Administered)<br>**Re:  Docket No. 24** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND
(B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") of Express Inc. and its

affiliated debtors and debtors in possession (collectively, the "**Debtors**"), by and through its

undersigned proposed counsel, hereby submits this objection (the "**Objection**") to the *Debtors'*

*Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain*

*Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority*

*Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final*

*Hearing, and (V) Granting Related Relief.* [Dkt. No. 24] (the "**DIP Financing Motion**").[2]  In

support of the Objection, the Committee respectfully states as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2]  Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Financing Motion.

## PRELIMINARY STATEMENT

1.      The Debtors filed these Chapter 11 Cases on an express track to two potential outcomes: a going concern sale or a potential liquidation.  Since its formation, the Committee has been working cooperatively with the Debtors (and vice-versa) towards a going concern transaction.[3]  While the Debtors have received a proposal for a going concern transaction, it is still not clear which path the cases will take.  Accordingly, the Committee had asked that the objection deadline for the DIP Financing Motion be adjourned, to allow the parties sufficient time to review any submitted stalking horse bid, and to adjust the Initial DIP Budget to reflect whether a going concern sale would be pursued.  Having clarity on the roadmap for these Chapter 11 Cases allows all parties, including the Committee, to evaluate the Debtors' requested relief in the actual context in which it is being sought.  Unfortunately, despite the Debtors having received a going concern bid, no party has had enough time to review fully the proposed transaction and the alternatives thereto.  Nor have the DIP Lenders agreed to move forward with a budget that reflects a going concern sale rather than their pursuit of a liquidation for their benefit.  While the Committee is hopeful that a going concern sale provides for the best path forward, including continuation of employment for thousands of employees, and assumption of vendor contracts and leases, the Committee must ensure that the terms of the proposed Final Order are appropriate *whether or not* a sale is ultimately consummated – and as it stands today, the proposed Final Order does not appropriately protect the estates from the potential downside risk of liquidation, and should not be approved.

---

[3] The Committee has also been working cooperatively with the Debtors to narrow the issues in this Objection. However, any definitive resolution requires the agreement of the DIP Lenders and is not within the sole control of the Debtors to resolve.

52348918.2

2.      Instead,  the parties are being forced to bless – with insufficient information as to the path forward for these cases – a financing that provides limited new money at great cost to the estates, converts prepetition obligations to postpetition superpriority claims, encumbers previously unencumbered assets (including avoidance actions), and builds in premature and inappropriate protections for the Debtors' liquidators (who also happen to be affiliated with certain of the DIP Lenders), despite the existence of multiple prepetition transactions involving these parties that the Committee intends to investigate; as such, the releases and stipulations are premature.[4]

3.      The proposed Final Order furthers the interests of the DIP Lenders at great expense and risk to the estates and to unsecured creditors.  And so the prepetition dynamic of the lenders' leverage over the Debtors may continue postpetition, with the blessing of this Court if the DIP Lenders have it their way.  In fact, the Prepetition Secured Parties may have themselves created the need for the DIP Facility just days before the Petition Date, forcing the Debtors to transfer their $49 million CARES Act refund to the Prepetition Secured Parties instead of using that money to fund operations.  In an alternative universe where the Debtors were allowed to make decisions without the influence of their lenders, there may be an Express that does not need a DIP loan (or at least a more reasonable DIP loan).

4.      The proposed Final Order is replete with one-sided protections for the DIP Lenders and potential traps for the estates.  For example, by granting the Final Order as proposed, the Court would effectively be gutting the critical and foreign vendor relief it previously approved – funds that vendors relied upon in shipping in the lead-up to the filing, and funds that the Debtors told

---

[4] The proposed Final Order includes stipulations regarding prepetition agreements with WHP Global that the Committee believes should not be addressed in the Final Order.  The Committee has reached an agreement in principle with WHP Global regarding the removal of these stipulations and certain other modifications to the Final Order related to WHP Global, and accordingly, does not raise those issues in this Objection.  To the extent the Committee's agreement with WHP Global cannot be effectively documented, the Committee reserves all rights to raise these concerns at the Final Hearing.

52348918.2

this Court that they needed to spend to stabilize these businesses – by only allowing the Debtors to spend limited critical and foreign vendor dollars at the pleasure of the DIP Lenders.  The Committee further understands that notwithstanding the inclusion of stub rent in the DIP Budget, the Debtors have not yet paid stub rent to landlords, and it is not clear when or whether the Debtors will do so to satisfy their obligations under section 365(d)(3) of the Bankruptcy Code.

5.      While the Debtors clearly need DIP financing (due in large part to the DIP Lenders' prepetition machinations), it should not be under the Final Order as proposed.  Although the Committee has concerns, as set forth herein, with the structure of the DIP Facilities, including the proposed roll-up and the related fees, it is ultimately the Debtor's burden to show that the proposed economic terms of the DIP Facilities are reasonable.  Thus while the economic terms of the DIP Facilities are themselves objectionable, the Committee is not objecting to those terms, and instead limits this Objection to the terms of the Final Order set forth in herein.  The Court should sustain this Objection and condition approval of the DIP Financing Motion upon the modifications described in this Objection.

## **BACKGROUND**

**I.      General Background**

6.      On April 22, 2024 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These cases are being jointly administered (the "**Chapter 11 Cases**") [Dkt. No. 67].

7.      On the Petition Date, the Debtors also filed a number of "first-day" motions, including the DIP Financing Motion.  After the first-day hearing, on April 24, 2024, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties;*

52348918.2

*(III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief.* [Dkt. No. 85].

8.    On May 3, 2024, the United States Trustee for Region 3 appointed the Committee [Dkt. No. 154]. The Committee consists of the following seven members: (i) Li & Fung (Trading) Limited, (ii) Manchu Times Fashion Limited, (iii) Jorge Chacon, (iv) Pacific Buying & Marketing Service, Ltd., (v) Radial, Inc., (vi) Motives International (Hong Kong) Limited and Motives International Limited, and (vii) The Macerich Company.

## II.    The Debtors' Prepetition Debt

9.    On the Petition Date, the Debtors had approximately $190 million in funded-debt obligations. Of that amount, approximately $106 million related to the Prepetition ABL Facility provided under the First Lien Prepetition ABL Credit Agreement, approximately $63 million related to the outstanding Prepetition FILO Term Loan Facility, and approximately $20 million related to issued and undrawn letters of credit on account of the Prepetition ABL Facility. *See* First Day Decl. ¶¶ 49-52. The Prepetition ABL Facility and the Prepetition FILO Term Loan Facility purportedly were secured by liens on substantially all of the Company's assets.

10.    As of the Petition Date, the Debtors had approximately $23 million in cash on hand, which the Debtors assert is cash collateral of the Prepetition Secured Parties. DIP Financing Motion ¶ 5.

## III.    Prepetition Transactions

11.    *CARES Act Refund.* The Prepetition Secured Parties may have themselves created the need for the DIP Facility less than a week before the Petition Date. On April 15, 2024, the Debtors received a long-anticipated $49 million CARES Act refund. First Day Decl., ¶ 46. Many of the Debtors' vendors and service providers continued to provide support to the Debtors in reliance on the Debtors' assurances that these funds would generate new liquidity and be available

to fund continued operations.  Despite these assurances, promptly upon receiving the $49 million refund – and less than a week before commencing these Cases – the Debtors were forced to transfer $49 million to the prepetition ABL Lenders, *see id.*, leaving the Debtors with insufficient liquidity to continue to operate outside of chapter 11.  The Debtors may have been able to avoid a DIP Facility altogether, or have had sufficient time necessary to document a binding stalking horse agreement prepetition, if the Prepetition Secured Parties had not required use of the Debtors' CARES Act refund to pay down the Prepetition ABL Facility.

12.     *Incurrence of New 2L Debt & Reserves.*  In September of 2023, the Debtors entered into a $65 million second lien asset-based term loan on a first-in, last-out basis with certain entities affiliated with the Debtors' liquidators, among others.  In the lead up to the bankruptcy filing, the Second Lien DIP Term Administrative Agent imposed a number of reserves (in excess of $35 million), which limited the Company's liquidity.  *See* First Day Decl. ¶¶ 35-38.  The Committee is investigating the propriety of these reserves, especially since they seem to have set the stage for the CARES Act funds being used to repay prepetition funded indebtedness, just days prior to the bankruptcy filing.

13.     *JV IP Agreements.* Almost 18 months ago, the Debtors entered into an agreement with WHP Global, whereby Express contributed certain of its key trademarks (valued at $400 million) to a subsidiary, and WHP Global purchased a majority interest in that subsidiary.  The subsidiary then licensed the intellectual property back to Express pursuant to a licensing agreement, under which Express is obligated to pay tens of millions of dollars in royalties to the subsidiary.  First Day Decl. ¶ 41.  The Committee is investigating the propriety of the underlying transactions, including the licensing agreements.

52348918.2

## IV.        The DIP Financing Motion

14.        Through the DIP Financing Motion, the Debtors are seeking approval of superpriority senior secured financing consisting of (a) a roll up of (i) approximately $136 million in prepetition obligations under the Prepetition ABL Facility, which includes $10 million of incremental availability (the "**First Lien DIP ABL Roll-Up Loans**"), and (ii) approximately $63 million in prepetition obligations under the Prepetition FILO Term Loan Facility (the "**Second Lien DIP Term Roll-Up Loans**", and together with the First Lien DIP ABL Roll-Up Loans, the "**DIP Roll-Up Loans**"), and (b) $25 million in new money term loans (the "**Second Lien New Money DIP Term Loans**", and together with the Second Lien DIP Term Roll-Up Loans, the "**Second Lien DIP Term Loans**", and the Second Lien New Money DIP Term Loans together with the DIP Roll-Up Loans, the "**DIP Loans**").  More specifically, the Debtors seek the following:

- First Lien DIP Facility.  The Debtors seek authority to roll-up approximately $136 million in prepetition obligations under the Prepetition ABL Facility with obligations under the Prepetition ABL Facility converted into First Lien DIP ABL Roll-Up Loans through a creeping roll-up on a dollar per dollar basis. The interest rate on the First Lien DIP Facility will be "Adjusted Term" SOFR + 4.25%.  The First Lien DIP Facility will incur a 1.0% closing fee on all commitments.

- Second Lien DIP Term Facility.  The Debtors seek authority to (a) obtain a single-draw second lien loan of new money in the aggregate principal amount of up to approximately $25 million, and (b) roll-up approximately $63 million in prepetition obligations under the Prepetition FILO Term Loan Facility with $25 million of the Prepetition FILO Term Loan Facility converted into Second Lien DIP Term Roll-Up Loans upon entry of the Interim Order and the remainder converted into Second Lien DIP Term Roll-Up Loans upon entry of the Final Order.  The interest rate on these Second Lien DIP Term Loans is Term SOFR +11.50%.  The Second Lien DIP Term Facility will incur a 3.75% closing fee on the new money term loan commitment.

15.        To the extent that their prepetition claims are not rolled up into DIP Loans, the proposed Final Order would give the Prepetition Secured Parties a generous adequate protection package.  To the extent of the diminution in value of their collateral, the Prepetition Secured Parties

would receive replacement liens on the collateral securing the Prepetition Secured Obligations, section 507(b) claims, and current payment of the Prepetition Secured Parties' reasonable professional fees and expenses.

16.    At the same time, the proposed Final Order effectively ties the Committee's hands as to the path forward for these cases.  Through the proposed order, the Debtors are purporting to waive or release valuable estate claims, including claims related to the use of the CARES Act Refund in the days leading up to the filing.  Finally, the DIP Credit Agreements have numerous hair trigger events of default, which hand control of these cases to the Debtors' liquidators (and their affiliated Second Lien DIP Term Lenders), as failure to comply in any respect with the liquidator agreements is an immediate event of default.

17.    As a result, the proposed Final Order purports to severely restrict the Committee's ability to investigate the Prepetition Secured Parties' liens and claims and the estates' remedies. Among other things, the proposed Final Order:

(a)    improperly waives the estates' right to surcharge the DIP Secured Parties' and Prepetition Secured Parties' collateral under section 506(c) for the necessary costs and expenses of preserving or disposing of the collateral, the Debtors' power to exclude proceeds of the Prepetition Collateral from the secured creditors' liens based on the "equities of the case" under section 552(b), and the Court's ability to require the DIP Secured Parties or the Prepetition Secured Parties to be subject to the equitable doctrine of marshaling (*see* Interim Order ¶¶ 10-12);

(b)    establishes a $50,000 budget for the Committee to investigate the claims and liens of the Prepetition Secured Parties, which include multiple facilities purportedly secured by numerous types of collateral (*see* Interim Order ¶ 24); and

(c)    imposes a deadline of July 8, 2024, (the "**Challenge Period**") to conduct this investigation (Interim Order ¶ 24).

18.    The DIP Financing prejudges the outcome of these cases by unduly skewing the playing field in favor of the secured creditors at the outset.  Despite that, the Committee has tried

to negotiate certain modifications to the proposed DIP Financing with the DIP Lenders, in the hopes that a consensual resolution could be reached and the costs of a contested hearing avoided. To date, no definitive agreement with them has been reached.  While the Committee will continue discussions with the DIP Lenders (and the Debtors) in advance of the hearing on the Motion, the Committee is constrained to file this Objection to preserve its rights in the event that a resolution cannot be reached.  For the reasons set forth in this Objection, the Motion should be denied unless modified as set forth herein.

## **OBJECTION**

19.     Through the DIP Financing Motion, unsecured creditors are asked to subsidize a process designed to deliver value to the DIP Lenders, at an implied cost that is too high to the Debtors and their creditors, including the vendors, service providers and landlords who have supported this business (and are asked to continue to do so at their own risk for the benefit of the secured lenders).  This is inappropriate and should not be approved.  While the Debtors may require postpetition financing in order to effectuate an orderly sale process, or an orderly liquidation to the extent that the sale process is not successful, "having an efficient liquidation process is in [the secured lenders'] interests because it enhances [their] recoveries on [their] collateral."  *See In re Mercon Coffee Corp., LLC*, Case No. 23-11945 (Bankr. S.D.N.Y) (MEW), Dec. 8, 2023 Hr'g Tr. at 30:7-9 [Dkt. No. 73].  As contemplated in the Final Order, the Debtors' secured lenders are asking to be paid handsomely (including fees and roll-up protection) in exchange for the Debtors running a process that inures to the secured lenders' benefit.  This, of course, should not be allowed, especially if there is not clarity that, at minimum, the Debtors are administratively solvent.  *See, e.g.*, *In re Casa Sys. Inc.*, Case No. 24-10695 (Bankr. D. Del.) (KBO), May. 3, 2024 Hr'g Tr. at 36:6-10 [Dkt. No. 290] (refusing to grant waivers over committee objection in case

where sale process was not adequately funded)[5]; *see also In re Mercon Coffee Corp.,* Case No. 23-11945 (Bankr. S.D.N.Y) (MEW), Dec. 8, 2013 Hr'g Tr. at 31:1-6 [Dkt. No. 73] (Judge Wiles rhetorically asking why should he allow a secured creditor to be paid for using chapter 11 to effectuate a process that will maximize recoveries for such secured creditor).

20.    In determining whether to approve postpetition financing, courts consider, among other factors, whether the financing "is in the best interests of the estate and its creditors" and whether the terms of the transaction are "fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *In re Mid-State Raceway, Inc.,* 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005); *see also In re L.A. Dodgers LLC,* 457 B.R. 308, 312 (Bankr. D. Del. 2011) (citing *In re St. Mary Hosp.,* 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988)).  To that end, a court will not approve a proposed financing "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990); *see also In re Aqua Assocs.,* 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor.").  Similarly, courts look with suspicion on financings that "would tilt the conduct of the bankruptcy case" or "prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors." *Ames Dep't Stores,* 115 B.R. at 37.

21.    Here, it has not been established that entry into the DIP Financing is in the best interests of the estates.  The DIP Financing Motion should therefore be denied in its current form, as the proposed Final Order, if approved, would waive important statutory and common law rights of unsecured creditors, including (i) the protections of the "equities of the case" exception of section 552(b) of the Bankruptcy Code, (ii) the right to realize upon the proceeds of avoidance

---

[5] The *Casa Systems* transcript is attached hereto as **Exhibit 1**.  The Committee is willing to provide copies of other cited transcripts and orders upon request.

actions, (iii) the right to invoke the equitable doctrine of marshaling, and (iv) the right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code.  Whatever their merit in other cases (if any), these waivers have no place in the circumstances of these cases where the Prepetition Secured Parties are not, in earnest, lending sufficient new money and are otherwise adequately protected, and where it is unclear whether sufficient funds will exist to cover the administrative expenses of these cases.  *See In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

### I.        The Prospective Waiver of Section 506(c) Rights Should be Eliminated

22.     To ensure that unsecured creditors are not unfairly subsidizing the DIP Lenders' recoveries, parties must be allowed to seek to surcharge expenses pursuant to section 506(c) of the Bankruptcy Code.  Section 506(c) exists to protect unsecured creditors and the estate from being saddled with the costs of running a bankruptcy case solely for the benefit of a debtors' secured creditors – exactly the circumstances the Committee is faced with here, whether the Debtors are moving forward with a going concern bid or a potential liquidation.  These are the precise circumstances in which section 506(c)'s surcharge protections should not be waived.  Section 506(c) of the Bankruptcy Code allows the estate to recover from property securing a claim "the reasonable, necessary costs and expenses of preserving, or disposing of, such property."  11 U.S.C. § 506(c); *see In re McKeesport Steel Castings Co.*, 799 F.2d 91, 93 (3d Cir. 1986); *see also In re Grant Assocs.*, 154 B.R. 836, 842 (S.D.N.Y. 1993) ("Preventing unsecured creditors from collecting for services which benefitted a secured creditor would give the secured creditor a windfall.").  Waiving this provision in advance is unwarranted here, where the Debtors' case strategy is singularly focused on ensuring the secured creditors' collateral is disposed of in a manner blessed (if not controlled) by the secured creditors.

52348918.2

23.     Like the equities-of-the-case exception of section 552(b) discussed below, section 506(c) is "designed to prevent a windfall to the secured creditor." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995); *see also Grant Assocs.*, 154 B.R. at 841.  The provision "shifts to the secured party, who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate." *Precision Steel*, 57 F.3d at 325.

24.     In light of this important policy, several courts have held that section 506(c) waivers are *per se* unenforceable.  *See, e.g.*, *Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.)*, 150 F.3d 868, 872 (8th Cir. 1998) (deeming a section 506(c) waiver "unenforceable"), *vacated on other grounds*, 177 F.3d 719 (8th Cir. 1999); *In re Ridgeline Structure, Inc.*, 154 B.R. 831, 832 (Bankr. D. N.H. 1993) (deeming a section 506(c) waiver "against public policy and unenforceable per se").  Other courts view such waivers skeptically and decline to approve them absent committee consent.  *See, e.g.*, *In re Mortg. Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del.), Mar. 20, 2007 Hr'g Tr. at 21:7-13 [Dkt. No. 346] (the court noting: "If the Committee doesn't agree with the waiver, it doesn't happen."); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del), June 5, 2014, Hr'g Tr. at 212:8-22 [Dkt. No. 3927] (disapproving a waiver "based primarily . . . on the fact that it's not fully consensual"); *In re Casa Sys. Inc.*, Case No. 24-10695 (Bankr. D. Del.) (KBO), May. 3, 2024 Hr'g Tr. at 36:6-10 [Dkt. No. 290] (refusing to grant waiver over committee objection in case where sale process was not adequately funded).

25.     To be clear, the Committee does not consent to the requested waivers, particularly of section 506(c).  The Debtors are running a sale process that will, first and foremost, go to repay

12

their DIP Facilities.  All the while, unsecured creditors continue to provide postpetition services to the Debtors, including as vendors and landlords, with no assurance that they will be paid for doing so.  These same vendors and landlords were promised that the Debtors would have ample funds available via first day relief, including critical and foreign vendor payments and payment of stub rent, and continued doing business with the Debtors prepetition on the basis of funds being available to satisfy these go-forward obligations.  *But the DIP Lenders have limited, by slashing the DIP Budget, the Debtors' ability to spend that which this Court authorized.*  Allowing the Debtors to remain in their stores (and to continue purchasing and liquidating inventory) primarily benefits the DIP Lenders, yet those vendors and landlords may not see a dollar of those sale proceeds, let alone payment on account of their unsecured claims.

26.    To the extent that sale (or, if a sale is not approved, liquidation) proceeds are insufficient to cover the costs of these cases, if section 506(c) has been waived, the estates will have no recourse, no ability to confirm any plan (let alone a liquidating plan) and unsecured creditors will be left holding the (empty) shopping bag.  Meanwhile, the DIP Lenders, particularly the Second Lien DIP Term Lenders, will have benefited twice over: First as DIP Lenders, repaid in full with high fees to boot, and second with certain of their affiliates as the Debtors' liquidators, earning commissions on account of inventory liquidated to repay the DIP Facilities.  A section 506(c) waiver in these cases would enable precisely the windfall that the section exists to preclude. If the Debtors are unable to afford the costs of these cases,[6] they must be able to seek to have the

---

[6] The Committee's concerns on this front might be abated if the Debtors were able to actually use the Administrative Claims Reserve established under the proposed Final Order for presumably this precise reason.  However, as discussed in further detail herein, the Administrative Claims Reserve may be illusory, as the consent of the DIP Lenders is required to release any funds from the Reserve, and the claims and liens of the DIP Lenders attach to the funds in the Reserve.

DIP Lenders pay the bill for the costs of liquidating their collateral to the detriment of all other stakeholders.

## II.       A Prospective Waiver of the "Equities of the Case" Exception is Improper

27.       A section 552(b) waiver is similarly inappropriate in cases such as these, where the sale process is run for the DIP Lenders' benefit on the backs of vendors and landlords who relied upon the Debtors' assurances that they would pay back those same creditors.  Section 552(b) of the Bankruptcy Code provides that a secured creditor's prepetition lien will attach to the postpetition proceeds of its prepetition collateral "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1).  The Interim Order, ¶ 12, and the draft Final Order shared with the Committee limit any section 552(b) waiver to a waiver of the Debtors' rights – and that would be fine, if the Committee did not understand that the DIP Lenders intend to press for a full waiver of *all parties'* rights under section 552(b).  To the extent that the Debtors wish to waive their own right to raise section 552(b), which is all the Committee believes that draft Final Order was intended to and can do, the Committee has no objection; the Committee strenuously objects, however, to any attempt to waive the *other parties' rights* to assert that section 552(b) applies, or the *Court's* ability to apply section 552(b) *sua sponte*, based on the facts and circumstances of these cases.

28.       Unlike many other provisions of the Code, the equities of the case exception is not a power that must be invoked by the debtor (or estate representative), but rather is vested in "the court." *Id.*  It may be permissible for the Debtors to commit that *they* will not ask the Court to invoke the provision.  The Debtors, however, can neither preclude the Court from invoking section 552(b), nor prevent other creditors and parties in interest from advocating for relief pursuant to section 552(b).  *See, e.g., In re Residential Cap., LLC*, Case 12-12020 (MG) (Bankr. S.D.N.Y.

June 25, 2012) [Dkt. No. 491] ¶ 18(c) (waiving the "equities of the case" exception prior to a 363 sale *solely with respect to the Debtors* and not any other party); *In re Endo Int'l plc*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y Oct. 20, 2022) [Dkt. No. 499] ¶ 24 (approving the use of cash collateral provided that: "(a) nothing in this Final Order shall in any way restrict the Court from considering or applying the 'equities of the case' exception under section 552(b) of the Bankruptcy Code *sua sponte*, and (b) either Committee may raise with the Court the Court's consideration of the application of the equities of the case exception under section 552(b) of the Bankruptcy Code," in certain circumstances); *see In Re Rite Aid Corporation*, Case No. 23-18993 (MBK) (Bankr. D.N.J. Dec. 22, 2022)  [Dkt. No. 1159] ¶ 40 (same).

29.     Consistent with the plain terms of the Bankruptcy Code, a number of courts have declined to impose section 552(b) waivers over committee objections.  *See, e.g., In re Linn Energy, LLC*, Case No. 16-60040 (DRJ) (Bankr. S.D. Tex.), July 28, 2016 Hr'g Tr. at 134:19-25 [Dkt. No. 746] (noting that preservation of the official committee's right to seek application of section 552(b) exception "really just conforms with applicable Circuit law anyway"); *In re Gen. Maritime Corp.*, Case No. 11-15285 (MG) (Bankr. S.D.N.Y.), Nov. 18, 2011 Hr'g Tr. at 74:15-24 [Dkt. No. 54] ("[T]he parties cannot limit the Court's power with respect to the doctrine of the equities of the case.  The debtor can agree that it will not assert the equities of the case doctrine under 552(b), but you can't preclude [the Court] from applying it."); *In re Metaldyne Corp.*, Case No. 09-13412 (MG) 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court . . . declines to waive prospectively an argument that other parties in interest may make.").

30.     To be clear, the Committee does not and will not agree that creditors' rights should be waived to ask the Court to apply this or any other Code provision necessary to protect unsecured creditors.  *See In re Casa Systems Inc.*, Case No. 24-10695 (KBO) (Bankr. D. Del.), May 3, 2024,

Hr'g Tr. at 36:6-10 [Dkt. No. 290] ("[I]t starts with Judge Walsh's statement, long, long ago, that he will never approve waivers over a Committee objection, and I don't think we deviate as a collective Court here from that position."). It is not clear whether a plan will be confirmed in these cases and whether that plan will provide any recovery for unsecured creditors, let alone administrative and priority creditors. In the event that there may be postpetition proceeds of prepetition collateral that could be available to compensate unsecured creditors, creditors' rights to argue that those funds should be used to compensate unsecured creditors should not be waived at the outset of these cases.

### III.      The Debtors Cannot Waive Creditors' Marshaling Rights

31.     The Debtors cannot waive the equitable doctrine of marshaling, a creditor right, without creditor consent. The equitable doctrine of marshaling is a creditor right that "rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. U.S.*, 375 U.S. 233, 236 (1963) (citation omitted). The proposed Final Order seeks to waive this right, providing that "in no event shall the DIP Agents, the DIP Lenders or any of the Prepetition Secured Parties be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral." *See* Interim Order ¶ 11. Such waiver is inappropriate here for two separate reasons.

32.     First, the right to marshal belongs to creditors, not debtors – it is an equitable right of a third party enforceable against other third-parties. Thus, the Debtors cannot forcibly waive this right on behalf of the creditors without satisfying the strict standards for grant of a third-party release. *See In re The Colad Grp. Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("While the debtor may seek authority to waive its own rights, it cannot waive the marshaling rights of parties

who have not consented and may not even have received notice of the debtor's motion."). The Debtors have not attempted to make the requisite showing.

33.     Second, even if the Debtors had the theoretical power to waive marshaling in appropriate circumstances, that relief is entirely unwarranted here and would be unduly prejudicial to unsecured creditors.  The Second Lien DIP Term Facility enjoys a borrowing base tied to advance rates on quintessential ABL collateral and a push-down reserve[7] for any borrowing base shortfall.  This reserve reduces the borrowing base (and thus limits future availability) dollar-for-dollar – which then frees up collateral to secure the DIP Loans.  Furthermore, through a "Discretionary Reserve" of $35 million, additional borrowing base is consumed, resulting in *even more* collateral being available to secure the DIP Loans – and less liquidity available for the Debtors to operate – let alone pursue a going concern transaction.

34.     In short, the DIP Lenders should be able to rely on their Prepetition Collateral for payment in full, and should be required to marshal against their existing collateral.  The Committee, however, is not asking that the Debtors forfeit their marshalling waiver entirely, but merely asks that the Debtors and the DIP Lenders agree to what is commonly known as "soft marshalling," whereby the DIP Lenders look last to previously unencumbered collateral.  Only in the event of a shortfall would the DIP Lenders look to previously unencumbered assets, including proceeds of avoidance actions, commercial tort claims, and proceeds of prepetition director and officer insurance policies.  Permitting the DIP Lenders to look *first* to unneeded extra collateral, particularly collateral of the type typically viewed as the province of unsecured creditors, creates a significant risk of a windfall at the expense of unsecured creditors.  Accordingly, the Final Order

---

[7] This reserve ensures otherwise available ABL borrowing base can serve as collateral for the Second Lien DIP Term Facility.

should be revised to require the DIP Lenders and the Prepetition Secured Parties to look first to their Prepetition Collateral and DIP Collateral, excluding previously unencumbered assets, and last to previously unencumbered assets, as has been done recently in other similarly complex cases. *See, e.g., In re Endo International plc*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y. Oct. 20, 2022), [Dkt. No. 499] ¶ 4(b); *In re Genesis Care Pty Ltd*, Case No. 23-90614 (MI) (Bankr S.D. Tex. July 19, 2023), [Dkt. No. 323] ¶ 9; *In Re Rite Aid Corporation*, Case No. 23-18993 (MBK) (Bankr. D.N.J.) [Dkt. No. 1159] ¶ 39.

### IV.    The DIP Documents Unduly Restrict the Debtors' Access to Funds, Rendering the DIP Financing Illusory

35.    In their DIP Financing Motion and supporting declarations, the Debtors cite the incremental (and necessary) liquidity afforded by the DIP Facilities that they claim will allow them to pay the necessary carrying costs of the bankruptcy cases.  The reality of the proposed DIP Facilities, however, is bleaker, as the Initial DIP Budget does not cover the anticipated carrying costs of these cases, and the Debtors are unable to pay expenses not otherwise provided for in the budget (*see* DIP Credit Agreements § 2.14 (prohibiting payment of chapter 11 administrative claims that are inconsistent with the Approved Budget without DIP Lender consent)).  For example, the latest publicly available budget only authorizes the Debtors to pay $3.7 million on account of critical and foreign vendors, almost 90% less than the amount the Debtors have received Court authorization to pay.  *See* Initial DIP Budget, Interim Order Ex. 1.  The Debtors presumably requested Court approval to pay amounts they thought necessary to run these bankruptcy cases, and yet are not permitted to access those funds, calling into question whether the Debtors' stores will have adequate levels of merchandise to continue operating.

36.    As a direct result of their promise to obtain, and presumably use, critical and foreign vendor relief, the Debtors are holding ample inventory that their vendors assumed would be paid

for following the bankruptcy filing.  But it appears that the DIP Lenders have no intention of allowing the Debtors to pay for such goods, even as the DIP Lenders (both in their capacity as DIP Lenders and as the Debtors' liquidators) are liquidating that inventory for their sole benefit. Similarly, the Debtors have continued to operate many of their stores post-petition, but it is unclear if and when the Debtors intend to pay stub rent or will be able to satisfy their post-petition lease obligations as required under section 365(d)(3).  The prospect of landlord motions to compel compliance imposes an otherwise avoidable cost on these estates.  This dynamic might be less troubling if the Committee and parties in interest had some sense of certainty that the Debtors might ultimately be able to confirm a chapter 11 plan.  The DIP Facilities offer hope that this may be the case, through the establishment of the Administrative Claims Reserve, the presumable intent of which is to budget for the costs of these cases.  *See* Interim Order ¶ 4(e).  That glimmer of hope fades, however, upon reviewing the number of restrictions that the DIP Lenders are placing on the Debtors' use of the funds in the Administrative Claims Reserve.  The proposed Final Order would improperly (a) provide the DIP Secured Parties and the Prepetition Secured Parties with liens on funds in the Administrative Claims Reserve, and (b) give the DIP and Prepetition Agents veto power over what administrative expense claims are paid.  This is clearly improper, and the DIP Lenders' claims and liens on those funds should be removed or at a minimum, subject to the requirement to pay any accrued and unpaid administrative expenses.  *See* Apr. 23, 2024 Hr'g Tr. 33:22-34:8 [Dkt. No. 136] ("[I]f someone comes in and asks for immediate payment of an admin claim and I believe it's appropriate then I will order it.").  Otherwise, the Debtors may be forced to reserve for administrative expense claims, depleting available liquidity and incurring fees on any reserved amounts, only for the DIP Lenders to ultimately decline to consent to the Debtors' use of those funds – undercutting any justification for the Debtors' waiver of their rights under

section 506(c).  The DIP Lenders must either be subject to surcharge for the carrying costs of these cases, or consent to the use of funds escrowed to pay those administrative expenses.

## V.    The Budget and Timeframe for a Committee Investigation Are Inadequate, and the Scope is Inappropriate

37.    The proposed Final Order prevents the Committee from conducting a thorough investigation of the Prepetition Secured Parties' claims and liens, or the propriety of the roll-up. Under section 1103(c)(2) of the Bankruptcy Code, the Committee has a statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor" and "any other matter relevant to the case or to the formulation of a plan."  11 U.S.C. § 1103(c)(2).  The proposed Final Order, however, would severely constrain the Committee's ability to fulfill its statutory duties by granting broad releases of virtually all estate claims against the Prepetition Secured Parties, which become binding upon the Committee and all other parties in interest upon the expiration of a short "challenge period."

38.    *First*, the Final Order would limit the Committee to a mere 66-day period from its appointment in which to investigate the Prepetition Secured Parties' liens and claims and file a standing motion.  To permit the Committee to fulfill its statutory and fiduciary duties to unsecured creditors, the Challenge Period should be extended to July 31, 2024.  Given the speed that this case is moving forward and the need to prioritize the focus around a transaction, neither time nor money should be wasted on an accelerated investigation period.

39.    *Second*, the Final Order imposes an obviously inadequate budget of only $50,000 to investigate potential claims against the Prepetition Secured Parties.  The Committee should be granted a $200,000 budget, which would better align the proposed Final Order with provisions in

other cases of similar size and complexity.[8]  Furthermore, a $200,000 budget will also better align the proposed Final Order with the timeline advanced by the Debtors and their secured creditors. *See In re Casa Systems Inc.*, Case No. 24-10695 (KBO) (Bankr. D. Del.), May. 3, 2024, Hr'g Tr. at 35:15-25 [Dkt. No. 290] ("If you want to pursue a case timeline of this nature, then you have to understand that the Committee, rightly, is going to have to get up to speed and spend enormous time looking into every single thing . . . .  They cannot stand-down.  So I have no doubts that the Committee has spent $800,000 already. . . .  So that was your choice, to pursue the timeline that you have pursued in this case and as a result, the Committee now has had no choice but to look at everything.").  The Final Order should also make explicit that nothing provided therein shall limit or otherwise prohibit the Committee's professionals from applying for (and if approved, being entitled to) administrative expenses with respect to work performed in connection with any investigation or challenge.

## VI.    Other Provisions of the Proposed Final Order Are Inappropriate

40.    In addition to the foregoing, certain other provisions of the proposed Final Order are unreasonable and should be removed or modified:

(a)    <u>Events of Default</u>:  The event of default provisions under the DIP Credit Agreements give the DIP Lenders inappropriate control over these cases. Buried in the DIP Credit Agreements are provisions that allow the DIP Lenders to dictate what can be done in these cases – including what relief this Court can fashion and even what motions parties-in-interest may file. First, and perhaps most broadly, the Debtors will default on the DIP

---

[8] *See In re Cano Health, Inc.*, Case No. 24-10164 (KBO) (Bankr. D. Del. Mar. 6, 2024) [Dkt. No. 271] (budget of $300,000); *In re Debt Financing Guarantor, LLC*, Case No. 23-10025 (KBO) (Bankr. D. Del. Feb. 16, 2023) [Dkt. No. 303] (budget of $200,000); *In re DCL Holdings (USA), Inc.*, Case. No. 22-11319 (JKS) (Bankr. D. Del. Feb. 23, 2023) [Dkt. No. 267] (budget of $250,000); *In re The Hertz Corp.*, et al, Case No. 20-11218 (MFW) (Bankr. D. Del, August 25, 2020) [Dkt. No. 1131] (providing no budget limits for investigation and challenge); *In re Phoenix Services TopCo LLC*, Case No. 22-10906 (MFW) (Bankr. D. Del. Nov. 2, 2022) [Dkt. No. 237] (budget of $300,000); *In re Newage, Inc.*, Case No. 22-10819 (LSS) (Bankr. D. Del. Sept. 30, 2022) [Dkt. No. 160] (budget of $200,000); and *In re TPC Group Inc.*, Case No. 22-10493 (CTG) (Bankr. D. Del. Aug. 2, 2022) [Dkt. No. 566] (budget of $200,000); *In re Smurfit-Stone Container Corp.*, No. 09-10235 (BLS), 2012 WL 13346320, at *9 (Bankr. D. Del. Sept. 24, 2012) (providing a $250,000 budget limit for investigations); *In re The Penn Traffic Co.*, No. 09-14038 (PJW), 2015 WL 14036958, at *11 (Bankr. D. Del. Jan. 15, 2015) (providing no budget limits for investigations).

Facilities if any party takes any action that is materially adverse to the DIP Secured Parties. *See* DIP Credit Agreements §§ 6.01(q)(x), 6.01(q)(xiv). Further, the Debtors will default on the DIP Facilities if any court of competent jurisdiction enters an order or grants relief that materially adversely impacts the rights or interests of the DIP Secured Parties. *See* DIP Credit Agreements § 6.01(q)(xviii). Beyond these provisions, the DIP Credit Agreements provide that a default will occur (a) upon the failure of any Loan Party to comply in any material respect with the terms of the Specific Liquidation Agreement or Store Closing Orders (*see* DIP Credit Agreements § 6.01(f)), and (b) upon a continuing breach under any JV IP Transaction Document or Bonobos IP Transaction Document (*see* DIP Credit Agreements § 6.01(n)). These default provisions give the DIP Secured Parties broad control over every aspect of these cases, notwithstanding that the cases are being run for their benefit. Absent their removal, the DIP Secured Parties can declare the DIP Facilities in default, terminating their commitment obligations and demanding repayment of the DIP Obligations, whenever the DIP Secured Parties believe an action has been taken that is adverse to their interests. Providing the DIP Secured Parties this level of case control is inappropriate and therefore the Court should not allow the Debtors to enter into the DIP Credit Agreements in their current form.

(b)     Remedies Period:  The DIP Credit Agreements inappropriately (a) prevent the Debtors from spending in accordance with the Approved Budget, and (b) foreclose the Debtors from having a reasonable amount of time to cure the hair trigger events of default. As to (a), the proposed Final Order prohibits the Debtors from spending any monies after any DIP Agent sends notice of a termination event unless the Debtors, in consultation with the DIP Agents, determine such money is necessary to avoid immediate and irreparable harm. This restriction is inappropriate: If the Debtors have received authority to spend funds, via an Approved Budget, they should be authorized to spend such funds during the remedies period. As to (b) the DIP Credit Agreements provide that the Debtors will default on the DIP Facilities if there is a breach of the many affirmative and negative covenants provided for in the DIP Credit Agreements. While that may be appropriate, what is inappropriate is precluding the Debtors from being able to cure such technical defaults within a reasonable amount of time. Accordingly, the events of default found in sections 6.01(c) and 6.01(p) should be subject to a five (5) business day cure period to allow the Debtors to cure any alleged event of default and maintain access to the DIP Facilities.

(c)     Notice of Reserves:  The Credit Agreements must be revised so that the Committee is afforded notice of material changes to the Debtors' liquidity. Under the Credit Agreements, the DIP Agents can establish any reserve they deem necessary with five (5) business days' notice. *See* DIP Credit Agreements § 2.17. However, no notice will be provided to the Committee prior to an increase in the size of a reserve. This is an issue because an

increase of a reserve can be material: it reduces availability and therefore reduces the Debtors' already limited liquidity. Accordingly, the Committee must be provided with notice prior to the DIP Agent increasing the size of any reserve by more than $1,000,000.

(d)     <u>Credit Bidding</u>: The proposed Final Order requires two clarifications with respect to credit bidding. First, the order should make clear that nothing precludes the Committee from asserting that "cause" exists to limit or foreclose a credit bid under section 363(k). The Court and the parties cannot possibly evaluate the existence of potential "cause" at this early stage of the case, and it is therefore inappropriate to prejudge the issue. Second, should the DIP Lenders successfully credit bid for assets, such credit bid must make clear that to the extent that the Committee successfully challenges liens supporting such a credit bid, the Court must be able to fashion an appropriate remedy.

(e)     <u>Releases</u>: The Court should not allow the Debtors to use the DIP Financing Motion to effectuate overbroad releases. The releases must be clarified to ensure that no related estate claims against non-DIP Lender third parties or the Debtors' directors and officers are released. The Committee is in the midst of conducting a comprehensive investigation into prepetition transactions, including potential estate claims against directors & officers, as well as third parties. Those claims cannot be released for no consideration through the DIP Financing Motion.

(f)     <u>Lien Challenges</u>: The proposed Final Order should be revised to make clear that the Committee's ability to challenge liens cannot be defeated on technical grounds related to the Debtors' corporate form. Lenders have, at times, sought to defeat committee lien challenges by arguing that, due to the debtor being a Delaware limited liability company, the committee cannot sue on the debtor's behalf. In response, Judge Silverstein, for instance, has required proposed DIP orders be modified to ensure that the committee can bring lien challenges free from such technical defenses. *See In Re: Techniplas, LLC*, Case No. 20-11049 (LSS) (Bankr. D. Del), May 8, 2020 Hr'g Tr. 57:13-22 [Dkt. No. 96] ("So, I need for the committee or other parties in interest to have a meaningful opportunity to review and, if appropriate, challenge the extent, validity, priority, *et cetera*, liens and bring all of the claims that are being articulated . . . . As I said, it's been addressed differently in different of my DIP orders. . . . [B]ut that needs to be addressed."). Here, while the lead Debtor, Express Inc., is not a Delaware LLC, many of the Debtor subsidiaries are Delaware LLCs. The Committee's investigation is ongoing, and the Committee has not yet determined which, if any, Debtor entities the Committee may seek to bring estate claims on behalf of. Accordingly, the proposed Final Order must be revised to provide that in no event may the Debtors or the DIP Lenders raise, as a defense in connection with any lien challenge, the alleged inability of creditors to file derivative suits on behalf of limited liability companies

23

under the Delaware Limited Liability Company Act or other state law analogues.

41.     The Committee, as noted above, has provided these and other comments on the proposed Final Order in the form of an issues list to the Debtors and the DIP Lenders, and is hopeful that many of its objections may be resolved in advance of the final hearing.  The Committee reserves its rights to further object or respond to the DIP Financing Motion on any grounds whatsoever, including the right to raise additional arguments at or before the final hearing.


[remainder of page left intentionally blank]

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Court should deny entry of the proposed Final Order unless modified as set forth herein, and grant other relief as necessary and appropriate.

Dated: May 24, 2024
Wilmington, DE

**SAUL EWING LLP**

*/s/ Lucian B. Murley*
Lucian B. Murley (DE Bar No. 4892)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6898
luke.murley@saul.com

-and-

Adam C. Rogoff (admitted *pro hac vice*)
Robert T. Schmidt (admitted *pro hac vice*)
Nathaniel Allard (admitted *pro hac vice*)
Megan M. Wasson (*pro hac vice* forthcoming)
**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-9100
arogoff@kramerlevin.com
rschmidt@kramerlevin.com
nallard@kramerlevin.com
mwasson@kramerlevin.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*