**EXHIBIT 1**

**Casa Systems transcript**

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2
                                     .  Chapter 11
 3   IN RE:                          .  Case No. 24-10695 (KBO)
                                     .
 4   CASA SYSTEMS, INC., et al.,     .  (Jointly Administered)
                                     .
 5                                   .  Courtroom No. 3
                                     .  824 North Market Street
 6             Debtors.              .  Wilmington, Delaware 19801
                                     .
 7                                   .  Friday, May 3, 2024
 8   . . . . . . . . . . . . . . . .  9:30 a.m.

 9                        TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE KAREN B. OWENS
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:        Patrick Venter, Esquire
                             SIDLEY AUSTIN LLP
13                           787 Seventh Avenue
                             New York, New York 10019
14
     For the Committee:      Maris Kandestin, Esquire
15                           MCDERMOTT WILL & EMERY
                             The Brandywine Building
16                           1000 North West Street
                             Suite 1400
17                           Wilmington, Delaware 19801

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:         Kim Ross, ECRO

21   Transcription Company:  Reliable
                             1007 N. Orange Street
22                           Wilmington, Delaware 19801
                             (302)654-8080
23                           Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
</pre>

1  APPEARANCES (CONTINUED):

2  For the Ad Hoc Group:     Kevin Eide, Esquire
                             AKIN GUMP STRAUSS HAUER & FELD LLP
3                            Robert S. Strauss Tower
                             2001 K Street, N.W.
4                            Washington, DC 20006

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2    <u>MOTION</u>:                                              <u>PAGE</u>

3    Agenda
     Item 9: Debtors' Motion for Entry of an Order (I)          4
4            Authorizing Debtors' Limited Use of Cash
5            Collateral, (II) Granting Adequate
             Protection to Secured Lender, (III)
6            Modifying Automatic Stay, and (IV)
             Granting Related Relief [D.I. 40, 4/3/24]
7
             Court's Ruling:                                41
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 9:33 a.m.)

2                THE COURTROOM DEPUTY:  All rise.

3                THE COURT:  Good morning, everyone.  Nice to see

4   you.  Please be seated.

5                We are gathered here today for, I think, the final

6   DIP hearing only in Casa, correct?

7                MR. VENTER:  Correct, Your Honor.  It's the final

8   cash collateral.

9                THE COURT:  Cash collateral, excuse me.

10               MR. VENTER:  Good morning, Your Honor.  Patrick

11  Venter, Sidley Austin, on behalf of the debtors.

12               I will start with a bit of positive news before we

13  got into some of the issues that we have for this morning's

14  hearing.  As parties may have noted, the Lumine Cloud RAN

15  sale did close on Monday.  The escrow amount of $20 million

16  was returned to Skyvera this past Tuesday.

17               At this point the debtors' focus is two pronged.

18  Number one is we want to do everything we can to maximize

19  value with respect to the cable sale.  That process is

20  ongoing.  Number two, we will continue to work to facilitate

21  a settlement among the key case parties, particularly the

22  creditors committee and the prepetition secured parties to

23  get to a smooth plan process that hopefully provides for a

24  significant plan recovery for unsecured creditors.

25               With thanks to Your Honor, the U.S. Trustee, the

1  committee and the cable stalking horse purchaser, among

2  others, we are pleased to note that the cable sale bidding

3  procedures had been agreed and that order was entered

4  yesterday at Docket No. 266.

5       There were some modifications that were made to

6  that order in consultation with the committee.  We did push

7  back certain sale milestones. The overall sale closing

8  timeline remained, which is critical for the debtors given

9  the overall situation in this matter.  We have also filed

10  several revised forms of order certification.  We have seen

11  those entered.  Thank you to the Court for that.

12       The debtors finally have also been engaging with

13  the committee on a series of document requests and to the

14  meeting and conferring with respect to those documents with

15  the second meet and confer scheduled for later this morning.

16       The big issue for today, of course, is the

17  proposed cash collateral order.  As Your Honor can see, there

18  are a number of open issues that remain.  The remaining

19  issues related primarily to four items.  The scope of liens

20  provided under the terms of that order, the length of the

21  case milestones, the committees challenge rights and

22  provisions with respect to legal fees, and waivers under

23  506(c)'s surcharge provision, the 552(b) equities of the case

24  provision and language around marshaling.  There was a

25  revised order filed overnight at Docket 272 which does limit

1  some of these issues, but not all.

2         We regret that we were not able to resolve all

3  these issues today or receive a consensual adjournment.  The

4  creditors committee specifically wanted to move forward today

5  and did not want to adjourn.  That is their right as an

6  objecting party.  So, here we are today.

7         The debtors had proposed to parties that we

8  adjourn this hearing one week to next Friday and use the

9  upcoming days to discuss global settlement inclusive of

10  resolution of the cash collateral issues.  Conversations were

11  continuing last night between the debtors' professionals, the

12  lenders professionals and the committee professionals.  We

13  just did not get there.

14         One major issue, as noted in our reply, has been

15  the allocation for budgeted committee professional fees.  The

16  initial request, as we outlined in our reply, appeared to be

17  north of $7 million for committee professional fees.  That is

18  against the approximate $6 million in liquidating GUC claims

19  as of the petition date based on our schedules and

20  statements.

21         Not to speak for the lenders, and they're

22  represented here, but I think the idea of the allocated fees

23  being that amount created some negative negotiating dynamics.

24  I do want to be fair though because the committee has

25  clarified that that was not the intended amount that they

1   were seeking. I do understand that they are prepared to

2   request a much smaller number at this point, although that

3   discussion is ongoing.

4          The committee and the prepetition lenders have

5   both signaled a willingness to engage in settlement

6   discussions.  We just did not get agreement from the

7   committee to adjourn the hearing.  The debtors view is that

8   this situation is screaming for a settlement.  The Lumine

9   sale ended up being successful in brining in additional

10  proceeds into the estate. That provides a little bit of

11  optionality as far as getting to a settlement and getting a

12  recovery for unsecured creditors that would have been a lot

13  more difficult a few weeks ago.  So, that is certainly

14  positive.

15         Our concern is that the significant professional

16  fee burn that is associated with every day that we are not

17  having settlement discussions and arguments among

18  professionals like these are ultimately hurting recoveries

19  both for the lenders and the unsecured creditors.  The

20  settlement dynamic, from our perspective, is not overly

21  complicated. This is a relatively simple liquidating plan

22  that we put forward and it is our hope that although issues

23  are currently disputed today that the committee and the

24  prepetition lenders are willing to continue engagement in

25  settlement discussions and/or potential mediation to the

1  extent necessary.

2        The debtors remain committed to pushing forward

3  those discussions and having them take place as soon as

4  possible and bring the parties together.  It's incumbent upon

5  us to do so.  Obviously, the situation today is not ideal

6  from the debtors' perspective, but we are hoping that this is

7  a low point and we can move past today's hearing and get to a

8  global resolution.  We will do everything we can to get

9  there.

10        So, we are prepared to address the various

11  objections that the committee raised, but I would suggest it

12  would be more productive for the Court to hear from the

13  committee as well as the ad hoc group and then we can go

14  through any objections that we need to.

15              THE COURT:  Okay.

16              MR. VENTER:  Thank you.

17              THE COURT:  I will hear from the committee.

18              MS. KANDESTIN:  Good morning, Your Honor.  For the

19  record Maris Kandestin of Young -- McDermott Will & Emery on

20  behalf of the official committee of unsecured creditors.    I

21  went a few firms back right there.  In the courtroom with me

22  today is my partner Darren Azman, and also my colleagues Luke

23  Barrett and Dante Pavan.

24        Your Honor, I would like to start by making some

25  observations.  As an initial matter we are not here today to

1  weigh the blame for where we are in terms of the case, the

2  budget, and the financial distress and situation of the

3  company at anyone's feet.  That said, there are some things

4  that have been extremely distressing to the committee and

5  what we view as maybe a concerted effort to minimalize or

6  marginalize the committee's role in these cases.

7          You know, we have significant concerns about the

8  debtors' actions prepetition including some of the

9  prepetition decision making. To put a finer point on it, Your

10 Honor, we have some concerns about how we all find ourselves

11 here today including some of the money that went out of the

12 company in the year prior to filing in the form of insider

13 transfers including, you know, intercompany transfers, but

14 also transfers to directors and officers.  There were more

15 then $32 million of transfers and of that amount

16 approximately $12.8 million went to directors and officers,

17 current and former, in the form of salary, yes, but also some

18 pretty lavish expense reimbursements, severance payments, and

19 retention bonuses that I believe took place in February.

20          We also have some concerns about the facts and

21 circumstances surrounding the exchange agreement where the

22 debtors exchanged their funded debt for no additional

23 liquidity, created a $40 million hole in their cash at the

24 same time, and also allowed the lenders to lien up the

25 remaining -- all of the remaining encumbered assets all

1  within the year prior to filing the cases.

2          We also have some concerns about the events

3  leading to the restructuring support agreement.  It is pretty

4  strict restructuring support agreement that we don't really

5  view as being necessary.  Much of what it is trying to

6  accomplish is typically accomplished in a cash collateral or

7  DIP order.

8          Your Honor, another point of concern for us is the

9  investigation.  We are concerned about the debtors' position

10 that the committee does not need to conduct its own

11 independent investigation into estate causes of action

12 because the independent director is doing so.  That

13 investigation has not yet been completed to my knowledge.

14 They have not agreed to share the full report when it is

15 completed and they have not agreed to share any of the

16 materials reviewed in preparation of the report.  They also

17 have not confirmed whether or not they have looked at what

18 they have gathered from custodians electronic communications.

19 And also, if they did why it's a burden to turn those over to

20 us.

21         So, we are completely in the dark as to whether

22 the releases, the very broad releases in the plan that is

23 scheduled for confirmation in a month, are warranted.  You

24 know, we don't know, but we don't think that it should be a

25 fait accompli that they are just gone.

1       Your Honor, the plan that I just spoke of provides

2  no recovery to general unsecured creditors.  The only class

3  of creditors entitled to vote are the lenders.  So, we find

4  ourselves in a really difficult spot where there are no

5  recoveries and we are working very hard to make sure that our

6  constituents aren't disenfranchised in these cases.  We are

7  facing a lot of opposition to that, which is unfortunately

8  why we find ourselves here today.

9       The debtors mentioned that, you know, there are

10  very little in the way of scheduled liquidated claims in this

11  case and that may be true, but that ignores the fact that

12  there are many unliquidated claims that may have significant

13  value and also that the bar date has not yet passed. Its not

14  going to pass until the 28th, I believe, which is six days

15  before confirmation.

16       So, I don't know that taking a position that we

17  don't have much to do because (A) the debtor is doing their

18  own investigation and we don't need to; and (B) we can just

19  look at the loan documents, that is all the investigation we

20  need to do into the prepetition liens; and then also (C)

21  there aren't that many constituents so, you know, you

22  shouldn't make a big fuss.

23       That brings us to the circumstances, as I

24  mentioned, about the exchange agreement and what they are

25  calling the superpriority credit agreement and, you know, all

1   of the actions that lead to that, which we need to

2   investigate.  We are concerned about all of these assets

3   being liened up so that there are no unencumbered assets to

4   my understanding as of the petition date leaving very little

5   avenue for recovery.  An avenue for recovery are these causes

6   of action, these estate causes of action that the debtors

7   want to release under the plan.

8           You know, the lenders unwillingness to even

9   provide bridge financing, you know, its forcing the debtors

10  to do this private sale transaction which but for the

11  involvement of the committee would have resulted in a $15

12  million purchase price instead of, you know, double that just

13  so that they could fund these cases. So, they are not willing

14  to fund the cases, they are willing to get the benefits of a

15  sale through Chapter 11, but they are not willing to pay the

16  freight.

17          So, I guess what we are here is for two really

18  important, but interrelated reasons.  How to make sure that

19  the committee is best positioned to meet its statutory

20  mandate under the bankruptcy code and to facilitate

21  recoveries to out of the money general unsecured creditors.

22          Now we heard from the debtor about how they think

23  we got here.  I would like to, sort of, level set from the

24  committee's perspective. So, the committee was formed on

25  April 16th, so that is 16 days ago.  McDermott was retained

1   15 days ago and Province was retained exactly two weeks ago.

2   Since that time the committee has had to synthesize and

3   absorb an enormous amount of paper in a really short amount

4   of time including the unusual request to approve a private

5   sale, bid procedures motion, various first day relief, plan

6   and disclosure statement, a restructuring support agreement,

7   a solicitation procedures motion, request for second day

8   relief and the debtors' schedules and statements to name a

9   few.

10          The debtors request to approve cash collateral on

11  a final basis is just one of the things that the committee

12  had to review during this, essentially, two-week timeframe.

13  Yet, at the request of the debtors and lenders, on Sunday,

14  April 21st by noon we sent a comprehensive list of our issues

15  with respect to the cash collateral order.  So, even if I am

16  being generous, we did this just three days after the

17  committee retained counsel and two days after the committee

18  retained FA.

19          The committee did not receive a response to its

20  issues list until Friday, April 26th.  And while the debtors

21  and lenders agreed to grant certain concessions, I would call

22  those things more like low hanging fruit. They weren't the

23  substantive, the true meet of our concerns.  The committee

24  provided responses to those responses on Monday, April 29th

25  along with a markup of the final order to address the, you

1  know, low hanging fruit items, but also to include some

2  compromise language because I think it's important to note

3  that most of the negotiations involved the committee having

4  to bid against itself. We were faced with just, no.  There

5  was no counterproposal, always no.

6          So, continuing to bet against ourselves we put

7  some compromise language in a proposed order.  And as for a

8  call that happened on April 30th, because our objection

9  deadline was the same day.  At this -- sorry, on the morning

10 of the 30th we met and conferred.  We made no progress.

11 There was no agreement on any of the substantive issues and

12 there wasn't even confirmation that the order that eventually

13 would be filed would include any of our edits.

14          So, with that we really had no choice but to file

15 a full objection, including all of the issues.  You know,

16 certain of the issues I know they talk about milestones as

17 being a prominent issue; its really not. I mean the case has

18 progressed since then and that is just -- we included that

19 because that was one of our issues, but we are not pressing

20 all of the issues.  So, that is just a misunderstanding.

21          So, on May 1st after receiving no outreach from

22 the lenders or the debtors about how to resolve this

23 objection we requested another meet and confer and we did so

24 yesterday.  Several times we met with the committee -- sorry,

25 the debtors and the lenders individually and separately to

1   try and bridge the gap. Unfortunately, no forward progress

2   was made with respect to our substantive issues and while

3   ordinarily we would consent to an adjournment in a case where

4   there is only four weeks left and they want to take one of

5   those weeks and push us off we didn't have a lot of hope that

6   it would get us anywhere.  While we are willing and ready to

7   engage in some global settlement negotiations, and we made

8   that clear yesterday, there are certain gating items that

9   need to be addressed that I will talk about in a second.

10          So, Your Honor, our papers describe in great

11  detail what our arguments are, but the issues I want to talk

12  about today fall into, you know, some broader categories.

13  The first one I will call issues impeding the committee's

14  ability to do its job. The first one is the committee

15  investigation budget.  The interim order provides for a

16  $25,000 investigation budget. As I discussed, we have some

17  serious concerns about the circumstances surrounding the

18  prepetition liens and the exchange agreement.  So, obviously,

19  we do not feel that this is market or appropriate.

20          THE COURT:  And in the final order that was filed

21  last it was increased to $75,000 I believe.  What is your

22  current ask?

23          MS. KANDESTIN:  That order was not shared with us

24  prior to filing.  So, we were still in the process of

25  reviewing it.  Our current ask would be 100, again, betting

1 against ourselves.

2            THE COURT:  Sure.

3            MS. KANDESTIN:  The debtors' position that we

4 don't need anymore money is because all we need to do is look

5 at the loan documents is very surface level.  Like that is

6 not a real investigation.  We need to do a thorough

7 investigation to adhere to our fiduciary duties.

8            THE COURT:  I can tell you that there is no debate

9 on that.

10            MS. KANDESTIN:  So, you know, also I was a little

11 shocked by the debtors' position that, you know, we can go

12 ahead and spend more money then what is allowed in the

13 investigation budget, but we do it at our own peril. I don't

14 think that is an appropriate position for debtors to take.

15 Really, its another thing that when I see it looks like they

16 are trying to minimize our role in these cases.  It makes me

17 think of what are those motives, what is behind that.

18            Then, you know, I will point out in the reply the

19 debtors point to a couple of cases citing to $25 and $50,000

20 budgets. One is Ryze Renewables, that case didn't have a

21 committee.  The $25,000 number appeared in the interim order

22 and there was no number in the final order because there was

23 no committee.  And in Town Sports International there was a

24 $50,000 investigation budget, but in that case there was a

25 cash collateral order but then a DIP came in and so the

1  investigation budget for that was basically cursory, its not

2  apples to apples here.

3         Unfortunately, one of the main reasons that we ran

4  into issues with the debtors is the fees allotted to the

5  committee professionals under the budget which is $800,000.

6  Now I think all of us agree that under the final order there

7  is no cap on fees in a pretermination event context. The

8  carveout is not capped and the debtors are required to true

9  up whatever termination event, true up whatever the incurred

10 unpaid fees of all of the estate professionals are.

11         The problem here is that given the amount of work

12 that the committee has already done in the two short weeks

13 it's been involved we have -- and given that we have an

14 $800,000 case budget we are dangerously close, if not over

15 that amount already.  The -- when we asked it to be

16 increased, because our concern is that we are going to spend

17 more and then there is going to be a budget variance default

18 and the lenders are going to call a default and then we are

19 going to end up in Chapter 7.

20         So, there is concern there for the committee.  We

21 asked that the budget be increased to be more reasonable.  We

22 asked that the debtors reallocate some of their fees and

23 expenses; that was a hard no.  And we just could not get

24 anywhere close to reasonable with the lenders on this.  I

25 felt like that was a very easy ask especially in light of the

1  value that the committee has provided in this case so far.

2  But, you know, and while we are happy that our fees will get

3  paid the variance bust is a real concern for us.

4         Then, Your Honor, that brings us to the challenge

5  period.  The lenders attempts -- again, I have not seen the

6  final order. I did not have time to review it. It was not

7  shared with me prior to filing.  The last time I saw it they

8  tried to shorten our challenge period by -- you know, to the

9  point where it was 45 days from our appointment which is

10 wholly unacceptable.  They also are insisting that it end at

11 the confirmation date.

12        They haven't pointed to any case law or statute

13 that says that we have to complete the investigation by the

14 effective date.  There is no reason why a post effective date

15 trustee cannot continue that work.  So, while we may be open

16 to having it be the effective date of the plan, not

17 confirmation, we were very -- we are not in favor of making

18 it any shorter then that.  So, to the extent it is going to

19 be the effective date then I think that that is resolved.

20        Then, you know, that brings us to the adequate

21 protection issues.  This is another big-ticket item for the

22 committee.  You know, the debtors are seeking to grant

23 adequate protection liens and claims in favor of the lenders

24 over all of the unencumbered assets that they didn't lien up

25 10 months ago. So, it is basically avoidance actions and

1  estate causes of actions against directors and officers for

2  prepetition conduct and breach of their fiduciary duties.

3  These are things that are going to be -- that the debtors

4  want to waive under the plan.

5           To lien those up when there has been no additional

6  cash outlay and they received a $40 million prepayment and

7  refused to fund the cases it seems highly unequitable to the

8  committee and this is really the only value where the

9  committee could extract some recoveries for general unsecured

10 creditors.  So, under those circumstances we don't feel that

11 they are appropriate.

12          Then, Your Honor, lastly, I will talk about the

13 waivers, the 506(c) waiver and the 552 waiver.  Now,

14 especially with respect to the equities of the case we have

15 some concerns about the lenders getting a windfall from the

16 upside of the committee brought to the table in terms of the

17 private sale.  You know, I know that the debtor has called

18 this a -- they call them, I think, standard practice

19 features, but maybe there is something terribly wrong with

20 me, but I don't practice law as in like a one size fits all

21 type of mentality.

22          I think that the facts and circumstances of each

23 case need to be evaluated and you just don't put them in

24 there because everybody does it.  It doesn't mean that they

25 are acceptable or appropriate.  And because of this and

1  because the cases are moving so quickly and the committee has

2  been retained for such a short period of time we feel that

3  these waivers should be considered in the context of

4  confirmation, in the confirmation order, not in this order,

5  to give the committee more time to get comfortable with them.

6  We don't feel that there is any prejudice to the lenders if

7  this is deferred for four weeks, but, you know, I will let

8  them speak to that.

9          So, with that, Your Honor, unless you have any

10 questions that would conclude our presentation subject to

11 rebuttal.

12         THE COURT:  I appreciate it. I have no questions.

13 Thank you.

14         Mr. Eide.

15         MR. EIDE:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. EIDE:  Kevin Eide of Akin Gump Strauss Hauer &

18 Feld on behalf of the ad hoc group.

19         Your Honor, thank you for taking the time to

20 consider these issues this morning.  This is not where we

21 wanted to be, but we are here.  As Mr. Venter indicated, the

22 ad hoc group was in favor of adjourning this hearing so that

23 additional discussions could occur both on cash collateral

24 issues as well as, sort of, overall case settlement issues.

25 That offer was rejected by the committee apparently because

1  they have a difference of view as to what constitutes a

2  reasonable fee budget in the context of this case.

3          THE COURT:  Can I just interrupt you?

4          MR. EIDE:  Yes.

5          THE COURT:  We don't need to talk about that issue

6  because we're here and I am on the bench and I am prepared to

7  rule on the issues.  We are going to do that.  And I

8  understand why the committee may want me to rule on these

9  issues in anticipation of a global settlement and I

10  understand why you want me to defer them so they can be

11  considered in the context of a global settlement.

12          MR. EIDE:  Okay.  Understood, Your Honor.

13          THE COURT:  So, I understand the state of play,

14  and I am here, and I am ruling today.

15          MR. ELDE:  Your Honor, I would first like to

16  address what we view as numerous inaccuracies and falsehoods

17  in the committee's objection.  From our perspective there are

18  a number of them.

19          So, first, let's start with the June 2023

20  transaction, this is the exchange transaction that you have

21  been hearing about.  So, first, Your Honor, in the objection

22  the committee seeks to have this Court believe that it was

23  some nefarious transaction implemented solely for the benefit

24  of the lenders and to the detriment of the debtors. This is

25  simply incorrect.

1          What they fail to acknowledge in their objection

2    is all of the context surrounding that exchange transaction.

3    So, over the course of 2022 the debtors performance suffered

4    quite substantially to the point that the company ultimately

5    got a going concern qualification from its auditor in March

6    2023 because they were unable to address their upcoming

7    maturities under the original term loan.

8          Now, they didn't really have an option, you know,

9    to get rid of the original term loan or to somehow refinance

10   it because of the performance the company had suffered so

11   substantially.  What the June 2023 exchange transaction

12   allowed was for the company to resolve the going concern

13   qualification issue by extending the maturity date of the

14   debt through 2027 so they could get around that issue. In

15   fact, the company, you know, felt -- if you look at Mr.

16   Durkin's first day declaration, they company felt that the

17   transaction put them in a position to strengthen their

18   business and pursue, you know, other plans.

19          Now unfortunately, over the course of 2023, the

20   company's performance continued to suffer.  Again, the

21   lenders were there trying to be accommodating and trying to

22   work out issues.  We entered into no less then five

23   amendments to the superpriority credit agreement pursuant to

24   which we waived the liquidity covenant test date, we waived

25   certain events of default relating to the voluntary

1  administration in Australia as well as the failure to pay

2  interest.  You know, we made accommodations to the stub term

3  loans so that the payment date on that would be kicked out to

4  avoid other issues for the company.  And all of these things

5  were helpful to the company.

6          The idea that we somehow harmed the company or the

7  company derived no benefit from this transaction is simply

8  untrue.  If you look at Mr. Durkin's declaration, he even

9  acknowledges that the deleveraging aspect of it, so the $40

10  million paydown was beneficial to the company.  I think it

11  hardly would come as any surprise that lenders dealing with a

12  company that is substantially underperforming and has a going

13  concern qualification might want to reduce the debt and might

14  want some additional security.  Its not nefarious and nothing

15  was improper and the company benefited.

16          THE COURT:  You would agree with me that those

17  aren't facts that have been established, correct?

18          MR. EIDE:  They're not facts that have been

19  established --

20          THE COURT:  Okay.

21          MR. EIDE:  -- but this is our view.  I wanted to

22  correct the record, because a number of what we view as

23  misstatements --

24          THE COURT:  Yeah.

25          MR. EIDE:  -- have been made and I feel it

1   incumbent upon us to at least respond to it.

2           THE COURT:  Okay.

3           MR. EIDE:  I agree that this is argument of

4   counsel and not a witness, and so facts that have been

5   established, but this is our view.  And I think it is

6   established by Mr. Durkin's -- it is addressed in

7   Mr. Durkin's declaration, which was moved into evidence on

8   the first day, without objection, I believe.  So in that

9   sense, there are some facts around it, but, you know ...

10          Now, secondly, Your Honor, in the objection there

11  are a lot of false allegations that the lenders are somehow

12  responsible for orchestrating these Chapter 11 cases and

13  dictating a restructuring timeline; again, this is untrue.

14  These Chapter 11 cases were not the idea of the lenders;

15  rather, the debtors proposed filing these cases to the

16  lenders and asked for our consent to use cash collateral.

17          We provided that consent, Your Honor, but we did

18  not push for the commencement of these cases; in fact, prior

19  to the commencement of these cases, we had discussed with the

20  debtors whether a Chapter 7 filing might make more sense.

21  They wanted to pursue these cases because they saw the

22  benefit in doing so, in the form of protecting their

23  employees and trying to preserve some jobs; they wanted an

24  orderly wind-down for any remaining aspects of the business

25  that were not sold; and they were believers in the sale

1  process.

2          We had some level of skepticism.  We've been

3  plenty surprised by the outcome of the Cloud/RAN sale.  I

4  don't know that that is the work of the Committee; in fact, I

5  highly doubt it.  I don't think they have a substantial role

6  there that, which, you know, they allege and claim, but it

7  was really the work of the debtors and their financial

8  advisors.

9          Now, with respect to the timeline, you know, the

10  lenders did not impose this timeline or these milestones on

11  the debtor, but rather, these -- this is the timeline that

12  the debtors proposed to us for a case when they asked for our

13  consent to use the cash collateral.  We didn't -- we didn't

14  shorten them; this is what was proposed to us.

15          Now, of course, they're important to us and we

16  want them to remain in place because they are key to sort of

17  the economic rationale of the case and whether it makes sense

18  to be here, but we did not -- they didn't come from us; they

19  came from the debtors and we agreed to them.

20          Now, with respect to the RSA, this is another

21  interesting point in the Committee's objection, they falsely

22  assert that it was the lenders who imposed this RSA on the

23  debtors and that it is somehow one-sided in our favor; in

24  fact, before the case was filed, we repeatedly told the

25  debtors, We're really in favor of an RSA and we thought we

1   could handle this more efficiently through a cash collateral

2   order or something to that effect.  And the debtors asked for

3   the RSA because they wanted assurances that we would be there

4   through the process.  We, again, agreed to the debtors'

5   request.  It wasn't something that we pushed, but rather, we

6   agreed to it.

7          Now, there are some other case issues that I would

8   like to address, you know, that are being sort of implicit in

9   the Committee's objection, which is, first, there's this sort

10  of underlying assumption that somehow the lenders had an

11  obligation to provide DIP financing or to subordinate

12  ourselves for the benefit of everyone else and put ourselves

13  in a worse position.  This is just not true.

14          In a case where a company has been declining for a

15  long period of time, there's no obligation to throw, you

16  know, more money at it.  There's also no obligation to put

17  ourselves in a worse position and potentially get zero on our

18  claims, so I just reject that notion on a fundamental level.

19          Now, there are a few other things that we've heard

20  here, you know, like we're not really funding the cases,

21  right.  This, again, I don't think is true.  The debtors

22  proposed a budget to us and what we've agreed to has been

23  what the debtors have asked for.  It provides for, you know,

24  payment of the critical vendors.  It provides for payments of

25  all sorts of things.

1    Now, the Committee would like a higher fee budget.

2  You can debate whether their ask is reasonable; I mean, I

3  think it's at 40 percent of some inflated number, which,

4  actually, if you look at it, exceeds the amount of the

5  general unsecured cash pool, from at, like, a liquidated-

6  claim perspective.  I don't really think that's reasonable in

7  the context of this case and so, you know, we have a problem

8  there.

9    They also claim that we are, you know, benefiting

10 from some windfall from the Cloud/RAN sale.  But, again, we

11 started this case looking at an 11-cent recovery.  A great

12 auction -- we're very happy -- but we're still looking at

13 maybe 20, tops, 30, percent recovery on our claims if

14 everything goes swimmingly with the cable auction, right.

15 And so I don't really see a windfall here, and I also dispute

16 that the Committee played any key role in making the

17 Cloud/RAN auction successful.

18    You know, finally, on the cash collateral order,

19 I'm not going to address each and every point that they

20 raise; I think Mr. Venter is prepared to do that.  You know,

21 with respect to -- I will make a couple of notes.

22    So, first, with respect to the adequate protection

23 collateral, you know, this is a case where we're deeply

24 unsecured.  We already have a lien on substantially all of

25 the assets.  The company is not really in a position to

1  provide us adequate protection.  This is something that we

2  can get to -- you know, we can agree to it as adequate

3  protection.  It's something that's important to us.  It's the

4  only adequate protection available and we have agreed to it

5  in connection with this order, but that doesn't mean we're

6  actually adequately protected here, right; it's just part of

7  what we agreed to and it's what we were able to get.

8           Now, you know, I guess the other thing on the cash

9  collateral order -- and this is not something that I'm

10 pleased to say -- but the lenders are not in a position to

11 consent to the use of cash collateral on terms other than

12 those set forth in the proposed final order.  And, you know,

13 we, therefore, sort of reserve our rights to terminate our

14 consent to use cash collateral in the event that an order on

15 some other terms is entered.  Now, that's not something I say

16 with pleasure or anything, but it is something I feel that I

17 need to say.

18          And with that, you know, I don't have anything

19 further, unless the Court has any questions.

20          THE COURT:  I don't have any questions, thank you.

21          MR. EIDE:  I appreciate it, Your Honor.  Thank

22 you.

23          THE COURT:  Shall we hear from Mr. Venter?

24          MS. KANDESTIN:  Oh.

25          MR. VENTER:  Thank you, Your Honor.

1          Patrick Venter of Sidley Austin on behalf of the

2   debtors.

3          It's clear we have a bit of a food fight on our

4   hands this morning.  I don't think that any of the lawyers,

5   as you noted, are prepared to address some of the factual

6   claims that have been made.  It's probably not a productive

7   use of anyone's time.  I would like to make a few short

8   rebuttals on some of the assertions that were made with

9   respect to the way the debtors are operating in these cases.

10          First off, with respect to discovery requests that

11   were sent to the debtors from the Committee, we did receive

12   Rule 2004 discovery requests containing 67 separate requests

13   on Tuesday.  On Wednesday morning, there was a meet-and-

14   confer with the UCC to discuss our concerns regarding the

15   number and types of requests being made.

16          The Committee asked us to let them know if we

17   opposed the discovery by 10:00 a.m. on Thursday.  We did

18   respond with a letter laying out many types of information

19   that we would provide to them without the need for any motion

20   and they agreed that that motion would not need to be filed

21   on that representation.

22          Not only have we been working with the Committee

23   to provide them with numerous categories of information, but

24   our efforts to meet and confer regarding their informational

25   requests were ongoing.  There is a call scheduled today, I

1  believe, for 11:00 Eastern, so I would disagree with the

2  assertions that we've not been cooperating as part of those

3  discussions.

4          Finally, with respect to the insider payments that

5  were referenced, again, I don't think that any counsel in the

6  room is in the best position to make a determination on any

7  of those things.  I believe the statements that were

8  referenced were with respect to disclosures and the debtors'

9  schedules and statements.  That's obviously going to be part

10 of the claims analysis that's ongoing through the debtors'

11 independent director.  And I know that there have been

12 conversations among financial advisors on the debtors' side

13 and on the Committee's side to help create a joint sense of

14 understanding amongst those issues.

15         We expect that those conversations will continue

16 to provide clarification on some of the issues that were

17 raised.  And we also have committed to keep the Committee in

18 the loop on the status of the claims analysis that's ongoing

19 and we included in the disclosure statement, per their

20 request, information regarding the scope of that ongoing

21 workstream and we intend to work with them in good faith with

22 respect to that issue.

23         Your Honor, I do have a list of all the issues

24 that were raised in the objection in our rebuttal; it is

25 largely a recitation of our reply.  I heard you say that you

1   were prepared to make a determination, so I'm happy to go

2   through and provide the summary, but if Your Honor has

3   already come to grounds on where you're comfortable, then I

4   do want to be mindful of your time and all the parties' time

5   here, as well.

6           THE COURT:  Well, if you think it's helpful, I

7   could make some general observations on the points --

8           MR. VENTER:  Perfect.

9           THE COURT:  -- the large points.  There was a

10  chart that's been attached --

11          MR. VENTER:  Yes.

12          THE COURT:  -- and, quite frankly, I figure the

13  parties were talking past each other, so I didn't look at the

14  chart, okay, because I think we're really here on the big

15  issues that Ms. Kandestin raised.

16          I make no judgment about whether -- if you want me

17  to rule on those, that is fine, but I think if I make some

18  rulings on the large points, perhaps the parties could come

19  to an agreement on the minor points.

20          MR. VENTER:  I think that might be helpful, Your

21  Honor.  I mean, you probably saw there were extremely minor

22  points --

23          THE COURT:  Okay.

24          MR. VENTER:  -- included in there and I would hope

25  that all of the advisors, with a little direction from the

1  Court, will be able to resolve those without any further

2  interjection from Your Honor.

3          THE COURT:  Okay.  It's difficult for me to know

4  if little things are minor, because they can be used

5  defensively in the future and every case is different and

6  sometimes you need to see how a case plays out to understand

7  the importance of even a phrase in a DIP or cash collateral

8  order, and so I am hesitant on saying anything could be

9  inconsequential.

10          MR. VENTER:  Completely understood, Your Honor.

11          I had in mind one provision in there, which I

12  believe is a dispute regarding whether a notice period would

13  be 7 business days or 10 calendar days, and I'm sorry that we

14  even have to be in front of you on something like that.

15          THE COURT:  Well, I actually said, You'll need to

16  explain to me, because I think there must be a difference.

17  And I know there's a difference.  There's at least one

18  scenario in which there will be a difference, I think, but I

19  was going to make you all put it on the record, because I

20  wanted to hear it.  And I thought maybe there's something

21  else I'm missing, that there could be not -- you know,

22  there's more scenarios.

23          MR. VENTER:  I was doing some of that math in my

24  head --

25          THE COURT:  Uh-huh.

1        MR. VENTER:  -- as well, and -- anyways, that's

2   probably all the time we need to spend on that.  Thank you.

3        THE COURT:  You're welcome.

4        MS. KANDESTIN:  Your Honor, we didn't press that

5   point in our responses on our issues list; we let that go.  I

6   don't know why we're talking about it.

7        THE COURT:  Right.

8        MS. KANDESTIN:  You know, and I don't feel the

9   need to respond to any of the subsequent presentations.  I

10  just want to preserve our rights on the final -- the form of

11  final order that was submitted.

12       THE COURT:  Okay.  Well, let me just make some

13  general observations on the large points, and these could be

14  out of order.  I was writing notes as Ms. Kandestin was

15  talking about the issues and I had written down some notes,

16  so, hopefully, I'll capture all of them.

17       With respect to the liens and claims, adequate

18  protection liens and claims on the previously unencumbered

19  assets, I have opined in the future that I disagree that

20  avoidance actions and the like are solely for general

21  unsecured creditors.  I think the Code provides that they're

22  for the benefit of the estate and that secured lenders can,

23  and in fact, do share in those recoveries.  I think the case

24  law addresses whether a debtor, meaning equity, can share in

25  the benefit of avoidance actions, and I think this has been

1  extrapolated and extended to the concept that it could only

2  be general unsecured creditors that can share and I think the

3  overwhelming amount of case law indicates that that's just

4  not the case.

5          And so I don't have a problem in cases such as

6  this where the lenders have no other collateral to look to

7  for adequate protection from seeking adequate protection

8  liens and claims on avoidance actions and commercial tort

9  claims.

10         There was a footnote that the Committee put in

11  their objection regarding some alternatives if I were to

12  allow the lenders to have adequate protection claims and

13  liens.  And I will admit I haven't studied all the points;

14  there were multiple points in that.  I will say that I am

15  concerned in a case of this nature that the liens and the

16  claims would extend to actions against the lenders themselves

17  in the proceeds, and so I think in a case of this nature, it

18  would be appropriate to carve that out.  And I've seen other

19  cases where that has been offered to the Committee and the

20  Committee has accepted that, and I think that that would be

21  appropriate here.

22         With respect to the fees, my general view is that

23  I can tell you that they're probably too low, but I can't

24  give you an amount.  I don't even know where the parties are.

25  It seems like we're now 75 -- on the investigation budget,

1  it's 75 versus 100; quite frankly, 125 is what I normally

2  see, so hundred is low in my opinion, so that needs to be

3  discussed.

4         I don't know where you are on the fees.  I don't

5  know what the spectrum is, so the parties are going to need

6  to talk about the fees.  It should come as no surprise that

7  the Committee is forced to spend a lot of time and energy and

8  spend fees and costs because of the aggressive timeline and

9  the aggressiveness of this case.  And so the idea that the

10 Committee could choose to stand-down is just unreasonable

11 because they can't even make a determination of whether they

12 can stand-down, because they were faced on the moment of

13 their appointment with considering not only a private sale,

14 but also bid procedures and then a plan.

15        If you want to pursue a case timeline of this

16 nature, then you have to understand that the Committee,

17 rightly, is going to have to get up to speed and spend

18 enormous time looking into every single thing, because every

19 single has been presented to them at the exact same time.

20 They cannot stand-down.  So I have no doubts that the

21 Committee has spent $800,000 already.  I wouldn't be

22 surprised.

23        So that was your choice, to pursue the timeline

24 that that you have pursued in this case and as a result, the

25 Committee now has had no choice but to look at everything.

1  They probably couldn't even make a determination as to

2  whether it was reasonable to even stand-down on something to

3  look at, because there was no time to even make that

4  decision.  So you should talk about a reasonable fee budget

5  in light of that circumstance.

6          With respect to the waivers, there, I don't

7  believe, has been a case -- and it starts with Judge Walsh's

8  statement, long, long ago, that he will never approve waivers

9  over a Committee objection, and I don't think we deviate as a

10  collective Court here from that position.

11          Also, I'm loathe to grant waivers in a case of

12  this nature where an adequate sale process was not funded and

13  that's just the reality of it.  It was a 21-day private sale.

14  There was interest.  It produced 100 percent more than what

15  the original value was, and query how much more could have

16  been granted to this estate if it wasn't a 21-day sale case.

17          And I understand that the lenders, and I agreed

18  with the lenders, that they are not required to fund the

19  case; it is their choice, but there are consequences to that

20  choice.  And you did not -- there is not adequate funding in

21  this case to have allowed for a proper sales process, so I'm

22  not inclined under the facts and circumstances to grant

23  waivers in this case.

24          With respect to the challenge period, I'm not

25  inclined to shorten the time period under the Local Rules.

1  That is the Committee's choice if they want to agree to it,

2  and they don't agree to it, so I'm not going to force a

3  shortened challenge period on the Committee.

4          I think that's all of the major issues.  I

5  understand that this delevers or changes the leverage of the

6  negotiations, and it is what it is, and we're here under the

7  facts and circumstances that have been presented to me.  And

8  I guess I will leave you to talk amongst yourselves about

9  where this case stands.

10          Because I understand, Mr. Eide, your client's

11  position, and I get it in every single case, and I do take it

12  seriously and I understand that it may be true that your

13  clients don't want to go forward anymore.  And I'm willing to

14  hear and talk to your clients about that, but these are my

15  decisions.

16          And I'll wait to hear from the parties on where

17  things stand, I think, is really where I need to leave you.

18  I am in the office today until 1 o'clock, then I am leaving

19  to go out of town.  So I will look to you all to let me know

20  what you need from me after these preliminary observations.

21          MR. VENTER:  Thank you, Your Honor.

22          I may request a short recess for the parties to be

23  able to confer --

24          THE COURT:  Okay.

25          MR. VENTER:  -- 30 minutes, please.

1          THE COURT:  Well, you're all here, so it makes

2   sense.  I'm not leaving.  It probably makes sense for

3   everybody to talk, if you can, and to let me know where

4   things stand while you're all gathered today, but I'll defer

5   to you.

6          MR. VENTER:  We'll plan on a 30-minute recess --

7          THE COURT:  Okay.

8          MR. VENTER:  -- but we will try to get to you in

9   advance to the extent that we need more time and not do it at

10  the very last second, as we often do in these situations.

11         THE COURT:  Yeah, I really don't care.  I'd rather

12  you all come to a resolution and I'll stay until the time,

13  but I do have, like I said, until 1 o'clock.

14         All right.  Let's adjourn and we'll check in on

15  you in 30 minutes.  Just have somebody come in and tell us

16  where things stand, and then when you're ready to come back

17  on, whatever time it is, just -- I'll be prepared.

18         MR. VENTER:  Thank you.

19         THE COURT:  Okay.  Thank you all very much.

20         We'll stand adjourned.

21      (Recess taken at 10:22 a.m.)

22      (Proceedings resumed at 12:31 p.m.)

23         THE CLERK:  All rise.

24         THE COURT:  Welcome back.  Please be seated.

25         All right.  Where do things stand?

1          MR. VENTER:  Good afternoon, Your Honor.

2          Patrick Venter, Sidley Austin, on behalf of the

3  debtors, for the record.

4          We do not yet have lender feedback.  We understand

5  that there's an ongoing conversation, which is active.

6  Understanding the restrictions on the Court's time this

7  afternoon, I think we'll need to adjourn this cash collateral

8  hearing.

9          THE COURT:  Okay.

10          MR. VENTER:  We do have a date set for next

11  Friday.  The debtors' proposal, which I understand that the

12  lenders support, would be to adjourn this hearing to next

13  Friday.

14          THE COURT:  Uh-huh.

15          MR. VENTER:  I believe Your Honor's rulings

16  earlier are helpful in allowing parties to analyze where they

17  sit with respect to settlement discussions.  We would like to

18  use the time over the course of next week to engage in those

19  conversations, come back on Friday.  We'll have the benefit

20  of a few days of settlement discussions and your rulings,

21  with respect to cash collateral, will continue to apply.

22          I understand that the Committee may object to

23  that, but that's the debtors' position.  I understand that

24  the lenders are supportive of that, as well.

25          THE COURT:  Okay.  Well, I'm happy to hear from

1  Committee counsel.

2          MS. KANDESTIN:  Thank you, Your Honor.

3          Again, Maris Kandestin of McDermott Will & Emery,

4  on behalf of the Committee.

5          Your Honor, there's a reason we declined to

6  adjourn the hearing from today to next Friday.  We do not

7  agree that the original proposal was, yes, let's adjourn it

8  and work on these settlement terms.  There was a deal that we

9  proposed yesterday, which was outright rejected.

10          So, we would like to see if the Court has any

11  availability Monday for at least a status conference to see

12  where we are.  I understand that the term lenders are having

13  a call right now, but that it's not going to be completed

14  before Your Honor has to leave for the day.  So if the Court

15  has availability Monday, that's obviously preferable to us,

16  for the same reasons why we declined the adjournment in the

17  first place.

18          THE COURT:  Okay.  Let me just ask, what do you

19  hope to achieve by having a status conference on Monday,

20  given that we're not going to re-argue.  Just to be clear, on

21  Friday -- if it was adjourned until next Friday, we're not

22  rearguing things that I already ruled on.  So what would you

23  hope to have achieved by holding a status conference on

24  Monday?

25          MS. KANDESTIN:  I don't have a lot of hope that

1   the lenders will move in any reasonable or sufficient way and

2   I don't want to drag this out until next Friday.

3            THE COURT:  So just reading between the lines, you

4   just want conversion to happen sooner, rather than later, if

5   they're not going to agree --

6            MS. KANDESTIN:  I would like --

7            THE COURT:  -- to put a blunt point on it?

8            MS. KANDESTIN:  I would like them to have to

9   explain to Your Honor why they haven't come back to us by

10  Monday, if that's the case.  If it's not the case, then I

11  think that, you know, we don't need the status conference.

12  If it is the case, I think they need to explain why they're

13  not accepting your rulings, which I heard them say are

14  suggestions.

15           THE COURT:  Let me be clear that I'm laughing

16  right now, because if the lenders are listening, they're not

17  suggestions; they're my rulings, and they're unhappy with

18  them, but they're my rulings.  And so I expect to see a final

19  order with my rulings in them, unless there's an agreement to

20  the contrary, because it's reached as a result of a

21  settlement.  I want to be abundantly clear that this is not a

22  negotiation with the Court.

23           So I'm going to see a final order with my rulings

24  in them or I'm going to see a settlement or I'm going to see

25  a conversion, or perhaps another option that I haven't been

1  able to think of.  So I don't know when I'm going to see

2  those.

3          Let's do this, though, I think that there -- is

4  there any harm by continuing to operate under the current

5  interim order until a hearing next Friday?

6          MS. KANDESTIN:  No, other than the variance issue

7  that I discussed.  We're not spending less money than we

8  were --

9          THE COURT:  Uh-huh.

10         MS. KANDESTIN:  -- and we've already exceeded our

11 allowance for the entire case.

12         I don't know exactly how that plays out in terms

13 of how much we spend, if that's going to trip that, but we

14 certainly don't want to give the lenders another reason or

15 opportunity to extract additional value or call a default.

16         THE COURT:  Okay.  I understand.

17         Okay.  Well, I have time on Monday morning --

18 excuse me -- Monday afternoon and I can hear you, virtually,

19 at 1:00 p.m. on the 6th --

20         MS. KANDESTIN:  Thank you, Your Honor.

21         THE COURT:  -- for a status conference.  And at

22 that point, you all can tell me where things stand.

23         MS. KANDESTIN:  Thank you.

24         THE COURT:  But in terms of what I see needs to

25 happen is the directing of a final order that incorporates my

1   comments and then anything else that the parties agree to.

2          And I understand that there may be settlement

3   discussions happening, but I expect a team to be working on

4   that order, so I'll see what happens, or draft an order for

5   conversion, all right.

6          MS. KANDESTIN:  Thank you, Your Honor.

7          THE COURT:  I don't say it lightly, but I

8   understand that may be the options that we're looking at.

9          All right.  We'll stand adjourned and I will see

10  you at 1 o'clock, virtually, on Monday.  Thank you.

11         MR. EIDE:  Thank you.

12         MR. VENTER:  Thank you.

13         MS. KANDESTIN:  Thank you.

14      (Proceedings concluded at 12:37 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                May 3, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                May 3, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25