## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EXPRESS, INC., *et al.*,[1] | ) Case No. 24-10831 (KBO) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF SELECTION OF STALKING HORSE BIDDER

**PLEASE TAKE NOTICE** that on April 22, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief,* [Docket No. 41] (the "Bidding Procedures Motion").[2] The proposed bidding procedures (the "Proposed Bidding Procedures") were attached as Exhibit 1 to the Bidding Procedures Motion.

**PLEASE TAKE NOTICE** that on April 24, 2024, the Court entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2] Capitalized terms used herein but not otherwise defined shall have meanings ascribed to them in the Bidding Procedures Motion, the proposed Bidding Procedures, or the Interim DIP Order, as applicable.

*Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [Docket No. 85] (the "<u>Interim DIP Order</u>").  The Interim DIP Order sets forth certain milestones related to the sale of all or substantially all of the Debtors' assets, or, in the alternative, the orderly liquidation of the Debtors' inventory and an exit from their retail store locations ("<u>DIP Milestones</u>"), including that the Debtors must sign a going-concern stalking horse asset purchase agreement (a "<u>Stalking Horse APA</u>") in accordance with the Interim DIP Order or DIP Credit Agreements by no later than May 22, 2024.

**PLEASE TAKE FURTHER NOTICE** that on May 22, 2024, pursuant to and in accordance with the Proposed Bidding Procedures, the Interim DIP Order, and DIP Credit Agreements, and the DIP Milestones thereunder, the Debtors, specifically, Express Inc. and certain of its subsidiaries, have executed an asset purchase agreement (the "<u>Stalking Horse APA</u>") with Phoenix Retail, LLC (the "<u>JV Purchaser</u>"), a consortium to consist of PHXWHP, LLC, an affiliate of EXPWHP, LLC and affiliates of certain of the Debtors' landlords, specifically, SPG Fashion Retail, LLC and BPR Acquisitions LLC, and have selected the JV Purchaser to act as the Stalking Horse Bidder for the Debtors' business operations (as part of the Acquired Assets and Assumed Liabilities under the Stalking Horse APA (each as defined in the Stalking Horse APA)).

**PLEASE TAKE FURTHER NOTICE** that the Stalking Horse APA is attached hereto as **<u>Exhibit A</u>** and a form of sale order to approve the Stalking Horse APA (the "<u>Form of Sale Order</u>") is attached hereto as **<u>Exhibit B</u>**.

**PLEASE TAKE FURTHER NOTICE** that the proposed Purchase Price shall include consideration in an amount calculated according to Section 2.1 of the Stalking Horse APA.

**PLEASE TAKE FURTHER NOTICE** that the Stalking Horse APA provides for, among other things, (a) a Break-Up fee equal to 3% of the Acquired Merchandise Amount (as defined in the APA) and (b) an Expense Reimbursement provision for reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the JV Purchaser and the WHP Global Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of the Stalking Horse APA, up to the amount of 3% of the Acquired Merchandise Amount (the "Bid Protections").[3]

**PLEASE TAKE FURTHER NOTICE** that the Debtors and the Stalking Horse Bidder reserve all of their rights to amend, modify, change, revise or otherwise alter in any respect the Stalking Horse APA and the Sale Order in accordance with the terms of the Stalking Horse APA and the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/express/.  You may also obtain copies of any filed documents by visiting the Court's website at https://courts.delaware.gov/chancery/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank.]*

---

[3]   The Debtors intend to seek approval of their ability to provide the Bid Protections through the proposed Bidding Procedures Order, which is currently set for hearing on May 31, 2024 at 1:00 p.m. E.T.

Dated: May 24, 2024 Wilmington,
Delaware

/s/ Michael W. Yurkewicz

| | |
|---|---|
| **KLEHR HARRISON HARVEY BRANZBURG LLP** | **KIRKLAND & ELLIS LLP** |
| Domenic E. Pacitti (DE Bar No. 3989) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Michael W. Yurkewicz (DE Bar No. 4165) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Alyssa M. Radovanovich (DE Bar No. 7101) | Emily E. Geier, P.C. (admitted *pro hac vice*) |
| 919 North Market Street, Suite 1000 | Nicholas M. Adzima (admitted *pro hac vice*) |
| Wilmington, Delaware 19801 | 601 Lexington Avenue |
| Telephone:     (302) 426-1189 | New York, New York 10022 |
| Facsimile:     (302) 426-9193 | Telephone:     (212) 446-4800 |
| Email:     dpacitti@klehr.com | Facsimile:     (212) 446-4900 |
|                 myurkewicz@klehr.com | Email:     joshua.sussberg@kirkland.com |
|                 aradvanovich@klehr.com |                 emily.geier@kirkland.com |
| |                 nicholas.adzima@kirkland.com |
| -and- | |
| | -and- |
| Morton R. Branzburg (*pro hac vice* pending) | |
| 1835 Market Street, Suite 1400 | Charles B. Sterrett (admitted *pro hac vice*) |
| Philadelphia, Pennsylvania 19103 | 333 West Wolf Point Plaza |
| Telephone:     (215) 569-3007 | Chicago, Illinois 60654 |
| Facsimile:     (215) 568-6603 | Telephone:     (312) 862-2000 |
| Email:     mbranzburg@klehr.com | Facsimile:     (312) 862-2200 |
| | Email:     charles.sterrett@kirkland.com |
| *Proposed Co-Counsel for the Debtors and Debtors in Possession* | *Proposed Co-Counsel for the Debtors and Debtors in Possession* |

**<u>Exhibit A</u>**

**Stalking Horse APA**

**<u>EXECUTION VERSION</u>**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MAY 22, 2024**

**BY AND AMONG**

**PHOENIX RETAIL, LLC,**

**AS THE JV PURCHASER,**

**EXPWHP, LLC,**

**AS THE WHP GLOBAL PURCHASER,**

**AND**

**EXPRESS, INC.**

**AND**

**ITS SUBSIDIARIES NAMED HEREIN**

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** .................................................................................................. 2
**Section 1.1** Purchase and Sale of the Acquired Business Assets ................................ 2
**Section 1.2** Purchase and Sale of the Acquired IP Assets ..................................... 5
**Section 1.3** Excluded Assets ........................................................................... 7
**Section 1.4** Assumption of Certain Business Liabilities ..................................... 8
**Section 1.5** Assumption of Certain IP Liabilities ............................................. 9
**Section 1.6** Excluded Liabilities ................................................................... 10
**Section 1.7** Assumption/Rejection of Certain Contracts and Leases and Designation Rights; Non-Assignment ............................................................. 10

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ............................................. 13
**Section 2.1** Consideration; Payment ........................................................... 13
**Section 2.2** Deposit .................................................................................... 14
**Section 2.3** Closing ................................................................................... 15
**Section 2.4** Closing Deliveries by Sellers ..................................................... 15
**Section 2.5** Closing Deliveries by the JV Purchaser ....................................... 16
**Section 2.6** Closing Deliveries by the WHP Global Purchaser .......................... 17
**Section 2.7** Withholding ............................................................................ 17
**Section 2.8** Purchase Price Adjustment ...................................................... 17

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ....................... 22
**Section 3.1** Organization and Qualification .................................................. 22
**Section 3.2** Authorization of Agreement ...................................................... 22
**Section 3.3** Conflicts; Consents ................................................................. 23
**Section 3.4** Title to Properties ................................................................... 23
**Section 3.5** Insurance ............................................................................... 24
**Section 3.6** Contracts ............................................................................... 24
**Section 3.7** No Litigation .......................................................................... 26
**Section 3.8** Permits; Compliance with Laws ................................................. 26
**Section 3.9** Environmental Matters ............................................................ 26
**Section 3.10** Intellectual Property; Data Privacy ........................................... 27
**Section 3.11** Tax Matters .......................................................................... 29
**Section 3.12** Benefit Plans ........................................................................ 30
**Section 3.13** Employees ............................................................................ 31
**Section 3.14** Affiliate Transactions ............................................................ 32
**Section 3.15** Brokers ................................................................................ 32
**Section 3.16** Material Suppliers ................................................................. 32
**Section 3.17** Title to Assets; Sufficiency of Assets ........................................ 32
**Section 3.18** Financial Statements ............................................................. 33
**Section 3.19** Absence of Certain Changes .................................................... 34
**Section 3.20** Merchandise ......................................................................... 34
**Section 3.21** Pricing Files ......................................................................... 34

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................. 34
**Section 4.1** Organization and Qualification .................................................. 34

i

# TABLE OF CONTENTS

**Page**

**Section 4.2**   Authorization of Agreement ........................................................34
**Section 4.3**   Conflicts; Consents ...................................................................35
**Section 4.4**   Financial Capability ..................................................................35
**Section 4.5**   Brokers .......................................................................................36
**Section 4.6**   No Litigation .............................................................................36
**Section 4.7**   Investment Representation; Investigation ..................................36
**Section 4.8**   [Reserved] ..................................................................................37
**Section 4.9**   No Foreign Person .....................................................................37
**Section 4.10**  Solvency .....................................................................................37
**Section 4.11**  HSR Act .....................................................................................37
**Section 4.12**  No Additional Representations or Warranties ...........................37
**Section 4.13**  No Outside Reliance ..................................................................37

**ARTICLE V BANKRUPTCY COURT MATTERS** .............................................................**38**
**Section 5.1**   Bankruptcy Actions ...................................................................38
**Section 5.2**   Cure Costs .................................................................................40
**Section 5.3**   Sale Order ..................................................................................40
**Section 5.4**   Approval .....................................................................................41
**Section 5.5**   Notices and Consents ................................................................41

**ARTICLE VI COVENANTS AND AGREEMENTS** ..........................................................**41**
**Section 6.1**   Conduct of Business of Sellers ..................................................41
**Section 6.2**   Access to Information ................................................................45
**Section 6.3**   Personal Data Matters ...............................................................46
**Section 6.4**   Employee Matters ......................................................................47
**Section 6.5**   Reasonable Efforts; Cooperation ..............................................49
**Section 6.6**   Further Assurances ....................................................................50
**Section 6.7**   Insurance Matters ......................................................................50
**Section 6.8**   Misallocated Assets; Wrong Pockets ........................................50
**Section 6.9**   Payments; Purchased Receivables; Certain Rent Matters .........51
**Section 6.10**  Seller Support Obligations ........................................................51
**Section 6.11**  Use of Seller Transferred Trademarks After Closing .................52
**Section 6.12**  Financing Matters ......................................................................53
**Section 6.13**  Transition Services Agreement ..................................................54
**Section 6.14**  Gift Certificates; Loyalty Programs ..........................................55
**Section 6.15**  Schedules and Exhibits ..............................................................55
**Section 6.16**  Acknowledgment by Purchaser ..................................................55

**ARTICLE VII CONDITIONS TO CLOSING** ...................................................................**56**
**Section 7.1**   Conditions Precedent to the Obligations of each Purchaser and Sellers .............56
**Section 7.2**   Conditions Precedent to the Obligations of each Purchaser ......56
**Section 7.3**   Conditions Precedent to the Obligations of Sellers ..................57
**Section 7.4**   Waiver of Conditions .................................................................58

**ARTICLE VIII TERMINATION** ....................................................................................**58**
**Section 8.1**   Termination of Agreement .........................................................58

# TABLE OF CONTENTS

Page

**Section 8.2**   Notice of Termination..................................................................60
**Section 8.3**   Effect of Termination..................................................................60

**ARTICLE IX TAXES**.................................................................................**61**
**Section 9.1**   Transfer Taxes.........................................................................61
**Section 9.2**   Allocation of Purchase Price....................................................61
**Section 9.3**   Cooperation.............................................................................62
**Section 9.4**   Preparation of Tax Returns and Payment of Taxes.................62
**Section 9.5**   Certain Acquired Entity Tax Matters.......................................63
**Section 9.6**   Straddle Period........................................................................63

**ARTICLE X MISCELLANEOUS**.............................................................**64**
**Section 10.1**   Non-Survival of Representations and Warranties and Certain Covenants.....64
**Section 10.2**   Expenses................................................................................64
**Section 10.3**   Notices...................................................................................64
**Section 10.4**   Binding Effect; Assignment....................................................65
**Section 10.5**   Amendment and Waiver..........................................................66
**Section 10.6**   Third-Party Beneficiaries.......................................................66
**Section 10.7**   Non-Recourse.........................................................................66
**Section 10.8**   Severability............................................................................66
**Section 10.9**   Construction...........................................................................67
**Section 10.10**  Schedules...............................................................................67
**Section 10.11**  Complete Agreement..............................................................67
**Section 10.12**  Specific Performance..............................................................67
**Section 10.13**  Jurisdiction and Exclusive Venue...........................................68
**Section 10.14**  Governing Law; Waiver of Jury Trial.....................................68
**Section 10.15**  No Right of Set-Off................................................................69
**Section 10.16**  Counterparts and PDF............................................................69
**Section 10.17**  Publicity.................................................................................69
**Section 10.18**  Bulk Sales Laws....................................................................69
**Section 10.19**  Sellers' Representative............................................................70
**Section 10.20**  Purchaser Obligations.............................................................70

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**......**70**
**Section 11.1**   Certain Definitions.................................................................70
**Section 11.2**   Index of Defined Terms..........................................................80
**Section 11.3**   Rules of Interpretation............................................................82

## INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT B   FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT
EXHIBIT C   FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE
EXHIBIT D   FORM OF ACQUIRED MERCHANDISE AMOUNT CALCULATION
EXHIBIT E   [RESERVED]

iii

**TABLE OF CONTENTS**

**Page**

EXHIBIT F    TRANSITION SERVICES AGREEMENT TERM SHEET
EXHIBIT G    SAMPLE COGS CALCULATION

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of May 22, 2024, is made by and among PHOENIX Retail, LLC, a Delaware limited liability corporation (subject to Section 10.4(b), the "JV Purchaser"), EXPWHP, LLC, a Delaware limited liability corporation (subject to Section 10.4(b), "WHP Global Purchaser"), and Express Inc., a Delaware corporation (as in existence on the date hereof, as a debtor-in-possession, and as a reorganized debtor, as applicable, "Express") and the Subsidiaries of Express that are indicated on the signature pages attached to this Agreement (together with Express, each a "Seller" and collectively, "Sellers"). The JV Purchaser, the WHP Global Purchaser and Sellers are referred to in this Agreement individually as a "Party" and collectively, as the "Parties."

WHEREAS, on April 22, 2024 (the "Petition Date"), Sellers, together with other of Sellers' Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 24-10831 (KBO) (Bankr. D. Del.) (collectively, the "Bankruptcy Cases");

WHEREAS, following consultation with their financial advisors and consideration of available alternatives and in light of their current circumstances, Sellers have determined that a sale of certain of Sellers' Intellectual Property and other assets as provided in this Agreement is necessary to preserve and maximize value, and is in the best interest of Sellers, their creditors, and other stakeholders;

WHEREAS, the JV Purchaser desires to purchase the Acquired Business Assets and assume the Assumed Business Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to the JV Purchaser the Acquired Business Assets together with the Assumed Business Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order;

WHEREAS, the WHP Global Purchaser desires to purchase the Acquired IP Assets and assume the Assumed IP Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to the WHP Global Purchaser the Acquired IP Assets together with the Assumed IP Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order; and

WHEREAS, the Parties desire to consummate the proposed transactions set forth in this Agreement as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth in this Agreement, and intending to be legally bound, the Parties agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 1.1** **Purchase and Sale of the Acquired Business Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to the JV Purchaser, and the JV Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Business Assets, free and clear of all Encumbrances other than Permitted Post-Closing Encumbrances.  "Acquired Business Assets" means all of Sellers' right, title and interest as of the Closing in and to all of the properties, rights, interests and other tangible and intangible assets of Sellers used in, held for use in, or relating to the Business (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any such properties, rights, interests, and other assets acquired by any Seller after the date of this Agreement and prior to the Closing, but excluding in all cases the Excluded Assets and the Acquired IP Assets.  Without limiting the generality of the foregoing, the Acquired Business Assets shall include the following:

(a)      (i) each Contract to which any Seller is a party listed on Schedule 1.1(a)(i) (collectively, the "Initial Assumed Contracts") and all Designated Contracts and (ii) all Leases to which any Seller or any of its Affiliates is a party listed on Schedule 1.1(a)(ii) (collectively, the "Initial Assumed Leases") and all Designated Leases (collectively in this clause (ii), the "Acquired Leases") (the real property governed by such leases, the "Acquired Leased Real Property") (clauses (i) and (ii), collectively, the "Assigned Business Contracts");

(b)      (i) all receivables and reimbursement entitlements associated with Acquired Leases, including those arising from tenant improvement agreements, (ii) all proceeds from gift card sales and gift card receivables and (iii) all receivables from wholesale accounts relating to the EXPRESS® or BONOBOS® businesses and all other accounts receivable, notes receivable, negotiable instruments and chattel paper of Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, in each case, listed on Schedule 1.1(b) (this clause (iii), collectively, the "Purchased Receivables");

(c)      all Cash and Cash Equivalents located at, or held by any Seller at, any of the Acquired Leased Real Property locations as of the Closing Date (excluding, for the avoidance of doubt, any Acquired Entity Cash) (the "Store Cash");

(d)      all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, in each case with respect to any of the Acquired Leased Real Property locations or the Assigned Contracts, in each case as of the Closing Date (excluding, for the avoidance of doubt, any Acquired Entity Cash) (the "Store Deposits");

(e)      all advertising and marketing materials, promotional materials and product samples, artwork, photography, images, videos, copy, catalogues, labels, brand books, style

2

guides, retailer presentations, drawings, recordings and similar material, and any other material showing the heritage of any Trademarks, in each case relating to, used in (or held for use in) or relating to the Business, or the Acquired Assets;

(f)     all transferrable rights (but not any obligations) of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation Contracts relating to any other Acquired Business Asset referenced in this Section 1.1;

(g)     to the extent related to the Acquired Leased Real Property; (i) to the extent transferable under applicable Law, all rights, interests and benefits accruing under all Permits and Governmental Authorizations (in each case, including any pending applications) (the "Acquired Permits"); (ii) all buildings, building systems, permanent fixtures, and all other structures, improvements, and appurtenances thereto and all rights against, and warranties and guarantees from, third parties; and (iii) all insurance monies and all warranty and condemnation proceeds received or receivable after the Closing (other than in respect of the Chacon/Carr Claims);

(h)     all Merchandise, Equipment, furnishings and other tangible property, in each case (i) located at any Acquired Leased Real Property, the New York Design Center, any distribution center, the Headquarters or the BBW Warehouse or (ii) relating to the E-Commerce Business; provided that, with respect to any such tangible asset that is leased by any Seller, the lease agreement covering such leased tangible asset is an Assigned Contract;

(i)     to the extent set forth on Schedule 1.1(i), (i) Merchandise that has shipped from the applicable vendor and is delivered to any Seller, (ii) on-order Merchandise, (iii) Merchandise in other Seller locations that are not (A) Excluded Stores or (B) described in the immediately preceding clause (h)(i) (together with the Merchandise referred to in clause (h) above, the "Acquired Merchandise"); provided that, with respect to any in-transit and on-order Merchandise that is in-transit or on-order pursuant to a Contract or purchase order, such Contract or purchase order is an Assigned Contract;

(j)     all right, title and interest of Sellers under the License Agreement between EXP Topco LLC and Express (the "Express License Agreement") and the License Agreement between Express and Bonobos, Inc. (the "Bonobos License Agreement");

(k)     all rights of indemnity, warranty rights, rights of contribution, rights to refunds or guarantees, rights of reimbursement, rights of set-off or counter-claim and rights of recoupment, and other rights of recovery of every kind and nature for the benefit of, possessed by or enforceable by, any Seller as of the Closing (regardless of whether such rights are currently exercisable), in each case to the extent arising from or relating to the Business (other than to the extent arising from the Acquired IP Assets), the Acquired Business Assets or the Assumed Business Liabilities;

(l)     all books and records, papers, data, databases, files, data, reports, taxonomies, instruments, documents and files collected, held by any Seller or used in connection with the Acquired Business Assets or the Business.  Without limiting the generality of the foregoing, such books and records, papers, data, databases, files, data, reports, taxonomies, instruments, documents and files shall include:  all (i) vendor and supplier lists and associated

information; (ii) customer data, together with all data held or collected in connection therewith (in any data field), including all contact information, demographic information, transaction and usage histories, registry information, loyalty program data (including with respect to customer participation, loyalty tiers, reward balances and other information) and gift card or gift certificate information (including with respect to usage, cards or certificates issued and balances); (iii) customer opt-out or opt-in lists; (iv) current customer models, segmentation, life time value, share of wallet, probability to shop and next product to buy, and other customer-based analyses or reports; (v) blog content, social media content, analytics (including data relating to Internet Properties) visitor data, product review and user-generated content (including images, text, video and all other content); (vi) other financing, marketing and business data; (vii) other cost, pricing and sales data; (vii) other information incorporated in or relating to any other Acquired Business Asset (including the development, maintenance, use or operation thereof); and (viii) usernames, passwords and credentials used to access, use, manage, maintain or renew any of the foregoing, in each case, to the extent related to the Acquired Business Assets, Assumed Business Liabilities or the Business or in the possession or control of any Seller or any of its Affiliates (collectively, the "Business Data"), but excluding, in each case, Business Data relating primarily to other Acquired IP Assets;

(m)     all rights and benefits of Sellers with respect to all insurance recoveries under any insurance policies of Sellers that relate to the Acquired Business Assets or Assumed Business Liabilities, including any and all claims, rights to assert claims and rights to proceeds on any such insurance policies, binders and interests for all periods before, through and after the Closing (collectively, "Insurance Rights").  The Insurance Rights shall exclude any of the foregoing with respect to any Excluded Insurance Policies or Acquired IP Assets and any rights to insurance recovery required to be paid to Persons other than a Purchaser under the Financing Order;

(n)     all avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law (the "Avoidance Actions"), and all other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or applicable Laws, including all actions relating to vendors and service providers used in the Business.  Notwithstanding the foregoing, neither the JV Purchaser, nor any Person claiming by, through or on behalf of the JV Purchaser (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an action based on, assert, sell, convey, assign or file any claim that relates to the Avoidance Actions, or assert or use any such Avoidance Actions for defensive purposes. Sellers shall retain the right to assert setoff rights that arise from Avoidance Actions in relation to any Liability that is not an Assumed Liability;

(o)     (A) all Tax Returns (or portions thereof) relating solely to the Business, Acquired Business Assets, Assumed Business Liabilities or Assumed Business Taxes and (B) any Tax attribute, Tax refund, prepaid Taxes, Tax receivable, Tax credit or any other Tax asset, in each case, of or with respect to any Assumed Business Taxes and any Tax assets that transfer to the JV Purchaser by automatic operation of Law as a result of the JV Purchaser acquiring the Acquired Business Assets; and

(p)      all goodwill associated with the Acquired Business Assets or the Business, other than to the extent arising from the Acquired IP Assets.

Notwithstanding the foregoing: (i) the Acquired Business Assets shall not include any Excluded Asset or Acquired IP Asset; and (ii) JV Purchaser may elect at any time prior to the Closing, by notifying Sellers of same in writing, to treat any asset (other than any Contracts) that would otherwise constitute an Acquired Business Asset in accordance with the terms of this Agreement as an Excluded Asset.  No such exclusion shall change the cash portion of the Purchase Price.  Without limiting the preceding sentence, for the avoidance of doubt, if any such exclusion excludes, or has the effect directly or indirectly of excluding, any Merchandise, such Merchandise shall constitute Acquired Assets for purposes of calculating the Acquired Merchandise Amount.

**Section 1.2      Purchase and Sale of the Acquired IP Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to the WHP Global Purchaser, and the WHP Global Purchaser shall purchase, acquire, and accept from Sellers, all of Seller's right, title and interest in and to, as of the Closing, the Acquired IP Assets, free and clear of all Encumbrances other than Permitted Post-Closing Encumbrances. "Acquired IP Assets" means all of the following (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any such assets acquired by any Seller after the date of this Agreement and prior to the Closing:

(a)      all Equity Interests that any Seller owns in EXP Topco LLC, a Delaware limited liability company (the "Acquired Entity") and any amounts owing from the Acquired Entity to any Seller;

(b)      subject to Section 1.7, all Contracts (i) pursuant to which any Seller receives an exclusive license under Intellectual Property or (ii) that are listed on Schedule 1.2(b), but in either case excluding the Bonobos License Agreement and the Express License Agreement (collectively, the "Assigned IP Contracts");

(c)      all Seller Owned Intellectual Property, including the Intellectual Property set forth on Schedule 3.10, together with (i) all rights of priority relating to any such Intellectual Property and (ii) all goodwill associated with any owned Trademarks included in the Seller Owned Intellectual Property;

(d)      all embodiments, whether in electronic, written or other media or form, of technology, software, coding and know-how either embodying Seller Owned Intellectual Property or otherwise used or held for use in connection with the Business, including with respect to the E-Commerce Business, and any designs, layouts, prototypes, tech packs, specifications, molds and mold specifications;

(e)      all domain names and other Internet Properties owned by or registered to Sellers and used by Sellers for the operation of the e-commerce sites branded under the EXPRESS®, BONOBOS® or UPWEST® Trademarks or any other EXPRESS-, BONOBOS- or UPWEST-formative Trademarks (including, to the extent owned by or registered to Sellers, www.express.com, www.bonobos.com and www.upwest.com), (ii) all other domains names,

5

websites, social media accounts, and other Internet Properties and digital assets, in each case owned by Sellers that use or incorporate the EXPRESS®, BONOBOS® or UPWEST® Trademarks or any other EXPRESS-, BONOBOS- or UPWEST-formative Trademarks, and (iii) all other Internet Properties owned by Sellers, together, in each case of (i) through (iii), with, to the extent owned by and in the possession of Sellers, (A) all site maps, templates, style guides, design materials and content (including any text, fonts, colors, cascading style sheets (CSS), layouts, video, images, graphics and e-mail templates) made available thereon, (B) all blog content posted on the foregoing Internet Properties, (C) all usernames, passwords and credentials used to access, use, manage, maintain or renew any of the foregoing, and (D) any documentation, information and other materials used or held for use primarily in connection with any of the foregoing;

(f)    all rights of publicity, personality rights and similar rights relating to, used in (or held for use in) or arising out of, the sale or marketing of any products or services of the Business;

(g)    all rights to collect royalties and proceeds in connection with the Acquired IP Assets with respect to the period from and after the Closing, all rights to sue, and to recover and retain damages, for any past, present and future infringements, dilutions, misappropriations of, or other violations of Seller Intellectual Property or other applicable Acquired IP Assets;

(h)    (i) Business Data relating primarily to other Acquired IP Assets, which include, for the avoidance of doubt, any prosecution and maintenance files and other records relating to Seller Intellectual Property, and any blog content, social media content, analytics (including data relating to Internet Properties) visitor data, product review and user-generated content (including images, text, video and all other content), and usernames, passwords and credentials used to access, use, manage, maintain or renew any other Acquired IP Assets, and (ii) copies of Business Data as described in clauses (ii) through (iv) of the definition of "Business Data";

(i)    all transferrable rights (but not any obligations) of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation Contracts relating to any other Acquired IP Asset referenced in this Section 1.2;

(j)    all Insurance Rights with respect to any Acquired IP Asset;

(k)    (A) all Tax Returns (or portions thereof) relating solely to the Acquired IP Assets, Assumed IP Liabilities or Assumed IP Taxes and (B) any Tax attribute, Tax refund, prepaid Taxes, Tax receivable, Tax credit or any other Tax asset, in each case, of or with respect to any Assumed IP Taxes and any Tax assets that transfer to the WHP Global Purchaser by automatic operation of Law as a result of the WHP Global Purchaser acquiring the Acquired IP Assets; and

(l)    all rights of indemnity, warranty rights, rights of contribution, rights to refunds or guarantees, rights of reimbursement, rights of set-off or counter-claim and rights of recoupment, and other rights of recovery of every kind and nature for the benefit of, possessed by or enforceable by, any Seller as of the Closing (regardless of whether such rights are currently

6

exercisable), in each case to the extent arising from or relating to other Acquired IP Assets (as opposed to the operation of the Business more generally).

Notwithstanding the foregoing, (i) Acquired IP Assets shall not include any Excluded Asset, and (ii) the WHP Global Purchaser may elect at any time prior to the Closing, by notifying Sellers of same in writing, to treat any asset (other than any Contracts) that would otherwise constitute an Acquired IP Asset in accordance with the terms of this Agreement as an Excluded Asset. No such exclusion shall change the Purchase Price.

**Section 1.3    Excluded Assets**. Notwithstanding anything to the contrary in this Agreement, no Purchaser shall acquire any right, title or interest to, in or under any of the following assets, properties, rights, interests, or claims of Sellers (collectively, the "Excluded Assets"):

(a)    other than the Store Cash and Store Deposits and other than as provided in Section 1.1(d), all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)    all Contracts of Sellers that are not Assigned Contracts, including any Excluded Store Contracts listed on Schedule 1.3(b)(i) and any other Contracts listed on Schedule 1.3(b)(ii) (collectively, the "Excluded Contracts");

(c)    all Personal Data that any Seller is required by Law to retain or the transfer of which to Purchaser is prohibited by or would otherwise contravene applicable Law or Sellers' applicable policies from transferring to Purchaser;

(d)    all books, records, files, and documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities; provided that Purchaser shall have the right to make copies of any portions thereof or (ii) that any Seller is required by Law to retain or is prohibited by Law from transferring to Purchaser;

(e)    all Equity Interests of any Seller or any other Person (other than the Acquired Entity);

(f)    the sponsorship of, and all rights, interests and assets associated with, the Seller Plans;

(g)    any records, documents or other information relating to employees of Sellers who are not Transferred Employees, and any materials containing information about any Transferred Employee, disclosure of which would violate applicable Law;

(h)    (i) all director and officer, fiduciary, employment practices and similar insurance policies (the "Excluded Insurance Policies"), and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries and (ii) all other current and prior insurance policies of any Seller that are not Assumed Benefit Plans;

(i)    all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(j)    all insurance proceeds received or receivable in respect of the Chacon/Carr Claims and any and all refunds and credits due to Sellers under any insurance policies of Sellers;

(k)    all credit card receivables;

(l)    Sellers' financial accounting books and records, corporate charter, minute and stock record books, corporate seal, checkbooks and canceled checks (whether written, electronic or in any other medium), advertising and promotional materials and similar items to the extent relating exclusively to any Excluded Assets or Excluded Liabilities.  Purchaser shall have the right, however, to make copies of any portions of such documents relating to the Acquired Assets;

(m)    Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price, or any other Transaction Agreement;

(n)    all Tax Returns of Sellers or their Affiliates or relating to Excluded Taxes (other than any Tax Returns or portions thereof that are Acquired Assets) and any Tax attribute, Tax refund, prepaid Taxes, Tax receivable, Tax credit or any other Tax asset, in each case, of or with respect to Excluded Taxes (other than Tax assets that transfer to Purchaser by automatic operation of Law as a result of Purchaser acquiring the Acquired Assets);

(o)    any assets, including Merchandise, furniture, fixtures and Equipment, located at any Excluded Store;

(p)    any permanent fixtures (but not, for the avoidance of doubt, any other personal or tangible property) located at the New York Design Center; and

(q)    any assets expressly excluded from Acquired Assets by the terms of Section 1.1.

**Section 1.4    Assumption of Certain Business Liabilities**.  On the terms and subject to the conditions set forth in this Agreement and in the Sale Order, effective as of the Closing, the JV Purchaser shall assume from each Seller (and from and after the Closing, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and each Seller shall transfer, assign, convey, and deliver to the JV Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Business Liabilities"):

(a)    all Liabilities and obligations of any Seller under the Assigned Business Contracts solely to the extent relating to facts, occurrences or other circumstances first arising after the Closing (or, if assigned to the JV Purchaser after the Closing, the assignment date of such Assigned Contract);

(b)    Liabilities for Cure Costs in connection with the assumption and assignment of the Initial Assumed Contracts and the Initial Assumed Leases up to the applicable amounts listed on Schedule 1.4(b) (the "Initial Cure Costs");

(c)    all Proposed Cure Costs in connection with the assumption and assignment of the Designated Contracts and Designated Leases (the "Designated Agreement Cure Costs");

(d)    Liabilities arising under section 503(b)(9) of the Bankruptcy Code listed on Schedule 1.4(d)/(g) (the "Assumed 503(b)(9) Claims");

(e)    [reserved];

(f)    all Liabilities and obligations otherwise expressly assumed by the JV Purchaser under Section 6.4;

(g)    all trade payables set forth on Schedule 1.4(d)/(g) in respect of Merchandise first received and accepted (i.e., logged into inventory) from a third party on or after the Petition Date in amounts per vendor not to exceed the amounts set forth on such schedule (the "Assumed Post-Petition Admin Claims"); provided, no such payable shall be assumed by or become an obligation of the JV Purchaser unless and until the applicable Merchandise has been delivered into a Seller facility (or, after the Closing, a facility acquired by the JV Purchaser pursuant to this Agreement);

(h)    all Liabilities (including all government charges or fees but not including Taxes) to the extent arising out of the ownership or operation of any Acquired Business Assets after the Closing Date;

(i)    all Liabilities (other than Taxes) relating to amounts required to be paid, or actions required to be taken or not to be taken, by the JV Purchaser under this Agreement;

(j)    without duplication, (i) all Transfer Taxes for which the JV Purchaser is responsible pursuant to Section 9.1 and (ii) all Taxes imposed with respect to the Acquired Business Assets, the Assumed Business Liabilities or the Business for any Post-Closing Tax Period, allocated, in the case of a Straddle Period, in accordance with Section 9.6 (in each case, other than Excluded Taxes);

(k)    sponsorship of the Assumed Benefit Plans and all Liabilities under or related thereto; and

(l)    all Liabilities outstanding as of and after the Closing with respect to Ordinary Course returns of Merchandise sold by any Seller at an Acquired Leased Real Property location, in compliance with the return policy in effect as of such sale.

Section 1.5    **Assumption of Certain IP Liabilities**.  On the terms and subject to the conditions set forth in this Agreement and in the Sale Order, effective as of the Closing, the WHP Global Purchaser shall assume from each Seller, and each Seller shall transfer, assign, convey, and deliver to the WHP Global Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed IP Liabilities"):

(a)      without duplication, (i) all Transfer Taxes for which the WHP Global Purchaser is responsible pursuant to Section 9.1 and (ii) all Taxes imposed with respect to the Acquired IP Assets or the Assumed IP Liabilities for any Post-Closing Tax Period, allocated, in the case of a Straddle Period, in accordance with Section 9.6 (in each case, other than Excluded Taxes);

(b)      all Liabilities (other than Taxes) relating to amounts required to be paid, or actions required to be taken or not to be taken, by the WHP Global Purchaser under this Agreement;

(c)      all Liabilities and obligations of any Seller under the Assigned IP Contracts solely to the extent relating to facts, occurrences or other circumstances first arising after the Closing (or if assigned to the WHP Global Purchaser after the Closing, the assignment date of such Assigned Contract); and

(d)      the FAM Payable.

**Section 1.6      Excluded Liabilities**.  Purchaser shall not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to, on or after the Closing Date, other than Liabilities that are specifically and expressly Assumed Business Liabilities or Assumed IP Liabilities, as applicable (all such Liabilities that are not Assumed Business Liabilities or Assumed IP Liabilities, the "Excluded Liabilities").

For the avoidance of doubt, (a) no Liability of the Acquired Entity shall be an Assumed Liability or an Excluded Liability and (b) all Liabilities of Sellers relating to escheat or unclaimed property obligations arising from the ownership or operation of the Business or the Acquired Assets prior to the Closing, including any such Liabilities arising from gift cards or certificates or loyalty programs issued or outstanding as of the Closing, shall in each case constitute Excluded Liabilities.

Without limiting the foregoing, neither the JV Purchaser nor the WHP Global Purchaser shall be obligated to assume, and none of them assumes, and each disclaims all the Excluded Liabilities.

**Section 1.7      Assumption/Rejection of Certain Contracts and Leases and Designation Rights; Non-Assignment**.

(a)      Schedule 1.7(a) sets forth (i) a true and complete list, as of the date of this Agreement, of all executory Contracts and unexpired Leases (other than the Initial Assumed Contracts, the Excluded Store Contracts, and the Initial Assumed Leases) to which any Seller is a party; and (ii) Sellers' proposed Cure Costs associated with respect to each such Contract and unexpired Lease set forth in Schedule 1.7(a) (the "Proposed Cure Costs").

(b)      The Purchasers reserve the right, by written notice to Sellers at any time prior to the Sale Hearing, to amend Schedule 1.1(a)(i), Schedule 1.1(a)(ii) or Schedule 1.2(b) to

remove Contracts and Leases from such schedules, and thereafter any so specified Contract or Lease shall cease to be an Assigned Contract or Acquired Lease.

(c)     From and after the date of this Agreement until the Sale Hearing, in its sole discretion, each Purchaser may, (i) designate a Contract listed on Schedule 1.7(a) for assumption and assignment to the JV Purchaser, WHP Global Purchaser or their designee, effective on and as of the Closing (such Contracts, the "Pre-Closing Designated Contracts"); or (ii) designate a Lease listed on Schedule 1.7(a) for assumption and assignment to a Purchaser or its designee, effective on and as of the Closing (such Leases the "Pre-Closing Designated Leases"). Schedule 1.1(a)(i), Schedule 1.1(a)(ii) or Schedule 1.2(b)(i), as the case may be, shall be (and shall be deemed) modified or supplemented to reflect additions or removals, as applicable, of Leases and Contracts that are designated for assumption and assignment as set forth in this Section 1.7(c). In the event that any Purchaser designates any additional Pre-Closing Designated Leases, such Lease shall be an Acquired Lease and the Merchandise located at such Acquired Leased Real Property shall be included in the calculation of the Acquired Merchandise Amount.

(d)     During the Designation Rights Period, in its sole discretion, each Purchaser may designate any Contract (the "Post-Closing Designated Contracts" and together with the Pre-Closing Designated Contracts, the "Designated Contracts") or Lease (the "Post-Closing Designated Leases" and together with the Pre-Closing Designated Leases, the "Designated Leases") listed on Schedule 1.7(a) that has not previously been rejected by Sellers or designated for assumption or assignment pursuant to Section 1.7(c) for assumption and assignment to a Purchaser or its designee by providing written notice to Sellers (the "Post-Closing Designation Notice") at least ten (10) days prior to expiration of the Designation Rights Period. Within three (3) Business Days of Sellers' receipt of a Post-Closing Designation Notice, Sellers shall provide written notice to the counterparty to such Post-Closing Designated Contract or Post-Closing Designated Lease (such counterparty, the "Designation Counterparty") of Sellers' intent to assume and assign such Post-Closing Designated Contract or Post-Closing Designated Lease (each, a "Seller's Notice"). Each Seller's Notice shall be filed with the Bankruptcy Court and include (i) the Proposed Cure Costs associated with such Post-Closing Designated Contract or Post-Closing Designated Lease as designated by the JV Purchaser; (ii) information or contact information and instructions on how to obtain information supplied by the JV Purchaser or its designee intended to provide such Designation Counterparty with adequate assurance of future performance; and (iii) the deadline to object to the assumption and assignment of such Post-Closing Designated Contract or Post-Closing Designated Lease (the "Objection Deadline"), which deadline shall be no fewer than ten (10) calendar days from service of such notice. The assumption and assignment of a Post-Closing Designated Contract or Post-Closing Designated Lease shall be effective without further order of the Bankruptcy Court upon expiration of the applicable Objection Deadline unless: (A) the Designation Counterparty timely serves an objection upon the JV Purchaser and Sellers that relates to adequate assurance of future performance or a cure issue that could not have been raised in an objection to any cure notice prior to the Sale Hearing and pertains to matters arising after the Closing; or (B) the Designation Counterparty otherwise consents to the assumption and assignment on terms mutually agreed by the JV Purchaser and the Designation Counterparty. If the JV Purchaser, Sellers and Designation Counterparty are unable to resolve such objection timely served pursuant to clause (A) above, Sellers shall schedule the matter for hearing on no less than five (5) Business Days' notice. Any Contract or Lease that is not assumed and assigned before the expiration of the Designation Rights Period shall not be acquired by the Purchasers.

(e)        Notwithstanding Section 1.7(d), during the Designation Rights Period, any Purchaser may deliver a written notice to Sellers of such Purchaser's entry into an agreement with a Designation Counterparty to any Post-Closing Designated Contract or Post-Closing Designated Lease pursuant to which such Designation Counterparty consents to the assumption and assignment to such Purchaser or its designee of such Post-Closing Designated Contract or Post-Closing Designated Lease on the terms set forth in such agreement.  The assumption and assignment of any Post-Closing Designated Contract or Post-Closing Designated Lease pursuant to this Section 1.7(e) shall be effective on the date set forth in the written notice provided to Sellers without further order of the Bankruptcy Court.  At the request of any Purchaser, Sellers shall file a notice with the Bankruptcy Court identifying such Post-Closing Designated Contracts or Post-Closing Designated Leases.  For the avoidance of doubt, all Designated Contracts and Designated Leases assumed and assigned to any Purchaser or its designee pursuant to this Section 1.7 shall be Assigned Contracts.

(f)        In the case of any Post-Closing Designated Contracts and Post-Closing Designated Leases that are assumed and assigned to a Purchaser, such Purchaser shall be responsible for any and all payment Liabilities of the JV Purchaser, Sellers or any of their respective Affiliates under such Post-Closing Designated Contracts and Post-Closing Designated Leases, in each case that are incurred and come due and payable during the period from and after the Closing through the effective date of such Post-Closing Designated Contract's or Post-Closing Designated Lease's assumption and assignment to the JV Purchaser.

(g)        Sellers shall (i) provide timely and proper written notice of a proposed Sale Order to all parties to any executory Contracts or unexpired Leases to which any Seller is a party that are Assigned Contracts, (ii) pay all Cure Costs (other than any Initial Cure Costs or Designated Agreement Cure Costs) with respect to any Assigned Contracts and (iii) take all other actions reasonably necessary to cause such Assigned Contracts to be assumed by Sellers and assigned to the applicable Purchaser or designee pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts or Leases are Assigned Contracts.  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to the applicable Purchaser the Assigned Contracts.  Each such Assigned Contract shall be identified in a Seller's Notice by: (x) the name or appropriate description and date of the Assigned Contract (if available); (y) the other party to the Assigned Contract and (z) the address of such party for notice purposes.  In addition, all of the information set forth in the preceding sentence shall be included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as set forth in Schedule 1.7(a), or as otherwise determined by (x) Sellers based on their books and records or (y) the Bankruptcy Court.  At the Closing, pursuant to the Sale Order and the Assignment and Assumption Agreement(s), Sellers shall assume and assign to the applicable Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to the applicable Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code.  At the Closing, the applicable Purchaser shall: (i) pay all Initial Cure Costs; and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.  The JV Purchaser shall pay all Proposed Cure Costs associated with any Designated Contract or Designated Lease that is

assumed and assigned to the JV Purchaser pursuant to this <u>Section 1.7</u>, upon the assignment of such Designated Contract or Designated Lease.

(h)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be assigned to, or assumed by, any Purchaser to the extent that such Contract is terminated by the counterparty to such Contract or terminates or expires by its terms on or prior to such time as it is to be assigned to or assumed by such Purchaser as an Assigned Contract and is not continued or otherwise extended upon assignment or assumption.

(i)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent (determined after giving effect to any order of the Bankruptcy Court and excluding any Governmental Authorization) in order to permit the sale, assignment, conveyance or transfer of any Acquired Asset to any Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent has not been obtained prior to the Closing or the end of the Designation Rights Period, as applicable, such asset shall not be transferred to, or received by, such Purchaser at the Closing or the end of the Designation Rights Period, as applicable.  If any such Consent is not obtained prior to Closing or the end of the Designation Rights Period, as applicable, the Closing shall nonetheless take place (subject to the satisfaction or waiver of the conditions set forth in <u>Article VII</u>) and the Designation Rights Period shall nonetheless end subject to the terms and conditions set forth in this Agreement.  Thereafter, through the earliest of: (x) such time as such Consent is obtained, (y) twelve (12) months following the Closing and (z) with respect to an Acquired Asset that is a Contract, the expiration of the term of such Contract in accordance with its current term or the execution of a replacement Contract by such Purchaser or its Affiliate (or in each case of <u>clauses (x), (y)</u> and <u>(z)</u>, the remaining term of such Contract or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if earlier), Sellers and the applicable Purchaser(s) shall cooperate in good faith and use commercially reasonable efforts to implement arrangements reasonably acceptable to the applicable Purchaser, on the one hand, and Sellers, on the other hand, intended to both (1) provide such Purchaser, to the fullest extent practicable and permissible, the claims, rights, remedies and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Assets incurred by any Seller or its Affiliates) of any such Acquired Assets (without infringing upon the legal rights of such third party or violating any Law) and (2) cause such Purchaser to assume and bear all Assumed Liabilities applicable to such Purchaser from and after the Closing in accordance with this Agreement.  Without limiting the generality of the foregoing, the cooperation under clause (1) of the preceding sentence shall include subcontracting, licensing, or sublicensing to any such Purchaser any or all of any Seller's rights and obligations with respect to any such asset subject to the other conditions and requirements set forth in that sentence.  With respect to any Acquired Asset for which a requisite Consent was not obtained prior to the Closing, if, after the Closing, such requisite Consent is obtained or otherwise satisfied, then the applicable Seller shall promptly transfer and assign such Seller's right, title and interest in and to such Acquired Asset to the applicable Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

**Section 2.1    Consideration; Payment**.

(a)    The aggregate consideration to be paid by the JV Purchaser for the purchase of the Acquired Business Assets shall be:  (i) the assumption of Assumed Liabilities and (ii) a cash payment in an amount equal to (A) the Acquired Merchandise Amount *minus* (B) the Specified Assumed Liabilities Amount (this clause (ii), the "Primary Purchase Price").

(b)    The aggregate consideration to be paid by the WHP Global Purchaser for the purchase of the Acquired IP Assets shall be (i) the assumption of Assumed IP Liabilities and (ii) a cash payment in an amount equal to the Acquired Entity Cash Amount (this clause (ii), the "Secondary Purchase Price" and, together with the Primary Purchase Price, the "Purchase Price").

(c)    At the Closing, the JV Purchaser shall deliver, or cause to be delivered, to Sellers or the Escrow Agent, as applicable, an amount of cash equal to:  (i) the Estimated Acquired Merchandise Amount less (ii) the Deposit less (iii) the Estimated Specified Assumed Liabilities Amount (cumulatively, the "Primary Closing Date Payment").   The Primary Closing Date Payment and any payment required to be made by the JV Purchaser pursuant to any other provision of this Agreement shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Sellers or the Escrow Agent, as applicable, at least two (2) Business Days prior to the date such payment is to be made.

(d)    At the Closing, the WHP Global Purchaser shall deliver, or cause to be delivered, to Sellers an amount of cash equal to the Estimated IP Amounts (cumulatively, the "Secondary Closing Date Payment").   The Secondary Closing Date Payment and any payment required to be made by the WHP Global Purchaser pursuant to any other provision of this Agreement shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by Sellers at least two (2) Business Days prior to the date such payment is to be made.

**Section 2.2    Deposit**.

(a)    The JV Purchaser will, on or within one (1) Business Day of entry of the Bidding Procedures Order, make an earnest money deposit with Acquiom Clearinghouse LLC (the "Escrow Agent") in the amount equal to 5% of the Acquired Merchandise Amount  (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, interest bearing escrow account (the "Escrow Account"), established pursuant to the escrow agreement, dated as of or prior to such date, by and among Sellers, the JV Purchaser and the Escrow Agent (the "Escrow Agreement").  The Escrow Account shall be maintained by the Escrow Agent in accordance with the Bidding Procedures Order.  The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or the JV Purchaser and shall be applied against payment of the Primary Purchase Price on the Closing Date.

(b)     If, prior to Closing, this Agreement has been terminated by Sellers pursuant to Section 8.1(e) or Section 8.1(g), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)     If, prior to Closing, this Agreement has been terminated by any Party other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to the JV Purchaser within three (3) Business Days after such termination.

(d)     The JV Purchaser and Sellers agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)     At the Closing or upon termination of this Agreement, the JV Purchaser and Sellers shall deliver joint written instructions to the Escrow Agent directing the Escrow Agent to transfer by wire transfer of immediately available funds one-hundred percent (100%) of the Deposit (together with any and all investment interest thereon, if any) to such account(s) as may be designated by the JV Purchaser or Sellers, as applicable.

**Section 2.3     Closing**.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, and the assumption of the Assumed Liabilities (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m., Eastern Time, on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions). However, without the written consent of the WHP Global Purchaser, in no event shall the Closing take place on a date that is prior to June 10, 2024. Subject to the requirements of the preceding sentences of this Section 2.3, the Parties may also mutually agree in writing to a different time and place for the Closing.  The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

**Section 2.4     Closing Deliveries by Sellers**.  At or prior to the Closing, Sellers shall deliver:

(a)     to each Purchaser, a bill of sale and assignment and assumption agreement, in respect of the Acquired Business Assets or the Acquired IP Assets, as applicable, substantially in the form of Exhibit A (each, an "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)     to the WHP Global Purchaser, a short-form intellectual property assignment agreement substantially in the form of Exhibit B-1, duly executed by the applicable Sellers;

(c)    to the WHP Global Purchaser, a short-form patent assignment agreement substantially in the form of <u>Exhibit B-2</u>, duly executed by the applicable Sellers;

(d)    to the WHP Global Purchaser, a short-form copyright assignment agreement substantially in the form of <u>Exhibit B-3</u>, duly executed by the applicable Sellers;

(e)    to the WHP Global Purchaser, instruments of transfer of the Equity Interests of the Acquired Entity, in customary form, duly executed by the applicable Sellers;

(f)    to the JV Purchaser, an assignment and assumption of lease for the each of the Acquired Leases, substantially in the form of <u>Exhibit C</u> (the "<u>Assignment and Assumption of Lease</u>"), duly executed by Sellers;

(g)    to the JV Purchaser, the Transition Services Agreement, duly executed by Sellers;

(h)    to each Purchaser, an IRS Form W-9 executed by each Seller or, in the case of a Seller that is disregarded as a separate entity from its owner for U.S. federal income tax purposes, each Seller's regarded owner for U.S. federal income Tax purposes; <u>provided</u> that the Purchasers' sole remedy with respect to Sellers' failure to deliver such form shall be to withhold Taxes from the consideration otherwise payable pursuant to this Agreement in accordance with <u>Section 2.7</u>;

(i)    to each Purchaser, an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Express certifying that the conditions set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> have been satisfied;

(j)    to the JV Purchaser, a joint written instruction, duly executed by Sellers, instructing the Escrow Agent to release to Sellers by wire transfer of immediately available funds, the Deposit; and

(k)    to the WHP Global Purchaser, an amount of cash equal to (i) 60% of the aggregate accrued and unpaid royalty under the Express License Agreement plus (ii) 100% of the aggregate accrued and unpaid royalty under the Bonobos License Agreement, in each case in satisfaction of such obligations (it being understood and agreed that the Parties may agree to offset such amounts against amounts payable to Sellers under this Agreement).

**Section 2.5    <u>Closing Deliveries by the JV Purchaser</u>**.  At the Closing, the JV Purchaser shall deliver, or cause to be delivered:

(a)    to the Escrow Agent, the Adjustment Escrow Amount into an escrow account (the "<u>Adjustment Escrow Account</u>") to be held by Escrow Agent in accordance with the terms of the Escrow Agreement; and

(b)    to Sellers:

(i)    the Primary Closing Date Payment, less the Adjustment Escrow Amount;

(ii)    an Assignment and Assumption Agreement, duly executed by the JV Purchaser;

(iii)    an Assignment and Assumption of Lease for each Acquired Lease, duly executed by the JV Purchaser;

(iv)    the Transition Services Agreement, duly executed by the JV Purchaser;

(v)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the JV Purchaser certifying that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied; and

(vi)    a joint written instruction, duly executed by the JV Purchaser, instructing the Escrow Agent to release to Sellers by wire transfer of immediately available funds, the Deposit.

**Section 2.6    Closing Deliveries by the WHP Global Purchaser**.  At the Closing, the WHP Global Purchaser shall deliver, or cause to be delivered, to Sellers:

(a)    the Secondary Closing Date Payment;

(b)    an Assignment and Assumption Agreement, duly executed by the WHP Global Purchaser; and

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the WHP Global Purchaser certifying that the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied.

**Section 2.7    Withholding**.  Notwithstanding anything to the contrary in this Agreement, Purchasers and any other applicable withholding agent shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amounts required to be deducted and withheld with respect to such payment under the Tax Code or any other provision of Tax Law.  To the extent that amounts are so deducted and withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

**Section 2.8    Purchase Price Adjustment**.

(a)    Closing Adjustment.

(i)    At least five (5) Business Days before the Closing, Sellers shall prepare and deliver to the JV Purchaser a statement (the "Estimated Business Amounts Statement") setting forth in reasonable detail its good faith estimate of (A) the Acquired Merchandise Amount (the "Estimated Acquired Merchandise Amount") and (B) the Specified Assumed Liabilities Amount (the "Estimated Specified Assumed Liabilities Amount") (collectively, the "Estimated Business Amounts").  The Estimated Business Amounts Statement shall set forth the calculations of the Estimated Business Amounts in

a manner consistent with the Sample COGS Calculation and using the accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies used by Sellers and their Affiliates in the preparation of their financial statements, subject to any modifications set forth in the Sample COGS Calculation.  During the period after the delivery of the Estimated Business Amounts Statement and prior to the Closing Date, the JV Purchaser shall have an opportunity to review the Estimated Business Amounts Statement.  On behalf of the Sellers, Express shall provide the JV Purchaser and its Advisors reasonable access to all properties, books and records and working papers (including auditors' work papers) relating thereto and the officers and other employees and Advisors of Sellers and their Affiliates to the extent reasonably necessary to assist the JV Purchaser and its Advisors in their review of the Estimated Business Amounts Statement.  Such access shall be in a manner that does not interfere with the normal business operations of Sellers.  Sellers shall in good faith consider any questions or comments received from the JV Purchaser regarding the Estimated Business Amounts Statement.  To the extent, however, that Express and the JV Purchaser disagree as to any one or more items, then with respect to each such item, the amount of such item set forth in the Estimated Business Amounts Statement sent by Express will be used for purposes of calculating the Estimated Business Amounts for the Closing.  The agreement of the JV Purchaser and Sellers to revisions to the Estimated Business Amounts Statement or the failure of the JV Purchaser and Sellers to agree to any such revisions shall not constitute a waiver or limitation of the JV Purchaser's or Sellers' rights and obligations pursuant to <u>Section 2.8(b)</u>, <u>Section 2.8(c)</u> or <u>Section 2.8(d)</u>.

(ii)    At least five (5) Business Days before the Closing, the WHP Global Purchaser shall prepare and deliver to Sellers a statement (the "<u>Estimated IP Amounts Statement</u>" and, together with the Estimated Business Amounts Statement, the "<u>Estimated Amounts Statements</u>") setting forth its good faith estimate of the Acquired Entity Cash Amount (the "<u>Estimated IP Amounts</u>").  During the period after the delivery of the Estimated IP Amounts Statement and prior to the Closing Date, Sellers shall have an opportunity to review the Estimated IP Amounts Statement.  WHP Global Purchaser shall provide Sellers and their Advisors reasonable access to all properties, books and records and working papers (including auditors' work papers) relating thereto and the officers and other employees and Advisors of WHP Global Purchaser to the extent reasonably necessary to assist Sellers and their Advisors in their review of the Estimated IP Amounts Statement.  WHP Global Purchaser shall in good faith consider any questions or comments received from Sellers regarding the Estimated IP Amounts Statement.  To the extent that Express and the WHP Global Purchaser disagree as to any one or more items, then with respect to each such item, the amount of such item set forth in the Estimated IP Amounts Statement sent by WHP Global Purchaser will be used for purposes of calculating the Estimated IP Amounts for the Closing.  The agreement of the WHP Global Purchaser and Sellers to revisions to the Estimated IP Amounts Statement or the failure of the WHP Global Purchaser and Sellers to agree to any such revisions shall not constitute a waiver or limitation of the WHP Global Purchaser's or Sellers' rights and obligations pursuant to <u>Section 2.8(b)</u>, <u>Section 2.8(c)</u>, or <u>Section 2.8(d)</u>.

18

(iii)    The Parties agree that the amounts set forth in the Sample COGS Calculation are solely for the purposes of providing an example calculation of the Acquired Merchandise Amount in accordance with the terms of this Agreement.  The Parties also agree that such amounts are solely illustrative and do not constitute any agreement or representation or warranty by any Party as to what such amounts shall be in the Closing Amounts Statements.  None of the Estimated Amounts Statements, the Closing Amounts Statements, or a Statement of Objections shall be bound by or required to include the amounts set forth in Exhibit D.

(b)    Post-Closing Adjustment.  Within ninety (90) days after the Closing Date, the JV Purchaser shall prepare and deliver to Sellers a statement (the "Closing Business Amounts Statement") setting forth the JV Purchaser's good faith calculation of each of the Acquired Merchandise Amount and the Specified Assumed Liabilities Amount (the "Closing Business Amounts").  The Closing Business Amounts Statement shall set forth in reasonable detail the JV Purchaser's calculations of the Closing Business Amounts in a manner consistent with the Sample COGS Calculation.  In that same ninety (90) day period, the WHP Global Purchaser shall prepare and deliver to Sellers a statement (the "Closing IP Amounts Statement" and, together with the Closing Business Amounts Statement, the "Closing Amounts Statements") setting forth WHP Global Purchaser's good faith calculation of each of the Acquired Entity Cash Amount (the "Closing IP Amounts").  The Closing IP Amounts Statement shall set forth in reasonable detail WHP Global Purchaser's calculations of the Closing IP Amounts.

(c)    Review.

(i)    After receipt of the Closing Amounts Statements, Sellers shall have thirty (30) days (or such longer period as the Parties may agree in writing, the "Review Period") to review the Closing Amounts Statements.  During the Review Period, Sellers and Sellers' Advisors shall have reasonable access to the relevant books and records of the applicable Purchaser, the personnel of, and work papers prepared by, the applicable Purchaser or the JV Purchaser's financial Advisors to the extent that they relate to the Acquired Merchandise Amount.  Sellers and Sellers' Advisors shall also have reasonable access to such historical financial information (to the extent in the JV Purchaser's possession) relating to the Acquired Merchandise Amount as Sellers may reasonably request.  All such requests shall be for the purpose of reviewing the Closing Amounts Statements and to prepare a Statement of Objections.

(ii)    On or prior to the last day of the Review Period, Sellers may object to a Closing Amounts Statement by delivering to the applicable Purchaser a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement (the "Statement of Objections").  If Sellers fail to deliver a Statement of Objections before the expiration of the Review Period, the Acquired Merchandise Amount, the Specified Assumed Liabilities Amount and the Acquired Entity Cash Amount reflected in the applicable Closing Amounts Statement will be deemed to have been accepted by Sellers and will be final and binding.  If Sellers deliver a Statement of Objections before the expiration of the Review Period, the applicable Purchaser and Sellers shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of such Statement of Objections or such longer period as such

19

Parties may agree in writing (the "Resolution Period"). If the objections are resolved within the Resolution Period, the applicable Closing Amounts Statement with such changes as may have been previously agreed in writing by the applicable Purchaser and Sellers, shall be final and binding on such Parties. All discussions related thereto will be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the date of this Agreement) and any applicable similar state rule, unless otherwise agreed in writing by Sellers and the applicable Purchaser.

(iii)     If Sellers and the applicable Purchaser fail to reach an agreement with respect to all of the matters set forth in the applicable Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts") shall be submitted for resolution to Kroll, LLC (the "Independent Expert"). Acting as an expert and not an arbitrator, the Independent Expert shall resolve only the Disputed Amounts and make any adjustments to the applicable Closing Amounts Statement based on such resolution. The relevant Parties will execute a customary engagement letter if so requested by the Independent Expert and will cooperate with the Independent Expert during the term of its engagement. The Independent Expert will have exclusive jurisdiction over any disputes arising out of or relating to the adjustments pursuant to this Section 2.8. Resort to the process involving the Independent Expert as provided in this Section 2.8(c) will be the only recourse and remedy of the relevant Parties against one another with respect to any such dispute. The relevant Parties agree that all adjustments shall be made without regard to materiality. The Independent Expert shall decide only the Disputed Amounts and its decision for each Disputed Amount must be within the range of values assigned to each such item in the applicable Closing Amounts Statement and the applicable Statement of Objections, respectively. The fees and expenses of the Independent Expert (the "Expert Fees") shall be paid *pro rata* by Sellers, on the one hand, and the applicable Purchaser, on the other hand, based upon the percentage that the amount actually contested but not awarded to Sellers or such Purchaser, respectively, bears to the aggregate amount actually contested by Sellers or such Purchaser, respectively, as determined by the Independent Expert. The Independent Expert shall make a determination as soon as practicable within thirty (30) days (or such other time as the Parties shall agree in writing) after its engagement, and its resolution of the Disputed Amounts. The Independent Expert's adjustments to the applicable Closing Amounts Statement and allocation of Expert Fees between the applicable Purchaser and Sellers shall, in each case, absent manifest or demonstrable error, be final, conclusive and binding upon such Parties.

(iv)     Each of the Acquired Merchandise Amount, the Specified Assumed Liabilities Amount and the Acquired Entity Cash Amount will be determined in accordance with the definitions set forth in this Agreement. The Parties agree that the purpose of determining each of the Acquired Merchandise Amount, the Specified Assumed Liabilities Amount and the Acquired Entity Cash Amount in accordance with this Section 2.8 is solely to accurately measure changes (if any) in any of the Acquired Merchandise Amount, the Specified Assumed Liabilities Amount and the Acquired Entity Cash Amount, respectively, from the Estimated Business Amounts and/or the Estimated IP Amounts set forth in the applicable Estimated Amounts Statement in order to determine each of the final Acquired Merchandise Amount, Specified Assumed Liabilities Amount and Acquired

Entity Cash Amount and that such processes are not intended to permit the introduction of accounting methods, practices, principles, policies and procedures, classifications, judgments and valuation and estimation methodologies that are different from those used by Sellers in the preparation of their financial statements, subject to any modifications set forth in the Sample COGS Calculation.

(d)     Payments.

(i)     If the aggregate Closing Business Amounts set forth in the Closing Business Amounts Statement as finally determined in accordance with Section 2.8(c) is greater than the aggregate Estimated Business Amounts (the amount of such difference, the "Positive Business Adjustment Amount"), then (A) within five (5) Business Days from the date on which such final determination is made, the JV Purchaser shall pay, or cause to be paid, to Sellers an amount in cash equal to the lesser of (x) the Positive Business Adjustment Amount and (y) the Adjustment Escrow Amount and (B) within two (2) Business Days from the date on which such final determination is made, Sellers and the JV Purchaser shall deliver a joint written authorization to the Escrow Agent authorizing the Escrow Agent to release from the Adjustment Escrow Account to the Sellers all of the funds in the Adjustment Escrow Account.

(ii)     If the aggregate Closing IP Amounts set forth in the Closing IP Amounts Statement as finally determined in accordance with Section 2.8(c) is greater than the aggregate Estimated IP Amounts, the WHP Global Purchaser will pay to Sellers an amount equal to such difference.

(iii)     If the aggregate Closing Business Amounts set forth in the Closing Business Amounts Statement as finally determined in accordance with Section 2.8(c) is less than the aggregate Estimated Business Amounts (the amount of such difference, the "Negative Business Adjustment Amount"), then Sellers shall pay to the JV Purchaser the Negative Business Adjustment Amount as follows: (A) if the absolute value of the Negative Business Adjustment Amount equals or exceeds the amount available in the Adjustment Escrow Account, then (i) Sellers and the JV Purchaser shall deliver a joint written authorization to the Escrow Agent within two (2) Business Days from the date on which such final determination is made, authorizing the Escrow Agent to release from the Adjustment Escrow Account to the JV Purchaser all of the funds in the Adjustment Escrow Account and (ii) Sellers shall, within five (5) Business Days from the date on which such final determination is made, pay to an account designated by the JV Purchaser an amount in cash equal to the absolute value of the Negative Business Adjustment Amount minus the amount of cash to be released to the JV Purchaser pursuant to the immediately preceding clause (i), and (B) if the absolute value of the Negative Business Adjustment Amount is less than the amount available in the Adjustment Escrow Account, then Sellers and the JV Purchaser shall deliver a joint written authorization to the Escrow Agent within two (2) Business Days from the date on which such final determination is made, authorizing the Escrow Agent to release from the Adjustment Escrow Account (i) to an account designated by the JV Purchaser an amount in cash equal to the absolute value of the Negative Business Adjustment Amount and (ii) to an account designated by Sellers the remainder, if any, of the funds in the Adjustment Escrow Account.

(iv)     If the aggregate Closing IP Amounts set forth in the Closing IP Amounts Statement as finally determined in accordance with <u>Section 2.8(c)</u> is less than the aggregate Estimated IP Amounts, Sellers shall pay to the WHP Global Purchaser an amount equal to such difference.

(e)     Any payments required to be made pursuant to <u>Section 2.8(d)</u> will be due (x) within five (5) Business Days of acceptance of the applicable Closing Amounts Statement or (y) if there are Disputed Amounts, within five (5) Business Days of the final resolution of any Disputed Amounts pursuant to <u>Section 2.8(c)(iii)</u>.  Any such amounts be paid by wire transfer of immediately available funds to such account as is directed by the applicable Purchaser or Sellers, as the case may be.

(f)     <u>Adjustments for Tax Purposes</u>.    Any payments made pursuant to <u>Section 2.8(d)</u> shall be treated as an adjustment to the consideration payable pursuant to this Agreement for Tax purposes, except to the extent otherwise required by Law.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by Express since January 1, 2022 in respect of Sellers and their businesses to the extent publicly available on the EDGAR system of the United States Securities and Exchange Commission as of the date of this Agreement (the "<u>Filed SEC Documents</u>") (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included in Filed SEC Documents to the extent they are forward-looking in nature) (it being understood that this clause (i) shall not apply to <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.3</u>, <u>Section 3.16</u>, or <u>Section 3.21</u>); (ii) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (iii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to <u>Section 10.10</u>, Sellers represent and warrant to Purchaser, as of the date of this Agreement and as of the Closing Date, as follows:

**Section 3.1     <u>Organization and Qualification</u>**.  Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

**Section 3.2     <u>Authorization of Agreement</u>**.  The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is or will be a party, and the consummation by such Seller of the Transactions and the transactions contemplated by the other Transaction Agreements, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions and the transactions contemplated by the other Transaction Agreements.  Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller.  Assuming due authorization, execution and delivery of this Agreement

22

and the other Transaction Agreements by the other parties hereto and thereto, this Agreement and the other Transaction Agreements constitute, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

Section 3.3    **Conflicts; Consents**.  Assuming that requisite Bankruptcy Court approvals are obtained, the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), the execution, delivery and performance by Sellers of this Agreement or the other Transaction Agreements to which any Seller is or will be a party, and the consummation by Sellers of the Transactions and the transactions contemplated by the other Transaction Agreements do not and will not (a) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable (b) require a consent or approval under, conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract or an Acquired Permit, (c) assuming each Party's compliance with the requirements of the HSR Act and any other applicable antitrust, competition, foreign direct investment or "FDI," or merger control Laws promulgated by any Governmental Body ("Foreign Competition Laws"), violate any Law or Order applicable to Sellers, or (d) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Assets, except, in the case of clauses (b) through (d), as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Entity, taken as a whole.

Section 3.4    **Title to Properties**.

(a)    One or more of Sellers has a good and valid leasehold interest to all real property leased by Sellers (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances).  Schedule 3.4(a) sets forth a true, correct and complete list of the addresses of all such Leased Real Property.  Sellers have made available to Purchaser or Purchaser's Advisors true and complete copies of each Acquired Lease.

(b)    With respect to the Leased Real Property, except as set forth on Schedule 3.4(b) (and subject to the entry of the Sale Order and the satisfaction of any Cure Costs): (i) the Leases are in full force and effect and there are no unwritten or oral modifications by Sellers or any of their Subsidiaries to the Leases; (ii) except as a result of the commencement of the Bankruptcy Case, to the Knowledge of Sellers, neither Sellers nor their Subsidiaries are in default under any of the Leases in any material respect, nor does any event or circumstance exist which, with the passage of time or the giving of notice would constitute such a default under any of the Leases; (iii) neither Sellers nor any of their Subsidiaries have received written notice from any Person that it is in such default under any of the Leases; and (iv) neither Sellers nor their Subsidiaries have received written notice from any Governmental Body regarding presently

pending or threatened condemnation or eminent domain proceedings or their local equivalent affecting or relating to such Leased Real Property.

(c)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers and their Subsidiaries own good title to, or hold a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to the Business, taken as a whole.

(d)     Except as set forth on <u>Schedule 3.4(d)</u>, Sellers own 40.0% of the outstanding capital stock or other Equity Interests of the Acquired Entity, free and clear of all Encumbrances (other than Permitted Encumbrances).

**Section 3.5     <u>Insurance</u>**.     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business and the Acquired Entity, taken as a whole, (a) Sellers and their Subsidiaries own or hold policies of insurance, or are self-insured, in amounts providing reasonably adequate coverage against all risks customarily insured against by companies in similar lines of business as Sellers and their Subsidiaries and (b) all such insurance policies are in full force and effect, except for any expiration thereof in accordance with the terms thereof. Sellers and their Subsidiaries have not received written notice of cancelation or modification with respect to such insurance policies other than in connection with ordinary renewals, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default by any insured thereunder.

**Section 3.6     <u>Contracts</u>**.

(a)     <u>Schedule 3.6</u> (a) sets forth a true and correct list of each Material Contract as of the date of this Agreement.  For purposes of this Agreement, "<u>Material Contract</u>" means any Contract to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan and purchaser orders or similar instruments) that:

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement;

(ii)     provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $100,000, other than indebtedness solely between or among any of Express and any of its wholly owned Subsidiaries;

(iii)     relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $100,000 (A) that was entered into after January 1, 2021 or (B) pursuant to which any earn-out, holdback, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments or other outstanding payment obligation by or to Sellers of more than $100,000 after the date hereof (in each case, excluding for the avoidance doubt, acquisitions or dispositions of supplies, merchandise, inventory, products, Equipment, properties or other

assets in the Ordinary Course, or of supplies, inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the businesses of Sellers);

(iv)    is a Contract (other than purchase orders) (A) with any Material Supplier or (B) for the purchase of materials, supplies, goods, services, Equipment or other assets pursuant to which Sellers would reasonably be expected to make or receive payments of more than $100,000 during any fiscal year (other than a Contract with any Material Supplier);

(v)    contains any provision (A) limiting or restricting, in any material respect, the right of Sellers to engage in any business, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, (C) granting a right of first refusal, right of first negotiation, right of first offer or similar right with respect to any material assets, rights or properties of the Business, or (D) any provision in any license agreements for Intellectual Property limiting Sellers' use of such Intellectual Property to specified fields of use or specified territories;

(vi)    any Contract that relates to any material settlement of any legal proceeding (A) under which any Seller has any material conduct obligations or continuing liabilities in excess of $100,000 after the date hereof or (B) with any Governmental Body; or

(vii)    is a Contract (other than the Express License Agreement and Bonobos License Agreement) pursuant to which any of Sellers (A) receives a license to use any Intellectual Property that is material to the continued operation of the Business (other than any nonexclusive license for off-the-shelf software granted on standardized terms that are generally commercially available or any open source software license); or (B) grants a license to use any material Seller Intellectual Property (other than any nonexclusive licenses of Intellectual Property granted in the Ordinary Course or that are incidental to a services agreement to facilitate the provision of services to or on behalf of any of Sellers).

(b)    True and complete copies of all Material Contracts have been made available to each Purchaser.  Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases, (ii) with respect to any Contract that has previously expired in accordance with its terms, and (iii) as set forth in Schedule 3.6(b), (A) each Material Contract is valid and binding on Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect (subject to the Enforceability Exceptions), except where the failure to be valid, binding or in full force and effect would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, except where such nonperformance would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a

25

whole, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller under any Material Contract, except where such default would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

Section 3.7    **No Litigation**.

(a)    There are no Actions pending or, to the Knowledge of Sellers, threatened against or affecting any of Sellers that would reasonably be expected to adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the Transactions.

(b)    There is no, and since January 1, 2023, there has not been any Action pending or, to the Knowledge of Sellers, threatened against Sellers or any of their respective Affiliates that relates to the Business or that would reasonably be expected to be, individually or in the aggregate, material to the Business, taken as a whole.

(c)    No Seller, nor any of its Affiliates is subject to any Order that relates to the Business or that would reasonably be expected to be, individually or in the aggregate, material to the Business, taken as a whole.

(d)    There is no, and since January 1, 2023 there has not been, any audit, examination or investigation by any Governmental Body pending or, to the Knowledge of Sellers, threatened against either Seller or any of its respective Affiliates that relates to the Business, in each case that would reasonably be expected to be, individually or in the aggregate, material to the Business, taken as a whole.

Section 3.8    **Permits; Compliance with Laws**.  Each Seller is, and has been since January 1, 2023, in compliance in all material respects with all Laws applicable to such Seller. Each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies (collectively, "Permits") necessary for the lawful conduct of its respective businesses as currently conducted, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to be, individually or in the aggregate, material to the Business, taken as a whole.  Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf is, and has been since January 1, 2020, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder.

Section 3.9    **Environmental Matters**.  Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws; (b)

since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved; (c) Sellers possesses and are in compliance with all Permits required under Environmental Laws ("Environmental Permits") for the operation of their businesses as currently conducted; (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, threatened against any Seller; (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller; and (f) no Seller has released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against any Seller, under Environmental Laws.

Section 3.10    **Intellectual Property; Data Privacy**.

(a)    Schedule 3.10(a) sets forth a correct and complete list of all Seller Owned Intellectual Property that is registered with, issued by, or the subject of a pending application before any Governmental Body or Internet domain name registrar, specifying the owner, application number, application date, patent number or registration number, and date of registration or issuance of each such item of Seller Owned Intellectual Property, as applicable.

(b)    Sellers exclusively own all of the rights, title and interest in and to the Seller Owned Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). All of the material Seller Owned Intellectual Property is subsisting and, to the Knowledge of Sellers, valid and enforceable. Immediately following the Closing, Purchaser will have legally enforceable and sufficient rights to use all Intellectual Property used in or necessary for, and material to, the conduct of the Business as currently conducted, free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers or any of their Affiliates has sold, transferred or otherwise conveyed, or purported to sell, transfer or otherwise convey, to any third party (other than to EXP Topco LLC), any right, title or interest in or to any material Intellectual Property Rights or Internet Properties constituting "Contributed Assets" as defined under that certain Contribution Agreement, dated January 23, 2023, between Express, LLC, Express Fashion Investment, LLC and EXP Topco LLC.

(c)    Since January 1, 2021, Sellers and their Affiliates have taken commercially reasonable steps, and have implemented commercially reasonable safeguards, in a manner reasonably consistent with industry standards, to maintain the confidentiality of all material non-public Seller Intellectual Property. Except as has not been, and would not reasonably be expected to be, material to the Business or would not reasonably be expected to result in the unenforceability of any non-public Seller Intellectual Property, no non-public Seller Intellectual Property or Business Data (including any source code constituting part of the Seller Intellectual Property) has been disclosed to or accessed by any Person other than subject to written and binding obligations of confidentiality, which obligations, to the Knowledge of Sellers, have not been violated in any respect that would reasonably be expected to be material to the Business. Sellers and their Affiliates have taken commercially reasonable steps to monitor and enforce their rights in all material Trademarks constituting part of the Seller Intellectual Property against unauthorized use by third parties, and have exercised reasonable quality control measures with respect to any licensees of such Trademarks.

(d)     No Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, neither Sellers nor their Affiliates have received any written communication (including in the form of an invitation to take a license), (i) challenging the ownership, validity, enforceability or use of any Seller Intellectual Property or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(e)     Since January 1, 2023, to the Knowledge of Sellers, (i) no Person has infringed, misappropriated or otherwise violated any Seller Intellectual Property in a manner that, individually or in the aggregate, has been or would reasonably be expected to be material to the Business, and (ii) the operation of the Business has not, and the use and commercialization of the Acquired Assets has not, violated, misappropriated or infringed the Intellectual Property of any other Person, except as has not resulted in, and would not reasonably be expected to result in, material liability or disruption to the Business.

(f)     The consummation of the Transactions will not result in the grant of any right or license to any third party of any Intellectual Property that is owned by or exclusively licensed to any Seller, which grant would reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities.

(g)     Each Person who has developed Intellectual Property material to the Business within the scope of such Person's employment or engagement with a Seller or its Subsidiary has validly assigned all of such Person's right, title and interest in and to such material Intellectual Property to Sellers, or all rights, title and interest in and to such material Intellectual Property has otherwise vested with Sellers automatically by operation of Law.  No such Person retains, or to the Knowledge of Sellers, claims to retain, any right, title or interest in or to such Intellectual Property.

(h)     Sellers have not used, incorporated, combined, linked, made available for remote access or distributed any Open Source Materials in a manner that requires that any of material software owned by them to be: (i) disclosed or distributed or otherwise made available in source code form; (ii) licensed for the purpose of making derivative works; (iii) redistributable at no charge or minimal charge; or (iv) licensed under the same license as such Open Source Materials.  Except as has not had and would not reasonably be expected, individually or in the aggregate, to be material to the Business and the Acquired Entity, taken as a whole, since January 1, 2023, the Sellers and their Affiliates have complied with their respective obligations and all terms and conditions of their licenses in Open Source Materials, and neither the Sellers nor any of their Affiliates have received any written notice or complaint alleging that it has failed to comply with the terms and conditions of any license to any Open Source Materials.

(i)     Since January 1, 2023, Sellers have taken commercially reasonable steps and have implemented commercially reasonable safeguards, in a manner consistent with industry standards, to protect the Business Data, Internet Properties and IT Systems, in each case, included in the Acquired Assets, from unauthorized use, disclosure, modification and access, and to ensure that the Acquired Assets are free from any disabling codes or instructions, spyware, Trojan horses, worms, viruses or other software routines that facilitate or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, software, data or other materials

28

("Malicious Code").  Within the past twelve (12) months, there has been no unplanned downtime, outage or service interruption of such IT Systems, in each case, that has caused a material disruption to the Business, and to the Knowledge of Sellers, such IT Systems are free of any material Malicious Code.

(j)     To the Knowledge of Sellers, since January 1, 2023, (i) Sellers and their Affiliates have complied in all material respects with all applicable Laws and their publicly posted policies concerning their collection, handling, security, transfer, distribution, use, exploitation and other processing of Personal Data, and (ii) there has been no unauthorized access, use, disclosure, intrusion or breach of security in with respect to any Business Data, Personal Data or IT Systems held or controlled by any of Sellers or their Affiliates, and included in the Acquired Assets, in each case, in a manner that would reasonably require Sellers or their Affiliates to notify a Governmental Body under any applicable Law, or that would otherwise be material to the Business.  Since January 1, 2023, no Action has been asserted or, to the Knowledge of Sellers, threatened against any Seller in writing by any Person with respect to any Business Data or Personal Data.

(k)     To the Knowledge of Sellers, (i) the consummation of the Transactions, including the transfer of the Acquired Assets to the Purchaser, shall not violate any of Sellers' or their Affiliates' published policies, contractual obligations, applicable Laws, or any other legally binding obligations concerning privacy or data security, and (ii) no such published policies, applicable Laws or other legally binding obligations shall prohibit or impair, in any material respect, the Purchaser's receipt or use of any Business Data or Personal Data in a manner substantially consistent with the manner as used in the Business during the twelve (12) months prior to Closing.

**Section 3.11   Tax Matters**.   Except as would not reasonably be expected to be, individually or in the aggregate, material to the Business and the Acquired Entity, taken as a whole:

(a)     All Tax Returns required to be filed with respect to the Acquired Assets, the Assumed Liabilities or the Business have been timely filed with the appropriate Governmental Body, and all such filed Tax Returns are true, complete and accurate in all respects.

(b)     All Taxes with respect to the Acquired Assets, the Assumed Liabilities or the Business that are due have been timely paid, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code.

(c)     Each of Sellers and their Affiliates has timely and properly collected, withheld and paid over to the appropriate Governmental Body (or where such payment is not yet due, set aside in an account for such purpose).  All Taxes required to have been collected, withheld and paid over by Sellers and their Affiliates in connection with amounts received or owed from or paid or owing to any employee, independent contractor, creditor, stockholder, customer or other third party, in each case, with respect to or in connection with the Acquired Assets, the Assumed Liabilities or the Business, have been timely collected, withheld or paid over to the appropriate Governmental Body.  Each of Seller and their Affiliates has complied with all applicable information reporting requirements with respect to or in connection with the Acquired Assets, the Assumed Liabilities or the Business.

(d)    No audit, examination, suit, claim, investigation, dispute, proceeding or other Action with respect to any Taxes or Tax Returns of or with respect to the Business, the Acquired Assets or Assumed Liabilities is currently in progress or, to the Knowledge of Sellers, has been proposed or threatened, which has not been resolved with or terminated by the applicable Governmental Body.

(e)    There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(f)    No written claim for deficiency of payment of Taxes with respect to the Acquired Assets, the Assumed Liabilities or the Business is outstanding, assessed or proposed in writing, which has not been resolved with or terminated by the applicable Governmental Body.

(g)    There is no waiver, extension or other modification of any statute of limitations in respect of Taxes with respect to the Acquired Assets, the Assumed Liabilities or the Business or extension or other modification of time with respect to an assessment or deficiency for Taxes with respect to the Acquired Assets, the Assumed Liabilities or the Business (other than extensions of time to file Tax Returns obtained in the Ordinary Course). No request for any such waiver, extension or modification is currently pending, in each case, which waiver, extension or modification is currently in force and/or could have effect after the Closing Date.

(h)    Except to the extent that doing so would not adversely impact the Acquired Assets, the Assumed Liabilities or the Business or the Purchaser's ownership of the Acquired Assets, the Assumed Liabilities or the Business, none of Sellers or any of their respective Subsidiaries has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(i)    Other than the Equity Interests in the Acquired Entity, none of the Acquired Assets constitutes stock, partnership interests or other equity interests in any Person for U.S. federal income tax purposes.

**Section 3.12    Benefit Plans**.

(a)    With respect to each Assumed Benefit Plan and each material Seller Plan, Sellers have made available to the JV Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material plan terms, including any amendments thereto, other than any document that any Seller is prohibited from making available to the JV Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material-related insurance Contract or trust agreement.

(b)    Each Seller Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits)

by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Assumed Liability. No material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan.  The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to the Acquired Assets and the Assumed Liabilities, taken as a whole.

(c)    The consummation of the Transactions will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Seller Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by the JV Purchaser or any of its Affiliates.

**Section 3.13    Employees**.

(a)    None of Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of Sellers and their Affiliates.  No demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union.  There is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of any Seller.  Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.  There is no material charge, complaint of discrimination or retaliation, lawsuit, governmental investigation or audit or other similar proceeding pending or, to the Knowledge of Sellers, threatened against Sellers by, on behalf of or relating to any Covered Employee.

(b)    Schedule 3.13(b) sets forth a true, correct and complete list, as of April 30th, 2024, of all Covered Employees and identifies the job title, work location, date of hire, exempt or non-exempt status, employment status (whether active or on leave of absence), part-time or full-time, annual base salary or regular hourly wage rate, and bonus or commission entitlement for each such employee, as well as whether such employee is on leave and the date of such leave. During the ninety (90)-day period preceding the date of this Agreement, Sellers have made no internal transfers that affected whether a particular individual is or is not classified as a Covered Employee.

(c)    Sellers have provided the JV Purchaser with a true, correct and complete list of all employees of Sellers and their Affiliates who have experienced an employment loss within the meaning of the Worker Adjustment and Retraining Notification Act of 1988 or any similar state and local or foreign Laws (the "WARN Act") within the ninety (90)-day period prior to the date of this Agreement, along with such employee's work location and date of hire (the

"WARN List") and Sellers shall provide an updated WARN List to the JV Purchaser on the Closing Date.

Section 3.14    **Affiliate Transactions**.  Except as set forth on Schedule 3.13(a) and other than (i) Seller Plans, (ii) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course and (iii) employment arrangements in the Ordinary Course, (a) no officer, director or executive committee member of any Seller or any member of their immediate family or any Affiliate of any Seller (a) is a party to any Contract or Lease required to be set forth on Schedule 1.7(a), or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, any Seller or, to the Knowledge of Sellers, any actual competitor, vendor or licensor of any Seller; (b) to the Knowledge of Sellers, none of the foregoing Persons has any cause of action or other claim whatsoever against Sellers related to the Business or the Acquired Assets; and (c) no Seller has any direct or indirect business arrangement with or financial obligation to the foregoing Persons.

Section 3.15    **Brokers**.  Except for Moelis, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers or its Affiliates.

Section 3.16    **Material Suppliers**.  Schedule 3.16 sets forth a true, complete and correct list of the ten (10) largest suppliers from which Sellers and their Subsidiaries purchased materials, supplies, products, services or other goods (measured by dollar volume of purchases from such suppliers) for the period ended December 31, 2023 (such suppliers collectively referred to as "Material Suppliers"), and the amount for which each such Material Supplier invoiced Sellers during such period.  Since January 1, 2023, there has not been any written notice from any Material Supplier that such supplier will cease, or materially decrease the rate of, supplying products to the Business or change the material terms (whether related to payment, price or otherwise) with respect to such supply.

Section 3.17    **Title to Assets; Sufficiency of Assets**.

(a)    Sellers have good and valid title to, or, in the case of leased or subleased Acquired Assets, valid and subsisting leasehold interests in, all Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).  Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances).

(b)    Other than (i) all Cash and Cash Equivalents, all bank accounts, and all deposits or prepaid or deferred charges and expenses, (ii) Excluded Contracts, (iii) Seller Plans and (iv) employees that do not become Transferred Employees, the Acquired Assets (as of the date of this Agreement), together with the Transferred Employees, the rights and benefits to be provided pursuant to this Agreement, the Transition Services Agreement, the Express License Agreement and the Bonobos License Agreement, the Assignment and Assumption Agreement and the Assignment and Assumption of Lease or any other Transaction Agreement, shall, in the aggregate,

constitute in all material respects all of the assets, properties, personnel and rights that are sufficient for Purchasers to conduct the Business in the same manner immediately following the Closing as it was conducted during the 12 month period prior to the Petition Date, other than with respect to Excluded Stores.

(c)     All of the plants, buildings, structures, Equipment and other tangible assets of the Business included in the Acquired Assets (as of the date of this Agreement) have been maintained in accordance with applicable Law and normal industry practice in all material respects, are in good operating condition and repair (normal wear and tear excepted) and are adequate and suitable for the purposes for which they presently used in the Business.

Section 3.18    **Financial Statements**.

(a)     True, correct and complete copies of (i) the audited consolidated balance sheets and statements of operations and comprehensive income, stockholders' equity and cash flow of Express as of and for the fiscal years ended January 28, 2023 and January 29, 2022, together with the auditor's reports thereon (the "Audited Financial Statements"), and (ii) an unaudited consolidated balance sheets and statements of operations and comprehensive loss, cash flow and stockholders' equity of Express as of and for the quarterly period period ended October 28, 2023 (such date being the "Interim Balance Sheet Date") (the "Interim Financial Statements" and, together with Audited Financial Statements, the "Financial Statements") have been provided to Purchaser.

(b)     The Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of Express and its Subsidiaries on a consolidated basis as of the dates and for the periods indicated in such Financial Statements. The Financial Statements have been prepared in accordance with the books of account and other financial records of Express and its Subsidiaries and have been prepared in conformity with GAAP (except, in the case of the Interim Financial Statements, for the absence of footnotes and other presentation items and for normal year-end adjustments that are not material individually or in the aggregate).

(c)     Express maintains a system of internal accounting controls designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements, including, that (x) transactions are executed in accordance with management's general or specific authorizations and (y) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.  Since January 1, 2023, neither Express nor any of its Subsidiaries has received any advice or notification from any independent accountants that Express or any of its Subsidiaries has used any improper accounting practice that would have the effect of not reflecting or incorrectly reflecting in the books and records of Express and its Subsidiaries any properties, assets, Liabilities, revenues, expenses, equity accounts or other accounts.  To the Knowledge of Sellers, there have been no instances of fraud, whether or not material, that occurred during any period covered by the Financial Statements.  Express has in place a revenue recognition policy consistent with GAAP.

(d)     Except (i) as reflected in the Financial Statements, (ii) as set forth in Schedule 3.18(d), (iii) for Liabilities that may have arisen since the Interim Balance Sheet Date in

the Ordinary Course and are not material to Express or its Subsidiaries, (iv) Liabilities arising under the executory portion of a Contract (excluding in each case Liabilities for breach, non-performance or default) and (v) the Excluded Liabilities, Express and its Subsidiaries do not have any Liabilities required to be set forth on an audited balance sheet of Express and its Subsidiaries.

Section 3.19    **Absence of Certain Changes**.  Other than as a result of the Bankruptcy Cases, since December 31, 2023, each Seller and its Subsidiaries have conducted their business in the Ordinary Course, and there has not been any event, circumstance, or development that, individually or together with all other events, circumstances, or developments, has had, or would reasonably be expected to have, a Material Adverse Effect.

Section 3.20    **Merchandise**.  The Merchandise, taken as a whole, is of a quantity, quality and mix historically useable, saleable or maintained, as applicable, in the Ordinary Course.  All Merchandise is free from defects in materials and workmanship (normal wear and tear excepted), except as would not be material to the Business.

Section 3.21    **Pricing Files**.  Sellers have maintained their pricing files in the Ordinary Course.  All pricing files and records are consistent in all material respects as to the actual cost to Sellers for purchasing the goods referred to therein and as to the selling price to the public for such goods in the Ordinary Course without consideration of any point of sale discounts.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Each Purchaser represents and warrants to Sellers, as of the date hereof and as of the Closing Date, as follows:

Section 4.1    **Organization and Qualification**.  The JV Purchaser is a limited liability corporation duly formed, validly existing and in good standing under the laws of the State of Delaware.  The WHP Global Purchaser is a limited liability corporation duly formed, validly existing and in good standing under the laws of the State of Delaware.  Purchaser has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.  Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or used by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions.

Section 4.2    **Authorization of Agreement**.  Purchaser has all necessary power and authority to execute and deliver this Agreement and the Transaction Agreements and to perform its obligations hereunder and to consummate the Transactions and the transactions contemplated by the other Transaction Agreements.  The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions and the transactions

contemplated by the other Transaction Agreements, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions and the transactions contemplated by the other Transaction Agreements. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

Section 4.3    **Conflicts; Consents**.

(a)    Assuming that requisite Bankruptcy Court approvals are obtained, the execution, delivery and performance by Purchaser of this Agreement or the other Transaction Agreements to which Purchaser is or will be a party, and the consummation by Sellers of the Transactions and the transactions contemplated by the other Transaction Agreements do not and will not (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) assuming each Party's compliance with the requirements of the HSR Act, violate any Law or Order applicable to Purchaser or (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any material Contract to which Purchaser is a party, except, in the case of clauses (ii) through (iii), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)    Except as set forth on Schedule 4.3(b), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except (i) any filings required to be made under the HSR Act, (ii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, or (iii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or materially delay the ability of Purchaser to consummate the Transactions.

Section 4.4    **Financial Capability**.

(a)    Purchaser has received and accepted, and delivered to Sellers a true, correct and complete copy of, an executed equity commitment letter, dated as of the date of this Agreement, among Purchaser and the other parties (the "Investors") (together with all annexes, schedules and exhibits thereto, and any fee letters relating thereto, the "Commitment Letter") relating to the commitment to provide the JV Purchaser the amount of equity financing set forth in such letter (the "Financing").  There are no side letters or other contracts or arrangements related to the funding of the full amount of the Financing other than as expressly set forth in the Commitment Letter provided to Express prior to the date hereof.

(b)    Except as set forth in the Commitment Letter, there are no conditions precedent to the obligations of the Investors to provide the Financing or any contingencies that would permit the Investors to reduce the total amount of the Financing to an amount less than the amount, together with any available debt financing, required to consummate the transactions contemplated by this Agreement.    Subject to the satisfaction of the conditions set forth in Section 7.1 and Section 7.2, the JV Purchaser does not have any reason to believe that it will be unable to satisfy on a timely basis any term or condition to Closing to be satisfied by it in the Commitment Letter or that the full amount of the Financing will not be made available, on or prior to the Closing Date.    There are no conditions precedent or other contingencies to the funding of the Financing other than as set forth in the Commitment Letter.

(c)    The Financing, together with the Debt Financing, shall provide Purchaser with immediately available cash on the Closing Date sufficient to consummate the Transactions on the terms contemplated by this Agreement, including payment of all amounts under Section 2.1, and to pay all related fees and expenses.

(d)    The Commitment Letter is the legal, valid, binding and enforceable obligation of the JV Purchaser and each other party thereto and is in full force and effect.  The JV Purchaser is not in breach of any of the terms or conditions set forth in the Commitment Letter. No event has occurred that, with or without notice, lapse of time, or both, would reasonably be expected to constitute a default or breach or a failure to satisfy a condition precedent on the part of the JV Purchaser under the terms and conditions of such Commitment Letter.  The Commitment Letter has not been withdrawn, rescinded or terminated or otherwise amended or modified in any respect, and no such amendment or modification is contemplated.    No counterparty to the Commitment Letter has notified the JV Purchaser of its intention to terminate such Commitment Letter or not to provide such Financing.  The JV Purchaser has paid in full any and all commitment fees or other fees and expenses required to be paid pursuant to the terms of the Commitment Letter on or before the date of this Agreement.

Section 4.5    **Brokers**.    There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of the Purchasers that might be entitled to any fee or commission in connection with the Transactions.

Section 4.6    **No Litigation**.    There are no Actions pending or, to any Purchaser's knowledge, threatened against or affecting such Purchaser that will or would reasonably be expected to adversely affect such Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

Section 4.7    **Investment Representation; Investigation**.  The JV Purchaser is acquiring the capital stock or other equity interests of the Acquired Entity for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws.    The JV Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act.    The JV Purchaser is knowledgeable about the industries in which the Acquired Entity operate and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time.  The WHP Global Purchaser has been afforded full access to the books

and records, facilities and personnel of the Acquired Entity for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Acquired Entity and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

**Section 4.8** **[Reserved]**.

**Section 4.9** **No Foreign Person**.  As of Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

**Section 4.10** **Solvency**.  Each Purchaser is, and immediately after giving effect to the Transactions, each Purchaser and the Acquired Entity shall:  (a) be able to pay its debts as they become due; (b) own property (tangible and intangible) that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of any Purchaser or the Acquired Entity.  In connection with the Transactions, no Purchaser has incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.11** **HSR Act**.  As of immediately prior to the Closing, the JV Purchaser and its Ultimate Parent Entity (as defined by 16 CFR 801.1), (a) will not be controlled by any other entity (as "control" is defined by the HSR Act), (b) will not have total assets of $10 million or more (as adjusted and published annually per the HSR Act) and (c) will not have annual net sales of $10 million or more (as adjusted and published annually per the HSR Act) for purposes of reportability under the HSR Act and regulations.

**Section 4.12** **No Additional Representations or Warranties**.  Except for the representations and warranties contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or representations and warranties in any certificate delivered under Section 2.5(b)(v) or Section 2.6(c) of this Agreement, Sellers acknowledge and agree that no Purchaser nor any other Person on behalf of any Purchaser makes any other express or implied representation or warranty with respect such Purchaser or with respect to any other information provided to Sellers by any Purchaser, and that no Purchaser nor any other Person on behalf of any Purchaser makes, and neither Sellers nor any Person on behalf of Sellers has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Purchaser.

**Section 4.13** **No Outside Reliance**.  Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, each Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) or representations and warranties in any certificate delivered under  of this Agreement (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to such

Purchaser or any member of the Purchaser Group and on which such Purchaser and the Purchaser Group may rely in connection with the Transactions.  Each Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the applicable Acquired Assets are being acquired by such Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including: (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any projections or in any meetings, calls or correspondence with management of any Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors; (b) any other statement relating to the historical, current or future businesses, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, or the quality, quantity or condition of any Seller's assets; (c) any implied representation of merchantability or fitness for any particular use or purpose; (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner; and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that no Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements.  Each Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the businesses of each Seller and is Affiliates including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers.  In making its determination to proceed with the Transactions, each Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to any Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that the Purchasers and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

**Section 5.1    Bankruptcy Actions**.

(a)    The Bidding Procedures Order shall approve the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement pursuant to Section 8.3(a) and Breakup Fee pursuant to Section 8.3(b)), other than the performance of those obligations to be performed at or after the Closing.  The Bidding Procedures Order shall be in form and substance acceptable to the Purchasers.  Each Purchaser agrees that it will promptly take such actions as are reasonably requested by any Seller to assist in obtaining Bankruptcy Court approval of the Bidding Procedures Order.  In the event the entry of the Bidding Procedures Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(b)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order.  Each Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.  Sellers may modify the Bidding Procedures Order or the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest.  However, any such modifications to the Bidding Procedures Order or the Sale Order shall be acceptable to Purchasers in their sole discretion.

(c)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order and any other Orders reasonably necessary to consummate the Transactions.

(d)     Subject to the last sentence of Section 5.1(b), the Purchasers shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary to consummate the Transactions, including for the purposes of providing assurances of performance by the Purchasers under this Agreement and demonstrating that the Purchasers are "good faith" the Purchasers under section 363(m) of the Bankruptcy Code, as well as reasonably demonstrating the Purchasers' ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Each Seller and each Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any third party and/or any Governmental Body with respect to the Transactions.

(f)     If an Auction is conducted, and the Purchasers are not the prevailing parties at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but are the next highest bidder at the Auction, the Purchasers shall be required to serve as a back-up bidders (the "Backup Bidder").   If the Purchasers are the Backup Bidder, the Purchasers' bid to consummate the Transactions on the terms and conditions set forth in this Agreement shall remain open and irrevocable until the earliest to occur of (i) the Outside Date, (ii) consummation of an Alternative Transaction, and (iii) Sellers' release of the Purchasers from the requirement to serve as a Backup Bidder.  If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid.  In such event, Sellers may consummate the Transactions on the terms and conditions set forth in this Agreement.

(g)     If the Purchasers are the Successful Bidder or Backup Bidder at the Auction, Sellers shall schedule a hearing with the Bankruptcy Court to consider entry of the Sale Order no later than June 14, 2024.  Sellers shall file such motions or pleadings as may be appropriate or

necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs.

(h)     Sellers shall use commercially reasonable efforts to cooperate with the Purchasers concerning the Bidding Procedures Order, the Sale Order, any other orders of the Bankruptcy Court relating to the Transactions, and the bankruptcy proceedings in connection therewith.  Sellers shall use commercially reasonable efforts to provide Purchasers with copies of all applications, pleadings, notices, proposed orders and other documents relating to such proceedings sufficiently in advance of the proposed filing date so as to permit the Purchasers sufficient time to review and comment on such drafts.  With respect to all provisions in those documents that impact the Purchasers or relate to the Transactions, such pleadings and proposed orders shall be in form and substance reasonably acceptable to the Purchasers.  Sellers shall use commercially reasonable efforts to give the Purchasers reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(i)     In compliance with the terms of the Bidding Procedures Order, the Sellers and the Purchasers acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval.

(j)     The applicable Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for each Assigned Contract.  The Purchasers agree that they will take all commercially reasonable actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court.

**Section 5.2     Cure Costs**.  Subject to entry of the Sale Order, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.7 on or prior to the date of such assignment), the applicable Purchaser shall pay the Initial Cure Costs and any Designated Agreement Cure Costs, and Sellers shall pay and other amounts and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to the applicable Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

**Section 5.3     Sale Order**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Sale Order, among other things, shall: (a) approve (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to the Purchasers on the terms set forth in this Agreement and free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to the Purchasers the Assigned Contracts; (c) find that the Purchasers are "good faith" buyers within the meaning of section 363(m) of the Bankruptcy Code, find that the Purchasers are not a successor to any Seller, and grant the Purchasers the protections of section 363(m) of the Bankruptcy Code; (d) find that, other than as expressly set forth in this Agreement, the Purchasers shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets,

40

including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (e) find that the Purchasers have provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts; (f) find that the Purchasers shall have no Liability for any Excluded Liability; (g) find that the consideration provided by the Purchasers pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets; (h) find that the Purchasers and Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; and (i) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

**Section 5.4   Approval**.  Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bidding Procedures Order and the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**Section 5.5   Notices and Consents**.  Prior to the Closing and as necessary following the Closing, Sellers will give, or will cause to be given, any notices to third parties necessary and appropriate to consummate the Transactions. Each of the Parties will use its commercially reasonable efforts to obtain any third-party consents, authorizations, Permits or sublicenses, in each case, as are necessary and appropriate to consummate the Transactions.  Sellers shall control all correspondence and negotiations with third parties regarding any such matters.  Sellers shall not be obligated to initiate any legal proceedings to obtain such consent authorization, Permit or approval.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

**Section 6.1   Conduct of Business of Sellers**.

(a)   Except (i) as required by applicable Law, (ii) as required or restricted pursuant to the Bankruptcy Code or any Order of the Bankruptcy Court (including the Financing Order and the related debtor-in-possession financing arrangements, provided the foregoing are not amended or modififed after the date of this Agreement in a manner that prevents Sellers' compliance with its obligations under this Agreement), (iii) as expressly required by this Agreement, or (iv) as set forth on Schedule 6.1(a), during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless the Purchasers otherwise consent in writing, Sellers shall use their commercially reasonable efforts to carry on their business in the Ordinary Course in all material respects; provided that no action by any Seller with respect to matters specifically addressed by Schedule 6.1(b) shall be deemed to be a breach of this Schedule 6.1(a) unless such action would constitute a breach of Schedule 6.1(b).

41

(b)     Except (i) as required by applicable Law, (ii) as required or restricted pursuant to the Bankruptcy Code or any Order of the Bankruptcy Court (including the Financing Order and the related debtor-in-possession financing arrangements, provided the foregoing are not amended or modifided after the date of this Agreement in a manner that prevents Sellers' compliance with its obligations under this Agreement), (iii) as expressly required by this Agreement or (iv) as set forth on Schedule 6.1(b), during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless the Purchasers otherwise consent in writing, Sellers shall not:

(i)     other than transactions among solely Sellers, (A) issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests of the Acquired Entity, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights convertible into, or exchangeable or exercisable for, or warrants or options to purchase any shares of such capital stock or other equity or voting interests, (B) redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests of the Acquired Entity, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, (C) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests of the Acquired Entity, or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests of the Acquired Entity;

(ii)     (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers or the Acquired Entity, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $5,000,000 outstanding at any time, in each case of this clause (A), other than Excluded Liabilities, (B) enter into any swap or hedging transaction or other derivative agreements or (C) make any loans, capital contributions or advances to, or investments in, any Person other than as permitted pursuant to Section 6.1(b)(v);

(iii)     sell, divest, distribute, assign, license, transfer or lease to any Person, in a single transaction or series of related transactions, any Acquired Asset owned by a Seller, except (A) Ordinary Course sales or dispositions of inventory to Persons that are not Affiliates and (B) transfers among Sellers;

(iv)     with respect to the capital budget of the Business and the Acquired Entity set forth on Schedule 6.1(b)(iv), make or authorize any capital expenditures, including for property, plant and Equipment, not contemplated in such capital budget;

(v)     except acquisitions of inventory in the Ordinary Course, make any acquisition of, or investment in, any material properties, assets, securities or business of any third party (including by merger);

(vi)    except pursuant to the terms of any Seller Plan in effect on the date of this Agreement, (1) grant to any Covered Employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former director, officer, employee or other individual service provider of Sellers or any of their Subsidiaries any severance, retention, change in control, termination or similar compensation or benefits, (3) grant or amend any equity, equity-based or other incentive awards, (4) hire any employee who is above the director level, (5) establish, adopt materially amend, or enter into any material Seller Plan or materially amend or terminate any material Assumed Benefit Plan, (6) transfer any employee under circumstances that would affect whether such employee is classified as a Covered Employee, or (7) take any action to accelerate any rights or benefits of any Covered Employee; provided that the foregoing shall not restrict any Seller from, in the Ordinary Course of business consistent with past practice, entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(vii)    make any changes in financial accounting methods, principles or practices, except as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(viii)    amend any Seller's articles of incorporation or bylaws or amend the comparable organizational documents of the Acquired Entity;

(ix)    enter into any joint venture with any third party;

(x)    grant any Encumbrance (other than Permitted Encumbrances) on any of its Acquired Assets other than as authorized by any Order of the Bankruptcy Court;

(xi)    release, compromise, settle or propose to settle any pending or threatened Action against any Seller (A) that would result in an Assumed Liability in an amount in excess of $100,000 individually or in excess of $200,000 in the aggregate, (B) granting injunctive or other equitable remedy against the Acquired Entity or the Business, (C) that imposes any material restrictions on the operations of Business, or (D) that requires the admission of wrongdoing by any Seller, the Acquired Entity or their respective Affiliates (to the extent related to the Business);

(xii)    (A) terminate (other than, except in the case of any Acquired Permit, upon expiration in accordance with its terms), or amend, supplement, modify or waive any material term of, or accelerate any material rights, benefits or obligations under, any Assigned Contract or any Acquired Permit, or (B) enter into any Contract that, if in effect on the date of this Agreement, would be a Material Contract, in the case of (B), other than in the Ordinary Course;

(xiii)   enter into any Contract for the purchase, sale, or lease of real property, or amend, modify, terminate, renew or fail to renew, or waive, assign or transfer any rights under any lease, sublease, license or occupancy agreement with respect to Acquired Leased Real Property;

(xiv)   abandon, cancel, fail to renew, or permit to lapse any Seller Intellectual Property, other than the expiration of Seller Intellectual Property that has reached the end of its final non-renewable term;

(xv)   amend in any material respect, cancel or terminate any material insurance policy naming a Seller or a Subsidiary of a Seller as an insured, a beneficiary or a loss payable payee without obtaining comparable substitute insurance coverage and with an effective date of such amendment, cancelation or termination prior to the applicable Closing Date;

(xvi)   with respect to the Acquired Assets, the Assumed Liabilities, or the Business, and not with respect to any income Taxes or income Tax Returns of Sellers and their Affiliates (A) make, change or revoke any material tax election, (B) fail to file any Tax Return or pay any Taxes when due, except to the extent the nonpayment thereof is permitted or required by the Bankruptcy Code, (C) adopt or change any material method of Tax accounting, (D) file any amended material Tax Return, (E) enter into any "closing agreement" within the meaning of Section 7121 of the Code (or any similar provision of state, local or non-U.S. Law), or (F) surrender or compromise any right to claim a material refund of Taxes, in each case of (A) through (F), to the extent such action could, individually or in the aggregate, reasonably be expected to have an adverse effect on a Purchaser or any of its Affiliates or direct or indirect owners;

(xvii)   transfer any cash or depository accounts located at any Acquired Leased Real Property or en route to such depository accounts, or any petty cash located at any Acquired Leased Real Property, distribution centers or corporate offices out of such locations outside of the Ordinary Course;

(xviii)   transfer into any Acquired Leased Real Property from distribution centers or an e-commerce platform any inventory or Merchandise held for more than one (1) year;

(xix)   prior to the Sale Hearing, reject any Contracts or Leases other than (A) Leases with respect to Excluded Stores, (B) as set forth on Schedule 6.1(b)(xix) or (C) following five (5) Business Days' prior written notice to Purchasers of any motion to reject the applicable Contracts, if Purchasers do not object to such intended rejection during such five (5) Business Day period;

(xx)   seek to accelerate the receipt of any royalty payments or licensing or other receivables generated by Sellers, by way of discount or otherwise;

(xxi)   issue any gift cards or gift certificates outside the Ordinary Course;

(xxii)   enter into any purchase orders except in accordance with the budget in Sellers' debtor-in-possession financing;

(xxiii)  close the operations of any retail store location other than (A) the Excluded Stores or (B) following the Sale Hearing, stores under any Lease that is not an Acquired Lease;

(xxiv)  cancel, terminate, fail to keep in place or reduce the amount of any insurance coverage without obtaining substantially equivalent (in the aggregate) substitute insurance coverage; or

(xxv)   authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)     Without limiting the foregoing, from and after the date hereof until the Closing or the earlier termination of this Agreement in accordance with its terms, Sellers shall consult and reasonably cooperate with the Purchasers in good faith with respect to (i) to the extent permissible under applicable Law, receiving and accepting Merchandise; (ii) issuing purchase orders for Merchandise; (iii) paying post- petition obligations; (iv) incurring costs and expenses; and (v) pricing and promotions with respect to Merchandise or gift cards.

(d)     Nothing contained in this Section 6.1 is intended to give any Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or businesses prior to the Closing.  Prior to the Closing, Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and their Subsidiaries' respective operations (including the Business).

Section 6.2    **Access to Information**.

(a)     From the date of this Agreement until the Closing, Sellers will provide each Purchaser and its authorized Advisors with reasonable access and upon advance notice and during regular business hours to the books and records, including work papers, schedules, memoranda, Tax Returns and other documents (for the purpose of examining and copying) of Sellers, in order for each Purchaser and its authorized Advisors to access such information regarding the Acquired Assets, the Assumed Liabilities or the Business, as is reasonably necessary for the purpose of integration planning or otherwise in furtherance of consummating the Transactions.  Such access shall not unreasonably interfere with the normal operations of any Seller or the Acquired Entity and all requests for access will be directed to Moelis or such other Person(s) as the Sellers or Moelis may designate in writing from time to time.  Notwithstanding anything in this Agreement to the contrary, Sellers shall not be required to provide access to or disclose information if and to the extent such access or disclosure would: (A) require any Seller to disclose any financial or proprietary information that would expose such party to risk of liability for disclosure of commercially sensitive information; (B) jeopardize the protection of the attorney-client privilege, attorney work product protection or other legal privilege; or (C) be in violation of applicable Laws (including the HSR Act and Foreign Competition Laws) or the provisions of any agreement to which any Seller is bound or would violate any fiduciary duty.  Notwithstanding the foregoing, the Parties agree that, to the extent the restrictions set forth in these clauses (A) through (C) apply,

Sellers shall, and shall cause their respective Affiliates to, cooperate in good faith to attempt to design and implement alternative disclosure arrangements to enable each Purchaser to evaluate any such information without violating an obligation of confidentiality to any third party, jeopardizing the attorney-client privilege or contravening any applicable Laws. Nothing herein will permit Purchaser or its Advisors to conduct any sampling or testing of environmental media or any other invasive investigation or assessment at any Leased Real Property, including of the type commonly known as a Phase II environmental site assessment, except with Seller's prior written consent.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of integration planning or otherwise in furtherance of consummating the Transactions.  Such information will be governed by all the terms and conditions of the Confidentiality Agreement.  The Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary in the Confidentiality Agreement.

(c)     From and after the Closing until the earlier of (i) the third (3rd) anniversary of the Closing Date and (ii) the wind-up and dissolution of Sellers, each Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns and other documents (for the purpose of examining and copying at Sellers' sole cost and expense) and to Transferred Employees to the extent that such access may be reasonably required by Sellers in connection with preparing financial statements, reporting and payment of Taxes, regulatory or securities Law reporting obligations, and compliance with applicable Laws, completion of the Bankruptcy Cases (including reconciliations and payment of claims) or for use in any Action (other than an Action between or among Sellers or any of their respective Affiliates, on the one hand, and any Purchaser or any of its Affiliates, on the other hand) or other legitimate non-competitive purposes in connection with Sellers' operation or ownership of any Excluded Assets following Closing or wind-down and dissolution.  The final sentence of Section 6.2(a) shall apply *mutatis mutandis* to any access provided pursuant to this Section 6.2(c). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of.

**Section 6.3     Personal Data Matters**.

(a)     Purchaser shall use its reasonable efforts to:  (i) employ appropriate security controls and procedures (technical, operational, and managerial) to protect the Personal Data of such customers ("Customer Data"), including the confidentiality and security thereof; (ii) abide by all applicable Laws and applicable policies and procedures of any Seller or any of its Subsidiaries with respect to Customer Data; and (iii) take any such actions as may be agreed between Sellers and Purchaser.

(b)     Purchaser shall use its reasonable efforts to honor all prior requests by any individual who has opted out of receiving marketing messages from Sellers or any of their respective Subsidiaries, as such requests have been communicated or disclosed to Purchaser.

(c)      Purchaser may use Customer Data solely for the purpose of continuing Sellers' business operations and continuing to provide and market similar goods and services to individuals, or as otherwise permitted under applicable Law.

**Section 6.4    <u>Employee Matters</u>**.

(a)      At least fifteen (15) Business Days prior to the Closing Date, the JV Purchaser shall extend to (i) substantially all employees of Sellers working at a facility located on any Acquired Leased Real Property and (ii) at least 400 of all other employees of Sellers and their Affiliates (other than employees of Sellers at Excluded Stores) (which employees will be identified by Purchaser in writing to Seller no later than the Sale Hearing) offers of employment (which may be extended in some or all cases through a mass or form communication), the terms of which shall be determined by the JV Purchaser in its sole discretion.  Any such offer, if accepted, shall become effective immediately after the Closing.  Covered Employees who accept such offers and begin active employment with the JV Purchaser in accordance with this <u>Section 6.4</u> shall be referred to in this Agreement as "<u>Transferred Employees</u>."  Sellers will reasonably cooperate with any reasonable requests by the JV Purchaser in order to facilitate the offers of employment and dissemination and the delivery of such offers.  The JV Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected.  Nothing in this Agreement shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the offer or will continue in employment with the JV Purchaser following the Closing for any period of time.

(b)      Without limiting the generality of any other provision of this Agreement: (i) for purposes of benefit plans and programs maintained by the JV Purchaser or any of its Affiliates after the Closing Date ("<u>Purchaser Plans</u>") providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plans to be waived for each Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (ii) the JV Purchaser shall make commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by each Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(c)      Except for any Assumed Liabilities, Sellers will have the sole and absolute responsibility for any financial or other commitments to employees of Sellers and their Affiliates for periods prior to and including the Closing, including any and all claims or obligations for severance pay, workers compensation claims and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan or any local, state or federal law, rule or regulation (including the WARN Act) prior to and including the Closing.  Notwithstanding the foregoing, if requested by the JV Purchaser no later than ten (10) days prior no the Closing, the Sellers will assign the Express Savings and Retirement Plan to the JV Purchaser as of the Closing, in which case such plan shall be an Assumed Benefit Plan and Acquired Business Asset and the liabilities thereunder will be Assumed Liabilities (in such case, the JV Purchaser and the Sellers will cooperate in good faith to facilitate such assignment and assumption).

(d)    If requested by the JV Purchaser no later than fifteen (15) Business Days prior to the Closing Date, Sellers and the JV Purchaser shall enter into a transition services agreement (the "Welfare Benefits TSA") which shall provide that, during the Benefits Transition Period (as defined below), Transferred Employees who were actively participating in the Seller Plans providing group welfare benefits as set forth on Schedule 6.4(d) (but not including those providing vacation, paid time off or severance benefits) ("Seller Welfare Plans") will be eligible to remain active participants in such Seller Welfare Plans, subject (other than in the case of medical, dental, and vision plans) to the consent of the applicable insurers and plan administrators for each such Seller Welfare Plan and the terms and conditions of such plans, it being understood that Sellers will make commercially reasonable efforts to obtain any such consents and will amend plans as necessary to facilitate the participation contemplated hereby (such Transferred Employees, the "Transition Plan Participants").   Subject to the further terms and conditions included in the Welfare Benefits TSA, the Welfare Benefits TSA shall provide that: (i) Sellers shall not modify or terminate any such Seller Welfare Plan during the Benefits Transition Period and shall (A) continue the Seller Welfare Plans during the Benefits Transition Period and (B) allow each Transition Plan Participant to remain eligible to participate in each Seller Welfare Plans for the duration of the Benefits Transition Period, (ii) the JV Purchaser shall promptly pay Sellers the costs, expenses and liabilities incurred by Sellers attributable to the of participation by Transition Plan Participants (and their eligible dependents or beneficiaries) in the Seller Welfare Plans during the Benefits Transition Period, including the cost of third-party insurance premiums, the actual claims costs for any self-insured Seller Welfare Plan, and all third-party administrative fees, charges, expenses or costs (all of which shall be determined based on Seller's internal per-employee imputed cost rather than actual claims experience) However, the JV Purchaser shall not be obligated to pay Sellers benefit claims incurred under the Seller Welfare Plans prior to the Closing or costs or expenses that would have been incurred under the Seller Welfare Plans absent the Welfare Benefits TSA.   For the avoidance of doubt, continued active participation by Transferred Employees in the Seller's 401(k) plan shall not be provided under the Welfare Benefits TSA.  If the JV Purchaser makes the request contemplated by the first sentence of this paragraph, the Parties agree to negotiate in good faith the terms of, and enter into effective as of the Closing, the Welfare Benefits TSA.  The "Benefits Transition Period" shall mean the period from the Closing Date through the ninetieth (90th) day following the Closing Date.  The JV Purchaser may terminate the Benefits Transition Period prior to such ninetieth (90th) day by providing written notice to Sellers seven (7) Business Days in advance of such termination.

(e)    The provisions of this Section 6.4 are for the sole benefit of the Parties and nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.4 or under or by reason of any provision of this Agreement).  Nothing contained in this Agreement, express or implied:  (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.4, alter or limit the JV Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f)     For so long as Sellers maintain a group health plan, Sellers shall be solely responsible for any and all Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9. After the group health plans in the "selling group" (as defined in 26 26 C.F.R. § 54.4980B-9, A-3(a)) are terminated, the JV Purchaser shall be responsible for providing coverage under Section 4980B of the Tax Code with respect to all M&A qualified beneficiaries to the extent it is a successor employer in accordance with 26 C.F.R. § 54.4980B-9, A-8(c)(1), provided that Sellers shall make commercially reasonable efforts to continue to maintain a group health plan for so long as any such M&A qualified beneficiaries remain eligible for such coverage, and shall in any case indemnify the JV Purchaser and its Affiliates in respect of any and all Liabilities that arise as a result of providing coverage because Sellers are unable so to maintain a plan.  Nothing in this Agreement shall be construed as a determination by any Party that any particular individual is an M&A qualified beneficiary or that the JV Purchaser is a successor for any purpose.

(g)     [reserved]

(h)     The JV Purchaser shall be solely responsible for any Liabilities arising under the WARN Act with respect to any individual whose loss of employment is initiated by the JV Purchaser or any of its Affiliates (including the Acquired Entity) after the Closing (or whose loss of employment occurs at the Closing due to a breach by the JV Purchaser of its offer obligations under Section 6.4(a)), and Sellers shall be solely responsible for any Liabilities arising under the WARN Act with respect to any individual whose loss of employment is initiated by Sellers  or any of their Affiliates (including the Acquired Entity) on or prior to the Closing.

(i)     If so agreed to by the Parties, the JV Purchaser and any applicable Affiliate of the JV Purchaser agree to follow the alternate procedure for United States employment tax withholding as provided in Section 5 of Revenue Procedure 2004-53, 2004-2 C.B. 320.  Sellers shall provide to the JV Purchaser (or its applicable Affiliate) all information required to be provided by the predecessor under such Revenue Procedure and any other information reasonably required by the JV Purchaser (or its applicable Affiliate) in connection with its reporting obligations thereunder.  Sellers shall thereafter have no United States employment tax reporting responsibilities, and the JV Purchaser (or its applicable Affiliate) shall have full United States employment tax reporting responsibilities, in each case, for Transferred Employees following the close of business on the Closing Date for the tax year in which the Closing Date occurs.

**Section 6.5    <u>Reasonable Efforts; Cooperation</u>**.

(a)     From and after the date of this Agreement, and subject to the terms and conditions of this Agreement, each Party shall, and shall cause its respective controlled Affiliates to, use its reasonable best efforts to perform its obligations under this Agreement and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as reasonably practicable the Transactions on or prior to the Outside Date.

(b)     The obligations of Sellers pursuant to this Agreement, including this <u>Section 6.4(a)</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code, and Sellers' duty to seek and

obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

Section 6.6    **Further Assurances**.  The Parties shall (a) execute and deliver, or cause to be executed and delivered, such documents and other instruments and (b) take, or cause to be taken, all such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the Transactions in accordance with the terms of this Agreement.

Section 6.7    **Insurance Matters**.  Purchaser acknowledges that, from and after the Closing, all insurance coverage provided in relation to any Seller and the Acquired Assets or the Business that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with any Seller or its Affiliates) shall, to the extent not constituting Acquired Assets, cease to provide any coverage to Purchaser and the Acquired Assets and the Business and no further coverage shall be available to Purchaser or the Acquired Assets or the Business under any such policies.  Notwithstanding the foregoing, from and after the Closing, Purchaser shall have the right to make claims and any right to any proceeds under such policies (other than under the Excluded Insurance Policies) with respect to any matter solely to the extent related to the Acquired Assets, the Assumed Liabilities or the Business inuring to the benefit of Sellers for periods prior to the Closing.  Sellers shall use reasonable best efforts to cooperate with Purchaser to submit any claims under such policies and to seek recovery or allow Purchaser to seek recovery under such insurance policies.  Seller shall also cooperate with Purchaser's reasonable requests if it seeks recovery, with respect to such matters and shall remit (or, at Purchaser's request, direct any such insurer to pay directly to Purchaser) any insurance proceeds actually obtained therefrom to Purchaser or its designee.  The insurance proceeds payable to Purchaser or its designee as set forth in the preceding sentence shall be net of Sellers' reasonable and documented out-of-pocket costs and expenses of seeking recovery, to the extent not otherwise paid or reimbursed by Purchaser.

Section 6.8    **Misallocated Assets; Wrong Pockets**.

(a)    If, following the Closing, any right, property or asset constituting an Excluded Asset is found to have been transferred to any Purchaser or any of its Affiliates, either directly or indirectly, such Purchaser shall transfer, or shall cause its Affiliates to transfer, at no cost, such right or property as soon as practicable to the applicable Seller or any of its Affiliates indicated by such Seller.  If, following the Closing, any right, property, asset or Liability constituting an Acquired Asset or an Assumed Liability is found to have been retained by any Seller or any of its respective Affiliates, either directly or indirectly, such Seller shall transfer, or shall cause its respective Affiliates to transfer, at no cost, such right, property, asset or Liability as soon as practicable to the applicable Purchaser or an Affiliate indicated by such Purchaser.

(b)    If, following the Closing, any right, property or asset constituting an Acquired Business Asset or an Assumed Business Liability is found to have been transferred to the WHP Global Purchaser or any of its Affiliates (excluding the JV Purchaser) in error, either directly or indirectly, the WHP Global Purchaser shall transfer, or shall cause its Affiliates to transfer, at no cost, such right or property as soon as practicable to the JV Purchaser or any of its Affiliates indicated by the JV Purchaser.  If, following the Closing, any right, property, asset or Liability constituting an Acquired IP Asset or an Assumed IP Liability is found to have been

transferred to the JV Purchaser or any of its Affiliates (excluding the WHP Global Purchaser) in error, either directly or indirectly, the JV Purchaser shall transfer, or shall cause its respective Affiliates to transfer, at no cost, such right, property, asset or Liability as soon as practicable to the WHP Global Purchaser or an Affiliate indicated by the WHP Global Purchaser.

**Section 6.9**     <u>Payments; Purchased Receivables; Certain Rent Matters</u>.

(a)     Sellers shall, or shall cause their applicable Affiliates to, promptly pay or deliver to the applicable Purchaser (or its designated Affiliates) any monies or checks that have been sent to Sellers or any of their respective Affiliates after the Closing by customers, suppliers or other contracting parties of the Business to the extent that they are in respect of the Business, an Acquired Asset or an Assumed Liability and not in respect of any Excluded Asset or Excluded Liability.

(b)     Each Purchaser shall, or shall cause its applicable Affiliates to, promptly pay or deliver to Sellers (or their designated Affiliates) any monies or checks that have been sent to such Purchaser (including the Business) after the Closing to the extent that they are in respect of an Excluded Asset or Excluded Liability.

(c)     JV Purchaser shall use commercially reasonable efforts to collect the Purchased Receivables. JV Purchaser shall promptly pay over to Sellers all cash that is received in respect of any Purchased Receivables. Notwithstanding the foregoing, JV Purchaser will be entitled to retain all proceeds of the Purchased Receivables that are in excess of an amount equal to 90% of the aggregate face amount, as of the Closing, of the outstanding Purchased Receivables. JV Purchaser will be entitled to retain any such excess as and when collected after delivering to Sellers cash (received in respect of Purchased Receivables) in an aggregate amount equal to such 90% threshold. Upon reasonable written request of Sellers from time to time, JV Purchaser shall provide reasonable updates as to such matters, including information regarding any such proceeds or collection efforts.

(d)     Sellers and/or JV Purchaser have reached and/or are in discussions regarding potential arrangements with the applicable counterparties regarding the terms of potential Acquired Leases. Promptly following the date of this Agreement, Sellers and JV Purchaser shall work in good faith, including with such applicable counterparties, to enter into definitive agreements documenting such arrangements, pursuant to which Sellers shall be entitled to the economic benefit, in the form of cash to be delivered to Sellers at Closing, of reduced rent under such arrangements with respect to the period from May 1, 2024 through the Closing Date.

**Section 6.10**   <u>Seller Support Obligations</u>. At or prior to Closing, the JV Purchaser shall replace, cash collateralize, backstop or settle in full each Standby Letter of Credit outstanding as of the date of this Agreement and set forth on <u>Schedule 6.10</u>, in each case by either (i) causing the termination, expiration or cancellation and return to Sellers of all outstanding Standby Letters of Credit, and/or (ii) with respect to each such Standby Letter of Credit, the furnishing to the DIP Agent of a cash deposit, or at the discretion of the DIP Agent, a backup standby letter of credit satisfactory to the DIP Agent. The JV Purchaser acknowledges and agrees that it shall be solely responsible for ensuring that any credit support provided pursuant to this <u>Section 6.10</u> satisfies all of the credit support provisions of the applicable Assigned Business Contract to which it relates.

Sellers will cooperate with the JV Purchaser in connection with the performance of the JV Purchaser's obligations under this <u>Section 6.10</u>. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, in no event will the JV Purchaser have any obligation under this <u>Section 6.10</u> to replace, settle or collateralize any Standby Letter of Credit (i) to the extent the inventory relating thereto has been included in the calculation of Acquired Merchandise Amount or (ii) if such Standby Letter of Credit relates to a Lease unless and until such Lease is deemed an Acquired Lease hereunder and has been actually assumed by the JV Purchaser.

**Section 6.11   <u>Use of Seller Transferred Trademarks After Closing</u>.**

(a)   Each Seller acknowledges and agrees that Sellers are assigning all of their rights, title and interest in and to all Seller Intellectual Property, including any and all Trademarks owned by or licensed to any Seller that constitute or incorporate the words "EXPRESS," "BONOBOS," "UPWEST," all logos used in connection therewith, and all derivations thereof (collectively, the "<u>Transferred Marks</u>"). Following the Closing, Sellers will have no further rights to, and shall not, use or display any of the Transferred Marks, or to permit or license any other Person to use or display any of the Transferred Marks, in each case, except as permitted in this <u>Section 6.11</u>.

(b)   For a period of up to ten (10) weeks following the Closing or, if earlier, until all applicable inventory has been exhausted, each Purchaser grants Sellers and their applicable Affiliates a royalty-free, fully paid up, worldwide, non-exclusive license to use and display the Transferred Marks in a manner consistent with the manner used and displayed during the twelve (12) months immediately prior to Closing, solely for the purpose of selling off existing inventories of goods of the type sold and marketed under such Transferred Marks as of the Closing, including through Excluded Stores, and for promoting such sales activities.

(c)   Any Seller that incorporates any Transferred Mark in its corporate or legal name may continue to use that same corporate or legal name for up to ten (10) weeks, after which Sellers shall ensure that any such entities either (i) are dissolved or (ii) change their corporate and legal names, as applicable, to no longer incorporate any Transferred Marks.

(d)   Each Seller shall ensure that any goods and services sold or promoted in connection with any such Transferred Marks are of a character and quality consistent with or better than the quality of those offered and provided by Sellers during the six (6) months immediately prior to Closing. Sellers shall not use or display the Transferred Marks in a manner that violates any applicable Law, or that damages or impairs the goodwill associated with any of the Transferred Marks. Purchaser acknowledges and agrees that rights under this <u>Section 6.11</u> will be used to conduct "going out of business" or similar sales at Excluded Stores or stores under Leases that are not Acquired Leases. The rights granted to Sellers and their Affiliates under this <u>Section 6.11</u> are non-transferable and non-sublicensable unless otherwise agreed in writing by WHP Global Purchaser. As between Sellers and their Affiliates, on the one hand, and WHP Global Purchaser, on the other hand, any goodwill arising from any use or display of the Transferred Marks as permitted under this <u>Section 6.11</u> shall inure exclusively to WHP Global Purchaser or its successors-in-interest with respect to such Transferred Marks, as applicable.

**Section 6.12    Financing Matters**.

(a)    Prior to the Closing, Sellers shall use their reasonable best efforts to, and to cause their respective officers and employees to, provide to the JV Purchaser reasonable cooperation reasonably requested by the JV Purchaser in connection with any debt financing pursued or obtained by the JV Purchaser in connection with the consummation of the Transactions (the "Debt Financing") (provided that such cooperation does not unreasonably interfere with the ongoing operations of Sellers and their Subsidiaries taken as a whole), including participating in a reasonable number of meetings, presentations, and due diligence sessions (including accounting due diligence sessions), in each case, to the extent reasonably necessary to allow the JV Purchaser to consummate the Debt Financing.  In no event shall Sellers be required to furnish any financial information which is not prepared in the Ordinary Course of business or any pro forma financial information and neither Sellers nor any of their Subsidiaries shall be required to pay any commitment or other similar fee prior to the Closing, provide any security, or except as set forth in this Agreement incur any other liability in connection with the Financing. It is understood and agreed that (i) none of Sellers nor any of their Subsidiaries, or any Persons who are directors of Sellers or any of their Subsidiaries at any time prior to the Closing shall be required to pass resolutions or consents to approve or authorize the execution of the Financing, (ii) no employees of Sellers or any of their Subsidiaries shall be required to take any action in their individual capacity in connection with the foregoing cooperation or that would subject them to any actual or potential personal liability, unless the JV Purchaser has agreed to fully indemnify such employee, (iii) none of Sellers or any of their Subsidiaries shall be required to (A) take any action that conflicts with, violates or results in a breach of or default under any Organizational Documents of Sellers or their Subsidiaries or any law, Order or material Contract; or (B) requires providing access to or disclosing information that Sellers reasonably determine is reasonably likely to jeopardize any attorney client privilege of, or conflict with any Confidentiality Agreements (not created in contemplation hereof) applicable to Sellers or any of their Affiliates, and (iv) the effectiveness of any documentation executed by Sellers or their Subsidiaries in connection with the Financing shall be subject to the consummation of the Closing.  The JV Purchaser shall indemnify and hold harmless the Seller Parties for and against any claims, liabilities, losses, damages, costs, expenses (including reasonable legal fees and expenses), judgments, inquiries and fines actually suffered or incurred by them in connection with any Action involving them arising out of or relating to the arrangement of the Financing, any action taken by them at the request of the JV Purchaser pursuant to this Section 6.12(a) and any information utilized in connection therewith (other than information provided in writing by Sellers or their Subsidiaries specifically for use in connection therewith), and each of such Persons is intended to be a third-party beneficiary of this Section 6.12(a).  Notwithstanding the foregoing, in no event shall the JV Purchaser be required to indemnify or hold harmless any Seller Party with respect to any claim, liability, loss, damage, cost, expense, judgment, inquiry or fine arising or resulting from (i) such Seller Party's willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment or (ii) a dispute solely between or among Seller Parties.  Any information provided to any member of the Purchaser Group pursuant to this Section 6.12(a) shall be subject to the Confidentiality Agreement and any other applicable agreements between or among the Parties regarding confidentiality.

(b)    The JV Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to obtain,

Debt Financing on customary terms satisfactory to it. The JV Purchaser shall, upon written request, keep Sellers informed on a reasonable basis and in reasonable detail of the status of its efforts to arrange the Debt Financing.

(c)     The JV Purchaser shall not take, and shall refrain from taking, directly or indirectly, any action that would reasonably be expected to result in a failure of any of the conditions contained in the Commitment Letter related to the Financing. The JV Purchaser shall give Sellers prompt written notice of any (A) actual or potential breach, default, termination or repudiation by any party to the Commitment Letter or any definitive document related to the Financing of which the JV Purchaser has become aware, (B) material dispute or disagreement between or among any parties to any Commitment Letter or any definitive document related to the Financing or (C) the occurrence of an event or development that could reasonably be expected to adversely impact the ability of the JV Purchaser to obtain all or any portion of the Financing contemplated by the Commitment Letter on the terms and conditions, in the manner or from the sources contemplated by any Commitment Letter or the definitive documents related to the Financing (or if at any time for any other reason Purchaser believes that it will not be able to obtain all or any portion of the Financing contemplated by the Commitment Letter on the terms and conditions, in the manner or from the sources contemplated by any Commitment Letter or the definitive documents related to the Financing).

(d)     Notwithstanding anything to the contrary in this Agreement, the JV Purchaser shall not, without the prior written consent of Sellers, (i) amend, modify, supplement or waive any of the conditions or contingencies to funding contained in the Commitment Letter or any other provision thereof or remedies thereunder (or any definitive agreements related thereto), in each case to the extent such amendment, modification, supplement or waiver would reasonably be expected to adversely affect the ability of the JV Purchaser to enforce its rights against other parties to the Commitment Letter or to timely consummate the transactions contemplated by this Agreement (including by making the conditions therein less likely to be satisfied or delaying the Closing), (ii) undertake any merger, acquisition, joint venture, disposition, lease, contract or debt or equity financing that would reasonably be expected to impair, delay or prevent consummation of the Financing contemplated by the Commitment Letter, or (iii) amend or alter, or agree to amend or alter, the Commitment Letter (or any definitive agreements related thereto) in any manner that would (x) provide for additional (or adversely modifies any existing) conditions precedent to the funding of the Financing, (y) reduce (or could have the effect of reducing) the aggregate amount of the Financing to an amount less than the amount, together with any available Debt Financing, required to consummate the transactions contemplated by this Agreement, or (z) otherwise reasonably be expected to prevent, impair or delay the consummation of the Financing or of the transaction contemplated by this Agreement. Purchaser shall promptly deliver to Sellers copies of any amendment, modification or waiver to or under any Commitment Letter or definitive agreements relating to the Financing.

**Section 6.13   Transition Services Agreement**. Between the date of this Agreement and the Closing, Sellers and Purchasers shall cooperate and negotiate in good faith to agree on the final terms of a transition services agreement (the "Transition Services Agreement)" containing the terms set forth in the Transition Services Agreement Term Sheet attached as Exhibit F hereto and otherwise in form and substance reasonably satisfactory to the Sellers and the JV Purchaser. In connection with the foregoing, between the date of the Agreement and the Closing Date, Sellers

and Purchaser will cooperate reasonably and in good faith to finalize the scope and other terms of the services to be provided pursuant to the Transition Services Agreement.  Without limiting the generality of the foregoing, such reasonable cooperation shall include Sellers providing access to data and information reasonably available to Sellers related to the services and making appropriate, knowledgeable personnel of Sellers or its Affiliates reasonably available to participate in meetings and other discussions to the extent any of the foregoing is requested by any Purchaser. Notwithstanding the foregoing, as part of the consideration of Purchasers entering into this Agreement, the Parties agree that, if Sellers and Purchasers do not agree to a Transition Services Agreement to be executed by Sellers and Purchasers as of the Closing, the terms and conditions of the Transition Services Agreement Term Sheet shall be effective as of the Closing as if it were the Transition Services Agreement and shall be legally binding upon both Sellers and Purchasers.

      **Section 6.14**   **Gift Certificates; Loyalty Programs**.   Following the Closing, the JV Purchaser shall accept and honor gift certificates, gift cards and loyalty program benefits issued or provided by Sellers prior to the Closing Date to the extent presented at any Acquired Leased Real Property within 180 days of the Closing Date.

      **Section 6.15**   **Schedules and Exhibits**.   The Parties agree to negotiate in good faith to finalize any Schedule or Exhibit contemplated by this Agreement that is not attached hereto as of the date of this Agreement.  The final form of each such Schedule or Exhibit shall be in form and substance satisfactory to the Parties.  Upon the Parties confirming that any such Schedule or Exhibit is satisfactory to them (email among counsel to the Parties being sufficient), such Schedule or Exhibit shall be deemed attached to this Agreement as if it had been attached as of its initial execution.

      **Section 6.16**   **Acknowledgment by Purchaser**.   Notwithstanding the foregoing or anything contained herein or elsewhere to the contrary:

      (a)   Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the businesses (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, the Acquired Entity, the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely, are relying, and will rely, solely, on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in that certain datasite administered by Intralinks (the "Dataroom"), the information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Moelis) (the "Information Presentation") or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations.  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations,

warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future businesses, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers and their Affiliates, or the quality, quantity or condition of any Seller's assets, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties.  Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1**    <u>**Conditions Precedent to the Obligations of each Purchaser and Sellers**</u>. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and each Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) preventing, enjoining or otherwise prohibiting the Closing that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and each such Order shall be in full force and effect and shall not have been stayed, reversed, amended or modified without the consent of each Party.

**Section 7.2**    <u>**Conditions Precedent to the Obligations of each Purchaser**</u>.    The obligations of each Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    Each of the representations and warranties of Sellers:

(i)    set forth in <u>Article III</u> (other than as set forth in <u>Section 7.2(a)(ii)</u>), without regard to any materiality or "Material Adverse Effect" qualifiers contained within such representations and warranties, shall be true and correct as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall

be true and correct on and as of such earlier date), except for such failures to be true and correct that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(ii)    set forth in Section 3.1 *(Organization and Qualification)*, Section 3.2 *(Authorization of Agreement)*, Section 3.3(a) *(Conflicts; Consents)* and Section 3.15 *(Brokers)*, without regard to any materiality or "Material Adverse Effect" qualifiers contained within such representations and warranties, shall be true and correct in all but *de minimis* respects, in each case as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all but *de minimis* respects on and as of such earlier date).

(b)    the covenants and agreements of Sellers to be performed or complied with at or prior to the Closing in accordance with this Agreement shall have been performed or complied with, as applicable, in all material respects;

(c)    since the date of this Agreement, there shall not have been a Material Adverse Effect;

(d)    Sellers shall have delivered, or caused to be delivered, to the JV Purchaser and the WHP Global Purchaser, as applicable, all of the items set forth in Section 2.4;

(e)    the counterparties to the Assigned Business Contracts and other agreements set forth on Schedule 7.2(e) shall have entered into amendments to or replacements of such agreements (and/or, as applicable, waivers of amounts due thereunder) that are (i) operative as of the Closing and (ii) in form and substance consistent with such Schedule and otherwise reasonably satisfactory to Purchasers.

**Section 7.3    Conditions Precedent to the Obligations of Sellers.** The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    each of the representations and warranties of each Purchaser set forth in Article IV shall be true and correct as of the date of this Agreement and as of Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date), in each case except for such failure to be so true and correct that, individually or in the aggregate, have not had, and would not reasonably be expected to have, a material adverse effect on the ability of such Purchaser to consummate the transactions contemplated by this Agreement.

(b)    each Purchaser shall have performed in all material respects all covenants and agreements required to be performed by it under this Agreement at or prior to the Closing; and

(c)    each Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5 and Section 2.6, as applicable.

**Section 7.4**     **Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

**ARTICLE VIII**
**TERMINATION**

**Section 8.1**     **Termination of Agreement**.  This Agreement may be terminated at any time prior to the Closing only in accordance with this Section 8.1 and in no other manner:

(a)     by the mutual written consent of Sellers and each Purchaser;

(b)     by written notice of either each Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction permanently enjoining, prohibiting or otherwise preventing the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either each Purchaser or Sellers, if the Closing shall not have occurred on or before June 30, 2024 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if such Party's (or such Party's Affiliate's) failure to perform in any material respect any covenant or agreement under this Agreement has been the proximate cause of the failure of the Closing to occur on or before such date;

(d)     by written notice of either Purchaser or Sellers, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in the Bankruptcy Case;

(e)     by written notice from Sellers to each Purchaser, if any Purchaser shall have breached any of its representations or warranties or failed to perform any of its covenants or agreements, which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.3(a) or Section 7.3(b) to be satisfied and (ii) has not been cured by the earlier of (A) the Outside Date, or (B) thirty (30) days following receipt by each Purchaser of written notice of such breach or failure to perform from Sellers.  Notwithstanding the foregoing, Sellers' right to terminate this Agreement pursuant to this Section 8.1(e) will not be available at any time that Sellers are in material breach of any covenant, representation or warranty hereunder which breach would give rise to the failure of a condition contained in Section 7.2(a) or Section 7.2(b) to be satisfied;

(f)     by written notice from any Purchaser to Sellers, if any Seller shall have breached any of its representations or warranties or failed to perform any of its covenants or agreements which breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 7.2(a) or Section 7.2(b) to be satisfied and (ii) has not been cured by the earlier of (A) the Outside Date, or (B) thirty (30) days following receipt by Sellers of written notice of such

58

breach or failure to perform from such Purchaser.  Notwithstanding the foregoing, Purchasers' right to terminate this Agreement pursuant to this Section 8.1(f) will not be available at any time that any Purchaser is in material breach of any covenant, representation or warranty hereunder which breach would give rise to the failure of a condition contained in Section 7.3(a) or Section 7.3(b) to be satisfied;

(g)     by written notice from Sellers to each Purchaser, if: (i) the Closing shall not have occurred on or prior to the date required pursuant to Section 2.3; (ii) all of the conditions set forth in Section 7.1 and Section 7.2 have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing); (iii) Sellers have confirmed in writing to each Purchaser (and not revoked such confirmation) at least two (2) Business Days prior to such termination that Sellers stand ready, willing and able to consummate the Closing; and (iv) Purchaser has failed to consummate the Closing;

(h)     by written notice from Sellers to each Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines, based on the advice of outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would violate such Person's or body's fiduciary duties;

(i)     by written notice of either each Purchaser or Sellers, if (i) any Seller enters into a definitive agreement(s) with respect to one or more Alternative Transactions with one or more Persons other than the Purchasers or the Successful Bidder or the Backup Bidder (in its capacity as such) at the Auction, (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder (in its capacity as such), or (iii) Sellers consummate an Alternative Transaction with the Successful Bidder;

(j)     by written notice from the Purchasers to Sellers, if the Purchasers are not the Successful Bidder or the Backup Bidder at the Auction;

(k)     by any Purchaser if Sellers withdraw or seek authority to withdraw the motion seeking approval of the Bidding Procedures Order; or

(l)     by any Purchaser if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (x) amended, modified or supplemented in a manner adverse to the Purchasers in any respect without each Purchaser's prior written consent or (y) voided, reversed or vacated or is subject to a stay, or (B) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in a manner adverse to the Purchasers in any respect without each Purchaser's prior written consent or (y) voided, reversed or vacated or is subject to a stay.

**Section 8.2**     **Notice of Termination**.  In the event of termination by Sellers or Purchaser pursuant to Section 8.1 written notice of such termination shall be given by the terminating Party to the other Party.

**Section 8.3**     **Effect of Termination**.

(a)     In the event this Agreement is terminated pursuant to Section 8.1, this Agreement shall become null and void and no Party nor any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement, except pursuant to the surviving Sections of this Agreement as set forth in the next sentence.  Section 2.2, Section 6.2(b), Section 8.1, this Section 8.3 and Article X shall survive any such termination.  If this Agreement is terminated pursuant to Section 8.1, the maximum Liability of Sellers under this Agreement shall be equal to the Expense Reimbursement and the Breakup Fee to the extent payable.  For the avoidance of doubt, the Expense Reimbursement and the Breakup Fee shall, if applicable, be paid upon termination of this Agreement in accordance with Section 8.1.

Notwithstanding anything contained in this Agreement to the contrary, in the event that Sellers terminate this Agreement pursuant to Section 8.1(e) or Section 8.1(g), the Deposit, together with all received investment income, if any, shall be delivered to Sellers in accordance with Section 2.2(b).  Sellers' receipt of the Deposit, together with all received investment income thereon, if any, shall constitute liquidated damages (and not a penalty) in a reasonable amount that will compensate Sellers in the circumstances in which this Agreement is terminated pursuant to Section 8.1(e) or Section 8.1(g).  The Parties acknowledge and agree that damages in such event would otherwise be impossible to calculate with precision.  Seller's right to the liquidated damages as set forth in the preceding sentence shall be Seller's sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) against the Purchasers, and any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents for any loss suffered as a result of any breach of any covenant, representation, warranty or agreement in this Agreement by any Purchaser or the failure of the Transactions to be consummated, and upon payment of such amounts, none of the Purchasers nor any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents shall have any further Liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.  For the avoidance of doubt, if this Agreement is terminated pursuant to Section 8.1, in no event shall the Purchasers' aggregate Liability under this Agreement exceed an amount equal to the amount of any Deposit made by Purchasers.

(b)     If this Agreement is terminated after entry of the Bidding Procedures Order (other than (i) by Purchasers pursuant to Section 8.1(c) (unless Sellers are not entitled to terminate this Agreement pursuant to Section 8.1(c) at the time) or (ii) pursuant to Section 8.1(a), Section 8.1(e) or Section 8.1(g)) then Express will pay to the JV Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the JV Purchaser and the WHP Global Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed 3% of the total Acquired Merchandise Amount ("Expense Reimbursement").

(c)     In consideration for each Purchaser having expended considerable time and expense in connection with this Agreement, if this Agreement is terminated after entry of the Bidding Procedures Order pursuant to Section 8.1(f), Section 8.1(h), Section 8.1(i), Section 8.1(j), Section 8.1(k) or Section 8.1(l), Sellers shall pay to the JV Purchaser a break-up fee in an amount equal to 3% of the total Acquired Merchandise Amount (the "Breakup Fee").  Express will pay the Breakup Fee to the JV Purchaser by wire transfer of immediately available funds within three (3) Business Days following such termination.  Each of the Parties acknowledges and agrees that the agreements contained in Section 8.3(b) and this Section 8.3(c) are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty.  Rather, the Parties agree that the Breakup Fee and Expense Reimbursement represent liquidated damages in a reasonable amount that will reasonably compensate the JV Purchaser in the circumstances in which such Expense Reimbursement or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by the JV Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(d)     Pursuant to the Bidding Procedures Order, the claim of the JV Purchaser in respect of the Expense Reimbursement, the Breakup Fee is and constitutes an allowed superpriority administrative expense claim against Sellers under sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of Sellers of the kind specified in section 503(b) of the Bankruptcy Code; provided that the priority of such superpriority administrative claims shall be junior to the Carve Out (as defined in the Financing Order as in effect on the date of this Agreement) and the Sellers' debtor-in-possession financing authorized by such Financing Order.

## ARTICLE IX
## TAXES

**Section 9.1    Transfer Taxes**.  Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other similar Taxes and recording charges ("Transfer Taxes") payable by reason of the sale of the Acquired Business Assets and the Business or the assumption of the Assumed Business Liabilities under this Agreement shall be borne and timely paid fifty percent (50%) by the JV Purchaser, on the one hand, and fifty percent (50%) by Sellers, on the other hand.  Any Transfer Taxes payable by reason of the sale of the Acquired IP Assets or the assumption of the Assumed IP Liabilities under this Agreement shall be borne and timely paid fifty percent (50%) by WHP Global Purchaser, on the one hand, and fifty percent (50%) by Sellers, on the other hand.  The Party responsible under applicable Law shall timely file or cause to be filed all Tax Returns related to any Transfer Taxes and promptly provide a copy of such Tax Returns to the other Party.  Purchaser and Sellers shall cooperate in good faith to reduce or eliminate any Transfer Taxes to the extent permitted by applicable Law.

**Section 9.2    Allocation of Purchase Price**.  For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate:  (i) the Primary Purchase Price, as finally determined pursuant to Section 2.8 (and any Assumed Business Liabilities or other amounts treated as part of the purchase price for the Acquired Business Assets for U.S. federal income Tax purposes) among the Acquired Business Assets and (ii) the Secondary

Purchase Price, as finally determined pursuant to Section 2.8 (and any Assumed IP Liabilities or other amounts treated as part of the purchase price for the Acquired IP Assets for U.S. federal income Tax purposes) among the Acquired IP Assets, in each case, in accordance with Section 1060 of the Code, the Treasury Regulations promulgated thereunder and the following procedures. As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Primary Purchase Price or the Secondary Purchase Price, as applicable, pursuant to Section 2.8 (a) the JV Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the final Primary Purchase Price (and other amounts treated as part of the purchase price for the Acquired Business Assets for U.S. federal income Tax purposes) among the Acquired Business Assets and (b) WHP Global Purchaser shall provide a proposed allocation of the final Secondary Purchase Price (and other amounts treated as part of the purchase price for the Acquired IP Assets for U.S. federal income Tax purposes) among the Acquired IP Assets, in each case, in accordance with Section 1060 of the Tax Code and the Treasury Regulations promulgated thereunder (the "Allocations") for Sellers' review and comment.  If Sellers deliver a written objection within forty-five (45) days after receipt of a draft Allocation proposed by a Purchaser, then such Purchaser and Sellers shall negotiate in good faith to resolve any such objection.  If Sellers and such Purchaser cannot resolve such dispute within forty-five (45) days of such Purchaser's receipt of Sellers' objection, then Sellers and such Purchaser shall be entitled to use their own allocation with respect to the items in dispute.  However, such Purchaser and Sellers shall be bound by any item on the Allocation not in dispute and any other item agreed by Sellers and such Purchaser (such undisputed or agreed items, the "Agreed Items").  Each Allocation, as prepared by a Purchaser if Sellers have not delivered a timely written objection to such Purchaser, or with respect to the Agreed Items, as applicable (a "Final Allocation"), shall be conclusive and binding on the Parties.  The Parties and their respective Affiliates shall file all Tax Returns in accordance with the Final Allocations and shall not take any Tax-related action inconsistent with the Final Allocations, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code.

       **Section 9.3**    **Cooperation**.  Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by Express and Purchaser, respectively, in connection with the preparation and filing of Tax Returns, the determination of any liability in respect of Taxes, the right to any refund, credit or prepayment in respect of Taxes, and any Action, audit, litigation, or other proceeding with respect to Taxes, in each case, with respect to the Acquired Assets, the Assumed Liabilities or the Business.  Purchaser shall reasonably cooperate with Sellers in recovering any refund of Taxes that is an Excluded Asset.

       **Section 9.4**    **Preparation of Tax Returns and Payment of Taxes**.

       (a)    Sellers shall prepare and timely file or cause to be timely filed all income Tax Returns of Sellers or any of their respective Affiliates and any Tax Returns required to be filed with respect to the Acquired Assets, the Assumed Liabilities or the Business for any taxable period ending on or before the Closing Date (other than any Tax Return required to be filed by the Acquired Entity).

       (b)    The JV Purchaser shall prepare and timely file or cause to be prepared and timely filed all Tax Returns with respect to the Acquired Business Assets, the Assumed Business Liabilities and the Business which Tax Returns have not been filed as of the Closing Date,

excluding, for the avoidance of doubt, any Tax Return required to be prepared by Sellers pursuant to Section 9.4(a). WHP Global Purchaser shall prepare and timely file or cause to be prepared and timely filed all Tax Returns with respect to the Acquired IP Assets, the Assumed IP Liabilities, or the Acquired Entity for any Tax period which have not been filed as of the Closing Date, excluding, for the avoidance of doubt, any Tax Return required to be prepared by Sellers pursuant to Section 9.4(a). With respect to any Tax Return described in the previous two sentences relating to a Straddle Period (a "Straddle Tax Return") that reflects any Liability for Excluded Taxes, the applicable Purchaser shall prepare such Tax Returns in a manner consistent with past practices, jurisdictions and methodologies, except as otherwise required by applicable Law or this Agreement, and shall provide Sellers with a draft of any such Straddle Tax Return as soon as reasonably practicable prior to the filing of any such Straddle Tax Return. The Purchasers shall consider in good faith any changes reasonably requested by Sellers with respect to any such Straddle Tax Return. With respect to each taxable period ending on or before the Closing Date and any applicable Straddle Period, WHP Global Purchaser shall cause the Acquired Entity to deliver to each applicable Seller: (i) no later than the fifteenth (15th) day of the fourth (4th) month after the end of the relevant taxable period, an estimated Schedule K-1; and (ii) no later than the thirtieth (30th) day of the sixth (6th) month after the end of the relevant taxable period, a final Schedule K-1.

Section 9.5    **Certain Acquired Entity Tax Matters**.

(a)    In the event of any Pass-Through Income Tax Action, neither JV Purchaser nor WHP Global Purchaser shall be entitled to make, nor shall either Purchaser permit any of its Affiliates to make, any election pursuant to Section 6226 of the Tax Code (or any similar provision of state, local, or non-U.S. Law) or use any procedure described in Section 6225(c)(2) of the Tax Code (or any similar provision of state, local, or non-U.S. Law) with respect to any such Action.

(b)    For U.S. federal and applicable state and local income Tax purposes, WHP Global Purchaser and Sellers agree to (and to cause their Affiliates to) treat to the purchase and sale of the Equity Interests of the Acquired Entity pursuant to this Agreement in a manner consistent with IRS Revenue Ruling 99-6, 1999-1 C.B. 432 (Situation 1). WHP Global Purchaser and Sellers shall not (and shall cause their Affiliates not to) take any position inconsistent with the tax treatment set forth in the previous sentence on any Tax Return, in any Tax proceeding or otherwise, in each case, except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code.

Section 9.6    **Straddle Period**.  For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any income, receipts or payroll Taxes and other Taxes not described in clause (b) of this Section 9.6 (other than Transfer Taxes), in each case, attributable to the portion of the Straddle Period ending on the Closing Date, shall be determined based on an interim closing of the books as though the relevant Straddle Period ended as of the close of business on the Closing Date; and (b) the amount of any property Taxes and similar Taxes that are imposed on a periodic basis attributable to the portion of the Straddle Period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1** __Non-Survival of Representations and Warranties and Certain Covenants__.  None of the representations and warranties and the covenants and agreements (solely to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other Transaction Agreement shall survive the Closing, and each of the same shall terminate and be of no further force or effect as of, the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Any covenant or obligation in this Agreement to be performed after the Closing shall survive until completion in accordance with its terms, and if no term is specified, then for 5 years following the Closing Date.  Purchaser on behalf of itself and the Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions.

**Section 10.2** __Expenses__.  Whether or not the Closing takes place, except as otherwise provided in this Agreement, including Section 8.3, all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other Transaction Agreements, the performance of this Agreement and the other Transaction Agreements and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses.  The Parties acknowledge and agree that any commitment, engagement or other fees directly payable to the lenders or agents under the Debt Financing and required as a condition to the Debt Financing shall be paid by Sellers at the Closing.

**Section 10.3** __Notices__.  Except as otherwise expressly provided in this Agreement, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing.  All such notices, demands and other communications will be deemed to have been given (a) when personally delivered; (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a Business Day and otherwise on the following Business Day; (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service; or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to the Purchasers:

Phoenix Retail, LLC
c/o WHP Global
530 Fifth Avenue
12th Floor
New York, NY 10036
Attention:      Gregg Donnenfeld
Email:          gdonnenfeld@whp-global.com

with a copy to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52nd St
New York, NY 10019
Attention:      Joshua A Feltman; Benjamin S. Arfa
Email:          jafeltman@wlrk.com; bsarfa@wlrk.com

Notices to Sellers:

Express Inc.
One Express Drive
Columbus, OH 43230
Attention:      Stewart Glendinning, Laurel Krueger
Email:          SGlendinning@express.com, LaKrueger@express.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY  10022
Attention:      Emily E. Geier, P.C.
Email:          emily.geier@kirkland.com

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL  60654
Attention:      Steve Toth
Email:          steve.toth@kirkland.com

Kirkland & Ellis LLP
95 South State Street
Salt Lake City, UT  84111
Attention:      Daniel Daines
Email:          daniel.daines@kirkland.com

**Section 10.4    Binding Effect; Assignment**.

(a)     This Agreement shall be binding upon each Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.  Notwithstanding the foregoing or anything in this Agreement to the contrary, any Purchaser may assign (in whole or in part) any of its rights, interests, or obligations under this Agreement to any other Affiliates without the prior written consent of the other Parties.  No such assignment shall relieve such Purchaser of its obligations under this Agreement.

(b)     In furtherance of the foregoing and without the consent of the Sellers, any Purchaser may designate, in accordance with the terms of this paragraph and effective as of the Closing, one or more Affiliates to acquire all, or any portion of, the Acquired Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price.  The above designation may be made by such Purchaser by written notice to Sellers at any time prior to the Closing Date.  The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

**Section 10.5    <u>Amendment and Waiver</u>**.  Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 10.6    <u>Third-Party Beneficiaries</u>**.  Except as otherwise expressly provided in this Agreement, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of <u>Section 6.11</u>, the indemnified Persons referred to in such Section, (ii) for purposes of <u>Section 10.7</u>, the Non-Recourse Persons, and (iii) the Parties and their respective permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

**Section 10.7    <u>Non-Recourse</u>**.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party (each, a "<u>Non-Recourse Person</u>") will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.  In no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or Fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this <u>Section 10.7</u>, and shall be entitled to enforce this <u>Section 10.7</u> as if a party directly hereto.

Section 10.8   **Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law. In the event any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 10.9   **Construction**.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions this Agreement.

Section 10.10  **Schedules**.  The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement.  The disclosure in any section or subsection shall be deemed to qualify any other sections and subsections of this Agreement to the extent that it is reasonably apparent from the face of such disclosure that such disclosure also qualifies or applies to such other sections and subsection.  Capitalized terms used in the Schedules and not otherwise defined have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course.  No Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course.  In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement.  The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement.  No information contained in this Agreement or in the Schedules will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

Section 10.11 **Complete Agreement**.  This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to in those documents contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions.  In

the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control.

**Section 10.12  Specific Performance**.

The Parties shall not be entitled to an injunction or injunctions to enforce specifically the Parties' respective covenants and agreements under this Agreement.  The Parties agree that the remedies set forth in Section 8.3 shall apply in the specified circumstances.

**Section 10.13  Jurisdiction and Exclusive Venue**.  Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal courts sitting in the state of Delaware) (the "Chosen Courts").  Each of the Parties irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute.  Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts.  No Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*.  The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and irrevocably waive any objection that any of the Chosen Courts is an improper or inconvenient forum for the resolution of any Agreement Dispute.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3.  Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

**Section 10.14  Governing Law; Waiver of Jury Trial**.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES.  ACCORDINGLY AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY

JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 10.15 <u>No Right of Set-Off</u>**. Each Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, waives any rights of set-off, netting, offset, recoupment or similar rights that such Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the applicable payment of the Purchase Price or any other payments to be made by such Purchaser pursuant to this Agreement or any other document or instrument delivered by such Purchaser in connection herewith.

**Section 10.16 <u>Counterparts and PDF</u>**. This Agreement and the other Transaction Agreements and any other agreements referred to in those documents and any amendments to those documents, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any other Transaction Agreement, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party, each Party or parties to the other Transaction Agreements will re-execute original forms and deliver them to all other parties. No Party or party to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

**Section 10.17 <u>Publicity</u>**. Neither Sellers nor any Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed. The foregoing prohibition shall not apply when, in the reasonable judgment of any Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which any Purchaser or Sellers lists securities. In the event of any disclosure pursuant to the preceding sentence, the Party intending to make such disclosure shall use its reasonable efforts consistent with such applicable

Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.  Prior to filing this Agreement with the Bankrupty Court, the Parties shall cooperate in good faith to redact or file under seal any Schedules that JV Purchaser reasonably believes contain commercially sensitive information to the extent permitted by the Bankruptcy Court.

**Section 10.18 <u>Bulk Sales Laws</u>**.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances.  The Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

**Section 10.19 <u>Sellers' Representative</u>**.  Each Party agrees that Express has the power and authority to unilaterally act on behalf of all or any of Sellers for the purposes specified under this Agreement.  Such power will include the power to make all decisions, actions, Consents and determinations on behalf of Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement.  No Seller shall have any right to object, dissent, protest or otherwise contest the same.  Each Purchaser shall be entitled to rely on any action or omission taken by Express on behalf of Sellers.

**Section 10.20 <u>Purchaser Obligations</u>**.  Unless otherwise expressly provided in this Agreement, any action required to be taken, obligation to be performed, or right to receive or acquire any interest, asset, benefit or otherwise, shall be several, and not joint and several, obligations of the JV Purchaser and the WHP Global Purchaser.

**ARTICLE XI**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

**Section 11.1   <u>Certain Definitions</u>**.

(a)   "<u>Acquired Assets</u>" means the Acquired Business Assets and the Acquired IP Assets.

(b)   "<u>Acquired Entity Cash</u>" means an amount, as of the Closing, equal to (i) all of the Acquired Entity's Cash and Cash Equivalents *minus* (ii) the amount of the FAM Payable *minus* (iii) reserves provided for in accordance with the Acquired Entity's organizational documents and other reserves and expenses ratably allocable to Sellers' interest in the Acquired Entity.

(c)   "<u>Acquired Entity Cash Amount</u>" means an amount equal to (i) 40% *multiplied by* (ii) the Acquired Entity Cash.

(d)   "<u>Acquired Merchandise Amount</u>" means the sum of:

(i)   90% *multiplied by* the COGS of the Category A Merchandise, plus

(ii)   50% *multiplied by* the COGS of the Category B Merchandise, plus

70

(iii)      50% *multiplied by* the COGS of the Bonobos Merchandise.

(e)      "Action" means any action, Claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(f)      "Adjustment Escrow Amount" means an amount to be agreed between Sellers and the JV Purchaser.

(g)      "Advisors" with respect to any Person means any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(h)      "Affiliate" with respect to any Person means any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.  For the avoidance of doubt, the Acquired Entity will be Affiliates of Sellers until Closing and Affiliates of Purchaser after Closing.  For purposes of this Agreement, however, in no event shall a portfolio company of any WHP Global Sponsor be considered an Affiliate of any Purchaser or any of their Subsidiaries.

(i)      "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the Equity Interests of Sellers or (ii) a material portion of the Acquired Assets and Assumed Liabilities, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise.  Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall not be an Alternative Transaction.

(j)      "Assigned Contracts" means the Assigned Business Contracts and Assigned IP Contracts.

(k)      "Assumed Benefit Plans" means such Seller Plans as may be identified by Purchaser prior to the Sale Hearing.

(l)      "Assumed Business Taxes" means all unpaid Taxes described in Section 1.4(i).

(m)      "Assumed IP Taxes" means all unpaid Taxes described in Section 1.5(a).

(n)     "<u>Assumed Liabilities</u>" means the Assumed Business Liabilities and the Assumed IP Liabilities.

(o)     "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(p)     "<u>BBW Warehouse</u>" means the Warehouse made available to Sellers by Bath and Body Works.

(q)     "<u>Bidding Procedures Order</u>" means an Order of the Bankruptcy Court approving (i) bidding procedures to be employed with respect to this Agreement and the Transactions, and (ii) the execution, delivery, and performance of this Agreement by Sellers (including payment of the Expense Reimbursement pursuant to <u>Section 8.3(a)</u> and Breakup Fee pursuant to <u>Section 8.3(b)</u>), other than the performance of those obligations to be performed at or after the Closing, which Order shall be in form and substance reasonably satisfactory to the Parties.

(r)     "<u>Bonobos Merchandise</u>" means all BONOBOS®-branded Merchandise and any other Merchandise located at or intended for sale at an Acquired Leased Real Property that is a BONOBOS store, in each case constituting Acquired Assets.

(s)     "<u>Business</u>" means, collectively, all businesses of Sellers, including (i) the business of designing, manufacturing, marketing, licensing, distributing and selling apparel and accessories, and (ii) the operation of stores and the retail sale of clothing and accessories at such stores and through e-commerce platforms, in each case of clauses (i) and (ii), other than the Excluded Assets and Excluded Liabilities.

(t)     "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(u)     "<u>Cash and Cash Equivalents</u>" means all of Sellers' or the Acquired Entity's, as applicable, cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(v)     "<u>Category A Merchandise</u>" means all Merchandise constituting Acquired Assets with a SKU identifier set forth on <u>Schedule 11.1(v)</u>.

(w)     "<u>Category B Merchandise</u>" means all Merchandise constituting Acquired Assets with a SKU identifier set forth on <u>Schedule 11.1(w)</u>.

(x)     "<u>Chacon/Carr Claims</u>" means any Claims relating to or arising out of the actions commenced by Jorge Chacon and Christie Carr alleging violations of California state wage and hour statutes and other labor standard violations.

(y)     "<u>Claims</u>" means all claims, causes of action, rights of recovery (including rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to

reimbursement) and rights of set-off, in each case, of whatever kind or description against any Person (including any claim as defined in the Bankruptcy Code).

(z)     "COGS" means the cost of goods sold of the applicable Merchandise determined in accordance with the Sample COGS Calculation (for the avoidance of doubt, net of load), including the methodologies and assumptions used in such calculation.

(aa)     "Confidentiality Agreement" means that certain letter agreement, by and between an Affiliate of Sellers and an Affiliate of a Purchaser.

(bb)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(cc)     "Contract" means any written contract, agreement, or other agreement that is binding upon a Person or its property, in each case, other than (A) a purchase order, service order, or sales order or (B) any Leases.

(dd)     "Covered Employees" means all employees of Sellers and their Affiliates who are not working at an Excluded Store.

(ee)     "Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of executory Contracts and Leases.

(ff)     "Debtors" means, collectively, the debtors-in-possession under the Bankruptcy Cases.

(gg)     "Designation Rights Period" means the period from the Closing Date through the earlier of (i) the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning Sellers in the Bankruptcy Cases, and (ii) July 31, 2024; provided that such date may be extended with respect to any Designated Contract or Designated Lease (a) for up to an additional one hundred eighty (180) days beyond July 31, 2024 with the consent of Purchaser and the applicable Designation Counterparty and (b) for up to an additional one hundred eighty (180) days beyond the expiration of the one hundred eighty (180) day extension period set forth in (a) above with the consent of Sellers, the JV Purchaser and the applicable Designation Counterparty; provided further, however, that notwithstanding the forgoing proviso, Purchaser and Seller shall work in good faith to ensure that the Designation Rights Period is extended in a manner that does not delay Sellers' intended conclusion of the Bankruptcy Cases.

(hh)     "E-Commerce Business" means the operation of the e-commerce sites of the Business in connection with the facilitation of the selling of Merchandise utilizing the internet, computer networks, or comparable electronic means, including, for example, to initiate or consummate the sale of Merchandise.

(ii)     "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests,

hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements.  For the avoidance of doubt, nonexclusive licenses of Intellectual Property shall not be considered "Encumbrances" under this Agreement except to the extent granted in connection with a security interest.

(jj)     "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment.

(kk)     "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles, machinery, and all other fixed assets.

(ll)     "Equity Interests" means any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of any Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(mm)     "ERISA" means the Employee Retirement Income Security Act of 1974.

(nn)     "Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(oo)     "Excluded Store" means each retail location set forth on Schedule 1.3(b)(i).

(pp)     "Excluded Store Contract" means the lease for the premises of any Excluded Store and each of the Contracts related primarily to any Excluded Store.

(qq)     "Excluded Taxes" means any (i) Taxes imposed on or payable by any Seller or any of its Affiliates for any Tax period (including any Taxes required to be withheld from the Purchase Price or any other payments or consideration payable to any Seller hereunder pursuant to Section 2.7); (ii) Taxes imposed with respect to any of the Acquired Assets, any of the Assumed Liabilities or the Business for any Pre-Closing Tax Period, allocated, in the case of a Straddle Period, in accordance with Section 9.6; (iii) Taxes imposed on or with respect to any of the Excluded Assets or the Excluded Liabilities, for any Tax period; (iv) Transfer Taxes for which Sellers are responsible pursuant to Section 9.1, and (iv) Taxes imposed on Purchaser or any of their respective Affiliates as a transferee or successor to any Seller or its respective Affiliates; provided that Excluded Taxes shall not include any Transfer Taxes for which Purchaser is responsible pursuant to Section 9.1.  Notwithstanding anything to the contrary, for purposes of this Agreement, all Excluded Taxes shall constitute Excluded Liabilities.

(rr)     "FAM Payable" means the $750,000 payable by Express to the Acquired Entity in respect of certain expense reimbursement obligations.

(ss)     "Financing Order" means the *Final Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens And*

*Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. __].

(tt)　　"Fraud" means common law fraud under Delaware Law, for the avoidance of doubt, taking into account the terms and conditions of this Agreement (including Section 4.12, Section 6.16, Section 10.1, Section 10.7, and Section 10.10).　Under no circumstances shall "Fraud" include any claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory, equitable fraud, promissory fraud or any other fraud or torts based on recklessness or negligence.

(uu)　　"GAAP" means United States generally accepted accounting principles as in effect from time to time.

(vv)　　"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(ww)　　"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(xx)　　"Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(yy)　　"Headquarters" means the Sellers administrative office headquarters.

(zz)　　"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(aaa)　　"Intellectual Property" means all of the following:　(i) patents, inventions, invention disclosures, industrial designs and utility models; (ii) trademarks, service marks, logos, trade dress, trade names, corporate names, and other indicia of commercial source or origin, and goodwill associated with any of the foregoing ("Trademarks"); (iii) copyrights and all works of authorship, whether copyrightable or not; (iv) Internet domain names, internet protocol addresses, social media accounts, websites, and rights in all the content provided on the foregoing (collectively, "Internet Properties"); (v) trade secrets; (vi) rights in or associated with any of the foregoing, and all other intellectual property rights and proprietary rights, in each case, arising in any jurisdiction of the world; and (vii) any registrations of and pending applications to register any of the foregoing clauses (i) through (vi), together with all renewals, reissuances, continuations, continuations-in-part, divisionals, revisions, extensions, and reexaminations thereof.

(bbb)　　"IT Systems" means computers, computer systems, hardware, networks, servers, workstations, peripherals, data communication equipment and lines, and telecommunications equipment and lines, in each case, currently owned or leased by Sellers.

(ccc)    "Knowledge of Seller," "Knowledge of Sellers," or words of like import means the actual knowledge, after reasonable inquiry of such individuals' direct reports in the applicable subject matter, without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Stewart Glendinning, Laurel Krueger and Mark Still, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(ddd)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body. For purposes of Section 6.1(b) of this Agreement, the term "Law" shall not include any order of the Bankruptcy Court.

(eee)    "Lease" means the agreements pursuant to which Leased Real Property is leased, subleased, or otherwise occupied.

(fff)    "Liability" as to any Person means any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ggg)    "Material Adverse Effect" means any event, change, occurrence or effect that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, Assumed Liabilities and the financial condition of the Business, taken as a whole.  No effect, change, event or occurrence to the extent arising out of or resulting from the following, shall constitute or be taken into account, individually or in the aggregate, in determining whether there has been or would reasonably be expected to be a Material Adverse Effect:  (a) general business or economic conditions in any of the geographical areas in which the Stores operate or affecting retail clothing stores generally; (b) national or international political or social conditions, including tariffs, riots, protests, the engagement by any country in hostilities or the escalation thereof, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state sponsored) attack; (c) any event, change, occurrence or effect affecting financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (d) the occurrence of any act of God or other calamity or force majeure events; (e) changes in applicable Law or GAAP; (f) plagues or outbreaks of epidemics or pandemics (including the novel coronavirus); (g)(A) the taking of any action expressly required by this Agreement (B) the failure to take any action if such action is prohibited by this Agreement, or (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1; (h) the negotiation, announcement or pendency of this Agreement or the consummation of the Transactions, or the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the businesses of Sellers and their Affiliates with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation

arising from or relating to this Agreement or the Transactions; (i) any seasonal fluctuations in the Business; (j) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Representatives) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect); (k) of any action taken by Purchaser of its Affiliates with respect to the Transaction or the financing thereof; (l) the matters set forth on the Schedules or in the Filed SEC Documents; (m) any material breach by Purchaser of this Agreement; (n) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; or (o) (A) any effect resulting from the filing or pendency of the Bankruptcy Cases, (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order, or the reorganization or liquidation of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers taken or not taken in order avoid a violation of such order. Notwithstanding the foregoing, in the case of each of <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>(e)</u> or <u>(f)</u>, to the extent that the Acquired Assets, the Assumed Liabilities or the Business, taken as a whole, are disproportionately affected as compared with other participants in the industries in which Sellers operate.

(hhh)  "<u>Merchandise</u>" means all inventory and merchandise (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) maintained or held by, stored by or on behalf of, or in transit to, any of Seller.

(iii)  "<u>Moelis</u>" means Moelis & Company.

(jjj)  "<u>New York Design Center</u>" means Sellers' design center located in New York, NY.

(kkk)  "<u>Open Source Materials</u>" means any software or other technology that is distributed as "free software," "open source software" or under similar licensing or distribution terms (such as the Creative Commons licenses, GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards License (SISL), the Apache License and any license identified as an open source license by the Open Source Initiative (www.opensource.org)).

(lll)  "<u>Order</u>" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body of competent jurisdiction, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(mmm)"<u>Ordinary Course</u>" means the ordinary and usual course of operations of the Businesses as conducted by Sellers through the Petition Date consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases.

(nnn)  "<u>Organizational Documents</u>" means the documents by which any Person other than a natural Person is organized (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any

certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as bylaws, a partnership agreement or an operating, limited liability or members agreement).

(ooo)    "Pass-Through Income Tax Action" means any Action relating to any items of income, gain, loss, deduction or credit of the of the Acquired Entity that, as a matter of Law, is or was required to be reported directly on a Tax Return of any Seller for a Pre-Closing Tax Period due to the classification of the Acquired Entity as a partnership for U.S. federal (and applicable state and local) income Tax purposes.

(ppp)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable or that are being contested in good faith and for which adequate reserves have been established in accordance with GAAP, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) any Encumbrances set forth on Schedule 11.1(ooo), (vi) any Encumbrances that will be removed or released by operation of the Sale Order, (vii) matters that would be disclosed by an accurate survey or inspection of the applicable real property, and (vii) any Encumbrance granted to any Purchaser or any of its controlled Affiliates.

(qqq)    "Permitted Post-Closing Encumbrances" means (i) Encumbrances described in clauses (ii) and (iii) in the definition of "Permitted Encumbrances" and any non-monetary encumbrances not in fact released upon Closing pursuant to the Sale Order, so long as, with respect to all Encumbrances that are "Permitted Post-Closing Encumbrances" pursuant to this clause (i), such Encumbrances do not materially detract from the use or value of the applicable property as it is currently being used, and (ii) other Permitted Encumbrances described in clause (i) and (iv) in the definition of "Permitted Encumbrances" securing monetary obligations which, individually or in the aggregate with all other Permitted Encumbrances treated as Permitted Post-Closing Encumbrances pursuant to this clause (ii), do not exceed $10,000.

(rrr)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(sss)    "Personal Data" means data or information (i) that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household or (ii) that is otherwise subject to a Law relating to privacy or security of data or information (including if it constitutes "personal information" or "personal data" or other equivalent term under any such Law).

(ttt)    "Post-Closing Tax Period" means any Tax period beginning after the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

(uuu)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending on the Closing Date.

(vvv)    "Purchaser" means the JV Purchaser and/or the WHP Global Purchaser, as the context may require.

(www)    "Purchaser Group" with respect to any Purchaser, means such Purchaser (including any Purchaser designee), any Affiliate of such Purchaser (including, following the Closing, the Acquired Entity, if applicable).

(xxx)    "Sale Hearing" means the hearing for approval of, among other things, the Transactions and entry of the Sale Order.

(yyy)    "Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the Transactions, which Order shall be in form and substance reasonably satisfactory to the Parties.

(zzz)    "Sample COGS Calculation" means the sample calculation set forth in Exhibit G that sets forth an illustrative calculation of the cost of goods sold (net of load) of Merchandise.

(aaaa)    "SEC" means the U.S. Securities and Exchange Commission.

(bbbb)    "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(cccc)    "Seller Intellectual Property" means all Intellectual Property that is owned or purported to be owned by, or exclusively licensed or purported to be exclusively licensed to, any Seller Parties, including the Intellectual Property licensed to any Seller Party pursuant to the Express License Agreement or Bonobos License Agreement.

(dddd)    "Seller Owned Intellectual Property" means all Intellectual Property that is owned or purported to be owned by any of the Seller Parties.

(eeee)    "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(ffff)    "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention

agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(gggg) "Specified Assumed Liabilities Amount" means the aggregate face amount of Assumed 503(b)(9) Claims and Assumed Post-Petition Admin Claims.

(hhhh) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(iiii) "Subsidiary" or "Subsidiaries" with respect to any Person, means any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(jjjj) "Tax" or "Taxes" means any federal, state, local, non-U.S. or other income, gross receipts, capital stock, franchise, profits, goods and services, withholding, social security, unemployment, payroll, employment, severance, disability, environmental, real property, ad valorem/personal property, production, registration, gains, license, lease, service, intangibles, stamp, excise, occupation, premium, escheat, unclaimed property, customs, duties, sales, use, transfer, value added, import, export, alternative or add-on minimum or estimated tax or other tax, levy, impost, license, fee, assessment or charge of any kind whatsoever in the nature of a tax, including any interest, penalty or addition thereto, whether disputed or not.

(kkkk) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(llll) "Tax Return" means any return, claim for refund, election, declaration, report, statement, information return or other document relating to Taxes filed or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(mmmm) "Transaction Agreements" means this Agreement and any other agreements, instruments, certificates or documents executed or entered into in connection with the transactions contemplated by this Agreement.

(nnnn) "Transactions" means the transactions contemplated by this Agreement.

(oooo) "WHP Global Sponsor" means [Ares, Oaktree, Solus] and their respective Affiliates (excluding [WHP Global], the Purchasers and their respective Subsidiaries).

**Section 11.2** **Index of Defined Terms**.

Acquired Business Assets ............................ 2
Acquired Entity ........................................... 5
Acquired IP Assets ..................................... 5
Acquired Leased Real Property ................... 2
Acquired Leases ........................................... 2
Acquired Merchandise ................................. 3
Acquired Permits ......................................... 3
Adjustment Escrow Account ...................... 16
Agreed Items ............................................. 62
Agreement ................................................... 1
Agreement Dispute .................................... 68
Allocations ................................................ 62
Assigned Business Contracts ....................... 2
Assigned IP Contracts ................................. 5
Assignment and Assumption Agreement .. 15
Assignment and Assumption of Lease ...... 15
Assumed Business Liabilities ...................... 8
Assumed IP Liabilities ................................ 9
Audited Financial Statements ................... 33
Avoidance Actions ....................................... 4
Backup Bidder .......................................... 39
Bankruptcy Cases ........................................ 1
Bankruptcy Code ......................................... 1
Bankruptcy Court ........................................ 1
Benefits Transition Period ........................ 48
Bonobos License Agreement ....................... 3
Breakup Fee .............................................. 61
Business Data .............................................. 4
Chosen Courts ........................................... 68
Closing ...................................................... 15
Closing Amounts Statements ..................... 19
Closing Business Amounts ........................ 18
Closing Business Amounts Statement ....... 18
Closing Date .............................................. 15
Closing IP Amounts ................................... 19
Closing IP Amounts Statement .................. 19
Cure Costs ................................................... 8
Customer Data ........................................... 46
Dataroom .................................................. 55
Deposit ...................................................... 14
Designated Agreement Cure Costs .............. 8
Designated Contracts ................................. 11
Designated Leases ..................................... 11
Disputed Amounts ..................................... 19

Environmental Permits .............................. 27
Equity Commitment Letter ........................ 35
Equity Financing ....................................... 35
Escrow Account ......................................... 14
Escrow Agent ............................................ 14
Escrow Agreement ..................................... 14
Estimated Acquired Merchandise Amount 17
Estimated Amounts Statements ................. 18
Estimated Business Amounts .................... 17
Estimated Business Amounts Statement ... 17
Estimated IP Amounts ............................... 18
Estimated IP Amounts Statement .............. 18
Excluded Assets ........................................... 7
Excluded Contracts ...................................... 7
Excluded Insurance Policies ........................ 7
Excluded Liabilities .................................. 10
Expense Reimbursement ........................... 60
Expert Fees ............................................... 20
Express ........................................................ 1
Express License Agreement ................. 3, 79
Express Representations ............................ 37
Final Allocation ........................................ 62
Financial Statements ................................. 33
Indebtedness ............................................. 42
Independent Accountant ............................ 19
Information Presentation ........................... 55
Initial Assumed Contracts ........................... 2
Initial Assumed Leases ................................ 2
Insurance Rights .......................................... 4
Interim Balance Sheet Date ...................... 33
Interim Financial Statements .................... 33
Internet Properties ..................................... 75
Investors ................................................... 35
JV Purchaser ............................................... 1
Malicious Code ......................................... 29
Material Contract ...................................... 24
Material Suppliers ..................................... 32
Negative Business Adjustment Amount .... 21
Non-Recourse Person ................................ 66
Objection Deadline .................................... 11
Outside Date ............................................. 58
Parties ......................................................... 1
Party ........................................................... 1
Permits ...................................................... 26

Petition Date ................................................1
Positive Business Adjustment Amount .....20
Post-Closing Designated Contracts ...........11
Post-Closing Designated Leases................11
Post-Closing Designation Notice..............11
Pre-Closing Designated Contracts.............11
Pre-Closing Designated Leases .................11
Primary Closing Date Payment .................14
Primary Purchase Price..............................13
Proposed Cure Costs..................................10
Purchase Price............................................14
Purchased Receivables.................................2
Purchaser Plans..........................................47
Resolution Period.......................................19
Review Period.............................................19
Secondary Closing Date Payment .............14
Secondary Purchase Price..........................14
Seller ...........................................................1

Seller Welfare Plans ..................................48
Sellers ..........................................................1
Statement of Objections.............................19
Store Cash ....................................................2
Store Deposits...............................................2
Straddle Tax Return ...................................63
Successful Bidder ......................................39
Trademarks .................................................75
Transfer Taxes ...........................................61
Transferred Employees..............................47
Transferred Marks ......................................52
Transition Plan Participants.......................48
Transition Services Agreement..................54
WARN Act ..................................................31
WARN List..................................................32
Welfare Benefits TSA................................48
WHP Global Purchaser................................1

**Section 11.3    Rules of Interpretation**.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other Transaction Agreement.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)    Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)    The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)    Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom in unreacted form at least five (5) Business Days prior to the date of this Agreement, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(j)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)    Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(m)    A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

**<u>Exhibit B</u>**

**Form of Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I)**
**APPROVING ASSET PURCHASE**
**AGREEMENT; (II) AUTHORIZING AND**
**APPROVING SALE OF CERTAIN ASSETS OF**
**DEBTORS PURSUANT TO SECTION 363 OF THE**
**BANKRUPTCY CODE FREE AND CLEAR OF ALLLIENS,**
**CLAIMS, INTERESTS, AND ENCUMBRANCES; (III) APPROVING**
**THE ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365OF THE**
**BANKRUPTCY CODE; (IV) AUTHORIZING THE DEBTORS TO CONSUMMATE**
**TRANSACTIONS RELATED TO THE ABOVE; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") in the above-captioned chapter 11 cases pursuant to sections 105(a),

363, and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy

Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Asset Purchase Agreement, or the Bidding Procedures Order, as applicable.

"Local Rules"), for entry of an order: (a) authorizing and approving that certain Asset Purchase Agreement, dated as of [●], 2024, by and among [Express, Inc.] and [its subsidiaries] (collectively, the "Sellers" and each, individually, a "Seller") and Phoenix Retail, LLC (the "JV Purchaser" and EXPWHP, LLC (the "WHP Global Purchaser") (together with their designees, successor and/or assigns, as provided under Section 4.1 of the Asset Purchase Agreement, the "Purchaser"), (as amended, restated, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), a fully conformed copy of which is attached hereto as **Exhibit A**, (b) approving the sale of the Acquired Assets and Assumed Liabilities pursuant to the Asset Purchase Agreement, (c) approving the assumption, assignment and sale of certain executory contracts[ and unexpired leases] pursuant to section 365 of the Bankruptcy Code, (d) authorizing the Debtors to consummate transactions related to the Asset Purchase Agreement, and (e) granting related relief; and this court (the "Court") having entered on [●], 2024, that certain *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"); and the Debtors having determined that the highest or otherwise best offer for the Acquired Assets and Assumed Liabilities was made by the Purchaser pursuant to the Asset Purchase Agreement; and the Court having conducted a hearing on  [●], 2024 at  [●] [a.m. / p.m.](ET) (the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the proposed sale of the Acquired Assets and Assumed Liabilities (the "Sale"), to consider the approval of the Sale pursuant to the terms and conditions of the Asset Purchase Agreement, and the Court having

considered: (i) the Motion, all objections thereto, and all replies in support thereof; (ii) the arguments of counsel made, and evidence adduced, related to the Motion; and (iii) the full record in these chapter 11 cases, including the record related to the hearing to consider the Bidding Procedures Order (the "Bidding Procedures Hearing") and the Sale Hearing held before the Court; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Asset Purchase Agreement and sale of the Acquired Assets and Assumed Liabilities and the related relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT:**

      A.     <u>Findings of Fact and Conclusions of Law</u>. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

      B.     <u>Jurisdiction</u>. This Court has jurisdiction over the Motion and over the property of the Debtors, including the Acquired Assets and Assumed Liabilities to be sold, transferred, and conveyed pursuant to the Asset Purchase Agreement, pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and the Motion in this district and Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Final Order</u>.  This order (this "<u>Order</u>") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Order, and directs entry of judgment as set forth herein.

D.      <u>Property of the Estate</u>.  The Debtors are the sole and lawful owner of, and have clear and marketable title to, the Acquired Assets and Assumed Liabilities to be sold pursuant to the Asset Purchase Agreement.  The Debtors' right, title and interest in and to the Acquired Assets and Assumed Liabilities constitute property of the Sellers' estates and title thereto is vested in the Sellers' estates within the meaning of section 541(a) of the Bankruptcy Code.

E.      <u>Statutory Bases for Relief</u>.  The statutory bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

F.      <u>Petition Date</u>.  On April 22, 2024 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

G.      <u>Bidding Procedures Order</u>.  This Court entered the Bidding Procedures Order on [●], 2024, (i) approving bid procedures and bid protections; (ii) scheduling certain dates and deadlines with respect thereto; (iii) approving the form and manner of notice thereof; (iv) establishing notice and procedures for the assumption and assignment of contracts and leases,

(v) authorizing the assumption and assignment of assumed contracts, (vi) authorizing the sale of assets; and (vii) granting related relief.

H.     Notice.  As evidenced by the affidavits of service and publication previously filed with the Court [Docket Nos. [69], [●], [●], and [●]], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures Order, the Sale Hearing, the Sale, and the assumption, assignment, and sale of the executory contracts[ and unexpired leases] to be assumed and subsequently assigned and sold pursuant to this Order has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) the United States Trustee for the District of Delaware; (b) the Committee (as defined below); (c) counsel to the DIP Agents; (d) counsel to [●]; (e) counsel to [●]; (f) [●]; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for all states in which the Debtors conduct business; and (l) any party that requests service pursuant to Bankruptcy Rule 2002.  With respect to entities whose identities or addresses are not reasonably ascertainable by the Debtors, publication of the Auction Notice in *The New York Times* (National Edition) and posted it on to the Debtors' restructuring website at https://cases.stretto.com/express on [●], 2024[, as evidenced by the *Verification of Publication* filed by the Debtors on [●], 2024 [Docket No. [●]]], was, and is deemed, sufficient, and reasonably calculated under the circumstances to reach such entities.  Additionally, the Notice of Successful Bidder, which included information about the Sale and the Sale Hearing, was filed by the Debtors on [●], 2024 [Docket No. [●]].  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or

further notice of the Motion, the Bidding Procedures Order, the Sale, and the Sale Hearing is, or shall be, required.  The Notice of Successful Bidder provided all interested parties with timely and proper notice of the Sale contemplated by the Asset Purchase Agreement, the Bidding Procedures Order, and the Sale Hearing.

I.      <u>Disclosures</u>.  The disclosures made by the Debtors in the Motion, the Notice of Successful Bidder, and related documents filed with the Court concerning the Asset Purchase Agreement, and at the Bidding Procedures Hearing and the Sale Hearing were sufficient under the circumstances.

J.      <u>Sale and Marketing Process</u>.  The Bidding Procedures attached as an exhibit to the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arms'-length negotiations, and substantively and procedurally fair to all parties.  Based on the evidence adduced at the hearing, the Debtors and their professionals have adequately marketed and conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order and the Bidding Procedures.  The sale process established by the Bidding Procedures Order and Bidding Procedures afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Acquired Assets and Assumed Liabilities.  The sale process was conducted in a noncollusive, fair, and good faith manner.  All potential purchasers had a full and fair opportunity to participate in the sale process and make higher or better offers.

K.      <u>Successful Bidder</u>.  The Debtors determined, in accordance with their business judgment and the Bidding Procedures Order and the Bidding Procedures, in consultation with the Consultation Parties (as defined in the Bidding Procedures), that the Purchaser's bid was a   Qualified   Bid   and   represented   the   highest   or   otherwise   best   offer   for   the

Acquired Assets and Assumed Liabilities.   As a result, the Debtors declared the Purchaser the

Successful Bidder in the Notice of Successful Bidder.

        L.    <u>Highest and Best Bid</u>.   After a full, fair, and robust sale process [and

Auction], the Sellers' determination that the Asset Purchase Agreement constitutes the highest and

best offer for the Acquired Assets and Assumed Liabilities constitutes a valid and sound exercise

of the Sellers' business judgment.   The total consideration provided by the Purchaser for the

Acquired Assets as reflected in the Asset Purchase Agreement represents not only a fair and

reasonable offer to purchase the Acquired Assets, but also the highest and best offer received by

the Debtors for the Acquired Assets.  No other entity or group of entities [has submitted a Qualified

Bid or otherwise] presented a higher or otherwise better offer to the Sellers to purchase the

Acquired Assets for greater economic value to the Sellers' estates than the Purchaser.   The

transactions contemplated under the Asset Purchase Agreement, including the total consideration

to be realized by the Debtors thereunder, (i) is the highest and best offer received by the Debtors

after extensive marketing, including through the Bidding Procedures, and (ii) is in the best interests

of the Debtors, their creditors, their estates, and other parties in interest.  The sale of the Acquired

Assets under the Asset Purchase Agreement represents the best available alternative for the

Debtors' estates.  Taking into consideration all relevant factors and circumstances, no other entity

has offered to purchase the Acquired Assets for greater economic value to the Debtors or their

estates.  Therefore, the Debtors' determination that the Asset Purchase Agreement constitutes the

highest and best offer and the Debtors' selection of the Asset Purchase Agreement as the

Successful Bid each constitute a valid and sound exercise of the Debtors' business judgment and

the Debtors' decision to enter into the Asset Purchase Agreement and consummate the transactions

contemplated thereunder constitutes a proper exercise of the fiduciary duties of the Debtors and their officers and directors.

M.      <u>Best Interests of the Estates, Creditors, and Parties in Interest</u>.  Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the consideration provided by the Purchaser under the Asset Purchase Agreement, the Sale constitutes a reasonable and sound exercise of the Sellers' business judgment, is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and should be approved.

N.      <u>Sound Business Purpose</u>.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Acquired Assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code, whether before and outside of a chapter 11 plan or otherwise.  Given all of the circumstances of these chapter 11 cases, such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

O.      <u>Good Faith</u>.  The Purchaser is purchasing the Acquired Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. Neither the Purchaser nor any of its Affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each such person is entitled to the full protections of section 363(m), and otherwise has proceeded in good faith in all respects in connection with these chapter 11 cases in that: (1) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (2) the Purchaser complied with the provisions of the Bidding Procedures

Order; (3) the Purchaser's bid was subject to the competitive bid procedures set forth in the Bidding Procedures Order; (4) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (5) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (6) the negotiation and execution of the Asset Purchase Agreement, including the Sale contemplated thereby, were at arms'-length and in good faith.  There was no evidence of insider influence or improper conduct by the Purchaser or any of its Affiliates in connection with the negotiation of the Asset Purchase Agreement with the Debtors.

P.    <u>No Collusion</u>.  The Asset Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, the Purchaser, or any of their respective Affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the Asset Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

Q.    <u>Fair Consideration</u>.  The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement: (1) is fair and adequate and (2) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and similar laws).

R.    <u>Purchaser Not a Successor</u>.  By consummating the Sale pursuant to the Asset Purchase Agreement (including operating the Acquired Assets under the Debtors' trade

names), the Purchaser is not a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between the Purchaser and any Debtor.  The Purchaser shall not be deemed to be holding itself out as a continuation of the Debtors based on the Sale, the Asset Purchase Agreement or this Order.  The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors.  Neither the Purchaser nor any of its Affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) or any Debtor's estate, except to the extent expressly provided in the Asset Purchase Agreement.

S.      No *Sub Rosa* Plan.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan of the Debtors.  The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation.

T.      Power and Authority.  The Debtors and the Purchaser, each acting by and through their existing agents, representatives, and officers, have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby.  Upon entry of this Order, the Debtors require no further consents or approvals to consummate the Sale contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

U.      Binding Agreement.  The Asset Purchase Agreement is a valid and binding contract between the Sellers and the Purchaser and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state,

territory, possession or the District of Columbia.  The Asset Purchase Agreement and the Sale itself, and the consummation thereof, shall be, to the extent provided in the Asset Purchase Agreement, specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Purchaser, and each of their respective affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting Encumbrances (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Order and the terms and provisions of the Asset Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7.  The rights and interests granted pursuant to this Order and Asset Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors

11

under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Asset Purchase Agreement and this Order without the need for further order of the Court.

V.      Valid Transfer.  The transfer of each of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Acquired Assets, and vests or will vest the Purchaser with all right, title, and interest of the Sellers to the Acquired Assets free and clear of all Adverse Interests (as defined below) (except to the extent set forth in the Asset Purchase Agreement) accruing, arising or relating thereto any time prior to the Closing Date, unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement.

W.      Free and Clear Sale.  Each Seller may sell the Acquired Assets free and clear of all Adverse Interests against such Seller, its estate, or any of the Acquired Assets (except to the extent set forth in the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  If the Sale were not free and clear of all Adverse Interests, or if the Purchaser would, or in the future could, be liable for any of the Adverse Interests (except to the extent set forth in the Asset Purchase Agreement), the Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors and their estates and creditors.  The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Acquired Assets free and clear of all Adverse Interests (except to the extent set forth in the Asset Purchase Agreement).

X.     Assigned Contracts.  The Sellers seek authority to assume, assign and sell to the Purchaser the Assigned Contracts, and any other executory contracts [or unexpired leases] related to the Acquired Assets that are to be assumed, assigned and sold to the Purchaser as more particularly set forth in the Asset Purchase Agreement (collectively, the "Assigned Contracts"). The Debtors have demonstrated that assumption, assignment and sale of the Assigned Contracts under the Asset Purchase Agreement is an exercise of its sound business judgment and is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts to be assumed, assigned and sold to the Purchaser under the Asset Purchase Agreement are an integral part of the Asset Purchase Agreement and the Sale and, accordingly, such assumption, assignment and sale are reasonable and enhance the value of the Debtors' estates. Subject to Paragraphs 39 and 40 hereof, any contract counterparty to any Assigned Contract that has not actually filed with the Court an objection to such assumption, assignment and/or sale as of the applicable deadline specified in the Bidding Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bidding Procedures Order or with the consent of the Debtors and the Purchaser) is deemed to have consented to such assumption, assignment and sale.

Y.     Designation Rights.   Pursuant to Section 1.7 of the Asset Purchase Agreement, the Purchaser shall maintain certain rights to modify the list of Assigned Contracts after the date of this Order and up to the applicable Designation Rights Period as set forth in such section.  Such modification rights include, but are not limited to, the right of the Purchaser, prior to the applicable Designation Rights Period, to designate certain Designated Contracts and Designated Leases for assumption by the Debtors and assignment and sale to the Purchaser, as well as for rejection by the Debtors.  The notice and opportunity to object provided to the contract

counterparties to such Assigned Contracts and to other parties in interest, as set forth in the Bidding Procedures Order and Asset Purchase Agreement, fairly and reasonably protects any rights that such contract counterparties and other parties in interest may have with respect to such Contracts.

Z.     Cure Notice.  The Sellers filed and served the notice of their intent to assume and assign the Assigned Contracts and of the Cure Payments upon each counterparty to an Assigned Contract (the "Contract Assumption Notice") in accordance with the Bidding Procedures Order.  Except to the extent the Debtors agreed to an extension, pursuant to the Bidding Procedures Order and the Contract Assumption Notice, contract counterparties to the Sellers' executory contracts [and unexpired leases] were required to file objections (each, a "Cure Objection"), if any, to the Cure Payments by no later than [●], 2024. The Contract Assumption Notice and the Bidding Procedures Order provided that in the absence of a timely filed Cure Objection, the Cure Payments relating to the period prior to the objection deadline would be controlling and fixed, notwithstanding anything to the contrary in any Assigned Contract, or any other document, and the contract counterparty to any Assigned Contract shall be deemed to have consented to the Cure Payments set forth in the Contract Assumption Notice.

AA.     Adequate Assurance of Future Performance.  In accordance with the Bidding Procedures Order, within 24 hours of the applicable Bid Deadline and the deadline to file the Stalking Horse Notice, the Debtors sent such counterparty evidence that the Proposed Assignee had the ability to perform under the executory contract or unexpired lease and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code. Counterparties to the Assigned Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contracts and the Cure Payments set forth in the notice (including objections related to the adequate assurance of future performance

and objections based on whether applicable law excuses the counterparty from accepting performance by, or rendering performance to, the Purchaser (or its designee) for purposes of section 365(c)(1) of the Bankruptcy Code). All objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable. [Pursuant to the section 1.7 of the Asset Purchase Agreement, the Debtors shall provide not less than [ten (10)] Business Days' notice to any contract counterparty to any contract that shall be designated an Assigned Contract under the Asset Purchase Agreement, except as otherwise agreed by the Debtors, the Purchaser, and such applicable contract counterparty.] Based on evidence adduced at the hearing and based on the record in these chapter 11 cases, to the extent necessary, the Sellers have satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1), 365(b)(3) (to the extent applicable) and 365(f)(2) of the Bankruptcy Code, in connection with the assumption, assignment and sale of the Assigned Contracts to the extent provided under the Asset Purchase Agreement and: (1) conditioned on the assumption, assignment and sale of the applicable Assigned Contract, the Purchaser will cure, in accordance with the terms set forth in this Order and the Asset Purchase Agreement, any default existing prior to the date of the assumption and assignment of such Assumed Contract, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (2) conditioned on the assumption, assignment and sale of the applicable Assigned Contract, the Purchaser has provided or will provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of assumption, assignment and sale of such Assigned Contract, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (3) Purchaser has provided adequate assurance of future performance of and under the Assigned Contracts, within the meaning of

sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2) of the Bankruptcy Code based on the evidence adduced at the Sale Hearing.

BB.    <u>Single, Integrated Transaction</u>.    Entry of this Order approving the Asset Purchase Agreement and all provisions of this Order and the Asset Purchase Agreement are a necessary condition precedent to the Purchaser consummating the Sale.    The provisions of this Order and the Asset Purchase Agreement and the transactions contemplated by this Order and the Asset Purchase Agreement and Sale to the Purchaser are inextricably linked and technically and collectively constitute a single, integrated transaction.

CC.    <u>Consummation is Legal, Valid and Authorized</u>.    The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with.

DD.    <u>Protection of Consumer Privacy</u>.    As contemplated in the Asset Purchase Agreement, and subject to the terms of this Order, the sale to the Purchaser under the Asset Purchase Agreement of any personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) satisfies the requirements of section 363(b)(1)(A) of the Bankruptcy Code.

EE.    <u>Legal and Factual Bases</u>.    The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Motion is granted as set forth herein.

2.    Any and all objections and responses to the Motion, the entry of this Order or the relief granted herein that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits.

16

[Notwithstanding anything in this Order to the contrary, all cure claim or adequate assurance objections to the objections that are identified in Exhibit [C] are reserved.] All persons and entities notified or deemed notified of the relief sought in the Motion and set forth in this Order that failed to timely object thereto are deemed to consent to such relief.

3.    Notice of the Motion, the Bidding Procedures Order, the Bidding Procedures Hearing, the Sale Hearing, and the Sale was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.    The Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures Hearing, are incorporated herein by reference.  No appeal, motion to reconsider, or similar pleading has been filed with respect to the Bidding Procedures Order, and the Bidding Procedures Order is a final order of the Court, has not been vacated, withdrawn, rescinded, or amended and remains in full force and effect.

5.    Approval of the Sale of the Acquired Assets.  The Asset Purchase Agreement and all other ancillary documents, and all of the terms and conditions thereof, and the Sale and related transactions contemplated thereby, are hereby approved in all respects, except as otherwise expressly set forth herein.

6.    Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Debtors into the Asset Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized to continue performance under and make all payments required by the Asset Purchase Agreement and all other ancillary documents as and when due thereunder without further order of this Court.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting

by and through their existing agents, representatives and officers, are authorized, without further order of this Court, to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement; (b) transfer and assign all right, title, and interest to all assets, property, licenses, and rights to be conveyed in accordance with the terms and conditions of the Asset Purchase Agreement; and (c) execute and deliver, perform under, consummate, and implement the Asset Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale, including any other ancillary documents, deeds, assignments, stock powers, transfers of membership interests and other instruments of transfer, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and such other ancillary documents.  Neither the Purchaser nor the Sellers shall have any obligation to proceed with the Closing under the Asset Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

7.      The Debtors are authorized to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Units (as defined in section 101(27) of the Bankruptcy Code), any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable Governmental Units or as any of the officers of the Debtors may determine are

necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

8.     This Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any Adverse Interests against any Debtor, any holders of Adverse Interests against or on all or any portion of the Acquired Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases, and any filing agents, filing officers, title agents, recording agencies, secretaries of state, and other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Acquired Assets. The terms and provisions of the Asset Purchase Agreement and this Order shall inure to the benefit of the Debtors, their estates and their creditors, the Purchaser and its Affiliates, and any other affected third parties, including all persons asserting any Adverse Interests in the Acquired Assets to be sold pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding. Nothing contained in any chapter 11 plan confirmed in any of these chapter 11 cases, any order confirming any such chapter 11 plan or any order approving the wind-down or dismissal of any of these chapter 11 cases or any subsequent chapter 7 cases (including any discharge of claims thereunder) or otherwise shall alter, conflict with or derogate from the provisions of this Order or the Asset Purchase Agreement, and

to the extent of any conflict or derogation between this Order or the Asset Purchase Agreement and such future plan or order, the terms of this Order and the Asset Purchase Agreement shall control.  This Order shall survive any dismissal or conversion of any of these chapter 11 cases or any dismissal of any subsequent chapter 7 cases.

9.      <u>Sale and Transfer of Assets</u>.  Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, upon the Closing Date and thereafter pursuant to the Asset Purchase Agreement, and pursuant to and except to the extent otherwise set forth in the Asset Purchase Agreement, the Acquired Assets shall be transferred free and clear of all encumbrances, claims, interests, and liens, including the Excluded Liabilities, (other than to the extent set forth in the Asset Purchase Agreement, including, solely to the extent set forth in the Asset Purchase Agreement, with respect to Assumed Liabilities, Permitted Encumbrances, and the Purchaser's obligations with respect to Designated Contracts and Designated Leases, Covered Employees and Transferred Employees) (collectively, the "Adverse Interests"), with all such Adverse Interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto.  Those holders of Adverse Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale being free and clear of their Adverse Interests pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Adverse Interests who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such Adverse Interests pursuant to section 363(f)(5) of the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Adverse Interests that constitute interests in the Acquired Assets, if any, attach solely to the

proceeds of the Sale ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale, subject to any defenses of the Debtors.

10.     The sale of the Avoidance Actions pursuant to the Asset Purchase Agreement is hereby approved.  To the extent any Avoidance Action is not assignable to the Purchaser or any of its Affiliates, the Debtors, and any chapter 11 or chapter 7 trustee (or any other designee) of any of the Debtors and their estates, shall be prohibited from bringing any such Avoidance Actions.

11.     Conditioned upon the occurrence of the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Acquired Assets or a bill of sale transferring all of the Debtors' right, title, and interest in such Acquired Assets to the Purchaser pursuant to the terms and allocations set forth in the Asset Purchase Agreement.  For the avoidance of doubt, the Excluded Assets set forth in the Asset Purchase Agreement are not included in the Acquired Assets, and the Excluded Liabilities set forth in the Asset Purchase Agreement are not Assumed Liabilities.

12.     All persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Purchaser in accordance with the Asset Purchase Agreement and this Order.

13.     Subject to the terms and conditions of this Order, the transfer of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in the Asset Purchase Agreement, constitute a legal, valid, and effective transfer of all of the Debtors' right, title, and interest in the Acquired Assets, notwithstanding any requirement for approval or consent by any person, and shall vest the Purchaser with the right, title, and interest

of the Sellers in and to the Acquired Assets as set forth in the Asset Purchase Agreement, as applicable, free and clear of all Adverse Interests of any kind or nature whatsoever (except to the extent set forth in the Asset Purchase Agreement).

14.     To the maximum extent permitted under applicable law, the Purchaser or its Affiliates, to the extent provided by the Asset Purchase Agreement, shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Sellers constituting Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are directed to be, transferred to the Purchaser or its Affiliates as of the Closing Date as provided by the Asset Purchase Agreement.  To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may revoke or suspend any grant, permit, or license relating to the operation of the Acquired Assets sold, transferred, assigned, or conveyed to the Purchaser or its Affiliates on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale. Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale set forth in the Asset Purchase Agreement.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

15.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets to be sold, transferred, or conveyed (wherever located) to the Purchaser pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing Date.

16.    Effective upon the Closing Date and except to the extent included in Assumed Liabilities or Permitted Encumbrances or as otherwise expressly provided in the Asset Purchase Agreement, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, contract counterparties, customers, licensors, litigation claimants, employees and former employees, dealers and sale representatives, and trade or other creditors holding Adverse Interests against the Debtors or the Acquired Assets, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity, or otherwise, arising under or out of, in connection with, or in any way relating to, the Acquired Assets or the transfer of the Acquired Assets, hereby are forever barred and estopped from asserting any Adverse Interests relating to the Acquired Assets or the transfer of the Acquired Assets against the Purchaser and its Affiliates, assets, or property, or the Acquired Assets transferred to the Purchaser, including, without limitation, taking any of the following actions with respect to or based on any Adverse Interest relating to the Acquired Assets or the transfer of the Acquired Assets (other than to the extent set forth in the Asset Purchase Agreement): (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its Affiliates, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Purchaser, its Affiliates, assets, or properties; (c) creating, perfecting, or enforcing any Adverse Interest against the Purchaser or its Affiliates, assets or properties; (d) asserting an Adverse Interest as a setoff (except for setoffs asserted prior to the Petition Date), or right of subrogation of any kind against any obligation due the Purchaser or Affiliates; (e) commencing or continuing any action in any manner or place that does not

comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof; or (f) interfering with, preventing, restricting, prohibiting or otherwise enjoining the consummation of the Sale.  No such persons shall assert or pursue against the Purchaser or its Affiliates, assets, or property any such Adverse Interest directly or indirectly, in any manner whatsoever.

17.    The Purchaser and its Affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) are not and shall not be (a) deemed a "successor" in any respect to the Debtors or their estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement or any other event occurring in the Debtors' chapter 11 cases under any theory of law or equity, (b) deemed to have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates, (c) deemed to have a common identity with the Debtors, (d) deemed to have a continuity of enterprise with the Debtors, or (e) deemed to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  The Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except to the extent otherwise expressly provided in the Asset Purchase Agreement, including, solely to the extent set forth in the Asset Purchase Agreement, with respect to Assumed Liabilities, Permitted Encumbrances and the Purchaser's obligations with respect to Designated Contracts and Designated Leases.  Except to the extent otherwise set forth in the Asset Purchase Agreement, including, solely to the extent set forth in the Asset Purchase Agreement, with respect to Assumed Liabilities, Permitted Encumbrances and the Purchaser's obligations with respect to Designated

Contracts and Designated Leases, the transfer of the Acquired Assets and the Assumed Contracts to the Purchaser under the Asset Purchase Agreement shall not result in (i) the Purchaser and its Affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Acquired Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors, (ii) the Purchaser and its Affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Acquired Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff (except for setoffs asserted prior to the Petition Date) or otherwise, directly or indirectly, any Adverse Interests or Excluded Liability or (iii) the Purchaser and its Affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Acquired Assets, having any liability or responsibility to the Debtors, in each case except to the extent expressly set forth in the Asset Purchase Agreement.

18.    Without limiting the effect or scope of the foregoing, except to the extent expressly provided in the Asset Purchase Agreement, as of the Closing Date, the Purchaser and its Affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) shall have no successor or vicarious liabilities of any kind or character with respect to the applicable Acquired Assets, including, but not limited to: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any of the Debtors' Affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of

the Debtors; (e) any claims of any former employees of the Debtors; (f) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law; and (g) any claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended; (ii) the Fair Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination in Employee Act of 1967, as amended; (viii) the Americans with Disabilities Act of 1990; (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985; (x) the Multiemployer Pension Plan Amendments Act of 1980; (xi) state and local discrimination laws; (xii) state and local unemployment compensation laws or any other similar state and local laws; (xiii) state workers' compensation laws; (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xx) any common law doctrine of de facto merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes

26

arising, accruing or payable under, out of, in connection with, or in any way relating to, the Acquired Assets, the Asset Purchase Agreement or the Assumed Contracts except to the extent otherwise set forth in this Order.

19.     Except as expressly set forth in the Asset Purchase Agreement, including with respect to Assumed Liabilities, Permitted Encumbrances and the Purchaser's obligations with respect to Designated Contracts and Designated Leases, Covered Employees and Transferred Employees, it is expressly ordered and directed that the Sale of the Acquired Assets is free and clear of any and all unemployment compensation taxes and any related contribution and reimbursement obligations of the Debtors, and all state tax and labor agencies shall treat the Purchaser as a "new employer" in all respects and for any applicable tax rates and contribution and reimbursement obligations and "experience rates" as of and after the Closing Date (and each state unemployment compensation law agency or department shall be prohibited from treating the Purchaser as a successor of the Debtors for any contribution rates, benefit charges, benefit rates, experience rates or similar charges or taxes).

20.     Subject to the Asset Purchase Agreement, the Purchaser is hereby authorized in connection with the consummation of the Sale to transfer or direct the transfer of any or all of the Acquired Assets and the Assumed Contracts (or any rights to acquire the Acquired Assets and the Assumed Contracts) to its direct and indirect subsidiaries in a manner as it, in its sole and absolute discretion, deems appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of the Acquired Assets or the rights under any Assumed Contract to its direct and indirect subsidiaries with all of the rights and protections accorded under this Order and the Asset Purchase Agreement, and the Debtors shall cooperate with and take all actions reasonably requested by the Purchaser to effectuate any of the foregoing.

21.    <u>Assumption and Assignment</u>.  Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, and subject to Paragraphs 27, 39 and 40 hereof, the Sellers' assumption, assignment and sale to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement of the Assigned Contracts is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Subject to Paragraphs 27, 39 and 40 hereof, the Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume, assign and sell to the Purchaser, effective upon the Closing Date of the Sale of the Acquired Assets or thereafter pursuant to the Asset Purchase Agreement, the Assigned Contracts free and clear of all Adverse Interests of any kind or nature whatsoever (except to the extent set forth in the Asset Purchase Agreement) and execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

22.    Upon the date that each Assigned Contract is assumed, assigned and sold, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.  The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing, as further provided in the Asset Purchase Agreement.  The Purchaser shall likewise cooperate with the Debtors and otherwise comply with the terms and conditions in relation to any Designated Contracts and Designated Leases under the Asset Purchase Agreement.

23.    The Assigned Contracts (including, for the avoidance of doubt, any non-disclosure agreement entered into by any of the Sellers following the Petition Date that constitutes an Assigned Contract) shall be transferred to, and remain in full force and effect for the benefit of the

Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract that is assumed, assigned and sold to the Purchaser pursuant to the Asset Purchase Agreement (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, or requires any counterparty to consent to assignment.

24.     Subject to Paragraphs 27, 39 and 40 hereof, the Purchaser has provided adequate assurance of future performance for the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

25.     Exhibit B attached hereto lists executory contracts and unexpired leases for which either (a) no Cure Objections were timely filed with the Court or (b) informal responses were received by the Debtors and resolved by mutual written agreement between the Purchaser, the Debtors, and the applicable contract counterparty.  The Cure Payments for the contracts listed on Exhibit B are hereby fixed at the amounts set forth in the Contract Assumption Notice or as otherwise agreed in writing by the Purchaser, the Debtors, and the applicable contract counterparty, and the contract counterparties to such executory contracts and unexpired leases are forever bound by such Cure Costs.  Unless the Purchaser and the applicable contract counterparty subsequently agree to different terms, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Purchaser shall pay to the applicable contract counterparty the Cure Payments relating to any Assigned Contracts on Exhibit B within seven (7) days of the assumption, assignment and sale thereof.  Upon payment of such Cure Payments as provided for herein, the contract counterparties to such Assigned Contracts are hereby enjoined from taking any action against the Purchaser or the Acquired Assets with respect to any claim for cure.  For the avoidance of doubt, the inclusion of an executory contract or unexpired lease on Exhibit B shall not limit the rights of

the Purchaser under the Asset Purchase Agreement (i) not to designate such executory contract or unexpired lease for assumption, assignment and sale at Closing and (ii) to designate such executory contract or unexpired lease for assumption, assignment and sale or for rejection post-Closing.

26.     At or prior to the Closing, Sellers shall deliver to the JV Purchaser the Assignment and Assumption of Lease (as defined in the Asset Purchase Agreement), duly executed by Sellers.

27.     Any executory contract[ or unexpired lease] for which there is an unresolved adequate assurance objection or cure claim objection set forth on Exhibit C hereto shall not be assumed, assigned and sold unless (i) all such objections relating to such contract or lease are withdrawn, (ii) the contract or lease counterparty consents, or (iii) the Court subsequently orders otherwise.

28.     The rights of the Purchaser to modify the lists of Assigned Contracts and Non-Assigned Contracts after the date of this Order and up to the applicable Designation Rights Period as set forth in Section 1.7 of the Asset Purchase Agreement are hereby approved and shall survive confirmation of any chapter 11 plan, notwithstanding sections 365(d)(2) and 365(d)(4) or any similar provision of the Bankruptcy Code.  Moreover, with respect to any Designated Contracts or Designated Leases which are not an Assigned Contract on the Closing Date and provided such Contract has not been rejected by the Debtors after the Closing Date pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from the Purchaser to the Debtors, the Debtors are hereby authorized to take all actions reasonably necessary to assume, assign and sell to the Purchaser pursuant to section 365 of the Bankruptcy Code any such Contract(s) as set forth in such notice(s); provided, that any [Cure Costs] applicable thereto shall be satisfied solely by the Purchaser. Notwithstanding anything in this Order to the contrary, on the date any such Contract is assumed,

assigned and sold to the Purchaser, such Contract shall thereafter be deemed a Purchased Asset for all purposes under this Order and the Asset Purchase Agreement.

29.     The payment of the applicable Cure Payments (if any) shall effect a cure of all defaults existing as of the date that the applicable Assigned Contracts are assumed and shall compensate for any actual pecuniary loss to such contract counterparty resulting from such default.

30.     Pursuant to section 365(f) of the Bankruptcy Code, the assignment and sale by the Debtors to the Purchaser of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Payments as provided for herein, the Debtors and the Purchaser shall not have any further liabilities to the contract counterparties to the Assigned Contracts, other than the Purchaser's obligations under the Assigned Contracts that become due and payable on or after the date that such Assigned Contracts are assumed, assigned and sold, including as set forth in Paragraph 4.18 of this Order.

31.     Any provisions in any Assigned Contracts that prohibit or condition the assignment and sale of such Assigned Contracts or allow the party to such Assigned Contracts to terminate, recapture, impose any penalty or condition on renewal or extension, purport to require the consent of any counterparty, or modify any term or condition upon the assignment and sale of such Assigned Contracts constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the assignment and sale of the Assigned Contracts to the Purchaser and all Assigned Contracts shall remain in full force and effect, without existing default(s), subject only to payment by the Purchaser of the appropriate cure amount, if any.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment and sale to the Purchaser of the Assigned Contracts have been satisfied.

32.     Subject to Paragraphs 39 and 40 hereof, any party having the right to consent to the assumption, assignment or sale of any Assigned Contract that failed to object to such assumption, assignment and/or sale is deemed to have consented to such assumption, assignment and sale as required by section 365(c)(1)(B) of the Bankruptcy Code.

33.     As of the date of assignment and sale to the Purchaser, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts arising from and after the assignment and sale.

34.     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

35.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed, assigned and sold or arising by reason of the Closing.  For the avoidance of doubt, nothing in this paragraph alters any counterparty's entitlement to the Cure Payments determined with respect to its Assigned Contract.

36.     Notwithstanding any term of any Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal

only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Purchaser subject to the other applicable terms of the Assigned Contract. Any extension or renewal options in connection with all Assigned Contracts that the Debtors have sought to exercise prior to the entry of this Order have been timely and validly exercised by the Debtors, and all Assigned Contracts are in full force and effect and have not been previously rejected, and the Debtors' time to assume or reject the Assigned Contracts has not otherwise expired.

37.     Neither the Purchaser nor any successor of the Purchaser shall be responsible for any Adverse Interests or obligations arising out of any of the executory contracts or unexpired leases that are not assumed, assigned, and sold to the Purchaser (whether at the Closing or prior to the applicable Designation Rights Period), except to the extent specifically provided by the Asset Purchase Agreement.

38.     Notwithstanding anything to the contrary in this Order, with respect to each Assigned Contract, from and after the date that such Assigned Contract is assumed, assigned and sold to the Purchaser, the Purchaser shall be responsible for continuing obligations under such Assigned Contract, cum onere, including, without limitation, liabilities for any breach of such Assigned Contract occurring after such assumption, assignment and sale and obligations to pay year-end adjustment and reconciliation amounts that become obligations after the entry of this Order (irrespective of whether such obligations accrued before, on, or after assumption, assignment and sale of the Assigned Contract), including tax reconciliations, common area charges and insurance premiums, in each case subject to the terms and conditions of the Assigned Contracts, and subject to any defenses provided by such Assigned Contracts and applicable non-bankruptcy law and unless otherwise agreed.

39.     Notwithstanding anything in this Order to the contrary, to the extent that executory contracts and unexpired leases that were not previously included in the Contract Assumption Notice are designated for assumption, assignment and sale after the Closing Date, the right of counterparties to such contracts and leases to object to the assumption, assignment and sale thereof, including with respect to cure amounts and adequate assurance of future performance, is reserved to the extent set forth in the following paragraph, and the Sellers shall not be authorized to assume, assign and sell such contracts and leases to the Purchaser absent compliance with the following paragraph or further order of the Court.

40.     In the case of any executory contracts and/or unexpired leases that the Debtors seek to assume, assign and sell pursuant to the Asset Purchase Agreement that were not previously included in the Cure Notice, within three (3) Business Days following receipt of a written notification by the Purchaser (email shall suffice) that an executory contract and/or unexpired lease is designated for assumption, assignment and sale, the Debtors shall file with the Court a written supplemental notice of the Debtors' intent to assume, assign and sell such executory contract and/or unexpired lease, substantially in the form of the Contract Assumption Notice attached as an exhibit to the Bidding Procedures Order (each, a "Supplemental Contract Assumption Notice"). The Debtors shall serve such Supplemental Cure Notice via first class mail (except as set forth in clause (i), which shall be by overnight mail) on each of the following parties (the "Supplemental Contract Assumption Parties"): (i) each counterparty to any such executory contract and/or unexpired lease (and their known counsel) to be assumed, assigned and sold by the Debtors, (ii) the U.S. Trustee, (iii) counsel to the Committee, and (iv) counsel to the Purchaser. The Debtors shall also serve on affected counterparties and their respective known counsel by electronic mail (if available) or overnight mail adequate assurance information for the Purchaser. The

Supplemental Contract Assumption Notice shall set forth the following information, to the best of the Debtors' knowledge: (a) the street address of any real property that is the subject of any unexpired lease that the Debtors seek to assume, assign and sell or a description of any executory contract that the Debtors seek to assume, assign and sell, (b) the name and address of the affected counterparties (and their known counsel), (c) a description of the deadlines and procedures for filing objections to the Supplemental Contract Assumption Notice, if so permitted as set forth below, and (d) any proposed cure amounts as of that time.  A party in interest may object to a Supplemental Contract Assumption Notice solely with respect (i) to the proposed cure amount contained therein but only to the extent such objection could not have been raised prior to the Cure Objection Deadline, or (ii) adequate assurance of future performance.  Any such objection must be in writing and filed and served so that such objection is filed with this Court and actually received by the Debtors and the Supplemental Contract Assumption Notice Parties no later than 14 calendar days after the date the Debtors served the applicable Supplemental Contract Assumption Notice.  If no permitted objection is timely filed and served with respect to the applicable Supplemental Contract Assumption Notice, all non-Debtor parties to such executory contract and/or unexpired lease shall be deemed to have consented to the cure amount set forth in such Supplemental Contract Assumption Notice.  If a permitted objection to a Supplemental Contract Assumption Notice is timely filed and served on the Supplemental Contract Assumption Notice Parties in the manner specified above, unless the parties agree otherwise in writing, a hearing will be scheduled by the Court to consider that objection.  The assumption, assignment and sale of any executory contract and/or unexpired lease set forth in a Supplemental Contract Assumption Notice shall be deemed to have occurred as of the date of filing of a Supplemental

Contract Assumption Notice upon payment of the cure amount, unless otherwise agreed by the relevant counterparty.

41.  <u>Consumer Privacy Provisions</u>.  The sale of personally identifiable information contemplated in the Asset Purchase Agreement is consistent with the Sellers' privacy policies and satisfies the requirements of section 363(b)(1)(A) of the Bankruptcy Code.

42.  The Purchaser shall be bound by and meet the material standards established by the Sellers' privacy policies solely with respect to the personally identifiable information transferred to the Purchaser pursuant to the Asset Purchase Agreement; provided, however, that nothing in this Order shall affect, limit, restrict, prohibit or impair any right to amend or replace the Sellers' privacy policies on a going forward basis with respect to the personally identifiable information transferred to the Purchaser, in accordance with the terms thereof and applicable law.

43.  <u>Stay Relief</u>.  The automatic stay pursuant to section 362 is hereby lifted to the extent necessary, without further order of this Court, to (i) allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement and any ancillary documents and (ii) allow the Purchaser to take any and all actions permitted under this Order, the Asset Purchase Agreement and any ancillary documents in accordance with the terms and conditions thereof.

44.  <u>Bulk Transfer Laws</u>.  Each of the Sellers and the Purchaser hereby waive, and shall be deemed to waive, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

45.  <u>Non-Interference</u>.  Following the Closing Date, no holder of an Adverse Interest in or against the Debtors or the Acquired Assets shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Adverse Interest or any actions that

the Debtors or their successors, including any chapter 11 or chapter 7 trustee, may take in these chapter 11 cases or any successor chapter 7 cases.

46.    <u>Authorization.</u>    The Debtors, including their respective officers, employees and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Asset Purchase Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Asset Purchase Agreement, this Order and the relief granted pursuant to this Order.

47.    <u>Good Faith.</u>    The Sale contemplated by the Asset Purchase Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, for the avoidance of doubt, the assumption, assignment and sale to the Purchaser of the Assumed Contracts and the Sale of the Acquired Assets free and clear of all Adverse Interests (unless otherwise assumed under, or permitted by, the Asset Purchase Agreement)), unless such authorization and consummation of such Sale were stayed pending such appeal.  The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Purchaser has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Acquired Assets, and therefore the sale of the Acquired Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

48.    <u>Cooperation.</u>    From time to time, as and when requested by any party, each party to the Asset Purchase Agreement shall execute and deliver, or cause to be executed and delivered,

all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in the Purchaser its right, title and interest in and to the Acquired Assets.

49.     <u>Scope of Approval</u>.  The failure specifically to include any particular provisions of the Asset Purchase Agreement, including any of the documents, agreements, or instruments executed in connection therewith, in this Order shall not diminish or impair the efficacy, approval, or effectiveness of such provision, document, agreement, or instrument, it being the intent of this Court that the Asset Purchase Agreement and each such document, agreement or instrument be authorized and approved in its entirety, except as otherwise specifically set forth herein.

50.     <u>Post-Closing Claims Administration</u>.  After the Closing Date: (a) neither the Debtors nor any successor in interest, including any chapter 11 or chapter 7 trustee in these chapter 11 cases or any successor chapter 7 cases, shall consent or agree to the allowance of any claim to the extent it would constitute an Assumed Liability or Permitted Encumbrance without the prior written consent of the Purchaser; and (b) the Purchaser shall have standing to object to any claim against the Debtors and their estates to the extent that, if allowed, it would constitute an Assumed Liability or Permitted Encumbrance, and the Court will retain jurisdiction to hear and determine any such objections.

51.     <u>Notice of Sale Closing</u>.  Within one (1) Business Day of the occurrence of the Closing of the Sale, the Debtors shall file and serve a notice of the closing of the Sale.

52.     <u>Computations of Time-Periods</u>.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

53.    <u>This Order Governs in Event of Inconsistencies</u>.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.  To the extent there are any inconsistencies between the terms of this Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

54.    <u>Modifications</u>.    The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

55.    From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments, and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by the Asset Purchase Agreement including such actions as may be necessary to vest, perfect, or confirm, of record or otherwise, in Purchaser its right, title, and interest in and to the Acquired Assets.

56.    The Debtors have demonstrated that the requested relief is necessary to avoid immediate and irreparable harm, as contemplated by Bankruptcy Rule 6003.

57.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Sale Order in accordance with the Motion.

1.2

1.3    <u>Non-Severability</u>.    The provisions of this Order are nonseverable and mutually dependent.

1.4    <u>No Stay</u>. Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.

1.5    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Asset Purchase Agreement, and all amendments thereto any waivers and consents thereunder, and of each of the agreements executed in connection therewith to which the Debtors are a party or which have been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

Dated: [●], 2024
Wilmington, Delaware

_____
KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE