## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EXPRESS, INC., *et al.*,[1] | Case No. 24-10831 (KBO) |
| Debtors. | **Re: Docket Nos. 24, 304** |

**RESPONSE OF RESTORE CAPITAL, LLC, TO OBJECTION OF
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION
OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

ReStore Capital, LLC, as the Second Lien Prepetition Term Agent and the Second Lien

DIP Term Agent (the "2L Agent"), by and through its undersigned counsel, hereby files this

Response (the "Response") in further support of (a) the *Motion of Debtors for Entry of Interim and*

*Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize*

*Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III)*

*Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*

[Docket No. 24] (the "Motion"),[2] and in response to (b) the *Objection of the Official Committee of*

*Unsecured Creditors to the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion, the *Declaration of Stewart Glendinning, Chief Executive Officer of Express, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 20], or the DIP Documents, as applicable.

*the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 304] (the "<u>Committee DIP Objection</u>").  In support of this Response, the 2L Agent respectfully states as follows:

## <u>BACKGROUND</u>

**A.  General Background**

1.      On April 22, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These cases are being jointly administered (the "<u>Chapter 11 Cases</u>").  *See Order Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 67].

2.      On May 3, 2024, the United States Trustee for Region 3 appointed the Official Committee of Unsecured Creditors (the "<u>Committee</u>").  *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 154].

**B.  The DIP Facility**

3.      At the outset of the Chapter 11 Cases, the Debtors advised this Court that they were hopeful to effectuate a Sale Transaction.  First Day Declaration ¶ 58 ("The Debtors are committed to achieving the highest or otherwise best bid for some or all of the Debtors' assets by marketing their assets pursuant to the bidding procedures for which the Debtors are seeking approval, and, if necessary, conducting an auction for any of their assets.").  To that end, the Debtors engaged with numerous parties to potentially fund these Chapter 11 Cases.[3]  *See* Keil DIP Motion Declaration ¶ 12 (stating that Moelis contacted approximately seven third-party institutions and certain of the

---

[3]      *Declaration of Adam Keil in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 30] (the "<u>Keil DIP Motion Declaration</u>").

Debtors' existing investors to determine whether any of these parties would be willing to provide postpetition financing to the Debtors). The Debtors ultimately determined that no party other than the DIP Lenders could provide the Debtors with a viable postpetition financing facility. As a result, the Debtors entered into the proposed debtor in possession financing facility with the DIP Lenders and agreed to consensual use of cash collateral with the Prepetition Secured Parties that would enable them to pursue and consummate a going concern sale or an orderly liquidation of their business. Keil DIP Motion Declaration ¶ 13.

4.      After extensive arm's length negotiations with the DIP Lenders, the Debtors obtained a $224 million debtor-in-possession revolving and term loan credit facilities (collectively, the "DIP Facilities"). The DIP Facilities include $25 million in new money term loans (the "Second Lien New Money DIP Term Loans"), and roll up (i) approximately $136 million in prepetition obligations under their Prepetition ABL Facility (the "First Lien DIP ABL Roll-Up Loans"), and (ii) approximately $63 million in prepetition obligations under the Prepetition FILO Term Loan Facility, with approximately $25 million of the Prepetition FILO Term Loan Facility rolled-up upon entry of the Interim Order (as defined below), and the remainder to be rolled-up upon entry of the Final Order (the "Second Lien DIP Term Roll-Up Loans," together with the First Lien DIP ABL Roll Up Loans, collectively, the "DIP Roll-Up Loans," and together with the Second Lien New Money DIP Term Loans, collectively, the "DIP Loans").

5.      The DIP Facilities were approved on an interim basis on April 24, 2024. *See Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief  (the "Interim*

Order") [Docket No. 85].  Pursuant to the Interim Order, a hearing on entry of the Final Order was set for May 16, 2024, and the objection deadline was May 9, 2024.  *See Omnibus Notice of Second Day Hearing to be Held on May 16, 2024 at 1:00 p.m. (ET)* [Docket No. 89].

6.       After the Committee was appointed, the Debtors, the DIP Secured Parties, and the Committee entered into negotiations regarding the DIP Facilities and issues raised by the Committee related to the Final Order.  As a result of those discussions, the parties agreed to move the hearing date for the Final Order to May 31, 2024, and the Committee's Final Order objection deadline to May 24, 2024 to continue discussions and review any going concern sale proposal the Debtors would receive on or about May 22, 2024.  In connection with that adjournment, the parties further agreed to amend the "going concern" Milestones set forth in the DIP Credit Agreements as follows:

- By May 24, 2024, that the Debtors must (i) enter into a "stalking horse" purchase agreement for a Going Concern Sale (a "GC Purchase Agreement"), or (ii) enter into a "stalking horse" agreement in the form of an agreement for a Liquidation.

7.       Upon the execution by the Debtors of a GC Purchase Agreement, the following additional milestones apply:

- May 24, 2024: Deadline for the Debtors to file the GC Purchase Agreement with the Court.

- June 3, 2024: Deadline for bids for a Going Concern Sale and the deadline for a final store list to be delivered to the DIP Lenders and Debtors for a Going Concern Sale.

- June 5, 2024: Auction date for a Going Concern Sale.

- June 14, 2024: Deadline for the entry of an Order approving the Going Concern Sale.

- June 18, 2024: Deadline for closing of the Going Concern Sale.

4

8.      Because not all issues among the Committee and the DIP Secured Parties were resolved by the Committee's May 24, 2024 objection deadline the DIP Secured Parties did not agree to a further extension, resulting in the filing of the Committee DIP Objection.

**C. Sale Process and Bids**

9.      One day prior to commencing these Chapter 11 Cases, April 21, 2024, a prospective joint venture (the "Phoenix JV") comprised of WHP Global, the Debtors' "most significant stakeholder," and Simon Property Group, L.P. ("Simon"), and BPR Acquisitions LLC ("BPR"), two of the Debtors' largest landlords, delivered a letter of intent to the Debtors (the "Phoenix LOI") for the purpose of bidding on a going concern sale of the Debtors' business in chapter 11. While the Debtors stated in the Motion that the Phoenix LOI would serve as a stalking horse bid in the Debtors' in-court sale process, the Debtors proceeded to run an in-court marketing process.

10.      To that end, the Debtors pursued further negotiations with the Phoenix JV. Those negotiations were apparently successful, and on May 24, 2024, the Debtors filed the *Notice of Stalking Horse Bidder* [Docket No. 305] (the "Stalking Horse Notice"). The Stalking Horse Notice states that on May 22, 2024, the Debtors executed a purchase agreement (the "Stalking Horse Bid") with Phoenix Retail, LLC (the "JV Purchaser"), a consortium consisting of PHXWHP, LLC, an affiliate of EXPWHP, LLC ("WHP Global Purchaser"), and affiliates of certain of the Debtors' landlords, specifically, Simon and BPR, and have selected the JV Purchaser to act as the stalking horse bidder for the Debtors' business operations (the "Going Concern Stalking Horse Bidder"). Stalking Horse Notice at 3.

11.      The hearing on the Debtors' bidding procedures, including a proposed break-up fee and expense reimbursement (the "Bid Protections") for the Going Concern Stalking Horse Bidder is scheduled for May 31, 2024, and the 2L Agent has filed a limited objection and reservation of

rights in opposition to approval of the Bid Protections. *See Limited Objection and Reservation of Rights of ReStore Capital, LLC, the Second Lien Prepetition Term Agent and Second Lien DIP Term Agent, to Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. 306].

12.     Concerned, however, that the Debtors would not receive an adequate going concern bid by the May 22, 2024 bid deadline, on that bid deadline, Hilco Merchant Resources, LLC (together with its affiliates, "HMR") and Gordon Brothers Retail Partners, LLC (together with its affiliates, "GBRP" and together with HMR, the "Liquidation Bidders") submitted a bid for substantially all of the assets of the Debtors in the amount of $261.3 million, which allocated $25 million for the Debtors' 40% equity interest in EXP Topco LLC, and the balance for the Debtors' other assets, including inventory, furniture, fixtures, and designation rights with respect to the Debtors leases and executory contracts (the "Liquidation Bid").

13.     As of the date of this Response, the Debtors have not provided the 2L Agent calculation of the Going Concern Stalking Horse Bidders' purchase price or an updated DIP Budget that would provide the Debtors adequate liquidity to ensure that the Debtors would have funding to consummate the Stalking Horse Bid and receive adequate cash to pay the DIP Lenders and the Prepetition Secured Creditors in full; however, the Debtors' have advised the 2L Agent's counsel that this is the case.

**D.  The Committee DIP Objection**

14.     As set forth above, because not all issues could be resolved, on May 24, 2024, the Committee filed the Committee DIP Objection.

15.     In the Committee DIP Objection, the Committee asserts, among other things, that the DIP Facilities provide limited new money at a great cost to the Debtors' estates and builds in premature and inappropriate protections for potential liquidators of the Debtors who are affiliated with the 2L Agent and certain of the Prepetition Secured Parties.  *See* Committee DIP Objection ¶ 2.  Further according to the Committee, there are multiple prepetition transactions involving these parties that the Committee desires to investigate, and as a result, the releases and stipulations contained in paragraph E and paragraph 25 of the Interim Order are premature.  *See id.* ¶ 2.

16.     While the Committee does not object to the economic terms of the DIP Facilities, the Committee requests that this Court approve the Motion subject to the Final Order being modified consistent with the challenges raised in the Committee DIP Objection.  *See id.* ¶ 5.

17.     For the reasons stated herein, the Court should overrule the Committee DIP Objection and modify the Final Order consistent with certain concessions to which the 2L Agent is prepared to consent.  Absent this Court overruling the remaining Committee objections, the 2L Agent is not prepared to (i) continue to provide the DIP Facilities on the economic terms proposed, including without significant additional reserves on eligibility, or (ii) consent to the use of its Cash Collateral.

## RESPONSE

**I.      THE DIP FACILITIES ARE IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THEIR CREDITORS AND ARE FAIR, REASONABLE, AND ADEQUATE GIVEN THE CIRCUMSTANCES**

18.     Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to

obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition financing where it reflected "sound and prudent business judgment" because it was "critical to the continued operation of the [debtors'] business and the ability of [the debtors] to propose a feasible plan of reorganization").

19.    To determine whether the business judgment test is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Duta Auto. Sys. Inc.*, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah Oct. 8, 1981).

20.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Facilities, the Court may take into consideration non-economic benefits to the Debtors under the DIP Facilities.  *See ION Media Networks, Inc.*, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms . . . .  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.").

21.    As advanced by the Debtors in the Motion, the "terms of the DIP Facilities are reasonable under the circumstances."  Motion ¶ 28.  That is because, as pointed out by the Debtors, the DIP Facilities are "necessary for the Debtors to maximize value on behalf of their constituents" in these Chapter 11 Cases, and because "[n]o party other than the DIP Lenders provided the

Debtors with an executable out-of-court or postpetition financing facility." *Id.* ¶ 27.  As further discussed in the Motion, the DIP Facilities were a product of arms'-length negotiation and a careful evaluation of alternatives.  *See id.* ¶¶ 27, 28.  The Debtors' entry into the DIP Facilities was an appropriate step given that the DIP Facilities: (a) allow the Debtors to avoid a value-destructive priming fight; (b) provide a path forward in chapter 11 by allowing the Debtors to facilitate a sale process; and (c) allow the Debtors to fund the administration of the Chapter 11 Cases for the benefit of the estates and all of the Debtors' stakeholders." *Id.* ¶¶ 32, 35, 39.  As a result, the DIP Facilities are in the best interests of the Debtors' estates and represent a sound exercise of the Debtors' reasonable business judgment.

## II.     THE DEBTORS' SECTION 506(C) WAIVER IS PROPER AND SHOULD BE APPROVED

22.     The Committee contends that the Debtors should not be permitted to waive its right to surcharge the DIP Secured Parties' and the Prepetition Secured Parties' collateral pursuant to Bankruptcy Code 506(c).  *See* Committee DIP Objection ¶ 22.

23.     Pursuant to Bankruptcy Code section 506(c), a debtor in possession "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. C. § 506(c).

A debtor in possession, acting in their business judgment, may choose to waive section 506(c), so long as the agreement to obtain postpetition financing does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines*, 163 B.R. at 974. Moreover, as a condition to providing the DIP Facilities, the Debtors agreed with the DIP Secured Parties to waive section 506(c).

24.     As is pertinent here, courts have upheld section 506(c) waivers as proper and enforceable.  *See In re Appliance Store*, 158 B.R. 384, 386 (Bankr. W.D. Pa. 1993) (finding 506(c) waiver enforceable); *see also InteliQuest Media Corp. v. Miller* (*In re InteliQuest Media Corp.*), 326 B.R. 825, 831 (10th Cir. B.A.P. 2005) (same).   In addition, District of Delaware bankruptcy courts routinely grant waivers of section 506(c).  *See, e.g.*, *In re Number Holdings, Inc.*, Case No. 24-10719 (Bankr. D. Del. May 9, 2024) (KJS) [Docket No. 467]; *In re Never Slip Holdings, Inc.*, Case No. 24-10663 (D. Del. Apr. 26, 2024) (LSS) [Docket No. 133]; *In re Cano Health, Inc.*, Case No. 24-10164 (D. Del. Mar. 6, 2024) (KBO) [Docket No. 271]; *In re Restoration Forest Products Group, LLC*, Case No. 24-10120 (D. Del. Mar. 6, 2024) (KBO) [Docket No. 179].

25.     Further, while the Committee argues that a Court will not approve a 506(c) waiver over an official committee of unsecured creditor's objection when a case is not adequately funded, *see* Committee DIP Objection ¶ 24 (citing *In re Casa Sys. Inc.*, Case No. 24-10695 (Bankr. D. Del.) (KBO), May 3, 2024 Hr'g Tr. at 36:6-10 [Docket No. 290]), the Committee has not provided any evidence to demonstrate that these Chapter 11 Cases are not adequately funded by the proposed DIP Facilities.  The DIP Lenders have provided DIP Facilities in the amount of $224 million for the Debtors to run a sales process, and to fund postpetition administrative expenses, including employee obligations, "stub rent," professional fees and critical vendor payments, and a winddown.  There is no obligation under Third Circuit or Delaware law for the DIP Lenders to provide funding sufficient to confirm a plan of reorganization and pay not only post-petition administrative expenses, but also prepetition administrative expense claims, such as section 503(b)(9) claims and priority claims, and this Court should not set such a precedent.

26.     Moreover, as the Debtors stated, the DIP Facilities provided the "incremental liquidity necessary to conduct a robust marketing process during the Chapter 11 Cases."  Motion

¶ 39.  And, as a result, the Debtors have received two significant offers for substantially all of their assets: (1) a going concern bid from the JV Purchaser that the Debtors contend will pay the DIP Secured Parties' and the Prepetition Secured Parties' claims in full as well as a substantial portion, if not all, of the prepetition and postpetition administrative claims, and (2) the Liquidation Bid in the amount of $261.3 million that will similarly cover all of the DIP Secured Parties' and Prepetition Secured Parties' claims, and provide the Debtors with cash sufficient to satisfy any remaining postpetition administrative expenses, potentially all other administrative expenses, and a distribution to unsecured creditors.

27.     Therefore, under the circumstances, the Debtors' decision to waive section 506(c) does not run afoul of the Bankruptcy Code and is a proper exercise of the Debtors' business judgment in obtaining postpetition financing.  Accordingly, the Debtors' waiver of 506(c) should be approved and the Committee's objection denied.

## III.   THE SECTION 552(B)(1) WAIVER OF THE EQUITIES OF THE CASE IS PROPER AND SHOULD BE APPROVED

28.     The Committee also contends that the DIP Lenders and the Prepetition Secured Parties should not be the beneficiaries of a 552(b)(1) waiver, and in the future the Committee and other creditors should be able to assert the "equities of the case" exception codified in Bankruptcy Code section 552(b)(1).  Specifically, the Committee contends that while Bankruptcy Code section 552(b)(1) allows a secured creditor's prepetition lien to continue in postpetition "proceeds" of prepetition collateral, it and other creditors may nonetheless request in the future that the Court enter an order cutting off the Prepetition Secured Lenders' right to "proceeds, products, offspring, or profits of such property" on which the Prepetition Secured Parties had a security interest under the prepetition credit agreement, based on the "equities of the case."  Committee DIP Objection ¶ 17(a).  The 2L Agent maintains that a Bankruptcy Code section 552(b) waiver, including a waiver

11

of the "equities of the case" is proper given the new money DIP Loans and the Debtors' consensual use of cash collateral that has been provided to the Debtors to run the post-petition marketing process and potentially consummate a going concern sale.

29.     In support of its position, the Committee contends, similar to its objection to a waiver of Bankruptcy Code section 506(c), that waivers of 552(b)(1) should not be approved over a committee's objection.  Committee DIP Objection ¶ 30 (citing *In re Casa Sys. Inc.*, Case No. 24-10695 (Bankr. D. Del.) (KBO), May 3, 2024 Hr'g Tr. at 36:6-10 [Docket No. 290]).  The Committee's position is based on this Court's recent reliance on former Judge Walsh's statement that waivers will never be approved over an official committee of unsecured creditor's objection. *See In re Casa Sys. Inc.*, Case No. 24-10695 (Bankr. D. Del.) (KBO), May 3, 2024 Hr'g Tr. at 36:6-10 [Docket No. 290] ("[I]t starts with Judge Walsh's statement, long, long ago, that he will never approve waivers over a Committee objection, and I don't think we deviate as a collective Court here from that position.").  While it is true that a committee's position regarding a waiver should be weighed heavily by the Court, neither Judge Walsh nor this Court has or should set such an absolute rule, and here the indisputable facts justify granting the Bankruptcy Code section 552(b)(1) waiver sought.

30.     *First*, the Committee's understanding of Judge Walsh's statement is not correct.  In a letter written by Judge Walsh, that was ultimately the basis for the Court's local rules governing debtor in possession financing, Judge Walsh stated that "should the Court deem it appropriate, given a strong showing at the first day hearing, to allow a waiver of [section] 506(c), if the subsequently appointed committee presents a persuasive argument, the Court should revisit the matter and be guided by what it hears at the final hearing."  Letter from Hon. Peter J. Walsh, U.S. Bankruptcy Court for the District of Delaware ¶ 21 (Apr. 2, 1998).  Here, the Committee has

12

provided no argument other than this Court's statement in *Casa Systems, Inc.*, and the facts and consequences of not granting the section 552(b)(1) waiver of the "equities of the case" exception demonstrate that the waiver is proper.

31.     Second, the equities of the case exception of Section 552(b)(1) is narrowly construed and is only enforced in limited circumstances where a secured creditor would receive a windfall because, for example, the value of the secured creditor's collateral is increased by an expenditure of estate funds that would otherwise be distributed to unsecured creditors in the case. *See, e.g.*, *In re Tower Air, Inc.*, 397 F.3d 191, 205 (3d Cir. 2005). The Committee has not provided any evidence that there were any unencumbered assets as of the Petition Date (other than potentially the proceeds of commercial tort claims, claims against officers and directors, and avoidance actions), and it cannot reasonably argue that any such proceeds would increase the value of the Prepetition Secured Lenders' existing collateral. Indeed, as to these proceeds, the DIP Agents and the Prepetition Secured Parties are willing to agree to soft-marshalling with respect to the assets that serve as collateral for the DIP Loans and Adequate Protection Superpriority Claims and Adequate Protection Liens so that those proceeds would only be available in the event that the Debtors' other assets would be insufficient to satisfy in full the outstanding DIP Obligations and the Prepetition Secured Lenders' Adequate Protection Liens and Adequate Protection Superpriority Claims. Even had they not accepted a soft-marshalling concept, the DIP Lenders and Prepetition Secured Lenders would not have received a windfall, but instead a fair *quid pro quo* for providing new money postpetition debtor in possession financing and the consensual use of Cash Collateral to provide sufficient availability to pay administrative expenses, certain critical prepetition creditor claims, and their own professional fees in amounts well in excess of what could

be surcharged against the Prepetition Secured Parties' collateral under Bankruptcy Code section 506(c).

32.     Moreover, while the Committee seems to think that there may be unencumbered assets that existed on the Petition Date, such as assets that may become unencumbered as a result of the Committee's investigation and a successful challenge, any such unencumbered assets would not provide a windfall to the DIP Lenders or the Prepetition Secured Parties at the expense of any unsecured creditors.  The DIP Lenders have provided $25 million in new money financing to the Debtors and the Prepetition Secured Parties have provided the Debtors with sufficient availability to run what appears to be a successful sale process, and, thus, provided the Debtors and all of their creditors an opportunity to be paid or receive distributions that might not have otherwise been available to them.

33.     Under the circumstances of these cases, the waiver of the section 552(b)(1) equities of the case exception should be granted, as courts in this district have routinely done before.  *See, e.g.*, *In re Number Holdings, Inc.*, Case No. 24-10719 (Bankr. D. Del. May 9, 2024) (KJS) [Docket No. 467]; *In re Never Slip Holdings, Inc.*, Case No. 24-10663 (Bankr. D. Del. Apr. 26, 2024) (LSS) [Docket No. 133]; *In re Cano Health, Inc.*, Case No. 24-10164 (Bankr. D. Del. Mar. 6, 2024) (KBO) [Docket No. 271]; *In re Restoration Forest Products Group, LLC*, Case No. 24-10120 (Bankr. D. Del. Mar. 6, 2024) (KBO) [Docket No. 179].

## IV.     THE DEBTORS' WAIVER OF EQUITABLE MARSHALLING IS PROPER AND SHOULD BE APPROVED

34.     The Committee also asserts that the Debtors cannot waive the equitable doctrine of marshalling without creditor consent.  *See* Committee DIP Objection ¶ 31.  According to the Committee, the Debtors may not waive the doctrine of marshalling without satisfying the standards for granting a third-party release.  *See id.* ¶ 32 (*citing In re The Colad Grp. Inc.*, 324 B.R. 208, 224

(Bankr. W.D.N.Y. 2005)).  In addition, the Committee asserts that, even if the Debtors had the power to waive marshalling in appropriate circumstances, such relief is unwarranted here.  *See* Committee DIP Objection ¶ 33.

35.     *First*, Delaware bankruptcy courts may approve waiver of the equitable doctrine of marshalling without creditor consent.  In *In re Hospital Acquisition LLC*, the official committee of unsecured creditor's objected to the debtor's motion to obtain postpetition financing, and specifically, the proposed final order's inclusion of a waiver of the equitable doctrine of marshalling.  *See In re Hospital Acquisition LLC*, Case No. 19-10998 (Bankr. D. Del. May 24, 2019) (BLS) [Docket No. 134] (arguing that equitable doctrine of marshalling should not be waived in final order approving debtor in possession financing because the prepetition secured parties were adequately protected).  Ultimately, the bankruptcy court approved a waiver of marshalling in the final order authorizing postpetition financing, notwithstanding the objection.  *See In re Hospital Acquisition LLC*, Case No. 19-10998 (Bankr. D. Del. May 24, 2019) (BLS) [Docket No. 278].

36.     Second, the authority relied on by the Committee, *In re The Colad Grp. Inc.*, is a case from outside of the Third Circuit, which is not binding on this Court and may only be relied on as persuasive authority.  In addition, it is distinguishable from these circumstances.  In *Colad*, while the bankruptcy court approved the requested postpetition financing, it denied the debtor's request for a waiver of the equitable doctrine of marshalling, for two reasons: first, the bankruptcy court found that notice of the request was not sufficient, and second, the bankruptcy court would not condone the debtor's attempt to waive marshalling for all other secured creditors, while maintaining marshalling for its own benefit.  324 B.R. at 223–24.  The bankruptcy court found notice to be insufficient because the moving papers failed to identify the debtor's prepetition

secured creditors.  See *id.* (observing that the "notice requirement of section 364(d)(1) must necessarily inure to the benefit of superior lienors.  Without an identification of those superior lienors, the court cannot possibly confirm the adequacy of notice.").  Here, the Motion has identified the Prepetition Secured Lenders.  Motion ¶¶ 20, 22.  Second, while the DIP Documents contemplate a waiver of the equitable doctrine of marshalling, they do not seek to preserve that right for the Debtors.  On these bases, *Colad* is not applicable here.

37.    Third, waiver of the equitable doctrine of marshalling is routinely granted in similar circumstances.  *In re Never Slip Holdings, Inc.*, Case No. 24-10663 (Bankr. D. Del. Apr. 26, 2024) (LSS) [Docket No. 133]; *In re Airspan Networks Holdings Inc.*, Case No. 24-10621 (Bankr. D. Del. Apr. 19, 2024) (TMH) [Docket No. 99]; *In re Restoration Forest Products Group, LLC*, Case No. 24-10120 (Bankr. D. Del. Mar. 6, 2024) (KBO) [Docket No. 179].

38.    *Fourth*, and finally, the DIP Agents have agreed to revise the Final Order to include "soft-marshalling" that requires the DIP Lenders and Prepetition Secured Creditors to obtain their recoveries first from the Prepetition Collateral and DIP Collateral other than the proceeds of avoidance actions, commercial torts claims and actions against directors and officers (the "Residual Collateral"), before seeking to be paid in full from the Residual Collateral.

39.    Therefore, the Committee's objection to the Debtors' waiver of equitable marshalling should be overruled.

## V.    THE COMMITTEE DOES NOT REPRESENT ADMINISTRATIVE CREDITORS AND VENDORS ARE NOT ENTITLED TO ADMINISTRATIVE CLAIMS UNDER BANKRUPTCY CODE SECTION 503(B)(9) FOR INVENTORY RECEIVED POST-PETITION WHEN TITLE PASSED PRE-PETITION

40.    The Committee also argues that the Initial DIP Budget does not cover the costs of the Debtors' Chapter 11 Cases, and specifically points to the DIP Credit Agreements' prohibition of payment of chapter 11 administrative claims that are not included with the Approved Budget

without DIP Lender consent. *See* Committee DIP Objection ¶ 35. The Committee also contends that the Initial Budget authorizes the Debtors to pay far less to critical and foreign vendors than the Debtors have received Court authorization to pay. *See id.* ¶ 35. According to the Committee, these costs could be addressed through the use of funds from the Administrative Claims Reserve; however, the Committee argues that the DIP Lenders have placed an excessive number of restrictions on the use of such funds. *See id.* ¶ 36.

41.     First, the Committee is a fiduciary that represents the interests of prepetition general unsecured creditors only. *See In re World Health Alts.*, 344 B.R. 291, 303 (Bankr. D. Del. 2006) (observing the "number of cases that support the proposition that the official committee of unsecured creditors owes its fiduciary duty only to the general unsecured creditors."). Creditors' committees do not represent the interests of administrative creditors, whose interests are represented by virtue of the "absolute priority rule." *See Id.* ("Presumably, the cases that find that the creditors committee owes a fiduciary duty to the general unsecured creditors only are recognizing the implicit conflict of interest between general unsecured creditors and priority creditors."). Therefore, the Court should reject any position of the Committee that is advanced on behalf of administrative creditors, and not for the benefit of those creditors the Committee is charged with representing.

42.     *Second*, there is no obligation under the Bankruptcy Code or applicable case law for the DIP Lenders to fund prepetition expenses that are junior to their DIP Liens and DIP Superpriority Claims. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 179 (Bankr. S.D.N.Y. 1989) (finding that a prepetition payment is not necessary where it does not increase the probability of a successful reorganization and would harm the interests of other creditors). Likewise, there is no obligation under the Bankruptcy Code or Third Circuit law for the DIP Lenders to pay all

administrative claims, including claims under Bankruptcy Code section 503(b)(9). *See, e.g.*, *In re Molycorp, Inc.*, 562 B.R. 67, 76 (Bankr. D. Del. 2017) (observing that a "secured creditor's consent to the payment of designated expenses limited in amount will not be read as a blanket consent to being charged with additional administrative expenses."); *see also In re Am. Resources Mgmt. Corp.*, 562 B.R. 67, 76 (Bankr. D. Utah 1985) (observing that "a secured creditor may, without doing violence to the letter or spirit of the Bankruptcy Code, selectively waive its liens and super-priority claims to permit payment of certain administrative expenses but not others").

43.     *Third*, any demand by the Committee to increase the amount payable to critical and foreign vendors as administrative claims for inventory that was not received within the twenty days prior to the Petition Date as required Bankruptcy Code section 503(b)(9) should be rejected. Under section 503(b)(9) of the Bankruptcy Code, vendors of goods received by a debtor within the period twenty days before the debtor's petition date in the ordinary course of the debtor's business are entitled to administrative priority claim status. *See* 11 U.S.C. § 503(b)(9). In the Third Circuit, "received" has been established to mean physical possession of the goods. *See In re World Imports, Ltd.*, 862 F.3d 338, 342 (3d Cir. 2017); *see also In re Bill's Dollar Stores, Inc.*, 164 B.R. 471, 477 (Bankr. D. Del. 1994).

44.     The passing of title is irrelevant to the Bankruptcy Code section 503(b)(9) inquiry. For example, if goods are purchased by a debtor prepetition and are received and in a debtor's physical possession within twenty days before the debtor's petition date, the vendor of such goods would be entitled to an administrative priority claim pursuant to section 503(b)(9). However, goods purchased by a debtor that are received and, in the debtors' physical possession after the petition date, are not. *See Vanco Trading v. Monheit (In re K Chemical Corp.)*, 188 B.R. 89, 95 (Bankr. D. Conn. 1995) (rejecting the argument that administrative priority claim status should be

accorded to a supplier for transaction that did not strictly accord with language of section 503(b)). Therefore, the Court should overrule the Objection to the extent that it seeks to increase improperly the amount payable to critical and foreign vendors as administrative priority claims pursuant to Bankruptcy Code section 503(b)(9).

## VI.   THE BUDGET AND TIMEFRAME FOR THE FOR THE COMMITTEE TO CONDUCT AN INVESTIGATION AND RAISE A CHALLENGE IS SUFFICIENT

45.   The Committee argues that the Challenge Period is insufficient to satisfy its statutory duty to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor" and "any other matter relevant to the case or to formulation of a plan," and that it should be extended to July 31, 2024.   Committee DIP Objection ¶¶ 37, 38 (quoting 11 U.S.C. § 1103(c)(2)).   In addition, the Committee asserts that the Investigation Budget Cap of $50,000 is inadequate to investigate potential claims against the Prepetition Secured Parties.   *See id.* ¶ 39.

46.   The Interim Order set the Challenge Period to be seventy-five days from the date of entry of the Interim Order, and the Investigation Budget Cap to be $50,000.   A number of District of Delaware bankruptcy courts have approved the same challenge period and found the same investigation budget to be sufficient.   *See, e.g.*, *In re Furniture Factory Ultimate Holdings, L.P.*, Case No. 20-12816 (Bankr. D. Del. Dec. 2, 2020) (JTD) [Docket No. 147]; *In re Ursa Piceance Holdings LLC*, Case No. 12065 (Bankr. D. Del. Sept. 29, 2020) (BLS) [Docket No. 123]. Nonetheless, with respect to the Investigation Budget Cap, the 2L Agent is prepared to increase the amount of the Investigation Budget Cap to $100,000, subject to the Committee's professionals agreeing to maintain and report separately on any fee application the time and expenses incurred for any investigation or challenge.   Moreover, the 2L Agent agrees that, if and to the extent that the Committee's professionals exceed the $100,000 Investigation Budget Cap, they may seek to

have an allowed an administrative expense claim for such work, which, if granted, shall be an allowed administrative expense claim.

47.    The 2L Agent will not, however, agree to an extension of the seventy-five day challenge period as it is in accordance with the Local Rules.  *See* Local Rule 4001-2(a)(i)(Q). Moreover, as is standard, the proposed final order only requires that the Committee make a request for standing with a copy of a complaint within that timeframe.

## VII.    THE COURT NEED NOT RULE THAT DELAWARE LIMITED LIABILITY COMPANY LAW DOES NOT APPLY FOR THE COMMITTEE TO BE ABLE TO OBTAIN STANDING TO ASSERT CHALLENGES

48.    The Committee requests that the Final Order be further revised to make clear that the Committee's standing to pursue claims and challenge liens cannot be defeated based on the Debtors' corporate form.  *See* Committee DIP Objection ¶ 40(f).  According to the Committee, while the Debtors' top entity, Express, Inc., is a Delaware corporation, other entities of the Debtors are Delaware limited liability companies, and applicable law may prevent the Committee from filing derivative suits on behalf of such entities.  *See id.*

49.    Because the ultimate parent entity of the Debtors is a Delaware corporation Delaware limited liability company law does not apply for the purposes of the Committee's derivative standing analysis.  Judge Silverstein summarized the long-established standing practice for the bankruptcy courts of the District of Delaware, stating that "as long as [there is] one incorporated entity, then . . . [there is no] LLC [standing] issue."  *See In re Winc, Inc.*, Case No. 22-11238 (Bankr. D. Del.) (LSS), December 6, 2022 Hr'g Tr. at 59:17-19 [Docket No. 53]; *see also N. Am. Catholic Educ. Programming Found. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (holding that when a corporation is insolvent, its creditors "have standing to maintain derivative

claims"). Consequently, there is no need for any acknowledgment that the Committee can obtain derivative standing.

## VIII. THE REMAINDER OF THE COMMITTEE'S OBJECTIONS TO THE FINAL DIP ORDER SHOULD BE OVERRULED

50. The remainder of the Committee's arguments include that (a) the event of default provisions under the DIP Credit Agreements give the DIP Lenders inappropriate control over the Debtors' Chapter 11 Cases; (b) the DIP Credit Agreements inappropriately prevent the Debtors from spending in accordance with the Approved Budget and foreclose the Debtors from having a reasonable amount of time to cure events of default; (c) the DIP Credit Agreements must be revised to afford the Committee notice of material changes to the Debtors' liquidity; (d) clarifications should be made regarding credit bid rights under section 363(k) of the Bankruptcy Code; and (e) the Court should not allow the Debtors to use the Motion to effectuate overbroad releases, including against non-DIP Lender third parties or the Debtors' directors and officers.

51. As to the Committee's arguments regarding the DIP Credit Agreements, the DIP Credit Agreements reflect terms heavily negotiated at arms'-length between the Debtors and DIP Secured Parties and, therefore, reflect the Debtors' sound business judgment. These terms were necessary for the DIP Secured Parties to offer the DIP Facilities to the Debtors in light of the risk that the DIP Secured Parties were undertaking. Regarding the Committee's positions as to credit bidding under section 363(k) of the Bankruptcy Code, the right to credit bid is not subject to the outcome of the Challenge Period, and the Court may fashion an appropriate remedy in the event of a credit bid that the Debtors seek to close before the expiration of the Challenge Period. Finally, the 2L Agent submits that the stipulations and releases negotiated between the DIP Secured Parties and the Debtors reflect the Debtors' sound business judgment.

**RESERVATION OF RIGHTS**

52.    The 2L Agent expressly reserves all rights to raise any other objections at the hearing on the Motion and the Committee DIP Objection and to amend, modify, or supplement this Response.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the 2L Agent respectfully requests that the Court enter an Order (i) approving the Motion, (ii) denying the Committee DIP Objection, and (iii) granting such other and further relief as the Court deems appropriate and consistent with this Response.

Dated:  May 28, 2024
        Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**

Gregg M. Galardi (No. 2991)
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Email: gregg.galardi@ropesgray.com

Stephen L. Iacovo (admitted *pro hac vice*)
Eric P. Schriesheim (admitted *pro hac vice*)
191 North Wacker Drive
Chicago, Illinois 60606-4302
Telephone: (212) 596-9000
Email: stephen.iacovo@ropesgray.com
       eric.schriesheim@ropesgray.com

*Counsel to ReStore Capital, LLC*