**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OMNIBUS REPLY OF DEBTORS
(I) IN SUPPORT OF FIRST DAY MOTIONS AND (II) IN
OPPOSITION TO (A) MOTION OF MR. KURZON FOR APPOINTMENT
OF A SHAREHOLDERS' COMMITTEE AND (B) GRANTING RELATED RELIEF**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

## <u>TABLE OF CONTENTS</u>

I.    Preliminary Statement.............................................................................................1

II.   Background ...........................................................................................................4
      A.    The WHP Partnership and Brand Development ..........................................4
      B.    Corporate Governance and Independence ...................................................6
      C.    The Reverse Stock Split and Shares Outstanding.......................................6
      D.    The CARES Act Refund and Cash Dominion ............................................8

III.  Reply....................................................................................................................9
      A.    Mr. Kurzon's First Day Objections Should be Overruled. ......................11
            1.    The Relief Sought by the NOL Motion Maximizes the Debtors'
                  Estates and Provides the Kind of Check Mr. Kurzon Apparently
                  Seeks.............................................................................................12
            2.    The Requested Additions to the NOL Order Are Improper. ..........13
            3.    Mr. Kurzon's Suggestions Regarding State Tax Attributes Are Not
                  Germane to the NOL Motion or to the Debtors' Valuation............14
            4.    The Debtors Have Already Filed a List of Equity Security Holders. .......15
            5.    Mr. Kurzon's Objection to the DIP Motion is Based on a Mistaken
                  Premise..........................................................................................15
            6.    The Bidding Procedures Provide the Protections that Mr. Kurzon
                  Seeks.............................................................................................16
      B.    An Equity Committee is Entirely Unwarranted........................................17
            1.    The Debtors are Hopelessly Insolvent, and There is No Reasonable
                  Prospect That Equity Holders are Entitled to a Meaningful
                  Distribution. ..................................................................................18
            2.    Other Factors Counsel Against the Appointment of an Equity
                  Committee......................................................................................21

IV.   Mr. Kurzon is Not Entitled Any Fees or Costs Associated with the Objection. ........22

V.    Reservation of Rights..........................................................................................23

VI.   Conclusion ..........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re American Remanufacturers, Inc.*,
  2010 WL 1027803 (Bankr. D. Del. Mar. 19, 2010)................................................................10

*In re Bed Bath & Beyond Inc.*,
  No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 29, 2023) ...........................................................11

*Business Guides v. Chromatic Comm. Enter's*,
  498 U.S. 533 (1991).............................................................................................................24

*Doering v. Union County Bd. Of Chosen Freeholders*,
  857 F.2d 191 (3d Cir. 1988).................................................................................................23

*Exide Techs. v. State of Wis. Inv. Bd.*,
  2002 WL 32332000 (D. Del. Dec. 23, 2002)........................................................................17

*Gambrell v. Hess*,
  777 F.Supp. 375 (D.N.J. 1991) ...........................................................................................23

*In re Grasso*,
  519 B.R. 137 (Bankr. E.D. Pa. 2014) ..................................................................................23

*In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Dec. 23, 2020).............................18

*Kurkowski v. Volcker*,
  819 F.2d 201 (8th Cir. 1987) ...............................................................................................23

*Lebron v. Mechem Fin. Inc.*,
  27 F.3d 937 (3d Cir. 1994)...................................................................................................23

*Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.*,
  174 U.S. 674 (1899)...............................................................................................................9

*In re Magnum Hunter Resources Corporation*,
  No. 15-12533 (KBO) (Bankr. D. Del. Apr. 20, 2016)...........................................................20

*Patterson v. Aikin*,
  841 F.2d 386 (11th Cir. 1988) .............................................................................................23

*In re Pilgrim's Pride Corp.*,
  407 B.R. 211 (Bankr. N.D. Tex. 2009)............................................................................17, 21

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968)..............................................................................................................21

*In re Samson Resources Corp.*,
   2023 WL 4003815 (Bankr. D. Del. June 14, 2023) .................................................................3

*In re Spansion, Inc.*,
   421 B.R. 151 (Bankr. D. Del. 2009) ...........................................................................17, 18, 21

*In re SunEdison, Inc.*,
   556 B.R. 94 (Bankr. S.D.N.Y. 2016) ......................................................................................21

*In re Trans World Airlines, Inc.*,
   180 B.R. 389 (Bankr. D. Del. 1994) ........................................................................................21

*In re Williams Commc'ns Grp., Inc.*,
   281 B.R 216 (Bankr. S.D.N.Y. 2002) ...............................................................................17, 18

**Statutes**

11 U.S.C. §101 ......................................................................................................................................5

11 U.S.C. § 503 ...................................................................................................................................23

11 U.S.C. § 1102 .................................................................................................................................17

11 U.S.C. § 1129 ...................................................................................................................................3

**Rules**

Fed R. Bankr. P. 1007 ........................................................................................................................15

Fed. R. Bankr. P. 2019 ...................................................................................................................13, 14

Fed. R. Bankr. P. 9011 ...................................................................................................................23, 24

Fed. R. Civ. P. 11 ................................................................................................................................23

Fed. R. Evid. 401 ................................................................................................................................10

Fed. R. Evid. 402 ................................................................................................................................10

Fed. R. Evid. 802 ................................................................................................................................10

The Debtors[1] hereby submit this reply to *Pro Se Shareholder (1) Omnibus Initial Objections to Debtor's First Day Motions and Opposition to Motion Waiving the Requirement to File a List of Equity Security Holders and (2) Motion for Shareholder's Committee and Request for Other Emergency Relief to Prevent Further Damage to the Debtors* [Docket No. 181] (the "Objection") filed by Jeffrey M. Kurzon ("Mr. Kurzon").  In support, the Debtors submit the *Declaration of Adam Keil in Support of Omnibus Reply of Debtors (I) In Support of First Day Motions and (II) In Opposition to (A) Motion of Mr. Kurzon for Appointment of a Shareholders' Committee and (B) Granting Related Relief* (the "Keil Declaration"), the *Declaration of Mark Still in Support of Omnibus Reply of Debtors (I) In Support of First Day Motions and (II) In Opposition to (A) Motion of Mr. Kurzon for Appointment of a Shareholders' Committee and (B) Granting Related Relief* (the "Still Declaration"), and the *Declaration of Kunal S. Kamlani in Support of Omnibus Reply of Debtors (I) In Support of First Day Motions and (II) In Opposition to (A) Motion of Mr. Kurzon for Appointment of a Shareholders' Committee and (B) Granting Related Relief* (the "Kamlani Declaration"), each filed contemporaneously herewith, and state as follows:

## I.    Preliminary Statement

1.    The Debtors commenced these chapter 11 cases to save an iconic fashion retailer by pursuing a going concern transaction.  If the Debtors are successful, substantial value will be preserved for a panoply of stakeholders:  thousands of jobs will be saved, hundreds of stores will remain open for the loyal shoppers of Express and Bonobos, and numerous vendors will continue

---

[1]    A detailed description of the facts and circumstances giving rise to the Debtors' chapter 11 cases is set forth in the *Declaration of Stewart Glendinning, Chief Executive Officer of Express, Inc. in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 20] (the "First Day Declaration").  Capitalized terms used, but not defined, herein shall have the meanings ascribed to such terms in the First Day Declaration, the Keil Declaration, the Still Declaration, the Kamlani Declaration, the *Declaration of Kunal S. Kamlani in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 31] (the "Kamlani Initial DIP Declaration"), or as otherwise defined herein, as applicable.

to engage in business with the Debtors.  This is chapter 11's hallmark purpose, and for a retailer otherwise on the brink of liquidation, this is the very definition of success.  In fact, the Debtors' efforts to achieve a going concern transaction have already begun to bear fruit with the signing of the Phoenix APA.  *See* Docket No. 305.

2.      To that end, it is vital that the Debtors obtain the balance of their requested first day relief on a final basis.  The Debtors negotiated with all parties in interest, including their lenders, the official committee of unsecured creditors, numerous landlords, the U.S. Trustee, vendors, and others to resolve formal and informal comments.  The Debtors do not believe that Mr. Kurzon's objections to the NOL Motion or the Creditor Matrix Motion are warranted or applicable, as set forth in more detail in this Reply.

3.      Additionally, Mr. Kurzon, based on a misunderstanding of the value of these estates and the potential (or lack thereof) for equity to recover, seeks appointment of an equity committee. But make no mistake, the Debtors and their estates are hopelessly insolvent—the threshold for considering the appointment of an equity committee.  The Debtors' debtor-in-possession financing provided the Debtors with one month to sign a going concern asset purchase agreement, otherwise the Debtors would have been forced to immediately liquidate.[2]  The Committee, which is fully informed and has every incentive to push for a different timeline or structure if there was reason to do so, has no objection to the Debtors' process.  This is not a close call, and adding a new and unnecessary administrative expense burden to these chapter 11 cases would only harm stakeholders and make any recovery for equity (already verging on impossible) further from reach.

---

[2]     *See Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [Docket No. 85, Exhibit 2, Addendum II] (establishing a May 22, 2024 deadline to sign a stalking horse asset purchase agreement).

4.       In eighteen pages of baseless allegations levied at the Debtors' management and advisors, Mr. Kurzon fails to provide any evidence demonstrating that there is a possibility of any recovery for equity holders, much less a substantial likelihood.  There is none.  Mr. Kurzon's request for the appointment of an equity committee should be denied.

5.       All that said, the Debtors are not resigned to the options at hand and are intent on maximizing value by evaluating all options available to the Debtors.  The Debtors are engaged with numerous parties and would be elated to generate additional interest and a higher bid than the Phoenix APA that is currently on the table.  At present, no such offer exists.  *See* Keil Declaration ¶¶ 22, 23.  The marketing and eventual auction process is the best possible valuation exercise—a market test of the value of the Debtors' assets.  "It is black letter law in [the Third] Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market.  A thing is worth what a willing buyer will pay to a willing seller following a proper marketing process."[3] If there is sufficient value to justify a distribution to equity (or to come even close to that sum), the marketing and auction process will demonstrate as much.  *See* Keil Declaration ¶ 22.

6.       The Debtors empathize with the loss Mr. Kurzon and other shareholders have or will experience.  However, the Bankruptcy Code prescribes adherence to a waterfall of mandatory priorities, and equity cannot recover until all creditors are paid in full.  *See* 11 U.S.C. § 1129(b)(2). Mr. Kurzon does not meet his burden of demonstrating that an equity committee is necessary or appropriate in these chapter 11 cases.  For these and other reasons set forth below, the Debtors respectfully request that the Objection be overruled, as it pertains to the first day relief, and denied as it pertains to Mr. Kurzon's cross motion for the appointment of an equity committee.

---

[3]        *See, e.g.*, *In re Samson Resources Corp.*, 2023 WL 4003815, at *2 (Bankr. D. Del. June 14, 2023).

II.     **Background**

7.      Notwithstanding unsupportable allegations to the contrary, the Debtors' current fiscal situation is not the result of market manipulation, the meme stock craze, or other equity trading.  Instead, and as the Debtors have explained, the industry-wide decline of brick and mortar retail coupled with supply chain constraints exacerbated by the end of the COVID-19 pandemic inflicted substantial challenges upon the Debtors businesses.  *See* First Day Declaration, ¶ 28. These discrete business challenges forced the Debtors to seek and obtain incremental liquidity in an effort to turn their businesses around.  These chapter 11 cases represent one more step towards viability.  For the benefit of all parties, the Debtors will summarize their efforts undertaken to stabilize their businesses.  A more comprehensive discussion of these efforts can be found in the First Day Declaration.

A.     **The WHP Partnership and Brand Development**

8.      In January 2023, Express entered into a new strategic partnership with WHP Global, a leading global brand management firm, leveraging Express's valuable intellectual property to advance the Express omnichannel platform, which signified the first great leap in its attempt to reinvigorate its brand and to drive greater scale and profitability of the Express platform. In connection with the closing of the new strategic partnership transaction with WHP Global, Express received gross proceeds of approximately $260 million consisting of (1) approximately $25 million in aggregate proceeds from the issuance and sale of 5.4 million shares of common stock (representing approximately 7.4% of Express' outstanding common stock at that time, on a pro forma basis) to an affiliate of WHP Global in a private placement, and (2) approximately $235 million from the sale of a 60% ownership interest in an intellectual property joint venture, EXP Topco, LLC, pursuant to which Express contributed certain of its intellectual property assets.  The intellectual property joint venture at the time was valued at approximately $400 million and

4

allowed the Company to develop its domestic U.S. licensing capability in non-core categories and expand its brand internationally.  *See* First Day Declaration, ¶¶ 30.

9.      The proceeds from the new strategic partnership with WHP Global allowed Express to pay down its then term loan and a portion of its revolving credit facility and remain focused on other available initiatives to further enhance its brand.  *See Id.*, ¶ 31.

10.      As a result of the Debtors improved leverage profile and strategic partnership with WHP Global, the Debtors and WHP Global entered into a definitive agreement with Walmart Inc. to acquire Bonobos, a menswear brand known for exceptional fit and an innovative online retail model that leverages physical tailoring "guide shops" seamlessly with virtual shopping.  Under the terms of the transaction, which had been arranged as part of the WHP Global strategic partnership, Express agreed to purchase Bonobos' operating assets, and assume certain related liabilities of the Bonobos business, for a purchase price of $25 million, subject to a customary working capital adjustment, and WHP Global agreed to purchase certain intellectual property related to the Bonobos brand for a purchase price of $50 million.  The Bonobos acquisition was completed in May 2023. *See Id.*, ¶ 31.

11.      WHP Global's interest in Express, Inc. as of April 15, 2024 is approximately 7.25%.  While WHP Global and the Debtors are joint venture partners with respect to EXP Topco, LLC, WHP Global is not an affiliate or insider of the Debtors.  11 U.S.C. §§ 101(2), (31).  EXP Topco, LLC is not a debtor in these chapter 11 cases and the Debtors are not authorized to engage in any Intercompany Transactions with EXP Topco, LLC.[4]

---

[4]    *See Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 235].

### B.   Corporate Governance and Independence

12.   To further bolster the Debtors' restructuring expertise and independence in connection with considering strategic alternatives, the Debtors appointed William Transier as an independent and disinterested director to Express, Inc.  In addition to serving as a member of the board, Mr. Transier has authority to review and act upon any matters pertaining to a restructuring in which a conflict exists between the Debtors and its shareholders, creditors, affiliates, or directors and officers.  *See* First Day Declaration, ¶ 70.

13.   Additionally, Yehuda Shmidman, the chief executive officer of WHP Global, resigned from the board of Express, Inc. before the Petition Date.  *See Id*., ¶ 71.  Accordingly, while as noted above, WHP Global is neither an affiliate nor an insider of the Debtors, the Debtors believe that they have taken significant steps to ensure their independence and to address even the appearance of conflict.

### C.   The Reverse Stock Split and Shares Outstanding

14.   On August 14, 2023, the Board approved the implementation of a 1-for-20 reverse stock split of Express, Inc.'s Common Stock, par value $0.01 per share, and a corresponding proportional reduction in the number of authorized shares.  *See* First Day Declaration, ¶ 47.  The reverse stock split was effected after market close on August 30, 2023, and shares of the Common Stock began trading on a split-adjusted basis as of market open on August 31, 2023.  *See* First Day Declaration, ¶ 47.  This reduction in outstanding shares caused by the reverse stock split had the effect of increasing the per share trading price of the Common Stock and brought Express back into compliance with the listing standards of the NYSE, which requires a listed company to maintain an average closing share price of at least $1.00 over a period of thirty consecutive trading days.  *See id*.

6

15.    While in 2017 the Board had authorized Express, Inc. to engage in a share repurchase program, Express, Inc. did not implement this program.  Instead, in a sound exercise of business judgment, Express, Inc. preserved working capital to fund its businesses and position the Company for long term stability rather than artificially constraining liquidity through a repurchase program at that time.  For clarity, the reverse stock split was not a repurchase program. *See* Keil Declaration, ¶ 7.

16.    As the Debtors disclosed in their most recent 10-Q and in the First Day Declaration, there are currently approximately 3,746,000 shares of Common Stock outstanding.  *See* Form 10-Q for the Quarterly Period Ended October 28, 2023, Express, Inc. at 1; First Day Declaration, ¶ 53. Moreover, pursuant to the Matrix Order,[5] the Debtors filed a list of equity security holders directly registered with the transfer agent as of a record date of April 15, 2024, which reflects an approximate total of 3,746,000 shares of Common Stock outstanding [Docket No. 225] (the "Equity List").[6]  Contemporaneously herewith, the Debtors filed an additional list of equity security holders directly registered with the transfer agent as of a record date of April 22, 2024, which shows an identical number of total shares outstanding as well as highly similar holdings by all registered holders.  The Debtors will further request the list with the most recent record date available in advance of the hearing.

---

[5]    "Matrix Order" means the *Interim Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by Email, and (D) Redact Certain Personally Identifiable Information of Natural Persons; (II) Approving the Form and Manner of Service of the Notice of Commencement; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief* [Docket No. 87].

[6]    A lower number of shares outstanding, 3.47 million, reflective of a scriveners' error was used in certain pleadings. Such figure reflects the portion of total shares outstanding held through Cede & Co.  *See* Equity List [Docket No. 225].

7

D.        **The CARES Act Refund and Cash Dominion**

17.        The CARES Act, enacted on March 27, 2020, includes several provisions that impact the Company's net operating losses originating in the tax years 2018, 2019 and 2020, (a) temporarily suspending the 80% limitation on the use of NOLs for certain years, (b) including the establishment of a five-year carryback of limitation on the use of certain net operating loss carryforwards, (c) relaxing certain limitation rules on business interest deductions, and (d) retroactively clarifying that businesses may immediately write-off certain qualified leasehold improvement property dating back to January 1, 2018.  As a result of these changes, the Company carried back certain of its U.S. federal net operating losses to offset taxable income in the five-year carryback period as part of the CARES Act, which carryback was expected to generate a substantial refund of previous cash taxes paid.  As a result, on April 15, 2024, the Company received a CARES Act refund in cash in the amount of approximately $49 million.

18.        However, on March 28, 2024, the ABL Agent had notified the Debtors that, as a result of insufficient liquidity to meet the necessary availability requirements under the Prepetition ABL Facility, a Cash Dominion Period had occurred and related measures would be implemented. It is commonplace in asset-based lending, where a lender provides a borrowing base loan secured against, among other things, a company's receivables, to have "cash dominion" provisions.  Upon the commencement of the Cash Dominion Period, a sweep was imposed whereby the lenders under the Prepetition ABL Facility engaged in frequent, periodic sweeps of the Debtors' cash receivables to satisfy amounts due under the Prepetition ABL Facility.  The credit agreement governing the Prepetition ABL Facility explicitly provides that in the event the Debtors triggered a Cash Dominion Period, the Debtors were required to use 100% of the CARES Act refund to pay down the Prepetition ABL Facility within one business day of receipt.  Receipt of the CARES Act

Refund helped the Debtors pay down the existing Prepetition ABL Facility, which aided negotiations surrounding the Debtors' DIP Facility and budget thereunder.

### III.    Reply

19.    The Debtors faithfully discharged their fiduciary duties by exploring and pursuing numerous other avenues to try to return to profitability and maximize equity value. Notwithstanding extraordinary efforts for over a year, the Debtors were unable to turn around their businesses outside of chapter 11.   While the Debtors are working expeditiously to identify, evaluate, and maximize the value of their assets in their marketing process, it remains highly uncertain—and, as is true with most chapter 11 cases, highly unlikely—that the process will allow the Debtors to pay creditors in full and return value to equity holders.  *See* Keil Declaration, ¶ 17. And there is unfortunately no probability such an offer is forthcoming.  It has long been the law that that where creditors are impaired, equity may not recover.  *Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.*, 174 U.S. 674, 684 (1899) ("any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation.").   Accordingly, absent a miraculous turn of events, equity will not recover here.

20.    Mr. Kurzon's Objection (as supported by the "Kurzon Declaration") (a) proposes unduly onerous amendments to the relief sought by the NOL Motion,[7] (b) speculates without evidence about the Debtors' decline in stock price, (c) seeks the appointment of an equity

---

[7]    "NOL Motion" means the *Motion of Debtors for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock* [Docket No. 8].

committee, and (d) seeks to recover fees and costs.  The Objection is without merit and should be overruled and/or denied, as applicable.[8]

21.     ***First***, with respect to the NOL Motion specifically, the notice period on large trades of the Debtors' Common Stock would actually provide Mr. Kurzon with precisely the kind of transparency and protection he purports to seek, a point he apparently now concedes.  However, Mr. Kurzon proposes wildly burdensome amendments to the relief sought by the NOL Motion. This request is improper because it introduces wholly new relief, applied to non-parties to this contested matter, without specificity.  Instead, to the extent Mr. Kurzon seeks such disclosure, more appropriate vehicles are available whereby such parties could be reasonably apprised of their responsibilities and of their right to object, if so desired.

22.     ***Second***, Mr. Kurzon requests appointment of an equity committee, which is wholly unwarranted due to the Debtors' hopeless insolvency.  There is no evidence of any plausible ability to provide for a recovery to equity holders, and the Debtors and their estates should not be forced to bear this substantial administrative expense.  While Mr. Kurzon asserts that his theories of market manipulation justify a committee to investigate, there is already a statutory committee appointed in these cases.  Were there any basis at all for his assertions, a committee representing

---

[8]     The Kurzon Declaration is inadmissible as evidence for a number of reasons, including because: (a) aside from potentially the number of outstanding shares Mr. Kurzon owns (Kurzon Declaration ¶ 2), which the Debtors do not dispute, nothing in the Kurzon Declaration has any relevance to the Objection (*see* Kurzon Declaration ¶¶ 1, 3-5, 7-34); (b) much of the Kurzon Declaration lacks foundation, including Mr. Kurzon's unsupported allegations regarding "a Wall Street plot to destroy shareholder value" (Kurzon Declaration ¶ 34), attempts to reconstruct total shares (Kurzon Declaration ¶ 30, Sched. 2), and statements regarding what "household investors" may see or be able to afford (Kurzon Declaration ¶¶ 32-33); and (c) the Kurzon Declaration is riddled with hearsay, including paragraphs 20-30 (describing attempts to contact the Company, reports on websites like Fintel.io, and statements from X (f/k/a Twitter)), Schedule 1, and Schedule 3.

Accordingly, to the extent that Mr. Kurzon seeks admission of his declaration into evidence, the Debtors object to its admissibility other than the first five sentences of paragraph two. *See* Fed. R. Evid. 401-402, 802; *In re American Remanufacturers, Inc.*, 2010 WL 1027803, at *3-4 (Bankr. D. Del. Mar. 19, 2010) (holding hearsay statements in declarations could not be accepted into evidence).

unsecured creditors would have every reason to pursue them.  ***Third***, Mr. Kurzon seeks the allowance of a substantial contribution claim in connection with his prosecution of the Objection. Yet, Mr. Kurzon has not properly sought such relief, and in any event does not and could not show the benefit to the administration of the estates required to be awarded an administrative claim.[9]

23.     For the foregoing reasons, and as set forth herein, the Debtors respectfully request that Mr. Kurzon's Objection be overruled, and his cross motion contained therein for the appointment of an equity committee be denied.

### A.    Mr. Kurzon's First Day Objections Should be Overruled.

24.     Mr. Kurzon does not actually object to the relief sought in the NOL Motion nor does he assert that any part of the Debtors' proposed order granting the NOL Motion (the "NOL Order") should be stricken.  Instead, Mr. Kurzon asks this Court to order burdensome and procedurally improper language to be appended to the NOL Order.  Because the relief sought by the Debtors actually achieves much of what Mr. Kurzon appears to want, and because his requested language is otherwise procedurally improper, this Court should overrule the Objection.[10]

---

[9]    Mr. Kurzon asserts that on April 19, 2024, he sent correspondence to Joshua Sussberg, a partner at Kirkland & Ellis LLP in relation to the chapter 11 cases of Bed Bath & Beyond Inc and its affiliates.  However, the occurrence of the effective date of the *Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates* (the "BBBY Plan") occurred on September 29, 2023.  *See* Notice of (I) Entry of the Order (A) Approving the Disclosure Statement on a Final Basis and (B) Confirming the Second Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and its Debtor Affiliates and (II) Occurrence of the Effective Date, *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 29, 2023) [Docket No. 2311].  Pursuant to the BBBY Plan, the administration of the wind-down debtors is conducted by an appointed plan administrator, who is represented by Pachulski Stang Ziehl & Jones LLP, and is not now, nor was he ever, represented by Kirkland & Ellis LLP or Mr. Sussberg.  Mr. Kurzon's allegations related to the Bed Bath & Beyond restructuring, and any other chapter 11 cases, including paragraphs 10–15 of the Kurzon Declaration, are irrelevant to the issues in these chapter 11 cases.

[10]   The Debtors had previously offered to withdraw the NOL Motion, but understanding Mr. Kurzon's objection to its withdrawal, the Debtors will proceed.  To the extent that improper or burdensome language were to be appended, the Debtors reserve their rights to withdraw the NOL Motion at such time.

1. **The Relief Sought by the NOL Motion Maximizes the Debtors' Estates and Provides the Kind of Check Mr. Kurzon Apparently Seeks.**

25.     As discussed in greater detail in the NOL Motion and the Still Declaration, in the ordinary course of the Debtors' business, the Debtors generated certain NOLs, 163(j) Carryforwards, and other Tax Attributes.  *See* NOL Motion, ¶¶ 9–11; Still Declaration, ¶ 5.  NOLs are generated where a company's operating expenses exceed income, as determined under the laws of a particular taxing jurisdiction, in a single tax year.  *See* Still Declaration ¶ 5.  Such NOLs may generally be carried forward or applied to reduce income in subsequent taxable years subject to applicable limitations and other conditions under applicable law.  *See id.*  In certain jurisdictions, and from time to time, carrybacks (such as the CARES Act provisions described herein and in the NOL Motion) are available.  163(j) Carryforwards allow the Debtors to carry forward business interest expense deductions and apply them in future years.  *See id.*  As set forth in the NOL Motion, the Debtors have approximately $128 million of federal NOLs, approximately $20 million of 163(j) Carryforwards, and over $1 million of other Tax Attributes.  *See* NOL Motion, ¶ 10.

26.     The Debtors' ability to utilize any such Tax Attributes could be hampered upon a change of control as a result of limitations imposed by relevant tax law.  *See* Still Declaration, ¶ 8. In order to preserve any Tax Attributes, the Debtors sought approval of procedures by which parties seeking to trade or acquire more than 4.5% of the Debtors' equity will need to abide in order to provide parties in interest, including the Debtors, notice of any equity trades that could negatively impact the Debtors' tax attributes.

27.     Pursuant to the proposed procedures for transfers of Common Stock set forth in the NOL Motion, any Substantial Shareholder (as defined in the NOL Motion) must (a) file a declaration with the Court advising all parties in interest of their status as a Substantial Shareholder and (b) Substantial Shareholders must provide all parties in interest with a 20-day objection period

to the extent (i) any Substantial Shareholder seeks to accumulate more Common Stock, (ii) any shareholder seeks to acquire enough Common Stock to become a Substantial Shareholder, (iii) any Substantial Shareholder seeks to trade Common Stock, or (iv) any Substantial Shareholder seeks to trade enough Common Stock to lose their status as a Substantial Shareholder.  *See* NOL Motion, ¶ 19.  While these procedures are designed to help the Debtors maximize value by preserving Tax Attributes, they will also provide Mr. Kurzon with the sort of monitoring mechanism and opportunity to object to trading he appears to seek with respect to large volume trades of the Debtors' equity.[11]  As a result, the Court should grant the NOL Motion.

### 2.    The Requested Additions to the NOL Order Are Improper.

28.    By the Objection, Mr. Kurzon also asks this Court to add significant requirements upon custodians, clearing agents, transfer agents, cash accounts, brokerage accounts of any kind, including retirement brokerage accounts, and any other relevant entities to produce reports regarding the kinds of securities of the Debtors they hold, as well as any voting agreements or restrictions pertaining thereto.  *See* Exhibit A, Kurzon Declaration.

29.    Compelling non-debtor parties to produce substantial amounts of information on an abridged timeline without proper notice should not be granted at this time.  Instead, to the extent any entity has a disclosable economic interest, and is representing multiple parties acting in concert, Mr. Kurzon is free to pursue relief pursuant to Fed. R. Bankr. P. 2019 ("Rule 2019") to

---

[11]    Further, the procedures contemplated by the NOL Motion will pose no additional burden upon Mr. Kurzon.  As reflected in the Equity List, as of April 15, 2024, Mr. Kurzon held 1,025 shares of Express, Inc. common stock and as reflected in the Updated Equity List, as of April 22, 2024, Mr. Kurzon held 1,750 shares if Express, Inc. common stock directly, in each case as reflected in the transfer agent's records.  Mr. Kurzon has represented to Debtors' counsel that he holds approximately 2,000 shares.  Given the large number of shares held through Cede & Co., the Debtors do not doubt the higher figure quoted by Mr. Kurzon.  However, even using Mr. Kurzon's estimate of 2,000 shares held, he holds no more than 0.05% of the outstanding shares of Express, Inc. Accordingly, the relief sought by the NOL Motion will not apply to any trades in which Mr. Kurzon may engage absent an increase in his holdings by roughly 8,900%.

compel any relevant creditor or equity security holder to comply with Rule 2019's requirement to disclose all disclosable economic interests.

30.     Because the parties from whom Mr. Kurzon seeks disclosures were not properly noticed of such request with time to prepare and object (if necessary), nor does the language Mr. Kurzon seeks in connection with a revised order approving the NOL Motion provide similarly situated parties with the ability to review whatever disclosures are made, the Objection should be overruled.

**3.     Mr. Kurzon's Suggestions Regarding State Tax Attributes Are Not Germane to the NOL Motion or to the Debtors' Valuation.**

31.     At a hearing before the Court on May 31, 2024 (the "May 31 Hearing"), Mr. Kurzon alleged that, by the NOL Motion, the Debtors failed to disclose all available tax attributes.  This misses the point of the NOL Motion, which was to preserve federal tax attributes that could be affected by transfers of large volumes of common stock.  While the relief sought by the NOL Motion would also be similarly beneficial with respect to state tax attributes, the description of tax attributes in the NOL Motion was illustrative of the type of asset the Debtors sought to preserve. It was not meant to be exhaustive.  That said, given the diffuse nature of the equity holdings in the Debtors, the Debtors had concluded subsequently that such transfers are not probable and are willing to withdraw the NOL Motion to assuage Mr. Kurzon's concerns.  The fact that these chapter 11 cases have now been pending for over a month and no party has engaged in such a disclosable transfer supports this conclusion.[12]

---

[12]     As Mr. Kurzon notes, the Debtors, consistent with their reporting obligations, have in fact previously disclosed such tax attributes as part of their public reporting with the Securities and Exchange Commission (the "SEC"). The Debtors made numerous other disclosures in SEC documents and reporting, as required of a publicly traded company.  *See* Still Declaration, ¶ 6.  The referenced report disclosed tax attributes as booked in accordance with generally accepted accounting principles.  *See id.*  Limitations on the Debtors' ability to realize value from any tax attribute means that the gross amount of the attribute shown in financial statements will generally exceed the value available to the Debtors.  *See id*, ¶ 7.  While it is true that the Debtors' tax attributes are assets of the estate and the Debtors properly filed the NOL Motion in order to preserve their availability during the pendency of these

### 4.    The Debtors Have Already Filed a List of Equity Security Holders.

32.    Mr. Kurzon's sole basis for objecting to the Creditor Matrix Motion is a request that the Debtors file a list of equity security holders.  Prior to the Petition Date, the Debtors agreed to informal comments from the U.S. Trustee to their proposed form of order with respect to the Creditor Matrix Motion.  Pursuant to this agreement, the Debtors forewent their request to waive the requirement of Fed R. Bankr. P. 1007(a)(3) and agreed to file a list of equity security holders directly registered with the transfer agent.[13]  In accordance with the Matrix Order, the Debtors filed such list at Docket No. 225.  The Debtors obtained an updated list from the Transfer Agent, which is filed contemporaneously herewith, and will seek a further updated list with the most recent record date available.  As a result, the Objection should be overruled as moot with respect to the Creditor Matrix Motion.

### 5.    Mr. Kurzon's Objection to the DIP Motion is Based on a Mistaken Premise.

33.    While Mr. Kurzon previously withdrew his objection to the DIP Motion, his previous objection, revived at the May 31 Hearing, claimed that the loan offered thereunder does

---

cases to maximize estate value, the ultimate value of such attributes will depend on (i) the availability of such attributes under applicable law, taking into account relevant limitations, (ii) the ability of the Debtors to generate taxable income in an amount sufficient, after taking into account all other allowable deductions for the relevant period, to be sheltered by such tax attributes and (iii) the amount of tax that is saved as a result of the application of such tax attributes (e.g., if a Debtor has a state net operating loss ("NOL") carryforward of $100 that is available to shelter $100 of state income, if the relevant state's income tax rate is 5%, that $100 NOL could reduce a maximum of $5 of cash tax in that state.  See Still Declaration, ¶ 7.  NOLs of one jurisdiction are not available to shelter income in another jurisdiction.  See Still Declaration, ¶ 8.  In particular, the limitations and contingencies in (i) and (ii) can mean that the expected value of such tax attributes is less than the aggregate state tax benefits even if all such tax attributes were usable immediately.  Therefore, even if such tax attributes were sold, the Debtors do not expect the combined proceeds (i.e., the proceeds from the equity sale, including those attributable to the tax attributes) would generate even close to enough value to clear all debt claims, much less to generate any recovery for the equity.  See Still Declaration, ¶ 8.

[13]    See, April 23, 2024 Hr'g Tr. at 72:21–25 ("MR. FREEDMAN:  After discussions with the U.S. Trustee, the debtors have amended the order, this is the one change from the filed version, and that the debtors will file a list of equity holders registered directly with the transfer agent.").

not constitute new money.  Specifically, Mr. Kurzon expresses a view that the $35 million in new money provided by the DIP Facilities does not constitute new money because the Prepetition ABL Lenders (who are not the only lenders party to the DIP Facilities) previously exercised their right in the Cash Dominion Period to sweep the Debtors' CARES Act refund.  As discussed, due to the Debtors' challenging financial position, coupled with the Prepetition ABL Lenders' rights under that facility, the Debtors had little optionality in terms of accessing the CARES Act refund directly—the refund *did*, however, enhance the Debtors' negotiating position with respect to the DIP Facilities.  Regardless of the status of the CARES Act refund, the extension of credit on a postpetition basis, which the DIP Lenders were under no prior obligation to provide, does constitute new money.

### 6.    The Bidding Procedures Provide the Protections that Mr. Kurzon Seeks.

34.    To respond to Mr. Kurzon's concerns relating to the Bidding Procedures Motion raised at the May 31 Hearing,[14] nothing in the marketing process contemplates the release of any claims, causes or action, including derivative claims or other, that the Debtors' estates may hold outside of standard releases against the purchaser and any avoidance actions included as part of the sale transaction.  Any causes of action that could in theory be connected to Mr. Kurzon's concerns and allegations raised at the May 31 hearing with respect to criminality, fraud, triple robbery, and otherwise, will be retained and are not otherwise altered as part of any sale transaction.  The tax attributes are also not contemplated to be sold under the Phoenix APA, nor

---

[14]    "Bidding Procedures Motion" means the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 41].

can they be transferred in an asset sale, so any value ascribed to those tax attributes is also unaffected.

### B.      An Equity Committee is Entirely Unwarranted.

35.      Mr. Kurzon has not shown any valid reason the Court should take the extraordinary step of establishing an equity committee.  The Bankruptcy Code provides for the appointment of an official equity committee only "if necessary to assure adequate representation of . . . equity security holders." 11 U.S.C. § 1102(a)(2).  The appointment of an equity committee is very unusual and "should be the rare exception" in chapter 11 cases.  *In re Spansion, Inc.,* 421 B.R. 151, 156 (Bankr. D. Del. 2009); *see also In re Williams Commc'ns Grp., Inc.*, 281 B.R 216, 223 (Bankr. S.D.N.Y. 2002) ("The appointment of official equity committees should be the rare exception"); 7 Collier on Bankruptcy ¶ 1102.03 [2], p. 1102-19 (16th ed. 2020) ("Appointment of committees of equity security holders is the exception rather than the rule in chapter 11 cases").

36.      As a rule, "if equity holders have no reasonable prospect of receiving a meaningful distribution, an equity committee could serve no legitimate role in negotiating a plan."  *In re Spansion, Inc.*, 421 B.R. at 156.  In other words, "[i]f a debtor appears to be 'hopelessly insolvent,' the appointment of an official equity committee is generally regarded as unjustified." *Exide Techs. v. State of Wis. Inv. Bd.*, 2002 WL 32332000, at *1–2 (D. Del. Dec. 23, 2002) (courts only consider additional factors when equity holders are likely to receive a distribution); *see also In re Williams Commc'ns Grp.*, 281 B.R. at 220 ("When a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted"); *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 n.15 (Bankr. N.D. Tex. 2009) ("Much of the authority suggests—and the court agrees—that appointment of an equity committee should be denied in cases where there is no doubt about the debtor's insolvency.").

37.     Mr. Kurzon bears the burden to prove that equity holders will receive a meaningful distribution under a strict application of the absolute priority rule.  *See In re Spansion, Inc.*, 421 B.R. at 156 (citing *In re Williams Commc'ns Grp.*, 281 B.R. at 223); *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Dec. 23, 2020) [Docket No. 940], Dec. 22, 2020, Hr'g Tr. at 49:17–20 ("The standard for appointing an equity committee is well established in this district. The moving party bears the burden of proof as well as the burden of persuasion to show that there is a substantial likelihood that equity holders will receive a meaningful distribution in the case under a strict application of the absolute priority rule[.]").  Because Mr. Kurzon does not supply credible evidence that equity holders will receive a meaningful distribution, he has not carried his burden.  There is nothing for an equity committee to add, and the request should be denied.

1.     **The Debtors are Hopelessly Insolvent, and There is No Reasonable Prospect That Equity Holders are Entitled to a Meaningful Distribution.**

38.     The Debtors commenced these chapter 11 cases in substantial financial distress. Indeed, the uncontroverted evidence is that, on the Petition Date, the Debtors' need for incremental liquidity was "urgent."  *See* Kamlani Initial DIP Declaration, ¶ 1.  The Debtors' liquidity position was a "crisis" and the $23 million the Debtors had in cash on hand was insufficient to operate their enterprise and satisfy obligations as they came due.  *Id.*, ¶ 11, 12.  While Express undertook considerable efforts to preserve and enhance liquidity, the business continued to suffer from the lasting impacts of the pandemic and shifting consumer behavior.

39.     While the Debtors understand Mr. Kurzon's frustration, his assertions regarding the Debtors' valuation are unsupported by the facts.  Mr. Kurzon argues, without citation, that the existence of another clothing store that purports to have an approximately $6 billion market capitalization evidences that the Debtors' valuation should clear the debt.  He is mistaken.  Instead, as SEC filings indicate, during the most recently available comparable period, Abercrombie was

profitable; the Debtors were not.  *Compare* Form 10-Q for the Quarterly Period Ended October 28, 2023, Express, Inc. at 6, *with* Form 10-Q for the Quarterly Period Ended October 28, 2023, Abercrombie & Fitch Co. at 3.[15]  It is unsurprising that two businesses in the same industry have experienced different market reactions, given their different capital structures and performance. Such an intuitive outcome cannot support an inference of misfeasance by short sellers or others.

40.     As a result of the substantial distress that caused the Debtors to seek relief in chapter 11, equity holders fall hundreds of millions of dollars short of being entitled to recovery. In short, any bid would need to provide the estates with over $419 million in consideration.  *See* Kamlani Declaration, ¶ 5.  Any subsequent bid will need to first clear the full amount of the bid contemplated by the Phoenix APA (approximately $198 million, and which provides for the repayment of all of the Debtors' prepetition secured debt and obtains certain concessions from other creditors in excess of the cash consideration provided).  *See id.*  Moreover, any such subsequent bid would need to pay all other remaining amounts in the claims pool in full, which represents at least $221 million.  *See id.*

41.     However, the $419 million minimum price to repay all claims in full is discounted because it contemplates any transaction counterparty stepping into the shoes of the JV Purchaser as-is.  The Stalking Horse APA contemplates significant concessions made by contract counterparties (which includes forgiveness of certain cure costs) and spares the estate substantial rejection damages claims.  *See id.*  Moreover, this figure does not attempt to quantify the aggregate value of contingent and unliquidated claims.  Unless such claims can be settled at $0 in the aggregate, they will increase the quantum of claims that must be paid prior to there being any

---

[15]    It appears from more recent reports that Abercrombie's performance has in fact, improved subsequently—further diverging from that of the Debtors.  *See* Condensed Consolidated Statements of Operations, Abercrombie & Fitch Co., May 29, 2024, https://corporate.abercrombie.com/investors/news-and-events/news/news/?id=24906.

available recovery for equity.  *See id*.  Further, the Debtors continue to accrue postpetition rent, vendor claims, and other administrative claims, which would need to be paid in full in order for equity to receive a distribution.  *See id*., ¶ 6.  There is no indication of market support for a transaction that provides even close to this level of consideration to the Debtors, whether through a going concern sale or a liquidation, and no credible valuation methodology would value the Debtors in such a range.

42.    In similar cases, parties seeking the imposition of an equity committee provide expert reports and alternative valuation reports that show they have a right to participate in distributions such that their interests require estate-funded representation in the case.  This Court has also previously declined to approve an equity committee in cases where the movants merely questioned the valuations of financial advisors, without instead providing an alternative valuation of the Debtors following a reorganization—in particular, when the Debtors' financial advisors have provided metrics that indicate no meaningful distributions for equity holders.  *See In re Magnum Hunter Resources Corporation*, No. 15-12533 (KBO) (Bankr. D. Del. Apr. 20, 2016) Hr'g Tr. at 80:14–23 ("Here, the movants have not presented an alternative valuation of the reorganized [debtors, rather], they have questioned some of the information used by . . . the debtors' financial advisor, to calculate the total enterprise value.").

43.    Here, while Mr. Kurzon correctly notes that the U.S. Trustee or the Court *may* appoint an equity committee in extraordinary cases, he does not provide evidence (let alone the sort of robust analysis required) to show that the likelihood of a recovery to equity justifies appointment here.  In the absence of any prospect of a meaningful recovery to equity, Mr. Kurzon's request for the appointment of an equity committee should be denied.[16]

---

[16]  Mr. Kurzon cites book value statements that were provided in, among other places, the Debtors' monthly operating reports.  But "book value" is not a reliable indication of value, as courts nationwide have found as all of the

### 2. Other Factors Counsel Against the Appointment of an Equity Committee.

44. While the Debtors' hopeless insolvency provides sufficient basis to deny Mr. Kurzon's request, to the extent this Court assesses additional factors regarding the propriety of appointing an equity committee, those too support denying the relief sought in the Objection.[17]

45. Courts may consider the complexity of the chapter 11 cases when determining whether to appoint an equity committee. While certain aspects of these chapter 11 cases are complex, those complexities do not include whether the equity is entitled to a recovery. That answer is straightforward given the chasm that stands between the value of the Debtors and a potential recovery for equity holders. In any event, if equity holders are ultimately within shouting distance of the money (which appears highly unlikely), the ongoing marketing and sale process (not any work that could be done by a hypothetical equity committee) will demonstrate as much.

46. Courts may also assess the practical impact of appointing an equity committee. Here, appointing an equity committee will only add significant expense and delay to these chapter 11 cases. As of the date hereof, the Debtors are less than **_two weeks away_** from either closing a going concern sale transaction or pivoting to an enterprise-wide liquidation, and each week the Debtors remain in chapter 11 results in approximately an estimated $3 million in incremental administrative expense arising from interest on the DIP Facilities and professional

---

relevant market evidence here confirms. *See, e.g., In re Trans World Airlines, Inc.*, 180 B.R. 389, 410 n.22 (Bankr. D. Del. 1994) ("Accounting conventions are not the controlling principles for the legal determination of whether a debtor's debts exceed the fair value of its assets for purposes of insolvency."); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 443 (1968) (recognizing that "going-concern value, not book or appraisal value, must govern" valuation in bankruptcy); *In re SunEdison, Inc.*, *In re SunEdison, Inc.*, 556 B.R. 94, 104 (Bankr. S.D.N.Y. 2016) ("[b]alance sheets … reflect book value, which does not ordinarily equate to market value"). The market talks, and here it is speaking loudly—making beyond clear that equity is not in the money.

[17] Courts consider factors including (i) the number of shareholders, (ii) the complexity of the case, and (iii) whether the cost of an additional committee significantly outweighs the concern for adequate representation. *In re Spansion, Inc.*, 421 B.R. at 156; *accord In re Pilgrim's Pride Corp.*, 407 B.R. at 216.

fees (before the fees of any additional equity committee are layered on top).  Without a reasonable prospect of equity value, appointing an equity committee will harm the Debtors' in-the-money stakeholders by potentially delaying the Debtors' emergence from chapter 11 and by imposing additional burdensome administrative expenses which will deter prospective purchasers.

47.    Further, considering the burdens that an additional official committee threaten to impose, the answer to whether an equity committee will add anything to the case is a resounding "no."  To the extent Mr. Kurzon is concerned that his interests will not be represented in the absence of an equity committee, the opposite is true.  The Committee represents unsecured creditors in these chapter 11 cases.  But, in order for Mr. Kurzon and other equity holders to recover anything, the Committee's constituency will necessarily be paid in full.  The Committee has every incentive (as well as a fiduciary duty) to advocate for that result if it is possible.  If the Debtors' businesses can support a recovery for equity, the Debtors will need to propose a plan that pays all unsecured creditors in full.  To the extent there is any evidence to support such a valuation, the Committee, with a fiduciary duty to maximize value for unsecured creditors, and estate-funded legal and financial professionals, would certainly challenge any plan proposed by the Debtors that did not provide such recovery for their constituency, with its attendant benefits to equity holders.  An official equity committee would not and could not uncover hidden value that would pay every stakeholder in these cases and that the Committee would not address.

48.    The exceptional circumstances that have supported the appointment of equity committees in rare cases are simply not present here, and there are no legitimate issues for an equity committee to investigate.

**IV.    Mr. Kurzon is Not Entitled Any Fees or Costs Associated with the Objection.**

49.    Mr. Kurzon's request for the costs incurred in preparing his Objection, while potentially routine in civil litigation, is wholly out of place in bankruptcy.  For a stakeholder to be

reimbursed for costs incurred, the stakeholder must prove that their efforts provided a substantial contribution to the administration of a bankruptcy case. *In re Grasso*, 519 B.R. 137, 139 (Bankr. E.D. Pa. 2014). This requires the stakeholder to show that his or her contribution resulted in "an actual and demonstrable benefit to the bankruptcy estate." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994). Further, a request for allowance of a substantial contribution claim requires notice and a hearing. *See* 11 U.S.C. § 503(b)(3)(D).

50.     Here, no substantial contribution has been conferred upon the estates. To the contrary, the Debtors have been forced to expend substantial time and resources responding to the Objection, which does not meaningfully object to any of the relief the Debtors seek, and to the request for appointment of an equity committee contained therein, which has no merit. As discussed above, the Debtors' hopeless insolvency renders appointment of an equity committee inappropriate in these chapter 11 cases. The request for costs should be denied.

## V.     Reservation of Rights.

51.     Although Mr. Kurzon currently represents himself in these chapter 11 cases, he is a barred attorney and is no doubt familiar with the requirements of Fed. R. Civ. P. 11 ("Rule 11"). The requirements of Rule 11, made applicable in relevant part to bankruptcy proceedings by Fed. R. Bankr. P. 9011 ("Rule 9011"), serve a clear purpose: to correct litigation abuse. *Doering v. Union County Bd. Of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir. 1988). This purpose exists whether a party is represented or proceeds *pro se*. It is for this reason that courts to consider the question find that Rule 11 is applicable to *pro se* litigants. *See, e.g.*, *Gambrell v. Hess*, 777 F.Supp. 375, 384 (D.N.J. 1991); *Patterson v. Aikin*, 841 F.2d 386, 387 (11th Cir. 1988); *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir. 1987).

52.     Rule 11 imposes a duty upon litigants, *pro se* or otherwise, to certify by their signature, that "to the best of the signer's knowledge, information, and belief formed after

reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such  as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *Business Guides v. Chromatic Comm. Enter's*, 498 U.S. 533, 541 (1991); Rule 9011(b)(2) (requiring a party to certify that "the claims, defenses, and other legal contentions [in a filing] are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law").

53.     Here, Mr. Kurzon's Objection, the Kurzon Declaration, his representations in Court, and his correspondence with counsel to the Debtors demonstrate a likely sincere belief in a theory for which he has provided no supportable factual basis.  Mr. Kurzon's belief, however fervent, that some form of market manipulation, and not business performance, led to the Debtors' current financial situation is unsupportable, and in any event, he has provided no evidence to support his allegations.

54.     Further, Mr. Kurzon continues to send proposed counsel to the Debtors many harassing emails, asserting incorrectly that they are "for settlement purposes only."  The Debtors expressly reserve their rights to seek to recover fees and costs incurred in responding to the Objection and any future attempts by Mr. Kurzon to harass the Debtors and litigate frivolous issues in these chapter 11 cases.

**VI.    Conclusion**

55.     Mr. Kurzon asks for (a) the Debtors to file an equity security list that they have already filed and (b) extraneous and additions to the NOL Order.  Mr. Kurzon also expresses a misapprehension about the relief sought in the Bidding Procedures Motion and the nature of the DIP Facilities.  Accordingly, the Objection should be overruled and the final orders entered.

56.     Further, there is no reasonable prospect that equity holders will receive any meaningful recovery in these chapter 11 cases.  Appointing an equity committee will do nothing to generate recovery for the Debtors' out-of-the-money shareholders.  At the same time, such an appointment will add significant expense to, and potentially delay and/or endanger, these chapter 11 cases to the detriment of the Debtors' other stakeholders.  Accordingly, the Court should overrule the Objection with respect to the first day relief, and deny the request to appoint an equity committee.

[*Remainder of Page Intentionally Left Blank*]

Dated:  June 3, 2024
Wilmington, Delaware

/s/ Domenic E. Pacitti

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Alyssa M. Radovanovich (DE Bar No. 7101)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:          dpacitti@klehr.com
                     myurkewicz@klehr.com
                     aradvanovich@klehr.com

-and-

Morton R. Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-3007
Facsimile:    (215) 568-6603
Email:          mbranzburg@klehr.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Nicholas M. Adzima (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                     emily.geier@kirkland.com
                     nicholas.adzima@kirkland.com

-and-

Charles B. Sterrett (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          charles.sterrett@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*