IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| EXPRESS, INC., *et al.*,[1] | ) ) | Case No. 24-10831 (KBO) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF ADAM KEIL IN SUPPORT OF OMNIBUS
REPLY OF DEBTORS (I) IN SUPPORT OF FIRST DAY MOTIONS AND
(II) IN OPPOSITION TO (A) MOTION OF MR. KURZON FOR APPOINTMENT
OF A SHAREHOLDERS' COMMITTEE AND (B) GRANTING RELATED RELIEF**

I, Adam Keil make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director of Moelis & Company LLC (together with its affiliates, "Moelis"), the proposed financial advisor and investment banker to the above captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of *Omnibus Reply of Debtors (I) In Support of First Day Motions and (II) In Opposition to (A) Motion of Mr. Kurzon for Appointment of a Shareholder's Committee and (B) Granting Related Relief* (the "Reply"), filed contemporaneously herewith.

3. I am a Managing Director of Moelis in Moelis' New York office, located at 399 Park Avenue, 4th floor, New York, NY 10022. Moelis is the proposed financial advisor and investment banker to the Debtors. As a Managing Director, I am responsible for the day-to-day

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

activities of the Moelis deal team in this engagement. I have 23 years of experience in investment banking, providing in-court and out-of-court recapitalization and restructuring advisory services to companies, creditors, sponsors, and other interested parties. Furthermore, I have specific expertise in chapter 11 bankruptcies, distressed mergers and acquisitions, lender negotiations, and distressed financings. I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the Reply.

4. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Moelis working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Moelis team, which, since March 2024, has been one of the principal restructuring advisors to the Debtors. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the prepetition and postpetition marketing efforts (the "Marketing Process"). I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

5. There is no apparent path forward that provides equity security holders in these chapter 11 cases with any recovery. The Marketing Process has revealed very little interest in the Debtors at values in excess of the Stalking Horse, and it is unclear whether the Debtors will receive any additional, better offers than the one reflected in the Stalking Horse transaction that has been filed with the Court. *See* Docket No. 305. If there is a higher and better offer than the Stalking Horse (which includes the buyer providing consideration of approximately $198 million in cash

consideration and assumed liabilities), it is highly unlikely that such offer would provide consideration that would exceed the Stalking Horse bid by approximately $220 million, which would be necessary for equity to be entitled to a distribution.

**I.     The Debtors' Stock Performance**

6.      In the months leading up to the Petition Date, as a publicly traded company, Express Inc. ("Express") worked to remain in compliance with the listing standards of the New York Stock Exchange (the "NYSE"), which requires a listed company to maintain an average closing share price of at least $1.00 over a period of thirty consecutive trading days.

7.      On August 14, 2023, the board of directors of Express (the "Board") approved the implementation of a 1-for-20 reverse stock split of Express's common stock, par value $0.01 per share, and a corresponding proportional reduction in the number of authorized shares of Express's common stock. Shares of Express's common stock began trading on a split adjusted-basis on August 31, 2023. This reduction in outstanding shares caused by the reverse stock split had the effect of increasing the per-share trading price of Express's stock, which helped Express return to compliance with the listing standards of the NYSE. The reverse stock split did not constitute a share repurchase program.

8.      Notwithstanding the reverse stock split to support the trading level of Express's common stock and efforts to improve the performance of their business, on March 6, 2024, Express's common stock was delisted from the NYSE, the result of Express failing to maintain an average global market capitalization of at least $15 million over a period of thirty consecutive trading days.

9.      Following the NYSE delisting, Express's stock has traded over the counter on the "pink sheets" under the ticker EXPR.Q. As a general matter, over-the-counter securities are securities that are not listed on a major exchange in the United States and are instead traded via a

broker-dealer network, usually due to the inability to meet or maintain the requirements to be listed on a national exchange. As of June 3, 2024, shares of the Debtors' stock were trading at $0.74 at market close with a market capitalization (the total dollar value of all outstanding shares) of approximately $2.75 million.[2] The recent trading performance and current trading levels suggest that the market views Express's stock as having option value at best.

**II.    The Going Concern Marketing Process**

10.    In the months leading up to the commencement of these chapter 11 cases, the Debtors, with the assistance of Moelis and their other advisors, engaged with third parties on a potential sale transaction over several months. The Debtors dedicated substantial time and effort reaching out to potential strategic and financial investors based on their experience in the retail sector and/or their capacity to operate a business like the Debtors'.

11.    Moelis, on behalf of the Debtors, conducted initial outreach to potential bidders perceived as being most likely to be able to transact on a limited timeline as imposed by the Debtors' liquidity runway in an effort to maximize the likelihood of filing with a proposed stalking horse bidder in place. After the initial outreach provided a path to filing with a potential stalking horse bidder in place, Moelis expanded its outreach in anticipation of the postpetition Marketing Process to market test the stalking horse bid in an effort to identify a value-maximizing transaction, if possible. Moelis contacted parties to gauge interest in several transaction structures, including an enterprise-wide sale or transactions at the asset level for the Debtors' distinct brands, including Express, Bonobos and UpWest. Prior to filing, Moelis contacted 23 potential strategic and financial investors through introductory emails and calls, which led to the execution of 11 non-

---

[2]    Source: Google Finance as of June 3, 2024 at 9:35 p.m. ET.

disclosure agreements ("NDAs") and access being granted to virtual data rooms, financial models, and other financial, operational, and legal diligence materials.

12. The Debtors remain focused on identifying and working expeditiously with interested parties in an effort to reach the terms of a viable going-concern transaction that allows the iconic fashion brand to live on and otherwise maximizes value for all stakeholders. As evidenced in the letter of intent (the "Phoenix LOI") provided by a prospective joint venture comprised initially of the Company's most significant stakeholder, WHP Global, and its two largest landlords, Simon Property Group, L.P. ("Simon") and BPR Acquisitions LLC ("Brookfield"), (the prospective joint venture entity, "Phoenix JV") attached as Exhibit C to the First Day Declaration, the Company has reached the first major step in consummating a potential going-concern sale transaction. The going-concern sale transaction contemplated in the Phoenix LOI provides for the Phoenix JV to: (a) acquire (i) certain leases and distribution centers; (ii) all inventory, merchandise, furnishings, fixtures, equipment, other tangible personal property and/or improvements to real property, associated with 100% of the acquired leases and distribution centers; (ii) the Express, Bonobos, and UpWest e-commerce businesses and domain names, other domains, websites, social media accounts, and other Internet properties and digital assets that use or incorporate the Express, Bonobos, and UpWest-formative trademarks, (iii) the Debtors' 40% interest in their intellectual property joint venture with WHP Global, and (iv) other assets to be determined; and (b) assume (i) the leases on a minimum 273 stores, (ii) employee-related obligations related to substantially all of the current store-level workforce and a significant number of the corporate-level employees, (iii) customer loyalty programs outstanding as of closing of any transaction contemplated under the Phoenix LOI, (iv) certain assets and liabilities of the Company and Bonobos with respect to customer financing arrangements, (v) all claims of the Company and

Bonobos associated with the payment card interchange fee settlement, and (vi) certain overhead, logistics, technology and other services and infrastructure-related assets and liabilities to be identified by the Phoenix JV, for aggregate consideration in the amount of $10 million plus 100% of the net orderly liquidation value of the Acquired Merchandise. The Phoenix LOI contemplates partnership with certain of the Debtors' key landlords, including Simon and Brookfield, and serves as a floor for the Debtors' Marketing Process and any Sale Transaction contemplated thereby.

13. The Debtors, the Moelis team, and the Debtors' other advisors have continued to engage with the Phoenix JV on the terms of the Phoenix LOI and the prospective transaction contemplated thereunder while also pursuing and considering other possible transaction options in accordance with the Bidding Procedures. Since the Petition Date, Moelis has been in contact with an additional 27 potential bidders. This process has resulted in the execution of 10 additional NDAs. Pursuant to the milestones approved by the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [Docket No. 85], as amended [Docket No. 299], bids are due by June 3, 2024.

14. Continued engagement with the Phoenix JV and other potential bidders is intended to help determine if the Phoenix JV's proposal, in the Debtors' business judgment, provides the maximum value currently available for the Debtors' estates under the circumstances. The Marketing Process and continued dialogue with the Phoenix JV and other potential bidders ultimately led to the Debtors and the Phoenix JV entering into a stalking horse agreement on May

22, 2024. The stalking horse agreement will now serve as a floor for competitive bidding. *See* Docket No. 305.

15. Moelis continues to expand on the prepetition Marketing Process and to conduct further outreach to potentially interested parties as part of the Debtors' postpetition Marketing Process. Moreover, this is a highly visible chapter 11 case, and it is not a secret to the market that Express is "for sale." This visible process provides an opportunity for any potentially interested parties to contact the Debtors and their advisors if interested in participating in a transaction involving the Debtors, and the Debtors and their advisors did, in fact, receive inbound interest from a few parties seeking to learn more about these chapter 11 cases, the Debtors' business, and the Marketing Process. However, none of these inbounds have resulted in an actionable indication of interest at any value, let alone at a value that would provide consideration to equity holders. The Marketing Process is continuing during these cases so that the Debtors can host an auction (the "Auction"), if necessary, to determine which, if any, of its potential purchasers provide the greatest possible recovery for the Debtors' stakeholders, and to pursue the highest or otherwise best possible bids available under the circumstances. The Debtors' ongoing Marketing Process is intended to maximize value for the estates, while allowing the Debtors to exit these chapter 11 cases as quickly as possible and remain operating as a going concern, if possible.

### III. The Liquidation Marketing Process

16. Moelis and the Debtors' other advisors, on behalf of the Debtors, also conducted outreach and held conversations with five counterparties, each of which executed an NDA, to solicit bids for a possible liquidation of the Debtors' assets as an alternative should a going concern bid not come to fruition or not be deemed adequate and worth pursuing. As a result of these discussions, the Debtors received two non-binding indications of interest regarding a possible liquidation, and one related actionable term sheet and asset purchase agreement. The Debtors and

their advisors continue to evaluate this proposal and the indications of interest received to date in light of ongoing discussions with the Stalking Horse bidder and other potential bidders, to identify which bid provides the highest or otherwise best possible bid to seek to maximize value for the Debtors' estates under the circumstances. For reasons that are described in more detail below, this proposal, like the Stalking Horse proposal, comes nowhere close to delivering sufficient value to pay general unsecured claims in full, let alone provide a recovery to equity holders.

### IV. Net Proceeds Available for Distribution

17. Another consideration in assessing the potential consideration available to stakeholders is the amount of proceeds available for distribution in a liquidation scenario. The Debtors' latest unaudited balance sheets, cash flow forecast, and receivables, inventory, and other property interests, serve as the basis for the vast majority of the net proceeds available for distribution in a possible liquidation scenario. When assessing the potential funds available for distribution, it is important to understand that the value that could be obtained by liquidating all of Debtors' assets, or the value a purchaser would generally be willing to pay for such assets, is often significantly less than the "book value" of such assets, which is the value of such assets referenced in the Debtors' voluntary petitions. Book value is generally not a reliable estimate of what funds will be available for distribution to creditors (and equity holders, if applicable).

18. One asset that may be perceived to represent a significant asset of these estates is the Debtors' 40% equity interests in non-Debtor EXP Topco LLC (the "JV"). The JV holds 100% of the intellectual property of Express, as well as other intellectual property assets. However, based on my understanding of chapter 11 retailer sale processes that have similar facts and circumstances to those present in these cases, in the event of a liquidation, the value of a retail debtor's assets and intellectual property are likely to diminish considerably absent a go-forward business to support the value of such intellectual property.

19. To generate a recovery for holders of the Debtors' existing equity interests, I understand that the Debtors would be required to satisfy the "absolute priority rule," which in these chapter 11 cases means any sale proceeds would have to first clear the entirety of the Debtors' funded debt obligations, and all other secured debt, administrative obligations, and unsecured prepetition claims.

20. As described in the *Declaration of Stewart Glendinning, Chief Executive Officer of Express, Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20], the Debtors had approximately $188.9 million in total funded debt obligations as of the Petition Date. The funded debt consisted of approximately (a) $105.7 million in aggregate principal amount outstanding under the Prepetition ABL Facility, (b) $63.1 million in aggregate principal amount outstanding under the Prepetition FILO Term Loan Facility, which consist of the senior most prepetition debt obligations and now make up the Debtors' DIP obligations, and (c) $20.1 million in letters of credit. Additionally, as described in greater detail in the *Motion of Debtors Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of (A) Certain Critical Vendors, (B) Certain Foreign Vendors, (C) Certain Lien Claimants, (D) 503(b)(9) Claimants, and (E) PACA Claimants, (II) Confirming Administrative Expense Priority of Critical Outstanding Orders, and (III) Granting Related Relief* [Docket No. 6], the Debtors owed approximately $211,573,850 to third-party trade vendors as of the Petition Date. This approximate amount excludes landlord and other non-trade creditor prepetition claim amounts. It also excludes prepetition litigation claims, contingent claims, and unliquidated liabilities as well as cash used to operate the Debtors' business and fund these cases and additional liabilities incurred since the Petition Date. As such, the Debtors would need to generate a bid providing consideration exceeding that provided by the Stalking Horse bid by at least $220 million,

whether through a going concern sale or a liquidation, in order to pay claims in full and contemplate any possible distribution to equity.

21. As a result of the extensive Marketing Process, Moelis and the Debtors have accumulated significant data regarding what the market will support as a going concern or liquidation value for the Debtors' business. Market testing the Debtors' assets and business as a whole with a variety of potentially interested purchasers, investors, and counterparties gives a high degree of confidence regarding the range of possible valuations that could currently be ascribed to the Debtors' businesses.

22. In short, based on my review of the Phoenix LOI and my understanding of the current status of the Marketing Process, recovery to equity is exceedingly unlikely absent the Debtors' unsecured creditors and potentially certain secured creditors consenting to a recovery for equity while their own claims are impaired, whether through a going concern or a liquidation transaction. The Debtors would need to secure a bid that exceeds the consideration provided in the Stalking Horse by at least $220 million in order to pay unsecured claims and contemplate any distribution to equity. Further, the excess consideration required before contemplating any distribution to equity is based on two key assumptions: (a) that certain unsecured creditors who are currently agreeing to voluntarily compromise existing claims in order to support a going concern transaction may or may not make such concessions in a competing bid, and (b) the excess consideration does not include any lease rejection claims, prepetition litigation claims, contingent claims or unliquidated liabilities. While each of these two assumptions are benefits of the Stalking Horse bid, absent these assumptions, the additional consideration required for distribution to unsecured claims prior any potential distribution to equity may be significantly more than $220 million dollars. Without quantifying any contingent, unliquidated liabilities or rejection damages

claims, and away from agreement of significant concessions from creditors, the Debtors estimate that any transaction would have to leave the estates with at least approximately $420 million in order for equity to receive any recovery. While the market will ultimately make that determination, it is, based on all information available have at this time, highly unlikely in light of the results of the Marketing Process to date.

## V.     CONCLUSION

23.     Based upon my experience and the Debtors' comprehensive Marketing Process, the liquidation or value at Auction of the Debtors' assets is highly unlikely to provide any recovery for equity holders.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 3, 2024

Respectfully submitted,

/s/ *Adam Keil*
Name:  Adam Keil
Title:  Managing Director
Moelis & Company LLC