IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF MARK STILL IN SUPPORT OF OMNIBUS
REPLY OF DEBTORS (I) IN SUPPORT OF FIRST DAY MOTIONS AND
(II) IN OPPOSITION TO (A) MOTION OF MR. KURZON FOR APPOINTMENT
OF A SHAREHOLDERS' COMMITTEE AND (B) GRANTING RELATED RELIEF**

I, Mark Still, hereby declare under penalty of perjury:

1. I am the Senior Vice President and Chief Financial Officer at Express, Inc. I have provided financial and managerial services for the Debtors since I joined their team in June 2005. I was promoted to Vice President of Finance in January 2016. I have served as the Chief Financial Officer since April 21, 2024. I have more than 18 years of experience in providing financial modeling services in the retail industry with the Debtors. I graduated from the Ross School of Business at University of Michigan in 2005 with a Master of Business Administration degree in finance. I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I submit this declaration (this "<u>Declaration</u>") in support of the *Omnibus Reply of Debtors (I) In Support of First Day Motions and (II) in Opposition to (A) Motion of Mr. Kurzon*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

*for Appointment of a Shareholders' Committee and (B) Granting Related Relief* (the "Reply"), in particular as it relates to the Debtors' tax attributes.

3. A description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Stewart Glendinning, Chief Executive Officer of Express, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20], and is incorporated by reference herein.

4. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, and/or (d) my opinions, experience, and knowledge as the Debtors' Senior Vice President and Chief Financial Officer. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and postpetition operations. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## The Debtors' Tax Attributes

5. In the ordinary course of business, the Debtors generate various tax attributes in connection with their operations. Such attributes are generated at both the state and federal levels, in each jurisdiction in which the Debtors operate. Very generally, a taxpayer generates net operating losses ("NOLs") if the tax-deductible expenses it has incurred exceed the taxable income it has earned during a single tax year in the relevant jurisdiction. The Debtors may apply or "carry forward" NOLs to reduce future tax payments, subject to certain restrictions and conditions under applicable law. The Debtors also generate tax attributes arising from carried forward business interest deductions ("163(j) Carryforwards") and a variety of other tax attributes, including general

business credits, research and development credit carryforwards, unused minimum tax credits, foreign tax credits, business tax credits, and capital loss carryforwards.

6. The Debtors reflect such tax attributes in their financial books in the ordinary course of business in accordance with GAAP. Accordingly, these tax amounts are reflected in various public reports and filings, including the Form 10-K for the Fiscal Year Ended January 28, 2023, Express Inc.

7. There are limitations on the Debtors' ability to realize value from any tax attribute, such that the actual value of any tax attribute is *not* the gross amount of the attribute shown in a financial statement in accordance with GAAP. The actual liquidated value to the Debtors of such tax attributes will depend upon (a) the availability of such tax attributes under applicable law, taking into account relevant limitations, (b) the ability of the Debtors to generate taxable income in an amount sufficient, after taking into account all other allowable deductions for the relevant period, to be sheltered by such tax attributes, and (c) the amount of cash tax saved as a result of the application of such tax attributes.

8. Among other things, I am aware that tax attributes accrued in one jurisdiction are available only in that jurisdiction such that the Debtor accruing such attribute must also have taxable income in the relevant jurisdiction against which to apply such attribute for it to have value. Further, I am aware that certain federal and state statutes and regulations cause certain tax attributes to be significantly limited or disallowed upon a change of control of an entity or upon its liquidation, which may make such attributes difficult to realize given the Debtors' current situation. Accordingly, while the Debtors' tax attributes do have some value, that value is not even close to material enough to believe that the value of these chapter 11 estates may exceed the amount of the secured or unsecured claims against them.

**The Relief Sought by the Creditor Matrix Motion Should Be Granted**

9.  On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, (B) File A Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by Email, and (D) Redact Certain Personally Identifiable Information of Natural Persons; (II) Approving the Form and Manner of Service of the Notice of Commencement; (III) Waiving the Requirement to File A List of Equity Holders; and (IV) Granting Related Relief* [Docket No. 9] (the "Creditor Matrix Motion").  Pursuant to an agreement with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), the Debtors agreed to forgo their request to waive the requirement to file a list of equity security holders.  Instead, the Debtors agreed to file a list of equity security holders registered directly with the transfer agent.  The Debtors did so on May 14, 2024.  The Debtors have further obtained an updated list of equity holders registered directly with the transfer agent with a record date of April 22, 2024, which the Debtors will file contemporaneously herewith.  I believe that the balance of the relief sought in the Creditor Matrix Motion is important to the efficient administration of these chapter 11 cases and should be approved.

10.  ***Consolidated Creditor Matrix***.  I believe allowing the Debtors to prepare and maintain a single consolidated list of creditors (the "Creditor Matrix") in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these chapter 11 cases. Converting and segregating the Debtors' computerized information to a format compatible with the matrix requirements, as well as the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and increase the risk of error

with respect to information already on computer systems maintained by the Debtors or their agents. Accordingly, I believe that filing a consolidated Creditor Matrix is in the best interests of the Debtors' estates.

11. **Consolidated List of the Thirty Largest Unsecured Creditors**. I believe that allowing the Debtors to file a single, consolidated list of their thirty largest general unsecured creditors will help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix. This will be a more efficient use of the Debtors' and their advisors' limited time and resources and will be most efficient for the U.S. Trustee in its efforts to communicate with these creditors. Accordingly, I believe that filing a single consolidated list of the Debtors' thirty largest general unsecured creditors is in the best interests of the Debtors' estates.

12. **Serve Certain Parties in Interest by Email.** I believe that it is appropriate to authorize the Debtors to provide service to certain creditors via email. The Debtors have a large number of vendors, customers, approximately 9,300 current employees as of the Petition Date, and over 30,000 former employees, and service by email will help alleviate administrative burdens. Email service is likely the most efficient and cost-effective manner by which service of all interested parties can be completed and is also the most likely to facilitate creditor responses. Accordingly, I believe that allowing the Debtors to serve their creditors by email, where an email address is available to the Debtors, is in the best interests of the Debtors' estates.

13. **Redact Certain Personally Identifiable Information**. I believe that it is appropriate to authorize the Debtors to redact the home and email addresses of natural persons and all personally identifiable information of minors, from any paper filed or to be filed with the Court in

these chapter 11 cases, including the Creditor Matrix and schedules of assets and liabilities and statements of financial affairs, because such information can be used to perpetrate identity theft, phishing scams, or to locate survivors of domestic violence, harassment, or stalking. Disclosure also risks violating data and privacy laws and regulations, thereby exposing the Debtors to potential civil liability and significant financial penalties. Because the Debtors will provide an unredacted version of the Creditor Matrix, the schedules of assets and liabilities and statements of financial affairs, affidavits of service, and any other applicable filings redacted pursuant to a Court order to the Court, the U.S. Trustee, counsel to the Official Committee of Unsecured Creditors, Stretto, Inc. in its capacity as claims and noticing agent, and any party in interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases, *provided* each such request would be subject to a review of whether such disclosure, on a case-by-case basis, would violate any privacy or data protection law or regulation, I submit that the Debtors' proposed redactions are appropriate under the circumstances.

**Entry into the DIP Facilities Is a Sound Exercise of the Debtors' Business Judgment**

14.     I believe that entry into the DIP Facilities[2] is a sound exercise of the Debtors' business judgment because the DIP Facilities are necessary to provide the liquidity needed for the Debtors to administer these chapter 11 cases and consummate a going concern-sale transaction, and because there are currently no other viable postpetition financing options available to the Debtors that would allow the Debtors to achieve their chapter 11 objectives.

---

[2] "DIP Facilities" has the meaning given to it in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 24].

15. As described in greater detail in the First Day Declaration and the Kamlani DIP Declarations,[3] the Debtors require immediate access to additional liquidity to ensure that they are able to continue to operate during these chapter 11 cases and maximize the value of their estates for the benefit of all parties in interest. Specifically, based on the Debtors' forecast developed with the assistance of their advisors, the Debtors anticipate that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover the remaining projected administrative and restructuring costs of these chapter 11 cases without access to the postpetition financing provided by the DIP Facilities. Critically, the liquidity provided by the DIP Facilities is necessary to provide the Debtors' customers, vendors, and employees with comfort that the Debtors will continue to operate in the ordinary course of business during these chapter 11 cases, and to bridge to a going-concern sale transaction on the timeline contemplated by the Bidding Procedures.[4]

16. As further described in the First Day Declaration and the Keil DIP Declaration,[5] the Debtors approached numerous potential providers of debtor-in-possession financing in the lead

---

[3] "Kamlani DIP Declarations" means, collectively, the *Declaration of Kunal S. Kamlani in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 31] and the *First Supplemental Declaration of Kunal S. Kamlani in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*.

[4] "Bidding Procedures" has the meaning given to it in the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. 41].

[5] "Keil DIP Declaration" means the *Declaration of Adam Keil in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 30].

up to the commencement of these chapter 11 cases, but no viable third-party postpetition financing sources were actionable. In the absence of workable third-party financing proposals, the DIP Facilities represent the best and only available postpetition financing option available to the Debtors. For all of these reasons, in my view entry into the DIP Facilities is a sound exercise of the Debtors' business judgment.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 3, 2024

/s/ *Mark Still*
Mark Still
Senior Vice President and Chief Financial Officer
Express, Inc.