**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| EXPRESS, INC., *et al.*,[1] | ) ) | Case No. 24-10831 (KBO) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF KUNAL S. KAMLANI
IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) APPROVING BIDDING PROCEDURES AND
BID PROTECTIONS,(II) SCHEDULING CERTAIN DATES AND DEADLINES
WITH RESPECT THERETO, (III) APPROVING THE FORM AND MANNER
OF NOTICE THEREOF, (IV) ESTABLISHING NOTICE AND PROCEDURES FOR
THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES,
(V) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS,
(VI) AUTHORIZING THE SALE OF ASSETS; AND (VII) GRANTING RELATED RELIEF**

I, Kunal S. Kamlani, make this Declaration pursuant to 28 U.S.C. § 1746:

1.  I am a Senior Managing Director at M3 Advisory Partners LP ("M3"), the proposed financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.  I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

*(VI) Authorizing the Sale of Assets* (the "Motion"), in particular as it relates to the current liquidity of the Debtors and the need for an expedited sale process.

3. A description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Stewart Glendinning, Chief Executive Officer of Express, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20]. A description of the facts and circumstances of the Debtors' need for postpetition financing is set forth in the previous *Declaration of Kunal S. Kamlani In Support Of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 42] (the "DIP Declaration").

4. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of M3 working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. I have overseen the M3 team serving as one of the principal advisors to the Debtors since November 2023. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and postpetition financing efforts. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**The Debtors' Financial Need for Approval of the Bidding Procedures**

5. In the months leading up to the commencement of these chapter 11 cases, the Debtors, with the assistance of M3 and their other advisors, quickly began engaging with third

parties on a potential Sale Transaction. It is my understanding, based on the Keil Declarations,[2] that during this prepetition marketing process (the "Marketing Process"), the Debtors dedicated significant time and effort to solicit interest from strategic and financial third parties, which included outreach and coordination across multiple potential buyers. As detailed in the Keil Declarations, these efforts led to certain parties commencing due diligence on the Debtors' assets and businesses prior to the Petition Date.

6. Based on our understanding of the Debtors' operational and financial performance, and as expressed in the Keil Declarations, it became apparent that the accelerated but robust Marketing Process was unlikely to yield a Sale Transaction that could be implemented through an out-of-court Sale Transaction due to timing and liquidity constraints. Thus, the Debtors determined that pivoting to an in-court Sale Transaction was the best option available to attempt to reach a value-maximizing transaction, widely market the Debtors' business, and mitigate continued supply chain pressure and limited liquidity due to the mounting accounts payable that remained outstanding for a significant period. As described in my DIP Declaration, the Debtors had only approximately $23 million of cash on hand as of the Petition Date, which was insufficient to operate their enterprise and continue paying their obligations as they came due during the first 28 days of these chapter 11 cases, including to their employees, critical vendors, and landlords. As of the Petition Date, substantially all of the Debtors' cash represented Cash Collateral, and

---

[2] *See* the *Declaration of Adam Keil in Support of the Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Lease, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. 42] (the "Original Keil Declaration") and the *Supplemental Declaration of Adam Keil in Support of the Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Lease, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief*, filed contemporaneously herewith (the "Supplemental Keil Declaration" and, together, the "Keil Declarations").

accordingly, the Debtors would not have been able to meet their near-term liquidity needs without access to Cash Collateral. *See* DIP Declaration, ¶ 11. Facing a liquidity crisis, the Debtors, with the assistance of their advisors, including M3, determined that they required incremental and immediate liquidity to address their postpetition financing needs. *Id.* ¶ 12. The Debtors needed immediate access to postpetition financing and access to Cash Collateral to maximize the value of the estate for the benefit of all stakeholders and satisfy administrative obligations. *Id.* ¶ 13.

7.      Since the Petition Date, the Debtors' management team and the M3 team continue to advise the Debtors regarding managing and forecasting liquidity, including tracking to a 13-week cashflow forecast. We have modeled multiple scenarios, including hybrid scenarios for different combinations of enterprise-wide going-out-of-business sales and going-concern sales based on differing amounts of stores and other assumptions to analyze and anticipate the Debtors' financial position at any given point in these cases. This is a critical exercise, and our analysis shows that, absent clarity on a path forward in the very near-term, the Debtors will need to disburse tens of millions of dollars to fund operations which otherwise could be used to satisfy secured and administrative and priority claims—in total, my team estimates that these expenditures would amount to approximately **$15 million** in non-recoverable value each week. This would result in a permanent and meaningful loss of value, as the Debtors ceased issuing purchase orders for inventory on the Petition Date which means the asset base is fixed and is depleting by the day while the expenses such as payroll, rent, and interest expense continue to be incurred and post-petition liabilities grow. Moreover, this calculus does not factor in the increasing operational risk of accelerated employee attrition as there is no key employee retention plan ("KERP") or key employee incentive plan in place. The Debtors must move quickly to monetize the remaining asset

base and eliminate growing post-petition liabilities before the expected outcome quickly changes from administrative solvency to administrative insolvency.

### Sound Business Purposes Support the Bidding Procedures and the Proposed Schedule

8. The Debtors and their advisors worked diligently to develop the Bidding Procedures, which are supported by the Committee and the DIP Lenders and are consistent with the proposed DIP Budget and related milestones. As described above, the Debtors, with the assistance of Moelis, continue to market the Assets and market test the Stalking Horse Bid. As set forth in the Bidding Procedures Motion, the Debtors are seeking approval of the Bidding Procedures to establish a clear and transparent process for the solicitation, receipt, and evaluation of bids on a court-approved timeline that allows the Debtors to timely consummate a sale of the Assets. I understand that the Bidding Procedures are designed to maximize recoveries for creditors and other stakeholders by facilitating a competitive bidding process within the Debtors' liquidity constraints.

9. The Marketing Process and timeline proposed in the Bidding Procedures is based on the Debtors' projected liquidity and is reasonable under the circumstances. Specifically, the Debtors face a challenging operating environment in light of **double-digit comparable store sales declines combined with upcoming obligations to fund payroll and rent, among other necessary expenditures**. These challenges may be exacerbated by vendor and customer responses to the uncertainty surrounding these chapter 11 cases, as well as potential employee attrition and a rapidly depleting asset base. Indeed, in order to stem value-destroying employee attrition during this critical inflection point, the Debtors would likely need to implement a KERP to retain employees, likely totaling an additional **$4 million**. Although the Debtors have the liquidity to fund these upcoming payments now, it is highly unlikely that it can satisfy both the near-term cost

of operations and fully satisfy its secured debt obligations and administrative and priority claims absent a Sale Transaction or other cash infusion into the Debtors' estates.

10. In response to these challenges, and as agreed upon by the DIP Lenders, the Debtors filed the Motion on the first day of these cases, setting forth three potential Sale Transaction timelines: (a) a Going-Out-of-Business timeline (which contemplates a full-scale wind-down of the Debtors' business); (b) a Going-Concern timeline (which contemplates a sale of the Debtors' entire business as a going-concern); and (c) a timeline for a Sale Transaction where there is neither a full-scale wind-down or a going-concern transaction, and the Debtors' assets are sold piecemeal to the highest bidders. Each timeline was similar, but slightly longer than the next, to account for the logistical challenges and liquidity pitfalls that accompanied each one.

11. The Debtors' decision to pursue three separate sale timelines on a concurrent basis was a creative solution born out of a necessity to be as efficient as possible in the face of severely constrained liquidity and to achieve value maximization. Specifically, the Debtors' management team and my team decided to provide a few more days for the going-concern transaction timeline given both the significant additional value associated with the going-concern transactions for the vast majority of stakeholders (if they can be achieved), as well as the realization of immediate value to the estates upon closing of a going-concern transaction. However, this timeline is pushing the limit on the Debtors' business to balance the requirements to parties in interest while moving quickly to ensure the Debtors' ability to satisfy administrative claims and obligations that continue to come due. The Debtors are doing everything in their power to consummate the going-concern transaction because that transaction is the one most likely to maximize value (if it can be consummated). But time is of the essence. Furthermore, the Debtors are prepared to pivot to a full-scale liquidation if at any point it is determined that the going-concern transaction is at risk.

12. Thus, as described in greater detail in my DIP Declaration, I believe that the DIP Milestones, which formed the basis for the Bidding Procedures milestones, were appropriate and achievable. *Id.* ¶ 19. My beliefs were driven by the Debtors' liquidity, cash flows, and operating performance as budgeted and modeled in advance of the Petition Date. The DIP Milestones are in place to ensure that the DIP Lenders preserve the value of their collateral, which directly ties to the model that my team and I, with assistance from the Debtors' management team, have prepared. The value of the Debtors' inventory and overall business will experience a significant decline if the Debtors continue through these chapter 11 cases without a decisive path by no later than the second week of June. Absent a definitive path forward, the Debtors will need to disburse funds to cover rent, payroll, and other obligations that are currently contemplated to be funded by two potential buyers. These cases will likely be extended, and these disbursements will be permanently lost.

13. As stated above, my team estimates that the cost to run the estates is approximately $15 million per week (not including any additional employee compensation that would be contemplated under a KERP). Our forecasts indicate that one to two additional weeks of uncertainty could be the difference between administrative solvency and insolvency. Accordingly, the main reason I and the Debtors' other advisors and management team determined that the DIP Milestones and Bidding Procedures are reasonable is because we understood that without consummation of either a going-concern sale transaction or a pivot to an enterprise-wide liquidation, the Debtors' liquidity would not be able to address the cash flow needs and satisfy the mounting administrative claims that would be accumulating in these chapter 11 cases.

14. Accordingly, the DIP Milestones informed the Bidding Procedures timeline that my team and I viewed as appropriate in light of the need for an expedited process to realize

significant cash into the estates either by way of consideration through a going-concern transaction (through both cash and liabilities lifted off the Debtors' balance sheet) or an enterprise-wide liquidation transaction (through both cash from either an equity bid or fee bid from proceeds related to store closing sales).

15. Relatedly, the initial Store Closings approved through the Store Closings Order[3] are coming to an end on June 30, 2024, and with them the cash flow that is being provided by the ongoing closing sales. It is imperative that the Debtors have a path forward through an expedited sale process, otherwise the Debtors' already fragile liquidity position will turn dire very quickly and the Debtors will be forced to commence enterprise-wide going-out-of-business sales to generate the requisite cash flow for the estates. The timeline under the Bidding Procedures, therefore, will create the necessary path to bring finality to the Debtors' restructuring, maximize value, and provide the best available recoveries to their stakeholders.

### The Stalking Horse APA Represents the Highest or Otherwise Best Offer

16. The Stalking Horse Bid addresses and in many ways, if it were approved by the Court as the Successful Bid, would mitigate the slew of challenges associated with the Debtors' liquidity position outlined above. My team, in connection with the Debtors, Moelis, and the Debtors' other advisors, considered each constraint detailed herein in evaluating the Stalking Horse Bid and negotiating the terms of the Stalking Horse APA, particularly the Acquired Assets and Assumed Liabilities. I believe that the Stalking Horse APA is the highest and best value that the Debtors received during the Marketing Process, especially given the facts that (a) it

---

[3] *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* [Docket No. 234].

contemplates a going-concern Sale Transaction as opposed to a liquidating Sale Transaction; and (b) it acquires a significant number of Assumed Liabilities that would other be the responsibility of the Debtors' estates and reduces the remaining claims pool. Specifically, the Stalking Horse APA contemplates a total purchase price of approximately $198 million, which consists of approximately $160 million cash consideration and $38 million of Assumed Liabilities. This purchase price amount does not include additional material value that is estimated to be worth approximately $100 million. For example, such additional unapplied value is associated with the handling of existing customer programs, existing landlord claims and other contract counterparty claims. Critically, the transaction contemplated under the Stalking Horse APA also significantly reduces outstanding general unsecured claims, which in turn will result in higher recoveries for allowed holders of general unsecured claims that remain compared to any other bid currently before the Debtors at this time. The Stalking Horse APA contemplates higher value for all parties through the Purchase Price, the Acquired Assets, and Assumed Liabilities, including retaining approximately 7,500 employees, approximately 450 stores, and provides go-forward relationships with many of the Debtors' existing vendors and other contract counterparties. Further, the Stalking Horse APA contemplates a significant deposit paid to the Debtors, which will amount to 5% of the Acquired Merchandise Amount.

17. For these reasons, and based on my experience as a restructuring professional, I believe approval of the Bidding Procedures, and the timeline contemplated thereunder, is in the best interests of the Debtors' estates and best positions the Debtors to achieve the highest or otherwise best outcome under the present circumstances for all parties.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  June 4, 2024                             /s/ *Kunal S. Kamlani*
                                                        Kunal S. Kamlani
                                                        Senior Managing Director
                                                        M3 Advisory Partners LP