**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESS, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SUPPLEMENTAL DECLARATION OF**
**ADAM KEIL IN SUPPORT OF THE DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES**
**AND BID PROTECTIONS, (II) SCHEDULING CERTAIN DATES AND DEADLINES**
**WITH RESPECT THERETO, (III) APPROVING THE FORM AND MANNER OF**
**NOTICE THEREOF, (IV) ESTABLISHING NOTICE AND PROCEDURES FOR**
**THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES,**
**(V) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS,**
**(VI) AUTHORIZING THE SALE OF ASSETS; AND (VII) GRANTING RELATED RELIEF**

I, Adam Keil, make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director of Moelis & Company LLC (together with its affiliates, "Moelis"), the proposed financial advisor and investment banker to the above captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this supplemental declaration (this "Declaration")[2] in support of the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Bidding Procedures Order, the Bidding Procedures, the First Day Declaration or the Original Declaration.

*Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets*, filed contemporaneously herewith (the "Motion"),[3] to supplement the statements set forth in my original declaration dated April 22, 2024 [Docket No. 42] (the "Original Declaration"), and in support of the Debtors' selection of the JV Purchaser (as defined below) as the Stalking Horse Bidder.

3. I am familiar with the marketing process and negotiations related to the asset purchase agreement (the "Stalking Horse APA") with Phoenix Retail, LLC (the "JV Purchaser"), a consortium to consist of PHXWHP, LLC, an affiliate of EXPWHP, LLC and affiliates of certain of the Debtors' landlords, specifically, SPG Fashion Retail, LLC and BPR Acquisitions LLC, attached as Exhibit A to the Debtors' *Notice of Selection of Stalking Horse Bidder* [Docket No. 305] (the "Stalking Horse Notice"), filed on May 24, 2024.

4. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Moelis working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Moelis team, which, since March 2024, has been one of the principal restructuring advisors to the Debtors. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the prepetition and postpetition marketing and financing efforts. I am over the age of 18 years and authorized to submit this

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion, the Bidding Procedures Order, the Bidding Procedures, or the First Day Declaration, each filed contemporaneously herewith, as applicable.

Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

### The Marketing Process

5.  As described in the Original Declaration, in the period leading up to the Petition Date, the Debtors, with the assistance of Moelis and their other advisors, launched a marketing process for a potential Sale Transaction (the "Marketing Process"). Prior to filing, Moelis contacted 23 potential strategic and financial investors through introductory emails and calls, which led to the execution of 11 non-disclosure agreements ("NDAs") and access being granted to virtual data rooms, financial models, and other financial, operational, and legal diligence materials.

6.  Immediately upon commencement of the Marketing Process, the Debtors and my team reached out to the Debtors' joint venture partner, WHP Global (through its subsidiary EXPWHP LLC) to relay the Debtors' plan to launch the process as they searched for solutions for the Debtors' financial and operational headwinds. EXPWHP, LLC—a direct subsidiary of WHP Global—is the majority owner of the intellectual property of both Express and Bonobos following the series of transactions in 2023 where WHP Global acquired a 60% ownership interest in an intellectual property joint venture, EXP Topco, LLC ("IPCo") to which Express contributed certain of its intellectual property assets.

7.  In light of WHP Global's stake in the Debtors' business and its status as an existing strategic partner, WHP Global was a natural partner with unique motivations to work with the Debtors to quickly identify and implement a solution to preserve the iconic brand and work to avoid a potential liquidation in the face of significant financial and operational hurdles. Further, absent agreement from WHP Global, the Debtors would face challenges transacting away from WHP Global due to its majority interest in IPCo and control over a License Agreement related to

IPCo.  The Debtors quickly determined that any transaction would likely require participation from WHP Global **_and_** another counterparty (*e.g.,* a potential operating partner given WHP Global's position as a leading global brand management firm), not WHP Global **_or_** another counterparty.  I understand that the Debtors used their best efforts to ensure that all interested parties were cognizant of this dynamic and understood that any transaction would likely require them to step into the Debtors' role as minority owner in IPCo and operator of the Express and Bonobos banners with a rightsized footprint and optimized operations and that WHP Global would remain a key counterparty in the go forward business absent their consent to some other treatment.

8. Nonetheless, the Debtors, the management team, and advisors were focused on ensuring that the Marketing Process canvassed the entire market for potentially interested parties that could provide a solution either alongside WHP Global or independently.  Due to the liquidity constraints outlined in the Kamlani Declaration,[4] the Debtors made clear to the interested parties that time was of the essence.  And although the Debtors explained to interested third parties that a prepetition Marketing Process, as robust as it was, would not yield a Sale Transaction out-of-court, they worked expeditiously with interested parties to understand paths for a going-concern transaction through an in-court process.

9. In the days leading up to filing these chapter 11 cases, the Debtors obtained a letter of intent (the "Phoenix LOI") provided by a prospective joint venture comprised initially of the Company's most significant stakeholder, WHP Global, and its two largest landlords, Simon Property Group, L.P. and BPR Acquisitions LLC, (the prospective joint venture entity, "Phoenix

---

[4] *See Declaration of Kunal S. Kamlani in Support of the Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets*, filed contemporaneously herewith (the "Kamlani Declaration").

JV") attached as Exhibit C to the First Day Declaration. While the Phoenix LOI provided the Debtors hope that a going-concern Sale Transaction was possible, the Debtors were aware that more work needed to be done in chapter 11 to pressure test this potential bid and conduct further outreach to potentially interested parties as part of the postpetition Marketing Process.

10. And the Debtors did just that. In the weeks after signing the Phoenix LOI, Moelis connected with 27 additional potential strategic and financial investors through emails and calls and executed 10 additional NDAs. During this time, the Debtors' advisors also kept all interested parties updated with respect to the timing surrounding entry of a stalking horse purchase agreement by no later than May 22, 2024, and submission of bids by June 3, 2024. My team and I continued to engage with interested parties and kept such parties apprised of the key dates and milestones in real time to ensure that all parties were fully aware of the process and expectations related thereto.

11. The Debtors and their advisors were always very clear about the three Sale Transaction timelines, which provide a path forward for either (i) a Going-Concern Sale Transaction; (ii) a Going-Out-of-Business Sale Transaction in lieu of a Going-Concern Stalking Horse; or (iii) No Going-Concern Sale Transaction after filing a Going-Concern Stalking Horse Notice. The Debtors and their advisors filed the Motion on the Petition Date, rather than on shortened notice in advance of the second day hearing, to ensure parties had maximum time to review, understand each path forward, and consult with the Debtors and their advisors if necessary to better understand the process. The Debtors' decision to pursue three separate sale timelines at once was a creative solution born out of a necessity to be as efficient as possible in the face of severely constrained liquidity and to achieve value maximization and comply with the requirements under the DIP Documents. The Bidding Procedures and the timeline contemplated thereunder was a key point of negotiation in connection with the Final DIP Order between the

Debtors, Committee, and DIP Lenders, which necessitated that both items be heard together. And this resulted in consensus across both the Final DIP Order and Bidding Procedures.

12. As stated in the Original Declaration, the timeline set forth in the Bidding Procedures originally filed, and the timeline the Debtors pivoted to as they gained traction with certain parties, was calculated with the intent to balance the need to provide adequate notice to Potential Bidders with the need to run an expeditious and efficient sale process and comply with the milestones set forth in the DIP Order.

| **Deadlines** | **Original Date** | | | **Modified Date** | |
| --- | --- | --- | --- | --- | --- |
| **Bid Deadline** | *Going-Out-Of-Business – May 24, 2024* | *Going-Concern – June 3, 2024* | Neither *Going-Out-of-Business* nor *Going-Concern – June 4, 2024* | **June 11, 2024** for all three paths | |
| **Auction** | *Going-Out-Of-Business – May 28, 2024* | *Going-Concern – June 5, 2024* | Neither *Going-Out-of-Business* nor *Going-Concern – June 11, 2024* | **June 12, 2024** for all three paths | |
| **Sale Objection Deadline** | *Going-Out-Of-Business – May 29, 2024* | *Going-Concern – May 31, 2024* | Neither *Going-Out-of-Business* nor *Going-Concern – June 4, 2024* | **June 13, 2024** for all three paths | |
| **Sale Hearing** | *Going-Out-Of-Business – at a date and time to be announced* | *Going-Concern – June 7, 2024* | Neither *Going-Out-of-Business* nor *Going-Concern – June 11, 2024* | *Going Concern* and *Going-Out-Of-Business –* **June 14, 2024** | *Neither Going Concern nor Going-Out-Of-Business –* **June 25, 2024** |

13. I understand that the timeline is necessary to address the realities of the Debtors' operational performance and the pressures to implement a material solution to the businesses.

Specifically, I understand that the significant headwinds faced along with the DIP Lenders' concerns regarding the value of their collateral, requires the Debtors to move quickly toward either a going-concern sale or an enterprise-wide liquidation transaction. The Debtors' advisors explained the purpose of each timeline and the facts and circumstances facing the Debtors to landlords, potential bidders, and other interested parties. Further, despite the efficient timeline for the sale process when measured against the Petition Date, the Marketing Process has been active since well before the Debtors filed in these cases, and the outreach by the Debtors and their advisors to 50 parties pre- and post-petition has provided potentially interested parties sufficient time to come forward and express interest in the Debtors' business or raise concerns around the process timeline. Interested parties have been provided access to the Debtors and their advisors, as appropriate, and none have expressed surprise of the facts necessitating the accelerated timeline. Critically, at no point has any interested party requested more time as part of the Marketing Process.

14. The continuation of the Marketing Process on a postpetition basis ultimately proved fruitful: the Debtors have received two Qualified Bids, one of them—the bid submitted by the JV Purchaser (the "Stalking Horse Bid")—contemplates a going-concern transaction. On May 22, 2024, following several weeks of hard-fought, arm's-length negotiations, the Debtors entered into the Stalking Horse APA with the JV Purchaser. After careful evaluation, and upon consultation with the Consultation Parties, on May 24, 2024, the Debtors filed the Stalking Horse Notice, with the Stalking Horse APA attached as Exhibit A thereto.

15. Now that the Debtors have clarity on the preferred going-concern path forward with the Stalking Horse Bidder, the Debtors can streamline the three timelines into one solidified schedule of later dates to pressure test the Stalking Horse Bid. I understand this streamlining is

reflected in the revised proposed Bidding Procedures Order that will be shared with the Court in advance of Thursday's hearing.

## The Proposed Bid Protections are Reasonable and Appropriate

16. Based on my experience, I believe that the proposed Bidding Procedures provide the Debtors with the appropriate flexibility to provide reasonable Bid Protections to Stalking Horse Bidders if necessary to attempt to maximize value for the Debtors' creditors and establish a floor for further bidding on the Debtors' business and ensure that a buyer exists to withstand the remainder of the sale process. Based upon my involvement in the process, I believe that the Stalking Horse APA was negotiated at arm's length and in good faith, and without self-dealing or manipulation. The Bid Protections both encourage and serve to attract or retain a potentially successful bid and establish a bid standard or minimum for other bidders for several reasons. Entry into the Stalking Horse APA was necessary to preserve the going-concern transaction path under the DIP Documents, while allowing other interested parties to continue performing diligence and finalizing their bids in advance of the deadline—an impossibility had the Debtors not executed a going-concern stalking horse agreement by May 22, 2024. The Stalking Horse APA also provides the framework for which all other interested parties are analyzing any transaction. Additionally, the Stalking Horse APA is the culmination of many arrangements and agreements reached with existing landlords and contract counterparties both supportive of, and interested in, participating in a going-concern transaction. It is my understanding that other going-concern bidders will likely be able to reap the benefits of concessions and agreement on a path forward from these key parties given their interest in participating in a going-concern transaction (as opposed to a liquidation). I also understand that the official committee of unsecured creditors support the Debtors' granting Bid Protections under the Stalking Horse APA as the committee recognizes the significant benefit

that the Debtors' estates are receiving in consideration for the Stalking Horse APA and the going-concern transaction contemplated thereunder.

17. I also believe that the Expense Reimbursement is reasonable, particularly given the sheer amount of work that bolstered the diligence process supporting the terms of the Stalking Horse Bid and the complexity of the facts and circumstances surrounding these chapter 11 cases and the Stalking Horse bid.  Beginning in the weeks leading up to filing these chapter 11 cases, the JV Purchaser implemented, with the assistance of various professionals including investment bankers, a diligence process that is akin to the underwriting of an entire business.  The JV Purchaser and their advisors have engaged closely with landlords and contract counterparties to stand up an entire new business and ensure that such vendors, landlords, and retained employees are able to hit the ground running while heading into a busy fall fashion season.  The Expense Reimbursement is just one piece of the puzzle that represents the hard-fought negotiations the JV Purchaser engaged in to get to this stage.

18. I also believe that the Stalking Horse Bid reflects the highest or otherwise best Bid at this time.  The JV Purchaser, along with its advisors, have worked tirelessly since before the Petition Date to shape the contours of a Sale Transaction that preserves the Debtors' business and primes it for future success upon emergence from chapter 11.  The Stalking Horse Bid is also the culmination of efforts from a variety of stakeholders, including certain of the Debtors' largest landlords and many contract counterparties throughout the Debtors' entire operational ecosystem, further evidencing the broad support for a going-concern transaction.  Further, not only does the Purchase Price provided for in the Stalking Horse APA offer proper footing to continue these chapter 11 cases, the Stalking Horse APA contemplates a significant deposit paid to the Debtors, which will amount to 5% of the Acquired Merchandise Amount (the "Deposit").  The Deposit is

an additional crucial component to the Stalking Horse Bid that demonstrates it is currently the highest and otherwise best Bid available to the Debtors. The Stalking Horse Bid provides significant value to creditors by allowing for the repayment in full of secured creditors, positioning the Debtors to make payment on account of all 503(b)(9) and administrative claims, and provides value to unsecured creditors through the Stalking Horse Bidder's assumption of certain liabilities and the continued business relationship between the Debtors and a number of creditors, including vendors, merchants and landlords, among others.

19.  In any event, even if there were any question over the "highest or otherwise best" consideration, I understand that the Debtors have carefully constructed language in the revised proposed Bidding Procedures order that makes clear that the Bid Protections are junior in priority to the DIP Obligations and are not accounted for in any Overbid or Qualified Bid proposed by the DIP Lenders or DIP Agents, which is supported by the DIP Lenders and the JV Purchaser. This construct removes any impediments to achieving a value-maximizing transaction and path forward for the Debtors. I understand that with these modifications, the DIP Lenders do not oppose the Debtors' granting Bid Protections under the Stalking Horse APA.

20.  Additionally, the Bid Protections are a condition to entry into the Stalking Horse APA and therefore a condition to the Debtors' receipt of the Deposit. Further, and critically, I believe that the Bid Protections are particularly reasonable given that they are calculated based off an amount less than the purchase price. *See* Stalking Horse APA, Section 8.3(b)–(c). I understand that the Stalking Horse APA currently contemplates that, upon Court approval, the Stalking Horse Bidder shall be provided Bid Protections that are calculated based on the Acquired Merchandise Amount, *not* the transaction value or purchase price. I understand that, based on the current state of negotiations of the Stalking Horse APA, such figure would ultimately result (if triggered) in an

amount up to approximately $5.78 million Break-Up Fee and $5.78 million Expense Reimbursement, for a total of up to approximately $11.56 million. Alternatively, if the Bid Protections were calculated based on the purchase price, as is typical in most stalking horse transactions, the Bid Protections would amount to an approximately $8.83 million Break-Up Fee and $8.83 million Expense Reimbursement, for a total of up to approximately $17.66 million. The contemplated fees of $5.78 million for each the Break-Up Fee and Expense Reimbursement amount to approximately 2.0% of the aggregate purchase price (or approximately 4.0% of the purchase price, collectively).

21. Bid protections, including a break-up fee and expense reimbursement are often included in stalking horse bids. A Break-Up Fee of three percent of the purchase price is within the norm, and Expense Reimbursement of three percent of the purchase price is within the range of reimbursement levels observed in other cases. My team and I have analyzed other chapter 11 cases in this district, which have held that bid protections similar to those the Debtors request approval of are appropriate.

22. Therefore, it is my belief, for the reasons set forth herein and in the Original Declaration, that the Bidding Procedures are reasonable under the circumstances and that the Debtors' selection of the JV Purchaser as Stalking Horse Bidder is an appropriate exercise of the Debtors' business judgment.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 4, 2024

/s/ Adam Keil
Name: Adam Keil
Title: Managing Director
Moelis & Company LLC