IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXPRESSS, INC., et. al.,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 181, 364 and 375** |
| | ) | |

*PRO SE* SHAREHOLDER SUR-REPLY RE MOTION FOR A SHAREHOLDER'S
COMMITTEE AND REQUEST FOR RELATED RELIEF

  *Pro Se* Shareholder, Objector and Movant Jeffrey M. Kurzon, sets forth, continues to

object on a limited and emergency basis and moves this Honorable Court, and seeks the relief

requested herein, upon information and belief, as follows:

I.  **Introduction**

1. Debtor's Counselors deserve credit, working hard in their reply (Dkt No. 364) to prove every

  which way that there is no hope for *these* Debtors, as their expert, the former Sears Holdings

  Corporation director (Dkt 31, p. 6), Mr. Kamlani has declared them "hopelessly insolvent,"

  as described by Debtors Counselors in their reply to this motion (see Kamlani Declaration,

  Dkt No. 379: "Our forecasts indicate that one to two additional weeks of uncertainty could be

  the difference between administrative solvency and insolvency" and "Dkt No. 366 "The

  Debtors are Hopelessly Insolvent," p. 4, and (paraphrasing), 'the company is for sale for

  $420 million dollars) even though the Debtor's CEO Mr. Glendinning never used such word

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are: Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

(solvent or insolvent) in his first-day 88 page declaration (Dkt No. 20) that included the pre-cursor to the current Stalking Horse Bid of roughly $198 million[2] (see Kamlani Declaration, Dkt No. 366). *These* Debtors, despite being a "meme stock"[3] for over three years (See "Shareholder Declaration" at Dkt No. 181, pps 11-12), despite having assets at the start of these ch. 11 bankruptcy proceedings that equate to a book value of nearly $100 million (Dkt No. 1), projected net sales of nearly $2 billion dollars,[4] there is no money, except it seems for the people declaring most vociferously there is no money. The undersigned came to the Debtor as soon as these proceeding began with questions, was conveniently ignored and is now seemingly treated as a hostile enemy, just for owning the stock, showing up, asking questions, some of which must have been very inconvenient to answer coming from an interested owner of the Debtor company. Before this Honorable Court is now the question of whether a Shareholder's Committee under the Bankruptcy Code should be appointed to serve in the best interests of the Debtor and justice for the Debtor's estate and interested stakeholders. In the absence of a Shareholder's Committee, the undersigned implores the Honorable Court to use all other available remedies to preserve value in the Debtor's estate for the benefit of the Debtor's employees[5], creditors[6], landlords, vendors, unsecured creditors

---

[2] None of this is for the shareholders, of course, since shareholders have been kept away from the negotiating table by the Counselors in this Honorable Court.

[3] An obvious question might be, if the Debtor's Counsel were more willing to communicate with the undersigned shareholder, why might such a "Meme Stock" be an appropriate investment for a securitized trust, a mystery bank, or any of the other approx. big financial "equityholders" exhibited in these proceedings (See Kaup Declaration Dkt No. 132, pp 6-9 and KPMG Motion Dkt No 355-3, pp. 21-24] when the Chair of the SEC has warned "Do you research – or get pie in your face." (see Dkt No. 181, p. 11, fn. 14). Something clearly does not compute.

[4] See attached Exhibit B: "Express CEO Seeks to Ease Bankruptcy Concerns," Nate Delesline III, Retail Dive, Feb. 15, 2024.

[5] Exception is made here for certain of the Debtor's Directors, former Directors and C-Suite overpaid employees taking risk free capital from the Debtor who clearly need to at least be interrogated at the Debtor's annual meeting as required by Delaware Law and the Debtor's charter documents.

[6] Exception is made here for the ABL Lenders, some of who, upon information and belief, may have breached legal duties of care and good faith and fair dealing, which are beyond the scope of this sur-reply, but suffice it to say even counsel for the unsecured creditors committee, Mr. Murley, took issue with their one (1) business capture of

and shareholders since each of these Persons, if not shareholders, or beneficial shareholders themselves, may by virtue of public interest, find it worthwhile to read the following. It is submitted that without shareholder participation, any plan from this bankruptcy may result in years and years of litigation, clogging the already overburdened federal and state courts of this country.

## II.  Timeline– Legal Basis of Sur-Reply

2.  Reference is made here to Dkt entries 1-394, not all of which have been reviewed by the undersigned for their sheer volume and references to outside documents and case law. Dkt 181 filed May 9 (the undersigned initial objections and motion), which show the undersigned as an attorney admitted and in good standing to the state courts of New York and Massachusetts, as well as certain federal courts, but without any bankruptcy law experience. April 22 was the Petition Date, followed by April 24 the First Day Hearings. The undersigned will make every best effort to appear in this Honorable Court on Thursday, June 6 at 9:30 am to plead this motion as a *pro se* shareholder.[7] The undersigned has deliberately not moved this Honorable Court to be admitted *pro hac vice* so as to represent all shareholders, as to do so would be an affirmation as to being capable bankruptcy counsel, a specialized field of law in this court of limited and specialized jurisdiction.  Any relief granted to the "*pro se*" should necessarily inure to the benefit of all members of the class of interests represented by the undersigned. While inconvenient to the authors of the First Day Motions, the Objections raised by the Objector have become even more relevant and the

---

the $49 Million CARES Act payment. See e.g. Dkt No. 304 at para 3 "the Prepetition Secured Parties may have themselves created the need for the DIP Facility just days before the Petition Date, forcing the Debtors to transfer their $49 million CARES Act refund to the Prepetition Secured Parties instead of using that money to fund operations."

7 The undersigned is a resident of Peterborough, NH, a drive of about six hours from the Court.

motion for a Shareholder's Committee is even more vital. Delaware Bankruptcy Local Rule 7007-2 allows the filing of sur-replies, but only with the court's permission, which was explicitly implied with the Court's order found in Dkt No. 351 ("Any reply in support of the Motion must be filed … by June 5, 2024"). The undersigned asks the Honorable Court for leniency and waiver with respect to Rule 7007-2 (page limit and other brief procedural rules) given the undersigned is unrepresented, must travel at least six hours to appear in person, and is in a bankruptcy court for the first time as a *pro se.*

### III.  Relevant Facts to Support the Now Limited Objections

#### A.  Limited Objection 1: The inability of Debtor management and Debtor Counsel to Properly Communicate Basic Facts Necessitates either a Shareholder's Committee, or at Least Some Compromise Neutral to Maintain a Fair, Balanced and Transparent Court

3.  On May 9, the undersigned filed timely objections before the entry of Final Orders Relating to the First Day Orders (Dkt No. 181). The undersigned explicitly stated that he was in favor of working towards a 'going concern' and did not want the court to construe any of his pleadings to interfere with the employment of any Debtor employees who have done no wrong. (Dkt No. 181, p. 3).

4.  In Dkt 181, "market manipulation" is mentioned nine times, which includes the undersigned's sworn affidavit. "Short and Distort" is also mentioned three times and evidence is proffered thereto specifically (see Sched. 3, Dkt No. 181). The undersigned is ready willing and able to testify as to the contents of the Shareholder Declaration; the only known mistakes were 1) inartful pleadings due to lack of counsel and the rushed nature of these proceedings and 2) the undersigned omitted 151 beneficially owned shares in his haste to pen his objections and motion (see Dkt No., 181; para. 2; the total beneficial shares as of the petition date should be 233, adding an additional 157 "beneficial" shares (non-retirement)

in four brokerage accounts, to make a total of combined holdings for the undersigned 3,768 shares rather than 3,611[8]. Further, given new evidence, e.g. Dkts. No. 225 and the Song Declaration (Dkt No. 368), the undersigned's views of the total shares outstanding have changed from what was stated in paragraph 19 of the Shareholder Declaration found at Dkt No. 181.

5.  The most salient facts brought out to date is based on what was inconsistently declared (Glendinning Affidavit at Dkt 20, pp. 47 and 53), attempted to be waived (see Dkt No. 9) and then submitted to the court (Computershare shareholder list at Dkt 225 prematurely dated as of April 15, a week prior to the Petition Date, and filed May 14, and undercounting the undersigned shares at 1,025, which is provably less than the 1,750 the undersigned has records to show he owned as of April 15, 2024[9]. Curiously, now that the list has been certified as "true and correct," (see Song Declaration at Dkt No, 368) but is still not correct, as the undersigned is ready, willing and able to present and prove to this Honorable Court that the undersigned owned 2,000 shares as of April 19 (and April 22, the Petition Date)[10] and that therefore this second attempt is again, despite certification from Stretto (see Song Aff.), _astonishingly_, wrong! As well, the Debtor's filing Dkt No. 1 mentions warrants in its blank table of equity holders, but has not definitely stated whether any warrants were issued or are outstanding even though their filing implies there may be. (See Dkt No. 1, ft note 2 _"Outstanding warrants are not reflected in ownership."_)

---

[8] Evidence is also available to show the court of three (3) "missing" shares in one of the undersigned's brokerage accounts at Citibank, NA, which, among other reasons, make it difficult to get an accurate share count.

[9] This evidence was presented to the Debtor's proposed Counsel Klehr Harrison Harvey Branzburg on May 17, the same day on which the undersigned became aware of the existence of Dkt. No. 225.

[10] This evidence, a 3-page print out from Compuershare.com was shared with Debtor's Counsel on May 17, 2024 via email. The undersigned will bring this evidence to court printed out, but is also willing to share it via email. The reason "privileged and confidential – for settlement purposes only" treatment is being sought is because the undersigned would like to maintain its stock transactions to the extent possible as a private matter.

6.  The cause of this "mistake" or "error" may be significant in that it could sway an election for a director or other important corporate governance matter, such as the outcome of a rights offering to refinance and recapitalize a corporation.[11] Beyond the important discrepancy in economic rights, 250 votes could be very significant if it were in the margins of victory, and the federal courts of the United States seem to still favor fair and honest elections despite political forces that may attempt otherwise (See, e.g. <u>Yang v. Kosinski</u>, No. 20-1494 (2d Cir. 2020).

7.  The question then is who is keeping Computershare, the Debtor's transfer agent, in check if not the Debtor's and the Debtor's Counsel, if they are offering erroneous evidence to a federal court of these United States? A Shareholder's Committee could do this.

**B.  Limited Objection 2: Assuming a total share outstanding of 3,746,725[12] shares of common stock, there is shareholder concern over the effect and impact of Debtor Motion 8 and its corresponding in force Interim Order 83 Concerning the Debtor's Common Stock / Proposed Final Order (Dkt No. 375)**

8.  As discussed in the status conference of May 31, the Debtor's last 10-k references $352 million in state (as opposed to federal or local) net operating loss tax attributes.[13] While sophisticated buyers may know this and make their own tax law valuations, this fact seems relevant and even if not required in the motion, could be of potential value to an acquirer looking at potentially acquiring a publicly traded stock with a 400-500 store globally distributed footprint and most-excellent online omnichannel platform for cloth shopping.

---

[11] Would Sears or Bed Bath & Beyond or countless other bankrupt companies had, given the opportunity to recapitalize with a rights offering, or a merger, still be around today? Barnes & Noble Education, Inc., for example, today is holding a shareholder meeting to approve a rights offering to recapitalize, which, had shareholder's had proper representation in this Honorable Court, may have been, or could still be, a possibility for recapitalizing the Debtor.

[12] The Song Declaration shows there are 3,746,580 shares, but the data within is wrong, since the undersigned owned 2,000 shares as of the Petition Date, and not 1,750 as shown in the Song Declaration. Question/Objection: why is Stretto entering this evidence rather than the many (8?) sworn officers of this Court?

[13] See Debtor's last 10-k filed with the SEC on March 31, 2023, p. 69, "As of January 28, 2023, the Company had U.S. state net operating loss carryforwards of $352.0 million."

9. **Most importantly, the Total Shares Issued and Outstanding needs to be corrected in the Proposed Final Order (Dkt No. 375)**.

10. Dkt No. 83 (the interim order) and the proposed final order No. 375 operates as a restriction on transfer of the Debtor's common stock, and it is widely known Delaware case law that restrictions on transfer should be as least onerous as possible and must be reasonable under the circumstances. Since it effectively works as a poison pill to restrict an acquirer of the stock, the restriction needs to be weighed with the potential benefits. While the undersigned is not a tax attorney by any shape or form, 4.9% (as opposed to 4.5%) seems to make more sense to allow a less restrictive approach, but most importantly, the Debtor and the Debtor's Counsel erred in calculating the restriction. 4.5% as total number of shares is **168,602.625** and not 156,285, which is referenced eight (8) times in the Interim Order and Dkt No. 375 Proposed Final Order (erroneously calculated with solely the Cede & Co. owned and not total shares outstanding).[14] This is ever the more important with, for example, fashion guru Gerard Guez slightly more than a five (5) percent position (see Dkt No. 1, and Dkt No. 181, Sch. 2).

### IV. Please Take Judicial Notice of Additional Salient Facts to Support the Need for a Shareholder's Committee and/or Related Relief Beyond Mere Monetary Relief

11. The Debtor's have stated in SEC Form 10-K-NT that they cannot timely file their annual report (filed with the SEC on May 6, 2024). They have also filed Form 15-12g, which is a go dark filing, so that they may be able to potentially skirt their public company reporting obligations and cover up what appears to be gross mismanagement. These are relevant as the

---

[14] A Shareholder's Equity Committee would have likely caught this error. Moreover, a Shareholder's Equity Committee with the right tax professional would help make the Debtor's Estate as attractive as possible for a potential acquirer; not just a purchaser of the Company's prime assets.

Chair of the SEC, Gary Gensler, recently stated regarding the SEC's approach to fail-to-delivers, "We prefer a policy and procedures approach."[15] It is submitted that this Honorable Court, the shareholders, and every investor from here to Tokyo and Buenos Aires and in between prefers a ***rule of law*** approach since contract law, and securities law, by their very nature, requires certainty and enforcement.

12. Since the Debtor is having such evident trouble managing its affairs, this Court should be receptive to ordering a shareholder meeting, which would have the additional important benefit of helping to determine who are the shareholders of the Debtor. In the Debtor's last DEF 14A filed with the SEC on April 28, 2023 for a June 7, 2023 shareholder meeting, Chairwoman of the Board stated "Leveraging the WHP Global partnership, we expect to drive accelerated, long-term growth through the acquisition and operation of a portfolio of brands." The undersigned has at least one question for the Chairwoman: what is happening with the Company's stock?

13. Unfortunately, when the Debtor's (eight?) Counsel so firmly stated concerning the undersigned:

**In eighteen[16] pages of baseless allegations levied at the Debtors' management and advisors, Mr. Kurzon fails to provide any evidence demonstrating that there is a possibility of any recovery for equity holders, much less a substantial likelihood. There**

---

[15] See Dr. Susanne Trimbath, PhD's, a widely recognized and respected author on financial market mechanics and "plumbing", tweet "When asked "what are your views on EU style penalties" for settlement fails #FTD, Gensler dodged a bit then said **"we chose to go with the policies and procedures approach... It's a bit of market practice plus regulatory oversight."** Q&A 14:19:00 in video." available at: https://x.com/SusanneTrimbath/status/1790826042544038303 (last viewed June 4, 2024) concerning Gensler's appearance at a European forum "Roundtable on Shortening the Settlement Cycle in the EU, 25 January 2004, Brussels, available at: https://webcast.ec.europa.eu/roundtable-on-shortening-the-settlement-cycle-in-the-eu (last visited June 3, 2024).

[16] This seems to be [Sic] for 28 as the undersigned's initial motion paper was 49, which included his declaration, among tons of other evidence for anyone willing to look inside.

**is none. Mr. Kurzon's request for the appointment of an equity committee should be denied. [Dkt 364, p. 4][17]**

They failed to see many of the facts presented to which this Honorable Court may wish to take judicial notice. Or they have deliberately failed to share pertinent information to which a business owner and investor should be made aware under Delaware (DGCL) and federal laws (e.g. the Securities Act of 1934).

14. As argued in Dkt No. 181, the Debtor is an international company with an international brand and with international investors. (see Dkt No. 181, p. 11, also see Dkt No. 181, list of "equityholders" e.g. Dimensional International Core Equity Fund and Morgan Stanley & Co International plc (*ibid*). *See also,* Debtor's Motion to Hire *KPMG INTERNATIONAL Limited (Dkts No 354 and 355*) and one of Debtor's Insurer American International Group and Lloyd's, a well-known insurer and reinsurer from London *(Dkt No. 355-3, p. 63)*. It is therefore possible, even probable, that the Debtor's stock is cleared not only through the American clearing houses, but also European ones.

> Today, three of the world's largest financial market infrastructures (FMIs) – DTCC, Clearstream and Euroclear – in collaboration with Boston Consulting Group (BCG), unveiled a blueprint for establishing an industry-wide digital asset ecosystem to drive acceptance of tokenised assets.
> By 2030, the tokenisation of global illiquid assets is projected to be a US\$16 trillion business opportunity. [18]

---

17 The lawyer joke comes to mind: "Were you lying now, or were you lying then?" See also, AdvancingExpress.com, FAQ's "Should I sell my stock now?" and response "We are not in a position to offer investment advice. Please contact your investment advisor to discuss the options available to you."
available at: https://www.advancingexpress.com/shareholder-faq (last visited June 5, 2024). While the undersigned is not a financial advisor either, it seems that the Debtor's witness has implied the Company's stock could be purchased outright for \$420 million, which is apropos given that this is a "meme" stock. (See Kamlani Declaration at Dkt No. 366, p. 5 "clear in excess of at least \$419 million")
18 "DTCC, Clearstream and Euroclear develop framework to advance adoption of digital assets," May 9, 2024, available at: https://www.clearstream.com/clearstream-en/newsroom/240529-3979370 (last visited June 4, 2024)

15. In the undersigned motion for an equity committee the DTCC, Euroclear and Clearstream
were all mentioned because the Debtor mentioned this themselves in their last 10-K filed
March 31, 2023 (more than 14 months ago) (**emphasis added**):

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

Our common stock trades on the NYSE under the symbol "EXPR". As of February 25, 2023, there were approximately 31 holders of record of our common stock. The number of holders of record is based upon the actual number of holders registered at such date and does not include holders of shares in "street name," or persons, partnerships, associates, corporations, or other entities identified in security position listings maintained by **depositories**.

If the Debtor's stock only used the DTCC (the largest American clearing agency, which is
owned by the ABL Lenders, as a "market participant"), they would have so stated to avoid any
10b-5 (anti-fraud provision under the '34 Act) liability. Instead, they chose to state the stock has
multiple depositories (plural), which in addition to Europe, could include Canada, and Latin
America and elsewhere, or perhaps they were referencing swaps depositories[19] which discussion
is highly important but beyond the limited scope of this sur-reply. Presumably the non-US
clearing firms have not been notified of these proceedings since the Debtor's delisted from the
NYSE (see SEC Form 8-k filed March 6, 2024) and has stated it would be too expensive to
notify individual equity holders.[20]

16. Dkt No, 181 states the law found at 11 U.S. Code § 1102, and the Debtor's Counsel
graciously expounds on it *generally* with case law, failing to state this is not a general
bankruptcy of any kind, shape or form. The purpose of the law is written in plain black letters
of the law: "**assure adequate representation of creditors or of equity security holders.**" [21]

---

[19] E.g. ICE Clear Credit, which clears trillions in derivatives trades, see https://www.ice.com/clear-credit (last visited June 5, 2024)

[20] In the KPMG International Limited motion and the Hilco Motion, the Debtor's list approximately 100 big financial institutions as "equityholders," which how they know, to the Undersigned's knowledge, has not been revealed, but should, as well as how "equityholder" is defined. Market mechanics are often described as plumbing because …

[21] See 11 U.S. Code § 1102(a)(2). The undersigned, behind Cede & Co. and WHP Global, is the third largest legal (as opposed to "beneficial") equity holder of the Debtor, which the undersigned believes the Court should consider.

Shareholders, as owners of the Company, have a clear interest in transparency, fairness, and the protection of their investments. And the giant elephant in the room, referenced in Dkt No. 181, has yet to be addressed in this Honorable Court (see Dkt No. 181, p. 4) and must be addressed since it is alleged that naked shorting of common stock has helped destroy this and many and other American and international companies such as the Debtor herein.

## IX. Conclusion and Relief Sought

Markets, like bankruptcy hearings, are supposed to be free, fair and transparent. With the Debtors, presenting the possibility of real value to its stock under the right circumstances for the right buyer at the right time, the Debtor, with proper protection from this Honorable Court, can potentially salvage its shareholders and salvage the deep value within its stock.[22]

Given the foregoing, the undersigned requests relief from this Honorable Court with the following:

A. Modification to the Company's Interim Order at Dkt 83 via the proposed final order Dkt No. 375 to (1) get the total shares outstanding and related calculations correct (2) consider moving the 4.5% restriction to 4.9% so as to be the least restrictive and protect existing shareholders and (3) modifying the order to get a SHARE COUNT to learn the extent of the torts and crimes inflicted on the Debtor's stockholders[23];

B. Order the U.S. Trustee herein to appoint an Equity Security Committee made up of willing stockholders and "equityholders" (or, in the alternative, a related equitable compromise such as a special neutral examiner) with securities law, forensic auditing and tax law experience with power to investigate (subpoena) all persons and entities

---

[22] The undersigned is not an investment advisor and encourages anyone interested in the Debtor's common stock to do thorough research and consult with their financial advisors (and attorneys) before trading the Debtor's stock.
[23] A quick and poorly drafted attempt at this was made by the undersigned in Ex A to Dkt No. 181 at p. 30.

so as to protect and preserve the value of the Debtor's estate for the benefit of all

stakeholders;

C.  All other relief the Court deems just and proper using its inherent powers at law and

in equity.

Respectfully submitted, *Pro Se*

*Reserving all rights and waiving none,*

/s/ Jeffrey M. Kurzon

Jeffrey M. Kurzon
*Pro Se* Shareholder
P.O. Box 454
Peterborough, NH 03458
Phone: 212-203-8918
Email: Jeff@Kurzon.com

EXHIBIT A – SHARE DATA FROM FINTEL.IO, A SEC DATA AGGREGATOR[24]

| Date | Price | Fail to Deliver Quantity | VOLUME FROM DAY | Short Interest |
|---|---|---|---|---|
| 2024-04-22 | 0.7 | 1,929 | 444,200 | |
| 2024-04-16 | 0.77 | 518 | 22,300 | |
| 2024-04-15 | 0.75 | 41 | 19,100 | 234,053 |
| 2024-04-10 | 0.7 | 7,140 | 39,800 | |
| 2024-04-09 | 0.71 | 11,220 | 32,400 | |
| **2024-04-08** | **0.66** | **28,397** | **41,700** | |
| 2024-04-05 | 0.67 | 6,124 | 92,600 | |
| 2024-04-03 | 1.3 | 39 | 253,800 | |
| 2024-04-01 | 1.3 | 27 | 40,400 | |
| 2024-03-28 | 1.45 | 1 | 31,500 | 219,957 |
| 2024-03-20 | 1.27 | 100 | 7,800 | |
| 2024-03-19 | 1.34 | 100 | 22,700 | |
| 2024-03-18 | 1.27 | 118 | 51,200 | |
| 2024-03-15 | 1.37 | 1,666 | 33,800 | 265,240 |
| **2024-03-13** | **1.33** | **46,291** | **70,900** | |
| 2024-03-12 | 1.3 | 9,663 | 123,200 | |
| **2024-03-11** | **1.6** | **95,521[25]** | **211,500** | |
| 2024-03-08 | 1.72 | 789 | 187,100 | |
| 2024-03-07 | 2.29 | 854 | 799,100 | |
| 2024-03-06 | 2.23 | 11,590 | 142,400 | |
| 2024-03-05 | 2.54 | 1,356 | 229,300 | |
| 2024-02-29 | 2.61 | 323 | 104,000 | 569,343 |
| 2024-02-28 | 2.78 | 335 | 188,500 | |
| 2024-02-27 | 2.52 | 335 | 220,900 | |
| 2024-02-26 | 2.64 | 317 | 117,500 | |

[24] SEC Fail to deliver (FTD) data is so opaque as to be unusable without computer science training. The SEC has done little to nothing meaningful to protect the household investor. This data was brought into evidence with Dkt 181, page 38, para 24 of the Shareholder Declaration. The Proposed Debtor Counsel must have missed it, so it is put here in full and in plain sight. When securities are systemically sold and not delivered, by apparent deliberate lack of SEC enforcement, the system is broken, which compels the judiciary as an equal branch of government to act.

[25] Referenced in Shareholder Declaration, Dkt No. 181, para 24.

| | | | | |
|---|---|---|---|---|
| 2024-02-23 | 2.59 | 16,612 | 195,300 | |
| 2024-02-22 | 2.69 | 24,096 | 125,600 | |
| 2024-02-21 | 2.54 | 16,906 | 145,700 | |
| **2024-02-20** | **2.83** | **160,567** | **204,900** | |
| **2024-02-16** | **2.76** | **94,191** | **338,400** | |
| 2024-02-15 | 2.04 | 55,270 | 2,907,800 | **602,114** |
| 2024-02-13 | 3.75 | 7,029 | 1,179,300 | |
| 2024-02-12 | 4.28 | 3,006 | 502,400 | |
| 2024-02-09 | 3.89 | 13,015 | 130,100 | |
| 2024-02-08 | 3.83 | 8,901 | 55,200 | |
| 2024-02-07 | 3.92 | 20,461 | 90,300 | |
| 2024-02-06 | 4.05 | 18,275 | 179,300 | |
| 2024-02-05 | 5.01 | 4,600 | 305,600 | |
| 2024-02-02 | 6.12 | 9 | 222,500 | |
| 2024-02-01 | 7.16 | 3,402 | 235,900 | |
| 2024-01-31 | 7.12 | 2,073 | 37,700 | **469,790** |
| 2024-01-30 | 7.14 | 2,661 | 29,000 | |
| 2024-01-29 | 7.2 | 950 | 19,600 | |
| 2024-01-26 | 7.29 | 350 | 22,600 | |
| 2024-01-25 | 7.4 | 1,395 | 23,200 | |
| 2024-01-24 | 7.45 | 1,588 | 28,500 | |
| 2024-01-23 | 7.36 | 252 | 18,800 | |
| 2024-01-22 | 7.45 | 1,106 | 29,000 | |
| 2024-01-19 | 7.4 | 5,585 | 22,100 | |
| 2024-01-18 | 7.4 | 1,362 | 32,900 | |

Sources: https://fintel.io/ss/us/expr (last visited June 1, 2024) and https://fintel.io/ss/us/exprq (last visited June 1, 2024)  … the volume data was found at yahoo.finance.com (last visited June 1, 2024). The SEC has this data and seemingly chooses to ignore it.

**Bold fields above** are used to highlight the absurd ratios of fail to deliver (FTD) quantities to total daily volume. For every security sold and not delivered, a robbery is occurring. This is partially why our groceries cost so much. Printing fake stock is the functional equivalent to printing fake currency.

EXHIBIT B: to Sur-Reply Re Dkt No. 181



**DIVE BRIEF**

# Express CEO seeks to ease bankruptcy concerns

In a memo on Wednesday, Stewart Glendinning said the apparel retailer is awaiting a $52 million CARES Act payment to help with long-term liquidity.

Published Feb. 15, 2024


Nate Delesline III
Reporter

*The Exterior of an Express retail store at the American Dream Mall. The company said a $52 million CARES Act payment will help improve long-term liquidity. Courtesy of Express Inc.*

## Dive Brief:

- Express Inc. CEO Stewart Glendinning in a memo Wednesday tried to ease bankruptcy concerns following a Monday report from The Wall Street Journal that said the retailer had retained debt restructuring firms and that a filing could be imminent.

- Glendinning said the retailer is taking action and working with vendors and landlords to preserve its short-term liquidity while it awaits a "significant" payout from the IRS under the Coronavirus Aid, Relief and Economic Security Act, according to the internal memo obtained by Retail Dive.

- The company is seeking to expedite the $52 million payment by breaking it into two installments — a $43 million payment, which all the stakeholders agree to, and a $9 million payment, which was under review as of late November. Express also anticipates a $5 million reduction in its 2022 income taxes. The

CARES Act payout is expected to provide "a substantial cash infusion into the business."

**Dive Insight:**

Glendinning has led the company since September following the resignation of CEO Tim Baxter. In his note to employees, Glendinning sought to downplay concerns that emerged this week about the company's liquidity and long-term outlook.

"Headlines rarely tell the full story, and I want you to be armed with the facts," Glendinning said. "We have made tremendous progress in our transformation over the past several months: We implemented a series of cost-savings initiatives, made changes to our workforce and streamlined our processes to enhance the efficiency of our operations."

Interim Chief Financial Officer Mark Still said during the company's third-quarter earnings call in November that approval from the IRS and the Congressional Joint Committee on Taxation is required for the disbursal of the CARES Act payments. Regarding the CARES Act payments, a source close to the company said it is now mainly a question of timing on when the cash will be received.

Express has not had any discussions with lenders regarding possible debt restructuring, the source told Retail Dive. Additionally, Kirkland & Ellis has worked with Express since the company went public in 2010, and restructuring advisory firm M3 was brought on at the request of lenders when the company entered a previous loan, the source said.

"We have acted with urgency and accomplished a lot in a short period of time, and I am grateful for your efforts," Glendinning said in the memo. "I also recognize that all of this change was not

easy, but it was necessary to position our organization for the future."

The retailer has initiated several changes to improve performance since the height of the pandemic when consumer interest in Express' core offering — business casual apparel — fell as work-from-home arrangements surged.

WHP Global closed on a strategic partnership with Express last January. The two entities formed an intellectual property joint venture where WHP contributed $235 million for a 60% stake, while Express retained 40%. In November the two entities announced plans for express to grow internationally, expanding into Central America and Mexico.

Alongside its namesake brand, the company also operates Bonobos, which it acquired with WHP Global for $75 million, and UpWest.

The company in August initiated a reverse stock split, which decreased outstanding shares but enabled the company to regain listing compliance with the New York Stock Exchange after receiving a delisting warning. At the same time, Express also cut 150 jobs.

The retailer in late November also lowered its full-year guidance for 2023. It now expects net sales to reach $1.84 billion and $1.87 billion, down from previous guidance of $1.9 billion to $2 billion.