IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| EXPRESS, INC., *et al.*,[1] | ) ) ) | Case No. 24-10831 (KBO) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF
ADAM KEIL IN SUPPORT OF
OF THE ORDER (I)APPROVING ASSET PURCHASE
AGREEMENT; (II) AUTHORIZING AND APPROVING
SALE OF CERTAIN ASSETS OF DEBTORS PURSUANT TO
SECTION 363 OF THE BANKRUPTCY CODE FREE AND CLEAR
OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (III)
APPROVING THE ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365
OF THE BANKRUPTCY CODE; (IV) AUTHORIZING THE DEBTORS TO CONSUMMATE
TRANSACTIONS RELATED TO THE ABOVE; AND (II) GRANTING RELATED RELIEF**

I, Adam Keil, make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director of Moelis & Company LLC (together with its affiliates, "Moelis"), the proposed financial advisor and investment banker to the above captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration")[2] in support of the *Order (I) Approving Asset Purchase Agreement; (II) Authorizing and Approving Sale of Certain Assets of Debtors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Bidding Procedures Order, the Bidding Procedures, the First Day Declaration or the Stalking Horse APA.

*Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (III) Approving the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (IV) Authorizing the Debtors to Consummate Transactions Related to the Above; and (V) Granting Related Relief* (the "Sale Order").[3]

3. I am familiar with the marketing process and negotiations related to the asset purchase agreement (the "Stalking Horse APA") with Phoenix Retail, LLC (the "JV Purchaser"), a consortium to consist of PHXWHP, LLC, an affiliate of EXPWHP, LLC and affiliates of certain of the Debtors' landlords, specifically, SPG Fashion Retail, LLC and BPR Acquisitions LLC, attached as Exhibit A to the Debtors' *Revised Notice of Selection of Stalking Horse Bidder* [Docket No. 414] (the "Stalking Horse Notice"), filed on June 5, 2024. I am also familiar with the Debtors' process for selecting the JV Purchaser's bid as the highest or otherwise best bid to purchase the applicable Assets (the "Successful Bid").

4. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Moelis working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I have overseen the Moelis team, which, since March 2024, has been one of the principal restructuring advisors to the Debtors. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the prepetition and postpetition

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures Motion, the Bidding Procedures Order, or the Bidding Procedures.

marketing and financing efforts. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Background and Qualifications**

5. Moelis is a leading international investment banking and financial advisory firm (NYSE: MC) with approximately 1,200 employees in locations around the world. Moelis provides a broad range of investment banking and financial advisory services including (a) mergers and acquisitions, (b) recapitalization & restructuring, (c) capital markets advisory, and (d) private funds advisory. Moelis has been, and is, involved in large and complex restructuring cases throughout the United States, including representing debtors, creditors, acquirers, and official committees in numerous chapter 11 cases in this and other districts.

6. I am a Managing Director of Moelis in Moelis' New York office, located at 399 Park Avenue, 4th floor, New York, NY 10022. Moelis is the financial advisor and investment banker to the Debtors. As a Managing Director, I am responsible for the day-to-day activities of the Moelis deal team in this engagement. I have 23 years of experience in investment banking, providing in-court and out-of-court recapitalization and restructuring advisory services to companies, creditors, sponsors, and other interested parties. Furthermore, I have specific expertise in chapter 11 bankruptcies, distressed mergers and acquisitions, lender negotiations, and distressed financings.

7. Prior to joining Moelis in 2008, I spent approximately eight years in the Recapitalization and Restructuring Group at Jefferies & Company, Inc. I received a B.S. in Economics with concentrations in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

8. Since I began my career, my experience has included involvement in the chapter 11 cases of major consumer product and retail companies, such as A&P, Cengage Learning, Inc., Motor Coach Industries International, Inc., Orchard Supply Hardware, Party City Holdco Inc., Sbarro LLC, Simmons Co., Toys R Us, Inc., Vlasic Pickles, and Winn-Dixie. I have also been involved in major chapter 11 cases across a range of industries, including but not limited to ATD Corporation, C&J Energy Services Ltd., Hornbeck Offshore Services Inc., iHeartMedia, Inc., Internap Technology Solutions Inc., Knotel, Inc., MD Helicopters Inc., NewPage Corporation, SFX Entertainment Inc., Sungard Availability Services, L.P., Talen Energy Supply, LLC., and WeWork Inc.

9. The Debtors engaged Moelis on March 11, 2024 to serve as their financial advisor and investment banker in relation to any potential restructuring transaction, sale transaction, or capital raising transaction, including the Debtors and their non-Debtor operations. I understand that the Debtors chose Moelis for these roles because of our expertise on issues relating to financially distressed companies and our extensive experience acting as an advisor in both in-court and out-of-court restructurings of companies of all sizes across a wide array of industries. Moelis and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate compensated professional in various capacities in numerous chapter 11 cases in this and other districts. I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of the Bidding Procedures Motion.

## The Marketing Process

10. Based on my experience and involvement with the sale and marketing process for a potential Sale Transaction (the "Marketing Process"), I believe that the Debtors conducted a thorough and fair Marketing Process transparently and in good faith.

11. As described in my Previous Declarations,[4] which I incorporate here by reference, in the six weeks leading up to the Petition Date, the Debtors, with the assistance of Moelis and their other advisors, launched a marketing process for a potential Sale Transaction (the "Marketing Process"). Immediately upon commencement of the Marketing Process, the Debtors and my team reached out to the Debtors' joint venture partner, WHP Global (through its subsidiary EXPWHP LLC) to relay the Debtors' plan to launch the process as they searched for solutions for the Debtors' financial and operational headwinds. EXPWHP, LLC—a direct subsidiary of WHP Global—is the majority owner of the intellectual property of both Express and Bonobos following the series of transactions in 2023 where WHP Global acquired a 60% ownership interest in an intellectual property joint venture, EXP Topco, LLC to which Express contributed certain of its intellectual property assets. Because of this dynamic between WHP Global and the Debtors, the Debtors understood that WHP Global would likely be a participant in any transaction.

12. Nonetheless, the Debtors, the management team, and advisors were focused on ensuring that the Marketing Process canvassed the entire market for potentially interested parties that could provide a solution either alongside WHP Global or independently. The Debtors initially explored transaction alternatives on both an in-court and out-of-court basis, however, it quickly became apparent that, as robust as it was, the prepetition Marketing Process, would not yield a Sale Transaction out-of-court. The Debtors explained this reality to interested third parties, and

---

[4] *See Declaration of Adam Keil in Support of the Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. 42]; *Supplemental Declaration of Adam Keil in Support of the Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. 380]

5

they worked expeditiously with interested parties to understand paths for a going-concern transaction through an in-court process.

13. Ultimately, on the eve of the commencement on these cases, the Debtors obtained a non-binding letter of intent provided by a prospective joint venture comprised of WHP Global and the Debtors' two largest landlords, Simon Property Group, L.P. and BPR Acquisitions LLC, (the prospective joint venture entity, "Phoenix JV") attached as Exhibit C to the First Day Declaration.

14. The Debtors filed these chapter 11 cases with the goal of continuing their prepetition marketing efforts to attempt to enter into a Sale Transaction(s) with the highest or otherwise best offer (or offers) for the benefit of all stakeholders. Accordingly, the Debtors, with the support of their key creditor constituencies, filed the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing The Assumption And Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 41] (the "Bidding Procedures Motion"). Although the Bidding Procedures Order was recently entered on June 6, 2024, the Debtors complied with and relied upon the established parameters under the Bidding Procedures for the Marketing Process throughout the entirety of the Marketing Process. The entire Marketing Process ran for approximately 90 days, including 50 days following the Petition Date, and it included outreach for both going-concern and liquidation transactions.

15. This continuation of the Marketing Process involved a months-long process in which the Debtors and their advisors sought strategic and financial investors to effectuate the

highest or otherwise best transaction available under the circumstances and included regular discussions and consultation with the requisite parties described in the Bidding Procedures, including the official committee of unsecured creditors (the "<u>Committee</u>"). Throughout this process, the Debtors kept certain key stakeholders and parties-in-interest, including Marketing Process participants, informed of the status of key developments in the Marketing Process. On May 22, 2024, in accordance with both the Bidding Procedures and DIP Order (milestones thereunder), the Debtors entered into the Stalking Horse APA with the JV Purchaser, which preserved the going-concern transaction timeline under those milestones. By the Bid Deadline, the Debtors also received bids for enterprise-wide liquidation transactions.

16. Overall, the Debtors and their advisors contacted 52 parties pre- and postpetition in connection with a going-concern transaction and five parties in connection with a liquidation. Additionally, in accordance with the Bidding Procedures, the Debtors filed the *Notice of Auction* [Doc. No. 429] on June 6, 2024, and published the Auction Notice in the *New York Times (National Edition)*. In accordance with the Bidding Procedures, on June 12, 2024, the Debtors consulted with the Bidders and Consulting Parties and determined that no formal Auction was necessary as the Debtors' and their advisors determined that no other bids were higher or otherwise better than the Stalking Horse Bid. The only competing bids for substantially all of the Debtors' assets contemplated a full liquidation of the Debtors' businesses. Due, in part, to the substantial increase to the unsecured claims pool that would occur in the event of a liquidation, the going-concern transaction is anticipated to provide substantially greater value to the creditors of the Debtors' estates. The Successful Bid contemplates a going-concern transaction that provides a material amount of cash consideration, preserves the vast majority of employees' jobs, allows the assignment of intellectual property, provides for the payment of all secured and administrative

claims, and generates the highest potential recovery currently available for holders of general unsecured claims by eliminating liabilities and reducing the potential size of the claims pool. Additionally, the Successful Bid allows the Debtors to retain certain assets, including but not limited to cash and deposits, certain contracts, personal data, and certain equity interests.[5] I understand that both the JV Purchaser and the Debtors have indicated that they are willing and able to consummate the transactions contemplated by the Stalking Horse APA on the terms set forth therein.

17. I believe, based on my involvement in the Marketing Process and my experience as an investment banker, that the Marketing Process and Bidding Procedures provided the Debtors with a reasonable amount of time to solicit and potentially identify and select a higher or otherwise better bid for the Acquired Assets than the sale transaction contemplated to be effected pursuant to the Stalking Horse APA, and, similarly, afforded interested parties a reasonable opportunity to conduct due diligence prior to submitting their proposals or bids.[6] The foregoing view is informed by the duration and scope of the Marketing Process described above, the due diligence conducted by potential interested parties, the feedback obtained from the parties solicited, as well as from the parties who submitted proposals and/or with whom the Debtors engaged in related negotiations. Given the foregoing, I believe that the Sale Transaction contemplated to be effectuated pursuant

---

[5] *See* Stalking Horse APA, Section 1.3.

[6] The Marketing Process in these cases lasted for approximately 90 days (of which approximately 50 days since the Petition Date), which is comparable in length to other recent marketing processes in this and other jurisdictions. *See e.g.*, *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. 2023) (marketing process spanned less than 50 days postpetition); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. 2023) (marketing process spanned approximately 60 days postpetition); *In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. 2023) (marketing process spanned approximately 90 days postpetition); *Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del. 2020) (marketing process spanned approximately 120 days postpetition); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. 2023) (marketing process spanned approximately 120 days postpetition); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. 2023) (marketing process spanned approximately 180 days); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. 2023) (marketing process spanned approximately 150 days).

to the Stalking Horse APA is the highest or otherwise best bid presently available to the Debtors under the circumstance.

### Selection of the Successful Bid

18. On May 22, 2024, the Debtors entered into the Stalking Horse APA with the JV Purchaser. On May 24, 2024, the Debtors filed the Stalking Horse Notice, with the Stalking Horse APA attached as <u>Exhibit A</u> thereto [Docket No. 305]. On June 5, 2024, the Debtors filed a revised Stalking Horse Notice, with the Stalking Horse APA again attached as <u>Exhibit A</u> thereto [Docket No. 414]. By the Bid Deadline of June 11, 2024, the Debtors had received three Bids for substantially all of the Debtors' assets—the Stalking Horse APA and two liquidation bids—and one additional Bid for one subset of the Debtors' business. The Debtors deemed that the two Bids for a liquidation transaction to be Qualified Bids in the context of a liquidation that could be called upon in the event that the going-concern transaction contemplated under the Stalking Horse APA does not close by the outside date thereunder and the Debtors pivot to a liquidation.

19. The Debtors worked with the Acceptable Bidders to determine whether each Bid constituted a Qualified Bid. The Debtors, in discussion with the Consultation Parties, determined that the two Bids for liquidation transactions would be Qualified Bids in the unlikely scenario that the Stalking Horse Bid was not consummated.

20. The Bid the Debtors received for a subset of the Debtors' business was for the UpWest IP and certain UpWest inventory. After evaluating the Bid, the Debtors determined that the Bid did not provide significant benefit to the estate in excess of what is provided for in the Stalking Horse APA after consideration of the associated cost and potential uncertainty associated with such Bid. The Stalking Horse APA contemplates purchase of the UpWest IP, and the Debtors will retain the UpWest inventory and liquidate it in connection with a winddown of that business

unit through e-commerce channels. I understand that the Debtors and M3 believe this winddown and the consideration provided by the Stalking Horse APA will provide substantially higher value to the estate than the bid for UpWest.

21. In addition to the Stalking Horse Bid and the Bid for the UpWest assets, the Debtors also received two liquidation bids (the "Liquidation Bids"). The Debtors deemed the Liquidation Bids to be Qualified Bids for purposes of a liquidation transaction. The Debtors engaged closely with the Consultation Parties and the Acceptable Bidders regarding the Liquidation Bids, and explained the criteria on which the Debtors were evaluating each of the Qualified Bids and how the Liquidation Bids would need to be improved. The Debtors engaged in this process to ensure that they were receiving the highest and best bids available. In the unlikely scenario where the going-concern transaction is not consummated by June 21, 2024 (or a date agreed upon by the Debtors, the JV Purchaser, and the Consultation Parties) the Liquidation Bids may be further considered by the Debtors.

22. Ultimately, the Debtors determined that the Stalking Horse Bid was the highest and best Bid for the reasons set forth herein. In assessing the Bids relative to the Stalking Horse Bid, the Debtors considered the key elements of the Stalking Horse Bid, which contemplated a going-concern transaction that assumed numerous contracts, leases and ensured continued go-forward engagement with hundreds of contract counterparties as well as a significantly reduced general unsecured claims pool compared to that of the liquidation transaction contemplated under the other Bids.

23. As provided in the Bidding Procedures, the Debtors may consider the following factors as well as any other factors that the Debtors deem appropriate: "(a) the amount, nature, and timing of the total consideration, which includes but is not limited to, assumed liabilities

(Administrative liabilities, cure payments), and the amount of Unexpired Leases and Executory Contracts; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; (e) whether the Qualified Bid contemplates a Sale Transaction(s) that would be consummated through a Plan or a sale pursuant to section 363 of the Bankruptcy Code; (f) the certainty of a Qualified Bid leading to a confirmed Plan; and (g) any other consideration that may impact the Debtors stakeholders." *See* Bidding Procedures, section XII

24. Along with the Debtors (and in consultation with the Committee), Moelis, M3 and Kirkland developed additional financial criteria by which they could compare differing bid structures given that the Debtors had received or were expecting to receive bids for a going-concern transaction, a liquidation transaction, fee/agency bids for a liquidation process, and bids solely for some or all of the Debtors' intellectual property interests. Additional financial criteria that the Debtors and their advisors included in their evaluation and analysis of the effect on the Debtors' stakeholders consisted of (i) total cash consideration and the associated timing of receiving the cash consideration; (ii) amount of assumed liabilities (if any); (iii) amount of assumed administrative and priority claims (if any); (iv) inclusion of post-closing adjustments that may reduce the final purchase price (if any); (v) whether any assets would be excluded from the potential purchaser's bid and therefore retained by the Debtors; (vi) an expectation of recovery for unsecured claims (if any); and (vii) general estimation of the general unsecured claims pool sizing under each bid and bid structure scenario, including liabilities avoided.

25. It is my understanding that the Debtors considered all of these factors when evaluating these bids. Specifically, the Debtors found that cash provided at closing, the total purchase price inclusive of administrative and priority claims, the relative certainty that the purchase price would not be subject to material reduction post-closing, the additional material value by eliminating liabilities that would otherwise limit recoveries for holders of general unsecured claims and reducing the potential size of the general unsecured pool through a going-concern transaction all weigh in favor of the Successful Bid's selection. The Debtors also considered non-financial, qualitative criteria, such as the benefit of a going-concern to the estates, including the preservation of approximately 7,500 jobs, assumption of over 450 store locations across 44 states, continued service to customers across the Express and Bonobos omnichannel retail platform and maintained relationships with many key contract counterparties.

26. Specifically, the Successful Bid, following an inventory adjustment conducted on June 7, 2024, contemplates a total purchase price of approximately $174 million consisting of approximately $136 million cash consideration and $38 million of Assumed Liabilities. I understand this number has been adjusted down due to less inventory and merchandise available for sale due to the Debtors' sales performance, the expected closing date changing from June 10th to June 14th, as well as the Debtors new understanding that certain "in-transit" merchandise was ultimately not going to be delivered to the Debtors as vendors announced their holding of certain shipments.[7] Furthermore, it is estimated that the Successful Bid reduces the general unsecured creditors' claims pool by at least $800 million.

---

[7] However, while such "in-transit" merchandise contributed to a downward adjustment in the Purchase Price, it is important to note that the Successful Bid contemplates assuming trade payables relating to certain in-transit merchandise, in turn further reducing liabilities of the Debtors.

27. Importantly, the JV Purchaser has indicated that their ability to close by no later than June 18th is dependent on successfully completing a few key operational requirements with third parties prior to the closing date and may in turn close subsequently thereafter. As a result of potential shifting in the closing date, there will be an inventory adjustment to account for any additional sales that the Debtors complete at market rates. This may result in lower inventory sold at closing of the going-concern transaction, but the Debtors will realize market value for such sales that occur in advance of the closing. As a showing of good faith, the Debtors and JV Purchaser have included in the Stalking Horse APA that in the event the transaction contemplated under the Stalking Horse APA does not close by an outside date of June 21st, then the JV Purchaser automatically forfeits 1/3 (or approximately $3.2 million) of its deposit regardless of cause. I understand such outside date can be extended subject to the consent of the Debtors, JV Purchaser, DIP Lenders, and Committee.

28. On May 24, 2024, the Debtors filed the Sale Order as <u>Exhibit B</u> to the Stalking Horse Notice. Through the Sale Order, the Debtors seek (a) authority to enter into, and approval of, the Stalking Horse APA, and (b) authorization and approval of the sale of the Acquired Assets free and clear of all liens, claims, liabilities, rights, encumbrances, and other interests (other than Assumed Liabilities) (collectively, the "<u>Sale Transaction</u>").

29. Pursuant to the Stalking Horse APA, the Sellers and the JV Purchaser have agreed to a sale of the Acquired Assets, on terms set forth in the Stalking Horse APA. The Stalking Horse APA contemplates the purchase of the Acquired Assets, free and clear of any liens or encumbrances, and the assumption of certain liabilities associated with the Acquired Assets. The Stalking Horse APA also contemplates the assumption and assignment to the JV Purchaser of Executory Contracts and Unexpired Leases as set forth in the *Notice of Assumption of Certain*

*Executory Contracts and/or Unexpired Leases* [Docket No. 446–452], with certain cure costs to be borne by the Purchaser pursuant to the terms of the Stalking Horse APA. I believe that the JV Purchaser has engaged with the Debtors in good faith throughout the Marketing and Sale Process, and in negotiations regarding the Stalking Horse APA.

30. Based on the above and my experience as a restructuring professional, I believe that the Debtors followed the procedures outline in the Bidding Procedures Order and made their decisions in good faith and according to the best interests of the Debtors' estates in order to achieve the highest or otherwise best outcome in selecting the JV Purchaser as the Successful Bidder.

## Conclusion

31. Accordingly, I believe that the Debtors engaged in a robust Marketing Process, and that the Sale Transaction and the terms of the Stalking Horse APA reflect the highest or otherwise best bid for the Acquired Assets available under the circumstances of these chapter 11 cases.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 13, 2024

/s/ *Adam Keil*
Name: Adam Keil
Title: Managing Director
Moelis & Company LLC