## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| EXPRESS, INC., *et al.*,[1] | ) ) | Case No. 24-10831 (KBO) |
| Debtors. | ) ) ) | (Jointly Administered) |

### DECLARATION OF
### KUNAL S. KAMLANI IN SUPPORT
### OF THE ORDER (I) APPROVING ASSET PURCHASE
### AGREEMENT; (II) AUTHORIZING AND APPROVING
### SALE OF CERTAIN ASSETS OF DEBTORS PURSUANT TO
### SECTION 363 OF THE BANKRUPTCY CODE FREE AND CLEAR
### OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (III)
### APPROVING THE ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365
### OF THE BANKRUPTCY CODE; (IV) AUTHORIZING THE DEBTORS TO CONSUMMATE
### TRANSACTIONS RELATED TO THE ABOVE; AND (II) GRANTING RELATED RELIEF

I, Kunal S. Kamlani, make this Declaration pursuant to 28 U.S.C. § 1746:

1.      I am a Senior Managing Director at M3 Advisory Partners LP ("M3"), the financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I submit this declaration (this "Declaration")[2] in support of the *Order (I) Approving Asset Purchase Agreement; (II) Authorizing and Approving Sale of Certain Assets of Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (III) Approving the Assumption, Assignment and Sale of Certain Executory*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128), Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Sale Order, the Bidding Procedures Order, the Bidding Procedures, the First Day Declaration or the Stalking Horse APA.

*Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (IV) Authorizing the Debtors to Consummate Transactions Related to the Above; and (V) Granting Related Relief* (the "Sale Order").

3.     A description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Stewart Glendinning, Chief Executive Officer of Express, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20] (the "First Day Declaration"). A description of the Debtors' need for an expedited sale process and current liquidity status is set forth in my *Declaration of Kunal S. Kamlani in Support of the Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets; and (VII) Granting Related Relief* [Docket No. 379] (the "Previous Declaration"), which is incorporated by reference into this Declaration.

4.     The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of M3 working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. I have overseen the M3 team serving as one of the principal advisors to the Debtors since November 2023. In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and postpetition financing efforts. I am over the age of 18 years and authorized to submit this

Declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

### The Stalking Horse Bid Represents the Highest or Otherwise Best Bid

5.     On May 22, 2024, the Debtors entered into the Stalking Horse APA with the Phoenix JV.  On May 24, 2024, the Debtors filed the Stalking Horse Notice, with the Stalking Horse APA attached as Exhibit A thereto [Docket No. 305].  On June 5, 2024, the Debtors filed a revised Stalking Horse Notice, with the Stalking Horse APA again attached thereto [Docket No. 414].

6.     By the Bid Deadline of June 11, 2024, the Debtors had received three Bids for substantially all of the Debtors' assets—the Stalking Horse APA and two liquidation bids.  In addition, the Debtors received one Bid for one small subset of the Debtors' business.  The Debtors deemed that the two Bids for a liquidation transaction to be Qualified Bids in the context of a liquidation and would be called upon in the event that the going-concern transaction contemplated under the Stalking Horse APA does not close by the outside date thereunder and the Debtors pivot to a liquidation.  Ultimately, the Debtors determined that the Stalking Horse Bid—the only going concern bid received—was the highest or otherwise best bid for the reasons set forth herein.

7.     I understand that, as provided in the Bidding Procedures, the Debtors may consider the following factors as well as any other factors that the Debtors deem appropriate in deciding on the highest or otherwise best bid: "(a) the amount, nature, and timing of the total consideration, which includes but is not limited to, assumed liabilities (Administrative liabilities, cure payments), and the amount of Unexpired Leases and  Executory Contracts; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction

contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; (e) whether the Qualified Bid contemplates a Sale Transaction(s) that would be consummated through a Plan or a sale pursuant to section 363 of the Bankruptcy Code; (f) the certainty of a Qualified Bid leading to a confirmed Plan; and (g) any other consideration that may impact the Debtors stakeholders." *See* Bidding Procedures, section XII.

8. Along with the Debtors (and in consultation with the Committee), Moelis, M3, and Kirkland developed additional criteria by which they could compare differing bid structures given that the Debtors had received or were expecting to receive bids for a going-concern transaction, bids for a liquidation transaction, fee/agency bids for a liquidation process, and bids solely for the Debtors' intellectual property interests. Additional financial criteria that the Debtors and their advisors included in their evaluation and analysis of the effect on the Debtors' stakeholders consisted of (a) total cash consideration and the associated timing of receiving the cash consideration; (b) amount of assumed liabilities (if any); (c) amount of assumed administrative and priority claims (if any); (d) inclusion of post-closing adjustments that may reduce the final purchase price (if any); (e) an expectation of a recovery for unsecured claims (if any); and (f) general estimation of the general unsecured claims pool sizing under each bid and bid structure scenario, including liabilities avoided.

9. The Debtors and their advisors considered all of these factors when evaluating these bids. Specifically, the Debtors found that the cash provided at closing, the total purchase price inclusive of administrative and priority claims, the relative certainty that the purchase price would not be subject to material reduction post-close, the additional material value by eliminating liabilities and significantly reducing the potential size of the general unsecured claims pool through a going-concern transaction all weigh in favor of the Successful Bid's selection. The Debtors also

considered non-financial, qualitative criteria, such as the benefit of a going-concern transaction to the estates, including the preservation of approximately 7,500 jobs, assumption of over 450 store locations across 44 states, continued service to customers across the Express and Bonobos omnichannel retail platform, and maintained relationships with many key contract counterparties.

10.     Specifically, the Successful Bid, following an inventory adjustment conducted on June 7, 2024, contemplates a total purchase price of approximately $174 million consisting of approximately $136 million in cash consideration and $38 million of Assumed Liabilities.  The purchase price has been adjusted down due to less inventory and merchandise available for sale due to the Debtors' sales performance, the expected closing date changing from June 10th to June 14th, as well as the Debtors new understanding that certain "in-transit" merchandise will not be delivered to the Debtors.  Furthermore, it is estimated that the Successful Bid reduces the general unsecured creditors' claims pool by at least $800 million in potential asserted claims.  The Successful Bid's significant reduction in the general unsecured creditors' claims pool compared to that of the other Qualified Bids in a liquidation directly results in a materially higher amount of recovery available to holders of general unsecured claims, many of which I understand are contemplated as contract counterparties as part of the going-concern with the Phoenix JV and, as such, supportive of a going concern transaction.

11.     Importantly, the Phoenix JV indicated that their ability to close by no later than June 18, 2024 is dependent on successfully completing a few key operational requirements with third parties that could require an additional three days.  As a result of a potential shift in the closing date, there will be an inventory adjustment to account for any additional sales that the Debtors complete to customers in the ordinary course of business.  This will result in less inventory sold at closing of the going-concern transaction, but the Debtors will realize a higher market value

for such sales that occur in the ordinary course and in advance of the closing.  As a showing of good faith, the Debtors and Phoenix JV have included in the Stalking Horse APA, that in the event the transaction contemplated under the Stalking Horse APA does not close by an outside date of June 21, 2024, then the Phoenix JV automatically forfeits one-third (or approximately $3.2 million) of its deposit regardless of cause.  I understand such outside date can be extended subject to the consent of the Debtors, Phoenix JV, DIP Lenders, and Committee.

12.     On May 24, 2024, the Debtors filed the Sale Order as <u>Exhibit B</u> to the Stalking Horse Notice.  Through the Sale Order, the Debtors seek (a) authority to enter into, and approval of, the Stalking Horse APA, and (b) authorization and approval of the sale of the Acquired Assets free and clear of all liens, claims, liabilities, rights, encumbrances, and other interests (other than Assumed Liabilities) (collectively, the "<u>Sale Transaction</u>").

13.     Pursuant to the Stalking Horse APA, the Sellers and the Phoenix JV have agreed to a sale of the Acquired Assets, on terms set forth in the Stalking Horse APA.  The Stalking Horse APA contemplates the purchase of the Acquired Assets, free and clear of any liens or encumbrances, and the assumption of certain liabilities associated with the Acquired Assets.  The Stalking Horse APA also contemplates the assumption and assignment to the Phoenix JV of Executory Contracts and Unexpired Leases as set forth in the *Notice of Assumption of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 446–452], with certain cure costs to be borne by the Purchaser pursuant to the terms of the Stalking Horse APA.

14.     My team, in connection with the Debtors, Moelis, and the Debtors' other advisors, and in consultation with the Committee, evaluated the Stalking Horse Bid and negotiated the terms of the Stalking Horse APA, particularly the Acquired Assets and Assumed Liabilities.  My team has also reviewed the provisions of the other Qualified Bids.  One of the bids received is for the

UpWest IP and certain UpWest inventory.  After evaluating the Bid, the Debtors determined that the Bid did not provide significant benefit to the estate in excess of what is provided for in the Stalking Horse APA after consideration of the associated cost and potential uncertainty associated with such Bid.  The Stalking Horse APA contemplates the purchase of the UpWest IP, and the Debtors will retain the UpWest inventory and liquidate it in connection with a winddown of that business unit through e-commerce channels.  I understand that the Debtors  believe this winddown and the consideration provided by the Stalking Horse APA will provide substantially higher value to the estate than the bid for UpWest.

15.    There are also two liquidation bids (the "Liquidation Bids"), which the Debtors deemed to be Qualified Bids in the context of a liquidation and would be considered in a scenario where the going-concern transaction is not consummated by June 21st (or a date agreed upon by the Debtors, the Phoenix JV, and the Consultation Parties).  The Debtors engaged closely with the parties regarding the Liquidation Bids and demonstrated how the Debtors were analyzing the Qualified Bids and how the Liquidation Bids were being compared against each other as well as against the Stalking Horse Bid.  The Debtors closely engaged with such parties to ensure all relevant information was available to properly inform the Liquidation Bids and ensure that the Debtors were receiving the highest or otherwise best bids through the process.

16.    I believe that the Stalking Horse APA is the highest or otherwise best bid that the Debtors received, especially given the facts that (a) it contemplates a going-concern Sale Transaction as opposed to a liquidating Sale Transaction; (b) it provides higher value than the Liquidation Bids by acquiring a significant number of Assumed Liabilities that would otherwise be the responsibility of the Debtors' estates; and (c) it materially reduces the remaining claims pool.  The Transaction is expected to result in the payment of all secured, administrative, and

priority claims.  And the Stalking Horse APA also, as described above, preserves the Debtors' business and thousands of jobs, which will benefit the Debtors' creditors for years going forward. Additionally, the Debtors' key stakeholders are in support of pursuing the Stalking Horse APA.  I understand that in the event that the Successful Bid is not consummated, the Debtors have two Qualified Bids to consider in pursuit of a liquidation transaction.

17.     The Stalking Horse APA includes fair and reasonable terms that maximize the value of the Debtors' estates for the benefit of all stakeholders, as the Debtors are duty-bound to do.  I also believe the Stalking Horse Bid represents the only viable transaction that will preserve the Debtors' operations as a going concern and is the only actionable alternative to a liquidation of the Debtors' business.  Further delays in the consummation of a sale on a going concern basis are unwarranted and unlikely to result in greater value to the Debtors' estates, particularly in light of current conditions in the brick-and-mortar retail industry.  Given the Debtors' liquidity and financial situation, consummating the going-concern transaction contemplated under the Stalking Horse APA as soon as possible is imperative to maximizing value for the Debtors' estates and ensuring that the Debtors remain administratively solvent.

18.     For these reasons, and based on my experience as a restructuring professional, I believe the Stalking Horse Bid is the highest or otherwise best bid, and the Court's approval of the Stalking Horse Bid is in the best interests of the Debtors' estates and best positions the Debtors to achieve the highest or otherwise best outcome under the present circumstances for all parties.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 13, 2024

/s/ *Kunal S. Kamlani*
Kunal S. Kamlani
Senior Managing Director
M3 Advisory Partners LP