

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

June 10, 2024

Sworn to me this 10th day of June, 2024

*[signature]*

Deborah Beshaw-Farrell
Notary Public, State of New York
No. 01BE5076617
Qualified in Kings County
Certificate on file in New York County
Commission Expires April 21, 2027

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

6/10/2024, NY & NATL, pg B4

_Larnyce Tabron_

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: EXPRESS, INC., et al., Debtors.
Chapter 11, Case No. 24-10831 (KBO)
(Jointly Administered)
Re: Docket No. 41, 427

**NOTICE OF AUCTION**

PLEASE TAKE NOTICE that on June 6, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief [Docket No. 427] (the "Bidding Procedures Order") authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction") regarding the sale or alternate value maximizing transaction with respect to certain of the Debtors' assets. The Auction will be governed by the bidding procedures attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures").

Copies of the Bidding Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to Stretto, Inc. by calling the restructuring hotline at (855) 337-3537 (toll free) and +1 (949) 617-1363 (International) or by visiting the Debtors' restructuring website at https://cases.stretto.com/Express/.

PLEASE TAKE FURTHER NOTICE that this Auction Notice will be published in the New York Times (National Edition).

PLEASE TAKE FURTHER NOTICE that the Bid Deadline is June 11, 2024, at 4:00 p.m. (prevailing Eastern Time), and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that the Debtors intend to conduct the Auction, at which they will consider proposals submitted to the Debtors and their professionals, if and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on June 12, 2024. The Auction, if necessary, shall commence on June 12, 2024, at the offices of Kirkland & Ellis LLP, Debtors' co-counsel, 601 Lexington Avenue, New York, NY 10022 at a time to be announced, which may be via remote video or in-person at the Debtors' election.

PLEASE TAKE FURTHER NOTICE that the Debtors reserve their rights to modify the Bidding Procedures in their business judgment, in any manner that will best promote the goals of the Bidding Procedures, or impose, at or prior to the Auction, additional customary terms and conditions on a Transaction, including: (i) extending the deadlines set forth in the Bidding Procedures; (ii) adjourning the Auction at the Auction; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; and (v) rejecting any or all Bids or Qualified Bids.

Dated: June 6, 2024, Wilmington, Delaware, /s/ Domenic E. Pacitti , KLEHR HARRISON HARVEY BRANZBURG LLP, Domenic E. Pacitti (DE Bar No. 3989), Michael W. Yurkewicz (DE Bar No. 4165), Alyssa M. Radovanovich (DE Bar No. 7101), 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Telephone: (302) 426-1189, Facsimile: (302) 426-9193, Email: dpacitti@klehr.com, myurkewicz@klehr.com, aradovanovich@klehr.com -and- Morton R. Branzburg (pro hac vice pending), 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103, Telephone: (215) 569-3007, Facsimile: (215) 568-6603, Email: mbranzburg@klehr.com, Co-Counsel for the Debtors and Debtors in Possession -and- KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP, Joshua A. Sussberg, P.C. (pro hac vice pending), Emily E. Geier, P.C. (pro hac vice pending), Nicholas M. Adzima (pro hac vice pending), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: joshua.sussberg@kirkland.com, emily.geier@kirkland.com, nicholas.adzima@kirkland.com -and- Charles B. Sterrett (pro hac vice pending), 333 West Wolf Point Plaza, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: charles.sterrett@kirkland.com, Co-Counsel for the Debtors and Debtors in Possession

The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128); Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8608); and Express Fashion Digital Services Costa Rica S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures (as defined herein), as applicable.

# Hey, Siri! Let's Talk About Your New Generative A.I. Makeover.

FROM FIRST BUSINESS PAGE

That has helped lead to a more conversational and versatile version of Siri, which will be shown on Monday, three people familiar with the company said. Siri will be powered by a generative A.I. system developed by Apple, which will allow the talking assistant to chat rather than just respond to one question at a time. Apple will market its new A.I. capabilities as Apple Intelligence, a person familiar with the marketing plan said.

Apple, OpenAI and Google declined to comment. Apple's agreement with OpenAI was previously reported by The Information and Bloomberg, which also reported the name for Apple's A.I. system.

Apple's move into generative A.I. will test whether the company can once again enter a new market and redefine it. While Apple didn't make the first digital music player, smartphone or smartwatch, it transformed those categories with the iPod, iPhone and Apple Watch. Now, after two years of watching Microsoft, Meta, Google and Samsung integrate generative A.I. into products, Apple is going from observer to potential challenger.

Weaving generative A.I. into iPhones is also set to be a key moment for the technology, which can answer questions, create images and write software code. Apple will broaden generative A.I.'s reach to more than a billion users and determine how useful it is for everyday iPhone customers.

To date, the technology's promise has been undercut by its flaws. Google has introduced and pared back generative A.I. search abilities that recommended people eat rocks, while Microsoft has been criticized for the security vulnerabilities of a personal computer that uses A.I. to record every second of activity.

"We're still figuring A.I. out because it's so complicated," said Carolina Milanesi, president of Creative Strategies, a tech research firm. "Apple is pretty conservative when it comes to everything, so I don't know that they will 'wow' people. But they have to do this because it will be how we interact with technology going forward."

Wall Street investors, and not Main Street consumers, are a major reason Apple is jumping into A.I. The technology has lifted the values of Microsoft, a big player in generative A.I., and Nvidia, which sells A.I. chips. In January, Microsoft dethroned Apple as the world's most valuable public tech company.

The market reshuffle happened as Apple stayed silent about A.I. The company has a policy of not sharing future product plans, but as its stock position dropped, Tim Cook, Apple's chief executive, broke protocol and told Wall Street analysts in a call in May that it would soon introduce generative A.I. offerings.

Apple's share price has rebounded since Mr. Cook made that commitment. As of Friday, Apple's stock had risen 6 percent this year, less than Microsoft's 14 percent increase and Nvidia's 151 percent jump.

(The New York Times has sued OpenAI and Microsoft over usage of copyrighted articles related to A.I. systems.)

Apple has long been under pressure to revamp Siri, which wowed people when it was released in 2011 but then did not change much over time. The talking assistant's shortfalls were featured by the comedian Larry David during the final season of "Curb Your Enthusiasm" in a scene where he yelled at Siri as it repeatedly provided the wrong directions.

Enter OpenAI, which has positioned itself at the forefront of the generative A.I. movement with ChatGPT. Apple plans to complement what OpenAI offers with technology that it developed in-house to do select iPhone tasks. Its system will help Siri set timers, create calendar appointments and summarize text messages.

The company also plans to promote its revamped Siri as more private than rival A.I. services because it will process many requests on iPhones rather than remotely in data centers. Apple's privacy focus proved to be a sticking point during negotiations with OpenAI and Google because it wanted to limit what iPhone data partners received, a person familiar with the negotiations said.

It's possible that Apple may look to offer the improved Siri as a service, analysts said. By charging $5 a month for people to use the talking assistant, the company could generate $4 billion to $8 billion in annual sales, according to Morgan Stanley.

Though it has been late to the generative A.I. race, Apple has pursued the idea of a digital personal assistant for about 40 years.

In 1987, it released a concept video showing a professor speaking to an assistant called the Knowledge Navigator, which could manage his calendar and pull up his lecture notes. The video helped inspire a group of A.I. researchers at SRI International, an independent research laboratory, to create a virtual assistant called Siri in 2008.

In 2010, Apple bought the technology for $200 million. The company released Siri a year later on the iPhone, demonstrating its ability to provide the time in Paris or pull up a list of 14 Greek restaurants.

"We set in motion a user-interface paradigm that no one has really improved upon," said Tom Gruber, a Siri co-founder who worked at Apple until 2018. "But we still don't have a personal A.I. — an assistant that knows my life. With generative A.I., it's feasible now."

---

# English-Language Books Are Filling Europe's Stores

**By CLAIRE MOSES and ELIZABETH A. HARRIS**

AMSTERDAM — When the Pulitzer Prize-winning author Jennifer Egan was in the Netherlands a few years ago promoting her most recent novel, "The Candy House," she noticed something unexpected. Most of the people who asked her to sign books at author events were not presenting her with copies in Dutch.

"The majority of the books I was selling were in English," Egan said.

Her impression was right. In the Netherlands, according to her Dutch publisher, De Arbeiderspers, roughly 65 percent of sales for "The Candy House" were in English.

"There was even a sense of a slight apology when people were asking me to sign the Dutch version," Egan said. "And I was like, 'No! This is what I'm here to do.'"

As English fluency has increased in Europe, more readers have started buying American and British books in the original language, forgoing the translated versions that are published locally. This is especially true in Scandinavian countries, the Netherlands and, increasingly, Germany, which is one of the largest book markets in the world.

Publishers in those countries, as well as agents in the United States and Britain, worry this could undercut the market for translated books, which will mean less money for authors and fewer opportunities for them to publish abroad.

"There is this critical mass," said Tom Kraushaar, publisher at Klett-Cotta in Germany. "You see in the Netherlands: Now there is a tipping point where things could really collapse."

The English-language books that are selling abroad are generally cheap paperbacks, printed by American and British publishers as export editions. Those versions are much less expensive than hardcovers available in the United States, for example, and much less expensive than the same books in translation, which have to observe minimum pricing in countries like Germany.

"People should read in whatever language they want," said Elik Lettinga, publisher of De Arbeiderspers in the Netherlands. But the export editions, she continued, "undercuts on price."

English sales have accelerated in recent years, in part because books now go viral on social media, especially TikTok. Booksellers in the Netherlands said that many young people prefer to buy books in English with their original covers, even if Dutch is their first language, because those are the books they see and want to post about on BookTok.

In some bookstores in Amsterdam, young adult sections carry mostly English-language books, with only a handful of Dutch options.

Leon Verschoor, a bookseller at Martyrium, a store in Amsterdam, said he had seen a real shift over his 30-year career in the book business. Those young readers, Mr. Verschoor said, "they'll never read in Dutch."

As the English versions cut into sales of translated titles abroad, it becomes more difficult — and sometimes impossible — for European publishers to recoup their costs when they publish a work from the United States or Britain. While major blockbusters will continue to be translated, publishers say, books by midlist authors may not be.

Christian Schumacher-Gebler, chief executive of the Bonnier Publishing Group in Germany, said this could hit authors in many ways. They would miss out on royalties from translated editions, which are higher than the payment they receive from inexpensive export copies. Also, the English-language books sent to Europe might not sell as well without a local company to run the ground game.

"An English publisher simply doesn't have a P.R. strategy in France or Germany or the Netherlands," Schumacher-Gebler said.



ILVY NJIOKIKTJIEN FOR THE NEW YORK TIMES

Scheltema, in Amsterdam, left. "We neglect our language," said one bookseller at the store about rising sales for books in English.

In an effort to combat the English-language appeal of TikTok, some Dutch publishers have started to release translated books under their English titles, with covers that are similar, or the same, as the original designs. The Dutch version of R.F. Kuang's 2023 novel "Yellowface" looks identical to the original, including the English title.

"We are in the middle of a transition," said Simon Dikker Hupkes, a commissioning editor at the Dutch publisher Atlas Contact. The fact that many readers overlook the Dutch translations, he said, "hurts our hearts a little."

Asha Hodge, 19, who described herself as an avid reader, said she preferred to read in English because she enjoyed posting about books in English on her Instagram account.

Ms. Hodge is part of a 35-person group chat named "Dutch Booksta Girlies," which consists of women who befriended each other on Instagram while discussing books. The other Dutch people in the group agreed that they preferred to read in English, said Ms. Hodge, who lives in the eastern city of Enschede.

Bookstores have adapted to the trend, buying more English-language versions of popular books or focusing on English editions of young adult novels.

"We neglect our language," said Peter Hoomans, a seller at Scheltema, a bookstore in Amsterdam.

Some booksellers in the Netherlands said that they were pleased that people were buying books, regardless of the language. Jan Peter Prenger, the chief buyer at Libris, a large group of independent bookstores in that country, said he welcomed the trend of reading in English and the large number of new, young readers it brings.

For the first time since the 1960s, he said, 15-year-olds are back in bookstores in droves. "That's gold," he said.

*Claire Moses reported from Amsterdam, and Elizabeth Harris from London and New York.*

---

# Tesla Shareholders Will Vote on Musk's Enormous Payday. What Happens After That?

**By MICHAEL J. de la MERCED and SARAH KESSLER**

After months of fighting over a pay package promised to Elon Musk six years ago — one that included stock grants now worth about $56 billion — matters are finally coming to a head.

At Tesla's annual meeting on Thursday, shareholders are set to vote on whether to reapprove the compensation deal after a Delaware judge voided it in January. The outcome could shift Mr. Musk's relationship with the company, and Tesla officials aren't taking any chances.

"If Tesla is to retain Elon's attention and motivate him to continue to devote his time, energy, ambition and vision to deliver comparable results in the future, we must stand by our deal," Robyn Denholm, the company's chair, wrote to investors on Wednesday.

Regardless of the vote's outcome, further lawsuits and other battles may follow, some of which could test the corporate legal system. Here's our guide to how different situations could play out.

**Tesla could use shareholder approval to argue its case for Mr. Musk's pay in court.** If it wins the vote on Mr. Musk's compensation, the company is likely to go to Chancellor Kathaleen McCormick, the judge in Delaware's Court of Chancery who rejected the compensation scheme, and argue that shareholders — armed with the information that she said they hadn't had when they approved the package — have re-ratified the proposal. That, the company is expected to say, makes the matter moot.

If Judge McCormick declares the plan acceptable, the plaintiffs who initially sued over it are likely to appeal to Delaware's Supreme Court. Among their potential arguments: The new vote doesn't resolve a matter that was already decided by a judge, and shareholders' votes may have been influenced by implied threats to Tesla's future if the vote didn't go Mr. Musk's way.

**A shareholder rejection of the pay package could result in a new deal — or a lawsuit.** The company would most likely continue its efforts in the Court of Chancery to reinstate the 2018 agreement. But Tesla said in a Monday filing that if that plan was not ultimately ratified, the automaker might need to negotiate a replacement compensation plan with Mr. Musk "in order to motivate him to devote his time and energy to Tesla." It added that "for Musk to agree to it, any new plan would need to be of a similar magnitude to the 2018 plan."

As Ben Kallo, an analyst at Robert W. Baird, put it to DealBook: "It's a 'take my ball and go home' sort of thing."

Because the value of Tesla's stock has increased significantly since 2018, creating a replacement plan may ultimately be more expensive than reinstating the old one. Tesla took a $2.3 billion accounting charge for the original plan. The company estimated it would need to take more than a $25 billion accounting charge to deliver a functionally equivalent plan today.

Another potential outcome if the matter doesn't go Mr. Musk's way: He could try a novel legal tactic by suing to demand that he be paid anyway, since he essentially had a contract to receive that money.

**Tesla's proposal to reincorporate in Texas is also up for a vote on Thursday.** If the company wins that vote and moves to Texas, it will continue its efforts in Delaware's Court of Chancery to reinstate the compensation package. In that case, Mr. Musk's critics worry that Tesla could use courts in its new home to attack its old one.

It would be highly unusual and aggressive for a state's judiciary to allow such an assault on another state's judiciary, said Ann Lipton, a business law professor at Tulane University. That said, Judge McCormick has put the onus on Tesla's Delaware law-



JONATHAN ERNST/REUTERS

A proposed pay package for Elon Musk is worth about $56 billion.

yers to tell her if the company decides to weaponize the Texas courts. It's unclear what she would do if that happened.

**Will the proposals pass?** Some context to consider:

■ The compensation proposal requires a majority of votes cast at the meeting to pass. The reincorporation issue requires a tougher standard: a majority of Tesla's outstanding shares.

■ Tesla has a higher percentage of retail investors in its shareholder base — 44 percent, according to S&P Global Market Intelligence — than any other company in the S&P 500. In Tesla's case, they're more likely to vote how Mr. Musk wants them to, but traditionally it's challenging to get small shareholders to vote at all.

■ Two influential shareholder advisory firms, Institutional Shareholder Services and Glass Lewis, have urged investors to reject the compensation plan, but they provisionally supported the reincorporation proposal. Advice from these so-called proxy advisers traditionally has held significant sway over institutional shareholders.

**The bottom line:** "The new vote only adds complexity; it doesn't remove it," Ms. Lipton said. And that uncertainty isn't helpful for Tesla: "I think it weighs on investor sentiment," said Mr. Kallo, "whether that's reality or not."

**Barstool Sports' First C.E.O. on Getting Ahead**

When Erika Ayers Badan started as the C.E.O. of Barstool Sports in 2016, the company had recently been valued at about $12 million. Seven years later, before she stepped down, the gambling company Penn Entertainment paid $551 million for the suite of often controversial blogs, podcasts and videos. (Barstool's founder, Dave Portnoy, bought it back shortly later.)

Taking the job at an unproven media company alongside Mr. Portnoy, who The Times wrote in 2022 "rose to fame by capitalizing on misogyny and other offensive behavior," and becoming the company's first female employee on top of it was a huge risk. In her upcoming book, "Nobody Cares About Your Career," Ms. Ayers Badan argues for taking those sorts of bets, among other career advice. She talked with DealBook's Sarah Kessler about why companies needed a point of view and about leading a company that was ostensibly for men. The interview has been condensed and edited.

**You wrote: "Women have two ways to change our situation. They can change it from a place of advocacy that's pure but on the outside" or "they can push from the inside." How did that work for you?**

One of the things that I was very sensitive to when I joined Barstool was this perception that I was essentially conducting career suicide by going to a perceived male company. And what I proved is that I took the right job and I was able to make something incredible come out of it, alongside some really incredibly talented people.

That's progress for women in the same way as women who are making progress outside of the stereotypically male-dominated environment. Both are really important.

**Do you think women should still be leaning in, by which I mean being aware of all the biases against us and trying to adjust our behavior accordingly?**

We have to be a whole lot less perfect than the women who came before us, who had to be a whole lot less perfect than the women who came before them. And I think that's incredibly exciting.

But you don't have to play it a certain way. I think I'm a good testament to that.

Part of what made Barstool successful was that it was not well behaved. At the same time, the company's reputation shut off some business opportunities, like when the show with ESPN got canceled after one episode. Is that trade-off worth it?

For better or worse, we are in an era of influence. And to become influential, you need to be opinionated and you have to show a point of view. You have to get people's attention. All media will look like that over time, as it becomes more fragmented and people have to find a way to go viral. The gatekeepers are, in large part, gone. You can't just say nothing. The entire media ecosystem has changed. And for me, the trade-off is definitively worth it.

**It feels like most executives are in a moment where they really don't want to speak out on issues or say anything that could potentially cause a backlash.**

You see people opting out altogether. And I don't know how long that works — it works if your product can speak for itself.

---

## DealBook/

DealBook helps you make sense of the day's most important business and policy headlines. Sign up for the newsletter at **nytimes.com/dealbook**

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: Chapter 11, Case No. 24-10831 (KBO)
EXPRESS, INC., et al.,[1] (Jointly Administered)
Debtors. Re: Docket No. 41, 427

**NOTICE OF AUCTION**

PLEASE TAKE NOTICE that on June 6, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Required Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief (Docket No. 427) (the "Bidding Procedures Order") authorizing the approved bidders and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction") regarding the sale or alternate value maximizing transaction with respect to certain of the Debtors' assets. The Auction will be governed by the bidding procedures attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures").

Copies of the Bidding Procedures Order, the Bidding Procedures, or other documents related thereto are available upon request to Stretto, Inc. by calling the restructuring hotline at (855) 337-3537 (toll free) and +1 (949) 617-1363 (international) or by visiting the Debtors' restructuring website at https://cases.stretto.com/Express/.

PLEASE TAKE FURTHER NOTICE that this Auction Notice will be published on The New York Times (National Edition).

PLEASE TAKE FURTHER NOTICE that the Bid Deadline is June 11, 2024, at 4:00 p.m. (prevailing Eastern Time), and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

PLEASE TAKE FURTHER NOTICE that the Debtors intend to conduct the Auction, at which they will consider proposals submitted to the Debtors in accordance with the Bidding Procedures and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

If necessary, shall commence on June 12, 2024, at the offices of Kirkland & Ellis LLP, Debtors' co-counsel, 601 Lexington Avenue, New York, NY 10022 at a time to be announced, which may be via remote video or in-person at the Debtors' election.

PLEASE TAKE FURTHER NOTICE that the Debtors reserve their rights to modify the Bidding Procedures in any manner they deem appropriate to promote the goals of the Bidding Procedures, in any manner that will best promote the goals of the Bidding Procedures; or impose, at or prior to the Auction, additional customary terms and conditions on a Transaction, including: (i) extending the deadlines set forth in the Bidding Procedures; (ii) adjourning the Auction at the Auction; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; and (v) rejecting any or all Bids or Qualified Bids.

Dated: June 6, 2024, Wilmington, Delaware, /s/ Domenic E. Pacitti, KLEHR HARRISON HARVEY BRANZBURG LLP, Domenic E. Pacitti (DE Bar No. 3989), Michael W. Yurkewicz (DE Bar No. 4165), Alyssa M. Radovanovich (DE Bar No. 7101), 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Telephone: (302) 426-1189, Facsimile: (302) 426-9193, Email: dpacitti@klehr.com, myurkewicz@klehr.com, aradvanovich@klehr.com -and- Morton R. Branzburg (pro hac vice pending), 1835 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103, Telephone: (215) 569-3007, Facsimile: (215) 568-6603, Email: mbranzburg@klehr.com, Co-Counsel for the Debtors and Debtors in Possession -and- KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP, Joshua A. Sussberg, P.C. (pro hac vice pending), Emily E. Geier, P.C. (pro hac vice pending), Nicholas M. Adzima (pro hac vice pending), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: joshua.sussberg@kirkland.com, emily.geier@kirkland.com, nicholas.adzima@kirkland.com -and- Charles B. Sterrett (pro hac vice pending), 333 West Wolf Point Plaza, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: charles.sterrett@kirkland.com, Co-Counsel for the Debtors and Debtors in Possession

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification number, are Express, Inc. (8128), Express Topco LLC (8079); Express Holdings, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6920); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.