Exhibit A

**173 Court Street**
**Brooklyn, New York 11201**

<u>**RETAIL LEASE AGREEMENT**</u>

Between

**173 COURT STREET HOLDINGS LLC, as Landlord**

And

**BONOBOS, INC., as Tenant**

| | |
|---|---|
| **Premises:** | **Ground Floor Retail Space, and**<br>**Basement Storage Area**<br>**(with Access to Landlord's Meter Room)** |
| **Date:** | April ⟨19⟩, 2017 |

**TABLE OF CONTENTS**                                    <u>Page</u>

Article 1.    Basic Terms and Definitions ...................................................... 1

Article 2.    Demise; Delivery; Rent; Percentage Rent ................................. 3

Article 3.    Use; Rules and Regulations; Tenant Operations; Signs ....................................... 6

Article 4.    Condition of the Premises; Landlord's Work ............................. 9

Article 5.    Tenant's Work .......................................................................... 10

Article 6.    Tax Payments ........................................................................... 13

Article 7.    Utilities; Services .................................................................... 14

Article 8.    Common Areas ......................................................................... 15

Article 9.    Repairs and Maintenance ......................................................... 16

Article 10.   Laws; Hazardous Substances ................................................... 17

Article 11.   Subordination; Estoppel Certificates ....................................... 20

Article 12.   Insurance .................................................................................. 21

Article 13.   Casualty ................................................................................... 23

Article 14.   Condemnation ........................................................................... 24

Article 15.   Assignment and Subletting ...................................................... 24

Article 16.   Access; Changes in Building and Real Property ...................... 27

Article 17.   Default ...................................................................................... 29

Article 18.   Remedies ................................................................................... 30

Article 19.   Security ..................................................................................... 33

Article 20.   Broker ....................................................................................... 34

Article 21.   Notices; Consents and Approvals ............................................ 34

Article 22.   No Representations; Liability; Tenant Indemnity .................... 35

Article 23.   End of Term .............................................................................. 36

Article 24.   Miscellaneous ........................................................................... 37


<u>Exhibits</u>
Exhibit A-1   -    Fixed Rent.................................................................... 41
Exhibit A-2   -    Percentage Rent............................................................ 42
Exhibit B-1   -    Landlord's Work........................................................... 46
Exhibit B-2   -    Tenant's Initial Plans.................................................... 48
Exhibit C     -    Premises....................................................................... 49
Exhibit D     -    Commencement Date Agreement.................................. 50
Exhibit E     -    Rules............................................................................ 52
Exhibit F     -    Tenant's Tax Payment – Escalation.............................. 53

<u>Riders</u>
Extension Option Rider.................................................................................... 54

## RETAIL LEASE AGREEMENT

      **Lease** dated April 19, 2017, between **173 COURT STREET HOLDINGS LLC**, a New York limited liability company ("**Landlord**"), and **BONOBOS, INC.**, a Delaware coporation ("**Tenant**").

      **Article 1.**    **Basic Terms and Definitions**

      **Section 1.1**    **Additional Rent.**  All sums, other than the Fixed Rent, payable by Tenant to Landlord under this lease, including Percentage Rent and the payment of deficiencies and increases in the Security, if any.

      **Section 1.2**    **Allowance.**  The term Allowance shall have the meaning ascribed to such term in Section 2.9 hereof.

      **Section 1.3**    **Broker.**  Robert K. Futterman, LLC.

      **Section 1.4**    **Building.**  The building and improvements located at 173 Court Street, Brooklyn, New York 11201.

      **Section 1.5**    **Commencement Date.**   The date all of the Delivery Requirements (defined below) are satisfied, subject to the provisions of Section 2.6. Landlord anticipates the Commencement Date will be, and Tenant shall not be required to accept delivery of the Premises before, April 15, 2017 (the "Anticipated Commencement Date").

      **Section 1.6**    **Expiration Date.**  The last day of the calendar month following the tenth (10th) anniversary of the Commencement Date.

      **Section 1.7**    **Extension Option.**   A single five (5) year extension option, more particularly described in the Extension Option Rider attached to this lease.

      **Section 1.8**    **Fixed Rent.**  The Fixed Rent is shown on Exhibit A-1 to this lease.

      **Section 1.9**    **Fixed Rent Credits, Fixed Rent Commencement Date.**
Notwithstanding anything to the contrary contained herein, Fixed Rent shall not be due and payable during the following eleven (11) Lease Months: 8th, 9th, 10th, 11th, 12th, 22nd, 23rd, 24th, 34th, 35th and 36th.  The "**Fixed Rent Commencement Date**" shall be the date that is seventy-five (75) days following the Commencement Date.

      **Section 1.10**    **Landlord's Work.**   The work, if any, described in Exhibit B-1 to this lease.

      **Section 1.11**    **Lease Month.**  A Lease Month shall be comprised of one (1) calendar month.  The first Lease Month (Lease Month 1) shall commence on the Fixed Rent Commencement Date but, notwithstanding the first sentence of this paragraph, if the Fixed Rent Commencement Date is not the first day of a month, then the first Lease Month shall be the period from the Fixed Rent Commencement Date to the last calendar day of the next month.

Each succeeding Lease Month shall end at the last day of the following calendar month. For example, if the Fixed Rent Commencement Date is April 1, 2017, then the first Lease Month would commence on April 1, 2017 and end on April 30, 2017. If, however, the Fixed Rent Commencement Date is April 2, 2017, then the first Lease Month would commence on April 2, 2017 and end on May 31, 2017, the second Lease Month (Lease Month 2) would commence on May 1, 2017 and end on May 31, 2017.

**Section 1.12    Lease Year.** A <u>Lease Year</u> shall be comprised of a period of twelve (12) consecutive calendar months. The first Lease Year (<u>Lease Year 1</u>) shall commence on the Fixed Rent Commencement Date but, notwithstanding the first sentence of this paragraph, if the Fixed Rent Commencement Date is not the first day of a month, then the first Lease Year shall include the additional period from the Fixed Rent Commencement Date to the end of the then current month. Each succeeding Lease Year shall end on the anniversary date of the last day of the preceding Lease Year. For example, if the Fixed Rent Commencement Date is June 1, 2017, then the first Lease Year would commence on June 1, 2017 and end on May 31, 2018, and each succeeding Lease Year would commence on June 1st and end on May 31st. If, however, the Fixed Rent Commencement Date is June 2, 2017, then the first Lease Year would commence on June 2, 2017 and end on June 30, 2018, the second Lease Year (Lease Year 2) would commence on July 1, 2018 and end on June 30, 2019, and each succeeding Lease Year would commence on July 1st and end on June 30th.

**Section 1.13    Intentionally Deleted.**

**Section 1.14    Notice Address.**

(a)    <u>Landlord</u>.       173 Court Street Holdings LLC
                              561 Seventh Avenue, 5th Floor
                              New York, New York  10018

(b)    <u>Tenant</u>.        Bonobos, Inc.
                              45 West 25th Street, 5th Floor
                              New York, New York  10010
                              Attn: General Counsel

        Copies of all notices pertaining to any Default applicable to Tenant shall be sent in the same manner and at the same time, to:

                              Ravid Law Group
                              601 S. Figueroa St., Suite 4475
                              Los Angeles, California 90017
                              Attn: Nadav Ravid, Esq.

**Section 1.15    Percentage Rent.** The <u>Percentage Rent</u> is shown of <u>Exhibit A-2</u> to this Lease.

**Section 1.16    Permitted Use.** Any lawful (non-food and non-beverage) retail use (at full price, not discounted) operating under the Trade Name, subject in all respects however to <u>Article 3</u>. Notwithstanding the foregoing, subject to compliance with applicable Laws, Tenant shall be permitted to serve complimentary alcoholic beverages to its customers

inside the Premises as an ancillary gesture to entertain its customers while shopping in the Premises.

**Section 1.17   Premises.**  The portion of the Building shown on <u>Exhibit C</u> to this lease, containing approximately 1,700 square feet on the ground floor of the Building and an additional 800 square feet of basement space (the "Basement Space"). Landlord makes no representation as to the accuracy of such measurements and Tenant understands and agrees that the foregoing measurements are used for calculation purposes only and not to represent actual measurements. Notwithstanding anything to the contrary contained herein, the Basement Space shall not be included in square footage of the Premises for purposes of calculating Fixed Rent, Additional Rent, or any other charges, or the Allowance.

**Section 1.18   Proportionate Share.**  Sixty-six and sixty-seven one hundredths (66.67) percent.

**Section 1.19   Real Property.**  The Building and the land on which it is located.

**Section 1.20   Rent.**  The Fixed Rent, Percentage Rent and all Additional Rent.

**Section 1.21   Security.**  Three (3) full months of initial Fixed Rent as security ($63,750.00).

**Section 1.22   Term.**  The period commencing on the Commencement Date and ending on the Expiration Date, subject to earlier termination or extension of this lease pursuant to the terms hereof.

**Section 1.23   Trade Name.**  The <u>Trade Name</u> shall mean Bonobos.  Tenant shall use and occupy the Premises under the Trade Name; provided, however, upon thirty (30) days' prior written notice to Landlord, Tenant may, without Landlord's consent, change the Trade Name to any other trade name(s) from time to time used by a majority of retail stores operated by Tenant, its parent(s), affiliate(s), or subsidiary(ies).

**Section 1.24   Certain Definitions.**  Any reference in this lease to (a) "**legal action**", includes any suit, proceeding or other legal, arbitration or administrative process, and any appellate proceedings in connection therewith, (b) "**person**" includes any individual or entity,  (c) "**this lease**" includes the Rules and the other Exhibits to this lease, and (d) "**including**" means "including without limitation".

**Article 2.    <u>Demise; Delivery; Rent; Percentage Rent; Allowance</u>**

**Section 2.1**    Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, for the Term, at the Rent and on the other terms of this lease.

**Section 2.2**    Tenant shall pay Landlord the Rent, without notice, abatement, deduction or offset (except as expressly provided in this lease), in lawful money of the United States of America, by Tenant's check or wire transfer or another method approved by Landlord, at Landlord's Notice Address or another address Landlord designates, and as provided in this lease.  The Fixed Rent shall be paid in equal monthly installments, in advance, on the first day of each calendar month during the Term. Rent shall be pro-rated for any partial month according to the number of days in the month occurring during the Term. Landlord's delay in rendering, or

- 3 -

failure to render, any statement required to be rendered by Landlord for any Rent for any period shall not waive Landlord's right to render a statement or to collect that Rent for that or any subsequent period. The rendering of an incorrect statement shall not waive Landlord's right to render a corrected statement for the period covered by the incorrect statement and collect the correct amount of the Rent, which Tenant shall pay within thirty (30) days after its receipt of the corrected statement.

      **Section 2.3**    (a)    Tenant is not required to pay any Rent until the Fixed Rent Commencement Date.

      (b)    Tenant is not required to pay Fixed Rent during the following Lease Months: 8th, 9th, 10th, 11th, 12th, 22nd, 23rd, 24th, 34th, 35th and 36th.

      (c)    If the Fixed Rent Commencement Date is not the first day of a month, the Rent for the month in which the Fixed Rent Commencement Date occurs shall be apportioned according to the number of days in that month and shall be due and payable when invoiced.

      **Section 2.4**    Unless otherwise specified in this lease, all Additional Rent shall be paid by Tenant within thirty (30) days after Tenant is billed therefor. Notwithstanding anything to the contrary contained herein, the total amount of Additional Rent, including, without limitation, Tenant's Tax Payments, due for the first twelve (12) months following the Fixed Rent Commencement Date shall not exceed an amount equal to Twelve Dollars ($12.00) per square foot of the floor area in the Premises (excluding the Basement Space).

      **Section 2.5**    Intentionally Deleted.

      **Section 2.6**    Notwithstanding the fact that Tenant may have entered or will enter the Premises, with Landlord's consent, and commence construction, Tenant shall not be deemed to have accepted possession of the Premises and the Commencement Date shall not be deemed to have occurred until the date that all of the following requirements are satisfied: (i) Tenant's receives a fully executed copy of this Lease; (ii) Landlord delivers physical possession of the Premises to Tenant in a broom clean condition with all of Landlord's Work substantially completed and free from any other tenancies, including, without limitation, free from any furniture, fixtures, equipment, inventory, personal property, or signage of the existing tenant; and (iii) Landlord receives a certificate of occupancy for the Premises from the applicable Authority, which certificate of occupancy shall permit the operation of a retail store in the Premises (collectively, the "Delivery Requirements").

      If for any reason the Commencement Date does not occur on or before the date ninety (90) days after the Anticipated Commencement Date, then Landlord shall pay to Tenant, as liquidated damages, one-half (1/2) day of Rent per day for each day after the ninetieth (90th) day after the Anticipated Commencement Date that the Commencement Date does not occur. If for any reason the Commencement Date does not occur on or before the date one hundred twenty (120) days after the Anticipated Commencement Date, then Landlord shall pay to Tenant, as liquidated damages, an additional one-half (1/2) day of Rent (for a total of one (1) full day of Rent) per day for each day after the one hundred twentieth (120th) day after Anticipated Commencement Date that the Commencement Date does not occur. If the Commencement Date does not occur within one hundred eighty (180) days after the Anticipated Commencement Date, then, in addition to Landlord's obligation to pay the liquidated damages described above, Tenant shall have the right to terminate this Lease upon written notice to Landlord. In the event of such

termination, Landlord shall reimburse Tenant for the costs and expenses incurred by Tenant in connection with this lease, including, but not limited to, the preparation and/or review of plans and specifications and any legal and/or other professional fees, up to an amount not to exceed Thirty Thousand Dollars ($30,000.00). Such reimbursement shall be paid to Tenant by Landlord within thirty (30) days after Tenant's demand therefor. This Section constitutes an express provision to the contrary pursuant to Section 223-a of the New York Real Property Law (or any similar Laws, hereinafter defined), which Landlord and Tenant agree is inapplicable to this lease (and Tenant hereby waives any right to damages or to rescind this lease which Tenant might otherwise have thereunder).

**Section 2.7**    Upon Landlord's request, Landlord and Tenant shall execute an agreement setting forth the Commencement Date, the Fixed Rent Commencement Date and the Expiration Date in the form attached hereto as Exhibit D.

**Section 2.8**    Notwithstanding anything to the contrary in this lease or in any exhibit or diagram attached to it, no vault or vault space or other area outside the boundary of the Real Property is included in the Premises. If Tenant is permitted to use or occupy any such vault, space or other area, it is under a revocable license, and if such license is revoked or the size of such vault, space or area is reduced, such revocation or reduction shall not be deemed to be an actual or constructive eviction, and shall not entitle Tenant to any abatement or reduction of Rent, or relieve Tenant from any of its obligations under this lease, or impose any liability on Landlord.  Tenant shall pay, as Additional Rent, all fees, taxes and charges imposed by any Authority (hereinafter defined) for any such vault, space or area used or occupied by Tenant.

**Section 2.9**    (a)    Subject to the provisions of this Section 2.9, Landlord shall pay to Tenant an allowance in the amount of up to Thirty-Four Thousand and 00/100 Dollars ($34,000.00) (herein called the "**Allowance**"), which amount shall be paid to Tenant for the cost and expense incurred by Tenant for the actual construction performed in connection with Tenant's initial alterations in the Premises (collectively, "**Tenant's Initial Work**") and for so called "soft costs", including, without limitation, architectural and engineering fees in connection with Tenant's Initial Work performed within twelve (12) months following the Commencement Date in accordance with the terms and provisions of this Lease, including Article 5 hereof, and for no other purposes; provided, however, that  no portion of the Allowance may be applied towards the cost of equipment, furniture or other items of personal property of Tenant.  In the event that the costs and expenses of Tenant's Initial Work shall exceed the amount of the Allowance, Tenant shall be entirely responsible for such excess.  Tenant shall not receive any portion of the Allowance that is not used for the express purposes described in the immediately preceding sentence unless agreed to in writing by Landlord.

(b)    The Allowance shall be payable by Landlord to Tenant on or before the last day of the 36th Lease Month; provided Tenant is not in Default in performing its obligations under this lease on the date the Allowance is paid by Landlord.  On or prior the first day of the 36th Lease Month, Tenant shall provide Landlord written request for disbursement of the Allowance which shall be accompanied by (1) a certificate signed by Tenant's architect or general contractor or an authorized representative of Tenant certifying that all of Tenant's Initial Work has been satisfactorily completed in accordance with Tenant's final plan approved by Landlord, and (2) a final lien waiver (in recordable form and form reasonably satisfactory to Landlord) and a general release from the general contractor who shall have performed Tenant's Initial Work.

(c)      The Allowance is being given for the benefit of Tenant or any transferee in connection with a Permitted Transaction (defined below) only.  Except as set forth in the preceding sentence, no third party shall be permitted to make any claims against Landlord or Tenant with respect to any portion of the Allowance.  If, on the date the Allowance is payable to Tenant, Tenant shall be in Default under this Lease, the Allowance shall not be due and payable to Tenant unless and until Tenant cures such Default.

(d)      If Landlord fails to provide Tenant with all or any portion of the Allowance by the deadline set forth above, time being of the essence, and such amount remains unpaid for thirty (30) days after notice from Tenant, then, in addition to all other rights and remedies of Tenant as a result thereof, Tenant may deduct such amount from the Rent next due and owing under this Lease until Tenant recovers all of the amounts outstanding.

**Article 3.      Use; Rules and Regulations; Tenant Operations; Signs**

**Section 3.1**      Tenant shall use the Premises only for the Permitted Use, subject, however, to the provisions of this lease.  Tenant, at its sole cost and expense, shall acquire any and all permits, licenses, certificates and approvals required by Laws for the Permitted Use and the conduct of Tenant's operations in the Premises. Notwithstanding the foregoing, Tenant shall not use any part of the Premises (i) in violation of this lease or the certificate of occupancy, if any, for the Premises or the Building or (ii) for any of the following (or offices therefor): employment agency; travel agency; foreign government or any business owned in whole or in part by a foreign government; foreign airline; a place of public assembly; the rendering of any health or health-related services; subject to Section 1.16, food or food related service; subject to Section 1.16, beveral or beverage related service; a school or classroom; gambling; any business that, in Landlord's reasonable judgment, may jeopardize the safety of the Building or its occupants

**Section 3.2**      Tenant shall not use the Premises, or any part thereof, in violation of the certificate of occupancy, if any, for the Premises or the Building.

**Section 3.3**      Tenant shall, and shall cause its employees, and contractors to comply with the rules and regulations annexed hereto as Exhibit E and such reasonable changes therein (whether by modification, restatement, elimination or addition) as Landlord may make at any time or times hereafter and communicate in writing to Tenant (the "**Rules**"). Landlord shall not make any changes to the Rules that would adversely affect Tenant's use of, visibility of, or access to and from the Premises, or that would materially increase any of Tenant's obligations under this Lease.  In the event there is any inconsistency between the Lease and the Rules, the Lease shall control. Landlord is not required to enforce the Rules against Tenant or any other tenant or occupant, their employees, contractors or invitees, and Landlord shall not be liable to Tenant for any violation of the Rules by another tenant or occupant or any of their employees, contractors or invitees.  Landlord's failure to enforce the Rules against Tenant or any other occupant of the Building shall not be considered a waiver of the Rules, provided, however, that Landlord shall use commercially reasonable efforts to enforce the Rules against all tenants and occupants of the Building, and provided further that the Rules shall not be enforced in a discriminatory manner.

**Section 3.4**      The continuous operation of Tenant's business in the Premises is of material importance to Landlord because of the adverse impact on the Building of vacant

retail space.  Tenant shall cause its business to be adequately stocked and staffed consistent with a majority of Tenant's other stores operating under the same Trade Name provided that the foregoing shall not be deemed to prohibit Tenant from operating its business as a showroom. Subject to Force Majeure, Tenant shall open continuously for business at the Premises at least forty-eight (48) hours per week, on days and during hours determined by Tenant in its sole discretion, excluding days observed as holidays by the Federal government.  In no event shall Tenant operate its business between the hours of eleven (11) p.m. and eight (8) a.m. Notwithstanding the foregoing, Tenant may be temporarily closed for (i) up to four (4) days per calendar year for the taking of inventory, (ii) not more than thirty (30) consecutive days no more frequently than as necessary in order to refurbish the Premises, and (iii) in connection with a transfer of the Premises to a permitted subtenant or assignee. Tenant shall not be deemed to have abandoned or vacated the Premises as a result of any closure contemplated by this Section 3.4. Notwithstanding anything to the contrary contained herein, in no event shall Landlord be entitled to specific performance to force Tenant to operate.

       **Section 3.5**    Tenant shall, at its expense: (<u>a</u>) keep the inside and outside of all glass in the doors and windows of the Premises clean and keep all exterior store surfaces of the Premises clean;  (<u>b</u>) replace promptly any cracked or broken glass of the Premises with glass of like color, grade, and quality, unless such glass is cracked or broken by Landlord or Landlord's employees, agents, or contractors, in which case Landlord shall be responsible for such replacement; (<u>c</u>) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests and shall arrange for extermination at regular intervals, not less frequently than quarterly and more often as necessary;  (<u>d</u>) keep any garbage, trash, rubbish or other refuse in vermin-proof containers within the interior of the Premises that are kept closed until removed;  (<u>e</u>) subject to Section 7.5, deposit such garbage, trash, rubbish and refuse, on a daily basis, in receptacles provided or required by the carter engaged by Tenant pursuant to the terms of this lease; (<u>f</u>) intentionally deleted; (g) keep all mechanical apparatus and equipment free of unreasonable vibration and noise which may be transmitted beyond the Premises; (h) keep in the Premises and maintain in good working order one or more dry chemical fire extinguishers;  (i) conduct its business at the Premises in accordance with high standards of retail operation in a manner consistent with a majority of Tenant's other stores operating under the same Trade Name; and, (j) prevent any offensive odors or any unreasonable noise from transmitting beyond the Premises. Notwithstanding anything to the contrary herein, under no circumstance shall Tenant be prohibited from playing music in the Premises in a manner consistent with Tenant's other stores; provided that such music does not unreasonably interfere with other tenants or occupants of the Building.

       **Section 3.6**    Tenant shall <u>not</u> (<u>a</u>) subject to Tenant's right to place a sandwich board outside the entrance to the Premises pursuant to Section 3.8, place or maintain any merchandise, show cases, tables for service, trash, refuse or other items in any vestibule or entry of the Premises, or on the walkways, sidewalks or elsewhere outside the Premises; (<u>b</u>) obstruct, or permit its employees, or contractors to obstruct, any driveway, walkway, sidewalk, parking area, or other areas made available for the general use, convenience, and benefit of all tenants of the Building and their customers, visitors, and invitees (hereinafter referred to as the "Common Areas"); (<u>c</u>) Subject to this Section 3.6, use or permit the use of any offensive advertising medium (such as, without limitation, loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television broadcasts within the Building) which is in any manner audible outside of the Premises; (<u>d</u>) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (<u>e</u>) cause or permit offensive odors

or fumes to emanate from the Premises; (f) solicit business in any Common Areas, including without limitation through distribution of handbills or other advertising matter in any Common Areas or the display of any merchandise in the Common Areas; (g) receive or ship articles of any kind outside the designated loading areas, if any, for the Premises; (h) conduct or permit to be conducted any auction, fire sale (except to liquidate inventory in response to an actual fire and only if such sale is not conducted for more than forty-five (45) days), going out of business sale (except, one time only, to liquidate inventory at the end of the term of this lease and only if such sale is not conducted for more than forty-five (45) days), bankruptcy sale (unless directed by court order), or other similar type sale in or connected with the Premises (but this provision is not intended to limit Tenant's freedom in setting its own selling prices); (i) use the Premises for any activity that is not generally considered appropriate for retail businesses conducted in accordance with good and generally accepted standards of operation; (j) use the Premises for any hazardous activity or in such manner as to constitute a nuisance of any kind (public or private); (k) cause waste; (l) do anything which, in Landlord's reasonable judgment, unreasonably disturbs other occupants of the Building; or (m) permit its employees to loiter immediately outside the Premises or the Building or within the Common Areas or to park cars in the Common Areas with "For Sale" signs (or signs of similar import) on them.

**Section 3.7**    Tenant acknowledges that Landlord intends the retail space in the Building to be operated in a manner that does not offend the community that it serves. Accordingly, Tenant shall not use the Premises for any immoral or disreputable use or activity or for any use that is objectionable to the community in which the Premises are located; and Tenant shall not sell, distribute, display, advertise or offer for sale at the Premises any item or service which, in Landlord's reasonable good faith judgment, may tend to injure or detract from the image of the Building within such community. Without limiting the generality of the foregoing, Tenant shall not sell, distribute, display or offer for sale (a) any drug paraphernalia, (b) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film, picture, recording, representation or merchandise of any kind, (c) any counterfeit goods or (d) any gun(s).

**Section 3.8**    The term "Sign" includes all signs, designs, monuments, logos, banners, projected images, awnings, canopies, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics, and decorations. No Sign shall be exhibited, installed, inscribed, painted or affixed, without the prior consent of Landlord (which shall not be unreasonably withheld, conditioned or delayed), on any part of the outside of the Building or on the windows or doors of the Premises; except that Landlord's consent shall not be required for any Sign placed inside the windows or doors of the Premises if such Signs are professionally produced and do not violate any other provisions of this lease. Notwithstanding anything to the contrary contained in this Lease, but subject to Landlord's reasonable approval of Tenant's drawings therefor, Tenant shall be permitted to have the maximum signage as permitted by local governmental authorities and other Laws on the front and sides of the Premises. Tenant shall have the right, without Landlord's prior approval, to (a) use visual window displays, including but not limited to, professionally prepared signs, promotional materials, and decals, on the storefront of the Premises, and in and around the areas surrounding the storefront located within the Premises for marketing purposes in a manner that is consistent with Tenant's other stores; (b) utilize its national sign package throughout the interior of the Premises, whether visible or not from the exterior; and (c) place a sandwich board outside the entrance to the Premises. Notwithstanding the foregoing, no neon Signs or blinking or flashing Signs are permitted. Unless otherwise expressly permitted, Tenant may not install Signs advertising a fire sale, liquidation sale, distress sale, foreclosure sale, receiver's or sheriff's sale, going out of business sale, lost

lease sale, or Signs of similar import.   Tenant shall, at its own expense, obtain all required licenses and permits for any Signs installed by Tenant, and renew them as required by applicable Laws.  All Sign(s) shall be installed and removed in a good and workmanlike manner, without damaging the Real Property, and in compliance with all applicable Laws and the applicable provisions of this lease.  Prior to installing any permitted Sign, Tenant shall deliver to Landlord any permits or approvals required by applicable Laws in connection with such installation.  Tenant shall maintain any permitted Signs in good, clean, neat and safe condition, and at the expiration or sooner termination of this lease, Tenant shall cause such Signs to be removed and cause the cancellation of any issued licenses or permits.  To the extent the installation of a Sign requires Landlord's prior approval, Tenant shall not change or alter any Sign approved by Landlord in any respect whatsoever, without first obtaining Landlord's prior consent to such change or alteration, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord may remove any Sign(s) installed or maintained in violation of this Article, and Tenant shall reimburse Landlord for all reasonable, out-of-pocket costs incurred by Landlord in so removing any such Sign promptly after being billed therefor.

     **Section 3.9**    Under no circumstance shall Landlord be permitted to use any of Tenant's walls for marketing purposes of Landlord or any other tenant of the Building, or for any other purpose, without Tenant's written consent, which consent Tenant may withhold in Tenant's reasonable discretion.

     **Article 4.**       **<u>Condition of the Premises; Landlord's Work</u>**

     **Section 4.1**    Tenant has examined the Premises and, subject to Section 2.6 and this Article 4 and Landlord performing Landlord's Work, if any, (a) Tenant accepts possession of the Premises in its "AS IS" condition on the date of this lease, and (b) except as set forth herein, Landlord has no obligation to perform any work, supply any materials, incur any expenses or make any installations to prepare the Premises for Tenant's occupancy. Notwithstanding anything to the contrary contained herein, Landlord shall correct any latent defects in the Premises discovered by Tenant and reported to Landlord within one (1) year after the Commencement Date.

     **Section 4.2**    Landlord shall, at its expense, perform Landlord's Work, in accordance with, and subject to, the applicable provisions of this lease. Tenant shall not unreasonably impede, delay, obstruct or interfere with, Landlord's performance of any and all of Landlord's Work.  Landlord shall correct any "punch list" items in Landlord's Work within thirty (30) days after Tenant's notice to Landlord of such items.

     **Section 4.3**    Landlord represents and warrants to Tenant that as of the Commencement Date, (i) the Premises, (ii) Landlord's Work, (iii) the structural aspects of the Building including, without limitation, the roof and the foundation, (iv) the Common Areas, and (v) the building systems including, without limitation, the HVAC, electrical, plumbing, and all other mechanical systems, shall all be in good order, condition, and repair, and in compliance with all Laws, including, without limitation, the Americans with Disabilities Act and hazardous material laws.

     **<u>Section 4.4</u>**    Notwithstanding anything to the contrary set forth herein, if as the result of the pre-existing condition of the Building or a violation of applicable Laws (including, without limitation, the applicable building code), Tenant is unable to obtain a building permit to

- 9 -

commence its construction, or if any such pre-existing condition or violation prevents Tenant from obtaining a certificate of occupancy, the Fixed Rent Commencement Date shall be extended by the number of days necessary for Landlord to correct such condition or cure such violation.

**Section 4.5**    Landlord shall, at its sole cost and expense, be required to maintain, repair, and replace any structural component of the Premises of the Building that was not visible during any site inspection performed by Tenant prior to entering into this Lease and that is initially discovered by Tenant in the Premises following Tenant's demolition of any existing improvements located within the Premises as of the Commencement Date.  The Fixed Rent Commencement Date shall be extended day-for-day until such time that Landlord repairs or replaces any such structural component to the extent Tenant's use or construction of the Premises is adversely affected by such component or the repair or replacement thereof. For the avoidance of doubt, the Landlord's repair and replacement obligations in this Section 4.5 shall not include purely aesthetic repairs or replacements (such as brick repointing for a finished look), provided the underlying component is otherwise in good condition.

**Article 5.**    **Tenant's Retail Improvements; Tenant's Work**

**Section 5.1**    Tenant, at Tenant's sole cost and expense (except for the Allowance) shall perform Tenant's Initial Work in accordance with finished and detailed architectural plans and specifications approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed), which Tenant's Initial Work shall be completed within twelve (12) months following the Commencement Date without the same being subject to any liens or encumbrances. Notwithstanding anything to the contrary contained herein, Landlord hereby approves Tenant's plans for Tenant's Initial Work attached as Exhibit B-2 hereto and made a part hereof.

**Section 5.2**    Except as may be expressly provided in this lease, Tenant shall not make any changes, improvements, alterations or additions (collectively, "**Tenant's Work**"),  to the Premises, the Real Property, the Building systems, or any part thereof, without Landlord's prior consent.  Landlord's consent shall not be unreasonably withheld or delayed if Tenant's Work (a) is nonstructural, and (b) does not (i) except with respect to Tenant's Initial Work, affect any part of the Real Property outside the Premises (including the Building roof) or the exterior of the Premises, (ii) affect any structural element of the Building, (iii) adversely affect any Building system, or (iv) require an amendment of the certificate of occupancy for the Premises or the Building.  Landlord's consent shall not be required with respect to such of Tenant's Work that (x) costs less than Fifty Thousand Dollars ($50,000.00) in any calendar year, as long as such Tenant's Work does not affect the structural aspects of the Building or any of the Building's systems, or (y) are cosmetic alterations (such as painting the interior of the Premises, carpeting, and installation of shelving and display cases) inside the Premises (collectively, (x) and (y) are referred to as the "**Cosmetic Alterations**"), provided Tenant complies with the other applicable provisions of this lease.  Tenant's Work shall be performed, at Tenant's expense, with diligence when started so as to promptly complete it in a good and worker-like manner using new or like-new materials of first class quality and in compliance with this lease, all Laws and, except with respect to Cosmetic Alterations, Tenant's Plans (as defined in Section 5.2) as approved by Landlord, which approval shall not be unreasonably withheld. To the extent there is any inconsistency between the terms of this lease or any tenant manual and the Tenant's Plans approved by Landlord, the terms of Tenant's Plans shall control.  Tenant's Work shall be fully

- 10 -

paid for by Tenant when payment is due. Except for trade fixtures, equipment and personal property, Tenant's Work shall be deemed, upon installation, to be improvements and betterments that become the property of Landlord at installation, and shall remain upon and be surrendered with the Premises, at the expiration of the Term (or the sooner termination of this lease in accordance with its provisions) unless, subject to Section 5.11, Landlord notifies Tenant in accordance with the provisions of this Article that Landlord relinquishes its rights thereto, in which case Tenant may, but shall not be obligated to, remove such Tenant's Work.

**Section 5.3**    Prior to commencing any Tenant's Work other than purely Cosmetic Alterations, Tenant shall, at Tenant's expense, deliver to Landlord detailed plans and specifications,  for Tenant's Work, in form reasonably satisfactory to Landlord, prepared, certified, signed and sealed by an architect or engineer licensed to practice in the State of New York, and suitable for filing with the applicable Authority, if filing is required by applicable Laws (such plans and specifications together with revisions thereto, collectively, "**Tenant's Plans**"), and obtain Landlord's approval of Tenant's Plans.  Landlord's approval of Tenant's Plans shall not be unreasonably withheld or delayed to the extent Landlord's consent to Tenant's Work shown on Tenant's Plans is not to be unreasonably withheld or delayed pursuant to this Article. Before commencing Tenant's Work, Tenant shall (a) obtain (and deliver to Landlord copies of) all required permits and authorizations of any Authority for such work, and (b) deliver or caused to be delivered to Landlord certificates (in form reasonably acceptable to Landlord) evidencing the following insurance coverages from each contractor and subcontractor: (i) worker's compensation insurance covering all persons to be employed in the performance of any Tenant's Work, and  (ii) commercial general liability insurance on a primary and non-contributory basis with a limit of liability reasonably approved by Landlord, and with contractual liability coverage, naming Landlord, Landlord's managing agent, if any, any Superior Landlord (hereinafter defined) and any Mortgagee (hereinafter defined) as additional insureds (each to the extent provided by name to Tenant in writing), and (iii) comprehensive automobile liability insurance (covering all owned, non-owned and/or hired motor vehicles to be used in connection with Tenant's Work) with a limit of liability reasonably approved by Landlord. The coverage limits of the foregoing insurance coverages shall be reasonable and consistent with insurance coverage limits required of similar tenants by landlords of comparable first-class mixed-use buildings in the Brooklyn borough of New York City.

At Landlord's request, Tenant agreed to delay Tenant's submission of Tenant's Plans to the applicable Authority until Landlord receives the certificate of occupancy for the Premises. Therefore, notwithstanding the foregoing or anything to the contrary contained in this Lease, Landlord acknowledges and agrees that commencing on the Commencement Date, Tenant shall have the right to enter the Premises and commence Tenant's initial Tenant's Work prior to Tenant's receipt of permits and authorizations from the applicable Authority.

**Section 5.4**    Landlord's consent to Tenant's Work and Landlord's approval of Tenant's Plans shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply with the provisions of this lease, and shall not constitute any representation or warranty by Landlord regarding the adequacy for any purpose of Tenant's Work or Tenant's Plans or their compliance with Laws, and shall not relieve Tenant from obtaining Landlord's express written approval to revisions thereto, which approval shall not be unreasonably withheld.  Promptly after substantial completion of Tenant's Work, Tenant shall, at Tenant's expense, obtain and deliver to Landlord copies of all sign-offs, letters of completion, approvals and certificates of any Authority required upon the completion of Tenant's Work

- 11 -

(including any required amendments to the certificate of occupancy for the Premises and/or Building).

**Section 5.5**    If, in connection with Tenant's Work or any other act or omission of Tenant or Tenant's employees, agents or contractors, a mechanic's lien, financing statement or other lien is filed against Landlord or all or any part of the Real Property, Tenant shall, at Tenant's expense, have such lien removed by bonding or otherwise within thirty (30) days after Tenant receives notice of the filing.

**Section 5.6**    All construction managers, contractors and subcontractors performing work for which a license is required by applicable Laws, shall be licensed by the appropriate Authorities.  Promptly following substantial completion of Tenant's Work that requires Landlord's consent, Tenant shall furnish to Landlord lien waivers and releases, in form reasonably satisfactory to Landlord, from Tenant's general contractor in connection with Tenant's Work.  Tenant shall not be required to obtain or provide Landlord with any completion bond or any other security for the completion of any of Tenant's Work.

**Section 5.7**    Intentionally Deleted.

**Section 5.8**    At Tenant's request, Landlord shall join in any applications for any authorizations required from any Authority in connection with Tenant's Work to which Landlord has consented (to the extent Landlord's consent is required), and otherwise cooperate with Tenant in connection with Tenant's Work, but Landlord shall not be obligated to incur any expense or obligation in connection with any such applications or cooperation. Landlord shall assist Tenant in expediting a certificate of occupancy for the Premises, provided such expediting is without cost or liability to Landlord.

**Section 5.9**    Tenant shall not place a load on any floor of the Premises exceeding the floor load per square foot which the floor was designed to carry and which is allowed by any Laws.

**Section 5.10**    Tenant shall be liable for any damage caused to any part of the Building, including its fixtures and equipment, arising from, or as a result of, Tenant's Work and/or its installation and/or removal of its Signs. If Tenant performs with Landlord's approval any work on the roof of the Building (for example, in connection with repair, maintenance, or installation of any air conditioning system), Tenant shall use only a contractor approved by Landlord, which approval shall not be unreasonably withheld, for such work and shall not do or cause anything to be done which would invalidate Landlord's then effective roof guaranty for the Building.  Tenant shall also be responsible for promptly repairing any damage to the roof or Building caused by such work; provided that Landlord may, at its option, effect any such repair or replacement, in which event Tenant shall reimburse Landlord for all reasonable, out-of-pocket costs incurred by Landlord in connection therewith within thirty (30) days after Tenant is billed therefor.

**Section 5.11**    On or before the Expiration Date or sooner termination of this lease, if applicable, Tenant shall, at Tenant's expense, remove from the Building (a) all Tenant's Work which Landlord designates for removal in a notice given by Landlord to Tenant at the same time Landlord grants consent to such Tenant's Work and (b) Tenant's trade fixtures, equipment and personal property which are removable without material damage to the Premises or the Building ("Tenant's Property"); provided, however, notwithstanding anything to the

contrary herein, in no event shall Tenant be required to remove any of Tenant's Initial Work. Tenant shall repair any damage to the Premises, and/or the Real Property, caused by the installation or removal of Tenant's Property, Signs or Tenant's Work. Except as expressly provided in this Section and except with respect to trade fixtures, equipment and personal property, Tenant's Work shall not be removed at the expiration or sooner termination of this lease. Any Tenant's Property or Tenant's Work that Tenant was required to remove and which is not removed by Tenant by the Expiration Date or sooner termination of this lease shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's expense.

Section 5.12    Notwithstanding anything to the contrary in this Lease, there shall be no chargeback to Tenant for the cost of any item included in Landlord's Work and/or performed prior to the Commencement Date (i.e., so-called "back charges"), and Tenant shall not be obligated to pay any additional construction charges or fees, such as, without limitation, barricade charges, freight elevator fees, dumpster or other trash fees, sprinkler system shut-down fees, plan review fees, or other such charges for work which is not included in Tenant's Work.

Article 6.    Tax Payments

Section 6.1    The term "**Real Estate Taxes**" (each, individually, a "*Real Estate Tax*") shall mean all taxes, assessments and special assessments, general or special, ordinary or extraordinary, foreseen or unforeseen, of any kind or nature whatsoever, including without limitation, municipal, school, county, open space taxes and business improvement and special improvement district assessments, levied, assessed or imposed at any time by any Authority upon or against the Real Property and/or any part thereof, and any rights or interests appurtenant thereto (hereinafter collectively referred to as the "**taxable property**"), including any taxes imposed on leasehold improvements. If, due to a future change in the method of taxation or in the taxing authority, a franchise, license, income, transit, profit or other tax, fee, or governmental imposition, however designated, shall be levied, assessed or imposed against Landlord, the taxable property (or any part thereof) or the rent or profit therefrom in lieu of, or as a substitute for, all or any part of the Real Estate Taxes, then such franchise, license, income, transit, profit, or other tax, fee, or governmental imposition shall be deemed to be included within the definition of Real Estate Taxes for the purposes hereof. Real Estate Taxes shall be determined with reference to any abatement or exemption from or credit against Real Estate Taxes applicable to all or part of the taxable property. Notwithstanding the foregoing, Real Estate Taxes shall not include any general income tax, franchise tax, estate, inheritance or gift tax, franchise, succession, or corporate taxes, late penalties (unless arising from Tenant's delinquency), or any mortgage, recording, stamp or transfer taxes payable in connection with the mortgaging, encumbrancing, transfer, sale or lease of all or part of the taxable property or of any beneficial interest in Landlord, or any portion thereof or interest therein.

Section 6.2    The term "Tax Year" means each twelve (12) month period, whether fiscal or calendar, established by the applicable taxing Authority(ies) for the Real Estate Taxes imposed by such Authority.

Section 6.3    Tenant shall pay Landlord the Tax Payments described in Exhibit F of this lease in accordance with the provisions thereof. Terms that are capitalized in such Exhibit shall have the meanings ascribed to them in this lease. In no event shall the Fixed Rent or any other item of Additional Rent be reduced by reason of any decrease in Real Estate Taxes.

**Section 6.4**    In addition to the Tax Payments, Tenant shall pay any and all: (a) other taxes, charges or impositions assessed on this lease or the Rent (to the extent such tax, charge or imposition is imposed on owners, landlords or tenants of real estate as such, rather than on taxpayers generally) by any Authority; (b) taxes assessed against any leasehold interest or personal property of any kind that is owned by or placed in, on, or about the Premises by Tenant; and (c) taxes and charges assessed by any Authority for Tenant's connection to or use of utilities.

**Section 6.5**    The Additional Rent payable by Tenant pursuant to this Article shall be paid by Tenant notwithstanding the fact that Tenant may be exempt, in whole or in part, from the payment of any Real Estate Taxes by reason of Tenant's diplomatic, charitable, or otherwise tax exempt status, or for any other reason whatsoever.

**Section 6.6**    Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the taxable property. Landlord is under no obligation to institute such proceedings. If, after Tenant has paid a Tax Payment, Landlord shall receive a refund of any portion of the Real Estate Taxes paid with respect to the Tax Year for which Tenant made such Tax Payment, Landlord shall promptly after receiving such refund pay Tenant its Proportionate Share of the net amount of such refund after deducting from such refund all reasonable, out-of-pocket expenses incurred by Landlord in obtaining such refund (including but not limited to reasonable attorneys' fees, expert's fees and disbursements incurred in connection with any application or proceeding). Alternatively, Landlord may, at Landlord's option, credit Tenant's Proportionate Share of such net refund against the next succeeding installment(s) of Rent coming due.

**Section 6.7**    The expiration of this lease shall not relieve Tenant of the obligation to make Tax Payments on a pro rata basis for the portion(s) of the applicable Tax Years preceding such expiration.

**Article 7.    Utilities; Services**

**Section 7.1**    Landlord shall not be responsible for providing any utility service to the Premises nor for providing meters, submeters or other devices for the measurement of utilities supplied to the Premises, and Tenant shall arrange for the furnishing to the Premises of such utility services as it may require. Tenant shall be solely responsible for and shall promptly pay the utility company, as and when the same become due and payable, all charges for water, sewer, electricity, gas, telephone, cable service, internet service, steam, and any other utility or other communication device used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm, or entity supplying same.

**Section 7.2**    Tenant shall not overload the electrical system serving the Premises, and shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, pipes, valves, or other facilities by which electric and other utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment that shall require additional utility facilities, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor, which approval shall not be unreasonably withheld. If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, as Additional Rent, the reasonable, out-of-pocket cost for providing such additional utility facilities.

**Section 7.3**    Landlord has no obligation to provide to Tenant or the Premises any services except as expressly set forth in this lease.  Without limiting the foregoing, Landlord is not responsible for providing heat, electric, water, gas, air conditioning, steam, sewer service, cleaning service, trash collection, extermination, cable or internet service or ventilation to the Premises.  Landlord does not represent or warrant that any utility or other service provided by Landlord, or any utility or other service used or to be used by Tenant at the Premises, (a) shall be adequate for Tenant's particular purposes or (b) shall be free from interruption or reduction.

**Section 7.4**    Subject to this Section 7.4, if any utility or other service (a) becomes unavailable from any public utility company, public authority or any other person or entity supplying or distributing same (including Landlord), or (b) is interrupted by reason of Laws, the making of any repairs or improvements, or measures taken to secure the safety of the Real Property,  or the safety and welfare of its tenants or occupants, or the public, or by reason of any similar cause beyond Landlord's reasonable control, (i) Landlord shall not be liable to Tenant in damages or otherwise, and (ii) Tenant may not abate Rent or be relieved of any of its monetary obligations under this lease. Notwithstanding the foregoing or anything to the contrary contained herein, in the event of any interruption of utilities to the Premises that is caused by the negligence or willful misconduct of Landlord, its agents, employees or contractors, and such interruption continues for more than five (5) consecutive days, Tenant's Rent shall abate until the restoration of such service.

**Section 7.5**    Tenant shall enter into, and maintain at all times during the Term, a contract for the daily removal of Tenant's trash from the Building, with the carter selected by Tenant and reasonably approved by Landlord, to provide trash removal services to the Building, subject to any applicable Rules.

### Article 8.    Access to Common Utilities Area and Meter Room

**Section 8.1**    The "**Common Utilities Area and Meter Room**" refers to that area and facilities located in the basement of the Premises which serve the Building including the Premises and other parts of the Building outside the Premises.

**Section 8.2**    Landlord reserves the right to (a) have access to the Common Utilities Area and Meter Room, and (b) enter the Premises at reasonable times on reasonable prior notice (but in any event at least twenty-four (24) hours' prior notice) (but prior notice shall not be required in an emergency) to inspect the Common Utilities Area and Meter Room (including utility reading by applicable utility vendors and contractors) and the Premises, and to perform any required repair work Landlord deems necessary to the Common Utilities Area and Meter Room, provided that such work does not interfere with Tenant's use of, access to, or the visibility of the Premises, and provided further that any such work is performed in accordance with Section 16.1.  If Tenant is not present when Landlord desires to enter the Common Utilities Area and Meter Room and the Premises in the event of an emergency, Landlord or Landlord's contractors may enter the Premises by force without liability to Tenant, except for any loss or damage caused by or due to the negligence or willful misconduct of Landlord or Landlord's contractors, provided such entry is otherwise conducted in accordance with this Section 8.2 and Section 16.1.

**Article 9.**     **Repairs and Maintenance**

**Section 9.1**    Landlord shall, at Landlord's expense, make all repairs and replacements needed to keep the exterior walls, columns, roof, roof membrane, exit stairs, foundation, floor and ceiling slabs, and all other structural portions of the Premises, including the mechanical, life safety, water, waste, and sprinkler systems, the electrical conduits, lines, equipment and systems, the plumbing lines, valves, pipes, fixtures, and systems, and the HVAC Units (defined below) and HVAC systems to the extent such systems, lines, pipes and equipment are not located within and do not exclusively serve the Premises (excluding all doors, door frames, storefronts, windows and glass) in a first-class condition; provided that Tenant gives Landlord notice of the necessity for such repairs.  Notwithstanding the foregoing, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all such repair costs to structural elements that are necessitated by the negligence or willful misconduct of Tenant, its employees, contractors, agents, subtenants, or employees.

**Section 9.2**    If the Premises are sprinklered, Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, in good order and repair and in compliance with all Laws, those elements of the sprinkler system within and exclusively serving the Premises, including the repair of the sprinkler heads and pipes. Except for the negligence or willful misconduct of Landlord or its agents, employees or contractors, Landlord shall not be responsible for maintenance, repairs or replacement of any element of the sprinkler system within and exclusively serving the Premises.

**Section 9.3**    Subject to Articles 13 and 14 and Section 10.1: Tenant shall make, at Tenant's sole expense, all repairs needed to maintain in good condition and order the non-structural portions of the Premises and all installations, equipment and facilities located within and exclusively serving the Premises, and all repairs needed to any plumbing, water, waste, heating, ventilating and air conditioning units ("HVAC Units"), and electric conduits, lines and equipment located within the Premises that serve only the Premises.  Without limiting the foregoing, but subject to Articles 13 and 14 and Section 10.1, Tenant shall make all repairs and replacements required with respect to the HVAC Units, electrical systems and plumbing systems located within and exclusively serving the Premises and any rooftop or exterior air conditioning equipment or HVAC Units serving only the Premises, any plumbing fixtures within and exclusively serving the Premises (including sinks and toilets), and the plumbing lines, valves, and pipes connected to or running from such fixtures to the point at which such lines, valves and pipes connect with the Building's common plumbing lines, to the extent such lines, valves, and pipes exclusively serve the Premises.  Tenant shall, at Tenant's expense, keep the sidewalk directly in front of the Premises free of rubbish, snow, ice and other obstructions, and otherwise in a clean condition.  All such repairs and replacements shall be made in compliance with the provisions of this lease (including Article 5).

**Section 9.4**    Tenant shall enter into and maintain, at Tenant's expense, a service, maintenance and repair contract, in scope reasonably satisfactory to Landlord, with a reputable service company, reasonably satisfactory to Landlord, for the HVAC Units exclusively serving the Premises.  Tenant shall, from time to time, furnish Landlord with a copy of such service contract, within thirty (30) days after request.  If Tenant fails to obtain or maintain such service contract or to deliver to Landlord a copy of such contract within thirty (30) days after request and such failure continues for ten (10) days after notice from Landlord, Landlord may, at its option, enter into a service contract providing for the maintenance, repair, and servicing of

such HVAC Units and bill Tenant for the charges due under such contract. Any such charges shall be paid by Tenant within thirty (30) days after Landlord delivers a bill therefor to Tenant, and such charges shall be deemed Additional Rent.

**Section 9.5** Subject to <u>Section 13.4,</u> Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all damage to the Building resulting from any negligence or willful misconduct of Tenant, Tenant's subtenants, or any of Tenant's or subtenants' employees, agents, employees, or contractors.

**Section 9.6** Except as provided herein, Landlord shall have no liability to Tenant, and the Rent shall not be abated by reason of Landlord performing any repairs or other work to all or any portion of the Premises and/or the Real Property. Landlord shall perform such repairs or other work in accordance with Section 16.1, and in any event, in a manner that does not materially adversely interfere with the conduct of Tenant's business in the Premises, or the access to or visibility of the Premises, and in a manner that does not cause damage to the Premises, Tenant's Work or Tenant's Property, but Landlord is not required to employ overtime labor or incur additional expenses.

**Section 9.7** Without limiting the generality of any other provisions of the Lease, Tenant shall have the right to make repairs in the event of Landlord's breach or failure, if the nature of the required repairs causes an emergency, health or safety situation, maintenance problem, or otherwise adversely affects Tenant's ability to conduct its business from the Premises, and such breach or failure is not cured within seventy-two (72) hours following notice from Tenant specifying such breach or failure (or, if such breach or failure shall reasonably take more than seventy-two (72) hours to cure, Landlord shall have failed to commence to cure the same within the seventy-two (72) hour period and thereafter diligently prosecuted the same to completion). Tenant's remedies for any Landlord breach or failure described herein shall include, at Tenant's option, in addition to any and all other rights and remedies of Tenant under this Lease or at law or in equity and without waiving any claim for damages or other relief, the right to make any payment or perform any obligation of Landlord which underlies Landlord's default or breach for and on behalf of the account of Landlord. Any amount paid or cost or liability incurred by Tenant in so doing, together with interest at the Default Rate until paid in full, shall be reimbursed to Tenant within thirty (30) days after demand by Tenant and Landlord shall save Tenant harmless therefrom. In the event that Landlord does not pay within thirty (30) days as provided herein, Tenant may deduct the same from Rent next coming due until such amount is fully recouped.

**Article 10.** **Laws; Hazardous Substances**

**Section 10.1** Tenant shall, at Tenant's expense, comply with all present and future laws, rules, regulations, orders, ordinances, judgments, and requirements (collectively, "<u>Laws</u>") of the United States of America, the State of New York, the city, town, village, municipality and/or county in which the Premises are located, or any present or future subdivision or instrumentality thereof, any court, agency, department, commission, board, bureau, and any fire insurance rating body (collectively, "<u>Authority</u>" or "<u>Authorities</u>") applicable to Tenant's occupancy of the Premises, Tenant's Work, Tenant's Property or the Premises. If, however, compliance requires structural work to the Premises, Tenant shall be required to effect such compliance, at Tenant's expense, only if the obligation to comply arises from Tenant's Work, Tenant's specific manner of using the Premises (as opposed to general retail use), or the

negligence or willful misconduct of Tenant, its employees, contractors, or agents. Notwithstanding the foregoing, Tenant shall not be responsible to comply with Laws that are triggered by Tenant's occupancy of the Premises or Tenant's Work, or the negligence or willful misconduct of Tenant, its employees, contractors or agents, to the extent such compliance is required due to the Premises or the Building having been non-compliant independent of Tenant's occupancy of the Premises or Tenant's Work, or the negligence or willful misconduct of Tenant, its employees, contractors or agents ("Independent Non-Compliance"). Landlord shall be responsible to comply with all Laws due to Independent Non-Compliance. Tenant shall promptly deliver to Landlord a copy of any notice, communication or other materials relating to the Premises, the Real Property (including the Building systems), Tenant's Property, Tenant's Work and/or Hazardous Substances (hereinafter defined) received by Tenant from, or sent by Tenant to, any Authority. Subject to Section 10.4, Tenant shall have an obligation to remediate any Hazardous Substances pursuant to this Section if the need for such remediation arises from Tenant's Work, Tenant's use of the Premises, or the intentional actions or omissions to act of Tenant, subtenants, and/or any of their employees, contractors, or agents. To extent within Landlord's possession, Landlord shall provide an environmental report and asbestos assessment to Tenant prior to the Commencement Date.

Section 10.2    Tenant shall not, and shall not permit any of its subtenants, employees, contractors, or agents to introduce into the Premises or the Real Property, use in the Premises or the Real Property or cause to be released from the Premises or the Real Property any Hazardous Substances.  Notwithstanding the preceding sentence, Tenant may use cleaning and office products in accordance with their customary use, provided that Tenant complies with all applicable Laws in connection therewith, and further provided that in no event may Tenant release or discharge such cleaning and/or office products into the plumbing, drainage or sewer system in excessive amounts. If Tenant breaches its obligations hereunder, Tenant, at Tenant's expense, shall promptly take all remedial action necessary to clean up any release, spill or discharge of Hazardous Substances. "Hazardous Substances" mean any flammable or otherwise hazardous material, any explosive and/or radioactive material, hazardous waste, hazardous or toxic substance or related material, asbestos and any material containing asbestos, petroleum and any petroleum derivative, pollutants, contaminants and any other substance or material which is defined as, determined to be, or identified as, a hazardous or toxic material or substance pursuant to any applicable Laws.

Section 10.3    If Tenant shall be obligated to remediate any Hazardous Substances pursuant to this lease, it shall remove and dispose of any such Hazardous Substances in compliance with all applicable Laws.  Tenant's remediation plan shall be subject to Landlord's reasonable approval and Tenant shall keep Landlord fully apprised of the progress of Tenant's remediation efforts.

Section 10.4    Except for the negligence or willful misconduct of Landlord or its agents, employees or contractors, and subject to this Section 10.4, Tenant shall indemnify, defend and hold harmless Landlord, its managing agent, its Superior Landlord, if any, its Mortgagee, if any, and their respective members, shareholders, partners, directors, managers, officers, employees, and agents, from and against all liabilities, damages, losses, fines, costs and expenses (including reasonable attorneys' fees and disbursements) resulting or arising from, or incurred in connection with any violation by Tenant of its obligations with respect to Hazardous Substances under this lease or otherwise under any applicable Laws.  Except for the negligence or willful misconduct of Tenant or its agents, employees or contractors, Landlord shall

- 18 -

indemnify, defend and hold harmless Tenant and its respective members, shareholders, partners, directors, managers, officers, employees, and agents, from and against all liabilities, damages, losses, fines, costs and expenses (including reasonable attorneys' fees and disbursements) resulting or arising from, or incurred in connection with any Hazardous Substances caused by the intentional acts or negligence of Landlord or its agents, employees or contractors, any Hazardous Substances at, in, on, under, or about the Building or Premises prior to the Commencement Date, and any violation by Landlord of its obligations with respect to Hazardous Substances under this lease or otherwise under any applicable Laws.

Landlord represents, to Landlord's actual knowledge without investigation or inquiry, to Tenant that as of the Commencement Date, there are no Hazardous Substances at, in, on, under or about the Building or the Premises in violation of any Laws.  Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be required to remediate or pay for the removal of any Hazardous Substances to the extent such Hazardous Substances exist in an amount in violation of applicable Laws and is determined by reasonably sufficient evidence generated by a qualified, independent environmental consultant to (a) have been present in the Premises prior to delivery of the Premises to Tenant or (b) be present in the Premises due to Landlord's use, storage, handling, release or disposal of Hazardous Substances on or about the Premises, Common Areas, or Building, or (c) not have been caused by the intentional acts or omissions of Tenant. Landlord shall remove such Hazardous Substances from the Premises if and to the extent such removal is required by applicable Laws; provided, however, if Tenant, in Tenant's commercially reasonable business judgment, determines that it cannot operate its business in the Premises in any commercially reasonable manner because of, and closes the Premises during, such Hazardous Substances removal by Landlord, then Rent shall abate from the day of such closure until such material interference no longer exists or Tenant re-opens for business (whichever occurs first).  This provision shall be in addition to any other remedies available to Tenant under this lease or otherwise.

Section 10.5    If Tenant conducts any auction, fire sale, going out of business sale, bankruptcy sale, or similar type of sale at the Premises in accordance with the provisions of this lease, Tenant shall obtain, and deliver to Landlord, prior to commencement of such auction or sale, any necessary permits, licenses and/or approvals required by any applicable Laws in connection therewith.

Section 10.6    Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from such Authorities as shall be necessary for, or incidental to, the conduct of its business in the Premises and shall comply with all Laws relating to the operation of its business as set forth in Section 10.1.  Landlord does not covenant, warrant or make any representation that any Authority license or permit that may be required in connection with the operation of Tenant's business will be granted, or if granted, will be continued in effect or renewed, and any failure to obtain, maintain, or renew such license or permit, or its revocation after issuance, shall not affect Tenant's obligations under this lease.

Section 10.7    Subject to the provisions of this Section, provided that Tenant is not in Default, Tenant, at Tenant's expense, may contest by appropriate proceedings prosecuted diligently and in good faith the legality or applicability of any Laws affecting the Premises for which Tenant is responsible hereunder (any such proceedings instituted by Tenant, a "Compliance Challenge"),  provided however, that Tenant's delay in compliance shall not cause (a) Landlord or Tenant to be subject to imprisonment or prosecution for a crime, (b) the Real

Property or any part thereof to be condemned or vacated, (c) the certificate of occupancy for the Building or any part thereof to be suspended or cancelled, and/or (d) the use and enjoyment of its space by another lessee or licensee at the Real Property to be materially adversely affected. Tenant must give Landlord at least ten (10) business days notice before Tenant initiates a Compliance Challenge, and shall not initiate it if Landlord reasonably objects. At Landlord's request, prior to initiating a Compliance Challenge, Tenant shall furnish Landlord with either cash or a bond from a surety company reasonably satisfactory to Landlord in form and substance, in an amount equal to 120% of the sum, as reasonably estimated by Landlord, of (i) the cost of such compliance and (ii) the amount of any and all penalties and fines that may accrue by reason of non-compliance and (iii) the amount of any Landlord liability to third parties due to such Compliance Challenge. Tenant shall keep Landlord informed regularly as to the status of any Compliance Challenge.

### Article 11.    Subordination; Estoppel Certificates

**Section 11.1**    This lease, and the rights of Tenant under this lease, are subject and subordinate in all respects to all present and future underlying leases of the Real Property, including all modifications, extensions and replacements thereof ("Superior Leases") and all present and future mortgages on any Superior Lease or on the Building and/or the Real Property including all increases, renewals, modifications, extensions, supplements, consolidations and replacements thereof ("Mortgages"), and all advances under any Mortgage. This Section is self-operative and no further instrument of subordination is required. Tenant shall, within twenty (20) days following receipt of Landlord's request, sign, acknowledge and deliver any instrument that Landlord, any landlord under a Superior Lease ("Superior Landlord") or any mortgagee under a Mortgage ("Mortgagee") may reasonably request to evidence such subordination. Notwithstanding anything to the contrary contained herein, Tenant's agreement to subordinate its interest and to attorn to any future lender, Mortgagee, or Superior Landlord is conditioned on Landlord providing Tenant, at Landlord's sole cost and expense, a commercially reasonable subordination, non-disturbance and attornment agreement from such future lender, Mortgagee, or Superior Landlord. Prior to the Commencement Date, Landlord shall, at Landlord's sole cost and expense, use commercially reasonable efforts to obtain a subordination, non-disturbance and attornment agreement reasonably acceptable to Tenant from Landlord's current mortgagee, lender or trustee.

**Section 11.2**    If any Mortgagee or any Superior Landlord or any successor or assignee thereof or any purchaser at a foreclosure sale or by deed in lieu of foreclosure succeeds to the rights of Landlord under this lease, then at the request of same, Tenant shall, subject to the terms of this Section 11.2, attorn to such Mortgagee, Superior Landlord, successor, assignee or purchaser as Tenant's landlord under this lease, provided that such Mortgagee, Superior Landlord, successor, assignee or purchaser agrees not to disturb Tenant's use or possession of the Premises or Tenant's rights under this lease so long as Tenant shall not be in Default under this lease. Tenant shall, within twenty (20) days following request by such Mortgagee, Superior Landlord, successor or assignee, sign, acknowledge and deliver any instrument that such Mortgagee, Superior Landlord, successor, assignee, or purchaser reasonably requests to evidence the attornment.

**Section 11.3**    If any Mortgagee or Superior Landlord requires any modifications of this lease, Tenant shall, within twenty (20) days following Tenant's receipt of a request, sign, acknowledge and deliver to Landlord instruments in form and substance reasonably requested by

- 20 -

Landlord providing for those modifications (provided they do not materially adversely affect Tenant's rights under this lease or increase Tenant's obligations under this lease).

**Section 11.4**    Landlord and Tenant shall, at any time and from time to time, within twenty (20) days following its receipt of a request from the other party, but not more than once per calendar year (unless required by the requesting party's lender), sign, acknowledge and deliver to the requesting party or any other person designated by that party a certification (a) that this lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications), (b) stating the date to which the Rent has been paid, (c) stating whether or not, to its actual knowledge, the other party is in default of its obligations under this lease and if so, describing the default, including any event that has occurred which, with the serving of notice or the passage of time, or both, would give rise to a default, and (d) stating to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any certification delivered pursuant to this Section may be relied upon by the third party for whom the certification is requested.

**Section 11.5**    Landlord represents and warrants to Tenant that there are no leases or other contracts, or encumbrances, or matters of public record applicable to the Real Property or the Building (collectively "Underlying Documents"), including without limitation, any Superior Leases or any reciprocal easement or operating agreements, covenants, conditions or restrictions, that conflict with this lease, or interfere with Tenant's use of the Premises for the Permitted Use, or decrease Tenant's rights hereunder, or increase Tenant's obligations hereunder. Notwithstanding anything herein to the contrary, in the event of any conflict between the terms and provisions of any Underlying Documents and the terms and provisions of this lease, as between Landlord and Tenant, the terms and provisions of this lease shall govern and control.

**Article 12.    <u>Insurance</u>**

**Section 12.1**    Tenant shall, at Tenant's expense, maintain at all times during the Term and at all times when Tenant is in possession of the Premises the following insurance: (a) commercial general liability insurance (or successor form of insurance designated by Landlord) in respect of the Premises, on an occurrence basis, with a combined single limit (annually and per occurrence and location) of not less than five million ($5,000,000) dollars naming as additional insureds Landlord and any other person designated by Landlord, (b) property insurance in an amount equal to one hundred (100%) percent of full replacement value (with a deductible not exceeding twenty-five thousand ($25,000) dollars) covering Tenant's Work (including improvements and betterments, whether or not the improvements and betterments are restored), Tenant's Property and the property of third parties located in the Premises, against fire and other risks included in the standard New York form of property insurance, including business interruption insurance covering a period of twelve (12) months, (c) workers' compensation and employer's liability insurance providing statutory benefits for Tenant's employees at the Premises (d) such other insurance as Landlord may reasonably require, provided such other insurance is consistent with insurance required of tenants entering into leases for similar Permitted Uses in similar buildings in the general vicinity of the Real Property. Such liability insurance policy shall include contractual liability, fire and legal liability coverage. Landlord shall have the right at any time and from time to time, but not more frequently than once every five (5) years, to require Tenant to increase the amount of the commercial general liability insurance required to be maintained by Tenant under this lease provided the amount

- 21 -

shall not exceed the amount then generally required of tenants entering into leases for similar Permitted Uses in similar buildings in the general vicinity of the Real Property.  Any company writing Tenant's insurance shall have an A.M. Best rating of not less than A-VIII, or such other rating as Landlord may at any time consider appropriate.

Section 12.2    Tenant shall deliver, to Landlord and each additional insured provided by name to Tenant in writing, (a) certificates in form reasonably acceptable to Landlord evidencing the insurance required by this lease to be maintained by Tenant before the Commencement Date (and with respect to any insurance required pursuant to Article 5, before the commencement of any Tenant's Work), and at least fifteen (15) days before the expiration of any such insurance, and (b) in connection with (i) a claim related to this lease, upon Landlord's reasonable request or Landlord's insurance provider's reasonable request, or (ii) Landlord's lender's request, a copy of each insurance policy; provided that, prior to submitting a copy of any insurance policy to Landlord or Landlord's insurance provider or Landlord's lender, Tenant shall be permitted to redact, edit, delete or otherwise alter any language not pertinent to the insurance coverages required of Tenant pursuant to this lease or which may be of a proprietary or confidential nature as determined by Tenant in Tenant's sole discretion.  All required insurance (including insurance required pursuant to Article 5) shall be primary and non-contributory (as shown on endorsement). The insurance policies required to be carried by Tenant hereunder shall be written so as to include the requirements for notice of cancellation or non-renewal in accordance with the New York State Insurance Law. Within five (5) business days of receipt of any notice of cancellation or non-renewal of insurance, the Tenant shall provide Landlord with a copy of any such notice received from an insurer together with proof of replacement coverage that complies with the insurance requirements of this Lease. Tenant may carry any required insurance under a blanket policy if that policy complies with the requirements of this lease and provides that Tenant's insurance for the Premises is on a "per location basis".

Section 12.3    Tenant shall not do or permit to be done any act which shall invalidate or be in conflict with Landlord's insurance policies, or increase the rates of insurance applicable to the Real Property.  If, as the result of a Default, Tenant's occupancy of the Premises (whether or not such occupancy is a Permitted Use), and/or specific hazards attributable to Tenant's occupancy, the insurance rates for the Real Property or Building increase, Tenant shall reimburse Landlord for one hundred (100%) percent of such increase in premium(s), within thirty (30) days after Tenant is billed therefor. Landlord represents and warrants to Tenant that Tenant's operation of the Permitted Use at the Premises will not invalidate or be in conflict with Landlord's insurance policies, or increase the rates of insurance applicable to the Real Property.

Section 12.4    Landlord and Tenant each hereby releases the other (and the other's agents and employees) with respect to any claim (including a claim for negligence) it may have against the other for damage or loss covered by its property insurance or covered by the property insurance such party is required to carry under the terms of this lease (including business interruption and loss of rent).  Landlord and Tenant shall each procure a clause in, or endorsement on, any property insurance carried by it, pursuant to which the insurance company waives its right of subrogation against the other party to this lease and its agents and employees or consents to a waiver of the right of recovery against the other party to this lease and its agents and employees.

**Section 12.5**    Any subtenant or other occupant of the Premises shall be obligated to comply with the provisions of this Article.

**Section 12.6**    Landlord shall carry during the term of this lease, in amounts and coverages determined by Landlord (but not less than the full replacement cost of the property so insured), "all-risk" type property damage insurance on the Real Property and commercial general liability insurance in amounts not less than the amounts required to be carried by Tenant hereunder.

**Article 13.    <u>Casualty</u>**

**Section 13.1**    If (a) the Premises are damaged by fire or other casualty, or (b) the Building (including any Building system) is damaged by fire or other casualty so that Tenant is deprived of reasonable access to the Premises or so that the Premises or any part of the Premises is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises, Tenant shall give prompt notice to Landlord.  If the Premises or Building are damaged in said manner, subject to the provisions of this Article 13, (i) Landlord shall, at Landlord's expense, promptly repair the damage to the Premises, excluding the damage to Tenant's Work or Tenant's Property and (ii) Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent reasonably required by Landlord in connection with Landlord's repair of the damage and shall promptly after Landlord's substantial completion of the repair to the Premises, commence to diligently repair Tenant's Work and Tenant's Property in order to resume its normal business in the Premises.  Until the earlier of (i) the seventy-five (75) days after the repairs to be performed by Landlord are substantially completed and (ii) the date Tenant reopens for normal business in the Premises, the Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have reasonable access or which is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises and which Tenant does not actually use for the conduct of its normal business.

**Section 13.2**    If (a) the Premises are rendered wholly untenantable, or (b) the Premises are damaged by any cause which is not covered by Landlord's insurance (plus any deductible and any self-insured amounts) or the proceeds that would have been received had Landlord carried the insurance required to be carried by Landlord under the terms of this Lease, or (c) the Premises are damaged in whole or in part during the last two (2) years of the Term and such damage cannot be repaired within two hundred seventy (270) days from the date of such casualty, or (d) the cost of repairing any damage to the Building by fire or other casualty exceeds twenty-five percent (25%) of the replacement cost thereof, as reasonably estimated by a reputable contractor, architect or engineer selected by Landlord, Landlord shall have the right, by notice given to Tenant within sixty (60) days following the date of the damage, to terminate this lease; provided, however, that Landlord shall only have the right to terminate this lease if Landlord also terminates the leases of all similarly situated tenants in the Building.  If this lease is terminated pursuant to this Section, the Term shall expire on the thirtieth (30th) day after the notice is given as fully and completely as if such date were the stated Expiration Date.

In addition, if the Premises are damaged or destroyed by fire or other casualty, Landlord shall provide Tenant with an estimate of the amount of time required to repair the Premises within sixty (60) days following the date of such casualty.  If such estimate indicates that the Premises cannot be repaired within twelve (12) months from the date of the casualty, then Tenant shall have the right to terminate this lease by providing written notice to the Landlord within

- 23 -

thirty (30) days after the date of Tenant's receipt of Landlord's estimate.  In the event the Premises and/or Building is damaged by fire or other casualty and the actual repair time exceeds twelve (12) months after the date of the casualty, Tenant shall have the right to terminate this lease upon written notice to Landlord delivered within thirty (30)  days after the expiration of such 12-month period. If the Premises are damaged in whole or in part during the last year of the Term and such damage cannot be repaired within thirty (30)  days from the date of such casualty, then Tenant shall have the right, by notice given to Landlord within sixty (60) days following the date of the damage, to terminate this lease.

      **Section 13.3**    This Article constitutes an express agreement governing any damage to or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, and any other similar Laws shall have no application to a fire or other casualty.

### Article 14.    <u>Condemnation</u>

      **Section 14.1**    If as the result of a taking by condemnation or similar legal action of an Authority or a taking by an Authority effected in any other manner (a) all of the Premises, or so much thereof as renders the Premises wholly unusable by Tenant, is taken, (b) Tenant no longer has reasonable access to or use of the Premises, (c) all or substantially all of the Building is taken or (d) a substantial portion of the Building is taken resulting in Landlord's determination to demolish the Building, or (e) the number of parking spaces in or serving the Real Property are reduced by such taking below the number of spaces required by any Laws and such reduction adversely impacts the use of the Premises, the Term shall expire on the date of the taking as fully and completely as if such date were the stated Expiration Date; provided, however, that Landlord shall only have the right to terminate this lease if Landlord also terminates the leases of all similarly situated tenants in the Building.  In the event of any such taking of all or any part of the Premises or the Real Property, Landlord shall be entitled to receive the entire award.  Tenant shall have no claim against Landlord or any Authority for the value of the unexpired portion of the Term or Tenant's Work, and Tenant hereby assigns to Landlord all of its right in and to any such award.  Tenant may, however, at Tenant's expense, make a separate claim to the appropriate Authority for the value of Tenant's Property and for moving expenses, provided such claim and award, if any, do not result in a reduction of the award which would otherwise be paid to Landlord.  If a taking does not result in the termination of this lease (i) Landlord shall, at Landlord's expense, as soon as practicable, restore that part of the Premises or the Real Property not taken to the extent reasonably practicable, so that the Premises are usable for the conduct of Tenant's normal business, and (ii) from and after the date of such taking, the Rent shall be reduced in the same proportion as the area of the Premises, if any, which was taken.

### Article 15.    <u>Assignment and Subletting</u>

      **Section 15.1**    Except as provided in this Article, Tenant shall not, without Landlord's prior consent, which shall not be unreasonably withheld, conditioned or delayed, assign, encumber or otherwise transfer this lease or any interest in this lease, by operation of law or otherwise, or sublet or permit others to occupy all or any part of the Premises, or license concessions or lease departments in the Premises, and any assignment, encumbrance, transfer, sublet, occupancy agreement, license or department lease shall be void ab initio if not in accordance with this Article.  The transfer or issuance of any ownership interests of Tenant, or any direct or indirect owner of Tenant, shall be considered an assignment of this lease which

requires Landlord's consent; provided, however, that notwithstanding the foregoing, none of the following transactions shall constitute an assignment or other transfer of this lease or sublease of the Premises or require Landlord's consent: (i) the transfer of stock or ownership interests on a national stock exchange or over-the-counter market, (ii) a transfer of stock among the current stockholders or members of Tenant, (iii) a transfer of stock among the current stockholders or members of Tenant and their immediate families (i.e., spouses, parents, brothers, sisters, children, grandchildren or any spouse of any such parent, brother, sister, child or grandchild) for legitimate estate planning purposes, (iv) a transfer of stock by will or devise to any of the persons identified in the foregoing clause (iii), or (v) any transfer or issuance of stock in connection with raising capital which does not result in a change of control of the Tenant, unless such change of control is in connection with a transfer that includes 75% of all retail stores operating under the same Trade Name.

In no event shall the transfer or issuance of shares or an initial public offering of Tenant's stock (or Tenant's parent stock) be deemed an assignment of this lease, subletting of the Premises or any part of the Premises, or other transfer, or require Landlord's consent. Tenant shall not permit any advertising or circulars regarding availability of the Premises for sublease or assignment without Landlord's consent, which shall not be unreasonably withheld.

      **Section 15.2**    Except with respect to Permitted Transactions, if Tenant desires to assign this lease or to sublet all or substantially all of the Premises, then upon Landlord's receipt of the Consent Request (hereinafter defined), Landlord may, at its option, elect to terminate this lease by notice given to Tenant, which notice shall specify a date for the termination of this lease (the "Recapture Termination Date"). Such option shall be exercised by giving Tenant notice of exercise within (30) days after the date Landlord receives the Consent Request. The Recapture Termination Date shall be a date no earlier than two (2) months and no later than four (4) months after the date the Consent Request and such supplemental documents and information are delivered to Landlord. Upon the Recapture Termination Date, this lease and the term thereof shall end and expire as fully and completely as if such date were the date set forth herein as the stated Expiration Date. Tenant shall thereupon quit, surrender and vacate the Premises in accordance with Section 23.1, without prejudice, however, to Landlord's rights and remedies against Tenant under the lease provisions in effect prior to the Recapture Termination Date or with respect to periods prior to the Recapture Termination Date, and any Rent owing shall be paid up to such date and any payments of Rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. If Landlord so terminates this lease, Landlord may, at its option and without liability to Tenant, lease the Premises to any person or entity that was negotiating with Tenant or that signed a lease, sublease or assignment agreement with Tenant for the Premises.

      **Section 15.3**    Notwithstanding any provision of this lease to the contrary, provided that Tenant shall not be in Default at the time of time of each such transaction, and provided further, that each such transaction is not performed to circumvent restrictions otherwise contained in this Article 15, Landlord's consent shall not be required with respect to an assignment of this lease or a sublease of all or a part of the Premises (the "Permitted Transactions"): (a) in connection with a merger, or consolidation of Tenant with another entity (provided that the resulting entity has a net worth at least equal to or in excess of the net worth of Tenant as of the date immediately prior to such merger or consolidation); and (b) to an entity in connection with such entity's purchase of all or substantially all of Tenant's assets or stock, provided that the assignee has a net worth at least equal to or in excess of the net worth of Tenant

- 25 -

as of the date immediately prior to such transfer; and (c) to a purchaser of a majority of the retail stores trading under the same Trade Name, provided that the assignee has a net worth at least equal to or in excess of the net worth of Tenant as of the date immediately prior to such transfer; and (d) to an entity that is controlled by, in control of, or under common control with, Tenant, and remains under such control for the remainder of the Term, provided such assignee or subtenant has a net worth at least sufficient to satisfy the then-remaining obligations of this lease.

      **Section 15.4**   Tenant acknowledges that the character and nature of the stores, store management and operations within the Building are important to Landlord and to the success of the Building.  Except for Permitted Transactions, Landlord shall not be required to approve or consent to any proposed assignment of this lease or sublease of the Premises; provided, however, that Landlord shall not unreasonably withhold, condition, or delay its consent to any proposed assignment of this lease or sublease of the Premises.  Subject to Landlord's right of termination pursuant to this Article (except for Permitted Transactions), Tenant may deliver to Landlord a written request (the "<u>Consent Request</u>") for Landlord's consent to a proposed assignment of this lease or sublease of the entire Premises which shall include (i) the name and address of the proposed subtenant or assignee, (ii) the nature and character of the business of the proposed subtenant or assignee, (iii) current bank, financial and other credit information on the proposed subtenant or assignee, and (iv) a copy of the proposed assignment or sublease, fully executed, which assignment or sublease shall be in compliance with the requirements of this Article.  Tenant shall promptly supply Landlord with such additional information as Landlord may reasonably request.  Except with respect to Permitted Transactions, Tenant shall pay Landlord on demand any reasonable out-of-pocket costs incurred by Landlord in connection with reviewing said proposed assignment or sublease, including the costs of investigating the proposed assignee or subtenant and Landlord's reasonable legal costs; provided, however, that such costs shall not exceed  Three Thousand Five Hundred Dollars ($3,500.00) in the aggregate. If Tenant assigns this lease or sublets the Premises after Landlord shall have consented to such sublease or assignment, Tenant shall pay Landlord, within thirty (30) days following payment to Tenant, fifty (50%) percent of:  (a) all sums and other consideration paid in connection with an assignment (including key money, bonus money, and any payments for assets, inventory, fixtures, furniture and equipment transferred by Tenant to the assignee to the extent such payments exceed the fair market value of such assets, inventory, fixtures, furniture and equipment) in excess of the Rent payable by Tenant pursuant to this lease for the corresponding period of such assignment, after Tenant recovers therefrom all reasonable costs incurred by Tenant in connection with that assignment which have been paid or are then due and payable; and (b) the excess, if any, of the rents, additional charges and/or other consideration paid in connection with a sublease over the Rent allocable to the subleased premises (which Rent shall be allocated equally throughout the Premises) accruing during the term of that sublease after Tenant recovers therefrom all reasonable costs incurred by Tenant in connection with that sublease which have been paid or are then due and payable. For purposes of this Section, the phrase "reasonable costs incurred by Tenant" shall mean customary brokerage commissions, the cost of any standard alteration made by Tenant to prepare the Premises for such assignee's or subtenant's occupancy, and reasonable attorneys' fees incurred in connection with such assignment or sublease, and all other reasonable costs and expenses incurred by Tenant in connection with such assignment or sublease. This Section shall not apply to a Permitted Transaction.

      **Section 15.5**  If this lease is assigned or the Premises are sublet, in whole or in part, Tenant shall remain liable for the performance of all of the terms, covenants and conditions

of this lease on the part of Tenant to be performed or observed.  Tenant's liability hereunder shall not be affected by any modification of this lease or agreement made between Landlord and any assignee or subtenant, or by reason of any delay or failure on Landlord's part to enforce any of its rights under this lease; provided that if any such modification or agreement increases the obligation of the assignee under this lease, the liability of the assignor-Tenant under this lease shall continue to be no greater than if such modification or agreement had not been made unless such assignee is a person or entity that directly or indirectly controls, is controlled by or is under common control with Tenant.

Section 15.6    The consent by Landlord to any assignment, transfer, sublet, occupancy, encumbrance or other transaction described in <u>Section 15.1</u>, shall not in any way be deemed to relieve Tenant from obtaining the express consent of Landlord prior to any further such transaction or any proposed assignment of sublease or sub-sublease, which consent may be granted or denied at Landlord's reasonable discretion.

Section 15.7    The acceptance by Landlord of Rent following any assignment, sublease, encumbrance, license, occupancy, or other transaction in violation of this Article, shall not be deemed a consent by Landlord to such transaction, nor a waiver of any right or remedy of Landlord hereunder.

**Article 16.**    <u>**Access; Changes in Building and Real Property**</u>

Section 16.1    Landlord reserves the right to (a) place concealed ducts, pipes and conduits through the Premises (without a material reduction or reconfiguration of the useable area of the Premises), provided all such ducts, pipes, and conduits are located completely beneath the floor of the Premises or completely within the walls or completely above Tenant's hung ceiling in non-stockroom areas, and provided further, however, if no finished ceiling is installed by Tenant in the non-stockroom area of the Premises, such ceiling area shall not be available to Landlord for this purpose, and if no finished ceiling is present in the stockroom area, then such ducts, pipes and conduits shall be located at a height no lower than twelve feet (12') from the finished floor of such area if on the ground floor and no lower than seven feet (7') if located in the basement, and (b) enter the Premises after Tenant's business hours on reasonable prior written notice (but in any event, at least 24 hours' prior notice) (but prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to prospective lenders and prospective purchasers of the Building and, during the last twelve (12) months of the term of this lease, to prospective tenants, or to perform any required repair work Landlord deems necessary to the Premises or the Building or for the purpose of complying with Laws. In connection with entering the Premises, Landlord shall use commercially reasonable efforts to expedite all work, minimize any interference with or disruption to Tenant's business, and maintain the safety and security of Tenant's employees and customers, including with the installation of temporary floor and surface protection, and following completion of the work, return Tenant's leasehold improvements, fixtures, property, and equipment to the original locations and condition to the fullest extent reasonably possible and repair any damage caused by Landlord's entry. At all times, Landlord shall avoid substantial interference with the regular conduct of Tenant's business in the Premises, provided, however, that Landlord shall not be required to utilize overtime labor. For the purposes hereof, "substantial interference" shall include (i) any daytime, but not overnight storage of materials or equipment or erection of construction aids or shoring in the Premises, (ii) any work (other than to a de minimis extent) during Tenant's hours of operation, and (iii) any work that cannot be completed within five (5)

- 27 -

days; provided, however, that in any event, Landlord shall comply with the terms of this Section 16.1, including, without limitation, the obligation to use commercially reasonable efforts to expedite all work and minimize any interference with or disruption to Tenant's business. In the event of any substantial interference, Tenant may invoke any remedy allowed at law or in equity or pursuant to its rights under the Lease, provided, however, except as otherwise provided herein, that Tenant shall not be permitted to withhold or offset Rent as and when due pursuant to the terms of the lease. . If Tenant is not present when Landlord desires to enter the Common Utilities Area and Meter Room and the Premises in the event of an emergency, Landlord or Landlord's contractors may enter the Premises by force without liability to Tenant, except for any loss or damage caused by or due to the negligence or willful misconduct of Landlord or Landlord's contractors, provided such entry is otherwise conducted in accordance with this Section 16.1.

**Section 16.2**    Subject to this Section 16.2 and Section 16.4, Landlord reserves the right at any time and from time to time to (a) make changes or revisions in the Real Property other than the Premises, including but not limited to the Building areas, walkways, driveways, parking areas, or other Common Areas, (b) construct improvements in the Real Property other than the Premises, (c) construct additions to, or additional stories on, the Building (which right includes the right to make use of structural elements of the Premises, including without limitation columns and footings, for such construction, provided such use does not encroach on the interior of the Premises), and (d) change the name, number or designation by which the Real Property and/or Building is known. Landlord's exercise of its rights pursuant to this Section shall not reduce the number of parking spaces serving the Real Property below that required by any Laws. Notwithstanding anything to the contrary contained herein, Landlord shall not make any changes to the Real Property or Building that would materially adversely affect Tenant's use of, visibility of, or access to and from the Premises, or materially increase any of Tenant's obligations under this Lease.

**Section 16.3**    Subject to Section 16.1, if there is to be any excavation or construction adjacent to the Building, Tenant shall permit Landlord and/or any other person to enter the Premises after Tenant's business hours to perform such work as Landlord or that person deems necessary to protect the Building, and except as provided otherwise herein, without any abatement of the Rent or liability to Tenant.

**Section 16.4**    Subject to this Section 16.4, Landlord shall have the exclusive right to use all or any part of the roof of the Building for any purpose, and to erect temporary scaffolds and other aids to construction on the exterior of the Building in connection with alterations, repairs or to comply with Laws (including New York City Local Law 11 of 1998), provided that access to the Premises shall not be denied. Any scaffolding, barricade, "dog house" or other construction aid or covering (collectively, "construction aids") utilized or authorized by Landlord in connection with any construction performed or authorized by or on behalf of Landlord during the term of this lease in front of the Premises shall be lighted and shall be constructed and maintained above the level of Tenant's storefront and signage, and shall not materially and adversely impact Tenant's use of or access to the Premises. Except in the case of an emergency, Landlord shall give Tenant thirty (30) days written notice prior to the installation of the construction aid, and Tenant shall have the exclusive right to install temporary signage on such construction aid, which temporary signage shall be designed by Tenant and provided by Landlord at Landlord's reasonable expense. Landlord shall promptly remove such construction aid at Landlord's expense after completion of such construction. Landlord agrees to take

reasonable actions to minimize the period during which such construction aids are erected to the extent commercially reasonable and practicable; provided, however, in no event shall such time exceed thirty (30) days, unless such construction aids are required to comply with applicable Laws.  In no event shall Landlord be permitted to install such construction aids during the thirty (30) day period before Tenant's initial opening for business at the Premises, during the sixty (60) day period after Tenant's initial opening for business, or during the months of October through December, except as required by Law or in case of an emergency. In the event Landlord does not comply with the above, then Fixed Rent due and payable under this lease shall be discounted by thirty (30%) percent for each day such construction aids remain erected in violation of this Section 16.4, apportioned between Landlord and Tenant on a *per diem* basis.

Section 16.5    Landlord shall exercise Landlord's rights under this Article in a manner which does not materially interfere with the conduct of Tenant's business in the Premises, or access to or the visibility of the Premises, and in a manner which does not cause damage to the Premises, Tenant's Work or Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense). In the event Landlord's repairs, maintenance, improvements, alterations, or other work in or about the Building materially interferes with Tenant's business, or if access to or egress from the Premises, or visibility of the Premises, is materially impaired for a period in excess of 72-hours, and Tenant closes its business in the Premises as a result of such work, then from and after said 72-hour period, Tenant's Rent shall abate until the earlier of (i) such repairs are substantially completed or (ii) the date Tenant reopens the Premises for business.

Section 16.6    Landlord shall keep or cause to be kept the Building and the Common Areas neat, clean, and orderly, properly lighted and landscaped, in a first class condition consistent with other first-class mixed-use buildings in the Brooklyn borough of New York City.

Section 16.7    Notwithstanding anything to the contrary contained in the Lease, Landlord shall not install or allow the construction or placement of any temporary or permanent kiosk, cart, planter, automated teller machine, telephones or any other obstruction or retail merchandising structure on the sidewalk in front of the Premises (the "Protected Area"). Landlord shall not materially block access or visibility to the Premises, or make any materially adverse changes or alterations whatsoever to the Protected Area.

### Article 17.    Default

Section 17.1    Each of the following (a "Default") is a default by Tenant under this lease:

(a)    Tenant fails to pay when due any Rent and the failure continues for seven (7) days following Landlord's notice (which notice shall also be considered any demand required by any Laws).  If, however, Landlord gives such a notice of failure to pay Rent three (3) times in any twelve (12) month period, any additional failure to pay any Rent when due within that twelve (12) month period shall be considered a Default, without the requirement of any notice by Landlord.

(b)    Tenant fails to comply with Article 15 or knowingly makes any misrepresentation under Section 24.2.

(c)     Tenant assigns this lease or subleases the Premises in violation of the terms of <u>Article 15</u> of this lease.

(d)     Tenant fails to comply with any other term of this lease and the failure continues for thirty (30) days following Landlord's notice.  If, however, compliance cannot, with diligence, reasonably be fully accomplished within that thirty (30) day period, Tenant shall have such additional period of time as is reasonable under the circumstances to fully comply, provided Tenant commences compliance within that thirty (30) day period and thereafter pursues compliance to completion with diligence.

(e)     A third party institutes against Tenant any legal action seeking any relief from its debts under any applicable bankruptcy or insolvency Laws which is not dismissed within ninety (90) days, or Tenant institutes any  legal action seeking such relief, and/or a receiver, trustee, custodian or other similar official is appointed for Tenant or for all or a substantial portion of its assets and such receiver, trustee, or similar official is not released within sixty (60) days, or Tenant commits any other act reasonably indicating insolvency such as making an assignment for the benefit of its creditors.

(f)     Except as otherwise expressly permitted under this lease, Tenant abandons the Premises prior to the Expiration Date.

**Section 17.2**    If a Default occurs, this lease is subject to the conditional limitation that Landlord may, at any time during the continuance of the Default, give notice to Tenant that this lease shall terminate on the date specified in that notice, which date shall not be less than five (5) days after Landlord gives such notice to Tenant.  If Landlord gives that notice, this lease and the Term shall expire and come to an end on the date set forth in that notice as if said date were the date originally fixed in this lease as the Expiration Date and Tenant shall quit and surrender the Premises to Landlord (but Tenant shall remain liable as provided in this lease).

**Section 17.3**    If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit.

**Section 17.4**    Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice from Tenant of said failure, (or such additional time as is reasonably necessary to cure such default, provided Landlord commences to cure such default within such 30 day period and diligently pursues such cure to completion) (or such lesser time as is reasonable under the circumstances in the event Landlord's default materially and adversely affects Tenant's use of the Premises), shall constitute a default and breach of this Lease by Landlord.  Tenant shall have all rights and remedies provided at law or in equity.

### <u>Article 18.</u>      <u>Remedies</u>

**Section 18.1**    If this lease is terminated pursuant to <u>Article 17</u> or Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action or by force or otherwise (which Landlord may do without further notice and without liability or obligation to Tenant or any occupant of the Premises (except for damage or loss caused by or

due to the negligence or willful misconduct of Landlord or its agents, employees or contractors)), all of the provisions of this Section shall apply (in addition to any other applicable provisions of this lease).

(a)    Tenant, and all other occupants, shall vacate and surrender to Landlord the Premises in accordance with this lease.

(b)    Landlord, at Landlord's option, may (i) relet the Premises, or any portion of the Premises, from time to time, in the name of Landlord, Tenant or otherwise, as determined by Landlord, to any person and on any terms, but the failure to relet the Premises, or any portion of the Premises, or to collect any rent shall not impose any liability or obligation on Landlord or relieve Tenant of any obligation or liability under this lease), and (ii) make any changes to the Premises as Landlord, in Landlord's judgment, considers advisable or necessary to put the Premises in the condition required hereunder in connection with a reletting, without imposing any liability or obligation on Landlord or relieving Tenant of any obligation or liability under this lease.

(c)    Tenant shall pay Landlord all Rent payable to the later of the date on which this lease is terminated or Landlord re-enters or obtains possession of the Premises.

(d)    Tenant shall also pay to Landlord, as damages, any deficiency between (i) the aggregate Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the monthly Additional Rent for each year thereof to be 1/12th of Additional Rent that was payable for the year immediately preceding the termination, re-entry or obtaining of possession) and (ii) the rents, if any, applicable to that period collected under any reletting of all or any portion of the Premises. Tenant shall pay any such deficiency in monthly installments on the days specified in this lease for payment of installments of the Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same arises. No suit to collect the deficiency for any month shall prejudice Landlord's right to collect the deficiency for any subsequent month. Tenant shall not be entitled to any rents payable (whether or not collected) under any reletting, whether or not those rents exceed the Rent. If Landlord relets the Premises, or any portion of the Premises, together with other space in the Building, the rents collected under the reletting and the expenses of the reletting shall be equitably apportioned for the purposes of this Article.

(e)    Landlord may recover from Tenant, and Tenant shall pay Landlord, on request, in lieu of any further deficiency pursuant to the preceding paragraph of this Section (as liquidated damages for such deficiency) the amount by which (i) the unpaid Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding the termination, re-entry or obtaining of possession) exceeds (ii) the then fair market rental value of the Premises, including the Additional Rent for the same period, both discounted to present value at an annual rate of interest equal to five (5%) percent. If, before presentation of proof of liquidated damages, Landlord relets the Premises or any portion of the Premises for any period pursuant to a bona fide lease with an unrelated third party, the net rents (after deducting reletting costs) payable in connection with the reletting shall be considered to be the fair market rental value for the Premises or the portion of the Premises relet during the term of the reletting.

(f)     Tenant shall also pay Landlord, as additional damages, any reasonable, out-of-pocket expenses incurred by Landlord in connection with the termination, reentry or obtaining of possession, and the reletting of the Premises, including all repossession costs, brokerage commissions (not beyond the term of this lease), reasonable attorneys' fees and disbursements,  and other expenses of repairing the Premises to good condition for reletting.

(g)     Subject to Section 22.4, nothing contained in this lease shall be considered to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages or otherwise by any Laws.

**Section 18.2**   Tenant hereby waives (a) the service of any notice of intention to re-enter or obtain possession of the Premises or to institute any legal action in connection therewith, except as provided in this lease and (b) on its own behalf and on behalf of all persons claiming under Tenant, including all creditors, any rights Tenant and all such persons might otherwise have under any Laws to redeem the Premises, to re-enter or repossess the Premises, or to restore this lease, after (i) Tenant is dispossessed pursuant to any Laws or by any Authority, (ii) Landlord reenters or obtains possession of the Premises, or (iii) the Expiration Date, each to the extent performed pursuant to this lease. The words "re-enter," "re-entry" and "re-entered" as used in this lease shall not be considered to be restricted to their technical legal meanings. Subject to the terms of this lease, Landlord shall have the right to enjoin any Default and the right to invoke any remedy allowed by any Laws in addition to any remedies provided in this lease.  Except as provided herein, all remedies provided in this lease are cumulative and Landlord's right to invoke, or the invocation of, any remedy shall not preclude Landlord from invoking any other remedy under this lease or under any and all Laws.

**Section 18.3**   To the extent permitted by Law, Landlord and Tenant each hereby waive trial by jury in any legal action brought by either party against the other in connection with this lease. If Landlord commences any summary proceeding against Tenant, Tenant shall not interpose any counterclaim in that proceeding (unless the failure to impose the counterclaim would preclude Tenant from asserting in a separate legal action the claim which is the subject of the counterclaim), and shall not seek to consolidate the proceeding with any other legal action.

**Section 18.4**   If Tenant fails to comply with any of its obligations under this lease and such failure is a Default under the terms of this lease, Landlord may, at its option, except with respect to the payment of Rent, cure such breach of this lease.  All reasonable, out-of-pocket costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Landlord in that connection shall be paid by Tenant to Landlord as Additional Rent within thirty (30) days after Tenant is billed therefor.

**Section 18.5**   In the event either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any Default hereunder, then and in that event, the non-prevailing party in such action or proceeding shall reimburse the prevailing party for the reasonable expenses of attorneys' fees, court costs and related disbursements incurred therein by the prevailing party.

**Section 18.6**   The failure of Landlord to seek redress for a Default, or of Tenant to seek redress for a default by Landlord, of Landlord or Tenant to insist upon the strict performance of any term of this lease, shall not prevent Landlord from redressing a subsequent Default, or Tenant from redressing a subsequent default by Landlord, or Landlord or Tenant

from thereafter insisting on strict performance.  The receipt by Landlord of the Rent with knowledge of a Default or Tenant's failure to strictly perform under this lease shall not be deemed a waiver of the Default or failure.  No term of this lease shall be considered waived by Landlord or Tenant unless the waiver is in a writing signed by the waiving party.  No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be considered other than on account of the next installment of the Rent, or as Landlord may elect to apply same.  No endorsement or statement on any check or letter accompanying any check or payment shall prevent Landlord from cashing the check or otherwise accepting the payment, without prejudice to Landlord's right to recover the balance of the Rent or pursue any other remedy.

> **Section 18.7**    If Tenant fails to pay any installment of the Fixed Rent or any Additional Rent within seven (7) days after Landlord's notice of such failure, in addition to any other right or remedy of Landlord, Tenant shall pay to Landlord within thirty (30) days following Landlord's invoice (a) a late charge equal to the greater of one hundred ($100.00) dollars and four (4%) percent of the amount unpaid and (b) interest at the rate (the "Default Rate") of twelve (12%) percent per annum on the amount unpaid, from the date the payment was first due to and including the date paid and, (c) and Landlord's bank charges for the return of any Tenant's check. Notwithstanding anything to the contrary contained herein, Tenant will not be required to pay such late charge or interest for the first late payment of Rent in any calendar year.

> **Section 18.8**    All legal actions relating to this lease shall be adjudicated in the courts of the State of New York having jurisdiction in the county in which the Building is located.  Tenant irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action relating to this lease, and Tenant shall not assert, by way of motion, as a defense or otherwise, any objection to any such court being the venue of such legal action or claim that such venue is an inconvenient forum for Tenant or any principal of Tenant.

> ### Article 19.    Security

> **Section 19.1**    Upon the execution of this lease, Tenant shall deposit with Landlord, as security for Tenant's compliance with this lease, the Security, in cash or, at Tenant's option, in lieu of providing the Security in cash, Tenant may provide a letter of credit in the sum of the amount required hereunder as cash Security ("Letter of Credit"). If Tenant elects to provide a Letter of Credit, the Letter of Credit must be in a form reasonably acceptable to Landlord and Landlord's counsel. Said Letter of Credit shall provide that it may be drawn upon by Landlord upon affidavit of default when presented for payment at the issuing bank's branch offices located in the City, County and State of New York. Landlord shall not be obligated to accept a Letter of Credit from Tenant unless it can be drawn upon at a branch located in the City, County and State of New York in such fashion. At least thirty (30) days prior to the expiration of any such Letter of Credit, Tenant shall furnish Landlord with an acceptable replacement or renewal Letter of Credit. If tenant should fail to do so, Landlord may, without notice to Tenant, draw upon the Letter of Credit for the full amount thereof, in which event Landlord shall thereafter keep the proceeds of the said Letter of Credit as a cash security deposit to be held by Landlord in accordance with the terms of this lease. In the event that Landlord has drawn upon the Letter of Credit, in whole or in part, Tenant shall reimburse Landlord for all amounts so drawn within ten (10) days after demand, plus all of Landlord's reasonable out-of-pocket costs and reasonable attorney's fees, or provide Landlord with an acceptable replacement Letter of Credit for the full amount required under the terms of this lease, together with payment for all of Landlord's reasonable out-of-pocket costs and reasonable attorney's fees.

If Tenant defaults in performing any of its obligations under this lease, Landlord may use all or any portion of the Security to cure such breach or for the payment of any other amount due and payable from Tenant to Landlord in accordance with this lease. If Landlord uses all or any part of the cash Security, Tenant shall, within fifteen (15) days following Landlord's notice, deposit with Landlord an amount sufficient to restore the full amount of the cash Security. Landlord shall not, unless required by any Laws, pay interest to Tenant on the cash Security, and if Landlord is required to maintain the cash Security in an interest bearing account or pay any interest to Tenant, Landlord shall retain the maximum amount of interest permitted under any Laws (which Landlord may withdraw and retain annually or at any other times).  Tenant shall not assign (other than to a permitted assignee of this lease) or encumber the Security, and no prohibited assignment or encumbrance by Tenant of the Security shall bind Landlord.  Landlord shall not be required to exhaust its remedies against Tenant or the Security before having recourse to Tenant, the Security or any other security held by Landlord, or before exercising any right or remedy, and recourse by Landlord to any one of them, or the exercise of any right or remedy, shall not affect Landlord's right to pursue any other right or remedy or Landlord's right to proceed against the others.  If there is then no uncured breach, the Security and any accrued and unpaid interest thereon, or any balance, shall be paid or delivered to Tenant promptly after the Expiration Date or earlier termination of this lease and Tenant's vacating of the Premises in accordance with this lease.  If Landlord's interest in the Real Property is sold or leased, Landlord shall transfer the Security and any accrued and unpaid interest thereon, or any balance, to the new Landlord and, upon such transfer, the assignor shall thereupon be automatically released by Tenant from all liability for the return of the Security or any interest (and Tenant agrees to look solely to the assignee for the return of the Security or any interest).

### Article 20.    Broker

**Section 20.1**    Tenant represents to Landlord that it has dealt with no broker in connection with this lease other than the Broker.  Tenant shall indemnify, defend and hold harmless Landlord from and against any claims for any brokerage commissions or other compensation which are made by any broker (other than the Broker) alleging to have dealt with Tenant in connection with this lease, and all costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. Landlord represents to Tenant that it has dealt with no broker in connection with this lease other than the Broker. Landlord shall pay any commission due the Broker pursuant to a separate agreement between Landlord and the Broker.  Landlord shall indemnify, defend and hold harmless Tenant from and against all claims, costs, expenses, liabilities and damages including reasonable attorneys' fees and expenses (a) arising from Landlord's failure to comply with its obligation in the preceding sentence and (b) in connection with any claims for any brokerage commissions or other compensation by any broker (other than the Broker) alleging to have dealt with Landlord in connection with this lease.

### Article 21.    Notices; Consents and Approvals

**Section 21.1**    Except as may be provided in this lease, all notices and other communications under this lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its Notice Address.  Either party may, by notice given in accordance with this Article, designate a different Notice Address, which address change shall become effective upon receipt, the date rejected or the date of attempted delivery (if the receiving party is not present).

**Section 21.2**   Any notice or other communication sent as provided in this Article shall be effective (a) on the date received, the date rejected, or the date of attempted delivery (if the receiving party is not present) if sent by overnight courier service, or (b) three (3) business days after mailing by registered or certified mail.

**Section 21.3**   If any provision of this lease requires either party's consent or approval, such consent or approval shall be effective only if given in writing.

**Section 21.4**   Any notice or other communication given by Landlord to Tenant in accordance with this Article may be signed and given by such party's attorney or managing agent, if any, with the same force and effect as if signed and given by such party.

**Article 22.**      **No Representations; Liability; Tenant Indemnity**

**Section 22.1**   Neither Landlord nor Landlord's managing agent, if any, has made any warranties, representations, statements or promises with respect to the Premises, the Real Property, the Building systems, any Additional Rent, any Laws or any other matter, unless expressly set forth in this lease.  This lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this lease, and any previous agreements between Landlord and Tenant are merged in this lease, which alone expresses their agreement.  Tenant is entering into this lease after full investigation, and is not relying on any warranties, representations, statements or promises made by Landlord or any other person not expressly set forth in this lease, and is not acquiring any rights of any nature, by implication or otherwise, except as expressly set forth in this lease.

**Section 22.2**   Except for the negligence or willful misconduct of Landlord or its agents (including the managing agent), employees or contractors,  neither Landlord nor Landlord's managing agent, if any, shall be liable for any damages to or loss of property of Tenant or others entrusted to employees, agents or contractors of Landlord, Landlord's managing agent, if any, or the Real Property. Neither Landlord nor Landlord's managing agent, if any, shall be liable for any injury, damage or loss to Tenant's Property, Tenant's Work, or to any other property of Tenant resulting from any cause, except to the extent caused by the negligence or willful misconduct of Landlord, Landlord's managing agent, if any, or their respective employees, agents or contractors, subject to Article 13.

**Section 22.3**   In the event of a transfer or lease of the entire Building the transferor or lessor shall be and hereby is relieved of all obligations and liabilities of Landlord under this lease accruing after the effective date of the transfer or lease, provided that the transferee or lessee assumes all of Landlord's obligations and liabilities under this lease effective from and after the effective date of the transfer or lease.

**Section 22.4**   In no event shall Landlord, its affiliates, agents, partners, members, managers, shareholders, officers, directors and principals, disclosed or undisclosed, be liable for incidental or consequential damages or have any personal liability under or in connection with this lease.  Tenant shall look only to Landlord's interest in the Real Property, including any rents, issues, profits, casualty and condemnation proceeds, or other income and equity from Landlord's interest in the Real Property, for the satisfaction of Tenant's remedies or to collect any judgment requiring the payment of money by Landlord under or in connection with this lease, and no other assets of Landlord or such persons shall be subject to lien, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies or the collection of any judgment under or in

- 35 -

connection with this lease. Notwithstanding anything to the contrary in this lease, in no event shall Tenant be responsible for consequential damages (e.g., lost profits), punitive damages or any damages other than direct, actual and compensatory damages incurred by Landlord.

**Section 22.5**    If Tenant requests Landlord's consent or approval and Landlord fails or refuses to give such consent or approval, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent or approval, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, unless Landlord acted in bad faith, in which case Tenant shall have the right to recover money damages.

**Section 22.6**    Intentionally Deleted.

**Section 22.7**    Neither Landlord nor Tenant shall have any liability to the other party, if Landlord or Tenant, as applicable, is unable to comply with, or is delayed in complying with, any of such party's obligations under this lease by reason of any strike, labor trouble, accident, war, act of God, government action, or other similar cause beyond such party's reasonable control ("Force Majeure").

**Section 22.8**    Tenant shall, to the extent not caused by the negligence or willful misconduct of Landlord or its contractors, employees, or agents (including Landlord's managing agent, if any), indemnify, defend and hold harmless Landlord and Landlord's managing agent, if any, from and against all (a) claims arising from any negligence or willful misconduct of Tenant, its subtenants, contractors, agents, or employees, (b) claims arising from any accident, injury or damage to any person or property in the Premises during the Term or when Tenant is in possession of the Premises, and (c) Tenant's failure to comply with Tenant's obligations under this lease (whether or not a Default), and all liabilities, damages, losses, fines, violations, costs and expenses (including reasonable attorneys' fees and disbursements) incurred in connection with any such claim or failure.

Landlord shall, to the extent not caused by the negligence or willful misconduct of Tenant or its contractors, employees, or agents, indemnify, defend and hold harmless Tenant from and against all (a) claims arising from any negligence or willful misconduct of Landlord, or its contractors, agents (including Landlord's managing agent, if any), or employees, (b) claims arising from any accident, injury or damage to any person or property in the Building (other than the Premises), and (c) Landlord's failure to comply with Landlord's obligations under this lease and all liabilities, damages, losses, fines, violations, costs and expenses (including reasonable attorneys' fees and disbursements) incurred in connection with any such claim or failure.

**Article 23.    End of Term**

**Section 23.1**    On the Expiration Date (a) Tenant (and all other occupants) shall vacate and surrender the Premises, leaving the Premises vacant, broom clean and in good order and condition, except for ordinary wear and tear and damage for which Tenant is not responsible under this lease, and (b) Tenant shall remove all of Tenant's Property and any Tenant's Work required to be removed pursuant to this lease. If the last day of the Term is not a business day, this lease shall expire on the immediately preceding business day. Tenant waives, for itself and for any person claiming under Tenant, any right which Tenant or any such person may have under Section 2201 of the New York Civil Practice Law and Rules or under any similar Laws.

If the Premises are not vacated and surrendered in accordance with this lease (whether by Tenant or any occupant related to Tenant), on the date required by this lease, Tenant shall indemnify and hold harmless Landlord against all losses, costs, liabilities, claims, damages and expenses incurred by Landlord in connection therewith, including reasonable attorneys' fees and disbursements whether in an action by or against Tenant or a third party, and including claims and liabilities of Landlord made by any succeeding tenant(s) or other third party; provided, however, that Tenant shall not be liable to Landlord for consequential damages resulting from such holdover unless Landlord has notified Tenant in writing thirty (30) days prior to the commencement of such holding over that possession of the Premises shall be required upon expiration or earlier termination of this Term for occupancy by a successor tenant. In addition, Tenant shall be liable to Landlord for per diem use and occupancy in respect of the Premises at a rate equal to one hundred fifty percent (150%) of the Fixed Rent and one hundred percent (100%) of the Additional Rent payable under this lease for the last year of the Term (which Landlord and Tenant agree is the Rent that is contemplated by them as being fair and reasonable under such circumstances and is not a penalty), pro-rated on a daily basis for each day of Tenant's occupancy of the Premises beyond the Term of this lease. In no event, however, shall this Section be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date.

**Section 23.2**    Intentionally deleted.

**Section 23.3**    Unless otherwise specifically provided: (a) any obligation of Landlord or Tenant under this lease which by its nature or under the circumstances can only be, or by the terms of this lease may be, performed after the Expiration Date; (b) any liability for a payment with respect to any period ending on or before the Expiration Date; and, (c) all indemnity and hold harmless provisions in this lease, shall survive the Expiration Date.

### **Article 24.**    **Miscellaneous**

**Section 24.1**    **Patriot Act.**  Tenant certifies and represents, to Tenant's actual knowledge as of the date of execution and delivery of this lease, that Tenant is not, and is not acting directly or indirectly for or on behalf of, any group, entity, or nation, named by any Executive Order of the President of the United States or the United States Treasury Department as a terrorist or other "Specially Designated National and Blocked Person," or other person, entity, nation or transaction banned or blocked pursuant to any law, order, rule or regulation that is enforced or administered by the United States Office of Foreign Assets Control or any successor entity, agency or department (an "SDN").  If Tenant is comprised of more than one person or entity, the foregoing certification is made as to each person and entity comprising Tenant.  Landlord certifies and represents, to Landlord's actual knowledge as of the date of execution and delivery of this lease, that Landlord is not, and is not acting directly or indirectly for or on behalf of, any group, entity, or nation, named by any Executive Order of the President of the United States or the United States Treasury Department as a terrorist or other "Specially Designated National and Blocked Person," or other person, entity, nation or transaction banned or blocked pursuant to any law, order, rule or regulation that is enforced or administered by the United States Office of Foreign Assets Control or any successor entity, agency or department. If Landlord is comprised of more than one person or entity, the foregoing certification is made as to each person and entity comprising Landlord.

- 37 -

**Section 24.2    Financial Statements.**  In connection with (i) a potential investor or party considering acquiring the Building (or portion thereof), or (ii) Landlord's refinancing of the Building or a portion thereof, Tenant shall within fifteen (15) business days after Landlord's written request (but not more often than one time during any 12 month period), furnish Landlord with an unaudited balance sheet and an annual profit and loss statement reflecting Tenant's then-current financial condition, certified by an officer of Tenant.

**Section 24.3    General.**  (a)  Subject to the provisions of this lease, this lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns.

(b)    This lease may not be changed or terminated, in whole or in part, except in a writing signed by Landlord and Tenant.

(c)    Notwithstanding any provision of this lease, or any Laws, to the contrary, or the execution of this lease by Tenant, this lease shall not bind or benefit Landlord or Tenant, unless and until this lease is signed and delivered by both Landlord and Tenant.

(d)    No act or omission of Landlord or Tenant, or their respective employees, agents or contractors, including the delivery or acceptance of keys, shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless it is in a writing signed by Landlord and Tenant.

(e)    The captions in this lease are for reference only and do not define the scope of this lease or the intent of any term.  All Article and Section references in this lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this lease.

(f)    If any provision of this lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by all applicable Laws.

(g)    There shall be no presumption against Landlord because Landlord drafted this lease or for any other reason.

(h)    If there is then no Default, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming under Landlord, subject however, to the terms of this lease.

(i)    Tenant hereby waives any rights Tenant may have in connection with any zoning lot merger, zoning application, or subdivision or transfer of development rights with respect to the Real Property or any part thereof, including any rights Tenant may have to be a party to or to execute or contest any instrument providing for such merger, subdivision or transfer.

(j)    If Tenant is comprised of two or more persons, the liability of those persons under this lease shall be joint and several. If Landlord is comprised of two or more

persons, the liability of those persons under this lease shall be joint and several.  Wherever appropriate in this lease, personal pronouns shall be considered to include the other gender and the singular to include the plural.

(k)    Tenant shall not record this lease or any memorandum of this lease.

(l)    This lease shall be governed by, and construed in accordance with, the Laws of the State of New York.

(m)    Landlord warrants and represents to Tenant that the Landlord is solely vested with fee simple title to the Premises and the Building and has full right and lawful authority to lease the Premises to Tenant.

**Section 24.4    Trademarks.**  Landlord shall not have the right to use Tenant's trade name, trademarks or logo ("Tenant's Trademarks"), nor shall the Tenant's Trademarks be used by Landlord in advertising nor in any other manner without the prior written consent of Tenant, which shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, Landlord shall be permitted to refer to Tenant's Trade Name in directional signage, Building directories, newsletters, brochures, joint advertising, and marketing efforts for the Building and other uses common to tenants in the Building.

**Section 24.5    Confidentiality.**  Any and all information contained in this lease or provided to or by Tenant and/or Landlord by reason of the covenants and conditions of this lease, economic or otherwise, shall remain confidential between Landlord and Tenant and shall not be divulged to third parties without consent of the other party, except as reasonably necessary to each party's employees and agents, including brokers, attorneys and accountants, provided that such recipients are required to keep such information confidential, or as otherwise required by law or court order.  In addition, until the date Tenant opens for business from the Premises, Landlord shall not without the prior written consent of Tenant, which consent Tenant may withhold in Tenant's sole discretion, disclose to third parties that Tenant has entered into this Lease.

**In Witness Whereof,** Landlord and Tenant have executed this lease on the date of this lease.

**LANDLORD**

**173 COURT STREET HOLDINGS LLC,**
**a New York limited lability company**

By: _____
    Name:
    Title:

**TENANT**

**BONOBOS, INC.,**
**a Delaware corporation**

By: _____
    Name:  Erin Ersenkal
    Title:   Chief Revenue Officer

**In Witness Whereof,** Landlord and Tenant have executed this lease on the date of this lease.

**LANDLORD**

**173 COURT STREET HOLDINGS LLC,**
**a New York limited lability company**

By: _____
Name:
Title:

**TENANT**

**BONOBOS, INC.,**
**a Delaware corporation**

By: _____
Name:   Erin Ersenkal
Title:   Chief Revenue Officer

- 40 -

Exhibit A-1

Fixed Rent

| Lease Year | Annual Rent | Monthly Rent |
|---|---|---|
| 1 | $255,000.00 | $21,250.00 |
| 2 | $261,375.00 | $21,781.25 |
| 3 | $267,909.38 | $22,325.78 |
| 4 | $274,607.11 | $22,883.93 |
| 5 | $281,472.29 | $23,456.02 |
| 6 | $288,509.09 | $24,042.42 |
| 7 | $295,721.82 | $24,643.49 |
| 8 | $303,114.87 | $25,259.57 |
| 9 | $310,692.74 | $25,891.06 |
| 10 | $318,460.06 | $26,538.34 |

## Exhibit A-2

## Percentage Rent

1)   (a)  In addition to Fixed Rent, commencing on the Fixed Rent Commencement Date, Tenant shall pay Landlord percentage rent (herein called "**Percentage Rent**") as determined by this <u>Exhibit A-2</u>.  The Percentage Rent for each Year (as hereinafter defined) shall be an amount equal to six (6%) percent (the "**Percentage**") times the amount of "**Gross Sales**" (hereinafter defined) made during such Year in excess of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100THS ($1,500,000.00) DOLLARS (the "**Gross Sales Break Point**").  The Percentage Rent shall be paid in monthly installments (together with the payment of the monthly Fixed Rent) as follows: on or before the thirtieth (30th) day after the end of the first calendar month in which the Gross Sales of Tenant exceeds the Gross Sales Break Point during each Year, and thereafter within thirty (30) days after the end of each calendar month during the remainder of such Year.

(b)  The Percentage Rent for each Partial Year (as hereinafter defined) shall be an amount equal to the Percentage Rent that would have been due for the full twelve (12) month period following the Fixed Rent Commencement Date or the full twelve (12) month period preceding the expiration or earlier termination of this lease (each a "Ghost Year"), had the twelve (12) month period been a full Year, times a fraction, the numerator of which is the number of days in the Partial Year, and the denominator of which is three hundred sixty-five (365).  Tenant shall furnish a report of the Gross Sales for the Ghost Year together with the payment of Percentage Rent due for the Partial Year within sixty (60) days after the end of the Ghost Year.  Each payment of Percentage Rent shall be paid by Tenant to Landlord without demand and otherwise as set forth in this Exhibit A-2 together with Tenant's monthly statement of Gross Sales provided for in Section 3, subject to the annual adjustment provided for in such Section 4.

2)                    The term "**Gross Sales**" shall include the amount of the sale price of all merchandise sold by Tenant and by any subtenant, licensee, concessionaire and other occupant in, at, from, or arising out of the use of the Premises, whether for cash or credit, or otherwise, and including the value of all consideration other than money received for any of the foregoing, without reserve or deduction for inability or failure to collect.  Except as expressly provided otherwise in this Lease, Gross Sales shall include all "**E-Commerce Sales**" (hereinafter defined). Notwithstanding anything to the contrary contained herein, internet sales not originating at the Premises, but where the customer has elected to have the merchandise shipped to the Premises for the customer's convenience, shall not be considered a Gross Sale. Each credit sale shall be treated as a sale for the full price in the month during which such sale is made, irrespective of whether or when Tenant receives payment therefor.  No franchise tax, capital stock tax, tax based upon assets or net worth or gross receipts tax, and no income or similar tax based on income or profits shall be deducted from Gross Sales.

Gross Sales shall not include any of the following (or there shall be deducted from Gross Sales, as applicable): (i) any sums collected and paid out for any sales, use, luxury, or excise tax imposed by any duly constituted governmental authority, (ii) the sale or collection of money by Landlord for retail merchandise, (iii) services in the nature of manager's complimentary sales (provided such complimentary sales shall not exceed a total of two percent (2%) of Gross Sales in any single Lease Year), (iv) sales to employees (provided such sales shall not exceed a total of three percent (3%) of Gross Sales in any single Year), (v) sales proceeds donated for charitable purposes or to non-profit organizations, (vi) charges and fees paid to any credit card companies in accordance with credit card purchase programs and check cashing services (provided said charges and fees shall not exceed three percent (3%) of Gross Sales in any single Year), (vi) penalties imposed by Tenant on its customers for returned checks, (vii) bulk or wholesale sales or transfers, (ix) insurance proceeds paid to Tenant; (ix) any debt based interest paid to Tenant; (x) refunds to customers for any return of merchandise; (xi) alterations, customizations, and repairs made at no profit to Tenant; (xii) costs of shipping merchandise to customers; (xiii) purchase price of all gift certificates redeemed for cash; (xiv) sums received from the sale of gift certificates (the sale price of the merchandise and services delivered in exchange for such gift certificate shall be included in Gross Sales); (xv) bad debts not in excess of three percent (3%) of Gross Sales in any one Year; (xvi) any exchange of merchandise between stores and/or warehouses of Tenant where such exchange is made solely for the convenient operation of the Tenant's business and not for the purpose of consummating a sale made in, at, or from the Premises; and (xvii) sales of trade fixtures or equipment after use thereof at the Premises.

The term "**E-Commerce Sales**" shall mean all sales originated at the Premises on Tenant's systems and devices through Tenant's Websites and other online systems utilized at the Premises by Tenant. The term "**Tenant's Websites**" shall include any website (whether one or more) operated by Tenant or any affiliate thereof, directly or with the assistance of another entity, that: (a) uses the same trade name as the trade name used by Tenant; and (b) offers for sale or lease goods or services of the same or similar type as those offered by Tenant.

3) Regardless of whether Percentage Rent is payable hereunder, Tenant shall furnish to Landlord within thirty (30) days after the end of each calendar month during the Term a complete statement (the "**Monthly Report**"), certified by an authorized representative of Tenant, setting forth (i) the amount of Gross Sales during such month, (ii) the aggregate amount of Gross Sales during such Year (or Partial Year, as the case may be), including such month, (iii) if Percentage Rent is payable hereunder, the amount, if any, by which such aggregate amount of Gross Sales exceeds the Gross Sales Break Point, and (iv) if Percentage Rent is payable hereunder, the amount of Percentage Rent previously paid by Tenant to Landlord for such Year (or Partial Year, as the case may be).  The Monthly Report shall be on Tenant's standard form.

4) Tenant will (regardless whether Percentage Rent is payable hereunder) furnish to Landlord within sixty (60) days after the end of each Year and any Partial Year, a complete statement (the "**Yearly Report**") certified by an authorized representative of Tenant showing in reasonable detail the amount of Gross Sales during such Year and, if Percentage Rent is payable hereunder, the amount paid to Landlord pursuant to

Section 1 of this Exhibit A-2 for such Year. If Percentage Rent is payable hereunder, then: (i) Tenant shall pay to Landlord the difference, if positive, between the Percentage Rent certified in the Yearly Report and the amount paid to Landlord pursuant to Section 1 for such Year or Partial Year, which payment shall be delivered along with the applicable Yearly Report; or (ii) Tenant shall receive a credit against the next payment(s) of Rent in the amount of the difference, if negative, between the Percentage Rent certified in the Yearly Report and the amount paid to Landlord pursuant to Section 1 for such Year or Partial Year or, if the Lease shall have expired, a refund of such overpayment. Notwithstanding the foregoing, in the event Subsection (ii) above applies and Landlord disputes the Percentage Rent certified in the Yearly Statement, then Tenant shall not receive any credit against the next payments of Rent, nor receive any refund, unless and until the audit procedure set forth in Section 7 below confirms the accuracy of the Percentage Rent certified in the Yearly Statement.

5) The Monthly Reports and the Yearly Reports (sometimes collectively referred to as the "**Reports**") required by Section 4 shall be delivered to Landlord at the notices address of Landlord.

6) Tenant shall keep in at its corporate offices (located off Premises), full, complete and proper auditable records of the Gross Sales at the Premises, whether for cash, credit or otherwise ("**Records**"), which shall include, without limitation, transaction details of tenant and of any subtenant, licensee, concessionaire and other occupant upon the Premises, together with any E-Commerce Sales, the amount of the sale price of all merchandise sold by Tenant and by any subtenant, licensee, concessionaire and other occupant in, at, from, or arising out of the use of the Premises, whether for cash or credit, or otherwise, and including the value of all consideration other than money received for any of the foregoing, without reserve or deduction for inability or failure to collect.

7) All such Records shall be retained and preserved for at least twenty-four (24) months after the end of the Year to which they relate, and shall be subject to inspection and audit by Landlord and its agents, during regular business hours, upon not less than twenty (20) days written notice from Landlord. Notwithstanding the foregoing, provided no Default has occurred, Landlord may not perform more than one (1) such audit or inspection with respect to any Year, nor shall it perform more than one (1) such audit during any twelve (12) consecutive month period. In no event shall Landlord use an auditor to review Tenant's Gross Sales that is paid on a contingency fee basis. In no event shall Landlord be permitted to conduct an audit during the months of November, December or January. If any audit is required or a controversy should arise between the parties hereto regarding the Percentage Rent payable hereunder, such Records shall be retained and preserved until such audit or controversy is terminated even though such retention period may be after the expiration of the Term or earlier termination of this Lease. The acceptance by Landlord of payments of Percentage Rent shall be without prejudice to Landlord's examination and audit rights hereunder. If such audit shall reveal a deficiency or overpayment in any payment of Percentage Rent: (i) Tenant or Landlord, shall forthwith pay to the other the amount of the deficiency or overage, as the case may be; and (ii) if the deficiency is by more than five percent (5%), Tenant shall pay the

44

reasonable, out-of-pocket costs of Landlord's audit.  Further, in the event the party owing payment fails to pay such deficiency, costs and interest upon thirty (30) days' written notice as provided in the preceding sentence, the other party shall have such rights and remedies as may be provided herein, or at law or in equity, arising by virtue of the non-paying party's failure to pay the amount owed.

8) The term "**Year**" means each successive twelve (12) month period from January 1 through December 31 occurring during the Term.  "**Partial Year**" means the period between and including the Fixed Rent Commencement Date, if that date is not January 1, and the next succeeding December 31.  If the Term ends on other than a December 31, the term "Partial Year" includes the period beginning on the last January 1 of the Term and ending on the last day of the Term.

## Exhibit B-1

## Landlord's Work

Landlord shall perform the following Landlord's Work at Landlord's sole cost and expense:

- Landlord shall deliver the Premises (which includes the ground floor space and the Basement Space) in structurally sound condition, fire rated, watertight, secure, and free and clear of any Hazardous Substances, including, but not limited to, asbestos (encapsulated or not). Additionally, Landlord shall deliver the ground floor of the Premises (but not the Basement Space) in white box condition. *Tenant has examined the Premises prior to the execution and delivery of this lease and, subject to Section 2.6 and Landlord's obligation to correct latent defects in the Premises as provided in Section 4.1 of this lease, Tenant acknowledges and agrees that Landlord has completed its obligations in connection with this bullet point as of the date of this lease.*

- Landlord shall deliver the Premises with a skylight in the rear of the Premises per Tenant's specifications. *Tenant has examined the Premises prior to the execution and delivery of this lease and, subject to Section 2.6 and Landlord's obligation to correct latent defects in the Premises as provided in Section 4.1 of this lease, Tenant acknowledges and agrees that Landlord has completed its obligations in connection with this bullet point as of the date of this lease.*

- Landlord shall deliver the Premises with new façade and storefront based on Tenant's specifications *(including replacement of damaged upper panels of the sign band); provided, however, Landlord shall not be required to match the stone bases on the opposite side of the storefront with each other.*

- Landlord shall deliver the Premises with a complete ADA bathroom per Tenant's specifications.

- Landlord shall provide all mechanical services to the Premises, including a new HVAC unit, sprinkler distribution per code, a 200 amp electrical service to a disconnect, and fire alarm connection point to the main building system. *Tenant has examined the Premises prior to the execution and delivery of this lease and, subject to Section 2.6 and Landlord's obligation to correct latent defects in the Premises as provided in Section 4.1 of this lease, Tenant acknowledges and agrees that Landlord has completed its obligations in connection with this bullet point as of the date of this lease.*

- Landlord shall deliver a floor slab flush with exterior grade (level within ¼" over 10') and ready to receive finishes. *Tenant has examined the Premises prior to the execution and delivery of this lease and, subject to Section 2.6 and Landlord's obligation to correct latent defects in the Premises as provided in Section 4.1 of this lease, Tenant acknowledges and agrees that Landlord has completed its obligations in connection with this bullet point as of the date of this lease.*

- Landlord to deliver the Premises with all demising walls and ceiling of the ground floor (not the basement) portion of the Premises spackled and ready to receive finishes. *Tenant has examined the Premises prior to the execution and delivery of this lease and, subject to Section 2.6 and Landlord's obligation to correct latent defects in the Premises as provided in Section 4.1 of this lease, Tenant acknowledges and agrees that Landlord has completed its obligations in connection with this bullet point as of the date of this lease.*

The above is subject to Tenant's architectural, engineering and physical inspection of the Premises.

## Exhibit B-2

### Tenant's Initial Plans

(see attached)

# BONOBOS

March 6., 2017

**Court Street**
173 Court Street,
Brooklyn, NY 11201

**DESIGN CONCEPT**








**EXISTING STORE PHOTOS**
**DESIGN INTENT ONLY**

     

MT-01 BLACK METAL - FIXTURES          WD-01 WHITE OAK - FIXTURES          WD-02 HICKORY - FIXTURES          WD-03 WALNUT - FIXTURES          FB-01 FABRIC - FITTING ROOM DRAPERY

**MATERIAL SAMPLES**

   

PT-01 SIMPLY WHITE PAINT  - WALLS
PT-01 SIMPLY WHITE PAINT  - DOORS / TRIM
PT-01 SIMPLY WHITE PAINT  - CEILINGS

PT-02 WROUGHT IRON PAINT

PT-03 ANCHOR GRAY PAINT

   

T-01 TILE - RESTROOM FLOOR

WF-01 WOOD FLOOR - SALES

VCT-01 VINYL COMPOSITE FLOOR - BOH

**MATERIAL SAMPLES**



**CONSTRUCTION PLAN**
SCALE: 1/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

5



**REFLECTED CEILING PLAN**
SCALE: 1/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

6



**FIXTURE PLAN**
SCALE: 1/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

7



**FLOOR FINISH PLAN**
SCALE: 1/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

8





**BASEMENT CONSTRUCTION PLAN &**
**BASEMENT REFLECTED CEILING PLAN**
SCALE: 1/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017    9





**BASEMENT FIXTURE PLAN &**
**BASEMENT FLOOR FINISH PLAN**
SCALE: 1/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

10





**STOREFRONT ELEVATION / SECTION**
SCALE: 3/8" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

11



**BUILDING SECTIONS**
SCALE: 1/8 = 1'-0"









**CASUAL SHOP (TOP) / TAILORED SHOP (BOTTOM) - INTERIOR ELEVATIONS**
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

13













**LOUNGE / GO BACK - INTERIOR ELEVATIONS**
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

14











**ADA RESTROOM / ADA FITTING ROOM - INTERIOR ELEVATIONS**
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

15











FITTING ROOM 1 / FITTING ROOM 2- INTERIOR ELEVATIONS
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

16



**BASEMENT CORRIDOR & CLOSET - INTERIOR ELEVATIONS**
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

17



BASEMENT BOH & MANAGER'S OFFICE - INTERIOR ELEVATIONS
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

18

   

BASEMENT JANITOR'S CLOSET - INTERIOR ELEVATIONS
SCALE: 1/4" = 1'-0"

O'NEIL LANGAN
ARCHITECTS, PC

**BONOBOS**

COURT STREET
March 6, 2017

19

## Exhibit C

## Premises

(see attached)





**Exhibit D**

**Commencement Date Agreement**

## COMMENCEMENT DATE AGREEMENT

      THIS COMMENCEMENT  DATE AGREEMENT made as of the _____ day of _____, 20__, between _____ ("Landlord") and _____ ("Tenant").

### RECITALS

A.  Landlord and Tenant are landlord and tenant under that certain lease dated as of _____, 20__, (the "Lease") pursuant to which Landlord has leased certain premises more particularly described therein to Tenant (the "Premises").  (Capitalized terms not described herein are described in the Lease.)

B.  The Commencement Date has occurred, the Fixed Rent Commencement Date and the Expiration Date are now known and Landlord and Tenant wish to confirm the dates.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.  The Commencement Date is _____.

2.  The Fixed Rent Commencement Date is _____.

3.  The Expiration Date is _____.

4.  The Lease Years are as follows:

5.  Lease Months for Fixed Rent Credits are as follows:

6.   This Commencement Date Agreement is the document that Landlord and Tenant intended to execute pursuant to Section 2.7 of the Lease.

7.   Landlord and Tenant hereby ratify and confirm the terms and provisions of the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this instrument as of the date above written.

_____, Landlord

By: _____
_____, Authorized  Signatory

_____ , Tenant

By:_____
_____, Authorized  Signatory

## Exhibit E

## Rules

The following are the Rules adopted by Landlord, as of the date of the lease to which these Rules are attached, with respect to the Building.

1. Tenant shall not engage in any conduct which will unreasonably interfere with the business, use and occupancy of any other tenant at the Building.  Subject to Section 3.5 of the lease, Tenant shall not make or permit to be made any unseemly or disturbing noises or disturb or interfere with the occupants of the Building or neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, television, talking machine, bullhorn or other amplifying device, noise.
2. Tenant shall not store any materials or objects outside of the Premises.
3. Tenant shall not drill holes into the exterior walls or roof of the Building, nor will Tenant attach wires or other devices to the exterior walls or roof without the prior written consent of the Landlord.
4. Tenant shall not use the bathrooms or other Building systems or any plumbing fixtures for any purpose or in any manner other than for the purposes and in the manner they were intended to be used, and no rubbish, rags, paper towels or other inappropriate materials shall be thrown therein.  Tenant shall keep the interior heat in the Premises at such a level that pipes will not freeze in the winter months.  Any and all damage resulting from any failure to comply with the foregoing requirements shall be borne by the tenant who, or whose agents, employees, contractors, visitors, or licensees have, caused such damage.
5. Subject to Section 3.8, Landlord shall have the right to prohibit any advertising by any Tenant which in Landlord's reasonable judgment, tends to impair the reputation of the Building or the desirability of the Building for retail tenants.  Upon notice from Landlord, any such advertising shall promptly cease.
6. Tenant shall not bring into, or permit in, the Premises any animals (except service animals for the disabled).
7. No hand trucks or similar devices may be used for moving articles in or out of the Premises, except those equipped with rubber tires, side guards and such other safeguards as Landlord requires.
8. Tenant shall, at all times, keep a copy of all keys for the Premises with the Landlord together with instructions for disarming any security systems.  No additional locks or bolts of any kind shall be placed upon any of the doors or windows by Tenant, nor shall changes be made to any existing locks or the mechanisms thereof without the prior written consent of Landlord. Upon the termination of the tenancy, Tenant shall return all keys to the Landlord including  keys to stores, bathrooms, and/or offices.

**Exhibit F**

**Tenant's Tax Payment -- Escalation**

1. The Tax Base Year, is the fiscal year July 1, 2016 to June 30, 2017.

2. The "Comparison Tax Year" shall mean, with respect to Real Estate Taxes, each Tax Year subsequent to the Tax Base Year.

3. If in any Comparison Tax Year, Real Estate Taxes shall be greater than Real Estate Taxes for the Tax Base Year for any reason (including but not limited to increase(s) in tax rate, and/or increase(s) in assessed valuation occurring by reason of, among other things, changes in the method of assessment, reassessments occurring in the normal course or outside of the normal course, and increases in assessments by reason of improvements, alterations and additions to the Building made by Tenant, other tenants, and/or Landlord, and including, but not limited to expiration of benefits under the Industrial and Commercial Incentive Program as defined and described in Sections 489-aaaa through 489-1111 of the New York State Real Property Tax Law and Sections 11-256 and 11-267 of the Administrative Code of the City of New York, and regulations promulgated under all of the foregoing, as amended from time to time), foreseen or unforeseen, Tenant shall pay Landlord, as Additional Rent, an amount (the "Tax Payment") equal to Tenant's Proportionate Share of such increase. The Tax Payment shall be due and payable within 30 days after Tenant is invoiced for the amount, but Landlord may permit Tenant to make the Tax Payment in monthly installments. Real Estate Taxes shall be apportioned between Landlord and Tenant on a *per diem* basis as of the Fixed Rent Commencement Date and the Expiration Date, so that Tenant shall pay only the portion of the Real Estate Taxes allocable to the Term. Landlord shall, within sixty (60) days after the end of each Comparison Year, deliver Tenant a statement showing the amount of actual Real Estate Taxes for such Comparison Tax Year.

4. If, after Tenant makes its Tax Payment (whether in a lump sum or in installments) for a specific Comparison Tax Year, the Real Estate Taxes are increased such that the amount of such Tax Payment theretofore remitted to Landlord is less than Tenant's Proportionate Share of such increased Real Estate Taxes, Tenant shall pay the deficiency to Landlord within 30 days following Tenant's receipt of an invoice for such deficiency, and if Tenant has been making the Tax Payment in installments, the required amount of the remaining installments shall be increased accordingly. If, after Tenant makes its Tax Payment for a specific Comparison Tax Year, the Real Estate Taxes are decreased such that the amount of such Tax Payment theretofore remitted to Landlord is more than Tenant's Proportionate Share of such decreased Real Estate Taxes, Landlord shall credit the excess (after deduction of Tenant's Proportionate Share of Landlord's reasonable, out-of-pocket expenses incurred in connection with such decrease, if any; provided, however, that such expenses shall not exceed the amount of Tenant's savings) against Tenant's next Rent payable under this lease or, if any excess is due Tenant at the Expiration Date, Landlord shall promptly pay such excess to Tenant.

<u>EXTENSION OPTION RIDER</u>

Tenant may, at its option, extend the Term, pursuant to the terms and provisions of this Extension Option Rider as follows:

1. **Extension Term; Extension Notice.**

   a. For purposes hereof, the term "**Option**" shall mean Tenant's right to extend the term of this Lease for an additional term (herein called the "**Extension Term**") of five (5) years commencing on the day immediately following the Expiration Date and ending on the day immediately preceding the fifth (5th) anniversary of the commencement of such Extension Term;

   b. The Option may be exercised only by Tenant's delivering notice (herein called the "**Extension Election Notice**") thereof to Landlord not later than 12 months prior to the expiration of the initial Term (the "**Outside Notice Date**"). Time shall be of the essence with respect to the exercise of such Option. Subject to the provisions of this Rider hereof, upon the giving of the Extension Election Notice the term of this Lease shall be extended in accordance with the terms hereof for the Extension Term without the execution of any further instrument. Prior to Tenant delivering the Extension Election Notice, Tenant may request in writing that Landlord provide Tenant with Landlord's Determination (defined below) (the "**Rent Estimate Request**"). Tenant must make such Rent Estimate Request at least three (3) months prior to the Outside Notice Date. The Extension Term shall be upon the same terms, covenants and conditions of this Lease as shall be in effect immediately prior to such extension, except that: (i) there shall be no right or option to extend the term of this Lease for any period of time beyond the expiration of the Extension Term; (ii) the Fixed Rent for the Extension Term shall be determined as provided in this Rider; and (iii) Tenant shall not be entitled to any inducements, work allowance, concessions or free rent.

2. **Default.** The giving of the Extension Election Notice at a time when any Default has occurred and is continuing shall be void and of no force and effect unless and until Tenant cures such Default. The termination of this Lease during the initial Term shall also terminate and render void any option or right on Tenant's part to extend this lease for the Extension Term, whether or not such option or right shall have been exercised; and nothing contained in this <u>Rider</u> shall prevent Landlord from exercising any right or option granted to or reserved by Landlord in this lease to terminate this lease.

3. **Extension Rent; Fair Market Value.**

   a. The Fixed Rent for the Premises the Extension Term shall be an amount equal to the Market Value Rent for the Premises determined to be prevailing as of the commencement date of the Extension Term determined in accordance with the provisions of this Rider. Provided that Tenant shall have exercised the Option to extend the term of this Lease in accordance with the terms of this Rider, Landlord shall, not less than 9 months prior to the commencement of the Extension Term,

notify Tenant of Landlord's estimate of the Market Value Rent ("**Landlord's Determination**") of the Premises for the Extension Term (herein called the "**Rent Notice**"). Within 30 days after Tenant's receipt of such notice, Tenant shall notify Landlord whether Tenant accepts or rejects Landlord's Determination. If Tenant accepts such estimate, the Fixed Rent for the Extension Term shall be Landlord's Determination set forth in the Rent Notice. If Tenant fails to reject such estimate within such 30-day period and such failure continues for ten (10) days after an additional notice from Landlord setting forth Landlord's Determination, time being of the essence, then the Fixed Rent for the Extension Term shall be Landlord's Determination set forth in the Rent Notice. If Tenant rejects Landlord's Determination within such 30-day period (or within such additional 10-day period, as applicable), then either Tenant or Landlord may initiate the arbitration process (the party initiating such process being herein referred to as the "**Initiating Party**") provided for herein by designating its arbitrator in a subsequent notice to the other party (herein called the "**Responding Party**") (which notice shall specify the name and address of the person designated to act as an arbitrator on its behalf) given to the Responding Party within 30 days of Tenant's notice of dispute. If Tenant fails to dispute Landlord's Determination as set forth hereinabove or if neither party initiates the arbitration process as provided above, time being of the essence, then Landlord's Determination as set forth in the Rent Notice shall be conclusive. Within 10 business days after the Responding Party's receipt of notice of the designation of the Initiating Party's arbitrator, the Responding Party shall give notice to the Initiating Party specifying the name and address of the person designated to act as an arbitrator on its behalf. If the Responding Party fails to notify the Initiating Party of the appointment of its arbitrator within the time above specified, then the Initiating Party shall provide an additional notice to the Responding Party requiring the Responding Party's appointment of an arbitrator within 5 business days after the Responding Party's receipt thereof. If the Responding Party fails to notify the Initiating Party of the appointment of its arbitrator within the time specified by the second notice, the appointment of the second arbitrator shall be made in the same manner as hereinafter provided for the appointment of a third arbitrator in a case where the two arbitrators appointed hereunder and the parties are unable to agree upon such appointment. The two arbitrators so chosen shall meet within 10 business days after the second arbitrator is appointed, and shall exchange sealed envelopes each containing such arbitrator's written determination of the Market Value Rent for the Premises during the Extension Term. The Market Value Rent specified by Landlord's arbitrator shall be the Landlord's Determination (hereinafter called "**Landlord's Submitted Value**") and the Market Value Rent specified by Tenant's arbitrator shall herein be called "**Tenant's Submitted Value**". Copies of such written determinations shall promptly be sent to both Landlord and Tenant. Any failure of either such arbitrator to meet and exchange such determinations shall be acceptance of the other party's arbitrator's determination as the Market Value Rent, if, and only if, such failure persists for 7 days after notice to the party for whom such arbitrator is acting, and provided that such 7 day period shall be extended by reason of any applicable condition of Force Majeure. If the higher determination of the Market Value Rent is not more than 102% of the lower determination of the Market Value Rent, then the Market Value Rent shall be deemed to be the average of the two determinations. If,

however, the higher determination is more than 102% of the lower determination, then within 5 days of the date the arbitrators submitted their respective the Market Value Rent determinations, the two arbitrators shall together appoint a third arbitrator.  In the event of their being unable to agree upon such appointment within said 5 day period, the third arbitrator shall be selected by the parties themselves if they can agree thereon within a further period of 5 days.  If the parties do not so agree, then either party, on behalf of both and on notice to the other, may request such appointment by the AAA (or any successor organization thereto) in accordance with its rules then prevailing or if the AAA (or such successor organization) shall fail to appoint said third arbitrator within 15 days after such request is made, then either party may apply, on notice to the other, to the Supreme Court, New York County, New York (or any other court having jurisdiction and exercising functions similar to those now exercised by said Court) for the appointment of such third arbitrator.  Within 5 days after the appointment of such third arbitrator, Landlord's arbitrator shall submit Landlord's Submitted Value to such third arbitrator and Tenant's arbitrator shall submit Tenant's Submitted Value to such third arbitrator.  Such third arbitrator shall, within 30 days after the end of such 5 day period, select either Landlord's Submitted Value or Tenant's Submitted Value as the Market Value Rent of the Premises during the Extension Term and send copies of his determination promptly to both Landlord and Tenant specifying whether Landlord's Submitted Value or Tenant's Submitted Value shall be the Market Value Rent of the Premises during the Extension Term.

b.  Each party shall pay the fees and expenses of the one of the two original arbitrators appointed by or for such party, and the fees and expenses of the third arbitrator and all other expenses (not including the attorneys' fees, witness fees and similar expenses of the parties which shall be borne separately by each of the parties) of the arbitration shall be borne by the parties equally.

c.  Each of the arbitrators selected as herein provided shall have at least 10 years' experience in the leasing or renting of retail space in comparable buildings in Cobble Hill, Brooklyn.

d.  If either party hereunder initiates the aforesaid arbitration process and as of the commencement date of the applicable Extension Term the amount of the Market Value Rent has not been determined, Tenant shall pay the amount equal to the Fixed Rent payable by Tenant during the last month of the initial Term of the lease, and when the determination has actually been made, an appropriate retroactive adjustment shall be made as of the commencement date of the Extension Term.  Overpayments shall be paid by Landlord to Tenant and underpayments shall be paid by Tenant to Landlord promptly after such determination.

e.  **Market Value Rent.** For purposes of this Rider, the determination of "**Market Value Rent**" shall mean the arms-length fair market annual rental rate under new and renewal leases and amendments entered into on or about the date on which the Market Value Rent is being determined for space comparable to the Premises in the Building and other comparable buildings (in terms of location, age, existing

improvements, services provided, and other such relevant factors) in the Cobble Hill area of Brooklyn, New York.  The determination of Market Value Rent shall include, without limitation, the following factors: rent abatements, tenant improvement allowances and any other concessions, and relevant factors.

**Exhibit D**

**Commencement Date Agreement**

## COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT made as of the _8th_ day of _may_, 20_17_, between _17 COURT STREET_ ("Landlord") and _BONOBOS, INC._ ("Tenant").

### RECITALS

A. Landlord and Tenant are landlord and tenant under that certain lease dated as of _5/8_, 20_17_, (the "Lease") pursuant to which Landlord has leased certain premises more particularly described therein to Tenant (the "Premises"). (Capitalized terms not described herein are described in the Lease.)

B. The Commencement Date has occurred, the Fixed Rent Commencement Date and the Expiration Date are now known and Landlord and Tenant wish to confirm the dates.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1. The Commencement Date is _5/8/17_.

2. The Fixed Rent Commencement Date is _7/22/2017_.

3. The Expiration Date is _5/31/2027_.

4. The Lease Years are as follows:

5. Lease Months for Fixed Rent Credits are as follows:

6. This Commencement Date Agreement is the document that Landlord and Tenant intended to execute pursuant to Section 2.7 of the Lease.

RETAIL LEASE AGREEMENT BETWEEN 173 COURT STREET AND BONOBOS, INC.

*EXHIBIT D:*          *COMMENCEMENT DATE AGREEMENT*

4).          The Lease Years as follows:

| Year # | Year Starts | Year ends |
|--------|-------------|-----------|
| 1 | 7/22/2017 | 7/31/2018 |
| 2 | 8/1/2018 | 7/31/2019 |
| 3 | 8/1/2019 | 7/31/2020 |
| 4 | 8/1/2020 | 7/31/2021 |
| 5 | 8/1/2021 | 7/31/2022 |
| 6 | 8/1/2022 | 7/31/2023 |
| 7 | 8/1/2023 | 7/31/2024 |
| 8 | 8/1/2024 | 7/31/2025 |
| 9 | 8/1/2025 | 7/31/2026 |
| 10 | 8/1/2026 | 5/31/2027 |

5).          Lease Months for Fixed Rent Credits are follows:

| Month # | YEAR 2018 |
|---------|-----------|
| 8 | March |
| 9 | April |
| 10 | May |
| 11 | June |
| 12 | July |

| Month # | YEAR 2019 |
|---------|-----------|
| 22 | May |
| 23 | June |
| 24 | July |

| Month # | YEAR 2020 |
|---------|-----------|
| 34 | May |
| 35 | June |
| 36 | July |

7. Landlord and Tenant hereby ratify and confirm the terms and provisions of the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this instrument as of the date above written.

_____, Landlord

By: _____

_____, Authorized  Signatory

Bonobos, Inc.
_____, Tenant

By:_____

Erin Ersenkal Authorized  Signatory