**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| EXPRESS, INC., *et al.*,[1] | Case No. 24-10831 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket No. 649** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) OBJECTION TO THE
DEBTORS' MOTION TO EXTEND DEBTORS' EXCLUSIVE PERIODS TO FILE A
CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF AND (II) CROSS-
MOTION TO TERMINATE EXCLUSIVITY FOR THE COMMITTEE**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Express Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") submits this combined objection (the "<u>Objection</u>") to the *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [D.I. 649] (the "<u>Exclusivity Motion</u>") and cross-motion to terminate exclusivity to allow the Committee to file and solicit a plan. In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Since its formation, the Committee has focused on the goal of facilitating a successful going-concern sale and working out, in a commercial manner, various other matters

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are Express, Inc. (8128); Express Topco LLC (8079); Express Holding, LLC (8454); Express Finance Corp. (7713); Express, LLC (0160); Express Fashion Investments, LLC (7622); Express Fashion Logistics, LLC (0481); Express Fashion Operations, LLC (3400); Express GC, LLC (6092); Express BNBS Fashion, LLC (3861); UW, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

arising in these cases, including a cooperative path to a plan of liquidation. For example, after raising discrete issues regarding the terms of the DIP financing, the Committee reached a consensual resolution on the DIP financing, and subsequently reached a global settlement with the Debtors and ReStore Capital, LLC. In addition, the Committee was extremely commercial from the start of these cases in negotiating the bidding procedures, analyzing the various bids, and working with the Debtors, purchasers, and other parties to ensure a successful sale process.

2.      And while the Committee is pleased that a going concern sale transaction occurred, a long list of parties made that result possible, including hundreds of vendors, landlords, and other creditors who provided material concessions to the purchaser. The sale (and the concessions agreed to by various landlords, vendors, and service providers to the purchaser) resulted in the orderly sale of the majority of the Debtors' going-concern business, preserving thousands of jobs, hundreds of leases, and numerous vendor relationships. Additionally, the sale process—along with the Committee's ultimate settlement with Restore Capital—left these estates with sufficient funds to confirm a plan, pay administrative and priority claims in full, and deliver a recovery to general unsecured creditors.

3.      After helping to facilitate the sale, the Committee's focus immediately pivoted to confirmation of a liquidating plan to wind down the estates. And make no mistake, these are now liquidating cases with the sole remaining assets being cash and potential causes of action.

4.      Despite what should be a straight-forward liquidating plan being pursued for the benefit of general unsecured creditors, discussions with the Debtors have been stalled for weeks over the Debtors' steadfast insistence upon pursuing a plan granting *broad releases* of both estate and third party claims against the Debtors' insiders (e.g., officers and directors)[2] culminating in

---

[2]      The Committee's focus is with the release of the Debtors' insiders because the purchasers and lenders already obtained releases. *See Order (I) Authorizing and Approving the Settlement Agreement by and Between the*

2

the Debtors filing a non-consensual plan and disclosure statement.  Any potential estate claims—as well as proposed third party, non-debtor claims—are being released by the Debtors for *ZERO consideration*.  Snatching defeat out of the jaws of victory, the Debtors are going down the wrong path.  No basis exists for a liquidating plan summarily to release and forfeit potential causes of action as a gift to the Debtors' insiders.  Instead of wasting unsecured creditors' funds to pursue such gratuitous releases, these cases should be (i) quickly proceeding to an expedited combined plan and disclosure statement process, (ii) confirming a consensual joint liquidating plan between the Debtors and the Committee, and (iii) transitioning these estates to a post-confirmation representative acceptable to the Committee to liquidate the estates' remaining assets (including investigating and pursuing any viable claims), and reconcile and pay the remaining claims against the estates.

5.      Although the Debtors and the Committee have worked cooperatively and constructively to date, the Committee cannot now stand idly by while the Debtors insist on pursuing a plan with inappropriate debtor and third-party releases benefitting the very people in charge of proposing the plan.  To date, the Debtors have refused to discuss a plan that removes the broad releases favoring their insiders and preserves potential estate assets.  Instead, by seeking to pursue a plan with such releases, the Debtors seek to waste estate assets and time attempting to jam an unacceptable plan on general unsecured creditors: **a plan which the Committee does not support and therefore would urge all unsecured creditors—the only stakeholders left—to reject in favor of a clear alternative plan without such releases**.

---

*Debtors, the Committee, and Restore; and (II) Granting Related Relief* [D.I. 651]; *Order (I) Approving Asset Purchase Agreement; (II) Authorizing and Approving Sale of Certain Assets of Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (III) Approving The Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (IV) Authorizing the Debtors to Consummate Transactions Related to the Above; and (V) Granting Related Relief* [D.I. 471].

6.  Unless the Debtors quickly get on the same page as their remaining economic stakeholders, the Court should not extend the Debtors' exclusivity period.  In fact, cause exists under section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code") for the Court to terminate the Debtors' exclusive right to file and solicit a plan with respect to the Committee, and allow the Committee to file its own liquidating plan that preserves value for unsecured creditors.  The Committee is ready to file and solicit such a plan in short order.

7.  For these reasons, the Committee respectfully requests that this Objection be sustained, the Exclusivity Motion be denied, and the Debtors' exclusivity periods terminated so that the Committee may file its liquidating plan.[3]

## RELEVANT BACKGROUND

### I.  The Sale Process

8.  The Debtors conducted a going concern sale (the "Sale") of the Debtors' assets culminating in the *Order (I) Approving Asset Purchase Agreement; (II) Authorizing and Approving Sale of Certain Assets of Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (III) Approving The Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (IV) Authorizing the Debtors to Consummate Transactions Related to the Above; and (V) Granting Related Relief* [D.I. 471].  The Committee worked closely with the Debtors and all parties to effectuate the Sale.  The Sale culminated in, among other benefits, a purchase price of $136 million in cash and $38 million of assumed liabilities.  *See Revised Notice of Selection of Stalking Horse Bidder* [D.I. 460].  The Sale closed on June 21, 2024 (the "Closing

---

[3]  The Committee is not asking for exclusivity to be terminated as to everyone.  It is seeking relief with respect to its right to propose a plan.

4

Date"). *See Notice of the Occurrence of Sale Closing of the Stalking Horse APA on June 21, 2024* [D.I. 535].

**II.     The Committee's Investigation and Initial Plan Discussions**

9.     Immediately after the Committee's formation in early May 2024, it launched its investigation.  To be efficient and cost-effective, the Committee primarily focused on the claims and liens of the secured lenders that were subject to the challenge period.  Through interviews, document requests, and other informal discovery in May and June, the Committee investigated the claims of the Debtors' secured lenders, as well as potential estate claims against the lenders.  That investigation and follow-on negotiations led to a settlement with Restore Capital LLC in early July.  The settlement was approved on July 26, 2024.  *See Order (I) Authorizing and Approving the Settlement Agreement by and Between the Debtors, the Committee, and Restore; and (II) Granting Related Relief* [D.I. 651].

10.     Although the Committee's investigation yielded certain information and documents relating to the Debtors' other potential claims (i.e., claims against parties other than the secured lenders, such as directors and officers), the Committee's focus was on the secured lenders.  This effort tied to the July 8th deadline to challenge the secured lenders' liens and claims.  In contrast, the Committee was not under any external deadline to assert claims against directors and officers.  Given that this is a liquidating case, ample time exists to preserve and, if appropriate, pursue these claims following consummation of a liquidating plan.

11.     During initial discussions regarding a consensual plan structure, the Committee made its position crystal-clear to the Debtors:  The liquidating plan should not have broad Debtor-releases or third-party releases.  Specifically, claims against directors and officers should be

preserved to be investigated and, if appropriate, brought by a liquidating trustee or plan administrator, especially since such claims are backed by a significant source of recovery.[4]

### III.    Post-Closing Plan Discussions

12.    Shortly after the Closing Date, in early July the Debtors first shared the Debtors' draft plan with the Committee.  To the Committee's surprise, the proposed plan had broad releases, releasing all of the estates' claims against directors and officers as well as releasing third-party claims for no consideration.  The Committee informed the Debtors' professionals that such releases were inappropriate, and provided a markup to that effect.  To date, the Debtors have insisted upon retaining such broad releases.  As such, the Committee has been constrained to oppose the Exclusivity Motion and seek to file its own liquidating plan to avoid a forfeiture of potential estate assets favoring the Debtors' insiders.

13.    On July 31, 2024 the Debtors filed the *Joint Chapter 11 Plan of Express, Inc. And Its Debtor Affiliates* [D.I. 689] (the "Plan") and the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Express, Inc. And Its Debtor Affiliates* [D.I. 690].[5]  The Plan contains broad Debtor and non-debtor releases.[6]  The Plan releases Debtor and third-party claims against Related Parties, which include the Debtors' current and former directors and officers.[7]

### LEGAL STANDARD FOR EXTENSION OR TERMINATION OF EXCLUSIVITY

14.    The Bankruptcy Code affords a debtor an exclusive 120-day period within which to propose a chapter 11 plan.  11 U.S.C. § 1121(b).  Under section 1121(d), a bankruptcy court may reduce or increase the debtor's exclusivity period "for cause."  11 U.S.C. § 1121(d).  The

---

[4]    The Committee understands the Debtors have D&O insurance policies (including tail coverage) of over $60 million.
[5]    Capitalized terms not defined herein have the definition ascribed to them in the Plan or Disclosure Statement.
[6]    *See* Plan § X.
[7]    *See* Plan  § I(130).

52673137.10

Bankruptcy Code does not define "cause," but the legislative history, as amplified by case law, indicates that the following nine factors may be relevant to the determination of whether exclusivity should be extended or reduced:

> (1) the size and complexity of the case; (2) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists.

*In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014).

15.     The legislative history also demonstrates that Congress disfavors "undue extension[s]" that result in "excessively prolonged and costly delay, to the detriment of creditors." *See* H.R. Rep. No. 103-835, at 36 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3344 (1994); *see also Bankruptcy Amendments Act of 1994: Hearing on S. 540 Before the H. Subcomm. on Econ. and Com. L. and the S. Comm. on the Judiciary*, 103d Cong. (1994) (statement of Philip S. Corwin, Director & Counsel, Am. Bankers Assoc.) ("We believe that in too many cases the courts have abused their discretion under [the 'for cause'] standard and have been too lenient in granting extensions of exclusivity. . . .").

16.     In fact, courts should not "routinely extend the exclusive period . . . when creditors object to such requests for extensions." *In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992). In determining whether "cause" exists courts should be mindful of undue delays. *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) ("The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old

7

Chapter XI.  Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.").  Even if "cause" exists, a bankruptcy court may still deny an extension of exclusivity in an "unusually large" case where, "the debtor has delayed in arriving at an agreement or is attempting to pressure other parties to yield to a position which is necessarily prejudicial."  *In re Sharon Steel Corp.*, 78 B.R. 762, 765-66 (Bankr. W.D. Pa. 1987).

**ARGUMENT**

17.     The Exclusivity Motion should not be granted, and the Debtors should not receive an extension of their exclusive period to file a plan.  Every day that these cases stay in chapter 11, pre-confirmation, unsecured creditor recoveries erode.  Value should not be lost as the Debtors' pursue gratuitous insider releases on a Plan that **the Committee does not support—and will urge the unsecured creditors to reject**—and where an alternative liquidating plan can quickly be pursued.

18.     In determining these issues, the Court is to determine whether "cause" exists to extend or, contrarily, terminate exclusivity.  *See* 11 U.S.C. § 1121(d).  For the reasons set forth below, the Committee respectfully requests that the Exclusivity Motion be denied and the Debtors' exclusive period be terminated.

**I.     The Remaining Undertakings of These Cases Are Neither Large Nor Complex**

19.     The size and complexity of the Debtors' cases alone do not provide cause for an extension of the exclusive periods.  *See In re Sharon Steel*, 78 B.R. at 765-66.  If size and complexity alone were sufficient to find cause, then debtors in complex cases would have an unlimited right to exclusivity and § 1121(d) of the Bankruptcy Code would be rendered meaningless in complex cases.  *See id.*

8

20.     While the Debtors assert that these cases are large and complex, in reality, the businesses have been sold and the remaining tasks in these cases are relatively simple.  Most of the important milestones in these cases that the Debtors' mention in the Exclusivity Motion have already occurred, and the only remaining material task of these cases is to confirm a *liquidating* plan.  No complex reorganization is provided for here, nor is a series of going concern sale transactions predicated upon the Plan.  Instead, the Plan should provide for the remaining steps of the wind-down with a plan administrator responsible for (i) making the appropriate distributions to creditors, (ii) investigating and (if warranted) pursuing the causes of action, and (iii) handling any remaining ministerial obligations of the wind-down debtors.  Such a liquidating plan can quickly be put together.

## II.     **No Additional Time is Required for the Debtors to Negotiate a Plan of Reorganization and Prepare Adequate Financial Information**

21.     The Debtors have known for months that these cases would result in a liquidating plan following the consummation of the Sale.  The framework of a consensual plan largely exists— which was what the Committee had hoped would occur but for the Debtors' pursuit of releases and other recent modifications to the initial draft plan.

22.     Given the divergent path between the Debtors and the Committee, granting the Debtors the additional time requested serves no legitimate purpose because the Debtors have already had ample time to negotiate with creditors.  The Debtors first shared the Debtors' draft plan with the Committee over a month ago.  The Committee provided a specific markup to facilitate a consensual plan.  The Debtors have continued to pursue an unacceptable path favoring insiders and otherwise making backward progress on the draft plan.

III.    **The Debtors Have Not Demonstrated Reasonable Prospects for Filing a Viable Plan and No Progress Has Been Made in Negotiating a Consensual Plan**

23.    Multiple factors hinge upon whether the Debtors' have a viable plan and whether negotiations with creditors have made any progress.  *See In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The breakdown of negotiations between the debtor and the objecting creditors affects a number of the factors, and the debtor has not shown that the 120–day extension sought is likely to significantly improve the progress of the case.") (internal citation omitted); *see also In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) ("One of the most important reasons for extending the debtor's period of exclusivity is . . . so that a consensual plan can be proposed and confirmed without opposition.").  Despite good faith efforts, negotiations over the contents of the Plan have ceased because of irreconcilable disagreements on the fundamental issue of whether the Plan ought to contain Debtor and third-party releases favoring insiders.

24.    Shortly after the Closing Date, the Debtors first shared the Debtors' draft Plan with the Committee containing Debtor and third-party releases.  Shortly thereafter, the Committee first expressed its view with the Debtors that Debtor and third-party releases are inappropriate and unjustified in these cases because it would prevent the plan administrator from investigating and pursuing potential causes of action for the benefit of unsecured creditors.  The Debtors indicated that they would not be willing to negotiate the removal of the Debtor and non-debtor releases from the plan.  Since the Closing Date, the Debtors and the Committee have been trading drafts of plans with no progress made.  Negotiations have since ceased as a result of the irreconcilable stances on the Debtor and third-party releases.[8]

---

[8]    Both Debtor and non-debtor releases are inappropriate when no consideration has been provided for the releases.  *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (considering whether a "substantial contribution" was made in exchange for debtor releases); *In re Spansion, Inc.*, 426 B.R. 114, 144

IV.      **Granting the Debtors' the Additional Time Requested Would Only Serve to Pressure Creditors into the Debtors' Demands That the Plan Contain Releases**

25.      Absent the pressure from the Debtors' pursuing gratuitous releases, these cases are the perfect candidate for a combined consensual plan and disclosure statement process, as contemplated under this Court's local rules.  *See* Del. Bankr. L.R. 3017-2.  A consensual joint plan and disclosure statement hearing would slash the costs of professional fees and increase recoveries to unsecured creditors.  In contrast, granting the relief in the Debtors' Exclusivity Motion only increases professional fees and drags these cases on longer than necessary thereby reducing recoveries to creditors.  If the Objection is sustained and the exclusive period is terminated, the Committee is prepared to file its own joint liquidation plan and disclosure statement without Debtor and third-party releases.  This avoids the delay of a contested confirmation hearing on the Debtors' Plan followed by the later filing and solicitation of a Committee plan.  Granting the relief sought in this Objection would promote efficiency and lead to an appropriate resolution of these cases.

26.      Denying the Exclusivity Motion is appropriate and will allow unsecured creditors to choose the plan they believe results in a better recovery, including preserving potential estate assets.  *See In re Parker St. Florist & Garden Ctr. Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass. 1983) ("Denying such a motion only affords creditors the right to file the plan; there is no negative effect upon the Debtor's co-existing right to file its plan.").

27.      It is critical to bear in mind: *The unsecured creditors are the only remaining economic stakeholders in these cases.*  The Exclusivity Motion only serves to put pressure on these

---

(Bankr. D. Del. 2010) (approving third-party releases for unimpaired classes because "[t]he unimpaired classes are being paid in full and have received *adequate consideration* for the release") (emphasis added). The Committee reserves all rights to address this as part of confirmation should the Debtors persist with their Plan on a non-consensual basis.

creditors especially where the Committee does not support this Plan and *would advise unsecured creditors to not vote in favor of the Debtors' Plan.* Putting pressure on the only remaining stakeholders to accept an unfavorable Plan or be forced to object to the Plan without the ability to propose its own plan is effectively holding the creditors hostage while the Debtors pursue broad insider releases for the benefit of the very insiders in charge of the Debtors' Plan, which is not permissible. *See In re Sharon Steel Corp.*, 78 B.R. 762, 765 (Bankr. W.D. Pa. 1987); *see also In re Wash.-St. Tammany Elec. Co-op., Inc.*, 97 B.R. 852, 856 (E.D. La. 1989) ("[T]he debtor should not be able to 'short circuit the requirements of Chapter 11 for confirmation of a reorganization plan' in this fashion") (quoting *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983)).

## CONCLUSION

28.    The Debtors have had more than enough time to move the plan process along and negotiate a consensual plan with the only remaining economic stakeholders in these cases. They have not done so. Instead, the Debtors have been unwilling to compromise their position on insider releases contained within their Plan.   These cases should not languish any longer.

29.    The Debtors cannot demonstrate sufficient "cause" to warrant the requested extension of the exclusive filing period, as all of the relevant factors weigh against a finding of "cause." The Court thus should terminate exclusivity so that these cases may come to an expeditious resolution that is fair and equitable to all parties.

52673137.10

WHEREFORE, the Committee respectfully requests that the Court (i) sustain its objection, (ii) deny the Exclusivity Motion, and (iii) terminate exclusivity with respect to the Committee to allow it to file and solicit its competing plan.

Dated: August 1, 2024,
Wilmington, DE

**SAUL EWING LLP**

*/s/ Lucian B. Murley*
Lucian B. Murley (DE Bar No. 4892)
Nicholas Smargiassi (DE Bar No. 7265)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6898
luke.murley@saul.com
nicholas.smargiassi@saul.com

-and-

Turner N. Falk
Center Square West 1500 Marker Street, 38th Floor
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: (215) 972-8415
turner.falk@saul.com

-and-

Adam C. Rogoff (admitted *pro hac vice*)
Robert T. Schmidt (admitted *pro hac vice*)
Nathaniel Allard (admitted *pro hac vice*)
**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
arogoff@kramerlevin.com
rschmidt@kramerlevin.com
nallard@kramerlevin.com

*Counsel for the Official Committee of Unsecured Creditors of Express Inc., et al.*