## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>EXP OldCo Winddown, Inc, *et al.*,<br><br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-10831 (KBO)<br><br>(Jointly Administered)<br><br>**Obj. Deadline:  October 22, 2024 at 4:00 PM ET (extended for UST)**<br>**Hearing Date:  October 29, 2024 at 9:30 am ET**<br><br>**Re:  D.I. 690, 691** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE SOLICITATION PROCEDURES, (III) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned counsel, hereby files this objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief*

---

[1] The Debtors in in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are EXP OldCo Winddown, Inc. (8128); Project Pine TopCo Winddown, LLC (8079); Project Pine Holding OldCo, LLC (8454); Project Pine Finance OldCo Corp. (7713); Project Pine OldCo, LLC (0160); Project Pine Investments OldCo, LLC (7622); Project Pine Logistics OldCo, LLC (0481); Project Pine Operations OldCo, LLC (3400); Project Pine GC OldCo, LLC (6092); Project Pine Tropic OldCo, LLC (3861); Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

(Docket No. 691) (the "Motion").[2]  In support of this Objection, the U.S. Trustee states:

## PRELIMINARY STATEMENT

1.        The Disclosure Statement does not satisfy the requirement of Bankruptcy Code section 1125 to provide adequate information.  The proposed Plan includes broad releases, including a Debtor Release and Third-Party Release.  Those releases are purported to be subject to an ongoing investigation by the Debtors into the propriety of such releases, including an analysis of the underlying potential claims and causes of action to be released.  The Disclosure Statement does not provide a detailed understanding of that investigation, nor a valuation of the claims being released.  The Disclosure Statement does not describe sufficiently what consideration, if any, is being offered by the Released Parties in exchange for the Debtor Release or Third-Party Release.  The Disclosure Statement also fails to provide any information detailing the Committee's opposition to the Debtor Release and Third-Party Release and the risks Committee opposition could impose on confirmation of the Plan.

2.        The Plan is also patently unconfirmable on its face for two reasons.  First, the Plan cannot be confirmed because it extracts non-consensual third-party releases from holders of claims or interests that (a) vote to accept the Plan, (b) vote to reject the Plan unless they opt out of the Third-Party Release on the ballot, and (c) are entitled to vote, but do not cast a ballot:

- ▪ Creditors voting in favor of the Plan have not affirmatively consented to the Third-Party Release because a person may vote for the Plan even though, if given the choice, they would not consent to the Third-Party Release.

- ▪ Creditors voting to reject the Plan who do not opt out of the Third-Party Release should not be deemed to consent to the Third-Party Release because the act of rejecting a plan

---

[2]  Capitalized terms used herein and not otherwise defined are defined as set forth in the Motion or the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Express, Inc. and Its Debtor Affiliates* (Docket No. 690) (the "Disclosure Statement").

while being silent as to the release does not evidence affirmative consent to the Third-Party Release.

- Creditors who are entitled to vote, but do not cast a ballot (and, by extension, do not opt out of the Third-Party Release) should also not have their silence deemed to be consent thereto.

3.      Second, the Plan cannot be confirmed because enforcement of the Third-Party Release via the Plan's injunction provision is impermissible because the Supreme Court in *Purdue Pharma* held that the Bankruptcy Code does not authorize injunctions to enforce nonconsensual, third-party releases.  Additionally, there is no need for an injunction to issue in support of a purely consensual third-party release and the Debtors have not met the standards for entry of an injunction.

4.      The solicitation procedures here are also inadequate.  Because the solicitation procedures incorporate ballots that improperly deem voters to have consented to the Third-Party Release despite those voters not having provided their affirmative consent to such release, they should not be approved.

5.      Additionally, the proposed solicitation procedures do not provide any notice—let alone adequate notice—to Affiliates and Related Parties of Releasing Parties that their claims against non-debtors may be released under the Plan.  The Plan seeks to bind Affiliates and Related Parties of Releasing Parties (i) without identifying which entities are covered by those definitions and (ii) and by deeming consent when such Affiliates and Related Parties have not affirmatively consented to the Third-Party Release.

6.      For the foregoing reasons, as more fully set forth below, the Disclosure Statement should not be approved.  Additionally, consideration of any revised Disclosure Statement should be adjourned for a period of time sufficient to enable review of the amendments therein.

## JURISDICTION AND STANDING

7.     Under (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the Motion and this Objection.

8.     Pursuant to 28 U.S.C. § 586, the U. S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code").  This duty is part of the U. S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.),* 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

9.     Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases and to comment on such plans and disclosure statements.

10.     The U.S. Trustee has standing to be heard on the on the Motion pursuant to 11 U.S.C. § 307.

## BACKGROUND

11.     On April 22, 2024, the Debtors filed the voluntary petitions for relief under chapter 11 of the Bankruptcy Code which initiated the above-captioned cases.  The Debtors are debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

12.     On May 3, 2024, the U.S. Trustee appointed the committee of unsecured creditors (the "Committee") pursuant to Bankruptcy Code section 1102(a)(1).

13.     On June 14, 2024, the Court approved a going-concern sale of substantially all of

the Debtors' assets.  D.I. 471 (sale order).  The sale closed on June 21, 2024.  D.I. 535 (*Notice of the Occurrence of Sale Closing of the Stalking Horse APA on June 21, 2024*).

14.      On July 31, 2024, the Debtors filed the Motion, Disclosure Statement, and Plan.

15.      The Committee is not a proponent of the liquidating Plan.  Indeed, the Committee has noted its opposition to the filed Plan.  D.I. 692 (*Official Committee of Unsecured Creditors' (I) Objection to the Debtors' Motion to Extend Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and (II) Cross-Motion to Terminate Exclusivity for the Committee*) (the "Exclusivity Objection").[3]

***Proposed Solicitation—Voting Class***

16.      Class 3 (General Unsecured Creditors) (the "Voting Class") is the only voting class under the Plan.  The Debtors intend to transmit the Solicitation Package, which includes the Ballot, to the Voting Class.  If a Holder of a Claim in Class 3 votes to accept the Plan, that holder shall be deemed to have consented to the Third-Party Release without exception.  If a Holder of a Claim in Class 3 votes to reject the Plan, the Holder will be deemed to consent to the Third-Party Release unless the Holder affirmatively opts out of the release on the ballot.  If a Holder of a Claim in Class 3 abstains from voting on the Plan, the Holder will be deemed to consent to the Third-Party Release unless the Holder affirmatively opts out by sending in the ballot with the opt out, but not the voting box, checked.

---

[3] ¶ 11 of the Exclusivity Objection:  "[T]he Committee made its position crystal-clear to the Debtors:  The liquidating plan should not have broad Debtor releases or third-party releases.  Specifically, claims against directors and officers should be preserved to be investigated and, if appropriate, brought by a liquidating trustee or plan administrator, especially since such claims are backed by a significant source of recovery."

¶ 25 of the Exclusivity Objection:  "Absent the pressure from the Debtors' pursuing gratuitous releases, these cases are the perfect candidate for a combined consensual plan and disclosure statement process, as contemplated under this Court's local rules… If the Objection is sustained and the exclusive period is terminated, the Committee is prepared to file its own joint liquidation plan and disclosure statement without Debtor and third-party releases."

*Proposed Solicitation—Non-Voting Classes*

17.     The Plan contains six (6) Non-Voting Classes.  Holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) of the Plan are Unimpaired and will not receive a Solicitation Package, but instead will receive a Confirmation Hearing Notice, a Deemed to Accept Opt-In Form, and a Notice of Non-Voting Status.[4]  Holders of Claims in Class 1 and Class 2 are deemed to accept the Plan but are not deemed to have consented to the Third-Party Release unless a Holder affirmatively opts in by completing and returning the optional Deemed to Accept Opt-In Form by the Voting Deadline.

18.     Holders of Claims and Interests in Class 4 (Intercompany Claims) and Class 5 (Intercompany Interests) will receive neither a Solicitation Package nor a Notice of Non-Voting Status; the Class 4 and 5 Claims and Interests are held by the Debtors or affiliates of the Debtors.

19.     Holders of Claims and Interests in Class 6 (Equity Interests in Express) and Class 7 (Section 510(b) Claims) of the Plan are Impaired and will not receive a Solicitation Package but instead will receive a Confirmation Hearing Notice, a Deemed to Reject Opt-In Form, and a Notice of Non-Voting Status.  Holders of Claims and Interests in Class 6 and Class 7 of the Plan are deemed to reject the Plan and deemed to reject the Third-Party Release unless a Holder affirmatively opts in by completing and returning the optional Deemed to Reject Opt-In Form by the Voting Deadline.

*Release Provisions*

20.     Article X(C) of the Plan contains the Debtor Release:

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for

---

[4] The proposed Deemed to Accept Opt-In Form erroneously informs recipients that they are "deemed to accept the Plan and opt-in to the Third-Party Release."  That language is inconsistent with Article I(A)(132) of the Plan (definition of "Releasing Party"), which states that parties in unimpaired, non-voting classes may choose whether to opt in to the Third-Party Release.  Further, there would be no purpose to sending an "opt-in" form to a claimant in a deemed accepting, nonvoting class who had no ability to accept or reject the Third-Party Release.

good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors and their Estates and, if applicable, the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, and the Wind-Down Debtors, as applicable, whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, and the Wind-Down Debtors, as applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Wind-Down Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the pursuit of the Wind-Down Transactions, the administration and implementation of the Plan, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in this Article X.C by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article X.C is: (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing the Plan; (ii) a good-faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the

Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates or, if applicable, the Wind-Down Debtors or the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

21.     Article X(D) of the Plan describes the Third-Party Release:

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the pursuit of the Wind-Down Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in this Article X.D, which include by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute

the Bankruptcy Court's finding that each release described in this Article X.D is: (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

22.     Article 1(A)(132) of the Plan defines "Releasing Party:"

"Releasing Party" means, collectively, in each case in its capacity as such: (a) each of the Debtors; (b) each of the Wind-Down Debtors; (c) the DIP Lenders; (d) the DIP Agents; (e) the Prepetition Lenders; (f) the Prepetition Agents; (g) the Committee and each of its members; (h) WHP and the IP Licensors; (i) the Purchasers; (j) all Holders of Claims who vote to accept the Plan; (k) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims who affirmatively opt in to the releases provided by the Plan; (m) each current and former Affiliate of each Entity in clauses (a) through clause (l); and (n) each Related Party of each Entity in the foregoing clauses (a) through clause (m); provided that a Related Party of a Person or Entity in the foregoing clauses (a) through (m) is a Releasing Party solely to the extent that such Affiliate or Related Party would be obligated to grant a release under principles of agency if it were so directed by such Person or Entity in the foregoing clauses (a) through (m) to whom they are related.

23.     Although the defined term "Releasing Party" does not include a Holder of a Voting Class Claim that is entitled to vote and fails to do so, other Plan documents make clear that is the intent.  Mot. Ex. 3 (Class 3 General Unsecured Claims Ballot) ("If you vote to reject the Plan or do not vote to accept or reject the Plan and do not affirmatively opt-out of the Third-Party Release by checking the box in Item 3 below, you will be deemed to have granted the Third-Party Release set forth in Article X.D of the Plan.").

24.     "Released Party" is defined in Article I(A)(131) of the Plan:

"Released Party" means, collectively, in each case in its capacity as such: (a) each of the Debtors; (b) each of the Wind-Down Debtors; (c) the DIP Lenders; (d) the DIP Agents; (e) the Prepetition Lenders; (f) the Prepetition Agents; (g) the Committee and each of its

members; (h) WHP and the IP Licensors; (i) the Purchasers; (j) all Holders of Claims who affirmatively opt in to the releases provided by the Plan; provided, however, that any party who opts out of the releases under the Plan shall not be a "Released Party"; provided further, however, that any party required to opt in to the releases contained in the Plan that fails to do so shall not be a "Released Party"; (k) each current and former Affiliate of each Entity in clauses (a) through clause (j); (l) each Related Party of each Entity in the foregoing clauses (a) through clause (k); (m) all Holders of Claims who vote to accept the Plan; and (n) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan.

25.    Article X(F) of the Plan contains an injunction provision to enforce the release provisions:

Effective as of the Effective Date, to the fullest extent permissible under applicable law, except as provided in Article X.L of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to this Article X of the Plan, whether released pursuant to the Debtor Release, released pursuant to the Third-Party Release, or released pursuant to another provision of the Plan (including the release of Liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are enjoined ((a) in the case of the Debtors and the Wind-Down Debtors, from and after the Effective Date, through and until the date upon which all remaining property of the Debtors' Estates vests into the Wind-Down Debtors, and has been liquidated and distributed in accordance with the terms of the Plan, and (b) in the case of the Released Parties, the Exculpated Parties, and all other Persons and Entities other than the Debtors and the Wind-Down Debtors, as applicable, permanently) from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, in each case to the extent provided by the relevant release, exculpation, or other Plan provision: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other

proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article X.B, Article X.C, Article X.D, or Article X.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchasers, or the Wind-Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors, or otherwise contemplated under the Sale Order. Such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchasers, or the Wind-Down Debtors.

## **ARGUMENT**

### I.    **The Disclosure Statement Does Not Contain Adequate Information.**

26.    Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see also In re*

*Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).   The Bankruptcy Code defines "adequate

information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's books
> and records, including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor, and a
> hypothetical investor typical of the holders of claims or interests in the case, ***that
> would enable such a hypothetical reasonable investor of the relevant class to
> make an informed judgment about the plan*** . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors*

*Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin.,*

*Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

27.     The disclosure statement requirement of section 1125 of the Bankruptcy Code is

"crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full

and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber*

*Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In*

*re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

28.     The "adequate information" requirement is designed to help creditors in their

negotiations with Debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94

(3d Cir. 1988).   Section 1129(a)(2) conditions confirmation upon compliance with applicable

Bankruptcy Code provisions. The disclosure requirement of section 1125 is one of those

provisions. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

29.     To be approved, a disclosure statement must include sufficient information to

apprise creditors of the risks and financial consequences of the proposed plan. *See In re Duratech*

*Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose

of the disclosure statement is to give creditors enough information so that they can make an

informed choice of whether to approve or reject the debtor's plan); *In re McLean Indus.*, 87 B.R.

830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

30.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The "adequate information" requirement merely establishes a floor -- not a ceiling -- for disclosure to voting creditors.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (*citing Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988)).

31.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."  *See Oneida*, 848 F.2d at 417 (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

32.     A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene.  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

33.     The Disclosure Statement and Solicitation Materials lack adequate information regarding the Plan's release and exculpation provisions to allow a typical creditor in the Voting Class to understand the Plan in a manner sufficient to make an informed decision.

34.     The releases and exculpation in the Plan are subject to the outcome of the Independent Investigation.  The Plan seeks to preserve the right of the Disinterested Director to object to, or seek to limit the scope of, those provisions.  In the Disclosure Statement, the Debtors

fail to explain in a succinct manner (i) the status of the Independent Investigation and (ii) how/when creditors and interest holders will be informed of the outcome of the Independent Investigation in connection with solicitation.  The Disclosure Statement does not provide a clear and concise description of (i) the potential claims proposed to be released by the Debtor Release and Third-Party Release, (ii) the consideration being provided by each Released Party in exchange for the Debtor Release and Third-Party Release (if any), and (iii) the value (if any) of the potential claims and causes of action that would be released.[5]

35.    The Disclosure Statement does not describe the Committee's opposition to the proposed Plan and the grounds therefor.  The Committee is a fiduciary to the unsecured creditor body as a whole, and an understanding of its position is essential to providing creditors and interest holders with adequate information.  The Disclosure Statement must detail the risks attendant to proceeding to confirmation in the face of opposition from the Committee.

36.    Additionally, the Disclosure Statement includes tentative (bracketed) estimates of recoveries to creditors.  Those amounts need to be made final prior to solicitation.  The Disclosure Statement also does not include a liquidation analysis (Exhibit C).  The liquidation analysis must be finalized prior to solicitation and must include the consideration the estates are receiving in exchange for the Debtor Release.

37.    It is the Debtors' burden to distill the Plan into a Disclosure Statement that provides "a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  The currently filed Disclosure Statement does not satisfy that burden.

---

[5]  The definition of Released Party includes each Related Party of a Released Party.  The Disclosure Statement must detail the value provided by each Released Party, including each Related Party thereof, as consideration for the proposed releases.

II.    **The Proposed Plan Is Facially Not Confirmable Because It Contains Impermissible Non-Consensual Third-Party Releases, and the Solicitation Procedures Should Not be Approved as Proposed.**

38.    If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied.  *See In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) *(*citing *In re Beyond.com Corp*., 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); *In re 266 Washington Assocs*., 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

39.    Non-consensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024).

40.    Contract principles govern whether a release is consensual.  *See Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017). That is because a third-party release is essentially a settlement between a non-debtor claimant and another non-debtor.

41.    Whether parties have reached an agreement — including an agreement not to sue — is governed by state law. The only exception is if there is federal law that preempts applicable state contract law.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

42.    No federal law applies to the question of whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. The Bankruptcy Code does not apply to agreements between non-debtors. And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law.  Nor

15

does Bankruptcy Code section 105(a) confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Thus, the state-law definition of consent is not diluted or transformed by the Bankruptcy Code.

43.     Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."); *see also Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) ("[T]he basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

44.     Because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation

authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id*. at 507 (holding that "the validity of the release … hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, No. BK 18-12156 CLB, 2024 WL 4024385, at *2 (Bankr. W.D.N.Y. Aug. 27, 2024) (quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed by state law." *Id.*

45.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will expressly consent to release their property rights or to have that release memorialized in the Plan.

46.     The "general rule of contracts is that silence cannot manifest consent." *Patterson,* 636 B.R. at 686.  "Acceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

47.     "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the

other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

48.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *see Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out).   Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981); *see Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks omitted).

49.     Using Delaware common law as a point of reference, silence does not equal consent except under limited circumstances not applicable here.  *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)).  Delaware follows the "mirror image" rule, requiring the acceptance to be identical to the offer.  *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out).

50.     Applicable state contract law cannot be disregarded on a default theory, applied by some courts, that creditors who remain silent forfeit their rights against non-debtors because they received notice of the non-debtor release, just as they would forfeit their right to object to a plan if they failed timely to do so.  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097,

2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL 4296938, at *8-*11.    As explained by this Court in *Smallhold*, the Supreme Court's *Purdue* decision undermined the fundamental premise of such a theory — that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights.    *In re Smallhold, Inc.*, 2024 WL 4296938, at *1-*2; *see also id*. at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing.").    Under the default theory, because pre-*Purdue* a chapter 11 plan (under certain circumstances, under certain circuit-level decisions) could permissibly include nonconsensual, non-debtor releases, non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights.    *See id*. at *10.    A failure to opt out under the default theory is not truly consent, but rather "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at *2; *see also id*. at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

51.    But entering relief against a party who defaulted by not responding is, "[u]nder established principles" permissible "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation." *Id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so. [After *Purdue*], that is no longer the case in the context of a third-party release."). After *Purdue*, however, it is now clear in all circuits that imposition of a non-debtor release is not available relief through a debtor's chapter 11 plan.    *See id*. at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be

entered by 'default' in the absence of an objection."); *see also id.* at *10.  Thus, *Smallhold* held

that "it is no longer appropriate to require creditors to object or else be subject to (or be deemed to

'consent' to) such a third-party release." *Id*. at *10.

52.     The *Smallhold* court provided an illustration that makes obvious why notice-plus-

failure-to-opt-out is not consent:

> Consider, for example, a plan of reorganization that provided that
> each creditor who failed to check an "opt out" box on a ballot was
> required to make a $100 contribution to the college education fund
> for the children of the CEO of the debtor.  Just as in the case of Party
> A's letter to Party B, no court would find that in these circumstances,
> a creditor that never returned a ballot could properly be subject to a
> legally enforceable obligation to make the $100 contribution.

*Id*. at *2 (footnote omitted).  Cases that impose a non-debtor release based merely on the failure to

opt out fail to "provide[] any limiting principle that would distinguish the third-party release from

the college education fund plan. And after *Purdue Pharma*, there is none." *Id*.  Thus, "ordinary

contract principles" apply to determine whether there is consent to a non-debtor release. *Id*. at *3.

53.     Just like it is legal error to define consent in a manner inconsistent with state law,

it is error to presume it exists.  As discussed above, consent arises when two sets of parties

affirmatively assent to something.  *See* 1 VOSS ON DELAWARE CONTRACT LAW § 2.05 (citing

*Loveman v. The NuSmile, Inc.*, C.A. No. 08C-08-223 MJB, memo. op. at *7 (Del. Super. Ct. Mar.

31, 2009) (Brady, J.)).  A party seeking to include non-debtor releases in a bankruptcy plan must

show that they are consensual.  To do so, state law requires that mutually agreeing third parties

must come forward, state their consent affirmatively, and ask the court to memorialize their

consent in a plan.  Nothing in the Bankruptcy Code authorizes bankruptcy courts to extinguish

claims by inferring consent outside the bounds of state law.

54.     An affirmative agreement — something more than the failure to opt out — is

required to support a consensual third-party release. *See In re Smallhold, Inc.*, 2024 WL 4296938,

at *3 ("[A] creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent."); *see also id*. at *8; *In re Tonawanda Coke Corp.*, 2024 WL 4024385, at *2; *Patterson*, 636 B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits.  For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out.  *Patterson*, 636 B.R. at 686.  "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent."  *Id.* at 688. Because the Plan forces third-party releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

55.     The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number."  *Id*.  It also stated that opting out would not affect the warranty coverage.  *See id*.  The customer did not take any steps to opt out.  *See id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id*. at 1282-83.

56.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an

agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

57.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

58.     The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception

applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id.* at 1286.

59.     Here, too, the debtors' creditors have not signed an agreement to release the non-debtor releasees. Nor may consent be inferred from their silence because they have no duty to respond to the offer of a non-debtor release and they have not retained any benefits offered in exchange for it.

60.     Applying the hornbook law on contracts cited above to the Third-Party Release, affirmative consent—and the limited circumstances in which silence can be consent under state law—are absent here. This is true for anyone deemed to consent merely because of a vote in favor of the plan and/or the failure to opt out of the Third-Party Release. The Third-Party Release in the Plan, which benefits numerous non-debtors, will be imposed upon the following categories of parties without their affirmative consent: (i) all parties who vote to accept the Plan; (ii) all parties who reject the Plan, unless they also affirmatively elect to opt out of the releases; (iii) all creditors in voting classes who do not return a ballot with an opt out election stated thereon; and (iv) Affiliates and numerous categories of Related Parties to the Releasing Parties.[6]

61.     First, this Court should reject the Debtors' proposal to impute acceptance of the Third-Party Release to Class 3 creditors voting in favor of the Plan, as that action does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. Because the Plan forces non-debtor releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under

---

[6] It does not appear that unclassified claimants holding claims addressed by Article II of the Plan (administrative, professional fee, priority tax and DIP claims) are Releasing Parties. The Debtors should clarify this point. If unclassified claimants are Releasing Parties, it is unclear how the Debtors intend to obtain their affirmative consent to the Third-Party Release.

*Purdue*.

62.     The Plan's conflation of voting for the Plan with acceptance of the Third-Party Release is inconsistent with state law.  Voting for a plan does not reflect the unambiguous assent necessary to find consent to a release.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual releases are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

63.     Voting on a chapter 11 plan is governed by the Bankruptcy Code, and voter support only reflects approval of the plan's treatment of the voters' claims *against the debtor*.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, *see* 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  People voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Nor are they "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred.  *Id.*  And because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions.  *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017) (holding customer did not retain any benefits such that a failure to opt out of arbitration indicated consent when the warranty applied regardless of the failure to opt out).  Further, acceptance of a "benefit" — distributions under the plan — that the offeror had no right to refuse the offeree does not manifest acceptance of the offer.  *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS

24

accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

64.     As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it.  211 B.R. at 507 (emphasis in original).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan."  *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt."  *Arrowmill*, 211 B.R. at 507.

65.     Further, a plan is presented as a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person should not be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan.  That is not true consent.  For those who believe the plan is the best way to maximize the return of their money from the debtor, requiring them to vote "no" on the Plan—thus raising the possibility that the Plan may not be able to be confirmed and they thus cannot receive the economic benefit under the Plan—to reject the nondebtor release would be penalizing them for exercising their right to vote in favor of the Plan.  That an offeree is penalized unless an "offer" is accepted "preclude[es] an inference of assent."  *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).

66.     In addition, the Bankruptcy Code guarantees that a creditor may not be required to accept in a chapter 11 plan less than it would receive in a chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7)(A). But a chapter 7 liquidation could not require a release of non-debtors as a condition of receiving a distribution (because it does not involve a plan).  Requiring a non-debtor release as a condition of receiving a distribution under a chapter 11 plan, absent the individual creditor's consent, is thus inconsistent with Bankruptcy Code section 1129(a)(7)(A).

67.     Hence, voting for a plan does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at 194.

68.     *Second*, the plan imposes non-debtor releases on those who vote to reject the Plan, unless they check an opt-out box on the returned ballot.  But it is even more obvious that those who vote to reject a plan are not consenting merely through silence by failing to opt out of the nondebtor release.  *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015).  Not only is there no "mutual agreement" as to the Plan, much less the Third-Party Release, the creditor has actually expressly stated its rejection of the Plan.  As the court in *Chassix* said, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan.  ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***" *Id.* (emphasis added).

69.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

70.     The U.S. Trustee recognizes that this Court in *Smallhold* found that the act of voting on a plan combined with a failure to opt out can constitute consent to a non-debtor release.  *See Smallhold*, 2024 WL 4296938, at *14.  This Court correctly held in *Smallhold* that "ordinary contract principles" apply to determine whether there is consent to a non-debtor release. *In re*

26

*Smallhold, Inc.*, 2024 WL 4296938, at *3. However, the U.S. Trustee respectfully submits that, in finding that voting to reject a plan without opting out constitutes "an affirmative step" necessary to infer consent (*id.* at *14), the Court erred by failing to consider whether any of the exceptions to the state-law rule that silence is not consent apply in this context.[7] They do not. As discussed above, merely voting for a plan is not an expression of consent to a non-debtor release. Voting either for or against a plan plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors.

71.     Thus, while voting on a plan is an affirmative act, it is not a "*manifestation of intention* that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). Creditors have no affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and even a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

---

[7] The Ninth and Second Circuit cases cited by this Court in *Smallhold* do not support the conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent. *Smallhold*, 2024 WL 4296938, at *14 n.60 (citing *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Those cases emphasize the importance of notice as a prerequisite to consent and explain the requirements for when someone can be deemed on "inquiry notice" of terms they did not read. *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75. But whether there is sufficient notice is a distinct question from whether there has been a manifestation of an intent to accept an offer. *See, e.g., Meyer*, 868 F.3d at 74 ("[A]n offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.") (internal quotation marks omitted; emphasis added); RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) ("The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak.").

72.     As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the nondebtor release.  Like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 2024 WL 4296938, at *2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.  State law affords no basis to conclude that consent to release *third-party* claims can properly be inferred from nothing more than a mere failure to check an opt-out box on a ballot rejecting the proposed treatment of its claims against the *debtor*.

73.     *Third*, under the proposed Plan, creditors in voting classes who do not vote on the Plan but do not return a ballot with the opt out box checked shall also be stripped of their direct claims against non-debtors, regardless of the reason they did not vote.  Those reasons may include that such creditors (a) never received the solicitation package, or received it late, due to mail errors or delays, or (b) received it timely, and completed it and returned it to the balloting agent, but through no fault of their own, the ballot never reached the balloting agent, or was received late. Other creditors in voting classes may receive the solicitation package, but not understand it, and may not have the time or financial resources to engage counsel and would never imagine that their rights against *non-debtors* could be extinguished through the bankruptcy of these Debtors.

74.     It is even more obvious that, as numerous courts in this district have held, the releases cannot be imposed on those who do not vote and do not opt out.  *See Smallhold,* 2024 WL 4296938, at *2.  This applies to those creditors who simply abstain from voting.  Those who abstain

from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan.

75.     Even where there are conspicuous warnings that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's silence as consent. *SunEdison*, 576 B.R. at 458–61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.[8] And creditors who have no intention of voting in the first place are unlikely to do so. Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. Here, the warning that a failure to opt out would bind a solicited party who does not vote to the Third-Party Release does not come until six (6) pages into the single-spaced ballot.

76.     Thus, the court in *SunEdison*, rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to or reject the plan should be deemed their consent to the release. *Id*. at 460–61. The debtors did not contend that an ongoing course of conduct between themselves and the nonvoting creditors gave rise to a duty to speak. *Id*. at 460. And the court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*. at 460-61.

77.     Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82. An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Wash. Mut., Inc.*, 442 B.R. at 355.

---

[8] Here, the Plan and associated materials, including the Disclosure Statement, are voluminous, running to hundreds of pages.

78.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix Holdings, Inc.*, 533 B.R. at 81. *See also Smallhold, Inc.*, 2024 WL 4296938, at *12 ("It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy."). As the court in *Emerge Energy Services, LP*, explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as waiver through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).

79.    *Fourth*, the Third-Party Release also will be imposed on all Affiliates[9] and at least thirty-one (31) categories of Related Parties,[10] without their affirmative consent, and in many instances without their receipt of notice, as further discussed in Section IV of this Objection.  "Even if there is an applicable exception to the general rule that silence does not constitute acceptance,

---

[9] "*Affiliate*" means, with respect to any person, or any other person, which directly or indirectly controls, or is under common control with, or is controlled by, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.  Plan Art. I(A)(8).

[10] "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.  Plan Art. I(A)(130).

courts have rejected the argument that an offeree's silence constitutes consent to a contract when the offeree reasonably did not know that an offer had been made." *Norcia*, 845 F.3d at 1285; *see also id.* ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.") (quotation marks omitted); *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017) (explaining there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement").

80.     In sum, there will be no affirmative consent to Third-Party Releases given by numerous persons and entities on whom such releases will be imposed. Such releases are therefore non-consensual.

81.     If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied. *See In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (citing *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)). The Third-Party Release renders this Plan patently unconfirmable, and therefore the disclosure statement should not be approved on a final basis. Moreover, the solicitation procedures incorporating the ballots that impose the Third-Party Release on parties who have not affirmatively consented to them should also not be approved.

## III.    The Proposed Plan Is Facially Unconfirmable Because the Third-Party Release Injunction Also Violates *Purdue*.

82.     This Court also may not approve the injunction enforcing the release by parties in interest against non-debtors because *Purdue* clearly stands for the proposition that non-consensual

third-party releases and injunctions are not permitted by the Bankruptcy Code. *See Purdue*, 144 S. Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)). Even if non-debtor releases are consensual, there is no Bankruptcy Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief because, if the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent "immediate and irreparable harm" to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

### IV.    The Solicitation Procedures Did Not Provide Notice to Numerous Persons That Their Claims Against Non-Debtors Will Be Released Under the Plan.

83.    The Plan includes a recitation of the Third-Party Release and related definitions. However, the Debtors did not serve any part of the Solicitation Package, or the Confirmation Hearing Notice, or any other document on the numerous Affiliates and Related Parties that would notify them that the Plan will strip them of their right to pursue their direct claims against a large number of non-debtor entities for no consideration. Moreover, it likely would be impossible for the Debtors to arrange to provide such notice, because the identity of many of the Related Parties— such as all agents of all Related Parties—are not, and cannot be, known by the Debtors.

84.    In *Folger Adam Security, Inc. v. DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir.

2000), the Third Circuit ruled that "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" 209 F.3d at 265 (citations omitted).

85.    The Debtors' proposed solicitation procedures will not provide notice to the Affiliates and Related Parties that is "reasonably calculated, under all the circumstances, to apprize [them] of the pendency of the action and afford them an opportunity to present their objections" to having Third-Party Releases extracted from them. *Id.*   In fact, most, if not all, of the Affiliates and Related Parties will receive no notice at all, because they are not themselves creditors or interest holders of the Debtors.  The Plan therefore must not be confirmed unless modified so that no Affiliates and Related Parties are deemed to give releases to non-debtors.  *See Purdue Pharma*, 144 S. Ct. at 2086 ("nothing in the bankruptcy code contemplates (much less authorizes)" a non-consensual release of direct claims held by creditors against non-debtor third parties); *In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 678 (Bankr. D. Del. 2022) (stating that the Court was unable to find that the 22 categories of "Related Releasing Parties" received notice, and because Court had concluded that "a request for opt-out consent must be grounded in adequate notice, it is inconsistent to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status."); *see also Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 660 (E.D. Va. 2022) (noting that "[t]he Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders.").

## **RESERVATION OF RIGHTS**

The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required, and to assert such other grounds as may become apparent upon further factual discovery.  The U.S. Trustee also reserves all rights with respect to Plan confirmation issues until the relevant objection deadline.

## **CONCLUSION**

**WHEREFORE**, the U.S. Trustee requests that this Court sustain this Objection and grant such other relief as it deems just and proper.


**Dated:**  October 22, 2024

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ John Schanne*
John Schanne, Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (202) 934-4154
Email: john.schanne@usdoj.gov