IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| EXP OLDCO WINDDOWN, INC., *et al.*,[1] | ) ) ) | Case No. 24-10831 (KBO) |
| Debtors. | ) ) ) ) | (Jointly Administered) |
|  | ) | **Re: Docket Nos. 691, 916** |

**DEBTORS' REPLY TO
THE U.S. TRUSTEE'S OBJECTION
TO THE DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) APPROVING
THE ADEQUACY OF THE DISCLOSURE
STATEMENT, (II) APPROVING THE SOLICITATION
PROCEDURES, (III) APPROVING THE FORMS OF BALLOTS AND
NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN
DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply") to the objection[2] of the United States Trustee ("U.S. Trustee") to the relief requested by the Debtors in the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are EXP OldCo Winddown, Inc. (8128), Project Pine TopCo Winddown, LLC (8079); Project Pine Holding OldCo, LLC (8454); Project Pine Finance OldCo Corp. (7713); Project Pine OldCo, LLC (0160); Project Pine Investments OldCo, LLC (7622); Project Pine Logistics OldCo, LLC (0481); Project Pine Operations OldCo, LLC (3400); Project Pine GC OldCo, LLC (6092); Project Pine Tropic OldCo, LLC (3861); Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2] *See United States Trustee's Objection to Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Docket No. 916] (the "Objection").

*Thereto, and (V) Granting Related Relief* [Docket No. 691] (the "<u>Motion</u>").³  In support of this Reply, and in further support of approval of the Disclosure Statement and entry of the Order (as defined in the Motion), the Debtors respectfully state as follows:

### **<u>Preliminary Statement</u>**

1. Following close engagement with the official committee of unsecured creditors (the "<u>Committee</u>") and numerous other stakeholders in these chapter 11 cases, the Debtors are now on the precipice of a fully consensual chapter 11 plan and solicitation process that contemplates fully consensual *opt-in* third-party releases, supported Debtor releases, and a consensual transaction that provides recoveries to holders of General Unsecured Claims.  The only remaining issue, the U.S. Trustee's objection to the injunction provision in the Plan, is not yet ripe and should be addressed at the confirmation hearing.

2. The Debtors have reached this juncture, after working closely with the Committee, with their main goal from the outset of these chapter 11 cases:  to implement a comprehensive chapter 11 plan that would efficiently and expeditiously maximize value for the Company's stakeholders following a going-concern transaction that (a) preserved thousands of jobs; (b) rationalized its store footprint while maintaining as many store locations as possible; and (c) increased the likelihood that commercial counterparties can continue to do business with Express for years to come.

3. The Debtors have cleared the biggest hurdle standing between the commencement of these chapter 11 cases and achieving the goals set forth above:  consummation of the going-

---

³ On July 31, 2024, the Debtors filed the *Joint Chapter 11 Plan of Express, Inc. and its Debtor Affiliates* [Docket No. 689] (as amended, supplemented, or otherwise modified from time to time) (the "<u>Plan</u>") and the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Express, Inc. and its Debtor Affiliates* [Docket No. 690] (as amended, supplemented, or otherwise modified from time to time) (the "<u>Disclosure Statement</u>").  Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Motion, the Plan, or the Disclosure Statement, as applicable.

concern sale transaction with Phoenix Retail, LLC, a consortium consisting of PHXWHP, LLC, an affiliate of EXPWHP, LLC and affiliates of certain of the Debtors' landlords, specifically, SPG Fashion Retail, LLC and BPR Acquisitions LLC. With the support of the Committee (as defined below), the DIP Lenders, and other key stakeholders, the transaction closed on June 21, 2024, and preserved 7,500 jobs, assumed the Debtors' leases for over 450 store locations across 44 states, continued service to customers across the Express and Bonobos omnichannel retail platform, maintained relationships with many key contract counterparties, and allowed the Debtors to pay down the outstanding DIP obligations in full.

4. The Debtors are now fully focused on bringing these chapter 11 cases to an equitable and efficient conclusion. To that end, the Debtors seek to confirm the Plan which outperforms stakeholders' expectations at the outset of these chapter 11 cases. The Plan provides for the satisfaction of all administrative and priority claims, results in meaningful recoveries to general unsecured creditors, and is supported by the Committee and its constituency (subject to acceptable documentation).

5. In connection with the Plan and Disclosure Statement, the Debtors, as estate fiduciaries, pursued several potential avenues to maximize value for the benefit of their estates, including evaluating and investigating any potential viable claims and causes of action. As described further in the Disclosure Statement, to properly evaluate any claims and causes of action that the Debtors and their estates could potentially pursue against officers, directors, or employees, the Debtors appointed a disinterested director with extensive restructuring experience and no prior affiliation with the Debtors' board of directors (the "<u>Disinterested Director</u>"). The Disinterested Director was vested with the powers and authority to conduct an investigation into potential estate Claims and Causes of Action against the Debtors' current or former directors, managers, officers,

equity holders, subsidiaries, affiliates, and other related parties. Accordingly, the Disinterested Director conducted an investigation into any potential estate claims and causes of action. The Debtors engaged with the Committee and their advisors on the Disinterested Director's investigation and all open areas remaining in these chapter 11 cases, including folding the Committee's professionals into the investigation process, and the Plan is a culmination of these efforts that provides for the consensual resolution of these successful chapter 11 cases. The revised proposed Disclosure Statement and Plan reflect such agreed path forward and materially reduces the unresolved points between the parties, notably:

- a fully opt-in structure for the Third-Party Releases;

- revisions to the Plan regarding Released Parties, Releasing Parties, Exculpated Parties, and Debtor Related Parties, and the removal of the injunction provisions from Article X.F of the Plan;

- the "Plan Administrator Agreement" to be negotiated by and among the Committee and the Plan Administrator in consultation with the Debtors;

- the establishment of (a) the "Wind-Down Budget" which shall be prepared by the Committee, in consultation with the Debtors, in accordance with the Plan and the Confirmation Order and (b) the "Wind-Down Oversight Committee" which shall be comprised of members selected by the Committee and tasked with overseeing the Wind-Down Debtors in accordance with the Plan; and

- establishment of Committee consent rights for matters involving, but not limited to, Definitive Documents, selection of any Disbursing Agent, the determination of returned cash becoming Distributable Proceeds, and the documents to be included in the Plan Supplement.

6.  The modifications to the Disclosure Statement and Plan, filed substantially contemporaneously herewith, render the overwhelming majority of the U.S. Trustee's objections moot, including the adequate disclosure in the amended Disclosure Statement, the solicitation procedures with regard to the Third-Party Releases contained in the Plan. The remaining argument in the Objection is entirely a confirmation-related issue, whereby the U.S. Trustee argues that the Plan does not meet the standards for entry of an injunction as to Third-Party Releases.

7. This argument—which is premature in advance of solicitation and the Plan confirmation hearing—is facially incorrect. The injunction included in the Plan is the standard mechanism to bind the releases and other functions of the Plan (including barring prepetition claims as is customary and standard in nearly every confirmed chapter 11 plan in a wind-down or reorganization scenario). The Debtors have worked closely and collaboratively with the U.S. Trustee to attempt to resolve a host of its objections in both the Disclosure Statement and Plan, before the hearing on the amended Disclosure Statement and plan to continue to do so in advance of both the hearings on the Disclosure Statement and Plan confirmation.

8. The purpose of a disclosure statement is to enable holders of claims and interests to make an informed, intelligent decision regarding whether to vote to accept or reject a chapter 11 plan. And the purpose of a hearing to approve a disclosure statement is to determine whether the information provided is adequate, as required by section 1125 of the Bankruptcy Code. While this determination includes considerations of accuracy and fairness, it does not include the consideration of substantive objections to a proposed plan. The procedurally proper time to consider such objections is at the confirmation hearing—where a proposed plan will actually be approved or denied. Here, the Debtors are providing clear, accurate, and fair information regarding the treatment afforded their various creditor constituencies, and, therefore, respectfully submit that the Disclosure Statement should be approved. Creditors had and will continue to have sufficient time to review the information contained in the Disclosure Statement in order to make an informed voting decision with respect to the Plan in advance of the Voting Deadline.

9. As further described herein, the Disclosure Statement satisfies the applicable standards under section 1125 of the Bankruptcy Code, and the Debtors therefore respectfully request that the Court overrule the Objection and enter the revised Disclosure Statement Order.

**Argument**

**I.     The Disclosure Statement Contains "Adequate Information."**

10.     The "adequate information" standard set forth in section 1125 of the Bankruptcy Code is not intended to be onerous—it requires only that a debtor provide enough information for voting parties to make an informed judgment when deciding whether to accept or reject a chapter 11 plan.  Courts have interpreted "adequate information" to mean information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders to vote on a chapter 11 plan.  *See, e.g., In re Lower Buck Hosp.*, 571 Fed. Appx. 139, 142 (3d Cir. 2014).  On the other hand, however, "overburdening a proponent's disclosure statement with information significant and meaningful to lawyers alone may result ultimately in reducing the disclosure statement to an overlong incomprehensible, ineffective collection of words to those whose interests are to be served by disclosure."  *In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021) (quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990)) ("The disclosure statement, on the other hand, should not be burdened with overly technical and extremely numerous additions, where such information would serve only to diminish the understanding of a typical creditor or interest holder."); *see also In re Stanley Hotel, Inc.*, 13 B.R. 926, 933–34 (Bankr. D. Colo. 1981) ("[C]ompounding a disclosure statement for the sake of a lawyer's notion of completeness, or because some additional information might enhance one's understanding, may not always be necessary or desirable . . . .").

11.     The Disclosure Statement describes, among other things, the nature of Holders' recoveries under the Plan, the history and background of these chapter 11 cases, risk factors to be considered when voting on the Plan, and the Debtors' Court-approved Sale Transaction that provided the primary source of funding for distributions under the Plan. As demonstrated in the table below and consistent with Third Circuit precedent, the revised Disclosure Statement contains

6

the categories of information necessary for voting creditors to make an informed judgment to accept or reject the Plan:

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Treatment of Claims and Interests | A description and summary of the treatment of all Claims and Interests under the Plan. | Article VII.A |
| Debtors' Corporate History, Structure, and Business Overview | An overview of the Debtors' corporate history, business operations, assets, organizational structure, and capital structure. | Article IV |
| Description of Events Leading to these Chapter 11 Cases | An overview of the events leading to the commencement of the Debtors' chapter 11 cases. | Article V |
| Sale and Marketing Process | An overview of the Debtors' robust third-party marketing process to solicit proposals for one or more potential sales of all or substantially all of the Debtors' assets. | Article VI.F |
| The SEC Investigation | A detailed description of the Investigation conducted by the SEC. | Article VI.L |
| The Disinterested Director's Investigation | A detailed description of the Investigation conducted by the Disinterested Director. | Article VI.M |
| The Releases Contemplated under the Plan | A description of the release provisions sought pursuant to the Plan. | Article III.P |
| The Debtors' Plan | A description of the Debtors' Plan. | Article VII |
| Liquidation Analysis | An analysis of the liquidation value of the Debtors. | Article X.C |
| Risk Factors | An overview of certain risks associated with the Debtors' businesses, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement. | Article VIII |
| Solicitation and Voting Procedures | A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan. | Article IX.F |
| Confirmation of the Plan | Confirmation procedures and statutory requirements for Confirmation and Consummation of the Plan. | Article X |
| Certain United States Federal Income Tax Consequences of the Plan | A description of certain U.S. federal income tax law consequences of the Plan. | Article XI |
| Recommendation | A recommendation by the Debtors that Holders of Claims in the Voting Class should vote to accept the Plan. | Article XII |

12. Notwithstanding these efforts, the Objection raises (now moot) concerns related to the adequacy of the information in the Disclosure Statement. The U.S. Trustee challenges the

7

detail provided in the Disclosure Statement on the outcome of the Investigation. Since the Objection was filed, the Debtors have engaged in productive discussions with the Committee and numerous other parties that have resolved the Committee's and other stakeholders' concerns in connection with the original Plan as filed. Following these discussions, the Debtors have agreed to revise the Plan and Disclosure Statement to secure the Committee's support, subject to acceptable final documentation. The Debtors have also updated the Plan and Disclosure Statement, setting forth in detail the scope, process, and results of the Investigation, mooting this component of the Objection.

13. The balance of the issues raised in the Objection are confirmation issues and do not challenge the Debtors on failing to meet the "adequate information" standard. To the extent that any of the points raised in the Objection are not addressed by specific changes to the Disclosure Statement, the Debtors respectfully submit that the Objection should be overruled. *See In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[O]verly technical and extremely numerous additions to a disclosure statement suggested by an objecting party may themselves be self-defeating in terms of the resulting clarity and understandability of the document to the average investor."). As amended, the Plan and Disclosure Statement provide the estates' stakeholders with adequate information to make an informed decision on whether to cast their vote for or against the Plan.

    **A.**    **The Releases Are Fully Consensual, and the Injunction is Permissible**.

14. The U.S. Trustee argues that the injunction (the "Injunction") enforcing the third-party release (the "Third-Party Release", and together with the debtor release contained in Article X.C of the Plan— the "Debtor Release"—the "Releases") in Article X.F of the Plan is

impermissible because (a) the Supreme Court in *Purdue Pharma*[4] held that the Bankruptcy Code does not authorize injunctions to enforce nonconsensual, third-party releases; (b) there is no need for an injunction to issue in support of a purely consensual third-party release; and (c) the Debtors have not met the standards for entry of an injunction.

15. The Third-Party Release in the revised Plan are applied only to stakeholders who affirmatively opt in to such releases. No Holders of Claims are deemed to consent to the Third-Party Release by silence or omission. Holders of Claims in Class 3 (the "Voting Class") will receive a Ballot, which includes a conspicuous disclosure in capital letters and bolded language printed directly on the Ballot describing the content and effect of the Third-Party Release. Holders of Claims in the Voting Class are instructed that they may check a box if they elect to opt in to the Third-Party Release. Only Holders of Claims in the Voting Class who manifest their consent by taking the affirmative act of returning a Ballot with the opt in box checked are subject to the Third-Party Release. Accordingly, the U.S. Trustee's proposition that the Injunction is impermissible because of *Purdue Pharma*'s ruling on non-consensual releases is not only facially incorrect, but entirely mooted by the revised Plan. *See Purdue Pharma* at 2087-88 ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan . . . .") (emphasis in original).

16. The U.S. Trustee's objection states that an injunction to enforce the Plan's release is not warranted as, even if the release is truly consensual, there is no threatened litigation and no need for an injunction. However, this short-sighted position assumes the relationships between the parties are fixed in perpetuity. The purpose of the injunction is to bind the agreement between the Debtors and their stakeholders, as embodied in the Plan, with finality, in the event that certain

---

[4] *See Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).

9

parties may one day change their mind. *See In re Gigamonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024), Hr'g Tr., Aug. 27, 2024, 64:19–22 (in response to the U.S. Trustee's objection to the plan's third-party releases under *Purdue Pharma*, the court determined that "the Supreme Court declined to express a view on what constitutes a consensual release or the procedural mechanism to obtain a consensual release."). In *Purdue Pharma*, the Supreme Court narrowly decided whether a bankruptcy court may not approve *non-consensual releases* and injunctions that extinguishes claims against non-debtor third parties. *See Purdue Pharma* at 2087. Accordingly, there is no support for the U.S. Trustee's argument that the Court may not confirm a chapter 11 plan containing an injunction with respect to consensual releases.

17. Further, the proposed Solicitation Procedures are entirely consistent with procedures routinely approved in this Court and generally in this district and contain conspicuous language regarding parties' ability to opt in to Releases. *See, e.g.*, *In re SunPower Corporation*, Case No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024) (authorizing debtors' opt-in procedures); *see also In re FTX Trading LTD.*, Case No. 24-11068 (JTD) (Bankr. D. Del. Oct. 8, 2023) (same). Additionally, Courts in this jurisdiction routinely approve releases where, as here, they are consensual. *See e.g.*, *In re Zymergen Inc.*, No. 23-11661 (KBO) (Bankr. D. Del. Feb. 5, 2024) (approving third-party releases with respect to creditors who returned a ballot without opting out of the third-party releases); *In re Virgin Orbit Holdings, Inc*., No. 23-10405 (KBO) (Bankr. D. Del July 31, 2023) (approving third-party release with respect to creditors that voted to accept the plan); *In re AeroCision Parent LLC*, No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) (same); *In re Allena Pharmaceuticals, Inc.*, No. 22-10842 (KBO) (Bankr. D. Del. May 18, 2023) (same); *In re Emerge Energy Services*, No. 19-11563 (KBO) (Bankr. D. Del. 2019) (approving third-party

releases with respect to creditors who (i) voted to accept the plan, (ii) returned a ballot without opting out of the third-party releases, or (iii) opted into the third-party releases).

18. The U.S. Trustee argues that the value of the potential claims being released is insufficiently disclosed, and therefore may foreclose the Debtors from pursuing potentially valuable claims and causes of action. To the extent the U.S. Trustee is concerned about potential claims for willful misconduct or fraud, such claims are not subject to the Releases. *See* Plan Art. X.C-D (providing that the Releases "**shall not operate to waive or release any Causes of Action arising from willful misconduct or actual fraud**") (emphasis in original).

19. This argument is mooted by the revised Disclosure Statement. As described in detail in the revised Disclosure Statement, the Disinterested Director conducted an investigation regarding potential claims and causes of action (the "Investigation"). With the benefit of the Disinterested Director's preliminary conclusions with respect to the Investigation, the Debtors engaged in good-faith, arm's length negotiations with the Committee surrounding the terms of a consensual Plan, including the scope of Releases. Those negotiations culminated with the current proposed Plan, that releases certain "Released Parties" while preserving all Retained Causes of Action including potential claims against "Non-Released Parties". The Retained Causes of Action are preserved for investigation and pursuit, if appropriate, by the Wind-Down Debtors. To the extent any claims or causes of action are later discovered that would be appropriately carved out of the Releases, the Debtors reserve the right to modify the Plan to do so. In addition, the Plan requires the Released Parties to provide consideration for the releases in the form of cooperation with the Wind-Down.

**II.    Objections Raising Confirmation Issues Are Premature and the U.S. Trustee Cannot Show that the Plan Is Patently Unconfirmable**.

20.    The Objection, though it accuses the Plan of being patently unconfirmable, does not present a bar to approval of the Disclosure Statement and the issues raised should be taken up at the plan confirmation stage.  The remaining issues raised by the U.S. Trustee relate to the confirmability of the Plan and are not appropriately raised at this juncture.  The Debtors look forward to supporting their position with regard to such arguments at the appropriate time:  the confirmation hearing.

21.    As a general matter, courts universally agree that a disclosure statement that adequately describes the chapter 11 plan at issue should be approved unless the disclosure statement "describes a plan of reorganization which is so fatally flawed that confirmation is ***impossible***" (*i.e.*, the plan is patently unconfirmable).  *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (emphasis added); *see also In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) (courts should disapprove of the adequacy of a disclosure statement on confirmability grounds only "where it is readily apparent that the plan accompanying the disclosure statement could *never* be legally confirmed") (emphasis added).  "A plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) (internal quotations and citation omitted) (alteration in original).

22.    Courts caution that "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); *see also In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 n. 10 (Bankr. E.D. Pa. 1987) (stating that deciding confirmation issues before solicitation may have a

disenfranchising effect because the disclosure statement itself is not mailed to all creditors until after court approval is obtained).

23. Courts routinely approve disclosure statements despite the existence of disputed issues related to confirmation, even those which may require an evidentiary hearing. *See, e.g.*, *In re Quigley Co., Inc.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-debtor former parent "implicate several confirmation issues" regarding the rights and incentives of certain claimants under the proposed plan); *In re Hyatt*, 509 B.R. 707, 711 (Bankr. D.N.M. 2014) (approving the disclosure statement and finding that the "proposed classification scheme does not render the Plan patently unconfirmable as a matter of law" despite the fact that the debtor's proposed classification scheme required "additional evidence that may be presented at a confirmation hearing"). Issues bearing on the propriety or the scope of debtor and third-party releases are not properly raised in opposition to the Disclosure Statement. *See, e.g.*, *In re Ellipso, Inc.*, No. 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (finding that certain disclosure statement objections were confirmation issues "more appropriately dealt with at a confirmation hearing"). Those are issues for the confirmation hearing.

24. The U.S. Trustee's argument that the Releases make the Plan patently unconfirmable should be disregarded. Here, the Releases meet the applicable legal standard because the Releases are fair, reasonable, and in the best interests of the Debtors' estates. The breadth of the Releases is consistent with those regularly approved in this jurisdiction and others. *See, e.g.*, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr D. Del. Oct. 13, 2024) (approving similar debtor and third-party release provisions including, among other categories, directors, officers, direct and indirect equity holders, and professional and financial advisors); *In re Sientra,*

*Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. June 18, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr D. Del. Mar. 29, 2023) (same); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Mar. 29, 2023) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. Sept. 4, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 14, 2020) (same).

25. Further, the Releases are an integral part of the Plan. Each of the Released Parties, as key stakeholders and critical participants in the Debtors' chapter 11 process, share a common goal with the Debtors in seeing the Plan succeed, and have afforded value to the Debtors and aided in the Debtors' efforts. The Disclosure Statement includes language regarding the Debtors' views on the appropriateness of the Debtor Release and intend to further establish the bases for its approval at confirmation. Most importantly, outside of the Debtor Release, the Third-Party Release is fully consensual, as discussed above. The Holders of Claims who grant the Third-Party Release demonstrate their affirmative consent by returning, as applicable, an Opt-In Form, or a Ballot with the optional box checked to indicate that such holder wishes to grant such Third-Party Releases.

26. Accordingly, the Court should overrule the Objection to the Disclosure Statement and permit the proposed Plan to be solicited. The Objection fails to show that the Plan is patently unconfirmable. Any substantive objections to the Releases are untimely and should be reserved until the Confirmation Hearing. The U.S. Trustee will have ample opportunity to prosecute its confirmation objections in connection with the Confirmation Hearing, to the extent these issues remain disputed.[5]

---

[5] For the avoidance of doubt, the Debtors reserve the right to respond to any and all objections asserted in the Objection in connection with confirmation of the Plan.

**Conclusion**

27.     For the foregoing reasons, the Debtors respectfully submit that the Disclosure Statement should be approved because it satisfies the requirements of section 1125 of the Bankruptcy Code and because the relief provided in the Proposed Disclosure Statement Order is fair, appropriate, and in the best interests of their chapter 11 estates.  The Debtors respectfully request that the Court overrule the Objection and enter the Proposed Disclosure Statement Order.

[*Remainder of page intentionally left blank*]

Dated: November 1, 2024
Wilmington, Delaware

*/s/ Domenic E. Pacitti*

| | |
|---|---|
| **KLEHR HARRISON HARVEY BRANZBURG LLP** | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Domenic E. Pacitti (DE Bar No. 3989) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Michael W. Yurkewicz (DE Bar No. 4165) | Emily E. Geier, P.C. (admitted *pro hac vice*) |
| Alyssa M. Radovanovich (DE Bar No. 7101) | Nicholas M. Adzima (admitted *pro hac vice*) |
| 919 North Market Street, Suite 1000 | 601 Lexington Avenue |
| Wilmington, Delaware 19801 | New York, New York 10022 |
| Telephone: (302) 426-1189 | Telephone: (212) 446-4800 |
| Facsimile: (302) 426-9193 | Facsimile: (212) 446-4900 |
| Email: dpacitti@klehr.com | Email: joshua.sussberg@kirkland.com |
| myurkewicz@klehr.com | emily.geier@kirkland.com |
| aradovanovich@klehr.com | nicholas.adzima@kirkland.com |
| -and- | -and- |
| Morton R. Branzburg (admitted *pro hac vice*) | Charles B. Sterrett (admitted *pro hac vice*) |
| 1835 Market Street, Suite 1400 | 333 West Wolf Point Plaza |
| Philadelphia, Pennsylvania 19103 | Chicago, Illinois 60654 |
| Telephone: (215) 569-3007 | Telephone: (312) 862-2000 |
| Facsimile: (215) 568-6603 | Facsimile: (312) 862-2200 |
| Email: mbranzburg@klehr.com | Email: charles.sterrett@kirkland.com |
| *Co-Counsel for the Debtors and Debtors in Possession* | *Co-Counsel for the Debtors and Debtors in Possession* |