*As Filed at Docket No. 690*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ~~EXPRESS~~EXP OLDCO WINDDOWN, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT**
**RELATING TO THE JOINT CHAPTER 11 PLAN**
**OF ~~EXPRESS,~~EXP OLDCO WINDDOWN, ~~I~~INC. AND ITS DEBTOR AFFILIATES**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are ~~Express~~EXP OldCo Winddown, Inc. (8128), ~~Express~~Project Pine Top~~c~~Co Winddown, LLC (8079); ~~Express~~Project Pine Holding OldCo, LLC (8454); ~~Express~~Project Pine Finance OldCo Corp. (7713); ~~Express~~Project Pine OldCo, LLC (0160); ~~Express Fashion~~Project Pine Investments OldCo, LLC (7622); ~~Express Fashion~~Project Pine Logistics OldCo, LLC (0481); ~~Express Fashion~~Project Pine Operations OldCo, LLC (3400); ~~Express~~Project Pine GC OldCo, LLC (6092); ~~Express BNBS Fashion~~Project Pine Tropic OldCo, LLC (3861); ~~UW~~Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of ~~the~~ Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF ~~EXPRESS~~EXP ~~OLDCO WINDDOWN~~, INC. AND ITS DEBTOR AFFILIATES (THE "~~PLAN~~PLAN"). NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY ~~OR PERSON~~OR PERSON FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN IN ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS.

*[Different first page link-to-previous setting changed from on in original to off in modified.]*

*[Link-to-previous setting changed from on in original to off in modified.].*

WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY SEEK TO OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE WIND-DOWN TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN <u>ARTICLE XI</u> OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE

*[Link-to-previous setting changed from on in original to off in modified.].*

CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE ~~IX~~VIII HEREIN, ENTITLED "RISK-FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

**SPECIAL NOTICE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements in the Plan and this Disclosure Statement, including information concerning the timing and amount of actual DISTRIBUTIONS to holders of Allowed Claims and Allowed Interests, among other things, constitute "forward-looking statements" within the meaning of United States federal securities laws.  Forward-looking statements include any statement that does not directly relate to any historical or current fact and can be identified by the use of words in the future tense and statements accompanied by words such as "expect," "potential," "continue," "may," "will," "should," "predict," "intend," "plan," "anticipate" or the negative version of these words or other comparable words.  Forward-looking statements are based on the Debtors' current expectations and assumptions, which may not prove to be accurate. These statements are not guarantees and are subject to risks, uncertainties, and changes in circumstances that are difficult to predict, and significant contingencies, many of which are beyond the Debtors' control.  Many factors could cause the Debtors' actual results to differ materially and adversely from any of these forward-looking statements.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- ~~Business strategy;~~

- Technology;

- Financial condition, ~~revenues, cash flows,~~ and expenses;

- The adequacy of the Debtors' capital resources and liquidity;

- Levels of indebtedness, liquidity, and compliance with debt covenants;

- Financial strategy, budget, **and** projections, ~~and operating results~~;

- The amount, nature, and timing of capital expenditures;

- Availability and terms of capital;

- ~~Successful results from the Debtors' operations;~~

- The ~~integration and benefits of asset and property acquisitions or the~~ effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- ~~Costs of conducting the Debtors' other operations;~~

- Delays in filing reports with the SEC and modifications to previously reported financial results as a result of the application of accounting standards;

- General economic and business conditions;

- Effectiveness of the Debtors' risk management activities;

- **Counterparty credit risk;**

- **The outcome of pending and future litigation;**

- ~~**Uncertainty regarding the Debtors' future operating results;**~~

- **Plans, objectives, and expectations;**

- ~~**Risks in connection with acquisitions;**~~

- **The potential adoption of new governmental regulations; and**

- **The Debtors' ability to satisfy future cash obligations.**

Among these factors are:  (a) the Debtors' ability to confirm the Plan and consummate the ~~restructuring~~ transactions contemplated by the Plan; (b) objections to the Plan and the potential that the Debtors may need to pursue an alternative ~~restructuring~~wind-down transaction if the Plan is not confirmed; (c) the effects of the Chapter 11 Cases, including increased legal and other professional costs necessary to execute the Debtors' ~~reorganization~~wind-down, on the Debtors' liquidity (including the availability of operating capital during the pendency of the Chapter 11 Cases), results of operations or business prospects~~,~~; (d) the effects of the Chapter 11 Cases on the interests of various constituents and financial stakeholders; (e) the length of time that the Company will operate under chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases; (f) risks associated with third-party motions in the Chapter 11 Cases; (g) Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the Chapter 11 Cases in general; (h) the Company's ability to comply with the restrictions imposed by the covenants, terms and conditions of its financing arrangements; (~~h~~i) employee attrition and the Company's ability to retain key executive management and other personnel due to the distractions and uncertainties resulting from the Chapter 11 Cases; (~~i~~j) the Company's ability to maintain relationships with suppliers, customers, employees and other third parties and regulatory authorities as a result of the Chapter 11 Cases; (~~j~~k) the impact and timing of any cost-savings measures and related local law requirements in various jurisdictions; ~~(k) risks related to the Company's strategic partnership with WHP Global;~~ (l) the financial and other effects of the Company's workforce reduction and other cost reduction actions, including an inability to realize the benefits from such actions within the anticipated timeframe; (m) finalization of the Company's annual financial statements, including completion of standard annual-close processes; (n) the outcome of pending and future claims made against the Company resulting in litigation; (o) the effect of natural disasters, pandemics, and general economic and political conditions on the Debtors; (p) adverse tax changes; and (q) compliance with laws and regulations.  These factors should not be construed as exhaustive and should be read in conjunction with the additional information and discussion of other risks identified in this Disclosure Statement.  The Debtors undertake no obligation to (and expressly disclaim any obligation to) update or revise any forward-looking statements included in this Disclosure Statement as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  The projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Allowed Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses,

**estimates, or recovery projections may or may not turn out to be accurate. We undertake no obligation to update or revise the forward-looking statements included in the Plan and Disclosure Statement, whether as a result of new information, future events or otherwise.**

*[Different first page setting changed from off in original to on in modified.].*
**KE DRAFT: 10.26.20**

## TABLE OF CONTENTS

Page

I.  **Introduction** ........................................................................................................ 1̶2

II.  **Preliminary Statement** ......................................................................................... 1̶2

III.  **Questions and Answers Regarding This Disclosure Statement and Plan** ......... 3̶4

    A.  What is chapter 11? ....................................................................................... 3̶4
    B.  Why are the Debtors sending me this Disclosure Statement? ......................... 3̶4
    C.  Why is the Bankruptcy Court holding a Disclosure Statement Hearing? ........ 4̶5
    ~~D.~~  ~~When is the Disclosure Statement Hearing?~~ ................................................... 4

    ~~E~~D.  Am I entitled to vote on the Plan? ................................................................... 4̶5
    ~~F~~E.  What is the Sale Transaction ~~under the Plan~~? ................................................ 4̶5
    ~~G~~F.  What is the Wind-Down under the Plan? ......................................................... 5̶6
    ~~H~~G.  What will I receive from the Debtors if the Plan is consummated? ................. 5̶6
    ~~I~~H.  What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, or DIP Claim? ......................................................... 7̶8
    ~~J~~I.  Are any regulatory approvals required to consummate the Plan? .................... 11̶2
    ~~K~~J.  What happens to my recovery if the Plan is not confirmed or does not go effective? ....................................................................................................... 11̶2
    ~~L~~K.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation~~?~~"? ................................................................... 11̶2
    ~~M~~L.  What are the sources of Cash and other consideration required to fund the Plan? .. 11̶2
    ~~N~~M.  What is the effect of the Plan on the Debtors' ongoing businesses? ............... 12̶3
    ~~O~~N.  Is there potential litigation related to the Plan? ............................................. 12̶3
    ~~P~~O.  Does the Plan preserve Causes of Action? ..................................................... 12̶4
    ~~Q~~P.  Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ....................................................................................... 13̶4
    ~~R~~Q.  What is the deadline to properly execute, complete, and submit Ballots (*i.e.*, vote)? ............................................................................................................ 22̶4
    ~~S~~R.  How do I vote for or against the Plan? ............................................................ 22̶4
    ~~T~~S.  Why is the Bankruptcy Court holding a Confirmation Hearing? ................... 22̶4
    ~~U~~T.  What is the purpose of the Confirmation Hearing? ........................................ 22̶5
    ~~V~~U.  When is the Confirmation Hearing set to occur? ........................................... 22̶5
    ~~W~~V.  Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................................... 22̶5
    ~~X~~W.  Do the Debtors recommend voting in favor of the Plan? ............................... 22̶5
    X.  Does the Committee recommend voting in favor of the Plan? ....................... 26

IV.  **The Debtors' Corporate History, Structure, and Business Overview** ............. 23̶6

    A.  Express' Background and Current Operations. ................................................ 23̶6
    B.  Express's Prepetition Corporate and Capital Structure and Liquidity Profile. .. 24̶7

V.  **Events Leading to the Chapter 11 Filings** ...................................................... 26̶9

*[Different first page setting changed from off in original to on in modified.].*

## TABLE OF CONTENTS (CONT'D)

**Page**

VI.    **Material Developments and Anticipated Developments of the Chapter 11 Cases** ... 3~~2~~9

    A.    Summary of Key Developments in the Chapter 11 Cases. ... 3~~2~~9
    B.    First Day Relief and Other Case Matters. ... 3~~0~~2
    C.    Appointment of Statutory Committee. ... 3~~2~~5
    D.    Retention of Debtors' Professionals. ... 3~~3~~5
    E.    Lease Rejections and Optimization. ... 3~~3~~5
    F.    Sale and Marketing Processes. ... 3~~4~~6
    G.    The Purchase Agreement and Sale Order. ... 3~~5~~7
    H.    Approval of the DIP Facility. ... 3~~5~~7
    I.    Adequate Protection Obligations. ... 3~~6~~8
    J.    The Bar Date Order. ... 3~~6~~9
    K.    Schedules and Statements. ... 3~~3~~9
    L.    SEC Investigation. ... 39
    ~~L~~M.    The Disinterested Director's ~~Independent~~ Investigation. ... 39
    ~~M~~N.    Settlement with the Committee and the DIP Term Loan Agent ... 3~~7~~40
    O.    Exclusivity Extension Order ... 41
    ~~N~~P.    Proposed Confirmation Schedule. ... 3~~8~~41

VII.    **Overview of the Plan** ... 3~~8~~42

    A.    General ~~Settlement~~Resolution of Claims and Interests. ... 3~~9~~42
    B.    Sale Transaction. ... 3~~9~~42
    C.    The Wind-Down. ... 40~~3~~
    D.    Release of Liens. ... 4~~3~~7
    E.    Distributable Proceeds and Waterfall Recovery. ... 4~~4~~8
    ~~F.    Administrative Claims Reserve. ... 44~~

    ~~G~~F.    Cancellation of Existing Securities and Agreements. ... 4~~5~~8
    ~~H~~G.    Corporate Action. ... 4~~5~~8
    ~~I~~H.    Section 1146 Exemption. ... 4~~5~~9
    ~~J~~I.    Preservation of ~~Causes~~Rights of Action. ... 4~~6~~9
    ~~2~~J.    Other Key Aspects of the Plan. ... 4~~7~~50
    ~~A.    Treatment of Executory Contracts and Unexpired Leases. ... 47~~

    ~~B~~K.    Conditions Precedent to the Effective Date. ... 5~~3~~7

VIII.    **Risk Factors** ... 5~~4~~9

    A.    Bankruptcy Law Considerations. ... 5~~5~~9
    B.    Risks Related to Recoveries under the Plan and Wind-Down Transactions. ... 5~~8~~62

IX.    **Solicitation and Voting Procedures** ... 6~~1~~5

    A.    Holders of Claims or Interests Entitled to Vote on the Plan. ... 6~~1~~5
    B.    Voting Record Date. ... 6~~1~~5
    C.    Voting on the Plan. ... 6~~2~~5
    D.    Votes Required for Acceptance by a Class. ... 6~~4~~7
    E.    Certain Factors to Be Considered Prior to Voting. ... 6~~4~~8

*[Different first page setting changed from off in original to on in modified.].*

*[Different first page setting changed from off in original to on in modified.].*

### TABLE OF CONTENTS (CONT'D)

**Page**

F.      Solicitation Procedures. 648

**X.    Confirmation of the Plan** 659

A.      The Confirmation Hearing. 659
B.      Requirements for Confirmation of the Plan. 6670
C.      Best Interests of Creditors/Liquidation Analysis. 6670
D.      Feasibility. 671
E.      Acceptance by Impaired Classes. 671
F.      Confirmation Without Acceptance from All Classes. 6872
G.      Valuation. 6973

**XI.   Certain U.S. Federal Tax Consequences of the Plan** 6973

A.      Introduction. 6973
B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors - Characterization of the Wind-Down Transactions. 745
C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed General Unsecured Claims. 745
D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders. 748

**XII.  Recommendation of the Debtors** 7781

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*
~~**KE DRAFT: 10.26.20**~~

## EXHIBITS[2]

EXHIBIT A        Chapter 11 Plan

EXHIBIT B        Proposed Disclosure Statement Order

EXHIBIT C        Liquidation Analysis

---

2        Each Exhibit is incorporated herein by reference.

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*
~~KE 71194724~~

## I.      INTRODUCTION

EXP OldCo Winddown, Inc. (f/k/a Express, Inc.) ("Express") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," or the "Company"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of ~~Express~~EXP OldCo Winddown, Inc. and Its Debtor Affiliates* (the "Plan"),[1] filed contemporaneously herewith.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

## II.     PRELIMINARY STATEMENT

Express is a household name in both women's and men's fashion and has provided Americans with stylish and versatile apparel and accessories for more than 40 years.  A trusted and iconic brand with a long history of providing consumers with sophisticated, high-quality products, Express' mission is to offer comfortable, practical, and professional fashion lines that emphasize confidence and self-expression.

Express has a storied history of growth and success.  Starting from one store in Chicago, Illinois, Express expanded its footprint to over 600 stores across the United States.  With a multi-banner portfolio boasting three distinct names in U.S. fashion, the Company employed approximately 9,300 people as of the Petition Date, of whom approximately 2,800 were full time.  Express filed these Chapter 11 Cases to implement a comprehensive ~~transaction~~marketing and sale process, and then distribute the proceeds through a chapter 11 plan that will efficiently and expeditiously maximize value for the Company's stakeholders.    Express commenced these Chapter 11 Cases intent on successfully ~~restructuring through~~consummating a value-maximizing, going-concern transaction that preserves thousands of jobs, rationalizes its store footprint while maintaining as many store locations as possible, and ensures commercial counterparties can continue to do business with Express for years to come.

Since the weeks leading up to the Petition Date, the Debtors worked ~~tirelessly~~ to identify and effectuate such a transaction on an expedited timeline.  Ultimately, those efforts were successful.  Following the 90-day marketing process for a potential transaction that contemplated the sale of all or substantially all of the Debtors' assets (the "Marketing Process"), the Debtors completed the Marketing Process by entering into a going-concern stalking horse asset purchase agreement (the "Purchase Agreement") with a consortium of WHP Global and affiliates of Express's two most significant landlords—SPG Fashion Retail, LLC ("Simon"), a newly formed, wholly owned indirect subsidiary of Simon Property Group, L.P., and BPR Acquisitions LLC, or an affiliate thereof ("Brookfield") (the "Stalking Horse Bidder" or "Phoenix").  The Bankruptcy Court entered an order approving the Purchase Agreement on June 14, 2024.  On June 21, 2024, the Debtors and Phoenix successfully consummated the Sale Transaction, which ~~boasted~~yielded a total purchase price of approximately $172 million, consisting of approximately $134 million in cash consideration and $38 million of Assumed Liabilities.  In addition, the Sale Transaction continue~~s~~d Express as a going concern, meaning that the majority of employees ~~will~~ continued to have jobs, many creditors ~~will~~ continued to have go-forward business partners, and customers ~~will~~ continued to enjoy the Express and Bonobos brands for years to come.  Importantly, the Sale Transaction provide~~s~~d ~~Distributable~~cash ~~P~~proceeds, which, together with other retained assets, will

---

[1]     Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

be used to provide a meaningful recovery to creditors pursuant to the Plan, and allows the Debtors to facilitate an efficient resolution of these chapter 11 cases.

In connection with their goal of continuing their prepetition marketing efforts to enter into a transaction(s) with the highest or otherwise best offer (or offers) for the benefit of all stakeholders, the Debtors, with the support of their key creditor constituencies, filed the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing The Assumption And Assignment of Assumed Contracts, (VI) Authorizing the Sale of Assets, and (VII) Granting Related Relief* [Docket No. 41] (the "Bidding Procedures Motion"). The Bidding Procedures Order was subsequently entered on June 6, 2024. The Debtors complied with and relied upon the established parameters under the Bidding Procedures for the Marketing Process throughout the entirety of the Marketing Process. The Marketing Process ran for approximately ninety (90) days, including fifty (50) days following the Petition Date, and included outreach for both going-concern and liquidation transactions.

The Debtors were focused on ensuring that the Marketing Process canvassed the ~~entire~~ market for potentially interested parties that could provide a solution either alongside its majority IP owner, WHP Global, or independently. The Sale Transaction is the result of ~~an expedited yet thorough~~the Marketing Process, which involved a months-long process in which the Debtors and their advisors sought strategic and financial investors to effectuate the highest or otherwise best transaction available under the circumstances and included regular discussions and consultation with the requisite parties described in the Bidding Procedures, including the ~~o~~Official ~~c~~Committee of ~~u~~Unsecured ~~c~~Creditors (the "Committee"). Throughout this process, the Debtors kept certain key stakeholders and parties-in-interest, including Marketing Process participants, informed of the status of key developments in the Marketing Process. On May 22, 2024, in accordance with both the Bidding Procedures and the DIP Order (and the milestones thereunder), the Debtors entered into the Purchase Agreement with Phoenix, which preserved the ~~going-concern~~going-concern transaction timeline under those milestones. By the Bid Deadline, the Debtors also received bids for enterprise-wide liquidation transactions.

Overall, the Debtors and their advisors contacted fifty-two (52) parties pre- and postpetition in connection with a potential going-concern transaction, and five (5) parties in connection with a potential liquidation. The only competing bids for substantially all of the Debtors' assets contemplated a full liquidation of the Debtors' businesses. Due~~,~~ in part~~,~~ to the substantial increase to the unsecured claims pool that would occur in the event of a liquidation, the Sale Transaction ~~is anticipated to~~has provided substantially greater value to the creditors of the Debtors' estates than in a liquidation scenario. The Sale Transaction contemplate~~s~~d a going-concern transaction that provide~~s~~d a material amount of cash consideration, preserve~~s~~d the vast majority of employees' jobs, allow~~s~~ed the assignment of intellectual property, provide~~s~~d for the payment of all secured and administrative claims, and generate~~s~~d the highest potential recovery currently available for holders of general unsecured claims by eliminating liabilities and reducing the potential size of the claims pool. Additionally, the Sale Transaction allow~~s~~ed the Debtors to retain certain assets, including but not limited to cash and deposits, certain litigation claims (including the Retained Causes of Action under the Plan), certain contracts, personal data, and certain equity interests.[2]

Following the U.S. Trustee's appointment of the Committee on May 3, 2024 [Docket No. 154], the Debtors promptly engaged in a diligence-sharing process with the Committee and its advisors to

---

[2]    *See* Purchase Agreement, Section 1.3.

educate them on the Debtors' business and bring them up to speed on the developments in these cases. ~~Since the commencement of these Chapter 11 Cases, the~~The Debtors have worked ~~diligently~~ to coalesce stakeholder consensus around the Debtors' expected path to Plan confirmation and provided an avenue for potential recovery for the Debtors' general unsecured creditors.  The Committee worked ~~closely~~ with the Debtors to reach the final terms of the Sale Transaction and were ~~fully~~ supportive of the Debtors' efforts and desires to execute the Purchase Agreement and Sale Transaction contemplated thereunder as soon as possible given the Committee's—and other key stakeholders'—appreciation of the "need for speed" to maximize value while preserving the business as a going concern.

The Plan, and the Wind-Down Transactions contemplated therein, represent the culmination of ~~immense effort from~~ the Debtors and their stakeholders' efforts to preserve a fundamentally sound and critically important retail and apparel business.  The Debtors also believe that Holders of Allowed General Unsecured Claims will receive through the Plan substantially improved consideration relative to what they would otherwise receive in a liquidation.

The Debtors believe the Plan provides the best available alternative for the Estates and creditor recoveries.  Based on the Liquidation Analysis attached hereto at **Exhibit C**, the Debtors believe that the Holders of General Unsecured Claims would otherwise receive a lower recovery in a chapter 7 liquidation.  The Plan provides ~~considerable~~ value to holders of general unsecured claims as a result of proceeds and other consideration generated from the Sale Transaction and its preservation of valuable landlord and vendor partnerships.  The Plan also provides for the preservation of other assets that may be pursued and liquidated for the benefit of unsecured creditors.  Further, if the Debtors' businesses were liquidated in a chapter 7 process, creditors would suffer a needless loss of value because the Estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.  The Debtors strongly believe that the Plan is in the best interests of their estates and represents the best available path forward at this time.  Accordingly, the Debtors strongly recommend that Holders of Claims entitled to vote to accept the Plan.

The Plan also reflects the result of extensive negotiations and a settlement with the Committee to preserve the Retained Causes of Action.  As a result of this settlement, the Committee supports confirmation of the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy

4

court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Why is the Bankruptcy Court holding a Disclosure Statement Hearing?**

Section 1125 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on the Disclosure Statement and recognizes that any party in interest may object to the Disclosure Statement. The Debtors are seeking approval of this Disclosure Statement on a final basis (the "Disclosure Statement Hearing").  The Bankruptcy Court has scheduled the Disclosure Statement Hearing for [September 4]November 6, 2024 at 10:30 a.m. (prevailing Eastern Time) and all parties in interest will be served notice of the time, date, and location of the Disclosure Statement Hearing once scheduled.  The Disclosure Statement Hearing may be adjourned from time to time without further notice.

**D. When is the Disclosure Statement Hearing?**

The Bankruptcy Court has scheduled the Disclosure Statement Hearing for [September 4], 2024, at [●]:00 [●].m. (prevailing Eastern Time).  All parties in interest will be served notice of the time, date, and location of the Disclosure Statement Hearing The Disclosure Statement Hearing may be adjourned from time to time without further notice.

Objections to the approval of the Disclosure Statement must be filed and served on the Debtors, and certain other parties, by no later than [August 28], 2024, at [4]:00 p.m.  (prevailing Eastern Time).

**D.      E. Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined in the Plan). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 5 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| Class 6 | Existing Equity Interests in Express | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**E.    ~~F.~~ What is the Sale Transaction ~~under the Plan~~?**

Under the Plan, the Debtors shall distribute the proceeds from the Sale Transaction.  Following the signing of the Purchase Agreement in connection with the contemplated going concern sale, on June 14, 2024, the Bankruptcy Court entered the *Order (I) Approving Asset Purchase Agreement; (II) Authorizing and Approving Sale of Certain Assets of Debtors Pursuant to Section 363 of the Bankruptcy Code Free and Clear of All Liens, Claims, Interests, and Encumbrances; (III) Approving the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (IV) Authorizing the Debtors to Consummate Transactions Related to the Above; and (V) Granting Related Relief* [Docket No. 471] (the "Sale Order"), pursuant to which the Debtors consummated the Sale Transaction on June 21, 2024.  ~~Following~~In connection with the closing of the Sale Transaction, the Debtors effectuated a going concern sale of all or substantially all of the Debtors' assets and now seek to distribute proceeds as recoveries to Holders of Allowed Claims under the Plan.

**F.    ~~G.~~ What is the Wind-Down under the Plan?**

After the Effective Date, the Debtors will initiate a Wind-Down process.  The Wind-Down is the wind down, liquidation, and dissolution of each of the Wind-Down Debtors, which will include, among other things, the disposition of some or all of the Wind-Down Debtors' remaining assets, potentially through one or more asset sales, together with a waterfall distribution of the net cash proceeds (if any) and wind down of each of the Debtors' post sale Estates, all as provided in the Plan.  A Plan Administrator ~~may~~will be appointed to facilitate the Wind-Down.

**G.    ~~H.~~ What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of allowed amounts, and recoveries on, Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. ~~Moreover, the Debtors, the Disinterested Director (as defined herein), and the Committee (as defined herein) continue to investigate and evaluate potential claims of the Debtors' Estate~~ and ultimate recoveries received.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions precedent necessary to consummate the Plan.

**THE  PROJECTED  RECOVERIES  SET  FORTH  IN  THE  TABLE  BELOW  ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to ~~the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed by the Claims Bar Date or the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed) in accordance with the terms of the Bar Date Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided that with respect to a Claim described~~

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | To the extent that ~~Ee~~ach Holder of an Allowed Other Secured Claim either | [$0] | 100% |

~~in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim or request for payment of an Administrative Claim, as applicable, Filed after the Claims Bar Date or the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late Filed Claim or agreement in writing by the Debtors and the Holder of such late Filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non bankruptcy law.  "Allow" and "Allowing" shall have correlative meanings~~potential recoveries from Retained Causes of Action.

| | | | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
|---|---|---|---|---|
| Clas s | Claim/Equity Interest | Treatment of Claim/Equity Interest | | |
| | | was not paid during the Chapter 11 Cases or was not an Assumed Liability under the Purchase Agreement, unless such Holder agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable ~~D~~ebtor~~s~~ (with the Committee's consent) or Wind-Down Debtor, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim: (i) payment in full in Cash; (ii) ~~Reinstatement of its~~delivery of such collateral securing such Allowed Other Secured Claim; or (iii) such other treatment rendering such Holder's Allowed Other ~~Priority~~Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, shall receive, at the option of the applicable Debtor (with the Committee's consent) or Wind-Down Debtor~~s~~, as applicable, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim: (i) payment in full in Cash; or (ii) ~~Reinstatement of its Other Secured Claim; or (iii)~~such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code. | [$29] | 100% |
| 3 | General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim ~~and the~~ | [$212][4] | [10% - 15%][5] |

**SUMMARY OF EXPECTED RECOVERIES**

---

[4] [~~Many of the Claims in Class 3 (General Unsecured Claims) are contingent, unliquidated, and/or disputed. The Proofs of Claim filed on account of such Claims often do not state a Claim amount. Moreover, many that do include a Claim amount assert unsupported amounts or amounts that the Debtors have yet to be able to reconcile. The information necessary to conclusively determine the amount of Claims in Class 3 is generally not available from the Proofs of Claim.~~]

[5] The Projected Recovery for Claims in Class 3 (General Unsecured Claims) is based on projected Distributable Proceeds, and does not attempt to ascribe a value to potential recoveries from Retained Causes of Action, as

| | | **SUMMARY OF EXPECTED RECOVERIES** | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (in millions)** | **Projected Recovery Under the Plan** |
| | | ~~Debtor against which such Allowed General Unsecured Claim is asserted~~ agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, its Pro Rata share of the Distributable Proceeds. | | |
| 4 | Intercompany Claims | Each Intercompany Claim shall be, at the option of the Debtors, with the consent of the Committee, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claim, or such other treatment as is reasonably determined by the Debtors, with the consent of the Committee. | N/A | N/A |
| 5 | Intercompany Interests | Each Intercompany Interest shall be, at the option of the Debtors, with the consent of the Committee, Reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Interest, or such other treatment as is reasonably determined by the Debtors, with the consent of the Committee. | N/A | N/A |
| 6 | Existing Equity Interests in Express | All Existing Equity Interests in Express will be cancelled and | N/A | N/A |

Proceeds, and does not attempt to ascribe a value to potential recoveries from Retained Causes of Action, as such recoveries are uncertain as of the date hereof.  Any recoveries on the Retained Causes of Action would be expected to increase the Projected Recovery for Class 3.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (in millions)** | **Projected Recovery Under the Plan** |
| | | extinguished, and Holders of Existing Equity Interests in Express shall receive no recovery on account of such Interests. | | |
| 7 | Section 510(b) Claims | Section 510(b) Claims shall be cancelled, released, and extinguished without any distribution to Holders of such Claims. | **N/A** | **N/A** |

**H.** ~~I.~~ **What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, or DIP Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.    Administrative Claims.**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors (with the Committee's consent not to be unreasonably withheld) or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Purchase Agreement shall be an obligation of the applicable Purchaser~s~ and shall not be an obligation of the Debtors or the Wind-Down Debtors~;~ ~provided, further, that any Allowed Administrative Claim that is not an Assumed Liability under the Purchase Agreement shall instead be satisfied solely from the Administrative Claims Reserve~ to the extent so assumed.

Except for Professional Fee Claims, DIP Claims, and U.S. Trustee Fees, and unless previously Filed, subject to the terms of the Sale Order, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Wind-Down Debtors and the requesting party on or before the Administrative Claim Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims, DIP Claims, and U.S. Trustee Fees, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## 2. Payment of Fees and Expenses under DIP Orders.

On the Effective Date, subject to the DIP Settlement Agreement (defined below), the Debtors shall pay all accrued and unpaid fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the DIP Agents and the DIP Lenders, whether incurred prior to or after the Petition Date, in each case to the extent payable or reimbursable under or pursuant to the DIP Order and DIP Credit Agreements, as applicable, if any (subject to any applicable conditions set forth in the DIP Orders). Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims. Nothing ~~herein~~in the Plan shall require the DIP Agents and DIP Lenders to File applications, a Proof of Claim, or otherwise seek approval of the Bankruptcy Court as a condition to the payment of such Allowed Administrative Claims.

## 3. Professional Fee Claims.

### (a) Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred on or prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Wind-Down Debtors ~~(~~, by and through the authorized signatories to the Professional Fee Escrow Account, ~~after consultation with the Plan Administrator), as applicable,~~ shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

### (b) Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(c)    **Professional Fee Escrow Amount.**

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors and/or the Committees before and as of the Confirmation Date projected to be outstanding as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate after a request from the Debtors, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Confirmation Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

(d)    **Post-Confirmation Date Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after entry of the Confirmation Order, the Debtors and the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals, including fees and expenses incurred by the Professionals, including fees and expenses incurred by the Professionals after the Confirmation Date and on or prior to the Effective Date.  Upon the entry of the Confirmation Order, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors may, the Plan Administrator and Wind-Down Debtors Oversight Committee, may each employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

4.    **DIP Claims.**

All outstanding DIP Claims were paid all principal and interest owed pursuant to the Final DIP Order and the DIP Documents from proceeds of the Sale Transaction.  Accordingly, the DIP Claims have been paid in full.  To the extent any DIP Claims are not fully satisfied as of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, costs, other charges, and expenses.  Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan, the Final DIP Order, and the Purchase Agreement, all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Pursuant to the DIP Credit Agreements, and subject to the DIP Settlement Agreement, all distributions pursuant to Article II.D of the Plan shall be made to the applicable DIP Agent for distributions to the applicable DIP Lenders in accordance with the DIP Credit Agreements and DIP Documents unless otherwise agreed upon in writing by such DIP Agent and the Debtors.  The DIP Agents shall hold or direct distributions for the benefit of the applicable Holders of DIP Claims.  Each DIP Agent shall retain all rights as DIP Agent under the DIP Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agents shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agents.

        **(a)**        **DIP ABL Claims.**

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP ABL Claim, each Holder of an Allowed DIP ABL Claim shall receive payment in full in Cash on the Effective Date.

        **(b)**        **DIP Term Loan Claims.**

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for each Allowed DIP Term Loan Claim, each Holder of an Allowed DIP Term Loan Claim shall receive payment in full in Cash on the Effective Date.

        **5.**        **Priority Tax Claims.**

All Allowed Priority Tax Claims were either paid during the Chapter 11 Cases or are an Assumed Liability under the Purchase Agreement and shall be satisfied solely under the ~~applicable~~ Purchase Agreement and shall not be an obligation of the Debtors or the Wind-Down Debtors.  To the extent that an Allowed Priority Tax Claim was not otherwise paid during the Chapter 11 Cases or assumed and paid under the ~~applicable~~ Purchase Agreement, or the holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Wind-Down Debtors, as applicable, either payment in full or such other treatment rendering such Holder's Allowed Priority Tax Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

        **6.**        **U.S. Trustee Fees.**

All U.S. Trustee Fees prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Wind-Down Debtors, as applicable, shall be jointly and severally liable to pay any and all ~~Quarterly~~U.S. Trustee Fees when due and payable.  Within two business days of the Effective Date, the Wind-Down Debtors ~~or the Plan Administrator~~ and any other authorized parties who have been charged with administering the ~~C~~confirmed Plan~~,~~ shall file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred.  The Debtors shall file all monthly operating reports relating to the time period prior to the Effective Date when they become due, using UST Form 11 MOR.  After the Effective Date, each of the Wind-Down Debtors shall file with the Bankruptcy Court separate UST Form 11 PCR reports when they become due. Each of the Debtors and the Wind-Down Debtors, as applicable, shall remain obligated to pay ~~Quarterly~~U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor or Wind-Down Debtor~~'~~s' case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Proof of Claim in the case and shall not be treated as providing any release under the Plan.

        **I.**        ~~**J.**~~**Are any regulatory approvals required to consummate the Plan?**

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**J.**    ~~K.~~ **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to wind-down their business efficiently, and distributions to Holders of Allowed Claims may be delayed.  It is possible that any alternative may provide Holders of Allowed Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article IX of this Disclosure Statement, and the liquidation analysis attached hereto as **Exhibit C** (the "Liquidation Analysis").

**K.**    ~~L.~~ **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation~~?~~"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court and entry of the Confirmation Order on the docket of the Chapter 11 Cases.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  See Article VII.~~2.B~~K of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" which begins on page 5~~4~~7, for a discussion of the conditions precedent to consummation of the Plan.

**L.**    ~~M.~~ **What are the sources of Cash and other consideration required to fund the Plan?**

Distributions under the Plan shall be funded by (i) Cash on hand, (ii) the Distributable Proceeds, ~~and~~which include, among other things, any prosecution and monetization of Retained Causes of Action, (iii) the proceeds of the Wind-Down, and (iv) to the extent provided for in Article VIII.C of the Plan, the Wind-Down Reserve; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance.

1.    **Cash on Hand.**

Except as otherwise provided in the Plan, the Debtors~~, Reorganized Debtors, or~~ or the Wind-Down Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims solely in accordance with the terms of the Plan~~, including any Cure Costs in connection with a Plan Restructuring~~.

2.    **Maintenance of the ~~Administrative Claims Reserve and the~~ Wind-Down Reserve Accounts.**

The ~~Plan Administrator~~Wind-Down Debtors shall establish and/or maintain~~, as applicable, each of the Administrative Claims Reserve and~~ the Wind-Down Reserve (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).  The Wind-Down Reserve shall be funded in the amount set forth in the Wind-Down Budget.

15

**M.**    ~~N.~~ **What is the effect of the Plan on the Debtors' ongoing businesses?**

As contemplated under the Plan, on the Effective Date, the Wind-Down Debtors shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries, and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The ~~Wind Down~~Wind-Down Debtors shall continue in existence for the purposes of (a) establishing and funding the ~~Administrative Claims Reserve and the Wind-Down~~Wind-Down Reserve, (b) enforcing and prosecuting claims, interests, rights, and privileges under the Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (c) filing appropriate tax returns, (d) complying with its continuing obligations under the Purchase Agreement and related documents, (e) liquidating all assets of the Wind-Down Debtors, and (f) otherwise administering the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

**1.    Sale Transaction.**

As discussed in Article VI.~~JJ~~G of this Disclosure Statement, on June 14, 2024, the Bankruptcy Court entered the Sale Order, pursuant to which the Debtors consummated the Sale Transaction on June 21, 2024. Upon the closing of the Sale Transaction, the Debtors effectuated a going concern sale of all or substantially all of the Debtors' assets and Assumed Liabilities free and clear of all Liens, Claims, Interests, charges, or other encumbrances.

**N.**    ~~O.~~ **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. See Article ~~III.O~~VIII.A.2 of this Disclosure Statement which begins on page ~~12~~59.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. See Article ~~XX~~.F of this Disclosure Statement which begins on page ~~68~~72.

**O.    ~~P.~~ Does the Plan preserve Causes of Action?**

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtors, as applicable, shall succeed to all rights to commence and pursue any and all ~~Vested~~Retained Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action ~~other than~~(which, for the avoidance of doubt, is a non-exclusive list of Retained Causes of Action not released ~~(via the Debtor Release)~~, waived, settled, compromised, or transferred).  Such rights shall be preserved by the Debtors and Wind-Down Debtors shall vest in the Wind-Down Debtors with the Wind-Down Debtor~~'s~~s' rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article ~~VIII~~X of the Plan or pursuant to the Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtors, and in accordance with the Plan ~~Administrator Agreement and the Plan~~.  No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors will not pursue any and all available Causes of Action of the Debtors against it.  The Wind-Down Debtors on behalf of the Debtors and the Wind-Down Debtors expressly reserve~~s~~ all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article ~~VIII~~X of the Plan.  Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtors on behalf of the Debtors and Wind-Down Debtors ~~and in accordance with the Plan Administrator Agreement~~, expressly reserve~~s~~ all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the ~~C~~consummation of the Wind-Down Transactions.

The Wind-Down Debtors on behalf of the Debtors, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors except as otherwise provided in the Plan, including Article ~~VIII~~X of the Plan.  The Wind-Down Debtors through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

**P.    ~~Q.~~ Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The releases by the Debtors (the "Debtor Release"), the releases by third parties (the "Third-Party Release"), and the exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the negotiations among the Debtors and key

17

stakeholders in obtaining their support for the Plan.  The Releases and Exculpations contemplated in the Plan are ~~subject to the ongoing~~proposed as part of a settlement with the Committee based on a preliminary investigation ~~relating to~~of certain historical transactions ~~or~~and actions (the "~~Independent~~ by the Debtors, their board of directors and management (the "Investigation") that ~~is currently being~~was conducted by the Disinterested Director ~~and is expected to be complete prior to the hearing on this Disclosure Statement.  To the extent the Independent Investigation concludes there are viable~~with the assistance of Klehr Harrison Harvey Branzburg LLP ("Klehr Harrison").  Based upon the Investigation, and as a result of negotiations with the Committee, certain parties were expressly identified as included in the Released Parties.  Only the Released Parties are being released pursuant to the Releases and Exculpations, and any Claims and/or Causes of Action against ~~certain parties, such parties will be expressly carved out of the~~ Non-Released Parties ~~and the Exculpated Parties, and such Claims and/or Causes of Action~~ will be retained by the Wind-Down Debtors.

~~THE RELEASES AND EXCULPATIONS IN THE PLAN ARE EXPRESSLY SUBJECT TO THE OUTCOME OF THE INDEPENDENT INVESTIGATION, AND THE DISINTERESTED DIRECTOR'S RIGHTS TO OBJECT TO SUCH PROVISIONS OR SEEK TO LIMIT THE SCOPE OF SUCH PROVISIONS.~~

~~Subject to the finalization and outcome of the Independent Investigation, the~~The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the DIP Facilities, the Sale Transaction, the Plan, and multiple other interrelated key transactions that together will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Moreover, each of the Exculpated Parties serves or served as a fiduciary of the Debtors' estates during the pendency of the chapter 11 cases.  Accordingly, ~~each of~~the Released Parties warrants the benefit of the Debtor Release and the Third-Party Release, and each of the Exculpated Parties warrants the benefit of the exculpation provisions under the Plan.  ~~Each~~A Holder of a Claims or Interests ~~will have the ability to exempt itself from the definition of~~is not a "Releasing Party" ~~by opting out or declining to~~unless it opts in to the ~~Third-Party~~Third-Party Release~~, as applicable~~.

Only Holders of Claims in Class 3 (the "Voting Class") are entitled to vote to accept or reject the Plan.  The voting ballot includes the option to opt ~~out of the Third-Party Release.  If a Holder of a Claim in the Voting Class returns a ballot and votes to accept the Plan, then such Holder shall be deemed to have consented to the Third-Party Release.  If a Holder of a Claim in the Voting Class (i) returns a ballot, (ii) either votes to reject the Plan or abstains from voting, and (iii) does not opt out of the Third-Party Release, such Holder shall also be deemed to have consented to the Third-Party~~in to the Third-Party Release.  To affirmatively opt ~~out of~~in to granting the Third-Party Release, a Holder of a Claim in the Voting Class who returns a ballot must check the box indicated on the Ballot.  By ~~opting~~failing to ou~~pt~~ ~~of~~in to the Third-Party Release~~, or by failing to opt into the Third-Party Release, as applicable~~, Holders of all Claims will forgo the benefit of obtaining the releases set forth in Article X of the Plan if such party would otherwise be a Released Party.

The Plan does not contain any non-consensual release of any non-debtor by any Third Party.  However, Holders of all Claims in Class 1, Class 2, Class 4, Class 5, Class 6, and Class 7 will also have the opportunity to opt into the ~~Third-Party~~Third-Party Release.  To affirmatively opt ~~into the Third-Party~~in to the Third-Party Release, Holders of Claims in these Classes must complete, sign, and date the Opt-In Form and return it promptly to the Notice and Claims Agent, in accordance with instructions provided in the Opt-In Form.

18

| SUMMARY OF APPLICABLE TREATMENT TO NON-VOTING CLASSES | | |
|---|---|---|
| **Class** | **Status** | **Treatment** |
| Class 1, Class 2, Class 4, Class 5 | Unimpaired—Deemed to Accept | Holders of Claims that are deemed to accept the Plan are not entitled to vote.  As such, Holders of such Claims, will receive a Notice of Non-Voting Status and applicable Opt-In Form, in lieu of a Solicitation Package. |
| Class ~~3~~4, Class 5, Class 6, Class 7 | Impaired—Deemed to Reject | Holders of Claims or Interests that are deemed to reject the Plan are not entitled to vote.  As such, Holders of such Claims or Interests will receive a Notice of ~~Non-Voting~~Non-Voting Status and applicable Opt-In Form, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims or Interests that are subject to a pending objection filed by the Debtors are not entitled to vote the disputed portion of their Claim or Interest.  As such, Holders of such Claims or Interests will receive a Notice of Non-Voting Status and applicable Opt-In Form. |

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND ~~DISCHARGED~~RESOLVED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, EACH SOLELY IN THEIR CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) EACH OF THE WIND-DOWN DEBTORS; (C) THE ~~RELEASING PARTIES~~DIP LENDERS; (D) THE DIP ~~LENDERS~~AGENTS; (E) THE ~~DIP AGENTS~~PREPETITION LENDERS; (F) THE PREPETITION ~~LENDERS~~AGENTS; (G) ~~THE PREPETITION AGENTS; (H) THE PLAN ADMINISTRATOR; (I)~~ THE COMMITTEE AND EACH OF ITS MEMBERS; ~~(J) WHP GLOBAL AND THE IP LICENSORS; (K) THE PURCHASERS; (L) ALL HOLDERS OF CLAIMS WHO VOTE TO ACCEPT THE PLAN; (M) ALL HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (N)~~ ALL HOLDERS OF CLAIMS WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (~~O~~I) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSES (A) THROUGH ~~THE FOLLOWING~~ CLAUSE (~~P~~H); AND (~~P~~I) EACH RELATED PARTY OF EACH ENTITY IN THE FOREGOING CLAUSES (A) THROUGH CLAUSE (~~O~~K)~~;~~; PROVIDED THAT A RELATED PARTY OF A PERSON OR ENTITY IN THE FOREGOING CLAUSES (A) THROUGH (~~O~~I) IS A RELEASING PARTY SOLELY TO THE EXTENT THAT SUCH AFFILIATE OR RELATED PARTY WOULD BE OBLIGATED TO GRANT A RELEASE UNDER PRINCIPLES OF AGENCY IF IT WERE SO DIRECTED BY SUCH PERSON OR ENTITY IN THE FOREGOING**

**CLAUSES (A) THROUGH (~~O~~I) TO WHOM THEY ARE RELATED.⁵; *PROVIDED, THAT* THE NON-RELEASED PARTIES SHALL NOT BE "RELEASING PARTIES" REGARDLESS OF WHETHER SUCH NON-RELEASED PARTY WOULD OTHERWISE CONSTITUTE A "RELEASING PARTY."**

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

## 1. Satisfaction and Release of Claims and Interests.

The assets of the Debtors and the Wind-Down Debtors, as applicable, are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose. Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan or the Definitive Documents, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind-Down Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan. The Confirmation Order shall be a judicial determination of the satisfaction and release of all Claims and Interests subject to the occurrence of the Effective Date.

## 2. Release of Liens.

---

⁵ ~~This definition and any related provision in the Plan remain subject to the outcome of any ongoing diligence efforts of the disinterested directors at the applicable Debtor Entities.~~

On the Effective Date, concurrently with the consumation of the ~~Wind-Down~~Wind-Down Transactions and except as otherwise set forth in the Sale Transaction Documentation, including the Purchase Agreement, and the Sale Order, any remaining Acquired Assets and Assumed Liabilities shall be transferred to and vest in the Purchasers free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Sale Transaction Documentation, including the Purchase Agreement and the Sale Order, each as applicable.  Without limiting the foregoing, except as otherwise provided in the Purchase Agreement, the Plan, the Plan Supplement, the Sale Transaction Documentation, including the Purchase Agreement and the Sale Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the effectuation of the Wind-Down Transactions and applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with ~~Article III~~Article III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

3.    **Debtor Release.**[6]

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors and their Estates and, if applicable, the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, or through, for, or because of, the foregoing Entities, from any and all claims and Causes of Action, including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, and the Wind-Down Debtors, as applicable, whether liquidated or unliquidated, fixed or contingent, accrued or unaccrued, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or under federal or state statutory of common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates, and the Wind-Down Debtors, as applicable, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), or the Estates, the Chapter 11 Cases, the Wind-Down Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of consummation of the Plan, the pursuit of the Wind-Down Transactions, the administration and implementation of the Plan ~~equitization (if applicable) or the Wind-Down (if applicable)~~, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, in all cases upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval~~, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of~~ of the releases described in Article X.C of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article X.C of the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the ~~Wind-Down~~ Wind-Down Transactions and implementing the Plan, including cooperation with the investigation, commencement and pursuit of the Retained Causes of Action; (ii) a good-faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; (vi) a sound exercise of the Debtors' business judgment; and (vii) a bar to any of the Debtors or their respective Estates or, if applicable, the Wind-Down Debtors or

---

[6]  ~~The following provision remains subject to the outcome of the Independent Investigation, and the Disinterested Director's rights to object to such provisions or seek to limit the scope of such provisions.~~

the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

For the avoidance of doubt and notwithstanding anything in the Plan to the contrary, nothing in Article X.C of the Plan shall release any Retained Causes of Action or any Claims or Causes of Action against any Non-Released Party.  Further, nothing in the Plan or the Confirmation Order shall operate as a release of, and the Debtors shall not release, any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  Notwithstanding anything herein to the contrary, the Debtor Release does not release any post-Effective Date obligations of any Person or Entity under this Plan or any document, instrument, or agreement executed to implement this Plan.

### 4.    Third-Party Release.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, in each case solely to the extent of the Releasing Parties' authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law, from any and all claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, whether in Law, equity, contract, tort, or arising under federal or state statutory or common law, or any other applicable international foreign or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them, including any derivative claims asserted or assertable on behalf of any of the Debtors, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or the Estates, the Chapter 11 Cases, the Wind-Down Transactions, their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of the Wind-Down Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the administration and implementation of the Plan Restructuring (if applicable) and the Wind-Down (if applicable), in all cases based upon any act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.  For the avoidance of doubt, Holders of Claims shall only be considered Releasing Parties with respect to the Third-Party Release to the extent that such Holders of Claims opt in to granting the Third-Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval described in Article X.D of the Plan, which include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release

23

described in Article X.D of the Plan is:  (i) consensual; (ii) given in exchange for the good and valuable consideration provided by the Released Parties; (iii) a good-faith settlement and compromise of such claims and Causes of Action; (iv) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a sound exercise of the Debtors' business judgment; and (viii) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

For the avoidance of doubt and notwithstanding anything in the Plan to the contrary, nothing in Article X.D of the Plan shall release any Retained Cause of Action or any the Claims or Causes of Action against any Non-Released Party.  For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall operate as a release of, and the Releasing Parties shall not release, any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of any court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.  Notwithstanding anything herein to the contrary, the Third-Party Release does not release any post-Effective Date obligations of any Person or Entity under this Plan or any document, instrument, or agreement executed to implement this Plan.

### 5.    Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any claim or Cause of Action for any act or omission arising on or after the Petition Date and prior to or on the Effective Date in connection with, relating to, or arising out of, the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation and Consummation of the Plan, the making of Distributions, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors, or the transactions or documentation in furtherance of any of the foregoing, including any postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of any sale, restructuring, or liquidation of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of the Plan, *provided, however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; *provided, further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in ~~Article X.E~~Article X.E of the Plan shall or shall be deemed to prohibit the Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors, in each case unless otherwise expressly provided for in the Plan. The Exculpation will be in addition to, and not in limitation

of, all other releases, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

For the avoidance of doubt and notwithstanding anything in the Plan to the contrary, nothing in Article X.E of the Plan shall release or exculpate any Retained Cause of Action or Non-Released Party. Notwithstanding anything herein to the contrary, the Exculpation shall not affect, limit, exculpate or release any post-Effective Date obligations of any Person or Entity under this Plan or any document, instrument, or agreement executed to implement this Plan.

### 6.    Injunction.

Effective as of the Effective Date, to the fullest extent permissible under applicable law, except as provided in Article X.L of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to ~~Article X~~Article X of the Plan, whether released pursuant to the Debtor Release, released pursuant to the Third-Party Release, or released pursuant to another provision of the Plan (including the release of Liens pursuant to ~~Article X.B~~Article X.B of the Plan), or are subject to exculpation pursuant to ~~Article X.E~~Article X.E of the Plan, are enjoined ((a) in the case of the Debtors and the Wind-Down Debtors, from and after the Effective Date, through and until the date upon which all remaining property of the Debtors' Estates vests into the Wind-Down Debtors, and has been liquidated and distributed in accordance with the terms of the Plan, and (b) in the case of the Released Parties, the Exculpated Parties, and all other Persons and Entities other than the Debtors and the Wind-Down Debtors, as applicable, permanently) from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, in each case to the extent provided by the relevant release, exculpation, or other Plan provision:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iii) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the ~~e~~Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.

~~No~~Other than the Wind-Down Debtors, Plan Administrator, or Liquidating Trust(ee), no Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to ~~Article X.B,  Article X.C,  Article X.D,  or  Article X.E~~Article X.B, Article X.C, Article X.D, or Article X.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind,

and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in ~~Article X.F~~Article X.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchasers, or the Wind-Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors, or otherwise contemplated under the Sale Order.  Such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchasers, or the Wind-Down Debtors.

For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, Article X.F of the Plan shall not enjoin the Wind-Down Debtors' or Liquidating Trust's pursuit of any Retained Causes of Action or Claims or Causes of Action against any Non-Released Party.

**7.    Preservation of Setoff Rights.**

Notwithstanding anything to the contrary in ~~Article X~~Article X of the Plan or in the Sale Order, any right of setoff or recoupment is preserved against the Debtors, the Purchasers, and any of their affiliates and successors to the extent such right(s) exist under applicable lLaw and subject to the Debtors', Purchasers', and any of their Affiliates' and successors', as applicable, rights to contest any such right(s) of setoff or recoupment; *provided, however,* that notwithstanding the foregoing or anything in the Plan to the contrary, the right of any Entity or Holder of a Claim or Interest to assert setoff or recoupment as a defense or affirmative defense to Claims brought against them is expressly preserved to the extent permitted by applicable lLaw and shall not be impaired, enjoined, precluded, restricted, or otherwise limited by the Plan or the Confirmation Order.

**8.    Protections Against Discriminatory Treatment.**

To the maximum extent provided by section 525 of the Bankruptcy Code and the supremacy clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or Wind-Down Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, Wind-Down Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, or has been insolvent before the commencement of the Chapter 11 Cases ~~(or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases~~.

26

9.    **Cooperation and Document Retention.**

On and after the Effective Date, (i) the Wind-Down Debtors ~~may~~shall maintain documents in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors, ~~or in connection with the terms of the~~subject to the approval of the Wind Down Debtors Oversight Committee (not to be unreasonably withheld), and (ii) the Purchaser shall maintain documents in accordance with the Purchase Agreement and the Sale Transaction Documents.

The Debtors and Wind-Down Debtors, and any directors and officers that are Released Parties, as applicable, shall use their commercially reasonable best efforts to provide cooperation necessary to maximize the value of the Retained Causes of Action and any Claims or Causes of Action against the Non-Released Parties, including, without limitation (i) providing (or directing third parties to provide) the Plan Administrator and its professionals with full access to the Debtors' and Wind-Down Debtors' books, records, and other documents that are relevant to the Retained Causes of Action (including privileged documents and materials insofar as such documents and materials are relevant to the Retained Causes of Action), (ii) providing the Plan Administrator and its professionals with reasonable access to employees and agents of the Debtors and Wind-Down Debtors (including, for the avoidance of doubt, the commercially reasonable best efforts from any directors or officers that are "Released Parties" under the Plan to cooperate ), as applicable, for fact finding, consultation, interviews, and as witnesses (including as needed to authenticate documents where appropriate) that are relevant to the Retained Causes of Action, (iii) taking commercially reasonable measures to retain documents relevant to the Retained Causes of Action, consistent with the "Document Retention" provision in the Plan and the Cooperation Agreement, and (iv) providing commercially reasonable assistance to maximize the value of the Retained Causes of Action and Claims and Causes of Action against the Non-Released Parties, as reasonably determined by the Committee, the Plan Administrator, or any of their respective professionals.  Any attorney client privilege, work-product protections, or other privilege or immunity held by any of the Debtors, including any predecessors, committee or sub-committees, or other designated Entities or Persons, to the extent that it is related to the Retained Causes of Action, shall vest in and be succeeded to by the Wind-Down Debtors under the terms of the Cooperation Agreement.  The transfer of any privileged books and records provided to the Plan Administrator under the terms of the Cooperation Agreement shall not result in the destruction or waiver of any applicable privileges pertaining to such books and records.  Further, none of the Debtors or the Wind-Down Debtors shall be liable for violating any confidentiality or privacy protections as a result of transferring the books and records to the Plan Administrator in accordance with the Cooperation Agreement as successor under the Plan.  For the avoidance of doubt, after the Confirmation Date and prior to the Effective Date, the Debtors shall reasonably cooperate with the foregoing paragraph in its entirety (except the transfer of privileged information), except that such cooperation shall be afforded to the Committees and their professionals in advance of the formation and retention of professionals by the Plan Administrator.

The Committee and its members and professionals shall be permitted to share any work product, analysis or discovery obtained relating to the Retained Causes of Action with the Plan Administrator, the Wind-Down Debtors Oversight Committee, and its and their respective advisors, without waiver of any privileges.

10.    **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All

27

injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

### 11.    No Discharge of the Debtors.

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors or the Wind-Down Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

### 12.    SEC.

Notwithstanding any language to the contrary in the Disclosure Statement, the Plan, and/or the Confirmation Order, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-debtor person or non-debtor entity in any forum.

### 13.    12. Subordination Rights.

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement final resolution is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

### Q.    R. What is the deadline to properly execute, complete, and submit Ballots (*i.e.*, vote)?

All Ballots must be properly executed, completed, and submitted so that they are **actually received** by Stretto, Inc. by [October [9]December 11, 2024, at [4]:00 p.m4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").

### R.    S. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan. All Ballots for Holders of Claims in Class 3 must be properly completed, executed, and delivered, so that the applicable Ballot is **actually received** by the Debtors' proposed claims and noticing agent, Stretto, Inc. ("Stretto" or the "Claims and Noticing Agent") **on or before [October 9]December 11, 2024, at [4]:00 p.m4:00 p.m., prevailing Eastern Time**. See Article IX of this Disclosure Statement, entitled "~~Solicitation and Voting~~Solicitation and Voting Procedures" for more information.

**S.       T. Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan (the "Confirmation Hearing") and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**T.       U. What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan ~~discharges a debtor from~~resolves any debt of the debtor that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**U.       V. When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [~~October~~ December [1~~6~~8], 2024, at [●]:00 [●].m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan and approval of the Disclosure Statement on a final basis must be filed and served on the Debtors, and certain other parties, by no later than [~~October 9~~December 11, 2024, at [4]:00 p.m4:00 p.m. (prevailing Eastern Time) in accordance with the Confirmation Hearing Notice that accompanies this Disclosure Statement and the Disclosure Statement Order.

**V.       W. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' proposed Claims and Noticing Agent via one of the following methods:

*By calling the telephone number included in your Ballot, or by contacting the Claims and Noticing Agent by phone at*:
855-337-3537 (US/Canada, toll-free)
949-617-1363 (International, toll)

*By regular mail, hand delivery, or overnight mail at*:
~~Express, Inc., et al. Claims Processing~~

EXP OldCo Winddown, Inc., et al. Claims Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the claims and noticing agent at https://cases.stretto.com/express or the Bankruptcy Court's website at https://www.deb.uscourts.gov (for a fee).

**W.      X. Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the settlements, as set forth in the Plan, provide for the best, and only available, alternative to the Debtors' creditors, provide a greater recovery (or potential for recovery) compared to a chapter 7 liquidation, and provide the greatest chance for the Debtors to emerge from chapter 11 as a going concern.

**X.      Does the Committee recommend voting in favor of the Plan?**

Yes.  As described in a letter accompanying this Disclosure Statement, the Plan has been the subject of extensive negotiations and discussions between the Committee and the Debtors, including the Disinterested Director.  The Plan reflects a negotiated settlement with the Committee, among other things, to preserve certain Retained Causes of Action and Causes of Action against the Non-Released Parties.  As such, the Plan represents a fair resolution and preserves potentially valuable claims that can be further investigated and prosecuted by the Wind-Down Debtors.  The Committee recommends voting in favor of the Plan.

## IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Express' Background and Current Operations.

#### 1.    The Beginning of the Express Story.

Express laid its initial roots over 40 years ago.  In 1980, the first Express store, then called "Limited Express," opened in Chicago's Water Tower Place mall.  From its inception, the Express brand represented the idea that consumers should be able to access style, quality, and value under one roof.

The business was a quick success, and the Company grew rapidly.  In the span of one year, the Company expanded from a single store to eight locations.  By 1986, the Express footprint expanded exponentially, from eight stores to 250 stores nationwide.

By 1987, Express began to carry men's merchandise in sixteen of its stores under a new brand name, "Structure," laying the groundwork for the Express brand to become a household name in both, men's and women's fashion.  By the early 90s, the Company had opened over 600 stores across the United States.

In 2003, the Company sold the Structure brand to Sears in order to consolidate Express's men's and women's fashion under the "Express" banner.  By May 2010, Express converted to a Delaware corporation, held an initial public offering, and listed its shares on the New York Stock Exchange.

### 2. Express' Business Operations Today.

*Express*.  Over the course of four decades, Express cemented itself as an iconic fashion retailer in North America for adolescent and young adult markets.  Not only does Express operate approximately 500 brick-and-mortar stores, but the brand also sells products on its e-commerce website, Express.com.

*UpWest.*  UpWest was launched in 2018 as a direct-to-consumer brand providing comfortable apparel and lifestyle home goods with a focus on quality and sustainability.  The heart of the UpWest brand lies in the sustainable sourcing of its products.

*Bonobos.*  Bonobos, Inc. ("Bonobos") is an e-commerce fashion retailer.  Bonobos is renowned for its professional and modern men's fashion attire.  In particular, Bonobos reinvented the khaki pant from loose-hanging to a tailored, flattering aesthetic.

As of the Petition Date the Company had over 9,000 employees, approximately one-third of which on a full-time basis.  The Company is proud to offer its employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, vision, and dental insurance plans, life insurance, disability benefits, workers' compensation, COBRA benefits, 401~~(k)~~(k) plan and retirement plans, and other employee benefit plans.

*~~Strategic Partnership~~WHP Transaction*.  In January 2023, Express entered into a ~~new strategic partnership~~transaction with WHP Global, a ~~leading~~ global brand management firm, in an attempt to leverag~~ing~~e Express's valuable intellectual property to advance the Express omnichannel platform.  ~~This step marked the first great leap in the Company's attempt to reinvigorate its brand and to drive greater scale and profitability of the Express platform, including into additional brands.~~  In connection with the closing of this ~~new strategic partnership~~ transaction with WHP Global, Express received gross proceeds of approximately $260 million consisting of (1) approximately $25 million in aggregate proceeds from the issuance and sale of 5.4 million shares of common stock (representing approximately 7.4% of Express' outstanding common stock, on a pro forma basis) to an affiliate of WHP Global in a private placement, and (2) approximately $235 million from the sale of a 60% ownership interest in an intellectual property joint venture, EXP Topco, LLC, pursuant to which Express contributed certain of its intellectual property assets.  The intellectual property joint venture ~~at the time~~ was valued in the transaction at approximately $400 million~~and allowed the Company to develop its domestic U.S. licensing capability in non-core categories and expand its brand internationally~~.

The proceeds from the ~~new strategic partnership~~transaction with WHP Global ~~allowed~~were used by Express to pay down its then term loan~~and~~, a portion of its revolving credit facility~~and remain focused on other available initiatives to further enhance its brand~~, certain taxes and transaction costs.  Shortly thereafter in April 2023, Express ~~made another significant strategic move and~~, together with WHP Global, entered into a definitive agreement with Walmart Inc. to acquire Bonobos, described further above.  Under the terms of ~~the~~that transaction, ~~which had been arranged as part of the WHP Global strategic partnership,~~Express agreed to purchase Bonobos' operating assets, and assume certain related liabilities of the Bonobos business, for a purchase price of $25 million, subject to a customary working capital adjustment, and WHP Global agreed to purchase certain intellectual property related to the Bonobos brand for a purchase price of $50 million.  The Bonobos acquisition was completed in May 2023.

### B. Express's Prepetition Corporate and Capital Structure and Liquidity Profile.

#### 1. ~~3.~~Corporate Structure.

~~Express~~EXP OldCo Winddown, Inc. is the ultimate parent of each Debtor.  On September 18, 2024, pursuant to section 6.11(c) the asset purchase agreement (the "APA") between the Debtors, the JV Purchaser, and the WHP Global Purchaser that was approved by the Court by the Sale Order, the Debtors changed the legal names of certain entities within their corporate structure to remove Licensed Marks (as defined in the APA).  A simplified corporate structure chart is provided below.  The Company maintains its corporate headquarters in Columbus, Ohio.

(Modified graphics)



## 2.  ~~4.~~ Capital Structure.

As of the Petition Date, the Debtors' long-term, funded debt obligations totaled approximately $189 million:

| Instrument | Maturity | Principal |
|---|---|---|
| **Secured Debt Facilities** | | |
| Prepetition ABL Credit Agreement | November 26, 2027 | $105.8 million |
| Prepetition FILO Credit Agreement | November 26, 2027 | $63.1 million |
| Letters of Credit | | $20.1 million |
| **Total Funded Debt** | | **$189.0 million** |

(a)  **The Prepetition Credit Agreements.**

Project Pine OldCo, LLC (f/k/a Express, LLC), as borrower, and certain of its direct and indirect parent companies and subsidiaries as debtor-guarantors, Wells Fargo, as administrative agent and collateral agent, and certain lenders are parties to that certain Credit Agreement, dated as of May 20, 2015 (as amended most recently as of September 5, 2023, the "Prepetition ABL Credit Agreement").

The Prepetition ABL Credit Agreement provides for a senior secured asset-based revolving credit facility with a maximum availability of $290 million.  As of the Petition Date, approximately

$106 million in aggregate principal amounts remained outstanding under the Prepetition ABL Credit Agreement.

On September 5, 2023, the Company entered into a "first-in, last-out" term loan facility in the aggregate principal amount of $65 million (the "Prepetition FILO Credit Agreement" and together with the Prepetition ABL Credit Agreement, the "Prepetition Credit Agreements").  As of the Petition Date, $63.1 million in borrowings remained outstanding under the Prepetition FILO Credit Agreement.

The Prepetition Credit Agreements mature on November 26, 2027.  They are guaranteed by all of Express' subsidiaries, excluding the Non-Guarantor Subsidiaries (such guarantors, the "Prepetition Obligors").  The Prepetition ABL Credit Agreement is secured on a first priority basis by substantially all of the assets of the Debtors party to the Prepetition ABL Credit Agreement.

The Prepetition FILO Credit Agreement is subordinated to the Prepetition ABL Credit Agreement and is secured on a second priority basis by substantially all of the assets of the Debtors party to the Prepetition FILO Credit Agreement pursuant to that certain Intercreditor Agreement dated as of September 5, 2023.

(b)    **Common Stock.**

As of the Petition Date, Express had 10,000 shares of preferred stock authorized but no shares of preferred stock are issued and outstanding.  As of the Petition Date, Express had 25,000,000 shares of common stock, par value $0.01 per share ("Common Stock"), authorized, of which 3,746,580 shares of Common Stock are [issued and] outstanding.  Shares of Common Stock previously traded on New York Stock Exchange ("NYSE") under the symbol "EXPR."  On March 6, 2024, the NYSE notified Express and publicly announced that it would commence proceedings to delist the Common Stock as a result of the Company failing to maintain an average global market capitalization of at least $15 million over a period of thirty consecutive trading days.  Shares of the Common Stock have since traded on the OTC Pink Open Market.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

A confluence of headwinds stressed the Company's financial performance leading up to the Petition Date.  This Article V summarizes how—over several years—the Company reacted to those headwinds.

The Company was plagued by market forces that affected the retail industry as a whole.  The retail industry, for several years, faced reduced revenue as a result of a decreased in-store foot traffic and a rise in giant e-commerce competitors.  Further, retailers globally suffered from the unprecedented disruption caused by the COVID-19 pandemic, which forced the Company to cut back operations and endure the havoc that spread through the supply chain.  As supply chain pressures mounted, the Company began to face severe cashflow challenges, which soon gave rise to lender and vendor concerns that further increased economic pressures.

1.    ~~Strategic Partnership~~**WHP Transaction.**

In January 2023, Express closed a ~~strategic partnership~~ transaction with WHP Global ~~to better position the Company to scale its brand through new category licensing and international expansion opportunities and to provide the Company with additional liquidity to fund operations~~described above.  As of the Petition Date, WHP Global owned a 60% stake in non-Debtor entity EXP Topco, LLC (the "IP JV"), into which certain of the Company's intellectual property was contributed in exchange for 40%

ownership of the IP JV.  The Company retained an exclusive license in the United States to the intellectual property contributed to the IP JV and paid royalty payments pursuant to an intellectual property license agreement dated as of January 25, 2023 (the "Express IP License Agreement").  As consideration for the 60% controlling stake in EXP Topco, LLC, WHP Global contributed $235 million to the IP JV.  In addition, WHP purchased 5.4 million newly issued shares of Express common stock at a purchase price of $4.60 per share, resulting in a $25 million cash infusion to the Company.

> **2.        ~~Strategic Acquisition~~Bonobos Transaction.**

In April 2023, Express ~~made another significant strategic move and,~~ together with WHP Global, entered into a definitive agreement with Walmart Inc. to acquire Bonobos—a menswear brand known for ~~exceptional fi~~ts ~~and an~~ innovative online retail model.  Under the terms of the transaction, ~~which had been arranged as part of the WHP Global strategic partnership,~~ Express purchased Bonobos' operating assets, and assumed certain related liabilities of the Bonobos business, for a purchase price of $25 million, subject to a customary working capital adjustment, and WHP Global agreed to purchase certain intellectual property related to the Bonobos brand for a purchase price of $50 million.  The Bonobos acquisition was completed in May 2023.

> **3.        The Reverse Stock Split.**

After receiving shareholder approval, on August 14, 2023, the Company's board of directors approved the implementation of a 1-for-20 reverse stock split of the Common Stock, and a corresponding proportional reduction in the number of authorized shares of Common Stock.  The reverse stock split was effected after market close on August 30, 2023, and shares of the Common Stock began trading on a split-adjusted basis as of market open on August 31, 2023.  This reduction in outstanding shares caused by the reverse stock split effectively increased the per share trading price of the Common Stock, bringing Express then back into compliance with the listing standards of the NYSE, which requires a listed company to maintain an average closing share price of at least $1.00 over a period of thirty consecutive trading days.  ~~The board of directors, through these efforts, enabled the Debtors' stock to remain listed on the NYSE for an additional approximately eight months.~~  However, on March 6, 2024, delisting proceedings were nonetheless commenced by the NYSE as a result of the Company failing to maintain an average global market capitalization of at least $15 million over a period of thirty consecutive trading days.

> **4.        New Financing.**

On September 5, 2023, the Debtors entered into a second-priority asset-based term loan agreement on a first-in, last-out basis (the "Prepetition FILO Term Loan Facility") with the FILO Lenders and ReStore as administrative agent and collateral agent (the "FILO Agent").  ~~The Prepetition FILO Term Loan Facility provided the Debtors with an additional $65 million and required the Debtors to meet certain financial covenants, including minimum excess availability.~~

> **5.        Liquidity Concerns and Landlord and Vendor Negotiations.**

In the months preceding the Petition Date, the Debtors faced an urgent need for incremental liquidity exacerbated by the actions of the Debtors' existing lenders.  The Company's financial performance was further impacted by ~~record~~ inflation, declining critical in-store foot traffic and sales, the growth of ~~giant~~ e-commerce competitors, ~~severe~~and disruptions to supply chains and inventory stocks~~, and mounting pressure from landlords and vendors~~.  These headwinds increased operating costs and decreased revenues.

~~The Company was heavily reliant on its relationships with landlords and vendors. Amid the Company's burgeoning stressors, the Company proactively addressed lender concerns by engaging their landlords for rent deferral agreements, but some landlords nonetheless provided notices of default relating to the underlying leases. Similarly, Express' outstanding accounts payable continued to mount, resulting in vendors threatening to cut off inventory supplies. The Company negotiated with vendors to ensure that it continued receiving necessary inventory on credit so as to survive as a viable, operational business. Notwithstanding these efforts, the Company faced continued pressures from landlords and vendors seeking to terminate inventory supplies and close stores.~~

In parallel, the Company negotiated its tight liquidity position with its existing lenders. In light of ~~the higher than average outstanding vendor accounts payable, as well as deferred and defaulted rent payments,~~ alleged deteriorating financial performance, the FILO Lenders imposed $20 million of additional borrowing base reserves pursuant to the Prepetition FILO Credit Agreement, which in turn further reduced liquidity. Concurrently, other financial creditors notified the Company that, as a result of insufficient liquidity to meet the necessary availability requirements under the Prepetition ABL Credit Agreement, a cash dominion period had been triggered and related measures would be implemented. Under this mechanism, all cash brought into the Company's accounts would be swept up by the Company's lenders.

Further compounding their liquidity problems, the Company received a lower inventory appraisal that resulted in an unexpected reduction in its net orderly liquidation value. In the days preceding the Petition Date, the Company further received notice from the FILO Lenders of an additional $15 million reserve under the Prepetition FILO Credit Agreement. The Company's liquidity position ultimately became difficult to effectively manage absent the tools available to chapter 11 debtors.

### 6. Advisor Engagement.

Express engaged M3 Advisory Partners LP ("M3") in August 2023 to support the management team in evaluating the business operations, prepare cash flow forecasts, and assess the Company's financial performance and ability to repay its outstanding obligations. The Company also engaged Kirkland & Ellis LLP in February 2024 and Moelis & Company LLC ("Moelis") in March 2024 to assist the Company in analyzing its financing needs and exploring capital structure alternatives and restructuring options, including initiating a ~~marketing~~ process to ~~ensure that the value of~~ market the Company ~~was maximized~~ for sale.

### 7. The CARES Act Tax Refund.

The CARES Act, enacted on March 27, 2020, includes several provisions that impact the Company, including (a) the establishment of a five-year carryback of net operating losses originating in the tax years 2018, 2019 and 2020, (b) temporarily suspending the 80% limitation on the use of net operating losses, (c) relaxing limitation rules on business interest deductions, and (d) retroactively clarifying that businesses may immediately write off certain qualified leasehold improvement property dating back to January 1, 2018. The Company carried back certain of its U.S. federal net operating losses to offset taxable income in the five-year carryback period pursuant to the CARES Act. On April 15, 2024, the Company received a tax refund arising from such carry back of losses in the amount of approximately $49 million. Pursuant to the Cash Dominion Period imposed under the Prepetition ABL Facility, the Company was required to remit the funds to the ABL Lenders within one business day of receipt. The Company engaged the ABL Lenders in an effort to retain a subset of the funds, but ultimately was required to pay the full balance of the refund to the ABL Lenders.

### 8. Footprint Rationalization and Marketing Process.

Unprofitable stores ~~have~~ hampered the Company's growth, turnaround initiatives, and cash flow liquidity, while competitors without burdensome retail footprints outpaced the Company by growing their e-commerce platforms. Over the past several months, Express undertook a bottoms-up footprint rationalization effort and developed a plan to wind down the Company's underperforming brick-and-mortar stores in collaboration with Hilco Merchant Resources, LLC ("Hilco"). As part of these efforts, the Company also undertook an intensive, store-level evaluation, testing stores' financial performance, rent relative to market, and supply chain and other operational considerations to ~~discern the best path forward in effectively~~ reduc~~ing~~e the Company's brick-and-mortar footprint. Based on this analysis, the Company and its advisors identified approximately 95 stores for closure to focus on the remaining portfolio and ability to invest capital into the stores that remained open.

In parallel with ~~the Company's turnaround~~these efforts, the Company, with the assistance of Moelis, began a marketing process for some or all of the Company's businesses. Specifically, Moelis engaged in arms'-length negotiations with the Debtors' existing secured lenders and agents (the "Prepetition Secured Parties"), WHP Global, and several additional third parties and lenders on the terms of a potential financing. The third-party financial institutions involved in the marketing process included well known commercial banks and specialty institutions that routinely provide asset-based and cash flow-based financing. Postpetition, Moelis ~~continued marketing the Company's business and the Company has remained committed to achieving the highest or otherwise best bid for some or all of Express' assets~~assisted the Company in entering into the Sale Transaction.

### 9. Corporate Governance Efforts.

~~The Company's board of directors and senior management proactively managed the Company's circumstances and maintained a strong governance process. In the months prior to the Petition Date, Express and its advisors collectively determined that appointing a disinterested director would be in the best interests of the Company and its stakeholders. To that end, the board of directors appointed William Transier as an independent and disinterested director of the Company (the "Disinterested Director").~~

In the months prior to the Petition Date, the board of directors appointed William Transier as an independent and disinterested director of the Company (the "Disinterested Director").

The Express board of directors adopted resolutions appointing Mr. Transier and delegat~~ing~~ed him authority to, among other things, take certain actions related to potential or actual conflicts of interest (if any) ~~that may arise~~ between the Company entity on one hand and the Company's shareholders, creditors, or affiliates (as applicable) on the other hand in connection with, among other things, a restructuring (the "Conflict Matters"). The Express board of directors delegated to Mr. Transier the authority to investigate and determine whether any matter constitutes a Conflict Matter, and to review, consider, investigate, negotiate, settle, approve, authorize, and act upon any Conflict Matters.

~~**10. Stakeholder Engagement.**~~

~~In the lead-up to the Petition Date, Express engaged with key stakeholders across its capital structure in the hopes of consummating a deleveraging, out-of-court transaction. Over several months, in the hopes of consummating a deleveraging, out-of-court transaction, Express engaged with key stakeholders explored options to strengthen its balance sheet and right-size its capital structure, as well as pursue potential financing paths. Specifically, as discussed in greater detail herein, the Company engaged with WHP Global, the Prepetition Secured Parties, and a significant number of its landlords and vendors.~~

## VI.   MATERIAL DEVELOPMENTS AND ANTICIPATED DEVELOPMENTS OF THE CHAPTER 11 CASES

### A.   Summary of Key Developments in the Chapter 11 Cases.

As the Company proceeded with the initiatives described above, it became evident that a restructuring through chapter 11 would best position Express for long term success.  To facilitate the consummation of such a restructuring, Express obtained about $214 million of postpetition debtor-in-possession financing, comprised of the DIP ABL Facility and the DIP Term Loan Facility.  Further, the Company filed, on the first day of these cases, global bidding procedures, a store closing motion, and lease rejection procedures, among other customary "first day" motions and filings.

Since the commencement of these cases, the Company has taken important steps to advance its restructuring goals:

- ***"First Day" Relief.***   Obtained all crucial "first day" relief, on a final basis, enabling the Company to smoothly transition its operations into chapter 11.

- ***DIP Facilities.***   Obtained approval of the DIP Facilities on a final basis with the support of key stakeholder constituencies providing continued access to sufficient liquidity for the Company to achieve its restructuring objectives.

- ***Phoenix Letter of Intent.***   Obtained a non-binding stalking horse bid proposal from Phoenix to purchase a substantial portion of the Company's assets pursuant to the proposed bidding procedures.   In its letter of intent, the Phoenix JV contemplated the acquisition of a substantial portion of the Company's assets and the assumption of leases on a minimum of 280 stores for an aggregate cash consideration in the amount of $10 million plus 100% of the net orderly liquidation value of the acquired merchandise, in addition to the assumption of the applicable liabilities.

- ***Sale Transaction.***   Completed a competitive marketing and bidding process and executed the Purchase Agreement.   On June 14, 2024, the Bankruptcy Court entered an order approving the Purchase Agreement.   The Sale Order, as defined herein, enabled the Debtors on June 21, 2024, to successfully consummate the Sale Transaction for a total purchase price of approximately $172 million, consisting of approximately $134 million in cash consideration and $38 million of Assumed Liabilities, while assuming over 450 store locations and retaining 7,500 employees.

- ***Footprint Rationalization.***   Initiated the closing of approximately 101 underperforming stores, collectively resulting in approximately $50 million in annual occupancy savings.

### B.   First Day Relief and Other Case Matters.

On the Petition Date, the Debtors filed several motions (the "<u>First Day Motions</u>") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.   At a hearing on April 23, 2024, (the "<u>First Day Hearing</u>") the Bankruptcy Court granted certain of the relief initially requested in the First Day Motions on an interim and final basis, as

applicable.  As of the date hereof, the Bankruptcy Court has granted all of the First Day Motions on a final basis, as specified below:[7][6]

- **Cash Management Motion**:  On May 15, 2024, the Bankruptcy Court entered an order [Docket No. 235] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* [Docket No. 12] on a final basis.

- **Utilities Motion**:  On April 25, 2024, the Bankruptcy Court entered an order [Docket No. 104] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 10] (the "Utilities Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Utilities Motion on a final basis on May 15, 2024 [Docket No. 233].

- **NOL Motion**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 83] approving the *Motion of Debtors for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock* [Docket No. 8] (the "NOL Motion") on an interim basis.  The Bankruptcy Court entered an order approving the NOL Motion on a final basis on June 6, 2024 [Docket No. 426].

- **Customer Programs Motion**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 88] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs, (II) Honor Certain Prepetition Obligations Related Thereto, and (III) Granting Related Relief* [Docket No. 13] (the "Customer Programs Motion") on an interim basis.  On May 14, 2024, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 227].

- **Creditor Matrix Motion**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 87] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by Email, and (D) Redact Certain Personally Identifiable Information of Natural Persons; (II) Approving the Form and Manner of Service of the Notice of Commencement; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief* (the "Creditor Matrix Motion") [Docket No. 9] on an interim basis.  On June 6, 2024, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 417].

---

[7][6]  The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/express.

- **Stretto Retention Application**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 80] approving the *Application of Debtors for Appointment of Stretto, Inc. As Claims and Noticing Agent* [Docket No. 4] (the "Stretto Retention Application") on a final basis.

- **Insurance & Surety Bond Motion**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 90] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered Into Prepetition and Pay Related Prepetition Obligations, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain, Renew, or Supplement the Customs Surety Bonds and (II) Granting Related Relief* [Docket No. 11] (the "Insurance & Surety Bond Motion") on an interim basis.  On May 15, 2024, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 232].

- **Taxes Motion**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 86] approving the *Motion of Debtors for Entry of Interim and Final Orders Authorizing the (I) Payment of Certain Taxes and Fees and (II) Undertaking of Tax Planning Activities* [Docket No. 7] (the "Taxes Motion") on an interim basis.  On May 15, 2024, the Bankruptcy Court entered an order approving the Taxes Motion on a final basis [Docket No. 231].

- **Wages Motion**:  On ~~October 18~~April 24, 202~~3~~4, the Bankruptcy Court entered an order [Docket No. 81] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 5] ("Wages Motion") on an interim basis.  On May 14, 2024, the Bankruptcy Court entered an order approving the Wages Motion on a final basis [Docket No. 224].

- **Critical Vendors Motion**:  On ~~October 18~~April 24, 202~~3~~4, the Bankruptcy Court entered an order [Docket No. 82] approving the *Motion of Debtors Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of (A) Certain Critical Vendors, (B) Certain Foreign Vendors, (C) Certain Lien Claimants, (D) 503(b)(9) Claimants, and (E) PACA Claimants, (II) Confirming Administrative Expense Priority of Critical Outstanding Orders, and (III) Granting Related Relief* [Docket No. 6] ("Critical Vendors Motion") on an interim basis.  On May 14, 2024, the Bankruptcy Court entered an order approving the Critical Vendors Motion on a final basis [Docket No. 221].

- **Joint Administration Motion**:  On April 23, 2024, the Bankruptcy Court entered an order [Docket No. 67] approving the *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3] on a final basis.

- **Store Closing Motion**:  On April 24, 2024, the Bankruptcy Court entered an order [Docket No. 84] approving the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* [Docket No. 14] (the "Store Closing Motion") on an interim basis.  On May 15, 2024, the Bankruptcy Court entered an order

approving the Store Closing Motion on a final basis [Docket No. 234] (the "Store Closing Order").

- **Request for an Equity Holders Committee**.  On May 9, 2024, shareholder Jeffrey M. Kurzon filed *Pro Se Shareholder (1) Omnibus Initial Objections to Debtor's First Day Motions and Opposition to Motion Waiving the Requirement to File a List of Equity Security Holders and (2) Motion for Shareholder's Committee and Request for Other Emergency Relief to Prevent Further Damage to the Debtors* [Docket No. 181] (the "Equity Committee Motion").  On June 6, 2024, the Bankruptcy Court held an evidentiary hearing to consider the shareholder's request and denied the Equity Committee Motion, finding a lack of evidence that equity holders could potentially receive a material recovery.

### C.    Appointment of Statutory Committee.

#### 1.    Appointment of the Official Committee of Unsecured Creditors.

On May 3, 2024, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 154] appointing the Committee.  The seven-member Committee has retained Kramer Levin Naftalis & Frankel LLP and Saul Ewing LLP as its legal counsel and Province, LLC as its financial advisor (collectively, the "UCC Professionals").  The Bankruptcy Court subsequently entered orders approving the retention of the UCC Professionals [Docket Nos. 532, 536, 537].  The Committee is composed of the following members:

- Li & Fung (Trading) Limited;

- Manchu Times Fashion Limited;

- Jorge Chacon;

- Pacific Buying & Marketing Service, Ltd.;

- Radial, Inc.;

- Motives International (Hong Kong) Limited and Motives International Limited; and

- The Macerich Company.

### D.    Retention of Debtors' Professionals.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable:  (a) Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as co-counsel to the Debtors; (b) Klehr Harrison Harvey Branzburg LLP, as co-counsel to the Debtors; (c) Moelis as investment banker to the Debtors; (~~e~~d) M3 Advisory Partners, LP, as financial advisor to the Debtors; (~~h~~e) RCS Real Estate Advisors as real estate advisor to the Debtors; (~~i~~f) Ernst & Young LLP as tax services provider to the Debtors; (~~j~~g) Stretto, Inc., as Claims and Noticing Agent and Administrative Agent; (~~k~~h) PricewaterhouseCoopers LLP, as audit services provider to the Debtors; and (~~l~~i) KPMG, LLP as tax consultants to the Debtors (collectively, the "Professionals").

The Bankruptcy Court subsequently entered orders approving the retention of the Professionals [Docket Nos. 387, 388, 390–392, 397–399, 501].

E.        **Lease Rejections and Optimization.**

As discussed in the First Day Declaration, a key component of the Company's prepetition and postpetition engagement revolvesd around a continuation and completion of the Debtors' ongoing effort to rationalize their retail store footprint.  This effort entailsed, among other things, the closure of certain underperforming stores (based on a comprehensive cost-benefit analysis) with the goal of creating an efficient and profitable remaining store footprint.  The Company's store portfolio rationalization process accelerated in the months leading up to the Petition Date in connection with the Company's broader restructuring efforts and has continued following the Petition Date.  During the twelve-month period ending on September 30, 2023, the Debtors closed approximately 100 stores, leaving the Debtors with approximately 580 operating stores as of the Petition Date.  Ultimately, the Debtors' management team and advisors determined that it would be appropriate to wind down and close approximately 95 underperforming brick-and-mortar stores on a postpetition basis.

~~Following the Petition Date~~Thereafter, the Debtors ~~closed around ten additional stores as of~~ management team and advisors determined that it would be appropriate to wind down and close an additional approximately 95 underperforming brick-and-mortar stores on a postpetition basis.  This consisted of an additional ten stores by May 31, 2024~~,~~ and ~~closed approximately~~ 85 additional stores in June.  The Debtors have taken the following steps with respect to their lease rejection and optimization and strategy:

1.        **Store Closings.**

On April 22, 2024, the Debtors filed the Store Closing Motion, through which the Debtors sought approval of certain Sale Guidelines (as defined in the Store Closing Motion) and to conduct 95 initial store closings.  On May 15, 2024, the Bankruptcy Court entered Store Closing Order on a final basis, approving the store closing procedures and the assumption of the Consulting Agreement (as defined in the Store Closing Motion).  On June 15, 2024, the Debtors filed the *Notice of Filing of Additional Store Closing List* [Docket No. 473], pursuant to the Store Closing Order, detailing the names, store numbers, and addresses of 17 additional store closings.

2.        **Lease Rejections.**

On April 22, 2024, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 16] (the "Rejection Procedures Motion," and the procedures contemplated thereby, the "Rejection Procedures"), through which the Debtors sought approval of certain procedures for rejecting or assuming executory contracts and unexpired leases.  On May 17, 2024, the Bankruptcy Court entered an order approving the Rejection Procedures Motion [Docket No. 269] (the "Rejection Procedures Order").  The Bankruptcy Court subsequently entered an order approving the rejection of certain leases proposed to be rejected by the Debtors' Rejection Motion [Docket No. 386].  Pursuant to the Rejection Procedures Order, the Debtors subsequently provided notice of and completed rejection of 17 unexpired leases effective as of May 31, 2024.

On ~~[●]~~August 2, 2024, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* requesting that the Bankruptcy Court extend the deadline established by section 365(d)(4) of the Bankruptcy Code for the Debtors to assume,

41

assume and assign, or reject unexpired leases of nonresidential real property to November 18, 2024.  On August 19, 2024, the Bankruptcy Court entered an order granting the requested relief [Docket No. 727] (together with any other such applicable order then in effect, the "Extension Order").

**F.    Sale and Marketing Processes.**

~~Foundational to the~~The Debtors' ~~reorganization is the Debtors' commitment~~entered the Chapter 11 Cases with the intent to right-size their lease portfolio and preserve thousands of jobs through the launch of a ~~robust~~ third-party marketing process to solicit proposals for one or more potential sales of all or substantially all of the Debtors' assets.  Prior to the Petition Date, Moelis contacted 23 potential strategic and financial investors, which led to the execution of 11 non-disclosure agreements and access being granted to virtual data rooms, financial models, and other financial, operational, and legal diligence materials.

Moelis continued its marketing process postpetition and continued to engage with the Phoenix JV to pursue the bid contemplated in the Phoenix JV's letter of intent.  Moelis conducted outreach to over 30 potentially interested parties as part of the postpetition marketing process, resulting in execution of an additional 10 non-disclosure agreements.

To effectuate these sale processes, the Debtors filed the Bidding Procedures Motion, seeking authority to proceed with multiple ~~expeditious, yet flexible,~~ bidding and sale processes.  The proposed bidding procedures (the "Bidding Procedures") provided for a bid deadline of June 11, 2024, an auction date of June 12, 2024, a sale objection deadline of June 13, 2024, and a proposed sale hearing date of June 14, 2024.

On June 6, 2024, the Bankruptcy Court entered an order approving the Bidding Procedures Motion [Docket No. 427] (the "Bidding Procedures Order").  Through the Bidding Procedures Order, the Debtors obtained approval for ~~(i)~~(i) bid protections relating to the stalking horse bidder, discussed further herein, and (ii) the manner and notice of the auction and sale hearing.

As part of the Marketing Process on a postpetition basis and in line with the Bidding Procedures Motion, the Debtors and their advisors envisaged three potential routes forward:  ~~(i)~~(i) a going-concern sale transaction; (ii) a going-out-of-business sale transaction in lieu of a going-concern stalking horse; or (iii) no going-concern sale transaction after filing a going-concern stalking horse notice.  The purpose of this tripartite approach was to ensure that the sale and marketing process achieved value maximization and resulted in the most expeditious and efficient process in compliance with Bankruptcy Court-approved milestones.  Through this process, the Debtors worked ~~diligently~~ with their advisors and received two liquidation bids in addition to the stalking horse going-concern bid.  The three tracks originally contemplated by the Bidding Procedures Motion converged into a single path, coalescing around the ~~value-maximizing~~ Purchase Agreement with the Stalking Horse Bidder.

**G.    The Purchase Agreement and Sale Order.**

On May 22, 2024, the Debtors executed the Purchase Agreement with Phoenix [Docket No. 305].  Specifically, the Purchase Agreement provided for a total purchase price of approximately $172 million, consisting of approximately $134 million in cash consideration and $38 million of Assumed Liabilities.  This purchase price amount does not include additional ~~material value that is estimated to be worth approximately $150 million, which may consist of additional unapplied~~potential value associated with the handling of existing customer programs, existing landlord claims and other contract counterparty claims.  ~~Indeed, the centerpiece of the Purchase Agreement is in its preservation of the business.~~  The Purchase Agreement protected the jobs of approximately 7,500 employees and enabled the assumption

and assignment of over 450 leases, as well as the continuation of relationships with existing vendors and other contract counterparties on a go-forward basis. ~~Further, the Purchasers paid a deposit to the Debtors in the amount of 5% of the Acquired Merchandise Amount, as contemplated under the Purchase Agreement.~~

Following the signing of the Purchase Agreement, on June 14, 2024, the Bankruptcy Court approved entry of the Sale Order.  On June 21, 2024, pursuant to the Sale Order, the Debtors consummated the sale contemplated in the Purchase Agreement.

### H.    Approval of the DIP Facility.

The Debtors' businesses ~~are~~were cash-intensive, with significant daily and monthly cash needs to meet obligations to vendors, employees, and landlords, among others.  In light of their cash needs, the Debtors undertook ~~extensive, arm's-length~~ negotiations with their Prepetition Secured Parties to obtain sufficient liquidity to fund the Debtors' day-to-day operations during the Chapter 11 Cases.  The DIP ABL Facility and the DIP Term Loan Facility (as from time to time amended, amended and restated, modified, or supplemented, collectively, the "DIP Facilities") were essential to the Debtors' realization of a successful, value-maximizing restructuring.  In particular, the liquidity provided under the DIP Facilities funded postpetition operations and chapter 11 process costs, including consummation of the Purchase Agreement, and sent a strong signal to the market and to the Company's key constituents that the Company would satisfy postpetition obligations in the ordinary course.

On April 24, 2024, the Bankruptcy Court entered the Interim DIP Order [Docket No. 85] approving, on an interim basis, the relief requested in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion").  Through the DIP Motion, as approved by the Interim DIP Order, the Debtors were granted interim access to an aggregate $214 million in commitments under the DIP Facilities to support working capital needs and administrative costs during the Chapter 11 Cases.  Specifically, following entry of the Interim DIP Order, the DIP Facilities were used to administer the Chapter 11 Cases, operate the Debtors' business in the ordinary course, and facilitate the marketing processes as the Debtors have sought and concluded, respectively, value-maximizing sales of its assets.  The DIP Facilities included $25 million in new money term loans (the "Second Lien New Money DIP Term Loans"), and roll up ~~(i)~~(i) approximately $126 million in prepetition obligations under their Prepetition ABL Facility (the "First Lien DIP ABL Roll-Up Loans"), and (ii) approximately $63 million in prepetition obligations under the Prepetition FILO Term Loan Facility (the "Second Lien DIP Term Roll-Up Loans," together with the First Lien DIP ABL Roll-Up Loans, collectively, the "DIP Roll-Up Loans," and together with the Second Lien New Money DIP Term Loans, collectively, the "DIP Loans").  The DIP Loans were secured by perfected first and second liens on substantially all of the Debtors' assets.  In addition to the funds made available through the DIP Facilities, the Interim DIP Order permitted the Debtors to use prepetition cash collateral to meet the Debtors' postpetition liquidity needs.  On June 6, 2024, the Bankruptcy Court approved the relief requested in the DIP Motion on a final basis [Docket No. 419] (the "Final DIP Order").

### I.    Adequate Protection Obligations.

The relief granted in the Final DIP Order includes granting certain adequate protection (the "Adequate Protection Obligations") to the Prepetition Secured Parties.  The Adequate Protection Obligations were intended to adequately protect the Prepetition Secured Parties' interests in collateral

securing their prepetition claims against the Debtors from any diminution in value (each, a "<u>Diminution in Value</u>").  Specifically, the Prepetition Secured Parties were granted:

(a)     liens on all or substantially all of the Debtors' assets (the "<u>Adequate Protection Liens</u>").  The Adequate Protection Liens are senior to all other *prepetition* liens in the Debtors' assets (but junior to the Carve Out[8][7]);

(b)     superpriority administrative expense claims (the "<u>Adequate Protection Superpriority Claims</u>") in the amount of any Diminution in Value.  The Adequate Protection Superpriority Claims are senior to any and all other administrative expenses claim, but junior to the Carve Out and superpriority administrative expense claims granted to the DIP Secured Parties; and

(c)     payment (the "<u>Adequate Protection Payments</u>") of any amounts due under the prepetition credit documents, including interest at the default rate, indemnities, and fees and expenses of the Prepetition Secured Parties.

Typically, determinations of whether any Diminution of Value has occurred take place after the effective date of a chapter 11 plan when creditor recoveries have been determined.  ~~Accordingly, the Debtors cannot currently estimate whether any Diminution of Value has occurred or will occur and, if such a Diminution of Value does occur, what the amount of the resulting Adequate Protection Superpriority Claim(s) may be.  In light of the Debtors' current business environment and the events of these Chapter 11 Cases, as described herein, it is possible that the value of the Debtors' assets securing the Prepetition Secured Parties' claims may have decreased during these Chapter 11 Cases.  As a result, the Prepetition Secured Parties could have substantial Adequate Protection Superpriority Claims under the terms of the Final DIP Order, which rank senior in priority to claims of General Unsecured Creditors.  Accordingly, any such Adequate Protection Superpriority Claims would need to be paid in full from distributable assets before any distributions could be made to General Unsecured Creditors.[9]~~ <u>Following entry of the Final DIP Order, all prepetition obligations to the Prepetition Secured Parties were rolled up into DIP Obligations that were subsequently repaid in full.</u>

**J.     The Bar Date Order.**

On May 2, 2024, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 152] (the "<u>Bar Date Motion</u>").  On May 20, 2024 the Bankruptcy Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing an Amended Schedules Bar Date and a Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 280] (the "<u>Bar Date Order</u>").  Pursuant to the Bar Date Order, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is July 10, 2024, at 11:59 p.m. (prevailing Eastern Time) (the "<u>General Bar Date</u>") and the last date for governmental units to file

---

[8][7]   "Carve Out" has the meaning set forth in ¶ 9 of the Final DIP Order.

[9]   ~~Following entry of the Final DIP Order, all prepetition obligations~~ have been rolled up.

Proofs of Claim in the Debtors' Chapter 11 Cases is October 22, 2024, at 11:59 p.m. (prevailing Eastern Time).

**K.      Schedules and Statements.**

On May 14, 2024, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 222] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") for a total of 47 days after the Petition Date. Accordingly, the Debtors were required to file the Schedules and Statements by no later than June 10, 2024. This schedule provided creditors with ample time to analyze and evaluate scheduled claims in advance of Solicitation and the General Claims Bar Date.

On May 30, 2024, the Debtors filed their Schedules [Docket Nos. 320-331, 334-345]. Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://cases.stretto.com/Express.

**L.      SEC Investigation.**

Separate from the Investigation, during these chapter 11 cases, following a self-disclosure by the Debtor, the SEC conducted an inquiry regarding the disclosure of certain perquisites and personal benefits received by the former Chief Executive Officer (the "Inquiry"). The Debtors have cooperated fully with the SEC Staff's inquiry.

**M.      ~~L.~~ The Disinterested Director's ~~Independent~~ Investigation.**

**1.      Investigation Overview.**

Prior to the Petition Date, the Company's board of directors appointed William Transier as the Disinterested Director. The scope of the Disinterested Director's authority included, among other things, conducting an investigation into potential prepetition claims and causes of action with the support of Klehr Harrison. As described in Article ~~V~~V of this Disclosure Statement, the Disinterested Director was delegated ~~sole~~the authority to ~~investigate and determine whether any matter constitutes a Conflict Matter, and to review, consider, investigate, negotiate, settle, approve, authorize, and act upon any~~: (a) conduct all investigations and analyses related to the Conflict Matters necessary or desirable; (b) to act on behalf of the Company and bind the Company, in connection therewith; and (c) take any and all actions to negotiate, resolve, abide by, and implement the decisions and actions of the Disinterested Director with respect to Conflict Matters.

The Disinterested Director investigated dealings involving the Company and its related parties, including the activities of the Company's directors and officers. The Investigation further included transactions and events during the relevant statutory period, dating back up to six years, that could give rise to potential claims and causes of action.

During the Investigation, the Disinterested Director, with the assistance of advisors, issued document and information requests to the Debtors, and received and reviewed over 100,000 documents, comprising approximately 658,000 pages from the Debtors, relevant to the Investigation. The Disinterested Director, through counsel, also interviewed several current and former Company employees and board members. The interviews performed during the Investigation lasted more than 50 hours and covered in great detail the range of topics most relevant to the Investigation. In light of the extensiveness

45

of the Investigation, the description herein of transactions and potential claims and causes and action examined as part of the Investigation is not exhaustive.

**2.**    **Settlement.**

~~In addition to serving as a member of the board of directors, the board of directors delegated sole authority to the Disinterested Director to conduct the Independent Investigation with respect to any potential claims or causes of action of the Debtors against any Related Party.  In furtherance thereof, to date, the Disinterested Director, with the assistance of advisors, has issued document and information requests to the Debtors, and received and reviewed over 10,000 documents, comprising approximately 142,000 pages from the Debtors, relevant to the Independent Investigation.  The Disinterested Director, with the assistance of advisors, will continue to receive and review additional relevant documents responsive to the requests and has and will continue to conduct interviews related to the same.  The Independent Investigation remains ongoing as of the date hereof, and the Disinterested Director will continue to investigate matters in accordance with his fiduciary duties and the authority delegated by the board of directors.  The Disinterested Director continues to evaluate the terms of the Plan and remains focused on preserving and maximizing the value of the Debtors' estates.~~

With the benefit of the Disinterested Director's preliminary conclusions with respect to the Investigation, the Debtors engaged in good-faith, arm's length negotiations with the Committee surrounding the terms of a consensual Plan, including the scope of Releases and Exculpations.  Those negotiations culminated with the current proposed Plan, that releases certain Released Parties, including the Debtor Related Parties, and preserves potential claims against Non-Released Parties.  Based upon this settlement the Committee recommends that holders of General Unsecured Claims accept the Plan.  Under the Plan, the Wind-Down Debtors are authorized to conduct their own investigation of the Non-Released Parties (including being provided with access to the thousands of documents reviewed as part of the Investigation) and, if appropriate, to pursue claims against the Non-Released Parties.

**N.**    ~~**M.**~~ **Settlement with the Committee and the DIP Term Loan Agent**

On July 10, 2024, after hard-fought arms-length negotiations, the Debtors, the Committee, and the DIP Term Loan Agent executed a settlement agreement (the "DIP Settlement Agreement") that stipulates, subject to Court approval, that ReStore pay $295,000 ~~thousand~~ to the Debtors' estates.  The $295,000 ~~thousand~~ payment is a settlement of the Committee's potential challenges, which amount will be made available under the Plan for the benefit of general unsecured creditors.

On July 26, the Bankruptcy Court entered the *Order (I) Authorizing and Approving the Settlement Agreement by and Between the Debtors, the Committee, and ReStore; and (II) Granting Related Relief* [Docket No. 651].  As a result of the DIP Settlement Agreement, the Additional Reserves (as defined in the Final DIP Order) ~~will be~~were released, and parties ~~will be~~are bound to the stipulations regarding the perfection of liens securing the Second Lien Prepetition Term Facility[108] and the releases of claims against the DIP Term Loan Agent arising out of the Second Lien Prepetition Term Facility, which releases ~~were~~ subject to the Committee's challenges ~~now being~~, were settled.

**O.**    **Exclusivity Extension Order**

On August 7, 2024, the Bankruptcy Court entered the *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the*

---

~~10~~ 8 "Second Lien Prepetition Term Facility" means that certain first-in, last-out term loan credit facility provided under the Second Lien Prepetition Term Credit Agreement.

*Bankruptcy Code And (II) Granting Related Relief* [Docket No. 705] (the "Exclusivity Order"). The Exclusivity Order extended the Debtors' (a) Filing Exclusivity Period through and including November 18, 2024, and (b) Solicitation Exclusivity Period through and including January 20, 2025. The Exclusivity Order entered by the Bankruptcy Court reflected an agreement between the Debtors and the Committee that granted limited relief requested in the exclusivity motion and addressed scheduling with respect to further relief.

### P.   ~~N.~~ Proposed Confirmation Schedule.

In consultation with the DIP Agents and the Committee, and pursuant to the milestones set forth in the DIP Facilities, the Debtors have agreed to certain scheduling milestones to ensure an orderly and timely implementation of the Wind-Down Transactions. The Debtors intend to proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. To that end, the Debtors have proposed the following case timeline, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | [July 31], 2024. |
| Solicitation Mailing Deadline | As soon as practicable after entry of an order approving of the Disclosure Statement, but in no event more than five (5) business days thereafter. |
| Publication Deadline | As soon as practicable after entry of an order approving of the Disclosure Statement, but in no event more than five (5) business days thereafter. |
| Plan Supplement Filing Deadline | [~~October 2~~December 4], 2024~~]~~. |
| Voting Deadline | [~~October 9~~]December 11, 2024, at 4:00 p.m., prevailing Eastern Time. |
| ~~Plan~~Confirmation Objection Deadline | [~~October 9~~]December 11, 2024, at 4:00 p.m., prevailing Eastern Time. |
| Deadline to File Voting Report | Two (2) business days prior to the confirmation hearing, at 12:00 p.m., prevailing Eastern Time. |
| Confirmation Brief and Confirmation and Final Disclosure Statement Objection Reply Deadline | Two (2) business days prior to the confirmation hearing, at 12:00 p.m., prevailing Eastern Time. |
| Confirmation Hearing Date | On or after ~~October~~[December 1~~6~~8], 2024, at [●] [a.m./p.m.], prevailing Eastern Time, subject to the Bankruptcy Court's availability. |

## VII.   OVERVIEW OF THE PLAN

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains property under the plan.

The Plan contemplates the distribution of the proceeds from the Sale Transaction pursuant to the Sale Order.  The Plan is the best path forward for the Debtors and their estates.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will substitute the obligations set forth in the Plan for pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

The key terms of the Plan, specific aspects of the Wind-Down Transactions following the Consummation of the Plan can be found in the Plan, attached hereto as **Exhibit A**, among others described herein and therein.

### A.    General ~~Settlement~~Resolution of Claims and Interests.

As discussed in the Plan, pursuant to section 1123 of the Bankruptcy Code, ~~and~~ in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute the resolution of the treatment of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Debtors, subject to the approval of the Wind-Down Debtors Oversight Committee, may compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

### B.    Sale Transaction.

The Sale Transaction ~~is~~was the sale for certain of the Debtors' assets pursuant to the Purchase Agreement.  Following the competitive marketing process and entry of the Sale Order, the Debtors consummated the Sale Transaction on June 21, 2024, and, among other things, the Acquired Assets and Assumed Liabilities transferred from the Debtors to the Purchasers free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and the Purchasers paid to the Debtors the ~~Distributable Proceeds~~purchase price, as and to the extent provided for in the Purchase Agreement.  The Sale Transaction provided value to the estate, including the purchase price of $172 million in cash, and additional non-cash consideration, including the payment of certain cure costs and the assumptions of liabilities arising out of ownership of the Acquired Assets, subject to certain terms and conditions.

The Debtors and the Purchasers shall be authorized to take all actions as may be deemed necessary or appropriate, if any, in furtherance of the Sale Transaction pursuant to the terms of the Purchase Agreement, the Sale Order, and the Plan. ~~On and after the Effective Date, except as otherwise provided in the Plan, the Wind-Down Debtors or the Purchasers, as applicable, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.~~

1.      **Sources of Consideration for ~~the~~ Plan Distributions.**

Distributions under the Plan shall be funded by (i) Cash on hand, (ii) the Distributable Proceeds, ~~and~~which include, among other things, the prosecution and monetization of Retained Causes of Action, (iii) the proceeds of the Wind-Down, and (iv) to the extent provided for in Article VIII.C of the Plan, the Wind-Down Reserve; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance. ~~Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.~~

~~2. Vesting of Wind-Down Debtor Assets.~~

~~Except as otherwise provided in the Confirmation Order, the Plan (including the Wind-Down Transactions Memorandum and Article X of the Plan), or the Purchase Agreement, as applicable, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Causes of Action, and any property retained by any of the Debtors pursuant to the Plan or the Purchase Agreement shall vest in each respective Wind-Down Debtor, as applicable, free and clear of all Liens, Claims, charges, other encumbrances, and interests for the purposes of winding down the Wind-Down Debtors. On and after the Effective Date, except as otherwise provided in the Purchase Agreement or the Plan, including Article X of the Plan, each of the Wind-Down Debtors, as applicable, may operate their businesses and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action~~ without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

**2.**      ~~3.~~**Transition Services Agreement.**

The Debtors and the Wind-Down Debtors, as applicable, shall be authorized to implement or otherwise continue adherence with the Transition Services Agreement pursuant to the Purchase Agreement. The Transition Services Agreement shall help ensure that employees are available to provide transition services to the Purchasers and the Debtors or the Wind-Down Debtors, as applicable, to wind down the Debtors' Estates. For the avoidance of doubt, the Wind-Down Debtors (and Liquidating Trust, if any) shall succeed automatically to the rights of the Debtors under the Purchase Agreement, Transition Services Agreement, and Sale Transaction Documents.

C.      **The Wind-Down.**

1.      **Establishment of the Wind-Down Debtors.**

~~On the Effective Date, the Wind-Down Debtors shall be formed or converted into for the benefit of the Wind-Down Debtor Beneficiaries, and each of the Debtors shall transfer the Wind-Down Debtor Assets for distribution in accordance with the terms of the Plan. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to affect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.~~

~~Pursuant to the Plan Administrator Agreement, the~~The Wind-Down Debtors will be established, formed, merged, or converted into on the Effective Date. The ~~Wind-Down~~Wind Down Debtors shall be

the successors in interest to the Debtors, and the Wind-Down Debtors shall be successors to the Debtors' rights, title, and interest to the Wind-Down Debtor Assets. The Wind-Down Debtors will conduct no business operations and will be charged with winding down the Debtors' Estates. The Wind-Down Debtors shall be managed by the Plan Administrator and shall be subject to the Wind-Down Debtors Oversight Committee. The Wind-Down Debtors shall be administered in accordance with the terms of the Plan and shall be subject to the Wind-Down Budget. The Wind-Down Debtors shall be administered in a manner consistent with the SEC's published guidance on liquidating trusts.

Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date the Wind-Down Debtor Assets shall be transferred to and irrevocably vest in the Wind-Down Debtors. For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned or sold pursuant to a prior order or the Plan, the Wind-Down Debtors specifically retain and reserve the right to assert, after the Effective Date, any and all of the Retained Causes of Action and related rights, whether or not asserted as of the Effective Date (and whether or not listed on the Schedule of Retained Causes of Action), and all proceeds of the foregoing, subject to the terms of the Plan. For the avoidance of doubt, nothing in this section shall limit the transfer of the Retained Causes of Action.

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, only the Wind-Down Debtors shall, with the consent of the Wind-Down Debtors Oversight Committee, have the right to pursue or not to pursue, compromise or settle any dispute with respect to the Wind-Down Debtor Assets transferred to the Wind-Down Debtors. On and after the Effective Date, the Wind-Down Debtors may, without further Bankruptcy Court approval but with the consent of the Wind-Down Debtors Oversight Committee, commence, litigate, and settle any Retained Causes of Action or Claims relating to any Wind-Down Debtor Assets transferred to the Wind-Down Debtors or rights to payment or Claims that belong to the Debtors as of the Effective Date or are instituted by the Wind-Down Debtors on or after the Effective Date, except as otherwise expressly provided in the Plan. All of the Wind-Down Debtors' activities shall be subject to the Wind-Down Budget. The Wind-Down Debtors shall be entitled to enforce all defenses and counterclaims to all Claims asserted against the Debtors and their Estates, including setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code.

The Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtor Asset without the need for filing any motion for such relief. On the Effective Date, the Debtors and the Plan Administrator shall have established the Wind-Down Debtors pursuant hereto.

## 2.    Directors and Officers of the Debtors and the Wind-Down Debtors.

On the Effective Date, the terms of the Debtors' existing boards of directors or managers, as applicable, shall expire, and the Plan Administrator shall be immediately and automatically deemed appointed by the Debtors or Wind-Down Debtors, as applicable, as the sole director and the sole officer of each of the Wind-Down Debtors, and the Plan Administrator shall succeed to the powers of the Debtors' directors and officers subject to. Without limitations on the foregoing, the Plan Administrator shall have the sole authority to act on behalf of the Wind-Down Debtors subject to coordination with and, where applicable, consent of the Wind-Down Debtors Oversight Committee.

## 3.    Vesting of Wind-Down Debtor Assets.

Except as otherwise provided in the Confirmation Order, the Plan (including the Wind-Down Transactions Memorandum and Article X of the Plan), or the Purchase Agreement, as applicable, and

50

~~Nn~~otwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date and thereafter if additional Wind-Down Debtor Assets become available, ~~the Debtors shall be deemed, subject to the Plan Administrator Agreement, to have automatically transferred to the applicable Wind Down Debtors all of their right, title, and interest in and to all of~~ pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, ~~all~~ (including the D&O Liability Insurance Policies), all Retained Causes of Action, and any property retained by any of the Debtors pursuant to the Plan~~, in accordance with section 1141 of the Bankruptcy Code. All such assets shall automatically vest in the Wind Down Debtors~~ or the Purchase Agreement shall irrevocably vest in and be granted and assigned to each respective Wind-Down Debtor, as applicable, free and clear of all ~~Claims,~~ Liens, ~~and~~Claims, charges, other encumbrances, and interests for the purposes of winding down the Wind-Down Debtors, subject only to the Allowed Claims and Interests as set forth ~~herein~~in the Plan and the expenses of the Wind-Down Debtors as set forth ~~herein and~~ in the Plan ~~Administrator Agreement~~. Thereupon, the Debtors shall have no interest in or with respect to the Wind-Down Debtor Assets or the Wind- Down Debtors.

On and after the Effective Date, except as otherwise provided in the Purchase Agreement, the Sale Order, or the Plan, each of the Wind-Down Debtors (subject to the rights and approval of the Wind-Down Debtors Oversight Committee), as applicable, may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

## 4.    Liquidating Trust Treatment

Notwithstanding anything to the contrary ~~herein~~in the Plan, the Plan Administrator, in his or her discretion (subject to the prior consent of the Committee or Wind-Down Debtors Oversight Committee, as applicable), may transfer all or any portion of the assets of the Wind-Down Debtors to a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations.  For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV of the Plan shall continue to govern all matters associated with the prosecution, settlement, or collection upon any ~~Causes of Action included on the Schedule of~~ Retained Causes of Action transferred to the Liquidating Trust. The Liquidating Trust, if any, shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Wind-Down Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust.  Upon the transfer of the Wind-Down Debtor~~'s~~s' assets to the Liquidating Trust, the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust.  To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests.  Prior to any Permitted Transfer, the Plan Administrator (subject to the prior consent of the Committee or Wind-Down Debtors Oversight Committee, as applicable) may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

### ~~4. Liquidating Trust Treatment.~~

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary and subject to Article IV.C.5 of the Plan, the Debtors expect to treat the Liquidating Trust, if any, as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly.  For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust.  If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Wind-Down Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

52

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit).  Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

## 5.    Disputed Ownership Fund Treatment.

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors and the Wind-Down Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

## 6.    The Wind-Down Debtors Oversight Committee.

The Wind-Down Debtors Oversight Committee shall consist of those parties selected by the Committee and identified in the Plan Supplement.  The Wind-Down Debtors Oversight Committee shall be entitled to retain professionals, paid by the Wind-Down Debtors, to advise the Wind-Down Debtors

53

Oversight Committee, which professionals may be Professionals who previously advised the Committee or the Debtors.

The Wind-Down Debtors Oversight Committee shall have the responsibility to review and advise the Plan Administrator (and the Liquidating Trust, if formed) with respect to the liquidation and distribution of the Wind-Down Debtor Assets transferred to the Wind-Down Debtors in accordance herewith. For the avoidance of doubt, in advising the Plan Administrator (or Liquidating Trust, if formed), the Wind-Down Debtors Oversight Committee shall maintain the same fiduciary responsibilities as the Plan Administrator. In addition, the rights of the Wind-Down Debtors Oversight Committee shall equally apply with respect to a Liquidating Trust in the event a Liquidating Trust is formed.

Vacancies on the Wind-Down Debtors Oversight Committee shall be filled by a Person designated by the Plan Administrator, with the consent of the remaining member or members of the Wind-Down Debtors Oversight Committee. The Plan Administrator shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Debtors Oversight Committee for cause or an order otherwise reconstituting the Wind-Down Debtors Oversight Committee for cause.

## 7. 6. The Plan Administrator.

As set forth below, the Plan The Plan Administrator shall be selected by the Committee in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall act for the Wind Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind Down and as otherwise provided in the Confirmation Order. On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date. The Plan Administrator shall begin to administer the distributions to the Wind-Down Debtor Beneficiaries and shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Vested Retained Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the amounts set forth in the Administrative Claims Reserve and the Wind Down Reserve in accordance with the Plan, and wind down the business and affairs of the Wind-Down Debtors, including (all without further order of the Bankruptcy Court): (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors, the Administrative Claims Reserve, and the Wind Down Reserve; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Administrative Claims Reserve and the Wind Down Reserve; (3) making distributions from the Administrative Claims Reserve and the Wind Down Reserve as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind Down Debtors and the Liquidating Trust, including filing tax returns; (8)

54

representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) complying with the Debtors' continuing obligations under the Sale Order, the Purchase Agreement, and the Transition Services Agreement; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

The Plan Administrator shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved and (ii) the date on which a Plan Administrator resigns, is terminated, or is otherwise unable to serve. The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Wind-Down Debtors and the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Wind-Down Debtors Oversight Committee. Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the Wind-Down Debtors Oversight Committee; provided that the Wind-Down Debtors shall file a notice with the Bankruptcy Court with respect to any successor Plan Administrator.

If the Wind-Down Debtors Oversight Committee does not appoint a successor within the time periods specified in the Plan Administrator Agreement, then the Bankruptcy Court, upon the motion of counsel to the Plan Administrator or counsel to the Wind-Down Debtors, shall approve a successor to serve as a Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind Down Debtors shall be terminated.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in <u>Article VII</u> of the Plan. The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court.

     **D.**     **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the Holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or the Wind-Down Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims shall not be released and such Liens shall remain in full force and effect until the DIP Claims are paid in full in Cash or otherwise treated in a manner consistent with <u>Article II.E</u> of the Plan.

E.    **Distributable Proceeds and Waterfall Recovery.**

On or after the Effective Date, the Debtors shall make distributions on account of Allowed Claims in accordance with Article II.B of the Plan using the Distributable Proceeds. In accordance with the Final DIP Order and the Plan, the Distributable Proceeds shall be allocated and paid to ~~Holders of Allowed Claims until paid in full from time to time in the following priority:~~ the Holders of Claims ~~or Interests~~, other than Allowed Professional Fee Claims, as applicable, until paid in full, in each case, on a Pro Rata basis, except as otherwise agreed to by such Holders of Claims or Interests, as follows~~: (a) other~~, and subject in all respects to the terms of Article II.B in the Plan:  (a) Allowed Administrative Claims and Allowed Priority Tax Claims; (b) Allowed Other Secured Claims; (c) Allowed Other Priority Claims; and (d) Allowed General Unsecured Claims that are not assumed by a Purchaser~~; provided that the aggregate amount of Distributable Proceeds allocated to Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims shall not exceed the Administrative Claims Reserve Amount~~.

~~F. Administrative Claims Reserve.~~

~~Prior to the Effective Date, the Debtors shall ensure that the Administrative Claims Reserve is funded in the amount of the Administrative Claims Reserve Amount, including by depositing Cash into the Administrative Claims Reserve, if necessary (and the Plan Administrator shall deposit Cash into or withdraw Cash from the Administrative Claims Reserve if the Administrative Claims Reserve Amount changes at any time).   On and after the Effective Date, the Plan Administrator shall administer the Administrative Claims Reserve.   The Administrative Claims Reserve Amount shall be used to pay Holders of all Allowed Priority Claims, Allowed Other Priority Claims, Allowed Administrative Claims (other than Professional Fee Claims or DIP Claims), Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims in full; provided, however, for the avoidance of doubt, that any such Allowed Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims that are Assumed Liabilities shall be satisfied under the Purchase Agreement and shall not be satisfied from the Administrative Claims Reserve.~~

~~If all or any portion of any such Claim shall become a Claim that is not Allowed, then the amount on deposit in the Administrative Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative Claims Reserve, shall remain in the Administrative Claims Reserve to the extent that the Wind Down Debtors determine necessary to ensure that the Cash remaining in the Administrative Claims Reserve is sufficient to ensure that all Allowed Priority Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (that are not Assumed Liabilities) will be paid in accordance with the Plan without any further action or order of the Court.   Any amounts remaining in the Administrative Claims Reserve after payment of all Allowed Priority Claims, Allowed Administrative Claims, Allowed Other Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the Wind Down Reserve until such time the Wind Down Debtors are dissolved in accordance with the Plan.~~

F.    ~~G.~~ Cancellation of Existing Securities and Agreements.

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Wind-Down Transactions (including, without limitation, the Definitive Documents and the Purchase Agreement), all notes, bonds,

indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

### G.    ~~H.~~ Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, and the Definitive Documents, ~~and the Purchase Agreement~~ shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, managing-members, limited or general partners, or officers of the Wind-Down Debtors, including:  (1) appointment of the directors, managers, members, and officers for the Wind-Down Debtors as provided ~~herein~~in the Plan; (2) the issuances, transfer, and distribution of the Wind-Down Debtor Assets, as applicable; (3) the formation of the Wind-Down Debtors and appointment of the Plan Administrator and Wind-Down Debtors Oversight Committee; (4) the formation of any entities pursuant to and the implementation of the Plan and performance of all actions and transactions contemplated hereby and thereby;  (5) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (6) all other acts or actions contemplated by the Plan, and the Definitive Documents, ~~and the Purchase Agreement,~~ or reasonably necessary or appropriate to promptly consummate the Wind-Down Transactions (including effectuating the Wind-Down Transactions Memorandum), regardless of whether such act or action is contemplated to occur before, on, or after the Effective Date).  All matters provided for in the Plan, and the Definitive Documents, ~~and the Purchase Agreement~~ involving the corporate structure of the Debtors or the Wind-Down Debtors, as applicable, and any corporate action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by <u>Article IV.E</u> of the Plan shall be effective notwithstanding any requirements under non-bankruptcy ~~l~~Law.

### H.    ~~I.~~ Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, ~~the Purchasers,~~ or to any other Entity, including from any Wind-Down Debtor to a Liquidating Trust) of property under the Plan, the Definitive Documents, ~~the Purchase Agreement,~~ or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors, (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (3) the making, assignment, or recording of any lease or sublease, or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, ~~including the Purchase Agreement,~~

57

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**I.**    ~~J.~~Preservation of ~~Causes~~Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtors shall succeed to all rights to investigate (including pursuant to Federal Rule of Bankruptcy Procedure 2004), commence and pursue any and all ~~Vested~~Retained Causes of Action of the Debtors and their Estates, whether arising before or after the Petition Date, that are not covered by the Debtor Release, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action (which, for the avoidance of doubt, is a non-exclusive list of Retained Causes of Action not released, waived, settled, compromised, or transferred).  Such rights shall be preserved by the Debtors and the Wind-Down Debtors, as applicable, and shall vest in the Wind-Down Debtors with the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in ~~Article X~~Article X of the Plan, or pursuant to the Purchase Agreement, which Causes of Action shall be deemed released and waived by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtors and in accordance with the ~~Plan Administrator Agreement and the Plan~~.  For the avoidance of doubt, the Schedule of Retained Causes of Action will not be inclusive of all potential Retained Causes of Action.  **No Entity may rely on the absence of a specific reference in the Schedules ~~of Assets and Liabilities or Statements of Financial Affairs~~, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Claims or Causes of Action of the Debtors against it.  The Wind-Down Debtors, on behalf of the Debtors and the Wind-Down Debtors, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including ~~Article X~~Article X of the Plan.**  Unless any Cause of Action against the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtors, on behalf of the Debtors and Wind-Down Debtors, ~~and in accordance with the Plan Administrator Agreement,~~ expressly reserve~~s~~ all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the consummation of the Wind-Down Transactions.

The Wind-Down Debtors, on behalf of the Debtors, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section

58

1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor or its Estate may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise provided in the Plan, including ~~Article X~~Article X of the Plan.  The Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  ~~The~~Subject to the consent of the Wind-Down Debtors~~,~~ Oversight Committee, the Wind-Down Debtors and/or Liquidating Trust as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

In pursuing any Claim, right, or Cause of Action, the Wind-Down Debtors and the Liquidating Trust, as applicable, shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which a Cause of Action may be brought under section 546 of the Bankruptcy Code.

All references to the Wind-Down Debtors in Article IV.H of the Plan shall apply to the Liquidating Trust, if formed.

**J.**  ~~2.~~**Other Key Aspects of the Plan.**

**1.**    ~~A.~~**Treatment of Executory Contracts and Unexpired Leases.**

**(a)**    ~~1.~~**Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the date that is ninety (90) days after the Effective Date, except as otherwise provided ~~herein~~in the Plan, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to the Assumption/Rejection Procedures Order or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, through or in connection with the Sale Order; or (5) are a contract, release, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth ~~herein~~in the Plan or in the Confirmation Order~~or,~~ the Purchase Agreement ~~to be approved pursuant to~~, or the ~~Plan~~Sale Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Notwithstanding anything ~~herein~~in the Plan to the contrary, with respect to any Unexpired Lease that is not assumed on the date that is ninety (90) days after the Effective Date pursuant to ~~Article V.A~~Article V.A of the Plan, the effective date of rejection of such Unexpired Leases shall be the later of:  (~~A~~a) the Effective Date, except (1) in connection with a ~~Bankruptcy~~ Court-ordered Cure Cost pursuant to ~~Article V.C~~Article V.C of the Plan or (2) if agreed by

the applicable counterparty, and (B)b) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors surrender the premises as set forth in subsection (B)b) above, all property remaining in the premises will be deemed abandoned free and clear of any interests, Liens, and encumbrances and landlords may dispose of such property without further notice or court order, unless otherwise agreed by the applicable lessor or pursuant to an order of the Bankruptcy Court.  If the effective date of any rejection of an Executory Contract or Unexpired Lease is after the Effective Date pursuant to the terms ~~herein~~of the Plan, the Wind-Down Debtors shall serve a notice on the affected counterparty setting forth the deadline for Filing any Claims arising from such rejection.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct GOB sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the date that is ninety (90) days after the Effective Date shall revest in, and be fully enforceable by the applicable Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption, subject to ~~Article V.A~~Article V.A of the Plan.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor or Wind-Down Debtors.

Subject to the Sale Order, to the maximum extent permitted by Law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A)a) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (B)b) increase, accelerate, or otherwise alter any obligations, rights or liabilities of the Debtors or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (C)c) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease.  Any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of ~~Article V.A~~Article V.A of the Plan) shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right, so long as consistent with the Purchase Agreement, to alter, amend, modify, or supplement (i) the Schedule of Assumed Executory Contracts and Unexpired Leases and (ii) any schedule of Executory Contracts and Unexpired Leases that is attached to the Purchase Agreement, with the consent of the applicable Purchaser, at any time up to the later of (x) the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning the Debtors, and (y) seventy-five (75) days following the Closing Date (as defined in the Purchase Agreement); provided that such date may be extended with respect to any Designated Contract (as defined in the Purchase Agreement) or Designated Lease (as defined in the Purchase Agreement) (a) for up to an additional one hundred eighty (180) days beyond such seventy-fifth (75th) day with the consent of the applicable Purchaser and the applicable Designation Counterparty (as defined in the Purchase

60

Agreement) and (b) for up to an additional one hundred eighty (180) days beyond the expiration of the one hundred eighty (180) day extension period set forth in (a) above with the consent of the Debtors, Phoenix, and the applicable Designation Counterparty (as defined in the Purchase Agreement) and (z) solely with respect to Unexpired Leases of nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, as such date may be extended by the Bankruptcy Court or with the consent of the applicable lessor counterpart, consistent with the Purchase Agreement, as applicable; *provided* that, subject to ~~Article V.C~~Article V.C of the Plan, at any time during such ninety (90)-day period after the Effective Date, the Wind-Down Debtors shall remain liable for any and all amounts incurred under any such Executory Contracts and Unexpired Leases on the Schedule of Assumed Executory Contracts and Unexpired Leases in the ordinary course of business; *provided further*, that, subject to ~~Article V.C~~Article V.C of the Plan, on the first Business Day that follows such ninety (90)-day period, (i) to the extent any Executory Contracts and Unexpired Leases remain on the Schedule of Assumed Executory Contracts and Unexpired Leases, such Executory Contracts and Unexpired Leases shall be deemed Assumed Executory Contracts and Unexpired Leases and the Wind-Down Debtors shall pay any and all Cure Claims owing under such Assumed Executory Contracts and Unexpired Leases pursuant to section 365 of the Bankruptcy Code or (ii) to the extent the Wind-Down Debtors have filed an amended or otherwise modified Schedule of Assumed Executory Contracts and Unexpired Leases, removing any Executory Contract or Unexpired Lease, such Executory Contracts and Unexpired Leases shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  The Debtors shall provide notice of any amendments to the Schedule of Assumed Executory Contracts and Unexpired Leases to the counterparties to the Executory Contracts or Unexpired Leases affected thereby.

**(b)** ~~2.~~ **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time shall be barred from asserting such claims against the Debtors and the Wind-Down Debtors and precluded from voting on ~~the~~any ~~P~~plan filed in these Chapter 11 Cases and/or receiving distributions from the Debtors and the Wind-Down Debtors on account of such ~~e~~Claims in these Chapter 11 Cases.  The Debtors or the ~~Wind-Down~~Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not timely filed; *provided* that the Debtors or the Wind-Down Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register as a result of being untimely filed**.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with ~~Article III.B~~Article III.B of the Plan and may be objected to in accordance with the provisions of ~~Article IX~~Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**(c)** ~~3.~~ **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors~~or,~~ the Wind-Down Debtors, or the Purchaser, as applicable, shall, in accordance with the Schedule of Assumed Executory Contracts and Unexpired Leases, the Purchase Agreement, and the Sale Order, pay all Cure

Costs, if any, relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan on such terms as the parties to such Executory Contracts or Unexpired Leases may agree; *provided* that, if a dispute regarding assumption or Cure Cost is unresolved as of the Effective Date, then payment of the applicable Cure Cost shall occur as soon as reasonably practicable after such dispute is resolved. Any Cure Cost shall be deemed fully satisfied, released, and ~~discharged~~resolved upon payment of the Cure Cost.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Cost must be Filed, served, and actually received by counsel to the Debtors no later than ten (10) days after the service of notice of assumption on affected counterparties. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment and any untimely request for an additional or different Cure Cost shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors without the need for any objection by the applicable Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

Any payment of Cure Costs by the Debtors or the Purchasers, as applicable, in connection with Executory Contracts and Unexpired Leases assumed or assumed and assigned pursuant to the Sale Transaction shall be satisfied in full by the Debtors or the Purchasers, as applicable, in accordance with the terms in the Purchase Agreement and the Sale Order (including the Assignment Procedures), including in the event of a dispute regarding ~~(i)~~(i) the amount of any payments to cure such a default, (ii) the ability of the Debtors, the Purchasers, or any assignee to provide "adequate assurance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption.

If there is any dispute regarding any Cure Costs, the ability of the Debtors, the Wind-Down Debtors, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure Costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, at the earliest convenience of the Bankruptcy Court; *provided* that no hearing will be scheduled on less than ten (10) days' notice to the affected counterparty and the Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, and that no such hearing shall be scheduled less than thirty (30) days after the Effective Date unless agreed to between the Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, and the affected counterparty.  The Debtors, the Wind-Down Debtors, or the Purchaser, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure Cost or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Bankruptcy Court determines that the Allowed Cure Cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Assumed Contracts and Unexpired Leases, the Debtors or the Purchaser, as applicable, shall have the right to (a) satisfy the Court-Ordered Cure Cost as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms ~~herein~~of the Plan or, (b) within fourteen (14)

days of such determination, remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of (i)(i) the date of entry of the Court-Ordered Cure Cost and, (ii) solely with respect to Unexpired Leases, the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable, and in the case of rejection of an Unexpired Lease pursuant to the preceding clause (ii), the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor or ordered by the Bankruptcy Court, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, as clarified by the Extension Order, an Executory Contract or Unexpired Lease may only be removed from the Schedule of Assumed Executory Contracts and Unexpired Leases if (1) the applicable counterparty consents to such rejection, (2) the applicable counterparty objected to the assumption or cure of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be assumed and should instead be rejected, including alleging an incurable default (and such objection remains outstanding), or (3) the court orders a Court-Ordered Cure Cost. Notwithstanding anything to the contrary herein in the Plan, the Wind-Down Debtors and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure Cost dispute.

The assumption of any Executory Contract or Unexpired Lease in connection with the Sale Transaction or the Plan and the cure of defaults associated therewith in accordance with section 365(b) of the Bankruptcy Code, including the payment of any Cure Costs as adjudicated or agreed upon by the Debtors and the applicable Purchasers, shall result in the full release and satisfaction of any Cure Cost, Claims, or defaults, whether monetary or nonmonetary, including those arising from or triggered by the filing of these Chapter 11 Cases and provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, in each case at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption or (2) the effective date of such assumption without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.** Notwithstanding anything in the Plan, the Purchase Agreement, the Sale Order, the Plan Supplement, or otherwise to the contrary, any non-Debtor party to any such Executory Contract or Unexpired Lease shall be entitled to receive, and nothing herein in the Plan shall release or result in the satisfaction of such party's right to receive, payment in full of all Cure Costs and all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease.

### (d) 4. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan, the Purchase Agreement, or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy lLaw to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

(e)   5. Insurance Policies.

~~Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, (i) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (ii) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall vest in the Wind-Down Debtors.~~

Notwithstanding anything to the contrary in the Definitive Documents, any bar date notice or claim objection, or any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, confers Bankruptcy Court jurisdiction, or requires a party to opt into any releases):

(a) on the Effective Date, each of the Debtors' Insurance Contracts, including the D&O Liability Insurance Policies, shall be assumed and revest unaltered in the applicable Wind-Down Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date;

(b) on and after the Effective Date, the Wind-Down Debtors shall be liable in full for any outstanding obligations of the Debtors or the Wind-Down Debtors, as applicable, under the Insurance Contracts regardless of whether such obligations arose before or after the Effective Date;

(c) nothing alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any Insurance Contracts, and for the avoidance of doubt, Insurers shall not need to nor be required to file or serve a cure objection or a request, application, claim, Cure Cost Claim, Proof of Claim, or motion for payment or allowance of any Administrative Claim, and Insurers shall not be subject to any claims bar date or similar deadline governing Cure Cost amounts, Proofs of Claim, or Administrative Claims;

(d) nothing in the Definitive Documents shall permit or otherwise effect a sale, assignment, or any other transfer of the Insurance Contracts and/or any rights, proceeds, benefits, claims, rights to payments, or recoveries under or relating thereto if such Insurance Contract would otherwise require the consent of the applicable Insurer to effect such sale, assignment, or other transfer; and

(e) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit:

(1) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims;

(2) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Court granting a claimant relief from the automatic stay or the injunctions set forth in Article X of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and

64

(3) the Insurers to draw against any or all of the collateral or security provided by or on behalf of the Debtors (or the Wind-Down Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Wind-Down Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Wind-Down Debtors, as applicable) under the applicable Insurance Contracts, in such order as the applicable Insurer may determine.

For the avoidance of doubt, (i) nothing in Article V.E of the Plan shall in any way affect the Wind-Down Debtors' ability to assert the Retained Causes of Action or any other applicable claims that are not otherwise released pursuant to the Plan and are properly asserted against the D&O Liability Insurance Policies, or access the proceeds of the D&O Liability Insurance Policies for any losses on account of such Retained Causes of Action or such other claims.

**(f)   1. Indemnification Provisions.**

Except as set forth in the Plan Supplement, all Indemnification Provisions, consistent with applicable law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of each of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date.; *provided* that, notwithstanding anything in the Plan to the contrary, the Wind-Down Debtors' obligation to fund such indemnification obligations shall be limited to the extent of coverage, if any, available under any D&O Liability Insurance Policy assumed by the Debtors and assigned to the Wind-Down Debtors in accordance with the terms and conditions thereof.  Accordingly, the Wind-Down Debtor Assets and any proceeds therefrom, if any, will not be used to fund such indemnification obligations of the Debtors or the Wind-Down Debtors, as applicable.

For the avoidance of doubt, however, any existing Indemnification Provisions for any Non-Released Party shall not be Reinstated and, under the applicable D&O Liability Insurance Policies, there shall be no retention, deductible or other obligation payable by the Debtors with respect to all applicable defense costs and payments in respect of settlements or judgments constituting Non-Indemnifiable Losses (as defined in the D&O Liability Insurance Policies).

**6. D&O Liability Insurance Policies.**

The Debtors shall maintain tail coverage under any D&O Liability Insurance Policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

The Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such

65

~~policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.  Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement the D&O Liability Insurance Policies as the Debtors deem necessary, including purchasing any tail coverage.~~

**(g)      ~~7.~~   Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, the Sale Order, or the Purchase Agreement, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, reciprocal easement agreements, construction operating and reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**(h)      ~~8.~~   Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan or the Sale Order.  Following the expiration of the Designation Rights Period, as applicable, the Debtors may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned and may not assume or assume and assign an Unexpired Lease previously designated as rejected on the Schedule of Assumed Contracts and Unexpired Leases absent the consent of the applicable lessor or order of the Bankruptcy Court.  A final and timely designation with respect to all Unexpired Leases of nonresidential real property will be made in accordance with Article V.A of the Plan.

**(i)      ~~9.~~   Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**(j)      ~~10.~~   Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor~~,~~ and not assigned to any third-party (including the Purchaser), including any Executory Contracts and Unexpired Leases assumed by such Debtor (but excluding any Executory Contracts), will be performed by the applicable Debtor or, after the Effective Date, the Wind-Down Debtors, liable thereunder in the ordinary course of their

business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases but excluding any Executory Contracts or Unexpired Leases that have been rejected as of the date of entry of the Confirmation Order) will survive and remain unaffected by entry of the Confirmation Order.

(k)      11. Sale Order Assignment Procedures.

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the Sale Order or the Assignment Procedures attached thereto.

K.      B. Conditions Precedent to the Effective Date.

1.      Conditions Precedent to the Effective Date.

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XII.B of the Plan;

(a)      1. the Wind-Down Transactions shall have been implemented in accordance with the Wind-Down Transactions Memorandum in all material respects;

(b)      2. the Confirmation Order shall have been entered and shall not be stayed;

(c)      3. all documents necessary to consummate the Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

(d)      4. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(e)      5. the Wind-Down Reserve and the Administrative Claims Reserve shall have each been funded;

(f)      6. the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

(g)      7. all waiting periods imposed by any Governmental Unit in connection with the transactions contemplated by the Plan and the Sale Transaction shall have terminated or expired and all authorizations, approvals, consents or clearances under the any applicable antitrust Laws in connection with such transactions shall have been obtained;

8. the Purchasers shall have acquired the Acquired Assets pursuant to the applicable Purchase Agreement, and in each case all conditions precedent to the closing of the Sale Transaction shall have been satisfied or duly waived;

(h)      9. any and all requisite governmental, regulatory, and third party approvals and consents shall have been obtained;

(i)      10. any material settlement between a Governmental Unit and the Debtors and their non-Debtor Affiliates, which is required to consummate the Plan, shall be entered into on

or prior to the Effective Date, and shall be in form and substance acceptable to the Committee; and

(j)      11. the aggregate amount of Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims to be paid pursuant to the Plan shall be reasonably acceptable to the Committee; and.

### 2.    Waiver of Conditions.

The conditions to the Effective Date set forth in <u>Article XI.A</u> of the Plan, may be waived by the Debtors, after prior consultation with the Committee's consent not to be unreasonably withheld, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan; provided that, the condition in <u>Article XI.A.6</u> of the Plan may not be waived without the consent of the affected Professionals.

### 3.    Effect of Failure of Conditions.

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

### 4.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## VIII.   RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.**

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.    The Debtors Will Consider All Available Restructuring Alternatives if the Wind-Down Transactions Are Not Implemented, and Such Alternatives

**May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.**

If the Wind-Down Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers, landlords, and vendors.

### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article XI of the Plan, the Confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived and not met, the Confirmation and Effective Date of the Plan will not take place.

### 4. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed

Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 5.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear ~~whether~~when the Debtors will be able to ~~reorganize~~liquidate their ~~business~~assets and what, if anything, Holders of Interests and Allowed Claims would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, and with the Committee's consent, not to be unreasonably withheld, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 6.    The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate such debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) ~~the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b)~~ additional administrative expenses involved in the appointment of a chapter 7 trustee, and (~~b~~a) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

## 8.    The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

## 9.    Contingencies Could Affect Votes of Voting Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class that is entitled to vote to accept or reject the Plan or require any sort of revote by such Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

## 10.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan remain subject to the completion of any ongoing diligence efforts by the Disinterested Director at the applicable Debtor Entities and objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' ~~reorganization~~wind down because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' ~~reorganizational~~wind

down efforts, and have agreed to make ~~further~~future contributions including cooperation with the Wind Down Debtors' investigation, commencement and pursuit of the Retained Causes of Action, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits embodied in the Plan.

> **11.    The Total Amount of Allowed Unsecured Claims May Be Higher than Anticipated by the Debtors.**

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

> **12.    The Total Amount of Allowed Administrative and Priority Claims May Be Higher than Anticipated by the Debtors.**

The amount of Cash the Debtors ultimately receive prior to and following the Effective Date may be lower than anticipated.  Additionally Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

> **13.    Possible Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "*Certain U.S. Federal Income Tax Consequences of the Plan*," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, Wind-Down Debtors, and Holders of certain Claims.

> **B.    Risks Related to Recoveries under the Plan and Wind-Down Transactions.**

> > **1.    The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Debtors' ability to make scheduled payments depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness.

> > **2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, and develop their businesses, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) the ability to develop, confirm, and consummate the Wind-Down Transactions specified in the Plan; (b) the ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) the ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) the ability to maintain contracts that are critical to the Debtors' operations; (e) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or

shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

~~These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.~~

### 3. The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

The Debtors are currently subject to or interested in certain legal proceedings, which may adversely affect the Debtors. In the future, the Wind-Down Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or judgments that could significantly affect the Wind-Down Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Wind-Down Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Wind-Down Debtors' businesses and financial stability, however, could be material.

### 4. The Wind-Down Transactions Will Affect the Debtors' Operations.

Pursuant to the Sale Transaction ~~all,~~ substantially all~~, or one or more groups of assets~~ of the Debtors ~~may be~~' assets were sold pursuant to Bankruptcy Code sections 105, 363 and 365. Any remaining assets of the Debtors will be transferred to the ~~Reorganized~~Wind-Down Debtors and will either be operated in the ordinary course or wound down. ~~To the extent substantially all the assets of the Debtors are sold in a Wind-Down Transaction, it~~It is anticipated that ~~Reorganized~~Wind-Down Debtors will have no active ongoing operations except as contemplated for the Wind-Down Debtors or the Plan Administrator, as applicable. ~~To the extent only certain of the Debtors' assets are sold, the Reorganized Debtors may continue operating the remaining assets. In any event, the Debtors could experience business disruptions that negatively affect their operations.~~

### ~~5. The Results of Wind-Down Sales May Not Meet Projections.~~

~~The Wind-Down sales may fail to meet projections due to the uncertainty of consumer demand, continued changes to the brick-and-mortar retail industry, and various macroeconomic conditions. Decreased demand for retail and consumer goods during the Wind-Down and over the coming months may impact sales at the Debtors' remaining stores, which, in turn, would negatively impact the ability of the Debtors to sell inventory and complete the Wind-Down.~~

### 5. ~~6.~~ Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the Debtors' market value.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful ~~reorganization~~wind-down of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; (d) the assumption that capital and equity markets remain consistent with current conditions; and (e) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

### 6. ~~7.~~ Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

### 7. ~~8.~~ The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a relatively small group of key management personnel. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' ~~businesses and the results of operations~~wind down.

### 8. ~~9.~~ The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 9. ~~10.~~ Inflation Could Adversely Impact the Debtors' Financial Condition and Results of Operations.

Inflation in the United States began to rise significantly in the second half of the calendar year of 2021 and continued to rise through the middle of 2022; the inflation rate remains relatively high. This is primarily believed to be the result of the economic impacts from the COVID-19 pandemic, including the global supply chain disruptions, strong economic recovery and associated widespread demand for goods, and government stimulus packages, among other factors. For instance, global supply chain disruptions have resulted in shortages in materials and services. Such shortages have resulted in inflationary cost increases for labor, materials, and services, and could continue to cause costs to increase as well as scarcity of certain products. The Debtors cannot, however, predict any future trends in the rate of inflation or associated increases in their operating costs and how that may impact their business. To the extent the Debtors are unable to recover higher operating costs resulting from inflation or otherwise mitigate the impact of such costs on their business, gross margins could decrease, and their financial condition and results of operations could be adversely affected. Acts by the U.S. Federal Reserve, or other governmental entities, intended to address inflation may also have a negative impact on the Debtors, such as increased borrowing costs.

> **10.** ~~11.~~ **Trading in Common Stock During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks.**

All of the Company's indebtedness is senior to the outstanding shares of Common Stock. The Plan contemplates that the existing equity interests in the Debtors will be cancelled ~~and discharged~~ in connection with the Chapter 11 Cases and the holders of those equity interests, including the holders of the Common Stock, will be entitled to no recovery. Accordingly, any trading in the Common Stock during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.    Holders of Claims or Interests Entitled to Vote on the Plan.

Only Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan. The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan. The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 4, 5, 6, or 7.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**

PLEASE REFER TO THE DISCLOSURE STATEMENT Order AND SOLICITATION PROCEDURES FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### B.    Voting Record Date.

**The Voting Record Date is [July 31], 2024** (the "Voting Record Date"). The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or

transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.  For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package based on a claim arising from a rejected executory contract or unexpired lease if such claim is filed by the Voting Record Date.

> **C.     Voting on the Plan.**

The Voting Deadline is [October 9]December 11, 2024, at [4]:00 p.m4:00 p.m. (prevailing Eastern Time).

To ensure that your Class 3 Ballot is counted, you *must either*:  (a) complete and submit the hard copy Class 3 Ballot or (b) vote through the Balloting Portal accessible through the Debtors' restructuring website at https://cases.stretto.com/express/.  Ballots will not be accepted by facsimile or electronic means (other than the Balloting Portal).

Use of Ballot.  To ensure that your Class 3 Ballot is counted, you must:  (a) complete your Class 3 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 3 Ballot; and (c) clearly sign and submit your Class 3 Ballot as instructed herein.

Use of Online Ballot Portal.  To ensure that your electronic Class 3 Ballot is counted, please follow the instructions on the Debtors' case administration website at https://cases.stretto.com/express/. You will need to enter your unique Balloting Portal identification number indicated on your ballot.  The Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots will not be accepted by facsimile or electronic means (other than the Balloting Portal).

Your Class 3 Ballot *must* be returned to the Claims and Noticing Agent so as to be *actually received* by the Claims and Noticing Agent on or before the Voting Deadline.  The Voting Deadline is [October 9]December 11, 2024, at 4:00 p.m., prevailing Eastern Time.

If a Class 3 Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, the following Class 3 Ballots will *not* be counted:

(a)     (a)     any Class 3 Ballot that partially rejects and partially accepts the Plan;

(b)     (b)     Class 3 Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), any agent, indenture trustee, or the Debtors' financial or legal advisors;

(c)     (c)     Class 3 Ballots sent by facsimile or any electronic means other than via the Balloting Portal;

(d)     (d)     any Class 3 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

(e)     (e)     any Class 3 Ballot cast by an Entity that does not hold a Claim in Class 3;

(f)     (f)     any Class 3 Ballot submitted by a Holder not entitled to vote on the Plan;

(g)    ~~(g)~~    any unsigned Class 3 Ballot (for the avoidance of doubt, Ballots validly submitted through the Balloting Portal will be deemed signed); and/or

(h)    ~~(i)~~    any Class 3 Ballot not marked to accept or reject the Plan or any Class 3 Ballot marked both to accept and reject the Plan.

The method of delivery of Class 3 Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a General Unsecured Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent *actually receives* the originally executed Class 3 Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

If multiple Class 3 Ballots are received from the same Holder of General Unsecured Claims with respect to the same General Unsecured Claims prior to the Voting Deadline, the latest, timely received, and properly completed Class 3 Ballot will supersede and revoke any earlier received Class 3 Ballots. If you wish to change your vote on the Plan prior to the Voting Deadline, please contact the Claims and Noticing Agent at ExpressBallotInquiries@stretto.com.

You must vote all of your General Unsecured Claims within Class 3 either to accept or reject the Plan and may *not* split your vote. Further, if a Holder has multiple Class 3 General Unsecured Claims, the Debtors may aggregate the Class 3 General Unsecured Claims of any particular Holder with multiple Class 3 General Unsecured Claims for the purpose of counting votes.

Please be sure to sign and date your Class 3 Ballot. If you are signing a Class 3 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 3 Ballot.

**PLEASE SUBMIT YOUR CLASS 3 BALLOT PROMPTLY**

**~~Express~~EXP OldCo Winddown, Inc., et al. Ballot Processing**
**c/o Stretto**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

**IF YOU WOULD LIKE TO COORDINATE HAND DELIVERY OF YOUR BALLOT, PLEASE SEND AN EMAIL TO EXPRESSBALLOTINQUIRIES@STRETTO.COM AND PROVIDE THE ANTICIPATED DATE AND TIME OF YOUR DELIVERY.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 3 BALLOT,**
**THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**U.S. TOLL FREE: 855-337-3537**
**INTERNATIONAL: 949-617-1363**
**OR EMAIL EXPRESSBALLOTINQUIRIES@STRETTO.COM.**

**IF THE ~~CLAIMS AND NOTICING AGENT~~CLAIMS AND NOTICING AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE ~~[JULY~~DECEMBER ~~31~~1], 2024, AT 4:00**

**P.M., PREVAILING EASTERN TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED) YOUR VOTE TRANSMITTED BY THIS CLASS 3 BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

**D.      Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**E.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to the "Risk Factors" section in Article ~~IX~~ IX of this Disclosure Statement.

**F.      Solicitation Procedures.**

**1.      Claims and Noticing Agent.**

Pursuant to the Bankruptcy Court's Order approving the Stretto Retention Application, the Debtors have retained Stretto to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

### 2.    Solicitation Package.

The following materials constitute the solicitation package that will be distributed to Holders of Claims in the Voting Class (collectively, the "Solicitation Package"):  (a) the Solicitation Procedures; (b) the applicable forms of Ballots, together with detailed voting instructions and instructions on how to submit the Ballots; (c) the Cover Letter, which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Class to vote to accept the Plan; (d) the Confirmation Hearing Notice; (e) the Disclosure Statement (and the exhibits thereto, including the Plan); (f) the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures); (g) a pre-addressed, postage pre-paid reply envelope; and (h) any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Class.

The Solicitation Package shall provide the Disclosure Statement (with all exhibits thereto, including the Plan), the Disclosure Statement Order (without exhibits) and the Solicitation Procedures in electronic format, flash drive or CD-ROM, and all other contents of the Solicitation Package, including the Cover Letter, Confirmation Hearing Notice, and Ballots, shall be provided in paper format.  In the case of Beneficial Holders of the General Unsecured Creditors in Class 3, the Solicitation Packages shall be served in accordance with the customary procedures of the bank or brokerage firm (or that firm's agent) (each, a "Nominee") holding the securities in "street name" for its Beneficial Holder clients.  Any Voting Holder who has not received a Solicitation Package should contact the Claims and Noticing Agent.

### 3.    Distribution of the Solicitation Package and Plan Supplement.

The Debtors are causing the Claims and Noticing Agent to distribute the Solicitation Package to Holders of Claims in the Voting Class on [Septemberor prior to [November 143], 2024 (the "Solicitation Mailing Deadline"), or, to the extent such distribution is not made by the Solicitation Mailing Deadline, immediately thereafter; *provided* that the Debtors shall distribute the Confirmation Hearing Notice no later than [two (2)] business days following the Solicitation Mailing Deadline, as provided in the Disclosure Statement Order.

The Solicitation Package (except the Ballot) may also be obtained from the Claims and Noticing Agent by:  (a) calling 855-337-3537 (US/Canada, toll-free) or +1 949-617-1363 (international, toll), (b) emailing ExpressBallotInquiries@stretto.com (with "Express Solicitation" in the subject line) and/or (c) writing to the Claims and Noticing Agent at ExpressEXP OldCo Winddown, Inc., et al. Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.  You may also obtain copies of the solicitation materials and any pleadings filed with the Bankruptcy Court, free of charge, by visiting the Debtors' restructuring website, https://cases.stretto.com/express, or for a fee on the Bankruptcy Court's website at https://www.deb.uscourts.gov, the required password for which can be gotten via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement, to the extent reasonably practicable, with the Bankruptcy Court no later than 7 days before the Voting Deadline (*i.e.*, July [31December 4], 2024). If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

## X.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

### B.        Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### C.        Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7 on such date. The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

The Liquidation Analysis (the "Liquidation Analysis") has been prepared M3, the Debtors' financial advisor, and is attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured

creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities.

Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

The Plan effects a Wind-Down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. The Debtors believe that the Plan provides a greater recovery to Holders of Claims than a chapter 7 liquidation would. A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan for several reasons. The chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' businesses that the Debtors had when they proposed to liquidate their assets and commence the Wind-Down. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.

Wind-down proceeds in a chapter 7 would likely be significantly lower particularly in light of the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in wind-down proceeds, recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' assets, and these Chapter 11 Cases, in order to complete the administration of the Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

The Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than ninety (90) days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

The Debtors submit that a chapter 7 liquidation could result in materially reduced wind-down proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

**D.    Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan contemplates the distribution of the proceeds from the Sale Transaction and subsequent ~~Wind Down~~Wind-Down of the Debtors' remaining Estates. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors, the Plan

provides an opportunity to bring the highest return for creditors, and the Plan satisfies the feasibility requirement of section 11129(a)(11) of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[119]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### F.    Confirmation Without Acceptance from All Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Although certain Impaired Classes are conclusively deemed to reject the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors, subject to the Plan, reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including

---

[119] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### G.      Valuation.

The Debtors believe that the comprehensive marketing process as summarized in Article VI.~~H~~F herein provides the best mechanism to estimate the value of the Debtors.  Because the Debtors conducted the Marketing Process, pursuant to which they contemplate selling the Debtor~~:~~s' assets as going concern through a transaction that was the highest and best proposal received, the Debtors have not conducted a "book based" valuation analysis.  Accordingly, the ultimate recoveries will result from the Estates' realization of the highest available valuation of the Debtors' assets.  Further, the Debtors determined that such a valuation satisfies obligations under section 1129 of the Bankruptcy Code and obviates the need for an independent valuation analysis.  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. June 9, 2023) (ECF No. 378) (order approving disclosure statement without a valuation analysis).

## XI.      CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.      Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of General Unsecured Claims.  This summary is based on the U.S. Internal Revenue Code of 1986, as

amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Wind-Down Debtors, or to Holders of General Unsecured Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). Moreover, this summary does not address any aspect of U.S. non-income (including estate or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income). Furthermore, this summary assumes that a Holder of an Allowed Claim holds only Claims in a single class and holds such Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors or the Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion also assumes that none of the Allowed Claims is treated as a "contingent payment debt instrument" for U.S. federal income tax purposes and that each of the Allowed Claims are denominated in U.S. dollars. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a General Unsecured Claim that for U.S. federal income tax purposes is: (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of

the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a General Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity).  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of a General Unsecured Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

B.    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors - Characterization of the Wind-Down Transactions.**

The Debtors expect that the Wind-Down Transactions will be structured as a sale of some, all, or substantially all of the Debtors' assets in one or more taxable sales.

The Debtors generally expect to recognize any gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets sold.  Any such net recognized gain generally will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation payable by the Debtors or the Wind-Down Debtors (as applicable).  The Debtors will be subject to the rules discussed below with respect to cancellation of indebtedness income ("COD Income").  The Wind-Down Debtors may be subject to the limitations on net operating losses ("NOLs"), deferred interest deductions under section 163(j)(j) of the IRC ("163(j)(j) Deductions") and other tax attributes discussed below.  These reductions and limitations may affect the Wind-Down Debtors' ability to shelter taxable gain (if any) recognized in connection with the Wind-Down sale with pre-emergence tax attributes.

The Debtors' tax attributes (if any) will not survive the implementation of the Plan.  Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further.

C.    **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed General Unsecured Claims.**

The following discussion assumes that the Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan. U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the tax consequences of the Wind-Down Transactions.

As described above, the Wind-Down Transactions are expected to be structured as a sale of some, all, or substantially all of the Debtors' assets in one or more taxable sales followed by a distribution of the net cash proceeds therefrom in accordance with the Plan.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

### 1.    Consequences of the Wind-Down Transactions to U.S. Holders of Allowed General Unsecured Claims.

Except to the extent that a U.S. Holder of an Allowed General Unsecured Claim and the Debtor against which such Allowed General Unsecured Claim is asserted agree to less favorable treatment, each U.S. Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the Distribution Proceeds (the "GUC Recovery").

To the extent receiving Cash, a U.S. Holder is expected to recognize gain or loss equal to (a) the amount of any Cash received, *minus* (b) the Holder's adjusted tax basis in its Allowed General Unsecured Claim.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID or market discount, (which differs from the treatment described above), see the sections entitled "Accrued Interest" and "Market Discount" below.

### 2.    Accrued Interest.

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Allowed Claim under the Plan is attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income

tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocates payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.*

### 3.    Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim who exchanges such Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on such exchanged Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, *multiplied* by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of an Allowed Claim (determined as described above) which was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Allowed Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-free transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

*U.S. Holders of Allowed Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim.*

### 4.    Limitations on Use of Capital Losses.

A U.S. Holder who recognizes capital losses will be subject to limits on its use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3 thousand ($1.5 thousand for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of its ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

5.      **The Wind-Down Debtors.**

The Plan provides that on the Effective Date, any property retained by the Debtors pursuant to the Plan or the Purchase Agreement shall vest in the applicable Wind-Down Debtor, and the ~~Plan Administrator, in his or her~~Wind-Down Debtors, at their discretion, may transfer all or any portion of the assets of the Wind-Down Debtors to the Liquidating Trust.

(a)      **Liquidating Trust Treatment.**

Although not free from doubt, other than with respect to any assets that are subject to potential disputed claims of ownership or uncertain distributions, the Liquidating Trust is expected to be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" under section 671 of the Tax Code.  If such treatment does apply, any Liquidating Trust beneficiaries holding a beneficial interest in the Liquidating Trust would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, would be treated as if they had received a distribution of an undivided interest in the assets of the Liquidating Trust and then contributed such undivided interest to the Liquidating Trust.  Other than with respect to any assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to the Liquidating Trust should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.  Other than with respect to any assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax is expected to be imposed on the Liquidating Trust with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by the Liquidating Trust, even if no distributions are made.

(b)      **Disputed Ownership Fund treatment.**

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, *or* to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

D.      **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders.**

The following discussion assumes that the Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of General Unsecured Claims.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal,

state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

### 1. Gain Recognition by Non-U.S. Holders.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Wind-Down Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Accrued Interest.

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest (or original issue discount, if any) with respect to Allowed General Unsecured Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)    the Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of Debtor's stock entitled to vote;

(b)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Debtor (each, within the meaning of the IRC);

(c)    the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d)    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same

manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of thirty percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a thirty percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest (or original issue discount, if any).  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any.

3.      FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual, or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

4.      **Information Reporting and Back-Up Withholding.**

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  July 31, 2024

Express, Inc.
on behalf of itself and all other Debtors

/s/ Stewart Glendinning

Stewart Glendinning
Chief Executive Officer
Express, Inc.

Dated:  November 1, 2024

EXP OldCo Winddown, Inc.

on behalf of itself and all other Debtors

/s/

Stewart Glendinning
Chief Executive Officer
EXP OldCo Winddown, Inc.

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

## <u>Exhibit A</u>

**Chapter 11 Plan**

[*Filed separately*]

*[Different first page setting changed from off in original to on in modified.].*
*[Different first page link-to-previous setting changed from on in original to off in modified.].*

*[Different first page setting changed from off in original to on in modified.].*

## Exhibit B

**Proposed Disclosure Statement Order**

**<u>Exhibit C</u>**

**Liquidation Analysis**

[*To come*]

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 11/1/2024 3:53:02 PM | |
|---|---|
| **Style name:** Color (Kirkland Default) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://dms.kirkland.com/LEGAL/112518054/1 | |
| **Modified DMS:** iw://dms.kirkland.com/LEGAL/112518054/27 | |
| **Changes:** | |
| Add | 785 |
| Delete | 729 |
| Move From | 24 |
| Move To | 24 |
| Table Insert | 0 |
| Table Delete | 3 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 1 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1566 |