IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| EXP OLDCO WINDDOWN, INC., *et al.*,[1] | ) Case No. 24-10831 (KBO) |
| Debtors. | ) (Jointly Administered) |

**DECLARATION OF
WILLIAM TRANSIER,
DISINTERESTED DIRECTOR OF
EXP OLDCO WINDDOWN, INC., IN SUPPORT
OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN
OF EXP OLDCO WINDDOWN, INC. AND ITS DEBTOR AFFILIATES**

I, William Transier, hereby declare under penalty of perjury:

**Professional Background and Qualifications**

1. I am a disinterested director on the board of directors (the "Board") of EXP OldCo Winddown, Inc. (together with its affiliated debtors and debtors in possession, the "Debtors"). I am the founder and Chief Executive Officer of Transier Advisors, LLC. I have served on the board of numerous other private and public companies, and served as a CFO and Chairman and CEO of publicly traded companies. I have over four decades of experience helping public and private companies execute business and financial strategies, including balance sheet recapitalizations, turnarounds, and in-court restructurings. I have also served as an independent director to numerous companies in distressed situations and have conducted numerous independent

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are EXP OldCo Winddown, Inc. (8128), Project Pine TopCo Winddown, LLC (8079); Project Pine Holding OldCo, LLC (8454); Project Pine Finance OldCo Corp. (7713); Project Pine OldCo, LLC (0160); Project Pine Investments OldCo, LLC (7622); Project Pine Logistics OldCo, LLC (0481); Project Pine Operations OldCo, LLC (3400); Project Pine GC OldCo, LLC (6092); Project Pine Tropic OldCo, LLC (3861); Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

investigations. My industry experience includes technology, energy, retail, manufacturing, and industrial services.

2. I hold a Master of Business Administration from Regis University, a Master of Arts in Theological Studies from Dallas Baptist University, and a Bachelor of Business Administration in accounting from the University of Texas. I am a Certified Public Accountant.

3. I am over the age of 18 and authorized to submit this declaration (this "Declaration") in support of confirmation of the *Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and its Debtor Affiliates* [Docket No. 953] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2] If I were called upon to testify, I could and would testify competently to the facts set forth herein. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management team, the Debtors' legal counsel and other advisors, and my review of relevant documents and information concerning the Debtors' operations, financial affairs, transaction, and restructuring initiatives. For the avoidance of doubt, I do not, and do not intend to, waive the attorney-client privilege or any other applicable privilege by submitting this Declaration.

## Appointment to the Board and Delegation of Authority

4. On April 18, 2024, the Board adopted a unanimous written consent (a) appointing me to serve as the independent and disinterested director on the Board (the "Disinterested Director") and (b) delegating certain powers and authorities to the Disinterested Director including authority to investigate and determine whether any matter constitutes a Conflict Matter, and to

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and its Debtor Affiliates* (the "Confirmation Brief"), as applicable.

review, consider, investigate, negotiate, settle, approve, authorize, and act upon any Conflict Matters.  As the Disinterested Director, I was delegated the authority to, among other things:  (a) conduct all investigations and analyses related to the Conflict Matters necessary or desirable; (b) to act on behalf of the Debtors and bind the Debtors, in connection therewith; and (c) take any and all actions to negotiate, resolve, abide by, and implement the decisions and actions with respect to Conflict Matters.  The scope of this authority included, among other things, conducting an investigation (the "Investigation") into potential prepetition estate claims and causes of action, with the assistance of the Debtors' Delaware co-counsel, Klehr Harrison Harvey Branzburg LLP ("Klehr Harrison"), and the Debtors' current and former directors, officers, managers, employees, attorneys, financial advisors, consultants, Professionals, or other professionals or advisors of the Debtors in their respective capacities as such, who were serving as such director, officer, manager, employee, attorney, financial advisor, consultant, Professional, or other professional or advisor of the Debtors on or after the Petition Date (each a "Debtor Related Party," and together the "Debtor Related Parties").  Since my appointment, as Disinterested Director, I have communicated regularly with the Debtors, their advisors, and Klehr Harrison.

**The Disinterested Director's Investigation**

5.   Following my appointment, I, with the assistance of Klehr Harrison, conducted the Investigation.  The scope of the Investigation was broad.  In connection with the Investigation, I considered certain potential claims and causes of action held by the Debtors' Estates relating to, among other things:

   (a)   Potential prepetition claims and causes of action; and

   (b)   Dealings and transactions involving the Debtors and their related parties, including the activities of the Debtors' directors and officers.

6. In furtherance of the Investigation, I, working with Klehr Harrison, issued document and information requests to the Debtors I received and facilitated the review of, in the aggregate, over 100,000 documents, comprising approximately 658,000 pages. I, through counsel, also interviewed over 25 of the Debtors' current and former employees, board members, and advisors, covering a variety of topics that spanned over 50 hours.

7. Throughout the Investigation, at my direction, Klehr Harrison also engaged with the official committee of unsecured creditors (the "Committee") and their advisors on the Investigation. This ultimately culminated in a settlement with the Committee on a clear path forward as described in the Debtors' Disclosure Statement and proposed Plan (the "Committee Settlement"). In light of the foregoing Committee Settlement, the description of transactions and potential claims and causes and action examined as part of the Investigation herein is not meant to be exhaustive.

## Committee Settlement

8. By October 2024, I had made initial conclusions as to the various matters addressed by the Investigation. With the benefit of the information learned by that date in the Investigation, the Debtors and the Committee engaged in good-faith, arm's length negotiations around the terms of a consensual Plan, including the scope of the Debtor Release, the Third-Party Release, and the Exculpation (each as defined herein). Those negotiations culminated with the current proposed Plan, which releases certain Released Parties, including the Debtor Related Parties, and preserves potential claims and causes of action against the Non-Released Parties. Based upon the Committee Settlement, the Committee recommended that holders of General Unsecured Claims accept the Plan.

9.  Pursuant to the Committee Settlement, the Plan provides for, among other things: (a) releases of certain parties, including the Debtors and the Debtor Related Parties; (b) the preservation of potential claims and causes of action against the Non Released Parties; (c) authorization of the Wind-Down Debtors to, after the Effective Date, investigate and, if appropriate, pursue potential claims and causes of action with respect the Non Released Parties; (d) the continuation of the Debtors' standard document retention practices on and after the Effective Date; and (e) the commercially reasonable cooperation of the Debtors, Wind-Down Debtors, and any directors and officers who are Released Parties in connection with the investigation and pursuit of potential claims and causes of action against the Non-Released Parties.

10. The Committee Settlement contemplates that the Wind-Down Debtors are authorized to conduct their own investigation of potential claims and causes of action against the Non-Released Parties (including, to the extent not already provided, being provided with access to the hundreds-of-thousands of unredacted documents reviewed and produced as part of the Investigation) and, if appropriate, to pursue such claims or causes of action against the Non-Released Parties. The principal terms of the Committee Settlement are detailed in Article X.I of the Plan, but generally consist of, among other things: (a) the preservation and maintenance of documents by the Wind-Down Debtors in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors subject to the approval of the Wind-Down Debtors Oversight Committee (not to be unreasonably withheld); (b) the preservation and maintenance of documents by the Purchaser in accordance with the Purchase Agreement and the Sale Transaction Documentation; (c) agreement by the Debtors, Wind-Down Debtors, and any directors and officers that are Released Parties to use commercially reasonable best efforts to provide the cooperation necessary to maximize the

value of the Retained Causes of Action and any Claims or Causes of Action against the Non-Released Parties including, without limitation (i) providing (or directing third parties to provide) the Plan Administrator and its professionals with full access to the Debtors' and Wind-Down Debtors' books, records, and other documents that are relevant to the Retained Causes of Action (including privileged documents and materials insofar as such documents and materials are relevant to the Retained Causes of Action), (ii) providing the Plan Administrator and its professionals with reasonable access to employees and agents of the Debtors and Wind-Down Debtors (including, for the avoidance of doubt, the commercially reasonable best efforts from any directors or officers that are "Released Parties" under this Plan to cooperate), as applicable, for fact finding, consultation, interviews, and as witnesses (including as needed to authenticate documents where appropriate) that are relevant to the Retained Causes of Action, (iii) taking commercially reasonable measures to retain documents relevant to the Retained Causes of Action, consistent with the "Document Retention" provision in this Plan, and (iv) providing commercially reasonable assistance to maximize the value of the Retained Causes of Action and Claims and Causes of Action against the Non-Released Parties, as reasonably determined by the Committee, the Plan Administrator, or any of their respective professionals.

11. The Plan also provides for the Debtors' release of their officers, directors, employees, and advisors who continued to hold such positions after the Petition Date. These individuals enabled the Debtors to continue to operate post-petition during the sale processes and ultimately sell the Debtors as a going concern and wind-down their businesses. The Investigation led me to conclude that, in light of such parties' contributions to the Estates (including agreement to the cooperation obligations under the Plan) and the ability to pursue Retained Causes of Action against the Non-Released Parties in the discretion of the Plan Administrator, it was an appropriate

exercise of the Debtors' business judgment to release any claims against any of these individuals as part of a negotiated Committee Settlement. I believe, in my business judgment, that the releases contained in the Plan are appropriate. Notably, the Plan does *not* purport to release claims against former officers, directors, employees, and advisors who did not hold such position at any time as of, or following the Petition Date, or any claims against insiders held by third parties without such third-party's affirmative consent. As noted above, the Committee's advisors participated in the Investigation, are satisfied with the Committee Settlement enumerated through the Plan, and encouraged holders of General Unsecured Claims to vote in favor of the Plan. *See Letter of the Official Committee of Unsecured Creditors in Support of Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and Its Debtor Affiliates* [Docket No 969, Ex. 8].

12. After reviewing and analyzing the terms and conditions of the Committee Settlement as memorialized in Article X.I of the Plan, I concluded that the Settlement is in the Estates' best interest. The Board also evaluated the revised Plan, which incorporates the final terms of the Committee Settlement. The Committee Settlement contained in the Plan was negotiated at arm's-length, in good faith by independent parties, represented by independent counsel, and is fair, reasonable, and in the best interests of the Debtors and their stakeholders. It is my understanding that the Plan reflects a settlement of numerous critical issues in these chapter 11 cases and has the support of the Committee. The settlements further benefit the estates by saving the time and expense of litigation. For these reasons, I believe that the Committee Settlement is reasonable and that the Court should confirm the Plan.

### Evaluation of Certain Plan Terms

13. I understand that the Plan contains provisions implementing certain releases and exculpations and enjoining certain Causes of Action. I believe these provisions (a) are the product of arm's-length negotiations; (b) have been critical to obtaining the support of the various

constituencies for the Plan; (c) are given for valuable consideration; and (d) are fair and equitable and in the best interests of the Debtors, their Estates, and these chapter 11 cases.

### A.  The Debtor Release Is Appropriate.

14. Article X.C of the Plan (the "Debtor Release") provides for releases by, among others, the Debtors and their Estates of certain Claims and Causes of Action, which for the avoidance of doubt, does not release any Retained Cause of Action or any Claims or Causes of Action against any Non-Released Party.[3] Under these circumstances, I believe that the Debtor Release, as amended, is appropriate, is in the best interests of the Debtors and their stakeholders, and is an integral part of the Plan (as described herein).

15. I am aware that key stakeholders were involved in the negotiation process that led to the Plan. I understand that the Debtor Release is the product of extensive, arm's-length negotiations between sophisticated parties represented by able counsel and advisors, and that the Debtors' key stakeholders were unwilling to support the Plan without the assurance that, in the case of the Released Parties, that such Released Parties would not be subject to post-emergence litigation or other disputes related to the restructuring, and in the case of the Non-Released Parties,

---

[3] Pursuant to the Plan, "*Released Party*" means, collectively, in each case in its capacity as such: (a) each of the Debtors; (b) each Debtor Related Party; (c) each of the Wind-Down Debtors; (d) the DIP Lenders; (e) the DIP Agents; (f) the Prepetition Lenders; (g) the Prepetition Agents; (h) the Committee and each of its members; (i) all Holders of Claims who affirmatively opt in to the releases provided by the Plan; *provided, however,* that any party that is required to opt in to the releases contained in the Plan that does not do so shall not be a "Released Party"; (j) each current and former Affiliate of each Entity in clause (a) and clauses (c) through (i), except to the extent that any such Affiliate would otherwise constitute a Non-Released Party; *provided, that* WHP and the IP Licensors shall not be "Released Parties" solely on account of their status as "Affiliates" of the Debtors, any Debtor Related Party, or the Wind-Down Debtors; (k) each Related Party of each Entity in the foregoing clauses (d) through clause (j); *provided, that* the Non-Released Parties shall not be "Released Parties" regardless of whether such Non-Released Party would otherwise constitute a "Released Party". For the avoidance of doubt, no (x) Related Party of a Non-Released Party nor (y) any former director or officer (who did not serve as a director or officer on or after the Petition Date) shall be a "Released Party" in any other capacity (including, without limitation, if such person served as a consultant or advisor), and any and all Claims and Causes of Action against such Persons (identified in (x) and (y)) shall be preserved and not released in accordance with this Plan. *See* Plan, Art. I.A.131.

that the Retained Causes of Action would be preserved for the further investigation and potential pursuit by the Plan Administrator.

16.     I believe that the Debtor Release is given in exchange for the good and valuable consideration provided by the Released Parties, including without limitation, the Released Parties' contributions to facilitating the Wind-Down Transactions and implementing the Plan, as well as their cooperation obligations under the Plan with respect to the investigation and pursuit of the Retained Causes of Action.  The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process.  And each of the Released Parties made substantial contributions to these chapter 11 cases.  The Debtor Release is appropriate because, among other things, certain of the Released Parties have actively supported the Plan, have, in the case of the DIP Lenders, provided substantial new-money financing that funded the administration of these chapter 11 cases, and have played critical roles in negotiating, formulating, and/or implementing the DIP Facilities, the Sale Transaction, and the Plan.  Because of the contribution of such individuals and entities, I believe, in my business judgment, that the releases contained in the Plan are appropriate.

17.     I believe that the Debtor Release is appropriately tailored in light of, among other things, the value provided by the Released Parties to the Debtors' Estates (including their cooperation obligations under the Plan), the critical nature of the Debtor Release to the Plan, the carve-out of actual fraud, gross negligence, or willful misconduct, and the exclusion of the Non-Released Parties.

18.     Based on the foregoing and under the circumstances, I believe that the Debtor Release constitutes a valid exercise of the Debtors' reasonable business judgment, represents a valid and good-faith settlement and compromise of the Claims and Causes of Action released by

the Debtors, is in the best interests of the Debtors and their stakeholders, and is an integral part of the Plan, and should be approved.

      **B.**      **The Third-Party Release Is Consensual and Appropriate.**

19.      Article X.D of the Plan provides for certain Releasing Parties to provide releases to the Released Parties (the "Third-Party Release"). I believe that the Third-Party Release is (a) a necessary and integral element of the Plan; (b) essential to the confirmation of the Plan; (c) fair, equitable, and reasonable; (d) given in exchange for the good and valuable consideration provided by the Released Parties; (e) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (f) a sound exercise of the Debtors' business judgment; and (g) a bar to any of the Releasing Parties or the Debtors or their respective Estates or, if applicable, the Wind-Down Debtors, asserting any claim or Cause of Action related thereto, of any kind, against any of the Released Parties or their property. Further, it is my understanding that the Third-Party Release is fully consensual and provides for an "opt-in" mechanism for all Holders of Claims or Interests. I also understand that the Third-Party Release is given and made after due and adequate notice and opportunity for hearing.

20.      I believe that the Third-Party Release is an integral component of the Plan. Like the Debtor Release, the Third-Party Release was critical to incentivizing parties to support the Plan. The Third-Party Release (and its fully opt-in structure) was a core negotiation issue and was instrumental in developing a plan of reorganization that maximizes value for all of the Debtors' stakeholders. As such, the Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan. Further, the Third-Party Release provides finality for the Wind-Down Debtors and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Wind-Down Debtors. I believe that the Third-Party Release is specific in

language and appropriately tailored under the facts and circumstances of these chapter 11 cases, including the value provided by the Released Parties to the Debtors' Estates (including their cooperation obligations under the Plan), the carve-out of actual fraud, gross negligence, or willful misconduct and that the Third-Party Release does not release any post-Effective Date obligations of any Person or Entity under the Plan or any document, instrument, or agreement executed to implement the Plan.

21. Accordingly, for all of the above reasons, I believe that the Debtors have a good-faith basis for including the Third-Party Release in the Plan and that the Third-Party Release is reasonable and appropriate in light of the unique circumstances of these chapter 11 cases and should be approved.

    **C.    The Exculpation Provision Is Appropriate.**

22. Article X.E of the Plan contains an exculpation provision (the "Exculpation"), which was proposed and formulated following extensive good-faith, arm's-length negotiations with key constituents, and appropriately limited in scope. The Exculpation is appropriate because, among other things, certain of the Exculpated Parties have actively supported the Plan, and have played critical roles in negotiating, formulating, and/or implementing the DIP Facilities, the Sale Transaction, and the Plan. The Exculpation—which carves out actual fraud, gross negligence, or willful misconduct—was important to the development of a feasible, confirmable chapter 11 plan, and I understand the Exculpated Parties[4] are relying upon the protections afforded to the

---

[4] Pursuant to the Plan, "Exculpated Parties" means, collectively, to the extent that they are estate fiduciaries, and in each case solely in their capacities as such on or after the Petition Date through and including the Effective Date: (a) each of the Debtors and the Debtor Related Parties; and (b) the Committee and each of its respective members, and each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other Professionals or advisors in each such instance solely to the extent that they served in such capacity between the Petition Date and Effective Date. For the avoidance of doubt, none of the Non-Released Parties shall be Exculpated Parties. *See* Plan, Art. I.A.76.

constituents involved in the Exculpation. Accordingly, I believe the protections afforded by the Exculpation are reasonable and appropriate.

23. For all of the above reasons, I believe the Exculpation constitutes a valid exercise of the Debtors' reasonable business judgment, there is a valid and good-faith reason for its inclusion in the Plan, and that the Exculpation is reasonable and appropriate in light of the unique circumstances of these chapter 11 cases and should be approved.

### D. The Injunction Provision Is Appropriate.

24. Article X.F of the Plan contains an injunction provision (the "Injunction"), which has been subject to extensive good-faith, arm's-length negotiations with key constituents, and I understand the current Plan reflects resolution of the United States Trustee's informal objection with respect to the Injunction. The Injunction temporarily enjoins all Persons and Entities from and after the Effective Date, through and until the date upon which all remaining property of the Debtors' Estates vests into the Wind-Down Debtors, and has been liquidated and distributed in accordance with the terms of the Plan, from commencing or maintaining any Claims or Causes of Action *against the Debtors or the Wind-Down Debtors* on account of, or in connection with, or with respect to, any Claims or Interests released, exculpated, or settled under the Plan. On the other hand, the Injunction Provision *permanently* enjoins all Persons or Entities who have held, hold, or may hold Claims or interests that are treated under the Plan on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchasers, or the Wind-Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors, or otherwise contemplated under the Sale Order. The Injunction is a necessary part of the Plan precisely because it enforces the key Debtor Release, Third-Party Release, and Exculpation provisions. Further, while the proposed plan is consensual, the Injunction is essential

to bind the good-faith agreement between the Debtors and their stakeholders, as embodied in the Plan, with finality, in the event that certain parties may one day change their mind.  The Injunction is consensual as to any party that did not specifically object thereto and narrowly tailored to achieve its purpose.  For all of these reasons, I believe the Injunction should be approved.

25. Based on these considerations, as a Disinterested Director and a member of the Board, I determined that the Plan is fair, reasonable, and in the best interests of the Debtors, their Estates, and their stakeholders, and that the Debtor Release, the Third-Party Release, the Exculpation, and the Injunction should be approved as part of confirmation of the Plan.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 13, 2024

/s/ *William Transier*
William Transier
Disinterested Director of the Board of
EXP OldCo Winddown, Inc.