## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXP OLDCO WINDDOWN, INC., *et al.*,[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF
## KUNAL S. KAMLANI IN SUPPORT OF
## CONFIRMATION OF THE JOINT CHAPTER 11 PLAN
## OF EXP OLDCO WINDDOWN, INC. AND ITS DEBTOR AFFILIATES

I, Kunal S. Kamlani, make this Declaration pursuant to 28 U.S.C. § 1746:

1.      I am a Senior Managing Director at M3 Advisory Partners LP ("M3"), the financial advisor for the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I submit this declaration (this "Declaration") in support of confirmation of the *Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and Its Debtor Affiliates* [Docket No. 953] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]  In particular, I submit this Declaration in support of my view that the proposed Plan satisfies all relevant provisions of the Bankruptcy Code.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are EXP OldCo Winddown, Inc. (8128), Project Pine TopCo Winddown, LLC (8079); Project Pine Holding OldCo, LLC (8454); Project Pine Finance OldCo Corp. (7713); Project Pine OldCo, LLC (0160); Project Pine Investments OldCo, LLC (7622); Project Pine Logistics OldCo, LLC (0481); Project Pine Operations OldCo, LLC (3400); Project Pine GC OldCo, LLC (6092); Project Pine Tropic OldCo, LLC (3861); Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382).  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2]     Capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan, the *Disclosure Statement Relating to the Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and Its Debtor Affiliates* [Docket No. 955] (together with any amendments subsequently filed by the Debtors, the "Disclosure Statement"), or the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and Its Debtor Affiliates* (the "Confirmation Brief"), as applicable.

3.      The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of M3 working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional.  For the avoidance of doubt, I do not, and do not intend to, waive the attorney-client privilege or any other applicable privilege by submitting this Declaration.

4.      I have overseen the M3 team serving as one of the principal advisors to the Debtors since November 2023.  In that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings and plan confirmation efforts.  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Background and Qualifications**

5.      M3 is an independent corporate restructuring and performance improvement advisory firm providing operational, strategic, and financial advice for clients.  On a combined basis, M3's principals have worked on hundreds of restructurings throughout their respective careers.   Prior  to  the  commencement  of  these  chapter  11  cases  on  April  22,  2024 (the "Petition Date"), M3 was engaged by the Debtors to help manage their liquidity, identify strategic options to enhance liquidity and profitability, and assist with the development of a business plan and the preparation for filing of these chapter 11 cases.

6.      I have more than 25 years of operating and advisory experience across a number of industries including retail, financial services, logistics, real-estate, healthcare, and global leisure and hospitality.  Prior to joining M3, I served as the President of ESL Investments, Inc., the

President and Chief Operating Officer of Prestige Cruise Holdings; the parent company of Oceania Cruises and Regent Seven Seas Cruise lines.  Prior to that I served as the Chief Operating Officer of Citi Smith Barney and served in the Corporate Development departments of Starwood Hotels & Resorts and ITT Corporation.  I started my career as an investment banking analyst at Bear Stearns.  In each of these roles I have been intimately involved in developing operating plans, and cashflow forecasts as well as in reviewing capital structuring alternatives in the context of organic growth initiatives and M&A transactions.  I served as a member of the Board of Directors of Staples Inc. and Sears Holdings Corporation.  As a Board Member, I have also served on Audit, Compensation, Finance, and Related Party Transaction Committees.

7.      The Debtors retained M3 on August 18, 2023, to serve as their financial advisor in relation to potential liability management and operational turnaround initiatives.  The Debtors chose M3 for these roles because of our expertise on issues relating to financially distressed companies and M3's extensive experience acting as an advisor in both in and out-of-court restructurings of companies of all sizes across a wide array of industries.  M3 and its professionals have considerable experience advising debtors in chapter 11 cases.  I am familiar with the Debtors' business and financial affairs, and I offer this Declaration in support of confirmation of the Plan.

**The Plan**

I.      **BACKGROUND.**

8.      I believe the Plan is the product of good-faith, arm's-length negotiations between the Debtors, the Committee, and other key stakeholder constituencies.  Importantly, the Plan has the support of the Debtors' entire remaining capital structure, including the Committee.  I believe, based on my experience and my consultation with the Debtors' legal counsel, that the Plan satisfies the requirements of Confirmation.  Notably, the Plan is proposed in good faith, is feasible, and is in the best interests of the Debtors' creditors.

Case 24-10831-KBO    Doc 1133    Filed 12/13/24    Page 4 of 29

9.      The Plan is the result of considerable collaboration among the Debtors, their advisors and legal counsel, and their stakeholders, in an effort to maximize the economic return to creditors under the facts and circumstances of these chapter 11 cases. The Plan provides for an orderly wind-down of the Debtors' estates, assuring that the Debtors' assets are distributed timely and efficiently. Further, in consultation with M3, the Debtors have determined that all Holders of Claims and Interests in all Impaired classes will likely recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.

10.     The currently filed Plan is the result of hard-fought and arm's-length negotiations between the Debtors and the Committee, which centered around the scope of the releases. The Plan now contemplates a fully consensual *opt-in* structure. Supported by releases for the Debtors and Debtor-Related Parties, Exculpation and Injunction provisions, and the enshrinement in the Plan of a consensual transaction that provides recoveries to holders of General Unsecured Claims, the Plan preserves potential claims and causes of action against the Non-Released Parties, and authorizes the Wind-Down Debtors to, after the Effective Date, investigate and, if appropriate, pursue potential claims and causes of action with respect to the Non-Released Parties. Thus, the Plan embodies a value-maximizing settlement and provides a meaningful recovery to as many of the Debtors stakeholders as possible under these circumstances. As discussed herein, I believe that the prompt confirmation and consummation of the Plan is in the best interest of the Debtors, their creditors, and all other parties in interest, and that, accordingly, the Bankruptcy Court should confirm the Plan.

## II.     THE PLAN SATISFIES THE REQUIREMENTS OF CONFIRMATION.

11.     I have been advised of the applicable standards under which a chapter 11 plan may be confirmed. For the reasons detailed below, and with the consultation and guidance of the Debtors' advisors and legal counsel, I believe, to the best of my knowledge, that the Plan

(a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code; (b) satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code[3]; and (c) is consistent with section 1123(b) of the Bankruptcy Code.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan and related documents.

**A.      The Plan Satisfies the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(1).**

12.     I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code.  As set forth below, I believe the Plan satisfies section 1129(a)(1) of the Bankruptcy Code.

**(a)      Proper Classification of Claims and Interests — Section 1122.**

13.     It is my understanding that section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

14.     I believe that each of the Claims and Interests in each particular class under the Plan is substantially similar to the other Claims and Interests in that class.  In general, the Plan's classification scheme follows the Debtors' capital structure and the Plan places Claims and Interests into separate Classes, with Claims and Interests in each class differing from the Claims and Interests in each other class in a legal or factual way or based on other relevant criteria.

15.     Under Article III of the Plan, Claims and Interests are classified as follows:

---

[3]    I understand that Section 1123(a)(8) applies only to debtors that are individuals, and as such is not a requirement for confirmation in these chapter 11 cases.

| Class | Claim / Equity Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| 5 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Deemed to Reject) |
| 6 | Existing Equity Interests in Express | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

16.     The Claims and Interests assigned to each Class listed above are substantially similar to the other Claims and Interests in that Class.  I believe there is a reasonable and valid factual, business, or legal basis for each instance of separate classification of Claims and Interests under the Plan, and there is no unfair discrimination between or among Classes of Claims or Interests.  Namely, the Plan separately classifies Claims and Interests because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience results from such separate classification.  In each instance, the Plan classifies Claims and Interests based upon their different rights and attributes.

17.     Specifically, the Plan separately classifies Other Secured Claims in Class 1 and Other Priority Claims in Class 2 based on their distinct legal nature.  Class 3 consists of all General Unsecured Claims.  Class 4 Intercompany Claims are separately classified because they do not involve third-party creditors, and Class 5 Intercompany Interests are separately classified from Class 6 Interests in Express because they arise from intercompany transactions and do not impact

recoveries to third parties.  Finally, Class 9 Section 510(b) Claims are separately classified to reflect the treatment of such Claims under section 510(b) of the Bankruptcy Code.

18.     For the foregoing reasons, I believe that the Plan satisfies section 1122 of the Bankruptcy Code.

> **(b)     Specification of Classes, Impairment, and Treatment — Section 1123(a)(1)–(3).**

19.     I understand that sections 1123(a)(1), (2), and (3) of the Bankruptcy Code require that a chapter 11 plan specify in detail the classification of claims or interests, whether such claims or interests are unimpaired by the plan, and the treatment of each class of claims or interests that is impaired.  Article III of the Plan specifies in detail the classification of Claims and Interests, whether such Claims and Interests are Impaired, and the treatment that each Class of Claims and Interests will receive under the Plan.  Accordingly, I believe the Plan fully complies with and satisfies sections 1129(a)(1)–(3) of the Bankruptcy Code.

> **(c)     Equal Treatment of Similarly Situated Claims and Interests — Section 1123(a)(4).**

20.     I understand that section 1123(a)(4) of the Bankruptcy Code requires that the Plan provide the same rights and treatment to each holder of claims or interest as other holders of allowed claims or interests within such holders' respective class.  It is my understanding that the Plan provides the same treatment for each Claim or Interest of a particular Class, except where the Holder of such Claim or Interest has agreed to a less favorable treatment.  I believe that the Plan satisfies this requirement because each Holder of Allowed Claims or Interests will receive the same rights and treatment as all other Holders of Allowed Claims or Interests within the same Class.

**(d)      Means for Implementation — Section 1123(a)(5).**

21.      I believe that Article IV of the Plan provides adequate means for implementation as required under section 1123(a)(5) of the Bankruptcy Code, including, among other things, (a) the sources of consideration for Plan distributions,[4] (b) the vesting of assets in the Wind-Down Debtors and the authorization for the Wind-Down Debtors and the Plan Administrator, as applicable, to take corporate actions necessary to effectuate the Plan,[5] (c) the cancellation of notes, instruments, certificates, and other documents and existing securities,[6] and (d) the preservation and retention of the Retained Causes of Action.[7]  The Plan also provides for the appointment of the Plan Administrator to manage the Wind-Down Debtors, and describes the Plan Administrator's duties and compensation.  I understand that the precise terms governing the execution of these transactions are set forth in the applicable Definitive Documents and/or forms of agreements contained in the Plan Supplement.

**(e)      Prohibition of Issuance of Non-Voting Securities — Section 1123(a)(6).**

22.      I am advised that section 1123(a)(6) of the Bankruptcy Code requires that a corporate debtor's chapter 11 plan provide for the inclusion in the reorganized debtor's charter (if any) of a prohibition against the issuance of non-voting equity securities and related protections for Holders of preferred shares.  As the Debtors are winding down, the Plan does not provide for the issuance of non-voting equity securities or preferred interests.  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

---

[4]      *See* Plan, Art. IV.B.1.

[5]      *See* Plan, Art. IV.C, IV.E.

[6]      *See* Plan, Art. IV.F.

[7]      *See* Plan, Art. IV.I.

(f)    **Selection of Officers and Directors — Section 1123(a)(7).**

23.    I am advised that section 1123(a)(7) requires that plan provisions be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[8]  Article IV of the Plan satisfies this requirement by providing that on the Effective Date the terms of the existing directors and officers will expire, and the Plan Administrator will be immediately and automatically deemed appointed as the sole director and the sole officer of each of the Wind-Down Debtors, and the Plan Administrator will succeed to the powers of the Debtors' directors and officers.  The manner for selection of the Plan Administrator is set forth in the Plan and Plan Supplement.  A description of the Plan Administrator's role and compensation was included in the Plan Supplement.

**B.    The Debtors Have Satisfied the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(2).**

(a)    **The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

24.    I understand that Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[9]

---

[8]    11 U.S.C. § 1123(a)(7).

[9]    *See* 11 U.S.C. §§ 1123(b)(1)–(3), (6).

25.     It is my understanding that the Plan includes various such discretionary provisions which are consistent with section 1123(b) of the Bankruptcy Code.  For example, the Plan provides for certain settlements of Claims and Interests, impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.  In addition, the Plan contains provisions implementing certain releases and exculpations, and enjoining certain causes of action.

26.     I believe each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, these Estates, and these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

      **(b)**     **The Plan Appropriately Implements the Committee Settlement of Claims and Causes of Action in Compliance with the Bankruptcy Code and the Bankruptcy Rules**

27.     I understand that section 1123(b)(3) of the Bankruptcy Code provides that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[10]  The Plan implements the Committee Settlement by and among the Debtors and the Committee.  The Committee and Debtors worked collaboratively to maximize recoveries to unsecured creditors and ensure timely, cost-effective confirmation and Wind-Down processes.

---

[10]    11 U.S.C. § 1123(b)(3)(A).

The Committee Settlement is the product of rigorous and productive negotiation processes among the Debtors and their stakeholders and resolves all disputes between the Debtors and the Committee relating to the chapter 11 cases.  The terms of the Committee Settlement represent a fair exchange among the parties to the benefit of all stakeholders and party interests.  Further, the Committee Settlement provides consensus and finality between significant economic stakeholders in these chapter 11 cases.  The Committee Settlement avoids costly and protracted litigation, the cost of which would significantly diminish returns to all stakeholders.  Accordingly, the Plan's discretionary settlement provisions satisfy the requirements of section 1123 of the Bankruptcy Code.

### (c) The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.

28.     As set forth in the Transier Declaration, the Debtors determined in a sound exercise of their business judgment that the Releases, Exculpation, and Injunction provisions are appropriate, justified, and integral to the Plan.  Accordingly, I believe that these provisions satisfy section 1123(b) of the Bankruptcy Code.

### (d) The Plan Complies with Section 1123(d) of the Bankruptcy Code.

29.     I understand that Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[11]

30.     It is my opinion that the Plan complies with Section 1123(d) of the Bankruptcy Code as the Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan, by payment of the default amount, if any, on

---

[11]    11 U.S.C. § 1123(d).

the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations and exceptions described in the Plan or in the Confirmation Order.

### C. The Debtors Have Satisfied the Applicable Provisions of the Bankruptcy Code — Section 1129(a)(2).

31.     Based on consultation and guidance from the Debtors' legal counsel, I believe that the Plan satisfies section 1129(a)(2) of the Bankruptcy Code, which I understand requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  As set forth below, I have been advised that the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in accordance with the Disclosure Statement Order.

### (a) The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.

32.     Here, I understand that the Court approved the Disclosure Statement as containing adequate information, and the Debtors solicited and tabulated votes on the Plan in accordance with the solicitation procedures approved by the Court.  I also understand that the Debtors, through their claims and noticing agent, Stretto, Inc., complied with the content and delivery requirements of the Disclosure Statement Order, as further described in the Voting Report.[12]  Finally, I have been advised that the Debtors transmitted the same Disclosure Statement to each Holder of a Claim or Interest in a particular class.

---

[12]     *Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Express, Inc. and Its Debtor Affiliates* (the "<u>Voting Report</u>") (filed contemporaneously herewith).

**(b)     The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.**

33.     As further set forth in the Voting Report, the Debtors solicited votes from the Holders of Claims and Interests in Impaired classes entitled to vote under the Plan—Class 3.  I understand that the Debtors did not solicit votes from Holders of Claims and Interests in Classes 1, 2, 4, 5, 6 or 7 because Holders of such Claims and Interests are either Unimpaired and conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. While the Debtors did not solicit votes from the Holders of Claims and Interests in such classes, the Debtors mailed the Confirmation Hearing Notice and a Notice of Non-Voting Status (including the applicable Opt-In Form) to such Holders in accordance with the Disclosure Statement Order.

34.     The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  As set forth in the Voting Report, the Plan has an acceptance rate of 96% by both number and amount of the Voting Class.

**D.     The Debtors Proposed the Plan in Good Faith — Section 1129(a)(3).**

35.     I believe that the Plan was proposed in good faith, with the legitimate and honest purpose of maximizing value for the Debtors and their estates.

36.     The Plan is the result of collaborative efforts between the Debtors, their advisors and legal counsel, and their stakeholders.  I believe the Plan maximizes the economic return to the creditors in light of the totality of the facts and circumstances of the case, and satisfies all the requirements of section 1129(a)(3) of the Bankruptcy Code.

**E.     Payment of Professional Fees and Expenses Is Subject to Court Approval — Section 1129(a)(4).**

37.     It is my understanding that section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, a debtor, or a person receiving distributions

of property under the plan, be approved by the Court or remain subject to approval by the Court as reasonable.  The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.  Moreover, Article II.B.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be Filed no later than forty-five (45) days after the Effective Date, thereby providing an adequate period of time for interested parties to review the requests for payment of Professional Fee Claims.  Accordingly, I believe that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

> **F.      The Plan Satisfies the Bankruptcy Code's Governance Disclosure Requirements — Section 1129(a)(5).**

38.      It is my understanding that section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan; appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and to disclose the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.  Article IV and Article VII of the Plan provide for the appointment of a Plan Administrator to act as the sole director and sole officer of each of the Wind-Down Debtors, and the Debtors have disclosed the identity, responsibilities, and compensation of the Plan Administrator, who was selected by the Committee in consultation with the Debtors, and the identities, responsibilities, and compensation of the members of the Wind-Down Debtors Oversight Committee, who were selected by the Committee.[13]  The Plan provides that the Plan Administrator shall act in a fiduciary capacity on

---

[13]      *See* Plan Supplement.

behalf of the interests of Holders of Claims and Interests who are entitled receive distributions pursuant to Plan, and will be overseen by the Wind-Down Debtors Oversight Committee.[14] Accordingly, I believe that the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

> **G.  The Plan Does Not Require Government Regulatory Approval of Rate Changes — Section 1129(a)(6).**

39.    It is my understanding that Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and, accordingly, will not require governmental regulatory approval.  As such, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

> **H.  The Plan Is in the Best Interests of Holders of Claims and Interests — Section 1129(a)(7).**

40.    The Debtors have considered the probable result of a hypothetical chapter 7 liquidation of the Debtors' assets in light of the fact that the Debtors are effectively liquidating their remaining assets in chapter 11.  In connection with the formulation of the Plan and the Disclosure Statement, I and my team at M3, with support from the Debtors and their other advisors, prepared an analysis comparing the treatment of Claims and Interests under the Plan against the treatment such Claims and Interests in a hypothetical chapter 7 liquidation scenario.

41.    On November 4, 2024, the Debtors filed the liquidation analysis (the "Liquidation Analysis"), a true and correct copy of which is attached as **Exhibit A,** which, in my view, demonstrates that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  I believe the

---

[14]    Plan, Art. VII.A.5.C.

Liquidation Analysis represents the Debtors' best estimate of the cash proceeds, net of liquidation related costs that would be available for distribution to the Holders of Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

42.     I believe that, based on the incremental additional costs of chapter 7, all Holders of Claims and Interests in all Impaired classes will likely recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.  The Debtors are winding down operations and liquidating all of their remaining assets and distributing such assets to their creditors, subject to the Plan.  Although a chapter 7 liquidation would achieve substantially the same end-goal, recoveries in a chapter 7 case liquidation would be lower in light of the additional expenses that would be incurred in a chapter 7 proceeding, and other additional costs associated with a chapter 7 liquidation, including the obligation to continue to pay all unpaid expenses included in the Wind-Down Budget that the Debtors incurred prior to conversion, such as compensation for Professionals.

43.     Accordingly, based on the foregoing and the Liquidation Analysis, I believe a chapter 7 liquidation would result in reduced recoveries and delayed distributions compared to the Plan.

**I.      Voting Requirements — Section 1129(a)(8).**

44.     I understand that the Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I understand that, under the Plan, certain Classes of Claims were unimpaired and conclusively presumed to accept the Plan and certain Classes of Claims and Interests are deemed to have rejected the Plan and, thus, were not entitled to vote.[15]  The Debtors received the requisite votes at the Voting Class—Class 3—

---

[15]  *See* Plan Art. III.

which was the only class entitled to vote on the Plan.[16]  Classes 6 and 7 will receive no recovery and are deemed to reject the Plan.  Classes 4 and 5 may be deemed to reject the Plan based on the Debtors' ultimate determination to reinstate or cancel Intercompany Claims and Intercompany Interests.  Notwithstanding the fact Classes 6 and 7, and, possibly, Classes 4 and 5, are deemed to have rejected the Plan, it is my opinion that the Plan is confirmable.

45.    While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

**J.    The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims — Section 1129(a)(9).**

46.    I understand that Section 1129(a)(9) of the Bankruptcy Code requires that, "except to the extent that the holder of a particular claim has agreed to a different treatment," a plan must provide for all holders of allowed administrative expense claims to be paid in full in cash on the effective date and for all holders of allowed priority claims to be paid in full in cash (depending on the specific type of claim, either on the effective date of a plan or over time with interest).[17] Article II.A of the Plan provides that all Allowed Administrative Claims will be paid (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing

---

[16]    *See* Voting Report.

[17]    11 U.S.C. § 1129(a)(9).

such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court, in satisfaction of Section 1129(a)(9)(A); *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Purchase Agreement shall be an obligation of the applicable Purchaser and shall not be an obligation of the Debtors or the Wind-Down Debtors to the extent so assumed.  In addition, Article II.E of the Plan provides that, to the extent any Allowed Priority Tax Claims (as defined in the Plan) was not paid during the chapter 11 cases or assumed and paid under the Purchase Agreement (each as defined in the Plan), Holders of such Allowed Priority Tax Claims will receive either payment in full, or such other treatment rendering such Holder's Allowed Priority Tax Claim Unimpaired in satisfaction of Section 1129(a)(9)(C) of the Bankruptcy Code.

**K.    At Least One Impaired Class of Claims Accepted the Plan —
Section 1129(a)(10).**

47.    I understand that the Bankruptcy Code requires that if any class of claims is impaired under the plan, then at least one class of impaired claims must accept the plan, without including any acceptance of the plan by any insider.  I have been advised that Holders of Claims in Class 3, which are Impaired under the Plan, voted to accept the Plan.

**L.      The Plan Is Feasible — Section 1129(a)(11).**

48.      I believe that the Plan is feasible.  Through the Plan, there will be an orderly liquidation and wind down of the Debtors' operations and timely distributions to Holders of Allowed Claims in accordance with the Plan, the Bankruptcy Code, and applicable law. Rather than unnecessarily elongate these cases through a conversion to chapter 7, the Plan provides closure and assurance that the assets of the Debtors' Estates are being distributed in an efficient and value maximizing manner subject to the Debtors' obligations under the Plan and without the need for any additional liquidity.  Based on my review of the Debtors' financial information and the Plan, I believe that the sources of consideration identified in Article IV.B.1 of the Plan are sufficient to satisfy all of the Debtors' obligations and potential distributions under the Plan, including on account of all Allowed Administrative Claims and Allowed Priority Tax Claims.  The Debtors have analyzed the Debtors' ability to maintain adequate liquidity to effectively wind down the Debtors' Estates and determined that, following the consummation of the Sale Transaction, the Debtors have adequate funds from, among other sources, (a) Cash on hand, (b) the Distributable Proceeds, (c) the proceeds of the Wind-Down; and (d) to the extent provided for in Article VIII.C of the Plan, the Wind-Down Reserve, provided, however, that Allowed Professional Fee Claims will be paid from the Professional Fee Escrow Account in the first instance.  Additionally, the Debtors and Committee have an agreed Wind-Down Budget that provides for the activities and expenses incurred in connection with the Wind-Down.  Thus, I believe that the Debtors will be able to meet their obligations under the Plan.

**M.      The Plan Provides for Payment of All Statutory Fees — Section 1129(a)(12).**

49.      Article II.C of the Plan includes an express provision requiring payment of all fees under 28 U.S.C. § 1930 in compliance with the Bankruptcy Code.

**N.      Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan.**

50.      It is my understanding that a number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan including Section 1129(a)(13), Section 1129(a)(14), Section 1129(a)(15), and Section 1129(a)(16) of the Bankruptcy Code because the Debtors have no obligation to pay retiree benefits, are not subject to domestic support obligations, are not "individuals," and are moneyed, business, or commercial corporations, and no party has asserted otherwise.

**III.     THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY CODE.**

51.      I understand that the Bankruptcy Code states that if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[18]

52.      To the best my knowledge, the Plan distributes value to Holders of Claims and Interest in the priorities set forth in the Bankruptcy Code, and no Holder of a junior Claim or Interest will receive a recovery on account of such junior Claim or Interest until all senior Claims are paid in full.  It is my understanding that (a) Class 3 voted to accept the Plan and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Interests in the Deemed Rejecting Classes.   As such, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

---

[18]     *See* 11 U.S.C. § 1129(b).

**A.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan.**

53.    I believe that the Plan's treatment of those Classes that rejected or are deemed to reject the Plan is proper and not "unfair" because Holders of Claims and Interests with similar legal rights will not be receiving materially different treatment under the Plan.  As I discussed above, the Plan's classification scheme categorizes Claims and Interests based on their priority within the Debtors' capital structure, their differing legal nature, and their respective rights against the Debtors.  Further, Claims and Interests in the Classes that rejected or are deemed to reject the Plan are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  Accordingly, I believe that the Plan does not discriminate unfairly with respect to Classes of Claims and Interests that rejected or are deemed to reject the Plan.

**B.    The Plan is Fair and Equitable — Section 1129(b)(2)(B)(ii).**

54.    I believe the Plan is "fair and equitable" to Holders of Claims and Interests in those classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes.  Specifically, no holder of any junior claim or interest will receive or retain any property under the Plan on account of such junior claim or interest.

55.    In addition, to the extent that Intercompany Interests are Reinstated under the Plan, it is my understanding that distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest.  Accordingly, I believe that any reinstatement of Intercompany Interests will have no economic substance.

IV.    **THE PLAN COMPLIES WITH THE OTHER PROVISIONS OF SECTION 1129 OF THE BANKRUPTCY CODE — SECTIONS 1129(C)–(E)).**

56.    It is my understanding that sections 1129(c)–(e) of the Bankruptcy Code are satisfied here because there is only one proposed joint chapter 11 plan in satisfaction of Section 1129(c), the Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933 as amended, and moreover no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds, in satisfaction of section 1129(d), and section 1129(e) is inapplicable because none of the Debtors' chapter 11 cases is a small business case.

V.    **GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER.**

57.    I understand that certain Bankruptcy Rules provide for the stay of an order confirming a chapter 11 plan, but that such a stay may be waived upon court order after a showing of good cause.

58.    Due to the complexity of the cases, with each passing day the Debtors are incurring significant administrative expense and professional costs.  These costs will be significantly reduced if the Debtors emerge expeditiously.  I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

VI.    **TECHNICAL MODIFICATIONS TO THE PLAN.**

59.    It is my understanding that the Debtors made certain technical modifications to the Plan in response to comments from stakeholders, including certain Holders of Claims and Interests and the United States Trustee.  I understand that such modifications do not adversely impact creditors who have not consented to such modified treatment.  I understand that the changes are permissible modifications to the Plan and are supported by the Debtors and the Committee, do not

reflect material differences to recoveries of each affected class—i.e., no Holder is "likely" to reconsider its acceptance.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 13, 2024

By: */s/ Kunal S. Kamlani*
Name: Kunal S. Kamlani
Title: Senior Managing Director
M3 Advisory Partners LP.

**<u>EXHIBIT A</u>**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS FOR EXP OLDCO WINDDOWN, INC., *et al.*[1]**

## I.    INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the Conversion Date (defined below) of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable based upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates.  As illustrated by this Liquidation Analysis, Holders of General Unsecured Claims would receive a lower recovery in a hypothetical liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended, and should not be used, for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based, are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS.  THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Disclosure Statement Relating to the Joint Plan of EXP OldCo Winddown, Inc. and Its Debtor Affiliates* [Docket No. 955] (the "Disclosure Statement").

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN CONVERSION DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about November 3, 2024 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date. As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law. There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest. The Liquidation Analysis is an estimate and is subject to material change and revision in all respects, and takes a conservative approach to analyzing the value to Holders of Claims in a chapter 7 liquidation.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1. <u>Unaudited Financial Statements</u>. This Liquidation Analysis contains numerous estimates. Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2.  <u>Chapter 7 Liquidation Costs</u>.  The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately twelve (12) months, in order to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates.  In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3.  <u>Distribution of Net Proceeds</u>.  Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimates used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee.  Any remaining net Cash would then be distributed to creditors in accordance with applicable law.

    Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4.  <u>Certain Exclusions and Assumptions</u>.  This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis.  Such tax consequences may be material.

## II.    **CONCLUSIONS**

> **THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

*($ in millions)*

| Ref # | | Chapter 11 Plan | Chapter 7 Liquidation |
|---|---|---|---|
| 1 | **Pro Forma Cash Balance** | $22.8 | $20.3 |
| 2 | Estimated CARES Act Tax Receivable | 1.0 | – |
| 3 | Going-Out-of-Business Sale Proceeds | 0.2 | 0.2 |
| 4 | Cash Collateralized Letter of Credit Proceeds | 2.8 | 2.8 |
| 5 | Causes of Action | TBD | TBD |
| 6 | Professional Fee Retainer Return | 0.9 | 0.9 |
| 7 | Settlement Payment | 0.8 | 0.8 |
| 8 | Utility Deposits | 0.7 | 0.7 |
| | **Total Estimated Distributable Value** | **$29.2** | **$25.6** |
| 9 | Chapter 7 Trustee Fee | – | ($0.8) |
| | **Total Fees** | **–** | **($0.8)** |
| | **Proceeds Available for the Benefit of Creditors** | **$29.2** | **$24.9** |
| | **Administrative and Priority Claims** | | |
| 10 | 503(b)(9) Claims | (5.1) | (5.1) |
| | **Total Administrative and Priority Claims** | **($5.1)** | **($5.1)** |
| | **Proceeds Available for the Benefit of General Unsecured Creditors** | **$24.1** | **$19.8** |
| | **Estimated Recoveries to Creditors** | | |
| 11 | Estimated Priority Claims | $5.1 | $5.1 |
| | Priority Claim Payments | (5.1) | (5.1) |
| | **Remaining Priority Claim Balance** | **–** | **–** |
| | *Recovery to Priority Creditor Class* | *100.0%* | *100.0%* |
| 12 | Estimated General Unsecured Claims | $206.7 | $206.7 |
| | Proceeds Available for the Benefit of Creditors | (24.1) | (19.8) |
| | **Remaining General Unsecured Claim Balance** | **$182.6** | **$186.9** |
| | *Recovery to General Unsecured Creditor Class* | *11.7%* | *9.6%* |

**Notes**

1. The pro forma cash balance assumes an Effective Date of December 16, 2024 in the Chapter 11 Plan case. The Chapter 7 Liquidation case assumes the cases convert on November 3, 2024. The pro forma cash balance is comprised of the forecast ending cash balance as of November 2, 2024, which is then reduced for operating disbursements through the Wind Down period. The Chapter 7 Liquidation case assumes elevated professional fees due to the lack of knowledge and relationships held by the Chapter 7 Trustee (and other professionals) with key counterparties that will be required to effectuate the wind down of the Estate, offset by the exclusion of a post-effective date budget funding requirement.

2. Estimated CARES Act Tax Receivable represents a potential federal tax receivable owed to the Estate, expected to be recovered after 2024; the Chapter 7 Liquidation case assumes zero recovery due to the expedited wind down of the Estate

3. Going-Out-of-Business Sale Proceeds includes proceeds from liquidating stores, UpWest inventory, FF&E, and augment sales; the Chapter 7 Liquidation case assumes lower recoveries due to an expedited liquidation and auction of residual UpWest inventory.

4. Represents proceeds from cash collateralized L/Cs that are expected to be cancelled.

5. For purposes of the Liquidation Analysis, no values have been ascribed to any potential litigation.

6. Represents the return of Debtor professional fee retainer.

7. Represents negotiated settlement payment with vendor.

8. Utility Deposits represent funds owed to the estate by utility providers, expected to be received in the post effective date period.

9. Trustee fees include all fees paid to the Trustee by the Debtors, consistent with the fee structure set forth in the Bankruptcy Code. The Trustee fee is estimated at 3% of all distributions to creditors from gross asset proceeds (including cash), inclusive of payments of chapter 7 and chapter 11 administrative claims and all prepetition claims. See 11 U.S.C. § 326(a)

10. 503(b)(9) claims represent the balance of merchandise and non-merchandise 503(b)(9) claims not assumed by Phoenix.

11. Represents Classes 1-2 (Other Secured Claims and Other Priority Claims).

12. Represents any Claim, other than a Secured Claim, that is not an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), a Tax Priority Claim, an Other Secured Claim, an Other Priority Claim, a DIP Claim, a Prepetition Credit Agreement Claim, an Intercompany Claim, or a Section 510 Claim.