

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

January 6, 2025

Sworn to me this 6th day of January, 2025

*[signature]*

Deborah Beshaw-Farrell
Notary Public, State of New York
No. 01BE5076617
Qualified in Kings County
Certificate on file in New York County
Commission Expires April 21, 2027

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

1/6/2025, NY/NATL, pg B3

*Larnyce Tabron*

[Clipping of published notice: "IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE — In re: EXP OLDCO WINDDOWN, INC., et al., Chapter 11, Case No. 24-10831 (KBO), (Jointly Administered) — NOTICE OF (I) ENTRY OF CONFIRMATION ORDER, (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES"]

# A Donor Gave Graduates a Cash Gift. Why Didn't They All Get One?

FROM FIRST BUSINESS PAGE

who were there: Rob Hale, a local telecom billionaire, turned up with over $1 million in duffel bags and handed $1,000 each to graduates as they got their degrees. They were to keep $500 for themselves and give $500 to help a person or an organization that needed it more than they did.

Because Ms. Yell and Mr. Ristaino weren't there, they — like others among the 20 percent of the graduating class, which totaled 1,200 people, who missed the ceremony — did not get the money.

"You've got to show up," Mr. Hale told People magazine when the tale of the rich man doling out $100 bills drew an enormous amount of media attention.

Like many people who heard the Hale tale, I didn't know about the absent graduates. I had just wanted to learn what the ones who were present that day had done with the money. In October, the university sent an email on my behalf to every one of them, and people responded with the loveliest stories.

One nursing student gave her $500 to the Dana-Farber Cancer Institute in Boston in honor of a family friend in treatment there who was probably going to die. A budding engineer handed the money over to her high school so the teachers who got her to college could put it to work with other teenagers. A third graduate, whose parents had moved to the United States from Cape Verde, used the money to help a Cape Verdean family rebuild a destroyed home.

But I got just as many notes from people like Ms. Yell. One graduate said she had missed the ceremony because her postural orthostatic tachycardia syndrome flared up. Another had older parents, who could not have handled the weather, and did not want to leave them at home.

Paige Santos, another UMass Dartmouth graduate, has cerebral palsy and uses an electric scooter that would not have done well in the monsoon conditions. She said she would have given her $500 to the Special Olympics, where she once competed as a javelin thrower.

What are we to make of a billionaire with a soft spot for striving graduates who draws a hard line on being present for the pomp and circumstance, no matter the circumstances? I couldn't



KYLIE COOPER FOR THE NEW YORK TIMES

Emma Yell and James Ristaino with their daughter, Elena Ristaino. Because the couple were unable to attend their graduation at the University of Massachusetts Dartmouth, they did not get a donor's gift. They were worried about exposing Elena to the rainy ceremony.

make sense of it, so I went to his office in Quincy, Mass., to ask.

Mr. Hale's inspiration to give and keep giving first hit him at a high school Easter Seals hoop-athon. He raised over $1,500 making layups on a basketball court within a specified period of time. "I felt a kind of internal glow," he told me when I asked him about that experience.

After college, he volunteered as a Big Brother to a boy who would later be in his wedding party. And as Mr. Hale built a high-flying start-up, saw it fall into bankruptcy and built a new one — Granite Telecommunications — he and his wife kept giving.

In 2022, the couple gave away $1 million each week. And last year, they donated $26.2 million to a variety of groups as part of Mr. Hale's successful quest to finish the 26.2-mile Boston Marathon.

Set against this record, the decision to exclude people who couldn't go to a graduation ceremony felt like an administrative oversight. So I took a few minutes to read Mr. Hale their emails aloud.

"Part of life is showing up," he said in response, echoing what he told People magazine. "The message I want to be delivered for those who don't attend by choice is, 'Hey, this is a celebration of four years of hard work, and you've got to show up.'"

Surely another part of life, however, is having compassion for people who can't show up on a particular day in specific conditions — but showed up repeatedly for four years or more to earn their diploma. It didn't seem like anyone had ever looked Mr. Hale in the eye and put it that way.

"If there were medical circumstances, we can certainly make accommodations," he said.

Ten days later, he changed his mind.

"Even though he is certainly sorry for the folks who could not make it, for any reason, there were still over 1,000 graduates that were there with him in the pouring rain for the commencement," Katie Sheridan, his executive assistant, said via email. "He would like to stick with the original sentiment that you had to be there in order to receive the envelopes."

Ryan C. Merrill, a UMass Dartmouth spokesman, said via email that under an agreement the school had signed, the $1,000 was only for students participating in the May 16 ceremony.

"With that said, the university remains committed to Mr. Hale's vision for his philanthropic distribution, should that ever change," he wrote.

Ms. Yell, who had hoped that Mr. Hale would make an exception so she and her partner could support organizations that help children with special needs, said she was disappointed all over again.

"I just want people like me — or us — to be seen," she said. "I feel constantly isolated in every way, and the graduation ceremony was just like the cherry on top of everything."

But you had to be there, right? Sentiment, and all that. Otherwise, you don't get seen by Mr. Hale, who told the crowd that "if you give a little bit more in your life, your life will be better for it." Of your own heart, he added.

The Hales' UMass Dartmouth gifts surpassed $1 million, and the cash in the unclaimed envelopes went into an endowed scholarship fund in the couple's names. And they are not done. Mr. Hale told me that he and his wife were planning a similar giveaway at a school he would not name to preserve the element of surprise.

What's that school to do about people who will not be able to go to its graduation in person?

UMass Dartmouth has an applied ethics minor, and I took this entire situation to one of its instructors, Catherine Villanueva Gardner, a professor of philosophy and women's and gender studies.

"One of the things that philosophers discuss is that if you are a recipient of a gift, it comes with responsibilities," she said.

This is crucial. The Hales should do what they want with their money. They earned it.

But nothing is stopping any institution from requiring donors to honor everyone or honor no one at all. A university probably wouldn't draw attention to the People magazine for turning the Hales' money away, but it would make an excellent case study for its applied ethics department.

---

# Chinese Companies Find Ways to Skirt U.S. Tariffs

FROM FIRST BUSINESS PAGE

tional costs for companies and consumers, without increasing the amount of manufacturing in the United States, Mr. Kamler said. He said he had been forced to raise his prices several times as a result of the tariffs.

"There's no real gain here," said Mr. Kamler, whose bikes are sold at Walmart and other retailers. "It's very inflationary."

As Mr. Trump prepares to return to office with sweeping plans to impose more levies on foreign goods, economists and business owners are pointing to unintended consequences that resulted from his tariffs the first time around.

Beginning in 2018, Mr. Trump imposed tariffs on hundreds of billions of dollars of foreign metals, washing machines, solar panels and products from China. His administration said the measures would force companies to set up factories in the United States. President Biden chose to maintain most of those tariffs — and added a few of his own on strategic goods like electric vehicles and semiconductors.

Some industries that compete with cheap Chinese products — like apparel and cabinet makers — credit those tariffs with keeping American manufacturers in business.

But for many other industries, the tariffs simply spurred a global reshuffling of manufacturing operations, one that did little to strengthen U.S. production or reduce ties with Chinese firms. Companies have merely shifted their factories to other low-cost countries in Asia or Latin America instead, and U.S. imports from those countries have surged.

Some companies have severed their ties with China. But others have retained close connections, even as they have moved their operations out of China. Economists say many companies, both Chinese and multinational, have continued to rely on Chinese products and parts, which are now flowing into the United States from factories set up outside China's borders.

In other words, some Chinese products are merely taking a longer trip around the world on their way to the United States, in an attempt to avoid tariffs. Rather than making global supply chains stronger and more diversified, economists say, this may be weakening them — while adding costs for companies and consumers.

In a speech in May, Gita Gopinath, the first deputy managing director of the International Monetary Fund, said trade and investment were being rerouted through what she called "connec-

tor countries," partly offsetting the erosion of more direct links between the United States and China.

The role of these connector countries, most notably Mexico and Vietnam, "may have helped cushion the global economic impact of direct trade decoupling between the U.S. and China," Ms. Gopinath said. "But whether it has helped to diversify exposures and increase supply chain resilience remains an open question."

Brad Setser, an economist and senior fellow at the Council on Foreign Relations, said the main effect of U.S. levies on China was to encourage companies to "find a way around the bilateral tariff."

"It reduces bilateral trade; it doesn't impact global trade," he said.

Mr. Setser added that China's role as a global exporter had not diminished, and that neither had the United States' role as an importer. It was just the countries through which trade was being routed that had shifted.

"Even though we have less direct bilateral trade, in a global sense, there's one surplus country, China, and there's one deficit country, the U.S.," Mr. Setser said. "We are still interconnected indirectly."

Trade data reflects this: The gap between the goods the United States exports to and imports from China narrowed to $278 billion in 2023 from $417 billion in 2018. While that level was set to rebound in 2024, economists say U.S. imports of goods from China that are covered by tariffs have clearly dropped.

At the same time, China's exports globally have surged, and U.S. trade deficits with Vietnam, Taiwan, Mexico, Canada and elsewhere have been widening. Economists say exports to the United States from some of those countries now contain more Chinese parts and raw materials than they did before.

Mr. Trump and his advisers are eyeing these new back doors that Chinese products are using to enter the United States. Mr. Trump has proposed an additional 60 percent tariff on U.S. imports from China, as well as a "universal" tariff of 10 to 20 percent on goods from elsewhere.

He and his advisers also appear to have doubts about the trade deal they renegotiated with Mexico, called the United States-Mexico-Canada Agreement, or U.S.M.C.A. They want to adjust its rules to try to ensure that more Chinese cars and auto parts will not find their way to the United States through Mexico.

But it is unclear how effective their efforts will be against the creativity of global companies that are driven by strong financial incentives to maintain access to the U.S. market.

In industry after industry, Chinese companies have found footholds abroad that allow them to bypass trade barriers with the United States. After the United States put hefty tariffs on Chinese solar panels, for example, many Chinese companies opened solar factories in Southeast Asia. U.S. solar companies have initiated trade cases, successfully appealing to the government for more protection from these factories.

U.S. efforts to block critical minerals and electric vehicle batteries from China from receiving government subsidies have also pushed Chinese companies to set up battery-making subsidiaries in Morocco and Singapore.

And in China, companies like Sailwin, Vanzbon and Tetakawi are advertising services helping Chinese companies find factory space in Mexico and recruit workers there, giving them a base to export to the United States without paying tariffs.

"Seize the opportunity in Mexico and seize the market," read one online Chinese-language ad. "Mexico is adjacent to the United States, and the North American Free Trade Agreement (U.S.M.C.A.) allows companies to easily access the North American market."

Some of these moves may emanate from a natural desire by Chinese companies to cater to global markets, especially at a time when China's domestic economy and consumer demand are relatively weak. But economists and business owners say some of it is undoubtedly an effort to circumvent Mr. Trump's 2018 China tar-




PHOTOGRAPHS BY KATE THORNTON FOR THE NEW YORK TIMES

"The net effect of what's going on with these tariffs is that Chinese factories in China are setting up Chinese factories in other countries," said Arnold Kamler, right, whose company, Kent International, imports some bicycles from China and makes others at a factory in South Carolina, left.

iffs, which the Biden administration has kept in place.

In some cases, global companies have also used accounting and tax tricks to make it appear that their shipments from China are lower, and thus pay fewer tariffs, without making major changes to their supply chains.

Lynlee Brown, a partner in Ernst & Young's global trade practice, said there were many strategies that companies could pursue to reduce the tariffs they paid, having to do with the way U.S. customs officials assign tariff rates to different products.

For example, an electronics company might move one important stage of its supply chain out of China and into Vietnam. That could allow the company to report to U.S. customs agents that the export came from Vietnam, even if the good is still finished in China and exported from China to the United States.

Another lever companies could play with, Ms. Brown said, is valuation. They can officially lower the value of the import by stripping out certain "intangible" costs, like payments for intellectual property, royalties, brand or research and development, and recording those to other global subsidiaries. By lowering the value of the import, they then pay a lower tariff.

It is unclear how much tactics like this have lowered the recorded value of trade between the United States and China, without really changing physical trade flows. U.S. customs duties spiked after the tariffs went into effect, but have fallen back since the beginning of 2022, possibly reflecting some of these changes.

But Ms. Brown said tax and accounting methods had allowed some companies to lower their tariff burden without changing "their physical supply chain at all."

"They did some fancy footwork within the customs regulations that impacts the value they declared for the products," she said.

Alan Wm. Wolff, a senior fellow at the Peterson Institute for International Economics and a former deputy director general of the World Trade Organization, said he anticipated an attempt by the Trump administration to follow Chinese trade further down the path it was taking through other countries to the United States.

But ultimately, those trade measures would not affect the U.S. economy much if the United States and China did not make bigger economic changes, he said.

"The U.S. has a trade deficit of a trillion dollars," he said. "If we don't change our macroeconomic policies, we're going to have a trade deficit of a trillion dollars rearranged."

Claire Fu contributed reporting from Seoul.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re: Chapter 11
EXP OLDCO WINDDOWN, INC., et al.,[1] Case No. 24-11083 (KBO)
Debtors. (Jointly Administered)

NOTICE OF (I) ENTRY OF CONFIRMATION ORDER, (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES

PLEASE TAKE NOTICE THAT on December 17, 2024, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") confirmed the Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and its Debtor Affiliates (Docket No. 1130) (the "Plan"),[2] which was attached as Exhibit A to the Findings of Fact, Conclusions of Law, and Order Confirming the Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and its Debtor Affiliates (Docket No. 1150) (the "Confirmation Order").

PLEASE TAKE FURTHER NOTICE THAT the Effective Date, as defined in the Plan, occurred on December 23, 2024.

PLEASE TAKE FURTHER NOTICE THAT pursuant to Article V.B of the Plan, unless otherwise wise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Debtors and the Holder of such Claim.

PLEASE TAKE FURTHER NOTICE THAT, except as otherwise provided by the Confirmation Order, the Plan, or a Final Order of the Bankruptcy Court, and except for Administrative Claims subject to 11 U.S.C. § 503(b)(1)(D) (for which a Governmental Unit shall not be required to file a request for payment for any Claims covered by 11 U.S.C. § 503(b)(1)(B) or (C) and 11 U.S.C. § 503(b)(9) (for which the general Claims Bar Date (as defined in the Plan) applies), and except for Professional Fee Claims, the deadline for filing requests for payment of Administrative Claims shall be (i) thirty (30) days after the Effective Date (i.e., January 30, 2025) or (ii) in the event an Executory Contract is rejected following the Effective Date, solely as to Administrative Claims related to such rejected Executory Contract, thirty (30) days after notice to the counterparty to such rejected Executory Contract (the "Administrative Claim Bar Date"). A Holder of an Administrative Claim (other than DIP Claims, Professional Fee Claims, or claims subject to section 503(b)(1)(D) of the Bankruptcy Code) that is required to, but does not, file and serve a request for payment of such Administrative Claim by the Administrative Claim Bar Date, such Holder shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property without the need for any objection from the Debtors or any notice to or action from, or approval of the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to the Plan, the Deadline to file final requests for payment of Professional Fee Claims is February 14, 2025 (the "Professional Fee Application Deadline"), which is the first Business Day that is forty-five (45) days after the Effective Date. All professionals must file final requests for payment of Professional Fee Claims by no later than the Professional Fee Application Deadline to receive final approval of the fees and expenses incurred in these Chapter 11 Cases.

PLEASE TAKE FURTHER NOTICE THAT the Plan and its provisions are binding on any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, and whether or not such Holder or Entity voted to accept the Plan.

PLEASE TAKE FURTHER NOTICE THAT the Plan, this Confirmation Order, and other documents and materials filed in these Chapter 11 Cases may be obtained at no charge from Stretto, Inc., the notice and claims agent retained by the Debtors in these Chapter 11 Cases (the "Notice, Claims, and Solicitation Agent") by (a) visiting the Debtors' restructuring website at https://cases.stretto.com/express/; (b) emailing Expressinquiries@Stretto.com with a reference to "EXP OldCo Winddown, Inc." in the subject line, or (c) calling the Debtors' Notice, Claims, and Solicitation Agent at (855) 337-3537 (U.S. & Canada) or +1 (949) 417-1363 (International). You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at: https://ecf.deb.uscourts.gov/.

Dated: December 31, 2024, Wilmington, Delaware, /s/ Domenic E. Pacitti

KLEHR HARRISON HARVEY BRANZBURG LLP, Domenic E. Pacitti (DE Bar No. 3989), Michael W. Yurkewicz (DE Bar No. 4165), Alyssa M. Radovanovich (DE Bar No. 7101), 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Telephone: (302) 426-1189, Facsimile: (302) 426-9193, Email: dpacitti@klehr.com, myurkewicz@klehr.com, aradovanovich@klehr.com -and- Morton R. Branzburg (admitted pro hac vice), 1835 Market Street, Philadelphia, Pennsylvania 19103, Telephone: (215) 569-3007, Facsimile: (215) 568-6603, Email: mbranzburg@klehr.com, Co-Counsel for the Debtors and Debtors in Possession -and- KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP, Joshua A. Sussberg, P.C. (admitted pro hac vice), Emily E. Geier, P.C. (admitted pro hac vice), Nicholas M. Adzima (admitted pro hac vice), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: joshua.sussberg@kirkland.com, emily.geier@kirkland.com, nicholas.adzima@kirkland.com -and- Charles B. Sterrett (admitted pro hac vice), 333 West Wolf Point Plaza, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: charles.sterrett@kirkland.com, Co-Counsel for the Debtors and Debtors in Possession

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification numbers, are EXP OldCo Winddown, Inc. (8128); Project Pine TopCo OldCo, LLC (8079); Project Pine Holding OldCo, LLC (8454); Project Pine Finance OldCo, LLC (7713); Project Pine OldCo, LLC (0160); Project Pine Investments OldCo, LLC (7622); Project Pine Logistics OldCo, LLC (0481); Project Pine Operations OldCo, LLC (3400); Project Pine GC OldCo, LLC (6092); Project Pine Tropic OldCo, LLC (3861); Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382). The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is One Express Drive, Columbus, Ohio 43230.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.