# EXHIBIT A
(Customer Agreement/ Sixth Amendment)

# ONERA, INC.

## CUSTOMER AGREEMENT

| | |
|---|---|
| **Customer**: Express, LLC | **Onera Representative**: Sarah Strobhar |
| **Customer Address**: 1 Express Drive Columbus OH 43230 | **Billing Address**: 1 Express Drive Columbus OH 43230 |
| **Primary Contact**: Steve Nicholas | **Billing Contact**: Jeffrey Richardson |
| **Telephone**: 614-353-3212 | **Billing Telephone**: 614-474-7000 |
| **E-Mail**: snicholas@express.com | **Billing E-Mail**: jrichardson@express.com |
| **Site(s)**: www.express.com | |
| **Omnichannel Initiative/s**: Ship from Store; Buy Online Pickup In Store | |

**Services**: Inventory Availability

Onera will provide its Inventory Availability service ("ATP"), this will consist of the following:

1. Safety Stock – provide recommendations for eligible SKUs via integrated service
2. Manual Configurations – provide configurations to manage safety stock
3. Visibility – provide visibility into recommendations and configurations (only includes standard reports, additional reports available for an additional monthly fee and to be mutually agreed upon between Parties)

**Fees**:

Monthly Fee: $15,000 per month for twelve (12) months after the Production Period commences.

**Term**:

One (1) year from the Production Period. If the Production Period does not commence three (3) months after the Integration Date, Customer has the right to terminate the Agreement with written notice.

The parties may mutually agree, through a written addendum, to renew the Agreement for successive one (1) year periods at the monthly rate mentioned above, or some other mutually agreed upon rate. The parties may also mutually agree to add, through a written addendum, additional sites or initiatives to this agreement, at a mutually agreed upon rate.

This Customer Agreement ("Agreement") is entered into by and between Onera, Inc., ("Onera") and the Customer listed above ("Customer"). This Agreement and the Terms and Conditions attached hereto set forth the entire understanding of the parties with respect to the subject matter described herein and constitutes the entire agreement between the parties, which shall be effective as of May [/d], 2017 ("Effective Date"). There shall be no force or effect to any different terms of any related purchase order or similar form even if signed by the parties after the date hereof.

| EXPRESS, LLC | ONERA, INC. |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| Name: JUDE PETER | Name: Sahil Gupta |
| Title: VP Ecommerce | Title: CEO and Co-Founder |

**TERMS AND CONDITIONS**

1. <u>Definitions</u>: In addition to terms defined elsewhere in the Agreement, the following terms have the following meanings:

1.1 "Services" means Onera's Inventory Availability module ("ATP").

1.2 "Services Term" means the period commencing on the Effective Date and continuing during the Production Period.

1.3 "Integration Date" means the mutually agreed upon date in writing (email permitted) on which Onera receives production ready data from the Customer.

1.4 "Integration Period" means the period commencing on the Integration Date ending on commencement of the Production Period.

1.5 "Production Period" means the period commencing on the date on which Onera activates Services that provides live safety stock recommendations.

2. <u>Services</u>. Subject to the terms and conditions of this Agreement, Onera will provide Customer with access to the Services and hereby grants Customer a non-exclusive right to access and use the Services during the Term. In addition, Onera will provide Customer with certain integration services necessary to integrate the Services to Customer's systems, as well as reasonable ongoing technical and analytical support for the Services. The commencement of the Production Period, as defined above, will be a date that is mutually confirmed by both parties in writing (e-mail permitted).

2.1 Customer will cooperate with Onera in connection with the performance of this Agreement by making available such personnel and information as may be reasonably required. Customer understands that Onera's performance is dependent in part on Customer's actions. Accordingly, Customer will timely provide Onera with the necessary items and assistance in connection with its performance of the Services. Onera shall determine the time, place, methods, details and means of performing the Services. Customer will also cooperate with Onera in establishing a password or other procedures for verifying that only designated employees of Customer have access to any administrative functions of the Services. Customer will be responsible for maintaining the security of Customer's account, passwords (including administrative and user passwords) and files, and for all uses of Customer's account. Customer shall not share with any third party any such account or password without the prior written consent of Onera.

2.2 Customer may not use or export the Services in violation of any applicable laws or regulations. Customer will not, and will not permit any third party to reverse engineer or otherwise attempt to discover the source code or underlying structure or algorithms of the Services (except to the extent such restrictions are contrary to applicable law), modify or create derivative works based on the Services, or otherwise use the Services outside of the scope permitted under this Agreement

3. <u>Confidentiality</u>. Each party (the "Receiving Party") understands that the other party (the "Disclosing Party") has disclosed or may disclose business, technical or financial information relating to the Disclosing Party's business (hereinafter referred to as "Proprietary Information" of the Disclosing Party). The Receiving Party agrees: (i) to take reasonable precautions to protect such Proprietary Information, and (ii) not to use (except as expressly permitted herein) or divulge to any third person any such Proprietary Information. The Disclosing Party agrees that the foregoing shall not apply with respect to any information after five (5) years following the disclosure thereof or any information that the Receiving Party can document (a) is or becomes generally available to the public, or (b) was in its possession or known by it prior to receipt from the Disclosing Party, or (c) was rightfully disclosed to it without restriction by a third party, or (d) was independently developed without use of any Proprietary Information of the Disclosing Party or (e) is required by law.

4. <u>Intellectual Property Rights</u>. Onera owns and will retain all right, title and interest in and to the Services. As between the parties, Customer Data (as defined below) will be owned by Customer. Customer will be solely responsible for the accuracy, quality, integrity and legality of Customer Data. Customer hereby grants to Onera a non-exclusive, worldwide license to copy, modify (including the right to create derivative works of), display and use Customer Data solely to provide the Services to Customer. In addition, Onera may use Customer Data in anonymized and aggregated format to improve and enhance the Services, provided that Onera does not disclose any such anonymized and aggregated data in any manner that would identify Customer or any of its end users or shoppers. "Customer Data" means any information, data and other material provided or supplied to Onera by Customer or Customer's shoppers in

the course of receiving or using Services. For purposes of clarification, Customer will not be providing to Onera, under any circumstances, its retail customers' personally-identifiable information.

5. Payment of Fees. Customer will pay Onera the Fees set forth in the Customer Agreement. All Fees shall be invoiced (via email to the contact set forth on the applicable Customer Agreement) as follows and except as expressly set forth in Section 6 (Termination) and Section 9 (Indemnity) of this Agreement, shall be non-refundable.

5.1 At the commencement of the Production Period, Onera shall begin to invoice Customer monthly in advance in an amount equal to the Monthly Fees (i.e. $15,000 per month), and again monthly in advance at the beginning of any subsequent term that is agreed upon in writing by the parties.

5.2 Full payment for all invoices is due and payable within forty-five (45) days from the date of delivery of Onera's invoice via email to Customer.

5.3 Service Level Agreement: Onera shall use all reasonable commercial efforts to ensure that Onera's Services are operating and available at least 99.9% of the time in any calendar month, excluding scheduled maintenance. Onera shall provide customer with reasonable advanced notice of any scheduled maintenance.

6. Termination.

6.1 If the Production Period does not commence three (3) months after the Integration Date, Customer has the right to terminate the Agreement with written notice and without any amounts due hereunder. During the Production Period either party may terminate this Agreement upon written notice to the other party if the other party materially breaches this Agreement and does not cure such breach within thirty (30) days after receiving written notice of such breach. Either party may terminate this Agreement, and must provide thirty (30) days notice, (i) upon the institution by or against the other party of insolvency, receivership or bankruptcy proceedings, (ii) upon the other party's making an assignment for the benefit of creditors, or (iii) upon the other party's dissolution or ceasing to do business. Termination or expiration of this Agreement shall not affect any rights or obligations of the parties, including the payment of amounts due, which have accrued up to the date of such termination or expiration.

6.2 Four months after the date Production Period commences, Customer will have the right to terminate this Agreement upon written notice to Onera at any time within five (5) business days after the specified four month mark, if (i) the Target Fulfillment Rate (as defined below) is not at least within 5% of a mutually agreed upon level (the "Target Fulfillment Rate Level") as measured over such four month period; or (ii) the Incremental Revenue (as defined below) generated by the Services has not reached a cumulative total of $135,000. "Target Fulfillment Rate" shall be calculated by dividing gross orders fulfilled successfully from Customer's omnichannel program by gross orders processed and released to be fulfilled from Customer's omnichannel program. For clarity, "gross orders" shall mean orders before exchanges and returns by the Customer's end users. Customer and Onera shall mutually agree upon the Target Fulfillment Rate Level in writing (email permitted) no later than the commencement of the Production Period. If Customer and Onera cannot come to a written agreement on the Target Fulfillment Level prior to the commencement of the Production Period, then such level shall be ninety-five percent (95%)."Incremental Revenue" shall mean gross revenue generated by Customer for sales of gross orders fulfilled successfully from stores at inventory levels at or below baseline safety stock levels, for SKUs where safety stock threshold is reduced by Onera from Customer's baseline amount (such baseline must be mutually agreed upon by the parties prior to the Production Period). For clarity, this Section 6.2 termination right is a one-time right that is exercisable only within five (5) business days of the specified four month mark if the applicable conditions have not been met; Customer may not terminate the Agreement under Section 6.2 at any other time.

6.3 In the event of any termination by Customer pursuant to this Section 6, Onera will reasonably assist Customer, at Customer's expense, to transition the Services to Customer or another third party provider.

6.4 Upon termination or expiration of this Agreement, the provisions of Sections 2.2, 3, 4, 5, 6, 7.2, and 8-11 shall survive and shall continue in full force and effect in accordance with their terms.

7. Warranties; Disclaimer.

7.1 Onera warrants that (a) the Services will operate in material conformity with any specifications set forth in writing by Onera, (b) it will perform the Services in a professional and workmanlike with employees having a level of skill commensurate with the requirements of this Agreement, and (c) the Services do not to Onera's knowledge infringe any third party intellectual property right or violate applicable law.

*7.2 Except for the warranties set forth in Section 7.1, Onera hereby disclaims all warranties, express or implied, including all implied warranties of merchantability, fitness for a particular purpose and title.*

8. Limitation of Liability. *With the exception of any indemnification obligations set forth below, neither party shall be liable for (a) any indirect, punitive, incidental, special or consequential damages arising out of this Agreement or the delay or inability to use the Services (including lost profits) or (b) any other damages in excess of the total amount paid (and payable) to Onera in the twelve (12) month period prior to the date of the claim, in each case whether based in contract, tort, strict liability or otherwise, and even if either party has been advised of the possibility of damages. The foregoing limitations will apply notwithstanding any failure of essential purpose of any limited remedy and to the maximum extent permitted under applicable law.*

9. Indemnification.

9.1 Onera agrees to indemnify, defend, and hold harmless Customer against any liabilities, damages and costs (including reasonable attorneys' fees) payable to a third party arising out of a third party claim alleging that the Services infringe any third party intellectual property right.

9.2 Notwithstanding the foregoing, Onera will have no obligation under this section or otherwise with respect to any infringement claim to the extent based upon (i) any unauthorized use, reproduction, or distribution of the Services or any breach of this Agreement by Customer, (ii) any combination of the Services with other products, equipment, software, uses or data not supplied, authorized or recommended by Onera, (iii) any modification of the Services by any person other than Onera or its authorized agents or contractors or (iv) any activity after Onera has provided Customer with a work around or modification that would have avoided such issue without materially adversely affecting the functionality or availability of the Services. If Onera reasonably believes that all or any portion of the Services, or the use thereof, is likely to become the subject of any infringement claim, suit or proceeding, Onera will procure, at Onera's expense, for Customer the right to continue using the Services in accordance with the terms hereof, replace or modify the allegedly infringing Service to make it non-infringing, or, in the event the preceding is infeasible or not commercially practicable, Onera may, in its sole discretion, terminate this Agreement upon written notice to Customer and refund to Customer any prepaid amounts for unused Services.

9.3 Customer shall provide Onera with prompt written notice upon becoming aware of any claim, suit or proceeding subject to indemnification hereunder and shall provide reasonable cooperation to Onera in the defense of or investigation of any claim, suit or proceeding. Onera, at its option, will have sole control of such defense, provided that Customer is entitled to participate in its own defense at its sole expense. Onera shall not enter into any settlement or compromise of any such claim without Customer's prior written consent, which shall not be unreasonably withheld, except that Onera may without such consent enter into any settlement of a claim that resolves the claim without liability to Customer and without impairment to any of Customer's rights or requiring Customer to make any admission of liability.

10. Publicity. Customer agrees that Onera may use Customer's company name and logo on Onera's marketing materials in order to identify Customer as a customer of Onera to prospective clients in non-public forums only. Otherwise Onera is not permitted to use Customer's name and logo in any advertising or publicity without the prior written consent of Customer, which may be withheld in its sole discretion.

11. General. For all purposes under this Agreement each party shall be and act as an independent contractor and shall not bind nor attempt to bind the other to any contract. Onera will be solely responsible for its income taxes in connection with this Agreement and Customer will be responsible for sales, use and similar taxes, if any. Onera will be responsible for performance of its agents and subcontractors under this Agreement. This Agreement and any dispute arising hereunder shall be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions thereof. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover reasonable costs and attorneys' fees. Without limiting anything herein, and except for payment obligations, neither party shall have any liability for any failure or delay resulting from any condition beyond the reasonable control of such party, including but not limited to governmental action or acts of terrorism, earthquake or other acts of God, labor conditions and power failures. Neither party shall have the right to assign this Agreement, except that either party may assign its rights and obligations without consent to an affiliate or to a successor to substantially all its relevant assets or business. In the event of any assignment of this Agreement by Onera, it successor will continue to perform under this Agreement and Customer will continue to have all rights, duties and obligations hereunder. No waiver, change, or modification to this Agreement will be effective unless in writing signed by both parties. Any notices in connection with this Agreement will be in writing and sent by first class US mail, confirmed

facsimile or major overnight delivery courier service to the address specified on the cover sheet of this Agreement or such other address as may be properly specified by written notice hereunder.  The parties agree that this Agreement may be signed by manual or facsimile signatures and in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated so that this Agreement shall otherwise remain in full force and effect and enforceable.

SIXTH AMENDMENT TO CUSTOMER AGREEMENT

THIS SIXTH AMENDMENT TO CUSTOMER AGREEMENT (this "<u>Amendment</u>") is entered into as of February 1, 2023 by and between Onera, Inc. and Express, LLC, and amends that certain Customer Agreement between them dated as of May 12, 2017 (the "<u>Agreement</u>"), as previously amended by the following amendments:

| *Title:* | *Date:* |
|---|---|
| Addendum No. 1 | As of October 2, 2018 |
| Addendum No. 2 | As of March 25, 2019 |
| Addendum No. 3 | As of December 18, 2019 |
| Addendum No. 4 | As of January 29, 2021 |
| Addendum No. 5 | As of January 25, 2022 |

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

WHEREAS, the parties wish to renew and amend the Agreement as set forth below;

NOW, THEREFORE, in consideration of the premises and the mutual undertakings set forth herein, the parties agree as follows:

1. <u>Amendments</u>. The Agreement is hereby amended as follows:

(a) *Term; Renewal.* The "Term" section on the signature page is amended by deleting the second paragraph (*"The parties may mutually agree. . . ."*) and adding the following text at the end thereof:

*The term of this Agreement (the "Term") shall (a) be extended commencing February 1, 2023 for a period of three (3) years and (b) thereafter automatically be renewed for consecutive periods of one (1) year (each year of such Term extension and renewal periods, a "Subscription Period") unless either party gives the other notice of non-renewal at least one hundred twenty (120) days before the relevant renewal date.*

(b) *Fees.* The "Fees" section on the signature page is hereby amended by adding the following text at the end thereof:

*For the Subscription Period commencing February 1, 2023, the quarterly fee shall be $45,000. For each subsequent Subscription Period, the quarterly fee shall increase by the lesser of (a) three percent (3%) over the quarterly fee for the immediately preceding*

*Subscription Period or (b) the most recent "12-Month Percent Change" in the Consumer Price Index for All Urban Consumers, U.S. City Average, for all items, 1982-84=100 (the CPI-U), published by the U.S. Department of Labor, unless the parties agree in writing on a different quarterly rate at least one hundred twenty (120) days prior to the beginning of such Subscription Period.*

(c) *Scope of Use.* (i) The "Services" section on the signature page of the Agreement is amended by adding the following text at the end thereof:

*Limitations on the scope of Customer's use of the Services as of January 1, 2023 are set forth on Exhibit A attached hereto.*

(ii) A new Exhibit A is added, in the form attached to this Amendment as Exhibit 1(c)(ii).

(d) *Payment Terms.* Section 5.2 of the Agreement is deleted and replaced by the following text:

*5.2 All fees hereunder are (a) non-cancelable, (b) except as specifically provided in this Agreement, non-refundable and (c) exclusive of taxes and expenses. Customer shall pay any sales, value-added or other similar taxes imposed by applicable law that Onera must pay based on the Services hereunder, except for taxes based on Onera's income. All amounts invoiced hereunder are due and payable within forty-five (45) days of the date of the invoice. Late payments of undisputed fees shall be subject to a finance charge of at the lower rate of (i) twelve percent (12%) per annum or (ii) the maximum rate allowed by applicable law.*

(e) *Confidentiality.* Section 3 of the Agreement is amended to read as follows (new or changed text underlined):

*3. Confidentiality. Each party (the "Receiving Party") understands that the other party (the "Disclosing Party") has disclosed or may disclose business, technical or financial information relating to the Disclosing Party's business ("Confidential Information"). During and after the Term, the Receiving Party shall: (i) take reasonable precautions to protect such Confidential Information, and (ii) not use (except as expressly permitted herein) or divulge to any third person any such Confidential Information. The foregoing shall not apply with respect to any information that the Receiving Party can document (a) is or becomes generally available to the public through no fault of the Receiving Party, or (b) was in its possession or known by it prior to receipt from the Disclosing Party, or (c) was rightfully disclosed to it without restriction by a third party, or (d) was independently developed without use of any Confidential Information. Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information as required by a court or applicable law; provided that the Receiving Party, if legally permitted, has provided reasonable advance notice to the Disclosing Party of such required disclosure and cooperated with any effort of the Disclosing Party to prevent or limit such disclosure. Upon the expiration or termination of this Agreement, the Receiving Party*

2

*shall promptly return to the Disclosing Party or, at the Disclosing Party's request, destroy any and all copies of Confidential Information in its possession or control and delete any Confidential Information stored in its electronic media; provided that (i) the Receiving Party shall not be required to delete electronic back-up files created and retained in accordance the Receiving Party's back-up procedures and not accessed or restored to general accessibility and (ii) the Receiving Party's legal counsel may retain copies of the Confidential Information which shall be used solely as archival copies for the purpose of defending any claim that the Receiving Party breached its obligations hereunder with respect to such Confidential Information.  Notwithstanding the return or deletion of the Confidential Information, the Receiving Party will continue to be bound by such the Receiving Party's obligations hereunder with respect to such Confidential Information.*

(f) *Termination*.  Section 6.1 of the Agreement is deleted and replaced by the following text:

*6.1  In addition to the termination rights specified elsewhere in this Agreement, this Agreement may be terminated by either party:*

*(a) upon at least thirty (30) days' advance notice to the other, if the non-terminating party has breached a material term of this Agreement described in such notice and failed to correct such breach before the effective date of termination specified in such notice.  By way of example but not limitation, any of the following shall be deemed material breaches by Customer: (A) exceeding the limitations on scope of use, if any, set forth in this Agreement (e.g., SKU locations, order volume); (B) providing access to Services to third parties (other than individual independent contractors of Customer using the Services on Customer's behalf and subject to the terms and conditions hereof); (C) failure to pay any undisputed amount due hereunder; and (D) breach of Section 3 above (Confidentiality).  By way of example but not limitation, any of the following shall be deemed material breaches by Onera: (X) materially decreasing the overall security of the Services during the then current Subscription Period; and (Y) breach of Section 3 above (Confidentiality);*

*(b) immediately upon notice to the other, if the other (A) ceases to conduct its business in the ordinary course; (B) becomes insolvent; (C) makes an assignment for the benefit of creditors; (D) petitions, applies for, or suffers (with or without its consent) the appointment of a custodian, receiver, trustee in bankruptcy or similar officer for all or any substantial part of its business or assets; or (E) avails itself of or becomes subject to any proceeding relating to bankruptcy, insolvency, reorganization, receivership, arrangement, adjustment of debts, dissolution or liquidation, which proceeding, if involuntary, is not dismissed within sixty (60) days of commencement thereof; or*

*(c) to cancel Subscription Periods commencing February 1, 2024 and/or February 1, 2025, upon written notice to the other party given not less than one hundred*

*twenty (120) days prior to the commencement of such Subscription Period, and upon such cancellation, the remainder of the current Term is terminated.*

  (g) *Non-Solicitation*.  A new Section 10A is added, as follows:

*10A.  <u>Non-Solicitation</u>.  During the Term and for twelve (12) months thereafter, each party hereto shall  refrain from soliciting any Personnel of the other party; provided that this section will not apply to Personnel who independently respond to indirect solicitations (such as general newspaper advertisements, employment agency referrals and internet postings) not targeting such Personnel.  As used herein, "Personnel" of a party includes any individual that such party  has employed or engaged at any time during the Term as an employee or independent contractor and with whom the other party hereto or its Affiliate has come into contact in connection with this Agreement.*

  (h) *Definition of "Affiliate"*.  A new Section 1.6 is added, as follows:

*1.6  "Affiliate" (whether or not capitalized) means, with respect to any Person, any other Person that Controls, is Controlled by, or is under common Control with, such first Person.  For purposes of this definition: (a) "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting stock or similar rights, the holding of office, by contract, or otherwise; and (b) "Person" means a natural person, corporation or other entity.*

  (i) *Service Level Agreement*. (i) Section 5.3 is amended to read as follows:

*5.3 <u>Service Level Agreement</u>.  Onera's service level commitment under this Agreement is set forth in <u>Exhibit B</u> attached hereto.*

  (ii) A new Exhibit B is added, in the form attached to this Amendment as <u>Exhibit 1(i)(ii)</u>.

  2. <u>Miscellaneous</u>.  All provisions of the Agreement not explicitly amended by this Amendment shall remain unaffected hereby.  This Amendment (a) shall be governed by, and construed in accordance with, the governing law provided for in the Agreement and (b) may be executed by telecopy and in several counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

      [*Signature page follows*]

IN WITNESS WHEREOF, each party has executed, or caused to be executed by its duly authorized officer, this Amendment as an instrument under seal as of the date first written above.

ONERA, INC.                                          EXPRESS, LLC

By: *Sahil Gupta*                                    By: [signature]
    Sahil Gupta (Mar 6, 2023 12:24 PST)
    Sahil Gupta, CEO                             Name: Niel Meyer
                                                 Title: VP Application Delivery

5

6

Exhibit 1(c)(ii)

Exhibit A to Agreement

Scope of Use as of January 1, 2023

3,975,000 active item/location combinations (sku/locs)

Exhibit 1(i)(ii)

Exhibit B to Agreement

Service Level Agreement

Target Availability: Onera strives to provide 99.0% Availability each calendar month.

Availability Calculation: "Availability" means the percentage of time, calculated as set forth below, that the Services are available for access and use by Customer through Onera's Internet connection.

Availability = $((a - b) / a) \times 100$, where:

"a" is the total number of hours in the relevant calendar month (on a 24x7 basis)

"b" is the total number of hours of Downtime in such calendar month

As used herein:

"Downtime" means any period, other than Excused Downtime and Scheduled Downtime, during which the Services are not available for access and use by Customer in accordance with this Agreement, measured from the time at which Customer first reports such unavailability to Onera to the time such unavailability is resolved (including without limitation by means of a workaround.

"Excused Downtime" means unavailability of Services due to any of the following:

(i) service interruption caused by a security threat, until such time as the security threat has been eliminated;
(ii) use of unapproved or modified hardware or software by or on behalf of Customer;
(iii) misuse of the Services;
(iv) Scheduled Downtime as described below;
(v) equipment, data, materials, software, hardware, services or facilities not provided by or on behalf of Onera;
(vi) Customer's network or Internet connection;
(vii) acts or omissions of Customer, its employees, contractors, agents, third-party suppliers or anyone gaining access to the Services with the permission or acquiescence of Customer;
(viii) bugs or other problems in the software, firmware or hardware of third parties;
(ix) outage, network unavailability or downtime outside the Onera data center; or
(ix) other circumstances beyond Onera's reasonable control that could not be avoided by its exercise of due care.

"Scheduled Downtime" means a period of unavailability of the Services for (i) scheduled system maintenance of which Onera has provided Customer at least 48 hours advance notice or such shorter notice as to which Customer may consent in writing (email shall be

7

|  |  |
|---|---|
| | sufficient for such notices and consents); or (ii) maintenance planned in agreement with Customer (*e.g.*, to implement a new release of the Software). Unless otherwise agreed by Customer in advance, Onera will perform scheduled maintenance on business days, between 11:00 p.m. EST and 3:00 a.m. EST. |
| Remedies: | The remedies stated in this Section are Customer's sole and exclusive remedies and Onera's sole and exclusive obligations for failures to meet the Availability target set forth above. If Availability in any calendar month is below the target, Customer will receive a credit ("Service Credit") equal to the percentage of fees for the Services for such month corresponding to the actual Availability during such month set forth in the table below. |

| *Availability* | *Credit* |
|---|---|
| 99.0% - 100% | No Credit |
| 97.5% - 98.9% | 2% |
| 95.0% - 97.4% | 5% |
| Less than 95.0% | 10% |

Service Credits will appear on the quarterly invoice issued after Availability is calculated. No Service Credits will be issued, and Customer will have no remedy for Availability failures, unless Customer is current on all payments hereunder during the relevant service month and when the Service Credit would otherwise be issued.

In the event of Downtime lasting for more than (a) twenty (20) consecutive full days (24 hours) or (b) twenty (20) full days in any six- (6-) month period, Customer may, as its sole remedy terminate this Agreement on thirty (30) day's written notice to Onera, given within fifteen (15) days after the twentieth (20th such day).

|  |  |
|---|---|
| For Dynamic Fulfillment Services: | *This section applies to Dynamic Fulfillment Services only.* |
| | Onera strives to meet the application programming interface (API) response times set forth below for each tier in at least 98% of cases during any given service month: |
| | 1-5 orderlines: 150 ms<br>6-10 orderlines: 300 ms<br>11-20 orderlines: 500 ms |
| | Response time is the processing time of the data center to complete transactions submitted from a web browser or a relevant tool for testing APIs. If Supplier fails to meet the API Response SLA for three (3) months in a twelve- (12-) month period, Customer may terminate the Agreement upon at least thirty (30) days' written notice and receive a refund of any prepaid and unused fees as of the effective date of termination. |