## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXP OLDCO WINDDOWN INC.[1] | ) | Case No. 24-10831 (KBO) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| TRACY L. KLESTADT, | ) | |
| PLAN ADMINISTRATOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 25-_____ (KBO) |
| | ) | |
| TIMOTHY BAXTER, MATTHEW | ) | |
| MOELLERING, and JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

SAUL EWING LLP
John D. Demmy (DE Bar No. 2802)
Lucian Murley (DE Bar No. 4892)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
 (302) 421-6800

HERBERT SMITH FREEHILLS
KRAMER (US) LLP
Natan Hamerman
Elan Daniels
Jeffrey S. Trachtman
Rachel Czwartacky
Hannah Kanter
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Attorneys for Plaintiff Tracy L. Klestadt, Plan
Administrator of EXP OldCo Winddown Inc.*

Dated:  December 29, 2025

---

1   The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is EXP OldCo Winddown, Inc. (8128).  The chapter 11 cases of the Debtor's affiliates Project Pine TopCo Winddown, LLC (8079); Project Pine Holding OldCo, LLC (8454); Project Pine Finance OldCo Corp. (7713); Project Pine OldCo, LLC (0160); Project Pine Investments OldCo, LLC (7622); Project Pine Logistics OldCo, LLC (0481); Project Pine Operations OldCo, LLC (3400); Project Pine GC OldCo, LLC (6092); Project Pine Tropic OldCo, LLC (3861); Project Pine California OldCo, LLC (8688); and Express Fashion Digital Services Costa Rica, S.R.L. (7382) were closed as of September 29, 2025.  All motions and contested matters that remained open as of the closing of such cases, or that are opened after the date thereof, are administered in the remaining chapter 11 case of EXP OldCo Winddown, Inc.

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

INTRODUCTION ......................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 7

THE PARTIES............................................................................................................... 8

FACTUAL ALLEGATIONS ......................................................................................... 9

I.      The Express, Inc. Executive Leadership Team and Board of Directors ......................... 10

II.     Defendants Steer Express's Sale Process for Their Own Benefit.................................... 12

     A.      Bluestar Makes an Unsolicited Offer to Purchase Express at a Premium Price ................................................................................................................. 14

     B.      Baxter Engineers a Proposal from WHP to Retain Control of Express.............. 19

     C.      Its Consideration Skewed by Management's Conflicts, Express Imprudently Allows the Bluestar Proposal to Lapse ........................................... 23

     D.      Express Proceeds with the Problematic WHP Transaction ................................. 26

III.    Express Enters Into an Even Worse Transaction to Acquire Bonobos........................... 32

IV.     Complaints Regarding Baxter's Abusive and Retaliatory Behavior Lead to His Departure.................................................................................................................... 35

V.      Following the Bonobos Transaction, Express's Decline into Bankruptcy Is Hastened..................................................................................................................... 36

CAUSES OF ACTION ................................................................................................ 37

FIRST CAUSE OF ACTION (Breach of Fiduciary Duty Against Tim Baxter)........................ 37

SECOND CAUSE OF ACTION (Breach of Fiduciary Duty Against Matt Moellering and the John Doe Defendants)............................................................................................ 39

PRAYER FOR RELIEF ............................................................................................... 41

i

Plaintiff Tracy L. Klestadt, not in any individual capacity but solely in his capacity as the Plan Administrator for the Debtor EXP OldCo Winddown Inc. and certain of its affiliates (formerly known as Express, Inc. ("Express" or the "Company"), and affiliates), for his complaint against Defendants Timothy Baxter ("Tim Baxter" or "Baxter"), Matthew Moellering ("Matt Moellering" or "Moellering"), and John Does 1-10, respectfully alleges, based on personal knowledge as to his own conduct and otherwise upon information and belief, as follows:

## INTRODUCTION

1.     By this action, Plaintiff seeks to recover for losses arising from breaches of fiduciary duties by Express Chief Executive Officer and director Tim Baxter and Chief Operating Officer Matt Moellering ("Defendants"). Driven by the self-serving and reckless actions of these Defendants, Express abandoned a 2022 take-private acquisition offer by Bluestar Alliance ("Bluestar") that would have dramatically improved the struggling Company's prospects, retired all of its funded debt, and paid shareholders an enormous premium on the steadily declining market value of their shares. Instead, they pursued and entered into an objectively less favorable deal with a close friend of Baxter's that preserved Defendants' leadership roles at the expense of Express's shareholders – putting Express on a fast-track towards bankruptcy and harm to all stakeholders.

2.     Bluestar's offer would have rescued Express, which had been unable to execute on an ambitious business plan and was struggling to keep up with peer companies even in a weak market. But it was well known that Bluestar's business model was to acquire struggling brands and revitalize them by overhauling management strategy under new leadership. Baxter and Moellering understood from Bluestar's initial approach in April 2022 (or, at the latest, shortly thereafter) that in any transaction with Bluestar, their control of Express – and quite possibly their employment – was at risk. This created an immediate conflict of interest that eventually led them

1

to steer the Board towards a markedly inferior transaction designed to preserve Defendants' control of the Company.

3.      Defendants understood, however, that receiving this credible and facially desirable offer obligated Express to engage with Bluestar and at least go through the motions of negotiating to improve the deal.  As negotiations progressed, however, two things happened that exacerbated Defendants' concerns and heightened the conflict of interest:  First, once Bluestar obtained access to Express's confidential information in June 2022, it was harshly critical of management's business plan – signaling to Defendants that Bluestar would likely follow its customary M.O. and install its own leadership and business plan after taking Express private.  Second, Bluestar eventually included in its revised offer in August 2022 a reference to a planned Transition Services Agreement ("TSA") – an even clearer indication that current management would *not* be leading Express into its new chapter.

4.      Reacting to these developments, Baxter, with the help of Moellering, scrambled before a key August Board meeting to find an alternative to the Bluestar transaction more likely to preserve their leadership roles and control of the Company's direction.  Defendants engineered a competing offer from WHP Global ("WHP"), a brand management company founded and run by Yehuda Shmidman, Baxter's close personal friend for over a decade.  Shmidman's involvement created a second, distinct conflict of interest for Baxter.  Instead of turning over negotiation of the competing offer to unconflicted representatives, Baxter actively favored WHP, providing Shmidman with the information necessary to craft an offer tailored to appeal to Express's board and management.  That preference to do business with WHP, a company run by a friend and industry confidante, and not their duty to obtain the best deal for Express's stakeholders, became the guiding principle for Defendants' actions and advice to the Board.

2

5.      Thus, at the August 19 Board meeting, on information and belief, Defendants swayed the Board to abandon the proverbial "bird in the hand" offered by Bluestar – an immediate cash pay-out for shareholders at a huge premium and full retirement of Express's debt.  Instead, Defendants steered the Board towards the "two in the bush" – a just-received proposal by WHP that had not yet been fully analyzed but on its face offered only a long-term possibility of success subject to many contingencies, and in the short term left Express mired in debt.  Defendants steered the Board by touting the WHP offer as a way to build upon the current overly optimistic business plan, which relied on Defendants' continuing leadership, and trumpeting a supposed cash infusion, which actually was quite limited and provided only short-term relief.

6.      The Board's consideration of the competing bids was tainted by Defendants' conflicts.  Although Defendants feared losing their leadership positions under the Bluestar proposal, they soft-pedaled the issue by omitting any reference to the TSA from their Board presentation.  And Baxter's undisclosed friendship with Shmidman was an independent conflict that tainted management's assessment of the relative merits of the offers and should have required Baxter's recusal so that unconflicted fiduciaries could independently analyze the offers and explain them to the Board.  At minimum, the conflict should have been expressly flagged so the Board could assess what other advice to seek.  However, although Baxter had admitted outside the Board's presence that the relationship posed a conflict, he never disclosed to the Board his close friendship with Shmidman.

7.      In the dark about the stark conflict, guided by management's unalloyed praise of WHP, and equipped with only limited financial forecasts that assumed rather than tested the success of Defendants' business plan, the Board pocket-vetoed the Bluestar offer.  With objective guidance, the Board would have sought a further extension of Bluestar's offer to properly analyze

WHP's proposal – received just 48 hours prior to the August 19 Board meeting called specifically to evaluate Bluestar's proposal – and permit an in-depth, side-by-side comparison. Instead, the Board let the Bluestar offer lapse – eventually entering into an objectively worse transaction that had become the only remaining offer on the table.

8.      A fully informed comparison would have yielded only one reasonable conclusion: The WHP proposal was vastly inferior to Bluestar's offer. Unlike the Bluestar transaction, the WHP transaction would not pay off all of the Company's debt and would not yield an immediate premium to shareholders. Even worse, the transaction's structure was skewed wildly in WHP's favor: Express would contribute its key asset, its intellectual property, to a joint venture controlled by WHP in which Express would maintain only a minority stake. This structure would destroy the value of Express's residual assets (branded inventory and the minority stake in the joint venture) by making them unsaleable to anyone other than WHP. Express would also have to commit to make guaranteed perpetual minimum royalty payments to the joint venture – paying to use its own trademarks and brands, regardless of sales. This essentially turned WHP's supposed equity investment into a disguised loan to Express that would be repaid over time regardless of Express's sales performance and revenue. And on top of all these other disadvantages, the Board would eventually learn that, to make any economic sense at all, the WHP deal would require a cash-strapped Express to first significantly expand its brands and operations through additional acquisitions, something Express could not reasonably expect to afford to do.

9.      As it played out, Express did not even receive the full benefit of the cash infusion that supposedly justified the WHP deal. Of the $260 million WHP paid to Express as investments in the PlatformCo and IPCo (both as defined below), *more than half* was immediately swallowed up by Express's outstanding obligations, including $95 million in prepayment for Express's term

loan – an obligation that would have been satisfied directly with new money under Bluestar's offer, over and above the premium price paid to shareholders.  A further $60 million that Express had *just received* from WHP went straight to the newly formed IPCo to prepay Express's guaranteed minimum royalty obligation for use of its own IP to sell its own merchandise, a net reduction of liquidity of $36 million after some of that was returned to Express on account of its minority stake. Finally, another $32 million went to pay taxes and transaction fees.  Of the $260 million of proceeds, only $89 million was added to Express's balance sheet as a result of the transaction.

10.    Anticipating pushback to this lopsided WHP deal from shareholders – who were never even informed of Bluestar's superior offer – Express's General Counsel and public relations firm prepared canned responses to numerous hypothetical challenges.  These included, for example, why Express would give up control of its key IP assets or ever agree to pay royalties on its own brand.  Even Express's own advisors, however, had difficulty coming up with good answers.  Indeed, by the time the deal closed, Express's own forecasts reflected that, unless Express – still struggling to perform on its own and running low on liquidity – soon acquired one or more brands in follow-on transactions, the WHP transaction would actually yield *lower* returns for stakeholders in most reasonable scenarios as opposed to doing nothing.  Nor was there any evaluation of the feasibility of such acquisitions given the business's cash needs and underperformance.  Yet, in need of immediate cash and having left itself with no alternative, Express entered into the transaction with WHP anyway.

11.    Defendants' self-interested decision to abandon Bluestar's proposal and pursue only the WHP transaction was the first domino to fall in Express's inexorable collapse into bankruptcy, but Defendants' conflicted conduct continued, hastening the Company's demise. Immediately after closing the WHP transaction, Express began negotiations to acquire Bonobos

from Walmart – part of a futile effort to scale up the new structure, which had been (unrealistically) touted by Defendants as the only hope for it to be profitable.

12.     Again, the situation was rife with conflicts, which Defendants did nothing to abate. WHP, as a co-acquiror, stood on two sides of the three-sided deal, since Shmidman now sat on the Express board but was negotiating for WHP to acquire Bonobos's intellectual property alone. Baxter continued to undermine Express's interests for the benefit of his friend Shmidman, endeavoring to keep him from being recused from discussions on Express's negotiation strategy and sharing information that undermined Express's negotiating position.  Moellering, too, ran roughshod over anyone at Express who tried to pump the brakes on this transaction within his operations and technology teams.  During these negotiations, an anonymous complaint was lodged concerning "double dealing" and unethical sharing of non-public information between Baxter and Shmidman during the Bonobos negotiations.  Around the same time, a complaint on a Company hotline likewise asserted that Moellering was failing to act on employee concerns, including that the Company was not operationally prepared to incorporate another business, and that employees feared being fired for calling this out.  The Defendants, however, plowed forward unabated.

13.     In the end, the Bonobos deal was even more skewed in WHP's favor than the initial WHP transaction.  WHP acquired *all* of Bonobos's intellectual property (with Express obtaining *no* interest this time), while Express assumed significant lease and working capital liabilities and purchased Bonobos's branded inventory, much of which eventually had to be sold at sizeable discounts.  This exacerbated Express's already precarious financial situation and was contrary to the concepts discussed in negotiations over WHP's original proposal in Fall 2022, which contemplated a joint ownership structure for future acquisitions.  In short, Express continued to suffer as a direct result of its conflicted decision-making.

14.     Defendants' actions to steer the Board away from Bluestar and towards WHP to save their leadership positions through a deal with the CEO's buddy ultimately pushed Express into bankruptcy.   Unsurprisingly, after financing the Bonobos acquisition, which consumed liquidity Express could scarcely afford to squander, the Company immediately needed more cash. The Company's desperate need to borrow money, brought on by the ill-advised Bonobos transaction, toppled the next domino in Express's decline:   Express ended up borrowing money from an affiliate of a known liquidator, which eventually imposed reserves on the Company and caused it to file for bankruptcy.   Each domino is traceable to the original decision, led by Defendants, to reject a lucrative take-private transaction in favor of a transaction with WHP that depended on the Company's successful execution of a business plan that had already repeatedly failed.   That decision resulted from a flawed process skewed by Defendants' conflicts, producing patently unreasonable decisions to the detriment of Express's shareholders and other stakeholders, causing vast harm to unsecured creditors that this action seeks to remedy.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the District of Delaware (the "District of Delaware") referring to the Bankruptcy Judges of the District of Delaware all cases and proceedings arising under and related to title 11 of the United States Code (the "Bankruptcy Code").

16.     This is a core proceeding under 28 U.S.C. § 157(b)(2) concerning the administration of assets of the estate.   In the alternative, this Court has concurrent jurisdiction over noncore proceedings under 28 U.S.C. § 1334(b) because the causes of action have a close nexus to the Debtors' Chapter 11 plan and the proceeding will have a significant effect on implementation of the Plan.

7

17.     Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Plaintiff also consents to entry of final orders and judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

18.     This Court has personal jurisdiction over the Defendants under Bankruptcy Rule 7004(f) because they are domiciled in the United States.

19.     Venue in the District of Delaware is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and/or is related to cases commenced under the Bankruptcy Code.

## THE PARTIES

20.     Plaintiff Tracy L. Klestadt is the Plan Administrator of EXP OldCo Winddown, Inc. (the "Wind-Down Debtor") for the Chapter 11 bankruptcy estates of Express (the "Debtor") and certain of its affiliates (collectively, with Express, the "Debtors"), as set forth in the *Findings of Fact, Conclusions of Law, and Order Confirming the Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and its Debtor Affiliates* (Docket No. 1150) (the "Confirmation Order") dated December 17, 2024, confirming the *Joint Chapter 11 Plan of EXP OldCo Winddown, Inc. and its Debtor Affiliates* (Docket No. 1143) (the "Plan"), and the Plan Administrator Agreement (the "Plan Agreement").  The Plan was declared effective as of December 31, 2024.  *Notice of Effective Date*, Docket No. 1190.

21.     The Debtor in the above-captioned chapter 11 case was formerly known as "Express, Inc."  Its former affiliates were the Express, Bonobos, and UpWest companies.  Debtors were incorporated in Delaware; Debtors' principal place of business was Ohio.

22.     Wind-Down Debtor EXP OldCo Winddown, Inc. is incorporated in Delaware.

23.     Article IV.I of the Plan preserves and vests in the Wind-Down Debtor all causes of action retained under the plan, whether arising before or after the petition date of April 22, 2024. The retained causes of action include all causes of action against Non-Released Parties, including any claims for breach of fiduciary duty arising from actual or contemplated pre-petition transactions, events, or relationships, any action or inaction in connection with such transactions, events, or relationships, and any other misconduct.  *See* Plan Supplement, Dkt. No. 1077.  Article VII.A of the Plan and the Plan Agreement authorize the Plan Administrator to investigate, prosecute, and/or settle such retained causes of action.

24.     Pursuant to an order entered September 29, 2025, the bankruptcy cases of the Debtors, excepting EXP OldCo Winddown, Inc., were closed, without prejudice to the Plaintiff's rights to pursue all causes of action held by those Debtors.  *Final Decree and Order Closing Certain of the Chapter 11 Cases*, Dkt. No. 1489.

25.     Defendant Tim Baxter is the former Chief Executive Officer and a former director of Express, Inc.  He is currently domiciled in either California or New York.  Baxter is a Non-Released Party under the Plan.

26.     Defendant Matt Moellering is the former President and Chief Operations Officer of Express, Inc. He is currently domiciled in Ohio.  Moellering is a Non-Released Party under the Plan.

27.     The John Doe Defendants are former officers and/or directors of Express or its affiliates, or other fiduciaries to one or more of the Debtors, whose identity is not yet known to Plaintiff, who participated in, or failed to prevent, the breaches of fiduciary duty described herein.

## FACTUAL ALLEGATIONS

28.     Express is an American fashion retailer that sells exclusively branded apparel and accessories.  It began as a women's clothing company in the 1980s under the name "Limited

Express." In 2001, its stores began selling apparel and accessories for men. In 2010, Express went public as the sixth-largest specialty retail apparel brand in the United States. At the height of its popularity in 2015, Express operated more than 600 retail stores throughout the United States, Canada, Latin America, and the Middle East, and its annual revenue peaked at $2.3 billion.

29.    Like many of its peers, Express's performance suffered during the Covid-19 pandemic. But as other brands began to recover, Express, led by Tim Baxter since 2019, struggled to turn things around, failing to meet sales targets and sinking deeper into debt. Aside from the challenging post-Covid retail environment – in which inflation, supply chain issues, and rising costs saw Express's customers moving to cheaper e-commerce alternatives – Express also acknowledged that it made missteps in its merchandising strategy, further cutting into its profit margins and hurting its brand. Sales continued to drop, and in April 2024, after a months-long cost-cutting strategy failed to get the Company back on track, Express filed for bankruptcy. In June 2024, the operating assets of Express were acquired in the bankruptcy by PHOENIX, a joint venture led by WHP Global, Simon Property Group, and Brookfield Properties. As noted above, the retained causes of action remain property of the Wind-Down Debtor.

I.    **The Express, Inc. Executive Leadership Team and Board of Directors**

30.    Tim Baxter was the Chief Executive Officer of Express from May 2019 through September 2023 and a director at Express during all relevant time periods. Prior to working at Express, Baxter worked for almost twelve years at Macy's, where he started as the Vice President and Divisional Merchandise Manager and finished as the Chief Merchandising Officer.

31.    While working at Macy's, Baxter met Yehuda Shmidman, current CEO of WHP. Baxter and Shmidman worked on various licensing deals while Baxter was at Macy's and Shmidman worked at Sequential Brands group, which managed various consumer brands sold exclusively at Macy's. At the time WHP proposed entering into the transaction in question with

Express, Baxter and Shmidman had known each other, and worked together in some capacity, for over a decade and had become close personal friends. Indeed, Shmidman referred to Baxter as "one of my very best friends" and as a "super close friend" in communications with WHP's equity partners and other industry connections. And on the night prior to the closing of the WHP transaction with Express, Shmidman stayed at Baxter's home in Columbus, Ohio; the pair joined a video call the following morning together from Baxter's home.

32.     Matt Moellering was President and Chief Operations Officer of Express from September 2019 to May 2023, when he "retired" amidst numerous complaints about his poor leadership and management style. In particular, Moellering's failure to acknowledge concerns raised by Express employees about the Company's ill-preparedness to enter into the pending Bonobos transaction was the subject of an anonymous complaint lodged against Moellering just prior to his departure. Moellering, who joined the Company in 2003, served in numerous executive leadership roles during his 20-year tenure with Express, including serving as Interim CFO from October 2021 to March 2022; Interim CEO and President from January to June 2019, preceding Baxter's hiring; COO from 2011; and CFO from 2007 to 2011, during which time he helped take Express public in May 2010. Moellering was previously Vice President at Limited Brands.

33.     Jason Judd ("Judd") was the Chief Financial Officer of Express from April 2022, when he replaced Matt Moellering as Interim CFO, until November 2023, when he resigned and was replaced by Mark Still as Interim CFO. Judd had a pre-existing relationship with Express COO Matt Moellering, as they had previously worked together at Limited Brands.

34.     Laurel Krueger ("Krueger") was the Chief Legal Officer and Corporate Secretary of Express from September 2021 through June 2024.

35.     In addition to Baxter, Express's Board of Directors prior to the WHP transaction included Mylle Mangum (Chair), Michael Archbold, Terry Davenport, Michael Devine, Karen Leever, Patricia Lopez, and Peter Swinburn.

## II.     Defendants Steer Express's Sale Process for Their Own Benefit

36.     When Bluestar made its offer to acquire Express in April 2022, the Company was still struggling to recover in the challenging post-pandemic retail environment.  Despite some limited revenue growth and a small uptick in its stock price early in the year, Express's overall trajectory was weak – the stock price had stagnated and its debt continued to grow.  Significantly, the uptick was caused primarily by involuntary meme-stock involvement in early 2022, when Express experienced sudden, short-lived spikes in its share price based on third-party social media activity.  Management knew – or certainly should have known – that this phenomenon did not reflect any actual or lasting economic improvement.

37.     In reality, the Company's five-year plan to turn its performance around was failing to produce results.  The average stock price had for five years remained below $5 despite its projected future value under the long-range plan as of April 2022 of $11.25.  Fueled by management's forecasts and memories of the Company's heyday in early 2016 when its stock topped $20, the Board clung to that increasingly unrealistic goal.  Express's advisors noted, and management understood, that the plan, developed in late 2021 during Moellering (as interim CFO) and Baxter's leadership, was aggressively optimistic in light of actual performance and challenging economic conditions.  The Company nevertheless reaffirmed the plan in May 2022.

38.     Through spring and summer 2022, weekly updates from CFO Jason Judd to Express's Board consistently observed that the Company's sales had fallen short of forecasts by millions of dollars – and continued to do so even after *reducing* forecasted targets.  For example, the plan's monthly forecast for August was revised down by $12 million between July and August,

and Express failed to meet its weekly targets even under this lowered forecast, falling short by nearly $3 million in the first week of August alone.  Management was well aware of Express's downward spiral.  A June 2022 email from Matt Moellering to Express's Chief Merchandising Officer, Malissa Akay, and Judd planning for "[w]orst case scenarios" in the coming months asked, "Is it my imagination, or does the worst case keep getting worse each day??"

39.     Clinging to his failing business Plan, Baxter responded to the Company's struggles by launching an expensive multi-city "Create Confidence" tour.  Conceived and executed by Baxter, the tour was aimed at pumping up the enthusiasm of Express's store-level managers and associates.  Together with a rotating cast of other Express personnel, including Moellering, Baxter flew from city to city to present on Express's brand and supposedly inspire its employees, racking up enormous expenses through the use of the Company's private plane and expensive hotels and restaurants, all in the midst of Express's financial struggles.  The tour centered Baxter as the face of Express, but had no discernible impact on Express's performance.  It also did nothing to inspire the confidence of Express's shareholders, as the stock price continued to decline.

40.     Meanwhile, Express's shareholders publicly criticized management for Express's poor performance, particularly targeting Baxter.  An "Open Letter to CEO Tim Baxter from two investors" dated April 6, 2022 was posted publicly to "Stocktwits," an investor social media platform, expressing stockholder concern about Express's stock price slipping below $2 and the Company's perceived inaction to correct it.  The author, an Express shareholder, also indicated in emails to Express's Vice President of Investor Relations, Gregory Johnson, that certain retail investors were "organizing" in the hope of pushing Express to take action.  Further shareholder emails addressed to Baxter in July questioned management's "ridiculous gambles" on spending

significant capital on Express's UpWest imprint and warned that "Express is headed for a Ch. 11 under your 'leadership.'"

41.     Other shareholders reached out directly to Baxter – the face of the brand – via Twitter, also criticizing Express's disappointing performance and demanding that management take action on behalf of investors before the Company could be purchased by bargain investors for "dirt cheap" due to its low stock price.

**A.      Bluestar Makes an Unsolicited Offer to Purchase Express at a Premium Price**

42.     Against this backdrop of struggling performance, Express received an unsolicited letter of intent from Bluestar on or about April 13, 2022.  This letter set forth Bluestar's intent to acquire all, or most, of Express's shares through a "take private" transaction.  The offer consisted of an all-cash tender for all of Express's issued shares, with an implied share price range of $7.08 to $8.73.  Express's share price was then $3.36 per share, meaning that the offer could have provided a market premium of anywhere from 110% to nearly 160%.  Bluestar's offer was not subject to financing contingencies, as it was to be funded by existing cash and other resources.

43.     Bluestar's offer was highly attractive and would have provided significant value to shareholders and creditors.  The Company's equity market capitalization at the time of the offer was around $225 million.  Even the low end of Bluestar's offer, $525 million, offered more than double that, while the high end, $650 million, was more than two and a half times market value – providing a massive premium.  Bluestar's offer also included paying off Express's term loan debt balance at closing – which it understood at the time was approximately $96 million.  In addition to improving Express's balance sheet, paying down that debt would have ████████████

████████████████████████████████████████████████████████

████████████████████████████

44.     Bluestar's non-binding offer had an expiration date of May 10, 2022 – although that was ultimately extended.  Express assembled a working group to evaluate the Bluestar offer, engaging Moelis & Company ("Moelis") to act as its investment banker and Kirkland & Ellis LLP ("Kirkland") to act as its legal advisor in connection with the potential transaction.

45.     On May 20, 2022, Bluestar sent a revised offer for $400 to $500 million, for an implied share price range of $5.44 to $6.76.  Because Express's share price had dropped further, Bluestar's offer still represented a market premium of nearly 110%, despite Express's worsening position.  The revised offer retained all of its previous terms – including payment of Express's term loan debt, which made the actual value of Bluestar's offer approximately $496 to $596 million.  The revised offer's expiration date was June 10, 2022.

46.     While Bluestar's original proposals did not specifically flag either replacing management or abandoning the Company's current business plan, Bluestar's well-known business model, as management surely was aware, was to purchase struggling companies, overhaul the business plan, and put new leaders at the helm.

47.     On June 1, Krueger introduced Perry Hall, Managing Director at Moelis, to Joseph Sutton and Joey Gabbay of Bluestar, Bluestar's General Counsel and CEO/Co-Founder, respectively.  Moelis began meeting with Bluestar to learn more about the terms of the deal.  At a June 2, 2022 meeting ██████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████  In this

preliminary conversation, █████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

48.     In the same meeting, ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ – further assuring Moelis that Bluestar's desire to acquire the Company was bona fide.

49.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ Baxter never acknowledged his potential conflict to his own Board when promoting the potential transaction with WHP.

50.     At the June 8, 2022 Board meeting, Express considered the revised Bluestar offer and the potential sale.  Since Bluestar had surfaced in April, Express had continued to struggle under Defendants' leadership, ████████████████████████████████████

████████████████████████████ Express's share price continued to decrease, dropping to $2.68 per share by June 8, while its funded debt mounted higher.  Moelis's presentation to the Board suggested that a sale of the Company would allow it to realize significant value for Express stakeholders over what was likely continuing on its current path.  By the June 8 Board

16

meeting, Bluestar's May proposal guaranteed Express a market premium of over 100%, and over 150% at the high end of its offer.

51.     At a June 9 meeting between Moelis and Bluestar, Moelis conveyed the Company's willingness to engage more formally with Bluestar by entering into a non-disclosure agreement and sharing its long-range plan, informing Bluestar as instructed that the plan would showcase the true value of the Express brand.  Bluestar, reaffirming its interest in acquiring Express, entered into the NDA on June 17 and launched a formal diligence process involving nearly weekly communications and information exchanges.

52.     As part of this due diligence, Express provided Bluestar with management's long-range plan and other financial documents.  Instead of impressing Bluestar and motivating an increased offer, the plan drew a series of criticisms.  ███████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  In other words, Bluestar was not convinced that Express's long-range plan was as viable or as valuable as suggested, and conveyed this to Moelis to be reported to the Company.  A call with management about this long-range plan, ███████████████████ was never scheduled, and Bluestar made no other attempts to meet with management about the plan or Company operations.

53.     Instead, Bluestar started looking elsewhere for someone to run the retail business – ██████████████████████████████ and ████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

████████████████████████████████████   However, Express clung

to projections generated by management that some viewed as almost comically optimistic and that

Express failed to meet week after week throughout the negotiation period.

54.     Through the summer, Bluestar repeatedly demonstrated its serious commitment to

the transaction, engaging regularly with Moelis to seek extensive diligence information, and

engaging B. Riley Financial, also its financial backer, as its financial advisor for the transaction.

On July 12, Baxter acknowledged to Krueger in an email that B. Riley Financial seemed to be a

good financial partner for Bluestar for this deal.

55.     Meanwhile, Express continued to perform poorly relative to its peers, as its sales

continued to disappoint and share price continued to decline.   Notwithstanding Express's

downward spiral, Bluestar remained committed.   On August 4, 2022, Bluestar submitted a further

revised offer with an equity value of $320 million, implying an offer share price of $4.37.

Consistent with its previous proposals, Bluestar's August 4 proposal offered a significant premium

over Express's actual share price of $1.79 – nearly 150%.  And it was still almost double Express's

then-current share price of $2.30 when the Board reviewed Bluestar's latest offer at its August 19

Board Meeting.  Because Bluestar was now offering to pay off *all* of Express's funded debt, which

had ballooned to $211 million, rather than only the $96 million of Express's term loan, the total

value of Bluestar's August offer ($531 million) was actually higher than the low end of its May

offer ($496 million), even though Express's share price had dropped nearly 30% in the interim.

56.     As noted, Bluestar exhibited no interest after mid-June in meeting further with

Express's management, heightening Defendants' concern that the Bluestar deal would leave them

out in the cold.   The other shoe dropped on August 4, when Bluestar's new offer included a

requirement to enter into a TSA to "facilitate a smooth transition of the business to Purchaser."

Such a requirement signaled to Baxter and Moellering Bluestar's certain intent to end their control of the Company and "transition" them out of their leadership positions.  Likewise, that Bluestar's August 4 offer did not increase its share price from its earlier offers, even after receiving the long-range business plan, signaled that Bluestar had little faith in the business plan or Defendants' ability to turn the company around.

57.    Moelis met with Bluestar following the August 4 offer to communicate Express's concerns over the TSA and to push for a higher offer price, but made no progress on either issue.

58.    With the Board's August 19 meeting – specifically called to consider the Bluestar offer – rapidly approaching, and Express's sales and stock price deteriorating, Defendants faced an ethical dilemma: preserving their leadership roles would require abandoning Bluestar's lowered but still lucrative proposal – a deal that was clearly in the best interests of the Company and its stakeholders.  Defendants made the wrong choice, breaching their fiduciary duty by scrambling to scuttle the Bluestar deal and preserve their control.  Key to achieving that goal was Baxter's procurement of a bespoke alternative proposal from WHP Global, the company founded and run by his close friend Yehuda Shmidman.

B.    **Baxter Engineers a Proposal from WHP to Retain Control of Express**

59.    Baxter had previously tried several times to steer Express into a transaction with Shmidman and WHP.  During the 2020-2021 period, while Express and similar retailers were struggling due to the Covid-19 pandemic, Shmidman repeatedly proposed potential transactions to Baxter.  Together, they considered acquiring Brooks Brothers and John Varvatos, looping in Moellering – then the acting CFO – to try to bring their plans to fruition, but neither transaction was ultimately completed.

60.    The failed John Varvatos transaction is particularly noteworthy here.  That transaction contemplated that Express would acquire extensive inventory without the

corresponding intellectual property, which would be acquired by WHP. At least one member of Express's Board, Peter Swinburn, expressed concern over the structure and execution risk of the proposed project. Swinburn commented that acquiring that extensive inventory without the corresponding intellectual property presented an enormous risk to Express, questioning whether WHP should be required to share that risk, and pushed management to negotiate improvements before moving forward with the deal.

61.     Ultimately, the Varvatos transaction was not consummated, but Baxter and Shmidman were undeterred: Baxter told Shmidman that he was "anxious" to explore future opportunities together, while Shmidman told Baxter that he looked forward to "finding the right one together in the future" to partner with Baxter and Express. And that is precisely what occurred in the summer of 2022.

62.     Following Bluestar's unsolicited offer, ██████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ On information and belief, Baxter subsequently reached out to Shmidman to ask WHP to submit an alternative proposal. Baxter tipped off Shmidman to make sure WHP's proposal would have immediate appeal to the Board by featuring the right rosy outlook on Express's future business prospects, tilting the playing field towards his friend. As a result, Shmidman delivered a proposal from WHP a mere two days before the Board's August 19 meeting – timing it perfectly to disrupt the Board's possible acceptance of Bluestar's latest terms.

63.     It also appears that Baxter paved the way on the Express side to fast-track the WHP transaction. Between receipt of Bluestar's August 4 offer and WHP's August 17 offer, there was a flurry of calls and meetings between and among Moelis, Kirkland, Krueger, Baxter, Judd, and

Moellering, which set Defendants' strategy in motion.  Though WHP's proposal arrived on August 17, Judd likely learned about it as early as August 9, after receiving a call from Baxter to discuss "Wardrobe," the deal name for a potential Express transaction.   On information and belief, Moellering, who had learned of Baxter and Shmidman's relationship as far back as April 2020 when he was involved in the original Brooks Brothers and John Varvatos proposals, was also made aware at the same time.  In any case, subsequent events suggest Moellering was certainly aware by an August 11 call scheduled by Baxter with Judd, Moellering, and Krueger.

64.     Following that call, Express notified both Kirkland and Moelis to expect an alternative proposal from WHP.  The WHP proposal that emerged served management's needs but was in many ways, from the start, inferior to the available Bluestar bid.  WHP proposed to bifurcate Express into an IP company ("IPCo") and a Platform company ("PlatformCo").  WHP proposed investing $40 to $70 million into PlatformCo to become a minority shareholder, while it would invest $165 to $190 million into IPCo to own a majority stake in the joint venture with Express.  WHP's primary focus was on Express's crown jewel:  The joint venture would own Express's intellectual property, with Express transferring its most valuable asset out of its control and ceding majority ownership of that core component of its business to WHP.  As a retail business that depended entirely on selling its own branded products in its own stores, Express could not sell any of its own inventory without access to that intellectual property.  In short, WHP's proposal was structurally similar to the failed John Varvatos proposal, and thus Express should have known that it was deeply problematic.

65.     Under WHP's proposal – and in contrast to Bluestar's proposal – the Express PlatformCo would be obligated to pay royalties to the joint venture IPCo for all current operations.  In other words, Express would have to pay WHP to use its own name and brand.  Express would

manage and operate PlatformCo, and WHP would manage and operate the IPCo.  WHP also proposed that, going forward, Express and WHP could acquire other brands together using the same construct, with Express having an ownership stake in the acquired IP.

66.     In contrast to Bluestar, WHP did not offer to pay off Express's funded debt and permit it to operate debt-free.  Nor did it offer to pay shareholders a premium for their shares. Instead, WHP proposed to infuse some cash into the existing business and grow the company through acquisitions without disrupting current Express leadership, Board, and business strategy. This obviously catered to management's desire to keep control of the Company.  But it was simultaneously designed, based on information spoon-fed by Baxter to Shmidman, to appeal to the Board's unrealistic expectations about the benefits of staying the course with the current long-term business strategy.

67.     With this new proposal just received and the August 19 meeting rapidly approaching, a neutral fiduciary seeking to help the Board make the best, informed decision would have (a) sought another extension of the Bluestar offer – now set to expire on September 2; (b) postponed the August 19 board meeting to provide time for Express's advisors to fully analyze the WHP proposal; and (c) prepared a thorough comparison of the two alternatives for the Board's consideration.  Biased towards the WHP proposal, Baxter and Moellering did none of these things. Instead, they pressed forward with the August 19 meeting, using it to push the Board to pivot towards WHP and away from Bluestar – even though the Board was ill-informed and ill-prepared to compare the two alternatives.

68.     Management kept the Board at arm's length while they shaped the information that would be presented at the August 19 meeting.  Since late May, no member of Express's Board – ███████████ – had been in direct contact with Bluestar, nor had the Board been advised in

advance that management had been working with WHP to generate a competing bid.  Management was in control of this process, and Baxter and Moellering did everything in their power to keep it that way.  Had other directors been fully informed or actively involved, they might have uncovered Baxter's conflict of interest with Shmidman and recused Baxter, or taken integrity-enhancing steps to have both proposals evaluated without the taint of management's preferences and self-preserving motivations.  Defendants might then have lost control over the process.

69.     After receipt of the August 4 Bluestar proposal, Moelis began to draft a presentation to the Express Board for the upcoming August 19 Board meeting.  Moelis's initial August 8 draft contained a prominent discussion of the TSA provision of Bluestar's offer.  But highlighting that provision would only have called attention to Defendants' conflicted interest in retaining their leadership roles.  Not surprisingly, discussion of the TSA was gradually reduced in further drafts after review by Defendants – and completely eliminated from the final version presented to the Board on August 19.

70.     Moreover, even with the August 19 Board meeting looming and Bluestar deal pending, Defendants continued to operate Express as though they expected the deal would *not* occur.  In the leadup to the August 19 meeting, management circulated agendas relating to planning a September 13 kickoff of the revised long-range plan, including three- and five-year business goals – something that would not have been necessary if the Company was to be acquired by Bluestar.

C.     **Its Consideration Skewed by Management's Conflicts, Express Imprudently Allows the Bluestar Proposal to Lapse**

71.     The curated Board materials and bespoke last-minute offer from WHP had the desired effect:  On August 19, 2022, based on management's presentation, the Board failed to act on the Bluestar proposal.  There is little written record of what transpired at the meeting, as the

23

minutes are perfunctory and uninformative. Following that meeting, Express largely ceased communicating with Bluestar and never even responded to Bluestar's August 4 proposal, ███ ████████████████████████████████████████████████████ letting it lapse on September 2 and leaving Express with no viable alternative to WHP's offer.

72.    This result emerged from a deeply flawed process tainted by Defendants' conflicts. Express received the engineered WHP proposal only two days before the August 19 meeting, and Express's advisors had not yet had time to actually diligence the deal. But Express took no steps either to postpone the August 19 meeting or to seek another extension of the Bluestar deadline (which Bluestar had granted without issue twice before) so that both strategic alternatives could be thoroughly analyzed and compared. The Board therefore decided to abandon Bluestar's offer imprudently, without the benefit of a full understanding of the alternatives.

73.    And it also did so without understanding that it was receiving conflicted advice. Defendants buried discussion of the TSA and downplayed their motivation to do the WHP deal to preserve their leadership roles at Express. Baxter also failed to disclose a second, separate conflict of interest that alone should have required him to recuse himself or otherwise ensure that the Board received independent, unconflicted advice: his close personal friendship with Shmidman. In this connection, Baxter failed to disclose that (1) he and Shmidman had a longstanding desire to work together again and had previously planned deals with the WHP transaction's precise structure, and (2) ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Moellering, despite knowing of Baxter's connection to Shmidman, also kept mum.

74.     On information and belief, these conflicts of interest caused management to present a skewed account of the proposals' relative merits, nudging the Board toward the new offer and away from Bluestar.  For example, Defendants focused the Board solely on the implied share price of Bluestar's proposal, which, while still offering a premium over Express's actual share price, had declined since the initial April 13 offer.  Defendants stressed the unfavorable comparison between this price and the pie-in-the-sky share prices some directors were expecting based on the long-term business plan.  But of course, Bluestar's lower implied per-share price simply reflected that Express's *actual* stock price was deteriorating – trading at $2.30 per share on August 17, days after Bluestar's August offer for $4.37 per share arrived and just two days before the Board evaluated the Bluestar offer at its August 19 meeting – a premium of 90%.  And focusing on the implied share price shifted the Board's attention away from a crucial component of Bluestar's offer – the additional $211 million it would provide to pay off Express's debt.  Management thus obscured one of the key problems with the WHP deal – that it would leave Express still saddled with huge and growing debt – even though Krueger raised this issue in an August 19 email to Kirkland.  Based on this skewed presentation, the Board effectively abandoned the Bluestar proposal by taking no action at the August 19 meeting.

75.     The Board next met on September 8, 2022, after the Bluestar offer lapsed on September 2.  This meeting focused on moving forward with WHP; Usman Saleem emailed his Moelis colleagues just prior to the meeting with a list of "everything we could need on the board call" that included only WHP-related topics.  At the meeting, the Board further reviewed the WHP proposal and discussed potential structures for the deal.  Notably, marked for further discussion was management's ability to continue executing its long-range plan – which would be possible under the WHP proposal but not Bluestar's.

76.     There is no indication that any consideration was given at the September 8 meeting to seeking an extension of the Bluestar offer to permit further analysis, comparison, or negotiation. Bluestar was discussed only in the past tense, as the Board expressed, for the first time, its rationale for abandoning the offer.   According to the minutes, the post hoc explanations included "uncertainties around Bluestar's ability to obtain financing for the transaction" and the "repeated reduction in value reflected in the Bluestar proposal."  Neither of these rationales holds water.  The first one is simply incorrect:  Bluestar's proposal had no financing contingency whatsoever and was, in any event, backstopped by B. Riley.  And the "reductions" in Bluestar's imputed per-share price reflected merely the declining market value of Express's shares and were largely offset by the increased amounts Bluestar would have paid to retire Express's debt.  Thus, the Board's stated reasons for abandoning Bluestar's proposal appear to reflect that it was misled or at least not fully informed about the relative merits of the two available transactions.  That is precisely why fiduciary duty law and good corporate practice required biased and interested officers and directors to recuse themselves in favor of unconflicted advisors and decision-makers who would take steps to ensure that the Board received a fully developed and objective comparative analysis of its options.

### D.     Express Proceeds with the Problematic WHP Transaction

77.     Following the lapse of Bluestar's offer, negotiation of the WHP transaction proceeded at a breakneck pace, culminating in approval of the transaction by the Board in December 2022, a whirlwind by multiple accounts.  Baxter and Moellering led negotiations with WHP, which courted management from the beginning:  In contrast to Bluestar's silence toward management, the process with WHP kicked off with a lengthy "management meeting" barely a week after the September 8 Board meeting.

78.     While the transaction kept Baxter and Moellering at Express's helm – at least temporarily – for the Company, it was, in many respects, far worse than the Bluestar proposal. Moelis's Board presentations optimistically projected that, at closing in January 2023, the WHP transaction would result in Express shares trading at $3.38 (shares had been trading at $1.35 prior to the approval) and estimated that *in 2027* Express stock would trade in the $4.30-$5.18 range (present valued to 2022).  But unlike the $4.37 per share that had been offered in cash by Bluestar, the WHP transaction did not guarantee those results *on an immediate risk-free basis*.  Nor did the Board even have access to these figures for comparison by the time of the August 19 Board meeting when it elected not to move forward with Bluestar's offer – as the WHP proposal had been received just two days prior, and Moelis had not yet prepared any materials for the Board's careful consideration.  On their face, these figures suggest that the immediate payoff from the Bluestar deal would have provided a distinctly higher immediate value.  And the slightly greater high-end value touted for 2027 depended on Express executing on its business plan near-flawlessly over the next five years, something it had repeatedly failed to do under then-existing – and, under the WHP deal, continuing – leadership.

79.     And there was clear reason to doubt management could achieve even these modestly optimistic outcomes.  The current management team had already demonstrated how poor it was at meeting the financial projections in its own long-range plan developed under Moellering's leadership as interim CFO, continuously falling short of its forecasts even after revising the plan's projections downward twice in the six months preceding approval of the WHP transaction.  Yet Moelis used these management-prepared projections to perform its analysis, applying those inputs to produce a range of implied outcomes.  In other words, Moelis did not perform an independent validation of the underlying projections of the long-range plan, which had repeatedly proven to be

wildly and unrealistically optimistic, and management did not request that it do so.   Instead,

Moelis's presentations merely showed what the results would look like if management's business

plan succeeded.  Because management's conflicts were not fully disclosed, the Board merely asked

routine questions, but did not seek an independent validation of management's projections or

Moelis's analyses – it simply accepted them.  Management in turn used Moelis's presentations

premised on achieving their business plan as a basis to justify the WHP transaction – even though

the successful outcomes supposedly demonstrated in those presentations were based entirely on

management's own historically faulty assumptions.

80.    Moreover, this analysis failed to account for several substantial structural

impediments and risks of the deal:

- Under the terms of the final deal, Express retained only a minority 40% stake in the joint venture IPCo into which it transferred its most valuable asset, its intellectual property, now to be controlled by a new venture with WHP taking a 60% ownership stake.  Without control, however, Express's remaining 40% stake was of exceedingly limited value.  And, in fact, when Express ultimately filed for bankruptcy, its minority stake was not separately saleable and the prevailing platform/IPCo structure made Express's remaining inventory worthless to anyone other than WHP, which controlled the IP.

- The WHP deal (unlike Bluestar's) required a guaranteed minimum royalty ("GMR") payment by Express to the IPCo joint venture over the length of a long-term license.  In other words, Express needed to pay a minimum amount to continue to use its own brand name and logos regardless of sales.  Moreover, the GMR served as a return on WHP's capital investment in the IPCo joint venture, providing interest-like returns on WHP's initial stake in the IP. Express effectively took on a debt-like obligation – for which it had to make regular payments – during a period when it already lacked liquidity and was saddled with material funded debt, all of which would have been repaid under the Bluestar transaction.

- Express received significantly less cash benefit from this transaction than the terms initially appeared to provide.  WHP's total $260 million payments to Express as investments in the PlatformCo and IPCo were immediately swallowed up by Express's outstanding obligations, including $10 million in transaction fees, $22 million in taxes, and $95 million in prepayment for Express's term loan – obligations that would have been avoided almost entirely under the Bluestar deal.  And with Express's flagging sales performance and

declining revenue, Express had to channel $60 million of the payments it had *just received* from WHP back to the IPCo as prepayment of its guaranteed minimum royalty obligation to avoid triggering the deal's penalties, leaving it with just $89 million added to its balance sheet, including its 40% stake of that $60 million.

- The "logic" of the transaction was not realistically achievable for Express. For the transaction to have had even a hope of making sense (as illustrated in presentations to the Board), Express needed to acquire *additional brands* and significantly *scale up operations*. But because Express was so cash-strapped – and because the WHP transaction did not provide meaningful relief on that front – it could not afford to rapidly acquire brands, as was ultimately borne out in its imprudent acquisition of Bonobos, discussed below. Management, having revised down the Company's long-range forecasts in September and November 2022, must have known these goals were not achievable, yet continued to push the WHP deal.

81.    There is no evidence the Board was aware of or considered these issues before abandoning Bluestar for the WHP transaction – indeed, the flawed process made that all but impossible. Nor did Defendants ever even attempt to quantify for the Board prior to its rejection of Bluestar how much it would cost to acquire additional brands – an important feature of the WHP transaction and necessary to make the deal profitable – and how unrealistic this would be for Express to achieve. Had these factors been adequately presented for the Board's consideration, the Board could have learned, before abandoning the Bluestar deal, that the WHP transaction did not present a superior alternative.

82.    By around December 2022, one person at Express – General Counsel Laurel Krueger – began to suspect that at least Baxter was not negotiating with Express's best interests in mind and was conceding critical points to WHP. Krueger was also concerned that Baxter was sharing internal documents and strategies with WHP during the negotiation process. Those concerns appear to have been well-grounded, as Baxter and Shmidman continued to have private side conversations about issues being negotiated in the WHP deal, outside of the officially scheduled one-on-one CEO discussions.

83.    Krueger raised the issue that, under the terms of the WHP deal, Express would be assuming liabilities in connection with future M&A transactions, but would not be getting credit for those liabilities in the form of increased ownership percentage of the entities that would own the IP of those companies as a result of that effective capital contribution.  Krueger raised these concerns to Baxter, who brushed them off, stating that this was how previous deals with WHP had been envisioned – deals such as Brooks Brothers and John Varvatos, which had never actually been completed, and, in the case of Varvatos, had presented structural red flags.  According to Baxter, Express collecting revenue from operations was a fair trade for being saddled with assumed operating liabilities under these deals, in addition to Express's new royalty obligations.  That extra burden apparently did not entitle Express to ask for any additional ownership stake in the most valuable underlying assets.

84.    Krueger also asked Express's public relations firm, Joele Frank (assisted by Moelis) to help develop answers to anticipated questions from investors about the WHP deal.  Krueger expected Express to be asked to justify why it would agree to pay a royalty for its own brand or agree to make any guaranteed minimum royalty payment immediately post-pandemic, and why the deal "favor[ed]" WHP by granting Shmidman a Board seat.  Drafts of potential responses to questions generated by Krueger and Express's advisors note the need to "spin" WHP's effective takeover of Express's brand, and observe that the question of why Express would agree to a guaranteed minimum royalty was "tough to answer."  Similarly, the draft notes that "What if this doesn't work?" is another "tough question" to answer, and suggests that the Company avoid answering questions about alternative offers, i.e., the Bluestar deal.  Though these questions – and the difficulty Express's advisors were having coming up with satisfactory answers – should have

raised alarms, especially in light of the recognized importance of Express's IP, Express continued to hurtle towards closing the deal with WHP.

85.     By December, Moelis's presentations to the Board based on Express's own forecasts indicated that, in the most plausible scenarios, the WHP transaction would yield lower returns for shareholders than *not pursuing the transaction at all*.  A December 7, 2022 Moelis presentation to the Board of Directors showed that the valuation of the WHP transaction, even if Express hit its projections, was *lower* than what shareholders would receive if Express hit its projections and *did not* do the deal with WHP.  In fact, according to that presentation, if Express had faith in its current business plan, the WHP deal would be superior to simply staying the course *only if* one of two things happened: (1) markets would have to value both the remaining platform business and Express's new IPCo using massively improved financial metrics as compared to the existing Company, or (2) if Express immediately followed the WHP deal with a follow-on transaction to acquire another brand, which it could not afford to do.  Moelis's presentation observed that if Express was "able to successfully achieve or surpass its Standalone November 2022 LRP forecast, the relative economics of the WHP Transaction may become less favorable relative to the Standalone (Nov 2022 LRP) plan."

86.     Thus, by continuing to pursue the WHP transaction in the face of this warning, management was effectively admitting it had no faith in its ability to achieve its own forecasts, which necessitated selling the Board on the WHP deal's pie-in-the-sky possibilities based on unfounded assumptions.  In addition, Express needed immediate cash, and with the Bluestar proposal having long since lapsed, WHP was the only option available.

87.     The market did not share the optimism of Express's conflicted leadership team with respect to the WHP deal, but instead anticipated that Express would *not* be able to realize the

needed scale and therefore reacted *negatively* to news of the WHP transaction.  On December 8, the date the WHP deal was announced, the stock rose a mere $0.42 – from $1.35 to $1.77 – an anemic bounce considering WHP's concurrent purchase of 7.4% of Express's shares at an agreed-on price of $4.60.  The very next day, moreover, prices fell dramatically to $1.24 – *below* pre-sale announcement levels.  And prices continued to drop during the run-up to the WHP closing in January 2023, when the price closed at $1.03 per share.

## III.     Express Enters Into an Even Worse Transaction to Acquire Bonobos

88.     Immediately following the closing of the WHP transaction, Express began negotiations to acquire Bonobos with WHP.  But in these negotiations, too, the conflict created by Tim Baxter's friendship with Yehuda Shmidman compromised Express's position in favor of WHP.  Although WHP and Express were adverse for the purposes of this transaction, with WHP acquiring the IP of Bonobos and Express taking on its operations, Baxter did not negotiate with Express's best interests in mind, inexplicably conceding key points to WHP and Shmidman to the detriment of Express.

89.     Under the terms of the WHP transaction, Shmidman gained a seat on Express's Board as a non-independent, interested Director.  General Counsel Laurel Krueger attempted to put into place a reasonable recusal protocol to insulate Shmidman from involvement in Board and Committee meetings concerning the Bonobos transaction.  Baxter, however, pushed back on that protocol, leading Krueger to suspect that Baxter had previously undisclosed conflicts surrounding WHP and Shmidman.

90.     It was only during the course of the Bonobos transaction that the full extent of Baxter's relationship with Shmidman began to emerge, with Krueger noting that Baxter and Shmidman regularly informed persons involved in the transaction of their close relationship, stifling Express's ability to take firm positions in its negotiations with WHP.  Krueger also

observed that Baxter and Shmidman would frequently tell stories of working together "in the bunker" – an office in New York – after Baxter left Macy's, describing "proudly" that they had planned the arrangement that ultimately became the WHP-Express transaction back "in those days." None of this was disclosed prior to the WHP transaction.

91.     Krueger, responsible for enforcing the Company's recusal and conflict procedures relating to Shmidman's Board seat, found that Baxter frequently attempted to circumvent the new procedures, ultimately undermining Express's positions during the Bonobos negotiations. Krueger believed that Baxter not only shared internal documents and information with WHP, but also emailed or texted Shmidman information from portions of Board meetings from which Shmidman had been excluded because of the recusal protocol.   In one instance, Krueger found that a concession she had discussed with Baxter in a previous conversation and asked him not to raise was repeated back to her by a WHP representative in the midst of the Bonobos negotiations.

92.     Krueger observed that Baxter and Moellering, following his lead, did not use available leverage when negotiating with WHP.  When WHP added language without Express's consent to the Bonobos proposal, Baxter and Moellering did not seek any recourse against WHP. Krueger also noted that Baxter insisted on maintaining WHP's timeline for the Bonobos deal, even though it would have been far more beneficial to Express to have additional time to negotiate and prepare for the transition.  When Krueger brought these concerns to Baxter, he accused her of not "respecting the partnership" with WHP.

93.     In another instance, Krueger wrote to Board Chair Mylle Mangum on April 7, 2023 that she was "disappointed" with Baxter for not pushing back against WHP seeking to make a "land grab" to own the software running the Bonobos business and *license* it to Express.  This was

a last-minute change to the transaction that Express had not previously been made aware of, and that was not within Baxter's sole discretion to approve but rather required a Board decision.

94.     Krueger raised these and other concerns about Baxter and the Bonobos transaction to the Board in April 2023, but was not the only one at Express to observe the troubling dynamic between Baxter and Shmidman.  In April, as the Bonobos deal was set to close, Krueger received an anonymous email complaint regarding Baxter and Shmidman's relationship.  The complaint alleged "double dealing" and unethical sharing of non-public information between Baxter and Shmidman.  The complaint also questioned Moelis's independence and demanded all financials of the transaction be reevaluated.

95.     Around the same time, the Company also received several hotline complaints correctly predicting a number of the issues with the Bonobos transaction that ultimately would come to negatively impact the Company, including that Express was not ready from an operational or financial standpoint to integrate another brand.  The complaint alleged that Moellering, who at that time was acting as both COO and interim Chief Technology Officer, was not receptive to feedback from the Company's IT team about the vulnerability of Express's eCommerce systems, for example, and its major concerns about the ability to integrate the two businesses as the deal would require.

96.     The terms of the Bonobos deal were materially worse than the initial WHP proposal had contemplated for the acquisition of additional brands.  The plan had been for Express to obtain a stake in new brands' IP through a newly formed IPCo, just as it maintained a stake in its *own* IP under the WHP deal.  However, at the close of the Bonobos deal, this was not a term of the agreement, and Express ended up with zero ownership interest in Bonobos's IP as WHP became the sole owner of the new Bonobos IPCo.  Instead, Express acquired all of Bonobos's inventory

for $25 million, and assumed all of Bonobos's operating liabilities, including $10 million in leases and $27 million in working capital liabilities. The assumption of liabilities proved a drag on the overall profitability of Express, and certain liabilities acquired because of the Bonobos acquisition ultimately became part of a general unsecured claims pool that was left unpaid when Express filed for bankruptcy less than a year later.

97.    The Bonobos acquisition also had a negative impact on Express's core operations, already suffering from less-than-ideal liquidity, forcing the Company to defer critical capital expenditures and the replenishing of its own Express inventory to fund the Bonobos acquisition. In the fall of 2023, the majority of the excess inventory Express had purchased – once touted as an attractive selling point for the Bonobos transaction – had to be sold at substantial promotional discounts, calling into question the quality of the Company's due diligence investigation.

## IV.    Complaints Regarding Baxter's Abusive and Retaliatory Behavior Lead to His Departure

98.    In January 2023, Krueger received another hotline complaint, this time regarding Baxter's personal use of the Company's private plane, including frequent trips to New York City (where WHP is headquartered). After an investigation by Kirkland, Baxter ultimately had to repay the Company $346,000. Express self-reported to the SEC, which found in its investigation that Baxter had received $979,269 in undisclosed perks and personal benefits, including the usage of the plane, which Baxter was also required to repay.

99.    The investigation into Baxter's plane usage led Baxter to clash with Krueger. These clashes continued throughout the course of the Bonobos transaction, with Krueger eventually submitting a complaint that Baxter was retaliating against her due to her participation in the investigation. After Kirkland investigated this allegation, Baxter was required to attend a training with Kirkland about retaliatory behavior. The Board, too, was becoming dissatisfied with both

Baxter's job performance and his poor conduct:  In Baxter's annual review as of March 2023, the Board criticized Baxter's behavior and leadership, noting that in addition to the Company's unacceptable financial performance under his leadership, Baxter's behavior was entitled, defensive, and lacked accountability.

100.    Additionally, the Company received further hotline complaints and emails regarding Baxter's abusive behavior.  These complaints alleged that Baxter was violating the company code of conduct by his abusive behavior towards Express employees and retaliation against those who challenged him, including Krueger.  In July 2023, Krueger received a complaint that Baxter berated external consultants for nearly two hours in a product meeting.

101.    This misconduct contributed to ending Baxter's tenure.  Over the summer, Baxter repeatedly clashed with other board members.  These clashes, together with the continued and numerous complaints about Baxter's conduct, culminated in the Board's decision to replace him. In September 2023, the Board told Baxter that if he didn't resign, he would be terminated for cause for violations of the Company code of conduct.  Baxter elected to resign as CEO and Director of Express, effective September 14, 2023.

## V.    **Following the Bonobos Transaction, Express's Decline into Bankruptcy Is Hastened**

102.    As Express's liquidity position deteriorated in the summer of 2023 and was projected to worsen heading into the fall, Express sought liquidity solutions including a term loan.

103.    Without access to more favorable financing, Express finalized a $65 million financing with ReStore resulting in the Company incurring substantial fees and burdensome interest rates.  ReStore was an affiliate of Hilco, a known liquidator with a history of forcing borrowers into bankruptcy, making it a poor choice for the struggling Express.  Indeed, in March 2024, ReStore imposed reserves against Express's borrowing base, predictably hastening Express's bankruptcy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Tim Baxter)

104.    Plaintiff repeats and realleges each and every allegation stated in the previous paragraphs as though fully set forth herein.

105.    At all relevant times through September 2023, Baxter was an officer and director of the Company.

106.    As an officer and director, Baxter owed the Company fiduciary duties of care, loyalty, oversight, and good faith.  Further, because the Company was involved in a change of control process, such duties – and the scrutiny a fiduciary faces – were enhanced.  In addition, Baxter suffered from a personal conflict of interest when he pursued a transaction with a close personal friend, Shmidman, making him an interested director.  This created an obligation to recuse himself and to disclose his conflict to the Board so it could take steps to ensure that it received non-conflicted advice.  Baxter breached these fiduciary duties under any level of scrutiny.

107.    Baxter's decision to favor WHP and disfavor the Bluestar transaction was not grounded in a reasonable stakeholder-minded rationale.  Baxter used his role as CEO and as a director on the Board to steer the Company towards a transaction with WHP for personal reasons – to do business with his friend and to preserve his leadership position at the Company.

108.    Baxter obscured his conflicts and his self-interest from the Board, including his concern that Bluestar's transition to its own leadership team and business plan, as foreshadowed by its insistence on a TSA, would diminish or eliminate his leadership role and potentially cost him his job.

109.    Baxter also breached his fiduciary duty by failing to disclose to the Board that he was not independent and disinterested with respect to transactions with WHP, due to his more than

37

decade-long personal and professional relationship with Yehuda Shmidman, WHP's CEO and founder.

110.    As detailed above, Baxter's conflicts of interest tainted the sale process and subsequent dealings with WHP in a variety of ways that breached his fiduciary duties and injured Express and its stakeholders: (1) he sought out a competing proposal from WHP and coached Shmidman on how to beat out Bluestar by painting a rosy picture of the current business plan; (2) he took no action to extend the Bluestar offer or postpone the August 19 meeting to permit full consideration of both offers, but rather, without disclosing his conflicts, presented a skewed picture of the proposals to convince the Board to let the objectively superior Bluestar proposal lapse; (3) he pushed forward with the WHP transaction in the face of projections that showed it was risky and unlikely to improve Express's prospects; (4) he undercut Express's interests in subsequent negotiations with WHP, accepting negotiated terms that advanced WHP's interests over those of Express; and (5) he similarly acted against Express's interests by making unreasonable concessions in favor of WHP in connection with the Bonobos acquisition and acting vindictively and improperly against personnel who questioned his course of conduct, preventing his misdeeds from emerging and the Company from trying to correct course.

111.    As a result of Baxter's breaches of fiduciary duty, Express was harmed.  Among other things, Express lost control of its valuable intellectual property, and then, ultimately, sold its inventory for less than the value it otherwise would have realized.  Express ended up in one bad transaction after another, ultimately leading to its bankruptcy filing.  Shareholders lost hundreds of millions of dollars of value they would have received under the Bluestar proposal and ended up with nothing, while many creditors were not repaid, jobs were lost, and Express was unable to continue as a stand-alone going concern.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Matt Moellering
### and the John Doe Defendants)

112. Plaintiff repeats and realleges each and every allegation stated in the previous paragraphs as though fully set forth herein.

113. At all relevant times, Defendant Matt Moellering was an officer of the Company, serving as the Company's President and Chief Operating Officer.

114. At all relevant times, the John Doe Defendants were either directors, officers, or others with fiduciary duties to the Company who participated in the foregoing or related breaches.

115. As officers, Moellering and the John Doe Defendants owed the Company fiduciary duties of care, loyalty, oversight, and good faith. Further, because the Company was involved in a change of control process, such duties – and the scrutiny a fiduciary faces – were enhanced.

116. Moellering and the John Doe Defendants breached their fiduciary duties to the Company by acting in their own self-interest, instead of the Company's best interest, and by failing to act with adequate care to ensure proper evaluation of the competing transactions in view of Baxter's increasingly obvious personal conflict of interest. Moellering sought to preserve his leadership position instead of ensuring maximum benefit to the Company's stakeholders at a time when the Company was deciding between two alternative transactions. Together with Baxter, Moellering promoted the WHP transaction over Bluestar, knowing he and Baxter were improperly motivated to do so for the sake of continuing their leadership positions at the company, rather than out of their duties to Express's stakeholders. Baxter and Moellering touted the strength of their own business plan – even as they had consistently missed their projections and needed to revise them downward – to fuel the Board's unfounded optimism in Express's turnaround. Defendants' actions led to the Board's rejection of Bluestar in favor of the alternative WHP proposal, even as

Bluestar was offering to pay $211 million to completely pay off Express's funded debt and a large premium on Express's equity.

117.     Moellering hid his and Baxter's motive from the Board as they worked to discredit the value of Bluestar's offer and promote the WHP transaction.  As a result of their actions, the Board abandoned the Bluestar acquisition offer before fully evaluating whether WHP's offer could actually create greater value for shareholders.

118.     Moellering was told by Baxter of the WHP proposal before it was officially extended to the Board, and was aware of or had reason to inquire into Baxter's conflict of interest with respect to Yehuda Shmidman and WHP, and thus his lack of independence, yet took no action to insulate the sale process from Baxter.  This allowed a conflicted Baxter to use his position on the Board to tip the scales towards the transaction with WHP – also Moellering's desired outcome because it protected his management role and potentially his employment.  In violation of his fiduciary duty to shareholders, Moellering acted unreasonably to protect himself and preserve his own leadership role, obscuring his conflicted motivations from the Board and tainting the fairness of the sale process.

119.     Defendants swayed the Board towards their preferred alternative without considering whether it offered stakeholders the best value, and in fact knew or should have known based on past underperformance and revisions to the long-range plan that their projections and predictions about the success of the Company under their leadership and the WHP transaction were improbable at best.  The resulting transaction and the Bonobos acquisition that followed, in both of which Defendants had significant negotiation roles, disadvantaged the Company and put it on the road to bankruptcy.  Moellering, in particular, received but ignored warnings from Company employees that Express was not operationally ready to acquire another brand.

120.     As a result of Defendants' breaches of fiduciary duty, Express was harmed.  Among other things, Express lost control of its valuable intellectual property, and then, ultimately, sold its inventory for less than the value it otherwise would have realized.  It ended up in one bad transaction after another, ultimately leading to its bankruptcy filing.  Shareholders lost hundreds of millions of dollars of potential payouts had the Bluestar proposal been timely pursued and ended up with nothing, while many creditors were not repaid, and Express was unable to continue as a stand-alone going concern.

## RESERVATION OF RIGHTS

Plaintiff expressly reserves the right to amend, modify, and/or supplement the foregoing causes of action and to bring any additional causes of action it may have standing to assert against Defendants and/or any other former directors or officers of the Debtors, including, without limitation, causes of action arising out of the same transactions or events described herein and that either discovery in this action or other ongoing investigation by plaintiff may reveal.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff respectfully requests that the Court enter judgment against the Defendants and grant the following relief:

a.   Damages in an amount to be determined at trial, believed to exceed $500 million;

b.   Prejudgment and post-judgment interest at the maximum rate permitted by law; and

c.   Such other relief as this Court deems just, proper, or equitable in the circumstances.

Dated:  December 29, 2025

**SAUL EWING LLP**

By: */s/ John D. Demmy*
    John D. Demmy (DE Bar No. 2802)
    Lucian Murley (DE Bar No. 4892)
    1201 North Market Street, Suite 2300
    P.O. Box 1266
    Wilmington, DE 19899
    (302) 421-6800

       -and-

**HERBERT SMITH FREEHILLS
KRAMER (US) LLP**

Natan Hamerman
Elan Daniels
Jeffrey S. Trachtman
Rachel Czwartacky
Hannah Kanter
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Attorneys for Plaintiff Tracy L. Klestadt, Plan
Administrator of EXP OldCo Winddown Inc.*